**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                           :

SARAH PALIN,                          :   No. 17 Civ. 4853

              Plaintiff,        :

                           :   Hon. Jed S. Rakoff

           -against-         :

                           :   ECF Case

THE NEW YORK TIMES COMPANY,   :

             Defendant.      :

                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
## ITS MOTION TO DISMISS THE COMPLAINT

Thomas S. Leatherbury
(pro hac vice motion pending)
VINSON & ELKINS L.L.P.
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, TX 75201-2975
Tel: (214) 220-7700
Fax: (214) 220-7716
tleatherbury@velaw.com

*Co-Counsel for Defendant*

David A. Schulz
Jay Ward Brown
LEVINE SULLIVAN KOCH & SCHULZ, LLP
321 West 44th Street, Suite 1000
New York, NY 10036
Phone: (212) 850-6100
Fax: (212) 850-6299
dschulz@lskslaw.com
jbrown@lskslaw.com

*Co-Counsel for Defendant*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................... ii

FACTUAL BACKGROUND .....................................................................................................1

A.     The Plaintiff and SarahPAC ...........................................................................................1

B.     The Crosshairs Map ......................................................................................................1

C.     The Arizona Shootings ..................................................................................................2

D.     The Editorial .................................................................................................................3

ARGUMENT .............................................................................................................................5

I.     THE CHALLENGED STATEMENTS, ON THEIR FACE, ARE NEITHER
       "OF AND CONCERNING" MRS. PALIN NOR OTHERWISE
       ACTIONABLE AS DEFAMATION ...................................................................................6

     The "Of and Concerning" Requirement ...........................................................................6

     The Alleged Defamation  ...............................................................................................10

II.     MRS. PALIN HAS NOT AND CANNOT ADEQUATELY PLEAD
       "ACTUAL MALICE," AN ESSENTIAL ELEMENT OF HER CLAIM ......................12

     The Alleged Failure To Consult Other Articles ...............................................................14

     The Alleged Failure to Adhere To The Times's Ethical Guidelines ................................17

     The Alleged Economic Or Political Motives To Use Mrs. Palin's Name ........................18

     The Alleged Failure To "Meaningfully" Retract Or Correct The Editorial ......................20

III.     MRS. PALIN MAY NOT SEEK DISGORGEMENT DAMAGES ................................22

CONCLUSION ...........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Actos End-Payor Antitrust Litig.*,
   848 F.3d 89, 97 (2d Cir. 2017).................................................................5

*Algarin v. Town of Wallkill*,
   421 F.3d 137, 139 (2d Cir. 2005)...........................................................7

*Alharbi v. TheBlaze, Inc.*,
   199 F. Supp. 3d 334, 361-62 (D. Mass. 2016).....................................24

*Ashcroft v. Iqbal*,
   556 U.S. 662, 678 (2009)........................................................5, 12, 13

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 544-46 (2007) ......................................................5, 12

*Biro v. Conde Nast*,
   807 F.3d 541, 545 (2d Cir. 2015)................................5, 12, 13, 21

*Biro v. Conde Nast*,
   963 F. Supp. 2d 255, 279, 281-82, 284 (S.D.N.Y. 2013) ...............5, 20, 21, 22

*Buckley v. Littell*,
   539 F.2d 882, 894 (2d Cir. 1976)...........................................................10

*Cardone v. Empire Blue Cross & Blue Shield*,
   884 F. Supp. 838, 847-48 (S.D.N.Y. 1995) .............................................9

*Casper Sleep, Inc. v. Mitcham*,
   204 F. Supp. 3d 632, 637 (S.D.N.Y. 2016)..............................................5

*Church of Scientology Int'l v. Behar*,
   238 F.3d 168, 173 (2d Cir. 2001)............................................................8

*City of Fairbanks v. Rice*,
   20 P.3d 1097, 1107-08 (Alaska 2000) ..................................................23

*Dolmetta v. Uintah Nat'l Corp.*,
   712 F.2d 15, 19 (2d Cir. 1983)...............................................................22

*Dongguk Univ. v. Yale Univ.*,
   734 F.3d 113, 123-26 (2d Cir. 2013) ..............................................13, 15, 20

*Dunlop-McCullen v. Rogers*,
   2002 WL 1205029, at *7 (S.D.N.Y. Feb. 21, 2002) ............................................................12

*Elias v. Rolling Stone LLC*,
   192 F. Supp. 3d 383, 391 (S.D.N.Y. 2016) ..................................................................6, 8

*Fulani v. N.Y. Times Co.*,
   260 A.D.2d 215, 216 (1st Dep't 1999) ....................................................................................9

*Gacek v. Owens & Minor Distrib., Inc.*,
   666 F.3d 1142, 1147-1148 (8th Cir. 2012) ...........................................................................10

*Garrison v. Louisiana*,
   379 U.S. 64, 74-75 (1964) ......................................................................................................12

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 333, 348-50 (1974) ...........................................................................................24, 25

*Gilman v. Spitzer*,
   538 Fed. App'x 45, 47 (2d Cir. 2013) .....................................................................................9

*Golden N. Airways v. Tanana Publ'g Co.*,
   218 F.2d 612, 621-22 (9th Cir. 1954) ....................................................................................6, 7

*Hart v. E.P. Dutton & Co.*,
   197 Misc. 274, 275 (Sup. Ct., Oneida Cnty. 1949) ...............................................................24

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
   491 U.S. 657, 665, 667 (1989) ...............................................................................12, 17, 19

*Haynes v. Alfred A. Knopf, Inc.*,
   8 F.3d 1222, 1227 (7th Cir. 1993) .........................................................................................10

*Hoffman v. Wash. Post Co.*,
   433 F. Supp. 600, 605 (D.D.C. 1977) ....................................................................................21

*Hustler Magazine Inc. v. Falwell*,
   485 U.S. 46 (1988) ..................................................................................................................19

*Immuno v. Moor-Jankowski*,
   74 N.Y.2d 548, 560 (1989) .....................................................................................................10

*Jankovic v. Int'l Crisis Grp.*,
   494 F.3d 1080, 1089 (D.C. Cir. 2007) .....................................................................................9

*Jankovic v. Int'l Crisis Grp.*,
   822 F.3d 576, 596-97 (D.C. Cir. 2016) ............................................................................18, 22

*Julian v. Am. Bus. Consultants, Inc.*,
    2 N.Y.2d 1, 17 (1956) ....................................................................................6

*Kirch v. Liberty Media Corp.*,
    2004 WL 2181383, at *5 n.15 (S.D.N.Y. Sept. 27, 2004)....................................7, 8

*Kirch v. Liberty Media Corp.*,
    449 F.3d 388, 399-400 (2d Cir. 2006) ............................................................7

*Kleinman v. Elan Corp.*,
    706 F.3d 145, 152 (2d Cir. 2013)....................................................................1

*Knaebel v. Heiner*,
    663 P.2d 551, 553 (Alaska 1983)....................................................................24

*Lan Sang v. Ming Hai*,
    951 F. Supp. 2d 504, 531 (S.D.N.Y. 2013)......................................................23

*Levin v. McPhee*,
    119 F.3d 189, 195 (2d Cir. 1997)....................................................................9

*Martinez v. Ketchum Advert. Co.*,
    865 F. Supp. 166, 167-68 (S.D.N.Y. 1994) ......................................................22

*Mayfield v. NASCAR*,
    674 F.3d 369, 377-78 (4th Cir. 2012) ..............................................................13

*McBeth v. Porges*,
    171 F. Supp. 3d 216, 221 (S.D.N.Y. 2016)........................................................1

