UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SARAH PALIN, an individual,<br><br>               Plaintiff,<br><br> – against –<br><br>THE NEW YORK TIMES COMPANY,<br>a New York corporation,<br><br>               Defendant. | No. 17 Civ. 4853<br><br>Hon. Jed S. Rakoff<br><br>ECF Case |

## PLAINTIFF'S MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 443-2199
Facsimile: (813) 443-2193

and

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile: (212) 754-0330

*Attorneys for Plaintiff Sarah Palin*

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................... 1

II.    MRS. PALIN PLEADED THE NECESSARY FACTS TO ESTABLISH A CLAIM ......................................................................................... 2

    A.     The False and Defamatory Article ...................................................... 3

    B.     The Palin Article Was "Of and Concerning" Mrs. Palin ..................... 4

    C.     *The Times'* Defamatory Statements are Substantially Untrue ........... 10

         1.     *The Times* Admitted That It Made Errors of Fact ................... 11

         2.     The Statements are Substantially Untrue ................................. 11

    D.     Mrs. Palin Has Alleged Actual Malice ............................................. 14

         1.     The Context of the Palin Attack............................................ 15

         2.     *The Times* Fabricated the Defamatory Statements................. 16

         3.     *The Times* Also Had Reason to Doubt the Truth of Its Statements ....................................................................... 17

         4.     The Violation of *The Times'* Journalistic Standards............... 19

         5.     *The Times'* Insufficient and Incomplete Retractions/ Apology....................................................................... 20

    E.     The Special Circumstances Warranting Restitution Damages .......... 21

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alharabi v. The Blaze, Inc.*, 199 F.Supp.3d 334 (D. Mass. 2016) ........................... 25

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................. 2, 3

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................... 3

*Bi-Rite Enterprises, Inc. v. Button Master*, 555 F.Supp. 1188 (S.D.N.Y. 1983) ..................... 23

*Biro v. Condé Nast*, 963 F.Supp.3d 255 (S.D.N.Y. 2013) ......................... 2, 15, 16, 20

*Biro v. Condé Nast*, 807 F.3d 541 (2d Cir. 2015) ..................... 3, 15, 16, 17

*Bolden v. Morgan Stanley & Co., Inc.*, 765 F.Supp. 830 (S.D.N.Y. 1991) ............................. 15

*Brayton v. Crowell-Collier Publishing Co.*, 205 F.2d 644 (2d Cir. 1953) ................ 6

*Breen v. Leonard*, 198 A.D.2d 392 (2d Dep't. 1993) ................................. 13

*Cardone v. Empire Blue Cross and Blue Shield*, 884 F. Supp. 838 (S.D.N.Y. 1995) ........................................................................... 5, 9

*Celle v. Fillipino Reporter Ent. Inc.*, 209 F.3d 163 (2d Cir. 2000) ................... 10, 16

*Church of Scientology Int'l v. Time Warner, Inc.,* 806 F. Supp. 1157 (S.D.N.Y. 1992) ........................................................................... 4

*Croixland Props. Ltd. Pshp. v. Corcoran*, 174 F.3d 213 (D.C. 1999) ........................ 5

*Dalbec v. Gentlemen's Companion, Inc.*, 828 F.2d 921 (2d Cir. 1987) ..................... 5

*Darby v. The New York Times Co.,* No. 07-12-00193-CV, 2014 WL 818614 (Tex. App. Feb. 26, 2014) ........................................................................... 13, 14

*Elias v. Rolling Stone, LLC*, 192 F.Supp.3d 383 (S.D.N.Y. 2016)........................... 5, 6

*Fetler v. Houghton Mifflin Co.*, 364 F.2d 650 (2d Cir. 1966) .................................... 5

*Franklin Prescriptions, Inc. v. The New York Times Co.*, 267 F.Supp.2d 425 (E.D. Pa. June 19, 2003) ........................................................................... 7

*F.T.C. v. Bronson Partners, LLC*, 654 F.3d 359 (2d Cir. 2011) ............................... 23

*Fulani v. N.Y. Times Co.*, 260 A.D.2d 215 (1st Dep't. 1999)................................... 9

*Gacek v. Owens & Minor Dist., Inc.*, 666 F.3d 1142 (8th Cir. 2012) ....................................... 12

*Gelencser v. Orange County Publ'n. Div. of Ottaway Newspapers*, 116 A.D.2d 696 (1986) .......................................................................................................................... 6

*Gertz v. Robert Welch, Inc.*, 680 F.2d 527 (7th Cir. 1982) ....................................... 19

*Gilman v. Spitzer*, 538 Fed.Appx. 45 (2d Cir. 2013) ................................... 9

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) ..................................... 23

*Gross v. Cantor*, 270 N.Y. 93 (1936) ....................................................................... 9

*Harwood Pharmaceutical Co. v. National Broadcasting Co.*, 9 N.Y.2d 460 (1961)................. 5

*Hart v. E.P. Dutton & Co.*, 93 N.Y.S.2d 871 (Sup. Ct. Oneida Cty. 1949) ...................... 24, 25

*Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222 (7th Cir. 1993) ........................... 12, 13

*Holmes v. Curtis Pub. Co.*, 303 F.Supp. 522 (D.S.C. 1969) ........................................ 7

*Horton v. Guillot*, No. 14-CV-1050, 2015 U.S. Dist. LEXIS 25134 (N.D.N.Y. Mar. 2, 2015) .............................................................................................................. 5

*Hunt v. Liberty Lobby*, 720 F.2d 631 (11th Cir. 1983) ............................................... 19

*Immuno AG v. Moor-Jankowski*, 74 N.Y.2d 548 (1989) ...................................... 12

*Jankovic v. Int'l. Crisis Grp.*, 494 F.3d 1080 (D.C.C. Cir. 2007) ......................................... 8, 9

*Kerwick v. Orange County Publ'n. Div. of Ottaway Newspapers, Inc.*, 53 N.Y.2d 625 (1981) ....................................................................................................... 13, 19, 20

*La Luna Ent., Inc. v. CBS Corp.*, 74 F.Supp.2d 384 (S.D.N.Y. 1999) ...................................... 5

*Law Firm of Daniel P. Foster, P.C. v Turner Broadcasting Sys., Inc.*, 844 F.2d 955 (2d Cir. 1988) ......................................................................................................... 10

*Liberty Life Ass. Co. v. Bahan*, No. 09 Civ. 4715(JSR), 2010 US Dist. LEXIS 87446 (S.D.N.Y. Aug. 20, 2010) ....................................................................................... 24

*Martin v. Daily News L.P.*, 990 N.Y.S.2d 473 (1st Dep't. 2014)............................................. 13

*Naantaanbuu v. Abernathy*, 746 F.Supp. 378 (S.D.N.Y. 1990) ................................. 6

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ....................................... 18

*Ocean State Seafood, Inc. v. Capital Newspaper, Div. of Hearst Corp.*, 492 N.Y.S.2d 175 (3d Dep't. 1985) ........................................................................................ 13

*Organovo Holdings, Inc. v. Dimitrov*, 2017 WL 2417917 (Del. Jun. 5, 2017) ...................... 25

*Ostrowe v. Lee*, 256 N.Y. 36 (1931) ........................................................................ 22

*Palmeri v. LG Electronics USA, Inc.*, C.A. No. 07-5706, 2008 WL 2945985
(D.N.J. July 30, 2008) ............................................................................................... 24

*Paramount Film Distrib. Co. v. State*, 30 N.Y.2d 415 (1972) ................................... 24

