UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SARAH PALIN, an individual,<br><br>          Plaintiff,<br><br>– against –<br><br>THE NEW YORK TIMES COMPANY,<br>a New York corporation,<br><br>          Defendant. | No. 17 Civ. 4853<br><br>Hon. Jed S. Rakoff<br><br>ECF Case |

## PLAINTIFF'S MEMORANDUM OF LAW
## ON CONTEXT, INFERENCES AND PLAUSIBILITY

BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 443-2199
Facsimile: (813) 443-2193

and

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile: (212) 754-0330

*Attorneys for Plaintiff Sarah Palin*

## <u>TABLE OF CONTENTS</u>

Table of Authorities .................................................................................................. ii

I.     Context is King ................................................................................................ 1

II.    The Plausibility of Plaintiff's Allegations Controls....................................... 2

III.   Mrs. Palin Plausibly Alleges Actual Malice .................................................. 3

       1.     How and Why the Article Was Created.............................................. 4

       2.     *The Times'* Professions of an Honest Mistake Are Inconsequential.................... 9

       3.     Mrs. Palin Plausibly Alleged Fabrication and Recklessness ............................... 9

Conclusion ............................................................................................................. 10

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Airlie Foundation, Inc. v. Evening Star Newspaper Co.*, 337 F.Supp. 421
(D.D.C. 1972) ................................................................................................ 9

*Alioto v. Cowles Comm., Inc.*, 519 F.2d 777 (9th Cir. 1975), aff'd 623 F.2d
616 (9th Cir. 1980) ........................................................................................ 5

*Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985) ................................. 2

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012) .................... 2

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................... 1

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................. 1,3

*Biro v. Condé Nast*, 807 F.3d 541 (2d Cir. 2015) ........................................ 1

*Biro v. Condé Nast*, 963 F.Supp.3d  255 (S.D.N.Y. 2013) ............................ 1

*Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921 (2d Cir. 1987) ................... 7

*Francis v. Giacomelli*, 588 F.3d 186 (4th Cir. 2009) ................................. 1

*Franklin Prescriptions, Inc. v. New York Times Co.*, 267 F.Supp.2d 425
(E.D. Pa. 2003) .............................................................................................. 8

*Gertz v. Robert Welch, Inc.*, 680 F.2d 527 (7th Cir. 1982) ......................... 10

*Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969), *cert. denied,* 396
U.S. 1049 (1970) ........................................................................................... 9

*Green v. Northern Pub'g Co.*, 655 P.2d 736 (Alaska 1982) ....................... 8, 9

*Hansen v. Stoll*, 636 P.2d 1236 (Ariz. Ct. App. 1981) ................................. 9

*Harte-Hanks Comm., Inc. v. Connaughton*, 491 U.S. 657 (1989) .............. 10

*Herron v. King Broad. Co.*, 776 P.2d 98 (1989) .......................................... 8

*Hildebrant v. Meredith Corp.*, 63 F.Supp.3d 732 (E.D. Mich. 2014) ........... 8

*Hines v. City of Albany*, 542 F.Supp.2d 218 (N.D.N.Y. 2008) ..................... 2

*Hunt v. Liberty Lobby*, 720 F.2d 631 (11th Cir. 1983) .............................. 10

*Klayman v. Judicial Watch, Inc.*, 22 F.Supp.3d 1240 (S.D. Fla. 2014)........................................ 8

*Kregler v. City of New York*, 646 F.Supp. 2d 570 (S.D.N.Y. 2009)............................................. 2

*Kuhn v. Tribune-Republican Pub. Co.*, 637 P.2d 315 (Colo.1981) .............................................. 8

*Linn v. United Plant Guard Workers of America, Local 114*, 383 U.S. 53
  (1966)........................................................................................................................... 4

*McBeth v. Porges*, 171 F.Supp.3d 216 (S.D.N.Y. 2016) ........................................................... 2

*Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574
  (1986)........................................................................................................................... 2

*Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir. 2016) .................................................. 4

*Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984) ............................................. 2

*Pep v. Newsweek, Inc.*, 553 F.Supp. 1000 (S.D.N.Y. 1983)..................................................... 8

*Prozeralik v. Capital Cities Communs., Inc.*, 605 N.Y.S.2d 218 (1993).................................... 9

*Robertson v. McCloskey*, 666 F.Supp. 241 (D.D.C. 1987) ......................................................... 8

*Sharon v. Time, Inc.*, 599 F.Supp. 538 (S.D.N.Y. 1984) .......................................................... 5

*Sisemore v. U.S. News & World Report*, 662 F.Supp. 1529 (D. Alaska
  1987) ........................................................................................................................... 5

*St. Amant v. Thompson*, 390 U.S. 727 (1968)................................................................. 8, 9, 10

*Tatum v. The Dallas Morning News, Inc.*, 493 S.W.3d 646 (Tex. 2015) .................................... 5

*Theatre Enterprises, Inc. v. Paramount Film Dist. Corp.*, 346 U.S. 537
  (1954)........................................................................................................................... 2

*Tosti v. Ayik*, 476 N.E.2d 928 (Mass. 1984), aff'd 508 N.E.2d 1368
  (Mass. 1987) ............................................................................................................... 5

*Vandenburg v. Newsweek, Inc.*, 507 F.2d 1024 (5th Cir.1975)................................................. 8

*Vasquez v. O'Brien*, 85 A.D.2d 791 (3d Dep't 1981).............................................................. 7

## I.    Context is King

*Twombly*[1] and *Iqbal*[2] established a "plausibility" pleading standard that makes trial courts gatekeepers tasked with evaluating the viability of lawsuits based not on their merits, but on the adequacy of pleadings using a nebulous standard that asks whether sufficient "factual content [has been pleaded to] allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Guided only by the vague directives that plausibility is  more than a mere possibility and less than a probability and that a plaintiff must allege "enough facts to raise a reasonable expectation that discovery will reveal [the elements of the alleged claim]," trial courts must now decide whether plaintiffs should be deprived of their day in court based on "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[3]

This framework can be problematic when applied to the "actual malice" element of a defamation claim because that inquiry requires an evaluation of the subjective intent of the author of the publication.  Rarely, if ever, will a defamation plaintiff know before discovery exactly how and why a defamatory article was published.  For that very reason, circumstantial evidence and reasonable inferences are sufficient at the pleadings stage to establish the plausibility of a defamation plaintiff's claim.[4]

For purposes of a motion to dismiss, it is appropriate to consider certain additional information to evaluate the context of a publication, as long as it also is viewed in the light most favorable to the plaintiff, taking all inferences from it in her favor, and without weighing it or the credibility of any such evidence.  Trial courts are permitted to consider a limited universe of

---

[1] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).
[2] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).
[3] *Biro v. Condé Nast*, 807 F.3d 541, 544 & 546 (2d Cir. 2015) (*citing Iqbal*, 556 U.S. at 678 and *Twombly*, 550 U.S. at 556); *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).
[4] *Biro v. Condé Nast*, 963 F.Supp.3d  255, 277 (S.D.N.Y. 2013); *Biro*, 807 F.3d at 545-546.

documents and information extraneous to the Complaint to evaluate context.[5]   Moreover, in

situations where an informational inequity exists, trial courts have the authority to permit limited

plausibility discovery or, as was the case here, to conduct a plausibility hearing to assist the court

in its gatekeeping role.[6]

## II.    The Plausibility of Plaintiff's Allegations Controls

To present a plausible claim at the pleading stage, the plaintiff need not show that her

allegations are more likely than not true, nor must she rule out the plausibility of the defendant's

explanation of its conduct.[7]   "Because plausibility is a standard lower than probability, a given

set of actions may well be subject to diverging interpretations, each of which is plausible."[8]   The

choice between or among plausible inferences or scenarios is one for the fact finder.[9]

A court may not properly dismiss a complaint that states a plausible version of the events

merely because the court finds a different version more plausible.   Even if the truth of a

plaintiff's allegations seems doubtful, "Rule 12(b)(6) does not countenance ... dismissals based

---

[5] Specifically, courts may consider documents incorporated by reference in the Complaint, any documents the plaintiff has in her possession or had knowledge of and upon which she relied in bringing suit, facts of which judicial notice may be taken, and documents the authenticity of which are not disputed by the parties.  *McBeth v. Porges,* 171 F.Supp.3d 216, 221 (S.D.N.Y. 2016).

