UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x
SARAH PALIN,                          :
                                      :
                                      :    17-cv-4853 (JSR)
        Plaintiff,                    :
                                      :    OPINION AND ORDER
        -v-                           :
                                      :
THE NEW YORK TIMES COMPANY,

        Defendant.
-------------------------------------x

JED S. RAKOFF, U.S.D.J.

Nowhere is political journalism so free, so robust, or perhaps so rowdy as in the United States. In the exercise of that freedom, mistakes will be made, some of which will be hurtful to others. Responsible journals will promptly correct their errors; others will not. But if political journalism is to achieve its constitutionally endorsed role of challenging the powerful, legal redress by a public figure must be limited to those cases where the public figure has a plausible factual basis for complaining that the mistake was made maliciously, that is, with knowledge it was false or with reckless disregard of its falsity. Here, plaintiff's complaint, even when supplemented by facts developed at an evidentiary hearing convened by the Court, fails to make that showing. Accordingly, the complaint must be dismissed.

## Background

In her one-count complaint filed on June 27, 2017, plaintiff Sarah Palin, an acknowledged public figure, alleged that defendant

The New York Times Company (the "Times") defamed her in an editorial published on June 14, 2017, the defamatory statements in which were not corrected until the next day. On July 14, 2017, the Times moved to dismiss the complaint for failure to state a claim as a matter of law, and the matter was promptly briefed by both sides.

On its face, the complaint plainly suffered from several material deficiencies. For example, it failed to identify any individual at the Times who allegedly acted with actual malice, positing instead a kind of collective knowledge unrecognized by the law in this area. But while the Court might have dismissed the complaint on such grounds, the editorial in question was signed by "The Editorial Board" of the Times, and in such a situation the Court believed it could not carry out its prescribed role of ascertaining whether the numerous allegations in the complaint to the effect that "the Times" knew this, or intended that, could, when taken most favorably to the plaintiff, be attributed to a specific individual or individuals without the Court's knowing a modicum of factual background. Accordingly, the Court ordered a brief evidentiary hearing on August 16, 2017 to ascertain who was (or were) the author(s) of the offending statements and other basic facts that would provide the context for assessing the plausibility or implausibility of the complaint's allegations.[1]

---

[1] By requiring district courts to make plausibility determinations based on the pleadings, see Ashcroft v. Iqbal, 556 U.S. 662 (2009) and Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the Supreme Court has, in effect, made district courts gatekeepers. Evaluating plausibility is "a context-specific task," Iqbal, 556 U.S. at 679,

Although, therefore, if the Court were to solely limit its evaluation to the face of the complaint, it would readily grant the motion to dismiss, the Court has instead evaluated the plausibility of the complaint in light of such background facts developed during the evidentiary hearing that, as shown by the parties' post-hearing briefs, were either undisputed (at least for purposes of the instant motion) or, where disputed, are taken most favorably to plaintiff. In brief, the pertinent factual allegations are as follows:

On the morning of June 14, 2017, James Hodgkinson opened fire on members of Congress and current and former congressional aides playing baseball at a field in Virginia. Complaint ("Compl.") ¶ 2, ECF No. 1; Transcript of Aug. 16, 2017 Hearing ("Tr.") at 4:22. That same day, Elizabeth Williamson, an editorial writer at the Times,

---

because a court must have some knowledge of the context in which the underlying events occurred in order to carry out the function with which the Supreme Court has tasked it. Thus, the Court here convened a hearing pursuant to Rule 43(c) of the Federal Rules of Civil Procedure, which provides that "When a motion relies on facts outside the record [as the instant motion does in effect by arguing that the allegations of the complaint are in context implausible], the court may hear the matter on affidavits or may hear it wholly or partly on oral testimony or on depositions." Although such a hearing was somewhat unusual, neither party at any point objected to the Court's holding the hearing or to the Court's considering (at least for the limited purpose of deciding this motion) such facts there developed that are not in dispute. See Transcript of Aug. 16, 2017 Hearing ("Tr.") at 72:15-25; Pl.'s Memo. of Law on Context, Inferences and Plausibility at 1-2, ECF No. 40 ("Memo. on Plausibility"); Def.'s Supp. Mem. in Further Support of its Mot. to Dismiss the Complaint ("Mem. in Further Support of Mot. to Dismiss") at 1, 4-8, ECF No. 42. As to any disputed fact, however, the Court, as it advised the parties at the hearing, makes no credibility determinations, Tr. at 74:1-3, and takes those facts most favorably to plaintiff.

