H7VVPALA1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  SARAH PALIN, *an individual*,

4                  Plaintiff,

5           v.                              17 CV 4853 (JSR)

6  THE NEW YORK TIMES COMPANY, *a*
   *New York corporation*,
7
                   Defendant.              ARGUMENT
8
   ------------------------------x
9                                          New York, N.Y.
                                           July 31, 2017
10                                         4:17 p.m.

11 Before:

12                  HON. JED S. RAKOFF,

13                                         District Judge

14                        APPEARANCES

15 BAJO CUVA COHEN TURKEL
        Attorneys for Plaintiff
16 BY:  KENNETH G. TURKEL
        SHANE B. VOGT
17      -AND-
   GOLENBOCK EISEMAN ASSOR BELL & PESKOE
18 BY:  S. PRESTON RICARDO

19 LEVINE SULLIVAN KOCH & SCHULZ
        Attorneys for Defendant
20 BY:  DAVID A. SCHULZ
        JAY W. BROWN
21      JEREMY A. KUTNER

22

23

24

25

H7VVPALA1

1          (Case called)

2          THE COURT:  We are here on the motion to dismiss.

3          Just to frame the background, in an editorial that

4    appeared in *The New York Times* on June 14, 2017, the editorial

5    first identified two instances of mass shootings that were

6    "fueled by politics"; the second of those was the attack in

7    Tucson, Arizona by Jared Lee Loughner on January 8, 2011, which

8    seriously wounded representative Gabby Giffords.  I might add,

9    though it has nothing to do with this motion or this case, that

10   everyone seems to have forgotten that there were five people

11   killed in that incident, including the chief judge John Roll of

12   the federal court.

13          In any event, the editorial stated:  "The link to

14   political incitement was clear.  Before the shooting, Sarah

15   Palin's political action committee circulated a map of targeted

16   electoral districts that put Ms. Giffords and 19 other

17   democrats under stylized crosshairs."

18          The editorial, also comparing that with the other

19   incident, the much more recent shooting on June 14, 2017

20   allegedly by James Hodgkinson, said the Hodgkinson shooting was

21   one in which there was "no sign of incitement as direct as in

22   the Giffords attack."  However, the editorial also included a

23   hyperlink to an ABC News article that itself stated that "no

24   connection has been made between the crosshairs map and the

25   Arizona shooting."

H7VVPALA1

1          Within two days following the publication of the

2     editorial, *The Times* changed the text by deleting the phrase as

3     referring to the link to political incitement was clear and

4     referring to that there was no sign of incitement as direct as

5     in the Giffords attack, and adding the sentence:  "But no

6     connection to that crime was ever established."

7          *The Times* also issued a correction in print and online

8     noting that:  "An earlier version of this editorial incorrectly

9     stated that a link existed between political incitement and the

10    2011 shooting of representative Gabby Giffords.  In fact, no

11    such link was established.

12          "The editorial also incorrectly described a map

13    distributed by a political action committee before that

14    shooting.  It depicted electoral districts, not individual

15    democratic lawmakers, beneath stylized crosshairs."

16          So we're ready to hear first from moving counsel.

17          MR. SCHULZ:  Thank you, Judge.

18          To clarify, maybe before I jump in on the timeline

19    that you just recited, the facts actually are -- although they

20    are not all pleaded in the complaint this way, but the

21    corrections were made within about 13 hours.

22          THE COURT:  Okay.

23          MR. SCHULZ:  The two corrections that were referred to

24    were about 45 minutes apart, so it was done very quickly,

25    although the exact times are not in the complaint.

H7VVPALA1

```
 1              I'd like to start by stressing the First Amendment

 2     overlay that exists here, because this case raises issues that

 3     are of central concern to the First Amendment, which is

 4     designed to protect robust speech on matters of public debate.

 5              This is a case arising out of an editorial on gun

 6     control issued the same day as that shooting.  It wasn't

 7     sometime earlier, it was that day, which also explains how it

 8     was written and the time it was written under.

 9              THE COURT:  Well, I'm happy to hear your stump speech,

10     but I think it's common ground that when a public figure is

11     involved, even false statements are protected unless they were

12     done with actual malice.  But if they are done with actual

13     malice, then there is no First Amendment protection, true?

14              MR. SCHULZ:  That is correct, Judge.

15              But the point I'm trying to make is that the First

16     Amendment overlay affects all of the theories that we argued as

17     to why and the grounds for dismissal here are in view with

18     constitutional concerns.  Everywhere there's a closed question,

19     the courts have made clear, the Second Circuit has made clear

20     that that First Amendment overlay says that you should be

21     resolving all doubts in favor of protecting the First

22     Amendment.

23              THE COURT:  I hear you.  But, on the other hand, isn't

24     it true on any motion to dismiss that all reasonable inferences

25     favorable to the adverse party, the party against whom the
```

 1   motion is directed, must be drawn in that party's favor?

 2            MR. SCHULZ:  Certainly, your Honor, on a motion to

 3   dismiss.

 4            THE COURT:  This is a motion to dismiss.

 5            MR. SCHULZ:  I'm agreeing with you.

 6            THE COURT:  Okay.

 7            MR. SCHULZ:  But let's just start there with actual

 8   malice, because that's what the Court brought up.

 9            Ms. Palin's theory of her claim, which is clearly

10   articulated on page 14 of her memo, is that she has alleged

11   actual malice because, in her view, *The New York Times*

12   knowingly inserted a deliberate lie into that editorial and did

13   it for two reasons:

14            One, because it thought it could profit off the use of

15   her name because it would drive web traffic and add revenue;

16   and, second, because *The Times* doesn't really like Ms. Palin,

17   and it needed to use her -- in their words -- to mount a

18   counterattack on conservative and right-wing media who are

19   demanding condemnation of hate speech by anti-Trump liberals

20   and wanted to use her for a counter-narrative.  That's their

21   theory of why there is actual malice here.  On its face,

22   neither of those theories is plausible, given the facts that

23   are alleged and what we know.

24            What we know from the Second Circuit in the *Biro* case

25   is that this Court is charged with looking very closely at the

H7VVPALA1

1      allegations of actual malice in particular to determine whether

2      they meet that threshold.  And as Judge Oetken noted in the

3      district court decision in that same case, this all makes sense

4      if you look at the constitutional concerns.  Actual malice is

5      something very hard to prove at trial and intentionally so.  It

6      requires evidence not just of a normal civil case, it requires

7      clear and convincing evidence; therefore, it's entirely

8      appropriate that on a 12(b)(6) motion that the Court must

9      require the plaintiff at a high threshold to make a reasonable

10      inference that there's plausible grounds to believe that actual

11      malice existed here.

