H8gdpalh
                              Hearing

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    SARAH PALIN,

4                    Plaintiff,                New York, N.Y.

5            v.                                17 Civ. 4853(JSR)

6    THE NEW YORK TIMES COMPANY, a
     New York corporation,
7
                     Defendant.
8
     ------------------------------x
9
                                               August 16, 2017
10                                             2:04 p.m.

11   Before:

12                     HON. JED S. RAKOFF,

13                                             District Judge

14                          APPEARANCES

15   BAJO CUVA COHEN TURKEL
          Attorneys for Plaintiff
16   BY:  KENNETH G. TURKEL
          SHANE B. VOGT
17            – and –
     GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP
18   BY:  SHAWN PRESTON RICARDO

19   LEVINE SULLIVAN KOCH & SCHULZ, LLP
          Attorneys for Defendant
20   BY:  DAVID A. SCHULZ
          MICHAEL D. SULLIVAN
21        JAY WARD BROWN

22

23

24

25

H8gdpalh

Hearing

1    THE CLERK:  This is August 16, 2017.  This is Sarah

2    Palin versus The New York Times, docket number 17 Civil 4853.

3         Will everyone please be seated, and will the parties

4    please identify themselves for the record.

5         MR. TURKEL:  Your Honor, Ken Turkel on behalf of the

6    plaintiff, Sarah Palin.

7         MR. VOGT:  Shane Vogt on behalf of the plaintiff,

8    Sarah Palin.

9         MR. RICARDO:  Shawn Ricardo on behalf of the

10   plaintiff.

11        MR. SCHULZ:  David Schulz on behalf of the defendant.

12   And, Judge, with me this afternoon is Michael Sullivan, who has

13   a pro hac vice motion pending but with the Court's permission

14   will participate today.

15        THE COURT:  Yes.

16        MR. SULLIVAN:  Michael Sullivan, your Honor, on behalf

17   of the defendant.

18        MR. BROWN:  And Jay Brown for the defendant, your

19   Honor.

20        THE COURT:  All right.  Please be seated.

21        So the Court has, pursuant to its Order of

22   August 10th, convened this evidentiary hearing.  So my

23   understanding is that the editorial in question had an original

24   author who is not available today but if it's necessary we'll

25   decide at the end of the hearing whether it is necessary to

H8gdpalh                          Bennet - direct

1    call that person, but that most of the language that is the

2    subject of the complaint was added by a second person who is

3    available.  So, please call the person.

4              MR. SULLIVAN:  Your Honor, the defendant calls

5    Mr. James Bennet.

6              THE COURT:  All right.

7              THE CLERK:  Please take the witness stand.

8     JAMES BENNET,

9         called as a witness by the defendant,

10        having been duly sworn, testified as follows:

11             THE CLERK:  Please be seated.

12             Please state your name and spell it slowly for the

13   record.

14             THE WITNESS:  My name is James Bennet.  J-a-m-e-s

15   B-e-n-n-e-t.

16             THE COURT:  All right.  Counsel, you have a half hour.

17             MR. SULLIVAN:  Thank you, your Honor.

18   DIRECT EXAMINATION

19   BY MR. SULLIVAN:

20   Q.  Good afternoon, Mr. Bennet.

21             Where are you employed?

22   A.  I work for The New York Times.

23   Q.  What is your position at The Times?

24   A.  I am the editorial page editor.

25   Q.  How long have you held that position?

1    A.  Since late spring of last year?

2    Q.  Where did you work prior to that?

3    A.  I worked at The Atlantic before that.

4    Q.  And what period of time were you with The Atlantic?

5    A.  I was there for ten years, from 2006 to 2016.

6    Q.  All right.  What was your position there?

7    A.  I was the editor-in-chief and then the editor-in-chief and

8    president.

9    Q.  Where did you work before that, before you joined The

10   Atlantic?

11   A.  I was at the New York Times before that for about 15 years.

12   Q.  All right.  And in what capacity did you serve?  Were you a

13   reporter or were you on the editorial staff?

14   A.  I was a reporter.

15   Q.  Let's now shift our focus, and I'm going to have you direct

16   your attention to the editorial at issue which was published by

17   The New York Times on June 14, 2017, titled "America's Lethal

18   Politics."

19        Now, Mr. Bennet, could you please tell us generally

20   how the editorial came to be written, the genesis for the

21   piece?  What was the genesis for that editorial?

22   A.  Well, after the shooting that morning in northern Virginia,

23   our editorial writer, based in Washington, suggested -- raised

24   the idea that we should --

25        THE COURT:  Just for the record, what is it you are

H8gdpalh                        Bennet - direct

1  looking at?

2          THE WITNESS:  I'm looking at the editorial.

3          THE COURT:  Which is?

4          MR. SULLIVAN:  Exhibit 1, your Honor, in the

5  defendant's binder, but it is also Exhibit 1 to the plaintiff's

6  complaint.

7          THE COURT:  I see.  OK.  Very good.  Go ahead.

8  BY MR. SULLIVAN:

9  Q.  Pardon me.  You were saying that that morning -- the

10  morning of the shooting, I take it --

11  A.  Right.

12  Q.  -- in northern Virginia?

13  A.  She initially raised the idea that we should comment.  And

14  we had a fair amount of back and forth then and over the course

15  of the day among editors and writers about the points that we

16  wanted to make.  And there were three -- in the end three basic

17  points that we arrived at.  One was simply, to the extent of

18  our ability, to focus attention on the horror of that day and

19  the act that these representatives out playing baseball on a

20  summer morning had come under fire; secondly, to restate what's

21  been a longstanding position of The Times' editorial board in

22  favor of sensible gun control of one sort or another, and,

23  third, to express concern about the state of political rhetoric

24  in the country and of political incitement, the danger that

25  we're increasingly treating political opponents like enemies in

1    a conflict.

2    Q.  All right.  Let me ask you this.  As you sent her off on

3    this task, did you give her any guidance and additional

4    direction?

5    A.  I asked her to look back at the editorials that The Times

6    had published in the immediate wake of the shooting of Gabby

7    Giffords, because my assumption was that we had talked about

8    the political climate and I wanted to harmonize whatever we

9    were saying now with the position the board had taken.  And

10   that is if we were concerned about the role of political

11   incitement, then we should be concerned about it in this case

12   as well.

13   Q.  OK.  Now, did you receive a draft of the editorial later

14   that day?

15   A.  I did.

16   Q.  And approximately what time was it that you received the

17   draft?

18   A.  It was around 5 o'clock, or a little thereafter, that I had

19   the drafts.

20   Q.  Did you, when you received this draft, did you review it?

21   A.  I did, yeah.

22   Q.  OK.  And tell me, what was your reaction to the draft?

23           THE COURT:  So have you included that draft in your

24   exhibits?

25           MR. SULLIVAN:  They were provided to the Court --

1           THE COURT:  No.  Answer my question.

2           MR. SULLIVAN:  It's not in our exhibits, your Honor.

3           THE COURT:  So are you not planning to offer it?

4           MR. SULLIVAN:  I'm not offering it.

5           THE COURT:  Well, I'm offering it.

6           Mark this as Court Exhibit 1, and it was represented

7    to the Court that this was the draft that your colleague

8    prepared.

9           And let me show it to you and see if you can confirm

10   that.

11          (Handing)

12          THE WITNESS:  That is correct, your Honor.

13          THE COURT:  Very good.  Go ahead.

14          MR. SULLIVAN:  Thank you, your Honor.

15   BY MR. SULLIVAN:

16   Q.  So just to see where we are.  The draft that the Judge just

17   handed you is in fact the draft that Ms. Williamson provided?

18   A.  I believe so, yeah.

19   Q.  All right.  Now, you get that draft.  You look it over.

20   And I think I have asked you before, what was your reaction?

21   When you saw this draft and you had examined it, what was your

22   reaction?

23   A.  That it was very much a first draft and that it wasn't

24   exactly accomplishing the objectives that we had set out that

25   morning to achieve.  I was really focused on the top of it

initially that read to me much more like a summary of the news

and the kind of work that -- the kind of information that most

of our readers would already be in possession of by the time

they received our editorial, and I was interested in having a

top on the piece that again, as I said earlier, more just sort

of conjured the sense of the horror of the day and the

significance of this act.

Q.  All right.  So basically kind of what you had in mind; is

that fair to say?

A.  Yeah, that's fair to say.

Q.  All right.  So did you send the draft back to

Ms. Williamson for revision?

A.  I didn't.  I remember I started to write a note on the top

for purposes of -- you know, with some instructions for the

purpose of sending it back, but it was late in the day and our

deadlines were looming.

         THE COURT:  I'm sorry, Mr. Bennet.  Maybe you ought to

move that microphone down a little because you are sort of

looking at the -- as you are talking, you are looking at the

exhibit so it is not picking up.

         THE WITNESS:  OK.  Is that better?

         THE COURT:  Yes, that is better.

A.  I was concerned about the deadlines approaching.  We just

didn't have that much time, and I wound up plunging in and just

beginning to effectively rewrite the piece.

H8gdpalh                        Bennet - direct

1    Q.  OK.  You concluded --

2    A.  On the top.

3    Q.  -- about the time restrictions.  Did it make more sense for

4    you to just roll your sleeves up and do it yourself?

5    A.  Yes.

6    Q.  All right.  Now --

7            THE COURT:  So plaintiff's counsel was on the verge of

8    standing up because of the blatantly leading question.

9            MR. TURKEL:  Yes, your Honor.

10           THE COURT:  I think we ought to refrain from leading

11   from now on.

12           MR. TURKEL:  Judge, may I have one moment?

13           THE COURT:  Yes.

14           MR. TURKEL:  Given the sort of circumstances of this

15   hearing, I don't know how relaxed or not relaxed evidentiary

16   rules are going to be as to documents, things like that.

17           THE COURT:  Well, the Rules of Evidence do not

18   strictly apply to this hearing.  Nevertheless, since the object

19   of both the rules of evidence and this hearing is to arrive at

20   the truth, if you think something is sufficiently in derogation

21   of the truth, then you should raise objection and I'll rule.

22   So leading tends to be in derogation of the truth because it

23   substitutes the words of counsel for the words of the witness,

24   which when it is a friendly witness is not a useful way to

25   proceed.  That's why I sustain your silently made objection.

1          MR. TURKEL:  Thank you, Judge.

2          MR. SULLIVAN:  All right.  I will abide by sort of the

3     spirit of that discussion then.  Thank you.

4          THE COURT:  Go ahead, counsel.

5          MR. SULLIVAN:  Thank you, your Honor.

6     BY MR. SULLIVAN:

7     Q.  Mr. Bennet, would you now look again at Exhibit 1 to the

8     complaint, which, your Honor, as I mentioned earlier, is also

9     Exhibit 1 of our exhibits here.

10         THE COURT:  I am going to assume all of these exhibits

11    for both sides will be received on consent unless either side

12    raises an objection at the moment that they are presented.

13         MR. SULLIVAN:  Yes, your Honor.

14         (Defendant's Exhibit 1 received in evidence)

15    BY MR. SULLIVAN:

16    Q.  All right.  Now, looking at Exhibit 1 there, that is the

17    editorial at issue, correct?

18    A.  Yes.

19    Q.  OK.  If you would turn to the second page of the editorial,

20    look, please, at the first paragraph at the very top of the

21    page.  Do you have that?

22    A.  I do.

23    Q.  OK.  Do you see where it states, "Was this attack evidence

24    of how vicious American politics has become?  Probably.  In

25    2011, when Jared Lee Loughner opened fire in a supermarket

1    parking lot, grievously wounding Representative Gabby Giffords

2    and killing six people, including a 9-year-old girl, the link

3    to political incitement was clear.  Before the shooting, Sarah

4    Palin's political action committee circulated a map of targeted

5    electoral districts that put Ms. Giffords and 19 other

6    Democrats under stylized crosshairs."  Do you see that?

7    A.  I do.

8    Q.  OK.  Now, focusing specifically on the language, "the link

9    to political incitement was clear," do you see that passage?

