UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SARAH PALIN, an individual,

                    Plaintiff,

    – against –

THE NEW YORK TIMES COMPANY,
A New York corporation

                    Defendants.

No. 17 Civ. 4853

Hon. Jed S. Rakoff

ECF Case

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
HER MOTION FOR RECONSIDERATION AND
<u>TO ALTER OR AMEND THE JUDGMENT</u>**

BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 443-2199
Facsimile:  (813) 443-2193

and

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile:  (212) 754-0330

*Attorneys for Plaintiff Sarah Palin*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

I.      INTRODUCTION ...................................................................................................... 1

II.     LEGAL STANDARD ................................................................................................ 2

III.    ARGUMENT:   The Court Should Reconsider Its Ruling That Any Amendment Of
        Mrs. Palin's Complaint Would Be Futile And Its Dismissal Of Mrs. Palin's Complaint
        *With Prejudice* On That Basis ................................................................................ 3

        A.      The Court Must Assess The Question Of Futility In Light Of Mrs. Palin's
                Proposed Amended Complaint. .................................................................... 4

        B.      Mrs. Palin's Proposed Amended Complaint Plausibly Alleges That *The New York
                Times* Acted With Actual Malice ................................................................. 7

IV.     CONCLUSION ........................................................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alioto v. Cowles Comm., Inc.*,
  519 F.2d 777 (9th Cir. 1975) ............................................................................ 12

*Allgaier v. Peterson*,
  No. 13-cv-5112, 2015 WL 5459808 (S.D.N.Y. Aug. 13, 2015)............................................ 4

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012)......................................................................... 6, 7, 8

*Anderson v. Bessemer City*,
  470 U.S. 564 (1985).......................................................................................... 8

*Bailey v. N.Y. Law Sch.*,
  No. 16-cv-4283, 2017 WL 835190 (S.D.N.Y. Mar. 1, 2017)............................................. 8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).......................................................................................... 8

*Biro v. Conde Nast*,
  807 F.3d 541 (2d. Cir. 2015).............................................................................. 15

*Celle v. Filipino Reporter Enters. Inc.*,
  209 F.3d 163 (2d Cir. 2000)..................................................................... 8, 9, 10, 14

*Curtis Publ'g Co. v. Butts*,
  388 U.S. 130 (1967)......................................................................................... 18

*Dalbec v. Gentleman's Companion, Inc.*,
  828 F.2d 921 (2d Cir. 1987)....................................................................... 8, 9, 19

*Duffy v. Leading Edge Prods., Inc.*,
  44 F.3d 308 (5th Cir. 1995) ............................................................................... 10

*Elias v. Rolling Stone LLC*,
  --- F.3d ----, 2017 WL 4126956 (2d Cir. Sept. 19, 2017)...................................... 7

*Ellis v. Chao*,
  336 F.3d 114 (2d Cir. 2003).............................................................................. 3

*Eramo v. Rolling Stone, LLC*,
  209 F. Supp. 3d 862 (W.D. Va. 2016) ........................................................... 9, 19

*Foman v. Davis*,
    371 U.S. 178 (1962) ........................................................................................... 3

*Gertz v. Robert Welch, Inc.*,
    680 F.2d 527 (7th Cir. 1982) ........................................................................... 12

*Goldwater v. Ginzburg*,
    414 F.2d 324 (2d Cir. 1969) ........................................................................ 9, 12

*Harris v. City of Seattle*,
    152 F. App'x 565 (9th Cir. 2005) ................................................................... 12

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989) ...................................................................... 8, 9, 10, 14

*Herbert v. Lando*,
    441 U.S. 153 (1979) ......................................................................................... 8

*Hunt v. Liberty Lobby*,
    720 F.2d 631 (11th Cir. 1983) ................................................................. 10, 18

*Hutchinson v. Proxmire*,
    443 U.S. 111 (1979) ......................................................................................... 9

*Jones v. N.Y. Div. of Military & Naval Affairs*,
    166 F.3d 45 (2d Cir. 1999) .............................................................................. 4

*Kaelin v. Globe Commc'ns Corp.*,
    162 F.3d 1036 (9th Cir. 1998) ........................................................................ 9

*Kerwick v. Orange Cty. Publ'ns Div. of Ottaway Newspapers, Inc.*,
    53 N.Y.2d 625 (1981) .................................................................................... 17

*Lin v. Toyo Food, Inc.*,
    No. 12-cv-7392, 2016 WL 4502040 (S.D.N.Y. Aug. 26, 2016) ...................... 4

*Nerney v. Valente & Sons Repair Shop*,
    66 F.3d 25 (2d Cir. 1995) ................................................................................ 4

*Nielsen v. Rabin*,
    746 F.3d 58 (2d Cir. 2014) .............................................................................. 4

*Porat v. Lincoln Towers Cmty. Ass'n*,
    464 F.3d 274 (2d Cir. 2006) ........................................................................ 1, 3

*Prozerlik v. Capital Cities Comm., Inc.*,
    605 N.Y.S. 2d 218 (1993) ................................................................................ 7

*Ronzani v. Sanofi S.A.*,
    899 F.2d 195 (2d Cir. 1990)...................................................................................... 1

*S.E.C. v. Espuelas*,
    579 F. Supp. 2d 461 (S.D.N.Y. 2008).......................................................................... 4

*Schiavone Constr. Co. v. Time, Inc.*,
    847 F.2d 1069 (3d Cir. 1988)...................................................................................... 9

*Sharon v. Time, Inc.*,
    599 F. Supp. 538 (S.D.N.Y. 1984) ............................................................................ 12

*Shoen v. Shoen*,
    48 F.3d 412 (9th Cir. 1995) ....................................................................................... 10

*Shrader v. CSX Transp., Inc.*,
    70 F.3d 255 (2d Cir. 1995).................................................................................... 2, 7

*Sisemore v. U.S. News & World Report, Inc.*,
    662 F. Supp. 1529 (D. Alaska 1987) ......................................................................... 13

*Smith v. Stevens*,
    957 F. Supp. 2d 466 (S.D.N.Y. 2013)......................................................................... 4

*Solano v. Playgirl, Inc.*,
    292 F.3d 1078 (9th Cir. 2002) .................................................................................... 9

*Spacecon Specialty Contractors, LLC v. Bensinger*,
    713 F.3d 1028 (10th Cir. 2013) .................................................................................. 18

*SPV OSUS Ltd. v. AIA LLC*,
    No. 15-cv-619, 2016 WL 3039192 (S.D.N.Y. May 26, 2016) .............................................. 4

*St. Amant v. Thompson*,
    390 U.S. 727 (1968)................................................................................................. 19

