The New York Times | Ethical Jounalism



The New York Times

# Ethical Journalism
A Handbook of Values and Practices for
the News and Editorial Departments

**September 2004**



# Ethical Journalism

**A Handbook of Values and
Practices for the News
and Editorial Departments**

The New York Times

*" Reporters, editors, photographers and all members of the news staff of The New York Times share a common and essential interest in protecting the integrity of the newspaper. As the news, editorial and business leadership of the newspaper declared jointly in 1998: 'Our greatest strength is the authority and reputation of The Times. We must do nothing that would undermine or dilute it and everything possible to enhance it.' "*

**Guidelines on Our Integrity, May 1999**

**1.**  **Introduction and Purpose**                               **3**

    The Scope of These Guidelines                          3
    Other Standards of Behavior                            5

**2.**  **Our Duty to Our Readers**                                **7**

**3.**  **Pursuing the News**                                      **8**

    Personal Relations with Sources                        8
    Obeying the Law in Pursuit of the News                 9
    Accepting Hospitality From Sources                    10
    Dealing with the Competition                          11

**4.**  **Protecting the Paper's Neutrality**                      **12**

    Providing Financial or Other Advice                   13
    Speaking Engagements                                  14
    Competitions and Contests                             16
    The Use of Borrowed Equipment                         17
    Collaboration and Testimonials                        18

**5.**  **Participation in Public Life**                           **19**

    Voting, Campaigns and Public Issues                   19
    Community Service                                     21

**6.**  **Advertisers, Marketing, Promotion**                     **23**

**7.**  **Obligations to The Times**                               **24**

    Speaking for The Times                                24

**8.**  **Books, Movies, Reprints and Copyright**                  **25**

**9.**  **Journalistic Work Outside The Times**                    **28**

Table of Contents

**10. Appearing on Broadcast Media**     **31**

**11. Sorting Out Family Ties**     **33**

      Disclosure of Possible Conflicts     33

**12. Investments and Financial Ties**     **35**

      Affirming Good-Faith Compliance     36
      Business-Financial, Technology and Media News     37
      Transitional Arrangements     38
      Annual Filing by Ranking Editors     39

**13. Rules for Specialized Departments**     **40**

      Sports     40
      Culture, Styles, Dining     40
      Art, Pictures, Technology     42
      Automobiles     42
      Travel     43

**14. Dealing with Outside Contributors**     **44**

**Appendix A.**     **45**

      Sample letter declining a gift     45

**Appendix B.**     **46**

      Sample letter declining an unsolicited award     46

**Appendix C.**     **47**

      Letter of understanding with the
      Newspaper Guild of New York     47

**Index**     **49**

**1.**   The goal of The New York Times is to cover the news as impartially as possible — "without fear or favor," in the words of Adolph Ochs, our patriarch — and to treat readers, news sources, advertisers and others fairly and openly, and to be seen to be doing so. The reputation of The Times rests upon such perceptions, and so do the professional reputations of its staff members. Thus The Times and members of its news department and editorial page staff share an interest in avoiding conflicts of interest or an appearance of a conflict.

**2.**   For more than a century, men and women of The Times have jealously guarded the paper's integrity. Whatever else we contribute, our first duty is to make sure the integrity of The Times is not blemished during our stewardship.

**3.**   Conflicts of interest, real or apparent, may come up in many areas. They may involve the relationships of staff members with readers, news sources, advocacy groups, advertisers, or competitors; with one another, or with the newspaper or its parent company. And at a time when two-career families are the norm, the civic and professional activities of spouses, family and companions can create conflicts or the appearance of conflicts.

**4.**   In keeping with its solemn responsibilities under the First Amendment, The Times strives to maintain the highest standards of journalistic ethics. It is confident that its staff members share that goal. The Times also recognizes that staff members should be free to do creative, civic and personal work and to earn extra income in ways separate from their work at The Times. Before engaging in such outside activities, though, staff members should exercise mature professional judgment and consider the stake we all have in The Times's irreplaceable good name.

### The Scope of These Guidelines

**5.**   These guidelines generally apply to all members of the news and editorial departments whose work directly affects the content of the paper, including those on leaves of absence.

# 1

## Introduction and Purpose

**1**

Introduction and Purpose

They include reporters, editors, editorial writers, photographers, picture editors, art directors, artists, designers, graphics editors and researchers. This group of professional journalists is what this text means by "staff" or "staff members."

**6.** News clerks, administrative assistants, secretaries and other support staff are generally not bound by these strictures, with two important exceptions: First, no newsroom or editorial page employee may exploit for personal gain any nonpublic information acquired at work, or use his or her association with The Times to gain favor or advantage. And second, no one may do anything that damages The Times's reputation for strict neutrality in reporting on politics and government; in particular, no one may wear campaign buttons or display any other form of political partisanship while on the job.

**7.** Our contracts with freelance contributors require them to avoid conflicts of interest, real or apparent. In keeping with that, they must honor these guidelines in their Times assignments, as set forth in Section 14.

**8.** The Times believes beyond question that its staff shares the values these guidelines are intended to protect. In the past The Times has resolved differences of view over applying these values amiably through discussion, almost without exception. The paper has every reason to believe that pattern will continue. Nevertheless, The Times views any deliberate violation of these guidelines as a serious offense that may lead to disciplinary action, potentially including dismissal, subject to the terms of any applicable collective bargaining agreement.

**9.** Our fundamental purpose is to protect the impartiality and neutrality of The Times and the integrity of its report. In many instances, merely applying that purpose with common sense will point to the ethical course. Sometimes the answer is self-evident. Simply asking oneself whether a course of action might damage the paper's reputation is often enough to gauge whether the action is appropriate.

**10.** Every staff member is expected to read this document carefully and to think about how it might apply to his or her duties. A lack of familiarity with its provisions cannot excuse a violation; to the contrary, it makes the violation worse. The provisions presented here can offer only broad principles and some examples. Our world changes constantly, sometimes dramatically. No written document could anticipate every possibility. Thus we expect staff members to consult their supervisors and the standards editor or the deputy editorial page editor if they have any doubts about any particular situation or opportunity covered by this document. In most cases an exchange of e-mails should suffice.

**11.** Thus this handbook is not an exhaustive compilation of all situations that may give rise to an actual or perceived conflict of interest. It does not exclude situations or issues giving rise to such conflicts simply because they are not explicitly covered within this document, nor does the document or any of its particular provisions create an implied or express contract of employment with any individual to whom the guidelines apply. The Times reserves the right to modify and expand the guidelines from time to time, as appropriate. (See the letter of understanding with the Newspaper Guild of New York, included as Appendix C below.)

**12.** The authority to interpret and apply these guidelines is vested in department heads and ranking editors, most notably in the standards editor and the deputy editorial page editor. They may delegate that duty to their ranking assistants, but they remain responsible for decisions made in their name.

#### Other Standards of Behavior

**13.** In addition to this handbook, we observe the Newsroom Integrity Statement, promulgated in 1999, which deals with such rudimentary professional practices as the importance of checking facts, the exactness of quotations, the integrity of photographs and our distaste for anonymous sourcing; and

the Policy on Confidential Sources, issued in 2004. These documents are available from the office of the associate managing editor for news administration or on the Newsroom home page under Policies.

**14.** As employees of the Times Company, we observe the Rules of the Road, which are the axiomatic standards of behavior governing our dealing with colleagues and going about our work. The Rules are available from the office of the associate managing editor for news administration. Together with a statement of supporting principles, the Rules are on the Internet at http://insite.nytco.com/OUR_COMPANY/our_company.html. We also observe the company's policies against harassment and on computers and electronic communications, which appear on the Internet at http://insite.nytco.com/OUR_COMPANY/POLICIES/policies.html.

**2** | Our Duty to Our Readers

15. The Times treats its readers as fairly and openly as possible. In print and online, we tell our readers the complete, unvarnished truth as best we can learn it. It is our policy to correct our errors, large and small, as soon as we become aware of them.

16. We treat our readers no less fairly in private than in public. Anyone who deals with readers is expected to honor that principle, knowing that ultimately the readers are our employers. Civility applies whether an exchange takes place in person, by telephone, by letter or online. Simple courtesy suggests that we not alienate our readers by ignoring their letters and e-mails that warrant reply.

17. The Times gathers information for the benefit of its readers. Staff members may not use their Times position to make inquiries for any other purpose. As noted in paragraph 6, they may not seek any advantage for themselves or others by acting on or disclosing information acquired in their work but not yet available to readers.

18. Staff members who plagiarize or who knowingly or recklessly provide false information for publication betray our fundamental pact with our readers. We will not tolerate such behavior.

**3**

Pursuing the News

19. The Times treats news sources just as fairly and openly as it treats readers. We do not inquire pointlessly into someone's personal life. Staff members may not threaten to damage uncooperative sources. They may not promise favorable coverage in return for cooperation. They may not pay for interviews or unpublished documents.

20. Staff members should disclose their identity to people they cover (whether face to face or otherwise), though they need not always announce their status as journalists when seeking information normally available to the public. Staff members may not pose as police officers, lawyers, business people or anyone else when they are working as journalists. (As happens on rare occasions, when seeking to enter countries that bar journalists, correspondents may take cover from vagueness and identify themselves as traveling on business or as tourists.)

21. Theater, music and art critics and other writers who review goods or services offered to the public may conceal their Times connection but may not normally assert a false identity or affiliation. As an exception, restaurant critics may make reservations in false names to protect their identity. Restaurant critics and travel writers must conceal their Times affiliation to eliminate the possibility of special treatment.

