**17-3801-cv**
*Palin v. The New York Times Company*

N.Y.S.D. Case #
17-cv-4853(JSR)

# In the
# United States Court of Appeals
## For the Second Circuit

————

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Aug 06 2019

AUGUST TERM, 2018

ARGUED: SEPTEMBER 21, 2018
DECIDED: AUGUST 6, 2019

No. 17-3801-cv

SARAH PALIN, an individual,
*Plaintiff-Appellant,*

*v.*

THE NEW YORK TIMES COMPANY,
*Defendant-Appellee.*

————

Appeal from the United States District Court
for the Southern District of New York.
No. 17-cv-04853 – Jed S. Rakoff, *Judge.*

————

Before: WALKER and CHIN, *Circuit Judges*, and KEENAN.*

————

---

* Judge John F. Keenan, of the United States District Court for the Southern District of New York, sitting by designation.

CERTIFIED COPY ISSUED ON 08/06/2019

1    This case is ultimately about the First Amendment, but the
2    subject matter implicated in this appeal is far less dramatic: rules of
3    procedure and pleading standards. Sarah Palin appeals the dismissal
4    of her defamation complaint against *The New York Times* ("the Times")
5    for failure to state a claim. The district court (Rakoff, *J.*), uncertain as
6    to whether Palin's complaint plausibly alleged all of the required
7    elements of her defamation claim, held an evidentiary hearing to test
8    the sufficiency of Palin's pleadings. Following the hearing, and
9    without converting the proceeding to one for summary judgment, the
10   district court relied on evidence adduced at that hearing to dismiss
11   Palin's complaint under Federal Rule of Civil Procedure 12(b)(6). We
12   find that the district court erred in relying on facts outside the
13   pleadings to dismiss the complaint. We further conclude that Palin's
14   Proposed Amended Complaint plausibly states a claim for
15   defamation and may proceed to full discovery.

16   We therefore VACATE and REMAND for proceedings
17   consistent with this opinion.

18                                    _____
19
20                          ELIZABETH M. LOCKE, Clare Locke LLP,
21                          Alexandria, VA (Thomas A. Clare, Joseph R.
22                          Oliveri, Clare Locke LLP, Alexandria, VA;
23                          Kenneth G. Turkel, Shane B. Vogt, Bajo Cuva
24                          Cohen Turkel P.A., Tampa, FL; S. Preston Ricardo,
25                          Golenbock Eiseman Assor Bell & Peskoe LLP,
26                          New York, NY, *on the brief*), *for Plaintiff-Appellant*.

27                          LEE LEVINE, Ballard Spahr LLP, Washington, DC
28                          (Jay Ward Brown, Ballard Spahr LLP, Washington,
29                          D.C.; David A. Schultz, Ballard Spahr LLP, New
30                          York, NY; David E. McCraw, The New York

Times, New York, NY, *on the brief*), *for Defendant-Appellee.*

————

JOHN M. WALKER, JR., *Circuit Judge*:

This case is ultimately about the First Amendment, but the subject matter implicated in this appeal is far less dramatic: rules of procedure and pleading standards. Sarah Palin appeals the dismissal of her defamation complaint against *The New York Times* ("the Times") for failure to state a claim. The district court (Rakoff, *J.*), uncertain as to whether Palin's complaint plausibly alleged all of the required elements of her defamation claim, held an evidentiary hearing to test the sufficiency of Palin's pleadings. Following the hearing, and without converting the proceeding to one for summary judgment, the district court relied on evidence adduced at that hearing to dismiss Palin's complaint under Federal Rule of Civil Procedure 12(b)(6). We find that the district court erred in relying on facts outside the pleadings to dismiss the complaint. We further conclude that Palin's Proposed Amended Complaint plausibly states a claim for defamation and may proceed to full discovery.

We therefore VACATE and REMAND for proceedings consistent with this opinion.

## BACKGROUND

On January 8, 2011, Jared Loughner opened fire at a political rally for Democratic Congresswoman Gabrielle Giffords in Tucson, Arizona ("the Loughner shooting"), killing six people and injuring thirteen others. Representative Giffords was seriously wounded in the attack.

