## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SARAH PALIN, an individual,

     Plaintiff,

v.

THE NEW YORK TIMES COMPANY,
a New York corporation, and
JAMES BENNET, an individual,

     Defendants.

_____/

Case No.:  17 Civ. 4853

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

     Plaintiff, Sarah Palin ("Gov. Palin"), by her undersigned attorneys, for her First Amended Complaint against Defendants, The New York Times Company ("*The Times*") and James Bennet, alleges as follows:

## NATURE OF THE ACTION

     1.    Gov. Palin brings this action to hold James Bennet and *The Times* accountable for defaming her by falsely asserting what they knew to be false:  that Gov. Palin was clearly and directly responsible for inciting a mass shooting at a political event in January 2011. Specifically, on June 14, 2017, *The Times* published an editorial authored in the name of its Editorial Board (which represents the "voice" of *The Times*[1]) that falsely stated as a matter of fact to millions of people that Gov. Palin incited Jared Loughner's January 8, 2011, mass shooting at a political event in Tucson, Arizona, during which he shot thirteen people, severely wounding United States Congresswoman Gabrielle Giffords, and killing six others, including Chief U.S. District Court Judge John Roll and a nine-year-old girl (the "Loughner Shooting").  A copy of the June 14, 2017, online version of *The Times'* defamatory editorial, "*America's Lethal*

---

[1] www.nytimes.com/interactive/opinion/editorialboard.html

*Politics*" (the "Palin Article") is attached as **Exhibit 1**.  A copy of the print version the Palin Article published on June 15, 2017, is attached as **Exhibit 2.**

2.     The primary author of the defamatory passages in the Palin Article, James Bennet ("Mr. Bennet"), is a seasoned journalist and editor with decades of experience who served as the Editor-In-Chief of *The Atlantic* at the time of the Loughner Shooting.  When Mr. Bennet wrote and *The Times* published the defamatory passages in the Palin Article, they had actual knowledge that there was no direct and clear link between Gov. Palin and the Loughner Shooting and that Gov. Palin did not politically incite Loughner's horrific crime.

3.     However, Mr. Bennet is an ardent gun-control advocate who harbors deep-seeded resentment and animus toward Gov. Palin and her political views.

4.     That ill-will and hostility motivated Mr. Bennet and *The Times* to use the false assertions of fact about Gov. Palin's incitement of and "direct" and "clear" link to Loughner's Shooting as an artifice to exploit and score political points using the shooting that occurred on June 14, 2017, when James Hodgkinson, a man *The Times* described as a "Bernie Sanders supporter and campaign volunteer virulently opposed to President Trump," launched a sniper-style attack with an assault rifle upon members of Congress and current and former congressional aides practicing for the annual charity Congressional Baseball Game at a field near the Capitol in Virginia.

5.     As early reports about the Hodgkinson shooting sparked speculation about whether his actions were motivated by liberal, anti-Republican political rhetoric, Mr. Bennet was outraged and decided to respond by reviving what he knew to be debunked speculation that Gov. Palin incited Loughner's Shooting.  To do so, Mr. Bennet ignored his own knowledge of the facts surrounding the Loughner Shooting, the well-known consensus (including within *The*

*Atlantic* and *The Times*) that Gov. Palin's political activities played no role in Loughner's Shooting, readily available information and articles about the Loughner Shooting, and the most basic and fundamental tenants of ethical journalism – including his Editorial Board's own fact-checking policies -- because Mr. Bennet was willfully blinded by a pre-determined desire to lash out against conservatives and Second Amendment advocates by attacking  Gov. Palin.

6.      The prominently-placed Palin Article capitalized on Gov. Palin's name and status as a conservative archetype in connection with Loughner's and Hodgkinson's horrific attacks to support its false assertion that there was a "sickeningly familiar pattern" of politically motivated violence against members of Congress.  This supposed "pattern" consisted of two events:  (1) the fabricated "clear" and "direct" link between Gov. Palin and her incitement of Loughner's 2011 assault against Representative Giffords and other innocent bystanders in Tucson, Arizona; and (2) Hodgkinson's Virginia shooting.

7.      Incredulously, at the time of publication Mr. Bennet knew about, remembered and had published, reviewed, edited and approved numerous articles/columns confirming that there was no established connection between Gov. Palin and Loughner's 2011 Shooting.

8.      Mr. Bennet also knew and believed that there was not even evidence that Hodgkinson's shooting was politically motivated.  Nevertheless, to make his predetermined point, Mr. Bennet proclaimed without any factual support that Hodgkinson's "derangement had found its fuel in politics" as pretext to rip-into Gov. Palin with his false statements about the link between her and the Loughner Shooting.

9.      Despite just publicly rededicating themselves to truthful journalism, fact-checking and accountability, Mr. Bennet and *The Times* published and promoted the Palin Article with actual knowledge that the lynchpin of the "sickening pattern" of politically-incited shootings was

the false assertion that Gov. Palin incited Loughner to murder six people, among them a child and federal judge, and seriously wound numerous others; a deliberately false and deadly serious charge which was buttressed by the admittedly false assertions that Gov. Palin circulated a map placing crosshairs over individual lawmakers, including Rep. Giffords, and that Hodgkinson's shooting was, like Loughner's, fueled by politics.

10.     Ultimately, Mr. Bennet and *The Times* labeled Gov. Palin's fabricated connection to the Loughner Shooting "lethal politics" and professed the established existence of that connection despite its known falsity because Mr. Bennet had already decided to use Gov. Palin as an artifice to promote gun control and to denounce "vicious" American politics.

11.     Given the history of attacks against Gov. Palin and her unfortunate role as an easy target for barbs against conservative policies, at the time of publication of the Palin Article Mr. Bennet and *The Times* did not suspect that the false attack upon Gov. Palin (the proverbial punching-bag for gun-control and political civility assaults) would evoke criticism and backlash from their own readers and liberal media outlets.  But, it did.

12.     As that backlash mounted, Mr. Bennet and *The Times* were forced to try to save face for intentionally fabricating facts about Gov. Palin to support their politically-motivated narrative.   Self-interest, not remorse or responsibility, motivated them to make edits and "corrections" to their fabricated claim, along with half-hearted Twitter apologies to their "readers"—**not** to Gov. Palin—none of which sufficiently corrected the falsehoods that the paper published.   In fact, none of the corrections or apologies even mentioned Gov. Palin or acknowledged that she did not incite a deranged man to commit mass murder.

13.     Gov. Palin brings this action to hold Mr. Bennet and *The Times* accountable for falsely stating to millions of people that she is responsible for inciting a mass shooting that

seriously injured fourteen and killed six innocent people, including a nine-year-old girl who, at that time, was the same age as Gov. Palin's youngest daughter.  Gov. Palin brings this action because Mr. Bennet and *The Times* did not live up to the primary responsibility attendant to the extraordinary power of the press: tell the truth.

<u>**PARTIES, JURISDICTION & VENUE**</u>

14.     Gov. Palin is an individual who resides in and is a citizen of the State of Alaska.

15.     *The Times* is a New York corporation with its principal place of business at 620 Eighth Avenue, New York, New York.

16.     Mr. Bennet is an individual who resides in and is a citizen of the State of New York.

17.     This Court has personal jurisdiction over Mr. Bennet and *The Times* pursuant to New York Civil Practice Law and Rules § 301 ("CPLR") because Mr. Bennet resides in, works in, is registered to vote in and is a citizen of New York, New York, *The Times* has offices and its principal place of business in New York, New York, and because this action arises out of their transaction of business in New York, New York.

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

19.     Venue properly lies within this judicial district pursuant to 28 U.S.C. § 1391 because *The Times* and Mr. Bennet reside in this judicial district and a substantial portion of the events giving rise to the claims asserted in this action occurred in this judicial district.

## THE FACTS

### Overview of the Parties

**A.**      **Gov. Palin**

20.      In 2006, Gov. Palin became the youngest and first female Governor of Alaska. She rose to national prominence in 2008 when Senator John McCain tapped her as his vice-presidential running mate, making her the first woman to run on the Republican presidential ticket.

21.      In July 2009, Gov. Palin resigned as Governor of Alaska and focused on her career as a prolific author, political commentator, television personality and voice for conservative values.

22.      Gov. Palin tries to live her life as a passionate voice on faith, family, and making America safe and secure for her family and the families of all Americans.

23.      Gov. Palin has been named to *TIME Magazine's* "*100 Most Influential People in the World*" list and one of the Smithsonian Institute's "*100 Most Significant Americans of All Time*."

**B.**      ***The Times***

24.      *The Times* is a multi-billion-dollar global media organization that publishes *The New York Times* daily newspaper, one of the oldest and most widely circulated print papers in the United States, and distributes content generated by its newsroom through its website www.NYTimes.com and several mobile platforms. *The New York Times* has been regarded as a national "newspaper of record," a moniker that reflects the considerable weight and influence attributed to the "voice" of *The Times*.

25.     *The Times'* print newspaper is sold in the United States and around the world through individual home delivery subscriptions, bulk subscriptions (primarily by schools and hotels) and single-copy sales.

26.     *The Times'* content reaches a broad audience through its print, web and mobile platforms, including over three million paid subscribers and approximately 122 million monthly unique visitors to its website.  *The Times* charges consumers for content provided on its website and mobile applications.  Digital subscriptions can be purchased individually or through group corporate or group education subscriptions.  *The Times'* "Metered Model" offers Internet users free access to a set number of articles per month on its website, and then charges users for access to content beyond that limit.

27.     In recent years, *The Times* has been transitioning from its celebrated past as a great American print newspaper to a subscription-first, mobile-first news provider that is increasingly dependent upon click-based digital advertisements to generate revenue.  Its digital-only subscriptions have more than doubled during that time; its digital advertising revenue rose 19% in the first quarter of 2017.

28.     As part of this transition, *The Times* and its Editorial department maintain their own social media accounts, such as Twitter and Facebook, on which they actively promote articles.  One such promoted article was the defamatory Palin Article.

