**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X
                                                     :

SARAH PALIN                                :    No. 17 Civ. 4853 (JSR)

                Plaintiff,         :

                                :    ECF Case

              -against-         :

                                :

THE NEW YORK TIMES COMPANY and JAMES    :
BENNET,

                Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF <u>THEIR MOTION FOR SUMMARY JUDGMENT</u>

Jay Ward Brown
David L. Axelrod
Thomas B. Sullivan
Jacquelyn N. Schell
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

*Counsel for Defendants*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ......................................................................................1

FACTUAL BACKGROUND............................................................................................2

A.      The Crosshairs Map ..........................................................................................2

B.      Drafting Of The Editorial...................................................................................4

         1.      *Research*............................................................................................4

         2.      *Initial Draft* ......................................................................................6

C.      The Editorial .....................................................................................................7

D.      Criticism Of The Editorial And The Times's Response.....................................8

E.      The Times Corrects The Editorial.....................................................................11

F.      This Litigation ..................................................................................................11

ARGUMENT .................................................................................................................12

I.       PALIN CANNOT DEMONSTRATE THAT BENNET WAS AWARE
BEFORE PUBLICATION THAT THE EDITORIAL COULD BE READ
TO ALLEGE THAT THE CROSSHAIRS MAP CAUSED THE
LOUGHNER SHOOTING AND THAT PALIN WAS PERSONALLY
RESPONSIBLE FOR IT.....................................................................................14

II.      PALIN CANNOT DEMONSTRATE THAT AT THE TIME OF
PUBLICATION BENNET KNEW OR WAS RECKLESS AS TO
WHETHER IT WOULD BE FALSE TO ASSERT A DIRECT CAUSAL
LINK BETWEEN THE CROSSHAIRS MAP AND THE LOUGHNER
SHOOTING .......................................................................................................20

CONCLUSION...............................................................................................................25

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                          **Page(s)**

*600 W. 115th St. Corp. v. Von Gutfeld*,
   80 N.Y.2d 130, 138 (1992) ...................................................................................12

*Anderson v. Liberty Lobby*,
   477 U.S. 242, 249, 257 (1986) ......................................................................13, 14

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*,
   757 F.2d 523, 528 (2d Cir. 1985).........................................................................3

*Bose Corp. v. Consumers Union of U.S., Inc.*,
   466 U.S. 485, 511 & n.30, 513 (1984)...................................................14, 15, 17

*Celotex Corp. v. Catrett*,
   477 U.S. 317, 323 (1986)...................................................................................13

*Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*,
   768 F.3d 183, 192 (2d Cir. 2014).......................................................................14

*Contemporary Mission, Inc. v. N.Y. Times Co.*,
   842 F.2d 612, 621 (2d Cir. 1988).......................................................................15

*Dodds v. Am. Broad. Co.*,
   145 F.3d 1053, 1064 (9th Cir. 1998) ..................................................................16

*Dunlop-McCullen v. Rogers*,
   No. 00 Civ. 3274 (JSR) (JCF), 2002 U.S. Dist. LEXIS 3202, at *16-17, 20
   (S.D.N.Y. Feb. 21, 2002) .............................................................................12, 13

*Fay v. Oxford Health Plan*,
   287 F.3d 96, 103 (2d Cir. 2002).........................................................................13

*Garrison v. Louisiana*,
   379 U.S. 64, 75 (1964)..................................................................................13, 20

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323, 340 (1974)...................................................................................12

*Goenaga v. March of Dimes Birth Defects Found.*,
   51 F.3d 14, 18 (2d Cir. 1995).............................................................................13

*Harte-Hanks Commc'ns v. Connaughton*,
   491 U.S. 657, 659, 665-66, 685 (1989) ...................................................... *passim*

*Hodges v. State Journal Publ'g Co.*,
   1980 OK 102, 617 P.2d 191, 196.......................................................................16

*Journal-Gazette Co. v. Bandido's, Inc.*,
    712 N.E.2d 446, 463 (Ind. 1999) .......................................................16

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496, 510 (1991) ...............................................................13

*Masson v. New Yorker Magazine, Inc.*,
    832 F. Supp. 1350, 1361-63 (N.D. Cal. 1993).....................................15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574, 586 (1986) ...............................................................13

*Mickens v. Kodiak*,
    640 P.2d 818, 820 (Alaska 1982) .....................................................12

*N.Y. Times v. Sullivan*,
    376 U.S. 254, 272, 280 (1964) ............................................12, 13, 24

*Newton v. Nat'l. Broad. Co.*,
    930 F.2d 662, 681 (9th Cir. 1990) ........................................15, 16, 17

*Olivit v. City & Borough of Juneau*,
    171 P.3d 1137, 1143 (Alaska 2007)..................................................12

*Palin v. N.Y. Times Co.*,
    940 F.3d 804, 813, 814, 815 (2d Cir. 2019).............................22, 24, 25

*Pearson v. Fairbanks Publ'g Co.*,
    413 P.2d 711, 713-14 (Alaska 1966) .................................................12

*Phila. Newspapers, Inc. v. Hepps*,
    475 U.S. 767, 772 (1986) ...............................................................12

*St. Amant v. Thompson*,
    390 U.S. 727, 730-31 (1968) ...........................................................13

*Tilton v. Cowles Publ'g Co.*,
    76 Wash. 2d 707, 725 (1969) ..........................................................16

*Woods v. Evansville Press Co.*,
    791 F.2d 480, 487 (7th Cir. 1986) ....................................................16

## Other Authorities

Fed. R. Civ. P. 56(a) ............................................................................13

Fed. R. Civ. P 12(b)(6)..........................................................................12

Hon. Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems
   § 5:5.1[B] (5th ed. 2017)..........................................................................................................15

## PRELIMINARY STATEMENT

In this defamation action, Sarah Palin challenges three sentences in an editorial written by James Bennet and published by The New York Times Company ("The Times") in June 2017. Concededly, these sentences, written in haste under deadline, were not worded as precisely as they could have been.  As a result, some readers understood them as an allegation that an ad circulated by SarahPAC, a political action committee associated with Palin, had directly caused a horrible act of gun violence by Jared Loughner years earlier, and that Palin herself was responsible for that ad.  But even assuming that the drafting and publication of those three sentences constituted negligence, in this case, it is Palin's burden as a public figure to prove, by clear and convincing evidence, that Bennet and The Times told a calculated falsehood about her—*i.e.*, that they published the sentences in question with "actual malice."[1]

Although the Court of Appeals held that Palin had adequately *alleged* actual malice, discovery has demonstrated that she cannot prove it by the requisite clear and convincing evidence and Defendants therefore are entitled to summary judgment.  This is so for two independent reasons:

First, at the time he wrote the allegedly defamatory portion of the editorial, Bennet did not intend, and was unaware that readers would understand his words in the defamatory sense alleged by Palin—that she had circulated an ad that directly caused Loughner to shoot his victims.  Bennet testified, both at a hearing before this Court and at deposition, that he never intended to assert a direct causal link between the advertisement circulated by SarahPAC and the Loughner Shooting, much less that Palin herself was personally responsible for the ad.  Nor did

---

[1] Palin has given notice she intends to move for a ruling that she is not a public figure.  Dkt. 95. Defendants will respond fully to that contention in response to her motion, if she files it. Suffice for present purposes to observe that the allegations of her Amended Complaint foreclose it.

