

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                        :
                                                        :
SARAH PALIN                                             :    No. 17 Civ. 4853 (JSR)
                                                        :
                                    Plaintiff,          :    ECF Case
                                                        :
                                                        :
               -against-                                :    **DEFENDANTS' STATEMENT OF**
                                                        :    **UNDISPUTED MATERIAL FACTS**
                                                        :
THE NEW YORK TIMES COMPANY and JAMES                    :
BENNET,                                                 :
                                                        :
                                   Defendants.          :
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        Pursuant to Rule 56.1 of the Local Rules for the United States District Court for the

Southern District of New York, Defendants The New York Times Company ("The Times") and

James Bennet ("Bennet," and, together with The Times, "Defendants") submit the following

Statement of Undisputed Material Facts in support of their Motion for Summary Judgment:

<u>**The Parties**</u>

        1.      Sarah Palin is the former governor of Alaska, a former vice presidential candidate,

and an influential public figure.  Am. Compl. ¶¶ 20-23.

        2.      SarahPAC was a political action committee created under Federal law and

domiciled in Virginia that ceased operation in 2016.  Sullivan Decl. ¶ 6, Ex. 5 ("Crawford Dep.")

at 25:13-26:5; Brown Decl. in Supp. of Defs.' Mot. to Dismiss Exs. A, B, Dkt. 26.

        3.      Bennet was, at all times relevant to this lawsuit, the editor overseeing all opinion

journalism at The Times, including columns written by opinion columnists, letters from readers,

individual contributions, op-eds solicited from outside writers, and masthead editorials written

by The Times Editorial Board.  Sullivan Decl. ¶ 3, Ex. 2 ("Bennet Dep.") at 12:6-19.

4.     The opinion division is separate from the larger newsroom division of The Times. Bennet Dep. at 12:25-13:7.

5.     Editorials are pieces that reflect the work of the Editorial Board of The Times. They do not include an individual author's byline.  Bennet Dep. at 12:14-17.

6.     Bennet oversaw the editorials and opinion pieces that The Times publishes, but did not individually review each piece.  Bennet Dep. at 12:9-19, 13:8-14:10, 42:23-11.

## The Crosshairs Map

7.     In 2010, SarahPAC published a map that featured crosshairs positioned over congressional districts of twenty Democrats who supported the Affordable Care Act, along with a list of each Representative's name (the "Crosshairs Map").  Am. Compl. ¶ 99; Sullivan Decl. ¶ 35, Ex. 34; Sullivan Decl. ¶ 7, Ex. 6 ("Palin Dep.") at 82:16-24, 140:15-22; Crawford Dep. at 67:1-8.

8.     The Crosshairs Map places a crosshairs symbol over Rep. Gabrielle Giffords' district, and listed her name. Sullivan Decl. ¶ 35, Ex. 34.

9.     Shortly after publication of the Crosshairs Map, violent attacks occurred on the offices of several Representatives identified on the Map, including that of Rep. Giffords. Sullivan Decl. ¶ 48, Ex. 47 (Linda Feldmann, *Stumping for McCain, Sarah Palin dials back the gun rhetoric*, The Christian Science Monitor (Mar. 26, 2010)) at 3]; Sullivan Decl ¶ 59, Ex. 58 (E. Robinson, *Is there a right to 'reload'?*, Wash. Post (Mar. 26, 2010)).

10.     Publication of the Crosshairs Map prompted a national debate, including discussion of the actual or potential impact of inflammatory rhetoric—specifically including the Crosshairs Map as an example.  Sullivan Decl. ¶ 48, Ex. 47 (discussing "epithets, death threats, and attacks on some members' offices" after passage of the Affordable Care Act).

11.     On November 4, 2010, Palin referred to the symbol on the Crosshairs Map as a "bull's eye" in a tweet.  Sullivan Decl. ¶ 36, Ex. 35 (Nov. 4, 2010 Sarah Palin Tweet).

12.     The Amended Complaint states that the Crosshairs Map "depicted crosshairs." Am. Compl. ¶ 99.

13.     At her deposition, Palin denied that the symbol placed over the districts on the Crosshairs Map represented a gun sight.  Palin Dep. at 23:16-24:2, 140:23-141:3, 143:14-25.

14.     Palin used the expression "Don't retreat. RELOAD" as a rallying cry for opponents of the Affordable Care Act, also known as Obamacare.  Sullivan Decl. ¶ 39, Ex. 38 at 2.

## The Loughner Shooting

15.     On January 8, 2011, Jared Loughner shot nineteen people at a political event in Tucson, killing a federal judge and five other people, and wounding thirteen others, including Rep. Giffords.  Am. Compl. ¶ 1.

16.     This renewed speculation by the public and the media whether Rep. Giffords' inclusion on the Crosshairs Map, and similar political rhetoric contributed, directly or indirectly, to political violence like the Giffords' shooting.  Palin Dep. at 148:2-17, 149:3-22; Sullivan Decl. ¶ 16, Ex. 15 (Frank Rich, *No One Listened to Gabrielle Giffords*, N.Y. Times (Jan. 15, 2011)); Sullivan Decl. ¶ 37, Ex. 36 (Dan Balz, *Cross hairs: Crossroads for Palin?*, Wash. Post (Jan. 11, 2011)) at A.9 (noting that issue of whether Palin "was partly to blame" became the top question on Facebook after shooting); Sullivan Decl. ¶ 38, Ex. 37 (Dana Milbank, *A McKinley moment?*, Wash. Post (Jan. 11,  2011)) at A.21 (opining that heat on Palin for "recklessly playing with violent images" was well deserved).

