UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SARAH PALIN, an individual,

               Plaintiff,

  – against –

THE NEW YORK TIMES COMPANY,
a New York corporation, and JAMES
BENNET, an individual,

               Defendant.

No. 17 Civ. 4853

Hon. Jed S. Rakoff

ECF Case

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone: (813) 443-2199
Facsimile: (813) 443-2193

and

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone: (212) 907-7300
Facsimile: (212) 754-0330
Facsimile: (212) 754-0330

*Attorneys for Plaintiff Sarah Palin*

## <u>TABLE OF CONTENTS</u>

Table of Contents ............................................................................................................. i

Table of Authorities ......................................................................................................... ii

I.      Introduction ........................................................................................................... 1

II.     *Stare Decisis* Does Not Mandate Continued Adherence to the Actual
        Malice Rule ............................................................................................................ 6

III.    Precedent Establishing the Actual Malice Rule Should be Overruled ............................ 8

IV.     The Actual Malice Rule Arose from Distinguishable Facts and Should Not
        Be Applied ............................................................................................................. 13

Certificate of Service ........................................................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*American Civil Liberties Union v. Reno*, 929 F.Supp. 824 (E.D. Pa. 1996), judgment aff'd, 521 U.S. 844 (1997)...................................................................... 2

*Bank of Or. v. Indep. News, Inc.*, 670 P.2d 616 (Or. Ct. App. 1983) ......................................... 17

*Blankenship v. Manchin*, 471 F.3d 523 (4th Cir. 2006)............................................................. 17

*Blum v. State*, 255 A.D.2d 878 (N.Y. App. Div. 1998) ............................................................. 17

*Bostock v. Clayton County, Georgia*, 2020 WL 3146686 (2020)........................................... 9, 10

*Burnett v. Coronado Oil & Gas Co.*, 285 U.S. 393 (1932) ........................................................ 7

*Civil Rights Cases*, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883) ............................................. 11

*Commonwealth of Virginia v. Rives*, 100 U.S. 313, 25 L.Ed. 667 (1880)................................. 11

*Curtis Pub. Co. v. Butts*, 388 U.S. 130 (1967).................................. 5, 6, 7, 12, 13, 14, 15, 18, 19

*De Jonge v. Oregon*, 299 U.S. 353 (1937).................................................................................. 15

*Dennis v. U.S.*, 341 U.S. 494 (1951)......................................................................................... 13

*Dilworth v. Dudley*, 75 F.3d 307 (7th Cir. 1996)...................................................................... 16

*Drews v. Michelson*, 327 N.W.2d 723 (Wis. Ct. App. 1982) .................................................. 17

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985) ...................... 7, 9, 20

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) .......................... 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 16, 18, 19, 20

*Gilbert v. WNIR 100 FM*, 756 N.E.2d 1263 (Ohio Ct. App. 2001)........................................... 17

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989) .............................. 1

*Henderson v. Van Buren Pub. Sch. Superintendent*, 644 F.2d 885, 6 Med. L. Rptr. 2409 (6th Cir. 1981) .............................................................................................. 17

*Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 853 N.E.2d 770 (Ill. App. Ct. 2006)........................................................................................................................ 17

*In re Ex Parte Commonwealth of Virginia*, 100 U.S. 339 (1879) ............................................. 11

*Jaffree v. Board of Sch. Comm'rs*, 554 F.Supp. 1104 (S.D. Ala. 1983) .......................................... 7

*Jaffree v. Wallace*, 705 F.2d 1526 (11th Cir. 1983) ........................................ 7

*Janus v. American Federation of State, County, and Mun. Employees, Council 31*, 138 S.Ct. 2448 (2018) ........................................................................ 10

*Kimble v. Marvel Ent., LLC*, 576 U.S. 446 (2015) ........................................ 7

*Kiseau v. Bantz*, 686 N.W.2d  164 (Iowa 2004) ........................................ 17

*Knight first Amendment Institute at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019) ...................................................................... 15

*Lee v. City of Rochester*, 174 Misc. 2d 763 (N.Y. Sup. Ct. 1997) .......................... 17

*Lluberes v. Uncommon Productions, LLC*, 663 F.3d 6 (1st Cir. 2011) ........................ 1

*Mahoney v. State*, 236 A.D.2d 37 (N.Y. App. Div. 1997) .......................... 16

*Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072 (3d Cir. 1985) ......... 17

*Mathis v. Cannon*, 573 S.E.2d 376 (Ga. 2002) ........................................ 16

*McKee v. Cosby*, 139 S.Ct. 675 (2019) ........................................ 8, 9, 10, 20

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) ........................ 5, 6, 18, 20

*Moss v. Stockard*, 580 A.2d 1011 (D.C. 1990) ........................................ 17

*NAACP v. Button*, 371 U.S. 415 (1963) ........................................ 8

*New Prime Inc. v. Oliveira*, 586 U.S. ——,139 S.Ct. 532, 202 L.Ed.2d 536 (2019) .................. 9

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ................................ 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 18, 19, 20

*Northern Securities Co. v. U.S.*, 24 S.Ct. 436 (1904) ........................................ 9

*Obsidian Finance Group, LLC v. Cox*, 740 F.3d 1284 (9th Cir. 2014) ................ 1, 19

*Orr v. Argus-Press Co.*, 586 F.2d 1108 (6th Cir. 1978) ........................................ 16

*Patterson v. McLean Credit Union*, 491 U.S. 164 (1989) .......................... 7

*Pegasus v. Reno Newspapers, Inc.*, 57 P.3d 82 (Nev. 2002) .......................... 17

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992) .......................... 7

*Price v. Time, Inc.*, 416 F.3d 1327 (11th Cir. 2005) ..................................................... 17

*Riddle v. Golden Isle Broad, LLC*, 621 S.E.2d 822 (Ga. Ct. App. 2005) .................................. 17

*Robertson v. Baldwin*, 165 U.S. 275 (1897) ........................................................... 13

*Rodriguez v. Nishiki*, 653 P.2d 1145 (Haw. 1982)..................................................... 17

*Rosenblatt v. Baer*, 383 U.S. 75 (1966) ................................................................. 5

*Sewell v. Trib Publ'ns, Inc.*, 622 S.E.2d 919 (Ga. Ct. App. 2005) .......................................... 17

*Shelley v. Kraemer*, 334 U.S. 1 (1948) ............................................................... 11

