# Ballard Spahr
### LLP

1675 Broadway, 19th Floor
New York, NY 10019-5820
TEL 212.223.0200
FAX 212.223.1942
www.ballardspahr.com

Thomas B. Sullivan
Tel: 212.850.6139
Fax: 212.223.1942
sullivant@ballardspahr.com

July 9, 2020

*By Electronic Filing*

Hon. Jed. S. Rakoff
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:     *Palin v. N.Y. Times Co.*, No. 17 Civ. 4853

Dear Judge Rakoff,

We represent Defendants The New York Times Company and James Bennet (collectively, "Defendants") in this matter.  Pursuant to the parties' conversation with Chambers yesterday, we write to provide substitute copies of two exhibits attached to the Declaration of Thomas B. Sullivan, Dkt. 99, filed in support of Defendants' motion for summary judgment.  When Exhibits 4 and 5 to the declaration, containing excerpts from the deposition testimony of Linda Cohn and Timothy Crawford, respectively, were filed with the Court, header information was inadvertently omitted. Specifically, the interior pages are missing the name of the witness, the date the deposition was conducted, and the page number of the transcript.  The attached replacement exhibits restore this missing information.  Plaintiff's counsel Shane Vogt has consented to this substitution.

Respectfully submitted,

*/s/ Thomas B. Sullivan*
Thomas B. Sullivan

Exhibit 4

Linda Cohn
May 07, 2020

1

2    IN THE UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3
     - - - - - - - - - - - - - - - - - -x
4
     SARAH PALIN,
5                                        No. 17-cv-4853

6                        Plaintiff,
              v.
7
     THE NEW YORK TIMES COMPANY and
8    JAMES BENNET,

9                        Defendants.

10   - - - - - - - - - - - - - - - - - -x

11

12           Remote videotaped deposition of LINDA

13   COHN, taken pursuant to Subpoena, was held via

14   videoconference, commencing May 7, 2020, at

15   10:02 a.m., on the above date, before Amanda

16   McCredo, a Court Reporter and Notary Public in the

17   State of New York.

18

19

20

21

22

23

24

25

Linda Cohn
May 07, 2020                                    16

```
 1                        L. Cohn
 2              Did you work with Phoebe Lett?
 3         A    Yes.
 4         Q    What was Phoebe's position?
 5         A    She was -- I really don't remember what her
 6    title was.  She took care of administrative tasks
 7    and she helped with fact checking.
 8         Q    In your position and role at The New York
 9    Times in the 2017 time period, did you also work on
10    fact checking?
11         A    Fact checking was part of everyone's role
12    from the writer on, so yes.
13         Q    And who bore the ultimate responsibility
14    for the factual accuracy of an editorial?
15         A    It was a shared responsibility starting
16    with the writer going on through to the copy editor.
17         Q    Was there anyone that had the ultimate
18    responsibility, though, for the factual accuracy of
19    the piece?
20              MS. SCHELL:  Object to form.
21         Q    You can answer.
22              MS. SCHELL:  You can answer.
23         A    Oh, I -- I'm not really sure what that --
24    what that even means.  No, I wouldn't say one person
25    was wholly responsible.  I mean, no.  There's no --
```

Linda Cohn
May 07, 2020                                    17

```
1                        L. Cohn

2    the copy editor's the last one to see the copy.

3    There is a certain responsibility there.  The fact

4    checker has a certain responsibility.  The writer,

5    the editor, and, of course, the editor of the page.

6    I'm not sure how to quantify.

7         Q    And when you -- when you use the term

8    "writer," would the writer be the same thing as the

9    author of the piece?

10        A    Yes.

11        Q    And the situation where an editorial was

12   written in the name of the editorial board, who

13   would the writer be?

14        A    It would depend on which editorial.

15        Q    So do you know who the writer was with

16   respect to the ""America's Lethal Politics""

17   editorial?

18        A    Elizabeth Williamson.

19        Q    And what role, to your knowledge, did James

20   Bennet have on the ""America's Lethal Politics""

21   editorial?

22        A    He did the last round of editing on it.

23        Q    And what role did you have on the

24   "America's Lethal Politics" editorial?

25        A    I did an initial edit.
```

Linda Cohn
May 07, 2020                              18

```
 1                      L. Cohn
 2      Q    And when you say "initial," what do you
 3  mean by that?
 4      A    Well, actually, I don't know that it was
 5  the first edit.  I did an edit on it around 4:30,
 6  5:00, put in a couple questions, and then turned it
 7  over to James.
 8      Q    And after you turned it over to James, do
 9  you recall doing anything else on the "America's
10  Lethal Politics" editorial?
11      A    Yes, I got it back from James, looked it
12  over, made sure it fit, worked on the headline,
13  and --
14      Q    And when -- I'm sorry.
15      A    -- and the blurb, which is the little
16  pull-quote we use.
17      Q    And what's the purpose of the blurb or the
18  pull-quote?
19      A    I actually can't remember, actually, if
20  there was a blurb on that one.  But the purpose of a
21  blurb is really to break up the type visually and
22  draw the reader in.
23      Q    And do you recall whether or not, after you
24  got the "America's Lethal Politics" editorial back
25  from Mr. Bennet, did you do any fact checking on it?
```

Linda Cohn
May 07, 2020                                      19

```
 1                    L. Cohn
 2          MS. SCHELL:  Object to form.
 3          You can answer.
 4     A    Yes.  I checked some -- at least one thing.
 5     Q    And what did you -- what do you recall
 6   checking after you got the editorial back from
 7   Mr. Bennet?
 8     A    There was a question about some kind of gun
 9   control rule, regulation, or law I remember spending
10   time on, along with Eileen Lepping.
11     Q    And was that it?
12     A    That's all I can remember.  That is the one
13   that stuck out.  There may have been other things.
14     Q    Okay.
15          Let me ask you, I'm going to send you
16   through what I'm going to mark as Exhibit A to your
17   deposition.
18                    (An unlikely journey to The New
19                    York Times editorial page was
20                    marked as Cohn A for
21                    identification, as of this
22                    date.)
23     A    Should I open that PDF, in other words?
24     Q    Yes.
25     A    Okay.
```

Linda Cohn
May 07, 2020                                39

1                        L. Cohn
2    Exhibit 8, down a couple of paragraphs in the one
3    that I was just reading from, it reads, "So why does
4    a story get framed this way?  Journalism educators
5    characterize this kind of framing as a storytelling
6    habit -- one of relating new facts to an existing
7    storyline -- and also as a reflex of news
8    organizations that are built to handle some topics
9    well, and others less well."
10           Did you ever hear anyone talk about the
11   concept of a storytelling habit while you were
12   working at The Times?
13           MS. SCHELL:  Objection to form.
14       A    I, I have never heard that phrase,
15   "storytelling habit," before.
16       Q    Have you ever heard anyone, while you were
17   working at The Times, talk about the concept of
18   "framing a story"?
19       A    Yes.
20           MS. SCHELL:  Objection to form.
21       Q    And what is your understanding of what
22   "framing a story" means?
23       A    Through what lens do we want to look at
24   this issue.  Is it -- for example, you might say is
25   it an economic issue, is it a cultural issue, do we

Linda Cohn
May 07, 2020                              40

```
 1                        L. Cohn
 2    want to see it politically in terms of the political
 3    parties.  That would be a general idea to me of what
 4    framing is.
 5        Q    And do you recall whether or not there were
 6    any discussions about framing in the context of the
 7    "America's Lethal Politics" editorial?
 8        A    I don't recall anyone using the word
 9    "framing" or "frame."
10        Q    Do you recall anyone discussing the lens
11    through which they wanted to look at the topics that
12    were discussed in the "America's Lethal Politics"
13    editorial?
14        A    Well, there was much discussion as to what
15    we wanted to say in the editorial.  I don't know
16    that the concepts of lenses or framing is exactly
17    what we were talking about.  We were really talking
18    about what's important in the story and what do we
19    want to say and what direction do we want the
20    editorial to go.  There was discussion about that.
21        Q    And when you say "what direction we want
22    the editorial to go," what do you mean by that?
23        A    Is this piece going to be mainly about gun
24    control or are we going to -- is there anything
25    specific we want in terms of gun control; is it
```

Linda Cohn
May 07, 2020                              41

```
1                       L. Cohn
2    going to be more about the political climate, the
3    fact that it was a member of Congress who was
4    attacked.  Yeah, what -- what themes are we going to
5    explore in this piece.
6        Q    And when you say there were discussions,
7    were those discussions -- did they take place
8    verbally or strictly by email?  Do you recall?
9        A    I recall there was an email from Bob Semple
10   laying out the initial direction.  And there were
11   various discussions throughout the day, just
12   informal.  I don't remember if they were phone, text
13   message, or email.  Probably a variety.
14       Q    Okay.
15           MR. VOGT:  Why don't we go ahead and take a
16       break there.  That's a good stopping point, and
17       we're at about an hour, and we'll come back at,
18       say, 11:10.
19           THE VIDEOGRAPHER:  We're now off the
20       record.  The time is 10:56 a.m.
21                   (Recess taken.)
22           THE VIDEOGRAPHER:  This marks the beginning
23       of Media Unit No. 2.  We're back on the record.
24       The time is 11:13 p.m.
25   BY MR. VOGT:
```

