UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SARAH PALIN, an individual, | No. 17 Civ. 4853 |
| Plaintiff, | Hon. Jed S. Rakoff |
| – against – | ECF Case |
| THE NEW YORK TIMES COMPANY, a New York corporation, and JAMES BENNET, an individual, | |
| Defendant. | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 443-2199
Facsimile: (813) 443-2193

and

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile: (212) 754-0330
Facsimile: (212) 754-0330

*Attorneys for Plaintiff Sarah Palin*

## **TABLE OF CONTENTS**

Table of Contents ........................................................................................................... i

Table of Authorities ...................................................................................................... ii

INTRODUCTION .......................................................................................................... 1

RESPONSE TO DEFENDANTS' PRELIMINARY STATEMENT ............................ 2

I.      The Summary Judgment Standard ................................................................... 3

II.     The Issue of Actual Malice on Summary Judgment Has Already Been
        Decided .............................................................................................................. 5

        A.      Defendants' Motion is Barred by Law of the Case ............................... 5

        B.      Defendants Misrepresent the Record to Try to Skirt the Law of the
                Case ....................................................................................................... 6

III.    Defendants' First Argument is a Thinly Veiled Request to Make New Law
        Based on Defamation by Implication Cases from Other Jurisdictions ............ 9

IV.     THERE IS SUBSTANTIAL EVIDENCE BENNET INTENDED TO
        CONVEY A DEFAMATORY MEANING ..................................................... 13

V.      There is Ample Evidence Benet Had Knowledge of Falsity ......................... 16

VI.     THERE IS AMPLE EVIDENCE BENNET PURPOSEFULLY AVOIDED
        THE TRUTH .................................................................................................. 19

VII.    Recklessness – Circumstantial Evidence & the Badges of Actual Malice .... 20

Certificate of Service .................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................. 4, 17

*Bell v. Rochester Gas & Elec. Corp.*, 329 Fed. Appx. 304 (2d Cir. 2009) ................................ 5

*Biro v. Conde Nast*, 807 F.3d 541 (2d. Cir. 2015) .................................................................... 21

*Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485 (1984) ....................................... 12

*Bose Corp. v. Consumers Union of United States, Inc.,* 692 F.2d 189 (1st
    Cir.1982) ......................................................................................................................... 14, 16

*Bryant v. Maffucci,* 923 F.2d 979 (2d Cir. 1991) ....................................................................... 5

*Celle v. Filipino Reporter Enterprises, Inc.*, 209 F.3d 163 (2d Cir. 2000) ..... 4, 14, 16, 17, 20, 21

*Clements v. Nassau County*, 835 F.2d 1000 (2d Cir. 1987) ........................................................ 5

*Dalbec v. Gentleman's Companion, Inc.,* 828 F.2d 921 (2d Cir.1987) .......................... 14, 16, 20

*Dodds v. American Broadcasting Co.,* 145 F.3d 1053 (9th Cir. 1998) ...................................... 12

*Dongguk Univ. v. Yale Univ.*, 734 F.3d 113 (2d Cir. 2013) ...................................................... 21

*Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308 (5th Cir. 1995) ........................................ 17, 20

*Garrison v. Louisiana,* 379 U.S. 64 (1964) ............................................................................... 21

*Guitar v. Westinghouse Elec. Corp.*, 396 F.Supp 1042 (S.D.N.Y. 1975) .................................... 3

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989) ............. 17, 19, 20, 21

*Herbert v. Lando*, 568 F.2d 974 (2d Cir. 1977), *rev'd,* 441 U.S. 153 (1979) .......................... 3, 4

*Hodges v. State Journal Publ'g Co.,* 1980 OK 102, 617 P.2d 191 (Sup. Ct.
    Okla. 1980) ............................................................................................................................ 12

*Hunt v. Liberty Lobby*, 720 F.2d 631 (11th Cir. 1983) ..................................................... 17, 20, 21

*Hutchinson v. Proxmire*, 443 U.S. 111 (1979) ...................................................................... 16, 17

*Insurance Group Comm. v. Denver & Rio Grande W. R.R.*, 329 U.S. 607 (1947) ...................... 6

*Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446 (Ind. 1999) ...................................... 11

*Kahl v. Bureau of National Affairs, Inc.*, 856 F.3d 106 (DC Cir. 2017) .................................. 14

*Kendall v. Daily News Publ'g Co.*, 716 F.3d 82 (3d Cir. 2013) ................................. 13

*Kerwick v. Orange Cty. Publ'ns Div. of Ottaway Newspapers, Inc.*, 53 N.Y.2d 625 (1981) .......................................................................................................... 20, 21

*Liberty Lobby v. Dow Jones & Company, Inc.*, 838 F.2d 1287 (D.C. Cir. 1988) .................... 16

*Loeb v. New Times Comm. Corp.*, 497 F.Supp. 85 (S.D.N.Y. 1980) ............................. 3

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) .................................... 4, 14, 18, 21

*Masson v. New Yorker Magazine, Inc.*, 832 F. Supp. 1350 (N.D. Cal 1993) ........................... 12

*Newton v. Nat'l Broad. Co.*, 930 F.2d 662  (9th Cir. 1990) ............................................. 10, 11, 13

*Palin v. The New York Times Company*, 940 F.3d 804 (2d Cir. 2019) ....... 3, 5, 6, 7, 9, 17, 20, 21

*Pinkney v. EMI Music Pub., Inc.*, 296 Fed. Appx. 186 (2d Cir. 2008) ........................................ 5

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ............................................ 5

*Rezzonico v. H & R Block, Inc.*, 182 F.3d 144 (2d Cir. 1999) ......................................... 6

*Shoen v. Shoen*, 48 F.3d 412 (9th Cir. 1995) ............................................................. 17

*Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028 (10th Cir. 2013) .......................................................................................................... 20, 21

*Sprague v. Am. Bar Ass'n*, 2003 WL 22110574 (E.D. Pa. July 21, 2003) ................................ 14

*St. Amant v. Thompson*, 390 U.S. 727 (1968) ................................................................ 17, 21, 22

*St. Surin v. Virgin Islands Daily News, Inc.*, 21 F.3d 1309 (3d Cir.1994) ................................ 14

*Stepanov v. Dow Jones & Co., Inc.*, 987 N.Y.S.2d 37 (2014) .................................... 13