*McCutcheon v. Fed. Election Comm'n*,
    134 S. Ct. 1434, 1442 n.2 (2014) ....................................................................8

*McFarlane v. Sheridan Square Press, Inc.*,
    91 F.3d 1501, 1515-16 (D.C. Cir. 1996)......................................................20, 22

*Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*,
    239 F.3d 172, 177 (2d Cir. 2001)....................................................................24

*Michel v. NYP Holdings, Inc.*,
    816 F.3d 686, 702 (11th Cir. 2016) ................................................................13

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1, 19-20, 23 (1990) ....................................................................10, 22

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254, 270-72, 286-88 (1964) ........................................................*passim*

iv

*Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*,
   111 F.3d 1386, 1395 (8th Cir. 1997) ....................................................20

*OAO Alfa Bank v. Ctr. for Pub. Integrity*,
   387 F. Supp. 2d 20, 55 (D.D.C. 2005) ...............................................17

*Pippen v. NBCUniversal Media, LLC*,
   734 F.3d 610, 614-16 (7th Cir. 2013) ...........................................13, 16

*Price v. Viking Penguin, Inc.*,
   881 F.2d 1426, 1432 (8th Cir. 1989) ...................................................10

*Provisional Gov't of Republic of New Afrika v. ABC*,
   609 F. Supp. 104, 108 (D.D.C. 1985) ....................................................9

*Rappaport v. VV Publ'g Corp.*,
   163 Misc. 2d 1, 9 (Sup. Ct. N.Y. Cnty. 1994) ....................................10

*Reuber v. Food Chem. News, Inc.*,
   925 F.2d 703, 716 (4th Cir. 1991) .......................................................19

*Rosenblatt v. Baer*,
   383 U.S. 75, 93 (1966)..........................................................................22

*Schatz v. Republican State Leadership Comm.*,
   669 F.3d 50, 56-58 (1st Cir. 2012)...................................13, 16, 20, 22

*SEG Sport Corp. v. State Athletic Comm'n*,
   952 F. Supp. 202, 204 (S.D.N.Y. 1997)..............................................24

*Silvercorp Metals Inc. v. Anthion Mgmt. LLC*,
   36 Misc. 2d 1231(A), 2012 WL 3569952, at *12 (Sup. Ct. N.Y. Cnty. Aug.
   12, 2012) ..............................................................................................23

*Tucker v. Fischbein*,
   237 F.3d 275, 286 (3d Cir. 2001)........................................................17

*Ventura v. Kyle*,
   825 F.3d 876, 887-88 (8th Cir. 2016) .................................................24

*Wachs v. Winter*,
   569 F. Supp. 1438, 1443 (E.D.N.Y. 1983) .........................................23

*Yohe v. Nugent*,
   321 F.3d 35, 40-41 (1st Cir. 2003)......................................................10

**Rules**

Fed. R. Civ. P. 12(b)(6)..................................................................................1, 5, 22

Fed. R. Civ. P. 12(f)......................................................................................22

**Other Authorities**

Restatement (Second) of the Law of Torts § 621 ...............................................23

1 Rodney A. Smolla, *Law of Defamation* § 4:40.50 (2d ed.) .........................................7

In this defamation action, Sarah Palin asserts a single cause of action against The New York Times Company ("The Times") arising from statements in an editorial about gun control it published on June 14, 2017 (the "Editorial").  The Times now moves to dismiss Mrs. Palin's Complaint because (i) the challenged statements, on their face, are neither "of and concerning" her nor otherwise actionable as defamation, and (ii) she is required to, but has not and cannot, plausibly plead actual malice.  In addition, (iii) her demand for disgorgement of advertising revenues fails as a matter of law.

## FACTUAL BACKGROUND[1]

### A.     The Plaintiff and SarahPAC

Mrs. Palin is a former public official and influential public figure.  Compl. ¶¶ 14-18. SarahPAC was a political action committee created under Federal law and domiciled in Virginia that ceased operation in 2016.  SarahPAC's regulatory filings do not reflect any specific role played by Mrs. Palin in its organization or structure.  *See* Declaration of Jay Ward Brown ("Brown Decl.") Exs. A-B.[2]  SarahPAC is not a party to this action.

### B.     The Crosshairs Map

In the course of public debate surrounding congressional consideration of the Affordable Care Act, SarahPAC published a map that featured crosshairs positioned over 20 congressional districts of Democrats who supported the legislation, along with a list of each Representative's name (the "Crosshairs Map").  Compl. ¶ 24; Brown Decl., Exs. C-D.  Mrs. Palin referred to the Crosshairs Map as depicting a "'bull's eye'" and, in the same time period, "issued her now oft

---

[1] For this motion only, The Times accepts as true the Complaint's well-pleaded allegations.

[2] On a Rule 12(b)(6) motion, a court may "consider documents attached to the complaint, statements or documents incorporated into the complaint by reference; matters of which judicial notice may be taken, such as public records; and documents that the plaintiff either possessed or knew about, and relied upon, in bringing suit."  *McBeth v. Porges*, 171 F. Supp. 3d 216, 221 (S.D.N.Y. 2016) (citing *Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013)).

repeated rallying cry" to opponents of so-called "Obamacare": "'Don't retreat. RELOAD.'" Brown Decl., Ex. C at 2.  One of those listed on the Crosshairs Map was Rep. Gabrielle Giffords of Arizona.  Shortly after its publication, violent attacks on the offices of several Representatives identified on the Map, including that of Rep. Giffords, led to a substantial national debate about the potential of such inflammatory rhetoric to incite those "on the fringe of the movement."[3] At the time, Rep. Giffords said on national television that "'when people do that, they've got to realize there are consequences to that action.'"  *Id.* at 1-2.

**C.   The Arizona Shootings**

On January 8, 2011, Jared Loughner shot nineteen people at a political event in Tucson, killing a federal judge and five other people, and wounding thirteen others, including Rep. Giffords.  Compl. ¶ 1.  There soon followed a renewed public controversy about Rep. Giffords' inclusion on the Crosshairs Map.[4]  During the ensuing criminal investigation, no evidence was discovered that Loughner had seen the Crosshairs Map.  Multiple news organizations, including The Times, reported that he was mentally unstable and had apparently developed animosity toward Rep. Giffords well before publication of the Crosshairs Map.  *Id.* ¶¶ 42-48 & Exs. 6-11.

---

[3] Eugene Robinson, "Is there a right to 'reload'?", Wash. Post (Mar. 26 2010) at A.23 (noting that at least 10 Representatives identified on Crosshairs Map requested additional security due to threats); *see* Linda Feldmann, "Stumping for McCain, Sarah Palin dials back the gun rhetoric," The Christian Science Monitor (Mar. 26, 2010) at 11 (discussing pressure on Palin to tone down her rhetoric).

[4] *See, e.g.*, Dan Balz, "Cross hairs: Crossroads for Palin?", Wash. Post (Jan. 11, 2011) at A.9 (noting that issue of whether Palin "was partly to blame" became the top question on Facebook after shooting); Dana Milbank, "A McKinley moment?" Wash. Post (Jan. 11,  2011) at A.21 (opining that heat on Palin for "recklessly playing with violent images" was well deserved).  The controversy surrounding the Crosshairs Map resurfaced again in 2015 after a gunman's attack on an abortion clinic in Colorado.  *See, e.g.*, Petula Dvorak, "Fiery rhetoric a close relative of violence", Wash. Post (Dec. 1, 2015) at B.1 (citing SarahPAC ad and decrying leaders who "incite and inflame with fiery speeches" even when that "may not be their intent").