*Peagler v. Phoenix Newspapers, Inc.,* 114 Ariz. 309 (1977) ....................................... 9

*Peck v. Tribune Co.*, 214 U.S. 185 (1909) ................................................................. 5

*Price v. Viking Penguin, Inc.*, 881 F.2d 1426 (8th Cir. 1989) ................................... 12

*Rappaport v. VV Publ. Corp.*, 618 N.Y.S.2d 746 (Sup. Ct. N.Y. Cty.1994) ............. 12

*Sachs v. Matano*, 22 N.Y.S.3d 310 (Sup. Ct. Nassau Cty. 2015) .............................. 5

*Silvercorp Metals, Inc. v. Anthion Mgmt. LLC*, 36 Misc.2d 1231(A), 2012 WL
3569952 (Sup. Ct. N.Y. Cty. Aug. 12, 2012) ........................................................... 25

*St. Armant v. Thompson*, 390 U.S. 727 (1968) .................................................... 16, 17

*Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) ............................................... 15

*TPTCC N.Y., Inc. v. Radiation Therapy Servs., Inc.*, 784 F.Supp.2d 485 (S.D.N.Y.
2011) ........................................................................................................................ 24

*Ventura v Kyle,* 825 F.3d 876 (8th Cir. 2016) .......................................................... 25

*Von Gerichten v. Long Island Advance*, 202 A.D.2d 495 (2nd Dep't. 1994) ........... 10

*Wallace v. Media News Group, Inc.*, 568 Fed.Appx. 121 (3d Cir. 2014) .................. 7

*Wandt v. Hearst's Chicago American*, 109 N.W. 70 (Wis. 1906) ............................. 7

*Yohe v. Nugent*, 321 F.3d 35 (1st Cir. 2003) ............................................................ 12

*Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977) ...................... 23

**OTHER AUTHORITIES**

New York Pattern Jury Instructions PJI 3:34 ............................................................. 10

*Restatement 3d of Unfair Competition* § 49 .............................................................. 24

*Restatement of Torts § 563* ......................................................................................... 9

## I.      **INTRODUCTION**

On June 14-15, 2017, The New York Times Company ("*The Times*") published the article "*America's Lethal Politics*" (The "Palin Article"), in which it used Sarah Palin ("Mrs. Palin") as the Conservative archetype for "how vicious American politics have become" and the linchpin of a false narrative about a "sickeningly familiar pattern" of violence against politicians that emanated from the fabricated existence of a "clear" and "direct" link between a map of targeted electoral districts circulated by "***Sarah Palin's*** political action committee" (the "Palin Map") and Jared Loughner's 2011 shooting in Arizona, which resulted in the deaths of 6 people, including a nine-year-old girl, and severely wounded 13 others, including Representative Gabby Giffords.  In support of its bogus assertion about Mrs. Palin's link to Loughner, *The Times* also falsely stated that the Palin Map "put Ms. Giffords and 19 other Democrats under stylized cross hairs."  It did not.

*The Times'* defamatory statements in the Palin Article are demonstrably false assertions of fact "of and concerning" Mrs. Palin.  The statements identify "Sarah Palin" by name; they are (and actually were) reasonably understood to be about her.  The statements were *not* opinion (*The Times* does not even claim that they were); they did not speculate or hypothesize about a "possible" link between Mrs. Palin and Loughner's shooting.  Instead, *The Times* falsely attested that the link between Mrs. Palin and Loughner's shooting existed, was clear and direct, emanated from the Palin Map that placed crosshairs on individual lawmakers, and was evidence of "vicious politics" and "political incitement."  At the time of publication, *The Times* knew these statements about Mrs. Palin were false, but fabricated the link anyway because Mrs. Palin is a well-recognized target for politically-slanted attacks who "inflames passions to drive viewership

and Web clicks." (Complaint[1] ¶¶ 29-30, Ex. 4)  At bare minimum, *The Times* published the Palin Article despite the obvious falsity of its defamatory statements.

While professing to have made a simple "mistake," *The Times* asks this Court to dismiss Mrs. Palin's defamation claim *with prejudice*.  In support of this extraordinary request, *The Times* proposes that the Court accept its slanted-version of the facts as the only plausible explanation of its misconduct, relies on general propositions of law lacking any meaningful application to Mrs. Palin's well-pleaded allegations, and ignores virtually all of the salient facts in and inferences to be drawn from Mrs. Palin's Complaint.

Ultimately, Mrs. Palin has alleged more than sufficient facts to establish that *The Times* published demonstrably false statements of fact "of and concerning" her with actual malice and that, as a result, Mrs. Palin is entitled to recover damages that should include restitution.  The motion to dismiss should be denied.

## II.   MRS. PALIN PLEADED THE NECESSARY FACTS TO ESTABLISH A CLAIM

Factually, *The Times* attacks three elements of Mrs. Palin's defamation claim:  (1) "of and concerning;" (2) falsity; and (3) actual malice.  Although *The Times* acknowledges that *all* of the facts alleged in Mrs. Palin's Complaint and *all* reasonable inferences therefrom must be accepted as true,[2] it disregards a majority of those facts and inferences.  Instead, *The Times* filed, cites to and primarily relies upon extrinsic evidence that actually supports Mrs. Palin's claim and confirms the existence of fact issues which only a jury may decide.

Mrs. Palin has established that each of the elements of her claim is "plausible" on its face and that she is not asserting "a largely groundless claim."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

---

[1]  The Complaint is hereinafter cited as "Comp."
[2]   *Biro v. Condé Nast*, 963 F.Supp.2d 255, 264 (S.D.N.Y. 2013) ("the Court accepts the complaint's factual allegations as true and draws inferences only in plaintiff's favor.")

(2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558-59 (2007) ("Twombly").  "Plausible"

means that the plaintiff has alleged "factual content that allows the Court to draw the reasonable

inference that the defendant is liable for the misconduct alleged" and "enough facts to raise a

reasonable expectation that discovery will reveal evidence of actual malice."  *Biro v. Condé

Nast*, 807 F.3d 541, 544 & 546 (2d Cir. 2015) (*quoting Iqbal*, 556 U.S. at 678 and *Twombly*, 550

U.S. at 556).  Mrs. Palin's allegations meet this standard.

## A.   The False and Defamatory Article

On June 14, 2017, *The Times'* entire Editorial Board[3] authored the Palin Article, which

falsely stated that a "direct" and "clear" link existed between the Palin Map circulated by "Sarah

Palin's political action committee" and Jared Loughner's January 8, 2011 shooting rampage (the

"Palin Link").  (Comp. ¶¶ 1, Ex. 1-2)  *The Times* told millions of people that the Palin Link was

established, evidence of "vicious politics" and a sign of the "political incitement" of Loughner's

horrific criminal acts.  (Id.)

The Palin Article was prominently placed in print and promoted to 39 million people on

Twitter.  (Comp. ¶ 78, Ex. 16)  In the article, *The Times* exploited Sarah Palin's name and status

as a paragon of Conservative politics by fabricating the Palin Link; doing so served *The Times*'

purpose of contrasting initial reports about the possibility that Democratic politics motivated

James Hodgkinson[4] to launch a sniper-style attack on June 14, 2017, against Republican

---

[3] According to its NYTimes.com Web page, The Editorial Board is comprised of 16 journalists with wide-ranging areas of expertise and decades of work in journalism.  Their primary responsibility is to write *The Times'* editorials, which represent the voice of the board, its editor and the publisher.  (*See* Vogt Declaration ("Vogt Dec.") **Ex. A**).