[6] *Hines v. City of Albany*, 542 F.Supp.2d 218, 232 (N.D.N.Y. 2008)(court permitted limited discovery to identify individual police officers accused of constitutional violations under § 1983); *Kregler v. City of New York*, 646 F.Supp.2d 570, 573 (S.D.N.Y. 2009) (trial court conducted a plausibility hearing) (rev'd. on other grounds, 375 Fed. Appx. 143 (2d Cir. 2010)).

[7] *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) (*citing Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597–98 (1986)); *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 768 (1984); *Theatre Enterprises, Inc. v. Paramount Film Dist. Corp.*, 346 U.S. 537, 540–41 (1954).

[8] *Anderson News,* 680 F.3d at 184 (*citing Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)* ("two or more witnesses" may tell mutually inconsistent but "coherent and facially plausible stor[ies]").

[9] *Id.*

on a judge's disbelief of a complaint's factual allegations."[10] "[A] well-pleaded complaint may proceed even if" it strikes a savvy judge that actual proof of the facts alleged is improbable, and "that a recovery is very remote and unlikely."[11]

### III.   Mrs. Palin Plausibly Alleges Actual Malice

Mrs. Palin's allegations plausibly establish actual malice.   Mrs. Palin alleged that *The Times* (which would include Mr. Bennet):

> "[U]sed its false assertion about Mrs. Palin as an artifice to exploit the shooting that occurred on June 14, 2017 … and capitalized on Mrs. Palin's name and Loughner's and Hodgkinson's horrific attacks to support its assertion that there was a 'sickeningly familiar pattern' of politically motivated violence against members of Congress[12]… [and that]… *The Times* fabricated this supposed 'pattern' and Mrs. Palin's role in it, resurrecting a debunked connection between Mrs. Palin's political activities and Loughner's 2011 rampage in Arizona…[and that]… [b]y doing so…implicitly attacked the conservative policies Mrs. Palin promotes[13]… [while]… *The Times* knew that there was no link or connection, let alone a 'clear' and 'direct' one, between Mrs. Palin's political activities and Loughner's 2011 shooting…[and]…knew that Mrs. Palin did not incite Loughner's horrific crime."[14]

Mrs. Palin supported these allegations with specific averments (not conclusions) of ultimate fact:

> *The Times* had ample facts available that established that there was no connection between Mrs. Palin and Loughner's crime.   *The Times'* Editorial Board and its staff followed Loughner's criminal case and the facts it revealed; the paper reported regularly about the case.   Those proceedings failed to unearth any evidence that Loughner's actions were politically motivated.   There is no evidence to suggest that Loughner ever saw the map of targeted electoral districts.[15]
>
> …
>
> The Palin Article cites no sources establishing Mrs. Palin's clear and direct incitement of Loughner's shooting in Arizona – and even a basic review of *The Times'* own above-mentioned articles and the source materials its staff compiled from and about Loughner's criminal case during that highly publicized event

---

[10] *Twombly*, 550 U.S. at 556 (internal quotation and citation omitted)(alternation in the original).
[11] *Id.* (internal quotation and citation omitted).
[12] Comp. ¶ 2-3.
[13] Comp. ¶ 35.
[14] Comp. ¶ 41.
[15] Comp. ¶ 47.

would have demonstrated that there was no direct and clear link between Mrs. Palin and Loughner's heinous acts.[16]