proposed that the Times editorial board write a piece about the shooting.[2] Tr. at 4:22-24, 5:13, 7:17. Before she began writing, James Bennet – the Times' editorial page editor, id. at 3:24 – asked Ms. Williamson to look at editorials the Times had previously published in the aftermath of a January 7, 2011 attack carried out by Jared Lee Loughner at a political event in Tucson, Arizona. See id. at 6:5-9, 60:17-18; Compl. ¶ 1. In this shooting spree, Loughner shot nineteen people, severely wounding United States Congresswoman Gabrielle Giffords and killing six others, including Chief U.S. District Court Judge John Roll and a nine-year-old girl. Compl. ¶ 1. Mr. Bennet asked a researcher to send Ms. Williamson these editorials, which the researcher did, copying Mr. Bennet. Tr. at 36:14-17, 37:8-13, 61:3-7.[3]

Shortly following Loughner's attack, speculation arose about a connection between the crime and plaintiff Palin. Compl. ¶ 24. This speculation focused on a map (the "SarahPAC Map") circulated by plaintiff's political action committee, SarahPAC, prior to the

---

[2] Ms. Williamson was not available to testify at the time of the hearing on August 16, 2017. See Tr. at 72:1-3. After Mr. Bennet's testimony was completed, the Court advised the parties that it now saw no need to call Ms. Williamson, unless either party wanted to do so. Id. at 73:1-3. The Times immediately declared that it saw no such need. Id. at 72:5-7. The Court then advised plaintiff that if she would like to call Ms. Williamson as a witness, plaintiff should file a letter with the court by no later than August 17, 2017 at 5:00 pm. Id. at 73:4-7. Plaintiff chose not to submit such a letter.

[3] At the request of plaintiff, and with no objection from defendant, these editorials were furnished to plaintiff subsequent to the evidentiary hearing but prior to post-hearing briefing by the parties. See Tr. at 72:8-12; 79:3-80:1.

shooting. Id. ¶¶ 24, 45. The map depicted stylized crosshairs placed over the geographic locations of congressional districts that Republicans were targeting in an upcoming election, including Representative Gabrielle Giffords' district, as well as photos (below the map) of the incumbent Democrats. See Decl. of Jay Ward Brown, Esq. in Support of Def.'s Mot. to Dismiss the Complaint ("Brown Decl.") Ex. D, ECF No. 26-4. In the end, however, articles published in the Times and elsewhere stated that no such connection had been established between the circulation of the SarahPAC Map and the Loughner shooting. See, e.g., Compl. ¶¶ 42-46 (describing such articles).

Ms. Williamson sent a first draft of the editorial to Mr. Bennet around 5:00 pm on June 14. Tr. at 6:16-19; Court's Hearing Exhibit 1. The original draft stated, in relevant part, that "[n]ot all the details [of the Hodgkinson shooting] are known yet, but a sickeningly familiar pattern is emerging: a deranged individual with a gun — perhaps multiple guns — and scores of rounds of ammunition uses politics as a pretense for a murderous shooting spree.... Just as in 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a nine year-old girl, Mr. Hodgkinson's rage was nurtured in a vile political climate. Then, it was the pro-gun right being criticized: in the weeks before the shooting Sarah Palin's political action committee **circulated** a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats

under stylized crosshairs." Court's Hearing Ex. 1. The word

"circulated" was highlighted as above in the manner indicating that

it was a hyperlink. See Court's Hearing Ex. 1. Accessing the

hyperlink would take the reader to an ABC News article published the

day after Loughner's attack, which stated, inter alia, that "[n]o

connection has been made between [the SarahPAC Map] and the Arizona

shooting." Brown Decl. Ex. C at 1, ECF No. 26-3.

After receiving Ms. Williamson's draft, Mr. Bennet "effectively

rewr[o]te the piece." Tr. at 8:25; compare Court's Hearing Ex. 1

(original draft) with Compl. Ex. 1 (original published version). Mr.