12           THE COURT:  I thought the definition of actual malice

13      was not a question of motive -- though motive may be part of

14      the mix that the Court may want to look at -- but under *New*

15      *York Times v. Sullivan*, actual malice is defined as knowledge

16      that the false statement was false or reckless disregard of

17      whether it was false or not.  That's the standard, is it not?

18           MR. SCHULZ:  Yes, it is, Judge.

19           Just to be clear, as the Supreme Court clarified in

20      *Garrison* and *St. Amant* and some other cases, both prongs of

21      actual knowledge and reckless disregard are intended to require

22      elements of knowledge of the defendant.  Reckless disregard

23      doesn't mean they overlooked something; it means they had

24      serious doubts -- they weren't sure it was false, but they had

25      serious doubts and published anyway.  So it's not a gross

1    negligence standard.

2            THE COURT:  I agree.  It's definitely not gross

3    negligence.  Reckless disregard is a well-established concept

4    in the law and it means usually stating something with

5    knowledge that there is a high probability that it is false.

6            MR. SCHULZ:  Correct.

7            So the plaintiffs here are attempting to suggest to

8    the Court that you should find plausible reason to believe that

9    *The Times* published this knowing it or, as they put it, you

10   should find plausible reason to believe that it was an

11   intentional lie aimed at Ms. Palin because they had an economic

12   motive and because they have a political motive.

13           THE COURT:  What I'm trying to get at is let's put

14   motive aside for the moment; I agree that that's not

15   irrelevant, but it's not itself a required aspect.  You could

16   have a case where you have no idea what the motive is, but if

17   you had direct evidence of actual knowledge of falsity, that

18   would be sufficient.

19           So here, we have their own hyperlink showing that

20   there is no evidence of any link.

21           MR. SCHULZ:  No established evidence.

22           THE COURT:  And yet they are saying -- both directly

23   and indirectly -- that there is such a link.

24           MR. SCHULZ:  Let's just take a peek.

25           I agree with you on motive, that the motive shouldn't

1 matter.  I just highlight that because in their memo opposing

2 this motion, that is their main reason for saying you should

3 find actual malice here, because there was a motive to lie.

4 The motive doesn't make sense.  The motive doesn't even make

5 sense in the editorial.  They say they wanted to use her to

6 push back on the conservative line.  The editorial itself

7 adopts the conservative line.  It says the conservatives are

8 right here; we should be upset on both sides by the rhetoric.

9 So their whole thing doesn't make sense on its own, but that's

10 their main theory.

11         But to turn to the question you are asking about, what

12 is the evidence of actual knowledge?  Their arguments are

13 essentially that the fact of a link between the crosshairs map

14 and the shooting had been so debated and had been generally

15 discounted that it's inherently implausible that they didn't

16 know that it was untrue.

17         THE COURT:  When you look at the map, it says SarahPAC

18 www.  Then it says:  "Twenty house democrats from districts we

19 carried in 2008 voted for the healthcare bill.  It's time to

20 take a stand."  Then there's a map that pinpoints each of those

21 districts.

22         MR. SCHULZ:  And identifies each of the

23 representatives by name.

24         THE COURT:  Below, not where the pinpointing occurs.

25         What even remotely plausible basis could anyone have

1    for believing that that was an incitement referred to violence?

2                MR. SCHULZ:  Well, Judge, you have to understand this

3    in the context of all of the facts that happened before.  That

4    map was put out by a PAC, almost immediately after the house

5    voted in favor of ObamaCare.  It was an anti-ObamaCare act and

6    it was essentially saying, These 20 representatives are in

7    districts that Sarah Palin and John McCain carried in the last

8    election.  We need to target them and throw them out because

9    they voted for this horrible law.

10               THE COURT:  Let's just stop there.

11               If it had said exactly what you just said, forget now

12   about the map, just what you just said, would you say that

13   anyone could plausibly or even conceivably view that as an

14   incitement to violence?

15               MR. SCHULZ:  Well, you have to combine that with the

16   fact that --

17               THE COURT:  Can you answer my question?

18               MR. SCHULZ:  Yes, absolutely, Judge.

19               THE COURT:  You think so?

20               So every time anyone says, We don't like the vote that

21   someone just made in Congress or anywhere else, and they are

22   coming up for reelection, let's target them for defeat, that,

23   in your view, could warrant any person, any reasonable person,

24   in saying, Oh, yes, that's an incitement to violence?

25               MR. SCHULZ:  Judge, it has to be understood in

H7VVPALA1

1     context.  It came out after this vote.  There was a lot of

2     other rhetoric.  Sarah Palin was tweeting at the same time, We

3     don't retreat; we reload.

4              THE COURT:  I thought that was in a different context.

5              MR. SCHULZ:  After that map came out, and this, again,

6     is in newspaper articles contemporaneous with this happening,

7     several of the representatives whose names were listed there,

8     were attacked or vandalized.  They had their homes vandalized,

9     they had their offices vandalized, including Gabrielle

10    Giffords, her office was vandalized, which caused her to go on

11    national TV and decry this type, specifically citing the map,

12    saying, Words have consequences.  This is bad.

13             And then, six months later, eight months later, she's

14    shot and this whole issue comes up again.  It wasn't me

15    suggesting it; it was the No. 1 issue on Facebook that was

16    being debated about what role did the map --

17             THE COURT:  Of course we all know that Facebook is the

18    standard of reasonableness.

19             MR. SCHULZ:  But my point is, Judge, to your question,

20    people at the time thought that there was a link here; that

21    this was outrageous conduct and they were making a lot out of

22    it.  It was widely discussed at the time.

23             THE COURT:  I'm still at a loss to see what's

24    outrageous about this.

25             Supposing, instead of the crosshairs, which not only

H7VVPALA1

1    are part of a gun, but they are part of innumerable optical

2    instruments, but instead of crosshairs it had been a

3    bull's-eye, would your argument be the same?

4              MR. SCHULZ:  The question is what would people -- what

5    would be the intended message there?  Was it the message --

6              THE COURT:  So you think every time Target Stores puts

7    out an ad, they are inciting people to violence?

8              MR. SCHULZ:  No, Judge.  It's not a question of what I

9    think; it's how people reacted to this ad.  Remember, this

10   editorial was written, what, six years -- 2010 -- six or seven

11   years after this happened.

12             THE COURT:  What it's asserting is not that people at

13   the time thought this, it's asserting as a fact that there's a

14   direct link between this and the shooting.