10   A.  I do, yeah.

11   Q.  And are you the author of that passage?

12   A.  I am.

13   Q.  Could you explain what you meant by the term "political

14   incitement" when you wrote this?

15   A.  Yeah.  There are a couple of things at work there.  One, I

16   had been very much affected by and was thinking about that day

17   a column that a colleague of mine, Tom Friedman, had written

18   during the course of the presidential campaign -- the last

19   presidential campaign.  Then candidate Donald Trump had at a

20   rally and in a speech -- I won't get the words exactly

21   correct -- had said something to the effect that, well, maybe

22   the Second Amendment people can do something about Hillary

23   Clinton.  And Tom had made a connection that day that I did not

24   make.  He had said that -- he wrote a piece saying basically to

25   hold on.  I have seen this movie before.  This is the kind of

H8gdpalh                        Bennet - direct

language that was heard at the runup to the assassination of

Rabin.  We need to take this kind of stuff very seriously.

          And then that morning in June this terrible thing had

happened.  Right?  We had actually seen the Congressman come

under fire on this field in Virginia.  And I was looking for a

very strong word to write about the political climate because I

wanted to get our readers' attention.  This is a word that we

do use sometimes; we don't use it every day.  We use lots of

strong expressions like "inflammatory rhetoric," things like

that.  Those aren't actually quite as powerful expression as it

has been largely drained of its power because it is used so

often, "incendiary rhetoric," so on and so forth.

          Also, I was thinking about -- the way I view that

particular word from is in my experience in one of my roles at

the time that I was a correspondent in Jerusalem at one point

for The Times, and the word "incitement" is used there by the

Israelis -- in my time by the Israelis about the Palestinians

but also, to some degree, by the Palestinians about the

Israelis to talk about a range of communications from, you

know, to deliberate orders, invocations, summonses for people

to carry out violent attacks to textbooks that are published

that align important facts from the other side's national

narrative or history, to tell outright lies about that history,

to maps that misrepresent the politics of the region.  And

that's specifically where I was drawing that word from.

1          THE COURT:  Well, maybe I am misunderstanding the

2     question.  What you're linking to political incitement is the

3     shooting by Mr. Loughner in 2011 of Ms. Giffords and others,

4     yes?

5          THE WITNESS:  Your Honor, what I was thinking of with

6     the word the link to political incitement was clear.  What I

7     was thinking of was the link between an example of political

8     incitement and this larger atmosphere.  What I mean is I was

9     very mindful as I was editing this editorial, I was thinking

10    here we are, we're deploring political incitement on the left.

11    We're not actually calling out any concrete example of such

12    incitement, not citing a single politician or political

13    organization.  And we were looking for -- I had asked

14    Elizabeth, I had said -- the shooter in Virginia was a Bernie

15    Sanders supporter.  One of the questions I'd asked was is there

16    an example of really incendiary rhetoric from Bernie Sanders?

17    Is there a connection between -- we didn't see that word and we

18    didn't see a connection between the victims in Virginia and any

19    specific political incitement.  That was the link I was

20    thinking of.

21         THE COURT:  Well, maybe I am asking a more narrow

22    question.  I am asking a question about grammar and sentence

23    structure, which presumably you have some expertise in.  The

24    sentence in its entirety reads:  "In 2011, when Jared Lee

25    Loughner opened fire in a supermarket parking lot, grievously

wounding Representative Gabby Giffords and killing six people,

including a 9-year-old girl, the link to political incitement

was clear."  Doesn't that mean as a matter of ordinary English

grammar and usage that that sentence is saying that the

shooting in 2011 was clearly linked to political incitement?

THE WITNESS:  That is not what I intended it to mean.

I understand what you're saying, your Honor.  But what I was

thinking of was of the link between the victim and the overall

climate, that there was actually an example of political

incitement that we could point to in that case to create a link

between the victim and the incitement.  I wasn't -- what I

wasn't trying to say was that there was a causal link

between -- a direct causal link between this map and the

shooting.

THE COURT:  In the next sentence you seem to be saying

that the political incitement was the result, in part, of Sarah

Palin's political action committee's map, yes?

THE WITNESS:  In which sentence, your Honor?

THE COURT:  The very next sentence, "Before the

shooting, Sarah Palin's political action committee circulated a

map of targeted electoral districts that put Ms. Giffords and

19 other Democrats under stylized crosshairs."

THE WITNESS:  Right, your Honor.  That is the -- is

again -- in my mind was the example -- the specific example

of -- and the word I used was "political incitement" or

1   "incendiary rhetoric" that connected the climate to the victim.

2               THE COURT:  OK.

3               THE WITNESS:  That is the link.

4               THE COURT:  So if that's the specific example of

5   political incitement that you are referring to, the whole point

6   of this is to link it to various crimes such as the shooting of

7   Ms. Giffords, yes?

8               THE WITNESS:  What I was concerned about is the

9   overall climate of political incitement and whether that gives

10  permission, to some degree, for violence against elected

11  officials.  I wasn't trying to say that any particular piece of

12  political incitement causes a maniac like Jared Lee Loughner to

13  take up arms and shoot at elected representatives.  I don't --

14  I just -- there isn't a part of it -- to my mind, it is a

15  distinction with a very big difference there between -- I

16  simply don't think -- I think that politicians who say things

17  that are incendiary should be criticized for saying things that

18  are incendiary hopefully before something terrible happens,

19  certainly after something terrible happens.  But I don't

20  think -- I think that it's well sort of saying that in saying

21  something terrible, they're causing a violent action to take

22  place.

23              THE COURT:  Well --

24              THE WITNESS:  I didn't mean to suggest the author

25  wasn't responsible -- I'm sorry, your Honor.

1          THE COURT:  If I understand what you're saying, you're

2     saying this map circulated by Sarah Palin's political action

3     committee was a direct cause of the kind of political

4     incitement that you think led to various acts of violence?

5          THE WITNESS:  I would not use the word "cause," your

6     Honor.  I would say that it is an example of the kind of

7     political incitement that contributes to this atmosphere.

8          But I was, again -- in my mind what I was doing was

9     drawing a contrast that I had -- that we had not found yet.

10    This goes back to even the introductory question there, "Was

11    this attack evidence of how vicious American politics has

12    become?  Probably."  The reason we said probably is that we

13    didn't yet have an example of incendiary politics that

14    connected to the victims in Virginia.

15         THE COURT:  So in the next paragraph, immediately

16    after the sentences we just talked about, you say,

17    "Conservatives and right-wing media were quick on Wednesday to

18    demand forceful condemnation of hate speech and crimes by

19    anti-Trump liberals.  They're right.  Though there's no sign of

20    incitement as direct as in the Giffords attack, liberals should

21    of course hold themselves to the same standard of decency that

22    they ask of the right."  Do you see that?

23         THE WITNESS:  Yes, I do.

24         THE COURT:  And that was your language, yes?

25         THE WITNESS:  Yes.

1            THE COURT:  So what was the -- what did you mean by

2      saying that the Giffords attack was a direct result of

3      incitement?

4            THE WITNESS:  It is the same idea, your Honor.  It is

5      the same -- there was a sign of incitement of the kind of

6      incitement that can contribute to this atmosphere.  Again, it

7      wasn't in my head that that was -- that was tantamount to

8      complicity in attempted murder.  It's simply rhetoric.  It

9      contributes to an angry environment that I did not intend to

10     imply that it was a causal link to this -- to this crime.

11           THE COURT:  Were you of the belief, or did you have

12     any information that suggested that what you are referring to

13     as political incitement was in any way linked to Mr. Loughner's

14     criminal activities?

15           THE WITNESS:  I did not know for certain one way or

16     another.

17           THE COURT:  What made you think that it might be true?

18           THE WITNESS:  Again, I wasn't -- I didn't -- I did not

19     think that Jared Loughner was acting because of -- it didn't

20     enter my reasoning at the time that Jared Loughner was acting

21     because of this map.  I was adducing the map only -- I was

22     adducing the map only as an example or intending to adduce the

23     map, your Honor, I should say, only as an example of the kind

24     of rhetoric that does contribute to this atmosphere of

25     political incitement and simply saying that in this case --

1    simply attempting to say that in this case there was a link

2    between such a -- such an example of inflammatory rhetoric and

3    the victim.  It was actually intended as a small point, but I

4    recognize that it introduced -- it was certainly read the way

5    you are reading it by many people.

6                THE COURT:  Is that why you then -- who was

7    responsible for issuing the correction?

8                THE WITNESS:  I was.

9                THE COURT:  Go ahead, counsel.

10               MR. SULLIVAN:  Thank you, your Honor.

11   BY MR. SULLIVAN:

12   Q.  We've discussed the use of "incitement" in the two

13   paragraphs.  I want to focus on the second paragraph that

14   mentions incitement, and that is the one immediately below the

15   first one you were directed to.

16               And you'll see there that that paragraph says,

17   "Conservatives and right-wing media were quick on Wednesday to

18   demand forceful condemnation of hate speech and crimes by

19   anti-Trump liberals.  They're right.  Though there's no sign of

20   incitement as direct as in the Giffords attack, liberals should

21   of course hold themselves to the same standard of decency that

22   they ask of the right."

23               Now, you see that reference there to "sign of

24   incitement" in that first clause of the third sentence, do you

25   see that?

1    A.  Yes.

2    Q.  OK.  Were you using the word "incitement" in the same sense

3    you explained to us earlier about based on your background?

4    A.  Yes.

5    Q.  OK.  And could you explain to us what you meant when you

6    wrote that there's no sign of incitement as direct as in the

7    Giffords attack?  I take it -- were you comparing the two

8    incidents, and what did you draw from that?

9    A.  I was, again, drawing a distinction here between what we --

10   again, my focus was again on the idea of left-wing incitement

11   and what had happened in Virginia that day.  And I was trying

12   to simply say even though we were -- we were criticizing the

13   left -- that what I thought I was dealing with and trying to

14   deal with was that we were criticizing the left for creating an

15   atmosphere of incitement, but we didn't have an example that

16   connected the victims there to that atmosphere.  I was then

17   describing the Giffords shooting that occurred in also an

18   atmosphere of great political anger and saying that there was

19   an example there of a link between the -- a concrete piece of

20   incitement and the victim.  I did not intend -- I just did not

21   intend -- I was not thinking of it as a causal link to the

22   crime.

23   Q.  All right.  Let me ask you this.  When you tasked your

24   people to do some, you know, looking into this, did they come

25   back with any information suggesting that Bernie Sanders had

H8gdpalh                          Bennet - direct

1    used rhetoric directed to the Congressman who was shot that

2    morning?

3    A.  No.  No.

4    Q.  Any at all?

5    A.  They didn't find anything that day.

6    Q.  All right.  If you would look again, please, at the first

7    paragraph and look now at the last sentence.  Do you see where

8    it says, "Before the shooting, Sarah Palin's political action

9    committee circulated a map of targeted electoral districts that

10   put Ms. Giffords and 19 other democrats under stylized

11   crosshairs"?

12   A.  Yes.

13   Q.  OK.  Did you draft that sentence?

14   A.  No, I didn't.

15   Q.  And where did you get it?

16   A.  I believe I took it from the original draft, yes.

17             THE COURT:  Court Exhibit 1 has that language, yes.

18             MR. SULLIVAN:  OK.  Thank you.

19   BY MR. SULLIVAN:

20   Q.  You see that the word "circulated" is underscored; do you

21   see that?

22   A.  Yes.

23   Q.  All right.  Now, if you were reviewing this on The Times'

24   website and you clicked on that word, a hyperlink would take

25   you to the ABC News website, where there are articles from 2011

1    about the Giffords shooting.  Mr. Bennet, at any point before

2    publication of the editorial, did you click on that hyperlink

3    and review those ABC stories?