*Tabaei v. N.Y. City Health & Hosps. Corp.*,
    No. 11-cv-2013, 2011 WL 6778500 (S.D.N.Y. Dec. 21, 2011) .......................................... 4

*Tavoulareas v. Piro*,
    763 F.2d 1472 (D.C. Cir. 1985) ................................................................................. 15

*Toliver v. Colvin*,
    No. 12-cv-227, 2014 WL 1660609 (W.D.N.Y. Apr. 24, 2014)............................................ 3

*Tosti v. Ayik*,
    476 N.E.2d 928 (Mass. 1985) ................................................................................... 13

*Vandenburg v. Newsweek, Inc.*,
    441 F.2d 378 (5th Cir. 1971) ...................................................................... 10, 18

*Vandenburg v. Newsweek, Inc.*,
    507 F.2d 1024 (5th Cir. 1975) .................................................................... 10, 18

*Vasquez v. O'Brien*,
    85 A.D.2d 791 (3d Dep't 1981) ....................................................................... 19

*Ventura v. Kyle*,
    63 F. Supp. 3d 1001 (D. Minn. 2014) ............................................................... 16

*Vista Outdoor Inc. v. Reeves Family Tr.*,
    No. 16-cv-5766, 2017 WL 1094568 (S.D.N.Y. Mar. 10, 2017) ........................ 2, 7

*Workneh v. Super Shuttle Int'l, Inc.*,
    No. 15-cv-3521, 2017 WL 1185221 (S.D.N.Y. Mar. 28, 2017) ............................ 8

*Zerangue v. TSP Newspapers, Inc.*,
    814 F.2d 1066 (5th Cir. 1987) ............................................................... 15, 16, 19

## Other Authorities

10B Wright et al., *Fed. Prac. & Proc. Civ.* § 2730 ........................................................ 9

Rodney A. Smolla, 1 Law of Defamation § 3:71 (2d ed.) ........................................... 12

## I.      INTRODUCTION

In its August 29, 2017 Opinion and Order ("Dismissal Order"), the Court not only found that Mrs. Palin's original Complaint failed to state a defamation claim against *The New York Times* because she failed to plausibly allege actual malice, but went a significant step further: The Court dismissed Mrs. Palin's complaint **with prejudice** because it incorrectly presumed based on limited legal briefing that she could never adequately allege actual malice and that any amendment to her Complaint would therefore be futile.  The Court did so without allowing Mrs. Palin to file a Proposed Amended Complaint[1] and thus found futility without the benefit of being able to consider the well-pleaded factual allegations that Mrs. Palin's Amended Complaint would actually contain relating to *The New York Times*' actual malice.  That was improper.

Mrs. Palin should be given a meaningful opportunity to plead her case, particularly given that the facts of which she is now aware make an even stronger showing of actual malice than what she originally was able to allege.  Mrs. Palin has attached a Proposed Amended Complaint to the accompanying Declaration of Shane Vogt.  Her Proposed Amended Complaint contains significant additional factual allegations more than plausibly alleging *The New York Times*' and James Bennet's actual malice — including allegations of *James Bennet's* actual knowledge that the defamatory statements about Mrs. Palin were false and/or *Mr. Bennet's* reckless disregard of the truth or falsity of those statements.  Notably, these allegations are grounded in evidence that was unavailable to Mrs. Palin at the time she filed her original Complaint and that only became

---

[1] In accordance with Second Circuit practice, Mrs. Palin requested that if the Court found that her Complaint failed to adequately allege actual malice, she be allowed the opportunity to amend her Complaint to provide additional factual allegations showing *The New York Times*' actual malice.  *See* Pl.'s Mem. of Law on Context, Inferences & Plausibility at 4 & n.17; *see also Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006); *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198-99 (2d Cir. 1990).

available to her through the very few limited documents and truncated testimony adduced through the Court's plausibility hearing.[2]

By this Motion, Mrs. Palin respectfully requests, under Federal Rule of Civil Procedure 59(e) and Local Rule 6.3, that the Court reconsider the limited portion of its Dismissal Order finding that any amendment to Mrs. Palin's Complaint would be futile and its consequent dismissal of her Complaint *with prejudice*.  (Dismissal Order at 25.)  She further requests that the Court grant her leave to amend her Complaint consistent with her Proposed Amended Complaint and that the Court to vacate its August 30, 2017 Judgment accordingly.

## II.    LEGAL STANDARD

Although reconsideration "should not be granted where the moving party seeks solely to relitigate an issue already decided," *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995), a motion to reconsider should be granted where "'the moving party can point to controlling decisions or data that the court overlooked — matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.'"  *Vista Outdoor Inc. v. Reeves Family Tr.*, No. 16-cv-5766, 2017 WL 1094568, at *1 (S.D.N.Y. Mar. 10, 2017) (quoting *Shrader*, 70 F.3d at 257).

Here, in finding that any amendment to Mrs. Palin's Complaint to plead additional allegations of *The New York Times*' actual malice would be futile, the Court necessarily speculated, based on limited legal briefing, as to what additional allegations Mrs. Palin might plead without allowing her the opportunity to present a Proposed Amended Complaint for consideration. (Dismissal Order at 25.)  In doing so, the Court overlooked the critical facts and

---

[2] Indeed, at the time Mrs. Palin filed her original Complaint, she could not have even known that Mr. Bennet was the author of the defamatory article about her, as *The New York Times* signed the article simply "The Editorial Board."

allegations that Mrs. Palin could and would plead regarding Mr. Bennet's (and *The New York Times'*) actual knowledge that their defamatory statements about Mrs. Palin were false and/or their reckless disregard of the truth or falsity of those statements.  And as made clear in Mrs. Palin's Proposed Amended Complaint, those well-pleaded facts plausibly establish actual malice at the pleadings stage.  As such, and in fairness, the Court should reconsider its dismissal with prejudice, grant Mrs. Palin leave to file her Proposed Amended Complaint, and vacate its Judgment accordingly.

**III.    ARGUMENT:  The Court Should Reconsider Its Ruling That Any Amendment Of Mrs. Palin's Complaint Would Be Futile And Its Dismissal Of Mrs. Palin's Complaint *With Prejudice* On That Basis.**

At the outset, the Court must consider the instant motion in light of this Circuit's liberal policy favoring leave to amend complaints and strict construction of the futility exception thereto — an exception that is properly considered *after* a plaintiff has an opportunity to proffer an amended complaint.