**Personal Relations with Sources**

22. Relationships with sources require the utmost in sound judgment and self discipline to prevent the fact or appearance of partiality. Cultivating sources is an essential skill, often practiced most effectively in informal settings outside of normal business hours. Yet staff members, especially those assigned to beats, must be sensitive that personal relationships with news sources can erode into favoritism, in fact or appearance. And conversely staff members must be aware that sources are eager to win our good will for reasons of their own.

**23.** Even though this topic defies hard and fast rules, it is essential that we preserve a professional detachment, free of any whiff of bias. Staff members may see sources informally over a meal or drinks, but they must keep in mind the difference between legitimate business and personal friendship. A City Hall reporter who enjoys a weekly round of golf with a City Council member, for example, risks creating an appearance of coziness, even if they sometimes discuss business on the course. So does a reporter who joins a regular card game or is a familiar face in a corporation's box seats or who spends weekends in the company of people he or she covers. Scrupulous practice requires that periodically we step back and take a hard look at whether we have drifted too close to sources we deal with regularly. The acid test of freedom from favoritism is the ability to maintain good working relationships with all parties to a dispute.

**24.** Clearly, romantic involvement with a news source would foster an appearance of partiality. Therefore staff members who develop close relationships with people who might figure in coverage they provide, edit, package or supervise must disclose those relationships to the standards editor, the associate managing editor for news administration or the deputy editorial page editor. In some cases, no further action may be needed. But in other instances staff members may have to recuse themselves from certain coverage. And in still other cases, assignments may have to be modified or beats changed. In a few instances, a staff member may have to move to a different department — from business and financial news, say, to the culture desk—to avoid the appearance of conflict.

#### Obeying the Law in Pursuit of the News

**25.** Staff members must obey the law in the pursuit of news. They may not break into buildings, homes, apartments or offices. They may not purloin data, documents or other property, including such electronic property as databases and e-mail or voice mail messages. They may not tap telephones, invade computer files or otherwise eavesdrop electronically on news sources. In short, they may not commit illegal acts of any sort.

**26.** Staff members may not use the identification cards or special license plates issued by police or other official agencies except in doing their jobs. Staff members who have applied for or hold "NYP" or other special plates should disclose that fact to the associate managing editor for news administration or the deputy editorial page editor. Staff members whose duties do not require special plates must return them.

**27.** Staff members may not record conversations without the prior consent of all parties to the conversations. Even where the law allows recording with only one party aware of it, the practice is a deception. Masthead editors may make rare exceptions to this prohibition in places where recordings made secretly are legal.

### Accepting Hospitality from Sources

**28.** The Times pays the expenses when its representatives entertain news sources (including government officials) or travel to cover them. In some business situations and in some cultures, it may be unavoidable to accept a meal or a drink paid for by a news source. For example, a Times reporter need not decline every invitation to interview an executive over lunch in the corporation's private dining room, where it is all but impossible to pick up the check. Whenever practical, however, the reporter should suggest dining where The Times can pay. A simple buffet of muffins and coffee at a news conference, for example, is harmless, but a staff member should not attend a breakfast or lunch held periodically for the press by a "newsmaker" unless The Times pays for the staff member's meals.

**29.** Staff members may not accept free or discounted transportation and lodging except where special circumstances give us little or no choice. Among them are certain military or scientific expeditions and other trips for which alternative arrangements would be impractical — for example, a flight aboard a corporate jet during which an executive is interviewed. Staff members should consult their supervisors and the

standards editor or the deputy editorial page editor when special circumstances arise.

**30.** Staff members who review artistic performances or cover athletic or other events where admission is charged (for example, the New York Auto Show) may accept the press passes or tickets customarily made available. No other staff members, not even editors in the culture and sports departments, may accept free tickets. Even when paying the box office price, no staff member may use his or her Times position to request choice or hard-to-get seats unless the performance has a clear bearing on his or her job.

#### Dealing with the Competition

**31.** Staff members compete zealously but deal with competitors openly and honestly. We do not invent obstacles to hamstring their efforts. When we use facts reported by another publication, we attribute them.

**32.** Staff members may not join teams covering news events for other organizations, and they may not accept payment from competitors for news tips. They may not be listed on the masthead of any non-Times publication, except for publications serving organizations of the sort described in paragraph 70. Common examples include a church or synagogue newsletter, an alumni magazine or a club bulletin.

**4**

Protecting the Paper's Neutrality

**33.** Staff members may not accept gifts, tickets, discounts, reimbursements or other inducements from any individuals or organizations covered by The Times or likely to be covered by The Times. (Exceptions may be made for trinkets of nominal value, say, $25 or less, such as a mug or a cap with a company logo.) Gifts should be returned with a polite explanation. A sample letter for use in such situations appears below as Appendix A.

**34.** Staff members may not accept employment or compensation of any sort from individuals or organizations who figure or are likely to figure in coverage they provide, edit, package or supervise.

**35.** Staff members may not accept anything that could be construed as a payment for favorable coverage or as an inducement to alter or forgo unfavorable coverage. They may share in reprint fees that other journalistic media pay The Times, according to the terms of our contract with the Newspaper Guild. They may also share in fees paid by non-journalistic parties for permission to reprint Times material in advertisements or promotions, though their share of those fees may not exceed $200 an article.

**36.** Staff members may accept any gifts or discounts available to the general public. Normally they are also free to take advantage of conventional corporate discounts that the Times Company has offered to share with all employees (for example, corporate car rental rates). And staff members may accept free admission at museums or other benefits extended to all Times employees by virtue of the Times Company Foundation's support of various cultural institutions.

**37.** Staff members must be mindful, however, that large discounts — even those negotiated by the Times Company — may create the appearance of partiality, especially by those who have a hand in the coverage of the company or industry offering the discount. If General Motors, for instance, offers substantial trade discounts to all Times Company employees, the Detroit

correspondent should not accept without discussing the possible appearance of favoritism with the responsible editors. If any such discounts do raise doubts, staff members should bring them to the attention of their department heads and the standards editor or the deputy editorial page editor before accepting.

**38.** Unless the special terms are offered by The New York Times Company or a Times subsidiary or affiliate, staff members may not buy stock in initial public offerings through "friends and family shares" where any plausible possibility exists of a real or apparent conflict of interest. Staff members may not accept allocations from brokerage firms.

#### Providing Financial or Other Advice

**39.** It is an inherent conflict for a Times staff member to perform public relations work, paid or unpaid. Staff members may not advise individuals or organizations how to deal successfully with the news media (though they may of course explain the paper's normal workings and steer outsiders to the appropriate Times person). They may not, for example, advise candidates for public office, write or edit annual reports or contribute to the programs of sports teams. They should not take part in public relations workshops that charge admission or imply privileged access to Times people, or participate in surveys asking their opinion of an organization's press relations or public image. They are free, however, to offer reasonable help to institutions such as their child's school, a small museum, a community charity or their house of worship. (See paragraph 70 for a fuller discussion of permissible participation.)

**40.** Staff members may not serve as ghost writers or co-authors for individuals who figure or are likely to figure in coverage they provide, edit, package or supervise. They may not undertake such assignments for organizations that espouse a cause.

**41.** Staff members may not engage in financial counseling (except in the articles they write). They may not manage money for others, proffer investment advice, or operate or help operate an investment company of any sort, with or without pay. They may not do anything that would require registration as an investment adviser. They may, however, help family members with ordinary financial planning and serve as executors or administrators of estates of relatives and friends and as court-appointed conservators and guardians.

### Speaking Engagements

**42.** The Times freely acknowledges that outside appearances can enhance the reputation of its bylines and serve the paper's interests. Nevertheless, no staff member may appear before an outside group if the appearance could reasonably create an actual or apparent conflict of interest or undermine public trust in the paper's impartiality. No staff member who takes part in a broadcast, Webcast, public forum or panel discussion may write or edit news articles about that event.

**43.** Staff members should be especially sensitive to the appearance of partiality when they address groups that might figure in coverage they provide, edit, package or supervise, especially if the setting might suggest a close relationship to the sponsoring group. Before accepting such an invitation, a staff member must consult with the standards editor or the deputy editorial page editor. Generally, a reporter recently returned from the Middle East might comfortably address a suburban synagogue or mosque but should not appear before a group that lobbies for Israel or the Arab states. A reporter who writes about the environment could appropriately speak to a garden club but not to conservation groups known for their efforts to influence public policy.

**44.** Staff members may not accept invitations to speak before a single company (for example, the Citigroup executive retreat)

Case 1:17-cv-04853-JSR   Document 53-27   Filed 09/25/17   Page 19 of 58

4 | Protecting the Paper's Neutrality

or an industry assembly (for example, organized baseball's winter meeting) unless The Times decides the appearance is useful and will not damage the newspaper's reputation for impartiality. In that case, The Times will pay expenses; no speaker's fee should be accepted. Staff members invited to make such appearances should consult their supervisors and the standards editor or the deputy editorial page editor.

**45.** Staff members should not accept invitations to speak where their function is to attract customers to an event primarily intended as profit-making.

**46.** Staff members may accept speaking fees, honorariums, expense reimbursement and free transportation only from educational or other nonprofit groups for which lobbying and political activity are not a major focus. If a speaking fee exceeds $5,000, the staff member must consult the standards editor, the associate managing editor for news administration or the deputy editorial page editor before accepting.