Shortly before the tragic attack, Sarah Palin's political action committee ("SarahPAC") had circulated a map that superimposed the image of a crosshairs target over certain Democratic congressional districts (evoking, in the view of many, images of violence). Giffords' district was among those targeted by the SarahPAC crosshairs map. The image had been publicized during the earlier political controversy surrounding the Affordable Care Act, but in the wake of the Loughner shooting, some speculated that the shooting was connected to the crosshairs map. No evidence ever emerged to establish that link; in fact, the criminal investigation of Loughner indicated that his animosity toward Representative Giffords had arisen before SarahPAC published the map.

Six years later, on June 14, 2017, another political shooting occurred when James Hodgkinson opened fire in Alexandria, Virginia at a practice for a congressional baseball game. He seriously injured four people, including Republican Congressman Steve Scalise ("the Hodgkinson shooting"). That same evening, the Times, under the Editorial Board's byline, published an editorial entitled "America's Lethal Politics" ("the editorial") in response to the shooting.

The editorial argued that these two political shootings evidenced the "vicious" nature of American politics.[1] Reflecting on the Loughner shooting and the SarahPAC crosshairs map, the editorial claimed that the "link to political incitement was clear," and noted that Palin's political action committee had "circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs," suggesting that the

---

[1] App'x 37.

congressmembers themselves had been pictured on the map.[2] In the next paragraph, the editorial referenced the Hodgkinson shooting that had happened that day: "Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask of the right."[3]

The Times faced an immediate backlash for publishing the editorial. Within a day, it had changed the editorial and issued a correction. The Times removed the two phrases suggesting a link between Palin and the Loughner shooting. Added to the editorial was a correction that read: "An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established."[4] The Times also clarified that the SarahPAC map had overlaid crosshairs on Democratic congressional districts, not the representatives themselves.

Twelve days after the editorial was published Palin sued the Times in federal court. She alleged one count of defamation under New York law. Thereafter, the Times moved to dismiss Palin's complaint for failure to state a claim.

After the motion to dismiss had been fully briefed, the case took an unusual procedural turn: the district judge held an evidentiary hearing on the motion to dismiss. The district judge stated that the

---

[2] App'x 36–37. The crosshairs were put on a map over the locations of the congressional districts, and the names of the congressmembers in question—including Representative Giffords—were listed at the bottom of the page.

[3] App'x 41.

[4] App'x 22.

hearing was to assess the plausibility of the "[o]ne close question" presented by the Times' motion to dismiss: whether Palin had sufficiently pled the actual malice element of her defamation claim.[5]

The district judge ordered the Times to identify the author of the editorial and the Times produced James Bennet, the editorial page editor at the Times and the author of the editorial, to testify at the hearing. Bennet was the hearing's only witness. Bennet explained at the hearing that his reference to Palin in the editorial was intended to make a rhetorical point about the present atmosphere of political anger. He also recounted the editorial's research and publication process and answered inquiries about his prior knowledge of the Loughner shooting six years earlier and any connection to Palin. Bennet testified that he was unaware of any of the earlier articles published by the Times, or by *The Atlantic* (where he had previously been the editor-in-chief), that indicated that no connection between Palin or her political action committee and Loughner had ever been established. In addition to answering questions from the Times' counsel, Bennet responded to questions by Palin's counsel and the district judge. Neither party objected to the district judge's decision to hold the hearing.

On August 29, 2017, the district court, relying on evidence adduced at the hearing, granted the Times' motion to dismiss. The district court determined that any amendment would be futile and dismissed Palin's complaint with prejudice. Later, Palin asked the district court to reconsider its decision that the dismissal was with prejudice and included a Proposed Amended Complaint with her

---

[5] Order re: Motion to Dismiss, ECF No. 35.

1    motion. The district court denied the motion for reconsideration and
2    leave to replead. She now appeals.

3                                    **DISCUSSION**

4         We review a district court's grant of a motion to dismiss the
5    complaint on the pleadings de novo and "constru[e] the complaint
6    liberally, accepting all factual allegations in the complaint as true, and
7    drawing all reasonable inferences in the plaintiff's favor."[6]

8         Under New York law a defamation plaintiff must establish five
9    elements: (1) a written defamatory statement of and concerning the
10   plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the
11   defamatory statement, and (5) special damages or per se
12   actionability.[7] In addition, "a public figure plaintiff must prove that
13   an allegedly libelous statement was made with actual malice, that is,
14   made 'with knowledge that it was false or with reckless disregard of
15   whether it was false or not.'"[8] It is undisputed that Palin, a former
16   governor of Alaska and Republican candidate for Vice President in
17   2008, is a public figure.