29.     The transition to the fast-paced digital age of journalism has not been easy for *The Times*, particularly in the area of accuracy.

30.     *The Times* and its Editorial Board have faced several instances of false reporting over recent years—the most recent of which occurred in April 2017, when Bret Stephens (a controversial columnist hired by Mr. Bennet) published a climate change column that was widely

criticized for factual inaccuracies.  In fact, the column is so deeply flawed that *The Times' own* reporters and news editors immediately started to denounce it on Twitter, as reported in the *Think Process* article, "The *NY Times* promised to fact check their new climate denier columnist – they lied."  (See **Exhibit 3**)  In response (just two months before publishing the Palin Article), Mr. Bennet affirmed that *The Times* Editorial Department applies "the same standards for fairness and accuracy" as the rest of the paper.  (See **Exhibit 4**)

31.     In fact, following the 2016 election, *The Times* had already pledged to rededicate itself to accurate reporting and publishing "the complete, unvarnished truth as best we can learn it."

32.     This supposed rededication to accuracy coincided with *The Times'* new advertising campaign, "*The Truth Is Hard*," which debuted at the Academy Awards in February 2017.  (See **Exhibit 5**)  As part of that campaign, *The Times* marketed itself by asking the public to "Support fact-based journalism" by subscribing to *The Times*, and professed that "Truth. It has no alternative… it comes at a cost… [and]… It's hard to find. But easier with 1,000+ journalists looking."  (See **Exhibit 6**)  *The Times* even professed to the public that "The Truth is more important now than ever."  (Id.)

## C.     The Editorial Board

33.     *The Times'* Editorial Board is comprised of 16 experienced journalists with varying focuses of expertise.

34.     The Editorial Board represents the "voice" of the board and *The Times* itself.

35.     *The Times'* publishes its editorials unsigned because they are the product of a group of people who bring their experience and intellect to bear on a given topic.  Editorials

usually are written by the board member who is most expert in the subject, and then edited by a deputy editor or, as was the case with the Palin Article, the Editorial Page Editor, Mr. Bennet.

36.     When it comes to facts—verifiable pieces of information—editorials are no different than any other article in *The Times*.  The Editorial Board's policy is that if something is represented as a fact, it has to be correct.

37.     Thus, as Mr. Bennet recognized in April 2017, the Editorial Board is supposed to ensure that facts are correct the same way *The Times* newsroom does.  Also, the Editorial Board relies upon the news pages of *The Times* (and other papers, too) for facts to support editorials.

38.     Editorial Board writers have the first and primary responsibility for fact-checking, but they are backed up by the editors who edit their editorials, staff researchers and copy editors.

39.     Those writing and editing editorials for *The Times'* Editorial Page, particularly Mr. Bennet, know and understand the importance of accuracy and fact-checking their work before publication, a policy that was summarized by *Times'* columnist Bret Stephens as follows:

> Sweat the small stuff.  Read over each sentence—read it aloud— and ask yourself:  Is this true?  Can I defend every single word of it?  Did I get the facts, quotes, dates and spellings exactly right?...

40.     In the end, however, Mr. Bennet is personally responsible for the content and accuracy of each and every editorial published by *The Times*, particularly the editorials which he authors and edits.

**D.     James Bennet**

41.     Mr. Bennet is the Editorial Page Editor for *The Times*.  He is Ivy-league educated and has decades of experience in journalism as a reporter and editor.  Early in his career, he spent 15 years working as a reporter for *The Times* in several roles, including as its' Detroit bureau chief, White House correspondent and Jerusalem bureau chief.

42.     From 2006 to 2016, Mr. Bennet served as Editor-In-Chief of *The Atlantic*.  In that role he had the final say on what *The Atlantic* published and he was responsible for reviewing his publication's articles for accuracy and potential defamation.  Throughout 2011, he reviewed, approved and had the final say on the stories published in *The Atlantic*.

43.     Mr. Bennet returned to *The Times* as its Editorial Page Editor in May 2016.

44.     Upon returning to *The Times*, Mr. Bennet was responsible for the hiring of Bret Stephens; a journalist who Mr. Bennet knew courted controversy.  Mr. Stephens' first *Times* column did not disappoint.  In it, Mr. Stephens misstated facts while questioning climate change, which resulted in well-publicized calls for greater fact-checking of *The Times'* Editorial Page.

45.     Mr. Bennet also has a long lineage in and personal connection to Democratic politics.  His father, Douglas J. Bennet, Jr., served in prominent roles for the Democratic Party, including running the U.S. Agency for International Development under President Jimmy Carter and serving as an Assistant Secretary of State in the Clinton Administration.  Mr. Bennet's grandfather was an economic advisor in President Roosevelt's administration.  His brother, Michael F. Bennet, served as Counsel to the Deputy Attorney General in the Clinton Administration, and later served in the Clinton White House.  Michael Bennet is currently the senior Democratic Senator for Colorado—a position to which he was appointed in late 2009.

46.     Sen. Bennet was running for re-election in 2010 when Gov. Palin's political action committee posted a map of targeted electoral districts (the "Palin Map"), including two districts in Sen. Bennet's home state.  The two incumbent Colorado lawmakers whose districts were depicted on the Palin Map, Reps. John Salazar and Betsy Markey, endorsed Sen. Bennet during his 2010 Democratic primary.

47.     On January 6, 2011—two days before the Loughner Shooting—a man called Sen. Bennet's offices and threatened to "come down there and shoot you all."   Following additional threats, the man was arrested (two days after the Loughner Shooting).   The FBI even placed additional security at Sen. Bennet's home and Denver office.

48.     Mr. Bennet was aware of the threats made against his brother surrounding the Loughner Shooting.   His *Atlantic* reported on the arrest made and the threat on Sen. Bennet's office.   (See **Exhibit 7**)   That article even disclosed the family connection between Mr. Bennet and his brother.

49.     Like Mr. Bennet, Sen. Bennet became an outspoken advocate for gun control.   He gave a floor speech on gun control in June 2016, joining 30 of his Democratic colleagues for a filibuster about gun laws.

50.     That same month, Gov. Palin endorsed Darryl Glenn, the Republican candidate who would become Sen. Bennet's opponent in the November 2016 election.   Mr. Glenn described himself as "an unapologetic Christian-constitutional-conservative-pro-life-Second Amendment-loving American."

51.     Shortly thereafter, Sen. Bennet was endorsed by Rep. Gabrielle Giffords' PAC, Americans for Responsible Solutions, a gun control political action committee.

52.     For the reasons set forth in paragraphs 45-51 above, as well as his own personal politics, support for gun control and hostility against political rhetoric, Mr. Bennet held ill-will and animosity toward Gov. Palin and a vested personal and professional interest in and closely followed the events surrounding the Loughner Shooting, specifically including any role Gov. Palin or her political activities may have played in it.   Mr. Bennet's brother was threatened by gun violence at the very same time of the Loughner Shooting (soon after the Palin Map was

released).  Those events were among the leading political stories covered by *The Atlantic* at that time.  And Mr. Bennet held deep-seeded political and personal beliefs against Second Amendment advocates and politicians standing on conservative "tea party" platforms—the most vocal, high-profile and targeted of whom was Gov. Palin.

53.    Simply stated, as a highly-educated journalist, editor-in-chief and gun control advocate working in a field that requires him to remember facts, who also had a strong personal connection to threats of gun violence against politicians, Mr. Bennet very closely followed and had and continues to have actual knowledge of the events surrounding the Loughner Shooting, the Palin Map, and the well-recognized consensus within the media that no link was ever established between the two.

## Actual Knowledge That No Link Was Established

54.    While Mr. Bennet was serving as Editor-In-Chief of *The Atlantic*, he was responsible for the content of, reviewed, edited and approved the publication of numerous articles confirming that there was no link between Gov. Palin and Loughner's Shooting.

55.    Mr. Bennet, *The Atlantic* and Andrew Sullivan (a close-friend of Mr. Bennet whom he hired to work for *The Atlantic* as a senior editor) also followed Gov. Palin very closely.

56.    For the better part of two years (from 2009 through 2011) while working for *The Atlantic*, Mr. Sullivan relentlessly pursued Gov. Palin claiming that she was not actually the mother of her son, Trig, who suffers from Downs Syndrome.  Mr. Bennet knew about and approved of Mr. Sullivan's "Trig-Trutherism" campaign.

57.    In the midst of that attack on Gov. Palin, and on the day of the Loughner Shooting, Mr. Sullivan (in *The Atlantic*) was one of the first journalists to raise the possibility of any connection between the Palin Map and Loughner.  In his January 8, 2011, *Atlantic* column,

"*An Assassination?*" Mr. Sullivan prominently posted an image of the Palin Map and, while cautiously refusing to claim any actual, established connection between the two, questioned the responsibility of "political rhetoric involving words like "target" and "gun-sights.""

58.     That same day, Mr. Sullivan live-blogged on *The Atlantic's* website under the post "*An Assassination Attempt in Arizona: Live-Blogging.*"

59.     In the ensuing days, Mr. Bennet's *Atlantic* published numerous articles about the Loughner Shooting which focused on any connection between Gov. Palin or the Palin Map and the shooting, including but not limited to:

> a.     "*Was shooting of Rep. Gabrielle Giffords Political?*" (January 8, 2011);
>
> b.     "*Did Sarah Palin's Target Map Play Role in Giffords Shooting?*" (January 10, 2011);
>
> c.     "*What We Know about Jared Lee Loughner*" (January 10, 2011);
>
> d.     "*Stop the Blame Game*" (January 11, 2011);
>
> e.     "*The More We Know*" (January 17, 2011);
>
> f.     "*Ten Days That Defined 2011*" (December 29, 2011).

60.     As *The Atlantic's* Editor-in-Chief, Mr. Bennet knew about, read, edited and/or approved his publication's articles and Mr. Sullivan's columns about the Loughner Shooting, all of which addressed whether any connection between Gov. Palin's political activities and Loughner's shooting existed.  Thus, Mr. Bennet gained actual knowledge of their contents.