Bennet realize, until after publication, that his words could be construed as making such an assertion.  Bennet's unrebutted testimony regarding his subjective state of mind is supported by contemporaneous emails and the testimony of his colleagues.  On this basis alone, Palin's claim fails as a matter of law.

Second, even assuming (contrary to the record) that Bennet actually had been aware prior to publication that readers would interpret his words to be an accusation that SarahPAC's ad played a direct causal role in Loughner's deadly shooting spree, there is no evidence in the record, much less clear and convincing evidence, that Bennet either knew that such a statement was false or that he had serious doubts about whether it was true.

## FACTUAL BACKGROUND

### A.    The Crosshairs Map

Palin is the former governor of Alaska, former vice presidential candidate, and influential public figure.  SUMF ¶ 1.  SarahPAC was a political action committee created under Federal law and domiciled in Virginia that ceased operation in 2016.  SUMF ¶ 2.  In the course of public debate surrounding congressional consideration of the Affordable Care Act, SarahPAC in 2010 published a map that featured stylized crosshairs positioned over the congressional districts of twenty Democrats who supported the legislation, along with a list of each Representative's name (the "Crosshairs Map").  SUMF ¶ 7.  Although Palin denied at deposition that the symbol represented a gun sight, SUMF ¶ 13, she had described it shortly after publication as a "'bull's eye[,]'" SUMF ¶ 11, and, in the same period, "issued her now oft repeated rallying cry" to opponents of so-called "Obamacare": "'Don't retreat. RELOAD[,]'"  SUMF ¶ 14.  Indeed, she

affirmatively pleads in this case that the Map "depicted crosshairs."  SUMF ¶ 12.[2]  One of those

listed on the Crosshairs Map was Rep. Gabrielle Giffords of Arizona.

Shortly after its publication, violent attacks on the offices of several Representatives

identified on the Crosshairs Map, including that of Giffords, led to a substantial national debate

about the potential of such inflammatory rhetoric to incite those "on the fringe of the

movement."[3]  At the time, Giffords said on national television that "'when people do that,

they've got to realize there are consequences to that action.'"  SUMF ¶ 14.

On January 8, 2011, Jared Loughner shot nineteen people at a Giffords political event in

Tucson, killing a federal judge and five other people, and wounding thirteen others, including

Giffords (the "Loughner Shooting").  SUMF ¶ 15.  There soon followed a renewed public

controversy about the inclusion of Giffords on the Crosshairs Map.[4]  The ensuing criminal

investigation did not disclose any evidence that Loughner had seen the Crosshairs Map.  SUMF

¶ 17.  Multiple news organizations, including The Times, reported that he was mentally unstable

---

[2] "A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding."  *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985).

[3] E. Robinson, *Is there a right to 'reload'?*, Wash. Post (Mar. 26 2010) at A23 (noting that many Representatives identified on Map requested additional security due to threats); *see* L. Feldmann, *Stumping for McCain, Sarah Palin dials back the gun rhetoric*, The Christian Science Monitor (Mar. 26, 2010) at 11 (discussing pressure on Palin to tone down her rhetoric).  SUMF ¶ 9.

[4] *See, e.g*., D. Balz, *Cross hairs: Crossroads for Palin?*, Wash. Post (Jan. 11, 2011) at A9 (noting that issue of whether Palin "was partly to blame" became top question on Facebook after shooting); D. Milbank, *A McKinley moment?*, Wash. Post (Jan. 11, 2011) at A21 (opining that heat on Palin for "recklessly playing with violent images" was well deserved).  SUMF ¶ 16.  The controversy surrounding the Crosshairs Map resurfaced again in 2015 after a gunman's attack on an abortion clinic in Colorado.  *See, e.g*., P. Dvorak, *Fiery rhetoric a close relative of violence*, Wash. Post (Dec. 1, 2015) at B1 (citing SarahPAC ad and decrying leaders who "incite and inflame with fiery speeches" even when that "may not be their intent").  Indeed, just one month before publication of the Editorial, the Washington Post again published an opinion piece arguing that the Crosshairs Map had "incite[d]" the Loughner Shooting.  P. Dvorak, *At a D.C. Pizzeria, the Dangers of Fake News Just Got All Too Real*, Wash. Post (Dec. 5, 2016).

and had apparently developed animosity toward Giffords before publication of the Crosshairs Map.  SUMF ¶ 18.

**B.     Drafting Of The Editorial**

On the morning of June 14, 2017, during a baseball practice in Virginia, James Hodgkinson opened fire with an assault rifle on a group of Republican members of Congress and others, seriously wounding several, including Rep. Steve Scalise.  SUMF ¶ 19.  Hodgkinson was a political supporter of Sen. Bernie Sanders and "'virulently opposed'" Pres. Trump.  SUMF ¶ 20.  Around 10:45 a.m. that day, Elizabeth Williamson, a writer for The Times's Editorial Board who was based in the District of Columbia, inquired of her New York-based colleagues via email whether the Board intended to write about the shooting involving Rep. Scalise.  SUMF ¶ 21. Williamson, Bennet, and their colleagues Robert Semple and Linda Cohn then discussed the idea by email, debating whether the proposed piece should focus on the horror of the shooting itself, the Board's long-held position in favor of sensible gun control regulation, or "concern about the state of political rhetoric in the country."  SUMF ¶ 22.  During that email exchange, Cohn pointed out one difference she perceived between the response to the 2017 shooting involving Scalise and the shooting involving Giffords a few years earlier, observing that she was "thinking back to what a giant story [G]abby Gifford[s'] shooting was. Amazing that shooting congressmen doesn't seem so shocking now."  SUMF ¶ 23.