17.     During the ensuing criminal investigation, law enforcement discovered no

evidence regarding whether Loughner had or had not seen the Crosshairs Map.  Sullivan Decl. ¶ 39, Ex. 38 (John Berman, *Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate*, ABC News (Jan. 9, 2011).

18.     In the weeks and months following the shooting, multiple news organizations, including The Times, reported that Loughner was mentally unstable and appeared to have developed animosity toward Rep. Giffords well before publication of the Crosshairs Map.  Am. Compl. ¶¶ 59, 61 & Exs. 8-12.

### The Congressional Baseball Shooting

19.     The morning of June 14, 2017, during a baseball practice in Virginia, James Hodgkinson opened fire on several Republican members of Congress and others, seriously wounding Republican Rep. Steve Scalise, among others.  Am. Compl. ¶ 4.

20.     Hodgkinson was a political supporter of Senator Bernie Sanders and "'virulently opposed'" President Trump.  Am. Compl. ¶ 4.

### Drafting the Editorial America's Lethal Politics

21.     On June 14, 2017, around 10:45 a.m., Elizabeth Williamson, a writer for the Editorial Board based in the District of Columbia, asked whether the Board intended to write about the shooting involving Rep. Scalise.  Sullivan Decl. ¶ 4, Ex. 3 ("Williamson Dep.") at 194:14-195:10; Sullivan Decl. ¶ 9, Ex. 8 (NYTIMES0001068-69).

22.     Williamson, Bennet, and their Editorial Board colleagues Robert Semple and Linda Cohn debated whether the proposed piece should focus on the shooting itself, the Board's position in favor of sensible gun control, or "concern about the state of political rhetoric in the country."  Sullivan Decl. ¶ 2, Ex. 1 ("Hr'g Tr.") at 5:13-6:1; Williamson Dep. at 199:22-200:2; Sullivan Decl. ¶ 10, Ex. 9 (NYTIMES 0001082); Sullivan Decl. ¶ 5, Ex. 4 ("Cohn Dep.") at

40:21-41:13.

23.     During that discussion, Cohn pointed out a difference she perceived between the response to the 2017 shooting involving Scalise and the shooting involving Giffords only a few years earlier, writing "I'm thinking back to what a giant story [G]abby Giffords shooting was. Amazing that shooting congressmen doesn't seem so shocking now."  Sullivan Decl. ¶ 11, Ex. 10 (NYTIMES0001070-71).

24.     Around noon, Semple decided that the Board should write a piece on the shooting, and Williamson began to draft one. Sullivan Decl. Ex. 10; Williamson Dep. at 206:10-18.

### *Research*

25.     To start the writing process Williamson researched breaking news reports about the Scalise shooting and familiarized herself with the Loughner Shooting in 2011.  Williamson Dep. at 195:21-196:25, 213:7-19; Sullivan Decl. ¶ 12, Ex. 11 (NYTIMES0001078).

26.     Semple tasked Times Editorial Assistant, Phoebe Lett, with conducting research for the piece and had her provide this research to Williamson.  Sullivan Decl. Ex. 9.

27.     Lett circulated four pieces to Williams, Bennet, and others that the Editorial Board had previously published relating to gun policy.  Sullivan Decl. ¶ 13, Ex. 12 (NYTIMES0001083); Sullivan Decl. ¶ 14, Ex. 13 (Aug. 17, 2017 email from J. Brown).

28.     Williamson asked Lett for assistance finding a prior editorial "that references hate type speech against dems in the runup to [the Giffords] shooting."  Sullivan Decl. Ex. 12.

29.     Bennet responded by asking if the Editorial Board had ever written "anything connecting [] the Giffords shooting to some kind of incitement."  Sullivan Decl. ¶ 30, Ex. 29 (NYTIMES0001157-58).

30.     Lett responded that the Editorial Board had not, but circulated an opinion piece by Frank Rich, *No One Listened to Gabby Giffords*, published in the aftermath of the Giffords Shooting.  Sullivan Decl. ¶ 15, Ex. 14 (NYTIMES0001159-60); Sullivan Decl. Ex. 15.

31.     During the planning of the Editorial, Bennet emailed Williamson:  "there's a point to be made about the rhetoric of demonization and whether it incites people to this kind of violence."  Sullivan Decl. Ex. 11.

32.     Bennet asked Williamson to be mindful of whether such rhetoric came from both sides of the political spectrum.  Sullivan Decl. Ex. 9 ("[I]f there's evidence of the kind of inciting hate speech on the left that we, or I at least, have tended to associate with the right (e.g. in the run-up to the Gabby Giffords shooting) we should deal with that."); Sullivan Decl Ex. 11; Sullivan Decl. Ex. 14.

33.     Bennet was "specifically asking if there was some evidence of a piece of incitement … that was directed at the ball players, the Congressmen who were playing ball that day."  Bennet Dep. at 245:22-25, 246:4-13.

34.     Much of the research Editorial Board employees conducted focused on prior editorials by The Times, because Bennet assumed that the Board "had talked about the political climate and I wanted to harmonize whatever we were saying now with the position the board had taken" previously.  Hr'g Tr. at 6:5-12; Sullivan Decl. Ex. 11; Cohn Dep. at 77:17-78:3.

### First Draft

35.     Williamson wrote the first draft of the America's Lethal Politics editorial (the "Editorial").  Williamson Dep. at 232:14-233:3; Sullivan Decl. ¶ 25, Ex. 24 (PALIN00234-35).