*Smith v. Allwright*, 321 U.S. 649 (1944) ............................................................... 7

*Stare Decisis*, 49 Colum. L. Rev. 735 (1949) ........................................................... 7

*State v. Phillips*, 540 P.2d 936 (Utah 1975)............................................................. 7

*State v. Taylor*, 664 P.2d 439 (Utah 1983) ............................................................. 7

*Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264 (3d Cir. 1980) .......................................... 17

*Swate v. Schiffers*, 957 S.W.2d 70 (Tex. Ct. App. 1998)................................................. 17

*Terminiello v. Chicago*, 337 U.S. 1 (1949)............................................................. 15

*Thomas v. Tel. Publ'g Co.*, 929 A.2d 993 (N.H. 2007) ................................................. 17

*Time, Inc. v. Hill*, 385 U.S. 374 (1967).................................................................. 6

*Wilson v. Daily Gazette Co.*, 588 S.E.2d 197 (W. Va. 2003) ............................................ 17

*WJLA-TV v. Levin*, 647 S.E.2d 383 (Va. 2002) ....................................................... 17

## OTHER AUTHORITIES

1 Law of Defamation § 1:21 (2d ed.) (Protection of Reputation—Purposes) ............................. 5

2 *Internet Law and Practice* § 24:15 ................................................................. 15

20 Am. Jur. 2d Courts § 125 ........................................................................... 7

Aaron Perzanowski, *Relative Access to Corrective Speech: A New Test for
    Requiring Actual Malice*, 94 Calif. L. Rev. 833 ................................................ 4, 5

Ann E. O'Connor, *Access to Media All A-Twitter: Revisiting Gertz and the Access to Media Test in the Age of Social Networking*, 63 Fed.Comm. L.J. 507 ............................. 14

California Code of Civil Procedure § 425.16 (California) ........................................ 20

Fla. Stat. § 768.295 (Florida) ................................................................................ 20

Hatherine D. Gotelaere, *Defamation or Discourse?  Rethinking The Public Figure Doctrine on the Internet*, 2 Case W. Reserve J.L. Tech. & Internet 1 (2011) ....................... 4

Jeff Kosseff, *Private or Public? Eliminating the Gertz Defamation Test*, Journal of Law, Technology & Policy [Vol. 2011] ............................................................. 16

Marc A. Franklin, *Suing Media for Liable: A Litigation Study*, 1981 Am. B. Found. Res. J. 795, 801, 829 ....................................................................... 2

Marc A. Franklin, *Winners and Losers and Why: A Study of Defamation Litigation*, 1980 Am. B. Found. Res. J. 455, 471, 489, 498 ................................... 2

Mary-Rose Papandrea, *The Story of New York Times Co. v. Sullivan*, Boston College Law School Legal Studies research Series, May 30, 2012 ......................................... 8

Michael L. Rustad, Sanna Kulevska, *Reconceptualizing the Right to Be Forgotten to Enable Transatlantic Data Flow*, 28 Harv. J.L. & Tech. 349 (2015) ............................. 18

Nat Stern, *Unresolved Antithesis of the Limited Public Figure Doctrine*, 33 Hous. L. Rev. 1027 (1996) ............................................................................ 2

Plaintiff, Sarah Palin ("Gov. Palin"), by counsel and pursuant to Federal Rule of Civil Procedure 56, moves for the entry of a partial summary judgment against Defendants, The New York Times Company ("The Times") and James Bennet ("Bennet") (collectively, "Defendants"), holding that Plaintiff is not required to prove the defamatory statements at issue in this case were published with "actual malice."[1]  In support, Gov. Palin states as follows:

## I.     <u>Introduction</u>

Through the lens of the actual malice rule, Sarah Palin's defamation claim against *The Times* and James Bennet is viewed no differently than a claim by someone like Darnella Frazier against an anonymous internet troll.  The rule applies to plaintiffs irrespective of the popularity of their beliefs and shields individual defendants as well as the press.[2]   Unbeknownst to many, an exponentially increasing number of people arguably could be subjected to the rule's "elusive[3]" standard of fault in circumstances beyond contemplation when the rule came into existence.

The actual malice rule was judicially-imposed to solve problems peculiar to a bygone era, long-before the Internet and social media took hold of American society.  Its justifications rest on incorrect and outdated beliefs about assumed risk and access to methods of mass communication which must be used to decide who must suffer the rule's "heavy, often insurmountable[4]"

---

[1] Plaintiff reserves all rights and arguments concerning the actual malice issue, including but not limited to, her right to prove actual malice (if necessary) and oppose Defendants' Motion for Summary Judgment on actual malice by demonstrating a reasonable jury could find the statements at issue in this case were published with actual malice.

[2] *Obsidian Finance Group, LLC v. Cox*, 740 F.3d 1284, 1291 (9th Cir. 2014) ("[T]he First Amendment defamation rules in *Sullivan* and its progeny apply equally to the institutional press and individual speakers") (collecting cases).

[3] *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989).

[4] *Lluberes v. Uncommon Productions, LLC*, 663 F.3d 6, 14 (1st Cir. 2011).

burden.[5]   Not surprisingly, the rule's effects have transgressed far afield from its intended purpose; prominent among them self-professed immunity for media companies like *The Times* and the intimidation of plaintiffs with legitimate claims.[6]

It has become clear that the rule is obsolete and unworkable, incapable of consistent application, and holds no footing in the modern speech landscape.  Defamation plaintiffs should not be subjected to its unwarranted burden.  This is not to say the importance of protecting speech from governmental censorship has diminished.  Rather, the foundation of the actual malice rule has eroded as society, technology, and the platforms for free speech evolved.  Gone are the days when a small group of powerful people enjoyed exclusive influence and control over the public debate through unmatched access to a limited means of communication with the American public.  Now, the Internet and social media have given a loud and far-reaching voice to virtually every citizen and empowered them with an equal opportunity to decide what information and ideas flow to and from their fellow citizens and to shape the public debate.