Linda Cohn
May 07, 2020                                    42

```
 1                    L. Cohn
 2      Q    You had mentioned before in your testimony
 3   that when you were working as the -- did you say
 4   night editor, or was it just you were the editor at
 5   night?
 6      A    My official title was weekend editor,
 7   but -- yeah.  It was the copy editor position.
 8      Q    And how would the copy editor position
 9   differ from just a regular editor position?
10      A    You are editing a copy that's already been
11   edited and approved by either the editor of the page
12   or the deputy or, in some instances, Bob Semple, and
13   is closer to the point where it is just ready to go
14   into the paper.  More emphasis on style, grammar,
15   and some fact checking.
16      Q    Okay.
17           And I'm going to go through just a few
18   different pieces and see if you recall at all
19   whether you worked on these.
20           Let me start with Exhibit 10.
21                         (Exhibit 10 was shown to the
22                         witness.)
23      Q    It should be a piece entitled "Playing All
24   the Angles" by Maureen Dowd.
25           Do you have that?
```

Linda Cohn
May 07, 2020                                    43

```
 1                     L. Cohn
 2      A    I'm opening it.  Do you know what day of
 3   the week it appeared?
 4      Q    I looked that up during the break.  It
 5   was -- according to Google, at least, it was a
 6   Saturday.
 7      A    I do not believe I worked on that, but I
 8   could be wrong.  If I could go back into The Times'
 9   computer and check to see who had worked on it, but
10   I don't believe so.
11      Q    You don't recall off the top of your head?
12      A    No.  I think I probably did not.
13      Q    And have you -- while you were working at
14   The Times, did you ever hear people refer to Sarah
15   Palin as a "mean girl"?
16      A    No.
17      Q    Did you ever hear anyone refer to her as
18   "Queen Bee Sarah"?
19      A    Not that I can recall.
20      Q    While you were working at The Times, did
21   you ever hear anyone within the editorial department
22   refer to Sarah Palin in a derogatory manner?
23           MS. SCHELL:  Objection to form.
24      A    "Editorial department," when you use that
25   phrase, are you referring to Opinion columnists,
```

Linda Cohn
May 07, 2020                                    44

```
 1                        L. Cohn
 2   because -- or?
 3       Q     First just start, like, editorial board
 4   members.
 5       A     Editorial board members, and --
 6       Q     So let me rephrase the question and phrase
 7   it in a proper manner.
 8             While you were working at The New York
 9   Times, did you ever hear an editorial board member
10   refer to Sarah Palin in a derogatory manner?
11             MS. SCHELL:  Objection to form.
12       A     Not that I can recall.
13       Q     And while you were working at The Times,
14   did you ever hear an op-ed columnist refer to Sarah
15   Palin in a derogatory manner?
16             MS. SCHELL:  Objection to form.
17       A     When you say "refer," are you saying in a
18   written piece, something they wrote, or something
19   they said?
20       Q     Something they said.
21       A     No.  I don't recall -- I mean, I don't
22   recall any conversations with op-ed columnists about
23   Sarah Palin other than William Kristol, whom I
24   edited for the entire year he was at The Times, and
25   we had conversations about Sarah Palin.  Nothing he
```

```
 1                      L. Cohn
 2   said was derogatory.  He was -- in fact, those
 3   columns were right when she started to appear more
 4   in the national stage and he was urging that she be
 5   considered as a VP candidate.  So they were -- there
 6   was nothing derogatory.
 7        Q    And who was William Kristol?
 8        A    A journalist, and he was a columnist for
 9   one year leading up to Sarah Palin's candidacy and
10   during the candidacy.  I don't -- I don't remember
11   if it was actually a calendar year or what, but
12   hired to cover that campaign.  And he was one of the
13   first people who started talking about Sarah Palin.
14   And I edited those columns, so we certainly had many
15   conversations.
16        Q    Could he be considered a conservative
17   journalist?
18             MS. SCHELL:  Objection to form.
19        Q    You can answer.
20        A    Yes.
21        Q    Would he actually be considered
22   neo-conservative?
23             MS. SCHELL:  Objection to form.
24             You can answer.
25        A    I'm not sure.  That term is -- I'm not
```

```
1                         L. Cohn
2    sure.  To me, he's a conservative.  I don't know
3    that I would -- I'm sure people have called him a
4    neo-con.
5         Q    Okay.
6              Let me show you -- you can close
7    Exhibit 10, and I'm going to send you Exhibit 11.
8                        (Exhibit 11 was shown to the
9                         witness.)
10        A    Okay.
11        Q    And Exhibit 10 -- I mean Exhibit 11 should
12   be a piece titled "Sarah Palin, Rage Whisperer."
13        A    Okay.
14        Q    And this is dated January 26, 2017, which I
15   believe was a Monday.
16        A    Okay.
17        Q    Do you recall whether or not you worked on
18   this piece?
19        A    I would not have worked on that piece
20   because -- wait.  This is online, right?
21        Q    Yes.
22        A    Yeah, I really worked on print.
23             And she's an outside commentator; that's
24   the Opinion department.  I only worked on Opinion --
25   New York Times Opinion columnists, which is, you
```

```
1                          L. Cohn
2    know, the kind of -- those definitions are starting
3    to change a bit now, but up until I left, it was
4    very clear.  There were, you know, two columnists a
5    day, about, sometimes one, and they were the
6    regular, stable, weekly Times op-ed columnists.
7              These are, like, out -- Nicole Wallace was
8    an outside contributor.  I wouldn't -- that goes to
9    a department I was not part of.  It was the Opinion
10   department.  But not -- yeah, it didn't go through
11   the editorial board copy editor.
12       Q    And do you recall reading this piece,
13   Exhibit 11?
14       A    No.
15       Q    Do you recall, at any point in time while
16   you were working for the editorial board, there
17   being any discussions within the editorial
18   department about any attacks that Sarah Palin had
19   made on the media?
20            MS. SCHELL:  Objection to form.
21       A    I don't recall any.  I -- I don't recall
22   any.  I was -- I was there at night and on weekends,
23   so it would have had to have been a telephone
24   conversation, and I don't recall any.
25       Q    Okay.
```

Linda Cohn
May 07, 2020                                        48

```
 1                    L. Cohn
 2          You can close Exhibit 11, and I'm going to
 3   send you Exhibit 12.
 4                    (Exhibit 12 was shown to the
 5                    witness.)
 6     A    Okay.
 7     Q    And it should be Charles Blow's
 8   December 3rd, 2010, column "She Who Must Not Be
 9   Named"; and that, I believe, was a Friday.
10     A    Okay.
11     Q    Do you recall whether you worked on this
12   piece?
13     A    I did not.
14     Q    Have you ever seen this piece before?
15     A    I have seen many, many Charles Blow
16   columns.  I do not recall seeing this particular
17   one.
18     Q    Do you recall there ever being any
19   discussions while you were working for the editorial
20   board about whether articles about Sarah Palin drive
21   web traffic?
22          MS. SCHELL:  Objection to form.
23     A    I never heard anyone say that ever.
24     Q    While you were working with the editorial
25   board, did anybody talk about web traffic or what
```

Linda Cohn
May 07, 2020                                49

```
 1                      L. Cohn
 2   topics may generate more interest online?
 3      A    We talked about what readers would find
 4   interesting and we did look to see how many readers
 5   had read certain pieces.  And, yes, we did -- yeah.
 6   There were times where people said, "Yeah, that will
 7   get a lot of clicks."  But -- yeah.
 8           As the years went on, there was more
 9   technology to track those things.  Most of the time
10   I was there, there was not.
11      Q    Let me show you another piece by Charles.
12   This is Exhibit 60.
13                      (Exhibit 60 was shown to the
14                      witness.)
15      A    Okay.
16      Q    And it should be a piece titled "The Tuscon
17   Witch Hunt" from January 14 of 2011, which I believe
18   was a Friday.
19           Do you know whether you worked on this
20   piece?
21      A    I did not.
22      Q    Have you ever seen this piece before?
23      A    I may have seen it.  I don't recall.  I've
24   seen hundreds of Charles Blow columns, so I don't
25   know, I'm sorry.
```