*Tavoulares v. Piro*, 763 F.2d 1472 (D.C. Cir. 1985) ........................................... 20, 21

*Tilton v. Cowles Publ'g Co.*, 76 Wash. 2d 707 (1969)  ............................................... 11

*Tobinick v. Novella*, 108 F.Supp.3d 1299 (S.D. Fla. 2015) ..................................... 20

*United States v. Gladden*, 394 F.Supp.3d 465 (S.D.N.Y. 2019) ................................. 6

*U.S. Commodity Futures Trading Com'n v. Hunter*, 2012 WL 297838 (S.D.N.Y. Jan. 31, 2012) .......................................................................................... 5

*Vandenburg v. Newsweek, Inc.*, 441 F.2d 378 (5th Cir. 1971) ....................................17

*Vandenburg v. Newsweek, Inc.*, 507 F.2d 1024 (5th Cir. 1975) .................................17

*Vasquez v. O'Brien*, 85 A.D.2d 791 (3d Dep't 1981) .................................................22

*Ventura v. Kyle*, 63 F.Supp.3d 1001 (D. Minn. 2014), *rev'd on other grounds*, 825
   F.3d 876 (8th Cir. 2016) ...................................................................................20, 21

*Wojnarowicz v. American Family Ass'n,* 745 F.Supp. 130 (S.D.N.Y. 1990)............................14

*Woods v. Evansville Press Co.,* 791 F.2d 480 (7th Cir. 1986)................................................12, 13

*Yiamouyiannis v. Consumers Union of the United States, Inc.*, 619 F.2d 932 (2d
   Cir. 1980) .......................................................................................................................3

*Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066 (5th Cir. 1987).....................................20, 21

**Page(s)**

### OTHER AUTHORITIES

Awareness of Meaning In Libel Law: An Interdisciplinary Communication & Law
   Critique, C. Clavert, 16 N. Ill. U. L. Rev. 111, 111-112 (1996)........................................9

**INTRODUCTION**

> Interesting that @FoxNews 'debunked' @SarahPalinUSA's @GabbyGiffords crosshairs, despite IT's A FACT that inspired me to #HuntRepublicans
>
> **Sarah Palin put Congress in the Crosshairs**
> **All we are sayin' is #HuntRepublicans**

-- James Devine, Twitter, June 17, 2017

After James Bennet ("Bennet") and The New York Times ("The Times") falsely accused Sarah Palin ("Gov. Palin") of inciting Jared Loughner to murder nine people, among them a nine-year-old girl and Federal Judge—and even *after* Defendants ran their woefully-insufficient "corrections" to *America's Lethal Politics*—Gov. Palin faced threats like the above, which came immediately on the heels of a "nut job who hates republicans" having already opened fire on Republican congressmen playing baseball on a field in Virginia.  [CSMF[1] ¶ 381, 22 (Vogt Decl. Ex. 21)]  Perhaps those who have never faced threats like this take them lightly, but even Bennet acknowledged their seriousness and the reality is that Gov. Palin lives in a world where people have actually tried to follow-through on calls to harm her and her family. [CSMF ¶ 381]

Defendants persist in trying to downplay the seriousness of what they said about Gov. Palin, mischaracterizing Bennet's actions as an "honest mistake" in syntax leading only "some readers" to understand their Editorial as asserting Gov. Palin caused Loughner's shooting. As shown below, Defendants' post-hoc "I didn't mean what my words clearly said" defense is belied by the facts. and no one except Bennet (so he claims) read his intentionally selected "strong"

---

[1] Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Facts & Counterstatement in Opposition to Defendants' Motion for Summary Judgment is cited herein as "CSMF ¶ ___"

words – "incitement" and "clear [and] direct link" – to connote anything other than their unmistakable plain meanings.

Defendants have a "loud and far-reaching" voice.  The Times is the "Paper of Record." That enormous power comes with great responsibility and accountability, and Defendants better than anyone know such power must be held to account.  Defendants defamed Palin with actual malice.  Bennet's self-serving claims to the contrary have already been rejected on appeal and remain legally and factually insufficient to shield Defendants from the necessary accountability for their actions.  They must face trial, or everyone else will think they can get away with the same tortious conduct.

## RESPONSE TO DEFENDANTS' PRELIMINARY STATEMENT

Contrary to what Defendants would have this Court believe, since the Court of Appeals ruled that it would be improper to grant summary judgment in this case on actual malice because of credibility issues and required inferences associated with Bennet's subjective intent, discovery has revealed *significantly more* evidence upon which a jury could reasonably conclude Defendants defamed Gov. Palin with actual malice.  Discovery unearthed more proof of Bennet's knowledge of falsity and additional evidence showing Defendants published the Editorial with reckless disregard of whether it was false or not.

**First,** Defendants' argument seeking to circumvent the Second Circuit's decision rejecting Bennet's "honest mistake" defense is barred by the law of the case doctrine.  Even if that were not the case, Defendants' contention that Gov. Palin must also now prove actual malice as to Bennet's awareness of how readers would understand his words is an incorrect statement of and an attempt to change controlling law.  The actual malice rule applies to the truth or falsity of the statements at issue—not to Bennet's understanding of how readers might interpret what he said.  This is not

2

a defamation by implication situation.  Defendants' effort to ascribe an alternative "impression" to the plain meaning of the unambiguous words Bennet used is *non sequitur*.  Moreover, even if the Court were inclined to disregard the law of the case and to then also create new law in this jurisdiction by adopting Defendants' request to impose an *additional* actual malice element on Plaintiffs' claim, the facts developed through discovery still are more than sufficient for a jury to reasonably conclude Bennet intended—or, at minimum, was aware of and recklessly disregarded—that the language he used would convey to readers that Gov. Palin's "Lethal Politics" were directly and clearly linked to and incited Loughner's shooting.

**Second**, assuming *arguendo* there is a basis to entertain Defendants' "traditional" actual malice argument given the Second Circuit's ruling that a summary judgment based on Bennet's testimony "would still have to [be] vacat[ed]," there is now significantly *more* evidence of Bennet's actual knowledge of falsity and reckless disregard of the truth.  *Palin v. The New York Times Company*, 940 F.3d 804, 812 (2d Cir. 2019).  Among other things, this additional evidence crystalizes Bennet's knowledge that Palin's map was not clearly and directly linked to and did not incite Loughner's shooting, and it solidifies the existing proof of Bennet's preconceived storyline, purposeful avoidance of the truth, failure to investigate, rejection of journalistic standards, bias and ill-will, and other circumstantial evidence of recklessness.