**D.     The Editorial**

During a baseball practice in Virginia on June 14, 2017, James Hodgkinson opened fire with an assault rifle on several Republican members of Congress and others, seriously wounding several, including Rep. Steve Scalise.  Compl. ¶ 2.  Hodgkinson was a political supporter of Senator Bernie Sanders who "'virulently opposed'" President Trump.  *Id.*

On the evening of the shootings, The Times published on its website the Editorial now at issue.  Compl., Ex. 1.  In relevant part, the Editorial briefly described the attack at the ballfield, referenced another mass shooting that took place in San Francisco the same day, and observed that "[a]n American would once have been horrified by and shocked by such savagery.  An American today would be right to be horrified – and not very surprised."  *Id.* at 1.  The Editorial then bemoaned "a sickeningly familiar pattern . . . emerging in the [Virginia] assault," noting that Hodgkinson was a Bernie Sanders supporter "virulently opposed to President Trump" who had posted harsh messages on social media.  *Id.*  The challenged passages followed:

> Was this attack evidence of how vicious American politics has become?  Probably.  In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, the link to political incitement was clear.  Before the shooting, Sarah Palin's political action committee circulated[5] a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.
>
> Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals.  They're right.  Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask of the right.

Compl. ¶ 37; *see also id.*, Ex. 1 at 2.

_____

[5] In the online Editorial, the word "circulated" is a hyperlink and a reader who clicked on it would be taken to a package of on-line news reports published by ABC.  The lead report, published in January 2011 after the Arizona shooting, is titled "Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate."  Brown Decl., Ex. C at 1.  It observed that "[n]o connection has been made between [the Crosshairs Map] and the Arizona shooting."  *Id.* at 2.

The Editorial then moved on to its main thesis:  "Was this attack evidence of how readily available guns and ammunition are in the United States?  Indisputably."  Compl., Ex. 1 at 2.  It posited that Hodgkinson should not have been able to, but easily did, obtain the weaponry used in the attack, discussed the reaction of gun control opponents to it, forecast an America in which virtually everyone carries a gun, and noted the policy choices facing President Trump and all Americans with respect to gun control.  *Id.* at 2-3.

That same evening, The Times published a series of news reports about the shootings, one of which – posted shortly after the Editorial – similarly revisited the Arizona attack that injured Rep. Giffords.  Compl., Ex. 6.  In describing the controversy surrounding that tragedy, the article noted that Mrs. Palin had "drawn sharp criticism" following publication of the Crosshairs Map, "though no connection to the crime was established."  *Id.* at 3-4.

Following the Editorial's publication online, some readers challenged the notion that the Crosshairs Map constituted  "political incitement" or that there was any "link" between it and the Arizona shootings.  The following morning, therefore, The Times revised the online version of the Editorial to remove those references and to make clear that, on the Map, the crosshair appeared over Rep. Giffords' district, not over her name or image.  Compl. ¶ 50-52, 55.  It also published a series of corrections, the final version of which reads as follows:

> An editorial on Thursday about the shooting of Representative Steve Scalise incorrectly stated that a link existed between political rhetoric and the 2011 shooting of Representative Gabby Giffords.  In fact, no such link was established.  The editorial also incorrectly described a map distributed by a political action committee before that shooting.  It depicted electoral districts, not individual Democratic lawmakers, beneath stylized cross hairs.

*Id.* ¶ 55.  On social media, The Times disseminated a statement saying, "We're sorry about this and we appreciate that our readers called us on the mistake."  *Id.* ¶ 58.

## ARGUMENT

Mrs. Palin's Complaint purports to allege a single cause of action, for defamation. Compl. ¶¶ 88-98.  Specifically, based on the two-paragraph passage from the Editorial quoted above, *id.* ¶ 37, she alleges that The Times "falsely stated as a matter of fact to millions of people that Mrs. Palin incited Jared Loughner's January 8, 2011, shooting rampage." *Id.* ¶ 1.

To survive a motion to dismiss brought pursuant to Rule 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 97 (2d Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal marks and citation omitted)).  The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (citations omitted).  In determining whether the Complaint states a "plausible" claim, "[t]he Court need not credit . . . 'mere conclusory statements' or 'threadbare recitals of the elements of a cause of action.'" *Casper Sleep, Inc. v. Mitcham*, 204 F. Supp. 3d 632, 637 (S.D.N.Y. 2016) (quoting *Iqbal*, 556 U.S. at 678).

The Second Circuit has specifically held that the pleading standard adopted in *Iqbal* and *Twombly* applies in defamation actions, including to the pleading of "actual malice," the fault standard that must be met by a public figure such as Mrs. Palin.  *Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 2015 (2016).  In fact, the *Iqbal/Twombly* standard "has a 'particular value' in this context," because "forcing defamation defendants to incur unnecessary costs can chill the exercise of constitutionally protected freedoms." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013) (internal marks and citation omitted), *cert. denied*, 136 S. Ct. 2015 (2016).  "In other words, in defamation cases, Rule 12(b)(6) not only protects against the costs of meritless litigation, but provides assurance to those exercising

their First Amendment rights that doing so will not needlessly become prohibitively expensive." *Id.*

In this case, Mrs. Palin's defamation claim fails as a matter of law because the plain language of the Editorial demonstrates that the challenged statements are neither "of and concerning" her nor otherwise actionable as defamation, and because Mrs. Palin is obliged, but has failed to plead facts that plausibly allege The Times published the challenged statements with "actual malice." Finally, the Complaint seeks a category of damages – disgorgement of advertising revenues – not recoverable in defamation as a matter of law.

## I.     THE CHALLENGED STATEMENTS, ON THEIR FACE, ARE NEITHER "OF AND CONCERNING" MRS. PALIN NOR OTHERWISE ACTIONABLE AS DEFAMATION

The Complaint fails to state a viable defamation claim for two threshold reasons, each discernible from the face of the Editorial. First, Mrs. Palin cannot satisfy the "of and concerning" requirement imposed by the law of defamation because the statements she challenges are directed to an entity, not to her personally. Second, the challenged statements are nonactionable as defamation because the specific meaning that Mrs. Palin assigns to them cannot form the basis of a valid cause of action as a matter of law.

### The "Of and Concerning" Requirement

Mrs. Palin, like all defamation plaintiffs, bears the burden of pleading and proving that the allegedly defamatory statements she challenges were "of and concerning" her. *E.g., Elias v. Rolling Stone LLC*, 192 F. Supp. 3d 383, 391 (S.D.N.Y. 2016), *appeal filed*, No. 16-2465 (2d Cir. July 15, 2016).[6] She attempts to plead this element of her claim by alleging that the

---

[6] Because Mrs. Palin is a resident of Alaska, Compl. ¶ 9, there is at least a question as to whether Alaska or New York law governs her claim. The Court need not resolve that question, however, because the relevant legal principles are the same in both states. *E.g., Julian v. Am. Bus. Consultants, Inc.,* 2 N.Y.2d 1, 17 (1956); *Golden N. Airways v. Tanana Publ'g Co.*, 218 F.2d

Editorial falsely accused her *personally* of inciting the Arizona shooting.  *See, e.g.,* Compl. ¶ 1

(alleging The Times falsely stated that "*Mrs. Palin* incited Jared Loughner's January 8, 2011,

shooting rampage"), ¶ 8 ("*Mrs. Palin*" challenges statement that "*she*, a devoted wife, mother

and grandmother . . . is . . . responsible for inciting an attack that seriously injured numerous

people"), ¶ 93 (defamatory statement was "that *she* incited a politically motivated attack") (all

emphases added).