[4]  *The Times* described Hodgkinson as a "Bernie Sanders supporter and campaign volunteer virulently opposed to President Trump" who's "derangement has found its fuel in politics" (Comp. Ex. 1).

lawmakers practicing for the annual charity Congressional Baseball Game at a field in Virginia. (Comp. ¶¶ 1, 2, 3, 28, 29, 30, 35, 37)

The Palin Article identifies Sarah Palin as the linchpin of a non-existent "pattern" of politically motivated shootings that consisted of two events: the Loughner shooting and the Hodgkinson[5] shooting. The title of the Palin Article, "*America's Lethal[6] Politics*," makes no reference to what *The Times* claims in this lawsuit is its main thesis: gun control. (Memo.[7] p. 4) The pull-quote[8] in the printed version of the Palin Article reads, "A sickening pattern emerges in the assault on members of Congress at a ball field." (Comp. Ex. 2) The "sickeningly familiar pattern" that *The Times* claimed to be emerging in the wake of Hodgkinson's shooting identified Sarah Palin as the only established factual example of a link between "political incitement" and a mass shooting.

## B.   The Palin Article Was "Of and Concerning" Mrs. Palin

The "of and concerning" requirement of a defamation claim generally is an issue of fact which the jury alone may decide, although the Court properly may dismiss an action pursuant to Rule 12(b)(6) where the operative statements "are **incapable** of supporting a jury's finding that the allegedly libelous statements refer to plaintiff." *Church of Scientology Int'l v. Time Warner, Inc.,* 806 F. Supp. 1157, 1159–60 (S.D.N.Y. 1992) (emphasis added). The question for the Court

---

[5] Despite including Hodgkinson as the only other part of this "pattern," *The Times* issued a "Fact Check" directed at "Partisans" for **falsely blaming** Democrats for Hodgkinson's shooting (Comp. ¶ 4, Ex. 3), thus demonstrating the fabrication of that part of the "pattern."

[6]   "Lethal" means "of, relating to, or causing death; deadly; fatal." *See* Dictionary.com Unabridged. Random House, Inc. www.dictionary.com/browse/lethal

[7] *The Times'* Memorandum of Law in Support of Motion to Dismiss the Complaint [Doc. 25] is cited herein as "Memo."

[8]   A "pull-quote" is "(in a magazine or newspaper) an excerpted line or phrase, in a larger or display typeface, run at the top of a page or in a mid-column box to draw attention to the text of the article or story from which it is quoted; blurb." *See* Dictionary.com Unabridged. Random House, Inc. www.dictionarycom/browse/pull-quote

is whether the complaint alleges facts sufficient to demonstrate a ***reasonable connection*** between the plaintiff and the alleged defamatory statement. *Cardone v. Empire Blue Cross and Blue Shield*, 884 F. Supp. 838, 847 (S.D.N.Y. 1995). Where the defamatory statements at issue are "reasonably susceptible" to being "of and concerning" the plaintiff, the issue should be left to the jury. *La Luna Ent., Inc. v. CBS Corp.*, 74 F.Supp.2d 384, 390 (S.D.N.Y. 1999); *Harwood Pharmaceutical Co. v. National Broadcasting Co.*, 9 N.Y.2d 460, 462 (1961) (statements susceptible to more than one reasonable interpretation should not be decided as a matter of law; jury should determine whether statement referred to the plaintiff). The plaintiff's burden is to plead sufficient facts to show that the defamatory statement "designates the plaintiff in such a way as to let those who know [her] understand that [she] is the person meant." *Fetler v. Houghton Mifflin Co.*, 364 F.2d 650, 651 (2d Cir. 1966); *Horton v. Guillot*, No. 14-CV-1050, 2015 U.S. Dist. LEXIS 25134, at *7 (N.D.N.Y. Mar. 2, 2015); *see also, Elias v. Rolling Stone, LLC*, 192 F.Supp.3d 383, 392 (S.D.N.Y. 2016) (determining whether "of and concerning" is sufficiently pleaded is based on whether those who know the plaintiff, upon reading the statements, would understand that the plaintiff was the target of the allegedly libelous statement); *Dalbec v. Gentlemen's Companion, Inc.*, 828 F.2d 921, 925 (2d Cir. 1987); *Peck v. Tribune Co.*, 214 U.S. 185, 188-90 (1909) (it suffices that the statements at issue lead the listener to conclude that the speaker is referring to the plaintiff by description, even if the plaintiff is never named or is misnamed); *Croixland Props. Ltd. Pshp. v. Corcoran*, 174 F.3d 213, 216 (D.C. 1999). The content of the entire publication, its tone and apparent purpose must be examined to determine whether a reasonable person would consider it as conveying facts about the plaintiff. *Sachs v. Matano*, 22 N.Y.S.3d 310, 312 (Sup. Ct. Nassau Cty. 2015).

Over the five pages of its argument addressing the "of and concerning" issue, *The Times* does not address the entirety of the context of the Palin Article, nor mention the title of the Palin Article. Instead, it strips out one sentence from the article and then cites to a technical definition of a PAC and other extrinsic evidence[9] to support the argument that Mrs. Palin and her political action committee must be "alter egos" in order for her to state a claim (without citation to any authority to support that assertion). (Memo. p. 7-8) That is not the controlling inquiry. The test is whether the defamatory statement is capable of supporting a jury's finding that, upon reading the statement, those who know the plaintiff would understand that she was the target of the libelous statements. *Elias*, 192 F.Supp.3d at 392.

Evaluating *The Times'* statements in context, the reference to Mrs. Palin's political activities through "Sarah Palin's political action committee" in an article entitled "*America's Lethal Politics*," which makes no reference to "SarahPAC" by its name, and identifies the Palin Map and Palin Link as its evidence of "vicious American politics," is reasonably susceptible to being understood by those who know Mrs. Palin as being about her. The Palin Article makes the explicit reference to "**Sarah Palin**" by name (*not* to her PAC by its name, "SarahPAC").[10] *The Times* recognizes that Mrs. Palin engaged in political activities associated with the Palin Map and refers to Mrs. Palin and *her* PAC as "eponymous." Importantly, *The Times* notes[11] that the word "circulated" in the Palin Article is hyperlinked[12] to another article that attributes the Palin

---

[9] It has long been the rule that extrinsic evidence is admissible to buttress the claim that the defamation is "of and concerning" the plaintiff, and the fact that resort to such evidence may be necessary does not defeat the claim. *Brayton v. Crowell-Collier Publishing Co.*, 205 F.2d 644, 645 (2d Cir. 1953); *Naantaanbuu v. Abernathy*, 746 F.Supp. 378, 381 (S.D.N.Y. 1990).

[10] *See* Memo. p. 8; Brown Declaration Ex. A-B.

[11] *See* Memo. FN 5.