On their face, these allegations must be taken as true and plausibly establish actual malice.[17] The additional facts developed through and in connection with the Court's efforts to examine the context of the publication only solidified Mrs. Palin's case. The draft of the offending article, the explanation of how and why the article was written, the other editorials gathered by and available to the authors when it was written, and the circumstances surrounding the author who penned the defamatory statements about Mrs. Palin, all confirmed what Mrs. Palin has already alleged: "when it comes to Mrs. Palin, *The Times* is willing to operate with a purposeful avoidance of the truth – marked by a deliberate decision not to acknowledge facts confirming the falsity of its charges against Mrs. Palin."[18]

### 1. How and Why the Article Was Created

James Bennet and other *Times'* editors and writers decided to use the tragedy of the Hodgkinson shooting as a pulpit to advance their narratives on gun control and political rhetoric. (Ex. 34[19] at 5:13-6:1; 7:23-25[20]) From the outset, Mr. Bennet had already decided to use Mrs. Palin as the example – the sole "factual" illustration – to support his thesis on vicious and lethal politics; and to that end specifically instructed Elizabeth Williamson and a *Times'* researcher to review prior *Times* editorials published in the wake of the Loughner shooting. (*Id.* pp. 6:5-12; 50:22-51:7) Actual malice is reasonably inferred when a publisher turns a blind-eye

---

[16] Comp. ¶ 67.

[17] To the extent the Court disagrees, Mrs. Palin should be permitted to amend to incorporate the recently revealed context of the publication into her Complaint. *See Michel v. NYP Holdings, Inc.,* 816 F.3d 686, 707 (11th Cir. 2016) (applying New York law); *Linn v. United Plant Guard Workers of America, Local 114*, 383 U.S. 53, 66 (1966).

[18] Comp. ¶ 65.

[19] Ex. __ refers to exhibits annexed to the accompanying Declaration of Shane B. Vogt, dated August 22, 2017. Pl. Hrg. Ex. __ refers to exhibits introduced at the August 16, 2017 hearing.

[20] The 8/16/17 transcript is attached as Exhibit 34 to the Vogt Declaration.

to the truth because it has a pre-determined theory it wants to advance.[21]

Mr. Bennet is a seasoned journalist with decades of experience as a reporter who also served editor-in-chief of *The Atlantic* for ten years.  (Ex. 34 4:2-14)  He has a personal[22] and professional[23] connection to the Loughner shooting and the circumstances surrounding it, from

---

[21] *Sisemore v. U.S. News & World Report*, 662 F.Supp. 1529, 1536 (D. Alaska 1987) ("[A] jury could infer 'reckless disregard' from evidence that the methodology of the news magazine was to write the story first, complete with theme and slant, and then use a reporter to generate colorful descriptions and quotes to differentiate it from the newspaper story upon which the 'story idea' was based... Factual inaccuracies to make [plaintiff] fit the preconceived [thesis] in the 'story idea' might be deemed by a jury in these circumstances to amount to reckless disregard for the truth."); *Tosti v. Ayik*, 476 N.E.2d 928, 936 (Mass. 1984), aff'd 508 N.E.2d 1368 (Mass. 1987) (Evidence that author of article did not know whether facts stated in his article were true but was nevertheless motivated to write about a predetermined topic was sufficient for jury to find that "this motive led the defendant to either fabricate the other charges or to make his accusations based on suspicions and not facts."); *Alioto v. Cowles Comm., Inc.*, 519 F.2d 777, 780-81 (9th Cir. 1975), aff'd 623 F.2d 616 (9th Cir. 1980) ([Authors] deliberately failed to cross-check on the validity of their statements because they did not want to find them to be untrue); *Sharon v. Time, Inc.*, 599 F.Supp. 538, 576 (S.D.N.Y. 1984) ("A jury could conclude that [author] chose not to ask Source C the ultimate question because he knew or suspected that Source C's answer would undermine his hypothesis...[which]...could be read to convey his 'subjective awareness of probable falsity.'"); *Tatum v. The Dallas Morning News, Inc.*, 493 S.W.3d 646, 673-74 (Tex. 2015) (Before author published a column he was "outraged" about the topic of his piece and had a motive not to learn if there was any explanation for the plaintiff's actions other than the conclusion drawn in the author's story.  "Had he investigated further and learned facts [contrary to what he published], this would have undercut the whole thrust of the column...")