Bennet's revised version of the editorial was published online on

the evening of June 14, 2017 and in print on June 15, 2017 under the

title "America's Lethal Politics." Compl. ¶¶ 3, 32-33. The two

paragraphs here relevant read as follows:

> Was this attack [by Hodgkinson] evidence of how
> vicious American politics has become? Probably.
> In 2011, when Jared Lee Loughner opened fire in
> a supermarket parking lot, grievously wounding
> Representative Gabby Giffords and killing six
> people, including a 9-year-old girl, the link to
> political incitement was clear. Before the
> shooting, Sarah Palin's political action
> committee **circulated** a map of targeted electoral
> districts that put Ms. Giffords and 19 other
> Democrats under stylized cross hairs.
>
> Conservatives and right-wing media were quick on
> Wednesday to demand forceful condemnation of
> hate speech and crimes by anti-Trump liberals.
> They're right. Though there's no sign of
> incitement as direct as in the Giffords attack,
> liberals should of course hold themselves to the
> same standard of decency that they ask of the
> right.

Id. Ex. 1 at 2; id. ¶ 3. The published version of the editorial retained the hyperlink to the ABC News article. See Def.'s Memo. of Law in Support of its Mot. to Dismiss the Compl. ("Mot. to Dismiss") at 3 n.5, ECF No. 25.

However, within a day or so of publication, the Times twice revised (and corrected) the text of the editorial, Compl. ¶¶ 50-52, and separately also issued two corrections online beginning on or about 11:15 am on June 15, id. ¶¶ 52, 55, Tr. at 30:9-17. The corrections were also in the print editions of the Times on June 16. Compl. ¶ 63. Specifically, the Times revised the editorial text online by deleting the phrases "the link to political incitement was clear" and "[t]hough there's no sign of incitement as direct as in the Giffords attack," and adding the sentence "But no connection to that crime was ever established." Id. ¶¶ 51-52. As to the corrections, published both online and in print, the first correction read:  "An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established." Id. ¶ 52. The second correction read: "An editorial on Thursday about the shooting of Representative Steve Scalise incorrectly stated that a link existed between political rhetoric and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established. The editorial also incorrectly described a map distributed by a political action committee before that

shooting. It depicted electoral districts, not individual Democratic lawmakers, beneath stylized crosshairs." Id. ¶¶ 55, 63.

Despite these corrections, plaintiff, less than three weeks later, filed the instant complaint alleging that the Times defamed her by including within the original version of the editorial the subsequently-corrected errors. Id. ¶ 37. As noted, the Times then promptly moved to dismiss the complaint. The motion was fully briefed by both sides, and the Court heard oral argument, after which it convened the aforementioned evidentiary hearing. The hearing was followed, in turn, by still more briefing. As a result, the motion is now fully ripe for decision.

## Discussion

On a motion to dismiss, the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the non-moving party. See Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008). However, conclusory allegations are not entitled to be assumed true. Ashcroft v. Iqbal, 556 U.S. 662, 680-681 (2009). Moreover, to survive a motion to dismiss, a complaint must contain "enough facts to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

Additionally, in a defamation case, these standards must be applied consistently with the First Amendment protections famously put forward in New York Times v. Sullivan, 376 U.S. 254 (1964) and its progeny. Thus, in "defamation cases, Rule 12(b)(6) not only protects against the costs of meritless litigation, but provides

8

assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." <u>Biro v. Conde Nast</u>, 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013); <u>see also</u> <u>Michel v. NYP Holdings, Inc.</u>, 816 F.3d 686, 702 (11th Cir. 2016) ("[A]pplication of the plausibility pleading standard makes particular sense when examining public figure defamation suits. In these cases, there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation.").

As noted, the complaint here alleges, in a single count, the tort of defamation. "Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." <u>Idema v. Wager</u>, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000) (citing <u>Morrison v. Nat'l Broad. Co.</u>, 19 N.Y.2d 453, 458 (1967)). The specific elements of this tort are set forth in applicable state law, here the law of New York.[4] "Under New York law, a plaintiff must establish five elements to recover in libel: 1) a written defamatory statement of fact concerning the plaintiff; 2) publication to a third party; 3) fault (either negligence or actual malice depending on the status of the libeled party); 4) falsity of the defamatory statement; and 5) special damages or per se

---

[4] "'The parties' briefs assume that New York law controls, and such implied consent . . . is sufficient to establish choice of law.'" <u>Chau v. Lewis</u>, 771 F.3d 118, 126 (2d Cir. 2014) (quoting <u>Krumme v. WestPoint Stevens Inc.</u>, 238 F.3d 133, 138 (2d Cir. 2000)).

actionability (defamatory on its face)." Celle v. Filipino Reporter Enterps. Inc., 209 F.3d 163, 176 (2d Cir. 2000).