15             MR. SCHULZ:  Right, Judge.  You have to understand the

16   concept.  The reason that the correction was made is that the

17   editorial writers, if you read the editorial literally for what

18   it says as to how it's characterized in the complaint, the

19   point that the writers were making is that in the Giffords

20   shooting, not that there was a causal link between the map and

21   the shooting, but there was a rhetorical link --

22             THE COURT:  Whoa, whoa.  Wait a minute.

23             MR. SCHULZ:  Judge --

24             THE COURT:  You think that the words "direct link" is

25   not a reference to causality?

H7VVPALA1

1           MR. SCHULZ:  It was a link between the rhetoric and

2     the shooting, yes.  And what they were trying to convey, Judge,

3     is all the things I was just saying.  When the map came out,

4     there was all of this upset; that in the Giffords shooting,

5     Giffords had been named in the ad, her district had been

6     targeted as someone who should be thrown out of office.  After

7     the ad came out, her campaign office was attacked; she made

8     national speeches about it; and then she was shot.

9           The point they were making is there's no similar

10    connection between this killer or the shooter in Virginia and

11    any of the people there.  I'm sorry.  There was no similar link

12    between Bernie Sanders, who everyone was saying incited this

13    killer, and anybody who was on that ball field.  Bernie Sanders

14    never put out an ad saying, We've got to get rid of

15    Representative Scalise or any of the other people on the ball

16    field.

17          THE COURT:  I'm sure Bernie Sanders' rhetoric was

18    quite cautious and quiet.  That's certainly his reputation.

19          MR. SCHULZ:  That's not my point, Judge.  That is not

20    my point.

21          The point of the editorial was at least in the

22    Giffords case there was a direct link between the controversial

23    ad and the controversial statements and the person who was

24    shot.  In the case of Bernie Sanders, all the controversial

25    statements and his fiery rhetoric against republicans was never

H7VVPALA1

1   directed against any of the individuals who were shot.  That's

2   a fact.  That's a simple point they were trying to get across.

3   When they realized the way they had phrased it, it was being

4   understood that there was a causal link, they immediately

5   corrected it.  That's what's going on here.

6           So to go back to the actual malice argument, the

7   question is did they knowingly lie about causal link.  There is

8   no plausible grounds to believe that from the facts that they

9   allege.

10          You start with the fact that there is this whole

11  history about what happened after the map came out and

12  instances of violence that they would have been aware of; that

13  it was widely discussed at the time of the shooting, that's in

14  the complaint, paragraph 24; and that other people had

15  construed this the same way.  They don't talk about it.  It's

16  Exhibit D to the second Brown declaration.

17          Six months before the shooting in Virginia, there was

18  a shooting in Washington, D.C., another mentally deranged

19  person went into a pizza store and shot up the store because he

20  believed political rumors he'd read online about Hillary

21  Clinton running a sex ring out of there with children.

22          *The Washington Post* at that point ran a column that

23  made much the same argument that *The Times* was making.  On

24  December 6, 2016, it said, and I'm quoting:  "Supporters of

25  former Alaska governor Sarah Palin put out a map with

1    crosshairs targeting the districts of 20 house democrats."

2            *And then it continues:  "On January 8, 2011, the day*

3    *of the shooting, the consequences were chilling.  Words matter.*

4    *That kind of disregard for common sense and responsibility cuts*

5    *into what we have today.  This editorial was part of an ongoing*

6    *political debate about the level of rhetoric, and The Times* was

7    using it in the context of an article written on the day of two

8    mass shootings bemoaning the fact that there was insufficient

9    attention being paid to the need for gun control on both sides

10   of the political aisle.  It was a gun control ad.

11           THE COURT:  Well, even on your reading there is no way

12   to read this, is there, as other than an assertion that the

13   political incitement that the map allegedly generated was a

14   cause of the shooting of representative Giffords for which

15   there was and remains zero evidence, right?

16           MR. SCHULZ:  I don't know that there -- well, let me

17   put it this way:  The editors were speculating and they were

18   repeating speculation that a lot of other people had said that

19   there is a link -- what they were saying is there is a link

20   between these mass shootings that are going on, they talked

21   about a pattern of mass shootings.  The complaints suggest,

22   Well, there were only two.  That's just not true.  The

23   pizzagate is another example.  There was the shooting in an

24   abortion clinic in Colorado Springs a few years earlier.  In

25   2008, when Barack Obama was running, six people were killed --

1    THE COURT:  All the things you're mentioning might be

2    relevant on a motion for summary judgment; we're talking about

3    a motion to dismiss.

4    MR. SCHULZ:  The question is is there plausible

5    evidence that this was an intentional lie, because that's the

6    theory of this case.

7    THE COURT:  The question for this motion is have, they

8    taking all the facts most favorably to them and all reasonable

9    inferences most favorably to them, alleged enough to infer that

10   the writer of the editorial was acting with actual malice or

11   with reckless disregard.  So it is unclear to me how all the

12   other things you are talking about, which go well beyond the

13   four corners of the complaint, are relevant to this motion.

14   MR. SCHULZ:  Most of these are in the four corners of

15   the complaint, are referenced by things -- even the fact check,

16   which they have cited they add in Exhibit 11, a fact check of

17   the editorial that was done by *The Washington Post*, they say,

18   Oh, look, it proves that it was wrong.  It does say there was

19   no established link; but that same fact check also goes on to

20   say it's unclear whether Loughner knew about the map.

21   So the fact is these are things that were subject to

22   dispute.  The question is is it plausible to believe that the

23   editorial writers intentionally misrepresented the evidence,

24   when you know everything that's there.

25   There was a news article in the same paper that got

H7VVPALA1

1    the facts more correct, saying that there was no established

2    link.  There were two op-eds in the same paper opposite the

3    editorial that get the facts right.  There is a link --

4            THE COURT:  So, I agree, that cuts both ways.  But

5    what about the argument that that really is further evidence of

6    reckless disregard because they had ample -- whoever was

7    writing this editorial had ample evidence right before them

8    that there was no link.

9            MR. SCHULZ:  Judge, that would make sense if they had

10   the evidence and they hid it.  If they had the evidence and

11   they didn't make a correction, the reckless disregard is not

12   just overlooking a fact, it has to be some subjective awareness

13   that they got it wrong.  And the fact that all of this evidence

14   is there and they correct it immediately, they don't try to

15   hide anything, it's just implausible to believe that that

16   supports a claim that they must have known that they did it.

17           That takes us back to motive.  Plaintiff recognizes

18   that this is a problem.  Well, it's not implausible to believe

19   that, because they thought they were going to make a lot of

20   money by putting Ms. Palin's name in the middle of a dense

21   editorial about gun control, not in the headline, no picture,

22   no nothing, and that somehow that's going to drive revenue.

23   The theory of their case is just fundamentally implausible.

24   The most they've demonstrated is an honest mistake that some

25   things weren't looked at; but that's not actual malice, that's

H7VVPALA1

1    negligence.