4    A.  No.

5    Q.  In preparing this editorial, at any point before

6    publication did you review the so-called crosshairs map that's

7    referred to in this piece?

8    A.  I didn't look at the map, if that's what the question is,

9    no.

10   Q.  Yes.  All right.

11            THE COURT:  Why not?

12            THE WITNESS:  I was not reporting the editorial, your

13   Honor, I was editing it, and so I was working from the draft

14   that was in front of me on a tight deadline.

15            THE COURT:  Back when you were editor of the Atlantic,

16   that included during the period when this shooting of

17   Ms. Giffords occurred, yes?

18            THE WITNESS:  Yes.

19            THE COURT:  And there was some suggestion at that time

20   that the map was somehow involved, and there were considerable

21   press reports that eventually culminated in I think a consensus

22   that there was no direct causal relationship.  At the time, did

23   you read those articles?  Do you have a recollection of reading

24   those articles?

25            THE WITNESS:  I don't have any recollection of it,

1   your Honor.

2           THE COURT:  Do you have a recollection of ever seeing

3   the map before?

4           THE WITNESS:  I don't, which doesn't mean I didn't see

5   it.  I just don't remember it.

6           THE COURT:  Go ahead, counsel.

7           MR. SULLIVAN:  Thank you, your Honor.

8   BY MR. SULLIVAN:

9   Q.  Now, in this process, let's go to the point where you had

10  finished your work on the piece.  It is now later in the day.

11  To your knowledge, were any substantive changes made to the

12  editorial after you completed your work on it?

13  A.  No.

14  Q.  Are you the person who authorized publication of the

15  editorial?

16  A.  Yes.

17  Q.  At the time you authorized publication, did you believe

18  that the statements in the editorial that we discussed

19  regarding political incitement and the crosshairs map were in

20  any sense false?

21  A.  No.  I believed them to be true.

22  Q.  All right.  Now, at my request, have you reviewed the two

23  articles attached to plaintiff's complaint as Exhibits 9 and

24  10, which are about the Giffords shooting and which The Times

25  published back in 2011?

H8gdpalh                    Bennet - direct

1   A.  Yes -- I'm sorry.  Exhibits 9 and 10?

2   Q.  Those were 9 and 10 to plaintiff's original complaint.

3   A.  I'm sorry.

4          THE COURT:  Are they separately marked here?

5          THE WITNESS:  They are.  But I know the ones you are

6   referring to from --

7   Q.  Sorry.  It is the two ones that appeared in The Times --

8          THE COURT:  So, I mean, just so we can maintain some

9   sort of --

10         MR. SULLIVAN:  Order.

11         THE COURT:  -- order or perhaps confusion, you are

12  referring to Defendant's Exhibits 5 and 6?

13         MR. SULLIVAN:  That is correct, Judge.

14         THE COURT:  OK.

15         MR. SULLIVAN:  Thank you.

16  BY MR. SULLIVAN:

17  Q.  All right.

18  A.  OK.

19  Q.  Did you review Defendant's 5 and 6?

20  A.  After you asked me to, yes.

21  Q.  Yes.  Exactly.  At my request, after the onset of suit.

22         Now, did you review either of those articles in

23  connection with your work on the editorial?

24  A.  That day when we were -- no, I did not.

25  Q.  OK.  And do you recall ever having read either of those two

1  articles previously?

2  A.  I don't remember.  I don't recall that.

3  Q.  OK.  Now, again, at my request, have you reviewed the three

4  articles attached to the complaint, and I'll give you the

5  corresponding, but they are Exhibits 6, 7 and 8 to plaintiff's

6  complaint which are --

7           THE COURT:  Defendant's Exhibits 2, 3 and 4.

8           MR. SULLIVAN:  Once again, thank you, your Honor.

9  Q.  So, Mr. Bennet, if you want to look in the binder.

10  A.  Yes.

11  Q.  You see Defendant's Exhibits 2, 3 and 4?

12  A.  Yes.

13  Q.  OK.  Now, those are about the Virginia shooting and they

14  were published by The Times on June 14 and 15 after publication

15  of the editorial.  Do you see that?

16  A.  Yeah.

17  Q.  All right.  Did you ever review those, those exhibits?

18  A.  Did I ever review them?  Yeah, I did.

19  Q.  And when did you review them?

20  A.  That was in a Burns story I saw the next day.  That is the

21  day after our editorial appeared in print, the 15th I think,

22  and the other is I saw that day and subsequently.  I'm not sure

23  exactly when.

24  Q.  OK.  But to put a final point on it, I take it you reviewed

25  them after publication of your editorial?

1  A.  Yes.

2  Q.  All right.  Let me ask you something.  Does The Times

3  editorial board maintain some sort of file about the Giffords

4  shooting or Jared Loughner that you could have consulted in

5  preparing the editorial?

6  A.  Not that I know of.

7          THE COURT:  So when those links were prepared that you

8  could, if you had the electronic version of the editorial, you

9  could press up and access --

10          THE WITNESS:  Yes.

11          THE COURT:  -- who prepared that?

12          THE WITNESS:  I believe that Elizabeth Williamson

13  prepared those links.

14          THE COURT:  And was that before or after -- was that

15  part of what she had sent to you?

16          THE WITNESS:  Yeah.  That language was in her -- I

17  think if you look at her original --

18          THE COURT:  I'm not talking about the language.  I'm

19  talking about the articles that are linked to that language.

20          In other words, if I understand it --

21          THE WITNESS:  Yes.

22          THE COURT:  -- she actually gave you the language,

23  "Before the shooting, Sarah Palin's political action committee

24  circulated a map of targeted electoral districts that put Ms.

25  Giffords and 19 other Democrats under stylized crosshairs."

1              But if you had the electronic version of that as the

2      editorial ultimately appeared, you could click on at that point

3      and get all these other articles?

4              THE WITNESS:  Oh, yeah.  Yes.

5              THE COURT:  So my question is when she sent it to you,

6      could you do that?

7              THE WITNESS:  I could have done that, yes.

8              THE COURT:  Did you do that?

9              THE WITNESS:  No, I didn't do that.

10             THE COURT:  OK.  Go ahead, counsel.

11             MR. SULLIVAN:  Thank you, your Honor.

12     BY MR. SULLIVAN:

13     Q.  Now, in preparing the editorial, did you review any

14     articles in any publications that reported there was no

15     evidence that Jared Loughner had ever seen the crosshairs map?

16     A.  When -- I'm sorry.  Can you ask the question again?

17     Q.  Sure.  Sure.  In preparing the editorial, you doing your

18     work that day, did you review any articles in any

19     publications -- now we are going beyond The Times -- that

20     reported that there was no evidence that Jared Loughner had

21     ever seen the crosshairs map?

22     A.  No.

23     Q.  OK.  At the time you wrote the editorial, did you know one

24     way or the other whether Jared Loughner had ever seen the

25     crosshairs map?

1   A.  No, I didn't, no.

2   Q.  All right.  What we are going to do now -- our time grows

3   short --

4           THE COURT:  Yes, I am going to give you a few extra

5   minutes because I interrupted your direct with the questions I

6   had.  So we will subtract that from your half hour.  So you

7   have about seven minutes left.

8           MR. SULLIVAN:  Perfect.  Thank you, your Honor.

9   Q.  Shifting our focus once again, after the editorial was

10  published, did there come a time when you became aware of

11  public postings on social media criticizing the editorial?

12  A.  Yes, late that night, sometime between 11:30, I think, and

13  midnight or so.

14  Q.  All right.  Did you read those comments?

15  A.  I read some, yeah.

16  Q.  OK.  And you read them that very evening?

17  A.  Yes.

18  Q.  All right.  As you read those comments, did they cause you

19  any concern?

20  A.  Yeah, they caused me a tremendous amount of concern, yes.

21  Q.  And what was your concern?

22  A.  Well, there were two -- there were two things that I saw,

23  that I remember seeing, that caused me a huge amount of

24  concern.  One was -- and I can't -- I remember having -- I

25  don't know if I was drawing the inference or if I was actually

1    seeing this, but that it actually had been dispositively shown

2    that there was no connection between political incitement and

3    the shooting of Gabby Giffords.  And if that was the case, we

4    shouldn't have mentioned the shooting in the course of this

5    editorial whatsoever.  So that was hugely concerning to me.

6            And the second was that we were accusing her -- in

7    this editorial, we were accusing Governor Palin of complicity

8    in this shooting, which, again, I also didn't remotely intend.

9    I just don't think that -- again, I didn't know if Jared

10   Loughner had seen the map or not, but I do think -- I did think

11   then and do think now that he was responsible for that

12   shooting.  And politicians should be, I think, criticized when

13   they use incendiary rhetoric, but it doesn't mean when they do

14   that -- I don't believe that it means when they do that that

15   they're trying to get anybody killed.  Really, we didn't mean

16   to communicate that, so I was very concerned to see that that

17   was one of the inferences that people had drawn from what I had

18   written.

19   Q.  All right.  In light of these concerns, what, if anything,

20   did you do to address those concerns?

21   A.  Very early that morning, which is the 15th, I think around

22   5 a.m., I reached out to Elizabeth again, Williamson, in

23   Washington and to one of the researchers on our staff, and I

24   asked them to, with fresh eyes, go back and ascertain what was

25   known and what was not known, what were the facts about the

1    relationship between Loughner's shooting and political

2    incitement.

3    Q.   All right.  When did you do that?

4    A.   Well, I reached out to them I think it was around 5 a.m.

5    Q.   All right.

6    A.   And I asked them -- we had a daily editorial board meeting

7    that morning, and I believe I asked them to skip it and focus

8    their attention wholly on resolving this, because I said, look,

9    if these accusations were correct, we needed to correct the

10   editorial.

11   Q.   OK.  Now, what did you learn about the question you asked

12   to be researched?  What was the -- what did they come back

13   with?

14   A.   I did not get clarity from our team by the time the

15   editorial board meeting ended, which is, I don't know, 10:15 or

16   10:30 that morning, maybe.  But somebody then showed me the

17   story that you brang me to earlier, that Alex Burns story that

18   had dealt with this subject and that had said that it wasn't

19   established clearly one way or the other.  I'm not using the

20   precise words that were used in that story, but those were the

21   precise words that we had then drawn to correct the editorial.

22   Q.   OK.  In the Alex Burns piece to which you refer, that is a

23   news report?

24   A.   Yes, that's right.

25   Q.   All right.  So what did you ultimately decide with respect

1   to whether a correction was warranted?

2   A.  We had -- we had created -- I had created an ambiguity that

3   people were reading to say something we didn't mean to say.

4   And that's not their fault, that's not our fault; that is a

5   mistake.  Right?  And so my priority was to correct the record

6   and -- and -- and I mean our first priority is to get the facts

7   right.  And so that's what -- that's what I was trying to do.

8   And I relied on the news report to do that.

9   Q.  All right.  When did you publish that correction?

10  A.  I think it was around 11 a.m./11:15, but we published more

11  than one correction.

12  Q.  As to that first one, that was 11:15?

13  A.  Yes.

14  Q.  The following morning?

15  A.  Yes.

16  Q.  11:15 a.m.?

17  A.  Yes.

18  Q.  Now, did you subsequently add to the initial correction?

19  A.  Yes, we did.  We were --

20  Q.  How did you --

21  A.  Well, we were scrambling, I will say, a little bit, and we

22  had dealt with the problem in the paragraph, the first

23  paragraph that caused the concern, but we had neglected to deal

24  with the "there's no sign of incitement as direct" language in

25  the following paragraph, which, as I said earlier, we repeated

H8gdpalh                        Bennet - direct

1   the same idea and created the same confusion as a result.  So

2   we then went back in and corrected that.

3   Q.  All right.  And did you at some point deal with this

4   business about the so-called crosshairs map?