The Second Circuit has explained that "[w]ithout doubt, this circuit strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)." *Porat*, 464 F.3d at 276; *accord Ellis v. Chao*, 336 F.3d 114, 126-27 (2d Cir. 2003).  This is because, as the U.S. Supreme Court has admonished, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  The futility exception is a narrow exception to this rule; leave to amend may be denied because a proposed amendment would be futile only "'if the proposed amended complaint would be subject to 'immediate dismissal' for failure to state a claim or on some other ground.'"  *Toliver v. Colvin*, No. 12-cv-227, 2014 WL 1660609, at *11 (W.D.N.Y. Apr. 24, 2014) (quoting *Jones v.*

*N.Y. Div. of Military & Naval Affairs*, 166 F.3d 45, 55 (2d Cir. 1999)).[3]  In assessing whether a proposed amendment would be futile, the court may not "resolve[] issues of fact," and allegations in an amended complaint **must** be taken as true.  *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014); *accord Nerney v. Valente & Sons Repair Shop*, 66 F.3d 25, 29 (2d Cir. 1995).

### A.    The Court Must Assess The Question Of Futility In Light Of Mrs. Palin's Proposed Amended Complaint.

As this Court has repeatedly recognized, in evaluating the potential futility of an amendment to a complaint the Court will first allow the plaintiff to proffer an amended complaint and will then consider and evaluate the question of futility in light of that proposed pleading.  *SPV OSUS Ltd. v. AIA LLC,* No. 15-cv-619, 2016 WL 3039192, at *8 (S.D.N.Y. May 26, 2016); *Tabaei v. N.Y. City Health & Hosps. Corp.*, No. 11-cv-2013, 2011 WL 6778500, at *4 (S.D.N.Y. Dec. 21, 2011); *Smith v. Stevens*, 957 F. Supp. 2d 466, 470-71 (S.D.N.Y. 2013).  This makes sense:  Trying to evaluate the question of futility without a proposed amended complaint necessarily requires improper speculation.  *See, e.g.*, *Lin v. Toyo Food, Inc.*, No. 12-cv-7392, 2016 WL 4502040, at *6 n.6 (S.D.N.Y. Aug. 26, 2016) (rejecting futility challenge and granting leave to amend complaint and explaining that "[t]he Court chooses not to speculate as to how it would have ruled if the arguments put forward in Plaintiffs' Motion papers were also included within Plaintiffs' Proposed Second Amended Complaint"); *S.E.C. v. Espuelas*, 579 F. Supp. 2d 461, 488 (S.D.N.Y. 2008) (rejecting futility argument and granting plaintiff leave to amend complaint because, having not seen the amended pleading and new allegations therein, "the Court declines to engage in speculation.").[4]

---

[3] Thus, where a plaintiff seeks leave to amend her complaint, "[t]he burden of showing futility ... is on the non-moving party."  *Allgaier v. Peterson*, No. 13-cv-5112, 2015 WL 5459808, at *4 (S.D.N.Y. Aug. 13, 2015).

[4] Superseded in part on other grounds by statute, 15 U.S.C. § 78t (2012).

Here, Mrs. Palin requested an opportunity to amend her Complaint if the Court found her actual malice allegations insufficient,[5] but the Court made its futility finding without allowing her the opportunity to proffer an amended complaint, thereby depriving her of the opportunity to show the Court the specific factual allegations she would make to demonstrate *The New York Times'* actual malice.  This is significant.

*The New York Times'* Motion to Dismiss and Supplemental Memorandum in support thereof primarily challenged Mrs. Palin's allegations of actual malice as deficient because they focused on the collective knowledge and actions of *The New York Times* rather than those of Mr. Bennet — which is not surprising because Mrs. Palin had no way of knowing who authored the defamatory statements about her when she filed this case.[6]  Likewise, in its Dismissal Order, the Court found the allegations of actual malice in Mrs. Palin's Complaint insufficient because her Complaint "fail[ed] to identify any individual who possessed the requisite knowledge and intent and, instead, attributes it to the Times in general," which the Court held "will not suffice." (Dismissal Order at 16.)

Following the evidentiary hearing and resulting (limited) legal briefing, the Court speculated about what Mrs. Palin would allege about the author, James Bennet's, subjective intent based on the arguments in Mrs. Palin's truncated memorandum [Dkt. No. 40].  The Court surmised that Mrs. Palin would try to allege actual malice based on Mr. Bennet's motive to defame Mrs. Palin arising from his long association with liberal publications and his "political opposition" to Mrs. Palin.  (*Id.* at 17-19.)  The Court also presumed that Mrs. Palin would try to establish actual malice based upon Mr. Bennet's failure to cite a source for his challenged

---

[5] *See supra* note 1.
[6] Def.'s Mem. of Law in Supp. of Its Mot. to Dismiss the Compl. at 12-17, 21 [Dkt. No. 25]; Def.'s Suppl. Mem. in Further Supp. of Its Mot. to Dismiss the Compl. at 1-3 [Dkt. No. 31].

statements, as well as his failure conduct an adequate investigation. (*Id.* at 20-21.)  The Court also assumed that Mrs. Palin's proposed amendment would include allegations about *The New York Times*' failure to comply with journalistic policies — which the Court characterized as being alleged in the Complaint "in wholly conclusory fashion." (*Id.* at 21.)

As to actual knowledge of falsity, the Court recognized that Mr. Bennet's knowledge of prior articles in *The Times* and *The Atlantic* would be alleged to support actual malice, but the Court credited Mr. Bennet's testimony that he did not remember reading those articles (stating that there was no connection between Mrs. Palin and Loughner's shooting) and that even if he had read them, he had forgotten them at the time he wrote the defamatory statements about Mrs. Palin.  The Court characterized Mrs. Palin's potential allegations of fact regarding Mr. Bennet's actual knowledge as mere "lawyers' arguments [that] do not substitute for the requisite factual showing." (*Id.* at 22.)

Mrs. Palin's Proposed Amended Complaint goes further and includes far more detail than the Court presumed based upon her allotted ten pages of legal argument following the plausibility hearing.  Those allegations, which the Court did not consider (and could not have considered) when it decided that an amendment would be futile, cure the purported deficiencies upon which the Court based its dismissal with prejudice.