**47.** Staff members who accept fees, honorariums or expenses for speaking engagements must file with the associate managing editor for news administration or the deputy editorial page editor by January 31 of each year an accounting of the previous year's appearances. If their fees total less than $5,000, no annual accounting is required. Fees earned under Times auspices for promotional or other approved purposes need not be included.

**48.** Staff members who write books and want to promote them must give their supervisor a schedule of proposed appearances. They may accept routine expenses and fees in promotional appearances, but they must make every effort to ensure that their appearances conform to the spirit of these guidelines and do not interfere with their responsibilities to the paper. If they have doubts about an appearance, they must consult their supervisor and the standards editor or the deputy editorial page editor.

ETHICAL JOURNALISM **15**

**49.** Speeches and other outside endeavors by staff members, paid or unpaid, should not imply that they carry the endorsement of The Times (unless they do). To the contrary, the staff member should gracefully remind the audience that the views expressed are his or her own. Outside commitments should not interfere with the speaker's responsibilities at The Times. Thus no staff member should agree to an extensive speaking schedule without approval from a supervisor.

### Competitions and Contests

**50.** Staff members may not enter competitions sponsored by individuals or groups who have a direct interest in the tenor of Times coverage. They may not act as judges for these competitions or accept their awards. Common examples are contests sponsored by commercial, political or professional associations to judge coverage of their affairs. The standards editor or the deputy editorial page editor may make exceptions for competitions underwritten by corporate sponsors if broad in scope and independently judged, such as the University of Missouri awards for consumer journalism, long sponsored by J.C. Penney.

**51.** Staff members may compete in competitions sponsored by groups whose members are all journalists or whose members demonstrably have no direct interest in the tenor of coverage of the field being judged. Times staff members may act as judges for such competitions and accept their awards. For example, a staff member may enter a university-sponsored competition for coverage of economic or foreign affairs but not accept an advocacy group's prize for outstanding environmental coverage.

**52.** This prohibition on taking part in sponsored competitions applies to film festivals or awards in which critics are asked to vote and to such competitions as the Tony Awards, the Heisman Trophy, most valuable player and rookie of the year honors

and admission to sports halls of fame. Cooperation of this sort puts the paper's independence into question.

**53.** A current list of some competitions that The Times has approved is posted on the Newsroom home page under Policies. Staff members who would like to enter others should consult their supervisors and the standards editor or the deputy editorial page editor. A critical factor in approving a competition, whatever its sponsorship, is a record of arm's-length decisions, including a willingness to honor critical reporting.

**54.** Staff members who win unsought awards from groups that do not meet the criteria established here should decline politely. A sample reply appears below as Appendix B.

**55.** Normally staff members are free to accept honorary degrees, medals and other awards from colleges, universities and other educational institutions. Those who cover higher education or supervise that coverage should be sensitive to any appearance of coziness or favoritism. Those in doubt should consult the standards editor or the deputy editorial page editor.

### The Use of Borrowed Equipment

**56.** Staff members who borrow equipment, vehicles or other goods for evaluation or review must return the borrowed items as soon as possible. Similarly, items borrowed to be photographed, such as fashion apparel or home furnishings, should be returned promptly.

**57.** Staff members may keep for their own collections — but may not sell or copy — books, recordings, tapes, compact discs and computer programs sent to them for review. Such submissions are considered press releases. Recorded or digital media, such as tapes or disks, must be destroyed or returned to the provider if not retained by the journalist; they may not be copied, given away or left where they could be carried off for illicit copying or reuse.

**Collaboration and Testimonials**

Protecting the Paper's Neutrality

58. Staff members may not collaborate in ventures involving individuals or organizations that figure or are likely to figure in coverage they provide, edit, package or supervise. Among other things, this prohibition applies to collaborating in writing books, pamphlets, reports, scripts, scores or any other material and in making photographs or creating artwork of any sort.

59. Except in reviews or columns published in The Times or on its Web site or appropriately voiced in authorized public appearances, staff members may not offer endorsements, testimonials or promotional blurbs for books, films, television programs or any other programs, products or ventures. Masthead editors may authorize rare exceptions (for instance, when a staff member has become expert in a field unrelated to his or her Times duties). This restriction does not apply when permission is given to reprint Times material.

**60.** Staff members of The Times are family members and responsible citizens as well as journalists. The Times respects their educating their children, exercising their religion, voting in elections and taking active part in community affairs. Nothing in this policy is meant to infringe upon those rights. But even in the best of causes, Times staff members have a duty to avoid the appearance of a conflict. They should never invoke The Times's name in private activities.

**61.** As noted in paragraph 6, certain of these requirements apply to all newsroom and editorial page employees, journalists and support staff alike. No newsroom or editorial employee may do anything that damages The Times's reputation for strict neutrality in reporting on politics and government. In particular, no one may wear campaign buttons or display any other sign of political partisanship while on the job. Otherwise, "staff members" in this section refers only to the professional journalists defined in paragraph 5.

### Voting, Campaigns and Public Issues

**62.** Journalists have no place on the playing fields of politics. Staff members are entitled to vote, but they must do nothing that might raise questions about their professional neutrality or that of The Times. In particular, they may not campaign for, demonstrate for, or endorse candidates, ballot causes or efforts to enact legislation. They may not wear campaign buttons or themselves display any other insignia of partisan politics. They should recognize that a bumper sticker on the family car or a campaign sign on the lawn may be misread as theirs, no matter who in their household actually placed the sticker or the sign.

**63.** Staff members may not themselves give money to, or raise money for, any political candidate or election cause. Given the ease of Internet access to public records of campaign contributors, any political giving by a Times staff member would carry a great risk of feeding a false impression that the paper is taking sides.

**64.** No staff member may seek public office anywhere. Seeking or serving in public office plainly violates the professional detachment expected of a journalist. It poses a risk of having the staff member's political views imputed to The Times, and it can sow a suspicion of favoritism in The Times's political coverage when one of its staff is an active participant.

**65.** Staff members may not march or rally in support of public causes or movements, sign ads taking a position on public issues, or lend their name to campaigns, benefit dinners or similar events if doing so might reasonably raise doubts about their ability or The Times's ability to function as neutral observers in covering the news. Staff members must keep in mind that neighbors and other observers commonly see them as representatives of The Times.

**66.** Staff members may appear from time to time on radio and television programs devoted to public affairs, but they should avoid expressing views that go beyond what they would be allowed to say in the paper. Op-Ed columnists and editorial writers enjoy more leeway than others in speaking publicly because their business is expressing opinions. The Times nevertheless expects them to consider carefully the forums in which they appear and to protect the standards and impartiality of the newspaper as a whole.

**67.** Staff members must be sensitive that perfectly proper political activity by their spouses, family or companions may nevertheless create conflicts of interest or the appearance of conflict. When such a possibility arises, the staff member should advise his or her department head and the standards editor or the deputy editorial page editor. Depending on circumstances, the staff member may have to recuse himself or herself from certain coverage or even move to a job unrelated to the activities in question.

**68.** A staff member with any doubts about a proposed political activity should consult the standards editor or the deputy editorial page editor. These restrictions protect the heart of our mission as journalists. Though The Times will consider matters case by case, it will be exceedingly cautious before permitting an exception.

#### Community Service

**69.** Staff members may not serve on government boards or commissions, paid or unpaid. They may not join boards of trustees, advisory committees or similar groups except those serving journalistic organizations or otherwise promoting journalism education. Those in doubt about such activities should consult their supervisors and the standards editor or the deputy editorial page editor. Depending on circumstances, exceptions may be made to permit staff members to serve their alma mater (or their children's alma mater) as a trustee or visitor at schools that seldom if ever generate news of interest to The Times.

**70.** The Times has no wish to impede good community citizenship. Normally the restriction on joining trustee boards or advisory committees will not apply to organizations that are highly unlikely to generate news of interest to The Times and that do not generally seek to shape public policy. These typically include houses of worship, community charities, local libraries, fine arts groups, hobby groups, youth athletic leagues, country clubs and alumni groups. Within reason staff members may help such groups with relatively modest fundraising. They should not play a leading role or ever lead a donor to expect a favor in return. They should never solicit anyone with whom they or The Times has professional dealings. Those in any doubt about what is permissible should consult the standards editor or the deputy editorial page editor.

Participation in Public Life

**71.** Staff members may not solicit funds for political, social, religious, educational, philanthropic or other causes that reach beyond the sorts of groups described in paragraph 70. Doing so could create an expectation of a favor in return. Staff members should think carefully about their own contributions to various causes, bearing in mind the need for neutrality on divisive issues. Those in doubt about contributions should consult their supervisors and the standards editor or the deputy editorial page editor.

**6**

Advertisers, Marketing, Promotion

**72.** The Times treats advertisers as fairly and openly as it treats readers and news sources. The relationship between The Times and advertisers rests on the understanding, long observed in all departments, that news and advertising are strictly separate — that those who deal with either one have distinct obligations and interests and neither group will try to influence the other.

**73.** Members of the news department should maintain their disinterest and objectivity by avoiding discussions of advertising needs, goals and problems except where those needs or problems are directly related to the business of the news department. In many instances, for example, the news and advertising departments may properly confer on the layout and configuration of the paper or the timing of special sections.

**74.** When authorized by the executive editor, members of the news staff may take part in interdepartmental committees on problems that affect several departments, including news. As far as possible they should leave advertising issues to colleagues from the business side.

**75.** From time to time, when authorized by the executive editor or the editorial page editor, staff members may take part in events organized by The Times for marketing or promotion. But they should stick to their expertise and refrain from saying anything that sounds like a sales pitch.