18        When actual malice in making a defamatory statement is at
19   issue, the critical question is the state of mind of those responsible for
20   the publication.[9] Because the Times identified Bennet as the author of

---

[6] *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (internal quotation marks omitted).

[7] *See Celle v. Filipino Reporter Enterps. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000) (citations omitted).

[8] *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173–74 (2d Cir. 2001) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)).

[9] *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013) ("[T]he plaintiff must identify the individual responsible for publication of a statement, and it is

the editorial, it was his state of mind that was relevant to the actual
malice determination. We will first address the district court's use of
the hearing in the process of deciding the motion to dismiss and then
determine whether Palin's Proposed Amended Complaint plausibly
states a claim for defamation.

## I.     The Hearing

The pleading standards articulated in *Bell Atlantic Corp. v.
Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)
are well-known: in order to satisfy Federal Rule of Civil Procedure 8,
a complaint must contain "enough facts to state a claim to relief that
is plausible on its face."[10] A claim is plausible "when the plaintiff
pleads factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct alleged."[11] A
well-pleaded complaint will include facts that "raise a right to relief
above the speculative level."[12] "The plausibility standard is not akin
to a 'probability requirement,' but it asks for more than a sheer
possibility that a defendant has acted unlawfully."[13]

On appeal, Palin argues that the district court's reliance on the
hearing to decide the motion to dismiss offends the Federal Rules of

---

that individual the plaintiff must prove acted with actual malice." (citing *New York
Times*, 376 U.S. at 287)).

[10] *Twombly*, 550 U.S. at 570.

[11] *Iqbal*, 556 U.S. at 678.

[12] *Twombly*, 550 U.S. at 555.

[13] *Iqbal*, 556 U.S. at 678.

Civil Procedure. We agree that the hearing runs headlong into the federal rules.

When presented with the Times' Rule 12(b)(6) motion to dismiss for failure to state a claim, the district court relied on Rule 43(c) to convene the hearing at which Bennet testified. The district court's invocation of Rule 43(c), which addresses taking testimony at trial, was misplaced: that rule has nothing to do with the proceedings at the motion-to-dismiss stage. Following the hearing, the district court granted the Times' motion to dismiss, finding that Palin failed to plausibly allege actual malice. This conclusion rested on inferences drawn from Bennet's testimony at the plausibility hearing.

Rule 12(d) provides: "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Rule 12(d), therefore, presents district courts with only two options: (1) "the court may exclude the additional material and decide the motion on the complaint alone" or (2) "it may convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material."[14]

The district judge took neither permissible route under Rule 12(d). The judge both relied on matters outside the pleadings to decide the motion to dismiss and did not convert the motion into one for summary judgment. To the contrary, his aim was explicit: to determine whether Palin's complaint stated a plausible claim for

---

[14] *Kopec v. Coughlin*, 922 F.2d 152, 154 (2d Cir. 1991) (quoting *Fonte v. Bd. of Managers of Continent Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988)).

relief under Rule 12(b)(6). The district judge explained that "[b]y requiring district courts to make plausibility determinations based on the pleadings, the Supreme Court has, in effect, made district courts gatekeepers."[15]

In an effort to salvage the propriety of the district court's decision, the Times argues that the district court complied with Rule 12(d) because it did not rely on matters outside the pleadings.[16] The Times argues that Bennet's testimony was not outside the pleadings because it presented material integral to the complaint by merely adding depth to what was apparent from the face of Palin's complaint. But the material that came to light at the hearing did considerably more than elaborate on the allegations in the complaint.

A matter is deemed "integral" to the complaint when the complaint "relies heavily upon its terms and effect."[17] Typically, an integral matter is a contract, agreement, or other document essential to the litigation.[18] Hearing testimony elicited by the trial judge after litigation has already begun is not the type of material that ordinarily has the potential to be a matter "integral" to a plaintiff's complaint.

---

[15] *Palin v. New York Times Co.*, 264 F. Supp. 3d 527, 530 n.1 (S.D.N.Y. 2017) (citing *Iqbal*, 556 U.S. at 662; *Twombly*, 550 U.S. at 554) (internal citations omitted).