61.     *The Atlantic's* January 10, 2011 article, "*What We Know about Jared Lee Loughner,*" (See **Exhibit 8**) includes the following passages:

> •     **He Was More Delusional Than Political**… Jared Lee Loughner appeared to be more driven by a delusional mind than a real interest in politics, mental health experts said Sunday…

- **Ambiguous Politics**   "The exact role of politics in Mr. Loughner's life—or whether he had a specific political perspective at all—is harder to pin down" says <u>Kirk Johnson, Serge Kovaleski, Dana Frosch and Eric Lipton</u> in *The New York Times*…

62.     The reference and hyperlink therein to *The New York Times* is to *The Times'* January 9, 2011 article, "*Suspect's Odd Behavior Caused Growing Alarm*" an in-depth report about Loughner's behavior and past.  (See **Exhibit 9**)  Thus, Mr. Bennet and *The Atlantic* were keeping tabs on what other media outlets, including *The Times*, were reporting about the Loughner Shooting.

63.     *The Atlantic's* January 17, 2011 article, "*The More We Know*," (See **Exhibit 10**) hyperlinked to a *National Review* article, which is described as being cited "in exonerating the far right from any influence on Jared Loughner's disturbed mind" and states:

> My point here is not that Loughner was a far right ideologue.  It is that he was a paranoid, mentally ill, gun-obsessed loner who had picked up shards of far right ideology—on currency, the constitution, gender roles—that need to be recognized for what they are.  It's muddled up in an addled mind and diseased soul into something unique.  Ron Paul bears no more **direct** responsibility for this madman than Sarah Palin does… (Emphasis added)

64.     This *National Review* article hyperlinked by *The Atlantic* is titled, "*Dupnik's Confession*," (See **Exhibit 11**), and it in turn cited and hyperlinked to a "long *New York Times* piece on [Loughner]," which is *The Times'* January 15, 2011 article "*Looking Behind the Mug-Shot Grin*" (See **Exhibit 12**), a heavily cited, well known, in-depth report on Loughner and his mental condition.

65.     Within days of the Loughner Shooting, the consensus within *The Times*, *The Atlantic* and media as a whole was that Gov. Palin and the Palin Map did not incite Loughner's Shooting, and that no direct or clear link between the two was ever established.  As Editor-In-

Chief of *The Atlantic*, Mr. Bennet was aware of this consensus within his publication and the journalism community.

66.      In fact, on January 15, 2011, Mr. Bennet's good friend and senior editor, Mr. Sullivan, published a column in *The Atlantic* titled "*Caldwell's Unfairness*," in which Mr. Sullivan demanded a correction from a journalist for the *Financial Times* who wrote that "Andrew Sullivan, the *New York Times* columnist Paul Krugman, and the Pima County Sheriff Clarence Dupnik ***linked*** the shootings to Republican ideology or rhetoric, as expressed by former vice presidential candidate Sarah Palin…" (See **Exhibit 13**) (emphasis added) Mr. Sullivan's column asked Mr. Caldwell for "actual evidence" to support such a charge and then stated that Mr. Sullivan's "first personal judgment of any link between Loughner and the Tea Party is to *debunk* it." Mr. Sullivan then concluded with the following passage:

> Did I explore the issue of far right violence after Giffords' father cited the Tea Party? You bet I did. How could I not? Did I ever link the shootings to Republican ideology or rhetoric? Nope. Do I think such rhetoric is over the top in a world where crazy people have access to guns? Yes. Do I agree with Giffords that Palin's imagery was dangerous? Yes. But as for the motive of Loughner, by the time 6:32 p.m. comes along, I have concluded that this was likely a psychotic breakdown, and cited a psychiatrist to that effect, and specifically ended with the case that he is "of no party." How can I be accused of linking Loughner to the GOP when I specifically cite that he seems to be of "no party"?

> *The Financial Times* needs to run a correction.

67.      Given his role within *The Atlantic*, Mr. Bennet knew about, read and discussed the "*Caldwell's Unfairness*" column with Mr. Sullivan. The men were close friends and Mr. Sullivan was demanding a retraction from a fellow journalist for contending that Mr. Sullivan wrote that a "link" existed between "Republican… rhetoric, as expressed by Sarah Palin" and the Loughner's Shooting. As Editor-In-Chief of *The Atlantic*, Mr. Bennet's job required him to be aware of such facts. Moreover, Mr. Sullivan's column and demand for a retraction stood out

even more in Mr. Bennet's mind because of his close personal connection to and professional obligations to follow the Loughner Shooting.

68.     In a year-ending 2011 piece, "*Ten Days That Defined 2011*," (See **Exhibit 14**) *The Atlantic* plainly recognized (under Mr. Bennet's supervision, approval and stewardship) that it was wrong to link Gov. Palin to the Loughner Shooting:

> In a meta media sense, the bad thing to come out of this already terrible story was a round of blame hurling, with people rushing to point at Sarah Palin's infamous <u>target map</u> or Loughner's left seeming (but not really) anti-Bush sentiments.  In truth, Loughner is clinically insane and this was not really about politics at all.  That many, including us, immediately jumped to that conclusion says some pretty sorry things about the state or our political machine.

69.     Certainly, Mr. Bennet read, reviewed, edited and remembered *The Atlantic's* recap of the most important events in 2011, the most prominent of which is listed as the Loughner Shooting and refers to "pointing at Sarah Palin's infamous <u>target map</u>"[2] as "blame hurling."

70.     As a well-educated, seasoned journalist charged with chief editorial responsibility for *The Atlantic* and the "voice" of *The Times*, with a close personal and political connection to the Loughner Shooting and whether Gov. Palin or her political activities played and role in it, Mr. Bennet certainly would have committed to memory that no link between Gov. Palin or the Palin Map was ever established and that no evidence was unearthed to suggest that Gov. Palin "politically incited" Loughner's horrific crime.

71.     Without question, Mr. Bennet and his colleagues diligently searched for evidence and reports that established any such link or connection because uncovering such a connection would have validated Mr. Bennet's beliefs and opinions about the implications of violent

---

[2] "Target Map" is a hyperlink to *The Atlantic* article "Did Sarah Palin's Target Map play Role in Giffords Shooting?"

political rhetoric and the need for gun control.  In other words, Mr. Bennet certainly would know and recall whether a direct and clear link between Gov. Palin or the Palin Map and the Loughner Shooting had actually been established.

72.     In fact, Mr. Bennet's *Atlantic* recognized the opposite: the rank speculation about any such link or political incitement was quickly dispelled after the Loughner shooting (including by publications such as *The Times*) because Loughner's criminal proceedings revealed that he was a mentally unstable man who was obsessed with Representative Giffords long before 2011.

73.     However, the mere suggestion in 2011 that Gov. Palin provoked or incited Loughner's attack profoundly impacted her personal and professional life.  Among other things, it led to the end of her position as a Fox News political commentator, influenced her decision not to run for President of the United States, and tainted her personal and professional image.

74.     It took Gov. Palin years to overcome the detrimental impacts of the false speculation that she caused Loughner to commit murder.

**The Palin Effect**

75.     Unfortunately, members of the media (including Mr. Bennet and other members of *The Times'* Editorial Department) continued to perceive Gov. Palin as a convenient target for attacks against conservative policies and a subject likely to spark readership interest.  As set forth above, Mr. Bennet's *Atlantic* hounded Gov. Palin over issues such as "Trig-Trutherism" because such controversial attacks drove readership.

76.     *The Times* even recognized this phenomenon in Charles M. Blow's December 3, 2010 column "*She Who Must Not Be Named*" (attached as **Exhibit 15**):

> She was a vice presidential nominee. But she lost. She was the
> governor of Alaska. But she quit. Now she's just a political

personality — part cheerleader, part bomb-thrower — being kept afloat in part by the hackles of her enemies and the people who admire her resilience in the face of them. The left's outsize and unrelenting assault on her has made her a folk hero. The logic goes that if she's making people on the left this upset, she must be doing something right.

Yet the left continues to elevate her every utterance so that they can mock and deride her. The problem is that this strategy continues to backfire. The more the left tries to paint her as one of the "Mean Girls," the more the right sees her as "Erin Brockovich." The never-ending attempts to tear her down only build her up. She's like the ominous blob in the horror films: the more you shoot at it, the bigger and stronger it becomes.

Yes, she's about as sharp as a wet balloon, but we already know that. How much more time and energy must be devoted to dissecting that?  How is this constructive, or even instructive at this point?  ***What purpose does it serve other than inflaming passions to drive viewership and Web clicks?***

As Politico's editor in chief, John F. Harris, and its executive editor, Jim VandeHei, very candidly expressed in August: "More traffic comes from an item on Sarah Palin's 'refudiation' faux pas than from our hundreds of stories on the complexities of health care reform or Wall Street regulation."

So left-leaning blogs like The Huffington Post plaster pictures of her and her family all over their sites with entries about her latest gaffe or sideswipe. But she's barely mentioned on popular conservative blogs.

The same leftward skew is also true on television. An analysis of CNN, MSNBC and Fox News from Nov. 3 to Dec. 2, using data from ShadowTV, a monitoring service, found that CNN mentioned the name "Sarah Palin" nearly 800 times… Left-leaning MSNBC mentioned it nearly 1,000 times. But Fox News, which employs her, mentioned it fewer than 600 times…

People on the left seem to need her, to bash her, because she is, in three words, the way the left likes to see the right: hollow, dim and mean. But since she's feeding on the negativity, I suggest three other words: get over it.

(Emphasis added)

77.     Mr. Blow's column acknowledges what Mr. Bennet knows and felt when he wrote and edited the Palin Article:   hostility toward Gov. Palin and her beliefs, and that using her name and attacks upon her inflames passions and drives viewership and Web clicks to media companies—even when those attacks are not true and spark controversy; an effect Mr. Bennet knew well from Mr. Sullivan's attack against Gov. Palin over her son.