**1.     _Research_**

Around noon, Semple decided that the Board should write a piece on the shooting, and Williamson began to do so.  SUMF ¶ 24.  Initially, Williamson researched breaking news relating to the Scalise shooting to "keep [herself] apprised of what authorities knew."  SUMF ¶ 25.  She also familiarized herself with the Loughner Shooting, which had occurred years earlier. _Id_.  Semple, who suggested focusing on gun control measures, asked an Editorial Assistant,

Phoebe Lett, to send several "basic gun control pieces" to Williamson.  SUMF ¶ 26.  Lett

circulated four past editorials relating to gun policy, which incidentally referenced the Loughner

Shooting and other notable shootings that had prompted policy debates.  SUMF ¶ 27.[5]

Bennet, who had suggested in an email that there might be "a point to be made about the

rhetoric of demonization and whether it incites people to this kind of violence," asked

Williamson to be mindful of whether such rhetoric came from both sides of the political

spectrum.  SUMF ¶¶ 31, 32 ("If there's evidence of the kind of inciting hate speech on the left

that we, or I at least, have tended to associate with the right (e.g. in the run-up to the Gabby

Giffords shooting) we should deal with that.").  He testified that he was "specifically asking if

there was some evidence of a piece of incitement … that was directed at the ball players, the

Congressmen who were playing ball that day."  SUMF ¶ 33.

Lett explained that the Editorial Board had not written on that topic, but circulated an

opinion column by Frank Rich, *No One Listened to Gabby Giffords*, published in the aftermath

of the Giffords Shooting.  SUMF ¶ 30.  The column discussed the increase in political violence

in the two years preceding the shooting, speculation about motives behind various attacks, and

criticisms of political rhetoric in response.  Rich acknowledged the difficulty of understanding a

shooter's motives and stated that "we have no idea" whether Loughner saw "Palin's own most

notorious contribution to the rancorous tone – her March 2010 Web graphic targeting

Congressional districts."  Rich concluded in his column that discussion of motivation

---

[5] Much of the research focused on prior editorials by The Times, rather than its news reports or
other news organizations' publications because, as Bennet testified, he assumed that the Board
"had talked about the political climate and I wanted to harmonize whatever we were saying now
with the position the board had taken" previously.  SUMF ¶ 34 (discussing importance of
reviewing past Board positions and making changes thoughtfully).

"sidestep[s] the issue" of failure to speak out against violence or take measures to curb it.

## 2.   *Initial Draft*

Williamson submitted her draft of the piece to her New York-based colleagues via The Times's document management system around 4:45 p.m. that day.   SUMF ¶ 44. Williamson understood that Cohn and Bennet would be responsible for finalizing the piece.   SUMF ¶ 45.   As it relates to the language at issue in this case, Williamson's draft contained the following passage:

> Just as in 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a nine year-old girl, Mr. Hodgkinson's rage was nurtured in a vile political climate.  Then, it was the pro-gun right being criticized: in the weeks before the shooting[,] Sarah Palin's political action committee circulated[6] a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs.

SUMF ¶ 36.

Cohn reviewed the draft and "wasn't sure if the piece worked," in part because she found it unclear whether the piece was focused on gun control or "about the political climate and the sort of lack of civility in America's political discourse."  SUMF ¶ 47.  She added questions to the draft and, around 6:00 p.m. that day, handed it off to Bennet for further revision.  SUMF ¶ 49.

Bennet, who was ultimately responsible for the content of such editorials, agreed that the draft needed substantial revision.  SUMF ¶ 51.  As the Editorial related to breaking news and the deadline for publication in the next morning's print edition was less than three hours away, he

---

[6] In her draft, Williamson inserted at the word "circulated" a hyperlink to a package of on-line news reports published by ABC.  SUMF ¶ 37.  The lead report, published in January 2011 shortly after the Arizona shooting, is titled "Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate."  *Id*.  It observed that "[n]o connection has been made between [the Crosshairs Map] and the Arizona shooting."  *Id.*  The hyperlink also appeared in the Editorial as originally published on line.

began revising it himself.  SUMF ¶¶ 52, 53.  In addition to other changes not relevant here,

Bennet revised the above-quoted paragraph from Williamson's draft and added a further

paragraph, as follows:

> Was this attack evidence of how vicious American politics has become?
> Probably.  In 2011, when Jared Lee Loughner opened fire in a supermarket
> parking lot, grievously wounding Representative Gabby Giffords and killing
> six people, including a 9-year-old girl, the link to political incitement was
> clear.  Before the shooting, Sarah Palin's political action committee circulated
> a map of targeted electoral districts that put Ms. Giffords and 19 other
> Democrats under stylized cross hairs.
>
> Conservatives and right-wing media were quick on Wednesday to demand
> forceful condemnation of hate speech and crimes by anti-Trump liberals.
> They're right.  Though there's no sign of incitement as direct as in the Giffords
> attack, liberals should of course hold themselves to the same standard of
> decency that they ask of the right.

SUMF ¶ 74.  Bennet testified that he used the word "incitement" in a broad sense, to "talk about

a range of communications" "that contributed to intensifying and raising the temperature of the

political debate," – that is "very, very, strong language that describes the person on the other side

of the debate as an enemy."   SUMF ¶ 61.  And with respect to his use of the words "link" and

"direct," Bennet was referring to the fact that Giffords' name and district appeared on the

Crosshairs Map, not that a direct causal link existed between the Map and Loughner's actions.

SUMF ¶ 93.

Meanwhile, Cohn and another colleague worked on fact-checking the draft, including the

specific details of gun laws cited in the draft, because Cohn knew from her experience that such

laws were "ornate and detailed and different in all the states."  SUMF ¶¶ 64, 65.

## C.     The Editorial

That evening, The Times published on its website the Editorial now at issue, with the

headline "America's Lethal Politics," which also was included in the print edition of the

newspaper for distribution the next morning.  SUMF ¶ 73.  The content of the Editorial speaks

for itself, but the relevant portions may be summarized as follows:  First, the Editorial described

the Scalise shooting, referenced another mass shooting that took place in San Francisco the same

day, and observed that "[a]n American would once have been horrified and shocked by such

savagery.  An American today would be right to be horrified – and not very surprised."  SUMF ¶

73.