36.     As it relates to the language Palin contends is defamatory, Williamson's draft included the following:

> Just as in 2011, when Jared Lee Loughner opened fire in a
> supermarket parking lot, grievously wounding Representative
> Gabby Giffords and killing six people, including a nine year-old
> girl, Mr. Hodgkinson's rage was nurtured in a vile political
> climate.  Then, it was the pro-gun right being criticized: in the
> weeks before the shooting[,] Sarah Palin's political action
> committee circulated a map of targeted electoral districts that put
> Ms. Giffords and 19 other Democrats under stylized crosshairs.

Williamson Dep. at 232:2-233:9; Sullivan Decl. Ex. 24.

37.     The word "circulated" was a hyperlink such that a reader who clicked on it would be directed to a package of on-line news reports published by ABC.  Williamson Dep. at 234:11-15; Brown Decl. in Supp. of Defs.' Mot. to Dismiss Ex. C; Sullivan Decl. Ex. 38 (Partial Version).

38.     The original version of the Editorial published online also included this hyperlink. Sullivan Decl. ¶ 50, Ex. 49 (Original Web Editorial); Brown Decl. in Supp. of Defs.' Mot. to Dismiss Ex. C.

39.     The first article in the package of hyperlinked news reports was an article published shortly after the Arizona shooting, titled "Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate."  Brown Decl. in Supp. of Defs.' Mot. to Dismiss Ex. C.

40.     This article included a statement that "[n]o connection has been made between [the Crosshairs Map] and the Arizona shooting."  Brown Decl. in Supp. of Defs.' Mot. to Dismiss Ex. C at 2.

41.     At the time she drafted the Editorial, Williamson did not recall reading in the ABC article that that suggested no evidence of a link between the Crosshairs Map and the Loughner Shooting.  Williamson Dep. 236:2-24, 237:23-238:5.

42.     Williamson did not recall reading any source that specifically addressed the link between the Crosshairs Map and the Loughner Shooting.  Williamson Dep. at 237:22-238:5.

43.     Williamson did not know why Loughner targeted Gifford.  Williamson Dep. 237:11-238:5.

44.     Williamson submitted this first draft to her editor, Linda Cohn, around 4:45 p.m. on June 14, 2017.  Williamson Dep. 232:14-233:3; Sullivan Decl. Ex. 16 (Email), 18 at 3-4 (Draft).

45.     Williamson received further drafts but believed that Cohn and Bennet would edit and finalize the Editorial.  Williamson Dep. 248:9-25; Sullivan Decl. ¶ 18, Ex. 17 (NYTIMES0003239).

46.     Williamson did no further work on the Editorial prior to publication.  Williamson Dep. at 248:9-25.

*Revisions*

47.     Cohn reviewed Williamson's draft and "wasn't sure if the piece worked" in part because she found it unclear whether the piece was focused on gun control or "about the political climate and the sort of lack of civility in America's political discourse."  Cohn Dep. at 57:19-58:7, 17:23-18:7, 57:19-58:7, 60:8-12.

48.     Cohn added some questions to the draft and around 5:00 p.m. and went to Bennet's office in person to speak with him about her criticism of the draft.  Cohn Dep. at 18:5-7, 57:5-16; Sullivan Decl. ¶ 19, Ex. 18 (NYTIMES0000288-91).

49.     Cohn then handed the draft off to Bennet for further revision.  Cohn Dep. at 17:23-18:7; 60:8-12.

50.     In relevant part, Williamson's draft included the sentence, "In the aftermath of Wednesday's shooting, the political right and left and both sides of the gun debate dove into their respective foxholes."  Sullivan Decl. Ex. 18 at 2.  Cohn added a question after that line asking,

"do we know of any elected official on the left who have incited violence? [O]r just unaffiliated people online or comedians. [M]ost are pro-gun control. [D]oes this graph imply equivalence?" *Id.*; Cohn Dep. at 92:12-22, 92:23-94:20.

51.     Upon reading Williamson's draft, Bennet, who was ultimately responsible for the content of such editorials agreed with Cohn that the draft needed substantial revisions and began substantially rewriting it himself. Hr'g Tr. at 7:19-8:7.

52.     As the Editorial related to breaking news, the Editorial Board sought to publish the Editorial in the next day's print edition of the paper. Bennet Dep. at 22:6-19; Cohn Dep. at 60:13-15, 61:7-13; Williamson Dep. 252:22-253:4.

53.     The deadline to submit the Editorial for publication in the next morning's print edition was roughly 8:00 p.m. Bennet Dep. at 22:6-19; Cohn Dep. at 61:7-13.

54.     At the time he decided to substantially rewrite the Editorial, Bennet had less than three hours to do so. Hr'g Tr. at 8:11-16; Cohn Dep. at 60:13-15, 101:22-102:10.

55.     Bennet ultimately "effectively rewrote the piece." Hr'g Tr. at 8:25.

56.     When he rewrote Williamson's draft, Bennet worried that phrases like "incendiary" or "inflammatory rhetoric" had been "drained of [their] power because [they are] used so often." Hr'g Tr. at 12:8-12.

57.     Bennet decided to use the word "incitement" because he had "a very specific history and experience with the term." Hr'g Tr. at 11:13-12:2.

58.     Bennet had served as The Times Jerusalem bureau chief and prior to the assassination of Israeli Prime Minister Yitzhak Rabin inciting language had been used. Hr'g Tr. at 11:13-12:2; Bennet Dep. at 112:23-113:18, 186:7-8.

59.     Bennet also chose to use "incitement" because it was "a very strong word to write

about the political climate," and it was a word that that was not used every day so it would draw readers' attention to the particular horror of the Scalise shooting.  Hr'g Tr. at 12:3-12; Bennet Dep. at 112:23-113:18.