Even as far back as 30 years ago, the Internet's impacts were obvious:   "It is no exaggeration to conclude that the Internet has achieved, and continues to achieve, the most participatory marketplace of mass speech that this country—and indeed the world—has yet seen."   *See American Civil Liberties Union v. Reno*, 929 F.Supp. 824, 881 (E.D. Pa. 1996), *judgment aff'd*, 521 U.S. 844, 851, 853 (1997) ("Anyone with access to the Internet may take

---

[5] "In practice, this requirement poses an insurmountable barrier in all but a relative handful of egregious cases." *See* Nat Stern, *Unresolved Antithesis of the Limited Public Figure Doctrine*, 33 Hous. L. Rev. 1027, 1028 (1996) (*citing* Marc A. Franklin, *Suing Media for Liable: A Litigation Study*, 1981 Am. B. Found. Res. J. 795, 801, 829 (study results demonstrate "trial court decisions overwhelmingly favored defendants"); Marc A. Franklin, *Winners and Losers and Why: A Study of Defamation Litigation*, 1980 Am. B. Found. Res. J. 455, 471, 489, 498 (analyzing a study of defamation decisions and concluding that "the most striking point shown . . . is the plaintiffs' notable lack of success")).

[6] *See* Plaintiff's Statement of Material Facts ("SMF") ¶ 1.

advantage of a wide variety of communication and retrieval methods…[and]…with a computer connected to the Internet can 'publish' information."). Since then, these impacts have continued to expand.

One need only look to the growing number of movements spawned by ordinary citizens without assistance from the press—Arab Spring, Occupy Wall Street, Black Lives Matter, the Woman's March, March for Our Lives[7]—to see how much free speech has progressed. Most recently, a 17-year-old girl from Minneapolis altered the course of American history by using Facebook to post a video of George Floyd being murdered by police.[8]

The current speech environment is incomparable to what confronted the Supreme Court in the 1960's and 1970's. Then, Martin Luther King Jr. was at the mercy of the press to disseminate his "Letter From Birmingham Jail"—which *The Times* declined to publish.[9] Now, one person with a cell phone has the power to instantly start a worldwide movement without any media assistance. One's ability to be heard by the masses, effectuate change, and criticize the government is no longer dependent upon a centralized group of newspapers, magazines, and broadcasters.

The opportunities, access, and audience available through the Internet were unimaginable when the actual malice rule was created. And when the rule was extended to public figures, no one could have anticipated the extraordinary number of people who use the Internet and social media on a daily basis to inject themselves into and influence the resolution of countless issues and controversies; all of whom arguably may be crossing into "public figure" territory.

---

[7] *See* Plaintiff's SMF ¶ 2.
[8] *See* Plaintiff's SMF ¶ 3.
[9] *See* Plaintiff's SMF ¶ 4.

It is a mistake to instinctively apply the actual malice rule while ignoring the Internet's impacts and the rule's unanticipated potential consequences.[10]  An intellectually honest evaluation of the justifications for the rule in the context of Internet and social media use shows a far greater number of people seemingly fall within the category of speakers that could be deemed to have sacrificed their ability to adequately defend their reputations.[11]  This includes people who engage in speech similar to that of Darnella Frazier[12], Greta Thunberg[13], Parkland students[14], and countless others; presumably unaware doing so could subject them to the same standard Defendants seek to impose on Sarah Palin.

The continued use of the actual malice rule ignores the existing imbalance between the right to protect one's reputation and the need to prevent government suppression of speech.[15] The Internet substantially weakened the free speech side of the rule's required balancing test; while the instantaneous, autonomous access it provides all Americans to free expression[16]

---

[10] "The traditional public figure doctrine, as formulated through Supreme Court jurisprudence, is unable to meet the needs of the Internet.  In an age where virtually anyone can create an online profile and a video can go 'viral' in a matter of hours, it is exceedingly difficult to analyze whether an individual, through his online activity, has voluntarily assumed the public spotlight and accompanying criticism such that he should be subject to the actual malice standard in a defamation suit."  *Defamation or Discourse?  Rethinking The Public Figure Doctrine on the Internet*, Hatherine D. Gotelaere, 2 Case W. Reserve J.L. Tech. & Internet 1 (2011).

[11] Actual malice is a "substantial abridgment" of reputational rights and "exacts a correspondingly high price from the victims of defamatory falsehood [as] many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the New York Times test."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342-343 (1974).

[12] *See* FN 8.

[13] *See* Plaintiff's SMF ¶ 5

[14] *See* Plaintiff's SMF ¶ 6

[15] *Gertz*, 418 U.S. at 343 (needs of the press must be balanced against an individual's right to protect their reputation)

[16] "New technologies, most notably the Internet, democratized communication in ways inconceivable to the *Gertz* court…Where traditional media allowed for one-to-many distribution of information, the Internet facilitates many-to-many communication.  On the Internet, for better or worse, each of us can have our say."  Aaron Perzanowski, *Relative Access to Corrective Speech: A New Test for Requiring Actual Malice*, 94 Calif. L. Rev. 833, 834.

(including the dissemination of false information and defamatory speech) tilted the scales even further in favor of protecting human dignity.  "The protection of reputation has taken on additional gravity since the development of the Internet.  It is now easier to defame another person than at any time in world history, as the Internet makes everyone a potential mass-media publisher."  *See* 1 Law of Defamation § 1:21 (2d ed.) (Protection of Reputation—Purposes). This imbalance continues to grow as the number of "private" people potentially exposing themselves to "public figure" status increases and social media permeates the fabric of more people's daily lives.

What this all shows is that the Defendants seek to impose the actual malice standard on Plaintiff in substantially dissimilar circumstances to those present in *New York Times v. Sullivan*, 376 U.S. 254 (1964), *Curtis Pub. Co. v. Butts*, 388 U.S. 130 (1967), and *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974).[17]  The right to protect one's reputation and recover compensation for the permanent harm Internet defamation causes outweighs the outmoded policies from which the actual malice rule arose.  Continuing to apply the rule subverts human dignity[18] even though the justifications for doing so have ceased to exist.  What's more, as explained in Section IV, the rule poses a substantial risk to free expression because it chills speech and fosters the proliferation of false information.

---

[17] 94 Calif. L. Rev. at 847-848 ("By focusing on the Court's conception of the media during the decade between Sullivan and Gertz, a picture of a doctrine inextricably tied to outdated assumptions emerges.")

[18] "[W]e have regularly acknowledged the 'important social values which underlie the law of defamation,' and recognized that '[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation… 'The right of a man to protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.'"  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 22 (1990) (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 86 and 92-93 (1966)).