Linda Cohn
May 07, 2020                              50

```
1                      L. Cohn
2      Q    Do you recall when you may have seen it?
3           MS. SCHELL:  Objection to form.
4      A    I don't recall seeing it, so I can't tell
5   you when I might have seen it.
6      Q    Do you know whether or not, on June 14 of
7   2017, anyone reviewed this article -- or, I'm sorry,
8   this column, by Mr. Blow, "The Tuscon Witch Hunt"?
9           MS. SCHELL:  Objection to form.
10     A    Whether anyone -- did you say whether
11  anyone reviewed it?
12     Q    Yeah.  Anyone -- let me rephrase the
13  question.
14          Do you know whether on June 14 of 2017,
15  whether anyone that worked on the "America's Lethal
16  Politics" editorial reviewed Mr. Blow's column, "The
17  Tuscon Witch Hunt"?
18     A    I do not.  That could have been on the list
19  of some articles that were circulated.  I'm sure
20  there were a list of articles that were circulated
21  during the fact-checking process.  But no, I can't
22  recall whether anyone reviewed it.
23     Q    And you can close that one.  Let me show
24  you one more.  This is Exhibit 61.
25                          (Exhibit 61 was shown to the
```

Linda Cohn
May 07, 2020                                         51

```
 1                      L. Cohn

 2                      witness.)

 3        A    Okay.

 4        Q    This should be a column titled "United in

 5   Horror" by Ross Douthat from January 9, 2011, and

 6   that's a Sunday.

 7             And do you know whether you worked on this

 8   column?

 9        A    I -- based on the date and the day of the

10   week, I probably did, if I wasn't on vacation.  But

11   can I take a second to read it?

12        Q    Yes.

13        A    Okay.

14             (Perusing document.)

15             I don't remember that column, but I may

16   have edited that.  As I said, I've edited hundreds

17   of op-ed columns, and so many by Ross Douthat, that,

18   you know --

19        Q    That's what I was going to ask you, too.

20        A    -- that I can't recall.

21        Q    Did you edit a number of Ross Douthat

22   columns?

23        A    Yes.

24        Q    Let's talk about June 14 of 2017 now.

25             Do you recall how you first learned about
```

Linda Cohn
May 07, 2020                                                52

```
1                       L. Cohn
2    the -- what we'll call "the Scalise shooting" that
3    happened in Virginia?
4        A    I -- I don't recall exactly.  I know I came
5    in a bit later in the day.  Whether I heard --
6    whether I saw it on my phone or on the way in, I
7    don't know.  I remember I got an email about it.
8        Q    And do you remember who the email that you
9    received was from?
10       A    Bob Semple.
11       Q    And do you remember what the subject matter
12   of the email from Mr. Semple was?
13       A    Can I see it?
14       Q    Well, I was just trying to figure out which
15   one -- let me start with this one.  I think this is
16   the first one I saw your name on.
17            I'm sending you Exhibit 16.
18                      (Exhibit 16 was shown to the
19                      witness.)
20       A    Okay, okay.
21       Q    And there's an email from Mr. Semple at
22   11:59 a.m., and you're among one of the people
23   listed on the "to" line.
24       A    Right.
25       Q    Is this the email that you were referencing
```

Linda Cohn
May 07, 2020                                    56

```
1                          L. Cohn

2      from the "America's Lethal Politics" editorial, were

3      you working on anything else on June 14 of 2017?

4           A    I'm sure I picked up other pieces and

5      worked on them during the day.  That would be

6      normal.  I don't think I really turned -- got that

7      involved with the legal politics piece until quite

8      late in the day.  So I'm sure I was working on

9      something else.  I don't recall what.

10          Q    Do you recall -- let me ask you this.

11               So once you get into the office, where was

12     your office located?

13          A    In relation -- in The Times Building?

14          Q    Yes.

15          A    In the editorial page section.

16          Q    Did you have your own office or did you

17     work at a cubicle or an area like that?  Where was

18     your work space?

19          A    I had my own office.  There was -- the copy

20     editors had an office.  I think there was maybe one

21     other than mine.

22               At that point, the empty deputy editor

23     office was, you know, across from me with some desks

24     in the middle.  And then James's was next to that.

25               So, like -- yeah, I was on the side --
```

Linda Cohn
May 07, 2020                                                 57

1                         L. Cohn

2     like, theirs was across the window and mine was

3     across the little workspace.

4          Q     Okay.

5                Do you recall, at any point in time on

6     June 14 of 2017, having any conversations either on

7     the phone or in an office with Mr. Bennet about the

8     "America's Lethal Politics" editorial?

9          A     I may have had some casual conversations,

10    but the only one I can recall is after the piece got

11    to me very late afternoon or early evening and I --

12    I might have texted him, but I think I went to his

13    office at one point.  I sort of remember standing in

14    front of his glass door, you know, opening up the

15    door or something, and saying, "You need to look at

16    this."

17         Q     When you said "you need to look at this,"

18    what were you referring to?

19         A     That I wasn't -- I recall thinking I wasn't

20    really sure if it's what he wanted.  I thought there

21    were some issues with it.  I thought there had been

22    quite the confusion over the day as to where this

23    piece was headed, as to be either more of a gun

24    control piece or to be more of a piece about the

25    political climate and the sort of lack of civility

1                        L. Cohn

2    in America's political discourse.

3        Q    And when you say you recall thinking you

4    weren't really sure, what weren't you really sure

5    about?

6        A    I wasn't sure what James intended, wanted

7    in the piece.  I wasn't sure if the piece worked.

8    And I think there were also some, maybe, issues

9    about fit for the prep paper, big question of how it

10   was going to work with the other pieces.  I think

11   there might have been some issues about length.

12       Q    And when you say you weren't sure it

13   worked, what do you mean by that?

14           MS. SCHELL:  Objection to form.

15       A    I wasn't sure it accomplished what James

16   would want it to accomplish.

17       Q    And what did you -- what was your

18   understanding of what James wanted it to accomplish?

19       A    Well, that's what I wasn't sure about.

20       Q    Okay.

21       A    I mean, we had -- you know, there were a

22   couple competing ideas about the piece.  Gun

23   control, I could see that Bob was kind of pushing

24   that.  However, our gun control -- usual gun control

25   writer and expert on the issue, Frank Clines, was

Linda Cohn
May 07, 2020                                    59

```
 1                      L. Cohn
 2    not in that day.  So Elizabeth was writing it.  And
 3    she's more of a political writer, but could
 4    certainly write about gun control.  So -- and then I
 5    think there were pushes from other people.  And I
 6    cannot actually recall who, although you showed me
 7    the email with Nick Fox's thought on it, which I
 8    hadn't recall -- actually, I don't think I've seen,
 9    because I don't think I was on that one, so I hadn't
10    seen that -- where he thought it would -- suggesting
11    it should be more about the broader political issue
12    of discourse.
13         Q    And were those the competing ideas that you
14    were referencing, gun control versus the political
15    climate issue?
16         A    Yes.
17              MS. SCHELL:  Objection to form.
18         A    Yeah.  I -- yeah.  I'm not -- I might not
19    say "competing" because you could deal with more
20    than one issue in a piece, but there was a question
21    as to how much nitty-gritty we wanted to get into on
22    gun control and what that would be.  Right, yes.
23         Q    And do you recall, during the course of
24    this conversation that you had with Mr. Bennet on
25    June 14 of 2017, what Mr. Bennet said in response to
```

1                       L. Cohn

2     the questions that you raised?

3         A    He said, "I'll take a look at it," and he

4     called up the piece.  He, I think, at one point

5     said, yeah, it needs some work, I'll do it.

6     Something to that effect.  That's not -- I'm not

7     quoting him.  That was the message.

8         Q    And do you recall around what time this

9     conversation occurred?

10         A    I don't know.  I mean, 5:00 maybe.  I don't

11     know.  Maybe later.  Approaching deadline.  I

12     then -- yeah.

13         Q    And you said approaching deadline.  When

14     was the deadline?

15         A    8:00.

16         Q    And what was that the deadline for?

17         A    The print edition.

18         Q    And was it for the print edition in the

19     U.S. or international?

20         A    U.S.

21         Q    Was there a deadline for the international?

22         A    We sent it to them before we left for the

23     night and I think -- I don't know.  And it did --

24     those deadlines do change over time.  But, like,

25     3:00 a.m. or something.