## I.      The Summary Judgment Standard

Gone are the days where summary judgment is the "rule" in defamation cases.  *Yiamouyiannis v. Consumers Union of the United States, Inc.*, 619 F.2d 932, 940 (2d Cir. 1980) (overruling *Guitar v. Westinghouse Elec. Corp.*, 396 F. Supp. 1042 (S.D.N.Y. 1975)). On summary judgment, the scales are not tipped in favor of a media defendant in a defamation case, even though our profound national commitment to free speech is involved.  *Id.* (citing *Herbert v. Lando*, 568 F.2d 974, 980 (2d Cir. 1977), rev'd, 441 U.S. 153 (1979)); *see also Loeb v. New Times Comm.*

*Corp.*, 497 F.Supp. 85, 94 (S.D.N.Y. 1980) ("[T]he court is mindful of the Second Circuit's recent pronouncement that it is no longer permissible to take into account the 'chilling effect' a libel suit may have on the exercise of first amendment rights.")  The controlling standard is that "neither grant nor denial of summary judgment is to be preferred" because defamation actions are for summary judgment purposes "to be treated no differently from other actions." *Id*.

This standard recognizes an important aspect of this and every other defamation case that is often ignored.  Defamation actions are a necessary and important component of the balance between free speech and individual liberty.  "States undeniably have an interest in affording individuals some measure of protection from unwarranted defamatory attacks.  Libel actions serve that end, not only by assuring a forum in which reputations can be publicly vindicated and dignitary injuries compensated, but also by creating incentives for the press to exercise considered judgment before publishing material that compromises personal integrity." *Celle v. Filipino Reporter Enterprises, Inc.*, 209 F.3d 163, 171 (2d Cir. 2000) (quoting *Herbert v. Lando*, 441 U.S. 153, 203 (1979) (Marshall, J., dissenting)).

As recognized in *Palin*, 940 F.3d at 812, and by the Supreme Court in *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991), in defamation cases all reasonable inferences must still be drawn in favor of the nonmoving party, "including questions of credibility and of the weight to be accorded particular evidence."  Here, as the Second Circuit ruled, summary judgment is inappropriate because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge…" and "the judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue of fact." *Id., see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

4

"In order to grant a motion for summary judgment, a district court must find that 'there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Bell v. Rochester Gas & Elec. Corp.*, 329 Fed. Appx. 304, 305 (2d Cir. 2009) (quoting Fed.R.Civ.P. 56(c)). "The summary judgment inquiry requires viewing the record in the light most favorable to the nonmoving party and resolving all ambiguities against the moving party." *Pinkney v. EMI Music Pub., Inc.*, 296 Fed. Appx. 186 (2d Cir. 2008). "[A]lthough the court should review the record as a whole, *it must disregard all evidence favorable to the moving party that the jury is not required to believe*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (emphasis added)). Where the evidence at issue is "susceptible of different interpretations or inferences by the trier of fact, summary judgment is inappropriate." *U.S. Commodity Futures Trading Com'n v. Hunter*, 2012 WL 297838, at *2 (S.D.N.Y. Jan. 31, 2012). Specific to this case, Courts are cautioned against awarding summary judgment to a defendant where that defendant's state of mind is at issue. *See Bryant v. Maffucci,* 923 F.2d 979, 985 (2d Cir. 1991). Indeed, "summary judgment is usually unwarranted when state of mind is at issue" and where (as the case is here) "solid circumstantial evidence exists to prove plaintiff's case." *Clements v. Nassau County*, 835 F.2d 1000, 1005 (2d Cir. 1987).

## II.   The Issue of Actual Malice on Summary Judgment Has Already Been Decided

As a preliminary matter, Defendants' motion should be rejected because it ignores the Second Circuit's decision that it would be reversible error to grant the relief they request. *Palin*, 940 F.3d at 812. More troubling, Defendants seek this unattainable relief by misstating the record.

### A.   Defendants' Motion is Barred by Law of the Case

Defendants' motion never addresses the Second Circuit's ruling that a summary judgment on actual malice based on Bennet's self-serving testimony would have to be vacated. *Id.* Since that ruling, nothing has changed in favor of Defendants that would overcome this insurmountable

obstacle.  Defendants still base their request for summary disposition of this case entirely upon Bennet's testimony about what he supposedly "knew," "recalled," and "intended" when he re-wrote the Editorial.  *See* Doc. 96, pp. 17-20, 23, 25.  The Second Circuit already ruled such evidence does not satisfy Defendants' summary judgment burden.

Under the law of the case doctrine, Defendants' Motion must be denied.  This doctrine provides that "a trial court cannot reconsider on remand an issue decided by an appellate court." *Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 148-149 (2d Cir. 1999) (citing *Insurance Group Comm. v. Denver & Rio Grande W. R.R.*, 329 U.S. 607, 612 (1947)); *see also United States v. Gladden*, 394 F.Supp.3d 465, 474-475 (S.D.N.Y. 2019) ("The law of the case doctrine has two branches. The first requires a trial court to follow an appellate court's previous ruling on an issue in the same case. This is the so-called 'mandate rule.' The second and more flexible branch is implicated when a court reconsiders its own ruling on an issue in the absence of an intervening ruling by a higher court. It holds that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case, unless cogent and compelling reasons militate otherwise." (citations and quotations omitted)).

Here, because of the unique procedural posture of this case and Defendants' argument in the appellate court that their motion to dismiss was converted to a motion for summary judgment, *Palin*, 940 F.3d at 812, the Second Circuit explicitly ruled on the issue of whether Bennet's self-serving testimony could support summary judgment.  The conclusion:  it cannot.  *Id.* (Even if Defendants' motion had been converted to one for summary judgment, "we would still have to vacate because the district court's opinion relied on credibility determinations not permissible at any stage before trial").  That ruling is binding and cannot be avoided.

### B.    Defendants Misrepresent the Record to Try to Skirt the Law of the Case

In what appears to be a calculated effort to circumvent the implications of law of the case,

Defendants assert the untenable positions that the Second Circuit only held "Palin had adequately *alleged* actual malice" [Doc. No. 96 at p. 6] and go so far as to claim (buried in a footnote) [Doc. 96 at p. 15, n. 7] that "[t]he first prong of this motion, that Bennet lacked awareness of any defamatory meaning and therefore could not have published the challenged statements with actual malice, was not raised previously…and neither this Court nor the Court of Appeals has had occasion to consider this argument."  Both propositions are false.