The Editorial, however, did not say any of this.  It mentions Mrs. Palin's name just once,

stating that the Crosshairs Map had been circulated by an *organization* affiliated with her:

> Before the shooting, Sarah Palin's *political action committee*
> circulated a map of targeted electoral districts that put Ms. Giffords
> and 19 other Democrats under stylized cross hairs.

*Id.* ¶ 37 (emphasis added).  The law does not permit Mrs. Palin to isolate her name from the

context in which it actually appears in the Editorial and thereby construct a defamatory meaning

that is "of and concerning" her personally.

The "of and concerning" requirement "is not a mere superficial technicality or trivial

detail of American defamation law.  Rather, [it] is a basic cornerstone doctrine that reflects the

deepest most fundamental social policies embodied in the law of defamation."  1 Rodney A.

Smolla, *Law of Defamation* § 4:40.50 (2d ed.).  The requirement "stands as a significant

limitation on the universe of those who may seek a legal remedy for communications they think

to be false and defamatory."  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 399-400 (2d Cir. 2006).

The "test for whether a statement is 'of and concerning' an individual is whether '[a]n

average viewer would . . ., taking into account the context in which the remark was uttered,

---

612, 621-22 (9th Cir. 1954) (construing Alaska law).  Moreover, where, as here, the alleged
defamation involves a matter of public concern, the First Amendment requires the plaintiff to
demonstrate that he or she was "clearly identifiable" as the subject of the challenged statement.
*E.g., Algarin v. Town of Wallkill*, 421 F.3d 137, 139 (2d Cir. 2005) (citations omitted).

perceive that [defendant] was making a factual statement about [plaintiff]." *Kirch v. Liberty Media Corp.*, 2004 WL 2181383, at *5 n.15 (S.D.N.Y. Sept. 27, 2004), (internal marks and citation omitted), *aff'd in relevant part*, 449 F.3d 388 (2d Cir. 2006).  The burden "is not a light one," *Elias*, 192 F. Supp. 3d at 391 (citations omitted), and whether a challenged statement reasonably can be understood as of and concerning the plaintiff is a question of law for the Court that "should ordinarily be resolved at the pleading stage." *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001).

In this case, the plain words of the Editorial refer to "Sarah Palin's political action committee"—not to Mrs. Palin herself.  That committee, which operated under the name "SarahPAC," was a creature of federal law.  According to Federal Elections Commission records (of which the Court may take judicial notice, *see supra* n.2), SarahPAC was founded in 2009 and ceased operations at the end of 2016.  *See* Brown Decl., Exs. A-B.  A political action committee ("PAC") "is a business, labor, or interest group that raises or spends money in connection with a federal election, in some cases by contributing to candidates." *McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1442 n.2 (2014).  "While these PACs may be associated with a candidate for federal office, they remain legally unaffiliated with the candidate's principal campaign committee."  FEC, "Types of nonconnected PACs", https://www.fec.gov/help-candidates-and-committees/registering-pac/types-nonconnected-pacs. Consequently, a PAC such as SarahPAC may be managed and operated entirely independently of a candidate.

Significantly, Mrs. Palin does not allege that she and her eponymous political action committee are or were alter egos such that a reference to one is necessarily a reference to the other.  Indeed, she does not plead any personal role or involvement at all in the control or operation of SarahPAC, nor do SarahPAC's public filings evidence any official role played by

Mrs. Palin personally, much less a role that would render the entity and the individual synonymous.  *See* Brown Decl., Exs. A-B.  In the absence of any factual allegations to the contrary, the Court is left with a publication that unambiguously refers to the conduct of an entity, not to the actions of the person for which it was named.  Whether the Editorial is "of and concerning" Mrs. Palin must be assessed in this context.  *E.g., Levin v. McPhee*, 119 F.3d 189, 195 (2d Cir. 1997) (in assessing meaning of challenged statement, court is to be "guided not only by the meaning of the words as they would be commonly understood, but by the words considered *in the context of* their publication") (citations omitted) (emphasis added).

It is well established that defamatory words directed at a corporation or other entity simply do not give rise to a claim by the individuals associated with it.  *E.g., Gilman v. Spitzer*, 538 Fed. App'x 45, 47 (2d Cir. 2013) (summary order) (allegations of extensive illegal activity by insurance company were not "of and concerning" senior executive); *Cardone v. Empire Blue Cross & Blue Shield*, 884 F. Supp. 838, 847-48 (S.D.N.Y. 1995) (statements defamatory of company are not "of and concerning" its CEO); *Fulani v. N.Y. Times Co.*, 260 A.D.2d 215, 216 (1st Dep't 1999) (statement defaming political group not "of and concerning" its coordinator).  As the D.C. Circuit recently reiterated:

> "[D]efamation is personal; . . . Allegations of defamation by an organization and its members are not interchangeable.  Statements which refer to individual members of an organization do not implicate the organization.  By the same reasoning, statements which refer to an organization do not implicate its members."

*Jankovic v. Int'l Crisis Grp.,* 494 F.3d 1080, 1089 (D.C. Cir. 2007) (quoting *Provisional Gov't of Republic of New Afrika v. ABC*, 609 F. Supp. 104, 108 (D.D.C. 1985) (citation omitted) (cited in *Fulani*, 260 A.D.2d at 216)).  Accordingly, in *Jankovic*, the court rejected the contention that "the namesake of a corporation can be defamed when false misdeeds are attributed to his company."  *Id.*

9

Similarly, in this case, Mrs. Palin cannot satisfy the "of and concerning" requirement because the challenged statements are directed to an entity, not to her personally.

**The Alleged Defamation**

To constitute actionable defamation, a challenged statement must be provably false. *Buckley v. Littell*, 539 F.2d 882, 894 (2d Cir. 1976); *see Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990) (alleged defamation addressing matter of public concern "must be provable as false before there can be liability").  In this case, the defamatory meaning alleged by Mrs. Palin  – *i.e.,* that the Crosshairs Map constituted a "clear" and "direct" "incitement" of Jared Loughner – is not capable of being proven false as a matter of law.

As Judge Posner explained in *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1227 (7th Cir. 1993), imputing a motive or state of mind to a person, based on that person's public conduct, is not actionable in defamation.  This is because a person's internal thoughts "can never be known for sure (even by [that person]) and anyone is entitled to speculate on a person's motives from the known facts of his behavior."  *Id.*  Put differently, an assertion about what motivated an individual is "not information that the plaintiff might be able to prove false in a trial."  *Id.*  The case law applying this well settled proposition is legion.[7]

---

[7] *See, e.g., Immuno v. Moor-Jankowski*, 74 N.Y.2d 548, 560 (1989) ("[s]peculations as to the motivations and potential future consequences of proposed conduct generally are not readily verifiable, and are therefore intrinsically unsuited as a foundation for libel"), *vacated*, 497 U.S. 1021 (1990), *adhered to on remand*, 77 N.Y.2d 235 (1991); *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1432 (8th Cir. 1989) ("Assertions whose elements are unverifiable, including statements regarding motive, are 'intrinsically unsuited' to serve as a basis for libel" (citation omitted)), *cert. denied*, 493 U.S. 1036 (1990); *Gacek v. Owens & Minor Distrib., Inc.*, 666 F.3d 1142, 1147-1148 (8th Cir. 2012) (allegations that plaintiff caused his co-worker's suicide were non-actionable because statements about *motives* cannot generally be proven true or false); *Yohe v. Nugent*, 321 F.3d 35, 40-41 (1st Cir. 2003) (speculation about what motivated an attempted suicide not actionable); *Rappaport v. VV Publ'g Corp.*, 163 Misc. 2d 1, 9 (Sup. Ct. N.Y. Cnty. 1994), *aff'd*, 223 A.D.2d 515 (1st Dep't 1996) ("Because statements concerning state of mind, such as hypotheses as to motivation, are not readily verifiable as true or false, courts of this State have consistently found them to be protected.").