[12] There are cases holding that linking back to another article or including a "web grab" in a publication can be considered and support the conclusion that a reasonable person would believe that a statement was of and concerning the plaintiff. *Gelencser v. Orange County Publ'n. Div. of*

Map to Mrs. Palin (not her PAC) in its title, "*Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate*," (emphasis added) in which appears a prominently placed photo of Mrs. Palin (the "ABC Article").[13]   The ABC Article proves Mrs. Palin's point:  Sarah Palin is synonymous with *her* PAC–certainly as it relates to the Palin Map and Palin Link.  So too does *The Times'* use of Sarah Palin and Sarah Palin's PAC interchangeably: another June 14, 2017 *Times'* article addressing the Hodgkinson shooting states, "*Sarah Palin*… drew sharp criticism for having posted a graphic online that showed crosshairs over the districts of several members of Congress… " (Comp. ¶ 42, Ex. 6)

Even if the explicit reference to Sarah Palin by name in association with her PAC within the full context of the Palin Article (including the ABC Article hyperlink) were not enough, additional evidence alleged in the Complaint supports the conclusion that *The Times'* false statements are "of and concerning" Sarah Palin.  Numerous reader comments within Exhibit 3[14] of the Complaint demonstrate that the Palin Article was understood to be of and concerning Mrs. Palin.  While not conclusive evidence, these statements do show that Mrs. Palin's claim is *plausible*.  At a minimum, *The Times* asked the Court to take judicial notice of other articles,

---

*Ottaway Newspapers*, 116 A.D.2d 696 (1986); *Franklin Prescriptions, Inc. v. The New York Times Co.*, 267 F.Supp.2d 425, 435 (E.D. Pa. June 19, 2003).

[13]  A plaintiff can fulfill the "of and concerning" requirement by showing the use of her photo in connection with a defamatory publication.  *Wandt v. Hearst's Chicago American*, 109 N.W. 70, 71 (Wis. 1906); *Holmes v. Curtis Pub. Co.*, 303 F.Supp. 522, 523 (D.S.C. 1969); *Wallace v. Media News Group, Inc.*, 568 Fed.Appx. 121, 125 (3d Cir. 2014).

[14]  Exhibit 3 of the Complaint is The Times' "Fact Check" Tweet about Partisans blaming Democrats for Hodgkinson's shooting.  A highlighted version of that exhibit filed in connection herewith identifies the relevant reader comments.  (Vogt Dec. Ex. B)  These comments include, among others: "*Your paper blamed 2011 Giffords shooting on **Sarah Palin**…*"; "*Yesterday NY Times blamed Giffords shooting on **Sarah Palin***"; "*and the times blamed **Sarah Palin** for Giffords*"; "*Partisans on your editorial board falsely blamed **Sarah Palin** yesterday*"; and "*Fact Check: Partisan NYT falsely blamed **Sarah Palin** for the Gabby Giffords shooting yet again.*"

cited in footnote 4 of its brief, which also demonstrate that references to the Palin Map are understood to be "of and concerning" Mrs. Palin:

> 4 *See, e.g.*, Dan Balz, "Cross hairs: Crossroads for ***Palin?***", Wash. Post (Jan. 11, 2011) at A.9 (noting that issue of whether ***Palin*** "was partly to blame" became the top question on Facebook after shooting); Dana Milbank, "A McKinley moment?" Wash. Post (Jan. 11, 2011) at A.21 (opining that heat ***on Palin*** for "recklessly playing with violent images" was well deserved).

(Memo. p. 4) (emphasis added).   *The Times* also asked the Court to take judicial notice of and consider the Palin Map,[15] which includes the following graphic at the bottom:



This graphic on the Palin Map asking supporters to "Join Me Today" followed by Mrs. Palin's signature highlights her direct connection to and association with her PAC and the Palin Map.

In short, the statement "Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs" is capable of being understood—and was ***actually*** understood—as being about and referring to Mrs. Palin.[16]

The cases and legal principles associated with corporate or "group"[17] defamation cited by *The Times* are inapplicable.[18]   *The Times* relies heavily upon selective quotes from *Jankovic* to

---

[15]   *See* Memo. p. 1, Brown Declaration Ex. C-D.

[16]   Mrs. Palin believes the "of and concerning" element is sufficiently pleaded.  However, if the Court agrees with *The Times'* assertion that additional factual allegations about Mrs. Palin's specific role in her PAC need to be alleged (Memo. p. 8-9), Mrs. Palin respectfully requests leave to amend to do so.

[17]   Significantly, all of the groups or entities in the cases cited by *The Times* were large.  For example, the group at issue in *Jankovic* was alleged in the operative pleading to be "a global enterprise with sales through separate companies based in more than fifty countries on five continents… with a network of more than 2500 regular employees, 100,000 sales consultants,

support the sweeping proposition that defamatory words directed at a corporation or other entity never give rise to a claim by the individuals associated with it.  (Memo. p. 9)  However, *The Times* omitted the following qualifying language from the end of the passage it quoted:

> This principle is not absolute, of course.  If, for example, one person is solely in charge of corporate decision making, an attack on a corporation would vicariously attack the decision maker.

*Id.* at 1089 (quotation omitted).  Here, the Palin Map was circulated by Sarah Palin's eponymous PAC and contains her signature next to the phrase "Join Me Today" at sarahpac.com.

This case is an example of defamation that *Jankovic* recognizes as actionable:  "When a statement refers to a group, a member of that group may claim defamation if the group's size or other circumstances are such that a reasonable listener could conclude the statement referred to each member or 'solely or especially' to the plaintiff."  494 F.3d at 1090-91 (citations omitted).[19] The *Peagler v. Phoenix Newspapers, Inc.* case is illustrative.  There, the publication at issue referred to the company Dodge City Motors, Inc. as "Peagler's Dodge City."  114 Ariz. 309, 316 (1977).  The court concluded that the defamatory statements were of and concerning Mr. Peagler individually because "he was so connected in the article with the business practices of the automobile agency that even the most discriminating reader would not likely distinguish between the practices of the corporation and Peagler."  *Id.* (citing *Restatement of Torts § 563*).

---

eight-nine shops, and more than fifty pavilions located in major cities throughout the world." *Jankovic v. Int'l Crisis* Group, 494 F.3d 1080, 1089 (D.C.C. 2007).

[18] In *Cardone, supra* and Gilman *v. Spitzer*, 538 Fed.Appx. 45 (2d Cir. 2013), the plaintiffs were not identified by name in the operative publications, which also contained language exempting the plaintiffs from the defamatory statements about the groups with which the plaintiffs claimed affiliation.  In *Fulani v. N.Y. Times Co.*, 260 A.D.2d 215, 216 (1st Dep't. 1999), the allegedly defamatory statement did not attribute any specific conduct to the plaintiff, but merely described her as being part "of" a group that "act[ed] like a cult," and "did not in any manner distinguish[] [her] from any other members of that group."

[19] *See also*, *Gross v. Cantor*, 270 N.Y. 93, 96 (1936)(quotation omitted) ("But if the words may by any reasonable application, import a charge against several individuals, under some general description or general name, the plaintiff has the right to go to trial, and it is for the jury to decide, whether the charge has the personal application averred by the plaintiff.").

*The Times'* own article, the ABC Article, other publications and *The Times'* readers demonstrate that Sarah Palin's PAC and Sarah Palin are synonymous.  Surely, it is plausible that *The Times'* statements are sufficient to demonstrate a reasonable connection between Mrs. Palin and the defamatory statements.

## C.   *The Times'* Defamatory Statements are Substantially Untrue

*The Times'* argument that its defamatory statements are not "provably false" is factually misleading and legally unsupported.  *The Times* admitted—twice—that it made "an error of fact" when it defamed Mrs. Palin.  *The Times* cannot erase that reality through creative lawyering.