[22] Mr. Bennet's brother, Michael, is the senior Democratic Senator from Colorado who, two days before the Loughner shooting, received death threats so serious that additional security was posted at his office and home; events which *The Atlantic* covered under Bennet's stewardship. (Ex. 34 pp. 69:10-70:1; Pl. Hrg. Ex. 14)  Two Colorado Democratic lawmakers whose districts are identified on the Palin Map supported Michael Bennet in his 2010 democratic primary.  (*Id.* 70:16-23; Pl. Hrg. Ex. 12)  In the 2016 election, Mrs. Palin endorsed Michael Bennet's opponent, Daryl Glenn, an outspoken Second Amendment advocate; while Sen. Bennet was endorsed by Rep. Giffords' gun control PAC.  (*Id.* 70:24-71:10; Pl. Hrg. Ex. 16-18)

[23] As Editor-In-Chief of *The Atlantic*, Mr. Bennet had a professional responsibility to review and monitor all of the content of his publication; and thus would have been aware of the articles *The Atlantic* published about such an important event as the Loughner shooting.   During Mr. Bennet's tenure, there were numerous articles published by *The Atlantic* (Ex. 11-22) concerning the Loughner shooting which established that there was no link between Mrs. Palin and Loughner's crime; while one piece in particular, Andrew Sullivan's January 15, 2011 article "*Caldwell's Unfairness*," demanded a retraction from a *Financial Times* journalist for claiming that Mr. Sullivan "*link[ed]* the [Loughner] shootings to Republican ideology or rhetoric."

which it also is reasonable to infer that Mr. Bennet was fully-aware of the well-publicized consensus that Mrs. Palin did not incite Loughner's shooting.[24]

Beyond Mr. Bennet's reasonably inferred actual knowledge of *The Atlantic's* 2011 publications about the Loughner shooting, the research Mr. Bennet ordered into *The Times'* own writings resulted in at least six Editorials and one Op-Ed Column,[25] which were emailed to Ms. Williamson and Mr. Bennet.  (Ex. 27-33, 34 60:1-61:7)  Two of these writings further establish that *The Times'* Opinion department had already concluded that Palin's Map did not incite Loughner's shooting.[26]

Ms. Williamson completed the initial draft of the Palin Article, which included a passage opining that "Hodgkinson's rage was nurtured in a vile political climate" akin to the climate surrounding the Loughner shooting, where "it was the pro-gun right being criticized:  in the weeks before the shooting Sarah Palin's political action committee <u>circulated</u> a map of targeted

---

(8/16/17 Pl. Hrg. Ex. 28) (emphasis added)  Although Mr. Bennet may now profess ignorance or an inability to recall whether he knew about all of *The Atlantic's* coverage, the believability of such claimed ignorance rests on credibility determinations that must be left for the fact finder.

[24] *See Politico's "No evidence Sarah Palin's PAC incited shooting of Rep. Gabby Giffords."* (Ex. 23)

[25] The appearance of this Op-Ed Column in the Times' research is contrary to what was expressed at the 8/16/2017 hearing.  (Ex. 34 60:11-21)  It also begs the question as to why this research, which did include Op-Ed columns, did not unearth Mr. Blow's January 14, 2011 Op-Ed column *"The Tucson Witch Hunt."*  (8/16/17 Pl. Hrg. Ex. 6)