As to the third element, plaintiff, because she is a public figure,[2] must under federal law "surmount a much higher barrier" and establish by clear and convincing evidence that the Times acted with "actual malice," that is, with knowledge that the statements were false or with reckless disregard of their falsity. Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 773, 775 (1986). "Though a state-based cause-of-action, the elements of a libel action are heavily influenced by the minimum standards required by the First Amendment." Celle, 209 F.3d at 176.

In its pending motion, the Times advances three bases for dismissing the Complaint: first, that the challenged statements are not "of and concerning" plaintiff; second, that the challenged statements are not provably false; and third, that plaintiff has not adequately plead actual malice. See Mot. to Dismiss at 1. The Court considers each in turn:

## 1. Whether the Statements are "Of and Concerning" Mrs. Palin

For purposes of the law of defamation, statements alleged to be defamatory are "of and concerning" a plaintiff where "'the allegedly defamatory content refer[s] to the plaintiff' such that those knowing the plaintiff 'understand that [she] was the person meant.'"

---

[2] Plaintiff does not dispute that she is a public figure. See, e.g., Pl.'s Memo. of Law in Opp. to Def.'s Mot. to Dismiss ("Memo. in Opp.") at 14, ECF No. 29; Compl. ¶¶ 14-18 (describing plaintiff as a public figure and former public official).

Gilman v. Spitzer, 538 F. App'x 45, 47 (2d Cir. 2013) (quoting Brady
v. Ottaway Newspapers, Inc., 84 A.D.2d 226, 228 (1981) and Geiser v.
Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980)). That is, a statement
is "of and concerning" a plaintiff if it "could have been understood
by a reasonable reader as being, in substance, actually about" the
plaintiff. Kirch v. Liberty Media Corp., 449 F.3d 388, 399 (2d Cir.
2006) (emphasis in original).

Here, the editorial in issue stated that "Sarah Palin's
political action committee" circulated the SarahPAC Map. Compl. Ex.
1 at 2 (emphasis added). The Times argues that plaintiff's claim of
defamation is "directed" at plaintiff's political action committee,
SarahPAC, and not plaintiff herself. Mot. to Dismiss at 6-10. "Under
the group libel doctrine, a plaintiff's claim is insufficient if the
allegedly defamatory statement referenced the plaintiff solely as a
member of the group." Church of Scientology Int'l v. Time Warner,
Inc., 806 F. Supp. 1157, 1160 (S.D.N.Y. 1992), aff'd sub nom Church
of Scientology Int'l v. Behar, 238 F.3d 168 (2d Cir. 2001).

However, the group libel doctrine is inapplicable where, as
here, "'the circumstances of the publication reasonably give rise to
the conclusion that there is a particular reference to the member.'"
Id. (quoting Restatement (Second) of Torts § 564A(b)). Three
circumstances permit the inference that the challenged statements
would be understood by a reasonable reader as being about plaintiff
in particular. First, the political action committee is not
mentioned by name. Second, plaintiff is referenced by name. Third,

the reference describes plaintiff's relationship to the political
action committee as possessive ("Sarah Palin's political action
committee"). Accordingly, because plaintiff is "distinguished from
other members of the group," the Court finds, for purposes of this
motion to dismiss, that the allegedly defamatory statements are of
and concerning plaintiff. Three Amigos SJL Rest., Inc. v. CBS News
Inc., 15 N.Y.S.3d 36, 41 (N.Y. App. Div. 2015), aff'd 28 N.Y.3d 82
(2016).[6]

### 2. Whether the Statements are Provably False

Falsity is a necessary element of a defamation action. Buckley
v. Littell, 539 F.2d 882, 889-894 (2d Cir. 1976); Gross v. New York
Times Co., 82 N.Y.2d 146, 152-153 (1993). Therefore, "a statement of
opinion relating to matters of public concern which does not contain
a provably false factual connotation will receive full
constitutional protection." Milkovich v. Lorain Journal Co., 497
U.S. 1, 20 (1990). Here, however, although the offending paragraphs
quoted above contain various assertions of opinion, a reasonable
reader could well view them as asserting that there was a "direct"
"link" between the SarahPAC Map and the Loughner shooting. Indeed,
according to Mr. Bennet's testimony, it was the receipt by the Times
of communications from readers complaining about such an assertion

---

[6] Although the Second Circuit stated in 2001 that the "of and
concerning" requirement should "ordinarily be decided at the
pleading stage," Church of Scientology Int'l v. Behar, 238 F.3d 168,
173 (2d Cir. 2001), it is not clear to this Court that this would
have prevented the Times from litigating this issue at trial as a
mixed issue of law and fact if the case had survived the motion to
dismiss.

that led Bennet to order the corrections thereafter made. See Tr. at 27:9-30:8.