2              THE COURT:  I know you have other arguments you want

3    to cover, but let's interrupt at this point; let me hear on the

4    actual malice issue from your adversary.

5              MR. SCHULZ:  Certainly.

6              MR. VOGT:  May it please the Court, your Honor, I

7    think that you've actually hit the nail on the head here.

8              THE COURT:  Well, let me throw some nails at you.  I

9    don't mean that as a direct link.

10             What possible motive would the writer of this

11   editorial have for accusing, as you would put it, Ms. Palin of

12   generating the conditions that led to this attack, when they

13   even hyperlink to something that says the opposite.

14             Motive, as I just pointed out, is not an essential

15   element, but it's not irrelevant.

16             What possible motive could they have?

17             MR. VOGT:  I think *The Times* itself said in Exhibit 4

18   of the complaint, your Honor, which is an article that talks

19   about she who must not be named, in which Charles Blow

20   references that people on the left seem to need her, to bash

21   her, because she is, in their words, the way the left likes to

22   see the right:  Hollow, dim, and mean.

23             She was a patsy in this instance.  You have a shooting

24   that *The Times* has come out and said that they believe is

25   politically motivated by a leftist who has fear connections to

H7VVPALA1

1    the republican party.  If your argument is going to be that

2    republicans should not go and attack the left now for political

3    rhetoric during that time period, a time period where you have

4    things like beheading photos of the president coming out --

5              THE COURT:  This is not an editorial overall as

6    directed at Ms. Palin, and she wasn't at this time running for

7    any office or anything like that.  This is an editorial

8    directed at the overall increase in highly divisive, charged

9    political language.  The suggestion is that that can, in turn,

10   incite, in the wrong hands, people to take political actions of

11   violence.

12             That's the thrust, is it not?

13             MR. VOGT:  I believe that the thrust is what the title

14   of the article is, which is *America's Lethal Politics*.  There

15   are two examples cited in it, as you noted early on.  One was

16   the shooting that day for which no one could tell whether a

17   political incitement was actually the cause or led to that

18   shooting.  The only other example given was Sarah Palin.  She

19   was the centerpiece of that article.  At least that's a

20   reasonable interpretation.

21             THE COURT:  Well, because, says your adversary, that

22   at the time, rightly or wrongly, rationally or irrationally,

23   there was a lot of debate as to whether this particular release

24   from her PAC had incited.  So that, says your adversary, is a

25   natural reason why they would have used that as another

H7VVPALA1

1   example.

2           MR. VOGT:  The problem is is that that was seven years

3   prior.  You have by this time period no evidence being

4   generated, despite Mr. Loughner's entire criminal proceeding,

5   extensive FBI investigation, files that had been provided to

6   *The New York Times* through public records request, things of

7   that nature, which we allege in the complaint.  You now have a

8   wealth of knowledge and six years of time have passed.  There's

9   still no evidence --

10          THE COURT:  So there's no doubt that in that sense

11   they got it wrong.  But the question we are talking about is as

12   opposed to a mistake, what reason is there to believe that this

13   was done with actual malice?

14          MR. VOGT:  I think that that's where you get into all

15   of the universe of evidence that we've pled in the complaint,

16   your Honor.  When you're talking about the potential for

17   fabrication, the case law says that when you fail to cite a

18   source for a fact, that's evidence; that gives rise to an

19   inference that a fact had been fabricated in a publication.

20   We've alleged no source was cited here.  This is a very

21   important fact about a very prominent person.  When you were

22   going to say something along the lines that there is a link

23   between a political figure and --

24          THE COURT:  Well, remember that the exact words on the

25   link is "the link to political incitement was clear."  I don't

1    know of any evidence you have in your complaint that this

2    release from her PAC did not generate political incitement.

3              MR. VOGT:  Political incitement with respect to the

4    shooting in question, your Honor.

5              THE COURT:  I think you're on stronger ground perhaps

6    when they get to "as direct as," the second sentence.  But the

7    first sentence is probably demonstrably true, yes.

8              MR. VOGT:  I wouldn't agree to that.

9              THE COURT:  You don't think there was political

10   incitement and that all sorts of people -- maybe wrongly -- but

11   all sorts of people were saying, Oh, how could you put out this

12   release?

13             MR. VOGT:  I think that I can argue contrary to that

14   simply based on the publications by *The Times* itself, including

15   those in its op-ed sections in which other op-ed writers, other

16   authors that wrote publications said no link had been

17   established.  They said it back in 2011 --

18             THE COURT:  Maybe the question is what is meant by

19   "political incitement."  But just on its face, is not a release

20   that denounces certain democrats for voting for the health bill

21   and saying, It's time to take a stand, a deducement to an

22   incitement to political action?

23             MR. VOGT:  I think the problem there though, Judge, is

24   there's no evidence to support --

25             THE COURT:  Whoa, whoa.

H7VVPALA1

 1          What do you think this was intended to do?  Do you

 2   think it was her PAC just was enamored with a map of the United

 3   States?

 4          On its face it was, was it not, an invitation to those

 5   who felt similarly to the PAC to take political action.

 6   Voting, of course, is what is the political action that it's

 7   directed at, but it's at least that, is it not?

 8          MR. VOGT:  I would agree with that statement, your

 9   Honor.

10          THE COURT:  Okay.  So it is linked to political

11   incitement.  So what I'm getting at is that sentence, the link

12   to political incitement was clear, is probably true.  What is

13   untrue, you're alleging, is what they then go on to say

14   followed from that, which is the link which they describe as,

15   in effect, direct to the Giffords shooting, yes?

16          MR. VOGT:  Correct.

17          I think it's also important to remember the full

18   context of the surrounding material in the article that your

19   Honor was just discussing.  Because when that political

20   incitement term first comes up, you're looking at an article

21   about America's lethal politics that has a highlighted quote

22   about a sickeningly familiar pattern arising that relates to

23   shootings of members of Congress.  So it's reasonable that an

24   average person looking at that article would read the term

25   "political incitement" to actually mean the violence that was

H7VVPALA1

1    at the heart --

2              THE COURT:  There's a difference between -- if this

3    editorial can only fairly be read as saying, Political rhetoric

4    has become overheated and we shouldn't be surprised, therefore,

5    that bad things happen when some deranged people fall prey to

6    that overheated rhetoric, then you would have no case.

7              So your case has to stand on the notion that it's

8    saying more than that; that it's saying that there is a direct

9    causal link between this article and the shooting.

10             MR. VOGT:  Correct.

11             If you look at the admissions afterward, the

12   retractions, the apologies, they actually admit as a matter of

13   fact that no such link was ever established.