5   A.  That came even later in the day.  I was not aware that

6   people were reading that to mean that -- that the actual

7   photographs of these representatives had been put under the

8   crosshairs.  That was brought to my attention later that day

9   actually by our communications office that had gotten an

10  inquiry from another news source.  And once I knew that people

11  were reading that to mean, you know, something that was

12  incorrect, we corrected that as well.

13  Q.  So you --

14          THE COURT:  So, just so I'm clear on this -- and I

15  understand the original source of this language was

16  Ms. Williamson and not yourself.  So the act -- you now looked

17  at the actual --

18          THE WITNESS:  Yes.

19          THE COURT:  -- map, yes?

20          THE WITNESS:  Yes, I have.

21          THE COURT:  And what it has is crosshairs directed at

22  particular geographic districts, yes?

23          THE WITNESS:  Yes, that's right.

24          THE COURT:  Why was it in your mind -- well, let me

25  rephrase it.  Is that as it presently, as you now see that it

1    is, is that an incitement of any kind?

2              THE WITNESS:  I'm sorry, I don't understand.

3              THE COURT:  So what I'm trying to get at is did you

4    think it was an incitement and one of the reasons you left in

5    your editorial Ms. Williams' language because you thought that

6    the map showed the actual persons with crosshairs, or did you

7    think that even if it just showed the districts with crosshairs

8    it was still an incitement?

9              THE WITNESS:  I don't remember, your Honor, whether I

10   had a mental image of what the map showed or not.  I was

11   working off of the draft that had originally pointed to the map

12   as an example of incitement, and I did not -- I did not have an

13   image that led me to think one way or another.

14             THE COURT:  So when you corrected that part of the

15   editorial and issued your correction, did you discuss that with

16   Ms. Williamson?

17             THE WITNESS:  I didn't.

18             THE COURT:  Why not?

19             THE WITNESS:  I -- I was doing ten other things that

20   day and I just didn't circle back to her about it.  I don't --

21   I don't remember why not.

22             THE COURT:  All right.

23             THE WITNESS:  I do know -- I mean, I had not discussed

24   that with her.

25             THE COURT:  All right.  Go ahead, counsel.

1          MR. SULLIVAN:  Your Honor, I have no further

2     questions --

3          THE COURT:  OK.

4          MR. SULLIVAN:  -- at this time.

5          THE COURT:  Very good.  Thank you.

6          Let's have cross-examination.

7          MR. TURKEL:  Judge, if it may please the Court?

8     CROSS-EXAMINATION

9     BY MR. TURKEL:

10    Q.  Mr. Bennet, my name is Ken Turkel.  We have never met

11    before.  I represent the plaintiff in this case.  I want to

12    sort of get something clarified or at least crystallized for

13    the Court and for my benefit also, and I'm trying to parse

14    through the various versions or answers you gave to questions

15    about this.  But is it your testimony today under oath that at

16    the time June 14, 2017, that the editorial was written that is

17    at issue, that you had no idea that a consensus of media

18    organizations had agreed that there was no link between the

19    Palin map and Jared Loughner's conduct in the shooting in

20    Tucson in January 2011?

21    A.  What I understand to be true is that the consensus is that

22    there is -- we don't know one way or the other whether Jared

23    Loughner ever saw this map.

24    Q.  All right.  If that's your understanding --

25    A.  Yes.

```
 1    Q.  -- what I'm asking you is on June 14, 2017, before you
 2    rewrote this editorial, is that what your understanding was
 3    then?
 4    A.  I didn't -- I didn't know one way or the other when I was
 5    working on this editorial.  I did not know.
 6    Q.  You had no idea when you worked on this editorial?
 7    A.  Whether he had seen the map or not, I did not know.
 8    Q.  And in the same vein, then, you would have had no idea
 9    whether the map or any specific representations in the map
10    incited him to his conduct, is that correct?
11    A.  Whether the -- I did not know if the map had incited him to
12    his conduct, yes, that's correct.
13    Q.  All right.  You were at The Times from 1991 to 2006, right?
14    A.  Yes.
15    Q.  White House correspondent and Jerusalem correspondent?
16    A.  Yes.
17    Q.  You were editor-in-chief at the Atlantic from 2006 to
18    April 2016, right?
19    A.  Yes.
20    Q.  Roughly.  I know you started in The Times in April 2016.
21    A.  Yes.  But my original title was editor and editor-in-chief
22    there.
23    Q.  In 2016 -- or in 2011, were you editor-in-chief at the
24    Atlantic?
25    A.  I was either editor or editor-in-chief, yes, but I was the
```

1   editor in charge.

2   Q.  All right.  Now, I want to sort of go back through some of

3   the things you testified about in a little more detail.

4          First, we can agree that the purpose of this

5   editorial, as discussed between you and your colleagues on the

6   editorial board, was to do three things, and I think I took

7   them down right but correct me if I am wrong.  One was to

8   address the horror of the day of the Scalise shooting, correct?

9   A.  Yes.

10  Q.  Secondly, it was to assert a sensible position on gun

11  control I think were the words you used?

12  A.  I don't think those are the -- it was to restate our, you

13  know, position in favor of gun control, something like that,

14  yes.

15  Q.  That's the problem with lawyers taking down when you

16  testify the words.

17         And lastly, to express your concern about the state of

18  political rhetoric and political incitement, correct?

19  A.  That was the idea, yeah.

20  Q.  All right.  Now, one of the things you testified to, either

21  in response to the Court's questioning or Mr. Sullivan's, was

22  that you had told Ms. Williamson to go back and look at

23  previous Times editorials that had been written in the wake of

24  the Giffords shooting, correct?

25  A.  That's right.

H8gdpalh                         Bennet - cross

1   Q.  You were aware that The Times had written editorials in the

2   wake of the shooting in Tucson, right?

3   A.  I didn't know for sure that we had but I assumed that we

4   had.

5   Q.  Do you follow any of your colleagues in the media on

6   Twitter?

7   A.  I do.

8   Q.  Do you follows Charles Blow?

9   A.  I do follow Charles, yeah.

10  Q.  Have you followed Alexander Burns?

11  A.  I think so, yeah.

12  Q.  Were you following them in 2011?

13  A.  I don't know.

14  Q.  All right.  Do you know whether Ms. Williamson ever went

15  back and looked at any of the editorials that The Times wrote

16  in the wake of the Tucson shooting in 2011?

17  A.  I do.  I am confident that she did.

18  Q.  Did she do so before she provided you with the first draft

19  of this editorial?

20  A.  Yes.

21  Q.  And when you say you are confident, because I haven't had a

22  chance to talk to her or do any real in-depth examination of

23  your emails or anything, why are you confident?

24          THE COURT:  Counsel, of course you are more than

25  welcome to tell us all about your preparation, or lack of

1    preparation, but I think it is better if you just ask

2    questions.

3              MR. TURKEL:  Understood, Judge.

4              THE COURT:  Thank you.

5    BY MR. TURKEL:

6    Q.  And you used the word "confidence."  That implies some

7    degree of certainty there?

8    A.  I asked her to do it.  I asked one of our researchers to

9    find the editorials and send them to Elizabeth, and so I'm

10   confident that she did as she was asked.

11   Q.  When you say "she," that she is the researcher?

12   A.  I know that the researcher sent editorials, and the "she"

13   I'm referring to is Elizabeth.

14   Q.  So would it be fair to say that you were then confident

15   when you received Ms. Williamson's draft that it reflected

16   whatever that research was that had been sent to you?

17   A.  Yeah.  Yes.

18   Q.  I want to look at that draft.

19             MR. TURKEL:  Now, Judge, I think that was what you

20   admitted the first as Court Exhibit 1, correct?

21             THE COURT:  Yes.

22   Q.  OK.  Do you have that in front of you, Mr. Bennet?

23   A.  I have it here somewhere.

24             Yes, I have it.

25   Q.  All right.  Now, would you agree with me that in just

 1   reading these -- the actual editorial that was published and

 2   the draft written by Ms. Williamson, that they are somewhat

 3   drastically different in their content?

 4              THE COURT:  Sustained.  Ambiguous.

 5              MR. TURKEL:  I will rephrase, Judge.

 6              THE COURT:  Good idea.

 7   BY MR. TURKEL:

 8   Q.  Do you consider the rewrite you did of the first draft to

 9   be an extensive rewrite?

10   A.  Yes, I do.

11   Q.  And when you read these two pieces side-by-side, would you

12   agree with me that the content changed substantially after your

13   rewrite?

14   A.  I'd have to read them again.  The content -- certainly the

15   writing changed.  The content, I'm not sure -- I'm not sure I

16   do agree.

17   Q.  Let's walk through it.  There are a couple of places I want

18   to point out to you.  All right?

19   A.  OK.

20   Q.  First of all, was this the only draft provided by

21   Ms. Williamson or anybody else on the board?

22   A.  Yes.

23   Q.  And you had mentioned something about having written a note

24   on top of one of them or other iterations of this draft that

25   you may have annotated?

H8gdpalh                        Bennet - cross

1   A.  There would have been -- there was the edited -- what we

2   had before us is her original draft and the final draft as

3   published.  There is a document that I would have edited that

4   had the annotations and editing changes and so forth in it.

5   Q.  And at the risk of perhaps redundancy, you received this

6   electronically, correct?

7   A.  Yes.

8   Q.  I want you to go down to the fourth full paragraph, right.

9   And the second sentence there provides as follows:  "Not all

10  the details are known yet, but a sickeningly familiar pattern

11  is emerging: a deranged individual with a gun -- perhaps

12  multiple guns -- and scores of rounds of ammunition uses

13  politics as a pretense for a murderous shooting spree."

14          Now, do you recall reviewing that sentence when you --

15  A.  I'm sure I did, yet I don't recall specifically reviewing

16  it.

17  Q.  And you would agree with me in your ultimate editorial that

18  was published, the statement that "a deranged individual uses

19  politics as a pretense" was taken out, right?

20  A.  Again, I've got to look at the other draft.  I don't --

21  Q.  Why don't you -- it would probably be helpful if you had

22  both drafts out side-by-side?

23  A.  I have the other one here now.

24          MR. TURKEL:  Judge, if the Court can indulge me?  I

25  can't remember what we called -- what we had as Exhibit 1 in

1   plaintiff's binder but I think it was Defendant's Exhibit 1.

2                  THE COURT:   It was Defendant's Exhibit 1, yes.

3                  MR. TURKEL:   Thank you, your Honor.

4   BY MR. TURKEL:

5   Q.   So what you are looking at right now, or what you should be

6   looking at, is the draft which, for the record, is the Court's

7   Exhibit 1 and the uncorrected first iteration of the published

8   editorial, which is Defendant's Exhibit 1.

9   A.   Right.   I guess what I see is a different version of that.

10  Some of the same words.

11                 Do you want me to read what's in the editorial?

12  Q.   Why don't you direct me to where you are at.   Are you on

13  page 1?

14  A.   Yes.   Exactly there, sir.

15  Q.   All right.   Now, nowhere in that paragraph do you make the

16  point or do you preserve the point made by Ms. Williamson that

17  a deranged shooter was using politics as a pretense, is that

18  correct?

19  A.   Well, it says, "The sniper, James Hodgkinson, who was

20  killed by Capitol Police officers, was surely deranged, and his

21  derangement had found its fuel in politics."

22                 So you're saying what's disappeared is the notion that

23  he was pretending that it was fueled in politics?

24  Q.   I'm not saying that.   I'm actually looking at two pieces --

25  A.   I'm sorry.   I didn't mean to put words in your mouth.

1    You're saying that Elizabeth said it.

2    Q.  Right.  We can agree that that thought, that it was a

3    pretense, was removed, correct?

4    A.  That is correct.

5    Q.  And instead what it was replaced with was a statement which

6    you wrote, which was, as you just read, "The sniper, James

7    Hodgkinson, who was killed by Capitol Police officers, was

8    surely deranged, and his derangement had found its fuel in

9    politics."