Mrs. Palin's proposed factual allegations must be accepted as true, *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012), including the allegations that *The New York Times* and Mr. Bennet had actual knowledge that their defamatory statements about Mrs. Palin were false and/or acted with reckless disregard for their truth or falsity — irrespective of Mr. Bennet's self-proclaimed ignorance of whether a link existed between Mrs. Palin and Loughner and Mr. Bennet's supposed inability to recall any of his publications' articles and the

common journalistic knowledge confirming that such a link was never established.[7]   At this stage, the Court is duty-bound to ignore Mr. Bennet's professions of good faith and to accept as true Mrs. Palin's allegations that Mr. Bennet knew about and recalled *The New York Times* and *The Atlantic* articles and the consensus among journalists which demonstrated that Mr. Bennet's statements about Mrs. Palin were false.   *See id.*   Indeed, If the law allowed otherwise, it would erect a "logically impossible test which by its practical application would inevitably result in no defamation case ever qualifying for judicial resolution."   *Prozerlik v. Capital Cities Comm., Inc.*, 605 N.Y.S. 2d 218, 225 (1993).   Stated differently, accepting Mr. Bennet's self-serving, untested testimony over Mrs. Palin's allegations would allow him and *The New York Times* to be impervious to defamation suits simply by professing at the dismissal stage that they did not remember knowing that their defamatory statements were false — even where circumstantial evidence belies that self-serving contention.   Because a fair reading of Mrs. Palin's Proposed Amended Complaint "'might reasonably be expected to alter [that] conclusion reached by the court,'" reconsideration is warranted.   *See Vista Outdoor*, 2017 WL 1094568, at *1 (quoting *Shrader*, 70 F.3d at 257).

> **B.**     **Mrs. Palin's Proposed Amended Complaint Plausibly Alleges That *The New York Times* Acted With Actual Malice.**

As the Second Circuit and this District have repeatedly and recently emphasized, a plaintiff's burden of plausibly alleging elements of a cause of action is "exceedingly low."   *Elias v. Rolling Stone LLC*, --- F.3d ----, 2017 WL 4126956, at *10 (2d Cir. Sept. 19, 2017) (Lohier, J., concurring in part and dissenting in part) ("[A]s the majority points out, the plausibility threshold is exceedingly low." (citing *Anderson News*, 680 F.3d at 184-85)); *Workneh v. Super Shuttle*

---

[7] In fact, virtually all of those allegations are indisputable.   The only fact that *The New York Times* might dispute (Mr. Bennet's actual knowledge) is an issue only a jury could decide and, regardless, must still be presumed in favor of Mrs. Palin at this stage of the case.

*Int'l, Inc.*, No. 15-cv-3521, 2017 WL 1185221, at *3 (S.D.N.Y. Mar. 28, 2017) ("Plaintiff has met the 'exceedingly low' burden of demonstrating [plausibility.]"); *Bailey v. N.Y. Law Sch.*, No. 16-cv-4283, 2017 WL 835190, at *7 (S.D.N.Y. Mar. 1, 2017) (same).  This "exceedingly low" burden "'does *not* impose a *probability* requirement at the pleading stage,'" and "'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely.'"  *Anderson News*, 680 F.3d at 184-85 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  Thus, even if the Court thinks that Mrs. Palin's allegations of *The New York Times*' actual malice seem doubtful or are "weak" or that *The New York Times*' version of events seems "more plausible," Mrs. Palin's Proposed Amended Complaint still states a claim and amendment is therefore not futile.  *Anderson News*, 680 F.3d at 184 (citing *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985).)

Importantly, the factual allegations in Mrs. Palin's Proposed Amended Complaint must be viewed in the context of the types of facts that courts — including the U.S. Supreme Court — have held constitute evidence of a defamation-defendant's actual malice.  As the Supreme Court has long recognized, defamation-defendants, unsurprisingly, "are prone to assert their good-faith belief in the truth of their publications," and therefore "plaintiffs will rarely be successful in proving awareness of falsehood from the mouth of the defendant himself."  *Herbert v. Lando*, 441 U.S. 153, 170 (1979).  Thus, because a defamation-defendant will nearly always claim subjective good faith in publishing, "a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence."  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989); *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000) ("'Malice may be proved inferentially because it is a matter of the defendant's subjective mental state, revolves around facts usually within the defendant's knowledge and control, and rarely is

admitted.'" (quoting *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987))).[8]

In evaluating the circumstantial evidence supporting a finding of actual malice, courts take a holistic approach that examines the totality of the evidence (here, allegations that must be assumed true) to determine whether a reasonable jury could find, based on the accumulation of that evidence (or, at this stage, those allegations), knowledge of falsity or reckless disregard for the truth.[9]   As the Second Circuit has explained, "'[t]here is no doubt that evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity.'" *Celle*, 209 F.3d at 183 (quoting *Goldwater v. Ginzburg*, 414 F.2d 324, 337 (2d Cir. 1969)).   Thus, for example, although a showing of bias or ill will alone may not be sufficient to demonstrate actual malice, the Supreme Court has expressly held that "evidence concerning motive" *is* relevant to the actual malice inquiry and can be an evidentiary building

---

[8] *See also, e.g.*, *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 871 (W.D. Va. 2016), ("[B]ecause actual malice is a subjective inquiry, a plaintiff 'is entitled to prove the defendant's state of mind through circumstantial evidence.'" (quoting *Connaughton*, 491 U.S. at 668)); *Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1090 (3d Cir. 1988) ("Therefore, objective circumstantial evidence can suffice to demonstrate actual malice.  Such circumstantial evidence can override defendants' protestations of good faith and honest belief that the report was true."); *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1087 (9th Cir. 2002) (explaining that because courts "have yet to see a defendant who admits to entertaining serious subjective doubt about the authenticity of an article it published," the actual malice inquiry is "guided by circumstantial evidence") (quotation marks and citations omitted); *Kaelin v. Globe Commc'ns Corp.*, 162 F.3d 1036, 1042 (9th Cir. 1998) (recognizing that defendants' "statements of their subjective intention are matters of credibility for a jury").

[9] Recognizing the need to evaluate such evidence, the U.S. Supreme Court has admonished that "[t]he proof of actual malice calls a defendant's state of mind into question and does not readily lend itself to summary disposition."  *Hutchinson v. Proxmire*, 443 U.S. 111, 1320 n.9 (1979) (citing 10B Wright et al., *Fed. Prac. & Proc. Civ.* § 2730 ("[T]he jury should be given an opportunity to observe the demeanor ... of the witnesses whose states of mind are at issue.")).

block toward proving malice.  *Connaughton*, 491 U.S. at 668; *Celle*, 209 F.3d at 183 ("Evidence of ill will combined with other circumstantial evidence ... may also support a finding of actual malice.").[10]  Similarly, although evidence of a failure to properly investigate **may** not be **alone** sufficient to support a finding of actual malice, courts have recognized that it is one piece of evidence that, in conjunction with other evidence, can support a finding of actual malice.  *Hunt v. Liberty Lobby*, 720 F.2d 631, 645 (11th Cir. 1983) ("'[A]ctual malice may be inferred when the investigation was grossly inadequate in the circumstances'" (quoting *Vandenburg v. Newsweek, Inc.*, 441 F.2d 378, 380 (5th Cir. 1971) ("*Vandenburg I*")); *see also Vandenburg v. Newsweek, Inc.*, 507 F.2d 1024, 1026-27 (5th Cir. 1975) (same) ("*Vandenburg II*").