**76.** No one in the news department below the masthead level (except when authorized by the executive editor) may exchange information with the advertising department or with advertisers about the timing or content of advertising, the timing or content of articles or the assignment of staff or freelance writers, editors, artists, designers or photographers.

**7**

Obligations to The Times

**77.** The Times's good name does not belong to any of us. No one has a right to expropriate it for private purposes.

**78.** Staff members may not use Times identification cards for purposes not connected with Times employment. Cards may not be used to obtain special treatment or advantage from governmental, commercial or other organizations (except when the card is required for a benefit available to all Times Company employees by virtue of its foundation's charitable relationships, such as free admission to the Metropolitan Museum).

**79.** Staff members may not use Times stationery, business cards, forms or other materials for any purpose except the business of the newspaper.

### Speaking for The Times

**80.** Staff members must not disclose confidential information about the operations, policies or plans of The Times or its corporate affiliates.

**81.** Department heads and masthead executives may authorize other staff members to comment publicly on policies or plans within the staff members' areas of responsibility and expertise. If staff members are approached by other media or other outsiders to discuss Times content or policy, they should refer the questioners to a masthead executive or the corporate communications department.

**82.** Staff members are free to discuss their own activities in public, provided their comments do not create an impression that they lack journalistic impartiality or speak for The Times.

**83.** None of these restrictions should be interpreted as barring a staff member from responding openly and honestly to any reasonable inquiry from a reader about that staff member's work. If a reader asks for a correction, that request should be passed promptly to a supervisor. If the request threatens legal action or appears to be from a lawyer, the complaint should be promptly referred to the legal department through a department head.

**84.** Any staff member intending to write or assemble a nonfiction book based on material that derives from his or her assignment or beat must notify The Times in advance, so The Times can decide whether to make a competitive bid to publish the work. In this regard, staff members cannot accept or entertain any sort of preemptory bid from an outside publisher before allowing The Times to consider the project. Staff members are required to inform The Times of any such project or proposal, in writing, by sending a letter or e-mail to their department head, as well as to the standards editor or the deputy editorial page editor. The notification should include any information about the anticipated time frame of the project, including (if applicable) the time frame that an outside publisher has set for bidding on the project.

**85.** Within a reasonable period, taking into account the time frame for the project, The Times will inform the staff member in writing whether it wants to compete for the project. If it does, The Times will provide the staff member with a competitive bid. In the end, the staff member and his or her agent have no obligation to accept The Times's offer. This process is intended to assure The Times a seat at the table in any negotiations, including auctions, involving books based on materials derived from a Times assignment or beat.

**86.** These guidelines do not apply to book proposals or projects that involve the reproduction of articles, columns, photographs, artwork or other material created by staff members and published in The Times or on nytimes.com. The Times owns such material outright, and no such material may be reproduced elsewhere without the prior written permission of The Times, nor may it be rewritten, updated or otherwise altered and then republished without The Times's prior written permission. Staff members are often approached by agents, producers, studios or others seeking rights to Times material. Such inquiries must be forwarded immediately to the standards editor or to the deputy editorial page editor and to the legal department. If a staff member represented by the

Newspaper Guild has questions about rights to payment for reprints of articles that the staff member has written, he or she should refer to The Times's collective bargaining agreement with the Guild. In general, this agreement calls for a 50/50 split of the fees involved.

**87.** In contemplating book projects — or other outside endeavors — staff members must never give an impression they might benefit financially from the outcome of news events. Staff members may not negotiate with any outside person or entity for any rights to an article or story idea before the article has run in The Times. Staff members involved in covering a running story may not negotiate over books, articles, films, programs or media projects of any sort based on that coverage until that news has played out, unless they have written permission in advance from the standards editor or the deputy editorial page editor.

**88.** No staff member may serve as a ghost writer or co-author for individuals who figure or are likely to figure in coverage they provide, edit, package or supervise.

**89.** No staff member will be given a leave of absence, paid or unpaid, to write a book without the explicit permission of the executive editor or the editorial page editor. Ideally, a staff member who feels he or she will need to leave to complete a book project should inform The Times of the intention to seek a leave at the same time he or she first makes the book project available for consideration by The Times. A decision to grant or deny a request for a book leave — like requests for most other leaves of absence — will be based on many factors, including previous book leaves or accommodations the newspaper has granted to the staff member; the impact the leave will have on departmental staffing needs, and the degree to which The Times believes the book project will accrue to the newspaper's interests. If a staff member represented by the Newspaper Guild has a question about a leave of absence, he or she should refer to The Times's collective bargaining agreement with the Guild.

**90.** At no time may a staff member turn over notes, interviews, documents or other working materials to any third party, including agents, producers, studios or outside production agencies, or share those materials with them unless legally compelled to do so. Staff members are advised that in such circumstances, The Times's legal department will provide assistance. (Those represented by the Guild should refer to their collective bargaining agreement for the parameters of that assistance.) As a matter of policy, The Times will not give commercial producers or publishers access to working materials any more than it would turn them over to government prosecutors for use in court.

**91.** This paragraph applies only to television and film: Staff members offered "consulting" agreements by agents, producers, studios or others must consult the standards editor or the deputy editorial page editor before accepting. No staff member may serve as a consultant to a film or program that he or she knows in advance is tendentious or clearly distorts the underlying facts. In no case should a consulting role be described in a way that invokes The Times or implies its endorsement or participation.

**9**

Journalistic Work Outside The Times

92.  Staff members are generally entitled to accept freelance assignments that do not directly compete with The Times's own offerings. Normally, work for competitors will not be permitted. When allowed in rare instances, permission will be limited to cases in which The Times is not interested in assigning the staff member a similar piece or project.

93.  The Times competes in a far larger arena today than in the past. The printed paper remains our flagship, as does The International Herald Tribune internationally, but we reach an audience of millions through The New York Times on the Web. We are learning to translate our journalism into outstanding television. We publish numerous books, both original and drawn from past articles; we offer archival photos of museum quality. We deliver The New York Times in its complete form via the Web. Our bedrock mission is to serve a high-quality audience that values Times journalism, relying on any appropriate medium.

94.  Competitors include any newspaper, magazine or other media of publication, regardless of form, with an editorial focus on either New York City or general-interest news and information. If the competitive status of a publication, Web site or TV production is unclear, a staff member should consult with the standards editor or the deputy editorial page editor.

95.  Staff members are encouraged (but not required) to offer their freelance work to The Times or, in the case of a Web site, to The New York Times on the Web before trying to sell it elsewhere. The Times offers a number of outlets for work for which a staff member is paid extra, including the Times Magazine, the Week in Review, the Book Review and special sections. (As paragraph 84 requires of book proposals, any freelance material that derives from a Times assignment or beat must first be offered to The Times before a staff member offers it elsewhere.)

**96.** Staff members must ensure that their freelance work does not interfere with their responsibilities to The Times and that it is consistent with these policies and guidelines. If any doubt exists, they must consult their supervisors and the standards editor or the deputy editorial page editor before accepting outside assignments.

**97.** Before accepting a freelance assignment, a staff member should make sure that the tone and content of the publication, Web site or program are in keeping with the standards of The Times. In general, a staff member should write nothing elsewhere that could not fit comfortably under his or her byline in The Times or that implies The Times's sponsorship or endorsement. An outside publication, program or Web site may identify staff members by their Times positions but only in a routine way.

**98.** Because their primary identification is with The Times, staff members who accept freelance assignments should adhere to these guidelines in carrying out those assignments. For example, a staff member on freelance assignment may not accept compensation, expenses, discounts, gifts or other inducements from a news source. Similarly, staff members who establish their own sites on the World Wide Web must insure that their online conduct conforms to these guidelines.

**99.** Frequency matters. Freelance work might create a conflict of interest if it is pursued with such regularity that it interferes with Times assignments or compromises the integrity or independence of The Times. Freelancing might also create a conflict if it identifies a staff member as closely with another publication or Web site as with The Times. A business reporter who wrote a column in every issue of a trade magazine might soon become more identified with that magazine than with The Times. A critic writing regularly for an arts magazine might foster the impression that The Times was not his or her prime responsibility. The use of a pseudonym does not alter the obligation to comply with this provision.

100. A regular contribution to an outside enterprise is permissible if it does not interfere with or flow from Times responsibilities or involve intellectual matter owed to The Times and its readers. Examples of acceptable affiliations might be a foreign desk copy editor who writes a monthly column on stamp-collecting or a mapmaker working as a freelance illustrator. Staff members considering such continuing ventures should confer with their supervisors and with the standards editor or the deputy editorial page editor.

**10** Appearing on Broadcast Media

**101.** Staff members may participate in radio, television or Internet interviews or discussions, paid or unpaid, that deal with articles they have written or subjects that figure in the coverage they provide, edit, package or supervise. Such occasional appearances must not imply that they carry the sponsorship or endorsement of The Times (unless they do). Staff members should be careful about the use of their names and that of the newspaper in materials promoting the appearances. As a courtesy, they should let their department head know about their plans to appear.

**102.** In deciding whether to make a radio, television or Internet appearance, a staff member should consider its probable tone and content to make sure they are consistent with Times standards. Staff members should avoid strident, theatrical forums that emphasize punditry and reckless opinion-mongering. Instead, we should offer thoughtful and retrospective analysis. Generally a staff member should not say anything on radio, television or the Internet that could not appear under his or her byline in The Times.