[16] *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153–54 (2d Cir. 2002) (holding that extraneous material is not "outside the pleadings" when the material is integral to complaint and relied upon by the plaintiff in framing the complaint).

[17] *Id.* at 153 (internal quotation marks omitted).

[18] *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("In most instances . . . the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls . . . ."); *see also Nicoisa v. Amazon.com, Inc.*, 834 F.3d 220, 234 (2d Cir. 2016) (an "order page" and "conditions of use" agreement were integral to the complaint when the complaint contained numerous references to them).

1   Regardless, Palin could not have "relie[d] heavily"[19] on Bennet's
2   testimony when drafting her complaint because she had no idea what
3   Bennet would say. Bennet's testimony revealed substantive
4   information about his motivations and the editorial drafting
5   process—none of which Palin could have known in advance of her
6   pleadings, much less "relie[d] heavily" on.[20]

7       The Times falls back on the argument that, even if the district
8   court relied on matters outside the pleadings, we may treat the
9   motion *as if* it had been converted to a motion for summary judgment.
10  We have held that the "conversion of a Rule 12(b)(6) motion into one
11  for summary judgment is governed by principles of substance rather
12  than form"[21] and that "[t]he essential inquiry is whether the appellant
13  should reasonably have recognized the possibility that the motion
14  might be converted into one for summary judgment."[22]

15      We decline to treat the Rule 12(b)(6) motion here as having been
16  converted to one for summary judgment. Apart from the fact that the
17  able and highly experienced district judge did not purport to convert
18  the motion, Palin had no prior notice that the district court might
19  resolve the Times' Rule 12(b)(6) motion after the judge's sua sponte
20  hearing, much less that he might treat the motion as one for summary
21  judgment. Indeed, the district court was explicit about treating the
22  motion only as a test of the sufficiency of the pleadings. The Times
23  relies on cases where the plaintiff had adequate notice and the district

---

[19] *Chambers*, 282 F.3d at 153 (internal quotation marks omitted).

[20] *Id.*

[21] *In re G &A Books*, 770 F.2d 288, 295 (2d Cir. 1985).

[22] *Id.*; *see also Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 592 (2d Cir. 1993).

1    court simply neglected to properly convert the motion.[23] This is not a
2    situation in which where the plaintiff ought to have seen a summary-
3    judgment decision coming.[24]

4           Even if the plaintiff had been given notice and the court had
5    explicitly converted the motion to one for summary judgment, we
6    would still have to vacate because the district court's opinion relied
7    on credibility determinations not permissible at any stage before
8    trial.[25] As we will discuss in the next section, the district court's
9    acceptance of Bennet's testimony as credible was what led it to grant
10   the Times' motion to dismiss.

11          The Times also argues that Palin was not deprived of a
12   meaningful opportunity to conduct discovery "pertinent to the
13   motion."[26] Presumably, the Times is referring to "discovery" on the
14   spot: Bennet's testimony and some related documents. Even
15   assuming that the hearing afforded Palin all of the discovery to which

---

[23] *See G & A Books*, 770 F.2d at 295; *Northville Downs v. Granholm*, 622 F.3d 579, 585–86 (6th Cir. 2010).

[24] In fact, the hearing transcript reflects the understandable confusion of Palin's counsel. App'x 395–97 (The Court: "Neither side raised any objection to my holding [the evidentiary] hearing . . . Counsel: . . . It wasn't a normal kind of hearing during a 12(b)(6) . . . . And to be honest, Judge, we really wouldn't have tendered an objection because we were trying to get a better understanding of kind of what the inquiry was . . . .").

[25] *See Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) (noting that at the summary judgment stage "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986))).

[26] Fed. R. Civ. P. 12(d); *see United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 88 n.13 (2d Cir. 2017) (noting the district court's "broad discretion to limit discovery in a prudential and proportionate way" (internal quotation marks omitted)).

she was entitled, this fact does not mitigate the errors committed by the district court.

It is clear to us that the district court viewed the hearing as a way to more expeditiously decide whether Palin had a viable way to establish actual malice. But, despite the flexibility that is accorded district courts to streamline proceedings and manage their calendars, district courts are not free to bypass rules of procedure that are carefully calibrated to ensure fair process to both sides. The procedural path followed by the district court conforms to neither of the two options permitted by Rule 12(d). While we are cognizant of the difficult determinations that *Twombly* and *Iqbal* often place on district courts, the district court's gatekeeping procedures must nevertheless comply with the Federal Rules of Civil Procedure.