78.     Given his political beliefs and personal and professional disdain for the policies Gov. Palin endorses, as well as the information he learned while editing and running *The Atlantic*, Mr. Bennet was well-aware of the reality that Gov. Palin is an easy target for attacks against conservative politics who, at the same time, generates traffic to media websites.

79.     Mr. Bennet and *The Times* also appreciate in the increasingly competitive digital media landscape in which they find themselves that attacking Gov. Palin, whether justified or not, scores political points with readers and stirs controversy that drives viewership and brings an economic benefit to their business.   In fact, *The Times* utilizes software, programs, and/or applications to evaluate which topics generate the most traffic.

### The Defamatory Palin Article

A.     **The Predetermined Conclusion of the Palin Article**

80.     After the Hodgkinson shooting on the morning on June 14, 2017, *Times* Editorial Board member Elizabeth Williamson raised the idea that the board should comment on the shooting.

81.     Ms. Williamson, Mr. Bennet, and other Editorial Board members, editors and writers had a fair amount of back and forth over the course of the day about the points they wanted to make following the Hodgkinson shooting and ultimately arrived at three:  (1) to focus attention on the shooting; (2) to restate the longstanding position of *The Times'* Editorial Board

in favor of sensible gun control; and (3) to express concern about the state of "political rhetoric" in the country and of "political incitement;" the danger of increasingly treating political opponents like enemies in a conflict.  During that back and forth, communications must have been exchanged and discussions had about the truth of any claim that Gov. Palin incited Loughner's Shooting.

82.     Mr. Bennet tasked Ms. Williamson with drafting the editorial, and asked her to look back at editorials and Op-Ed columns that *The Times* had published in the immediate wake of the Loughner Shooting because Mr. Bennet knew and recalled that *The Times* (like his *Atlantic* during that time) had written about the Loughner Shooting and wanted to make sure that the editorial Ms. Williamson was drafting would be consistent with what *The Times* said following the Loughner Shooting.

83.     Specifically, Mr. Bennet wanted the research to focus on any conclusions *The Times* reached following the Loughner Shooting regarding the role of "political incitement."

84.     From the outset, Mr. Bennet's subjective intent was pre-determined to use the Loughner Shooting as the sole example of "political incitement" to advance a gun-control and anti-political rhetoric agenda, an intent presumably communicated to others within *The Times*.  Mr. Bennet did not care whether any political incitement, in fact, existed.  He merely wanted confirmation that the agenda he had already decided to promote was consistent with *The Times'* prior writings on gun control.  Simply stated, Mr. Bennet only cared about hypocrisy (i.e. whether *The Times* spoke out at all after the Loughner Shooting), not accuracy (i.e. what *The Times* and other media outlets actually said about the link).

85.     Based on his prior personal and professional experience and his actual knowledge of *The Atlantic's* publications and other media publications described in paragraphs 59-69,

above, Mr. Bennet already knew that there was no established connection or link between political rhetoric or "incitement" and Loughner's shooting, let alone any "clear" and "direct" link between Gov. Palin or the Palin Map and Loughner's horrific crime.

86.     That is why Mr. Bennet's intent when directing Ms. Williamson and a *Times* researcher to review prior *Times* publications was not to verify facts.  Mr. Bennet's intent was merely to verify whether *The Times* had criticized right-wing "incitement" in the context of the Loughner's Shooting because he was worried about being vulnerable to a charge of hypocrisy if he was silent on the topic in the wake of Hodgkinson's shooting.

87.     Thus, before Ms. Williamson had ever set pen to paper and any research had been conducted, Mr. Bennet already had made up his mind to use Gov. Palin as the only factual example of political incitement of a mass shooting—regardless of whether the facts supported his very serious charge.

88.     At Mr. Bennet's direction, *The Times* researcher reviewed some of *The Times'* editorials and Op-Ed columns about the Loughner Shooting.

89.     That research resulted in at least six editorials and one op-ed column (See Composite **Exhibit 16**) addressing political rhetoric and gun control in the context of the Loughner Shooting:

> (a)     "Bloodshed and Invective in Arizona," January 9, 2011;
>
> (b)     "As We Mourn," January, 12, 2011;
>
> (c)     "Gabby Giffords's Farewell," January 26, 2012;
>
> (d)     "6,000 Bullets," July 23, 2012;
>
> (e)     "Myths About Gun Regulation," January 31, 2013;
>
> (f)     "Democrats Find Their Voice on Gun Control," July 29, 2016; and

(g)    "No One Listened to Gabrielle Giffords," January 15, 2011.

90.    *The Times* researcher emailed the results of this search to Ms. Williamson and Mr. Bennet.

91.    Ms. Williamson, an experienced journalist who covered national politics and several congressional and presidential races (including Gov. Palin's 2008 campaign), reviewed the research compiled regarding *The Times'* prior editorials and op-ed columns on the Loughner Shooting.  She also conducted her own research about the subject.

92.    Through her prior professional experience and that research, Ms. Williamson knew that a link had never been established between Gov. Palin, the Palin Map or political incitement and Loughner's Shooting.

93.    That is why Ms. Williamson did not make such a knowingly false assertion about a link between Gov. Palin and the Loughner Shooting in the editorial she initially drafted.

94.    Ms. Williamson's initial draft (attached as **Exhibit 17**) was untitled, began with a factual account of the Hodgkinson shooting, and then followed with these pertinent passages:

> Just after 7 a.m. on Wednesday, members of Congress met in a quiet section of Alexandria, Va., to practice for this week's bipartisan congressional baseball game when James Hodgkinson appeared from behind the dugout, and began firing through the chain link fence.
>
> Mr. Hodgkinson was armed with a long rifle and "I think he had handguns as well," said Representative Jeff Flake of Arizona, who saw the gunman just as the shooting started. Mr. Hodgkinson fired at least 50 rounds at the group of congressmen, current and former staffers, who dove for cover or tried to crawl to safety. "He was hunting us," said Representative Mike Bishop, Republican of Michigan, who was at home plate when the gunman appeared. He seemed to be "double-tapping," the trigger, Mr. Bishop said, firing so rapidly "you couldn't get up and run." Senator Rand Paul of Kentucky, also at the field, told CNN it "was basically a killing field."

Security officers detailed to Representative Steve Scalise of Louisiana, the House majority whip, exchanged fire with Mr. Hodgkinson as Mr. Scalise, wounded, left a trail of blood as he combat-crawled to hide in taller grass. He is in critical condition after surgery on the bullet wound in his hip. The gunman was killed; in all five people were injured, including Capitol Police officers need to check/update

That in 10 minutes a single gunman could wreak such carnage in a bedroom community a short drive from the Capitol is horrifying, but no longer surprising. Not all the details are known yet, but a sickeningly familiar pattern is emerging: a deranged individual with a gun-perhaps multiple guns-and scores of rounds of ammunition uses politics as a pretense for a murderous shooting spree. Mr. Hodgkinson was a Bernie Sanders supporter and campaign volunteer virulently opposed to President Trump, who among many anti-Trump messages posted "Time to Destroy Trump & Co." on social media in March.

Just as in 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a nine year-old girl, Mr. Hodgkinson's rage was nurtured in a vile political climate. Then, it was the pro-gun right being criticized: in the weeks before the shooting Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs.

95.     The word "circulated" in Ms. Williamson's draft is a hyperlink to a January 9, 2011 ABC Article, "*Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate*," (See **Exhibit 18**) (the "ABC Article").   The ABC Article includes a prominently placed photo of Gov. Palin, disuses the Palin Map and plainly states:

No connection has been made between this graphic and the Arizona shooting, but it has put the Palin team somewhat on the defensive.

96.     Based on her own personal knowledge and having read the ABC Article that she hyperlinked as a source in her draft, Ms. Williamson knew that any assertion that there was a clear and direct link between Gov. Palin and Loughner's Shooting would be false.   Therefore,

she made no such assertion.  Likewise, because no evidence existed establishing a connection between Hodgkinson's shooting and political rhetoric, she did not make that assertion either.

97.     Instead, Ms. Williamson suggested that Hodgkinson used "politics as a ***pretense*** for a murderous shooting spree." (Ex. 17, emphasis added) "Pretense" means "a professed rather than real intention or purpose… a false showing of something."

98.     Ms. Williamson analogized the nurturing of Hodgkinson's rage in a "vile political climate" to the circumstances surrounding the Loughner Shooting—where the "pro-gun right [was] being criticized;" and so she cited Gov. Palin as an example of one who was being criticized at that time (2011).

99.     Ms. Williamson did, however, falsely state that the Palin Map "put Giffords and 19 other Democrats under stylized crosshairs."  *Id.*   The Palin Map depicted crosshairs over targeted electoral districts, not Rep. Giffords and other individual lawmakers.

**B.**     **Mr. Bennet's Defamatory Re-Write and Purposeful Avoidance of the Truth**

100.    Ms. Williamson sent her initial draft of the Palin Article to Mr. Bennet.

101.    Upon receipt, Mr. Bennet reviewed it and considered it very much a first draft because it did not accomplish the objectives he wanted to achieve.

102.    Mr. Bennet considered the first few passages of the draft unnecessary because they contained a summary of the news about the Hodgkinson shooting, which he knew *The Times* readers would already know by the time the editorial was published.  As an editorial, the column Mr. Bennet was working on was not "hot news."

103.    Mr. Bennet also did not like the way Ms. Williamson wrote about the connection between the Palin Map and the Loughner Shooting, so he decided to substantially re-write the editorial himself.

104.    Because *The Times* already had reported on the facts of the Hodgkinson shooting, the editorial Mr. Bennet was substantially re-writing was not "hot news" that had to be published immediately or on a deadline.  The points Mr. Bennet wanted to make could have waited to allow for a careful review for factual accuracy consistent with *The Times'*  and its' Editorial Board's practices and policies outlined in paragraphs 36-40, above.