The Editorial then bemoaned "a sickeningly familiar pattern . . . emerging in the

[Virginia] assault," noting that Hodgkinson was a Bernie Sanders supporter "virulently opposed

to President Trump" who had posted harsh messages on social media.  SUMF ¶ 73.  The

passages challenged by Palin, as set forth in the two above-quoted paragraphs, followed.

The Editorial then moved on to its main thesis:  "Was this attack evidence of how readily

available guns and ammunition are in the United States?  Indisputably."  *Id*.  It posited that

Hodgkinson should not have been able to, but easily did, obtain the weaponry used in the attack,

discussed the reaction of gun control opponents to it, forecast an America in which virtually

everyone carries a gun, and noted the policy choices facing President Trump and all Americans

with respect to gun control.  *Id.*

That same evening, The Times published a series of news reports about the shootings,

one of which – posted shortly *after* the Editorial – similarly revisited the Arizona attack that had

injured Giffords.  SUMF ¶ 77.  In describing the controversy surrounding that tragedy, the news

article noted that Palin had "dr[awn] sharp criticism" following publication of the Crosshairs

Map, "though no connection to the crime was established."  *Id*.  Bennet had not read this article

or any draft of it prior to publication of the Editorial.  SUMF ¶ 78.

### D.    Criticism Of The Editorial And The Times's Response

Following publication of the Editorial online, Ross Douthat, an opinion columnist,

brought to Bennet's attention by email around 10:00 p.m. that evening questions about what he

understood the Editorial to be suggesting, explaining that he understood that there was "no

evidence that Jared Lee Loughner was incited by Sarah Palin or anyone else, given his extreme

mental illness and lack of any tangible connection to that crosshair map."  SUMF ¶¶ 79-81.

Bennet responded by email a few minutes later:

> Thanks, and I'll look into this tomorrow. But my understanding [is] that in the
> Giffords case there was a gun sight superimposed over her district; so far in
> this case we don't know of any direct threat against any of the congressman on
> the field.  That's not to say that any of it is ok, obviously, or that the violence
> in either case was caused by the political rhetoric.  But the incitement in this
> case seems, so far, to be less specific.

SUMF ¶ 81.  Douthat in turn replied by email, explaining his concern about the Editorial as he

had understood it:

> The targets were used by Palin, or her group, in a map of seats targeted for
> pickup in the midterms.  You can argue about whether that crosses a line …
> but the point is that the map had no link, none at all, to Giffords' actual
> murder.  People assumed a link initially … but the investigation debunked it.  I
> think Loughner was instigated by a non-answer she'd given him at a town hall
> about one of his theories of grammar, or his obsession with lucid dreaming, or
> something.  His act had nothing to do with the political climate, so far as
> anyone can tell.  Whereas the Alexandria shooter seems to have had an explicit
> political motivation.  So saying that Giffords was a case of incitement and this
> one isn't reads like we're downplaying that motive or implying that Loughner
> had right-wing motivations that he simply didn't have."

SUMF ¶ 82.  And Douthat subsequently pointed out to Bennet Tweets by readers that suggested

others were misinterpreting the Editorial as well.  SUMF ¶¶ 80.

   The testimonial and documentary evidence demonstrates without dispute that no one

involved in the preparation of the Editorial had intended to convey the proposition inferred by

Douthat and some other readers.  Bennet testified that, in using the word "incitement," he was

referring to "the danger that we're increasingly treating political opponents like enemies [in] a

conflict."  SUMF ¶ 83.  And the "direct" connection or "link" that Bennet intended to posit was

between the particular piece of political rhetoric at issue in the earlier shooting (the Crosshairs

Map) and one of the victims (Giffords), not a direct causal link between the Map and Loughner's decision to fire shots. SUMF ¶ 93. Cohn understood the challenged passage to be a discussion of "the kind of heated political rhetoric against which all these sorts of violent activities were happening," not a suggestion "that the map led [Loughner] to commit the shooting." SUMF ¶ 83 ("I certainly didn't mean someone was giving, like, orders or saying go shoot someone or go commit a violent act, but just that the rhetoric was ugly enough that it would boil up and foster people to take things into their own hands."). And Williamson, who had used the phrase "political rhetoric" in her original draft, explained she was referring to "a general overheated back-and-forth political climate." *Id*.

In response to Douthat's late-night email alerting him to the fact that readers were interpreting the Editorial as alleging the existence of a direct causal link between the Crosshairs Map and Loughner's attack, Bennet immediately sent a message to Williamson to see if she was available to begin investigating and, early the next morning, Bennet emailed several people who had worked on the Editorial to request their help. SUMF ¶¶ 99-102. Bennet, who had not intended to suggest such a direct causal link and therefore had not considered while writing the sentences challenged by Palin whether such a link between the Map and Loughner's actions had been established, explained in writing to his colleagues that morning by email that he was *unsure* whether a direct connection between Loughner and the Crosshairs Map had been proven or disproven and he asked that Lepping "get to the bottom of this as quickly as possible." SUMF ¶ 101. Both Lepping and Williamson promptly began looking into this question. *Id.* Ultimately, they determined that multiple news outlets, including The Times, had reported that Loughner was mentally unstable and appeared to have developed animosity toward Giffords prior to SarahPAC's publication of the Map, but that it had never been affirmatively proven or disproven

whether Loughner was familiar with or inspired by the Crosshairs Map.  SUMF ¶ 104.

### E.    The Times Corrects The Editorial

As a result of Lepping's and Lett's research, The Times promptly revised the online

version of the Editorial to remove the words that had caused readers to draw the unintended

inference of an assertion that the Crosshairs Map was a direct cause of the Loughner shooting,

and also to make clear that, on the Map, the crosshair symbol appeared over Giffords' district,

not over her name or image.  SUMF ¶ 105.  The final version reads:

> An editorial on Thursday about the shooting of Representative Steve Scalise
> incorrectly stated that a link existed between political rhetoric and the 2011
> shooting of Representative Gabby Giffords.  In fact, no such link was
> established.  The editorial also incorrectly described a map distributed by a
> political action committee before that shooting.  It depicted electoral districts,
> not individual Democratic lawmakers, beneath stylized cross hairs.

SUMF ¶ 109.  On social media, The Times disseminated a statement saying, "We got an

important fact wrong, incorrectly linking political incitement and the 2011 shooting of Giffords.

No link was ever established.  We're sorry about this and we appreciate that our readers called us

on the mistake."  SUMF ¶ 111.