60.     Bennet worried that "some of what I saw [in Israel] could happen here."  Bennet Dep. at 123:22-25.

61.     Bennet said that, when he reported from Jerusalem for The Times, the word "incitement" was used broadly to "talk about a range of communications" "that contributed to intensifying and raising the temperature of the political debate," that is "very, very, strong language that describes the person on the other side of the debate as an enemy."   Hr'g Tr. at 12:13-25, 47:20-48:1; Bennet Dep. at 112:23-113:18.

62.     Such incitement ranged from "deliberate orders, invocations, summonses for people to carry out violent attacks" to more subtle contributions to the poisonous atmosphere between the groups, like "maps that misrepresent the politics of the region."  Hr'g Tr. at 12:20-24.

63.     Bennet had previously written an article for The Times, discussing a meeting of a joint Israeli-Palestinian "committee on 'prevention of incitement,' which [was] focusing on messages in the schools and news media encouraging violence."  Sullivan Decl. ¶ 29, Ex. 28 (NYTIMES0003278-81).

64.     While Bennet revised the Editorial, Cohn, Eileen Lepping, and Nick Fox focused on fact-checking the Editorial.  Cohn Dep. at 74:8-75:8.

65.     In particular, they focused on specific details of cited gun laws, which Cohn knew from her experience to be "ornate and detailed and different in all the states," requiring additional fact checking.  Cohn Dep. at 74:8-75:8; Sullivan Decl. ¶ 60, Ex. 59 ("Lepping Dep.")

at 86:7-12.

66.     Around 7:22 p.m., Bennet emailed a revised draft to Williamson, asking her to

"'[p]lease take a look" to "make sure that the piece is correct."  Bennet Dep. at 266:13-16;

Sullivan Decl. Ex. 17.

67.     Bennet assumed that Williamson had fact-checked her initial draft before sending

it to him.  Bennet Dep. at 263:21-264:6.

68.     Bennet also believed that Williamson would check the revised draft to make sure

he had not added anything contrary to her research.  Bennet Dep. at 264:23-266:16; Hr'g Tr.

60:1-9.

69.     Bennet did not click on the hyperlink or review the ABC article included at that

link.  Bennet Dep. at 261:15-262:10; Hr'g Tr. at 20:23-21:4.

70.     When The Times published the Editorial Bennet did not know whether there was

or was not a direct causal link between the Crosshairs Map and the Giffords shooting, and had

not read anything suggesting that such a connection did not exist.  Bennet Decl. ¶ 10; Bennet

Dep. at 97:3-11.

71.     Bennet did not click the link because he was "on a tight deadline," and viewed his

role as editing the Editorial, not reporting it.  Hr'g Tr. at 21:11-14.

72.     Bennet and Cohn continued working on the draft and a proposed headline until

shortly after 8:00 p.m.  Cohn Dep. at 104:18-105:5, 117:19-118:3; Sullivan Decl. ¶ 49, Ex. 48

(NYTIMES0000250-253).

## Publication of the Editorial

73.     The Times published the Editorial on its website around 9:00 p.m.  Am. Compl.

¶ 1, Ex. 1; Def. Ex. 2 (Print Editorial).

74.     The Editorial included the following passages, which Palin contends are

defamatory:

> Was this attack evidence of how vicious American politics has
> become?  Probably.  In 2011, when Jared Lee Loughner opened
> fire in a supermarket parking lot, grievously wounding
> Representative Gabby Giffords and killing six people, including a
> 9-year-old girl, the link to political incitement was clear.  Before
> the shooting, Sarah Palin's political action committee circulated a
> map of targeted electoral districts that put Ms. Giffords and 19
> other Democrats under stylized cross hairs.
>
> Conservatives and right-wing media were quick on Wednesday to
> demand forceful condemnation of hate speech and crimes by anti-
> Trump liberals.  They're right.  Though there's no sign of
> incitement as direct as in the Giffords attack, liberals should of
> course hold themselves to the same standard of decency that they
> ask of the right.

Am. Compl. ¶ 117; Def. Ex. 2.

75.     The hyperlink added by Williamson remained in the published draft.  Sullivan

Decl. Ex. 49.  Bennet did not click on the hyperlink and has no memory of having seen the

article on June 14, 2017.  Hr'g Tr. at 20:23-21:4; Bennet Dep. at 261:15-262:10.

76.     The international print edition of The Times did not include the passage that Palin

contends is defamatory or reference "Sarah Palin's political action committee." Sullivan Decl. ¶

51, Ex. 50 (NYTIMES0002914).

77.     That same evening, The Times published a series of news reports about the

shootings.  Am. Compl. Ex. 6.

78.     Bennet did not read The Times news stories about the Scalise shooting prior to

publication of the Editorial.  Hr'g Tr. at 24:13-25:1.

### Criticism of the Editorial and The Times' Response

79.     Following publication of the Editorial online, some readers posted comments on

and tweeting reactions to the Editorial challenging the notion that the Crosshairs Map constituted

"political incitement" or that there was any "link" between it and the Arizona shootings.  Bennet

Dep. at 85:20-86:22.

80.    Ross Douthat, a Times opinion writer, first told Bennet that readers were

questioning the Editorial in an email he sent at around 10:00 p.m. on June 14th. Sullivan Decl. ¶

22, Ex. 21 (NYTIMES0001716-17); Bennet Dep. at 81:22-24.

81.    Douthat explained that he believed there was "no evidence that Jared Lee

Loughner was incited by Sarah Palin or anyone else, given his extreme mental illness and lack of

any tangible connection to that crosshair map".  Sullivan Decl. Ex. 21; Bennet Dep. at 86:12-14.