The historical importance of *Sullivan, Butts*, and *Gertz*, can easily obscure the obligation to question whether they should still apply.  But it is wrong to instinctively presume the necessity and appropriateness of the actual malice rule—and potentially subvert the right of basic human dignity—simply because it cured evils that imperiled speech in a bygone era and invoked rousing concepts like our "profound national commitment to the principle of debate on public issues" and the importance of "assur[ing] the unfettered exchange of ideas for the bringing about of political and social changes desired by the people."  *Sullivan*, 376 U.S. at 269-70.   Indeed, the Supreme Court counseled against such a "blind application" of the rule.  *Butts*, 388 U.S. at 148 (citing *Time, Inc. v. Hill*, 385 U.S. 374, 390 (1967)).  No one questions the importance of the free speech principles *Sullivan* sought to protect.  What must be questioned is a Pavlovian-adherence to the actual malice rule every time the press invokes *Sullivan,* which ignores the Internet's profound impacts on speech, the unfettered access to the marketplace of ideas it provides, and the resulting proliferation of the uninhibited, robust, and wide-open debate *Sullivan* and its progeny sought[19]—but are no longer necessary—to ensure.

Society changed, and with it so must the law.  At bare minimum, the actual malice rule should not be applied because the reasons for doing so no longer exist.

## II.      *Stare Decisis* **Does Not Mandate Continued Adherence to the Actual Malice Rule**

The arguments raised herein undoubtedly arouse *stare decisis* reservations.  Defendants may try to pigeonhole Plaintiff's arguments as embodying a singular request to ignore binding precedent, but that is not the case.

There is one component of Plaintiff's argument (Section III) that asserts the actual malice rule should be overruled.  Plaintiff is not oblivious to the implications of *stare decisis*.  Although

---

[19] "The *New York Times-Butts-Gertz* culpability requirements further ensure that debate on public issues remains 'uninhibited, robust, and wide-open."  *Milkovich*, 497 U.S. at 20.

there are instances of lower courts refusing to apply binding precedent,[20] the appropriateness of doing so is admittedly suspect[21] (and often depends on the eyes of the beholder or injustice motivating the departure from controlling law).   Notably, Constitutional questions are less susceptible to *stare decisis.*[22]

Independently, Plaintiff contends the actual malice rule is inapplicable because the surrounding context of this case is substantially dissimilar from that presented in *Sullivan*, *Butts*, *Gertz*, and the like.  *Stare decisis* is limited in application to cases involving substantially similar facts.  20 Am. Jur. 2d Courts § 125 ("Under the doctrine of stare decisis, when a court has laid down a principle of law as applying to certain facts, it will adhere to that principle and apply it to

---

[20] *See e.g., Jaffree v. Board of Sch. Comm'rs*, 554 F.Supp. 1104, 1128 (S.D. Ala. 1983); rev'd in part sub nom, *Jaffree v. Wallace*, 705 F.2d 1526 (11th Cir. 1983), cert. denied, 446 U.S. 926 (1984), aff'd 472 U.S. 38 (1985); *State v. Phillips*, 540 P.2d 936, 938 (Utah 1975), *overruled* by *State v. Taylor*, 664 P.2d 439, 448 n.4 (Utah 1983).

[21] *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 764 (1985) (Burger, concurring) (noting "*Gertz*, however, is now the law of the land, and until it is overruled, it must, under the principle of *stare decisis*, be applied by this Court.")

[22] *Kimble v. Marvel Ent., LLC*, 576 U.S. 446 (2015); William O. Douglas, *Stare Decisis*, 49 Colum. L. Rev. 735, 736 (1949) ("A judge looking at a constitutional decision may have compulsions to revere past history and accept what was once written.  But he remembers above all else that it is the Constitution which he swore to support and defend, not the gloss which his predecessors may have put on it."); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 954-55 (1992) (Rehnquist, J., concurring in the judgment in part and dissenting in part) ("Erroneous decisions in such constitutional cases are uniquely durable, because correction through legislative action, save for constitutional amendment, is impossible. It is therefore our duty to reconsider constitutional interpretations that 'depart from a proper understanding' of the Constitution.") (citations omitted); *Patterson v. McLean Credit Union*, 491 U.S. 164, 175 n.1 (1989) ("[C]onsiderations of stare decisis have added force in statutory cases because Congress may alter what we have done by amending the statute. In constitutional cases, by contrast, Congress lacks this option, and an incorrect or outdated precedent may be overturned only by our own reconsideration or by constitutional amendment."); *Smith v. Allwright*, 321 U.S. 649, 665 (1944) ("In constitutional questions, where correction depends upon amendment and not upon legislative action this Court throughout its history has freely exercised its power to reexamine the basis of its constitutional decisions."); *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406-07 (1932) (Brandeis, J., dissenting) ("[I]n cases involving the Federal Constitution, where correction through legislative action is practically impossible, this Court has often overruled its earlier decisions.").

all future cases where the facts are substantially the same.").   As explained in Section IV, the factual circumstances justifying application of the actual malice rule are absent today. Plaintiff's challenge to the *application* of the actual malice rule on factual grounds does not rest on the soundness of Supreme Court precedent or implicate *stare decisis* concerns.

## III.   Precedent Establishing the Actual Malice Rule Should be Overruled

The actual malice rule was implemented in response to the government using criminal laws alongside defamation lawsuits by government officials against members of the press to try to stifle the voices of Civil Rights leaders[23] during the Civil Rights movement.[24]   It began as a "policy-driven" means of protecting the "breathing space[25]" necessary for speech critical of the government. *McKee v. Cosby*, 139 S.Ct. 675, 676 (2019) (Thomas, C., concurring).

*Sullivan* and its progeny are understandably celebrated as "great cases," but their popularity is not "the road to salvation for a court of law."   *Gertz* 418 U.S. at 370 (White, J., dissenting).   These decisions seem to embody of the type of well-intended judicial legislation courts are warned to avoid in the face of immediate social ills; less they exceed the defined responsibilities with which courts are charged, ignore the impartial position courts must maintain

---

[23] *See* Mary-Rose Papandrea, *The Story of New York Times Co. v. Sullivan*, Boston College Law School Legal Studies Research Series, May 30, 2012, pp. 2-8.

[24] The 1960's saw, among other things, the 1963 March on Washington,  passage of the Civil Rights Act and "Bloody Sunday" in Selma in 1964, passage of the Voting Rights Act and assassination of Malcolm X in 1965, and the assassination of Martin Luther King Jr. and passage of the Fair Housing Act in 1968.