Linda Cohn
May 07, 2020                                    61

```
 1                    L. Cohn
 2      Q    And do you recall, at any point on June 14
 3   of 2017, did anyone express an urgency to get this
 4   particular piece, "America's Lethal Politics", out
 5   that day?
 6           MS. SCHELL:  Objection to form.
 7      A    We -- the sense was -- yes, we wanted to
 8   get it in the paper the next day, which -- you know,
 9   once we put it on what we call the DEW, the
10   schedule, you know, when Bob Semple said, "Yes,
11   let's put it on there," the goal is to get it in the
12   next day's print paper and to get it online that
13   night.
14      Q    Was there already another editorial that
15   was planned for the June 15, 2017, edition of the
16   paper before you started working on "America's
17   Lethal Politics"?
18           MS. SCHELL:  Objection to form.
19      A    Well, there -- there were at least two or
20   three editorials that day.  I'd have to look at them
21   to remind myself whether it was two or three.  So we
22   could have had those.
23           Is that what you were asking?
24      Q    Yes.
25      A    Yes.
```

Linda Cohn
May 07, 2020                                          62

```
1                           L. Cohn

2       Q    Do you have any independent recollection of

3    what those were?

4       A    No.

5       Q    Let me show you another document, which is

6    Exhibit 20.

7                        (Exhibit 20 was shown to the

8                         witness.)

9       A    Okay.

10      Q    This should be an email from Mr. Bennet on

11   June 14 at 12:41 p.m.

12      A    Uh-huh.

13      Q    Do you recall this email?

14      A    I'm going to take a second to read it.

15      Q    Yes, please do.

16      A    (Perusing document.)

17           Okay.  I don't recall that email.

18      Q    In this email, Mr. Bennet says, "Hard for

19   me to imagine that Bernie himself is guilty of

20   anything like that.  But if there's evidence of the

21   kind of inciting hate speech on the Left that we, or

22   I at least, have tended to associate with the Right

23   (e.g., in the run-up to the Gabby Giffords

24   shooting), we should deal with that."

25           Do you recall, at any time, having any
```

Linda Cohn
May 07, 2020                                    67

```
 1                      L. Cohn
 2  anyone that was working on the "America's Lethal
 3  Politics" editorial that related to any link between
 4  political incitement and the Giffords shooting?
 5          MS. SCHELL:  Objection to form.
 6      A    I cannot recall a conversation.
 7      Q    And can you recall, at any point in time on
 8  June 14 of 2017, whether you personally looked to
 9  see whether or not any link between political
10  incitement and the Giffords shooting had been
11  established?
12          MS. SCHELL:  Objection to form.
13      A    I do not recall looking.
14      Q    And do you recall if anyone else looked to
15  see whether or not a link had been established
16  between political incitement and the Giffords
17  shooting?
18          MS. SCHELL:  Objection to form.
19      A    Excuse me, could you ask that again?
20      Q    Sure.  Do you remember whether or not, on
21  June 14 of 2017, anyone who was working on the
22  "America's Lethal Politics" editorial looked to see
23  whether or not a link had been established between
24  political incitement and the Giffords shooting?
25          MS. SCHELL:  Same objection.
```

Linda Cohn
May 07, 2020                                        68

1                        L. Cohn

2      A    I don't think I would know if they had

3   looked.

4      Q    Which I understand, you don't think that

5   you would know.

6           But do you know whether anyone did?

7      A    I don't remember hearing that -- I don't

8   remember it.  I mean, I just don't remember whether

9   anyone did.

10     Q    And as we sit here today, do you know

11  whether or not any link between political incitement

12  and the Giffords shooting has been established?

13          MS. SCHELL:  Objection to form.

14     A    I know that there was no link established

15  between the flyer we mentioned and the Giffords

16  shooting.

17     Q    And when --

18     A    I --

19     Q    When you say "the flyer we mentioned," are

20  you referring to the map that was circulated by

21  Sarah Palin's political action committee?

22     A    Correct.

23     Q    And how is it that you know that no link

24  was established between the map circulated by Sarah

25  Palin's political action committee and the Loughner

Linda Cohn
May 07, 2020                                           69

1                    L. Cohn

2      shooting?

3          A     Because when I walked into work the next

4      day, I discovered we'd been wrong and we were

5      running a correction.

6          Q     And how did you discover that you were

7      wrong?

8          A     Everyone told me when I walked in the door.

9          Q     When you say "everyone told me when I

10     walked in the door," who's everyone?

11         A     James was there, Jesse Wegman.  Just the

12     room was abuzz with discussion of that.

13               But because I worked on the correction with

14     James and Jesse Wegman, I most clearly remember that

15     there was a general gasp in the room like, "Oh, my

16     God.  How could we get this wrong?"

17         Q     Did -- what time did you get to work on

18     June 15th?

19         A     I don't know.  I, I -- I don't know.  I

20     would assume probably, like -- I'd have to see when

21     the correction ran, and then I would know I was

22     there probably an hour before.  Probably like 11:00,

23     12:00.  11:00.  I don't know.

24         Q     That was a Thursday.  Did you normally get

25     into the office later on Thursdays?

Linda Cohn
May 07, 2020                                    73

```
1                      L. Cohn
2      A    I am sure I was included on some of those,
3  yes.
4      Q    And do you recall whether or not, on the
5  morning of -- or the afternoon of June 14, 2017, you
6  went back and looked at any links that were shared
7  amongst the people that were working on the
8  "America's Lethal Politics" editorial?
9           MS. SCHELL:  Objection to form.
10     A    Did you say on the 15th or on the 14th?
11     Q    On the 14th, but I'll rephrase it because
12 it was probably a bad question.
13          On June 14 of 2017, do you recall at any
14 point in time reviewing editorials that were
15 circulated amongst the people who were working on
16 the "America's Lethal Politics" editorial?
17     A    I vaguely recall seeing some gun control
18 stories.  Whether I looked them up on my own or they
19 were the ones being circulated, I don't know.
20     Q    Do you have any recollection of whether or
21 not, on June 14 of 2017, you conducted any research
22 related to political rhetoric or political
23 incitement in connection with the "America's Lethal
24 Politics" editorial?
25          MS. SCHELL:  Objection to form.
```

Linda Cohn
May 07, 2020                          74

1                    L. Cohn

2      A    I really can't specifically recall.  I

3  mean, I know I got that -- I wasn't really involved

4  with that piece until very late in the day, so I

5  really can't recall what kind of research I was

6  doing prior to that or in that small amount of time

7  I had it.

8            I do remember doing some research on one

9  aspect of gun control that we were very nervous we

10  were going to get that wrong.  And as happens with

11  fact checking, you have a sense of what aspects you

12  think are most susceptible to confusion or to error,

13  even, and I remember spending a lot of time on that

14  because gun control issues are very ornate and

15  detailed and different in all the states.  And it's,

16  it's -- it tends to be an issue that can be very

17  prone to error because there's so many different

18  kinds of guns and different laws and such a

19  patchboard across the country.  So -- and because

20  Elizabeth was not our gun control writer, I do

21  remember doing -- being concerned, I think along

22  with Eileen Lepping, the fact checker, and probably

23  Nick Fox, who was reading the piece while I was

24  reading it, but he had it on view and I had -- had

25  it active about -- it was something about a gun

Linda Cohn
May 07, 2020                                    75

```
 1                    L. Cohn

 2   control regulation or rule, and we spent quite a bit

 3   of time researching that.

 4        Q    And do you know --

 5        A    Unfortunately --

 6        Q    Go ahead.

 7        A    Unfortunately, we spent a lot of time on

 8   that and that ate up quite a bit of time, yeah.

 9        Q    And just generally speaking, when you were

10   working on a piece that had an issue that was

11   susceptible to confusion or error in it, would you

12   typically slow down, like, take a step back and say,

13   "Wait, we need to slow down on this piece and make

14   sure we get it right"?

15             MS. SCHELL:  Objection to form.

16        A    If deadline pressure allowed, yes.  I mean,

17   you use your instincts as to what you think is --

18   are the susceptible points in terms of accuracy in a

19   piece of writing and devote the time that you have

20   accordingly.

21        Q    And do you know, at any point in time on

22   June 14 of 2017, did you have any discussions with

23   Mr. Bennet about the issue in the piece that you had

24   just described to me that you thought was -- you had

25   a sense was most susceptible to confusion or error?
```

Linda Cohn
May 07, 2020                              76

```
 1                    L. Cohn

 2           MS. SCHELL:  Objection to form.

 3      A     There might have been some little written

 4   back-and-forth.  But, I mean, probably that -- I

 5   believe that was between me, Eileen Lepping,

 6   possibly Nick Fox, maybe Elizabeth, because I just

 7   remember it being fairly granular about gun control,

 8   not really about our policy about gun control, which

 9   is more, you know, something -- that I probably

10   would have discussed more with James.  But this had

11   a certain specificity that was more a question, I

12   think, for the writer and Eileen.

13      Q     Did -- in this email that we're looking at,

14   the one on June 14 of 2017 that's Exhibit 25,

15   there's an email from Elizabeth Williamson at

16   1:40 in that one.  It says, "Phoebe, Thanks.  Is

17   there one that references hate-type speech against

18   Dems in the run-up to her shooting?  James

19   referenced that."

20      A     Right.

21      Q     Do you know whether anyone ever did any

22   research for articles that related to hate-type

23   speech against Dems in the run-up to the Gabby

24   Giffords shooting on June 14, 2017?

25           MS. SCHELL:  Objection to form.
```

Linda Cohn
May 07, 2020                                    77

1                        L. Cohn

2        A     I don't know if anyone did.  I don't know

3    if --

4        Q     Did you --

5        A     I don't know if they did or didn't.

6        Q     Did you ever research that specific issue?

7              MS. SCHELL:  Objection to form.

8        A     I may have.  I mean, I spent much of the

9    day just reading news, refreshing myself on certain

10   issues.  I don't recall if I read that or not.