As set forth above, in addition to holding Palin adequately *alleged* actual malice, the Second Circuit explicitly ruled Bennet's self-serving testimony cannot support summary judgment because it raises "credibility determinations not permissible at any stage before trial."  *Palin,* 940 F.3d at 812-815.  The Second Circuit specifically noted the impropriety of "crediting" Bennet's testimony about what he "recalled" and rejecting the permissible inferences required to be drawn in favor of Palin from such evidence as articles published by *The Atlantic* under Bennet's stewardship, Bennet's biases and ill-will, and his personal connections to the Loughner shooting— all of which raise credibility issues and required inferences that *still* must be drawn in Gov. Palin's favor.  *Id.* at 812, n. 25, 813-815.  When addressing the sufficiency of Gov. Palin's complaint, the Second Circuit took the extra step of ruling, "[t]he jury may ultimately agree with the district court's conclusion that Bennet was credible—***but it is the jury that must decide***."  Id. at 815 (emphasis added).

Aware of this problem, Defendants seek to side-step it by distorting the record to claim they are raising an argument about Bennet's "awareness of defamatory meaning" that was never raised or considered before.  This is simply untrue.  The record in this Court shows Defendants' arguments on this very point.  One glaring example is Defendant's Supplemental Memorandum of Law in Further Support of Its Motion to Dismiss the Complaint [Doc. No. 42], which not only

asserts the very argument now being raised, but also explicitly contends based on many of the same cases Defendants cite in their present motion that "[Bennet's] testimony reinforces the conclusion that Mrs. Palin can never ultimately meet her burden of demonstrating actual malice— *no such knowledge of "probable falsity" can exist, as a matter of law, if the author did not intend the alleged defamatory meaning and was not aware it would be conveyed by his statement at the time of its publication*." *See* Doc. No. 42 at pp. 9-11 (emphasis added) (compare cases cited in Doc. No. 42 at p. 7 and FN 5 to cases cited in Doc. No. 96 at pp. 15-16).[2]  This same argument was the entire focus of Defendants' Reply Memorandum In Further Support of Its Motion to Dismiss the Complaint.  *See* Doc. No. 44.  In the Answer Brief in the ensuing appeal, Defendant echoed the same position: "The District Court properly rejected these allegations as implausible, especially in light of the 'obvious alternative explanation' for the challenged statements' genesis: that Bennet had made an unintentional mistake…the only plausible inference a reasonable person might draw from these specifically alleged facts is that The Times, or more specifically, Bennet, made 'an unintended mistake.'"  *See* Doc. No. 72 at pp. 12, 22.

Removing any doubt as to whether Defendants' "intended meaning" argument was raised and considered before, the Second Circuit's opinion provides:

> "Bennet explained at the hearing that his reference to Palin in the editorial was intended to make a rhetorical point about the present atmosphere of political anger….In the Times' view, the district court correctly determined that Palin's original complaint and the PAC both gave rise to only one plausible conclusion: that Bennet made an unintended mistake by including the erroneous facts about Palin.  We disagree…The district court at one point stated Bennet's 'behavior is much more plausibly consistent with making an unintended mistake and then correcting it than with acting with actual malice.  Perhaps so, but it is not the district court's province

---

[2] This Supplemental memorandum followed two hearings on the motion to dismiss, at which the same issue involving Bennet's intent/meaning also was addressed.  *See i.e.* Vogt Decl. Ex. 173, 7/31/2017 Hr'g Tran. at 11:12-14:10; Doc. 41-34, 8/16/2017 Hr'g Tran. at 13:5-17:10, 19:5-30:8.

> to dismiss a plausible complaint because it is not as plausible as the
> defendant's theory.  The test is whether the complaint is plausible,
> not whether it is less plausible than an alternative explanation.  The
> jury may ultimately agree with the district court's conclusion that
> Bennet was credible—but it is the jury that must decide."

*Palin*, 940 F.2d at 809, 813, and 815.

The predicate for the "first prong" of Defendants' argument—that it is an argument they had not "raised previously" and neither this Court nor the Court of Appeals "had occasion to consider" it—is flat wrong.  Even if Defendants try to overcome this problem by claiming the procedural posture of the case is different now than when the Second Circuit ruled, that would still be an exercise in futility because the Second Circuit plainly acknowledged Defendants' "intended meaning" defense and rejected it, and summary judgment remains a jury issue in this case because Bennet's self-serving testimony (much of which was before the Second Circuit) still cannot be accepted as true.

## III.   Defendants' First Argument Is a Thinly Veiled Request to Make New Law Based on Defamation by Implication Cases from Other Jurisdictions

In their effort to avoid the law of the case, Defendants also ask this Court to create new law by imposing an additional actual malice element for Plaintiff's defamation claim.  The Supreme Court, this Circuit, and New York courts have never held this additional actual malice element to be a required component of a plaintiff's defamation claim nor a necessary additional actual malice standard a plaintiff must prove.  Defendants are asking this Court to adopt what one commentator aptly described as "a new, constitutionally mandated fault element" that has been advanced by "legal scholars, libel defense attorneys, and a number of federal courts to again alter the constitutional landscape of libel law" by "add[ing] further protection—protection beyond the actual malice standard and procedural requirements—to the constitutional shields that now guard defendants in civil libel actions." *See* Awareness of Meaning In Libel Law: An Interdisciplinary

9

Communication & Law Critique, C. Clavert, 16 N. Ill. U. L. Rev. 111, 111-112 (1996).

Defendants' argument based on non-binding case law seeks a monumental change in the law. And, the non-binding cases they cite clearly are distinguishable because they are rooted in defamation by implication—not statements which, like Bennet's, on their face directly and explicitly convey a meaning that is defamatory per se. As this Court noted previously, "What [the Editorial is] asserting is not that people at the time thought this, it's asserting as a fact that there's a direct link between this and the shooting." See 7/31/2017 Hr'g Tran. at 11:12-14 (Vogt Decl. Ex. 173).