A contrary rule would inhibit a wide range of expression.  Commentators routinely assert, for example, that specific violent video games, musical lyrics, or films "incited" individuals to commit murder or suicide.[8]  Whether violent speech or imagery causes actual violence has been the subject of social, academic, and political debate for decades.  Under Mrs. Palin's theory of defamation liability, all of this commentary would be actionable.

To be sure, Mrs. Palin asserts both that "no direct or clear link" has been established between political rhetoric and Loughner's actions, and that there is no "evidence" that Loughner saw the Crosshairs Map.  Compl. ¶¶ 34-35, 46-47.  But Palin's fundamental contention, that there is "no link" between the Map and Loughner, "direct" or otherwise, is just as speculative as the Editorial which, after all, speaks only of a "link" between "political incitement" and the Arizona tragedy.[9]  What motivated or influenced Loughner is unknown—perhaps even by him.[10]  As the exhibits to the Complaint demonstrate, journalists have long attempted to discern his motivations.  *See, e.g.* Compl., Exs. 6-11 & Brown Decl., Ex. C.  But those articles also are, by definition, speculation.  Simply put, whether or not Loughner was influenced—directly or indirectly, knowingly or unknowingly—by the Crosshairs Map or any of the other contemporaneous political rhetoric is not capable of being proven true or false.  As a result, the meaning attributed to the Editorial by Mrs. Palin is not actionable in defamation.

---

[8] *See, e.g.*, Marilyn Manson, "Columbine: Whose Fault is It?," Rolling Stone (May 28, 1999) (responding to allegations that Columbine shooters were inspired by Manson's music); Mark Guarino, "Was Chicago rapper inspiration for 'bored' killing in Oklahoma?" Christian Science Monitor (Aug. 23, 2013) (speculating on "link" between rap lyrics and an act of gang violence).

[9] Indeed, in her own Complaint, Mrs. Palin asserts that any link between the Crosshairs Map and the Arizona shooting is "false speculation."  Compl. ¶ 27.

[10] Mrs. Palin suggests that Loughner's criminal proceedings established he was not influenced by the Crosshairs Map.  *See* Compl. ¶ 25.  It is a matter of public record, however, that Loughner pled guilty to federal charges and that the State of Arizona declined to bring state charges. As a result, evidence of his motive or state of mind was never adduced at a trial.

## II.     MRS. PALIN HAS NOT AND CANNOT ADEQUATELY PLEAD "ACTUAL MALICE," AN ESSENTIAL ELEMENT OF HER CLAIM

The Complaint fails to state a claim for another, independent and equally dispositive reason:  The First Amendment prohibits a public figure such as Mrs. Palin from prevailing in a defamation action unless she can prove, by clear and convincing evidence, that the allegedly defamatory statements were published with "actual malice," that is, with knowledge of their falsity, or despite a "high degree of awareness" of their "probable falsity."  *E.g., Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964) (public figures may recover damages only for publication of "calculated falsehood[s]"); *see Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989).  As a matter of law, Mrs. Palin's Complaint fails to plead any facts that could plausibly establish actual malice.

Mrs. Palin faces an especially "heavy burden" with respect to this element of her claim – a burden intended to provide essential "breathing space" for free expression and a free press. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 272 (1964); *accord, e.g., Dunlop-McCullen v. Rogers*, 2002 WL 1205029, at *7 (S.D.N.Y. Feb. 21, 2002) (Rakoff, J.).  As the Supreme Court emphasized in *Sullivan*, this burden serves our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," notwithstanding that such debate "may well include vehement, caustic, and sometimes unpleasantly sharp"—and even "erroneous"—commentary about public figures. 376 U.S. at 270-71.

Following *Iqbal* and *Twombly*, the Second Circuit has specifically held that a public figure must "plead 'plausible grounds' to infer actual malice by alleging 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' actual malice."  *Biro*, 807 F.3d at 546.  In this context, "naked assertions," "conclusory statements," and factual allegations that do not permit a "reasonable inference that the defendant is liable for the misconduct alleged" are

insufficient to survive a motion to dismiss.  *Id.* at 544 (quoting *Iqbal*, 556 at 678); *see also*

*Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) (affirming dismissal for failure

to plausibly allege actual malice); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614-16

(7th Cir. 2013) (same); *Mayfield v. NASCAR*, 674 F.3d 369, 377-78 (4th Cir. 2012) (same);

*Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012) (same).

As a threshold matter, it bears emphasis, the allegations of the Complaint cannot be

reconciled with Mrs. Palin's premise that The Times as an institution sought to damage her

through the publication of calculated falsehoods.  Her Complaint concedes that, in short order

after the Editorial appeared, The Times published two other articles, each of which expressly

reported that "no connection" between Loughner and the Crosshairs Map "was ever established."

Compl. ¶¶ 42, 46.  The Editorial itself included a link to another article that disclosed the same

information.  *Id.*, Ex. 1 at 2 & Brown Decl., Ex. C.  And when the issue was brought to The

Times's attention by readers, it swiftly and prominently published a correction.  *Id.* ¶¶ 52-55.

The only plausible inference a reasonable person might draw from these facts is that The Times

made a mistake.  Put differently, it is inherently *im*plausible to urge, as Mrs. Palin does, that The

Times as an institution deliberately set out to defame her, while simultaneously arming its

readers, including Mrs. Palin, with the very information she claims it was attempting to falsify.

Nonetheless, as both the Supreme Court and the Second Circuit have emphasized, the

actual malice inquiry properly focuses on the state of mind of those who actually were

responsible for the content of the publication at issue in a given case, not the collective

knowledge imputed to their corporate employer.  *E.g., Sullivan*, 376 U.S. at 287; *Dongguk Univ.*

*v. Yale Univ.*, 734 F.3d 113, 123-24 (2d Cir. 2013).  Mrs. Palin's Complaint pleads no facts

which, even if proven, could plausibly support a finding that those employees of The Times

responsible for the Editorial's publication intentionally included in it statements about her that they knew to be false or probably false.

Mrs. Palin purports to allege four facts or categories of fact that she contends demonstrate that The Times published the challenged statements with actual malice: (1) failure to heed other articles it published on the same topic, Compl. ¶¶ 4, 5, 41-47, 67-68; (2) violation of its journalistic policies, *id.* ¶¶ 6, 69-72, 81; (3) an economic or political motivation to defame Mrs. Palin, *id.* ¶¶ 28-31, 35, 39-40, 76-77, 80, 84-85, 96; and (4) failure to more fully retract or correct the challenged statements, *id.* ¶¶ 49-66.  These allegations, whether considered separately or collectively, cannot plausibly establish actual malice as a matter of law.

**The Alleged Failure To Consult Other Articles**

Mrs. Palin's contention that she can prove actual malice is based primarily on her allegation that The Times knew or should be deemed to have known there was no evidence the Crosshairs Map influenced Loughner when it published the challenged statements because previous and contemporaneous articles it published contained that information.  *See id.* ¶¶ 4, 42-47.  Mrs. Palin argues, alternatively, either that (1) knowledge of the contents of those articles is properly imputed to the corporate defendant, thereby establishing that The Times "knew" the challenged statements were false, or (2) the failure of The Times employees responsible for the Editorial to search out and consult those articles demonstrates a reckless disregard of the truth.