The standard of pleading and proof for the "falsity" element of a defamation claim is whether the statement "was false, meaning substantially untrue."  *Celle v. Fillipino Reporter Ent. Inc.*, 209 F.3d 163, 182 (2d Cir. 2000) (*citing* New York Pattern Jury Instructions PJI 3:34, at 276).  The accuracy of the statement must be assessed on the publication as a whole, including evaluation of the headline.  *See Von Gerichten v. Long Island Advance*, 202 A.D.2d 495, 496 (2d Dep't. 1994); *Law Firm of Daniel P. Foster, P.C. v Turner Broadcasting Sys., Inc.*, 844 F.2d 955, 959 (2d Cir. 1988).  The language must be given a "fair reading,…  not read in isolation, but must be perused as the average reader would against the whole apparent scope and intent of the writing."  *Celle,* 209 F.3d at 177 (quotation omitted).  "The words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed."  *Id.* (quotation omitted)

Despite these well-recognized standards, *The Times* again ignores the entire context of its article and the plain meaning of the defamatory statements about Mrs. Palin; this time so it can pigeonhole the statements into the argument that "motive or state of mind" can never be proven.  This argument ignores the plain meaning of what *The Times* actually said, the context in which it

was said, and *The Times'* own admissions that it made an "error of fact" and "got an important fact wrong."

      1.     <u>***The Times* Admitted That It Made Errors of Fact**</u>

The contention that *The Times'* statements about Mrs. Palin cannot be proven to be substantially untrue is irreconcilable with *The Times'* real-time admissions of the falsity of its publication.  *The Times* confirmed in a statement to CNN through spokesperson, James Bennet, *The Times'* Editorial page editor and head of the Editorial Board, that "We made an ***error of fact*** in the editorial …"  (Emphasis added).  (Comp. ¶ 64)  This admission followed an NYT Opinion Tweet which stated "***We got an important fact wrong, incorrectly linking political incitement and the 2011 shooting of Giffords.  No link was ever established.***"  (Comp. ¶ 58) (emphasis added)  A "fact" is "something that actually exists; reality; truth."[20]

The admitted error of "fact" which *The Times* made in its statements about Mrs. Palin cannot be re-characterized in hindsight as an opinion, nor generalized as a statement about Loughner's mental state, just so that *The Times* can make a revisionist legal argument.  On this basis alone, *The Times'* argument concerning the demonstrable falsity of its defamatory statements should fail.

      2.     <u>**The Statements are Substantially Untrue**</u>

*The Times'* argument that the defamatory meaning of its statements is incapable of being proven substantially untrue also fails because it ignores the plain language of what *The Times* actually said.  *The Times* stated that a "direct" and "clear" link existed between Sarah Palin's map and Loughner's shooting.  *The Times* identified this ***fact*** as "evidence" of "violent American politics" and a "sign" of "political incitement."  *The Times* also stated as a matter of fact that the

---

[20]  *See* Dictionary.com Unabridged.  Random House, Inc.  www.dictionary.com/browse/fact

Palin Map put crosshairs over individual lawmakers, including Giffords; a verifiably false assertion (which *The Times* completely ignores).

*The Times* now claims that these **facts** which it presented as true in the Palin Article are "not capable of being proven true or false" and that the entire editorial is "speculative," blatantly contradicting its real-time admissions and its use of the words "clear" and "direct" to describe **the link** it told millions of people had been established. The sleight of hand *The Times* uses to make this argument is to conflate the concept of Loughner's "motive" with *The Times'* unqualified factual assertion that the Palin Link had been "clearly" and "directly" established and was evidence of political incitement. The statement that a clear and direct link exists is factual.

The cases cited by *The Times* are distinguishable because they involve situations where a publication expressed an *opinion*[21] (which *The Times* is not claiming here). None of those cases involve the publication of an assertion of fact that there was an established link between the plaintiff and another person's commission of a crime. The primary case cited by *The Times*, *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993), makes this distinction clear.[22] The statements in the book at issue in *Haynes* were specifically represented as "conjecture" and

---

[21]  *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1438 (8th Cir. 1989) (opinion about perjury and failure to investigate crouched as "possibilities and likelihoods"); *Gacek v. Owens & Minor Dist., Inc.*, 666 F.3d 1142, 1147 (8th Cir. 2012) ("theory" and "surmise" that fellow-employee's complaint "pushed [man] over the edge" and was "final straw" before suicide); *Yohe v. Nugent*, 321 F.3d 35, 41 (1st Cir. 2003) (Police Chief's "belief [plaintiff] was suicidal "according to witness statements" was opinion); *Rappaport v. VV Publ. Corp.*, 618 N.Y.S.2d 746 (Sup. Ct. N.Y. Cty. 1994) (opinion regarding fitness for judicial office based on assignment of cases); *Immuno AG v. Moor-Jankowski*, 74 N.Y.2d 548, 558-59 (1989) (letter to editor voicing partisan groups concerns about animal testing in highly specialized scientific journal), *adhered to on remand*, 77 N.Y.2d 235, 255 (1991) (it was plain to reasonable reader of scientific journal that letter was "voicing no more than a highly partisan point of view.").

[22]  *Haynes* notes that "A statement of fact is not shielded from an action for defamation by being prefaced with the words "in my opinion," but if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Id.*

characterized as "speculation" because the author "drew a natural although not inevitable inference… did not pretend to have the inside dope… [and]… [did not] claim insight, nor information the plaintiff might be able to prove false in trial."  *Id.*

Here, in contrast, *The Times* asserted the existence of objectively verifiable facts that Mrs. Palin has alleged and can prove (including through *The Times'* own admissions) were never were established and, therefore, were not evidence or a sign that Loughner's crime was incited by the Palin Link.  Equally, the falsity of *The Times'* statements about the Palin Map targeting individual lawmakers can be verified by the map itself.

*The Times* did not present its statements about Mrs. Palin as conjecture, speculation or opinion.  *The Times'* does not contend that its defamatory statements are protected opinion— presumably because of *The Times'* "error of fact" admissions.  And even if *The Times* had tried to argue that its statements about "political incitement" were protected opinions,[23] they still would be actionable because statements of opinion based on undisclosed facts are not protected. *See e.g. Breen v. Leonard*, 198 A.D.2d 392 (2d Dep't. 1993); *Ocean State Seafood, Inc. v. Capital Newspaper, Div. of Hearst Corp.*, 492 N.Y.S.2d 175 (3d Dep't. 1985).

Another case involving *The Times* is more akin to the facts presented here.  In *Darby v. The New York Times Co.,* No. 07-12-00193-CV, 2014 WL 818614 (Tex. App. Feb. 26, 2014), the court concluded that *The Times'* statement in an article that an FBI informant "encouraged" a plot by two political activists to make firebombs and hurl them at police cars at a political convention "was not speaking of unverifiable fact or proffering vague rhetoric."  That court

---

[23]  The appearance of the Palin Article in the Editorial Section is not dispositive.  *Martin v. Daily News L.P.*, 990 N.Y.S.2d 473, 480 (1st Dep't. 2014); *see also Kerwick v. Orange County Publ'n. Div. of Ottaway Newspapers, Inc.*, 53 N.Y.2d 625, 626, 627 (1981).

recognized that even "[o]pinions may be actionable if they imply false statements of objective fact."  *Id.* at *3. (citation omitted)

**D.**      **Mrs. Palin Has Alleged Actual Malice**

*The Times'* next contention is that Mrs. Palin has not and cannot allege "actual malice." *The Times* predicates this argument upon the misguided notion that its "swift" corrections to the Palin Article and the existence of other stories contradicting the defamatory statements about Mrs. Palin demonstrate that the "only plausible inference a reasonable person might draw" is that *The Times* made a simple mistake.  (Memo. p. 13)  That is incorrect.

It is equally (if not more) plausible that the Editorial Board knew that its statements about Mrs. Palin were false, but published them anyway because the board does not like Mrs. Palin or her political views and needed to use her and those views to mount a counterattack against "Conservatives and right-wing media… demand[ing] forceful condemnation of hate speech and crimes by anti-Trump liberals" following Hodgkinson's shooting.  (Comp. Ex. 1, p. 2)  This holds particularly true given that *The Times'* Opinion Department acknowledged that such an attack on Mrs. Palin inflames passions that drive website traffic.