[26] *"Bloodshed and Invective in Arizona" (Jan. 9, 2011)* (Ex. 29) ("Jared Loughner, the man accused of shooting Ms. Giffords, killing a federal judge and five other people, and wounding 13 others, appears to be mentally ill… His paranoid Internet ravings about government mind control place him well beyond usual ideological categories…It is facile and mistaken to attribute this particular madman's act directly to Republicans or Tea Party members…"); *"No One Listened to Gabrielle Giffords" (Jan. 15, 2011) (Op-Ed Column)* (Ex. 33) (For the sake of discussion, let's stipulate that Loughner was a 'lone nutjob' who had never listened to Glenn Beck or been a card-carrying member of either the Tea or Communist parties… Did Loughner see Palin's own most notorious contribution to the rancorous tone – her March 2010 Web graphic targeting Congressional districts?  We have no idea – nor does it matter… That Loughner was likely insane, with no coherent ideological agenda, does not mean that a climate of antigovernment hysteria has no effect on him or other crazed loners out there.")  (Ex. 29, 33)

electoral districts that put Ms. Giffords and 19 other democrats under stylized crosshairs."

Ms. Williamson's draft already contained the "circulated" hyperlink to the ABC Article, which

(like *The Atlantic's* and *The Times'* own editorials and columns) concluded that "no connection

has been made between [Palin's map] and the Arizona shooting…"[27]

Upon receiving Ms. Williamson's draft, Mr. Bennet took it upon himself to re-write the

piece,[28] drawing inspiration from Thomas Friedman's August 9, 2016 column "*Trump's Wink*

*Wink to 'Second Amendment People,'*" (which Mr. Bennet inexplicably did not cite or reference

in his re-write)[29] and its premise that "Donald Trump's language … could end up ***inciting*** …

violence."[30]   Mr. Bennet deleted Ms. Williamson's verbage regarding the climate surrounding

the Loughner and Hodgkinson shootings and inserted the defamatory factual pronouncements

that there is a "direct [and] clear link" between Mrs. Palin and Loughner's shooting.[31]   To drive

home his point, Mr. Bennet labeled Mrs. Palin's activities "political incitement;" a "very strong"

word which Mr. Bennet chose based on his time as a journalist in Jerusalem because it conveyed

"***deliberate orders, invocations, summonses for people to carry out violent attacks…***" (Ex. 34

12:5-24) (emphasis added).   Mr. Bennet's conscious decision to use the words "incitement" and

"clear [and] direct link" also help establish actual malice.[32]

---

[27] 8/16/17 Pl. Hrg. Ex. 5

[28] Ex. 34 8:11-9:5

[29] Ex. 34 46:24-47:12.

[30] Ex. 24.

[31] Ex. 34 10:19-12:2

[32] *Vasquez v. O'Brien*, 85 A.D.2d 791, 792 (3d Dep't 1981) ("The content of the statements themselves and the context in which they arose may give rise to significant suggestions of possible falsity which should alert the speaker…[and]…inaccurate or untrue use of language, in the intense political climate then prevailing, could certainly be found to be evidence of actual malice on the part of defendant…"); *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987) (Defendant's failure to offer a plausible explanation for its choice of language [calling plaintiff a "fraud" as opposed to simply informing readership that a statement was fraudulent] was sufficient for a jury because the ultimate finder of fact could reasonably have

Mr. Bennet claims that he did not review the Palin Map, the hyperlinked ABC article, nor *The Times'* editorials and column compiled by his research staff, and did not recall *The Atlantic's* numerous writings on the subject—all of which raised serious doubts about the veracity of the charge Mr. Bennet was making about Mrs. Palin.   Even if this were true, actual malice can be inferred because Mr. Bennet was willfully blind to all of the available information refuting the sole "fact"[33] upon which his theory rested.[34]   (Ex. 34 48:4-24; 49:1-16)   At best, Mr. Bennet

---

concluded that the… 'allegation[] [was] so inherently improbable that only a reckless man would have put [it] in circulation. *See St. Amant*, 390 U.S. at 732."); *Klayman v. Judicial Watch, Inc.*, 22 F.Supp.3d 1240, 1252 (S.D. Fla. 2014) (Use of the word "convicted" was sufficient for the trier of fact to find that author "gained sufficient knowledge from her research to either know the terminology 'convicted' was false, or to have serious doubts as to its veracity.")