If these readers were reasonably reading the sentences here at issue to suggest that, as a factual matter, distribution of the SarahPAC Map was directly causally linked to Loughner's shooting, then, as even the Times appears to concede, that is a factual statement that can be proved false, and, according to the complaint, has already been so proven, since, among other things, there is no evidence that Loughner ever saw the SarahPAC Map. Compl. ¶ 47. But even if, on the Times' somewhat strained reading, the statements here at issue should be read to suggest no more than that the SarahPAC Map helped foster "political incitement" (albeit seemingly directed at the specified incumbents), which in turn was "direct[ly]" and "clearly" linked to Loughner's shooting, these are still factual assertions that can be demonstrated to be false and, according to the complaint, were made in reckless disregard of their falsity. Id. ¶¶ 25, 47-48.

As to the first assertion, that circulation of the SarahPAC Map helped foster political incitement, this is akin to the kind of factual assertion that juries in effect have to resolve regularly in false advertising cases that assess the effect of a given advertisement on consumers. See Johnson & Johnson * Merck Consumer Pharm. Co. v. Smith Kline Beecham Corp., 960 F.2d 294, 297-298 (2d Cir. 1992); Mylan Pharm., Inc. v. Proctor & Gamble Co., 443 F. Supp. 2d 453, 459-460 (S.D.N.Y. 2006). As to the second assertion, that

13

the political incitement directed at the incumbents was directly
linked to Loughner's shooting, the Times argues that this is really
an assertion about an individual's motivation to act, which, it
claims, can never be proved false. See Mot. to Dismiss at 10-12
("What motivated or influenced Loughner is unknown — even by him.").
But, as the courts have so often noted, "the state of a man's mind
is as much a fact as the state of his digestion," Siegelman v.
Cunard White Star Ltd., 221 F.2d 189, 198 (2d Cir. 1955), though
such mental states are often proved or disproved circumstantially.
Indeed, the Times itself stated in its published correction that "An
earlier version of this editorial incorrectly stated that a link
existed between political incitement and the 2011 shooting of
Representative Gabby Giffords. In fact, no such link was
established."  Compl. ¶ 58; see also id. ¶ 58 ("We got an important
fact wrong, incorrectly linking political incitement and the 2011
shooting of Giffords. No link was ever established."). As this very
statement suggests, the link in question can, as a factual matter,
either be "established," i.e., proved, or disproved.

That the offending statements appeared in an editorial, which
by its nature presents an overall opinion or opinions, is relevant,
but hardly dispositive. See Brian v. Richardson, 87 N.Y.2d 46, 52
(1995). Unlike statements in cases relied upon by the Times that
voiced editorial opinions about connections that "appeared to be" or
"could well happen," see, e.g., Immuno v. Moor-Jankowski, 77 N.Y.2d
235, 255 (1991), the statements here complained of stated

14

unequivocally that there was a "direct" and "clear" link between the SarahPAC Map and the Loughner shooting, albeit a link created by intermediating "political incitement." A reasonable reader could well infer that the Times was in possession of objective evidence that the SarahPAC Map incited Mr. Loughner's shooting, whereas, according to the complaint, the Times had no evidence of either a direct or indirect link.

In short, some or all of the statements here at issue are fact-laden statements that can be proven false, and the complaint adequately alleges evidence sufficient to enable a reasonable juror to find them false if the juror so chose.[7]

### 3. Actual Malice

Public figures who seek damages for defamatory statements must, however, do more than prove that the statements about them were false. They must also prove by "clear and convincing evidence" that the statements were made with "actual malice" — that is, with knowledge that the statements were false or with reckless disregard as to their falsity. Sullivan, 376 U.S. at 279-280; Masson v. New Yorker, 501 U.S. 496, 508 (1991); Biro v. Conde Nast, 807 F.3d 541,

---

[7] Plaintiff also argues that still another false statement in the editorial was the statement that the SarahPAC Map "put Ms. Giffords and 19 other Democrats under stylized cross hairs," when in fact, as the Times' second correction noted, it was the geographic districts of the incumbents that were placed under the cross hairs. However, this misstatement was authored by Ms. Williamson, not Mr. Bennet (who testified that he never saw the SarahPAC Map, Tr. 21:5-9), id. 20:6-16, and plaintiff has presented no material evidence that Ms. Williamson acted with actual malice, and, indeed, plaintiff declined the Court's invitation to have Ms. Williamson testify.