14             THE COURT:  Well, so why isn't that really an argument

15   that while on its face the editorial doesn't necessarily carry

16   the implications you claim it does, once they realize that some

17   people were reading it that way, they wanted to make sure that

18   no one was under a misapprehension; so they then made the

19   corrections that they made so that even those people who were

20   misreading it would be disabused of their mistake.

21             MR. VOGT:  I think that that's sort of where the

22   rubber meets the road on the inquiry on the motion to dismiss

23   phase, is we think that it is, on its face, capable of

24   defamatory meaning.  In fact, people who read the article,

25   which we cited in our papers, other publications who looked at

1    these statements that way, came to the conclusion that this was

2    not only about her, but it established a link between her map

3    and these shootings, a direct link.

4             THE COURT:  I say to you a little bit what I said to

5    your adversary:  It doesn't really matter, does it, what other

6    people thought; it's what it is.  Either it is what you say it

7    is or it is what they say it is.  All the commentators in the

8    world standing on the head of a pin doesn't make it more or

9    less what it is.

10            MR. VOGT:  Ultimately the inquiry is whether six

11   people sitting in a box can look at this and determine whether

12   or not an average person would think that it was of and about

13   her and a statement of fact.

14            THE COURT:  By the way, in my courtroom it's usually

15   nine.

16            MR. VOGT:  Apologize, your Honor.

17            But that's really what we're getting to.  At this

18   stage of the proceeding, I appreciate that arguments have been

19   made on the other side.  I hope that we've made compelling

20   arguments as well.  But that gets us right back to where we

21   are, which is at a motion to dismiss.  Those types of issues

22   are best left for the nine people that ultimately will be

23   sitting here one day.

24            THE COURT:  So your adversary says that one of the

25   implicit -- what they think is the implicit weakness of your

H7VVPALA1

position is shown by the fact that you'll hypothesize motives

that are implausible such as that this was done to generate

revenue.  Why isn't that ridiculous on its face?

          MR. VOGT:  Well, because at this phase, which the case

law notes, when you're dealing with actual malice, all we can

do is hypothesize for the most part.  We don't have the benefit

of depositions and discovery about what their actual thought

processes were.

          THE COURT:  Of course, that's true with respect to

every motion to dismiss that's ever been filed in any case in

the United States.  So you're in no better or worse shape than

anyone else.

          MR. VOGT:  Right.  So because of that though, this

specific area of the case law says that you look at

circumstantial evidence and derive inferences from those, all

of which have to be construed in our favor, and see whether or

not it's at least plausible or conceivable that this can

happen.

          THE COURT:  But as we know from the Supreme Court's

decisions in recent decades, the Court can take account of

whether something is plausible or not.  Why isn't the revenue

argument patently implausible?

          MR. VOGT:  I don't think that it is because it's *The*

*New York Times* themselves who said, You have a member that

writes op-ed columns for *The Times*, did in '11, still does now,

H7VVPALA1

1    who said point-blank in an article that people write articles

2    about this woman and take shots at her because they inflame

3    passions and they derive revenue to websites.

4           There is no way it can be implausible.

5           THE COURT:  So wait.  So that governs what standard

6    this Court should apply?  I can't just apply what I thought I

7    was supposed to apply, which is what a reasonable person would

8    find plausible or implausible; I have to apply what some

9    commentator somewhere in the world thought is plausible or

10   implausible?

11          MR. VOGT:  I don't think that you have to apply --

12          THE COURT:  I can even take Congress's note of it.

13          MR. VOGT:  It's an admission of a party opponent.

14          THE COURT:  Excuse me.  I don't see how that can be

15   said.

16          No party opponent can tell a judge -- even through an

17   admission -- what a reasonable person would or would not find

18   plausible.  That's not a question for a party opponent

19   admissions, assuming arguendo this is, which is, I think, a

20   question in itself.  It's a question for the Court.

21          MR. VOGT:  I agree, your Honor.

22          My only point was that that's evidence that the Court

23   can consider.  It seemed like the Court was inferring that

24   there was nothing in the complaint that would establish that

25   that argument was plausible.  I was simply pointing out to say,

H7VVPALA1

1  Well, *The Times* obviously thought it was plausible because they

2  themselves have said, including the editorial department.

3          THE COURT:  Let's go back to your adversary.  We're

4  going to come back to you in a few minutes.

5          But we'll hear anything further that defense counsel

6  wants to say on actual malice.  And then if there are other

7  issues you wanted to raise, I'll hear you on that.

8          MR. SCHULZ:  Thank you, Judge.

9          First, on actual malice, I do think that it's

10  implausible to suggest her motive was to make money.  Even if

11  you accept that Ms. Palin is a lightning rod, people will read

12  about her, they would have put her in the headline, they would

13  have made a photo.  The suggestion that the headline shows that

14  this was about her, this is an editorial about gun control in

15  which the shooting of Gabby Giffords and the potential link of

16  that sort of type of rhetoric that Sarah Palin's PAC put out is

17  kind of a passing thing.

18          THE COURT:  Their argument is that Sarah Palin, for

19  better or worse, is a hot-button person; and that by using her

20  as an example, they generate greater support for their

21  editorial, which then translates indirectly into increased

22  revenue for *The Times*, something like that.  I admit I'm having

23  a little trouble with their argument in that regard, but what

24  about that?

25          MR. SCHULZ:  And the argument might make sense if they

H7VVPALA1

made up something just to put Sarah Palin in here.  They were

harkening back to a controversy that had been going on for

years about the impact of that ad that had been cited as

recently as six months earlier by *The Washington Post* in the

same context.  The point of this article was not about Sarah

Palin, it was about America's politicians' inability to pass

common-sense gun reform.  It was an editorial written on a day

in which there were two mass shootings in the country.

            THE COURT:  Excuse me for interrupting.

            But they not only singled out Sarah Palin, but they

single her out much more strongly than the other example.

            MR. SCHULZ:  Well, they single her out because, as

they say, there was a more clear link between the whole episode

involving her and Gabby Giffords that didn't exist with Bernie

Sanders and Steve Scalise.  That's the only point they were

making.

            Your Honor, you just were asking my adversary about

this notion, you said, doesn't the map on its face is an

invitation to take action.  And it is.  And one of the points

that is of concern here is that that type of rhetoric, that the

use of military or weapons symbolism in this way does incite

people to action, we know it happened after the map came out,

that there was increased security for the people who were named

there, there were real consequences and that's what they were

talking about.

H7VVPALA1

1        The editorial was bemoaning the fact that that type of

2    rhetoric does invite people who are deranged or mentally

3    unstable to do things; it inflames them, like the person at the

4    pizza shootout, like the man who went to Planned Parenthood,

5    like the person who shot all the city council in Missouri, like

6    the person who killed a democratic party leader in Arkansas.