10            Now, you wrote that, right?

11   A.  Yes.

12   Q.  And you can agree with me, I would hope, that

13   Mr. Hodgkinson was dead at the scene, in other words, he was

14   killed the day of the Scalise shooting, right?

15   A.  Right.

16   Q.  By Capitol Police?

17   A.  Right.

18   Q.  No interviews, right?

19   A.  Right.

20   Q.  No criminal prosecution where he testified, right?

21   Correct?

22   A.  That's true.

23   Q.  Nobody asked him, hey, what fueled your conduct, right?

24   A.  Right.

25   Q.  Notwithstanding that, and I'm not an expert on grammar

1    either, but the form of this paragraph after you state that

2    "his derangement had found its fuel in politics," you then jump

3    to a very similar sort of paragraph structure, as you do on the

4    next page, where you make the statement -- or, rather, sentence

5    to provide:  "Mr. Hodgkinson was a Bernie Sanders supporter and

6    campaign volunteer virulently opposed to President Trump.  He

7    posted many anti-Trump messages on social media, including one

8    in March that said 'Time to destroy Trump & Co.'"

9           Do you see that?

10   A.  Yes.

11   Q.  Now, there were numerous times during the course of your

12   testimony, and I'm sure I wrote them down, but where I thought

13   what you were saying was there was no real example to use with

14   respect to Hodgkinson, right?

15   A.  There was no example of a connection between the victims

16   that day and a specific example of -- of inflammatory political

17   rhetoric that we found that day.

18   Q.  Right.  But, nonetheless, what you wrote was that politics

19   had fueled his derangement, it found its fuel in politics.

20   Then you used these sentences about Bernie Sanders, right?

21   A.  Yes.

22   Q.  All right.  Now I want you to turn to the next page.  All

23   right?  This is where we had the paragraph concerning my

24   client, Governor Palin.  And you now jump from attributing the

25   Hodgkinson attack to a derangement fueled by politics to the

1    statement that this was probably evidence of how vicious

2    American politics have become.

3            And then in a very similar sentence structure you

4    write about, "In 2011, when Jared Lee Loughner opened fire in a

5    supermarket parking lot, grievously wounding Representative

6    Gabby Giffords and killing six people, including a 9-year-old

7    girl, the link to political incitement was clear," just like in

8    the previous paragraph, you said his derangement was fueled by

9    politics, right?

10   A.  No, I was not trying to draw that exact parallel that you

11   are asserting.

12   Q.  All right.  So we can agree, regardless of what you were

13   trying to do, the structure of that sentence seems somewhat

14   familiar to the previous one, doesn't it?

15   A.  What is the structural similarity?

16   Q.  You use a factual statement about a death and then at the

17   end of it write something like "his derangement was fueled by

18   politics and the link to political incitement was clear."  You

19   don't find those structurally similar?

20   A.  I don't -- I don't --

21           THE COURT:  I'm letting him go on, but I think, for

22   example, most of these sentences have subjects and verbs that

23   seem to follow a common pattern, and I'm not convinced,

24   counsel, to be frank, that you are going to be able to make

25   much out of this particular --

H8gdpalh                          Bennet - cross

1          MR. TURKEL:  I've got one more question.  Your point

2     is well taken, Judge.

3     BY MR. TURKEL:

4     Q.  The last sentence of that paragraph at the top is the

5     sentence that says, "Before the shooting" -- in other words,

6     after you make this "link to political incitement was clear,"

7     it then says, "Before the shooting, Sarah Palin's political

8     action committee circulated a map" with a hyperlink there,

9     right?

10    A.  Yes.

11    Q.  All right.  The next paragraph you double down on it, and

12    you say, "Though there's no sign of incitement as direct as in

13    the Giffords attack," right?

14    A.  That says that, yes.

15    Q.  Now, what you'd expressed to the Court was this was

16    supposed to be or intended to be a comment on I believe you

17    said political rhetoric?

18    A.  Yes.

19    Q.  All right.

20    A.  And the political climate.

21    Q.  The political climate.

22          Now, I want you to go back to Court Exhibit 1.

23    A.  Yes.

24    Q.  And if you would look at the fifth full paragraph there.

25    A.  Mm-hmm.

H8gdpalh                         Bennet - cross

1   Q.  That's sort of the paragraph we're dealing with in the

2   ultimate editorial that starts, "Just as in 2011, when Jared

3   Lee Loughner opened fire in a supermarket parking lot,

4   grievously wounding Representative Gabby Giffords and killing

5   six people, including a 9-year-old girl, Mr. Hodgkinson's rage

6   was nurtured in a vile political climate," correct?

7   A.  Yes.

8   Q.  All right.  That changed in your version to "the link to

9   political incitement was clear," right?

10  A.  I don't -- I can't say which -- I'm sorry, I just can't say

11  what changed to what.  I would have to --

12  Q.  Well, the sentence is the same except the "vile political

13  climate" --

14  A.  Is it?  I'm --

15  Q.  Right?  In other words, the draft originally discussed a

16  political climate; do you see that?

17  A.  I'm sorry to ask you to do this, but would you mind

18  starting over which two sentences you are referring to so I can

19  keep track?

20  Q.  Sure.  On Court Exhibit 1, which is the draft --

21  A.  Right.

22  Q.  -- the last part of the first sentence of paragraph 5,

23  which starts, "Just as in 2011," do you see that?

24  A.  Yes.

25  Q.  All right.  Ms. Williamson originally wrote,

1    "Mr. Hodgkinson was nurtured in a vile political climate."

2    A.  Yes.

3    Q.  Do you see that?

4          All right.  When you rewrote it, that portion of the

5    sentence turned into "the link to political incitement was

6    clear."  Do you see that?

7    A.  Yes.

8    Q.  All right.  And then there was the sentence in the original

9    draft that says, "Then, it was the pro-gun right being

10   criticized," and it discusses the map, right?

11   A.  Yes.

12   Q.  And you take out when you rewrite any reference to the

13   pro-gun right and just write this sentence that Sarah Palin's

14   political action committee had circulated a map, right?

15   A.  Yes.

16   Q.  All right.  Now, one of the things you said that I think

17   the word counsel had used was the genesis of this was the

18   speech that President Trump had made sometime around the time

19   you guys wrote this article?

20   A.  It wasn't the genesis of this.  I don't think it was --

21   came out of -- when he asked about the genesis, he was asking

22   about how the editorial got started that day and --

23   Q.  I think it was something that the Judge --

24   A.  I was saying I had in my mind that day, when this horrible

25   thing happened, I was thinking about that column that Tom

1   Friedman had written.

2   Q.  You didn't hyperlink to that column, right?

3   A.  No.

4   Q.  You also mentioned, I think, someone asked you, either the

5   Court or Mr. Sullivan, what did you mean -- you just discussed

6   what you were thinking about, and you also mentioned I think a

7   speech President Trump had given.  Did you mention that?

8   A.  That was what Tom's column -- Tom Friedman's column was

9   about was about that speech.

10  Q.  You didn't mention that speech anywhere in here either, did

11  you?

12  A.  No.

13  Q.  You said you were looking for a very strong word, the word

14  "incitement," and you explained to us the reflections on your

15  time reporting in Jerusalem, right?

16  A.  Yes.

17  Q.  I think you used the definition of the word incitement, the

18  meaning includes "direct orders," right?

19  A.  The meaning -- I'm sorry.  Can you restate the question?

20  Q.  When you defined incitement, or at least your understanding

21  of the word incitement, you stated today earlier in your direct

22  testimony that it meant, among other things, direct orders?

23  A.  I don't remember what specific words I used earlier.  If

24  you say that's what I said, then -- but what I thought I was

25  saying was that it encompassed a lot of different forms of

 1   political rhetoric, political speech.

 2   Q.  Now, it --

 3           THE COURT:  Well, let me make sure I understand.

 4           I thought I understood, but correct me if I have this

 5   wrong, that one of the ideas you were advancing in this

 6   editorial was that overheated political rhetoric can create a

 7   climate conducive to violent acts?

 8           THE WITNESS:  Yes.

 9           THE COURT:  OK.  By the way, that is just a theory on

10   your part, right?

11           THE WITNESS:  Yes.

12           THE COURT:  OK.

13           THE WITNESS:  Your Honor, and a worry, you know, about

14   the time we're living in, and, you know, the guy who walks into

15   the supermarket in Washington -- I mean, excuse me, the pizza

16   place in Washington and opened fire because of something he'd

17   read, the risk that there is a connection between this kind of

18   really angry discourse that we've got and this kind of

19   violence.

20           THE COURT:  That's your theory.  Someone could

21   disagree and say that deranged individuals, there is no

22   connection, they do things for deranged reasons, or whatever.

23   But you were advancing at least a theory?

24           THE WITNESS:  Yes.

25           THE COURT:  OK.

1          THE WITNESS:  Yeah.  And, again, the pattern that we

2     refer to here is -- and this is not to say the theory is

3     correct or anything, but there had been a lot of attacks on

4     elected officials over the course of the last 10 or 15 years.

5     You know, there have been a number of violent incidents.  So

6     that the pattern is -- there is a pattern.  It's not

7     dispositive that there is a link here at all.  It's not

8     dispositive that there is a link to the widespread availability

9     of guns, which is the other theory that we were advancing in

10     this editorial, but I think those were two legitimate grounds

11     for concern.

12          THE COURT:  But in order to make plausible that

13     theory, or make it more plausible, you wanted to have an

14     example beyond the example of what had occurred in the shooting

15     in the softball game, yes?

16          THE WITNESS:  Yes.

17          THE COURT:  And that's why you sent Ms. Williamson out

18     to look at the Loughner thing, among other things, yes?

19          THE WITNESS:  Well, no.  The real reason I asked her

20     to look at that was just to make sure that, umm, I was worried

21     about our being vulnerable to a charge of hypocrisy if in the

22     case of the shooting of Gabby Giffords we had written an

23     editorial criticizing right-wing incitement and positing a link

24     and then here on a day when several republican congressmen were

25     being shot, if we were silent about the danger of political

1   incitement, that we would look like hypocrites.  So the reason

2   I wanted to --

3          THE COURT:  I'm totally shocked to hear that any

4   member of any media has ever been accused of hypocrisy or being

5   hypocritical, but I'm glad to have my naiveté corrected.

6          Anyway, go ahead.

7          THE WITNESS:  This is what set this in motion, and I'm

8   not myself prepared to laugh about it yet, but I appreciate

9   your Honor's observation.  Your Honor, I get it.

10  BY MR. TURKEL:

11  Q.  To be clear, to the extent you were trying to use two

12  examples, the Scalise example and the Giffords example, you and

13  I can agree that no one ever found a link to Bernie Sanders,

14  his rhetoric, and James Hodgkinson, right?

15  A.  I don't know of any such link.

16  Q.  And you have already testified that no one, as far as you

17  know, had ever found a link between the Palin map and the

18  Tucson shooting?

19         THE COURT:  I want to go back to my other point again.

20  Can you disregard my facetious --

21         THE WITNESS:  No, I --

22         THE COURT:  But if your purpose of having her look at

23  the Loughner editorials was simply to make sure that The Times

24  was being consistent, then that would be no reason why the

25  Loughner incident would have occurred in your editorial.  So

1    the reason, whatever the motivation for having her look at

2    Loughner, the reason she put it in, and you put it in more

3    forcefully, was because you thought it was another example of

4    the thesis you were advancing, yes?

5              THE WITNESS:  Yes.

6              THE COURT:  OK.

7              THE WITNESS:  Absolutely.

8              THE COURT:  Very good.  Go ahead, counsel.

9              MR. TURKEL:  Yes, Judge.

10   Q.  If you could turn to Exhibit 2 in the plaintiff's notebook,

11   which is the one right there to your right.