Here, Mrs. Palin's Proposed Amended Complaint contains numerous new and detailed factual allegations demonstrating that *The New York Times **and*** Mr. Bennet both actually knew that the defamatory statements about Mrs. Palin were false and/or that they recklessly disregarded the truth or falsity of those statements.

*First*, Mrs. Palin's Proposed Amended Complaint contains well-pleaded facts showing that Mr. Bennet had actual knowledge that his defamatory statements linking Mrs. Palin to Loughner's horrific January 2001 mass shooting were false and further alleges *how* Mr. Bennet had that knowledge.  (*See* Proposed Am. Compl. ("PAC") ¶¶ 2, 5, 7-8, 54-74, 85, 152-58, 214.) In fact, Mrs. Palin's Proposed Amended Complaint alleges that Mr. Bennet knew and remembered that Mrs. Palin did not incite Loughner's shooting for *numerous* reasons:

- Mr. Bennet, in his previous role as Editor-in-Chief of *The Atlantic* (in which position "he was responsible for the content of, review[ing], edit[ing], and approv[ing]" that

---

[10] *See also, e.g.*, *Shoen v. Shoen*, 48 F.3d 412, 417 (9th Cir. 1995) ("[I]ll will **is** considered circumstantial evidence of actual malice.") (emphasis added); *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 315 n.10 (5th Cir. 1995) ("[E]vidence of ulterior motive can often bolster an inference of actual malice.").

publication's articles) had "read, reviewed, edited, and approved for publication numerous articles in *The Atlantic* which established that there was no such connection [between Mrs. Palin and Loughner's shooting]." (*Id.* ¶¶ 54, 59-68, 153.)  In fact, in that role Mr. Bennet reviewed, edited, and/or approved *many* articles concluding and making clear that there was absolutely no connection between Mrs. Palin and Loughner's shooting. (*Id.* ¶¶ 59-63, 68-69.)

- Mr. Bennet, in his previous role as Editor-in-Chief of *The Atlantic*, "knew about, read and discussed" and "approved for publication," a column by his close-friend, Andrew Sullivan, titled "'*Caldwell's Unfairness*,' which specifically demanded a retraction from another journalist for accusing Mr. Sullivan *of saying* there was a "link" between Mrs. Palin or political rhetoric and the Loughner Shooting." (*Id.* ¶¶ 66-67, 154.)

- Mr. Bennet, in his previous role as Editor-in-Chief of *The Atlantic*, "read, reviewed, edited and remembered *The Atlantic's* recap of the most important events in 2011" and its "year-ending 2011 piece, '*Ten Days That Defined 2011*,'" which concluded that "'Loughner is clinically insane and [his shooting] was not really about politics at all. That many, including us, immediately jumped to that conclusion says some pretty sorry things about the state or our political machine.'" (*Id.* ¶¶ 68-70.)

- "Within days of the Loughner Shooting, the consensus within *The Times*, *The Atlantic* and media as a whole was that Mrs. Palin and the Palin Map did not incite the Loughner's Shooting, and that no direct or clear link between the two was ever established.  As Editor-In-Chief of *The Atlantic*, Mr. Bennet was aware of this consensus within his publication and the journalism community." (*Id.* ¶ 65.)

- "[B]ecause of [Mr. Bennet's] close personal and political ties to the Loughner Shooting and the issues of gun control and political rhetoric, Mr. Bennet knew about, closely followed, read about and committed to memory *The Atlantic*'s publications and other news reports about the events surrounding the Loughner Shooting, and in particular, the consensus that no link was established between the Palin Map and Loughner's crime." (*Id.* ¶ 155.)

- "[A]s a highly-educated journalist, editor-in-chief and gun control advocate working in a field that requires him to remember facts, who also had a strong personal connection to politically-related threats of gun violence against politicians, Mr. Bennet very closely followed and had and continues to have actual knowledge of the events surrounding the Loughner Shooting, the Palin Map, and the well-recognized consensus within the media that no link was ever established between the two." (*Id.* ¶ 53.)

These allegations are not conclusory.  They are well-pleaded ultimate facts that, assumed true (as they must be), plausibly allege that Mr. Bennet had actual knowledge that Mrs. Palin did not incite and had not been clearly and directly linked to Loughner's Shooting at the time he wrote the defamatory statements professing that such a link existed.

**Second**, Mrs. Palin's Proposed Amended Complaint contains numerous well-pleaded factual allegations of judicially-recognized circumstantial evidence of actual malice — allegations showing that Mr. Bennet and *The New York Times* recklessly disregarded the truth or falsity of their defamatory statements about Mrs. Palin.  These allegations, too, are not conclusory and are the very same types of facts that courts (including the U.S. Supreme Court) have found to constitute legally sufficient circumstantial evidence of actual malice.  In other words, they plausibly allege actual malice, which is all that is required to survive a motion to dismiss.

**Preconceived Storyline And Avoidance Of Contradictory Information.**  The Second Circuit has expressly held that a jury can find actual malice based on "a predetermined and preconceived plan to malign [the plaintiff's] character."  *Goldwater*, 414 F.2d at 337.  Indeed, as the Ninth Circuit and a leading defamation treatise have explained, "'evidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often prove to be **quite powerful evidence**.'"  *Harris v. City of Seattle*, 152 F. App'x 565, 568 (9th Cir. 2005) (quoting Rodney A. Smolla, 1 Law of Defamation § 3:71 (2d ed.)) (emphasis added); *accord Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 539 (7th Cir. 1982) (following remand from Supreme Court, finding actual malice because, *inter alia*, defendant "conceived of a storyline" and then published a defamatory article consistent with that preconceived storyline).[11]  Here, Mrs. Palin's

---

[11] *See also, e.g.*, *Alioto v. Cowles Comm., Inc.*, 519 F.2d 777, 780-81 (9th Cir. 1975), *aff'd*, 623 F.2d 616 (9th Cir. 1980) (finding actual malice where the authors "deliberately failed to cross-check on the validity of their statements because they did not want to find them to be untrue"); *Sharon v. Time, Inc.*, 599 F. Supp. 538, 576 (S.D.N.Y. 1984) ("A jury could find that [the author] chose not to ask Source C the ultimate question because he knew or suspected that Source C's answer would undermine his hypothesis…[which]…could be read to convey his 'subjective

Proposed Amended Complaint specifically alleges that Mr. Bennet (and *The New York Times*) had a preconceived storyline for their defamatory article and consciously disregarded known evidence and readily available research and articles that would have contradicted that storyline. (PAC ¶¶ 5, 80-111, 157, 162-64.)  It expressly alleges both that Mr. Bennet had a preconceived storyline and what that storyline was:

- "From the outset, Mr. Bennet's subjective intent was pre-determined to use the Loughner Shooting as the sole example of 'political incitement' to advance a gun-control and anti-political rhetoric agenda.  Mr. Bennet did not care whether any political incitement, in fact, existed.  He merely wanted confirmation that the agenda he had already decided to promote was consistent with *The Times'* prior writings on gun control.  Simply stated, Mr. Bennet only cared about hypocrisy, not accuracy." (*Id.* ¶ 84.)