**103.** New York Times Television draws on the paper's staff in producing programs for broadcast on its partly owned channel, DiscoveryTimes, and on networks and channels owned by outside parties, such as Public Television and the Discovery Channel. Staff members may not appear on broadcasts that compete directly with The Times's own offerings on television or the Internet. They may not accept assignments from the Times's TV clients or potential clients without its approval. As the paper moves further into these new fields, its direct competitors and clients or potential clients will undoubtedly grow in number. A staff member who has any doubt about the status of a particular program should consult the standards editor or the deputy editorial page editor.

**104.** Appearances might create a conflict of interest if they come so regularly that they interfere with Times assignments or compromise the integrity or independence of The Times.

They might also create a conflict if they identify a staff member as closely with a radio or television program or a Web site as with The Times. A Washington reporter who appeared weekly on a television program might soon become more known for that program than for work done for The Times. Occasional appearances on the same program would not run that risk.

**105.** Staff members who want to promote their books through broadcast appearances must conform to the requirements set out in paragraph 48.

**11**

Sorting Out Family Ties

**106.** In a day when most families balance two careers, the legitimate activities of companions, spouses and other relatives can sometimes create journalistic conflicts of interest or the appearance of conflicts. They can crop up in civic or political life, professional pursuits and financial activity. A spouse or companion who runs for public office would obviously create the appearance of conflict for a political reporter or an editor involved in election coverage. A brother or a daughter in a high-profile job on Wall Street might produce the appearance of conflict for a business reporter or editor.

**107.** To avoid such conflicts, staff members may not write about people to whom they are related by blood or marriage or with whom they have close personal relationships, or edit material about such people or make news judgments about them. For similar reasons, staff members should not recruit or directly supervise family members or close friends. Some exceptions are permissible — in a foreign bureau, for instance, where a married couple form a team, or in the case of an article by a food writer profiling her brother the Yankee star, where the kinship is of genuine news interest.

**Disclosure of Possible Conflicts**

**108.** Staff members must be sensitive to these possibilities. Any staff member who sees a potential for conflict or a threat to the paper's reputation in the activities of spouse, friends or relatives must discuss the situation with his or her supervising editor and the standards editor or the deputy editorial page editor.

**109.** In some cases, disclosure is enough. But if The Times considers the problem serious, the staff member may have to withdraw from certain coverage. Sometimes an assignment may have to be modified or a beat changed. In a few instances, a staff member may have to move to a different department — from business and financial news, say, to the culture desk — to avoid the appearance of conflict.

110. Although this policy necessarily imposes restraints, The Times has no wish to intrude upon the private lives of its staff members and their families. Nothing in this document seeks to prohibit a companion, spouse or other relative of a Times staff member from taking part in any political, financial, commercial, religious or civic activity. The Times understands that friends and relatives of its staff have every right to pursue full and active lives, personally and professionally. If restrictions are necessary, they fall on the Times employee. But any attempt to disguise a staff member's participation in prohibited activity by using a relative's name or any other alias (or by acting anonymously) violates this guideline.

111. In all cases The Times depends on staff members to disclose potential problems in a timely fashion so that we can work together to prevent embarrassment for staff members and The Times.

**112.** Every member of the Times staff must be constantly vigilant against any appearance that he or she is abusing nonpublic information for financial gain. That imperative applies to all departments.

**113.** Though staff members must necessarily accept certain limits on their freedom to invest, this policy leaves a broad range of investments open to them. Any staff member, regardless of assignment, is free to own diversified mutual funds, money market funds and other diversified investments that the reporter or editor cannot control. Any member also may own treasury bills, investment-grade municipal bonds, debt securities other than speculative bonds, and securities issued by the New York Times Company. And staff members are of course free to own stocks entirely unrelated to their Times assignment.

**114.** No staff member may own stock or have any other financial interest in a company, enterprise or industry that figures or is likely to figure in coverage that he or she provides, edits, packages or supervises regularly. A book editor, for example, may not invest in a publishing house, a health writer in a pharmaceutical company or a Pentagon reporter in a mutual fund specializing in defense stocks. For this purpose an industry is defined broadly; for example, a reporter responsible for any segment of media coverage may not own any media stock. "Stock" should be read to include futures, options, rights, and speculative debt, as well as "sector" mutual funds (those focused on one industry).

**115.** Staff members may not buy or sell securities or make other investments in anticipation of forthcoming articles that originate with The Times. In general, staff members must refrain from acting on such information before noon Eastern time the day of print publication. This restriction does not apply to spot news that first appears on wire services or that originates elsewhere. That information is public.

Investments and Financial Ties

**Affirming Good-Faith Compliance**

Investments and Family Ties

**116.** Staff members in any department will be asked when hired to affirm that they have no investments that would violate paragraph 114 with respect to the assignment they are being given. If a new staff member is unable to make this affirmation, the staff member may choose to sell the conflicting holding. (See paragraph 128.) If not, he or she must be given a different assignment where no such conflict exists.

**117.** Staff members should be acutely sensitive that the investments and business interests of their spouse, family and companions may create real or apparent conflicts of interest by raising questions of favoritism. Staff members will be asked when hired to affirm that to the best of their knowledge no spouse, family member or companion has financial holdings that might reasonably raise doubts about the impartiality of the staff member's reporting or editing in his or her proposed assignment. Depending on circumstances, the new staff member may have to recuse himself or herself from certain coverage or accept an alternative assignment unrelated to the holdings in question.

**118.** The associate managing editor for news administration or the deputy editorial page editor may from time to time ask staff members in any department to affirm that they have no investments in violation of paragraph 114. Such a request might be expected, for example, when a staff member is about to begin a new assignment or work on a particularly sensitive article.

**119.** Similarly, staff members may be asked on occasion to affirm that to the best of their knowledge no spouse, family member or companion has financial holdings that might reasonably raise doubts about the impartiality of the staff member's reporting or editing. If and when such conditions come up, the staff member must alert his or her department head and the standards editor. Depending on circumstances,

the staff member may have to recuse himself or herself from certain coverage or even to move to a job unrelated to the holdings.

**120.** If a reporter who owns stock in a company outside his or her regular beat is assigned to write an article about that company or its industry, the reporter must discuss the investment with the assigning editor before beginning the work. Similarly, editors assigned to major articles or a series about companies or industries in which they have investments must advise their supervisors of potential conflicts before beginning the editing. In many instances it will be perfectly permissible for the work to proceed, but the reporter or editor who works on such an article or series may not buy or sell stock in the company or industry until two weeks after publication.

### Business-Financial, Technology and Media News

**121.** Staff members in business-financial news regularly work with sensitive information that affects financial prices. Because of that sensitivity, they are subject to additional and stricter requirements. Staff members in technology news and media news are subject to the same rules as those in business-financial news, for the same reason.

**122.** Members of these three departments may not play the market. That is, they may not conduct in-and-out trading (buying and selling the same security within three months). They may not buy or sell options or futures or sell securities short. Any of these actions could create the appearance that a staff member was speculating by exploiting information not available to the public.

**123.** In special circumstances — a family financial crisis, for example — the associate managing editor for news administration may waive the three-month holding period.

**124.** Supervising editors in business-financial, technology or media news should be especially cautious in investing because they may reasonably expect to become involved in the coverage of virtually any company at any time. Their counterparts in other departments should be equally sensitive to possible conflicts in supervising coverage of companies in their domain.

**125.** Because of the sensitivity of their assignments, some business-financial staff members may not own stock in any company (other than the New York Times Company). These include the Market Place writer, other market columnists, the regular writer of the daily stock market column, reporters regularly assigned to mergers and acquisitions, the daily markets editor, the Sunday investing editor, the Sunday Business editor, the business and financial editor and his or her deputies.

**126.** Masthead editors and other editors who play a principal part in deciding the display of business and financial news, including its display on Page 1, may not own stock in any company (other than the New York Times Company).

**127.** The editorial page editor, the deputy editorial page editor and the Op-Ed editor may not own stock in any company (other than the New York Times Company). Nor may editorial writers and Op-Ed columnists regularly assigned to write about business, finance or economics.

### Transitional Arrangements

**128.** A staff member who owns stock and moves into an assignment where such holdings are not permitted must sell the stock. Those who are newly barred from owning stock of any sort (for example, on being promoted to deputy business and financial editor) may dispose of their shares in phases, following a reasonable plan worked out with the associate managing editor for news administration. But the phase-out does not apply to reporters or editors who own shares in specific industries they are newly assigned to cover. For instance, it is manifestly

untenable for a new Automobiles editor to own stock in an auto company, so divestiture must be prompt.

**129.** Whenever this document requires the sale of stock holdings, a staff member can satisfy the requirement by putting the shares into a blind trust (or into an equivalent financial arrangement that meets the same goal: preventing an individual from knowing at any given time the specific holdings in the account and blocking the individual from controlling the timing of transactions in such holdings). If The Times assigns a staff member to a new job where mandatory divestiture would impose an undue hardship, The Times will reimburse the staff member for the reasonable costs of setting up a blind trust.

#### Annual Filing by Ranking Editors

**130.** To avoid an appearance of conflict, certain editors must annually affirm to the chief financial officer of The Times Company that they have no financial holdings in violation of paragraphs 125-127 or any other provision of these guidelines. They include the executive editor, the managing editor, deputy and assistant managing editors, associate managing editors, the business and financial editor, his or her deputies and the Sunday Business editor. They also include the editorial page editor, the deputy editorial page editor and the Op-Ed editor.