## II.   Palin's Proposed Amended Complaint

Having determined that the district court erred in relying on evidence that came to light in the plausibility hearing when it granted the Times' motion to dismiss, we must ascertain what effect, if any, that error had on the dismissal of Palin's defamation complaint. To do so, we will review Palin's Proposed Amendment Complaint ("the PAC") to determine whether she stated a plausible claim for defamation. Because of the district court's decision to hold the plausibility hearing, this case comes to us in unique form. After the district court dismissed her claim with prejudice, Palin attached a PAC to her motion for reconsideration of the "with prejudice" part of the dismissal. The PAC included certain material added by the hearing and we discern no fault here because Bennet's testimony, reliable or not, was now part of the record. The district court denied the motion for reconsideration, finding that leave to replead would be futile and that the PAC suffered the same "fatal flaws" as the original

complaint.[27] Our review of the grant of a motion to dismiss is de novo;[28] therefore we now turn to whether the PAC states a plausible claim for relief. We conclude that it does.

In the Times' view, the district court correctly determined that Palin's original complaint and the PAC both gave rise to only one plausible conclusion: that Bennet made an unintended mistake by including the erroneous facts about Palin.  We disagree.

In both the original complaint and the PAC, Palin's overarching theory of actual malice is that Bennet had a "pre-determined" argument he wanted to make in the editorial.[29] Bennet's fixation on this set goal, the claim goes, led him to publish a statement about Palin that he either knew to be false, or at least was reckless as to whether it was false. The PAC contains allegations that paint a plausible picture of this actual-malice scenario in three respects: (1) Bennet's background as an editor and political advocate provided sufficient evidence to permit a jury to find that he published the editorial with deliberate or reckless disregard for its truth, (2) the drafting and editorial process also permitted an inference of deliberate or reckless falsification, and (3) the Times' subsequent correction to the editorial did not undermine the plausibility of that inference.

*First*, Palin alleges that, because of the editorial positions Bennet held at *The Atlantic* and *The New York Times*, a jury could plausibly find that Bennet knew before publishing the editorial that it

---

[27] Memorandum and Order denying Motion for Reconsideration, ECF No. 61.

[28] *Elias*, 872 F.3d at 104.

[29] App'x 472.

was false to claim that Palin or her political action committee were connected to the Loughner shooting.

The PAC alleges that, from 2006 to 2016, Bennet was the editor-in-chief of *The Atlantic*, where "he was responsible for the content of, reviewed, edited and approved the publication of numerous articles confirming there was no link between Mrs. Palin and Loughner's shooting."[30] The complaint references several articles about the Loughner shooting published by *The Atlantic* during Bennet's tenure, the most notable of which is entitled *"Ten Days That Defined 2011."* The part of that article discussing the Loughner shooting reads: ". . . the bad thing to come out of this already terrible story was a round of blame hurling, with people rushing to point at Sarah Palin's infamous target map . . . . In truth, Loughner is clinically insane and this was not really about politics at all."[31]

At the hearing, Bennet stated that he could not recall reading those articles, and even if he had read them, he did not have them in mind when he published the editorial. The district court, in rejecting Palin's theory as implausible, credited this testimony as truthful when it found that Bennet's failure to read the articles was simply a research failure that did not rise to the level of actual malice.

By crediting Bennet's testimony, the district court rejected a permissible inference from the articles: that one who had risen to editor-in-chief at *The Atlantic* knew their content and thus that there was no connection between Palin and the Loughner shooting. That Palin's complaint sufficiently alleges that Bennet's opportunity to

---

[30] App'x 481.

[31] Richard Lawson, *Ten Days That Defined 2011*, The Atlantic, Dec. 29, 2011.

know the journalistic consensus that the connection was lacking gives rise to the inference that he actually did know.