105.    However, that review for factual accuracy did not happen because Mr. Bennet had already decided on the thesis he wanted to advance, with Gov. Palin as its sole factual predicate, and he wanted to advance his conclusion as quickly as possible.  To that end, Mr. Bennet willfully disregarded the truth, his own personal knowledge of the facts, *The Times'* research that he had ordered, Ms. Williamson's hyperlink to the ABC Article, and his Editorial Department's and *The Times'* policies and procedures on accuracy and fact-checking—so that he could immediately launch an attack on Gov. Palin and the policies she symbolizes because he was predetermined to make political points at her expense, regardless of the veracity of his serious charges against her.

106.    Mr. Bennet's malicious intent was rooted in his personal and professional animosity toward Gov. Palin and her politics (as detailed in paragraphs 45-53, above) which had grown to a boiling point while Mr. Bennet followed the 2016 presidential campaign and election, and then erupted in the defamatory Palin Article immediately following Hodgkinson's shooting.

107.    In fact, Mr. Bennet had already found his inspiration for his foregone conclusion about Gov. Palin and his eventual re-write of Ms. Williamson's draft in fellow-*Times* journalist, Thomas Friedman's, August 9, 2016 column, "*Trump's Wink Wink to 'Second Amendment People*," (See **Exhibit 19**) and its premise that "Donald Trump's language… could end up **inciting**… violence," akin to the "wave of toxic **incitement** against [Yitzhak] Rabin," which

included calls for Rabin's death prior to his assassination at a peace rally in 1995. (Emphasis added)

108.    As an editor, Mr. Bennet is in the business of knowing and understanding the meanings and significance of words and adjectives—so much so that he has spent the past eleven years correcting other journalists on their use.

109.    Mr. Bennet was calculated and deliberate in his decision to use a very strong phrase, "political incitement," as the label for Gov. Palin's political activities; and he did so because he wanted to drive home the horrific impact of the "clear [and] direct link" that he had already decided to profess to exist between Gov. Palin and Loughner's Shooting.

110.    When choosing to use the word "incitement," Mr. Bennet drew from his journalism experience in Jerusalem and intended "incitement" to mean "deliberate orders, invocations, summonses for people to carry out violent attacks."

111.    Having already determined the conclusion he wanted to make and the words he would use to describe it, Mr. Bennet willfully chose to ignore the truth—because the truth would not allow Mr. Bennet to make the point he had decided to make—and in so doing he intentionally defamed Gov. Palin.

C.    **The Defamatory Passages**

112.    On June 14, 2017, Mr. Bennet and *The Times* exceeded the bounds of legality, decency and civility by publishing the false and defamatory Palin Article, "*America's Lethal Politics,*" which was promptly Tweeted to nearly 39 million *Times* Twitter followers.  (See **Exhibit 20**).

113.   On June 15, 2017, *The Times* published the Palin Article in *The New York Times* print edition (See **Exhibit 2**).  The print edition did not contain any hyperlink or citation to the ABC Article.

114.   Mr. Bennet's underlying premise in the Palin Article professed that there is a "sickening pattern" of politically "incited" violence against members of Congress and that this pattern stems from Gov. Palin's direct and clear incitement of Loughner's  Shooting.

115.   Mr. Bennet and *The Times* fabricated this supposed "pattern" and Gov. Palin's role in it, resurrecting the false connection (which Mr. Bennet and *The Times* knew had been debunked) between Gov. Palin's political activities and Loughner's 2011 rampage in Arizona; thereby attacking the conservative policies Gov. Palin promotes, inflaming passions and driving digital advertising revenues at Gov. Palin's expense.

116.   There was no legitimate reason or factual basis for the defamatory statements in the Palin Article, much less for Mr. Bennet and *The Times* to have falsely linked Gov. Palin to Loughner's and Hodgkinson's shootings in any respect.

117.   In the Palin Article,  within the context of the fabricated pattern of politically motivated shootings, Mr. Bennet wrote and *The Times* published the following false and defamatory statements of and concerning Gov. Palin:

> Was this attack evidence of how vicious American politics has become?  Probably.  In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, the link to political incitement was clear.  Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.
>
> Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals.  They're right.  Though there's no sign of

incitement as direct as in the Giffords attack, liberals should of
course hold themselves to the same standard of decency that they
ask for of the right.

118.   Mr. Bennet knew the inflammatory consequences of using the phrases "Lethal
Politics," "political incitement," "direct link" and "clear link."   Mr. Bennet also knew that the
Palin Map did not put crosshairs over individual lawmakers.

119.   Nevertheless, these defamatory statements of and concerning Gov. Palin were
published and circulated to millions of *The Times'* readers in print, on-line and through mobile
and social media.

120.   The online version of the Palin Article included several advertisements, which
generated revenue for *The Times* (*See* online advertisements highlighted in **Exhibit 21**).   *The
Times* generates advertising revenue from banners, video, rich media and other interactive ads on
its web and mobile platforms; such as those that ran on the Palin Article.

121.   When Mr. Bennet re-wrote and *The Times* published the Palin Article, they knew
that there was no link or connection, let alone a "clear" and "direct" one, between Gov. Palin's
political activities and Loughner's Shooting.   They also knew that Gov. Palin did not
"incite" Loughner's horrific crime.

122.   As set forth in paragraphs 54-72, above, Mr. Bennet had actual knowledge of
numerous *Atlantic* articles confirming and the media's consensus that there was no direct and
clear link between Loughner's Shooting and Gov. Palin's political activities.

123.   In addition, on June 14, 2017, *The Times* published its article "*Shooting Is Latest
Eruption in a Grim Ritual of Rage and Blame*" (attached as **Exhibit 22**), which recognized:

> In 2011, the shooting of Mr. Giffords by a mentally ill assailant
> came during a convulsive political period, when a bitter debate
> over health care yielded a wave of threats against lawmakers.
> Sarah Palin, the former vice-presidential candidate, drew sharp

criticism for having posted a graphic online that showed cross hairs over the districts of several members of Congress; including Ms. Giffords—***though no connection to the crime was established***.

(Emphasis added)

124.    A June 15, 2017 column written by *The Times* Op-Ed columnist, Mr. Stephens, "'*The Indigenous American Berserk' Strikes Again"* (attached as **Exhibit 23**), which Mr. Bennet would have been involved in reviewing, editing and/or approving for publication, acknowledged the same:

> It was foul of the left to accuse the Tea Party of inciting Loughner's rampage—Bernie Sanders among them—all the more so since evidence for the claim was so strained.
> …
>
> Jared Loughner was a paranoid schizophrenic of no fixed ideological orientation.

125.    That same day, *The Times* published Op-Ed columnist Charles M. Blow's column "*Rhetoric and Bullets"* (attached as **Exhibit 24**) (another column which Mr. Bennet would have been involved in reviewing, editing and/or approving for publication), that recounts how, shortly after Loughner's 2011 attack, Mr. Blow was "moved to commit an entire column to condemning the left for linking the shooting so closely to political rhetoric," and how he felt compelled to do the same thing on the heels of Hodgkinson's Virginia shooting because:

> What I abhor is ideological exploitation that reduces these acts to a political sport and uses them as weapons to silence political opponents and their "rhetoric," rather than viewing them as American tragedies that we can work together to prevent through an honest appraisal and courageous action.

126.    The "entire column" to which Mr. Blow referred in his June 15, 2017 column was published by *The Times* just days after Loughner's 2011 rampage, and dispelled any notion that Loughner's crime was incited by political rhetoric.  Mr. Blow's January 14, 2011, column "*The*

*Tucson Witch Hunt*" (attached as **Exhibit 25**), would have been amongst the Op-Ed columns

researched at Mr. Bennet's direction on June 14, 2017, and provides as follows:

> Immediately after the news broke, the air became thick with conjecture, speculation and innuendo.  There was a giddy, almost punch-drunk excitement on the left.   The prophecy had been fulfilled: "words have consequences."   And now, the right's rhetorical chickens had finally come home to roost.
>
> The dots were too close and the temptation to connect them too strong.  The target was a Democratic congresswoman.  There was the map of her district in the cross hairs.  There were her own prescient worries about overheated rhetoric.
>
> Within hours of the shooting, there was a full-fledged witch hunt to link the shooter to the right.
>
> "I saw Goody Proctor with the devil!  Oh, I mean Jared Lee Loughner!  Yes him.  With the devil!"
>
> ***The only problem is that there was no evidence then, and even now, that overheated rhetoric from the right had anything to do with the shooting.  (In fact, a couple of people who said they knew him have described him as either apolitical or "quite liberal.")  The picture emerging is of a sad and lonely soul slowly, and publicly, slipping into insanity.***

(Emphasis added)  Certainly, the research Mr. Bennet ordered on June 14, 2017

would have found Mr. Blow's *"The Tucson Witch Hunt"* op-ed column.

127.    Another *Times* January 15, 2011 article, "*Looking Behind the Mug-Shot Grin*"

(attached as **Exhibit 12**), which was cited by *Atlantic* articles published under Mr. Bennet's

authority (See paragraphs 63-64, above) also recognized that no direct or clear link between

political rhetoric and Loughner's actions could be claimed:

> Since last Saturday's shooting frenzy in Tucson, investigators and the news media have spent the week frantically trying to assemble the Jared Loughner Jigsaw puzzle in hopes that the pieces will fit, a clear picture will emerge and the answer to why will be found, providing the faint reassurance of a dark mystery solved.

Instead, the pattern of facts so far presents only a lack of one, a curlicue of contradictory moments open to broad interpretation. Here he is, a talented saxophonist with a prestigious high school jazz band, and there he is, a high school dropout.  Here he is, a clean-cut employee of an Eddie Bauer store, and there he is, so unsettling a presence that tellers at a local bank would feel for the alarm button when he walked in.
…

What the cacophony of facts do suggest is that Mr. Loughner is struggling with a profound mental illness (most likely paranoid schizophrenia, many psychiatrists say); that his recent years have been marked by a stinging rejection—from his country's military, his community college, his girlfriends and, perhaps, his father; that he, in turn, rejected American society, including its government, its currency, its language, even its math.  Mr. Loughner once declared to his professor that the number 6 could be called 18.
...
In the last three months, Mr. Loughner had a 9-millimeter bullet tattooed on his right shoulder blade and turned increasingly to the Internet to post indecipherable tutorials about the new currency, bemoan the presence of illiteracy and settle scores with the Army and Pima Community College, both of which had slammed him. He also may have felt rejected by the American government in general, and by Ms. Giffords in particular, with whom he had a brief—and, to him, unsatisfactory—encounter in 2007.