### F.    This Litigation

Palin filed suit on June 27, 2017.  Dkt. 1.  On August 29, 2017, following argument on

The Times's motion pursuant to Rule 12(b)(6), this Court dismissed this action, ruling that Palin

had not adequately pleaded actual malice.  Dkt. 45 at 1.  On September 25, 2017, Palin moved

for reconsideration, proffering a proposed amended complaint, Dkt. 54-1.  This Court

subsequently denied the motion for reconsideration, Dkt. 61, and Palin appealed.  The Court of

Appeals reversed and remanded for further proceedings.  Palin filed her Amended Complaint on

December 30, 2019.  Dkt. 70.  The parties have since completed all relevant discovery.  Pursuant

to the Court's Civil Case Management Plan, Dkt. 90 at 2, Defendants timely gave notice of their

intent to file this motion for summary judgment, Dkt. 94, and now timely file their motion.

## ARGUMENT

"Freedoms of expression require 'breathing space.'" *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 772 (1986) (quoting *N.Y. Times v. Sullivan*, 376 U.S. 254, 272 (1964)).  Errors, while certainly regrettable, are also "nevertheless inevitable in free debate." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974).  Consistent with these principles, the First Amendment requires public-figure defamation plaintiffs, including Palin, to prove, by clear and convincing evidence, that the publisher made the challenged statements with "actual malice."  *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 659 (1989).   The New York and Alaska state constitutions, both of which extend broader protection to speech than that required by the federal constitution, also impose the same burden on Palin as a matter of state law.  *See 600 W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 138 (1992); *Mickens v. Kodiak*, 640 P.2d 818, 820 (Alaska 1982).  And, if Alaskan law applies, Palin likewise is required to prove actual malice as a matter of state common law because the statements at issue involve a matter of public interest.  *See Olivit v. City & Borough of Juneau*, 171 P.3d 1137, 1143 (Alaska 2007); *Pearson v. Fairbanks Publ'g Co.*, 413 P.2d 711, 713-714 (Alaska 1966).

"Actual malice" is a term of art.  It means that a plaintiff must present clear and convincing evidence that the defendant published false information about plaintiff "with knowledge that it was false or with reckless disregard of whether it was false or not."  *Sullivan*, 376 U.S. at 280.  As this Court has recognized, "proving actual malice is a heavy burden." *Dunlop-McCullen v. Rogers*, No. 00 Civ. 3274 (JSR) (JCF), 2002 U.S. Dist. LEXIS 3202, at *20 (S.D.N.Y. Feb. 21, 2002).  It is not enough to show that the defendant was negligent in publishing; a plaintiff must "demonstrate that the author in fact entertained serious doubts as to the truth of his publication, or acted with a high degree of awareness of probable falsity."

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991) (internal marks and citations omitted). The question is *not* whether "a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 730-31 (1968). Indeed, even an "extreme departure from professional standards . . . cannot provide a sufficient basis for finding actual malice." *Harte-Hanks*, 491 U.S. at 665. In other words, a defendant can only be held liable in a public figure-plaintiff defamation case for "calculated falsehood[s]." *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964).

Summary judgment must be granted when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002). After the moving party meets its initial burden of demonstrating "the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), "the opposing party must come forward with specific facts showing that there is a genuine issue for trial by a showing sufficient to establish the existence of every element essential to that party's case, and on which that party will bear the burden of proof at trial," *Dunlop-McCullen*, 2002 U.S. Dist. LEXIS 3202, at *16-17 (internal marks and citations omitted). The party opposing summary judgment must demonstrate to the court that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986), and summary judgment should be granted "where the nonmovant's evidence is conclusory, speculative, or not significantly probative," *Dunlop-McCullen*, at *17; *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (party opposing summary

13

judgment cannot rely only on argument that movant's witnesses are not credible).  There is no

genuine factual dispute "when the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party."  *Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic*

*Dist. Comm'n*, 768 F.3d 183, 192 (2d Cir. 2014) (internal quotation marks omitted).

Whether the record in this case would support a finding of actual malice is a question of

law.  *Harte-Hanks*, 491 U.S. at 685; *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485,

511 (1984).  And, to defeat this motion, Palin is required to come forward now with sufficient

evidence "such that a reasonable jury might find that actual malice had been shown *with*

*convincing clarity*."  *Anderson*, 477 U.S. at 257 (emphasis added).  Despite the completion of

extensive discovery, Palin cannot meet her burden here for at least two separate reasons:  The

undisputed evidence establishes that Bennet lacked awareness at the time of publication that his

words might convey the defamatory meaning Palin alleges, and in any event, he did not know

such a meaning would be false.

I.      **PALIN CANNOT DEMONSTRATE THAT BENNET WAS AWARE BEFORE
        PUBLICATION THAT THE EDITORIAL COULD BE READ TO ALLEGE
        THAT THE CROSSHAIRS MAP CAUSED THE LOUGHNER SHOOTING AND
        THAT PALIN WAS PERSONALLY RESPONSIBLE FOR IT.**

Palin is unable to show – by the required clear and convincing evidence – that, at the time

of publication, Bennet was aware of the defamatory meaning that she alleges the Editorial

conveys – namely, that "Palin was clearly and directly responsible for inciting a mass shooting at

a political event in January 2011" by having circulated the Crosshairs Map.  Am. Compl. ¶ 1.  As

a matter of law, therefore, Palin cannot meet her burden of proving that the statements at issue

were published with actual malice.[7]

More specifically, as noted above, the actual malice standard "requires the plaintiff to demonstrate with clear and convincing evidence that the defendant *realized* that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Bose*, 466 U.S. at 511 n.30 (emphasis added); *accord Contemporary Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 621 (2d Cir. 1988). It necessarily follows that the actual malice standard is not met where a defendant was unaware of the defamatory meaning his or her words conveyed. As Judge Sack has aptly put it: "A person who believes and intends to say one thing is not lying, and is therefore not guilty of 'actual malice,' merely because he or she chooses the wrong language to say it or because those who hear the statement reasonably believe it to mean something different." Hon. Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems § 5:5.1[B] (5th ed. 2017).

"The purpose of the awareness element is to ensure that liability is not imposed upon a defendant who acted without fault. This must hold true regardless of whether the defendant's statement is directly or indirectly libelous." *Masson v. New Yorker Magazine, Inc.*, 832 F. Supp. 1350, 1361-63 (N.D. Cal. 1993), *aff'd on other grounds*, 85 F.3d 1394 (9th Cir. 1996). Courts have warned against exposing defendants to liability "not only for what was not said but also for what was not intended to be said" because such a result would "eviscerate[] the First Amendment protections established by *New York Times*." *Newton v. Nat'l. Broad. Co.*, 930 F.2d 662, 681 (9th Cir. 1990); *see Bose*, 466 U.S. at 513 (observing that writer's "choice of . . .