Bennet responded by email a few minutes later:

> Thanks, and I'll look into this tomorrow. But my understanding
> [is] that in the Giffords case there was a gun sight superimposed
> over her district; so far in this case we don't know of any direct
> threat against any of the congressman on the field.  That's not to
> say that any of it is ok, obviously, or that the violence in either case
> was caused by the political rhetoric.  But the incitement in this case
> seems, so far, to be less specific.

Sullivan Decl. Ex. 21.

82.    Douthat in turn replied by email, explaining his concern about the editorial as he

had understood it:

> The targets were used by Palin, or her group, in a map of seats
> targeted for pickup in the midterms.  You can argue about whether
> that crosses a line … but the point is that the map had no link, none
> at all, to Giffords' actual murder.  People assumed a link initially
> … but the investigation debunked it.  I think Loughner was
> instigated by a non-answer she'd given him at a town hall about
> one of his theories of grammar, or his obsession with lucid
> dreaming, or something.  His act had nothing to do with the
> political climate, so far as anyone can tell.  Whereas the
> Alexandria shooter seems to have had an explicit political
> motivation.  So saying that Giffords was a case of incitement and
> this one isn't reads like we're downplaying that motive or implying

> that Loughner had right-wing motivations that he simply didn't
> have."

Sullivan Decl. Ex. 21.

83.    The drafters of the Editorial—Cohn, Williamson, and Bennet—did not intend to suggest a causal link between the Crosshairs Map and the Loughner Shooting.  Hr'g Tr. at 5:24-6:1 (testifying that "incitement" referred to "the danger that we're increasingly treating political opponents like enemies a conflict"); Bennet Dep. at 112:23:113:18; Bennet Decl. ¶ 8; Cohn Dep. at 96:22-97:7, 94:12-20 ("I certainly didn't mean someone was giving, like, orders or saying go shoot someone or go commit a violent act, but just that the rhetoric was ugly enough that it would boil up and foster people to take things into their own hands."); Williamson Dep. at 233:16-21 (testifying that "political rhetoric" referred to "a general overheated back-and-forth political climate"), 234:3-15.

84.    Bennet has admitted that he "did a very poor job . . . of trying to express" his intended thought and "created an inference for readers that there was a causal link between political incitement and the shooting of Gabby Giffords."  Bennet Dep. at 93:8-12.

85.    Bennet was not "trying to say that any particular piece of political incitement causes a maniac like Jared Lee Loughner to take up arms and shoot at elected representatives," nor that Palin was responsible for this particular piece of political incitement.  Hr'g Tr. at 15:11-13; Bennet Decl. ¶ 9.

86.    Bennet did not know then, and does not know now, whether or not Loughner was aware of the Crosshairs Map at the time he committed the shooting.  Bennet Decl. ¶¶ 10-11; Hr'g Tr. 33:10-34:12.

87.     Bennet stated that he "didn't remotely intend" to "accus[e] Governor Palin of complicity in this shooting,"  Hr'g Tr. at 28:6-8.

88.     Moreover, he said that he "was very concerned to see that that was one of the inferences that people had drawn from what I had written." Hr'g Tr. at 28:15-18.

89.     Though he later recognized that "some people" can interpret incitement to mean a "call to violence," he testified that "[t]hat was not the way [The Times was] using it in the editorial." Bennet Dep. at 114:10-15.

90.     Bennet's aim in the Editorial was "to express concern about the state of political rhetoric in the country of political incitement, the danger that we're increasingly treating political opponents like enemies in a conflict." Hr'g Tr. at 5:23-6:1.

91.     Specifically, Bennet worried that "the overall climate of political incitement . . . gives permission, to some degree, for violence against elected officials." Hr'g Tr. at 15:8-11.

92.     Bennet was attempting to advance the idea "that overheated political rhetoric can create a climate conducive to violent acts." Hr'g Tr. at 48:4-8; Bennet Decl. ¶ 8.

93.     Bennet mentioned the map circulated by SarahPAC as "an example of the kind of political incitement that contributes to this atmosphere" and one which had mentioned by name a person who ultimately was a victim of the Loughner Shooting. Hr'g Tr. at 16:5-7; *id.* at 17:21-18:2, 19:16-22, 50:22-51:7; Bennet Decl. ¶ 6.

94.     While the editorial "criticized the left for creating an atmosphere of incitement" in advance of the Scalise Shooting," Bennet was not aware of a specific, concrete example of such rhetoric "that connected the victims [of the Scalise Shoooting"] there to that atmosphere." Hr'g Tr. at 19:11-20; Bennet Decl. ¶ 7.

95.     The question asked at the very beginning of the paragraph at issue—was the Scalise Shooting "evidence of how vicious American politics has become?"—was answered in the Editorial with "probably." Hr'g Tr. at 16:8-14.

96.     Bennet did not intend to suggest that the Crosshairs Map had included "actual photographs of these representatives . . .put under the crosshairs," as opposed to over their districts, and the Editorial specifically referred to it as "a map of targeted electoral districts."  see Hr'g Tr. 31:3-8; Sullivan Decl. ¶ 50, Ex. 49 at 3.

97.     Williamson viewed the Editorial as talking about the "general overheated back-and-forth political climate."  Williamson Dep. at 233:16-21.

98.     Cohn read the Editorial as saying that the "rhetoric was ugly enough that it would boil up and foster people to take things into their own hands."  Cohn Dep. at 94:12-20.