[25] The genesis for the Supreme Court's "breathing space" concerns was *NAACP v. Button*, 371 U.S. 415, 433 (1963), which involved attempts to oppress minority speech.  At issue was a Virginia statute that infringed the right of the NAACP and its members and lawyers to associate for the purpose of assisting persons who seek legal redress for infringements of their constitutionally guaranteed and other rights.   *Id.* at 428.   The Court struck the statute as unconstitutional because it could "easily become a weapon of oppression, however evenhanded its terms appear…[and]…freeze out of existence all such activity on behalf of the civil rights of Negro citizens."   *Id.* at 435-436.

in a democratic society, and lead to rules that cannot be checked and balanced by the other

branches of government.  As Justice Holmes aptly stated:

> Great cases, it is appropriate to remember, like hard cases make
> bad law. For great cases are called great, not by reason of their real
> importance in shaping the law of the future, but because of some
> accident of immediate overwhelming interest which appeals to the
> feelings and distorts the judgment.  These immediate interests
> exercise a kind of hydraulic pressure which makes what previously
> was clear seem doubtful, and before which even well settled
> principles of law will bend." [26]

For this reason, among others,[27] the validity of the actual malice rule often has been

questioned.  *See McKee*, 139 S. Ct. 675; *Gertz*, 418 U.S. at 370 (White, dissenting) ("As I see it,

there are wholly insufficient grounds for scuttling the libel laws of the States in such wholesale

fashion, to say nothing of deprecating the reputation interest of ordinary citizens and rendering

them powerless to protect themselves."); *Dun & Bradstreet*, 472 U.S. at 764 (Burgur, concurring

in judgment) ("I continue to believe, however, that Gertz was ill-conceived and therefore agree

with Justice White that Gertz should be overruled…The great rights guaranteed by the First

Amendment carry with them certain responsibilities as well.").  These questions resonate louder

as the justifications for the actual malice rule continue to disappear, and the Supreme Court

reaffirms the importance of textualism.[28]

---

[26] *Northern Securities Co. v. U.S.*, 24 S. Ct. 436, 468 (1904) (Holmes, dissenting)

[27] Other questions raised include the absence of textual support for the actual malice rule in the First Amendment and whether it was appropriate to constitutionalize centuries of well-established defamation law.  *McKee*, 139 S.Ct. at 677 (citing *Dun & Bradstreet*, 418 U.S. at 766 (White, J. concurring in judgment) ("*New York Times* was the 'first major step in what proved to be a seemingly irreversible process of constitutionalizing the entire law of libel and slander.'")

[28] *See Bostock v. Clayton County, Georgia*, 2020 WL 3146686, *4 ("If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives. And we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations. *See New Prime Inc. v. Oliveira*, 586 U.S. ——, —— – ——, 139 S.Ct. 532, 538–539, 202 L.Ed.2d 536

9

There is no need to repeat the sound reasoning of those who have already questioned the actual malice rule's viability.  Suffice it to say, Plaintiff adopts those arguments while noting the factors considered in deciding whether to overrule precedent appear to support receding from the actual malice rule.  *See Janus v. American Federation of State, County, and Mun. Employees, Council 31*, 138 S. Ct. 2448 (2018) (factors include the quality of the past decision's reasoning, the workability of the rule it established, its consistency with other related decisions, developments since the decision was handed down, and reliance on the decision).

There are, however, several points that warrant brief discussion.  These include: the important practical distinction between public officials and public figures; the absence of the immunity justification for the actual malice rule in the public figure context; the lack of weight afforded to the chilling effect of the actual malice rule; and the boundaries of courts' authority to legislate.

First, *Sullivan*'s original rule providing that public *officials*[29]—agents of the government who necessarily expose themselves to constitutionally-protected criticism—should face a higher burden when they sue the press for criticizing them[30] seems unnecessary.  The First Amendment already prohibited the government from curtailing free speech, be it through legislative,

---

(2019)").  "By its terms, the First Amendment addresses only 'law[s]' 'ma[d]e' by 'Congress.'" *McKee*, 139 S. Ct. at 682, n.3.  The actual malice rule seems to run afoul of the Supreme Court's recent recognition that "[o]nly the written word is the law, and all persons are entitled to its benefit."  *Bostock*, 2020 WL 3146686 at \*3.

[29] Unlike public figures, public officials occupy a special position in society.  As Justice Brennan remarked in *Sullivan*, "public men, are, as it were, public property."  376 U.S. at 268.  In *Gertz*, Justice Powell noted government officials "must accept certain necessary consequences" including "the risk of closer public scrutiny than might otherwise be the case." 418 U.S. at 344.

[30] *Sullivan*, 376 U.S. at 283 ("We hold today that the Constitution delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct.")

executive or judicial action;[31] which should include lawsuits brought by agents of the government against the people they serve. The quantum leap from *Sullivan*'s premise to imposing the same rule on private citizens deemed "public figures" is significantly different and unjustifiable on the same grounds, particularly in light of the recognition that false statements are valueless and unprotected by the First Amendment.

Second, the expansion of *Sullivan's* actual malice rule from public officials to public figures lacks the original justification for the rule—immunity—among the latter group. *Sullivan* explicitly recognizes the symbiotic relationship between state actor immunity and the newly-minted "privilege" it created for their citizen-critics: "a privilege for criticism of official conduct appropriately analogous to the protection accorded a public official when he is sued for libel by a private citizen." *Sullivan*, 376 U.S. at 282-283 ("It would give public servants an unjustified preference over the public they serve, if critics of official conduct did not have a fair equivalent of the immunity granted to officials themselves.") Public figures are not agents of the

---

[31] "That the action of state courts and of judicial officers in their official capacities is to be regarded as action of the State within the meaning of the Fourteenth Amendment, is a proposition which has long been established by decisions of this Court. That principle was given expression in the earliest cases involving the construction of the terms of the Fourteenth Amendment. Thus, in *Commonwealth of Virginia v. Rives*, 100 U.S. 313, 318, 25 L.Ed. 667 (1880), this Court stated: 'It is doubtless true that a State may act through different agencies,— either by its legislative, its executive, or its judicial authorities; and the prohibitions of the amendment extend to all action of the State denying equal protection of the laws, whether it be action by one of these agencies or by another.' *In Ex parte Commonwealth of Virginia*, 1880, 100 U.S. 339, 347, 25 L.Ed. 676, the Court observed: 'A State acts by its legislative, its executive, or its judicial authorities. It can act in no other way.' In *Civil Rights Cases*, 1883, 109 U.S. 3, 11, 17, 3 S.Ct. 18, 21, 27 L.Ed., this Court pointed out that the [First] Amendment makes void 'state action of every kind' which is inconsistent with the guaranties therein contained, and extends to manifestations of 'state authority in the shape of laws, customs, or judicial or executive proceedings.' Language to like effect is employed no less than eighteen times during the course of that opinion. Similar expressions, giving specific recognition to the fact that judicial action is to be regarded as action on the State for the purposes of the Fourteenth Amendment, are to be found in numerous cases which have been more recently decided." *Shelley v. Kraemer*, 334 U.S. 1, 14–18 (1948).