11       Q     When you -- in this time period, June 14 of

12   2017, when you were conducting research in

13   association with editorials that you were working

14   on, how would you typically do that?  I mean, would

15   you go to The Times website?  Would you use Google?

16   What would you do?

17       A     All the above.  It depends on the issue.

18   If we had a long history of pieces, I would go and

19   read those previous pieces.  Because one of the

20   concerns is that if the board has a position, if we

21   change our position, we want -- we want to make sure

22   we're doing it with thought and, you know, it's a --

23   that we've made a thoughtful decision if there is

24   some policy change.  So you want to make sure you're

25   reflecting past, established positions.  So I

Linda Cohn
May 07, 2020                                78

```
1                      L. Cohn
2  probably would rely mostly on -- you know, that
3  would be a primary source.
4            And then news stories, which could be from
5  The Times or from any other publication.  And yes, I
6  would probably get to them through Google.
7      Q    If you were trying to verify a fact through
8  news stories, would you look for news stories in The
9  Times first?
10           MS. SCHELL:  Objection to form.
11     A    Not necessarily.  I would consider it a
12 good source, but, I mean, I often would be checking
13 Washington Post.  Sometimes it's just about you
14 Google something and it was whichever established
15 source would come up first.
16     Q    And when you conducted research in
17 connection with editorials that you were working on,
18 would you save your research?
19     A    No.  I mean, I didn't keep files of what I
20 read for each piece, no.
21     Q    So if an occasion arose, if you needed to
22 go back and find what sources you had relied on to
23 verify a fact in an editorial, how would you go
24 about doing that?
25           MS. SCHELL:  Objection to form.
```

Linda Cohn
May 07, 2020                              79

L. Cohn

2      A    Well, often writers would compile lists of

3   sources they had and they would send it to an email.

4   So some writers -- say, for example, Mira Kamdar was

5   a writer in editorial.  She would always send a long

6   list which would have a source for almost

7   everything, everything that could be broken down

8   into a little fact in a piece, which the fact

9   checkers would look at.  I would look at some of

10  them.  And then -- so -- for those, there might be a

11  record.  I'm not really quite sure -- could you ask

12  that again?

13     Q    Yeah.

14     A    Sorry, I started talking and I just kind of

15  went on.

16     Q    I was just asking if a situation arose

17  where the accuracy of the fact in an editorial was

18  questioned, how would you go about going back and

19  checking the sources that were used to verify the

20  fact in question?

21     A    Well, it would depend on how much time had

22  elapsed.  But, you know, you could go into your

23  Google history and, you know, there would probably

24  be hundreds and hundreds of things in a day that you

25  had looked at, and you could look at that.

Linda Cohn
May 07, 2020                                    91

```
 1                      L. Cohn

 2      Q     Yes.

 3            Do you know?

 4      A     I don't know what you were given.

 5      Q     Well, let me ask you this.

 6            Were you using Scoop as your content

 7   management system as of June 14 of 2017?

 8      A     Yes.

 9      Q     Okay.

10            And if you look at the -- if we start with

11   the last page of the exhibit, there should be a line

12   there, it says, "Elizabeth Williamson, back field,

13   4:44 p.m."

14      A     Oh, yes, uh-huh.

15      Q     And then if we go up above that to the

16   second page of the exhibit, it should have your name

17   there with "back field" at 5:03 p.m.

18      A     Yes.

19      Q     Do you know, would that be, that 5:03 p.m.

20   stamp, would that be an accurate time period for

21   when you would have first reviewed and made any

22   changes or comments on the "America's Lethal

23   Politics" editorial?

24      A     It means that I opened the file and made

25   some change, which could be as small as adding a
```

Linda Cohn
May 07, 2020                                    92

```
1                        L. Cohn

2    space, and then stored it.  But that sounds about

3    right for when I first picked it up.

4        Q    All right.  And if you go up above your

5    name at that time stamp at 5:03, the first full

6    paragraph on that page where it says, "In the

7    aftermath of Wednesday's shooting, the political

8    Right and Left and both sides in the gun debate dove

9    into their respectful foxholes."

10           Do you see that?

11       A    Yes.

12       Q    In bold, it says, "Do we know of any

13   elected officials on the Left who have incited

14   violence?  Or just unaffiliated people online or

15   comedians, most are pro-gun control.  Does this

16   graph imply equivalence?"

17           Did you insert that?

18       A    I'm pretty sure I did.  We usually, if this

19   were -- if I were looking in Scoop online, I would

20   hover my little cursor over there and it would

21   confirm who put it in.  But I believe that was me,

22   to the best of my recollection, yes.

23       Q    And do you recall why it was that you were

24   asking this first question, "do we know of any

25   elected officials on the Left who have incited
```

Linda Cohn
May 07, 2020                                            93

```
 1                    L. Cohn
 2   violence?"
 3      A    Because the phrase before it says "both
 4   sides" -- where it says "both sides dove into" --
 5   actually, let me read the sentence that came before
 6   that, just to --
 7      Q    And you may want to read -- read the entire
 8   thing, because I'm going to ask you some other
 9   questions about this, too.  So go ahead and read the
10   entire thing.
11           So going back, the question of "do we know
12   of any elected officials on the Left who have
13   incited violence," do you recall, after reading the
14   entire draft that we're looking at, why you asked
15   that question?
16      A    Because, in that sentence, we're saying the
17   political Right and Left, the piece is implying
18   there's been this kind of vitriolic speech on both
19   sides of the political spectrum.  And for me, the
20   issue comes -- and what the thresh of the piece is
21   that it comes back to gun control.
22           So while people on the Left might have been
23   speaking in very strong terms politically about, you
24   know, how political opponents were hurting the
25   country, it wasn't -- they were also talking about
```

Linda Cohn
May 07, 2020                                    94

```
 1                    L. Cohn
 2   gun control.
 3           So their rhetoric wasn't paired with the
 4   idea that the free flow of guns throughout our
 5   culture was acceptable.  That, to me, was the
 6   distinction between the Left and the Right,
 7   particularly as it pertains to this piece about a
 8   shooting.
 9      Q    And then you used the word "incited" in
10   that question.
11           What did you mean by "incited"?
12      A    Maybe fostered or said things that might
13   make people who were prone to such things feel that
14   they should take some sort of violent action.  I
15   don't know.  Just sort of a general -- I don't -- I,
16   I -- I certainly didn't mean someone was giving,
17   like, orders or saying go shoot someone or go commit
18   a violent act, but just that the rhetoric was ugly
19   enough that it would boil up and foster people to
20   take things into their own hands.
21      Q    Now, at any point in time on June 14 of
22   2017, did anyone answer that question that you
23   asked, whether or not you knew of any elected
24   officials on the Left who had incited violence?
25           MS. SCHELL:  Objection to form.
```

Linda Cohn
May 07, 2020                                    95

```
1                        L. Cohn
2      A    I don't remember a specific -- someone
3  saying, you know, "person X did."  I don't remember
4  any discussion.
5      Q    And when you say in here "or just
6  unaffiliated people online or comedians," what were
7  you referring to?
8      A    Well, I was here really -- when we talk
9  about the political Right and Left, I was really
10 talking about people, not late night comedians or
11 someone like a Kathy Griffin.  Someone you would
12 think is a little bit more part of the political
13 discussion.
14     Q    And was this -- do you recall whether this
15 editorial was written around the same time period
16 that Kathy Griffin came under fire for posting a
17 picture of her holding a severed head of President
18 Trump?
19     A    I actually do not remember the timing of
20 when she did that.
21     Q    But you do recall her doing that, correct?
22     A    I do.
23     Q    Is that one of the things you were thinking
24 of when you referenced "or just unaffiliated people
25 online or comedians" here?
```

Linda Cohn
May 07, 2020                              96

1                      L. Cohn

2           MS. SCHELL:  Objection to form.

3      A    Seeing the word "comedian" makes me think

4  it could be that.  In retrospect, I don't know if

5  that's what I was thinking of.

6      Q    And when you asked "does this graph imply

7  equivalence," what do you mean?

8      A    That the heated rhetoric on the Right and

9  the heated rhetoric on the Left were the same.  I

10 think I thought that somehow the respective foxholes

11 line was a little bit -- and the Left was doing this

12 and doing that and the Right is doing that.  It was

13 just parallel that their rhetoric was somehow

14 equivalent.

15     Q    And when you said "incited violence" in

16 this bolded section that we've been looking at, at

17 this time on June 14 of 2017, at 5:03 p.m., did you

18 believe that the map that Sarah Palin's political

19 action committee had circulated had incited Jared

20 Loughner to commit his shooting in 2011?

21          MS. SCHELL:  Objection to form.

22     A    I -- no.  I -- not that directly.  I would

23 think of it more as -- the way you phrased it sounds

24 very direct, that it -- that the map led him to

25 commit the shooting.