According to The Times, in addition demonstrating that a defendant made a statement with actual malice—that is, that he or she either knew was false or acted with reckless disregard of whether it was false or not—a plaintiff must now also prove the defendant was aware of the defamatory meaning his or her words conveyed. *See* Doc. 96, p. 13. Defendants make this argument as if it is established law, yet fail to cite a single *binding* case that supports this proposition. Instead, Defendants cite factually distinguishable cases from state and federal courts in other jurisdictions involving situations where the defamatory meaning of ambiguous and innocuous statements had to be inferred or implied to establish a claim.

For instance, Defendants cite *Newton v. Nat'l Broad. Co.,* 930 F.2d 662, 681 (9th Cir. 1990), which involved statements alleged to give rise to defamatory impressions, not statements (like the ones at issue here) that are defamatory on their face. Specifically, Wayne Newton alleged NBC aired a broadcast that conveyed the false impression that the Mafia and mob sources helped him buy a Las Vegas casino and hotel and that he deceived the gaming authorities about his relationship with the mafia. *Id.* at 667. A jury decided the case in favor of Newton, awarding compensatory and punitive damages. After trial, the district court upheld the liability finding in

part because it concluded NBC edited and complied the broadcast in a way that created "defamatory impressions" and those impressions were "clear and inescapable**.**" *Id.* at 679. Consequently, the Court found the jury could reject the testimony of the publishers that they had not intended to leave a false impression.   *Id.* at 680. On appeal, the Ninth Circuit reversed, explaining that by determining the impressions were "clear and inescapable," the trial court "substituted its own view as to the supposed impression left by the broadcast for that of the journalists who prepared the broadcast." *Id.* at 682.

While there are a number of distinguishing factors, this case and *Newton* are different in two significant ways.   First, the defamatory statements in this case are explicit and facially defamatory.   Second, unlike in *Newton*, this case involves substantial evidence showing what Bennet meant and intended to say – not the least of which is the plain meaning of his chosen words. *See infra,* Part IV.   In *Newton*, the court *exclusively* relied on the statements themselves to support a finding of intent.

Defendants cite *Dodds v. American Broadcasting Co.,* 145 F.3d 1053, 1063 (9th Cir. 1998), for the proposition that a defendant must have intended to convey a defamatory impression. *See id.* at 1064.   But, again, this case is not one dealing with "impressions."   Like *Newton*, *Dodds* is also a case where there was <u>no</u> evidence the publishers intended to convey the defamatory impression. *Id.*   That cannot be said here.   *See infra,* Part IV.   More importantly, *Dodds* clarifies that a defendant's intent to convey a defamatory impression is a unique attribute of defamation by implication cases.   Indeed, the analysis regarding intent is consumed within the Court's discussion of defamation by implication.   Critically, however, there were some statements in *Dodds* that were actionable on their face.   And for those statements, the *Dodds* court engaged only in the traditional

actual malice analysis—i.e. did defendants publish the challenged statements with knowledge of their falsity or with reckless disregard for their truth or falsity.  *See id.* at 1061-1063.

*Woods v. Evansville Press Co.,* 791 F.2d 480, 487 (7th Cir. 1986) is another defamatory implications case.  In *Woods,* a television station owner alleged he was libeled in a newspaper column that implied that he was dishonest, in financial trouble, and a religious fraud.  The Court explicitly acknowledged there was no claim the statements were facially false and defamatory. Also, like in *Newton* and *Dodds*, there was <u>no</u> evidence the defendants intended that the statements "be read to contain the defamatory innuendoes the plaintiff attributes to it."  *Id.*

*Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485 (1984), cited by Defendants, is also a case where the record was devoid of any evidence of actual malice.  The only claimed evidence of actual malice was the inaccuracy of the statement itself.  *Id.* at 513.

Other cases Defendants cite likewise involve situations where there is little or no evidence of actual malice.  *See Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 463 (Ind. 1999) (no evidence reflecting Pinckley's state of mind or whether she "entertained serious doubts as to the truth of the headline" or had a "high degree of awareness" of the headline's probable falsity); *Tilton v. Cowles Publ'g Co.*, 76 Wash. 2d 707, 725 (1969) (involving limited circumstantial evidence of actual malice);  *Hodges v. State Journal Publ'g Co.,* 1980 OK 102, 617 P.2d 191, 195-196  (no evidence to refute publishers claims of good faith, or showing publication conflicted with the information author obtained or that source was unreliable, and no evidence of any personal motive to injure plaintiff or abdicated their traditional roles of fairly reporting the news.)

Defendants' remaining case,  *Masson v. New Yorker Magazine, Inc.,* 832 F. Supp. 1350, 1361-63 (N.D. Cal 1993), is far afield from the facts presented here because it involved a plaintiff claiming he was defamed by being misquoted.  The portion of the case upon which Defendants

heavily rely concerned a jury instruction that added the defendant's awareness of the defamatory meaning as an element of the claim, which the district court realized was breaking new ground when it resorted to model instructions, *Newton,* and *Woods*, to impose "awareness of defamatory meaning" element on the plaintiff's defamation claim.   In doing so, the court also noted "in the case at hand… the defamation is somewhat ambiguous and indirect."   *Id.* at 1363.

Simply stated, Defendants cannot use non-binding defamation by implication cases to superimpose a new, additional actual malice element on Palin's claim.   By nature, defamation by implication cases involve an additional "communicative intent" element because the statements at issue on their face are not defamatory.   *Kendall v. Daily News Publ'g Co.*, 716 F.3d 82, 90 (3d Cir. 2013).   Under New York law, defamation by implication "is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements." *Stepanov v. Dow Jones & Co., Inc.*, 987 N.Y.S.2d 37, 43 (2014).   In cases such as this one, the words at issue are facially defamatory and explicitly false.

If awareness and intent to convey defamatory meaning were an element of all defamation claims as Defendants suggest, there would be no need for defamation by implication.   Certainly, one would expect the courts of New York to have made such a pronouncement if that were true.

## IV.   THERE IS SUBSTANTIAL EVIDENCE BENNET INTENDED TO CONVEY A DEFAMATORY MEANING

Even is this Court decides to adopt the new standard Defendants request, one requiring an additional showing of actual malice as to a defendant's awareness of defamatory meaning (in additional actual malice as to falsity), there is more than sufficient evidence upon which a jury could reasonably conclude Bennet was aware of the defamatory meaning apparent on the face of the statements he wrote about Palin.