Both of these contentions are squarely foreclosed by the Supreme Court's decision in *Sullivan* itself.  In that case, the Court considered the publication of an editorial advertisement containing facts contradicted by earlier news stories that had been published elsewhere in the newspaper.  As the Court explained:

> The mere presence of the stories in the files does not, of course, establish that the Times "knew" the advertisement was false, since

> the state of mind required for actual malice would have to be
> brought home to the persons in the Times' organization having
> responsibility for the publication of the advertisement.

*Sullivan*, 376 U.S. at 287.  In other words, knowledge of those stories could not, as a matter of

law, be constructively imputed to those "having responsibility for the publication."  *Id.*  By the

same token, the Court held, the failure of the responsible Times' employees to investigate,

discover and consult those stories "supports at most a finding of negligence in failing to discover

the misstatements, and is constitutionally insufficient to show the recklessness that is required for

a finding of actual malice."  *Id*. at 288.

So too here.  The allegation that The Times had published other articles stating that no

connection between Loughner and the Crosshairs Map had been found cannot, as a matter of

law, be deemed to establish that The Times therefore "knew" the challenged statements in the

Editorial were false.  Moreover, just as in *Sullivan*, the alleged failure of those responsible for the

Editorial's publication to search out and consult prior articles "is constitutionally insufficient to

show the recklessness that is required for a finding of actual malice."  *Id.* at 288.

As the Second Circuit has recently explained, because actual malice is a subjective

standard focused on a defendant's awareness of probable falsity, an alleged failure to conduct an

investigation cannot plausibly establish actual malice unless the person responsible for the

challenged statement's publication already had "obvious reasons" to doubt its accuracy.

*Dongguk*, 734 F.3d at 124.  In *Dongguk*, the Court of Appeals squarely held that "'a publisher

who does not already have 'obvious reasons to doubt' the accuracy of a story is not required to

initiate an investigation that might plant such doubt[.]'"  *Id.* (citations omitted).  Accordingly, the

court determined that, even though the person responsible for the publication at issue had "noted

her skepticism" about the authenticity of a key document, such skepticism did not amount to the

kind of "obvious reasons to doubt" necessary to trigger a duty to investigate further.  *Id.* at

125-26.  In the absence of such a showing, the court explained, the "failure to discover a

misstatement may demonstrate negligence[,] but it does not establish actual malice."  *Id.*[11]

In this case, the Complaint pleads no facts that raise a plausible inference that the

challenged statements were so inherently dubious that their inclusion in the Editorial triggered an

obligation on the part of its authors to investigate further.  To the contrary, there is an obvious

"link" between the kind of "political incitement" exemplified by the Crosshairs Map and Rep.

Giffords – her district is specifically depicted beneath crosshairs and her name is featured on the

Map itself.  Moreover, at the time of its dissemination, Rep. Giffords' office was vandalized and

she warned of the potential consequences of such political rhetoric on national television.  Brown

Decl., Ex. C at 1, 5-6.

Perhaps more significantly, however, the Complaint advances an overarching theory that

simply is not plausible on its face – that The Times "knew" the truth, because it had both

previously and contemporaneously reported it in other articles, but nevertheless deliberately set

out to defame Mrs. Palin by inserting a false statement that referenced her in the body of an

editorial that is not even otherwise about her.  To accept that  proposition, the Court would also

necessarily have to embrace the following reasoning:  that (1) the absence of a "link" between

Mrs. Palin and the Arizona shootings was generally well known, (2) the editorial writers

nevertheless wrote the challenged false statements about her despite knowing that fact and

---

[11] *Accord*, *Schatz*, 669 F.3d at 56, 58 (allegations that defendant reprinted previously published statements without "'any additional investigation' to determine whether what it said was true," or any other "'additional' legwork," held insufficient as matter of law to establish plausible claim of actual malice); *Pippen*, 734 F.3d at 614 ("Defendants had many ways to learn whether Pippen had filed for bankruptcy.  For example, all bankruptcy court dockets can be searched simultaneously through the federal courts' PACER service.  And then there's the tried-and-true journalistic practice of asking a story's subject.  If rather than relying on the rumor mill the defendants had conducted even a cursory investigation, they would have discovered that Pippen had not declared bankruptcy—and they concede this.  But failure to investigate is precisely what the Supreme Court has said is insufficient to establish reckless disregard for the truth.").

deliberately ignoring other articles appearing in their own newspaper that contradicted their published statements, (3) those same writers embedded in the Editorial itself a link to contradictory source material, and (4) they then promptly corrected the statements when they "unexpectedly" were found out.  This is the very definition of "implausible."  Even taking as true the Complaint's only plausible allegation in this regard—that the responsible editorial writers failed to check the accuracy of the challenged statements—such an allegation simply does not support a finding of actual malice as a matter of law.

**The Alleged Failure to Adhere To The Times's Ethical Guidelines**

Mrs. Palin also devotes a substantial portion of her Complaint to the assertion that The Times failed to adhere to its own journalistic policies and that such failures constitute proof of actual malice.  Compl. ¶¶ 6, 69-72, 81.  Neither assertion withstands reasonable scrutiny.

First, as the Supreme Court has explained, even an "extreme departure from professional standards" is insufficient to demonstrate actual malice as a matter of law.  *Connaughton*, 491 U.S. at 665.  This is for good reason.  Where an alleged failure to adhere to professional standards or policies does not speak to a publisher's subjective belief in the truth of what it published, it has no legitimate bearing on the actual malice inquiry.  *Tucker v. Fischbein*, 237 F.3d 275, 286 (3d Cir. 2001) (actual malice not established where defendant allegedly engaged in poor journalistic practices, violated editorial guidelines, had preconceived story-line, and failed to conduct thorough investigation, but did not entertain serious doubts about truth).[12]

---

[12] *See also, e.g., OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 55 (D.D.C. 2005) ("The Court does not condone any ethical or professional breaches that might have occurred. However, none of them can fairly be said to bear on the defendants' subjective knowledge of the falsity of the criminal allegations in the article.  That test examines the publisher's subjective state of mind, and does not turn on what more, or different, a good publisher could have done.").

Second, a simple review of the "policies" the Complaint alleges The Times violated reveals they are confined to its overarching aspirations that Times journalists comport themselves with "integrity," publish accurate information, and correct the errors they make promptly.  Compl. ¶¶ 69-71.  Even if The Times could fairly be said to have fallen short of these goals in this instance, none of them is probative of the only issue to which they are conceivably relevant in this case – *i.e.,* the Editorial writers' knowledge, at the time of publication, of the probable falsity of the challenged statements.  Indeed, the Complaint itself pleads facts that demonstrate The Times *complied* with the only subset of the referenced policies that can even arguably be described as something more than broadly aspirational – "admit[ting] mistakes and correct[ing] them promptly."  *Id.* ¶ 71.

### The Alleged Economic Or Political Motives To Use Mrs. Palin's Name

Mrs. Palin next attempts to satisfy the actual malice element of her claim by alleging that the authors of the Editorial were motivated to include in it false, defamatory references to her for either or both of two related purposes: (1) to capitalize on her fame and thereby increase advertising revenue through more "clicks" on its website, or (2) to tarnish her political beliefs.  *See, e.g.*, Compl. ¶ 35 (by "fabricat[ing] this supposed 'pattern' and Mrs. Palin's role in it, . . . . The Times implicitly attacked the conservative policies Mrs. Palin promotes and drove its digital advertising revenues at Mrs. Palin's expense").  The effort is unavailing.  "[T]he mere presence of some ulterior motive—whether a profit motive, a motive to produce the most interesting stories, or a personal desire to harm the subject of a story—is not enough to support a finding of actual malice." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 596 (D.C. Cir. 2016), *cert. denied*, 137 S. Ct. 1434 (2017).