*The Times* made a very serious charge against Mrs. Palin.  The severity of that charge, combined with the other evidence of actual malice set forth below, demonstrates the implausibility of *The Times'* suggestion that all of its Editorial Board members had no idea that the facts in the Palin Article were false—even more so given that they hyperlinked the ABC Article and also knew about other *Times'* articles (including some in the Editorial section for which the Editorial Board is responsible)[24] confirming that no link existed.  *The Times'*

---

[24]    It is reasonable to infer that the Editorial Board was aware of articles published in the Editorial section.

profession of a simple mistake is not just implausible, it is incapable of supporting a reasonable and rational finding that it is true.

"Actual malice can be proven, of course, by direct evidence. More often, however, actual malice is inferred through circumstantial evidence." *Biro v. Condé Nast*, 963 F.Supp.3d 255, 277 (S.D.N.Y. 2013). Actual malice can be inferred at the pleadings stage from allegations that refer "to the nature and circumstances of the alleged defamation or previous dealings with the defendant." *Biro*, 807 F.3d at 546. Courts have noted various circumstances that may be probative of actual malice, including where: a story was fabricated; the defendant's allegations are so inherently improbable that only a reckless person would have published; obvious reasons to doubt the veracity; motive for defaming plaintiff; defendant knows or suspects it made an error and refuses to acknowledge; and the words or acts of defendant before, at, or after the publication indicate defendant knew its statement was or may well have been false. *Biro,* 963 F.Supp.3d at 277-78. Whether actual malice can plausibly be inferred will depend on the facts and circumstances of each case. *Biro*, 807 F.3d at 545. Mrs. Palin's Complaint is replete with factual allegations about the context of the defamatory publication and the predicate facts from which to infer "actual malice," all of which should be considered in the aggregate. *Tavoulareas v. Piro*, 817 F.2d 762, 794 (D.C. Cir. 1987); *Bolden v. Morgan Stanley & Co., Inc.*, 765 F.Supp. 830, 834 (S.D.N.Y. 1991).

## 1.     The Context of the Palin Attack

Members of the media, including *The Times*,[25] perceive Mrs. Palin as a convenient target for attacks against Conservative policies and a subject likely to spark readership interest.

---

[25] *The Times* recognized this phenomenon in Charles M. Blow's December 3, 2010 column "*She Who Must Not Be Named,*" which states: "*Yet the left continues to elevate her every utterance so that they can mock and deride her…Yes, she's about as sharp as a wet balloon, but we already*

(Comp. ¶ 28)   Thus, in the Palin Article, *The Times* used Mrs. Palin as the traffic-driving Conservative archetype for vicious politics to countervail early supposition that Democratic political rhetoric[26] was to blame for Hodgkinson's attack on Republican lawmakers, as well as to counter the resulting outcry from "Conservatives and right-wing media" against liberal hate speech.   At a minimum, *The Times'* decision to use Mrs. Palin as the proverbial patsy supports an inference that *The Times* was blinded to the obvious falsity of its claims about her.

The facts pleaded by Mrs. Palin go much farther than mere "ulterior motive" or "profit motive," as suggested by *The Times*.   (Memo. p. 18-19)   Her allegations demonstrate a specifically identified intent to fabricate facts about Mrs. Palin to fit a false narrative or, alternatively, a purposeful avoidance of the truth because she is a reviled[27] and easy target for attacks against Conservative policies who inflames passions and drive Web traffic.   *Biro*, 963 F.Supp.2d at 277-78 (relationship of the parties can be relevant to determination of actual malice).

### 2. *The Times* Fabricated the Defamatory Statements

A plaintiff can satisfy the actual malice standard by alleging that a story was fabricated by the defendant.   *St. Armant v. Thompson*, 390 U.S. 727, 732 (1968) ("professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant…); *Biro*, 807 F.3d at 545.   Fabrication can be established where "the defendant

---

know that. How much more time and energy must be devoted to dissecting that?  How is this constructive, or even instructive at this point?  **What purpose does it serve other than inflaming passions to drive viewership and Web clicks?"**  (emphasis added) (Comp. ¶ 29-30)

[26] This Democratic rhetoric is described in Exhibit 7 (p. 3) of the Complaint (Kathy Griffin and a bloodied decapitated Trump and Trump as Shakespeare's murdered Caesar in Central Park).

[27]   "Evidence of ill will combined with other circumstantial evidence indicating that the defendant acted with reckless disregard of the truth or falsity of a defamatory statement may support a finding of actual malice."  *Celle*, 209 F.3d at 183 (citations omitted).

*provides no source* for the allegedly defamatory statements or if the purported source denies giving the information." *Id.* (emphasis added)

Mrs. Palin alleges that *The Times* fabricated its statements and cited no sources establishing Mrs. Palin's clear and direct link to Loughner's shooting.  (Comp. ¶ 67)  Mrs. Palin further alleges that *The Times* and its Editorial Board had actual knowledge of facts that established that there was no link between Mrs. Palin and Loughner's crime—the Editorial Board and staff followed Loughner's highly-publicized criminal case[28] and the facts it revealed; the paper reported regularly about the case.  (Comp. ¶ 47)  The absence of any source or supporting evidence, coupled with *The Times'* knowledge of the facts and records surrounding Loughner's case plausibly establishes that *The Times* fabricated its statements.

### 3. *The Times* Also Had Reason to Doubt the Truth of Its Statements

Actual malice also is established, despite professions of good faith, when a story is the "product of [ ] imagination … so inherently improbable that only a reckless man would have put [it] in circulation … [and] … where there are obvious reasons to doubt the veracity" of the source of the story.  *St. Amant*, 390 U.S. at 732.  At bare minimum, *The Times* had reason to doubt the truth of its statements about Mrs. Palin and the Palin Map.  Its own articles[29] at the

---

[28]  Loughner's criminal proceedings failed to unearth any evidence that Loughner's actions were politically motivated, let alone incited by Mrs. Palin or the Palin Map.  (Comp. ¶ 47)  There is no evidence to suggest that Loughner ever saw the map of targeted electoral districts that the Palin Article references.  (Id.)

[29]  "*Shooting Is Latest Eruption in a Grim Ritual of Rage and Blame*" ("**no connection to the crime was established**.") (Comp. ¶ 42, Ex. 6); "'*The Indigenous American Berserk' Strikes Again*" (Comp. ¶ 43, Ex. 7); "*Rhetoric and Bullets*" (Comp. ¶ 44, Ex. 8); "*The Tucson Witch Hunt*" (" **there was no evidence then, and even now, that overheated rhetoric from the right had anything to do with the shooting**")(Comp. ¶ 45, Ex. 9); and "*Looking Behind the Mug-Shot Grin*" (no direct or clear link between political rhetoric and Loughner's actions could be claimed) (Comp. ¶ 46, Ex. 10).

time of Loughner's shooting and when the Palin Article was published help establish this ultimate fact.

Here, *The Times'* argument employs a tortured reading of *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ("*Sullivan*"), selectively quoting an excerpt from the case while ignoring the distinguishable factual scenario.  (Memo. p. 14-15)  The omitted portion of the quoted passage explains why, in *Sullivan*, the failure to check the accuracy of an advertisement against news stories in *The Times'* own files was insufficient to establish actual malice:

> With respect to the failure of those persons to make the check, the record shows that they relied upon their knowledge of the good reputation of many of those whose names were listed as sponsors of the advertisement, and upon a letter from A. Phillip Randolph, known to them as a responsible individual, certifying that the use of the names was authorized.  There was testimony that the persons handling the advertisement saw nothing in it that would render it unacceptable under The Times' policy of rejecting advertisements containing 'attacks of a personal character'; their failure to reject on this ground was not unreasonable.