[33]  Mr. Bennet concedes that his theory must be predicated on facts.  (Ex. 34 58:3-8).

[34]   *Kuhn v. Tribune-Republican Pub. Co.*, 637 P.2d 315, 318 (Colo.1981) (A jury could reasonably find reckless disregard when author admitted that he had no basis for most of his erroneous statements and failed to take the time to corroborate allegations made in his article. "When one fails to contact and question obvious available sources of corroboration, fabricates specific facts appearing in a story, and writes a story in a manner calculated to invite a factual inference that the newspaper has uncovered governmental corruption and bribery, one knowingly risks the likelihood that the statements and inferences are false and thereby forfeits First Amendment protections."); *Hildebrant v. Meredith Corp.*, 63 F.Supp.3d 732, 746-47 (E.D. Mich. 2014) (A reasonable jury could infer fabrication when the author admitted that he did not know where defamatory information came from.  That there is evidence that [author] may have fabricated the statement is enough to show that he should have entertained serious doubts.  To require a defendant to actually have doubts about the accuracy where, as here, there is evidence that the defamatory statement was fabricated, would eviscerate the 'reckless' standard."); *Pep v. Newsweek, Inc.*, 553 F.Supp. 1000, 1002 (S.D.N.Y. 1983) (Facts such as failure to investigate, or reliance on a questionable source are relevant to actual malice determination:  they may tend to show that a publisher did not care whether an article was truthful or not, or perhaps that the publisher did not want to discover facts which would have contradicted his source.); *Robertson v. McCloskey*, 666 F.Supp. 241, 250 (D.D.C. 1987) (Defendant's "sin of omission was not simply a failure to investigate, but a failure to consider contradictory evidence already in his possession."); *Franklin Prescriptions, Inc. v. New York Times Co.*, 267 F.Supp.2d 425, 438 (E.D. Pa. 2003) (Author of publication reviewed plaintiff's website, and thus "had reliable information that contradicted the alleged defamatory implication" but omitted from an illustration in the article the very section which refuted the defamatory statements.); *Herron v. King Broad. Co.*, 776 P.2d 98, 106 (1989) ("However, when a reporter does in fact conduct an investigation and his investigation does not support his false statement or brings to his attention facts which rebut the false statement, that is evidence from which a jury can infer reckless disregard." (*citing Kuhn*, 637 P.2d 315; *Vandenburg v. Newsweek*, 507 F.3d 1024 (5th Cir. 1975); and *Green v.*

engaged in selective reporting[35] to support his pre-determined conclusions, which also constitutes actual malice.

### 2. *The Times'* **Professions of an Honest Mistake Are Inconsequential**

Particularly at the dismissal stage, *The Times'* contention that Mr. Bennet made an honest mistake – that when he used the words "incitement" and "clear [and] direct link" he did not really mean what he said—is inconsequential. "The defendant in a defamation action brought by a public official cannot… automatically insure a favorable verdict by testifying that he published with a belief that the statements were true."[36] If a defendant could avoid liability simply by claiming the equivalent of "oops…that's not what I meant,"[37] it would "erect a logically impossible test which by its practical application would inevitably result in no defamation case ever qualifying for jury resolution." [38]

### 3. *Mrs. Palin Plausibly Alleged Fabrication and Recklessness*

Mrs. Palin plausibly alleged that *The Times* fabricated its defamatory statements and cited no sources establishing a clear and direct link between her and Loughner's shooting. The

---

*Northern Pub'g Co.*, 655 P.2d 736 (Alaska 1982) (Plaintiff "offered evidence that the defendant's reporters were aware of the exonerating autopsy report…[which]…created an issue of material fact on reckless disregard.")).