544-545 (2d Cir. 2015). Reckless disregard can be established by "evidence of an intent to avoid the truth," Harte-Hanks Comms., Inc. v. Connaughton, 491 U.S. 657, 693 (1989), evidence that the defendant "entertained serious doubts as to the truth of his publication," St. Anant v. Thompson, 390 U.S. 727, 731 (1968), or evidence that the defendant acted with a "high degree of awareness of [a statement's] probable falsity," Garrison v. State of Louisiana, 379 U.S. 64, 74 (1964). See Dongguk Univ. v. Yale Univ., 734 F.3d 113, 124 (2d Cir. 2013). But even then, a defamation complaint by a public figure must allege sufficient particularized facts to support a claim of actual malice by clear and convincing evidence, or the complaint must be dismissed.

Here, as already mentioned, the complaint fails on its face to adequately allege actual malice, because it fails to identify any individual who possessed the requisite knowledge and intent and, instead, attributes it to the Times in general. This will not suffice. "When there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice." Dongguk Univ., 734 F.3d at 123; see Sullivan, 376 U.S. at 287 ("[T]he state of mind required for actual malice would have to be brought home to the persons in the [defendant's] organization having responsibility for the publication of the [statement].").

16

But even assuming, in light of the evidentiary hearing, that the complaint should now be construed as asserting actual malice on the part of Mr. Bennet - the primary, if not sole author of the sentences in question and the Times' editorial page editor - plaintiff still fails to meet the actual malice standard.  That standard is grounded in "a profound national commitment to the principle that debate on public issues be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." Sullivan, 376 U.S. at 270. Sullivan and succeeding cases "have emphasized that the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies." St. Amant, 390 U.S. at 731-732. "[S]peaking out on political issues is a core freedom protected by the First Amendment and probably presents the 'strongest case' for applying 'the New York Times [v. Sullivan] rule.'" Schatz v. Republican State Leadership Comm., 669 F.3d 50, 51 (1st Cir. 2012) (quoting Harte-Hanks, 491 U.S. at 666 n.7, 686-687)).

Coupling this protective overlay with the more technical requirement that a public figure, in order to survive a motion to dismiss a claim of defamation, must allege specific facts that plausibly evidence actual malice in a clear and convincing manner, it is plain that plaintiff has not and cannot meet this standard,

even with the benefit of the facts brought forth by the evidentiary
hearing.[2]

To put the matter simply, Bennet – as the undisputed testimony
shows – wrote the putatively offending passages of the editorial
over a period of a few hours and published it very soon thereafter.
Shortly after that, his mistakes in linking the SarahPAC Map to the
Loughner shooting were called to his attention, Tr. 27:8-17, and he
immediately corrected the errors, not only in the editorial itself
but also by publishing corrections both electronically and in print,
Tr. 28:19-29:10; Compl. ¶¶ 50-55, 63. Such behavior is much more
plausibly consistent with making an unintended mistake and then
correcting it than with acting with actual malice.

Plaintiff's response is, first, to posit that the Times in
general, and Mr. Bennet in particular, had a motive to defame Mrs.
Palin. As to the Times in general, the complaint alleges that "there
is existing hostility toward Mrs. Palin" and "her name and attacks
upon her inflame passions and thereby drive viewership and Web
clicks to media companies." Compl. ¶ 30. As to the alleged
"hostility," it goes without saying that the Times editorial board
is not a fan of Mrs. Palin. But neither the fact of that opposition,
nor the supposition that a sharp attack on a disfavored political
figure will increase a publication's readership, has ever been

_____

[2] For these purposes only, the Court has taken as true plaintiff's
interpretation of the evidence that emerged at the evidentiary
hearing, on the supposition that plaintiff could amend her complaint
to include such a gloss.

enough to prove actual malice. See, e.g., Harte-Hanks, 491 U.S. at 665 ("[A] newspaper's motive in publishing a story - whether to promote an opponent's candidacy or to increase its circulation - cannot provide a sufficient basis for finding actual malice."). For "it is hardly unusual for publications to print matter that will please their subscribers; many publications set out to portray a particular viewpoint or even to advance a partisan cause. Defamation judgments do not exist to police their objectivity." Reuber v. Food Chem. News, Inc., 925 F.2d 703, 716 (4th Cir. 1991).