7    These people have mental illnesses, but they hear the rhetoric

8    and they get inflamed.  That's the point it was making.

9        Just to finish up on actual malice, I want to go back

10   to the signal constitutional concerns and the questions.

11       As I said at the outset, the Second Circuit in *Biro*

12   has stressed the constitutional importance of the actual malice

13   inquiry itself; and that a court is charged to be sure that

14   they meet the pleading standard.  I would submit that they

15   haven't here.

16       But I'd also like to cite your Honor to the opinion of

17   the D.C. Circuit in *Ollman*, which was dealing with a different

18   issue; it was a pre-*Milkovich* case about is there a special

19   protection for opinion.  But the court was really grappling

20   with the same issue of when we know there are significant

21   constitutional First Amendment concerns at stake, how do we

22   deal with that in deciding whether a claim should go forward or

23   not?

24       And then a concurrence in the *en banc*, Judge Bork

25   writes at length about how a court should address whether

H7VVPALA1

1      something that is said is actionable or not actionable in

2      taking account of the First Amendment considerations.  He says

3      there's three things we should be looking at in trying to

4      figure out where the First Amendment line should be drawn or

5      what type of speech should be deemed not actionable.

6              So the first thing is the nature of the speech and the

7      parties involved.  What we have here is an intense political

8      debate about gun control and a leading figure in that debate

9      who's bringing this libel claim here.  It's clearly at the

10     heart of what the First Amendment was intended to protect to

11     allow that type of things, as Judge Bork --

12             THE COURT:  Let's hypothesize for a moment.

13             I don't mean to interrupt your recitation of what

14     another circuit had to say, but supposing the writer of this

15     editorial, before the editorial is published, sees the

16     hyperlink, say the editor adds the hyperlink, as common

17     experience suggests is often done.  The writer reads the

18     hyperlink and sees that there is no direct connection or

19     nothing has been established that suggests anything like a

20     direct connection.

21             In my hypothetical, the writer says, I don't care.

22     I'm going to leave it as is.

23             Would that be evidence of actual malice?

24             MR. SCHULZ:  In your hypothetical, I think if the

25     writer knew that there was something that was materially wrong

H7VVPALA1

1    and decided to publish anyway, that would be evidence of

2    reckless disregard malice.

3            THE COURT:  So reading the complaint most favorably --

4    but still reasonably -- to the adversary, why isn't that at

5    least a plausible possibility that should allow this case to go

6    to discovery?

7            MR. SCHULZ:  Because it's not plausible given all the

8    other facts.  The link was left in there.  If they intended to

9    mislead people and they had read that, why would they leave the

10   link there?  If they had read the rest of the paper and read

11   these other things into it, the only plausible thing that can

12   be concluded from all the facts that have been put before the

13   Court is that an error was made, an honest mistake was made in

14   how it was phrased.

15           Again, I keep coming back, we're accepting for

16   purposes of this argument that the editorial means what they

17   said it meant.  But I don't think that's actually a fair

18   reading.  And when we get into this and talk to the editorial

19   writers about what they actually intended, I don't think that

20   the editorial intended to say there was a direct cause

21   between --

22           THE COURT:  Certainly used the word "direct."

23           MR. SCHULZ:  They say there was a clear link between

24   that type of rhetoric and the attack on Gabby Giffords, because

25   she was in it, her office was vandalized, she spoke about it,

H7VVPALA1

1  there was a whole set of connections between her and the

2  political rhetoric that didn't exist with Steve Scalise and the

3  democratic rhetoric.  That's the point they were making.  It's

4  a simple point.  It wasn't necessarily that Loughner sought and

5  was motivated because of the map.  That's not the point they

6  were trying to make.  But even accepting that, I say it's

7  implausible to believe that they knowingly made that statement,

8  given what's here.

9          So just to return to *Ollman* quickly, so in deciding

10  where you should draw these lines, the first question is we're

11  in the core because of the parties and the nature of the

12  speech.  The second is what is the impact of allowing this case

13  to go forward?  In other words, what's the nature of the proof

14  that they are going to be going after?

15          They say that to go forward with this case and to make

16  their case, they need to know everything that 23 people at *The*

17  *Times* who work there now or used to work there, that they wrote

18  that might show that they had ill will towards --

19          THE COURT:  No, no.  I think that's a separate issue.

20          If their discovery requests are overbroad, then we

21  need to cut them down.  But I don't see what that has to do

22  with the motion to dismiss.

23          I understand totally why there are First Amendment

24  policy concerns here, that's why the Supreme Court decided *New*

25  *York Times v. Sullivan* and subsequent cases.

1          But I think the law -- I'm just a simple barefoot

2     district judge.  The law here seems to me very clear.  The law

3     is we know what actual malice is defined as; it's either

4     knowledge of falsity or reckless disregard.  Assuming the rest

5     meets the requirements, either they've alleged that

6     sufficiently to pass the standards or they haven't.  And all

7     the rest seems to me to be secondary.

8          MR. SCHULZ:  I would agree with you, Judge, that the

9     actual malice test itself is driven by the First Amendment.

10    All I'm suggesting is particularly in light of *Biro* and the

11    Second Circuit's concern that these things be carefully

12    considered at this stage, because the whole point of having

13    these protections is to avoid the chilling impact of the burden

14    of litigation, the threat of major recoveries of the time and

15    the effort.

16          THE COURT:  Sure.  That would be true whether they've

17    asked for 23 depositions or one deposition, the same policy

18    would still apply.

19          MR. SCHULZ:  That's true.

20          But my point is that's why it's important to consider

21    these at this stage and not down the road.

22          THE COURT:  All right.

23          Do you want to turn to your other issues?

24          MR. SCHULZ:  I was going to turn to -- since we are on

25    *Ollman*, *Ollman* itself was about when do you have a claim that's

H7VVPALA1

1    actionable.  Maybe I should turn to this question of whether

2    there is provably false.

3              (Continued on next page)

H7VKPAL2

1          MR. SCHULZ:  (Continuing)  Another reason why this

2    case should be thrown out at the pleading stage is that what's

3    at the heart of this, what they claim in the complaint, is the

4    defamation is not provably true or false; and therefore the

5    case shouldn't be allowed to go forward.  And that's exactly

6    what Judge Bork was analyzing in the Ollman case.

7          THE COURT:  Eventually I'll let you get to the quoting

8    Ollman, but I'm not sure why, taking it, again, most favorably

9    to them, why this is in effect a statement of fact, that there

10   was a direct causal link between the Sarah Palin PAC release

11   and the shooting of Representative Giffords.  The Times,

12   because of that danger, the people that would be interpreting

13   it that way corrected it 13 hours later or whatever.  But that

14   very fact, your adversary points out, suggests that people were

15   reading it that way.  And why isn't it on its face a fair

16   reading?  It may not be the only reading, but why isn't it a

17   fair reading?