12             MR. TURKEL:  And your Honor should have a copy with

13   tabs on that.

14             THE COURT:  I'm sorry.  Which tab?

15             MR. TURKEL:  Exhibit 2, your Honor, in the plaintiff's

16   notebook.

17             THE COURT:  Yes.  Got it.

18   A.  It is also the editorial?

19   Q.  Yes.  This is the corrected version.  If you'd look three

20   pages in, you will see the first correction, as we like to

21   refer to it, which is June 15, 2017.  Do you see that?

22   A.  I do see it, yeah.

23   Q.  All right.  Now, if you would turn to the second page.

24             Let's just, as a predicate, if you go down to the

25   first page, nothing changed with respect to the James

H8gdpalh                    Bennet - cross

1   Hodgkinson paragraph, correct?

2   A.   Which paragraph again?

3   Q.   The last paragraph on page 1.

4   A.   Yeah.  As far as I know, nothing changed in there.

5   Q.   Go to page 2 and the top paragraph.

6   A.   Mm-hmm.

7   Q.   Now, first, you deleted the language stating that "The link

8   to political incitement was clear."

9   A.   Mm-hmm.

10   Q.   Correct?

11   A.   Yes.

12   Q.   And substituted for that, or added there, is, "At the time,

13   we and others were sharply critical of the heated political

14   rhetoric on the right," correct?

15   A.   Yes.

16   Q.   And that is the first time the word "political rhetoric"

17   shows up in any iteration of these drafts, by the way, or these

18   articles, is it not?

19   A.   I don't know.

20   Q.   If you would look further, again we have the circulated

21   hyperlink and the changes made with respect to the "targeted

22   electoral district," as opposed to "targeted individuals,"

23   right?

24   A.   Yes.

25   Q.   And then a sentence is added at the end that says, "But in

H8gdpalh                    Bennet - cross

1    that case no connection to the shooting was ever established."

2    A.  That's right.

3    Q.  And in the next paragraph you removed the language saying,

4    "Though there's no sign of incitement as direct as in the

5    Giffords attack," right?

6    A.  Yes.

7    Q.  All those changes were made by you, were they not?

8    A.  By me and other editors on the -- yes.

9    Q.  All right.  Now, turn to the next page and let's look at

10   how you actually articulated the correction to the reader there

11   at that portion at the end.  Do you see that?

12   A.  Yes.

13   Q.  And in that you wrote, "An earlier version of this

14   editorial incorrectly stated that a link existed between

15   political incitement" -- and you used the word "political

16   incitement", or the words -- "and the 2011 shooting of

17   Representative Gabby Giffords."  Do you see that?

18   A.  Yes.

19   Q.  And, "In fact, no such link was established," correct?

20   A.  Yes.

21              MR. TURKEL:  All right.  Judge, at this time we'd

22   offer what has been previously marked as Plaintiff's Number 2

23   and have it accepted as either Plaintiff's Number 1 and

24   whatever next is in order, however the Court --

25              THE COURT:  Yes.  That is fine.

1            (Plaintiff's Exhibit 2 received in evidence)

2   BY MR. TURKEL:

3   Q.  Now, if you turn to Plaintiff's Exhibit Number 3, which is

4   the second correction, and we'll call it that because that

5   little portion I just read changes in this iteration, does it

6   not?

7   A.  Mm-hmm.  Wait.  Say that again.  I'm sorry.

8   Q.  If you go to the third page of Plaintiff's Exhibit 3.

9   A.  Yes.

10  Q.  Where it says, "Correction:  June 16."

11  A.  Yes.

12  Q.  Right?

13  A.  Mm-hmm.

14  Q.  This is another correction that was made, right?

15  A.  I am -- this was -- this is the full correction that

16  reflects all the changes that were made, including the change

17  to the crosshairs.  So it's the -- it's in a sense the same

18  correction on the editorial but it is the complete one

19  reflecting these other changes.

20  Q.  I understand that.

21  A.  OK.

22  Q.  But one marked difference is instead of stating, as you did

23  in the previous correction, that a link -- that the editorial

24  stated that a link existed between political incitement in the

25  2011 shooting of Representative Gabby Giffords, you had now

1   changed that word to "rhetoric"?

2   A.  I didn't make that change.

3   Q.  The Times changed that word to rhetoric, did they not?

4   A.  Yes, the word was changed.  Yes, The Times changed it.

5   Q.  So that word "incitement" was taken out and "rhetoric" was

6   supplanted, right?

7   A.  Right.

8   Q.  Did you know that change was being made?

9   A.  No.

10  Q.  Did you authorize that change?

11  A.  No.

12  Q.  Who made that change?

13  A.  I don't know.  I mean, it is not unusual for the copy desk

14  to make changes in the language of corrections.  This does

15  happen.

16  Q.  So you're saying it was someone at the copy desk who --

17  A.  Like I said, I don't know who specifically made it.  What

18  I'm saying is the general proposition that it is not unusual

19  for the copy desk to make sure the corrections, the language,

20  the way they are written conforms to Times' style.  That does

21  happen.

22              THE COURT:  Let me ask a different question.

23              If one were to go on The Times' Web page now and look

24  at this editorial, would it see the corrected version?

25              THE WITNESS:  Yes.

1              THE COURT:  And would that include not only the change

2       about, you know, removing the link and removing the direct but

3       also the correction about the map?

4              THE WITNESS:  Yes.

5              THE COURT:  OK.  Go ahead.

6              THE WITNESS:  And it would have the -- I assume since

7       this is the last version -- I sure hope so -- but I assume it

8       would have this version of the full corrected at the bottom of

9       the piece as well.

10             THE COURT:  Go ahead.

11      BY MR. TURKEL:

12      Q.  You would agree with me in the versions of your editorial

13      that use the phrase "linked to political incitement," none of

14      those ever stated "linked to political rhetoric," right?

15      A.  None of them stated link to political rhetoric, yes.

16      Q.  That shows up in that correction in Exhibit 3, correct?

17      A.  The word "rhetoric" shows up in that correction.

18             MR. TURKEL:  All right.  Judge, at this time we'd

19      offer Plaintiff's Exhibit 3 and ask that it be marked next in

20      order.

21             THE COURT:  Yes.  Received.

22             (Plaintiff's Exhibit 3 received in evidence)

23      BY MR. TURKEL:

24      Q.  Go to Plaintiff's Exhibit 4, if you could, Mr. Bennet.

25             This is a tweet from the NYT Opinion Twitter account.

H8gdpalh                    Bennet - cross

1    Is that a New York Times editorial board opinion?

2    A.  Yes.  It is The New York Times Department Twitter account,

3    yeah.

4    Q.  Who prepares the content for those tweets, who does that?

5    A.  Our social media team does it.

6    Q.  And do you authorize it before they do it, or do they just

7    do what they want?

8    A.  Not every tweet, no, I don't authorize every tweet.  They

9    don't do just what they want.  We have standards that they

10   follow.

11   Q.  Did you authorize this tweet?

12   A.  I did.

13   Q.  All right.

14   A.  I did.  I remember as we were correcting it, they were

15   tweeting out the correction and the apology.  I didn't -- I

16   didn't read the tweet before it went out but I authorized its

17   publication.

18   Q.  I don't know what that means.  Did you know what they were

19   going to tweet when they tweeted it?

20   A.  Yes.  Yes, I did.

21   Q.  And so what they tweeted was, "We got an important fact

22   wrong incorrectly linking political incitement in the 2011

23   shooting of Giffords.  No link was ever established."

24   A.  Right.

25   Q.  And in this one you used the word "incitement" again,

1    right?

2    A.  Yes, we did.

3    Q.  And it was an important fact, right?

4    A.  Yeah.

5    Q.  Because notwithstanding the fact that you may have had

6    theories, as you discussed with Judge Rakoff, or opinions, they

7    do, to some degree, have to be predicated on fact, do they not?

8    A.  That's right.

9    Q.  Now, I want you to look at -- and, Judge, at this time we'd

10   offer Plaintiff's Exhibit 4.

11                 THE COURT:  Received.

12                 (Plaintiff's Exhibit 4 received in evidence)

13   BY MR. TURKEL:

14   Q.  Look at Exhibit 6 now in that same binder, and I want to

15   look at these previous New York Times editorials that we

16   discussed earlier in your testimony.

17   A.  I'm sorry.  My opinion of 6 isn't here.

18   Q.  That would be a problem.  Could we get you a copy of it?

19   A.  At least there is nothing between those two pages.

20   Q.  6 and 7, there is nothing attached?

21   A.  Yes.

22                 THE COURT:  You know, that's the kind of trick lawyers

23   play all the time.

24                 MR. TURKEL:  In all the stuff we do, that is actually

25   how we try and catch you.  So the old missing exhibit trick.

H8gdpalh                         Bennet - cross

1    A.   The Charles column, yes.

2    Q.   Yes.  This is the column January 14, 2011, written by

3    Charles Blow, in the wake of the Tucson shooting, correct?

4    A.   That's right, yes.

5    Q.   And it is titled, "The Tucson Witch Hunt," right?

6    A.   Yes.

7    Q.   Now, I don't want to go through this every time, but you

8    don't recall reading this before you wrote the editorial, based

9    upon what you've told me earlier?

10   A.   No.

11   Q.   Would this be --

12           THE COURT:  Meaning, because it was a poorly worded

13   question, no, to the best -- to the best of your recollection,

14   you did not read it previously, true?

15           THE WITNESS:  I -- I do not recall whether I read this

16   or not.

17           THE COURT:  OK.  But at the time --

18           THE WITNESS:  I'm sorry.

19           THE COURT:  All right.  A follow-up question.

20           At the time you wrote the editorial, there was not any

21   conscious memory of this column that was in your mind at the

22   time, correct?

23           THE WITNESS:  That's correct.

24           THE COURT:  OK.

25   BY MR. TURKEL:

H8gdpalh                        Bennet - cross

1    Q.  And going back to something we discussed earlier, which was

2    your confidence level that your researcher had provided these

3    previous Tucson shooting editorials to Ms. Williamson, you were

4    confident that she read some editorials.  I assume you don't

5    know exactly which ones?

6    A.  I know that she read the editorial -- I know -- I'm sorry.

7    I know that she read the editorial.  I believe that she read

8    the editorials we wrote in the immediate wake of the shooting,

9    yes.

10   Q.  So if you would look at this one --

11            THE COURT:  This is not an editorial, is it?

12            THE WITNESS:  This is a column.

13   Q.  This is a column, I'm sorry.

14   A.  I'm sorry.  This is from 2011.  Yes, this is an editorial.

15   And I didn't ask for any columns.  I'm sorry, I missed the

16   thrust of your question.  I didn't ask for any columns to be

17   sent.  I only asked for masthead editorials, which are the

18   pieces written by the editorial board, to be sent.

19            THE COURT:  The point -- I think there was some

20   confusion.

21            THE WITNESS:  Yes.

22            THE COURT:  You don't know whether she saw this, you

23   don't know whether she searched for this, all you know is that

24   she was directed and probably did search for the editorials?

25            THE WITNESS:  Yes.

1             THE COURT:  OK.

2    BY MR. TURKEL:

3    Q.  Were you copied or in any way in the chain of communication

4    between the researcher and Ms. Williamson when articles may

5    have been sent to her?

6    A.  When the editorials were sent to her, I believe I was

7    copied.

8    Q.  And this particular column, the last paragraph, in

9    discussing the shooting in Tucson, states as follows:  "The

10   only problem is that there was no evidence then, and even now,

11   that overheated rhetoric from the right had anything to do with

12   the shooting.  (In fact, a couple of people who said they knew

13   him have described him as either apolitical or "quite

14   liberal.")  The picture emerging is of a sad and lonely soul

15   slowly, and publicly, slipping into insanity."  Do you see

16   that?