- "[B]efore Ms. Williamson had ever set pen to paper and any research had been conducted, Mr. Bennet already had made up his mind to use Mrs. Palin as the only factual example of political incitement of a mass shooting — regardless of whether the facts supported his very serious charge." (*Id.* ¶ 87.)

And it alleges that Mr. Bennet consciously avoided evidence that would contradict his preconceived storyline — and how and why he did so:

- "Mr. Bennet knew that fact-checking would only undermine his pre-determined conclusion and prevent him from using Mrs. Palin as the sole factual predicate for the points he was trying to make, so he consciously avoided evidence that would contradict his preconceived storyline." (*Id.* ¶ 164.)

- "Mr. Bennet tasked Ms. Williamson with drafting the editorial, and asked her to look back at editorials and Op-Ed columns that *The Times* had published in the immediate wake of the Loughner Shooting.  ... At Mr. Bennet's direction, *The Times* researcher

---

awareness of probable falsity.'"); *Sisemore v. U.S. News & World Report, Inc.*, 662 F. Supp. 1529, 1536 (D. Alaska 1987) ("[A] jury could infer 'reckless disregard' from evidence that the methodology of the news magazine was to write the story first, complete with theme and slant, and then use a reporter to generate colorful descriptions and quotes to differentiate it from the newspaper story upon which the 'story idea' was based. ... Factual inaccuracies to make [plaintiff] fit the preconceived [thesis] in the 'story idea' might be deemed by a jury in these circumstances to amount to reckless disregard for the truth."); *Tosti v. Ayik*, 476 N.E.2d 928, 936 (Mass. 1985), *aff'd*, 508 N.E.2d 1368 (Mass. 1987) (finding actual malice where author did not know whether facts stated in his article were true but was nevertheless motivated to write about a predetermined topic; jury could reasonably find that "this motive led the defendant to either fabricate the other charges or to make his accusations based on suspicions and not facts.").

reviewed some of *The Times'* editorials and Op-Ed columns about the Loughner Shooting.  ... That research resulted in at least six editorials and one op-ed column ... addressing political rhetoric and gun control in the context of the Loughner Shooting.  ... *The Times* researcher emailed the results of this search to Ms. Williamson and Mr. Bennet. ... Ms. Williamson ... reviewed the research ... [and therefore] knew that a link had never been established between Mrs. Palin, the Palin Map or political incitement and Loughner's Shooting.  [Thus,] Ms. Williamson did not make [] a knowingly false assertion about a link between Mrs. Palin and the Loughner Shooting in the editorial she initially drafted.  [But] Mr. Bennet [] did not like the way Ms. Williamson wrote about the connection between the Palin Map and the Loughner Shooting, so he decided to substantially re-write the editorial himself. ... [In so doing,] Mr. Bennet willfully disregarded the truth, his own personal knowledge of the facts, *The Times'* research that he had ordered, Ms. Williamson's hyperlink to the ABC Article, and his Editorial Department's and *The Times'* policies and procedures on accuracy and fact-checking — so that he could immediately launch an attack on Mrs. Palin and the policies she symbolizes because he was predetermined to make political points at her expense, regardless of the veracity of his serious charges against her."  (*Id.* ¶¶ 82, 88-93, 103, 105.)

- "Even though the charges Mr. Bennet was making against Mrs. Palin were extremely serious and easily verifiable, Mr. Bennet did not read or review the hyperlinked ABC Article, the other research his staff compiled or any of the numerous other articles about the charges he was making against Mrs. Palin, all of which were easily and instantaneously available by searching *The Times'* website (an Editorial Department practice for fact-checking every editorial column) because he knew they would show that there was no connection between Mrs. Palin and Loughner."  (*Id.* ¶ 157.)

Mrs. Palin's Proposed Amended Complaint even plausibly alleges Mr. Bennet's motivation for doing so:  "Mr. Bennet was outraged over the Hodgkinson shooting and the inability to implement gun control and quell political rhetoric in the years since the Loughner Shooting.  Mr. Bennet was further enraged by the current president, and his rhetoric.  So, Mr. Bennet decided to use the Hodgkinson shooting as a pulpit to re-affirm his pre-determined narrative about political rhetoric and gun control and to use Mrs. Palin as its only factual support."  (*Id.* ¶ 160.)  Under settled law, these factual allegations, assumed true, plausibly establish actual malice.

**Bias, Motive, And Ill Will.**  As noted above, "evidence concerning motive" and ill will is also relevant to the actual malice inquiry and can lend support to a finding of actual malice.  *Connaughton*, 491 U.S. at 668; *Celle*, 209 F.3d at 183.  Indeed, the Second Circuit has expressly

recognized that actual malice can be inferred at the pleadings stage from "the nature and circumstances of the alleged defamation or previous dealings with the defendant." *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d. Cir. 2015).  Here, in addition to *The New York Times*' profit-motive and desire to use Mrs. Palin's name to drive readership (as alleged in Mrs. Palin's original Complaint), Mrs. Palin's Proposed Amended Complaint specifically alleges:

- "Mr. Bennet [holds] deep-seeded animosity and ill-will toward Mrs. Palin and the political views she symbolize[s]," as a result of his "long lineage in and personal connection to Democratic politics," Mrs. Palin's endorsement of a political challenger for his brother's Senate seat and her endorsement of challengers to politicians who endorsed his brother.  (PAC ¶ 165; *see also id.* ¶¶ 45-52.)

- "Mr. Bennet held ill-will and animosity toward Mrs. Palin and a vested personal and professional interest in and closely followed the events surrounding the Loughner Shooting, specifically including any role Mrs. Palin or her political activities may have played in it," because "Mr. Bennet's brother was threatened by gun violence at the very same time of the Loughner Shooting (soon after the Palin Map was released)" and he is "an outspoken advocate for gun control," whereas Mrs. Palin advocates for robust Second Amendment rights.  (*Id.* ¶¶ 49, 52.)