**13**

Rules for Specialized Departments

### Sports

**131.** To avoid an appearance of bias, no member of the sports department may gamble on any sports event, except for occasional recreational wagering on horse racing (or dog racing or jai alai). This exception does not apply to staff members who cover such racing or regularly edit that coverage.

**132.** Except as provided in paragraph 30, members of the sports department may not accept tickets, travel expenses, meals, gifts or any other benefit from teams or promoters.

**133.** Sports reporters assigned to cover games may not serve as scorers. Members of the sports department may not take part in voting for the Heisman Trophy, most valuable player and rookie of the year awards, entry into the Baseball Hall of Fame or similar honors.

### Culture, Styles, Dining

**134.** The Times has exceptional influence in such fields as theater, music, art, dance, publishing, fashion and the restaurant industry. We are constantly scrutinized for the slightest whiff of favoritism. Therefore staff members working in those areas have a special duty to guard against conflicts of interest or the appearance of conflict.

**135.** Reporters, reviewers, critics and their editors in the Book Review, the Times Magazine and the cultural news, media news and styles departments, beyond abiding by the other provisions of this document, may not help others develop, market or promote artistic, literary or other creative endeavors.

**136.** They may not suggest agents, publishers, producers or galleries to aspiring authors, playwrights, composers or artists. They may not suggest chefs to restaurant owners or designers to clothing manufacturers. They may not recommend authors, playwrights, composers or other artists to agents, publishers, producers or galleries.

**137.** They may not offer suggestions or ideas to people who figure or are likely to figure in coverage they provide, edit, package or supervise. They may not invest in productions that figure or are likely to figure in their coverage. (Food writers and editors may not invest in restaurants.) They may not comment, even informally, on works in progress before those works are reviewed.

**138.** They may not serve on advisory boards, awards juries, study committees or other panels organized by the people they cover or whose coverage they supervise. They may not accept awards from such people. And they may not request extra copies of books, tapes or other materials that are routinely submitted for review.

**139.** An arts writer or editor who owns art of exhibition quality (and thus has a financial stake in the reputation of the artist) may inspire questions about the impartiality of his or her critical judgments or editing decisions. Thus members of the culture staff who collect valuable objects in the visual arts (paintings, photographs, sculpture, crafts and the like) must annually submit a list of their acquisitions and sales to the associate managing editor for news administration.

**140.** The Times recognizes that members of its talented staff write books, operas and plays; create sculpture, and give recitals. It further recognizes that such projects require commercial arrangements to come to fruition. A writer requires a publisher, a playwright a production company.

**141.** Nevertheless those commercial ties can be a breeding ground for favoritism, actual or perceived. Staff members who enter into such arrangements must disclose them to their supervisors, who may require them to withdraw from coverage of the parties involved. Staff members who have a publisher or a movie contract, for example, must be exceedingly sensitive to any appearance of bias in covering other publishers or studios. Those with any doubts about a proposed arrangement should consult the standards editor or the deputy editorial page editor.

**142.** Certain positions, such as those of the Book Review editor and the culture editor, have such potential for conflicts that those editors may not enter into any commercial arrangements with publishers, studios, or other arts producers without the executive editor's written approval.

### Art, Pictures, Technology

**143.** Beyond honoring all the other provisions of this document, Times photographers, picture editors, art directors, lab personnel and technology editors and reporters may not accept gifts of equipment, programs or materials from manufacturers or vendors. They may not endorse equipment, programs or materials, or offer advice on product design. This guideline is not meant to restrict The Times from working with vendors to improve its systems or equipment.

**144.** With the approval of the picture editor, the design director, the technology editor or the Circuits editor, staff members may test equipment or materials on loan from manufacturers or vendors, provided such tests are properly monitored. The equipment or materials should be returned promptly after testing unless purchased by The Times.

### Automobiles

**145.** It is our policy that no one may test drive or review a vehicle for The Times unless the paper is paying the vehicle's owner the normal market rental or its equivalent. Rare exceptions may occur when an equivalent rent is largely hypothetical, as with military vehicles, vintage autos or race cars.

**146.** Reviewers should carry out their testing expeditiously and return the vehicle promptly. A reasonable amount of personal use is permissible provided that the use contributes to the review.

**Travel**

**147.** No writer or editor for the Travel section, whether on assignment or not, may accept free or discounted services of any sort from any element of the travel industry. This includes hotels, resorts, restaurants, tour operators, airlines, railways, cruise lines, rental car companies and tourist attractions. (See also paragraph 33, which applies to all staff members.) This prohibition applies to the free trips commonly awarded in raffles at travel industry events. It does not apply, however, to routinely accumulated frequent-flyer points.

**148.** Travel editors who deal with non-staff contributors have a special obligation to guard against conflicts of interest or the appearance of conflict. They must bear in mind that it is our policy not to give Travel assignments to freelance writers who have previously accepted free services. Depending on circumstances, the Travel editor may make rare exceptions, for example, for a writer who ceased the practice years ago or who has reimbursed his or her host for services previously accepted. It is also our policy not to give Travel assignments to anyone who represents travel suppliers or who works for a government tourist office or as a publicist of any sort. The Travel editor may make rare exceptions, for example, for a writer widely recognized as an expert in a particular culture.

**149.** Writers on assignment for Travel must conceal their Times affiliation. The validity of their work depends on their experiencing the same conditions as an ordinary tourist or consumer. If the Times affiliation becomes known, the writer must discuss with an editor whether the reporting to that point can be salvaged. On rare occasions, the affiliation may be disclosed, for example, when a special permit is required to enter a closed area.

**150.** No Travel writer may write about any travel service or product offered by a family member or close friend. (See paragraph 107.)

**151.** These rules also apply to writers and editors for Weekend, Escapes, Sophisticated Traveler and the like.

**14**

Dealing with Outside Contributors

**152.** Times readers apply exacting standards to the entire paper. They do not distinguish between staff written articles and those written by outsiders. Thus as far as possible, freelance contributors to The Times, while not its employees, will be held to the same standards as staff members when they are on Times assignments, including those for the Times Magazine. If they violate these guidelines, they will be denied further assignments.

**153.** Before being given an assignment, freelance contributors must sign a contract with The Times. These contracts oblige them to take care to avoid conflicts of interests or the appearance of conflict. Specifically, in connection with work for The Times, freelancers will not accept free transportation, free lodging, gifts, junkets, commissions or assignments from current or potential news sources. In addition, they will publish no similar article in a competing publication (see paragraph 94) within 14 days unless The Times approves.

**154.** The contracts' concise provisions cannot cover every circumstance that might arise. Assigning editors should ensure that contributors are aware of this document and to the greatest extent possible, in fact honor its provisions while on assignment for The Times. Any disagreement over whether a specific provision applies to outside contributors should be resolved before the assignment proceeds.

**155.** Assigning editors in business and financial news who deal with non-staff contributors have a special duty to guard against conflicts of interest or the appearance of conflict. To the extent possible, assigning editors should ensure that outside contributors meet the strict standards outlined in Section 12 above for the business and financial news staff.

**Sample letter declining a gift**

Dear XXXXXXXXX,

Your recent gift came as a pleasant surprise. I appreciate your thinking of me.

But the gift puts me in an awkward position. The New York Times bars its reporters and editors from accepting anything of value from the people or groups they cover. The paper does not want to risk the perception that it will cover a subject more thoroughly or skew its coverage of controversial subjects because interested parties have expressed appreciation for its efforts.

So I must return your gift with thanks. I hope you understand our position, and I thank you for your thoughtfulness.

Sincerely,

Appendix A

Appendix B

**Sample letter declining an unsolicited award**

Dear XXXXXXXXX,

Your recent letter informing me that I'd been selected to receive an award from XXXXXXXX came as a pleasant surprise. I appreciate the sentiment behind the award.

But your decision puts me in an awkward position. The New York Times bars its reporters and editors from accepting awards conferred by groups that have an interest in the subjects covered by the award recipients. The paper does not want to risk the perception that it will cover a subject more thoroughly or skew its coverage of controversial subjects because interested parties have applauded its efforts.

So I must decline your award with thanks. I hope you and your colleagues understand our position.

Thank you again for your kind words.

Sincerely,

## Letter of understanding with the Newspaper Guild of New York

**The New York Times**
229 WEST 43RD STREET
NEW YORK, N.Y. 10036

JAY I. SABIN, ESQ.
Vice President
Labor Relations

Tel: 212 556-7893
Fax: 212 556-5901
E-mail: jis@nytimes.com

July 28, 2004

Mr. Barry F. Lipton
President
Newspaper Guild of New York
1501 Broadway, Suite 708
New York, New York 10036

Re:   Ethical Journalism

Dear Barry:

This will confirm our understanding reached during
recent negotiations concerning the newsroom conflict of interest
policy entitled "Ethical Journalism."

We have agreed that Guild-related activities and Guild-
sponsored member benefits and discounts shall be excluded from
the limitations on employee conduct contained in Paragraphs 33
(Guild benefits/discounts); 34 (Guild employment/compensation);
39 (Guild public relations); 42 (appearances at Guild meetings);
62 (Guild campaign buttons); 69 (Guild trustees); and wherever
else they may be referenced in the policy.  In addition, with
respect to the monetary caps referenced in Paragraphs 35, 46 and
47, The Times agrees to discuss with the Guild, from time to
time, whether such figures should be revised.

We have also agreed to discuss with the Guild any
growth in the number of New York Times' competitors, clients or
potential clients insofar as such growth relates to the
application of Paragraph 103.  In addition, we have agreed to
discuss appropriate fee schedules for Guild covered employees who
appear on television, radio or other media at the request of The
Times.