The PAC also includes allegations suggesting that Bennet in particular was more likely than the average editor-in-chief to know the truth about the Loughner shooting because he had reason to be personally hostile toward Palin, her political party, and her pro-gun stance. Bennet's brother, a Democrat, had served as a United States Senator for Colorado since 2009. In 2010, Senator Bennet was endorsed by two House members whose districts had been targeted by the SarahPAC map. Two days before the Loughner shooting, a man threatened to open fire on Senator Bennet's offices, and thereafter both Bennet brothers became "outspoken advocate[s] for gun control."[32] Also, during the 2016 election, Palin endorsed Senator Bennet's opponent and Representative Giffords endorsed Senator Bennet.

The district court gave no weight to these allegations, finding that political opposition did not rise to the level of actual malice. We agree with the district court that political opposition alone does not constitute actual malice, but we conclude that these allegations could indicate more than sheer political bias—they arguably show that Bennet had a personal connection to a potential shooting that animated his hostility to pro-gun positions at the time of the Loughner shooting in 2011.[33] Palin's allegations are relevant to the credibility of Bennet's testimony that he was unaware of facts

---

[32] App'x 480.

[33] *Cf. Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 590 (D.C. Cir. 2016) ("[A] newspaper's motive in publishing a story . . . cannot provide a sufficient basis for finding actual malice." (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665 (1989))).

1   published on his watch relating to the Loughner shooting and that he
2   made a mistake when he connected Palin to the that shooting. Palin's
3   allegations present a plausible inference that Bennet's claim of
4   memory loss is untrue.

5       At a minimum, these allegations give rise to a plausible
6   inference that Bennet was reckless when he published the editorial
7   without reacquainting himself with the contrary articles published in
8   *The Atlantic* six years earlier.[34] And that plausible inference of
9   recklessness is strengthened when added to Palin's allegations that
10  Bennet had reason to be personally biased against Palin and pro-gun
11  positions in general. When properly viewed in the plaintiff's favor, a
12  reasonable factfinder could conclude this amounted to more than a
13  mistake due to a research failure.

14      ***Second***, the PAC also alleges that certain aspects of the drafting
15  and publication process of the editorial at *The New York Times* permits
16  an inference of actual malice. Elizabeth Williamson, the editorial
17  writer who drafted the initial version of the editorial, had hyperlinked
18  in her draft an article entitled "*Sarah Palin's 'Crosshairs' Ad Dominates*
19  *Gabrielle Giffords Debate*." The article stated, contrary to the claim in
20  the published editorial, that "[n]o connection" was made between the
21  SarahPAC map and Loughner.[35] The link was also included in the
22  final version of the editorial, a version that Bennet essentially rewrote.
23  The Times argues that the hyperlink shows the absence of malice. But

---

[34] *See Behar*, 238 F.3d at 173–74 (actual malice satisfied upon a showing the statement was made "with reckless disregard of whether it was false or not" (internal quotation marks omitted)).

[35] App'x 642–43.

the PAC alleges that, by including a hyperlink that contradicted the argument of his editorial, Bennet "willfully disregarded the truth."[36]

The district court, siding with the Times, concluded that including the hyperlinked article was further evidence of simple mistake. After crediting Bennet's testimony that he did not read the hyperlinked article, the district judge concluded that a mistake was the only plausible explanation. But the inclusion of the hyperlinked article gives rise to more than one plausible inference, and any inference to be drawn from the inclusion of the hyperlinked article was for the jury—not the court. In any event, under these circumstances, it was arguably reckless for Bennet to hyperlink an article that he did not read.

*Third*, the district court concluded that the correction swiftly issued by the Times again demonstrated that the only plausible explanation for the erroneous statements was a mistake. Yet, it is also plausible that the correction was issued after a calculus that standing by the editorial was not worth the cost of the public backlash. Bennet could have published the editorial knowing—or recklessly disregarding—the falsity of the claim, and then decided later that the false allegation was not worth defending.

At bottom, it is plain from the record that the district court found Bennet a credible witness, and that the district court's crediting his testimony impermissibly anchored the district court's own negative view of the plausibility of Palin's allegations.

The district court at one point stated that Bennet's "behavior is much *more plausibly* consistent with making an unintended mistake

---

[36] App'x 494.