128.   *The Times'* Editorial Board, including Mr. Bennet, Ms. Williamson, and the other writers, editors and staff who worked on the Palin Article, all followed Loughner's criminal case closely and knew about the facts it revealed.  *The Times, The Atlantic* and the other media outlets that they followed all reported regularly about the case.  Those investigations, proceedings, and reports failed to unearth any evidence that Loughner's actions were politically motivated, let alone "incited" by Gov. Palin or the Palin Map.  In fact, there is no evidence to suggest that Loughner ever saw the Palin Map.  Such evidence about a fact as important as a direct and clear link between Gov. Palin and incitement of the Loughner Shooting is not something that any journalist—particularly Mr. Bennett—would forget.

129.    To the contrary, the well-known media consensus was what   Mr. Bennet's *Atlantic* recognized in 2011:  "Loughner is clinically insane and this was not really about politics at all."

130.    And yet, Mr. Bennet decided to move forward with his incendiary, false charges against Gov. Palin.

### *The Times* Concedes the Falsity of the Palin Article— ###
### <u>But Does Not Meaningfully Retract It or Apologize</u> ###

131.    Soon after the Palin Article was published, *The Times* was hit by public backlash from its readers and even liberal-leaning media outlets over falsely stating that Gov. Palin incited Loughner to commit murder.

132.    This public backlash took Mr. Bennet by surprise.  He never expected to be called out for attacking Gov. Palin, even if Mr. Bennet's claim of a direct and clear link was false.

133.    Motivated not by remorse over defaming Gov. Palin or over falsely asserting that she incited Loughner's Shooting, Mr. Bennet set out to do as little as possible to save face amongst *Times* readers and his colleagues.

134.    First, he tried to quietly save face by editing the Palin Article online.  When that failed to quell the outcry, he and *The Times* made further edits to the Palin Article and posted two woefully insufficient online "corrections" and an "apology" — to *The Times'* readers, not to Gov. Palin.

135.    The first edit merely deleted the phrase "the link to political incitement was clear" from the end of the following sentence:  "In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl."  It also added the words:  "But no connection to that crime was ever established."  *The Times* left in place, however, an inconsistent and defamatory

sentence in the next paragraph of the column, which stated:   "*Though there's no sign of incitement as direct as in the Giffords attack*, liberals should of course hold themselves to the same standard of decency that they ask of others."  (Emphasis added)

136.    Faced with continuing public and media criticism, *The Times* then deleted the phrase, "[t]hough there's no sign of incitement as direct as in the Giffords attack…" while adding a half-hearted correction (the "First Attempted Correction") written in a passive voice about the "link" between "political incitement" and Loughner's heinous crime:

**Correction: June 15, 2017**
*An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established.*

137.    The First Attempted Correction did not remove the unnecessary reference in the column to Gov. Palin, even though there was no established connection between "political incitement" and Loughner's crime.  As written, it also suggests that such a connection may still be established, when Mr. Bennet and *The Times* already knew that no such link existed. Moreover, the First Attempted Correction made no mention of Gov. Palin, while the column continued to reference her by name.

138.    Given that Mr. Bennet's entire premise in re-writing the Palin Article was the "sickening pattern" of politically incited violence that emanated from a fabricated link between Gov. Palin and Loughner's 2011 crime, which *The Times* conceded did not exist, the entire Palin Article should have been retracted—not minimally and inadequately corrected.

139.    Instead, *The Times* published a second online correction (which proved equally lacking), but only after it was called out by CNN for falsely asserting that the Palin Map placed crosshairs over individual lawmakers and, specifically, Rep. Giffords.  Still devoid of any

reference to Gov. Palin, this second correction (the "Second Attempted Correction") addressed the mischaracterization of the map of targeted electoral districts as placing stylized cross hairs on Gabrielle Giffords and other lawmakers *individually* and changed the word "incitement" to "rhetoric."

> ## Correction: June 16, 2017
> *An editorial on Thursday about the shooting of Representative Steve Scalise incorrectly stated that a link existed between political rhetoric and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established. The editorial also incorrectly described a map distributed by a political action committee before that shooting. It depicted electoral districts, not individual Democratic lawmakers, beneath stylized cross hairs.*

140.     By referring only to "a" political action committee, *The Times'* Second Attempted Correction continued the paper's steadfast refusal to acknowledge and correct that it had falsely asserted that Gov. Palin incited Loughner's deadly rampage.

141.     *The Times* and Mr. Bennet simply refused to meaningfully apologize to Gov. Palin for what they had done.

142.     Instead, in a reflection of *The Times'* and Mr. Bennet's utter lack of concern for the harm they had inflicted, *The Times'* Editorial Page tweeted "We're sorry about this and we appreciate that our readers called us on the mistake;" as if *The Times* had made a simple, ministerial error such as misspelling someone's name or getting a date wrong:



143.    *The Times* never issued a full and fair retraction of its defamatory Palin Article and never issued any apology to Gov. Palin for stating that she incited murder.

144.    For *The Times* to have made a legally sufficient retraction, it would have to have issued it in such a manner as to manifest an honest intention and sincere effort to repair the harm done to Gov. Palin.  It did not.

145.    To do so would have required a complete retraction free from insinuations and hesitant withdrawals.   Quite simply, a full, fair and legally sufficient retraction would have required the removal of the Palin Article in its entirety because, absent the false and defamatory assertion that Gov. Palin incited Loughner's  Shooting and absent the admittedly false assertion that Hodgkinson's "rage had found its fuel in politics," *The Times'* continued assertion that

Gov. Palin is part of a "pattern" of politically motivated crimes emanating from "lethal Politics" is false and indefensible.

146.    *The Times'* hesitant, equivocal and incomplete acknowledgement of the falsity of its statements linking Gov. Palin to Loughner's crime and the undeniable truth that Loughner's Shooting was not politically incited, did not approach the degree of the retraction and apology necessary and warranted by *The Times'* false assertion that Gov. Palin incited a mass shooting and murder.

147.    On June 16, 2017, *The Times'* refusal to accept responsibility continued when, in its print edition of *The New York Times*, *The Times* merely re-published at the bottom of its Editorial Page, in fine print, the same two prior, inadequate online corrections—completely devoid of any reference or apology to Gov. Palin.

148.    Incredibly, Mr. Bennet and *The Times* confirmed that they would not accept responsibility for the defamatory Palin Article in a statement provided to CNN, in which Mr. Bennet said:

> While it is always ***agonizing*** to get something wrong we appreciate it when our readers call us out like this.  We made an ***error of fact*** in the editorial and we've corrected it.  ***But that error doesn't undercut or weaken the argument of the piece.***

(Emphasis added)

149.    Mr. Bennet's statement demonstrates that, when it comes to Gov. Palin, he and *The Times* are willing to operate with a purposeful avoidance of the truth—marked by a deliberate decision not to acknowledge facts confirming the falsity of the grave charges they cast against Gov. Palin.

150.    *The Times'* unwavering refusal to issue a meaningful apology to Gov. Palin and a complete retraction is not surprising given *The Times'* public pronouncements about its

imperviousness to legal liability for libel.  As recently as May 10, 2017, *The Times'* Public Editor,[3] Liz Spayd, touted that "hardly anyone jousts with *The Times* when it comes to formally asserting libel…[because]…When they do, they almost never win….[and that]… the last time the newspaper lost a libel suit in the United States was at least the early 1960s" (*see* **Exhibit 26**), while further noting:

> But it's curious how few companies or individuals actually do sue the paper for allegedly libelous claims.  That's a good thing if this is a measure of how rarely people feel defamed by *The Times*.  It's a bit more disconcerting if it suggests that those with a legitimate claim feel too intimidated to even try.

## ACTUAL MALICE

151.   Mr. Bennet and *The Times* published the defamatory Palin Article with actual knowledge of its falsity or reckless disregard for the falsity of the statements made about Gov. Palin.

## A.   Actual Knowledge of Falsity

152.   Mr. Bennet had actual knowledge that the false and defamatory statements he wrote and *The Times* published about Gov. Palin were untrue.  As set forth in paragraphs 45 – 53 and 57 - 70, above, Mr. Bennet knew and had significant personal and professional motivation to and actually did commit to memory that Gov. Palin and the Palin Map did not incite Loughner's Shooting.

153.   Mr. Bennet read, reviewed, edited and approved for publication numerous articles in *The Atlantic* which established that there was no established link between the Palin Map and Loughner's crime. Mr. Bennet knew about and recalled those articles when he wrote the Palin Article.

---

[3]   *The Times'* Public Editor evaluates journalistic integrity and examines both the quality of journalism and the standards being applied across the newsroom.

154.    Mr. Bennet also read, reviewed and approved for publication Mr. Sullivan's column, "*Caldwell's Unfairness*," which specifically demanded a retraction from another journalist for accusing Mr. Sullivan *of saying* there was a "link" between Gov. Palin or political rhetoric and the Loughner Shooting.

155.    Moreover, because of his close personal and political ties to the Loughner Shooting and the issues of gun control and political rhetoric, Mr. Bennet knew about, closely followed, read about and committed to memory *The Atlantic's* publications and other news reports about the events surrounding the Loughner Shooting and, in particular, the consensus that no link was established between the Palin Map and Loughner's crime.

156.    When he re-wrote Ms. Williamson's draft and added his passages about "lethal politics," "political incitement," and existence of the "clear and direct link" between Gov. Palin and Loughner, Mr. Bennet knew that he was making definitive statements of fact, but cited no sources establishing Gov. Palin's clear and direct link to and incitement of Loughner's Shooting.

157.    Even though the charges Mr. Bennet was making against Gov. Palin were extremely serious and easily verifiable, Mr. Bennet did not read or review the hyperlinked ABC Article, the other research his staff compiled or any of the numerous other articles about the charges he was making against Gov. Palin, all of which were easily and instantaneously available by searching *The Times'* website (an Editorial Department practice for fact-checking every editorial column) because he knew they would show that there was no connection between Gov. Palin and Loughner.

158.    Instead, Mr. Bennet and *The Times* deliberately ran the Palin Article knowing that the statements made about Gov. Palin were false and defamatory.

**B.    <u>Reckless Disregard</u>**

159.     Alternatively, Mr. Bennet and *The Times* published the Palin Article with reckless disregard for and a purposeful avoidance of the truth.

160.     Mr. Bennet was outraged over the Hodgkinson shooting and the inability to implement gun control and quell political rhetoric in the years since the Loughner Shooting.  Mr. Bennet was further enraged by the current president and his rhetoric (*i.e.,* Friedman's 8/9/16 column, as referenced in paragraph 107, above).  So, Mr. Bennet decided to use the Hodgkinson shooting as a pulpit to re-affirm his predetermined narrative about political rhetoric and gun control and to use Gov. Palin as its only factual support.

161.     Mr. Bennet also made the conscious decision to use the incendiary label of political "incitement" to encapsulate his false assertion of a clear and direct link between Gov. Palin and Loughner in order to emphasize the seriousness of the charge he was making against Gov. Palin.  The seriousness of that charge — that Gov. Palin's Map was akin to "deliberate orders, invocations, summonses for people to carry out violent attacks" and directly and clearly linked to Loughner's Shooting  — made fact-checking it even more important.

### 1.   Preconceived Storyline and Avoidance of Contradictory Information

162.     Mr. Bennet's personal, political and professional motivations and ill-will toward Gov. Palin's politics led him to ignore facts of which he already had knowledge and facts which were easily, instantly and readily available; and also drove him to ignore and to refuse to even look at the hyperlinked ABC Article and the research compiled by his *Times* staff, all of which refuted the false assertions Mr. Bennet made about Gov. Palin.

163.     As set forth above in paragraphs 81-93 and 104-111, Mr. Bennet had a predetermined and preconceived plan to attack Gov. Palin and conceived his storyline about her in advance.

164.    Mr. Bennet knew that fact-checking would only undermine his pre-determined conclusion and prevent him from using Gov. Palin as the sole factual predicate for the points he was trying to make, so he consciously avoided evidence that would contradict his preconceived storyline.

2.    **Bias and Ill Will**

165.    As set forth in paragraphs 41-53, above, Mr. Bennet held deep-seeded animosity and ill-will toward Gov. Palin and the political views she symbolized, and had a history of allowing his publication attack Gov. Palin (i.e. "Trig-Trutherism").

166.    Moreover, Mr. Bennet and other members of *The Times'* Editorial Department Gov. Palin was as a convenient target for attacks against conservative policies who also inflames passions and drives viewership, as set forth in paragraphs 75-79, above.

167.    Mr. Bennet also knew, based on his professional experience, that controversy — even over false allegations — also drives readership and brings an economic benefit to his publications, as alleged in paragraphs 44, 55-57 and 79, above.

168.    In addition to profit  motive and the desire to use Gov. Palin's name to stir controversy and drive readership, Mr. Bennet held deep-seeded hostility and ill-will toward Gov. Palin based on his long association with liberal publications, personal connections to the Loughner Shooting and his brother's adversarial relationship with Gov. Palin, as well as his ardent political views on gun control and political rhetoric and his personal politics and his family's political background.

3.    **Grossly Inadequate Investigation About Serious Charge Under No Time Pressure**

169.    Mr. Bennet authored defamatory passages that directly and in no uncertain terms made very serious charges against Gov. Palin in an editorial column which by its very nature and

under the circumstances was not "hot news."  Mr. Bennet was under no legitimate time pressure to publish the Palin Article before fact-checking it.

170.    Despite the seriousness of asserting that Gov. Palin politically incited one of the most infamous mass shootings in American history, Mr. Bennet and *The Times* failed to take even the most basic steps to investigate and test the accuracy of their false and defamatory statements, such as looking at the hyperlinked ABC Article in Ms. Williamson's draft or any of the research Mr. Bennet ordered to be completed.

171.    In Fact, Mr. Bennet did not fact-check the single factual example of the "sickening" pattern of politically incited violence against members of congress upon which his thesis was based because he knew that a fact-check would confirm that there was no link between Gov. Palin and Loughner's Shooting (thus contradicting his preconceived storyline).

172.    Thus, Mr. Bennet and *The Times* engaged in highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.

### 4.   Obvious Reason to Question Falsity

173.    Mr. Bennet's and *The Times'* failure to investigate is further compounded by the inherent improbability of and obvious reasons to doubt the veracity of the charges they made against Gov. Palin.

174.    Amongst journalists — particularly those holding political views such as those of Mr. Bennet — it was common knowledge (even in 2011) that no link between the Palin Map and Loughner's Shooting was ever established.

175.    In fact, if a "clear" and "direct" link between Gov. Palin and Loughner's Shooting had been made, it would be something that would have been highly publicized and well-known

to any journalist — particularly one with the personal connections, political views and high-ranking media positions that Mr. Bennet held.

176.     Thus, the nature and severity of the false statements about Gov. Palin were such that Mr. Bennet and *The Times* did, in fact, entertain serious doubts as to their truth and/or such that they published them with a high degree of awareness of their probable falsity.

### 5.   Failure to Adhere to Journalistic Policies

177.     Mr. Bennet and *The Times* also failed to comply with their own policies, practices and standards by failing to engage in well-established, "rudimentary" practice of fact-checking of the Palin Article— at a time when *The Times* and Mr. Bennet openly acknowledged the importance of accuracy and *The Times* was marketing itself to the public as a purveyor of absolute "TRUTH."

178.     As set forth in paragraph 40, above, Mr. Bennet was personally responsible for the content and accuracy of every editorial —particularly those he wrote and edited.  And Mr. Bennet claimed in April 2017 that his Editorial Department adhered to the same standards for fairness and accuracy as *The Times* news reporting side.

179.     However, in this instance, Mr. Bennet turned a blind-eye to *The Times'* own policies and procedures, which forbid his conduct and label it "intolerable."

180.     In its handbook entitled "Ethical Journalism: A Handbook of Values and Practices for the News and Editorial Departments"[4] (attached as **Exhibit 27**), *The Times* mandates that:

> Reporters, editors, photographers and all members of the news
> staff of The New York Times share a common and essential

---

[4]  The journalistic standards spelled out in *The Times* 1999 "Guidelines on Our Integrity" are a supplement to its 2004 Handbook, and provide that: "… it is imperative that The Times and its staff maintain the highest possible standards… [and that]… falsifying any part of a news report cannot be tolerated and will result automatically in disciplinary action up to and including termination."

interest in protecting the integrity of the newspaper.  As the news, editorial and business leadership of the newspaper declared jointly in 1998: 'Our greatest strength is the authority and reputation of The Times.  We must do nothing that would undermine or dilute it and everything possible to enhance it.'

…

The Times treats its readers as fairly and openly as possible.  In print and online, we tell our readers **the complete, unvarnished truth as best we can learn it.**  It is our policy to correct our errors, large and small, as soon as we become aware of them.

…

Staff members who plagiarize or **who knowingly or recklessly provide false information for publication betray our fundamental pact with our readers.  We will not tolerate such behavior.**

(Emphasis added)

181.    Mr. Bennet also ignored and violated *The Times'* Standards and Ethics policy,

which is posted online (attached as **Exhibit 28**), and states in pertinent part:

**Fairness**
The goal of The New York Times is to cover the news as impartially as possible—"without fear or favor," in the words of Adolph Ochs, our patriarch—and to treat readers, news sources, advertisers and others fairly and openly, and to be seen to be doing so.  The reputation of The Times rests upon such perceptions, and so do the professional reputations of its staff members.  Thus The Times and members of its news department and editorial page staff share an interest in avoiding conflicts of interest or an appearance of conflict.

**Integrity**
For more than a century, men and women of The Times have jealously guarded the paper's integrity.  Whatever else we may contribute, our first duty is to make sure the integrity of The Times is not blemished during our stewardship.  At a time of growing and even justified public suspicion about the impartiality, accuracy and integrity of some journalists and some journalism, it is imperative that The Times and its staff maintain the highest possible standards to insure that we do nothing that might erode readers' faith and confidence in our news columns.  This means that the journalism we practice daily must be beyond reproach.

Because our voice is loud and far-reaching, The Times recognizes an ethical responsibility to correct all its factual errors, large and small. The paper regrets every error, but it applauds the integrity of a writer who volunteers a correction of his or her own published story. We observe the Newsroom Integrity Statement, promulgated in 1999, which deals with such rudimentary professional practices as the importance of checking facts, the exactness of quotations, the integrity of photographs and our distaste for anonymous sourcing.

**Truth**

As journalists we treat our readers, viewers, listeners and online users as fairly and openly as possible. Whatever the medium, we tell our audiences the complete, unvarnished truth as best we can learn it. We correct our errors explicitly as soon as we become aware of them. We do not want for someone to request a correction. We publish corrections in a prominent and consistent location or broadcast time slot. Staff members who plagiarize or who knowingly or recklessly provide false information for publication betray our fundamental pact with our readers. We do not tolerate such behavior.

182.    Mr. Bennet likewise ignored and violated the Society of Professional Journalists' Code of Ethics (attached as **Exhibit 29**), followed by *The Times* and also published on its website, which states in pertinent part:

**Seek Truth and Report It**

Journalists should be honest, fair and courageous in gathering, reporting and interpreting information.

Journalists should:

- Test the accuracy of information from all sources and exercise care to avoid inadvertent error. Deliberate distortion is never permissible.

- Diligently seek out subjects of news articles to give them the opportunity to respond to allegations of wrongdoing.

- Distinguish between advocacy and news reporting. Analysis and commentary should be labeled and not misrepresent fact or context.

…

**Minimize Harm**

Ethical journalists treat sources, subjects and colleagues as human beings deserving of respect.

Journalists should:

- Show compassion for those who may be affected adversely by news coverage.

183.    Worse yet, Mr. Bennet even ignored his own Editorial Department's practices and policies, which are more-fully described in paragraphs 36-40, above.

184.    Specifically, Mr. Bennet did not ensure that what he was representing as fact about Gov. Palin was correct and he did not fact-check his re-write.

185.    Mr. Bennet also failed to follow any of the basic steps to ensure the accuracy of the Palin Article, steps which he expects of all of his editorial writers.  He did not read each sentence of his re-write and ask himself: Is this true?  Can I defend it?  Did I get the facts exactly right?

186.    Mr. Bennet's and *The Times'* failures to follow "rudimentary" fact-checking practices are only compounded by the seriousness of the charges Mr. Bennet made against Gov. Palin.

187.    As recognized by his good friend, Mr. Sullivan, Mr. Bennet's first instinct should have been to debunk any supposed "link" between the Palin Map and the Loughner Shooting. Instead, Mr. Bennet did the opposite.

188.    In publishing the Palin Article and their half-hearted "corrections" and apology—instead of removing the entire article or, at the very least, all references in it to Gov. Palin, and making a meaningful and sincere public apology to Gov. Palin—Mr. Bennet and *The Times*

violated and blatantly ignored all of their own practices and policies and the basic standards of ethical journalism which they have adopted, expect others to abide by and use to market themselves to the public.

### *The Times* Should Not Profit At Gov. Palin's Significant Expense

189.   In the Palin Article and the way in which *The Times* and Mr. Bennet handled it in the days following its publication, profit, ill-will, hostility and politics took precedence over their self-professed principles.

190.   This is particularly troubling given that *The Times* had just unleashed its "Truth" advertising campaign and, on November 13, 2016, had pledged to rededicate itself to the "fundamental mission" of *The Times* journalism (the "Pledge"):

> That is to report to America and the world honestly, without fear or favor, striving always to understand and reflect all political perspectives and life experiences in the stories that we bring to you.   It is also to hold power to account, impartially and unflinchingly.

191.   In this instance, *The Times* (including Mr. Bennet) is the power that must be held to account and, consistent with its Pledge, should accept full economic and journalistic responsibility to Gov. Palin for the falsehoods in the Palin Article and the failure to meaningfully retract it and issue a full and complete apology to Gov. Palin.

192.   As set forth above, Mr. Bennet and *The Times* know that Gov. Palin is a proverbial "lightning rod" that can be used as an easy target for political barbs intended to inflame passions to generate website traffic.   Mr. Bennet also knows that controversy sells.

193.   In fact, Mr. Bennet, by virtue of his roles at *The Atlantic* and *The Times*, knew that he could, and he actually did, use controversy to drive viewership.

194.   Mr. Bennet and *The Times* also knew that the defamatory statements about Gov. Palin would be viewed by millions of people and republished by numerous other news

outlets and websites, both because of the horrific conduct *The Times* ascribed to Gov. Palin in connection with the most prominent news story of that day; and also because such re-publication is a part of *The Times'* conscious business strategy.

195.    *The Times* actively promoted the Palin Article on social media, including on its Twitter feed, which has over 38 million followers, as did *The Times'* Editorial Board, whose Twitter feed has nearly 600,000 followers.

196.    Not surprisingly, the widely circulated and heavily promoted Palin Article resulted in hatred and hostility toward Gov. Palin.

197.    As one example, a democratic strategist seized on *The Times'* narrative about Gov. Palin, tagging Gov. Palin in a Tweet about the false link between Gov. Palin and the Giffords shooting along with the hash tag "#HuntRepublicans."

198.    As set forth in the above referenced ethical policies and standards, which *The Times* and Mr. Bennet adopted and expect of themselves and others, "Ethical journalists treat… subjects… as human beings deserving of respect."

199.    Gov. Palin, regardless of her political views, is first and foremost a human being, whom *The Times* and Mr. Bennet did not treat with respect in the Palin Article and its aftermath.

200.    Anyone would be devastated by being falsely labeled an inciter of the murder of six people, including a nine-year-old girl.  Apparently, *The Times* and Mr. Bennet forgot or simply did not care in this instance that Gov. Palin is no different than any other human being.

201.    When *The Times* and Mr. Bennet resurrected a 6-1/2 year-old false narrative about Gov. Palin, they not only ripped open old wounds, but also used their loud and "far reaching voice" to inflict new ones which are far worse and painful for Gov. Palin.

202.    As a direct and proximate result of *The Times'* and Mr. Bennet's intentional and malicious misconduct, Gov. Palin suffered anguish, humiliation, embarrassment, and damage to her reputation—all of which are continuing in nature and will be suffered in the future.  Gov. Palin is entitled to recover for these harms, as well as damages for the cost of repairing her reputation and/or the cost of correcting the defamatory statement.

203.    As a direct and proximate result of *The Times'* and Mr. Bennet's intentional and malicious misconduct, and their deliberate misuse of the known benefits of Gov. Palin's name and status, *The Times* reaped ill-gotten gains from Internet advertising on the Palin Article, which under the unique and special circumstances of this case, it should not be permitted to retain.

204.    *The Times* should not be permitted to profit from a false and defamatory column printed with actual malice and with the knowledge that because of the identity of the victim of the publication it will inevitably "drive viewership and web clicks."

205.    All conditions precedent to the filing and maintenance of this action have been performed, have occurred or have been waived.

## Cause of Action
### (Defamation)

206.    Gov. Palin re-alleges and incorporates paragraphs 1 through 205.

207.    *The Times* and Mr. Bennet published or caused to be published false and defamatory statements in the Palin Article, which did and had the tendency to expose Gov. Palin to hatred, contempt, ridicule and/or disgrace.

208.    The defamatory statements in the Palin Article are of and concerning Gov. Palin, and reasonably understood to be about Gov. Palin.

209.    The defamatory statements in the Palin Article are false.

210.    *The Times* and Mr. Bennet published the defamatory statements in the Palin Article knowing that they are false or with reckless disregard for the truth of the statements.

211.    The defamatory statements in the Palin Article constitute defamation *per se* because they tended to injure Gov. Palin in her trade, business or profession and directly implicated Gov. Palin in a horrific crime, including that she and her virtual presence incited a politically motivated assault upon and murder of innocent victims that included sitting federal officials and a 9-year-old girl.

212.    In light of Gov. Palin's standing in the community, the nature of the statements made about her, the extent to which those statements were circulated, and the tendency of such statements to injure someone such as Gov. Palin, the defamatory statements in the Palin Article have directly and proximately caused Gov. Palin to suffer significant damages, including damage to her reputation, humiliation, embarrassment, and mental anguish, all of which are ongoing in nature and will be suffered in the future.  Also, Gov. Palin is entitled to recover damages for the costs associated with repairing her reputation and/or correcting the defamatory statement.

213.    The re-publication of the defamatory statements in the Palin Article in other publications, as well as via the dissemination of the Palin Article through social media, caused Gov. Palin to suffer additional damages; all of which were foreseeable to Mr. Bennet and *The Times*.

214.    *The Times* and Mr. Bennet published the Palin Article with actual knowledge that stories attacking Gov. Palin inflame passions, which drives viewership and Web clicks.  Thus, *The Times* and Mr. Bennet knowingly and voluntarily exploited and retained a benefit conferred by Gov. Palin, in special circumstances particular to this case in which it would be inequitable for *The Times* to retain that benefit without paying the value thereof to Gov. Palin.

215.    The facts and circumstances at issue in this case present a unique and special situation in which the "broad and flexible" equitable remedy of unjust enrichment should be applied.

216.    Unjust enrichment is premised upon equitable principles and governed by "broad considerations of right, justice and morality."

217.    The essential inquiry in any action for restitution is whether it is against equity and good conscious to permit the defendant to retain what is sought to be recovered.

218.    *The Times*' and Mr. Bennet's tortious conduct alleged herein presents special circumstances in which it would be inequitable and unjust to allow *The Times* to retain the advertising revenue generated from the defamatory Palin Article without paying Gov. Palin the value thereof.

219.    As a direct and proximate result of *The Times*' and Mr. Bennet's inequitable, unjust and tortious conduct, Gov. Palin is entitled to restitution in the form of *The Times'* advertising revenues attributable to the Palin Article.

220.    *The Times* and Mr. Bennet's conduct was committed knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm Gov. Palin, or in blatant disregard of the substantial likelihood of causing her harm, thereby entitling Gov. Palin to an award of punitive damages.

221.    As a direct and proximate result of *The Times'* and Mr. Bennet's misconduct, Gov. Palin is entitled to compensatory, special and punitive damages in an amount to be proven at trial far in excess of $75,000.00.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, Sarah Palin, demands judgment against Defendants, The New

York Times Company and James Bennet, as follows:

i. An award of compensatory, special and punitive damages in appropriate amounts to be established at trial;

ii. Injunctive relief prohibiting the publication or republication of the defamatory statements in the Palin Article;

iii. An award of Plaintiff's costs associated with this action, including but not limited to her reasonable attorneys' fees and expenses; and

iv. Such other and further relief as the Court deems just and appropriate to protect Plaintiff's rights and interests.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated:  New York, New York
   December 30, 2019

*/s/ Shane B. Vogt*
Kenneth G. Turkel (admitted *pro hac vice*)
Email:  kturkel@bajocuva.com
Shane B. Vogt (admitted *pro hac vice*)
Email:  svogt@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 443-2199
Facsimile: (813) 443-2193

S. Preston Ricardo
E-mail:  pricardo@golenbock.com
GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile: (212) 754-0330

*Attorneys for Plaintiff*