---

[7] This first prong of this motion, that Bennet lacked awareness of any defamatory meaning and therefore could not have published the challenged sentences with actual malice, was not raised previously precisely because it depends on evidence beyond the four corners of the pleadings, and neither this Court nor the Court of Appeals has had occasion to consider this argument.

language, though reflecting a misconception, does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella," and rejecting rule under which "any individual using a malapropism might be liable, simply because an intelligent speaker would have to know that the term was inaccurate in context, even though he did not realize his folly at the time"); *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1064 (9th Cir. 1998) (reaffirming that defendant "must have actually intended to convey the defamatory impression," and noting that "there is no actual malice where journalists unknowingly mislead the public" (internal quotations marks omitted)); *Woods v. Evansville Press Co.*, 791 F.2d 480, 487 (7th Cir. 1986) ("Simply because a statement reasonably can be read to contain a defamatory inference does not mean . . . . that the publisher of the statement either intended the statement to contain such a defamatory implication or even knew that readers could reasonably interpret the statement to contain the defamatory implication.").

This principle squarely applies even where the court believes it would have been better to use different language or finds the implication from the statement at issue "clear and inescapable." *Newton*, 930 F.2d at 681; *see Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 463 (Ind. 1999) ("use of an inaccurate word as a result of a misconception or poor interpretation is not actual malice"); *Hodges v. State Journal Publ'g Co.,* 1980 OK 102, ¶ 25, 617 P.2d 191, 196 ("where there was no evidence that the publisher intended or was aware of a potentially defamatory meaning of an article, which meaning was admittedly at variance with the known truth, 'malice' as required by *New York Times* . . . could not be inferred"); *Tilton v. Cowles Publ'g Co.*, 76 Wash. 2d 707, 725 (1969) (reversing with instructions to enter judgment for defendant because plaintiff had failed to "prove with convincing clarity that defendant was aware of a high probability that the public would read the article as reporting a criminal charge,

16

or at least that defendant entertained serious doubts on this matter," when report concerned civil matter).   And the principle also squarely applies even where, as here, the writer is an "intelligent speaker," *Bose*, 466 U.S. at 513, or professional journalist, *Newton*, 930 F.2d at 681.

Here, the undisputed evidence demonstrates that Bennet did not intend to allege that circulation of the Crosshairs Map caused the Loughner Shooting, much less that Palin herself personally was responsible for that Map, and that he was caught entirely by surprise when he learned, after publication, that some readers had drawn such inferences from the language he used to convey his intended meaning.   More specifically:

**Bennet's Intended Meaning:**   Bennet testified that his aim in the Editorial was "to express concern about the state of political rhetoric in the country of political incitement, the danger that we're increasingly treating political opponents like enemies in a conflict."   SUMF ¶ 90.   He worried that "the overall climate of political incitement . . . gives permission, to some degree, for violence against elected officials."   SUMF ¶¶ 91-92 (agreeing that one idea he was attempting to advance "was that overheated political rhetoric can create a climate *conducive* to violent acts") (emphasis added).   Other witnesses involved in editing and drafting the Editorial also testified that this was their aim.   As Williamson put it, she viewed the Editorial as talking about the "general overheated back-and-forth political climate."   SUMF ¶ 83.   Cohn similarly said that she read the Editorial as saying that the "rhetoric was ugly enough that it would boil up and foster people to take things into their own hands."   *Id*.

**Bennet's Reference to the Map:**   Bennet explained that he was not "trying to say that any particular piece of political incitement causes a maniac like Jared Lee Loughner to take up arms and shoot at elected representatives," nor that Palin was responsible for this particular piece of political incitement.   SUMF ¶ 85-88 (noting that readers thought The Times was "accusing

Governor Palin of complicity in this shooting, which . . .  I also didn't remotely intend.  . . .
Really, we didn't mean to communicate that, so I was very concerned to see that that was one of
the inferences that people had drawn from what I had written.").  Instead he mentioned the Map
circulated by SarahPAC as "an example of the kind of political incitement that contributes to this
atmosphere" and one which had mentioned by name a person who ultimately was a victim of the
Loughner Shooting.  SUMF ¶ 93.  By contrast, while the Editorial "criticiz[ed] the left for
creating an atmosphere of incitement" in advance of the Scalise Shooting, Bennet was not aware
of a specific, concrete example of such rhetoric "that connected the victims [of the Scalise
Shooting] to that atmosphere."  SUMF ¶ 94.  Therefore, the "link" between inflammatory
rhetoric and the Loughner Shooting was more "clear."  As Bennet notes, this was the question
asked at the very beginning of the Editorial – was the Scalise Shooting "evidence of how vicious
American politics has become?" – which was answered, due to this precise uncertainty,
"probably."  SUMF ¶ 95.

     **Bennet's Choice of Words:**  When he rewrote Williamson's draft of the Editorial,
quickly and on deadline to discuss a breaking news event, Bennet worried that phrases like
"incendiary" or "inflammatory rhetoric" had been "drained of [their] power because [they are]
used so often."  SUMF ¶ 56.  He was searching for "a very strong word to write about the
political climate," a word that that was not used every day, as a way to draw readers' attention to
the particular horror of the Scalise shooting and so chose "political incitement"  SUMF ¶ 58-59.

     In this regard, Bennet brought to his writing that day "a very specific history and
experience with the term" he adopted, "incitement" – language like that in Israel which preceded
the assassination of Israeli Prime Minister Yitzhak Rabin.  SUMF ¶¶ 57-58  It was his worry that
"some of what I saw there could happen here."  SUMF ¶ 60.  He said that, when he reported

from Jerusalem for The Times, the word "incitement" was used broadly to "talk about a range of communications" "that contributed to intensifying and raising the temperature of the political debate," that is "very, very, strong language that describes the person on the other side of the debate as an enemy."   SUMF ¶ 61.  This ranged from "deliberate orders, invocations, summonses for people to carry out violent attacks" to more subtle contributions to the poisonous atmosphere between the groups, like "maps that misrepresent the politics of the region."  SUMF ¶ 62.  Notably, he had written about such incitement at that time, discussing a meeting of a joint Israeli-Palestinian "committee on 'prevention of incitement,' which [was] focusing on messages in the schools and news media encouraging violence."  SUMF ¶ 63.  While he recognized that "some people" can interpret incitement to mean a "call to violence," put simply "[t]hat was not the way [he was] using it in the editorial."  SUMF ¶ 89.[8]

Bennet's and his colleagues' testimony in this regard is not only unrebutted, but contemporaneous documents produced in discovery directly corroborate Bennet's testimony regarding the more general point that he intended to make and thought, prior to publication, that his words were conveying.  As Bennet explained in an email to his colleague Douthat minutes after Douthat first raised with him a question about the Editorial's meaning that very evening:

> [M]y understanding [is] that in the Giffords case there was a gun sight superimposed over her district; so far in this case we don't know of any direct threat against any of the congressman on the field.  That's not to say that any of it is ok, obviously, or that the violence in either case was caused by the political rhetoric.  But the incitement in this case seems, so far, to be less specific.

---

[8] Bennet is neither alone nor the first to have used "incitement" in this sense.  See, e.g., J. Rudoren, "Israeli Official Points to 'Incitement' by Palestinians," N.Y.Times (Jan. 6. 2014) (available at https://www.nytimes.com/2014/01/07/world/middleeast/israeli-official-points-to-incitements-by-palestinians.html?searchResultPosition=3); H. Cooper, "China Accuses U.S. and Japan of Incitement," N.Y. Times (May 31, 2014) (available at https://www.nytimes.com /2014/06/01/ world/asia/china-accuses-us-and-japan-of-sowing-discord-in-asia-pacific.html ?searchResultPosition=24).

SUMF ¶ 81.  Indeed, during the planning of the Editorial earlier that day, Bennet had asked his team to determine *whether* the Editorial Board had ever written "anything connecting [] the Giffords shooting to some kind of incitement."  SUMF ¶ 29.  Immediately after publication of the Editorial and in light of the misinterpretation of it, Bennet reiterated this query in his written communications with others.  SUMF ¶ 102.[9]

Bennet has admitted that he "did a very poor job . . . of trying to express" his intended thought and "created an inference for readers that there was a causal link between political incitement and the shooting of Gabby Giffords."  SUMF ¶ 84.  But the fact that his writing was unclear does not mean that Bennet intentionally lied in the Editorial.  *See Garrison*, 379 U.S. at 75 (requiring proof of "calculated falsehood" to demonstrate actual malice).  To defeat this motion for summary judgment, Palin must point to clear and convincing evidence from which a reasonable jury could find that Bennet was aware and therefore intended that readers would understand the challenged sentences in the Editorial to be an allegation that the Crosshairs Map directly caused Loughner to shoot his victims and that Palin personally was responsible for that Map.  There is no such clear and convincing evidence and Palin's defamation claim therefore fails as a matter of law.

## II.   PALIN CANNOT DEMONSTRATE THAT AT THE TIME OF PUBLICATION BENNET KNEW OR WAS RECKLESS AS TO WHETHER IT WOULD BE FALSE TO ASSERT A DIRECT CAUSAL LINK BETWEEN THE CROSSHAIRS MAP AND THE LOUGHNER SHOOTING.

Even assuming, *arguendo*, that Bennet was aware and therefore intended that readers would understand the Editorial as an allegation that the Crosshairs Map caused the Loughner

---

[9] Bennet similarly did not intend to suggest that the Crosshairs Map had included "actual photographs of these representatives . . .put under the crosshairs," as opposed to over their districts, SUMF ¶ 96, though some readers apparently read it that way despite the fact that the Editorial specifically referred to it as "a map of targeted electoral districts."  SUMF ¶ 73.

Shooting and that Palin personally was responsible for the Map (which the unrebutted evidence demonstrates he was not), Palin nevertheless is unable to point to clear and convincing evidence that Bennet, when he published the Editorial, knew or was reckless regarding whether it would be false to assert such a direct causal link between the Crosshairs Map and the Loughner Shooting.  Specifically, Bennet, the author of the disputed portion of the Editorial, has testified unambiguously that he did not know then, and does not know now, whether or not Loughner was aware of the Crosshairs Map at the time he committed the shooting.  *See* SUMF ¶ 86.  Palin therefore is unable to prove actual malice for this second, independent reason, and her Amended Complaint should be dismissed on this ground as well.

In her Amended Complaint, the proffered version of which was before the Court of Appeals when it ruled on The Times's 12(b)(6) motion, Palin speculatively pleads numerous categories of "facts" purportedly constituting proof that Bennet "must" have known it was false to suggest such a causal link.  However, Palin herself testified that, at the time the Editorial was published, "reasonable people could have interpreted either way" whether there was a "connection between the crosshairs map and Jared Loughner's motivation."  SUMF ¶ 154 ("I guess it's tough for me to judge whether the public believed that there was a consensus out there as to motivation of Jared.").  This admission by Palin prevents her from establishing that Bennet "must have known" it was false to suggest such a connection between the Map and the Shooting.  But even beyond Palin's own concession, there simply is *no* evidence to support many of her conclusory allegations, and those allegations that do have some factual support fall far short of constituting clear and convincing evidence of knowing falsity or reckless disregard for truth.

The first set of allegations that the Court of Appeals held sufficiently plausible, if proven, to support a finding of actual malice involved "the editorial positions Bennet held at The Atlantic

and The New York Times." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 813 (2d Cir. 2019).

Specifically, the panel credited Palin's allegations that, as editor in chief of *The Atlantic*

magazine, Bennet must have "reviewed, edited and approved the publication of numerous

articles [that] confirmed there was no link between Mrs. Palin and Loughner's shooting,"

focusing in particular on an article titled "Ten Days That Defined 2011." *See id.* at 813-14.

While The Times and the Court were required to accept the truth of these allegations in

connection with its 12(b)(6) motion, the allegations are, quite simply, wholly unsupported by the

evidence.

      **Bennet's Alleged Knowledge of the Supposed Consensus:**  Bennet consistently and

without contradiction has testified that he does not recall reading and was not at the time of

publication of the Editorial aware of having read any of the articles cited by Palin that

purportedly demonstrate a consensus that the Loughner Shooting was not in any way caused by

the Crosshairs Map.  *See* SUMF ¶ 140.

      **Bennet's Alleged Role in the "*Atlantic* Articles":**  Contrary to Palin's allegations, the

undisputed evidence establishes that Bennet was *not* in fact the editor responsible for the articles

in question, and Palin's contention that Bennet "must" have reviewed them and known their

content has no basis in fact.  Many of the "articles" cited by Palin were not articles at all, but

posts in *The Dish*, a blog controlled and edited by Andrew Sullivan hosted on the same website

as *The Atlantic* magazine at the time the Loughner Shooting occurred.  SUMF ¶¶ 118, 120, 122,

125.  Sullivan and his staff made over 1,400 individual posts to *The Dish* in that month alone.

SUMF ¶ 117.  Sullivan testified without contradiction that he had complete editorial

independence in running *The Dish* and that no one, including Bennet, reviewed or edited his blog

posts before publication.  SUMF ¶¶ 114-115.  Bennet so testified as well.  *Id.*  Asked what role

Bennet had played in *The Dish*, Sullivan responded, "[n]one whatsoever."  SUMF ¶ 116.

Similarly, the piece "Ten Days That Defined 2011," on which Palin and therefore the Court of Appeals placed heavy emphasis, was a blog post by *The Atlantic Wire*, not *The Atlantic* magazine.  SUMF ¶ 129.  Palin cited other pieces published in *The Atlantic Wire* as well.  SUMF ¶ 130-132.  The *Atlantic Wire* was a "sister site" run by a separate editor, Gabriel Snyder, that primarily acted as a news aggregation hub.  SUMF ¶ 128.   Another "article" on which Palin premised her allegations was a post on the site of the *National Journal*, and Bennet did not edit the content of that separate publication.  SUMF ¶ 135-136.

**Bennet's Alleged Knowledge of the Times' Articles Cited By Palin:**  Each of the persons involved in the drafting of the Editorial testified that they have no recollection of editing, drafting, or even reading the pieces from *The Times* that Palin contends would have demonstrated to them that it would be false to suggest a causal link between the Crosshairs Map and the Loughner Shooting.  SUMF ¶ 139.  As Cohn testified, she has "edited hundreds of op-ed columns."  SUMF ¶ 139.

**Bennet's Purported Personal Connections:**  Palin also alleged that "Bennet in particular was more likely than the average editor-in-chief to know the truth about the Loughner shooting because he had reason to be personally hostile toward Palin, her political party, and her pro-gun stance," including because Bennet's brother is a Senator from Colorado who was endorsed by House members whose districts had been targeted by the Crosshairs Map, that a man had threatened to attack Sen. Bennet's offices in the days before the Loughner Shooting, that both Bennets had become advocates for gun control, and that Palin had endorsed Sen. Bennet's opponent.  *See Palin*, 940 F.3d at 814.  As this Court previously noted, "[i]f such political opposition counted as evidence of actual malice, the protections imposed by *Sullivan*

and its progeny would swiftly become a nullity." *Palin*, 264 F. Supp. 3d at 538; *see Harte-Hanks*, 491 U.S. at 665 (ruling that newspaper's desire to "promote an opponent's candidacy . . . cannot provide a sufficient basis for finding actual malice").  And in any event, Bennet testified that he does not recall speaking with his brother about the threat to his office.  SUMF ¶ 142. Bennet similarly does not recall that Senator Bennet had given a floor speech about gun violence, SUMF ¶ 143, and was unaware that Palin had endorsed his brother's opponent in 2016, that the Crosshairs Map had included among targeted districts two lawmakers who had endorsed his brother, or that Giffords' PAC had endorsed Senator Bennet.  SUMF ¶¶ 144-145.  Significantly, in response to a subpoena from Palin, Sen. Bennet stated that a reasonable search had discovered no communications with his brother regarding any of these topics.  SUMF ¶ 148.

**Bennet's Alleged Feelings Toward Palin and Conservative Politics:**  Finally, there is also no evidence to support the contention that Bennet included a reference to Palin's name out of personal animosity toward her more broadly.  *See* Am. Compl. ¶¶ 45-52.  To the extent Palin contends Bennet was motivated by political, rather than personal disagreements, *see id.*, testimonial and documentary evidence demonstrates without contradiction that Bennet attempted to broaden the range of political views in the Opinion section, in particular by including more conservative voices.  SUMF ¶ 153.  Nor is there any evidence to suggest that Palin's name was included to attract subscribers or drive advertising revenue, particularly given that the single reference to her name occurs in the fifth paragraph of a lengthy Editorial and is not part of the headline, the lede, or any accompanying photo or graphic.  *See* Am. Compl. ¶¶ 6, 11.  Moreover, as noted, even if there were any evidence of personal ill-will, political disagreement, or an economic motive for publication of the Editorial, none of these factors are a sufficient basis for a finding of actual malice.  *Harte-Hanks*, 491 U.S. at 665-66.

**Bennet's Alleged Knowledge of the Contents of the Hyperlinked Articles:** Palin alleges that Bennet either did or should have clicked on the hyperlink embedded under the word "circulated" in Williamson's draft and that, had he done so, he would have been taken to an article that purportedly proved that there was no link between the Crosshairs Map and the Loughner Shooting, and that his failure to have done so is evidence he "willfully disregarded the truth." *See Palin*, 940 F.3d at 815. But Bennet has twice testified that he did not click on the hyperlink that Williamson had included in her initial draft and has no memory of having seen the linked ABC articles on June 14, 2017. SUMF ¶ 69. Bennet had less than three hours to substantially rewrite the Editorial. SUMF ¶ 54. He explained that he did not click the link because he was "on a tight deadline," and viewed his role as editing the Editorial, not reporting it. SUMF ¶ 71. Moreover, as discussed above, Bennet has testified unequivocally that he was not intending to suggest any sort of direct causal link between the Crosshairs Map and the Loughner Shooting and that he did not know whether such a link existed at the time he wrote the Editorial. Simply put, Bennet cannot be said to have willfully avoided the truth about a statement he was not even aware he was making.

Palin therefore is unable to meet her burden of offering clear and convincing evidence that Defendants published a statement suggesting a direct causal link between the Crosshairs Map and the Loughner Shooting either knowing that such a suggestion was false, or with reckless disregard for whether it was false, and defendants are entitled to summary judgment.

## <u>CONCLUSION</u>

For each of the foregoing independent reasons, Defendants respectfully request that the Court grant their motion for summary judgment and dismiss the Amended Complaint.

Dated:  New York, New York          Respectfully submitted,
           June 19, 2020

                                                  BALLARD SPAHR LLP

By: /s/ Jay Ward Brown

    Jay Ward Brown
    David L. Axelrod
    Thomas B. Sullivan
    Jacquelyn N. Schell
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com
*Counsel for Defendants*