99.     Bennet sent a text message to Williamson around 11:00 p.m., asking if she was available to begin investigating Douthat's concerns.  Sullivan Decl. ¶ 23, Ex. 22 (JBENNET0000038-39).

100.     Williamson responded early the following morning that she would look into the issue.  Sullivan Decl. Ex. 22.

101.     On June 15 at 5:08 a.m., Bennet emailed several people who had worked on the Editorial to ask them to "get to the bottom of this as quickly as possible."  Sullivan Decl. ¶ 24, Ex. 23 (NYTIMES0001803).

102.     Bennet also told Williamson that he needed "a rock-solid version of what we should say – that an investigation showed no link to incitement, or no direct link, or no clear link. I don't want to soften it if we don't need to.  If there was no link, we should say so."  Bennet Dep. at 278:25-279:11; Sullivan Decl. ¶ 40, Ex. 39 (NYTIMES0003261); Sullivan Decl. Ex. 22.

103.     Bennet asked this because, "At that point, [he] didn't know" the answer and "wanted our people to go back and start over and figure out precisely what the right way to characterize it was." Bennet Dep. at 279:17-24.

## The Times Revises the Editorial

104.    After investigating, the Editorial Board was not able to affirmatively prove or disprove any direct connection between Loughner and the Crosshairs Map.  Williamson Dep. at 261:6-9, 277:2-11; Cohn Dep. at 68:14-22.

105.    Nonetheless, The Times revised the online version of the Editorial to remove portions understood as suggesting a direct connection and to make clear that, on the Map, the crosshair appeared over Giffords' district, not over her name or image.  Am. Compl. ¶¶ 134-40.

106.    The Times published the first revised online version at 11:15 a.m. on June 15. Hr'g Tr. at 30:9-17; Sullivan Decl. ¶ 41, Ex. 40 (PALIN02729-32).  Specifically, The Times deleted the phrases "the link to political incitement was clear" and "[t]hough there's no sign of incitement as direct as in the Giffords attack" and added the sentence "But no connection to that crime was ever established."  Op. & Order at 7, Dkt. 45; Sullivan Decl. ¶ 20, Ex. 19 (NYTIMES0002912); Sullivan Decl. Ex. 40.

107.    The Times also published a series of corrections.  The first version of the correction, published at the bottom of the online version of the Editorial on June 15, 2017, read:

> An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords.  In fact, no such link was established.

Sullivan Decl. ¶ 28, Ex. 27 (PALIN02733-37).

108.    Once The Times revised the Editorial on June 15, 2017, the publicly-accessible version of the Editorial available on The Times website did not contain language connecting the Crosshairs Map to the Loughner shooting.  Sullivan Decl. Ex. 40.

109.    The final version of the correction, published at the bottom of the online version of the Editorial on June 16, 2017, read:

> An editorial on Thursday about the shooting of Representative
> Steve Scalise incorrectly stated that a link existed between political
> rhetoric and the 2011 shooting of Representative Gabby Giffords.
> In fact, no such link was established.  The editorial also incorrectly
> described a map distributed by a political action committee before
> that shooting.  It depicted electoral districts, not individual
> Democratic lawmakers, beneath stylized cross hairs.

Sullivan Decl. Ex. 27.

110.    On July 16, 2017, the print version of The Times contained the final version of

the correction in the Editorial section of the newspaper.  Sullivan Decl. ¶ 52, Ex. 51

(NYTIMES0002916).

111.    On June 15, 2017, at 11:33 a.m., 11:37 a.m., and 11:40 a.m., The Times published

a series of tweets on the opinion division Twitter account, @NYTOpinion, including the text:

"We got an important fact wrong, incorrectly linking political incitement and the 2011 shooting

of Giffords.  No link was ever established.  We're sorry about this and we appreciate that our

readers called us on the mistake."  Sullivan Decl. ¶ 26, Ex. 25 (PALIN03829-33); Sullivan Decl.

¶ 27, Ex. 26 (PALIN03827-28).

### **Allegations Regarding Actual Malice**

112.    Prior to his most recent role at The Times, Bennet was the Editor-in-Chief for *The

Atlantic* monthly magazine.  Bennet Dep. at 41:16-18.

113.    Palin contends that as the Atlantic's Editor-in-Chief Bennet must have "reviewed,

edited and approved the publication of numerous articles [that] confirm[ed] there was no link

between Gov. Palin and Loughner's shooting."  Am. Compl. ¶¶ 42, 54-59.

114.    *The Dish* was a blog controlled and edited by Andrew Sullivan that was hosted on

the same website as *The Atlantic* magazine at the time the Loughner Shooting occurred in

January 2011.  Bennet Decl. ¶ 15; Sullivan Decl. ¶ 42, Ex. 41 ("A. Sullivan Dep.") at 85:11-

86:6; 86:22-87:3; 106:21-107:11; Bennet Dep. at 48:2-8; 49:3-50:11; Hr'g Tr. at 64:20-65:1; 67:4-5.

115.    Sullivan had complete editorial independence in running *The Dish*.   No one, including Bennet, reviewed or edited his blog posts before publication.   Bennet Decl. ¶ 15; A. Sullivan Dep. at 85:11-86:6; 106:21-107:11; Bennet Dep. at 46:6-48:7; Hr'g Tr. at 64:20-65:1; 67:4-5.

116.    Bennet had no role "whatsoever" in *The Dish.*   A. Sullivan Dep. at 86:22-87:3.

117.    Sullivan and his staff made over 1,400 individual posts to *The Dish* in January 2011 alone.  A. Sullivan Dep. at 90:5-8.

118.    The piece titled "An Assassination," discussed in the Amended Complaint at Paragraph 57, was a blog post from *The Dish*, not a column in *The Atlantic.* A. Sullivan Dep. at 58:18-21, 91:3-93:3; Sullivan Decl. ¶ 43, Ex. 42 (PALIN04351-58); Am. Compl. ¶ 57.

119.    James Bennet had no role in preparing or editing the blog post "An Assassination."  A. Sullivan Dep. at 93:4-7.  At the time of publication of the Editorial, Bennet had no recollection of reading "An Assassination."  Hr'g Tr. at 21:19-22:1.

120.    Sullivan's live blog titled "An Assassination Attempt in Arizona: Live-Blogging," discussed in Paragraph 58 of the Amended Complaint, was published as part of *The Dish*.  A. Sullivan Dep. at 56:8-16, 93:8-96:15; Sullivan Decl. ¶ 56, Ex. 55 (PALIN04359-72); Am. Compl. ¶ 58.

121.    James Bennet had no role in preparing or editing the live blog tiled "An Assassination Attempt in Arizona: Live-Blogging."  A. Sullivan Dep. at 96:16-22.  At the time of publication of the Editorial, Bennet had no recollection of reading of Sullivan's live blog. Hr'g Tr. at 21:19-22:1.

122.    The piece titled "Caldwell's Unfairness," discussed in the Amended Complaint at Paragraphs 66-67, was a blog post from *The Dish*, not a column in *The Atlantic*. A. Sullivan Dep. at 62:22-74:15, 98:8-99:14; Sullivan Decl. ¶ 44, Ex. 43 (PALIN04388-91); Am. Compl. ¶¶ 66-67.

123.    James Bennet had no role in preparing or editing the blog post "Caldwell's Unfairness."  A. Sullivan Dep. at 99:15-25.

124.    At the time of publication of the Editorial, Bennet had no recollection of reading "Caldwell's Unfairness."  Hr'g Tr. at 21:19-22:1, 65:2-4.

125.    The piece titled "The More We Know," discussed in the Amended Complaint at Paragraphs 59 and 63, was a blog post from *The Dish*, not an article in *The Atlantic*. A. Sullivan Dep. at 74:16-75:3, 96:23-98:7; Sullivan Decl. ¶ 57, Ex. 56 (PALIN04498-505); Am. Compl. ¶¶ 59, 63.

126.    James Bennet had no role in preparing or editing the blog post "The More We Know."  A. Sullivan Dep. at 98:4-7.

127.    At the time of publication of the Editorial, Bennet had no recollection of reading "The More We Know."  Hr'g Tr. at 21:19-22:1.

128.    *The Atlantic Wire* was a "sister site" to *The Atlantic* magazine, run by a separate editor, Gabriel Snyder, that primarily acted as a news aggregation hub.  Bennet Decl. ¶¶ 13-14; Bennet Dep. at 124:20-125:4; Sullivan Decl. ¶ 45, Ex. 44 ("Douthat Dep.") at 66:11-21; A. Sullivan Dep. at 101:20-102:9.

129.    The piece titled "Ten Days That Defined 2011," discussed in the Amended Complaint at Paragraphs 59, 68 and 69, was a blog post from *The Atlantic Wire*, not an article in *The Atlantic*.  Bennet Dep. at 127:13-128:4; Sullivan Decl. ¶ 31, Ex. 30 (PALIN04486-97); Am.

Compl. ¶¶ 59, 68-69.

130.    The piece titled "Was Shooting of Rep. Gabrielle Giffords Political," discussed in the Amended Complaint at Paragraph 59, was a blog post from *The Atlantic Wire*, not an article in *The Atlantic*.  Sullivan Decl. ¶ 53, Ex. 52 (PALIN04514-21); Am. Compl. ¶ 59.

131.    The piece titled "Did Sarah Palin's Target Map Play Role in Giffords Shooting," discussed in the Amended Complaint at Paragraphs 59 and 69 n.2, was a blog post from *The Atlantic Wire*, not an article in *The Atlantic*.  Sullivan Decl. ¶ 54, Ex. 53 (PALIN04392-99); Am. Compl. ¶¶ 59, 69 n.2.

132.    The piece titled "What We Know About Jared Lee Loughner," discussed in the Amended Complaint at Paragraphs 59 and 61, was a blog post from *The Atlantic Wire*, not an article in *The Atlantic*.  Sullivan Decl. ¶ 55, Ex. 54 (PALIN04530-38); Am. Compl. ¶¶ 59, 61.

133.    Bennet did not edit the content of *The Atlantic Wire* and does not recall reading the posts to it cited by Palin in her Amended Complaint at the time of publication or prior to publishing the Editorial.  Bennet Decl. ¶¶ 10, 13-14; Hr'g Tr. at 21:19-22:1.

134.    *National Journal* was another "sister site" to *The Atlantic* magazine, run by a separate editor, Ron Fournier.  Bennet Decl. ¶¶ 13-14.

135.    The piece titled "Stop The Blame Game," discussed in the Amended Complaint at Paragraphs 59, was published by *National Journal*, not *The Atlantic*.  Sullivan Decl. ¶ 58, Ex. 57; Am. Compl. ¶¶ 59.

136.    Bennet did not edit the content of *National Journal* and does not recall reading "Stop The Blame Game" at the time of publication or prior to publishing the Editorial.  Bennet Decl. ¶¶ 10, 13-14; Hr'g Tr. at 21:19-22:1.

137.    Cohn did not edit the piece titled, "She Who Must Not Be Named," discussed in

the Amended Complaint at Paragraph 76, and does not recall ever reading it.  Cohn Dep. at 48:7-17; Sullivan Decl. ¶ 47, Ex. 46 (PALIN03562-64); Am. Compl. ¶ 76.

138.    Cohn did not edit the piece titled, "The Tucson Witch Hunt," discussed in the Amended Complaint at Paragraph 126, and does not recall reading it at the time of publication or prior to publishing the Editorial.  Cohn Dep. at 49:16-50:5; Sullivan Decl. ¶ 46, Ex. 45 (PALIN03655-58); Am. Compl. ¶ 126.

139.    Bennet, Williamson, and Cohn each have no recollection of editing, drafting, or even reading the pieces from The Times that Palin contends would have demonstrated to them that it would be false to suggest a causal link between the Crosshairs Map and the Loughner Shooting.  Bennet Decl. ¶ 10; Hr'g Tr. at 22:22-25:6, 59:2-24, 62:15-63:23; Williamson Dep. at 285:10-288:11 (testifying that she did not recall seeing Pl. Ex. 64, 67, 149, 150, or 60 while drafting Editorial); Cohn Dep. at 46:11-50:20 (testifying that she did not recall working on Pl. Ex. 10, 11, 12, 60, 61); *id.* at 48:14-17; 51:7-18 (testifying that she cannot recall individual columns because of the volume she has edited over years working as an editor).

140.    Bennet does not recall reading and was not at the time of publication of the Editorial aware of having read any of the articles cited by Palin that purportedly demonstrate a consensus that the Loughner Shooting was not in any way caused by the Crosshairs Map.  Bennet Decl. ¶ 10; Hr'g Tr. 21:15-22:1; 26:13-27:1, 59:2-24; 63:20-67:12; Bennet Dep. 122:15-22; 123:23-124:6; 132:3-11; 134:10-15.

141.    Palin also alleged that Bennet had "reason to be personally hostile toward Palin, her political party, and her pro-gun stance," namely that Bennet's brother is a Senator from Colorado who was endorsed by House members whose districts had been targeted by the Crosshairs Map, that a man had threatened to attack Sen. Bennet's offices in the days before the

Loughner Shooting, that both Bennets had become advocates for gun control, and that Palin had endorsed Sen. Bennet's opponent in 2016.  Am. Compl. ¶ 50; *Palin*, 940 F.3d at 814.

142.    Bennet does not recall speaking with his brother about the threat to his office, and it was not the sort of topic about which they typically would speak.  Bennet Dep. at 145:5-15.

143.    Bennet does not recall that Sen. Bennet had given a floor speech about gun violence.  Bennet Dep. at 163:11-13.

144.    Bennet was unaware at the time he wrote the Editorial that Palin had endorsed Michael Bennet's opponent in his 2016 senate race.  Hr'g Tr. at 70:24-71:10.

145.    Bennet was unaware at the time he wrote the Editorial that the Crosshairs Map had included among targeted districts those of two lawmakers who had endorsed his brother. Hr'g Tr. at 70:19-23.

146.    Bennet was unaware at the time he wrote the Editorial that Giffords' PAC had endorsed Senator Bennet.  Hr'g Tr. at 71:11-17.

147.    Linda Cohn testified that Bennet was "very concerned [about] the epidemic of gun violence," but the issue was not a "big focus" of his.  Cohn Dep. at 113:11-21.

148.    In response to a subpoena from Palin, Sen. Bennet stated that a reasonable search had discovered no communications with his brother James Bennet regarding threats made against his office in January 2011.  Sullivan Decl. ¶ 33, Ex. 32 at No. 7 (Non-Party Michael Bennet's Responses and Objections to a Subpoena from Plaintiff ("Sen. Bennet R&O")).

149.    In response to a subpoena from Palin, Sen. Bennet stated that a reasonable search had discovered no communications with his brother, James Bennet, concerning Sen. Bennet's speeches on gun control.  Sen. Bennet R&O Nos. 8-9.

150.    Bennet did not write, edit, or comment on any of Sen. Bennet's speeches on gun

control.  Bennet Dep. at 62:25-63:6.

151.    In response to a subpoena from Palin, Sen. Bennet stated that a reasonable search had discovered no communications with his brother, James Bennet, concerning Palin's endorsement of Sen. Bennet's political opponent in 2016.  Sen. Bennet R&O No. 10.

152.    In response to a subpoena from Palin, Sen. Bennet stated that a reasonable search had discovered no communications with his brother, James Bennet, concerning gun control or gun legislation.  Sen. Bennet R&O No. 13.

153.    As Editor of The Times's opinion section, Bennet sought to expand the range of voices represented, including by adding more conservative writers or contributors.  Bennet Dep. at 200:4-21; 209:22-210:24.

154.    Palin concedes that, at the time the Editorial was published, "reasonable people could have interpreted either way" whether there was a "connection between the crosshairs map and Jared Loughner's motivation."  Palin Dep. at 195:14-20.; *id.* at 195:24-196:2 ("I guess it's tough for me to judge whether the public believed that there was a consensus out there as to motivation of Jared.").

155.    Palin concedes that, following some initial reporting that connected the Crosshairs Map and Loughner Shooting, "obviously there was not the clarification made even within The New York Times team in those years" that no such connection existed because "otherwise why would The New York Times have said it again" in the Editorial in 2017.  Palin Dep. at 201:2-6.

Dated:  June 19, 2020

Respectfully submitted,

BALLARD SPAHR LLP

By: _/s/ Jay Ward Brown_
    Jay Ward Brown
    David L. Axelrod
    Thomas B. Sullivan
    Jacquelyn N. Schell
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

*Counsel for Defendants*