government and enjoy no such immunity.  Cases such as *Butts* acknowledge *Sullivan*'s immunity justification for actual malice and its absence in the public figure context, but do not explain why the actual malice rule can be extended to public figures despite their lack of immunity.  *See Butts,* 388 U.S. at 154.  This distinction and the doubts it raises concerning the legitimacy of the extending *Sullivan* to public figures is significant.

Third, through the actual malice rule, courts must classify plaintiffs based on standards that effectively punish them for engaging in free speech in order to deprive them of the same well-established right to seek redress for reputational harm that their fellow private citizens enjoy.  The actual malice rule was extended to public figures based on the premise that by exercising their own First Amendment rights (whether by "assum[ing] roles of special prominence in the affairs of society…[or]…thrust[ing] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved…"), certain people[32] should be subjected to a higher burden to plead and prove a claim for defamation. *Gertz*, 418 U.S. at 344-345.  The proposition that private citizens sacrifice the right to protect their reputations as a consequence of successfully engaging in free speech raises obvious chilling-effect concerns.  Perhaps these concerns were less important in the 1960's, when very few people could attain public figure status, but today they should carry significantly greater weight.  Important voices that could be empowered by the Internet to enter the public debate may not because the actual malice rule makes them more susceptible to but less capable of redressing false and defamatory attacks.  This was not, nor could it have been, a concern placed onto the scales in *Butts or Gertz.*

---

[32] *Gertz* suggests the successful exercise of free speech rights by public figures "invite[d] attention and comment" and that these individuals presumptively "enjoy[ed] significantly greater access to the channels of effective communication and hence… a more realistic opportunity to counteract false statements than private individuals normally enjoy."  418 U.S. at 344-345.

Finally, the actual malice rule arose outside the confines of the unique and often unenviable role courts serve in American democracy.  Courts, unlike legislatures and executives, must exercise restraint when wading into the immediate problems of the day:

> …History teaches that the independence of the judiciary is jeopardized when courts become embroiled in the passions of the day and assume primary responsibility in choosing between competing political, economic and social pressures.
>
> Primary responsibility for adjusting the interests which compete in the situation before us of necessity belongs to the Congress.  The nature of the power to be exercised by this Court has been delineated in decisions not charged with the emotional appeal of situations such as that now before us…
>
> Beyond these powers we must not go; we must scrupulously observe the narrow limits of judicial authority even though self-restraint is alone set over us.  Above all we must remember that this Court's power of judicial review is not "an exercise of the powers of a super-Legislature."

*Dennis v. U.S.*, 341 U.S. 494, 524-525 (1951) (*citing Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)).  This is to say, irrespective of *Sullivan*'s and its progeny's results and their celebration as "great cases," those decisions should nevertheless fall if they veered outside the recognized limits of judicial authority.

## IV.    The Actual Malice Rule Arose from Distinguishable Facts and Should Not Be Applied

The rules emanating from *Sullivan, Butts,* and *Gertz* cannot be extracted from the factual circumstances from which they came to exist.  "Blind application" of the actual malice rule is improper.  *See Butts*, 388 U.S. at 148.  Courts must consider the factors which arise in the particular context at issue.  *Id.*  In other words, media defendants cannot continue to benefit from general pronouncements of law plucked from these decisions and transposed upon circumstances to which they never were intended to apply.

The actual-malice rule was justified on facts that do not exist today.  The rule arose during a time where the methods of mass communication consisted of newspapers, magazines, and broadcasters; naturally limiting the number of people with access to the mass communication necessary to inject themselves into the national debate and defend themselves against defamatory attacks.[33]   That environment gave rise to certain justifications for the actual malice rule and public figure doctrine, such as the belief that very few people could expose themselves to the risk of defamation through voluntary participation in the public debate and enjoyed the corresponding media access that provided an opportunity for rebuttal.  *See Gertz*, 418 U.S. at 344.[34]

But we no longer live in an era where the public depends exclusively on the traditional press as the only "outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities—who wish to exercise their freedom of speech even though they are not members of the press."  *Sullivan*, 376 U.S. at 266.  In the decades since *Sullivan, Butts,* and *Gertz*, the Internet drastically altered the communications landscape and created significant "breathing space" for everyone to enter the public debate and freely discuss their supposed grievances and proposed remedies.

---

[33] The Internet and its vehicles for speech "extended communicative power previously vested solely in the hands of a small group of publishers and broadcasters to the public."  94 Cal. L. Rev. at 835.

[34] As one commentator explains, "[t]he Supreme Court's basic assumptions as to media in the time of New York Times and Gertz reflect the nature of media in that time—'a simplistic and antiquated conception'—that hardly compares to how the media world looks today."  Ann E. O'Connor, *Access to Media All A-Twitter: Revisiting Gertz and the Access to Media Test in the Age of Social Networking*, 63 Fed. Comm. L.J. 507, 523.  Further, "[w]hen the Court was deciding *Gertz*, it did so with a singular understanding of the media landscape as it existed in 1974.  At that time, the media were entirely limited to print and broadcast media, often represented by large conglomerate news organizations."  *Id.* at 528-29.

As discussed above, the Internet is readily-accessible to virtually everyone and provides equal access to a forum where debate on public issues is "uninhibited, robust, and wide-open…includ[ing] vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Sullivan*, 376 U.S. at 270 (citing *Terminiello v. Chicago*, 337 U.S. 1, 4; *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937)). Case in point, every American has direct access to the President of the United States through his Twitter account[35], several of this generation's most significant social movements sprouted on social media[36], and "citizen journalism" and "online social movements" have flourished online and become part of the modern lexicon. [37]

The actual-malice rule arose because access such as this did not exist. It emanated from the notion that very few people would command substantial public interest and have sufficient access to the means of communication necessary to expose through discussion the falsehood and fallacies of defamatory statements. *See Butts*, 388 U.S. at 154-155. Now, a vast majority of the citizens of this country habitually use the Internet, social media, message boards, YouTube, online profiles, online comments, and/or similar virtual forums to publicly exchange information and their opinions, question and hold our government to account, and thrust themselves into the "vortex" of pressing social issues seeking to influence outcomes and affect social change.[38] As many as 87% of Americans get their news on mobile devices or computers[39] and social media outpaces print newspapers as a news source in the United States.[40] Given this undeniable

---

[35] *Knight First Amendment Institute At Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019).
[36] *See* FN 7.
[37] *See* Plaintiff's SMF ¶¶ 7-8.
[38] *See* Plaintiff's SMF ¶ 9; *see also* 2 *Internet Law and Practice* § 24:15 ("Because individuals can now easily thrust themselves into the public debate by setting up their own websites, participating in discussions in chat rooms or posting messages on bulletin boards, it would appear easier to assume limited public figure status.")
[39] *See* Plaintiff's SMF ¶ 10.
[40] *See* Plaintiff's SMF ¶ 11.

proliferation of online speech, the primary reason for the actual malice rule—the need to create uninhibited, robust, and wide-open debate—no longer justifies its application.

A significantly greater number of people also expose themselves to the risk of injury from online attacks through social media and the Internet.[41] *Compare Gertz*, 418 U.S. at 345 (assuming that private individuals voluntarily expose themselves to the risk of injury from defamatory falsehoods is "unjustified"). And there is much greater access to the channels of effective communication today, which provides more people the opportunity to counteract false statements; neither of which was the case when the Supreme Court extended the actual malice rule to public figures.

The inability to consistently determine who qualifies as a public figure is compelling evidence of why the actual malice rule is outdated. One Circuit went so far as to say, "anyone who publishes becomes a public figure in the world bounded by the readership of the literature to which he has contributed." *Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir. 1996). As noted by one of many legal scholars to examine this issue, various categories of plaintiffs have been held to be both public figures and private figures, despite similar facts: government contractors, criminal defendants, companies that advertise, college professors, entertainers, lawyers, high school students, business executives, coaches, owners of bars and restaurants, physicians, and police officers. [42]

---

[41] Plaintiff's SMF ¶ 12.

[42] Jeff Kosseff, *Private or Public? Eliminating the Gertz Defamation Test*, Journal of Law, Technology & Policy [Vol. 2011] (*comparing Mathis v. Cannon*, 573 S.E.2d 376, 382 (Ga. 2002) (stating an owner of municipal solid waste contractor is a public figure because ―his more public efforts in helping develop the quasigovernmental project‖), *with Mahoney v. State*, 236 A.D.2d 37, 40 (N.Y. App. Div. 1997) (stating a government contractor is not a public figure because ―[n]either the receipt of public funds . . . nor involvement in a controversial industry, alone, confers public figure status on an individual‖); *comparing Orr v. Argus-Press Co.*, 586 F.2d 1108, 1116 (6th Cir. 1978) (finding a criminal defendant was a public figure because ―his

conduct has made him the target of a criminal proceeding about which the public has a need for information and interpretation"), *with Thomas v. Tel. Publ'g Co.*, 929 A.2d 993, 1018 (N.H. 2007) (finding a criminal defendant accused of bank robbery was not a public figure because his alleged crimes "[were] not matters of public controversy"); *comparing Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 274 (3d Cir. 1980) (holding that a company is a public figure because "through its advertising blitz, [it] invited public attention, comment, and criticism"), *with Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 853 N.E.2d 770, 777 (Ill. App. Ct. 2006) ("[T]he mere fact that [plaintiff] advertised its merchandise does not, without more, establish it as a limited purpose public figure."); *comparing Blum v. State*, 255 A.D.2d 878, 880 (N.Y. App. Div. 1998) (finding a professor involved in a tenure dispute to be a public figure because he "thrust" himself into the public forefront), *with Sewell v. Trib Publ'ns, Inc.*, 622 S.E.2d 919, 923 (Ga. Ct. App. 2005) (finding a professor to be a private figure in a libel lawsuit regarding classroom comments he made about the Iraq war because he "in no way thrust himself to the forefront of the controversy in any public forum"); *comparing Rodriguez v. Nishiki*, 653 P.2d 1145, 1149 (Haw. 1982) (finding plaintiff musicians to be public figures in a lawsuit against a newspaper), *with Riddle v. Golden Isles Broad, LLC*, 621 S.E.2d 822, 826 (Ga. Ct. App. 2005) (finding plaintiff musician was a private figure "[b]ecause there was no public controversy"); *comparing Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1083 (3d Cir. 1985) (finding that a lawyer representing a well-known motorcycle gang was a public figure because "it is clear that the present case involves a public controversy"), *with Gilbert v. WNIR 100 FM*, 756 N.E.2d 1263, 1272 (Ohio Ct. App. 2001) (finding that a prominent community attorney was not a public figure in a libel suit over news reporting about a murder investigation); *comparing Henderson v. Van Buren Pub. Sch. Superintendent*, 644 F.2d 885, 6 Med. L. Rptr. 2409, 2410 (6th Cir. 1981) (finding that a high school government president was a public figure when he "intentionally thrust himself into the controversy as between the School Board and the students at the high school . . ."), *with Wilson v. Daily Gazette Co.*, 588 S.E.2d 197, 209 (W. Va. 2003) (finding that a prominent high school athlete was not a public figure because "[n]othing in the record remotely suggests that [plaintiff] was a ‗central‘ figure in any purported public controversy involving sportsmanship that existed prior to the Gazette‘s publications"); *compare Blankenship v. Manchin*, 471 F.3d 523, 531 (4th Cir. 2006) (finding that a well-known businessman was a public figure in his defamation suit), *with Bank of Or. v. Indep. News, Inc.*, 670 P.2d 616, 621 (Or. Ct. App. 1983) (finding bank executive was not a public figure); *compare Price v. Time, Inc.*, 416 F.3d 1327, 1346 (11th Cir. 2005) (stating plaintiff, University of Alabama‘s football coach, was "undisputedly a public figure"), *with Moss v. Stockard*, 580 A.2d 1011, 1033 (D.C. 1990) (finding that a college coach was not a public figure); *compare Pegasus v. Reno Newspapers, Inc.*, 57 P.3d 82, 92 (Nev. 2002) (finding that a restaurant owner was a limited public figure for defamation lawsuit over negative restaurant review), *with Lee v. City of Rochester*, 174 Misc. 2d 763, 771 (N.Y. Sup. Ct. 1997) (finding that bar owner plaintiff was not a public figure); *compare Swate v. Schiffers*, 975 S.W.2d 70, 76 (Tex. Ct. App. 1998) (finding because plaintiff doctor "has certainly been drawn into controversy," he was a public figure), *with WJLA-TV v. Levin*, 564 S.E.2d 383, 391 n.3 (Va. 2002) (indicating that plaintiff doctor was not a private figure); *compare Drews v. Michelson*, 327 N.W.2d 723 (Wis. Ct. App. 1982) (unpublished disposition) (finding plaintiff police officer who had filed a discrimination complaint was a public figure), *with Kiseau v. Bantz*, 686 N.W.2d 164, 178 (Iowa

Beyond those problems, one of the bedrock assumptions upon which the actual malice rule rests is that society can tolerate defamatory statements because they are "inevitable in free debate."[43]  This necessarily presumes untruths will be the exception.  *See Butts*, 388 U.S. at 152 ("We have recognized the inevitability of ***some*** error in the situation presented in free debate." (emphasis added)).  However, false information is rampant online and spreads farther and faster than the truth.[44]  This phenomenon harms the public debate *Sullivan* and *Gertz* sought to protect, and simultaneously shows why defamatory falsehoods cannot sufficiently be overcome by the "self-help" discussed in *Gertz*.  *See Gertz*, 418 U.S. at 344.  We are worlds away from the days when a public figure was capable of meaningfully defending herself against defamation by issuing press statements or holding a press conference to refute false charges.[45]

---

2004) (finding plaintiff police officer was a not a public figure, even though she is a high-ranking officer).

[43] Despite the fact that false statements are valueless and devoid of constitutional protection, *Milkovich,* 497 U.S. at 18, some justify them based on *Sullivan*'s premise that "erroneous statement[s] [are] inevitable in free debate, and… must be protected…"  *Sullivan*, 376 U.S. at 271-272.  However, reliance on this proposition in the public figure context is misplaced because it arose within the narrow confines of overruling "cases which impose liability for erroneous reports of the political conduct of officials [because they] reflect the obsolete doctrine that the governed must not criticize their governors."  *Id.*  Extending this justification to false statements about public *figures* simply ignores the fact that such *figures* do not in any sense "govern" the people criticizing them.

[44] *See* Plaintiff's SMF ¶ 13.

[45] "Unlike the human brain with its imperfections and forgetfulness, the web recollects nearly everything and every-one. Information is perpetually accessible, and data subjects have limited ability to conceal past transgressions. Now we are switching to a system in which the Internet is a treasure trove of immutable memories and data subjects must take extraordinary steps in order to forget. That is an enormous transformation. Social media postings that go viral permanently stigmatize by creating a 'digital Scarlet letter,' which is 'an indelible record of people's past misdeeds .... The Internet is indeed a cruel historian.'"  Michael L. Rustad, Sanna Kulevska, *Reconceptualizing the Right to Be Forgotten to Enable Transatlantic Data Flow*, 28 Harv. J.L. & Tech. 349, 352–53 (2015) (internal citations omitted).

It simply is no longer necessary or appropriate to apply the actual-malice rule.  Anyone who posts comments, pictures, videos, memes, tweets, or similar expressions online or on social media about topics such as elections, President Trump, Black Lives Matter, the police, protests, LGTBQ rights, equality, #metoo, local politics, school boards, college campuses, homeowner's associations, COVID-19, or anything else "of concern" to other people arguably can be swallowed by the actual malice rule.  Moreover, once subjected to that standard, it must be satisfied not just in actions against members of the press, but against anyone who posts false and defamatory false statements.   *Obsidian Finance Group*, 740 F.3d at 1291.[46]  The public vs private figure dichotomy is rooted in standards entirely dependent on outdated assumptions about people's access to the media, their ability to thrust themselves into important public controversies, and effectively counter false attack.  The lines between public and private figures and the media and individuals are murky at best, while the primary beneficiaries of the actual malice rule remain members of the press who invoke it to justify publishing false statements they, as journalists, had no business publishing in the first place.  And legitimate concerns exist over the progression of the *Sullivan, Butts,* and *Gertz* to the point where actual malice applies to everyone, the rule chills free speech by forcing people with important voices to remain silent if they want to preserve their dignity and the right to protect their reputations, and public debate suffers greater harm because the rule proliferates more and more false information.

---

[46] *Obsidian* goes on to note that "[w]ith the advent of the Internet and the decline in print and broadcast media … the line between the media and others who wish to comment on political and social issues becomes far more blurred.").  *Id.*

The States' common law of defamation co-existed with the First Amendment for centuries before *Sullivan* was decided and can strike the required balance[47] between constitutionally protected free speech and the individual's right to protect his or her good name (which lies "at the root of any decent system of ordered liberty"[48]).  Some state legislatures have even enacted anti-SLAPP[49] laws, which provide means to test the merits of defamation lawsuits at early stages.  The necessary equilibrium between human dignity and speech can be struck without the actual malice rule. The need and justifications for the rule no longer exist.  It should not be applied.

Dated:  June 19, 2020.

*/s/ Shane B. Vogt*
Kenneth G. Turkel (admitted *pro hac vice*)
Email:  kturkel@bajocuva.com
Shane B. Vogt (admitted *pro hac vice*)
Email:  svogt@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 443-2199
Facsimile: (813) 443-2193

Michael M. Munoz
E-mail:  mmunoz@golenbock.com
GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile: (212) 754-0330

*Attorneys for Plaintiff*

---

[47] *Milkovich*, 497 U.S. at 13-14; *McKee*, 139 S.Ct. at 678-679.
[48] *Dun & Bradstreet*, 472 U.S. at 757-758 (quoting *Gertz*, 418 U.S. at 348).
[49] *See e.g.,* Fla. Stat. § 768.295; California Code of Civil Procedure § 425.16.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment was filed electronically on June 19, 2020.  This Notice will be sent by operation of the Court's electronic filing system to counsel of record for all parties as indicated on the electronic filing receipt.  Parties and their counsel may access this filing through the Court's system.

*/s/ Shane B. Vogt*
Attorney