Linda Cohn
May 07, 2020                                    97

```
 1                      L. Cohn

 2            I -- no, I did not see that.  I saw it as,

 3      as one example of the kind of heated political

 4      rhetoric against which all these sorts of violent

 5      activities were happening.  That it was part of a

 6      backdrop of how the conversation in this country was

 7      becoming heated and often used violent imagery.

 8       Q    If you go to the first page of the exhibit,

 9      there's a paragraph there that starts, "That in 10

10      minutes a single gunman."

11            Do you see that one?

12       A    Yes.

13       Q    And then there's a bolded question there,

14      "Are there signs of mental illness or just in the

15      sense that anyone who commits mass shootings is

16      deranged?"

17            Is that a question that you put in there?

18       A    I'm not sure.

19       Q    And do you know whether, during the course

20      of the day on June 14, 2017, whether anyone answered

21      that question, whether there were signs of mental

22      illness with Mr. Hodgkinson?

23       A    I don't know.

24       Q    And right before that bolded question we're

25      looking at, it says, "Not all the details are known
```

Linda Cohn
May 07, 2020                                              98

```
1                          L. Cohn
2    about, but a sickeningly familiar pattern is
3    emerging: a deranged" -- and if we take out the bold
4    part -- "individual with a gun -- perhaps multiple
5    guns -- and scores of rounds of ammunition uses
6    politics as a pretense for a murderous shooting
7    spree."
8            When you reviewed this, where it says "a
9    sickeningly familiar pattern is emerging," what was
10   your understanding of what that pattern was?
11           MS. SCHELL:  Objection to form.
12       A    I really can't recall what I would have
13   been thinking at the time about a specific phrase
14   like that.
15       Q    Do you recall whether or not, on June 14 of
16   2017, around the time of 5:00, this draft that we've
17   been looking at, were you aware of any of the other
18   pieces that were being worked on for the editorial
19   page the following day?
20           MS. SCHELL:  Objection to form.
21       A    I would have been aware of other pieces
22   being worked on.  As a matter of course, I would
23   have been aware of other pieces.
24       Q    Were you aware of op-eds that were being
25   worked on for the editorial page the following day?
```

Linda Cohn
May 07, 2020                                    100

```
1                    L. Cohn

2     Q    And would anyone have been checking to see,

3  like, as of June 14 of 2017, for example, whether

4  the op-ed -- there were op-ed pieces that were being

5  written on the same subject matter as the editorials

6  that were being written?

7         MS. SCHELL:  Objection to form.

8     A    I mean, every -- those things were open.

9  Everyone was free to look and had access to the

10 directories for Opinion.  So I don't recall that it

11 was any one person's specific job to do that.  I

12 mean -- yeah.

13    Q    And during the June 14 of 2017 time period,

14 was there anyone checking to make sure that there

15 wasn't going to be any kind of inconsistency

16 factually between op-eds and editorials that were

17 published the same day in the paper or online?

18        MS. SCHELL:  Objection to form.

19    A    Well, I mean, everyone was trying to get

20 their individual parts right.  And then, I think,

21 you know, when I was a copy editor, I would see both

22 sometimes and, yes, sometimes you would notice

23 something in one piece.  An Opinion piece might

24 trigger you to recheck something in an editorial and

25 vice versa, but...
```

Linda Cohn
May 07, 2020                                          101

```
1                        L. Cohn
2      Q    Do you know who the copy editor was for the
3    "America's Lethal Politics" editorial?
4      A    I don't recall who would have picked that
5    up.  I don't know.
6      Q    We'll go through it.  I think I have who it
7    is.  I was just seeing if you remember while we were
8    talking about that.
9            Let me show you now what we're going to
10   mark as 32F.
11           And have you already closed 32E?
12     A    No.
13     Q    Let me ask you one more question before we
14   move on.  The portion that we were looking at with
15   respect to your edits and back field was at
16   5:03 p.m.  And if you look on the first page, above
17   those edits, you have -- it shows Mr. Bennet, back
18   field, at 6:32 p.m.
19     A    Uh-huh.
20     Q    Do you see that?
21     A    Yes.
22     Q    Do you know whether or not the conversation
23   that you talked about earlier that you had with
24   Mr. Bennet when you were at the door of his office,
25   did that occur in the time period between 5:03 p.m.
```

Linda Cohn
May 07, 2020                                    102

```
1                        L. Cohn

2   and 6:32 p.m.?

3       A    I think it would probably have been around

4   then.  I -- yeah.  It wasn't before I picked up the

5   piece.  And I know it was by 7:00, I would say.  So

6   it could have been at 6:30.  Either a little before

7   or a little after.

8       Q    So once Mr. Bennet picks up the piece at

9   6:32 p.m., are you able to go in and make changes to

10  it?

11      A    No.

12      Q    So once he's in the document, what

13  capabilities did you have with respect to the

14  editorial?

15      A    I could only see what it would have looked

16  like before he picked it up.  I could only see the

17  previous version unless he hit the "save" button,

18  which would update it.

19      Q    Okay.

20           And then now if you go to Exhibit 32F.

21      A    Okay.

22                    (Exhibit 32F was shown to the

23                     witness.)

24      Q    If you go to the last page of the exhibit,

25  there should be a time stamp there below your name
```

Linda Cohn
May 07, 2020                                           103

```
 1                    L. Cohn
 2  and back field at 7:17 p.m.?
 3      A    Yes.
 4      Q    Would that indicate that, by 7:17 p.m., you
 5  were able to go back in and access and make changes
 6  to the document?
 7      A    That shows that, at 7:17, I stored some
 8  change I had made, I think, yeah.
 9      Q    Would you have been able to do that if
10  Mr. Bennet was still editing the piece at that time?
11      A    No.  I mean, while I -- well, I think --
12           MS. SCHELL:  Objection to form.
13      A    I think the way the system worked at that
14  time -- you know, I can't recall.  We changed
15  computer systems, but there was a period where one
16  person could be working on the headline and someone
17  else could be working on the text.
18           But if we're just talking about the text,
19  that just shows that, at 7:17, I made a change and
20  stored it.  I don't know whether I kept the piece up
21  after that or if he then took it and went back into
22  it.  I would have to see all the time stamps.  I
23  don't know.  It does show I made a change at 7:17.
24      Q    And if you -- if you start looking through
25  Exhibit 32F that we're looking at, the text of the
```

1                        L. Cohn

2    editorial itself, you see how it's all bold?

3        A    Yes.

4        Q    What does that indicate?

5        A    You know, I'm not completely sure, because

6    I don't know how these things are printed out

7    from -- what it looks like when you print out

8    something from Scoop.

9             But it -- I don't think it was just so in

10   bold in the type.  That may be showing -- it could

11   be showing new text.  That's my guess.  But I

12   can't -- I can't know for sure.  I would have to ask

13   more of a tech person.

14       Q    And then on this first page, right at the

15   beginning, underneath that bolded line where

16   Mr. Bennet's name is.

17       A    Uh-huh.

18       Q    It says "print headline," and there's a

19   number of potential headlines listed there?

20       A    Correct.

21       Q    Do you know whether you came up with those

22   potential headlines?

23       A    Let me look at those and think back.

24            I can't say for sure because other people

25   could have contributed headlines too, like Nick Fox

Linda Cohn
May 07, 2020                                    105

```
1                        L. Cohn
2    or, you know, anyone else could have put them in.
3    Elizabeth could have sent some in.  People could
4    have inserted some in, so I don't know.  Certain
5    ones sound like me to me, but...
6         Q    And then if you go down to the very bottom
7    of the first page, there's a paragraph there that
8    reads, "Was this attack evidence of how vicious
9    American politics has become?  Probably, in 2011,
10   when Jared Lee Loughner opened fire in a" --
11        A    I'm sorry --
12        Q    Do you see that?
13        A    I just got to it now.
14        Q    That's okay.
15             Do you see that paragraph that starts with
16   "Was this attack evidence"?  Can you read that
17   paragraph for me?  Not out loud, just read it to
18   yourself.
19        A    Oh, good.
20        Q    Okay.
21             Do you know who wrote that paragraph?
22        A    It would -- it would -- I would only be
23   able to guess.  I don't know.
24        Q    When we had looked back at that
25   Exhibit 32E, which was the 5:03 version, at that
```

Linda Cohn
May 07, 2020                                    106

```
 1                    L. Cohn
 2   particular paragraph, do you notice how it's changed
 3   between the 5:03 version in Exhibit 32E and this
 4   version in Exhibit 32F?
 5        A    I wish I could have them together, but can
 6   you -- can you read this other paragraph to me while
 7   I'm looking at this one?
 8        Q    Yeah.  I'll read it to you while you're
 9   looking at this one.
10             And this is out of Exhibit 32E.  It says,
11   "Just as in 2011 when Jared Lee Loughner opened fire
12   in a supermarket parking lot, grievously wounded
13   Representative Gabby Giffords and killing six
14   people, including a nine-year-old girl,
15   Mr. Hodgkinson's rage was nurtured in a vial
16   political climate.  Then, it was in the pro-gun
17   Right being criticized.  In the weeks before the
18   shooting, Sarah Palin's political action committee
19   circulated a map of targeted electoral districts
20   that put Ms. Giffords and 19 other Democrats under
21   stylized crosshairs."
22        A    Okay.  And what's --
23             MS. SCHELL:  Shane, did you have a
24        question?
25             MR. VOGT:  Yeah.
```

Linda Cohn
May 07, 2020                                    112

```
1                    L. Cohn
2    spend a long time working on a piece and so no other
3    editor could pick up that piece.  It was not usual
4    to spend, you know, hours on a piece, but -- it's
5    also relative.  It's a little hard for me to answer
6    that.  He did sometimes edit heavily, yes.  And if
7    he had the piece up, other people would not have
8    been able to get into it.  That's always the case.
9    When I have a piece up, someone can't get into it.
10       Q    While you worked for Mr. Bennet, did he
11   show any particular interest in certain topics?
12            MS. SCHELL:  Objection to form.
13       A    He seemed to, you know -- the editorial
14   page is just such a generalist page.  There were a
15   lot of issues he was interested in.  He was
16   interested in big cultural issues and he wanted us
17   to be doing more on that.  He was interested in the
18   work Brent Staples was doing, writing about race.
19            Obviously, you know, interested in
20   politics, it's an editorial page, so yes.  He seemed
21   to have pretty broad interests.
22       Q    Did -- did you ever see him express a
23   particular interest in political rhetoric?
24            MS. SCHELL:  Objection to form.
25       A    I think he's very -- thinks about language
```

Linda Cohn
May 07, 2020                                    113

|   |   |
|---|---|
| 1 | L. Cohn |
| 2 | a lot and he's very sensitive about language and how |
| 3 | it affects the culture.  I think that's something |
| 4 | that interests him.  And I know that he was a very |
| 5 | strong believer in maintaining discourse.  I think |
| 6 | that was of interest to him.  I don't know if I |
| 7 | could define something being -- what was your |
| 8 | phrase -- of particular interest? |
| 9 | Q    Yes. |
| 10 | A    Yeah. |
| 11 | Q    Did Mr. Bennet ever express a particular |
| 12 | interest in gun control issues? |
| 13 | MS. SCHELL:  Objection to form. |
| 14 | A    He was very concerned, yeah, of the |
| 15 | epidemic of gun violence in the country.  But in |
| 16 | that amount of time, I don't see that as being a big |
| 17 | focus.  I don't think there was one individual focus |
| 18 | that had developed yet at that time or -- I mean, or |
| 19 | maybe since.  But I couldn't say that was a big |
| 20 | focus of his, no.  Certainly no more than his |
| 21 | predecessors. |
| 22 | Q    At this time period, June 14 of 2017, were |
| 23 | you aware that Mr. Bennet's brother was a |
| 24 | U.S. senator? |
| 25 | A    Yes. |

Linda Cohn
May 07, 2020                                    114

```
 1                      L. Cohn
 2      Q    And at this time period, June 14 of 2017,
 3  were you aware that Mr. Bennet's brother, his office
 4  was threatened around the same time as the Giffords
 5  shooting?
 6      A    No.
 7          MS. SCHELL:  Objection to form.
 8      Q    Did you ever hear Mr. Bennet talk about his
 9  brother's office being threatened at any point in
10  time?
11      A    No.
12          MS. SCHELL:  Objection to form.
13      Q    What does the phrase "trim" mean?
14          MS. SCHELL:  Objection.
15          Where are you looking?
16          MR. VOGT:  I'm just asking a question.
17          MS. SCHELL:  Oh, okay.
18      A    To cut.
19      Q    And in the context of an editorial, when
20  the phrase "trim" is used, what would that mean?
21          MS. SCHELL:  Objection to form.
22      A    To cut or shorten.
23      Q    Let me show you Exhibit 103.
24                      (Exhibit 103 was shown to the
25                      witness.)
```

Linda Cohn
May 07, 2020                                        116

```
 1                      L. Cohn
 2   it was inaccurate?
 3          MS. SCHELL:  Objection to form.
 4      A    No.  But I can see here he said that I
 5   don't think it was a high school ball field.  So
 6   maybe we cut the word "high school" and just say
 7   ball field, if we don't know for sure if it was a
 8   high school or grade school or some other.  So I can
 9   see that in the email.  Yeah.
10      Q    Let me show you Exhibit 108.
11                   (Exhibit 108 was shown to the
12                   witness.)
13      A    Okay.
14      Q    And it should be a June 14th email string.
15   It starts at the very top, there's an
16   8:18 p.m. email from you to Mr. Fox; is that right?
17      A    Yes.
18      Q    And the subject line is Shooting H-E-D and
19   blurg [sic]?
20      A    Yeah.  That's a typo.  Blurb.
21      Q    So he's writing you here concerning the
22   headline for the editorial and the blurb for it; is
23   that right?
24      A    I think we said this was from me to him,
25   but -- that part -- but, yeah, I don't know who --
```

Linda Cohn
May 07, 2020                                              117

```
 1                    L. Cohn
 2   maybe he started the chain, yes.
 3       Q    I think he started it at, if you look down
 4   there, at 7:12 p.m.?
 5       A    Uh-huh.
 6       Q    And then one of the things he writes down
 7   there is, "Circumstances were unusual, but the cause
 8   of the assault on Congressional representatives is
 9   not -- the availability of firearms."
10           Do you see that?
11       A    Uh-huh.
12       Q    Did you have any conversations or
13   discussions with Mr. Fox about the headline or blurb
14   for the editorial?
15       A    Well, I can see here we had some back and
16   forth, but I don't know if we had discussions in
17   person.  I remember we had quite a bit of back and
18   forth between James about the headline.
19       Q    What do you recall about the back and forth
20   between you and Mr. Bennet about the headline?
21       A    I mean, I threw out some ideas.  You know,
22   he would -- I remember him being, hmm, maybe, hmm,
23   and then I think he threw something out.  I don't
24   really remember who chose what, but it can just take
25   a while to get something -- it took a while to get
```

Linda Cohn
May 07, 2020                                    118

```
 1                      L. Cohn
 2   something he liked and approved of.  I don't know if
 3   he, in the end, wrote the headline.
 4        Q    The back and forth that you were just
 5   talking about with Mr. Bennet concerning the
 6   headline, was that verbal or was it done through
 7   email or chat?
 8        A    I really can't recall.  I can't recall.
 9   But there was probably some chat.  There was
10   probably some phone call.
11        Q    And then we had looked at, on Exhibit 32F,
12   there were several potential print headlines listed
13   in there.
14             And then I'm going to show you Exhibit 32G.
15                      (Exhibit 32G was shown to the
16                      witness.)
17        A    Wait, sorry, I think I opened something
18   that's not 32G.  Hold on one second.
19             Okay, I have 32G.
20        Q    If you go to the very last page of the
21   exhibit.
22        A    Okay.
23        Q    Do you see the print headline there has
24   several, I think -- it's one long -- it appears to
25   be one long sentence, but is that several different
```

Linda Cohn
May 07, 2020                                    119

```
 1                    L. Cohn
 2   potential headlines?
 3        A    It is.
 4        Q    And if you go up a few pages before that,
 5   there should be what we call a Bates number down at
 6   the bottom, it says "NY Times," and then has a
 7   number after it.
 8        A    Okay.
 9        Q    The one I'm looking at should say 224.
10        A    Okay.  Let me go down then.
11             Yes, got that.
12        Q    And do you see the print headlines listed
13   there?
14        A    No.
15        Q    I may have my numbers off.
16             Let me ask you this:  If you go to the very
17   first page of the exhibit, it has the "America's
18   Lethal Politics" headline?
19        A    Yes.
20        Q    Who came up with that title or headline?
21        A    I'm pretty sure that was James.
22        Q    And do you know whether or not he was the
23   one who inserted that headline into the editorial in
24   Scoop or did somebody else do that?
25        A    I don't recall.  Often he would tell me a
```

Linda Cohn
May 07, 2020                                        159

```
 1

 2            C E R T I F I C A T E

 3

 4       I, AMANDA McCREDO, a Shorthand Reporter

 5   and Notary Public of the State of New York, do

 6   hereby certify:

 7   That the witness whose examination is

 8   hereinbefore set forth was duly sworn, and that

 9   such examination is a true record of the

10   testimony given by such witness.

11   I further certify that I am not related to any

12   of the parties to this action by blood or

13   marriage, and that I am in no way interested in

14   the outcome of this matter.

15

16

17              _____

18              AMANDA McCREDO

19

20

21

22

23

24

25
```

Exhibit 5

1

2                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK

3                      CASE NO.:  17 Civ. 4853

4

SARAH PALIN, an individual,

5
          Plaintiff,

6
-vs-

7

8   THE NEW YORK TIMES COMPANY,
    a New York corporation, and
9   JAMES BENNET, an individual,

10          Defendants.
    _____/

11

12

13                        VIDEOTAPED

14

15                        DEPOSITION

16                           OF

17                    TIMOTHY CRAWFORD
                   (Via Videoconference)

18

19                      May 12, 2020
                   10:03 a.m. - 1:19 p.m.

20

21              (Proceedings conducted remotely)

22

23              Stenographically Reported By:
                    SHARON VELAZCO, RPR
24            Registered Professional Reporter

25

```
 1              MR. VOGT:  Yes.  I am just objecting to the form
 2         of his question.  And, it is legal issues for if and
 3         when this ever is attempted to be used in court.  It
 4         is a lawyer thing so we don't waste a lot of time
 5         during this.  It is lawyer stuff.
 6              THE WITNESS:  Sorry.
 7              So, Thomas, can you repeat the question, please?
 8    BY MR. SULLIVAN:
 9         Q.   Of course.  Was her style of rhetoric an
10    important part of Ms. Palin's appeal?
11              MR. VOGT:  Same objection.
12              THE WITNESS:  I think it was a small part, but
13         yeah.  Absolutely.  Sure.
14    BY MR. SULLIVAN:
15         Q.   And when you say she talked like the Republican
16    voters, what do you mean by that?
17              MR. VOGT:  Objection to form.
18              You can answer.
19              THE WITNESS:  I mean that she was talking about
20         their everyday problems, as -- because she is
21         experiencing those problems, as well.  And, when she
22         would talk about -- when she would talk about too
23         many taxes, too much government interference, et
24         cetera, et cetera, people understood -- people --
25         people believed, and I believed that she understood
```

 1        them.

 2   BY MR. SULLIVAN:

 3        Q.   And did voters appreciate, in your view, her

 4   authenticity?

 5             MR. VOGT:  Objection to form.

 6             You can answer.

 7             THE WITNESS:  Sure.

 8             I mean, "voters" is pretty general.  You would

 9        have to say "some voters."

10   BY MR. SULLIVAN:

11        Q.   Did her supporters appreciate her --

12        A.   Absolutely.  Absolutely.

13        Q.   So, you mentioned that you first got to know

14   Mrs. Palin well through her political action committee; is

15   that correct?

16        A.   I think you need -- I need to go through the

17   narrative of how it began.

18        Q.   Yes.  I am going -- we will go through that in a

19   second.

20        A.   Okay.  But yes, that's correct.

21        Q.   What is a political action committee, to start at

22   the high level?

23        A.   A political action committee, as defined by the

24   FEC, is essentially a group of individuals who can band

25   together and -- for their common, their common beliefs,

Timothy Crawford
05/12/2020                                                    26

1    common good.

2             It was originally set up for corporations to

3    solicit their management to donate money to candidates or

4    incumbents that they wanted to support, for whatever

5    reason.

6        Q.   So you would -- say, if General Electric wanted

7    to create a PAC --

8        A.   They did.

9        Q.   -- they would get all their senior executives

10   together and say --

11       A.   And I don't remember the exact wording on the

12   FEC, but it was management level, that they could solicit.

13   I think.  They couldn't solicit all their employees.

14       Q.   We have been using the phrase "PAC."  Is PAC just

15   shorthand for Political Action Committee?

16       A.   It is.

17       Q.   What distinguishes a leadership PAC from any

18   other kind of PAC?

19            MR. VOGT:  Objection to form.

20            You can answer.

21            THE WITNESS:  So, as I said, when it first --

22       when I was first at the FEC in 1975 and PACs were

23       just beginning, they were all corporate PACs except

24       for there were some organizations that had PACs.

25            The NEA had -- well, all of the unions had PACs,

1          but the National -- I can't remember, the N-E-C, or

2          N-A-C, that was an acronym, it was a Democratic PAC

3          that was -- that was began in that time.  ACU had a

4          PAC.  Americans for Constitutional Action had a PAC.

5          And then corporations had a PAC.

6              Leadership PACs -- I can't pinpoint when they

7          came into effect.  But, essentially, it was -- a

8          leadership PAC was a -- a member of Congress who held

9          a high-ranking position in their conference.  So,

10         majority leader, minority leader, maybe the

11         communications person, conference chair -- those kind

12         of things would be called leaders, and they -- some

13         of those people set up PACs.  And the -- the reason

14         would be for those PACs to support either members of

15         their conference, their caucus, or candidates running

16         for seats.

17    BY MR. SULLIVAN:

18         Q.   So, is the First Monday PAC by Speaker Gingrich,

19    was that -- would that be considered a leadership PAC?

20         A.   It was.

21         Q.   Would Congressman Watson's PAC be considered a

22    leadership PAC?

23         A.   Yes, because he was head of conference at that

24    time.

25         Q.   So, is a leadership PAC then associated with a

1    BY MR. SULLIVAN:

2        Q.   In crafting a solicitation, was any thought given

3    to the impact on Mrs. Palin's reputation for each

4    solicitation?

5        A.   Always.

6        Q.   You had mentioned that Mrs. Palin would be asked

7    to give her approval to solicitations being sent out in

8    her name; correct?

9        A.   From her.

10       Q.   And why was that?

11       A.   I asked and answered, but it is because it's

12   going from her.  So she would want to know about what she

13   was saying, and approve what she was going to say.

14       Q.   I'm going to send you what is our next exhibit

15   here.

16            (Exhibit No. 15 was marked for Identification.)

17            THE WITNESS:  Okay, if this thing keeps scrolling

18       up, because I am going to run out of space over here

19       on my --

20   BY MR. SULLIVAN:

21       Q.   It will keep scrolling up.

22       A.   Okay.  15?

23       Q.   15, yes.

24            Please let me know when you have it downloaded.

25       A.   I have it.

1          Q.   So, I have sent over what has been marked as

2     Defense Exhibit 15.  Do you recognize this image?

3          A.   I do.

4          Q.   And what is it?

5          A.   It is a map of the United States, with Google Map

6     Tools trying to show where districts are, the districts

7     were districts that went for McCain-Palin, but were

8     represented by Democratic members.

9          Q.   You said Google Map Tools.  What do you mean by

10    that?

11         A.   As I recall this, that was pulled from the Google

12    -- from Google Map Tools back then.

13         Q.   The map of the United States, or the symbols

14    placed over the districts?

15         A.   The symbols that are marking where --

16         Q.   I'm sorry.  The symbols that are marking where?

17         A.   Where the districts are.

18         Q.   Are you aware that some people have interpreted

19    those symbols to be gun sites?

20         A.   Can I log out?

21         Q.   Let's keep it up for a second just because we are

22    going to be talking about it in a little bit.

23         A.   Okay.  It is disconcerting because I can't see

24    you.

25         Q.   Oh, okay.

Timothy Crawford
05/12/2020                                            68

1       A.   Let me do that -- now, I can.  Okay.

2            Yes, I am aware of that.

3       Q.   And, when creating the map, was there any

4  discussion of the symbols looking like gun sites?

5       A.   I don't recall the conversation to whether or not

6  it was specifically looking like gun sites.

7            And, I just recall that -- I recall that --

8  recall that the conversation went, "We pulled -- we pulled

9  these from Google Mapping Tools," and I remember me saying

10  that "That will be okay then."

11      Q.   Who first came up with the idea of this map?

12      A.   Hang on a second.  I've got workmen outside.  So

13  if you could -- that's the reason you are hearing the

14  background noise.  Jason Rechter did.

15      Q.   And when was that?

16      A.   In the -- spring of 2010.

17      Q.   And who actually created the map?

18      A.   Hang on one second.  I'm going to ask this guy to

19  stop.

20      Q.   Shall we go off the record for --

21      A.   I'll be back in 30 seconds.

22           Okay.  Sorry.  I'm back.  He was moving away.

23           So --

24      Q.   Okay.  So you can hear me?

25      A.   Yes.

```
 1

 2                    CERTIFICATE OF REPORTER

 3

 4    STATE OF FLORIDA

 5    COUNTY OF MIAMI-DADE

 6

 7          I, SHARON VELAZCO, Registered Professional

 8    Reporter, certify that I was authorized to and did

 9    stenographically report the deposition of TIMOTHY

10    CRAWFORD; and that the transcript is a true record of my

11    stenographic notes.

12          I further certify that I am not a relative,

13    employee, attorney, or counsel of any of the parties, nor

14    am I a relative or employee of any of the parties'

15    attorneys or counsel connected with the action, nor am I

16    financially interested in the action.

17

18          Dated this 13th day of May, 2020.

19

20    _____
      SHARON VELAZCO, RPR
21    Registered Professional Reporter

22

23

24

25
```