The same standards would govern this inquiry.  Bennet's self-serving testimony as to his state of mind and his intended meaning should be disregarded, and proof of subjective awareness can be demonstrated by inference from objective facts.  *See Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 182–83 (2d Cir. 2000) ("although actual malice is subjective, a court will typically infer actual malice from objective facts").  To require otherwise would allow a defendant to defeat a defamation claim by testifying "I didn't mean it" – which is precisely what Defendants aim to do.  Numerous courts have recognized that actual malice "may be inferred from objective facts because a defendant will rarely admit he acted with actual malice."[3]

Defendants' argument and proffered "evidence" concerning Bennet's "intent" is akin to the situation addressed in *Sprague v. Am. Bar Ass'n*, 2003 WL 22110574, at \*4 (E.D. Pa. July 21, 2003).  There, the court recognized:

> The instant case is no exception. In their motion for summary judgment, defendants deny intending or even anticipating that readers of the Journal would interpret the term "lawyer-cum-fixer" in the defamatory way. Conversely, plaintiff contends that this defense is at odds with common sense since it is the expertise of authors and editors to know the meaning of words. More importantly, plaintiff presents objective circumstantial evidence from which a rational jury could conclude that by publishing the article in question, defendants acted with actual malice. The record presents several pieces of evidence that could support a jury finding that when defendants employed the label "lawyer-cum-fixer" they

---

[3] *Wojnarowicz v. American Family Ass'n,* 745 F.Supp. 130, 147 (S.D.N.Y. 1990); *see also Bose Corp. v. Consumers Union of United States, Inc.,* 692 F.2d 189, 196 (1st Cir.1982) ("whether [defendant] in fact entertained serious doubts as to the truth of the statement may be proved by inference, as it would be rare for a defendant to admit such doubts."); *Dalbec v. Gentleman's Companion, Inc.,* 828 F.2d 921, 927 (2d Cir.1987) ("Malice may be proved inferentially because it is a matter of the defendant's subjective mental state, revolves around facts usually within the defendant's knowledge and control, and rarely is admitted."); *Kahl v. Bureau of National Affairs, Inc.,* 856 F.3d 106, 116 (DC Cir. 2017) ("Of course, actual malice rarely is admitted" (quotations and citations omitted)); *Masson v. New Yorker Magazine,* 501 U.S. 496, 521 (1991) (listing items of circumstantial evidence regarding defendant's state of mind at the time of publication which raised genuine issues of material fact as to actual malice for jury consideration); *St. Surin v. Virgin Islands Daily News, Inc.,* 21 F.3d 1309, 1318 (3d Cir.1994) (same).

either deliberately cast this description in an ambiguous light in the hope of insinuating a false import to the reader, or that defendants knew or recklessly disregarded the possibility that its words would be interpreted by the average reader as false statements of fact.

Keeping in mind the Second Circuit already rejected Bennet's self-serving testimony about what he "intended" to mean, the additional evidence surrounding Bennet's re-write of the Editorial solidifies the reasonable conclusion Bennet knew and intended to say exactly what the plain meaning of the words he used mean such as the following:

- Bennet admitted to knowing that it is reasonable readers understand "incitement" to mean a "call to violence" [CSMF ¶ 88 (Bennet Depo. 114:10-15]

- Although claiming Bennet's true intent was to "express concern about the state of political rhetoric," he rewrote Williamson's draft, even though it already said what Bennet claims he was trying to convey.  There was no reason to make the change except to convey something different. [CSMF ¶ 331-340]

- Bennet clearly understood "rhetoric" and "incitement" have different meanings.  Defendants even changed the word "incitement" to "rhetoric" in the second correction. [CSMF ¶ 340, 367, 375]

- Bennet's own definition of "incitement," a "very strong word," originates from factual situations where violent attacks were carried out, such as the assassination of Rabin, and he used the word in the context of the Scalise shooting under the title "Lethal Politics."  [CSMF ¶ 340, 342-344, 347][4]

- Bennet even concedes Tom Friedman's article about incitement leading to Rabin's assassination was a driving force behind his choice of language. [CSMF ¶ 342-344]

- Bennet titled the Editorial "America's Lethal Politics"— which in conjunction with the word "incitement," a word which Bennet admittedly knew to mean "deliberate orders,

---

[4] Defendants' reliance upon a prior article written by Bennet discussing incitement is completely irrelevant, because Bennet described the basis for his use of the word during his testimony on 8/16/2017 and never mentioned this piece.

invocations, summonses to carry out violent attacks," (chief among them the assassination of Rabin) clearly gives rise to a reasonable inference that Bennet intended to convey to readers that Gov. Palin's actions incited Loughner to shoot and kill innocent people.  [CSMF ¶ 340, 351]

- Bennet's editor, who worked with him on the Editorial, knew exactly what "incitement" meant:  "that it – that the map led him to commit the shooting."  [CSMF ¶ 341]

- Defendants do not cite any example someone interpreting Bennet's language in the Editorial to mean anything other than what Palin maintains it says.

- Bennet's colleagues and readers immediately knew Bennet made a causal connection.  [CSMF ¶ 341, 364, 79-81]

## V.   THERE IS AMPLE EVIDENCE BENNET HAD KNOWLEDGE OF FALSITY

Because a defendants' state of mind "does not readily lend itself to a summary disposition." *Hutchinson v. Proxmire*, 443 U.S. 111, n. 9 (1979), a "court typically will infer actual malice from objective facts."  *Celle*, 209 F.3d at 183 (citing *Bose Corp. v. Consumers Union of United States, Inc.*, 692 F.2d 189, 196 (1st Cir. 1982).  Indeed, actual malice may be proven inferentially because defendants rarely admit to knowledge or doubts of falsity.  *Id.*  Thus, a defamation plaintiff can use "evidence of negligence, motive and intent such that an accumulation of evidence and appropriate inferences supports the existence of actual malice."  *Id.* (citing *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987)).

In evaluating the circumstantial evidence supporting a finding of actual malice, courts must consider the totality of the evidence to determine whether a reasonable jury could find, based on the accumulation of that evidence, knowledge of falsity or reckless disregard for the truth.  Among other things, actual malice can be established "through the defendants' own actions or statements, the dubious nature of his sources, and the inherent probability of the story [among] other circumstantial evidence."  *Celle*, 209 F.3d at 183 (citing *Liberty Lobby v. Dow Jones & Company,*

*Inc.*, 838 F.2d 1287, 1293 (D.C. Cir. 1988)).  Thus, for example, although a showing of bias or ill will *alone* may not be sufficient to demonstrate actual malice, such evidence concerning motive *is* relevant to the actual malice inquiry and helps establish actual malice.  *Palin*, 940 F.3d at 814-816; *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989); *Celle*, 209 F.3d at 183 ("Evidence of ill will combined with other circumstantial evidence ... may also support a finding of actual malice.").[5]  Similarly, although evidence of a failure to properly investigate *may* not be *alone* sufficient to support a finding of actual malice, courts have recognized that it also is a piece of evidence that, in conjunction with other evidence, can support a finding of actual malice. *See Palin*, 940 F.3d at 814-15; *Hunt v. Liberty Lobby*, 720 F.2d 631, 645 (11th Cir. 1983) ("'[A]ctual malice may be inferred when the investigation was grossly inadequate in the circumstances'" (quoting *Vandenburg v. Newsweek, Inc.*, 441 F.2d 378, 380 (5th Cir. 1971)); *see also Vandenburg v. Newsweek, Inc.*, 507 F.2d 1024, 1026-27 (5th Cir. 1975) (same).

A defendant, like Bennet, cannot "automatically insure a favorable verdict by testifying he published with a belief the statements were true."  *Celle*, 209 F.3d at 190 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)).  Even indirect evidence of actual malice can defeat a defendant's claim he acted in good faith.  *Id.*  Moreover, on summary judgment, self-serving testimony must be rejected.  *Palin*, 940 F.3d at 812; *Anderson*, 477 U.S. at 255.  Credibility determinations are unquestionably at play when self-serving testimony about a person's mental state are involved.  *See Hutchinson*, 443 U.S. 111, n. 9 (1979); *Palin*, 940 F.3d at 812-814.  On

---

[5] *See also, e.g.*, *Shoen v. Shoen*, 48 F.3d 412, 417 (9th Cir. 1995) ("[I]ll will *is* considered circumstantial evidence of actual malice.") (emphasis added); *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 315 n.10 (5th Cir. 1995) ("[E]vidence of ulterior motive can often bolster an inference of actual malice.").

summary judgment, these credibility issues and all inferences still are drawn in favor of the non-movant.  *See Masson*, 501 U.S. at 520; *Palin*, 940 F.3d at 814.

Here, there is a mountain of direct and circumstantial evidence showing Bennet knew there was no clear and direct link between Palin and Loughner and that Palin's map did not incite Loughner's crime:

- Bennet specifically instructed Williamson to research whether there was any established link between incitement and Loughner's shooting.  Bennet conceded, and Williamson confirmed, her draft article embodied the results of her research, which was that there was no direct and clear link between Palin's Map and Loughner.  [CSMF ¶ 68, 331-333]  Thus, Bennet knew there was  no link or but rewrote the draft anyway to say a link existed – consistent with the narrative he already decided to portray.  [CSMF ¶ 22, 335-339]

- Bennet still claims he could not recall whether he read news reports and Atlantic's articles confirming no link existed, which in and of itself already created credibility and fact issues sufficient to deny summary judgment.  However, Bennet's testimony about his knowledge got worse for Defendants when he was deposed.  Bennet conceded he "regularly" read The Times and "consumed" The Atlantic's website in 2011, even admitting he "must have read" some of The Atlantic's articles about Loughner and even spoke with Andrew Sullivan about the shooting.  [CSMF ¶ 113, 263-284]

- New evidence unearthed in discovery revealed that soon after the Loughner Shooting, Bennet was emailed a potential article and the hyperlinked story "How the media botched the Arizona shooting," which like a Times article written at the same time discussed the false narratives of incitement surrounding the Loughner shooting and explained how "framing " caused journalists to falsely conclude people like Palin incited Loughner's crime.  [CSMF ¶ 266-271]

- Bennet claims he did not know whether a link existed but even this self-serving claim admits knowledge of falsity because it concedes Bennet proves he knew it was false to say there was a "direct" and "clear" link.  [CSMF ¶ 86, 356]

- There is substantial evidence of Bennet's ill-will, bias, and motive.  Beyond what the Second Circuit already recognized as sufficient, discovery showed:

  ► The events leading to the Editorial [CSMF ¶ 285-308], notable among them Bennet's focus on Palin and The Times and the Left being accused of incitement shortly before the Scalise shooting, and Bennet's injection of the incitement narrative after seeing Hodgkinson's social media validate that Bennet was trying to level the playing field.

  ► The Times and Bennet had systemic and personal bias against Palin, and Bennet was "trolling" consistent with Sulzberger's directives.  [CSMF ¶ 227-230, 231-262, 200-217]

## VI.     THERE IS AMPLE EVIDENCE BENNET PURPOSEFULLY AVOIDED THE TRUTH

Even if, *arguendo*, the evidence of Bennet's actual knowledge of falsity could be deemed insufficient to preclude summary judgment, there is also more than sufficient evidence upon which a jury could reasonably conclude Defendants purposefully avoided the truth.  This case is a textbook example of a publisher blindly adhering to a preconceived narrative in furtherance of which he turned a blind-eye to obvious reasons to doubt the veracity of the defamatory statements at issue.  *Harte-Hanks*, 491 U.S. at 692.

Here, the facts developed during discovery show Bennet injected the incitement narrative about Plaintiff and purposefully avoided the truth with intent to voice his narrative regardless of the truth:

- Bennet still advanced the narrative <u>after</u> admitting no link was established.  [CSMF ¶ 369, 376-377]

- Bennet injected his narrative <u>after</u> seeing the shooters pro-Bernie social media, on the heels of the Trump/Caesar backlash against The Times, and <u>after</u> the decision was already made to write about gun control, then rewrote the piece because Williamson didn't advance his narrative. [CSMF ¶ 308, 315-320]

- Bennet pursued his narrative based on a "pattern" of incitement he knew did not exist. [CSMF ¶ 355-356]

- Bennet ignored the results of Williamson's research and rewrote the Editorial to advance his narrative. [CSMF ¶ 335-340]

- Bennet had reason to pursue his narrative and disregard the truth, including his personal biases, connections, gun control and anti-rhetoric agenda, and "political scorekeeping." [CSMF ¶ 213, 215-217, 231-250, 302-308]

- Bennet avoided the truth, ignoring Williamson's research and failing to read any of the materials or hyperlink. [CSMF ¶ 318-333, 338-339]

## VII.   Recklessness—Circumstantial Evidence & the Badges of Actual Malice

There is also a significant amount of other circumstantial evidence of actual malice in this case. The circumstantial evidence of actual malice[6] that overcomes self-serving claims of good faith can take many forms. These recognized badges of actual malice (as well as the inferences to be drawn from them) must be evaluated **cumulatively** or **in the aggregate**. *Celle*, 209 F.3d at 183.

Here, the additional circumstantial evidence of recklessness includes:

- **Failure to Investigate**. Bennet ignored the results of Williamson's research and didn't read any research he received. [CSMF ¶ 318-333, 338-339] He ignored his own

---

[6] Badges of actual malice include, but are not limited to: (1) evidence of negligence, motive, and intent (*Celle*, 209 F.3d at 183; *Palin*, 940 F.3d at 814 (political opposition is evidence of actual malice and goes to credibility)); (2) the defendants' own actions or statements (*Id.*); (3) the dubious nature of sources (*Id.*); (4) the inherent improbability of the story (*Tobinick v. Novella*, 108 F.Supp.3d 1299, 1310 (S.D. Fla. 2015); *St. Amant*, 390 U.S. at 732; *Dalbec*, 828 F.2d at 927); (5) bias or ill will (*Palin*, 2019 WL 3558545, at *6-7; *Connaughton*, 491 U.S. at 668; *Celle*, 209 F.3d at 183; *Shoen v. Shoen*, 48 F.3d 412, 417 (9th Cir. 1995); *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 310, n. 10 (5th Cir. 1995)); (6) failure to investigate (*Hunt v. Liberty Lobby*, 720 F.2d 631, 645 (11th Cir. 1983)); (7) refusal to retract and apologize (*Tavoulares v. Piro*, 763 F.2d 1472, 1477 (D.C. Cir. 1985); *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987); *Ventura v. Kyle*, 63 F.Supp.3d 1001, 1014 (D. Minn. 2014)); (8) failure to adhere to journalistic policies (*Kerwick v. Orange Cty. Publ'ns Div. of Ottaway Newspapers, Inc.*, 53 N.Y.2d 625, 627 (1981); and (9) grossly inadequate investigation under no time pressure (*Hunt*, 720 F.2d at 645; *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1057-58 (10th Cir. 2013)).

practices and The Times' standards to the contrary.  [CSMF ¶ 176-191, 193-194]   *See Masson, Inc.,* 960 F.2d at 901; *Garrison v. Louisiana,* 379 U.S. 64, 74, (1964); *St. Amant v. Thompson,* 390 U.S. 727, 731 (1968); *Harte–Hanks,* 491 U.S. at 692; *Dongguk Univ.*, 734 F.3d at 124.

- **Bias, Motive, And Ill Will.**   As noted above, there is substantial evidence of Bennet's bias, motive and ill-will. *See Palin*, 940 F.3d at 814-15; *Connaughton*, 491 U.S. at 668; *Celle*, 209 F.3d at 186; *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d. Cir. 2015).

- **Refusal To Retract/Apologize.**   Despite knowing his narrative was false, Bennet still pursued it and left Palin in the Editorial, never meaningfully apologizing.  Defendants conceded the International Edition of the Editorial, making no mention of Palin, adequately conveyed the points they wanted to make.  [CSMF ¶ 355-356, 357-359, 360-380]  *See Tavoulareas v. Piro*, 763 F.2d 1472, 1477 (D.C. Cir. 1985); *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987); *Ventura v. Kyle*, 63 F. Supp. 3d 1001, 1014 (D. Minn. 2014) (explaining that "most authorities" hold that failure to retract can establish actual malice), *rev'd on other grounds*, 825 F.3d 876 (8th Cir. 2016).

- **Failure To Adhere To Journalistic Policies.**   Bennet admittedly failed to follow The Times' heightened standards, and never fact-checked his re-write; even going so far as to ignore the results of Williamson's research. [CSMF ¶ 176-194, 331-334, 338-339]  *Kerwick v. Orange Cty. Publ'ns Div. of Ottaway Newspapers, Inc.*, 53 N.Y.2d 625, 627 (1981).

- **Grossly Inadequate Investigation Under No Time Pressure.**  An editorial is "not news," and The Times had other editorials on deck to run that day instead of the Editorial.  [CSMF ¶ 52-54]  *Hunt*, 720 F.2d at 645 (*quoting Vandenburg I*, 441 F.2d at 1026-27; *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1057-58 (10th Cir. 2013 (rush to publish despite lack of time pressure is evidence of actual malice).

- **Inherently Improbable Defamatory Statements.**  Bennet disregarded obvious reasons to doubt the veracity of the statements he made, not the least of which was no knowledge of any "pattern," the supposed thesis of his narrative. [CSMF ¶ 263-265, 271, 331-333, 355-356]  *St.*

21

*Amant*, 390 U.S. at 732; *Dalbec*, 828 F.2d at 927 (same; presents a jury question).[7]  Similarly, "courts have upheld findings of actual malice when a defendant failed to investigate a story weakened by inherent improbability[.]"

Cumulatively, the foregoing evidence is more than sufficient for a reasonable jury to find actual malice.  It certainly raises disputed issues of fact sufficient to make actual malice a jury issue.

Defendants' Motion should be denied.

Dated:  July 17, 2020.

/s/ Shane B. Vogt
_____
Kenneth G. Turkel (admitted *pro hac vice*)
Email:  kturkel@bajocuva.com
Shane B. Vogt (admitted *pro hac vice*)
Email:  svogt@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 443-2199
Facsimile: (813) 443-2193

Michael M. Munoz
E-mail:  mmunoz@golenbock.com
GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile: (212) 754-0330

*Attorneys for Plaintiff*

---

[7] *See also Vasquez v. O'Brien*, 85 A.D.2d 791, 792 (3d Dep't 1981) ("The content of the statements themselves and the context in which they arose may give rise to significant suggestions of possible falsity which should alert the speaker ... [and] inaccurate or untrue use of language, in the intense political climate then prevailing, could certainly be found to be evidence of actual malice on the part of defendant.").

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment was filed electronically on July 17, 2020.  This Notice will be sent by operation of the Court's electronic filing system to counsel of record for all parties as indicated on the electronic filing receipt.  Parties and their counsel may access this filing through the Court's system.

*/s/ Shane B. Vogt*
Attorney

23