Indeed, neither of Mrs. Palin's contentions survive reasonable scrutiny, as a matter of logic or law.  Her first contention fails as a matter of logic because it is not plausible to allege, as the Complaint does, that The Times implemented a plan to increase advertising revenue on its website by embedding a single mention of her name in the body of a lengthy Editorial, but not in its headline, its lede, or in an accompanying photograph or graphic.  It fails as a matter of law because the Supreme Court has repeatedly rejected the premise that actual malice can be inferred from a profit motive: "If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* [*v. Sullivan*] to *Hustler Magazine* [*Inc. v. Falwell*, 485 U.S. 46 (1988)] would be little more than empty vessels." *Connaughton*, 491 U.S. at 667.

Mrs. Palin's second contention fares no better.  As the Fourth Circuit has explained, "many publications set out to portray a particular viewpoint or even to advance a partisan cause.  Defamation judgments do not exist to police their objectivity[.]" *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 716 (4th Cir. 1991).  And, as a matter of logic, the Complaint once again pleads facts that, if anything, negate the contention that The Times, much less the Editorial's authors, harbored a political motivation to harm Mrs. Palin.  The Complaint includes as exhibits other articles published by The Times virtually *simultaneously* with the Editorial, on both its news and opinion pages, that reject the notion of a link between Loughner and the Crosshairs Map, as well as an opinion column published in 2010 that warned *against* what the author perceived as unnecessary attacks on Mrs. Palin.  Compl. ¶¶ 29, 42-44.  More significantly, the Editorial itself rebuts the premise of Mrs. Palin's contention that its authors were motivated to defame her by an anti-conservative bias.  *See* Compl., Ex. 1 at 2 ("Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by

anti-Trump liberals.  They're right.  Liberals should be held to the same standard of decency they

ask of the right.").  Interpreting the language of the Editorial in the manner the Complaint

advocates—as proof of political bias, despite its plain language—"is simply too much of a

stretch . . . to credit, even at the pleading stage." *Schatz*, 669 F. 3d at 57.[13]

### The Alleged Failure To "Meaningfully" Retract Or Correct The Editorial

The allegation that The Times should have more fully corrected or retracted the

challenged statements, Compl. ¶¶ 49-66, is equally incapable of establishing actual malice.

Whether a defendant published with actual malice is measured at the time of publication, *Biro*,

963 F. Supp. 2d at 281, and a subsequent failure to retract or correct is therefore not probative of

a defendant's state of mind at the time of publication, *see Sullivan*, 376 U.S. at 286 (defendant's

failure to retract after plaintiff's request was "not adequate evidence of malice for constitutional

purposes"); *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996)

(failure to retract or correct discredited statements does not establish actual malice); *Nw.*

*Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1395 (8th Cir. 1997) (same).  As

the court in *Biro* explained, "a failure to retract occurs, by definition, *after* publication, meaning

that its probative value as to a defendant's state of mind at the time of publication is dubious at

best."  963 F. Supp. 2d at 281-82;  *see also, e.g., Dongguk*, 734 F.3d at 126.

Moreover, here again, the allegations of the Complaint itself belie the significance that

Mrs. Palin would place on The Times's post-publication conduct, even if it were otherwise

relevant to the actual malice determination.  As the Complaint and the exhibits to it demonstrate,

corrections *were* published both in the print newspaper and on The Times website, and they were

---

[13] The potential consequence of this theory of actual malice for defamation litigation brought by public figures is underscored by the sweeping written discovery requests served by Mrs. Palin on The Times.  She seeks through interrogatories and documents requests every internal communication anyone employed by The Times has had about her since 2011, regardless of whether related to the Editorial.  *See* Brown Decl., Exs. F-G.

disseminated widely by The Times on social media.  Those corrections promptly, fully and

directly addressed each of the statements about which Mrs. Palin complains.  While a failure to

retract or correct is not probative evidence of actual malice, a decision to publish corrections in

this manner actually undermines any plausible claim of actual malice.  As one court explained,

"since the issue of actual malice focuses on the defendant's state of mind, his attitude toward the

truth or falsity of the material published, it is significant and tends to negate any inference of

actual malice on the part of the [defendant] that it published a retraction of the indisputably

inaccurate portions of the . . . article in the next day's edition."  *Hoffman v. Wash. Post Co.*, 433

F. Supp. 600, 605 (D.D.C. 1977) (citation omitted), *aff'd*, 578 F.2d 442 (D.C. Cir. 1978).

* * * * * * *

In the last analysis, whether considered individually or collectively, the four sets of

"facts" the Complaint alleges do not state a plausible claim of actual malice as a matter of law.

This is the lesson of a host of cases, in this Circuit and elsewhere, that have concluded that

analogous collections of similar allegations, even if proven, do not amount to clear and

convincing evidence of actual malice.

In *Biro*, for example, the Second Circuit affirmed the district court's decision dismissing

a complaint that sought to ground a finding of actual malice in allegations that the *New Yorker*

(1) failed to investigate the challenged statements before publishing them, (2) relied on

anonymous and biased sources, (3) ignored exculpatory facts about the plaintiff, (4) failed to

retract, and (5) employed a reporter who had a propensity to defame.  *Biro*, 963 F. Supp. 2d at

284; 807 F.3d at 546.  In dismissing the complaint, the court found that "none of [the plaintiff's]

allegations—singly or together—plausibly suggest that . . . [the *New Yorker*] either knew that

[the] statements were false or had serious doubts about their truth and dove recklessly ahead

21

anyway."  963 F. Supp. 2d at 285 (quoting *Schatz*, 669 F.3d at 58).[14]   In this case as well, none of

the allegations of Mrs. Palin's Complaint, individually, provides "support for a finding of actual

malice" and "cumulatively, they do not amount to much, and surely not enough under the

standard set by the Supreme Court."  *McFarlane*, 91 F.3d at 1516.

## III.   MRS. PALIN MAY NOT SEEK DISGORGEMENT DAMAGES

Mrs. Palin's request for the disgorgement of The Times's purported "ill-gotten gains" in

the form of online advertising revenues derived from the Editorial, *see* Compl. ¶¶ 84-85, 96,

should be dismissed or stricken because the relief sought is not available in a defamation action

under either New York or Alaska law.  Moreover, even if state law purported to permit such an

award, it would violate the First Amendment.[15]

"Imperfect though it is, an action for damages is the only hope for vindication or redress

the law gives to a man [or woman] whose reputation has been falsely dishonored."  *Milkovich*,

497 U.S. at 23 (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 93 (1966) (Stewart, J., concurring));

---

[14] *Accord Jankovic*, 822 F.3d at 597 (Plaintiff's "theories fare no better when viewed in the aggregate . . . . What is still missing is evidence that [defendant] had 'serious doubts' about the truth of the defamatory statement or that it published the statement with a high degree of awareness of its probable falsity . . . ."); *McFarlane*, 91 F.3d at 1516 (finding that plaintiff could not demonstrate actual malice as matter of law with evidence that reporter "failed to contact anyone with first-hand knowledge of the alleged events, that he had been unable to corroborate the allegations about McFarlane, that he should (and may) have been aware of an inconsistency between Ben–Menashe's story and his passports, that he had been alerted that Ben–Menashe had not been present for a crucial meeting as reported in the book, and that he perjured himself in an affidavit submitted to the district court").

[15] Although Mrs. Palin's Complaint does not expressly denominate her request for such relief as a separate cause of action, she appears to be asserting a claim for the equitable remedy of disgorgement.  *See* Compl. ¶ 96.  Accordingly, this motion to dismiss it pursuant to Fed. R. Civ. P. 12(b)(6) is appropriate.  *See Dolmetta v. Uintah Nat'l Corp.*, 712 F.2d 15, 19 (2d Cir. 1983) ("courts look at the essence of the stated claim and not the label by which a plaintiff chooses to identify it").  In the alternative, the relevant paragraphs of the Complaint may and should be stricken under Fed. R. Civ. P. 12(f).  *See, e.g., Martinez v. Ketchum Advert. Co.*, 865 F. Supp. 166, 167-68 (S.D.N.Y. 1994).

accord *Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 531 (S.D.N.Y. 2013) ("[t]he usual rule is

that . . . . the only remedy for defamation is an action for damages" (citation omitted)).  At

common law, defamation damages take a very specific, and limited form – the "actual harm

caused to the reputation of the person defamed."  Restatement (Second) of the Law of Torts

§ 621.  Thus, a "defamed party may recover damages for harm to reputation, wounded feelings

and humiliation, resulting physical ailments, and estimated future damages of the same kind."

*City of Fairbanks v. Rice*, 20 P.3d 1097, 1107-08 (Alaska 2000); *see Wachs v. Winter*, 569 F.

Supp. 1438, 1443 (E.D.N.Y. 1983) (describing recovery as "damages that are commensurate

with the harm suffered").

      In seeking disgorgement of The Times's advertising revenue, Mrs. Palin is attempting to

obtain an additional remedy that bears no relation to the injury she allegedly sustained.

Mrs. Palin cannot and does not claim that she would have been entitled to receive a portion of

The Times's advertising revenues if she had not been defamed, or that she was forced to pay for

advertisements in The Times to combat the Editorial's sting.  Moreover, advertising revenue The

Times received, even if it could somehow be attributed to the Editorial, did not come from Mrs.

Palin.  Under such circumstances, there is simply no precedent for the proposition asserted in the

Complaint that Mrs. Palin is entitled to disgorgement of The Times's advertising revenue as an

element of her damages in this defamation action.  *See Silvercorp Metals Inc. v. Anthion Mgmt.

LLC*, 36 Misc. 2d 1231(A), 2012 WL 3569952, at *12 (Sup. Ct. N.Y. Cnty. Aug. 12, 2012)

(rejecting plaintiff's attempt to obtain profits defendant received from short sale position after it

published defamatory information as part of scheme to drive down plaintiff's stock price).

      Indeed, such a proposition has been soundly rejected each time it has previously been

asserted.  As recently as last year, the Eighth Circuit conducted a survey of American

jurisprudence, searching for any case "awarding profits in a defamation case under an unjust-enrichment theory, or even suggesting money damages are an inadequate remedy in a public-figure defamation case." *Ventura v. Kyle*, 825 F.3d 876, 887 (8th Cir. 2016), *cert. denied*, 137 S. Ct. 667 (2017). Not surprisingly, it found "none." *Id.; accord Alharbi v. TheBlaze, Inc.*, 199 F. Supp. 3d 334, 361-62 (D. Mass. 2016); *Hart v. E.P. Dutton & Co.*, 197 Misc. 274, 275 (Sup. Ct. Oneida Cnty. 1949) (where plaintiff sought recovery of defendant's profits from a book he claimed falsely portrayed him "as traitors to America in time of war," court held damages sought were not available as matter of law and observed that "an innovation such as the plaintiff seeks in this action would impose new and unnecessary hazards upon publishers and would be contrary to the policy of our law"), *aff'd*, 277 A.D. 935 (4th Dep't 1950).[16]

Even if there were precedent under state law for the recovery of disgorgement damages in these circumstances, such an award would be precluded by the First Amendment. The Supreme Court has left no doubt that the *only* constitutionally sufficient basis on which a state may award damages arising from defamatory speech about a matter of public concern is the compelling governmental interest in compensating plaintiffs for "actual injury" to their reputations. *Gertz v. Robert Welch, Inc.*, 418 U.S. 333, 348-49 (1974) ("we endorse this approach in recognition of the strong and legitimate state interest in compensating private individuals for injury to reputation."). More importantly, the Court has emphasized that a state's interest in affording its citizens a cause of action for defamation extends "*no further*" than compensating them for

---

[16] As the Eighth Circuit further recognized in *Ventura*, 825 F.3d at 887-88, a claim for disgorgement damages in a defamation action constitutes an improper attempt to secure an equitable remedy. "Equitable relief requires a showing that there is no adequate remedy at law." *SEG Sport Corp. v. State Athletic Comm'n*, 952 F. Supp. 202, 204 (S.D.N.Y. 1997); *accord Knaebel v. Heiner*, 663 P.2d 551, 553 (Alaska 1983). It is well settled that money damages provide an adequate remedy at law in defamation cases. *E.g., Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 239 F.3d 172, 177 (2d Cir. 2001).

"actual injury" they have sustained as a result of the defamation.  *Id.* at 349 (emphasis added).

As the Court explained, "actual injury" is therefore limited to harm actually sustained by the

plaintiff as a result of "impairment of reputation and standing in the community, personal

humiliation, and mental anguish and suffering." *Id.* at 350.

By definition, the "actual injury" limitation imposed on defamation damages by the First

Amendment does not extend to the disgorgement of "benefits" allegedly received by the

defendant.  Such an award would constitute precisely the kind of "gratuitous" recovery that the

Supreme Court held in *Gertz* "the States have no substantial interest in securing for plaintiffs."

*Id.* at 349.  For this reason, even if state law otherwise allowed such an award, it would violate

the First Amendment.

## CONCLUSION

For the foregoing reasons, The Times respectfully requests that this Court dismiss the

Complaint in its entirety with prejudice.[17]


Dated:  New York, New York            Respectfully submitted,
   July 14, 2017

VINSON & ELKINS L.L.P.            LEVINE SULLIVAN KOCH & SCHULZ, LLP
Thomas S. Leatherbury            By: */s/ Jay Ward Brown*
(pro hac vice motion pending)             David A. Schulz.
Trammell Crow Center             Jay Ward Brown
2001 Ross Avenue, Suite 3700            321 W. 44th Street, Suite 1000
Dallas, TX 75201-2975            New York, NY 10036
Tel: (214) 220-7700            Tel: (212) 850-6100
Fax: (214) 220-7716            Fax: (212) 850-6299
tleatherbury@velaw.com            dschulz@lskslaw.com
         jbrown@lskslaw.com

*Co-Counsel for Defendant*

         *Co-Counsel for Defendant*

---

[17] At the Initial Conference, counsel for Mrs. Palin expressly disclaimed any interest in amending the Complaint to allege additional facts.  *See* Brown Decl., Ex. E at 7:7-23.  Accordingly, if the Complaint is dismissed, dismissal should be with prejudice.

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of July, 2017, a true and correct copy of the

foregoing **DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION**

**TO DISMISS THE COMPLAINT was** filed with the Court through the electronic filing

system, which will automatically serve electronic notice of the same on all counsel of record.

_/s/ Jay Ward Brown_
Jay Ward Brown