376 U.S. at 287.

Mrs. Palin has alleged the opposite—that no sources were relied upon (let alone responsible ones), and that the Editorial Board (not the advertising department) failed to check articles (including those published by its own Editorial section) that were easily obtainable online[30] (as opposed to a manual search necessary in 1964, when *Sullivan* was decided).  Worse, *The Times* hyperlinked the ABC Article[31] which, unlike *Sullivan*, gave *The Times* obvious reason to doubt the veracity of its charges against Mrs. Palin.  Here, there is considerably more reason

---

[30]   A query for "Jared Lee Loughner" on *The Times'* website quickly compiles 136 articles. (Vogt Dec. Ex. E)

[31]   Notably, the ABC Article was published in January 2011 – which does not support *The Times'* assertion that the hyperlink to the ABC Article recognizing the absence of a "link" over seven years ago somehow absolves *The Times* from liability.  It does, however, demonstrate that the Editorial Board had even more reason to doubt the validity of its June 14, 2017 factual assertions.

beyond the "mere presence of the stories in the files" to establish that *The Times* knew that its statements about Mrs. Palin were false.  Certainly, *The Times* failed to investigate[32] in the face of known facts calling into doubt the truth of its charges against Mrs. Palin.

Mrs. Palin pleaded actual knowledge and recklessness based not only on *The Times'* own articles, but also upon her allegations that the Editorial Board followed Loughner's criminal case closely and compiled research about Loughner's case.  (Compl. ¶¶ 46, 67)  *The Times* also had a copy of the Palin Map—a cursory review of which would have demonstrated that crosshairs were not placed over individual lawmakers.  These facts combined with the rest of the facts Mrs. Palin alleges set forth a plausible claim and support a reasonable inference that *The Times* recklessly published the Palin Article with actual malice.

### 4. The Violation of *The Times'* Journalistic Standards

Further evidence that *The Times* acted with actual malice towards Mrs. Palin is the fact that the Editorial Board violated *The Times'* own policies and procedures.  The violation of standards of journalism is evidence of actual malice.  *Kerwick*, 53 N.Y.2d at 626.  In fact, such violations combined with an admission of the falsity of a statement in an editorial is sufficient to require a trial on actual malice — even when a retraction is made.  *Id.* at 627.  In *Kerwick*, the publisher claimed an honest mistake: "Reliance on memory rather than search of material, or organic research."  *Id.*  Nevertheless, the court concluded that a jury trial on actual malice was required.

---

[32] "Although a publisher does not have an absolute duty to investigate, a publisher cannot feign ignorance or profess good faith when there are clear indications present which bring into question the truth or falsity of defamatory statements."  *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 538 (7th Cir. 1982) (citations omitted) (prior articles were edited by the same person who reviewed the defamatory publication); *see also*, *Hunt v. Liberty Lobby*, 720 F.2d 631, 645 (11th Cir. 1983) ("an inference of actual malice can be drawn when a defendant publishes a defamatory statement that contradicts information known to him").

Mrs. Palin alleges that *The Times* violated its policies.[33]  Those policies require truthful reporting supported by fact-checking and testing the accuracy of information, compliance with which was non-existent.  *The Times'* policy violations, combined with the admitted falsity of the statements about Mrs. Palin and its own articles and research files contradicting its statements, set forth a plausible claim of actual malice.

### 5. *The Times'* Insufficient and Incomplete Retractions/Apology

*The Times'* spin on the facts giving rise to its insufficient "corrections" does not defeat Mrs. Palin's actual malice allegations.  In fact, no retraction—regardless of how "swift" or complete it may be—overcomes the necessity of a jury trial on actual malice.  *Kerwick*, 53 N.Y.2d at 627.  However, words and actions after publication can be relevant to actual malice.  *Biro*, 963 F.Supp.2d at 278.

*The Times'* assertion that it made its corrections in response to reader concerns and that it "promptly, fully and directly addressed each of the statements about which Mrs. Palin complains" contradicts Mrs. Palin's well-pleaded allegations.  At most, this raises fact issues.

Public backlash caused *The Times* to make edits and two woefully insufficient "corrections" to its fabricated story, along with half-hearted Twitter apologies—none of which sufficiently corrected the falsehoods that the paper published.  (Comp. ¶¶ 51-56)  Most notably, none of these corrections or apologies mentioned Mrs. Palin or acknowledged that there was no link between "Sarah Palin" and Loughner.  (*Id.*)  The fact that *The Times* did not issue a full and

---

[33] These policies include, among others: tell "the complete, unvarnished truth as best we can learn it, and that those who knowingly or recklessly provide false information for publication betray our fundamental pact with our readers;" "we observe… such rudimentary professional practices as the importance of checking facts…;" "test the accuracy of information from all sources and exercise care to avoid inadvertent error.  Deliberate distortion is never permissible;" and "Distinguish between advocacy and news reporting.  Analysis and commentary should be labeled and not misrepresent fact or context."  (Comp. ¶¶ 69-71)

fair retraction of its defamatory Palin Article, and did not issue a public apology to Mrs. Palin, is additional evidence of actual malice that should be considered.

Given that the entire premise of the Palin Article was the "pattern" of politically incited violence emanating from the Palin Link, which *The Times* conceded did not exist, the entire Palin Article should have been retracted – not minimally and inadequately corrected – and *The Times* should have apologized to Mrs. Palin. (Comp. ¶ 54) Incredibly, when *The Times* acknowledged that the Palin Article falsely stated that the Palin Map placed stylized cross hairs on Gabrielle Giffords and other lawmakers—*individually*—it referred only to "a" political action committee (not "Sarah Palin's political action committee"), thus demonstrating the paper's steadfast refusal to acknowledge that it had defamed Mrs. Palin. (Comp. ¶ 56)

Worse, in its print edition of *The New York Times*, *The Times* merely re-published at the bottom of its Editorial page the same two prior, inadequate online corrections. (Comp. ¶ 63) The printed corrections are completely ineffective because they were not made within the context of the entire article—thus making the reference to "a" political action committee rather than "Sarah Palin's political action committee" even more egregious than in the on-line corrections.

These facts support the inference that, in publishing the Palin Article and the way in which *The Times* handled it in the days following its publication, *The Times* put profit and politics above its self-professed principles. (Comp. ¶ 73)

E.     **The Special Circumstances Warranting Restitution Damages**

In addition to the defamation damages Mrs. Palin seeks, this case presents a unique factual scenario in which equitable principles should be applied to also permit the recovery of

restitution.  The cases cited by *The Times* merely demonstrate that the law has not caught up with the digital age in which modern defamation occurs.

Mrs. Palin alleges that *The Times* appreciates that in the increasingly competitive digital media landscape in which it finds itself, attacking Mrs. Palin brings an economic benefit to its business.  (Comp. ¶ 31)  In recent years, *The Times* has been transitioning from its celebrated past as a great American print newspaper to a subscription-first, mobile-first[34] news provider that is increasingly dependent upon click-based digital advertisements to generate revenue.  (Comp. ¶ 22)

*The Times* actively promoted the Palin Article on social media, including on its Twitter feed, which has over 38 million followers; as did *The Times'* Editorial Board, whose Twitter feed has nearly 600,000 followers.  (Comp. ¶ 78, Ex. 16)  The online version of the Palin Article included several advertisements, which generated revenue for *The Times*.  (Comp. ¶ 39, Ex. 5) *The Times* generates advertising revenue from banners, video, rich media and other interactive ads on its web and mobile platforms, such as those that accompanied the Palin Article.  (Comp. ¶ 40)

Accepting as true Mrs. Palin's allegations that *The Times* posted the Palin Article with actual malice and knowledge that stories attacking her "inflame passions to drive viewership and Web clicks," equitable principles should be applied to prevent *The Times* from retaining the ill-gotten benefits of its malicious attack.  Nearly a century ago, Justice Cardozo recognized that "the spoken word dissolves, but the written one abides and perpetrates the scandal."  *Ostrowe v. Lee*, 256 N.Y. 36, 39 (1931) (internal quotation and citation omitted).  The harm Justice Cardozo

---

[34]  As part of this transition, *The Times* and its Editorial department maintain their own social media accounts, such as Twitter and Facebook, on which they actively promote articles.  (Comp. ¶ 23)

recognized is even greater in the digital age, when publishers such as *The Times* instantaneously transmit and promote articles on the Internet and through mobile apps and social media to millions of people, securing advertising revenue as soon as web pages are viewed.  The realities of modern libel require remedies commensurate with the equities involved.

To be clear, Mrs. Palin seeks the equitable remedy of restitution, not "disgorgement."[35] "[D]isgorgement is a distinctly public-regarding remedy, available only to government entities seeking to enforce explicit statutory provisions."  *F.T.C. v. Bronson Partners, LLC*, 654 F.3d 359, 372 (2d Cir. 2011).  "[R]estitution" is a "unifying theory of private-law liability akin to tort or contract—a descriptor of a class of wrongs rather than of any particular remedy."  *Id.* at 370. "[C]ourts and commentators often use the term restitution as a metonym for the class of remedies particularly identified… [as sounding in] "unjust enrichment."  *Id.*  "[T]he rubric of restitution" embraces several historically distinct private law claims, some of which evolved at law and others of which evolved in equity."  *Id.* at 371 (citing *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).  A range of disparate rights and remedies can be explained in terms of the common objective of preventing unjust enrichment.  *Id.* at 370.

No cases, including those cited by *The Times*, have considered the concept of restitution within this framework as a means of redressing the wrongs occasioned by digital defamation.  In other situations involving non-physical violations of an individual's rights, however, the remedy is allowed.  Restitution is an available remedy in privacy cases and Lanham Act cases.  *See e.g. Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 576 (1977); *Bi-Rite Enterprises, Inc. v. Button Master*, 555 F.Supp. 1188, 1198 (S.D.N.Y. 1983), superseded by 578 F.Supp. 59

---

[35] Mrs. Palin recognizes her use of the term "disgorge" in Paragraph 84 of the Complaint, but clarifies herein that her intent is the seek restitution.  The labels affixed to disgorgement and restitution are often interchanged but, as set forth herein, mean different things.

(S.D.N.Y. 1983); *Restatement 3d of Unfair Competition* § 49.  An action based on invasion of privacy "may be said to resemble, in many respects, an action based on libel."  *Hart v. E.P. Dutton & Co.*, 93 N.Y.S.2d 871, 876 (Sup. Ct. Oneida Cty. 1949).

"The essential inquiry in any action for unjust enrichment or **restitution** is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered."  *Paramount Film Distrib. Co. v. State*, 30 N.Y.2d 415, 421 (1972) (citations omitted) (emphasis added).  This Court is familiar with the essential elements of restitution—all of which Mrs. Palin pleaded.[36]  This Court also has noted that the "equity and good conscience" element provides broad discretion.  *Liberty Life Ass. Co. v. Bahan*, No. 09 Civ. 4715(JSR), 2010 US Dist. LEXIS 87446, at *6 (S.D.N.Y. Aug. 20, 2010); *TPTCC N.Y., Inc. v. Radiation Therapy Servs. Inc.*, 784 F.Supp.2d 485, 502 (S.D.N.Y. 2011).

At the pleadings stage, Mrs. Palin has alleged sufficient facts to meet the *Twombly* standard and raise her right to restitution above a speculative level.  *Palmeri v. LG Electronics USA, Inc.*, C.A. No. 07-5706, 2008 WL 2945985, *5 (D.N.J. July 30, 2008) (applying New Jersey law).  Mrs. Palin has alleged that the defamatory and unnecessary use of her name in the Palin Article was occasioned with actual malice and knowledge that such use would "inflame passions to drive traffic," thereby conferring a benefit upon *The Times* in circumstances under which it would be inequitable for *The Times* to retain that benefit.  In this day and age, it is inconceivable that the law would allow an online publisher to retain the benefits of advertising adorning a defamatory article published with actual malice.  At minimum, permitting Mrs. Palin's restitution theory to proceed to the discovery phase to further develop the facts is not contrary to controlling law and does not run afoul of the First Amendment.

---

[36] Comp. ¶¶ 76-78, 84-85, 96.

The authorities cited by *The Times* do not apply to the unique facts of this case and the broad equitable reach of restitution.  The mere "absence of attempts to bring an action similar to the instant one" is not *ipso facto* proof that an action does not lie, which was the strained logic employed in *Hart*, 93 N.Y.S.2d at 879.  Moreover, the profits attributable to an entire book are distinguishable from advertising profits arising from one on-line defamatory article.  *Id*.  The *Ventura* case analyzed unjust enrichment under Minnesota law and only from a quasi-contract-based perspective.  *Ventura v Kyle,* 825 F.3d 876, 887 (8th Cir. 2016).  *Alharabi*  merely followed *Ventura's* logic.  *Alharabi v. The Blaze, Inc.,* 199 F.Supp.3d 334, 361 (D. Mass. 2016).  *Silvercorp.* involved diminution in value of stock and specifically noted that the plaintiff failed to allege the conferance of a benefit.  *Silvercorp Metals Inc. v. Anthion Management LLC,* No. 150374/2011, 2012 WL 3569952, *12 (Sup. Ct. N.Y. Cty. August 16, 2012).  Delaware has recognized that "disgorgement" is "theoretically" available in a defamation case, but  did not make sense in a case involving stock.  *Organovo Holdings, Inc. v. Dimitrov*, C.A. No. 10536-VCL, 2017 WL 2417917, *20 (Del. Jun. 5, 2017) (citing *Silvercorp.*)

Equity and good conscience support the viability of a restitution theory of recovery in this case.

### CONCLUSION

Based on the foregoing, Palin respectfully requests that the Motion to Dismiss be denied.

Dated: July 21, 2017.                                    Respectfully submitted,

*/s/ Shane B. Vogt*
Kenneth G. Turkel (admitted *pro hac vice*)
Email:  kturkel@bajocuva.com
Shane B. Vogt (admitted *pro hac vice*)
Email:  svogt@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602

Telephone:  (813) 443-2199
Facsimile: (813) 443-2193

S. Preston Ricardo
E-mail:  pricardo@golenbock.com
GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile: (212) 754-0330

*Attorneys for Plaintiff Sarah Palin*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Memorandum of Law in Opposition to Motion to Dismiss was filed electronically on the 21st day of July 2017.  This Memorandum of Law will be sent by operation of the Court's electronic filing system to counsel of record for all parties as indicated on the electronic filing receipt.  Parties and their counsel may access this filing through the Court's system.

/s/ Shane B. Vogt
Attorney