[35] *Airlie Foundation, Inc. v. Evening Star Newspaper Co.*, 337 F.Supp. 421, 429 (D.D.C. 1972) (Plaintiff's theory of the case was that notwithstanding [defendant's] assertion that it took no position in its own story with regard to the truth or falsity of the [alleged defamatory statements], it nevertheless engaged in a course of selective reporting in dealing with the charges.); *Goldwater v. Ginzburg*, 414 F.2d 324, 337 (2d Cir. 1969), *cert. denied,* 396 U.S. 1049 (1970) (Second Circuit noted that selective reporting, particularly where it tends to lend credence to a predetermined result, is a factor to be considered on the issue of malice.)

[36] *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968); *Pep*, 553 F.Supp. at 1002.

[37] *Hansen v. Stoll*, 636 P.2d 1236, 1240 (Ariz. Ct. App. 1981) (Even where author "actually believed his accusations…a person cannot close his eyes to the obvious truth, yet still claim lack of knowledge" (*summarizing St. Amant*, 390 U.S. at 732)).

[38] *Prozeralik v. Capital Cities Communs., Inc.*, 605 N.Y.S.2d 218, 225 (1993).

absence of any source[39] or supporting evidence in the article, coupled with *The Times'* knowledge of the facts and records surrounding Loughner's case[40] plausibly establishes that *The Times* fabricated its statements or, at bare minimum, had reason to doubt the truth of its statements about Mrs. Palin and the Palin Map, but failed to investigate[41] in the face of known facts (the ABC Article, *The Atlantic's* articles, *The Times'* editorials and columns) calling into doubt the truth of its charges against Mrs. Palin.  In fact, Mr. Bennet willfully ignored the results of the minimal investigation *The Times* did conduct.  In short, it is plausible that Mr. Bennet either fabricated the link or ignored evidence that the link did not exist because he was predetermined to make a political point at Mrs. Palin's expense, regardless of the veracity of his charges against her.

## CONCLUSION

Based on the foregoing, Palin respectfully requests that the Motion to Dismiss be denied.

---

[39] Fabrication can be established where "the defendant ***provides no source*** for the allegedly defamatory statements or if the purported source denies giving the information." *St. Amant*, 390 U.S. at 732. (emphasis added)

[40] Actual malice also is established, despite professions of good faith, when a story is the "product of [ ] imagination … so inherently improbable that only a reckless man would have put [it] in circulation … [and] … where there are obvious reasons to doubt the veracity" of the source of the story. *Id.*

[41] "Although a publisher does not have an absolute duty to investigate, a publisher cannot feign ignorance or profess good faith when there are clear indications present which bring into question the truth or falsity of defamatory statements." *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 538 (7th Cir. 1982) (citations omitted) (prior articles were edited by the same person who reviewed the defamatory publication); *see also*, *Hunt v. Liberty Lobby*, 720 F.2d 631, 645 (11th Cir. 1983) ("an inference of actual malice can be drawn when a defendant publishes a defamatory statement that contradicts information known to him"); *Harte-Hanks Comm., Inc. v. Connaughton*, 491 U.S. 657, 692-93 (1989).  It is certainly reasonable to infer that a failure to consider known sources that would establish the falsity of a statement is motivated by a concern that those sources would raise doubt concerning the veracity of the statements. *Id.* at 684.

Dated: August 21, 2017.               Respectfully submitted,

*/s/ Shane B. Vogt*                         
Kenneth G. Turkel (admitted *pro hac vice*)
Email: kturkel@bajocuva.com
Shane B. Vogt (admitted *pro hac vice*)
Email: svogt@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone: (813) 443-2199
Facsimile: (813) 443-2193

S. Preston Ricardo
E-mail: pricardo@golenbock.com
GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY 10017
Telephone: (212) 907-7300
Facsimile: (212) 754-0330

*Attorneys for Plaintiff Sarah Palin*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Memorandum of Law was filed electronically on the 21st day of August 2017.  This Memorandum of Law will be sent by operation of the Court's electronic filing system to counsel of record for all parties as indicated on the electronic filing receipt.  Parties and their counsel may access this filing through the Court's system.

_/s/ Shane B. Vogt_
Attorney