Here, moreover, as previously noted, it is not the Times' collective knowledge and intent that is relevant but rather Mr. Bennet's. As to hostility, the best that plaintiff can muster is that Mr. Bennet has a long association with liberal publications and that his brother is the Democratic senator from Colorado who was endorsed by Congresswoman Giffords' political action committee in his 2016 election and whose opponent was endorsed by Mrs. Palin in that same election. Tr. at 34:17-19, 68:20-22, 70:24-71:17; see also Memo. on Plausibility at 5-6 & n.22. If such political opposition counted as evidence of actual malice, the protections imposed by Sullivan and its progeny would swiftly become a nullity.

As for the alleged economic motive, there is not a shred of factual support, either in the complaint or in the evidentiary hearing, for the supposition that considerations of attracting readership ever entered Mr. Bennet's mind when he was drafting this particular editorial. Indeed, if that were his goal, one would have

19

expected him to mention Mrs. Palin's name more than once in the editorial or use her name in the social media promoting the editorial, neither of which was done. See Compl. Exs. 1, 16.

In her complaint, plaintiff also relies on her allegations that the Times cited "no source" for the challenged statements and failed to conduct an adequate investigation into their veracity, allegations that plaintiff now suggests apply to Mr. Bennet as well. Memo. in Opp. at 16-19; Transcript of July 31, 2017 Hearing at 19:20; Memo. on Plausibility at 8-10. As to the Times in general, this allegation is undercut by the fact that the original draft of the editorial that Ms. Williamson sent Mr. Bennet, as well as the version published, included a hyperlink to an article that described in some detail the SarahPAC Map and its circulation and concluded that there was no proven link between that circulation and the Loughner shooting. Tr. at 20:6-25; Compl. Ex. 1 at 2; Brown Decl. Ex. C (ABC News article). "The hyperlink is the twenty-first century equivalent of the footnote for purposes of attribution in defamation law." See Adelson v. Harris, 973 F. Supp. 2d 467, 484 (S.D.N.Y. 2013). The inclusion of this article through the hyperlink shows, first, that the Times did do some research before publishing the editorial (despite the very limited time available) and, second, that the allegation of actual malice is even more improbable because the Times included as a hyperlink an article undercutting its own conclusions.

Once again, however, it is Mr. Bennet's knowledge and intent that are ultimately at issue so far as actual malice is concerned, and Bennet testified that he himself did not read the hyperlinked article when rewriting the editorial nor do any further investigation of his own (though he was copied on a communication sent by the researcher that he had directed to find and examine prior Times editorials regarding Mrs. Palin and the Loughner shooting). See Tr. at 20:20-21:14, 61:3-7. But it is well-established that supposed research failures do not constitute clear and convincing evidence of actual malice, even of the "reckless" kind. Indeed, in Sullivan itself, the Supreme Court recognized that the editorial advertisement there at issue contained facts contradicted by earlier news stories printed in the New York Times. 376 U.S. at 287. The Court held that the existence of these prior stories did not establish actual malice in part because failure to investigate "supports at most a finding of negligence in failing to discover the misstatements." Id. at 288.

Similarly, failure to comply with journalistic policies – which the complaint here also alleges, although in wholly conclusory fashion, Compl. ¶¶ 69-72 – cannot establish actual malice absent allegations supporting an inference of reckless disregard. See, e.g., Harte-Hanks, 491 U.S. at 665 ("[A] public figure plaintiff must prove more than an extreme departure from professional standards" to demonstrate actual malice).

Alternatively, plaintiff argues that Bennet actually knew, or recklessly disregarded, that his editorial statements were false, because of prior articles in the Times and the Atlantic (where Bennet was editor-in-chief for many years) that he presumably read and that disclaimed any link between the SarahPAC Map and the Loughner shooting.  At the evidentiary hearing, Bennet testified that he did not remember reading any of these articles or, if he did read them when they appeared years earlier, he did not have them in mind when he wrote the editorial. Tr. 21:19-22:3, 22:22-26:3, 58:14-67:14. Plaintiff's position is that either Mr. Bennet, contrary to his testimony, read and remembered these sources, in which case he knew the challenged statements were false, or else, consistent with his testimony, he did not read and/or remember these sources, in which case he acted with willful blindness in publishing the editorial. See Memo. on Plausibility at 5-9; Memo. in Opp. at 17-19.

But these kinds of lawyers' arguments do not substitute for the requisite factual showing. The fact is that all these articles appeared years earlier, and there is no reason to suppose that, even if Bennet had read them at the time, he would necessarily remember their conclusions, especially since, as the complaint itself notes, there were also articles that appeared shortly after the Loughner shooting that drew contrary conclusions. Compl. ¶ 24. As the Supreme Court stated in Sullivan, "The mere presence of . . . stories in the files does not, of course, establish that the Times 'knew' the [publication at issue] was false." 376 U.S. at 287.

22

Plaintiff argues, however, that Bennet's failure, at the very time he was preparing the editorial, to read either the hyperlinked article or the past editorials gathered by his researcher are evidence of reckless disregard. As for the hyperlinked article, however, the inclusion of the article along with the editorial cuts against any inference of actual malice. If Bennet purposely failed to read it because he knew it would undercut his thesis, why would he not have removed the hyperlink, which he had full power to do. See Tr. 22:11-15 (no "substantive changes" were made to the editorial following Bennet's work on it, and he "authorized publication of the editorial").

As for the editorials emailed to Ms. Williamson and copied to Mr. Bennet by the Times' researcher, Bennet knew by the time he rewrote the editorial that Ms. Williamson had likely reviewed them, so there was little incentive for him to read them as well. See Tr. 60:1-9. Plaintiff claims that, if Bennet had read them, he would have seen that at least two of them contradicted his erroneous statements. See Memo. on Plausibility at 6. But this is doubly wrong: it does not matter what they contained unless his failure to read them reasonably suggests reckless disregard, which it does not; and, in any event, they do not contradict his thesis nearly as much as plaintiff suggests.

The first article, Bloodshed and Invective in Arizona, states in relevant part:

> Jared Loughner . . . appears to be mentally ill. . . . It is facile and mistaken to attribute this particular madman's act directly to Republicans or Tea Party members. But it is legitimate to hold Republicans and particularly their most virulent supports in the media responsible for the gale of anger that has produced the vast majority of these threats, setting the nation on edge.

Memo. on Plausibility Ex. 29. The second article, an op-ed by Frank Rich entitled No One Listened To Gabrielle Giffords, states in pertinent part:

> Did Loughner see Palin's own most notorious contribution to the rancorous tone — her March 2010 Web graphic targeting Congressional districts? We have no idea — nor does it matter. . . . That Loughner was likely insane, with no coherent ideological agenda, does not mean that a climate of antigovernment hysteria has no effect on him or other crazed loners out there.

Id. Ex. 33.

As is evident, both articles contain some language tending to corroborate parts of the challenged statements. For example, Frank Rich's piece stated that even if Mr. Loughner was insane, that "does not mean that a climate of antigovernment hysteria has no effect on him." Id. And the other editorial indicates that people (not including the author) had drawn a connection between the SarahPAC Map and Mr. Loughner's shooting. Id. Ex. 29. So Bennet, even if he had read these articles (which he claims he did not), would not automatically have been led to conclude that his editorial was erroneous.

The Court has considered plaintiff's other alleged evidence of actual malice and finds it too inconsequential to be worth further discussion. The Court has also considered whether the various items of supposed evidence of actual malice discussed above, even if individually insufficient to support an inference of actual malice, are collectively sufficient to support an inference of actual malice.  But, as the foregoing discussion demonstrates, each and every item of alleged support for plaintiff's claim of actual malice consists either of gross supposition or of evidence so weak that, even together, these items cannot support the high degree of particularized proof that must be provided before plaintiff can be said to have adequately alleged clear and convincing evidence of actual malice.

We come back to the basics. What we have here is an editorial, written and rewritten rapidly in order to voice an opinion on an immediate event of importance, in which are included a few factual inaccuracies somewhat pertaining to Mrs. Palin that are very rapidly corrected. Negligence this may be; but defamation of a public figure it plainly is not.

For the foregoing reasons, the Court grants defendant's motion to dismiss. Because, moreover, this Court has canvassed in the discussion above all the various additions that plaintiff has even remotely suggested it would include in an amended complaint, the dismissal is "with prejudice," that is, final. Clerk to enter judgment.

SO ORDERED.

Dated:    New York, NY
          August 29, 2017

_____
JED S. RAKOFF, UJS.D.J.