18         MR. SCHULZ:  I understand, Judge.  And my

19   understanding to that is, that doesn't get at the gist of our

20   objection or our concern that we say the reason why this is not

21   an actual -- it's not a question of whether it's a fact or an

22   opinion.  Like Milkovich itself says, that's not the concern,

23   we don't need to other about what we characterize it as.  The

24   question is, is this a type of fact that is a fair subject for

25   litigation in a libel case.  And the fact here, what they've

H7VKPAL2

1    claimed the defamatory meaning is, very clearly in paragraph 1

2    and repeated throughout the complaint, they say the defamatory

3    meaning that they want to show the jury that was conveyed is

4    that Ms. Palin incited Jared Loughner to shoot.  So, even if

5    you accept that, the question is the editor's speculation about

6    what was in Jared Loughner's mind, right?

7         And the courts repeatedly have said that's not an

8    appropriate basis for libel litigation, understanding what

9    people's motives were, and it doesn't matter whether you call

10   it fact or opinion.  The Village Voice versus Rappaport case,

11   cited in our brief, was presented as a question of historic

12   fact, and the court said, what you label it doesn't matter, the

13   question is, is it the type of fact --

14        THE COURT:  So, to take a purely, purely hypothetical

15   case, supposing, hypothetically, a high government official, in

16   addressing a group of police officers, said, you've been much

17   to nice to the people you're arresting; for example, you help

18   them into the arrest vehicle, making sure they don't bump their

19   heads, and why are you being so nice?  And then, in my pure

20   hypothetical, two days later, a policeman doesn't any longer

21   put his hand on the head of the person he's arresting -- a

22   policeman who heard this speech -- and so the guy bumps his

23   head.  Are you saying whether the policeman did that because of

24   what the high public official had told him, it's not a question

25   of fact?

H7VKPAL2

1            MR. SCHULZ:  Again, I say it's not a question of

2    whether you call it a fact or not.  It's a question of is that

3    the type of issue that should be fairly the subject of a

4    litigation claim.  If a newspaper had a photograph of the cop

5    doing that and said this is what President Trump wants people

6    to do, that this was done because of the statements that were

7    made by this high government official --

8            THE COURT:  I'm not dealing with President Trump.  I'm

9    dealing with a total hypothetical.

10           MR. SCHULZ:  But my point is, that would be the

11   speculation of the newspaper of what was in that guy's mind.

12   Now, it might be a question of fact but their interpretation of

13   that situation they're entitled to have, and it doesn't matter

14   whether you call it a fact or not.  The fact that, as has been

15   widely reported, there's been no evidence that Jared Loughner

16   actually saw the map doesn't necessarily refute the claim that

17   this type of speech --

18           THE COURT:  Let me make sure I understand.  So

19   supposing Mr. Loughner, again, contrary to fact, but supposing

20   Mr. Loughner had said, you know, I read Sarah Palin's call to

21   action, I'm planning to go out and shoot Representative

22   Giffords.  If I understand your theory, who knows, even though

23   he said that, maybe it was really his psychoanalytical problems

24   that were motivating him, maybe he was being motivated by the

25   demons of his demented mind, so it's not fair game for an

H7VKPAL2

1    actual malice claim.  How can that be?

2            MR. SCHULZ:  Well, we're not on actual malice here.

3    We're on whether --

4            THE COURT:  No, right, I'm sorry.  How can it be that

5    that's not the kind of thing that could be the subject of a

6    lawsuit in this claim?

7            MR. SCHULZ:  Again, it's because the person who's

8    being sued is commenting on a set of facts where they have a

9    point of view, and they're suggesting that they believe there

10   could be a link here or that they see a causal connection here,

11   that they have a right to articulate that, again, going back to

12   Ollman, where these things exist, where it's a clear public

13   debate and involving a public figure, where allowing the case

14   to go forward is going to have a chilling effect on people

15   talking about these types of things.

16           THE COURT:  So, again, just to make sure I understand

17   your position, again, contrary to the facts, just as a

18   hypothetical, if the editorial had said Mr. Loughner admitted

19   that the reason he shot Representative Giffords was because he

20   had been motivated by the release from the Sarah Palin PAC and,

21   in my hypothetical, that's false and they had no basis for

22   saying that but they said it, are you saying that you could not

23   bring a defamation lawsuit in that circumstance?

24           MR. SCHULZ:  I lost the thread.  What is it that they

25   said was false?

H7VKPAL2

1          THE COURT:  That he was motivated by reading the Sarah

2     Palin PAC release to shoot Representative Giffords?

3          MR. SCHULZ:  Again, if it's a question of someone's

4     motivation -- that's what Haynes holds very specifically and a

5     number of other cases, that that's not the type of thing.

6     Again, taking the context and where we are, that there are

7     First Amendment protections that should exist around people's

8     ability, a newspaper's ability, to talk about matters of public

9     concern, involving public figures, and particularly where to

10    allow the case to go forward, the discovery is going to be

11    about, well, what was Jared --

12         THE COURT:  If I understand your position, it is that

13    even if you have actual malice, you can make up anything you

14    want and as long as you say it's about motivation and it's a

15    public figure, you can't be sued?

16         MR. SCHULZ:  I'd have to think about the limits of

17    that, Judge.  Obviously, we're talking about a range.  The

18    question is, can you make things up that you know to be untrue?

19    Well, then whether it's proveably true or false, if it's

20    damaged their reputation and they can prove that you knew it to

21    be untrue, I guess I'd have to think about how those pieces fit

22    together.  But the point is, in this case, we have arguably no

23    plausible claim that there was an intentional lie that was

24    made, and what they want to go forward on, if we're going to

25    try to prove the truth of it or make a defense of truth, it's

H7VKPAL2

1   going to involve incredible amounts of investigation into what

2   were his real motivations.  It's not enough to just say no link

3   has been established.  What is posited here is that this type

4   of rhetoric has ill effects.  Did Jared Loughner see Gabriele

5   Giffords on TV after her office was ransacked, saying this

6   stuff has repercussions, and did that inflame him in any way?

7   What were the other effects of this type of rhetoric that may

8   have had an influence on him?  That's just not an

9   appropriate -- it's not the sort of proveably true or false

10  thing.  It's really very, very similar to Haynes, where the

11  issue was the statement was made that, as a matter of fact,

12  that the plaintiff had left his wife because he was motivated

13  to make more money and that money made him leave his family.

14  Well, what he did or didn't do as a fact, that doesn't make it

15  actionable.  That's the holding of Haynes.

16          THE COURT:  Learned Hand -- you may have heard of him.

17          MR. SCHULZ:  Rings a bell.

18          THE COURT:  -- famously said that the state of a man's

19  mind is a fact just as much as the state of his digestion.  And

20  I'm not sure where the difference lies, but let me hear from

21  your adversary --

22          MR. SCHULZ:  Should I say anything else?  There were

23  two other points.

24          THE COURT:  I'm a little concerned, as I have an

25  ongoing bench trial that is already slated to go to

H7VKPAL2

1    8:00 o'clock tonight, and I know both sides submitted very full

2    briefs, but if there's something you're dying to say on the

3    other two points, go ahead.

4            MR. SCHULZ:  Well, I think they're covered in my

5    brief.  On the disparagement point, the economic damages, I

6    just want to point out the fact that in responding to our

7    motion their basic position was, well, there's no common law to

8    support this theory but because of changes you should.  And I

9    want to underscore that, as a federal court applying state law,

10   it's entirely inappropriate to create new causes of action.

11   They don't cite any state law that accepts this and Gertz

12   specifically prohibits it, as a constitutional matter.

13           THE COURT:  Yes.  Very good.  Thank you very much.

14           Let me hear from plaintiff's counsel.  Just real

15   quickly, on the last point, are you still pursuing that theory

16   of damages?

17           MR. VOGT:  The restitution theory?

18           THE COURT:  Yes.

19           MR. VOGT:  The reason --

20           THE COURT:  That has, as I understand it, no support

21   in any case that you have cited to me or that has been called

22   to my attention that is contrary to at least the statements of

23   the New York State courts that govern this issue and that

24   appears to be an invitation to the Court to make up new law for

25   the State of New York.  But other than those few problems, do

H7VKPAL2

1   you still want to pursue that part of your claim?

2          MR. VOGT:  Your Honor, I think that this is a truly

3   unique and special circumstance, which warrants at least the

4   raising of these types of damages in this case, because what

5   you have is a situation where before you get the benefit of

6   discovery, and knowing what was going on behind the scenes, you

7   at least do have this admission that people used the benefit of

8   this woman's name to derive an economic benefit.  That's the

9   hallmark --

10          THE COURT:  I'm not at all clear that it constitutes

11   an admission, but that's a separate issue.  I don't know where

12   that gives me the power to create an entire new form of damages

13   that has never been applied to this kind of case.

14          MR. VOGT:  The only thing I would say, Judge --

15          THE COURT:  And I'm not an unimaginative judge but

16   give me a break.

17          MR. VOGT:  The only thing is, I would say this -- and

18   this is why we went back with quite a bit with some of the case

19   law that we cited -- it's not really a new or expansion of an

20   area of law.  Restitution has been around for a long, long

21   time.

22          THE COURT:  But not for a defamation claim.

23          MR. VOGT:  It has been for torts and contracts.  And

24   the remedy of restitution has been applied in invasion of

25   privacy cases, which the court in New York in the Hart case

1    said is a libel --

2              THE COURT:  Okay.  Well, I will look again at your

3    papers but why don't you move on to the other matters.

4              MR. VOGT:  Is there anything your Honor wants me to

5    address in particular?  Because I know a lot was said.

6              THE COURT:  I think the only point that you might want

7    to address is their statement that putting aside -- even

8    assuming actual malice, what's being in effect alleged here is

9    something about Mr. Loughner's motivation which doesn't lend

10   itself then to this kind of cause of action.

11             MR. VOGT:  I think our papers are clear on this as

12   well, but when you state that there exists a link between a map

13   that has come out and the commission of this horrific crime,

14   that is a statement of fact.  That is so much of a statement of

15   fact, that when the Times came out and made the corrections

16   about this, they said, we made an error of fact.  When the head

17   of the editorial board released a statement to CNN, which is

18   also included in the complaint, he said, we made an error of

19   fact.  In the correction itself, it says:  We incorrectly

20   stated that a link existed between political incitement and the

21   2011 shooting.  In fact, no such link was established.

22   Repeatedly you have The Times saying, we made an error of fact.

23             THE COURT:  Yes, but I come back to the same point I

24   was making to your adversary.  I'm not bound by the parties'

25   characterizations.  In fact, I have to look at this on what the

H7VKPAL2

facts and the law are that are presented to me, not what

someone claims are the, quote, facts.  If The Times described

as a fact what in fact in law is an opinion, then it's still an

opinion.  Right?

MR. VOGT:  It could be.  But then you'd have to look

at, even if you considered it to be an opinion, whether or not

it's based on undisclosed facts because, as we set forth in our

moving papers, Judge, if it's based on --

THE COURT:  You're saying that implicit in their,

quote, opinion, assuming we were to view it that way, are

assumptions of fact that can be falsified or proven, as the

case may be, and therefore there are facts being asserted here,

even if ultimately it leads to an opinion, but it's an opinion

that is based on, among other things, proveable or falsifiable

facts?

MR. VOGT:  Correct.  And I think that is a distinction

between the case that my adversary was noting, where the

husband leaving for another woman, the court -- I believe the

quote is -- the author there didn't pretend to have the inside

dope.  It's the opposite here.  You have the newspaper of

record, with its entire editorial board, putting out a piece

saying a link was established; not only was that link

established but it was clear and it was direct.  That's not the

situation that you have in the book in that case.

So I think, your Honor, you're not here talking about

H7VKPAL2

1    a situation that's not verifiable.  I would point out -- I know

2    it's not binding on the Court, but we did cite to a Texas case

3    which at least factually was the most similar thing that I

4    could find here, which was the Darby case out of Texas, where

5    the New York Times was sued because a reporter made a claim

6    that an FBI informant had encouraged a plot to throw firebombs

7    at a political convention.  And in that case, the Court

8    concluded that that's not a statement of unfair libel opinion.

9    Encouragement is very similar to incitement.  I know that the

10   phraseology is not identical, but in that case at least, The

11   Times had to defend itself against the claim.

12          THE COURT:  Thank you very much.

13          I want to thank both counsel both for their excellent

14   arguments and also for politely enduring my dumb questions.

15   This is an interesting matter, not as interesting, of course,

16   as the bench trial I'm conducting right now, but here's what I

17   am going to do:  I will get you a decision on this motion no

18   later than the end of August, but I am going to stay all

19   discovery until then.  And then, depending how we come out on

20   that, we'll either move forward on discovery or not and adjust

21   the schedule a little bit if we have to as a result.  So, I'll

22   reserve for now, and take the matter sub judice.

23          Anything else anyone needs to raise?

24          Very good.  Thanks very much.

25          MR. BROWN:  Thank you, your Honor.   * * *