17   A.   Right.  It's not the last paragraph of the piece.  It the

18   last paragraph --

19   Q.  On that page?

20   A.  Yes.  I'm sorry.  Yes, I've got it.

21   Q.  And, again, you have no recollection of ever reading that

22   before writing --

23   A.  That's right.

24   Q.  -- your June 14, 2017 piece, right?

25             All right.  Go forward, if you could, to -- I want to

1    look at Exhibit -- Judge, at this time, we'd offer that, which

2    will be Exhibit 6, Plaintiff's 6, into evidence?

3              THE COURT:  Yes.  Received.

4              (Plaintiff's Exhibit 6 received in evidence)

5              THE COURT:  I think, for completeness, we should make

6    note of the very immediately following sentence after the

7    sentence you just read, which reads:  "I have written about

8    violently rhetoric before, and I'm convinced that it's

9    poisonous to our politics, that the preponderance of it comes

10   from the right, and that it has the potential to manifest in

11   massacres like the one in Tucson."

12             Go ahead, counsel.

13             MR. TURKEL:  Yes, Judge.

14   BY MR. TURKEL:

15   Q.  And on June 14, 2017, the date that you published the

16   editorial in issue, on the same date -- if you would turn to

17   Exhibit 7.

18   A.  Yes.

19   Q.  -- the Times published an article titled, "Shooting is

20   Latest Eruption in a Grim Ritual of Rage and Blame."  Do you

21   see that?

22   A.  I do, yeah.

23   Q.  This was written the same day as your editorial, correct?

24   A.  It did.

25   Q.  It was written by Alexander Burns, right?

H8gdpalh                          Bennet - cross

1    A.   Yes.

2    Q.   And if you could, turn to the third page of 5.

3    A.   Yes.   Third page.   I'm sorry.

4    Q.   Yes.   And the bottom paragraph on that page provides, "In

5    2011, the shooting of Ms. Giffords by a mentally ill assailant

6    came during a convulsive political period, when a bitter debate

7    over healthcare yielded a wave of threats against lawmakers.

8    Sarah Palin, the former vice-presidential candidate, drew sharp

9    criticism for having posted a graphic online," and it is

10   blocked out there, "that showed" -- if you pick up on the next

11   page the rest of it -- "cross hairs over the districts of

12   several members of Congress, including Ms. Giffords -- though

13   no connection to the crime was established."

14   A.   Right.

15   Q.   Now, would you agree that one of the policies or procedures

16   inside the editorial board, or any editorial board, when it

17   comes to fact checking for articles is actually to rely on the

18   news pages of The Times itself?

19   A.   We utilized these pages from The Times, yeah.

20   Q.   I take it you didn't read that article prior to writing the

21   editorial at issue in this case?

22   A.   I didn't see it -- as I said earlier, I didn't see it until

23   we were correcting the article the next morning.

24   Q.   When you edited The Atlantic, do you recall covering the

25   Tucson shooting?

H8gdpalh                          Bennet - cross

1    A.  I didn't cover it myself.

2    Q.  Let me rephrase that.  That's a fair statement.

3         Do you recall The Atlantic covering the Tucson

4    shooting?

5    A.  I'm sure, yes, we did.  We wrote about it.

6    Q.  I want you to look at Exhibit 28.

7         MR. TURKEL:  Judge, I could have forgotten to offer

8    the previous exhibit, I think it was number 7, in evidence.

9         THE COURT:  Received.

10        (Plaintiff's Exhibit 7 received in evidence)

11        MR. TURKEL:  I'm sorry, it was not 7, your Honor.  Let

12   me -- yes, it is.  It is 7.

13        THE COURT:  Yes.

14   Q.  If you would turn to 28, Exhibit 28?

15   A.  28?

16   Q.  Yes.

17   A.  "Caldwell's Unfairness"?

18   Q.  Yes.

19   A.  Yeah.

20   Q.  Now, The Daily Dish, was that written by Andrew Sullivan?

21   A.  Yes, it was.

22   Q.  You hired Mr. Sullivan to The Atlantic, right?

23   A.  We brought The Daily Dish over to The Atlantic.  It was an

24   independent and under editorial control of The Atlantic --

25   excuse me.  Sometimes I felt like it was the editorial control

H8gdpalh                    Bennet - cross

1   of The Atlantic.  To the editorial control of The Daily Dish.

2   Q.  Were you familiar with this article he writes called

3   "Caldwell's Unfairness"?

4   A.  I'm not.

5   Q.  You're not familiar with the existence of a dispute between

6   him and Christopher Caldwell in which Caldwell actually accused

7   Mr. Sullivan of linking the Tucson shootings to Republican

8   ideology or rhetoric?

9   A.  I'm sorry.  Can I just take a moment to look at this?

10  Q.  Yes.

11  A.  I'm trying to refamiliarize myself.

12          (Pause)

13          OK.  I don't remember this.

14  Q.  And so to the extent -- at the time -- and this would have

15  been what, January 15, 2011, you were editor-in-chief at The

16  Atlantic, right?

17  A.  I was.

18  Q.  You didn't know that Mr. Sullivan was essentially demanding

19  a retraction from another journalist who accused him of stating

20  that there was a link between the Loughner shootings and

21  Republican rhetoric and ideology?

22  A.  I may well have been aware of this at the time.  I'm just

23  now trying to remember the -- but I don't --

24  Q.  Take a look --

25  A.  Go ahead.  I'm sorry.

 1   Q.  Take a look at the last paragraph of this.

 2   A.  Yes, the "Did I explore"?

 3   Q.  Yes.  In that Mr. Sullivan writes, "Did I explore the issue

 4   of far right violence after Giffords' father cited the Tea

 5   Party?  You bet I did.  How could I not?  Did I ever 'link the

 6   shootings to Republican ideology or rhetoric'?  Nope.  Do I

 7   think such rhetoric is over the top in a world where crazy

 8   people have access to guns?  Yes.  Do I agree with Giffords

 9   that Palin's imagery was dangerous?  Yes.  But as for the

10   motive of Loughner, by the time 6.32 pm comes along, I have

11   concluded that this was likely a psychotic breakdown, and cited

12   a psychiatrist to that effect, and specifically ended with the

13   case that he is 'of no party.' How can I be accused of linking

14   Loughner to the GOP when I specifically cite that he seems to

15   be 'of no party'?

16         "The Financial Times needs to run a correction."

17         And I guess, from what you have told me, it is your

18   testimony you were unaware that Mr. Sullivan was demanding a

19   correction from the Financial Times when they accused him of

20   this very link that is at issue in this case?

21   A.  No, that's not what I said.  I honestly -- I just don't

22   remember whether or not he did this.  I mean, obviously he did

23   do it.  I just don't remember what my knowledge of it was at

24   the time.

25   Q.  As editor-in-chief, would he have had to come to you for

1    authority to make such a claim or demand?

2    A.  No.

3    Q.  He could have done that on his own?

4    A.  He had editorial control of The Daily Dish.  That was our

5    agreement.

6    Q.  To the extent that he could demand a retraction from

7    another publication?

8    A.  Yes.

9    Q.  And so where we'll leave this point is you don't recall

10   whether you knew of this at the time?

11   A.  That's right.  I don't recall whether I knew it at the

12   time.

13   Q.  The -- so going through -- just a few more matters that

14   relate to your remembrance or knowledge of the Tucson shooting.

15           THE COURT:  Yes.  Counsel, you have used your 45

16   minutes, and I showed unusual restraint in not asking many

17   questions myself.  But I will give you five more minutes, as I

18   did your adversary, or seven minutes, to be precise.

19           MR. TURKEL:  I'm ready to wrap up, your Honor.

20           THE COURT:  Very good.

21   BY MR. TURKEL:

22   Q.  In the apologies, I do recall you talking to Judge Rakoff

23   about, in general terms, how you don't want to accuse

24   politicians of conduct where it is not actually based.  You

25   gave somewhat detailed testimony on that.

H8gdpalh                    Bennet - cross

1          At no time did you actually use my client's name in

2     any of the retractions or corrections or apologies that you

3     issued, did you?

4     A.  In the -- do we use her name in any of the corrections?

5     Q.  Yes.  Did you apologize?

6     A.  I didn't.  We did not apologize to her.

7     Q.  With respect to the actual hyperlink that we discussed

8     earlier, and just to be clear, you had the present ability to

9     click on that hyperlink, did you not?

10    A.  Yes.

11         MR. TURKEL:  Judge, may I have just one moment to

12    confer?

13         THE COURT:  Go ahead.

14         (Pause)

15         MR. TURKEL:  Judge, I just have about three more

16    questions --

17         THE COURT:  Go ahead.

18         MR. TURKEL:  -- I feel duty bound to ask.

19    BY MR. TURKEL:

20    Q.  Mr. Bennet, your brother Michael Bennet is a senator in

21    Colorado, right?

22    A.  Yes.

23    Q.  Two days before the Tucson shooting his office was

24    threatened, was it not?

25    A.  I don't remember that, but if you say it's true, I'm sure

1   it is.

2   Q.  If you could just turn to Exhibit 14.

3            MR. TURKEL:  Judge, I forgot to offer the last exhibit

4   into evidence, but as a housekeeping matter --

5            THE COURT:  Yeah.  That was 28?

6            MR. TURKEL:  Yes.

7            THE COURT:  28 is received.

8            (Plaintiff's Exhibit 28 received in evidence)

9   BY MR. TURKEL:

10  Q.  Exhibit 14 is an article from January 10, 2011, two days

11  after the Giffords shooting, from The Atlantic, which at the

12  time you were the editor-in-chief of, stating, "Arrest Made in

13  Threat on Sen. Bennet's Office."  You do see that?

14  A.  Yes.

15  Q.  Does that refresh your memory?

16  A.  No.  No.  I'm sorry.  I remember an arrest was made -- I

17  mean, I remember a threat.  I remember this incident.  I just

18  didn't remember when it took place.

19  Q.  Well, it took place two days after --

20  A.  Yes, you said that.  I understand.

21  Q.  If you turn to the second page of that same article from

22  The Atlantic.

23  A.  Um-hmm.

24  Q.  There is a disclosure that says, "Senator Bennet's brother

25  James Bennet edits The Atlantic," right?

H8gdpalh                        Bennet - cross

1   A.  Yes.

2   Q.  All right.  And --

3           THE COURT:  What accounts for the fact that neither

4   you nor your brother nor apparently your parents know how to

5   spell "Bennett"?

6           THE WITNESS:  I know.  It dogs us all, actually.  It

7   is one of those simple names that gets misspelled all the time

8   as a result.

9           THE COURT:  Go ahead, counsel.

10  BY MR. TURKEL:

11  Q.  Just to wrap this point up, if you go back -- and we offer

12  14, Judge.

13          THE COURT:  Yes.  Received.

14          (Plaintiff's Exhibit 14 received in evidence)

15  BY MR. TURKEL:

16  Q.  If you go back to number 12, that is the map at issue.  Do

17  you see that?

18  A.  Yes.

19  Q.  John Salazar and Betsy Markey are two lawmakers from

20  Colorado, both of whom endorsed your brother in his 2010

21  election; do you recall that?

22  A.  Yes.  I mean, I recall them endorsing him.  I actually

23  didn't know that they were on the map.

24  Q.  And do you know -- or do you recall that Sarah Palin

25  endorsed your brother's opponent in his 2016 election?

H8gdpalh                    Bennet - cross

1   A.   I -- I did not know that at the time, or at least I didn't

2   remember it.  I didn't know it at the time.  I didn't know it

3   when I was writing the editorial -- rewriting the editorial.

4   But I know as a consequence of this and the exhibits that have

5   been submitted and so forth that that's the case.

6   Q.   I'm not sure I understand that.  You are saying you didn't

7   know when you wrote the editorial that Sarah Palin had endorsed

8   your brother's opponent?

9   A.   If I had known that, I didn't remember it.  That's all I'm

10  saying.  It doesn't surprise me, certainly.

11  Q.   And, lastly, you would admit that Congresswoman Giffords'

12  political action committee, Americans for Responsible

13  Solutions, which is a gun violence prevention PAC, endorsed

14  your brother for his 2016 election, right?

15  A.   I didn't know that.

16  Q.   You weren't aware of that?

17  A.   I was unaware of that.

18            MR. TURKEL:  That's it.

19            Judge, thank you.

20            THE COURT:  OK.  Thank you.

21            Redirect.

22            MR. SULLIVAN:  Your Honor, I have no redirect.

23            THE COURT:  All right.  Very good.

24            Thank you very much.  You may step down.

25            (Witness excused)

H8gdpalh

1          THE COURT:  All right.  So we have several open items.

2     First, whether there is any need to call Ms. Williamson, who I

3     understand, if we were going to call her, is available next

4     week.

5          So does either side feel the need to call

6     Ms. Williamson?

7          MR. SCHULZ:  Not the defendant, your Honor.

8          MR. TURKEL:  Judge, I think from our perspective, what

9     would probably be more constructive is to actually see what was

10    sent to her, which editorials and that correspondence, before

11    we would even know whether it made sense to convene again to

12    talk to her.

13         THE COURT:  Well, OK.  I will take that under

14    consideration.

15         I mean, I think it's important to recognize why the

16    Court convened this hearing.  I have to determine ultimately

17    whether the pleadings are sufficient, but the pleadings in this

18    case -- the pleadings in every case -- require a court to draw

19    inferences and determine plausibility, as the Supreme Court has

20    put it, and, therefore, it seemed to me that there was a need

21    for this short hearing to provide the context in which I would

22    be able to rationally determine what were reasonable inferences

23    and what were plausible possibilities.  So that's the limited

24    purpose of this hearing, as I made clear in my Order, and both

25    counsel understood that and raised no objection to it.

H8gdpalh

1          So it's not clear to me that that limited purpose

2     would be advanced materially by having Ms. Williamson testify,

3     but I'll think about it for the next day or so.

4          Why don't I do this rather than put plaintiff's

5     counsel on the spot?  If you still think tomorrow that

6     Ms. Williamson should be called, send me a letter saying why by

7     no later than 5 p.m. tomorrow and I will consider that.  If a

8     letter is sent, defense counsel can send a letter by no later

9     than 5 p.m. the following day in response.  But that, at least

10    at the moment, given the narrow framework of this hearing, I am

11    not sure that it will be particularly useful to the Court.

12    This is, of course, without prejudice to the fact that maybe if

13    the case goes forward, of course she could be deposed --

14    undoubtedly will be deposed and, for that matter, Mr. Bennet

15    can be deposed.  This hearing in no way precludes any of that

16    if the case goes forward.  This was a narrow hearing for a

17    narrow purpose.  But I'll wait to see what plaintiff's counsel

18    wants in that regard, and then I will make a decision depending

19    on the submissions.  If there are no submissions, I will assume

20    no one wants Ms. Williamson.

21          Secondly, independent of that, I would benefit from

22    counsel submitting on both sides a brief submission on what

23    this hearing, if anything, adds to the determinations that I

24    need to make, particularly on the issue of actual malice, which

25    I think looms as a significant issue.  But, again, I want to

74

H8gdpalh

stress, I'm not making any determinations and I don't ask you

to make any determinations about the credibility of Mr. Bennet

or not.  That's not the purpose of this hearing.  The purpose

of this hearing is to ascertain what is a plausible and what is

not plausible possibility in this so far as a motion to dismiss

is concerned.  So I would benefit from any insights either side

wants to offer in that regard.

       If Ms. Williamson is -- if you do want Ms. Williamson,

then these submissions should be 24 hours after she testifies,

which would be some day next week.  If neither side wants

Ms. Williamson, then the submission should be next Monday.

And, either way, I am determined to decide this motion by the

close of the month, as I indicated previously, so there is a

little bit of a time constraint.

       Submissions should be no more than 10 double-spaced

pages, filed and docketed with the court.  And I don't want

responses, just 10 pages from each side.

       I think that's everything that was on my list.

Anything that counsel wants to raise?

       MR. TURKEL:  Judge, I think, with respect to the

request that in lieu of calling her it may be sufficient for us

just to see the documents that were described by Mr. Bennet --

       THE COURT:  Let me find out --

       MR. TURKEL:  Tell me how to follow up.

       THE COURT:  That is an interesting point.

H8gdpalh

1          Any objection in providing that to plaintiff's

2     counsel?

3          MR. SCHULZ:  Yeah, I'm not quite sure which documents.

4          THE COURT:  I think what he means, if I understood it,

5     was there was an email -- there was a researcher who was asked

6     to find these editorials, and then the researcher sent them to

7     Ms. Williamson and to Mr. Bennet, as I understood his

8     testimony.  Is that what we are talking about?

9          MR. TURKEL:  Yeah.  From what I understood, he was

10     kept in the chain there.

11          THE COURT:  Yes.  Exactly.  Yes.

12          MR. TURKEL:  And I don't know if there was one or two.

13     I don't know.  I mean, he just sort of described those

14     communications.  So that would probably give us enough insight

15     to know.

16          Judge, to some degree, I understand the narrow inquiry

17     at hand.  I equally have some difficulty juxtaposing it with

18     12(b), and I don't know if we are going to brief that or not --

19          THE COURT:  Well, I mean, you're free -- both sides

20     are free to argue on, in their papers, that I should take no

21     account of this hearing, if that's your position.  Neither side

22     raised any objection to my holding that hearing, and we had a

23     telephone conference and if you had objection to it, you should

24     have raised it then.  But that doesn't preclude you from

25     saying, Judge, there is nothing here that in the end, as a

H8gdpalh

matter of law, you really should take cognizance of, that's

your position.  I thought -- I mean, one of the questions that

I thought I needed to know the answer to in order to assess

this complaint was whether the portions of the editorial that

were complained of were the product of a single author, of a

collective group of authors.  The complaint, understandably,

just referred to The Times, or The Times' editorial board.  And

I thought, in fairness to not just the plaintiffs but in order

to do my job, I needed to know a little bit more there, and

that was established today without debate from either side.  So

we now have undisputed fact as to how this editorial came about

that neither side disputes.

          I would like to take cognizance of that for the

purpose of ruling on this motion.  I think I probably will take

cognizance of it for purposes of ruling on this motion.  But if

you think or either side thinks that that violates the law

somehow, then put that into your papers when you submit that

10-page brief.

          MR. SCHULZ:  Yes, I shall.

          MR. TURKEL:  That would be one sensitivity, and I

don't like to use the word "violate the law."  We're on the

same treaty.  It wasn't a normal kind of hearing during a

12(b)(6) but --

          THE COURT:  The fact that it wasn't ordinary and usual

was not the only reason why I convened it.

H8gdpalh

1            MR. TURKEL:  I know.

2            And to be honest, Judge, we really wouldn't have

3       tendered an objection because we were trying to get a better

4       understanding of kind of what the inquiry was.  You described

5       it in the Order and we got a better sense today.  I think the

6       sensitivity would be two-fold.  One, pockets of testimony today

7       were -- well, a bunch of us discussed there were -- you know,

8       if that's part of the inquiry where -- I don't want to get into

9       the weeds because we are at the four-corner stage with

10      references to people or things that weren't remembered.

11      Secondly, the other one would be just making sure that to the

12      extent there are any defects that are curable, we have the

13      right to amend, and being able to sort of assess that against

14      the background of this type of a hearing.  So those are --

15           THE COURT:  Well, I mean, yeah, the question of

16      whether you can amend or not is a separate question which I'll

17      take up.  The law normally permits that, but there are

18      exceptions to that.  That's not before me.  I haven't really

19      thought about that.

20           I should make clear in my order, but I will make clear

21      again, the purpose of this hearing was to give the Court an

22      idea of what inferences reasonably can be drawn and what is a

23      plausible allegation, given this complaint.  I think that I

24      have clear authority to convene this hearing for that purpose

25      and neither side objected.

H8gdpalh

1          But I would go further and say I think it is a darn

2     good idea.  Other judges should do it.  The Supreme Court of

3     the United States, in the cases of Iqbal and Twombly, has put

4     the district courts in the position of, in effect, gatekeepers.

5     A 12(b)(6) motion now requires a court, in a way that it never

6     did prior to those major Supreme Court cases, to make

7     determinations about plausibility.

8          Now, you cannot make a determination about

9     plausibility without knowing something about the context in

10    which the underlying events occurred.  If a court were asked --

11    if the complaint made some claim about cooking, this is one

12    court that would have no way of assessing the plausibility of

13    that complaint because, being an old-fashioned judge, I know

14    nothing about cooking, although I have to say my two brothers

15    are excellent cooks.

16          So the point is I think it's important, in order to

17    carry out that function that the Supreme Court has placed on

18    the district court, to get some knowledge of the context.

19    That's the sole reason I had this hearing, and it's not to make

20    credibility determinations.

21          MR. TURKEL:  Understood.

22          THE COURT:  OK.

23          MR. TURKEL:  So I guess -- and where I began, you'll

24    let us know if you want us to make an application with respect

25    to the documents --

H8gdpalh

1          THE COURT:  So, yeah.  I'm sorry.  Where do we stand

2     on providing those documents?

3          MR. SCHULZ:  Judge, I need to confer with my client.

4     But if the request is to see the specific editorials that were

5     provided to Ms. Williamson, I think we would probably identify

6     those for plaintiff.

7          THE COURT:  OK.  Good.  So you need to do that, if

8     you're going to do it, certainly by early tomorrow morning so

9     they can make their determination by the close of business

10    tomorrow whether they want to apply to have Ms. Williamson

11    testify.

12         MR. TURKEL:  Yes.  I would just go a step farther,

13    Judge.  We would just like the communication forwarding them to

14    her.  I think that is probably as pertinent as the actual

15    editorials, but I don't want to overstep the scope of the

16    hearing.  I just --

17         THE COURT:  No, I think --

18         MR. TURKEL:  I wanted to know how it was communicated.

19         THE COURT:  I think -- I did not allow discovery in

20    connection with this hearing because it was not intended to

21    substitute for the rules of discovery.  I think for making the

22    assessment as to Ms. Williamson, all you really need at most is

23    to know which editorials she, you know, was sent by the

24    researcher.  So I will ask defense counsel, subject to checking

25    with his client, to provide that by early tomorrow morning.

H8gdpalh

1          MR. TURKEL:  OK.

2          THE COURT:  OK.

3          MR. TURKEL:  Should we follow up or write a letter as

4     indicated?

5          THE COURT:  Yes.

6          MR. TURKEL:  OK.

7          THE COURT:  All right.

8          MR. TURKEL:  Thank you, Judge.

9          THE COURT:  Anything else?

10          OK.  Very good.  Thanks very much.

11          MR. SULLIVAN:  Thank you, your Honor.

12          THE CLERK:  All rise.

13

14                              -   -   -

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

JAMES BENNET

Direct By Mr. Sullivan . . . . . . . . . . . . . 3

Cross By Mr. Turkel  . . . . . . . . . . . . . .33

                    PLAINTIFF EXHIBITS

Exhibit No.                                   Received

  2   . . . . . . . . . . . . . . . . . . . . . .54

  3   . . . . . . . . . . . . . . . . . . . . . .56

  4   . . . . . . . . . . . . . . . . . . . . . .58

  6   . . . . . . . . . . . . . . . . . . . . . .62

  7   . . . . . . . . . . . . . . . . . . . . . .64

 28   . . . . . . . . . . . . . . . . . . . . . .69

 14   . . . . . . . . . . . . . . . . . . . . . .70

                    DEFENDANT EXHIBITS

Exhibit No.                                   Received

  1   . . . . . . . . . . . . . . . . . . . . . .10