- "Mr. Bennet held deep-seeded hostility and ill-will toward Mrs. Palin based on his long association with liberal publications, personal connections to the Loughner Shooting and his brother's adversarial relationship with Mrs. Palin, as well as his ardent political views on gun control and political rhetoric and his personal politics and his family's political background."  (*Id.* ¶ 168; *see also id.* ¶¶ 41-53.)

- "Mr. Bennet [] knew, based on his professional experience, that controversy — even over false allegations — also drives readership and brings an economic benefit to his publications," and sought to revive the false allegations that Mrs. Palin motivated Loughner's Shooting to obtain increased readership for himself and *The New York Times*. (*Id.* ¶ 167; *see also id.* ¶ 166 ("Moreover, Mr. Bennet and other members of *The Times'* Editorial Department perceived Mrs. Palin was as a convenient target for attacks against conservative policies who also inflames passions and drives viewership.")

These allegations further bolster the plausibility of *The New York Times*' actual malice.

**Refusal To Retract/Apologize.**  Courts across the country have likewise explained that "[e]vidence of the [defendant's] steadfast refusal to retract [is] properly considered as bearing on the issue of actual malice." *Tavoulareas v. Piro*, 763 F.2d 1472, 1477 (D.C. Cir. 1985), *vacated on other grounds*, 759 F.2d 90 (D.C.Cir.1985); *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d

1066, 1071 (5th Cir. 1987); *Ventura v. Kyle*, 63 F. Supp. 3d 1001, 1014 (D. Minn. 2014)

(explaining that "most authorities" hold that failure to retract can establish actual malice), *rev'd*

*on other grounds*, 825 F.3d 876 (8th Cir. 2016).   In its Dismissal Order, the Court gave

significant weight to *The New York Times*' "prompt" corrections.   However, Mrs. Palin's

Proposed Amended Complaint alleges that *The New York Times* and Mr. Bennet refused to

**meaningfully** retract their defamatory statements about Mrs. Palin despite being confronted with

the falsity of those statements:

- "Motivated not by remorse over defaming Mrs. Palin or for falsely asserting that she incited Loughner's Shooting, Mr. Bennet set out to do as little as possible to save face amongst *Times* readers and his colleagues." (PAC ¶ 133.)

- "The First Attempted Correction did not remove the unnecessary reference in the column to Mrs. Palin, even though there was no established connection between 'political incitement' and Loughner's crime.  As written, it also suggests that such a connection may still be established, when Mr. Bennet and *The Times* already knew that no such link existed.  Moreover, the First Attempted Correction made no mention of Mrs. Palin, while the column continued to reference her by name." (*Id.* ¶ 137.)

- "Still devoid of any reference to Mrs. Palin, ... *The Times'* Second Attempted Correction continued the paper's steadfast refusal to acknowledge and correct that it had falsely asserted that Mrs. Palin incited Loughner's deadly rampage." (*Id.* ¶¶ 139-40.)

- "*The Times* and Mr. Bennet simply refused to meaningfully apologize to Mrs. Palin for what they had done." (*Id.* ¶ 141.)

- "*The Times* never issued a full and fair retraction of its defamatory Palin Article and never issued any apology to Mrs. Palin for stating that she incited murder" because it never "manifest[ed] an honest intention and sincere effort to repair the harm done to Mrs. Palin." (*Id.* ¶¶ 143-44.)

Moreover, Mrs. Palin's Proposed Amended Complaint alleges that *The New York Times* and

Mr. Bennet **continued to stand by the substance of those statements despite their admitted**

**falsity**: "Mr. Bennet and *The Times* confirmed that they would not accept responsibility for the

defamatory Palin Article in a statement provided to CNN," in which Mr. Bennet continued to

maintain that any error in the editorial "doesn't undercut or weaken the argument of the piece."

(*Id.* ¶ 148.) These allegations, too, constitute plausible allegations of *The New York Times*' actual malice.

**Failure To Adhere To *The New York Times*' Own Journalistic Policies.**   A journalist's failure to comply "with the standards of [the] profession in information gathering and dissemination" is recognized circumstantial evidence of actual malice.   *Kerwick v. Orange Cty. Publ'ns Div. of Ottaway Newspapers, Inc.*, 53 N.Y.2d 625, 627 (1981).   Here, Mrs. Palin's Proposed Amended Complaint alleges not only that *The New York Times* generally failed to comply with its own journalism policies, standards, and practices in publishing its defamatory statements about Mrs. Palin, but that Mr. Bennet specifically avoided complying with them:

- "Mr. Bennet turned a blind-eye to *The Times'* own policies and procedures, which forbid his conduct and label it 'intolerable.'"  (PAC ¶ 179.)

- "Mr. Bennet and *The Times* [] failed to comply with their own policies, practices and standards by failing when they failed to engage in well-established, "rudimentary" fact-checking of the Palin Article — at a time when *The Times* and Mr. Bennet openly acknowledged the importance of accuracy and *The Times* was marketing itself to the public as a purveyor of absolute 'TRUTH.'"  (*Id.* ¶ 177.)

- "Mr. Bennet [] ignored his own Editorial Department's practices and policies," which require ensuring that "if something is represented as a fact, it has to be correct," and mandate "fact-checking [] work before publication."  (*Id.* ¶¶ 36-40, 180-83.)

- "Mr. Bennet did not ensure that what he was representing as fact about Mrs. Palin was correct and he did not fact-check his re-write," as required by *The New York Times* policies."  (*Id.* ¶ 184.)

- "Mr. Bennet also failed to follow any of the basic steps to ensure the accuracy of the Palin Article that he expects of all of his editorial writers.  He did not read each sentence of his re-write and ask himself: Is this true?  Can I defend it?  Did I get the facts exactly right?"  (*Id.* ¶ 185.)

- "Mr. Bennet likewise ignored and violated the Society of Professional Journalists' Code of Ethics ... followed by *The Times* and also published on its website, which states in pertinent part:... 'Journalists should: Test the accuracy of information from all sources and exercise care to avoid inadvertent error.  Deliberate distortion is never permissible.'" (*Id.* ¶ 182.)

These allegations are also not conclusory and constitute further plausible allegations of *The New York Times*' actual malice.

**Grossly Inadequate Investigation Under No Time Pressure.**  Courts across the country also recognize that "[w]hen a story is not 'hot news,' 'actual malice may be inferred when the investigation ... was grossly inadequate in the circumstances.'"  *Hunt*, 720 F.2d at 645; *Vandenburg I*, 441 F.2d at 380; *Vandenburg II*, 507 F.2d at 1026-27; *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1057-58 (10th Cir. 2013) (rush to publish despite lack of time pressure is evidence of actual malice); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 158 (1967) (suggesting that "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers," can support a finding of actual malice).  Here, Mrs. Palin's Proposed Amended Complaint specifically alleges that Mr. Bennet and *The New York Times* conducted a grossly inadequate investigation while under no time pressure to publish:

- "Because *The Times* already had reported on the facts of the Hodgkinson shooting, the editorial Mr. Bennet was not 'hot news' that had to be published immediately or on a deadline."  (PAC ¶ 104.)

- "Mr. Bennet authored defamatory passages that directly and in no uncertain terms made raising a very serious charges against Mrs. Palin in an editorial column which, by its very nature and under the circumstances was not 'hot news.'"  (*Id.* ¶ 169.)

- "Despite the seriousness of asserting that Mrs. Palin politically incited one of the most infamous mass shootings in American history, Mr. Bennet and *The Times* failed to take even the most basic steps to investigate and test the accuracy of their false and defamatory statements, such as looking at the hyperlinked ABC Article in Ms. Williamson's draft or any of the research Mr. Bennet ordered to be completed."  (*Id.* ¶ 170.)

- "Mr. Bennet did not fact-check the single factual example of the 'sickening' pattern of politically incited violence against members of congress upon which his thesis was based, because he knew that a fact-check would confirm that there was no link between Mrs. Palin and Loughner's Shooting (thus contradicting his preconceived storyline)."  (*Id.* ¶ 171.)

- "The points Mr. Bennet wanted to make could have waited to allow for a careful review for factual accuracy consistent with *The Times'* Editorial Board's practices and policies." (*Id.* ¶ 104.)

- "Mr. Bennet and *The Times* engaged in highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers."  (*Id.* ¶ 172.)

Notably, the Court's statement in its Dismissal Order crediting Mr. Bennet's claim that there was "very little time available" for *The New York Times* to publish the defamatory editorial would amount to improper fact-finding in the face these well-pleaded factual allegations.  Accepted as true, which they must be at this stage, these allegations continue to bolster Mrs. Palin's already strong showing of actual malice.

**Inherently Improbable Defamatory Statements.**   Actual malice also can be established, independently, when a statement is "so inherently improbable that only a reckless man would have put [it] in circulation ... [and] where there are obvious reasons to doubt [its] veracity[.]"  *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968); *Dalbec*, 828 F.2d at 927 (same; presents a jury question).[12]   Similarly, "courts have upheld findings of actual malice when a defendant failed to investigate a story weakened by inherent improbability[.]"  *Zerangue*, 814 F.2d at 1070; *accord Eramo*, 209 F. Supp. 3d at 873.  Here, the seriousness of Mr. Bennet's and *The New York Times*' charges against Mrs. Palin and are self-evident, and the unmistakable language Mr. Bennett used to defame her ("incitement," "clear," and "direct") made those charges against her much worse.  As alleged in Mrs. Palin's Proposed Amended Complaint, those deadly serious charges were overwhelming improbable, and *The New York Times* and Mr.

---

[12] *See also Vasquez v. O'Brien*, 85 A.D.2d 791, 792 (3d Dep't 1981) ("The content of the statements themselves and the context in which they arose may give rise to significant suggestions of possible falsity which should alert the speaker ... [and] inaccurate or untrue use of language, in the intense political climate then prevailing, could certainly be found to be evidence of actual malice on the part of defendant.").

Bennet had "obvious reasons to doubt the veracity of the charges made against Mrs. Palin" (PAC ¶ 173), and they did in fact doubt their veracity:

- "Amongst journalists — particularly those holding political views such as those of Mr. Bennet — it was common knowledge (even in 2011) that no link between the Palin Map and Loughner's Shooting was ever established." (*Id.* ¶ 174.)

- "In fact, if a 'clear' and 'direct' link between Mrs. Palin and Loughner's Shooting had been made, it would be something that would have been highly publicized and well-known to a journalist — particularly one with the personal connections, political views and high-ranking media positions that Mr. Bennet held." (*Id.* ¶ 175.)

- "[T]he nature and severity of the false statements about Mrs. Palin were such that Mr. Bennet and *The Times* did, in fact, entertain serious doubts as to their truth and/or such that they acted with a high degree of awareness of their probable falsity." (*Id.* ¶ 176.)

- "Within days of the Loughner Shooting, the consensus within *The Times*, *The Atlantic* and media as a whole was that Mrs. Palin and the Palin Map did not incite the Loughner's Shooting, and that no direct or clear link between the two was ever established.  As Editor-In-Chief of *The Atlantic*, Mr. Bennet was aware of this consensus within the journalism community." (*Id.* ¶ 65.)

(*See also id.* ¶¶ 59-63, 66-70 89, 123, 125-28 (highlighting some of the extensive reporting on Loughner's shooting confirming that it had no connection with Mrs. Palin).  This is yet further circumstantial evidence that, independently and collectively with all of the other circumstantial evidence, plausibly shows *The New York Times*' (and Mr. Bennet's) actual malice.

*      *      *

In sum, Mrs. Palin's Proposed Amended Complaint sets forth numerous detailed factual allegations not contained in her original Complaint — and that Mrs. Palin could not have possibly learned until after filing her original Complaint — that plausibly establish actual malice but that the Court did not consider when it decided that amendment would be futile. Accordingly, Mrs. Palin respectfully requests that, in light of her Proposed Amended Complaint, the Court reconsider its dismissal with prejudice and grant her leave to file the Proposed Amended Complaint, and vacate its August 30, 2017 Judgment.

## IV.      CONCLUSION

For the foregoing reasons, Mrs. Palin respectfully requests that the Court grant her Motion for Reconsideration, reconsider its finding that any amendment to Mrs. Palin's Complaint would be futile and dismissal of her Complaint with prejudice, grant her leave amend her Complaint consistent with her Proposed Amended Complaint, and vacate its August 30, 2017 Judgment accordingly.

Dated: September 25, 2017          _/s/ Shane B. Vogt_____
                                  Kenneth G. Turkel (admitted *pro hac vice*)
                                  Email:  kturkel@bajocuva.com
                                  Shane B. Vogt (admitted *pro hac vice*)
                                  Email:  svogt@bajocuva.com
                                  BAJO | CUVA | COHEN | TURKEL
                                  100 North Tampa Street, Suite 1900
                                  Tampa, Florida 33602
                                  Telephone:  (813) 443-2199
                                  Facsimile:  (813) 443-2193

                                  S. Preston Ricardo
                                  E-mail:  pricardo@golenbock.com
                                  GOLENBOCK EISEMAN ASSOR BELL
                                  & PESKOE LLP
                                  711 Third Avenue
                                  New York, NY  10017
                                  Telephone:  (212) 907-7300
                                  Facsimile:  (212) 754-0330

                                  *Attorneys for Plaintiff*

2877450.1                              21