Very truly yours,

Agreed To and Accepted By:

Barry Lipton, President
Newspaper Guild of New York

Js 15a:\bl-ethicalguidesideltr2

Appendix C

**References are provided as paragraph numbers**

Index

activities
    political. see political activities
    private. see private activities
    prohibited, 25
    recreational, news sources and, 23
admission, to museums, 36
advertisers, relationship with, 72
advertising department, and news department
    interactions, 73, 76
advice, providing, 39, 41
advisory committees, serving on
    when allowed, 70
    when prohibited, 69
affiliation
    concealing
        by critics and reviewers, 21
        by travel writers, 149
    normally disclosed, 20
    with outside publishers, acceptable examples of, 100
anonymity
    of critics and reviewers, 21
    of news sources, 13
    of staff member, in conflict situations, 110
    of travel writers, 21, 149
art critics
    anonymity of, 21
    rules governing behavior of, 143, 144
art directors, rules governing behavior of, 143, 144
artistic performances, free tickets for, guidelines
    for accepting, 30
assigning editors, freelance contributors and, 154, 155
athletic events, free tickets for, guidelines for
    accepting, 30, 132
attribution, 31
authors, staff as, 48, 105
    co-authorship and, 40, 88
    promotional tours and, 48
automobile review, 145-146
awards
    from educational institutions, 55
    unsolicited, 54
    sample letter declining, Appendix B
    voting for, 52, 133
ballot causes, endorsing, 62
Baseball Hall of Fame, 133
behavior
    special rules governing
        art, pictures, technology departments, 143-144
        automobile testing, 145-146
        culture, styles, dining departments, 134-142
        sports department, 131-133
        travel department, 147-151
    standards of
        covered by guidelines, 512
    Newsroom Integrity Statement (1999), 13

Rules of the Road, 14
benefit dinners, lending name to, 65
benefits
    financial, from news coverage, 87
    New York Times Foundation and, 36, 78
bias. see impartiality
blind trust, mandatory divestiture and, 129
boards of trustees, serving on
    when allowed, 70
    when prohibited, 69
Book Review, 95
Book Review editor, 142
Book Review staff, rules governing behavior of, 134-142
books
    blurbs, 59
    for review, 57
    staff-authored
        competitive bidding guidelines, 84-85
        financial benefit and, 87
        leave of absence and, 89
        promotion of, 48, 105
        Times publication of, 93
borrowed equipment
    keeping, 57
    return of, 56, 144
    vehicles, 145, 146
brokerage firms, 38
business and financial news
    editor of
        annual good-faith affirmation by, 130
    investment restrictions on, 121-127
    freelance contributors and, 155
    investment restrictions on staff members in, 121, 127
business cards, use of, 79
business stationery, use of, 79
campaign buttons, 6, 61, 62
campaigning, political, 6
campaigns, lending name to, 65
car reviewers, 145-146
charitable events, lending name to, 65
Circuits editor, 144
civility, treating readers with, 16
co-authorship, 40, 88
collaboration, when prohibited, 58
colleges. see educational institutions
comments, public, by staff members, 81, 82
commercial ventures, by staff members, 140, 141
commissions, serving on, 69
communication
    electronic. see electronic communications
    with readers, 16
community groups, serving with, 70

Index

community service, participation in, 69-71

compact discs, for review, 57

companions. see also family members
investment and business activities of, 117, 119
political activity of, 67

compensation, prohibited, 34
speaker's fee, 44

competitions, entering
approved list of, 53
when allowed, 51
when prohibited, 50

competitive bidding, on staff-authored
non-fiction books, 84-85

competitors
arena and scope of, 93, 94
broadcast media, 103
treatment of, 31
working with, 31

computer programs, for review, 57

computers
illegal activities relating to, 25
policies concerning, 14

confidential information, 80

conflict
appearance of, avoiding, 23
family members' activities and
disclosing, 108-111
examples and exceptions, 106, 107
freelance contributors and, 148, 155
possible areas of, 3
regular broadcast media appearances as, 104
travel writers and editors and, 148

consent, to record conversations, obtaining, 27

conservators, serving as, 41

consultation, internal
on appearing on broadcast media, 103
on appropriateness of freelance assignment, 94, 100
for clarification of policy provisions, 10
to clarify movie and television consulting roles, 91
on potential conflict with family members'
activities, 111

"consulting" agreements, movie and television, 91

content. see tone and content

contests, entering. see competitions, entering

contracts
with freelance contributors, 7, 153, 154

contributors, freelance. see freelance contributors

conversations, recording, 27

copyright items, 86

corporate discounts, 36-37

corrections, 15
reader's request for, 83

court-appointed conservators, serving as, 41

courtesy
informing departmental heads about plans, 101
to readers, 16

coverage
ensuring neutrality of, 33-38

advice and, 39-41
borrowed equipment and, 56, 57, 144
collaboration and testimonials and, 58, 59
competitions and contests and, 50-55
speaking engagements and, 42-49
Times ownership of, 86
withdrawal from, 67, 109

critics. see reviewers
participation in contests, 52
rules governing behavior of, 134-142

culture editor, 142

culture editors and writers, rules governing
behavior of, 134-142

de minimis gifts, 33

debt securities, 113

demonstration, political, 62

department heads
consultation with, 10
responsibility of, 12

design director, 144

detachment, professional. see impartiality

Dining editors and writers, rules governing
behavior of, 134-142

disciplinary action, scope of, 8

disclosure
of family members' activities, 108-111
of fees accepted, 47
financial, good-faith compliance with, 116, 120
inappropriate, 6, 17
of staff member's identity, 20

discounts
acceptable, 36
caution in accepting certain, 37
travel writers and editors and, 147

Discovery Channel, 103

divestiture, of financial holdings, acceptable
arrangements for, 128, 129

documents, transfer to third party, 90

donations
to community groups, 71
political, 63

editorial page editors
annual good-faith affirmation by, 130
investment restrictions on, 127

editorial writers
investment restrictions on, 127
participation on radio and television programs, 66

editors
ad-hoc assignments posing conflicts, 120
of business and financial news
annual good-faith affirmation by, 130
stock ownership limitations on, 121-127

in cultural and arts departments, rules governing
behavior of, 134-142

educational institutions
accepting awards from, 55
serving as trustee of, 69

elections, voting in, 62
electronic communication
    for consultation, 10
    illegal activities relating to, 25
    policies on, 14
    from readers, 16
e-mail. see electronic communications
employment, prohibited, 34, 39
endorsement
    implied, avoiding, 97
    personal versus corporate, 49, 59
    political, 62
equipment, borrowed
    keeping, 57
    return of, 56, 144
    vehicles, 145, 146
errors, correction of, 15
    reader's request for, 83
Escapes editors and writers, rules governing
    behavior of, 147-151
estate administrators, serving as, 41
ethics guidelines
    interpretation and application of, 12
    modification and expansion of, 11
    and other standards of behavior, 13, 14
    private activities and, 60, 110
    purpose of, 14
    scope of, 5-12
    staff members and, 10
evaluation items
    keeping, 56
    return of, 56, 144
    vehicles, 145, 146
executive editor, authorization by, 74-76, 89, 142
executors, serving as, 41
expenses, for speaking engagement
    disclosing, 47
    when acceptable, 46
    when prohibited, 44
expropriation, of Times name, 77
fact checking, 13
false identity
    foreign travel and, 20
    generally prohibited, 20
    restaurant critics and, 21
false information, 18
family members
    activities of
        investment and business, 117, 119
        political, 67
    potential for conflict, 106, 107
    Times's respect for, 110
    providing financial advice to, 41
    travel services or products offered by, 150
fashion editors and writers, rules governing
    behavior of, 134-142
favoritism
    freedom from. see impartiality
    perceptions of, 37, 134, 141

film festivals, 52
financial advice, providing, 41
financial disclosure, good-faith compliance with, 116-120
financial news. see business and financial news
food critics. see restaurant critics
foreign travel, protecting identity during, 20
free admission, to museums, 36
free tickets, accepting, guidelines for, 30
freelance assignments, by staff members
    for competitors, 93
    competitors versus non competitors, 92-94
    frequency, 99
    interference with normal workload, 96, 100
    offering first to Times, 95
    regular contribution, 100
    tone and content, 97
    Web presence, 98
freelance contributors
    conflict of interest and, 148, 155
    contract with, 7, 153, 154
    disagreements with, 154
    standards applied to, 152
    travel editors and, 148
frequency
    of broadcast media appearances, 104
    of freelance assignments, 99
friend, travel services or products offered by, 150
"friends and family shares," 38
fundraising
    for community groups, 70
    for political causes, 63, 71
gambling, 131
ghost writing, 40, 88
gifts, acceptance of
    when allowed, 36
    when prohibited, 33
    sample letter declining, Appendix A
good-faith compliance, with financial disclosure
    on hiring, 116
    of investments and business activities of family
        members, 117
    on ongoing basis, 117, 118
government boards, serving on, 69
guardians, serving as, 41
harassment, policies against, 14
Heisman Trophy, 52, 133
help to organizations, prohibited and acceptable, 39
hiring, investment disclosure at, 116
honorariums
    disclosing, 47
    when acceptable, 46
    when prohibited, 44
honorary degrees, acceptance of, 55
identification cards, Times, 26, 78
identity
    concealing by travel writers, 21, 149
    disclosing by staff member, 20

Index

illegal acts, examples of, 25
impartiality, 82. see also neutrality
  commercial ties and, 141
  news sources and, 22
  test of, 23
impersonation, 20
in-and-out trading, 122
information
  confidential, 80
  disclosing inappropriately, 6
  false, 18
  gathering of, 17
  nonpublic
    acting on, time constraints for, 115
    exploiting for personal gain, 6
    financial gain from, 112
initial public offerings, of stock, 38
inquiries, from readers, responding to, 16
interdepartmental committees, 74
Internet interviews
  participation in, 101
  tone and content of, 102
interviews
  Internet, 101
  transfer to third party, 90
investment companies, 41
investments
  disclosure on hiring, 116
  divesting
    arrangements for, 128-129
  insider information and
    acting on, time constraints for, 115
    financial gain from, 112
  limits imposed on, 114, 115, 120, 122
  permissible holdings, 113
  providing advice on, 41
judging competitions
  when allowed, 51
  when prohibited, 50, 52

lab personnel, rules governing behavior of, 143, 144
law, observing, 25-27
leaves of absence, 5, 89
legal action
  reader-initiated, 83
  to relinquish working materials, 90
legislation, endorsing, 62
letters, from readers, 16
letters (sample)
  declining gifts, Appendix A
  declining unsolicited awards, Appendix B
license plates, special, 26
lobbying groups, speaking to, 43
lodging
  accepting, guidelines for, 29
  travel writers and editors and, 147
marching, for public causes, 65
market columnists and writers, stock ownership
  limitations on, 125

Market Place writer, stock ownership limitations on, 125
marketing, Times-sponsored, 75
masthead, competitive, listing on, prohibitions and
  exceptions, 32
masthead editors, 59
  annual good-faith affirmation by, 130
  stock ownership limitations on, 126
meals
  accepting, guidelines for, 28
  news sources and, 23
medals, acceptance of, 55
money management, 41
money market funds, 113
most valuable player awards, 133
movies
  "consulting" agreements and, 91
  film festivals, staff participation at, 52
municipal bonds, 113
museums, free admission to, 36
music critics, anonymity of, 21
mutual funds, 113
  "sector", 114
name
  lending to public causes, 65
  Times, expropriating, 77
neutrality, protecting and maintaining, 6, 9, 33-38
  borrowed equipment, 56, 57, 144
  collaboration and testimonials, 58, 59
  competitions and contests, 50-55
  financial and other advice, 39-41
  speaking engagements, 42-49
New York Times Company, owning securities of,
  113, 125, 127
New York Times Foundation, and benefits, 36, 78
New York Times Television, 93, 103
news department, and advertising department
  interaction, 73, 76
news events, financial benefit from, 87
news sources
  anonymous, 13
  cultivating, 22
  hospitality from, accepting, 28-30
  legal obligations toward, 25-27
  personal relations with, 22-24
  professional detachment from, 23
  protecting personal details of, 19
  romantic involvement with, 24
  treating fairly, 18
Newspaper Guild
  leaves of absence and, 89
  relinquishment of working papers and, 90
  reprint fees and, 35, 86
newsroom employees, strictures governing all, 6, 61
Newsroom Integrity Statement (1999), 13
nonpublic information
  acting on, time constraints for, 115
  exploiting for personal gain, 6
  financial gain from, 112

notes, transfer to third party, 90
Ochs, Adolph, 1
online presence
    by staff, 98
    by Times, 86, 93-95
Op-Ed columnists
    investment restrictions on, 127
    participation in radio and television, 66
Op-Ed editors
    annual good-faith affirmation by, 130
    investment restrictions on, 127
opinion-mongering, avoiding, 102
outside contributors. see freelance contributors
outside publisher
    acceptable affiliations with, examples of, 100
    staff-authored non-fiction books and, 84
ownership, of published material, 86
partiality. see impartiality
partisanship, political, 6, 61, 62
photographers, rules on behavior of, 143, 144
photographs
    integrity of, 13
    from Times, 93
picture editor, 144
plagiarism, 18
political activities, 62
    participation in, 62-68
    case by case review, 68
political partisanship, 6, 61, 62
press passes, 30
press releases, submissions considered as, 57
private activities
    ethical guidelines and, 60
    family members and, 110
    public discussion of, 82
professional detachment. see impartiality
profit-making events, speaking at, 44
promotional appearances
    of self-authored works, 48, 105
    Times-sponsored, 47, 75
pseudonym, use of, 99
public affairs programs, appearance on, 66
public comments, by staff members, 81
public life, participation in, 60, 61
    community service, 69-71
    political activities, 62-68
public office, seeking or serving, 64
public relations works, 39
Public Television, 103
punditry, avoiding, 102
quotations, exactness of, 13
radio programs
    participation in, 66, 101
    tone and content of, 102

rallying, for public causes, 65
ranking editors
    annual good-faith affirmation by, 130
    consultation with, 10
    responsibility of, 12
readers
    communication with, 16
    duty to, 15-18
    legal action threatened by, 83
    responding to reasonable inquiries from, 16, 83
reassignment of duties, situations demanding
    conflicting investments, 116
    family conflict, 109
    investment and business activities of family
        members, 117
    political activities of family members, 67
    romantic involvement, 24
recording conversations, 27
recreational activities, news sources and, 23
recruitment, of family members, 107
recusal, situations demanding
    investments and business activities of
        family members, 117, 119
    political activities of family members, 67
    romantic involvement, 24
reimbursement, for establishing blind trust, 129
reprint fees, 35
    split formula for, 86
    upper limit on certain, 35
resolution, of differences, 8
responsibility
    of department heads and ranking editors, 12
    of staff member, freelance work interfering with,
        96, 100
restaurant critics
    anonymity of, 21
    rules governing behavior of, 134-142
review items
    keeping, 57
    return or destruction of, 56, 57, 144
    vehicles, 145, 146
reviewers
    anonymity of, 21
    free tickets for, guidelines for accepting, 30
    rules governing behavior of, 134-142
romantic involvements, with news source, 24
rookie of the year award, 133
Rules of the Road, 14
schools. see educational institutions
"sector" mutual funds, 114
signatory, to public statements, 65
solicitation of funds. see fundraising
Sophisticated Traveler editors and writers, rules
    governing behavior of, 147-151
sources, of news. see news sources
speaker's fee
    disclosing, 47
    upper limit on, 46

Index

when acceptable, 46
when prohibited, 44
speaking engagements
approval for, 49
compensation for. see speaker's fee
prohibited settings, 44, 45
to promote books, 48
protecting neutrality and, 42-49
special license plates, 26
sponsorship
of competitions, 50
implied, avoiding, 97
sports department, rules governing, 131-133
sports events, free tickets for, guidelines for
accepting, 30, 132
spouse. see also family members
investment and business activities of, 117, 119
political activity of, 67
staff members. see also specific editors and writers
by department
application of policy by, 10
as authors. see authors, staff as
in business-financial, technology, media news,
stock ownership restrictions, 121-127
creative talents of, commercial ties and, 140, 141
defined, 5
free tickets for, guidelines for accepting, 30
freelance assignments by, 95-100
identity disclosure by, 20
on interdepartmental committees, 74
legal obligations of, 25-27
normally not included as (clerks, secretaries,
assistants), 6
public comments by, 81
in sports department, rules governing, 131-133
at Times-sponsored marketing and
promotional events, 75
standards of behavior
covered by code, 5-12
Newsroom Integrity Statement (1999), 13
Policy on Confidential Sources (2004), 13
Rules of the Road, 14
stock
buying in initial public offerings, 38
buying or selling, time constraints on, 115, 120, 122
owning, 113-114
selling to avoid conflict, 116
arrangements for, 128-129
styles editors and writers, rules governing
behavior of, 134-142
Sunday business editor
annual good-faith affirmation by, 130
investment restrictions on, 125
supervision, of family members, 107
tapes, for review, 57
technology and media news, investment restrictions
on staff members in, 121-127
technology editor, 144
telephone taps, 25
television programs

appearance on, 66, 101
"consulting" agreements and, 91
Times entry into. see New York Times Television
tone and content of, 102
test drive, 145, 146
testimonial, personal versus corporate, 59
tickets, free, guidelines for accepting, 30, 132
Times
bidding competitively on staff-authored
non-fiction books, 84, 85
content and policy of, commenting on, 80, 81
first refusal for freelance work, 95
identification cards issued by, 26, 78
marketing and promotional events sponsored
by, 47, 75
relinquishing working materials, policy on, 90
staff obligations to, 77-83
Times Magazine, 95
staff of, rules governing behavior of, 134-142
tone and content
of freelance assignments, 97
of radio, television programs and Internet
interviews, 102
Tony Awards, 52
transportation, accepting, guidelines for, 29, 44
travel, overseas, protecting identity during, 20
travel editors, rules governing behavior of, 147-151
travel writers
anonymity of, 21, 149
rules governing behavior of, 147-151
treasury bills, 113
trustees, 69, 70
University of Missouri awards for consumer
journalism, 51
unsolicited awards, 54
sample letter declining, Appendix B
values, resolving differences over, 8
vehicle review, 145, 146
views, personal, 49
violations
action taken against, 8
ignorance of policy provisions and, 10
voice-mail messages. see electronic communication
voting
for awards, 52, 133
in political elections, 62
Web site. see also Internet interviews
staff-owned, 98
Times, 86, 93-95
Week in Review, 95
Weekend editors and writers, rules governing
behavior of, 147-151
working materials, transfer to third party, 90
workload, interference with
broadcast media appearances, 104
freelance assignments, 96, 100