1    and then correcting it than with acting with actual malice."[37] Perhaps
2    so, but it is not the district court's province to dismiss a plausible
3    complaint because it is not as plausible as the defendant's theory. The
4    test is whether the complaint is plausible, not whether it is less
5    plausible than an alternative explanation.[38] The jury may ultimately
6    agree with the district court's conclusion that Bennet was credible—
7    but it is the jury that must decide. Therefore, at the pleading stage, we
8    are satisfied that Palin has met her burden to plead facts giving rise
9    to the plausible inference that Bennet published the allegedly
10   defamatory editorial with actual malice. We emphasize that actual
11   malice does not mean maliciousness or ill will; it simply means the
12   statement was "made with knowledge that it was false or with
13   reckless disregard of whether it was false or not."[39] Here, given the
14   facts alleged, the assertion that Bennet knew the statement was false,
15   or acted with reckless disregard as to whether the statement was false,
16   is plausible.

17         The Times also argues that Palin failed to plausibly allege two
18   other elements of a defamation claim: (1) that the editorial is not "of
19   and concerning"[40] Palin and (2) the challenged statements cannot
20   reasonably be understood as assertions of provably false fact. The

---

[37] *Palin*, 264 F. Supp. 3d at 537 (emphasis added).

[38] *See Iqbal*, 556 U.S. at 678 ("The plausibility standard is not akin to a probability requirement . . . .") (internal quotation marks omitted).

[39] *Behar*, 238 F.3d at 174 (internal quotation marks omitted); *see id.* ("The reckless conduct needed to show actual malice is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing, but by whether there is sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." (internal quotation marks and citation omitted)).

[40] *See Elias*, 872 F.3d at 104.

1  district court considered and rejected both of these arguments, and
2  we agree.

3      First, Palin has plausibly alleged that the challenged statements
4  are "of and concerning" her.[41] The Times argues that SarahPAC, as a
5  political action committee, is a creature of federal law and entirely
6  distinct from Palin herself. At the pleading stage, however, the bar to
7  satisfy this element is low. As we held in *Elias*, the plaintiff "need only
8  plead sufficient facts to make it plausible—not probable or even
9  reasonably likely—that a reader familiar with [the plaintiff] would
10  identify [the plaintiff] as the subject of the statements at issue."[42]

11      Palin's allegations are more than sufficient to plausibly allege
12  that the challenged statements were "of and concerning" her. The
13  editorial refers to Palin specifically—"Sarah Palin's political action
14  committee."[43] The legal designation of a political action committee
15  under federal law notwithstanding, Palin has plausibly pleaded that
16  a reader would identify her as the subject of the statements. The
17  Times' arguments to the contrary are unpersuasive.

18      Second, the Times argues that we can also affirm the district
19  court because the challenged statements are not reasonably capable
20  of being proven false.[44] The Times claims that Loughner's motivations

---

[41] *Id.* ("[A] defamation plaintiff must allege that the purportedly defamatory statement was of and concerning him or her . . . ." (internal quotation marks omitted)).

[42] *Id.* at 105 (citing *Iqbal*, 556 U.S. at 678).

[43] App'x 37.

[44] *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–20 (1990); *see also Celle*, 209 F.3d at 178 (noting that under New York law differentiating opinion from actionable fact involves "a determination of whether the statement is capable of

1  are ultimately unknowable and speculative. This objection also goes
2  nowhere. We agree with the district court that a reasonable reader
3  could view the challenged statements as factual, namely that Palin,
4  through her political action committee, was directly linked to the
5  Loughner shooting. The social media backlash that precipitated the
6  correction further suggests that the Times' readers perceived the false
7  statements as fact-based.

8      We conclude by recognizing that First Amendment protections
9  are essential to provide "breathing space" for freedom of expression.[45]
10  But, at this stage, our concern is with how district courts evaluate
11  pleadings. Nothing in this opinion should therefore be construed to
12  cast doubt on the First Amendment's crucial constitutional
13  protections. Indeed, this protection is precisely why Palin's
14  evidentiary burden at trial—to show by clear and convincing
15  evidence that Bennet acted with actual malice—is high. At the
16  pleading stage, however, Palin's only obstacle is the plausibility
17  standard of *Twombly* and *Iqbal*. She has cleared that hurdle.

18      Naturally, we take no position on the merits of Palin's claim.

## CONCLUSION

20      For the reasons stated above, we VACATE and REMAND the
21  judgment of the district court for further proceedings consistent with
22  this opinion.

---

being objectively characterized as true or false" (internal quotation marks omitted)).

[45] *New York Times*, 376 U.S. at 271–72.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit