UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SARAH PALIN, an individual,

               Plaintiff,

  – against –

THE NEW YORK TIMES COMPANY,
a New York corporation, and JAMES
BENNET, an individual,

               Defendant.

No. 17 Civ. 4853

Hon. Jed S. Rakoff

ECF Case

## PLAINTIFF'S RESPONSE TO DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS [DOC. NO. 97] & COUNTERSTATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone: (813) 443-2199
Facsimile: (813) 443-2193

and

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY 10017
Telephone: (212) 907-7300
Facsimile: (212) 754-0330
Facsimile: (212) 754-0330

Plaintiff, Sarah Palin ("Gov. Palin"), by counsel and pursuant to Local Rule 56.1(b), files this Response to Defendants' Statement of Material Facts [Doc. No. 97], filed by Defendants, The New York Times Company ("The Times") and James Bennet ("Bennet") (collectively, "Defendants"), and, pursuant to Local Rule 56.1(b), submits her Statement of Additional Material Facts in Opposition to Defendants' Motion for Summary Judgment, and states as follows:

<p style="text-align:center"><strong><u>Preliminary Statement/Objection</u></strong></p>

Plaintiff objects to Defendants' Statement of Undisputed Materials Facts in its entirety to the extent it seeks to assert facts as "undisputed" that are based on the testimony of James Bennet. The Second Circuit already ruled Mr. Bennet's testimony implicates credibility issues, the drawing and weighing of inferences, and the weighing evidence that are jury functions. *Palin v. The New York Times Company*, 940 F.3d 804, 812 (2d Cir. 2019) (citing *Soto v. Gaudette*, 862 F.3d 148, 157 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986))); *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 521 (1991) (citing *Anderson*, 477 U.S. at 255) ("[t]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue of fact.").

<p style="text-align:center"><strong><u>RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS</u></strong></p>

<p style="text-align:center"><strong><u>The Parties</u></strong></p>

1.      Plaintiff **OBJECTS** to the phrase "public figure" because it is a legal conclusion, not a statement of fact. Subject to and with full reservation of Plaintiff's argument that the actual-malice rule and its "public figure" component should no longer apply for the reasons more fully set forth in Plaintiff's Motion for Partial Summary Judgment [Doc. No. 100], it is undisputed that Plaintiff is the former governor of Alaska and vide-presidential candidate.

2.      Undisputed that SarahPAC was Sarah Palin's PAC, domiciled in Virginia that ceased operations in 2016, the goal of which was to promote Palin and her agenda and to which Palin was critical.  [Vogt Decl. Ex. 10, Crawford Depo. 57:1-7, 64:19-22]

3.      Undisputed.

4.      Disputed.  Although The Times' Newsroom and Opinion divisions are considered separate, the opinion division relies upon the newsroom division for facts in support of Editorials and both divisions are governed by The Times Ethics Handbook and Guidelines on Integrity, including their standards for fact-checking, accuracy, and corrections. [Vogt Decl. Ex. 12, PL Depo Ex 2; Vogt Decl. Ex. 13, PL Depo Ex 3; Vogt Decl. Ex. 11, PL Depo Ex 1 at p. 3; Vogt Decl. Ex. 6, Cohn Depo 29:5-10; Vogt Decl. Ex. 2, Lepping Depo 77:11-78:15]

5.      Undisputed.

6.      Disputed, except to the extent that Bennet concedes he is ultimately responsible for everything the opinion section publishes.  [Vogt Decl. Ex. 4, Bennet Depo 13:8-24]

**The Crosshairs Map**

7.      Disputed.  The map did not "feature[] crosshairs."  The "Take Back the 20" map was created by SarahPAC's Internet consultant, Upstream, and staffer Andy Davis, with symbols "pulled from Google mapping tools" to depict 20 congressional districts "that went for McCain-Palin, but were represented by Democratic members."  [Vogt Decl. Ex. 10, Crawford Depo 67:1-68:10, 70:1-4]

8.      Disputed.  The map did not place a "crosshairs" symbol over Rep. Giffords' district; it used symbols "pulled from Google mapping tools" to depict 20 congressional districts that "went for McCain-Palin, but were represented by Democratic members."  [Vogt Decl. Ex. 10, Crawford Depo 67:1-68:10, 70:1-4]

9.      Plaintiff **OBJECTS** to this statement because improperly and inaccurately suggests a causal connection and/or attempts to draw an inference between the publication of the map and "violent attacks," contrary to the facts and controlling summary judgment standard.  *Palin*, 940 F.3d at 812.  Nevertheless, this statement is disputed because it is false.  The vandalism on Rep. Giffords' office occurred early (2:40 a.m.) on the morning on ***March 22, 2010—BEFORE*** Sarah Palin posted the map on March 23, 2020.  [Vogt Decl. Ex. 176, "*Rep. Giffords' Tucson office vandalized after health care vote*" Arizona Daily Star, Mar. 22, 2010 ("The front door was smashed out at Congresswoman Gabrielle Giffords' congressional office last night."); Vogt Decl. Ex. 172, Def. Depo Ex. 16 (Palin March 23, 2010 10:18 a.m. "Don't Get Demoralized!  Get Organized! Take Back the 20!" Tweet); Vogt Decl. Ex. 177, "Vandalism reported at offices of three Democrats [including Giffords]", CNN, Mar. 22, 2010 (discussing vandalism before map posted); Vogt Decl. Ex. 178, "Vandals Attack Dem Offices Nationwide," Talking Points Memo, Mar. 23, 2010 9:00 a.m. (compiling list of vandalism occurring before map was posted)]  Moreover, the vandalism referenced in the Washington Post article Defendants cite (Sullivan Decl. Ex. 58—"Is there a right to reload?") were directed at Representatives not identified on the map, *i.e.,* Rep. Carnahan (Missouri); Rep. Louise Slaughter (New York); Democratic Party offices (Wichita, Cincinnati, Rochester); Rep. Bart Stupak (Michigan).  [compare Sullivan Decl. Ex. 34 (map) to Sullivan Decl. Ex. 58]  Moreover, as explained in the Washington Post article Defendants cite, the "vandalism appears to have been inspired by Alabama blogger, Mike Vanderboegh, who trumpeted the bright idea that opponents of health-care reform should throw bricks at Democratic headquarters across the country." [Doc. No. 99, Sullivan Decl. Ex. 58 at p. 3]  Vanderboegh is a "longtime leader and propagandist in the antigovernment 'Patriot' movement specializing in fiery rhetoric urging violent self-defense' against a tyrannical, Constitution-flouting U.S. government determined to impose

3

the Communist principles of gun control and universal health care." [Vogt Decl. Ex. 179, SPLC Extremist Files, Michael Brian Vanderboegh] On March 19, 2010, Vanderboegh reacted to the imminent passage of health care reform by posting on his blog, "To all modern Sons of Liberty: THIS is your time. Break their windows. Break them NOW." [Vogt Decl. Ex. 180, "To All Modern Sons of Liberty," Sipsey Street Irregulars, Mar. 19, 2010] In January 2011, *Mother Jones* reported that "Giffords Office Was Vandalized by Followers of Former Militia Leader [Vanderboegh]" [Vogt Decl. Ex. 181 (citing Sullivan Decl. Ex. 58)].

10.     Disputed. Publication of the map did not "prompt[] a national debate." The "debate" and "epithets, death threats, and attacks on some members' offices after passage of the Affordable Care Act" occurred before Palin posted the map. [See Paragraph 9, above] Moreover, as explained in the Christian Science Monitor article ("*Stumping for McCain, Sarah Palin dials back the gun rhetoric*") cited by Defendants, Palin spoke at a nationally televised campaign rally for McCain in *Tucson* on March 26, 2010 and said, "We know violence isn't the answer…When we take up our arms, we're talking about our vote…" [See Doc. No. 99, Sullivan Decl. Ex. 47 at p. 2]

11.     Palin **OBJECTS** to and disputes this statement because it mischaracterizes Plaintiff's tweet (Sullivan Decl. Ex. 35), ignores Plaintiffs testimony explaining the tweet, and distorts the facts and evidence to try to suggest Plaintiff intended the symbols on the map to be a "bull's eye." Plaintiff testified that by placing the word "bullseye" *in quotes* she was referring to it "facetiously or, like, that's what they say, that's what they call it. But it wasn't hey, these are bullseyes, somebody go out and get an individual…I always put quotation marks around it to say this what what somebody else says" [Vogt Decl. Ex. 9, Palin Depo 145:20-146:15]. Plaintiff also OBJECTS based on relevance because there is no evidence that Bennet was aware of this tweet.

Moreover, as explained in Paragraphs 8-9, above, this statement is disputed because the symbols on the map were not crosshairs or a "bullseye."

12.     Plaintiff **OBJECTS** to and disputes this statement because it mischaracterizes and takes out of context the allegations in Plaintiff's First Amended Complaint ("FAC") [Doc. No. 70].  Paragraph 99 of the FAC uses the phrase "crosshairs" to explain Defendants' statement "that the Palin Map 'put Giffords and 19 other democrats under stylized crosshairs'" is false.  [Doc. No. 70 at p. 24]  Throughout her FAC, Palin alleges the editorial falsely asserts the map placed crosshairs over individual lawmakers.  [See i.e. FAC ¶¶ 9, 118]

13.     Undisputed.

14.     Plaintiff **OBJECTS** to the relevance of her use of the phrase "Don't retreat, instead reload" because Bennet testified he was not even aware of her referenced Tweet or use of this phrase when he wrote and published the defamatory passages in the subject Editorial and, further, that he did not consider metaphors such as this used in politics to be "incitement."  [Vogt Decl. Ex. 6, Bennet Depo 98:19-99:13, 102:11-23] Plaintiff further **OBJECTS** to the extent this statement ignores Plaintiff's testimony explaining that the expression "Don't retreat.  Reload" is "an old saying of my dad's…a retired teacher and coach…that's where he would go with motivation…" and was never meant as an allusion to a gun, "Not at all.  'Don't retreat, reload,' means don't back down, don't let them tell you to sit down and shut up just because they have the power of the pen or whatever they—whatever they want to use to make you stop what you're doing if what you're doing is right.  Don't let them.  Don't retreat."  [Vogt Decl. Ex. 9, Palin Depo 144:8-145:19]

## The Loughner Shooting

15.     Undisputed, although this statement omits the reference in the cited allegation to the nine-year-old girl Loughner murdered.

16.     Plaintiff **OBJECTS** to this statement as an incomplete, inaccurate, and an argumentative description of the aftermath of Loughner's shooting.  Undisputed that certain members of the media falsely speculated about the motive for Loughner's shooting immediately after it occurred, among whom The Times' Paul Krugman stood out as one of the first to incorrectly rush to judgment.  [Vogt Decl. Ex. 3, ("Assassination Attempt In Arizona," P. Krugman, NYT Opinion, Jan. 8, 2011 at 3:22 p.m. ("We don't have proof yet that this was political, but the odds are that it was…"); Vogt Decl. Ex. 104, ("Climate of Hate," P. Krugman, NYT, Jan. 9, 2011); Vogt Decl. Ex. 38, PL Depo Ex. 38 (Ross Douthat 6/14/17 email string with Bennet stating, "people assumed a link initially—there was a Paul K[rugman] column that was particularly vivid in blaming Republicans—but the investigation debunked it."); Vogt Decl. Ex. 74, PL Depo Ex. 123 ("*Caldwell's Unfairness*," A. Sullivan, Jun. 16, 2017 (discussing Krugman's "leap" to linking Loughner to Palin map); Vogt Decl. Ex. 102, PL Depo Ex. 181 ("*We Don't Have Proof Yet*" J. Taranto, WSJ, Jan. 10, 2011)]  This speculation occurred in the days immediately after Loughner's shooting, but soon after a consensus was reached that Loughner's shooting was not incited by or connected to Palin's map.  [Vogt Decl. Ex. 32, PL Depo Ex. 30 at pp. 19-21 ("As We Mourn," NYT Editorial, Jan. 12, 2011 (recognizing President Obama's statement during Loughner shooting memorial service that "If, as has been discussed in recent days, their death helps usher in more civility in our public discourse, let us remember it is not because a simple lack of civility caused this tragedy—**it did not**" and noting Palin maintained "journalists and pundits" had committed a "blood libel")); Vogt Decl. Ex. 106, PL Depo Ex. 182 ("*It Did Not*," J. Taranto, WSJ, Jan. 13,

2011 (noting how "New York Times's response to last weekend's murders in Tucson was to instigate a witch hunt against Republican politicians, and how President Obama's statement "It did not" (quoted in "*As We Mourn*") "[w]ith those three truthful words—an improvisation or a late addition, as they were not in the prepared text—[President Obama] rebuked the out-of-control liberal media that have, under the leadership of the New York Times, been engaging in a vicious campaign of lies and smears.")); Vogt Decl. Ex. 74, PL Depo Ex. 123 ("*Caldwell's Unfairness*," in which Andrew Sullivan demanded a correction from The Financial Times for article accusing him of "linking" Loughner shooting to Palin map; ; Vogt Decl. Ex. 107 ("*Massacre, followed by libel*," C. Krauthammer, Washington Post, Feb. 26, 2011 ("Not only is there no evidence that Loughner was impelled to violence by any of those upon whom Paul Krugman, Keith Olbermann, the New York Times, the Tucson Sheriff and other rabid partisan as fixated.  There is no evidence that he was responding to *anything*, political or otherwise, outside of his own head."); Vogt Decl. Ex. 107 ("Sarah Palin Is Right About 'Blood Libel'," Rabbi Shmuley Boteach, WSJ. Jan. 14, 2011 ("Sarah Palin has every right to use ['Blood Libel'].  The expression may be used whenever an amorphous mass is collectively accused of being murderers or accessories to murder.")]  The Times, *The Atlantic* (while Bennet was at its helm), *Wall Street Journal*, and *Washington Post*— all of which Bennet was "regularly reading" for his news in 2011—were among the major news outlets confirming within ***days*** (not weeks or months) of Loughner's shooting that it was not linked to or incited by Gov. Palin or the map.  [Vogt Decl. Ex. 4, Bennet Depo. 103:25-104:10; *see* Vogt Decl. Ex. 32, 38, 74, 103, 104, 106, 107, above; *see also* Vogt Decl. Ex. 83, PL Depo. Ex. 147 ("*Was the Shooting of Rep. Giffords Political?*"—The Atlantic/Wire); Vogt Decl. Ex. 84, PL Depo. Ex. 148 ("*Did Sarah Palin's Target Map Play Rile in Giffords Shooting?*"—The Atlantic/Wire); Vogt Decl. Ex. 85, PL Depo. Ex. 149 ("*What We Know About Jared Lee*

*Loughner*"—The Atlantic/Wire); Vogt Decl. Ex. 86, PL Depo. Ex. 150 "*Stop the Blame Game*"—

The Atlantic); Vogt Decl. Ex. 87, PL Depo. Ex. 151 "*The More We Know*"—The Atlantic/Dish);

Vogt Decl. Ex. 88, PL Depo. Ex. 153 ("*Ten Days That Defined 2011*"—The Atlantic/Wire); Vogt

Decl. Ex. 16, PL Depo Ex. 8 ("*Time, the Enemy*"—NYT); Vogt Decl. Ex. 50, PL Depo. Ex. 60

("*The Tucson Witch Hunt*"—NYT); Vogt Decl. Ex. 51, PL Depo. Ex. 64 ("*Suspect's Odd Behavior*

*Caused Growing Alarm*"—NYT); Vogt Decl. Ex. 52, PL Depo. Ex. 67 ("*Looking Behind the Mug-*

*Shot Grin*"—NYT); Vogt Decl. Ex. 102, PL Depo Ex. 181 ("*We Don't Have Proof Yet*"—WSJ),

182 ("*It Did Not*"—WSJ); Vogt Decl. Ex. 80 ("The bogus claim that a map of crosshairs by Sarah

Palin's PAC incited Rep. Gabby Giffords' shooting").  In fact, on January 15, 2011, The Times

publicly discussed how the media's rush to judgment about the motive for Loughner's actions

should be a teaching moment for how the media's bias and "storytelling habits" led them to falsely

accuse people like Gov. Palin of inciting the shooting when it became known fairly quickly after

the tragedy that Loughner was not motivated by anything Gov. Palin said or did.  [Vogt Decl. Ex.

16, PL Depo Ex. 8 ("Time, the Enemy," ("The Times had a lot of company [in the 'egregious rush

to judgment in the Times coverage of the Arizona shooting'], as news organizations, commentators

and political figures shouldered into an unruly scrum battling over whether the political

environment was to blame.  Meanwhile, opportunities were missed to pick up on evidence—quite

apparent as of early the first day—that Jared Lee Loughner, who is charged with the shootings,

had a mental disorder and might not have been motivated by politics at all."))]

17.     Undisputed there is no evidence Loughner saw the map.  However, this statement

is incomplete in that omits the testimony of The Times' witnesses who investigated the underlying

facts surrounding Loughner's shooting who confirmed no link between Loughner and the map was

established.  [Vogt Decl. Ex. 2, Lepping Depo. 15:6-17 ("[T]here was a [police] report saying that

there was no direct connection between political incitement and the Loughner shooting."); Vogt
Decl. Ex. 6, Cohn Depo. 68:10-22 ("I know that there was no link established between the [map
circulated by Sarah Palin's PAC] and the Giffords shooting.")]

18.     Undisputed, except to the extent multiple news organizations, including The Times,
reported in the **_days_** (not "weeks and months") following the shooting that Loughner was mentally
unstable and developed animosity toward Gifford **years** before Palin's map.  [*See* Paragraph 16,
above.]

<p style="text-align:center"><strong><u>The Congressional Baseball Shooting</u></strong></p>

19.     Undisputed.

20.     Undisputed.

<p style="text-align:center"><strong><u>Drafting the Editorial America's Lethal Politics</u></strong></p>

21.     Undisputed.

22.     Disputed.  There was no "debate" about the focus of the proposed editorial.  As set
forth in the below table, Robert Semple and Williamson discussed the piece and Semple decided
to write about the Scalise shooting and "gun control" well before Bennet got involved:

| Time | Description | Supporting Evidence |
|---|---|---|
| 10:46 a.m. | E. Williamson emails B. Semple, J. Bennet, and N. Fox with the subject line "are we writing on the congressional shooting?" | Vogt Decl. Ex. 174 (NYTIMES 1034) |
| 10:49 a.m. | E. Williamson emails "possible shooter ID" with link to Washington Post article identifying James Hodgkinson | Vogt Decl. Ex. 96, PL Depo Ex. 164 |
| 10:53 a.m. | E. Williamson emails "POSSIBLE shooter's POSSIBLE social media pages pro-Bernie, anti-Trump" with links to Hodgkinson's Facebook, LinkedIn and Twitter accounts | Vogt Decl. Ex. 97, PL Depo Ex. 165 |

| Time | Description | Supporting Evidence |
|------|-------------|---------------------|
| 11:28 a.m. | R. Semple responds to Williamson's 10:46 a.m. question by saying, ***"Can't see it yet…but keep looking…a nut case who hates republicans???…"*** | Vogt Decl. Ex. 21, PL Depo Ex. 15 (emphasis added) |
| 11:31 a.m. | N. Fox responds that he "talked to Bob about the politicize of horror angle and he didn't quite see it…" | Vogt Decl. Ex. 21, PL Depo. Ex. 15 |
| 11:49 a.m. | R. Semple emails his potential angles for a piece:<br><br>"We have written a ton (mainly Frank [Clines]) on gun control…we did a huge series on it a few years ago…while this is almost certainly a lone nut, ***it would be interesting to know ho many of those Republican athletes are beholden to the NRA and its generally anti-regulatory philosophy, and whether something like this might pound a little sense into their heads…***whether the guy bought the rifle at a gun show or inherited from his grandmother, it's still a gun, of which there enough [sic] for practically every man woman and child in this country…" | Vogt Decl. Ex. 22, PL Depo Ex. 16 (emphasis added) |
| 11:59 a.m. | R. Semple responds to himself by saying, "second (or third) message— ***the more I think about the gun control angle, the better I like it.***" | Vogt Decl. Ex. 22, PL Depo Ex. 16 (emphasis added) |
| 12:04 p.m. | L. Cohn replies in email string "The nutcase went to my high school in Belleville…I'm thinking back to what A GIANT STORY [g]ABBY Giffords shooting was.  Amazing that shooting congressmen doesn't seem so shocking now." | Vogt Decl. Ex. 23, PL Depo Ex. 17 |
| 12:08 p.m. | R. Semple confirms the Editorial Board will write a piece, ***"OK we should definitely shoot for a piece, not huge, but a piece.***" | Vogt Decl. Ex. 23, PL Depo Ex. 17 (emphasis added) |

It was not until **_forty minutes after_** Semple made the decision to write a piece about the Scalise shooting and gun control that Bennet—in response to Williamson's 10:53 a.m. email circulating Hodgkinson's "pro-Bernie, anti-Trump" social media accounts—interjected with his narrative about "the rhetoric of demonization and whether it incites people to this kind of violence" and the "inciting hate speech" he "tended to associate with the right." [Vogt Decl. Ex. 25, PL Depo Ex. 20; Vogt Decl. Ex. 4, Bennet Depo 247:3-249:5, 250:4-23]:

23.     The content of Cohn's referenced email is undisputed.

24.     Undisputed, subject to the additional facts set forth in Paragraph 22, above.

### *Research*

25.     Disputed to the extent this statement mischaracterizes Williamson's research as "familiarize[ing] herself with the Loughner Shooting in 2011."  Rather, at Bennet's request, Williamson specifically researched whether there was a link between incitement and the Loughner shooting and whether there was any evidence of a link between incitement and the Hodgkinson shooting.  [Vogt Decl. Ex. 3, Williamson Depo 142:1-143:24, 126:8-131:22; Vogt Decl. Ex. 6, Bennet Depo 245:5-247:2]

26.     Disputed.  Semple—consistent with his decision to address gun control in the editorial—asked Lett to send Williamson "four [of his] basic gun control pieces (dealing mainly with the plentitude of weapons and porous controls) that also happen to mention Gabrielle Giffords…" [Doc. 99, Sullivan Decl. Ex. 9; Vogt Decl. Ex. 9, Lett Depo 87:15-21]  Plaintiff also **OBJECTS** to this statement to the extent it insinuates Semple tasked Lett to conduct *all* the research for the editorial.    As set forth in Paragraph 25, above, Bennet specifically tasked Williamson with researching whether there was a link between incitement and Loughner's shooting.

27.     Undisputed that Lett circulated the "four basic gun control pieces (dealing mainly with the plentitude of weapons and porous controls) that also happen to mention Gabrielle Giffords…" Semple asked her to send to Williamson.  (Sullivan Decl. Ex. 9) (these four pieces included "*Rep. Gabby Giffords Farewell*" (1/27/2012), "*6000 Bullets in Colorado*" (7/24/2012), "*Democrats Find their Voice on Gun Control*" (7/29/2016), and "*Myths About Gun Regulation*" (1/2/2013)—all of which were pieces written by Semple.)  [Doc. 99, Sullivan Decl. Ex. 13 (PL Depo. Ex. 30)]

28.     Undisputed except as to completeness.  Williamson asked Lett for assistance finding a piece on "hate type speech" (Sullivan Decl. Ex. 12), in response to Bennet's 12:41 p.m. email [Vogt Decl. Ex. 25].  As set forth in Paragraph 25, above, Williamson was already conducting the research Bennet asked for concerning incitement and the Loughner shooting, and she testified she did not know or ask what Bennet meant by the term "hate speech." [Vogt Decl. Ex. 3, Williamson Depo 207:18-208:5, 209:18-210:16]

29.     Disputed.  This statement takes the facts out of context and asserts an inaccurate timeline of events. In response to Williamson's 1:40 p.m. email to Lett (see Paragraph 28, above; Sullivan Decl. Ex. 12), Lett then emailed Bennet at 1:46 p.m. asking, "I'm trying to find the piece Elizabeth is referring to here, do you happen to know which one she is talking about?"  [Vogt Decl. Ex. 28, PL Depo Ex. 27]  Bennet responded to Lett (not Williamson) at 2:07 p.m., asking, "No—I was just wondering if there was such a piece; that is, did we ever write anything connecting to the Giffords shooting to some kind of incitement?" [Id.]

30.     Disputed.  This statement takes the facts out of context and asserts an incomplete timeline of events. At 2:20 p.m., Lett replied to Bennet's 2:07 p.m. email (see Paragraph 29, above) by forwarding him a link to a Frank Rich column (not an Editorial):  "*No One Listened to Gabrielle*

*Giffords*," Jan. 15, 2011.  [Vogt Decl. Ex. 28, PL Depo Ex. 27; Vogt Decl. Ex. 30, PL Depo Ex. 30 at pp. 11-15 (Frank Rich Column)]  At 2:34 p.m., Bennet responded to Lett by saying "Good for Us.  Can you let Elizabeth [Williamson] know?"  [Vogt Decl. Ex. 28, PL Depo Ex. 27]  Bennet testified that he doesn't recall what he meant by "Good for Us," but the inference to be drawn is that Bennet was free to advance his preconceived narrative because the Editorial Board had not written about the subject.  [Vogt Decl. Ex. 4, Bennet Depo 252:6-24]  At 2:52 p.m., Bennet followed up by asking Lett to send him the four basic gun control pieces Semple asked Lett to send to Williamson.  [Vogt Decl. Ex. 28, PL Depo Ex. 27]  Bennet does not recall whether he read all of the materials Lett sent him.  [Vogt Decl. Ex. 4, Bennet Depo 250:24-251:11]  Bennet asked Lett to "dig a little further" because it "seemed strange" to him that the Editorial Board had not "editorialized at all about the [Loughner] shooting…because it was an important news event and the kind of thing we would typically editorialize on."  [*Id.*, Bennet Depo. 253:8-254:10]  Lett found 2 additional Editorials ("Bloodshed and Invective In Arizona" and "As We Mourn").  [*Id.*, Bennet Depo 254:6-10; Vogt Decl. Ex. 29, PL Depo Ex. 29; Vogt Decl. Ex. 30, PL Depo Ex. 30 at pp. 16-21]  However, Bennet claims he did not read those pieces either.  [Vogt Decl. Ex. 24, Bennet Depo 254:11-18]

      31.    Disputed.  This statement takes the facts out of context and asserts an inaccurate timeline of events. As set forth in Paragraph 22, above, Semple decided the Board should write a piece on the shooting and gun control 40 minutes ***before*** Bennet interjected his incitement narrative in response to Williamson's email about Hodgkinson's "pro-Bernie, anti-Trump" social media accounts.  [Vogt Decl. Ex. 25, PL Depo Ex. 20]  Bennet testified that he "thought that [the Board] should deal with this issue of incitement if there was evidence of inciting hate speech on the Left." [Vogt Decl. Ex. 4, Bennet Depo 250:4-14]  However, Bennet conceded he and the Board never

uncovered any evidence of inciting hate speech on the Left leading up to Hodgkinson's shooting [*Id.*, Bennet Depo 250:15-13 ("We didn't find a specific example of hate speech connected to the people on the -- hate ·speech, I'm sorry, I don't usually use that term of, of -- of rhetoric of demonization connected to the ball players that day.· You know, naming Steve Scalise or something like that.")]

32.     Disputed.  Bennet did not "ask Williamson to be mindful of whether such rhetoric came from both sides of the political spectrum."  Rather, as set forth in Paragraph 31, above, Bennet interjected his incitement narrative in response to Williamson's email about Hodgkinson's "pro-Bernie, anti-Trump" social media accounts; and testified that he "thought that [the Board] should deal with this issue of incitement if there was evidence of inciting hate speech on the Left." Unlike Bennet, Williamson did not associate any speech on the right that she considered to be inciting hate speech to the Gabby Giffords shooting.  [Vogt Decl. Ex. 3, Williamson Depo 208:18-209:3, 209:18-210:6]  Bennet conceded he and the Board never saw any evidence of inciting hate speech on the Left leading up to Hodgkinson's shooting [Vogt Decl. Ex. 4, Bennet Depo 250:15-13 ("We didn't find a specific example of hate speech connected to the people on the -- hate ·speech, I'm sorry, I don't usually use that term of, of -- of rhetoric of demonization connected to the ball players that day.· You know, naming Steve Scalise or something like that.")]

33.     Disputed.  Bennet specifically asked Williamson to research the Loughner shooting and the Scalise shooting.  [Vogt Decl. Ex. 3, Williamson Depo. 142:1-14, 126:8-25]

34.     Disputed. This statement is false.  The research did not "focus" on prior editorials by The Times.   As discussed in Paragraphs 25-33, above, at Bennet's request, Williamson specifically researched whether there was a link between incitement and the Loughner shooting and whether there was a link between incitement and the Hodgkinson shooting.  [Vogt Decl. Ex. 3,

Williamson Depo 142:1-143:24, 126:8-131:22; Vogt Decl. Ex. 4, Bennet Depo 245:5-247:2].  As for "editorials," Semple merely asked Lett to send Williamson "four basic gun control pieces (dealing mainly with the plentitude of weapons and porous controls) that also happen to mention Gabrielle Giffords…"  Bennet also told Lett he "was just wondering" whether there were any editorials "connecting to the Giffords shooting to some kind of incitement?" [Vogt Decl. Ex. 28, PL Depo Ex. 27]  Also, Benet's cited testimony from the 8/16/17 Hearing (p. 6:5-12) is impeached by Williamson (Williamson Depo. 142:1-14).

### *First Draft*

35.    Undisputed.

36.    Undisputed Williamson's draft included the quoted passages.  Palin objects to the characterization of Palin's contentions as incomplete.

37.    Undisputed except that the referenced hyperlink does not appear to direct a reader who clicked on it to a "package of on-line news reports published by ABC."  Exhibit C of the cited Brown Declaration appears to contain materials from different URLs.  Undisputed the hyperlink directed readers to a January 9, 2011 ABC article by John Berman [Vogt Decl. Ex. 32, PL Depo Ex. 34; Vogt Decl. Ex. 3, Williamson Depo 234:3-235:16], which in its byline states it is a "**4 Min read**" and in its first multi-sentence paragraph (found on the top of page 2) states:

> No connection has been made between this graphic and the Arizona shooting, but it has put the Palin team somewhat on the defensive. Rebecca Mansour, a spokesperson for SarahPac, told conservative commentator Tammy Bruce, "We never imagined, it never occurred to us that anybody would consider it violent." Insisting she was speaking for herself, and not on behalf of Palin, Mansour added, "We never ever, ever intended it to be gun sights."

38.    Undisputed the Editorial included a hyperlink to the article quoted above (PL Depo. Ex. 34)

39.     Disputed for the reasons stated in Paragraph 37, above.

40.     Undisputed that the January 9, 2011 ABC article by John Berman states in pertinent part:

> No connection has been made between this graphic and the Arizona shooting, but it has put the Palin team somewhat on the defensive. Rebecca Mansour, a spokesperson for SarahPac, told conservative commentator Tammy Bruce, "We never imagined, it never occurred to us that anybody would consider it violent." Insisting she was speaking for herself, and not on behalf of Palin, Mansour added, "We never ever, ever intended it to be gun sights."

41.     Undisputed that Williamson had no "specific" recollection of reading the ABC article "because three years have gone by since I conducted that research." [Vogt Decl. Ex. 3, Williamson Depo 234:3-236:1]  However, disputed as an incomplete statement of Williamson's knowledge at the time she drafted the editorial which, based on the research she conducted concerning the Loughner shooting, was that she knew she could not say there was a clear and direct link between the map circulated by Sarah Palin's political action committee and the Loughner shooting.  [*Id.,* Williamson Depo 143:2-24]

42.     Disputed.   Plaintiff **OBJECTS** to this statement concerning Williamson's recollection of the research she conducted because The Times failed and refused to produce Williamson's search and browsing history from June 14, 2017.  [Vogt Decl. Ex. 3, Williamson Depo. 1271:1-131:22]  This statement also is disputed because Williamson testified she recalled the results of the research Bennet asked her to conduct concerning the Loughner shooting, based on which she knew she could not say there was a "clear and direct link" between the map circulated by Sarah Palin's political action committee and the Loughner shooting.  [*Id.*, Williamson Depo 143:2-24]

43.     Disputed.    Plaintiff **OBJECTS** to this statement concerning Williamson's knowledge of the research she conducted because, although she turned over her search and browsing history from June 14, 2017 to counsel for The Times, The Times failed and refused to produce that documentation in response to discovery requests served by Plaintiff.    [*See* Paragraph 42, above.]   Plaintiff also objects because the cited testimony does not support the statement that Williamson "did not know why Loughner targeted Gifford."   This statement also is disputed because Williamson testified she recalled the results of the research Bennet asked her to conduct concerning the Loughner shooting, based on which she knew she could not say there was a clear and direct link between the map circulated by Sarah Palin's political action committee and the Loughner shooting.   [Vogt Decl. Ex. 3, Williamson Depo 143:2-24]

44.     Disputed.   Williamson emailed her first draft to Bennet, Semple, Fox, Frank Clines, as well as Cohn, at 4:45 p.m.   [Vogt Decl. Ex. 59, PL Depo Ex. 72 ("shootings is in backfield" reference in Williamson's email indicates draft has been submitted to The Times content management system for editing); Vogt Decl. Ex. 3, Williamson Depo 230:16-231:11]]

45.     Undisputed, but incomplete to the extent Williamson also testified Bennet was responsible for fact-checking the portions of the editorial he re-wrote.   [Vogt Decl. Ex. 3, Williamson Depo 67:14-68:6]

46.     Undisputed.

### *Revisions*

47.     Disputed as to the characterization of Cohn's cited testimony, which states in pertinent part:

> I sort of remember standing in front of his glass door, you know, opening up the door or something, and saying, "You need to look at this."…I recall thinking I wasn't really sure if its what **_he wanted_**.  I thought there had been quite the confusion over the day as to where

17

> this piece was headed, as to be either more of a gun control piece or to be more of a piece about the political climate and the sort of lack of civility in America's political discourse...***I wasn't sure what James intended, wanted in the piece.***  I wasn't sure if the piece worked…I wasn't sure it accomplished what James would want it to accomplish…there were a couple competing ideas about the piece…

[Vogt Decl. Ex. 6, Cohn Depo 57:13-58:22 (emphasis added)]

48.     Undisputed, except to the extent this statement is incomplete in that it does not identify the "questions" Cohn asked, indicated by the bold text in the draft editorial.  [Sullivan Decl. Ex. 18 at pp. 1-2]

49.     Disputed.  Cohn testified that when she went to Bennet's office to raise her concerns about the piece (*see* Paragraph 47, above), Bennet responded by saying something along the lines of, "yeah, it needs some work, I'll do it."  [Vogt Decl. Ex. 6, Cohn Depo 60:3-7]

50.     Plaintiff objects to the phrase "in relevant part."  Otherwise, undisputed.

51.     Undisputed.

52.     Disputed.  The editorial was not itself "breaking news," and the Hodgkinson shooting was already being covered by The Times newsroom.  [Doc. 41-34, 8/16/17 Hrg. Transcr. 24:11-23].  Cohn testified that "goal" was to get it in the next day's print paper" but there were already at least two or three other editorials scheduled to run in the next day paper which could have been run instead.  [Vogt Decl. Ex. 6, Cohn Depo 61:2-24]

53.     Disputed.  Cohn testified the deadline was sometime between 8:00 and midnight, and the Editorial Section did not go to press until later.  [Vogt Decl. Ex. 6, Cohn Depo. 130:4-132:25]

54.     Disputed.  As set forth in paragraphs 52-53, above, the editorial was not itself "breaking news," the Hodgkinson shooting was already being covered by The Times newsroom,

Cohn testified that "goal" was to get it in the next day's print paper" but there were already at least two or three other editorials scheduled to run the next day and the print deadline was between 8:00 p.m. and midnight.

55.     Undisputed.

56.     Plaintiff **OBJECTS** to and disputes this statement because Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, although Bennet made this conclusory statement, he cites no facts to support his supposed belief, and therefore lacks sufficient foundation to admit.

57.     Plaintiff **OBJECTS** to and disputes this statement because Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812 Moreover, this statement is incomplete and omits portions of Bennet's quoted testimony, which reads in full:

> Q. Could you explain what you meant by the term "political incitement" when you wrote this?
>
> A. Yeah. There are a couple of things at work there. One, I had been very much affected by and was thinking about that day a column that a colleague of mine, Tom Friedman, had written during the course of the presidential campaign -- the last presidential campaign. Then candidate Donald Trump had at a rally and in a speech -- I won't get the words exactly correct -- had said something to the effect that, well, maybe the Second Amendment people can do something about Hillary Clinton. And Tom had made a connection that day that I did not make. He had said that -- he wrote a piece saying basically to hold on. I have seen this movie before. This is the kind of direct language that was heard at the runup to the assassination of Rabin. We need to take this kind of stuff very seriously.
>
> And then that morning in June this terrible thing had happened. Right? We had actually seen the Congressman come under fire on this field in Virginia. And I was looking for a very strong word to write about the political climate because I wanted to get our readers' attention. This is a word that we do use sometimes;

we don't use it every day. We use lots of strong expressions like "inflammatory rhetoric," things like that. Those aren't actually quite as powerful expression as it has been largely drained of its power because it is used so often, "incendiary rhetoric," so on and so forth.

Also, I was thinking about -- the way I view that particular word from is in my experience in one of my roles at the time that I was a correspondent in Jerusalem at one point for The Times, and the word "incitement" is used there by the Israelis -- in my time by the Israelis about the Palestinians but also, to some degree, by the Palestinians about the Israelis to talk about a range of communications from, you know, to deliberate orders, invocations, summonses for people to carry out violent attacks to textbooks that are published that align important facts from the other side's national narrative or history, to tell outright lies about that history, to maps that misrepresent the politics of the region. And that's specifically where I was drawing that word from.

[Doc. 41-34, 8/16/17 Hr'g Tr. at 11:13-12:25]

58.     Undisputed.

59.     Undisputed, as part of the testimony cited in Paragraph 57, above.

60.     Plaintiff **OBJECTS** and disputes this statement because Bennet's self-serving testimony about his beliefs lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, this statement omits portions of and mischaracterizes the quoted testimony to improperly suggest Bennet used "incitement" to draw readers' attention to the Scalise shooting. Bennet's re-write uses "incitement" in the context of Sarah Palin and the Loughner shooting [Vogt Decl. Ex. 33, PL Depo Ex. 35 (*America's Lethal Politics* (original version))], and Bennet concedes that despite researching the issue of any incitement leading to the Scalise shooting, they "didn't find anything." [Vogt Decl. Ex. 4, Bennet Depo 245:5-247:1]

61.     Defendants' summarization of Bennet's referenced testimony is undisputed.

62.     Defendants' summarization of Bennet's referenced testimony is undisputed.

63. Plaintiff **OBJECTS** to the relevance of this statement and article because Bennet did not mention it when testifying about drafting the Editorial. [Doc. 41-34 at 11:13-12:25]

64. Disputed. The cited testimony does not support the statement that "[w]hile Bennet revised the Editorial, Cohn, Eileen Lepping, and Nick Fox focused on fact checking the Editorial." Bennet testified Defendants did not fact check the Editorial until after Bennet completed his re-write ("We--you know, fact checked the version that was edited, not this [Williamson's draft] version."). [Vogt Decl. Ex. 4, Bennet Depo 262:11-263:17] Cohn testified that after turning over the Editorial to Bennet at around 5:00 p.m. she did not do anything on it again until she got it back from Bennet. [Vogt Decl. Ex. 6, Cohn Depo 18:4-16] Moreover, Bennet was responsible for fact-checking the portions of the Editorial he re-wrote. [Vogt Decl. Ex. 3, Williamson Depo 68:1-6]

65. Disputed. This statement mischaracterizes Cohn's cited testimony and omits the question asked ("Q.·Do you have any recollection of whether or not, on June 14 of 2017, you conducted any research related to political rhetoric or political incitement in connection with the "America's Lethal 24·  ·Politics" editorial?"), as well as the beginning of Cohn's answer to that question, which states, "I really can't specifically recall. I mean, I know I got that I wasn't really involved with that piece until very late in the day, so I really can't recall what kind of research I was doing prior to that or in that small amount of time I had it." [Vogt Decl. Ex. 6, Cohn Depo 73:20-74:7]

66. Disputed, and Plaintiff **OBJECTS** because this statement mischaracterizes the evidence. Bennet sent Williamson an email at 7:22 p.m. that said only "I really reworked this one. I hope you can see what I was trying to do. Please take a look. Thank you for the hard work today and I'm sorry to do such a heavy edit." [Vogt Decl. Ex. 100, PL Depo Ex. 172] The statement

21

"make sure the piece is correct" <u>does</u> <u>not</u> appear anywhere in this email.  [*Id.*; Vogt Decl. Ex. 4, Bennet Depo 266:11-22]

67.     Disputed.  Bennet's self-serving testimony lacks credibility and cannot be accepted as true.  *Palin,* 940 F.3d at 812.  Moreover, this statement is incomplete because it omits that Williamson's draft embodied the results of her research about the Loughner shooting.  [Vogt Decl. Ex. 4, Bennet Depo. 264:3-12]

68.     Disputed.  Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, Bennet was responsible for fact-checking the portions of the Editorial he rewrote.  [Vogt Decl. Ex. 3, Williamson Depo 68:1-6]  Also, Bennet already knew Williamson's draft was the embodiment of the research she conducted about the Loughner shooting, including the research Bennet specifically requested concerning any link to incitement [Vogt Decl. Ex. 4, Bennet Depo 262:17-263:17, 264:3-12], which was embodied in the paragraph Bennet rewrote – which Williamson testified she originally wrote to reflect the true results of the research Bennet asked for:

> ·A     I wrote my piece based on what I found, so I did not draw a link in what I wrote.
>
> Q· · ·Why not?
>
> A· · ·I talked about the overheated political climate.
>
> Q· · ·Why didn't you draw a link?
>
> A     Because that's not my job.· I wrote -- I wrote my piece based on the research that I did, and what I wrote reflected that research.
>
> Q· · ·When you say that's not your job, what do you mean?
>
> A· · ·I did my job.· So I did the research, and I wrote the piece based on the research that I found.
>
> Q· · ·Based on the research that you found, did you think that you could say that there was a clear and direct link between the map

circulated by Sarah Palin's political action committee and the Loughner shooting?

A· · ·No.

[Vogt Decl. Ex. 3, Williamson Depo 142:3-143-24 (lines 143:5-24 quoted above)]

69.     Plaintiff **OBJECTS** to and disputes this statement because Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true, *Palin*, 940 F.3d at 812, and Defendants failed and refused to produce Bennet's browsing and search history from June 14, 2017, which would have showed what Bennet clicked on and reviewed. [Vogt Decl. Ex. 4, Bennet Depo. 293:21-294:4]

70.     Disputed.  Bennet knew the results of Williamson's research, which showed no link.  (*See* Paragraph 68, above).  Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.

71.     Disputed for the reasons stated in Paragraph 52-54 and 69, above.  Also, Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812.  Moreover, the contention that Bennet did not have time to click on the hyperlink and review the ABC article is false.  Bennet made his first change to the operative paragraph of Williamson's draft at **6:39 p.m.**  and had re-written that paragraph and the following one to include the defamatory statements about the "clear" and "direct" link between Plaintiff's "incitement" and Loughner by **6:58 p.m.** [Vogt Decl. Ex. 210, PL Depo Ex 32(L) at pp. 55-57, 49-52].  As noted in the byline of the ABC Article [Vogt Decl. Ex. 32, PL Depo Ex. 34], it would at most only have taken **4 minutes** to read that entire article.

72.     Undisputed.

### Publication of the Editorial

73.     Undisputed.

74.     Undisputed, although an incomplete summary of all Plaintiff's operative allegations.

75.     Undisputed that the published version of the Editorial contains the hyperlink. Disputed that Bennet did not click on the hyperlink and has no memory of having seen the article; for the reasons stated in Paragraph 71, above, and because Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.

76.     Undisputed.

77.     Disputed.  The Times published "news reports" about the Scalise shooting soon after it occurred and throughout the day on June 14, 2017.  [Vogt Decl. Ex. 108, "*What Happened at the Shooting…,*" NYT, June 14, 2017 @ 3:15 p.m.]  Also, this statement cites to Ex. 6 of the FAC, but that Exhibit does not support this statement.

78.     Disputed.   Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, Defendants should be precluded from arguing about what Bennet clicked or reviewed because they failed and refused to produce his browsing and search history from June 14, 2017.  [Vogt Decl. Ex. 4, Bennet Depo. 293:21-294:4]  Also, Bennet testified that despite specifically asking for research concerning whether there was any incitement leading to the Scalise shooting, they "didn't find anything"— which means he must have been aware of news stories about the Scalise shooting.  [*Id.*, Bennet Depo 245:5-247:1]

### Criticism of the Editorial and The Times' Response

79.     Undisputed, except as to the use of the word "some."  Bennet stated Defendants were "taking ***a lot of criticism*** for saying that the attack on Giffords was in any way connected to incitement…"  [Vogt Decl. Ex. 37, PL Depo Ex. 37 (emphasis added)]  Numerous readers and

journalists commented.  [*See* Paragraph 364, below; *see also* Vogt Decl. Ex. 70, PL Depo Ex. 96 (Comments on Editorial)]

80.     Disputed.  Douthat told Bennet in his email the night of June 14, 2017 that "[t]here was not, and continues to be so far as I can tell, no evidence that Jared Lee Loughner was incited by Sarah Palin or anyone else…], and made no mention in this email about readers questioning the Editorial.  [Vogt Decl. Ex. 41, PL Depo Ex. 39]  Douthat's first mention of other comments on the Editorial was the following morning, when Douthat sent Bennet links to two tweets from left-leaning journalists.  [Vogt Decl. Ex. 40-42, PL Depo Ex. 38; 38(A); 38(B); Vogt Decl. Ex. 8, Douthat Depo. 95:16-98:11]

81.     Undisputed that the contents of the cited email string between Douthat and Bennet [Sullivan Decl. Ex. 21] speak for themselves.  Also undisputed that Bennet responded to Douthat's statement that there was "no evidence that Jared Lee Loughner was incited by Sarah Palin or anyone else" over 30 minutes later by saying he would "look into this tomorrow."  [Sullivan Decl. Ex. 21]

82.     Undisputed.

83.     Plaintiff **OBJECTS** to and disputes this statement because it is false and misleading, and mischaracterizes the testimony of several witnesses.  First, Bennet wrote the defamatory portions of the Editorial—not Williamson or Cohn—specifically including the rewrite of the paragraph Williamson drafted embodying the results of her research showing no direct link between incitement and Loughner's shooting.  The testimony of Williamson Defendants partially quote related to her original draft of the Editorial <u>NOT</u> the final version Bennet re-wrote.  [Vogt Decl. Ex. 3, Williamson Depo 232:2-234:10]  The partially quoted testimony of Cohn had <u>nothing</u> to do with Bennet's drafting of the defamatory language at issue. The quoted portion of Cohn's

testimony is taken out of context to make it appear as if she was talking about the use of the word "incitement" in the final version of the Editorial when, in reality, Cohn's testimony about the word "incitement" was in reference to the question she added into Williamson's first draft of the Editorial ("Do we know of any elected officials on the Left who have incited violence?· Or just unaffiliated people online or comedians, most are pro-gun control…"). [Vogt Decl. Ex. 6, Cohn Depo 92:4-22]. The entirety of Cohn's testimony about her thoughts at that time is that she did not believe the map circulated by Sarah Palin's PAC incited Loughner to commit his shooting in 2011 because "incitement," Cohn said, "sounds very direct, that it—that the map led him to commit the shooting." [*Id.*, Cohn Depo 96:15-97:7] Bennet's testimony about his "intent" when he wrote the defamatory passages at issue lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812.

84.     Disputed. Bennet's testimony about his subjective beliefs or intent lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, Bennet did not create an "inference" for readers that there was a causal link—he stated unequivocally that the map was "incitement" and was clearly and directly linked to Loughner's shooting [Vogt Decl. Ex. 35, PL Depo Ex. 35 (Original Editorial)]. Even those within The Times knew this language conveyed a causal link. Cohn understood "incitement" to be "very direct" and mean "that it—that the map led him to commit the shooting" [Vogt Decl. Ex. 6, Cohn Depo 96:15-97:7], and Douthat immediately understood Bennet's use of "incitement" to draw a causal connection between Palin's map and Loughner's shooting (see Vogt Decl. Ex. 43, PL Depo Ex. 39)]

85.     Disputed. Bennet's testimony about his subjective beliefs or intent lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, Bennet used "incitement," which he knew was a very "strong word" that meant "deliberate orders, invocations, summonses

for people to carry out violent attacks…[Doc. 41-34, 8/16/17 Hr'g. Trans. 11:13-12:25] and was "a call to violence."  [Vogt Decl. Ex. 4, Bennet Depo 114:10-15]

86.    Disputed.   Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.

87.    Disputed.  Bennet's testimony about his subjective beliefs or intent lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.

88.    Disputed.   Bennet's testimony about his subjective beliefs lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, Bennet used "incitement," which he considered a very "strong word" that he knew meant "deliberate orders, invocations, summonses for people to carry out violent attacks…" (Doc. 41-34, 8/16/17 Hr'g. Trans. 11:13-12:25) and "a call to violence." (Bennet Depo 114:10-15)  The evidence also refutes that Bennet was truly "concerned," because his response on the night of June 14, 2017 when learning from Douthat that the Editorial was false was to respond that he would "look into this tomorrow."  (PL Depo Ex. 380  Moreover, Bennet did not create an "inference" for readers that there was a causal link—he stated unequivocally that there is a "clear" and "direct" link between incitement by the map and Loughner's shooting (PL Depo Ex. 35), language which even those within The Times knew meant the map caused Loughner to shoot (*see* Cohn Depo 96:15-97:7; *see also* PL Depo Ex. 39).

89.    Disputed.  Bennet's self-serving testimony about his subjective beliefs or intent lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, although Bennet made this conclusory statement, he cites no facts to support his supposed belief, and therefore lacks a factual predicate to establish the requisite foundation to admit his testimony. Defendants do not cite a single example of anyone interpreting the defamatory statements

consistent with Bennet.  Moreover, Bennet used "incitement," which he considered a very "strong word" that he knew meant "deliberate orders, invocations, summonses for people to carry out violent attacks" (8/16/17 Hr'g. Trans. 11:13-12:25) and "a call to violence" (Bennet Depo 114:10-15).  Bennet did not create an "inference" for readers that there was a causal link—he stated unequivocally that there is a "clear" and "direct" link between incitement by the map and Loughner's shooting (PL Depo Ex. 35), language which even those within The Times knew meant the map caused Loughner to shoot.  (Cohn understood "incitement" to be "very direct" and mean "that it—that the map led him to commit the shooting" [Vogt Decl. Ex. 6, Cohn Depo 96:15-97:7] and Douthat immediately understood Bennet's use of "incitement" to draw a causal connection between Palin's map and Loughner's shooting [Vogt Decl. Ex. 43, PL Depo Ex. 39)]  Also, Bennet knew the difference between incitement and rhetoric, as demonstrated by the changes made to the correction.  (*See* Paragraph 107 and 109, below).

90.    Disputed.  Bennet's testimony about his subjective "aim in the  Editorial" lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Bennet's true "aim" is apparent from, among other things, the communications and events leading up to and surrounding his rewrite of Williamson's draft—such Bennet's injection of the "incitement" narrative into what was originally intended to be a "gun control" piece (*see* Paragraphs 22-23, above) and insistence on re-writing it to ensure what he "wanted" to accomplish (*see* Paragraph 47, above) even though he already knew there was no evidence of incitement associated with the Scalise shooting (*see* Paragraph 31, above) and that the results of Williamson's research embodied in her draft did not make any link between political incitement and Loughner's shooting (*see* Paragraphs 41 and 67, above).

91.    Disputed.  Bennet's testimony about his subjective "worries" lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, this contention is disproven by the fact that Bennet never called out liberals or democrats for incitement.  [Vogt Decl. Ex. 4, Bennet Depo. 101:10-102:3]

92.    Disputed.  Bennet's testimony about his subjective beliefs lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  In support, *see* Paragraph 91, above.  Moreover, if Bennet was supposedly trying to address "rhetoric," Williamson's Draft already did that.

93.    Disputed.  Bennet's testimony about his subjective beliefs lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  In support, *see* Paragraph 91, above.

94.    Undisputed that Bennet had actual knowledge and testified there was no link between incitement and the Scalise shooting, and therefore no "pattern" of incitement to support his narrative.  [Vogt Decl. Ex. 4, Bennet Depo. 246:14-247:2; Vogt Decl. Ex. 25, PL Depo. Ex. 25, PL Depo. Ex. 20]  In fact, Bennet was not aware of any example of what he considers to be "incitement" on the Left and had never called out the Left for "incitement."  [Vogt Decl. Ex. 4, Bennet Depo 101:10-102:3]

95.    The language of the Editorial speaks for itself and is undisputed, but, as set forth in Paragraph 94, above, the entire premises of Bennet's supposed thesis, like the Palin incitement claim, was debunked.

96.    Disputed.  Williamson wrote referenced passage about crosshairs being placed over lawmakers, not Bennet.  [Vogt Decl. Ex. 31, PL Depo Ex. 33; Vogt Decl. Ex. 3, Williamson Depo 232:24-234:10, 269:11-270:16]

97.    Disputed.  This statement is false.  Williamson's partially quoted testimony was about her **draft**, not the final Editorial.  [Vogt Decl. Ex. 3, Williamson Depo 232:2-234:10; 270:2-

16]  As set forth in Paragraph 41 and 67, above, Bennet re-wrote this portion of Williamson's draft even though it embodied the results of her research on the  Loughner shooting.

98.     Plaintiff objects to and disputes this statement because it is false and mischaracterizes the referenced testimony.  Cohn was not testifying about the use of the word "incitement" in the Editorial—she was testifying about *her* use of "incitement" in the question she posed in Williamson's ***original draft*** of the Editorial.  [Vogt Decl. Ex. 6, Cohn Depo. 91:15-96:25; Sullivan Decl. Ex. 18]

99.     Undisputed.  However, the entirety of the text messages should be included.  (*See* Paragraph 362, below).

100.    Undisputed.

101.    Undisputed.

102.    Undisputed.

103.    Disputed.  Bennet's testimony about his subjective beliefs lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Bennet was covering for himself – and his e-mail asking Williamson and Lepping to research "what the truth is here" raises even more doubts about his credibility because, based on Bennet's "honest mistake" excuse, there was no need to ask for this research, and doing it was inconsistent with Bennet's claim this was an error in syntax.

**The Times Revises the Editorial**

104.    Disputed.  As set forth above, the Editorial Board already knew there was no direct connection between Plain's map and Loughner's shooting – they said there is a "direct" and "clear" link.  (*See* Paragraphs 42 and 68, above).

105.    Disputed.  The referenced passages of the Editorial did not "suggest" a direct connection.  (*See* Paragraphs 84-85, above).

106.    Undisputed.

107.    Undisputed.

108.    Disputed.  As described above, and alleged by Plaintiff, the entire premise of the Bennet's narrative in the Editorial mentioning Palin was mentioned was bogus – there was no "pattern" and therefore no reason to mention Palin.  (*See* Paragraphs 94-95, above).  Nonetheless, Bennet insisted on keeping that section and Palin in the "Lethal Politics" Editorial, even though Board member Jesse Wegman (like Douthat) told Bennet that doing so was nothing more than political scorekeeping.  [Vogt Decl. Ex. 43, PL Depo. Ex. 39 (Douthat email); Vogt Decl. Ex. 63, PL Depo. Ex. 81 (Wegman email re. "sneaking the link in.")].

109.    Undisputed.

110.    Undisputed, except to note the print edition corrections does not mention Palin or the name of the Editorial.

111.    Undisputed, except to note no such tweets were sent out following the second correction (*see* Paragraph 109, above) to the Editorial.

**Allegations Regarding Actual Malice**

112.    Disputed.  Bennet was Editor of "The Atlantic magazine **and The Atlantic's website.**" [Vogt Decl. Ex. 4, Bennet Depo 41:12-25 (emphasis added)]

113.    Disputed to the extent this statement mischaracterizes and incorrectly summarizes the allegations in paragraphs 42 and 54-59 of the FAC, which speak for themselves.  Moreover, Bennet conceded at his deposition that while Editor-in-Chief "regularly read" The Atlantic in 2011 and "must have read at least several" of articles about the Loughner Shooting published on The Atlantic's website [Vogt Decl. Ex. 69, PL Depo. Ex. 122; Vogt Decl. Ex. 4, PL Depo Ex 22; Bennet Depo 122:6-22].  Bennet testified he "must have read at least several" of these Loughner

articles because he "was a regular reader of The Atlantic's website both because [he] was interested in it as a reader and because [he] would try to keep [his] eye on it for purposes of commenting to our editor about what [he] liked and didn't like." [Vogt Decl. Ex. 4, Bennet Depo 122:23-123:7] In fact, Bennet described himself as "consuming [The Atlantic's] site." [*Id.*, Bennet Depo 123:7-9]

114.    Disputed.  The Dish was "integrated" into The Atlantic's website –it was "digitally present[ed] as part of the Atlantic.com [and] …its audience would be credited -- as part of The Atlantic's network of sites"—and The Atlantic "took responsibility for the production, meaning, the digital production of the site… mean[ing] maintaining the links, maintaining the archive, and so forth, and at the same time had the ability to sell advertising on the business side against the content that -- and the page views that [The Dish] was producing.  [Vogt Decl. Ex. 4, Bennet Depo 49:3-25]

115.    Undisputed.

116.    Undisputed.

117.    Disputed.  (*See* Paragraphs 112-114, above.)

118.    Disputed.  As set forth in Paragraphs 113 and 114, above, and shown through the URL for "An Assassination" [Sullivan Decl. Ex. 42 at p. 1]—the post appeared on *The Atlantic's* website, of which Bennet was the Editor, and for which he was responsible.

119.    Undisputed as to first sentence.  Disputed as to second sentence.  Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, Bennet conceded at his deposition that he "regularly read" The Dish [Vogt Decl. Ex. 4, Bennet Depo. 54:5-9] and The Atlantic website in 2011 and "must have read at least several" of articles about the Loughner Shooting published on The Atlantic's website (*see*

Paragraph 113, above).  Moreover, as set forth in Paragraph 121, below, Bennet recalls Sullivan writing posts about Palin and spoke to Andrew Sullivan about the Loughner shooting.

120.    Disputed.  As set forth in paragraphs 112-114, above, and shown through the URL for "An Assassination Attempt in Arizona: Live-Blogging,"" [Sullivan Decl. Ex. 55 at p. 1]— Sullivan's live blog appeared on *The Atlantic's* website, of which Bennet was the Editor and for which he was responsible.

121.    Undisputed as to first sentence.  Disputed as to second sentence.  Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, Bennet conceded at his deposition that he "regularly read" The Dish [Vogt Decl. Ex. 4, Bennet Depo. 54:5-9] and The Atlantic website in 2011 and "must have read at least several" of articles about the Loughner Shooting published on The Atlantic's website (*see* Paragraph 113, above), and recalls Sullivan posting about Palin and even spoke to Sullivan about the Loughner shooting (*see* Paragraph 119, above).

122.    Disputed.  As set forth in paragraphs 112-114, above, and shown through the URL for "Caldwell's Unfairness" [Sullivan Decl. Ex. 43 at p. 1]—this post appeared on *The Atlantic's* website, of which Bennet was the Editor and for which he was responsible.

123.    Undisputed.

124.    Disputed.  Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  In support, *see* Paragraph 119, above.

125.    Disputed.  As set forth in paragraphs 112-114, above, and shown through the URL for "The More We Know" [Sullivan Decl. Ex. 56 at p. 1]—this post appeared on *The Atlantic's* website, of which Bennet was the Editor and for which he was responsible.

126.    Undisputed.

127.    Disputed.  Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  In support, *see* Paragraph 119, above.

128.    Undisputed, except that The Wire, like The Dish, was integrated into The Atlantic's Website.  [*See* URLs on Sullivan Decl. Exs. 30, 52, 53, 54.]

129.    Disputed.  As set forth in paragraphs 112-113, and shown through the URL for "Ten Days That Defined 2011" [Sullivan Decl. Ex. 30 at p. 1]—this post appeared on *The Atlantic's* website, of which Bennet was the Editor and for which he was responsible.  Also, during his deposition, Bennet testified "it's possible" he read this piece.  [Vogt Decl. Ex. 4, Bennet Depo 127:13-128:8; Vogt Decl. Ex. 88, PL Depo Ex. 153]

130.    Disputed.  As set forth in paragraphs 112-113, and shown through the URL for "Was Shooting of Rep. Gabrielle Giffords Political" [Sullivan Decl. Ex. 52 at p. 1]—this post appeared on *The Atlantic's* website, of which Bennet was the Editor and for which he was responsible.  Also, this post was among those listed in PL Depo. Ex. 122 Bennet testified he "must have read."  (Bennet Depo. 122:6-22)

131.    Disputed.  As set forth in paragraphs 112-113, and shown through the URL for "Did Sarah Palin's Target Map Play Role in Giffords Shooting" [Sullivan Decl. Ex. 53 at p. 1]—this post appeared on *The Atlantic's* website, of which Bennet was the Editor and for which he was responsible.  Also, this post was among those listed in PL Depo. Ex. 122 Bennet testified he "must have read."  (Bennet Depo. 122:6-22)

132.    Disputed.  As set forth in paragraphs 112-113, and shown through the URL for "What We Know About Jared Lee Loughner" [Sullivan Decl. Ex. 54 at p. 1]—this post appeared on *The Atlantic's* website, of which Bennet was the Editor and for which he was responsible.  Also,

this post was among those listed in PL Depo. Ex. 122 Bennet testified he "must have read."
(Bennet Depo. 122:6-22)

133.   Disputed.  Bennet's testimony about what he recalls reading lacks credibility and
cannot be accepted as true.  *Palin v*, 940 F.3d at 812.  Moreover, Bennet conceded at his deposition
that he "regularly read" The Atlantic website in 2011 and "must have read at least several" of
articles about the Loughner Shooting published on The Atlantic's website [Vogt Decl. Ex. 69, PL
Depo Ex 122; Vogt Decl. Ex. 4, Bennet Depo 122:6-22].  Bennet testified he "must have read at
least several" of these Loughner articles, that was because he "was a regular reader of The
Atlantic's website both because [he] was interested in it as a reader and because [he] would try to
keep [his] eye on it for purposes of commenting to our editor about what [he] liked and didn't
like."  [*Id.*, Bennet Depo 122:23-123:7]  In fact, Bennet described himself as "consuming [The
Atlantic's] site."  [*Id.*, Bennet Depo 123:7-9]  The Atlantic wire posts about the Loughner shooting
are listed in PL Depo. Ex. 122 at pp. 1, 5, among numerous other articles and posts debunking the
Palin/Loughner link.

134.   Undisputed except that *National Journal*, like *The Dish*, was integrated into The
Atlantic's Website.  [*See* URL on Sullivan Decl. Ex. 57 at p. 1; *see also* PL Depo. Ex. 122 at p. 5
("Stop the Blame Game" with Atlantic URL).]

135.   Disputed.  As shown through the URL for "Stop The Blame Game" [Sullivan Decl.
Ex. 57 at p. 1; PL Depo. Ex. 122 at p. 5]—this post appeared on *The Atlantic's* website, of which
Bennet was the Editor for which he was responsible.

136.   Disputed.  Bennet's testimony about what he recalls reading lacks credibility and
cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, Bennet conceded at his deposition
that he "regularly read" The Atlantic website in 2011 and "must have read at least several" of

articles about the Loughner Shooting published on The Atlantic's website (PL Depo Ex 122; Bennet Depo 122:6-22].  Bennet testified he "must have read at least several" of these Loughner articles because he "was a regular reader of The Atlantic's website both because [he] was interested in it as a reader and because [he] would try to keep [his] eye on it for purposes of commenting to our editor about what [he] liked and didn't like."  (Bennet Depo 122:23-123:7)  In fact, Bennet described himself as "consuming [The Atlantic's] site."  (Bennet Depo 123:7-9) "Stop the Blame Game" is among the articles on PL Depo. Ex. 122 at p. 5 Bennet testified he must have read.

137.    Undisputed.

138.    Undisputed.

139.    Disputed.    Plaintiff **OBJECTS** to this statement concerning Bennet's, Williamson's, and Cohn's recollection of editing, drafting, and reading prices from The Times because although they turned over their search and browsing history from June 14, 2017 to counsel for The Times, The Times failed and refused to produce that documentation in response to discovery requests served by Plaintiff, and The Times refused to produce documents Plaintiff requested concerning who edited, drafted, and researched the pieces Defendants cite in this statement.  [Bennet Depo. 293:21-294:4; Cohn Depo. 78:21-79:25; Williamson Depo. 127:1-130:13] Moreover, Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  As set forth in paragraphs 112-136, above, Bennet likely read The Atlantic articles about the Loughner shooting.  Bennet also testified he regularly read The Times.  (Bennet Depo. 104:25-105:18)  Williamson testified she recalled the results of the research Bennet asked her to conduct concerning the Loughner shooting, based on which she knew she could not say there was a clear and direct link between the map circulated by Sarah Palin's political action committee and the Loughner shooting (Williamson Depo 143:2-24).

140.     Plaintiff **OBJECTS** and Defendants should be precluded from arguing about what Bennet recalls or reviewed because they refused to produce his browsing and search history from June 14, 2017.  [Bennet Depo. 104:25-105:18]  Also, Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, Bennet conceded at his deposition that he "regularly read" The Atlantic in 2011 and "must have read at least several" of articles about the Loughner Shooting published on The Atlantic's website because he "was a regular reader of The Atlantic's website both because [he] was interested in it as a reader and because [he] would try to keep [his] eye on it for purposes of commenting to our editor about what [he] liked and didn't like," and Bennet described himself as "consuming [The Atlantic's] site."  (*See* Paragraphs 112-136, above.)  Also, Bennet knew Williamson's draft was the embodiment of the research she conducted about the Loughner shooting, including the research Bennet specifically requested concerning any link to incitement (Bennet Depo 262:17-263:17).

141.     Undisputed, however the referenced allegations speak for themselves.

142.     Disputed.  Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, with respect to the threat on his brother's office, Bennet testified that he did, in fact, recall a threat on his brother's office: "I remember an arrest was made -- I mean, I remember a threat. I remember this incident. I just didn't remember when it took place."  [Doc. No. 41-34, 8/16/17 Hr'g. Trans. 69:10-18]  This is not surprising because Bennet conceded such threats are a "big deal." [Vogt Decl. Ex. 4, Bennet Depo 145:16-146:14]

143.     Disputed.  Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, it is highly suspect that Bennet would not recall his brother giving a speech during the filibuster immediately after the Pulse

Nightclub shooting, when his Editorial Board wrote about the filibuster and the Pulse shooting, and gun control was one of Bennet's hot button issues.  [Vogt Decl. Ex. 4, Bennet Depo 163:20-23, 164:4-165:16; Vogt Decl. Ex. 162, PL Depo Ex. 286]

144.   Disputed.  Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, when asked, "You are saying you didn't know when you wrote the editorial that Sarah Palin had endorsed your brother's opponent?" Bennet conceded "If I had known that, I didn't remember it. That's all I'm saying. It doesn't surprise me, certainly."  [Doc. No. 41-34, 8/16/17 Hr'g Trans. 71:6-10]

145.   Disputed.  Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.

146.   Disputed.  Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.

147.   Undisputed Bennet was "very concerned [about] the epidemic of gun violence." Cohn's referenced testimony about a "big focus" is irrelevant because Bennet himself testified issues involving gun control were "important to [him] personally.  [Vogt Decl. Ex. 4, Bennet Depo 165:5-7]

148.   Undisputed.

149.   Undisputed.

150.   Disputed.  Bennet testified he could not "remember" editing his brothers' speeches on gun control.  [Vogt Decl. Ex. 4, Bennet Depo 62:25-63:6]  Moreover, his testimony about his involvement with his brother's speeches on gun control lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Bennet also admitted to being directly involved in his brother's political career [*Id.*, Bennet Depo 63:7-16]

151.    Undisputed.

152.    Undisputed.

153.    Disputed for the reasons more fully explained in Paragraphs 251-262, below.

154.    Disputed.  Defendants' statement is incorrect and incomplete, as shown by Palin's full testimony on pages 194-196 of her deposition.  [Vogt Decl. Ex. 9]

155.    Disputed.  Defendants' statement is incorrect and incomplete, as shown by Palin's full testimony on pages 198-201 of her deposition.  [Vogt Decl. Ex. 9]

## PLAINTIFF'S COUNTERSTATEMENT OF MATERIAL FACTS

### The Times

156.    *The New York Times* is regarded as the "Paper of  Record," reflecting the considerable weight and influence attributed to the "voice" of *The Times*.  [Vogt Decl. Ex. 166 (NYT Innovation Report) at p. 22; *see also* Vogt Decl. Ex. 182, 183]

157.    *The Times* publishes one of the oldest and most widely circulated print papers in the United States.  [Vogt Decl. Ex. 159 (NYT 2019 Annual Report) at p. 6]

158.    Over the past decade, *The Times* has been transitioning to a subscription-first, mobile-first content provider primarily dependent on digital subscriptions and digital advertising to generate revenue.  [*Id*. at pp. 2, 6-7; Vogt Decl. Ex. 166 at pp. 82-84]

159.    In its 2014 Innovation Report, The Times recognized it had fallen behind in a "critical area" in the digital age: "the art and science of getting our journalism to readers."  [Vogt Decl. Ex. 166, p. 4]

160.    The Times also acknowledged '[t]he realities of a cluttered Internet and distracted mobile world require extra effort to get our journalism to readers." [Id at p.7]

161.    The Times was under attack by news "startups" trying to "disrupt" its industry using new technology to offer cheaper and inferior alternatives, such as Huffington Post, Vox, Business Insider, Buzzfeed, Politico, and Twitter.  [Id. at p. 17]

162.    To compete in this challenging digital landscape, The Times shifted its focus from journalism to "audience development" through strategies such as promotion and distribution through social media and mobile platforms, tagging, search engine optimization, and similar methods of engaging readers.  [Id. at pp. 24, 26]  During that process, The Times integrated its journalism with its "business side."  [Id. at pp. 60-61]

163.    The Times also decided to be more "aggressive" in promoting itself and implementing its competitors' standard practices for maximizing traffic.  [Id. at p. 95]

164.    During its digital-transition, The Times began developing artificial intelligence-based tools that helped them determine what content to publish and promote on social media and summarized what The Times audience was reading so it could target certain topics and connect topics with readers.  [Vogt Decl. Ex. 168]

165.    Among these tools, The Times developed "*Project Feels*," an artificial intelligence model that predicts readers' emotional response to content The Times publishes [Vogt Decl. Ex. 169; Vogt Decl. Ex. 5; Stile Depo 46:22-47:6], and "*ReaderScope*," an AI-driven data insights tool that summarizes what The Times' audience is reading and uses that data to visualize interest in certain topics.  [*Id.* ; Vogt Decl. Ex. 5, Stile Depo 44:20-45:16]

166.    The Times data strategy team also built "Blossom Bot," a digital tool that predicts how articles and posts will perform on social media and suggests which stories should be promoted by drawing from enormous stores of data including information on story content and performance metrics on social media.  [Vogt Decl. Ex. 15, PL Depo Ex. 272; Stile Depo 88:15-17]

167.   The Times also developed an in-house data analytics dashboard, "*Stela*," a tool that pulls in data from multiple sources and presents it in one place (a dashboard or "view"), with simplified visuals and non-jargony categories catered towards journalists to help reporters and editors get feedback on the things they are being asked to do online, such as tweaking headlines and promoting stories on social media.  [Vogt Decl. Ex. 165, PL Depo Ex. 293 at pp. 1-3; Vogt Decl. Ex. 5, Stile Depo 27:20-28:17, 29:22-30:12]

168.   Stela pulls in data from The Times' desktop and mobile websites, as well as all of The Times' mobile apps, as well as third-party data sources like Google analytics and Chartbeat, to provide data on specific articles, such as pageviews, referrals, top comments from social media, information on what social posts are performing the best, and the "conversation" surrounding a story.  [Vogt Decl. Ex. 165, PL Depo Ex. 293 at p. 4; Vogt Decl. Ex. 5, Stile Depo 31:14-43:18]

169.   The Times uses these tools for content strategy—deciding which topics to write about and promote on social media.  [Vogt Decl. Ex. 169]

170.   The Times actively promotes content in several ways, such as on its social media accounts (i.e. Facebook and Twitter), homepage, through news alerts and newsletters, and similar strategies.  [Vogt Decl. Ex. 159 at pp. 46-49]

171.   As The Times was transitioning from a traditional print publication to primarily a digital platform, it also eliminated its Public Editor position—which was responsible for holding The Times accountable for its journalism ethics and standards—and replaced it with a "Reader Center," described as  "faux-accountability" system.  [Vogt Decl. Ex. 153 ("The Public Editor Signs Off"); Vogt Decl. Ex. 154, ("Reader Center Already Proving a Step Backward"); Vogt Decl. Ex. 171, Ingber Depo Ex. D; Vogt Decl. Ex. 155]

**The Editorial Board**

172.    The Editorial Board represents the "loud and far-reaching voice" of The Times. [Vogt Decl. Ex. 11; PL Depo. Ex. 1 at p. 4]

173.    In 2017, *The Times'* Editorial Board was comprised of 16 experienced journalists with varying focuses of expertise, led by its editor, James Bennet ("Bennet").   [FAC ¶¶ 33-34]

174.    In June 2017, the Editorial Board members and Opinion staff included, among others, the following individuals who worked on "*America's Lethal Politics*":

a.    Bennet:  the editorial page editor of The New York Times, in charge of the Opinion department.  [Vogt Decl. Ex. 209 at p.1]

b.    Robert B. Semple Jr. ("Semple"):  Editorial Board Member who served as an Associate Editor and senior statesman of the Editorial department, who "had worked at The Times for 50·years-ish, if not more [and]… at that point, he was technically an editor of the -- for the page, but he read and shaped the language in a lot of our editorials with Linda [Cohn] and Nick [Fox], I guess, at that point."  Semple since retired from The Times.  [Id. pp. 1-2; Vogt Decl. Ex. 7, Lett Depo 43:5-12, 77:4-13; Vogt Decl. Ex. 6, Cohn Depo 14:19-24];

c.    Linda Cohn ("Cohn"): Editorial Board Member who served "as an editor at the Editorial page since 1988, beating the arrival of the Internet by years [who] worked with Op-Ed columnists, most recently Paul Krugman and Ross Douthat. She retired in November 2017.  [Vogt Decl. Ex. 209, p. 2; Vogt Decl. Ex. 6, Cohn Depo 12:10-14:9, 11:20-12:2];

d.    Nick Fox ("Fox"):  Editorial Board Member who served as an Editor at the Editorial page and had worked for The Times since 1995.  [Vogt Decl. Ex. 209, p. 2; Lett Depo 43:5-12];

e.    Jesse Wegman: Editorial Board Member who joined the board in 2013 and who's expertise included The Supreme Court and Legal Affairs.  [Vogt Decl. Ex. 209, p. 4];

f.    Elizabeth Williamson ("Williamson"):   Editorial Board Member who joined the board in 2015 and focused on National Politics and Congress [Vogt Decl. Ex. 209,  p. 5]

Before joining The Times, Williamson worked as a reporter for the Wall Street Journal's Washington D.C. special projects team, writing features about national politics and the culture of Washington. [Id.]

g.   Eileen Lepping ("Lepping"): Researcher for Editorial Board since 2007, who served as the "main" fact-checker in 2017. [Vogt Decl. Ex. 2, Lepping Depo 18:18-20:15; Vogt Decl. Ex. 7, Lett Depo 28:13-19]

h.   Phoebe Lett ("Lett"): Editorial Board research, administrative, and editorial assistant who performed various administrative tasks and helped fact-check pieces. [Vogt Decl. Ex. 7, Lett Depo 23:17-25:10, 27:4-28:4; Vogt Decl. Ex. 172, Lett Depo Ex. A; Vogt Decl. Ex. 6, Cohn Depo 16:5-7]

175.   Cohn, Lepping, Lett, Bennet, and Fox "were all on the team that took the writing and edited it, fact checked it, had it copy edited, and ready to be published." [Vogt Decl. Ex. 7, Lett Depo 76:19-77:3]

### The Times Professed Journalistic Standards

176.   The Times admittedly holds itself to a higher standard of care with respect to seeking and publishing the truth. [Vogt Decl. Ex. 159, PL Depo Ex. 280 at p. 1 ("Our mission [is] to seek the truth…")]

177.   "The central mission of The New York Times is to help people understand the world by providing them with trustworthy, deeply reported, independent and timely news and information." [Id. at p. 2]

178.   The Times holds itself to "the highest standards of journalistic ethics." [Vogt Decl. Ex. 12, PL Depo Ex. 2 at p. 2]

179.   The Times' adopted standards apply to the newsroom and opinion section alike. [Id., PL Depo Ex. 2 at p. 2 ("These guidelines generally apply to all members of the news and editorial departments whose work directly affects the content of the paper…")]

180.     In June 2017, The Times and Bennet were bound by The Times' Ethical Journalism Handbook of Values and Practices for the News and Editorial Departments [Vogt Decl. Ex. 12, PL Depo Ex.  2] and the Guidelines on Integrity [Vogt Decl. Ex. 13, PL Depo Ex. 3; Vogt Decl. Ex. 4, Bennet Depo 70:24-73:12]

181.     When it comes to facts—verifiable pieces of information—editorials are no different than any other article in *The Times*—the Editorial Board's policy is that if something is represented as a fact, it has to be correct.  [Vogt Decl. Ex. 11, PL Depo Ex. 1 at p. 3; Vogt Decl. Ex. 6, Cohn Depo 29:5-10]

182.     The Times' Editorial Department "ensures" facts are correct "[t]he same way the newsroom does, by reporting."  [Vogt Decl. Ex. 11, PL Depo Ex. 1 at p. 2]

183.     The Editorial Board relies upon the news pages of *The Times* (and other papers) for facts to support editorials.  [Vogt Decl. Ex. 11; Vogt Decl. Ex. 2 Lepping Depo 77:11-78:15]

184.     Editorial Board writers have the first and primary responsibility for fact-checking, although they are "backed up" by the editors who edit their editorials, staff researchers and copy editors. [Vogt Decl. Ex. 1, PL DEPO EX 1 at p. 4; Vogt Decl. Ex. 6, Cohn Depo 29:13-31:19; Vogt Decl. Ex. 2, Lepping Depo 25:3-6; Vogt Decl. Ex. 3, Williamson Depo 68:1-6]

185.     With respect to the Editorial at issue in this case, Bennet was responsible for fact-checking the portions he re-wrote.  [Vogt Decl. Ex. 3, Williamson Depo 67:14-68:6]

186.     The relevant policies governing The Times and Bennet from the Ethical Journalism Handbook (PL DEPO EX 2) provide:

> A.     "DUTY TO READERS":  "In print and online, we tell our readers the complete, unvarnished truth as best we can learn it.  It is our policy to correct our errors, large and small, as soon as we become aware of them.  [Vogt Decl. Ex. 12 at p. 5]

B.    "FAMILY TIES":  A spouse or companion who runs for public office would obviously create the appearance of conflict for a political reporter or an editor involved in election coverage.  A brother or daughter in a high-profile job on Wall Street might produce the appearance of conflict for a business reporter or editor…To avoid such conflicts, staff members may not write about people to whom they are related by blood or marriage or with whom they have close personal relationships, or edit material about such people or make news judgments about them. [*Id.* at p. 24]

187.    The Guidelines On Integrity provide that "it is imperative that The Times and its staff maintain the highest possible standards" and practice daily journalism which must be "beyond reproach" (PL Depo Ex. 3 at p. 1) including the following specific practices::

a.    <u>Fact Checking</u>: Writers at The Times are their own principal fact checkers and often their only ones…If deadline pressure requires skipping a check, the editors should be alerted with a flag like "desk, please verify," but ideally the writer should double back for the check after filing; usually the desk can accommodate a last-minute repair… [Vogt Decl. Ex. 13 at pp. 2-3]

b.    <u>Corrections</u>:  Because our voice is loud and far-reaching, The Times recognizes an ethical responsibility to correct all its factual errors, large and small…any complaint should be relayed to a responsible supervising editor and investigated quickly.  If a correction is warranted, ***fairness demands that it be published <u>immediately</u>.  In case of reasonable doubt or disagreement about the facts, we can acknowledge that a statement was "imprecise" or "incomplete" even if we are not sure it was wrong.***  [Vogt Decl. Ex. 13 at pp. 3-4 (emphasis added)]

188.    Bennet confirmed he and The Times followed the policies embodied in The Times Ethics Handbook and Guidelines on Integrity in June 2017.  [Vogt Decl. Ex. 4, Bennet Depo 70:24-71:9, 73:6-15; 74:24-75:12]

189.    Bennet also confirmed he was not aware of any situation where a correction was made that involved an issue on which there was reasonable doubt or disagreement about the facts

or where he acknowledged that a statement was imprecise or incomplete.  [*Id.*, Bennet Depo 75:20-76:10]

190.    The Times' correction policy is further explained in its Manual of Style and Usage [Vogt Decl. Ex. 160], which provides:

> **corrections.** Because its voice is loud and far-reaching, The Times recognizes an ethical responsibility to correct all its factual errors, large and small (even misspellings of names), promptly and in a prominent reserved space in the paper.  A correction serves all readers, not just those who were injured or complained, so it must be self-explanatory, tersely recalling the context and the background while repairing the error…If a correction is warranted, it should follow immediately…For the handling of more general lapses (those of fairness, balance and perspective), *see* <u>editor's notes</u>.

191.    Bennet defined an "editor's note" as "usually not a correction of fact—although it can be that as well…corrections are much more our standard way of addressing mistakes that are made in the paper.  And editor's notes tend to be reserved for those occasions, I think, when The Times is addressing a body of work, like the Iraq war coverage."  [Vogt Decl. Ex. 4, Bennet Depo 76:21-77:10]

192.    Following several prominent factual errors by The Times over recent years, The Times recognized the need to slow down and fact-check its work.  [Vogt Decl. Ex. 15, PL Depo Ex. 7 ("Systemic Change Needed After Faulty Times Article," L. Spayd, Dec. 18, 2015); Vogt Decl. Ex. 16, PL Depo Ex. 8 ("*Time, the Enemy*," A. Brisbane, Jan. 15, 2011)]

193.    Bennet likewise held himself to the principle that "a writer must listen carefully, question everybody's assumptions, including his own."  [Vogt Decl. Ex. 112, PL Depo Ex. 191 at p. 2; Vogt Decl. Ex. 4, Bennet Depo 68:2-69:13]

194.     Ultimately, Bennet acknowledged he is responsible for the accuracy of each and every editorial published by *The Times*, particularly the editorials which he authors and edits. [Vogt Decl. Ex. 4, Bennet Depo 13:8-24; Vogt Decl. Ex. 3, Williamson Depo 65:16-68:6]

195.     The Times also publicly pronounced its devotion to "transparency" in its editorial and fact-checking processes ("We should be much more transparent than we were in the past.  We should tell people how we do things.  We should be open about how we make decisions.")  [Vogt Decl. Ex. 157 at p. 2 (quoting Dean Baquet)]

## The Times' Subverts its Principles to Profits

196.     In the digital landscape, The Times operates in a "highly competitive environment where it competes for subscription and advertising revenue with both traditional and other content providers, as well as search engines and social media platforms."  [Vogt Decl. Ex. 159 at p. 11]

197.     In this digital environment, The Times' "ability to compete depends on, among other things, audience engagement, its ability to reach new users, and its visibility on search engines and social media platforms and in mobile app stores."  [*Id*. at p. 11]

198.     As she was being ousted from The Times shortly before the Editorial was published, The Times' Public Editor, Liz Spayd, noted that, "Digital disruption and collapsing business models get all the attention, but the prospect of major media losing its independence, and its influence, ranks equally high among the industry's perils."  [Vogt Decl. Ex. 153 ("The Public Editor Signs Off" at p. 2]

199.     Spayd also recognized The Times' elimination of its Public Editor position showed the paper's move away from "institutional integrity," demonstrated an unwillingness to seriously listen to criticism and doubt the impulses and wisdom of its inner sanctum, and was leading to

"morph[ing] into something more partisan, spraying ammunition at every favorite target and openly delighting in the chaos."  [*Id.* at pp. 2-3]

### The Times Systemic Bias

200.    The Times has a Left-leaning media bias.  [Vogt Decl. Ex. 185]

201.    The Editorial Board and Opinion pages have a Left media bias. [Vogt Decl. Ex. 186]

202.    One review of the Editorial Board found it to be "consistently left" and "could not find even one example of an editorial piece with a Center or Right perspective."  [Id.]

203.    This review concluded:

> [T]he New York Times Editorial Board never writes favorably or sympathetically about the Republican Party, its members and ideas. We found The New York Times Editorial Board engages in some sensationalism around issues, contributing to its Far Left Stance…The New York Times Editorial Board consistently displays a Far Left stance on policies and issues of the day.

[Id.]

204.    In June 2016, when she first took over as The Times' Public Editor, Liz Spayd, wrote about public perception about The Times' bias—which she described as "poison."  [Vogt Decl. Ex. 187, ("*Why Readers See The Times as Liberal*")]

205.    After noting that The Times' coverage "is in fact biased," Spayd called out The Times' "home page…[a]nchoring its top right corner is the Opinion section, which promotes the columns and editorials of its mostly liberal writers."  [Id. at p. 2]   "'Readers know the difference between opinion and news,' you'll often hear.  I'm not sure all do, especially when the website makes neighbors of the two and social platforms make them nearly impossible to tease apart."  [Id.]

206.    Spayd made specific note of "the placement of an editorial calling for gun control on the front page last December, which garnered a record number of comments, was shrill proof of the kind of Times bias they expect."  [Id. at p. 3]

207.    Spayd went on to say, "WHAT'S happening at The Times isn't only about The Times.  It's part of the fracturing media environment that reflects a fractured country.  That in turn leads liberals and conservatives toward separate news sources.  A Pew Research Center survey two years ago found that liberals are flocking to The Times, with 65 percent of its readers possessing political values that were left of center."  [Id. at p. 3]

208.    Spayd concluded with, "Imagine a country where the greatest, most powerful newsroom in the free world was viewed not as a voice that speaks to all but as one that has taken sides…Or has that already happened?"  [Id. at p. 4]

209.    The Times' gun control editorial Spayd mentioned (see Paragraph 206, above), "End the Gun Epidemic in America," was published December 15, 2015.  This Editorial ran on the front page of the newspaper—the first time an editorial has such placement since 1920.  [Vogt Decl. Ex. 188 ("*End the Gun Epidemic in America*"); *see also* Vogt Decl. Ex. 189 ("*Conservatives take shots at New gun control editorial*," T. Kludt, CNN, Dec. 7, 2015, at p. 2 ("The Times generated quite the stir with its Saturday editorial on the "gun epidemic."  It was the first time the newspaper ran an editorial on page one since 1920, when it expressed regret over the nomination of Warren G. Harding")]

210.    The Times and its Editorial Board hold a well-established history of bias concerning Second Amendment rights and gun control, even publishing a book on the subject. [Vogt Decl. Ex. 11, PL Depo Ex. 1 at p. 8; Vogt Decl. Ex. 161, PL Depo Ex. 285 ("*Gun Control:*

*Changing Perspectives*"); Vogt Decl. Ex. 162, PL Depo Ex. 286; Vogt Decl. Ex. 30, PL Depo Ex. 30]

211.    They also have a history of bias against Sarah Palin.  [*See, e.g.,* Vogt Decl. Ex. 17, PL Depo. Ex. 10; Vogt Decl. Ex. 18, PL Depo. Ex. 11]

212.    Hannah Ingber, who was tapped to lead The Times Reader Center shortly before the Palin Editorial was published, once attacked Palin for being a mother while running for Vice President:

> Watching Sarah Palin accept the Republican nomination for vice president, all I could think was that I am so grateful my mother did not run for president or VP while I was a baby.  This is hardly good judgment on Palin's part.
>
> …
>
> But running on a national ticket months after your child was born? Let alone a son who has Downs Syndrome and therefore under the best of circumstances is going to need every last bit of attention. How can one possibly be an involved and nurturing parent while campaigning in such a heated race?
>
> You can be a great mother and work.  But you can't be a great mother and work 80 hours a week.  There is no way you are a great mother if you are not there…

[Vogt Decl. Ex. 170, Ingber Depo Ex. D]

213.    Bennet described Palin as "in over her head," "lacking sufficient preparation," and "polarizing."  [Vogt Decl. Ex. 4, Bennet Depo 133:3-11, 134:14-17]

214.    Within The Times, Gov. Palin was also seen as a convenient target for attacks against conservative policies and a subject likely to spark readership interest, as described by Charles M. Blow in his column "She Who Must Not Be Named" [Vogt Decl. Ex. 19, PL Depo Ex. 12]:

> She was a vice presidential nominee. But she lost. She was the governor of Alaska. But she quit. Now she's just a political personality — part

cheerleader, part bomb-thrower — being kept afloat in part by the hackles of her enemies and the people who admire her resilience in the face of them. The left's outsize and unrelenting assault on her has made her a folk hero. The logic goes that if she's making people on the left this upset, she must be doing something right.

Yet the left continues to elevate her every utterance so that they can mock and deride her. The problem is that this strategy continues to backfire. The more the left tries to paint her as one of the "Mean Girls," the more the right sees her as "Erin Brockovich." The never-ending attempts to tear her down only build her up. She's like the ominous blob in the horror films: the more you shoot at it, the bigger and stronger it becomes.

Yes, she's about as sharp as a wet balloon, but we already know that. How much more time and energy must be devoted to dissecting that? How is this constructive, or even instructive at this point? What purpose does it serve other than inflaming passions to drive viewership and Web clicks?

As Politico's editor in chief, John F. Harris, and its executive editor, Jim VandeHei, very candidly expressed in August: "More traffic comes from an item on Sarah Palin's 'refudiation' faux pas than from our hundreds of stories on the complexities of health care reform or Wall Street regulation." So left-leaning blogs like The Huffington Post plaster pictures of her and her family all over their sites with entries about her latest gaffe or sideswipe. But she's barely mentioned on popular conservative blogs.

The same leftward skew is also true on television. An analysis of CNN, MSNBC and Fox News from Nov. 3 to Dec. 2, using data from ShadowTV, a monitoring service, found that CNN mentioned the name "Sarah Palin" nearly 800 times… Left-leaning MSNBC mentioned it nearly 1,000 times. But Fox News, which employs her, mentioned it fewer than 600 times… People on the left seem to need her, to bash her, because she is, in three words, the way the left likes to see the right: hollow, dim and mean. But since she's feeding on the negativity, I suggest three other words: get over it.

215.    In an increasingly competitive digital media landscape, attacking Gov. Palin in the context of gun control issues was the type of biased, partisan "spraying [of] ammunition at [a] favorite target and openly delighting in the chaos" [Vogt Decl. Ex. 153 ("The Public Editor Signs Off")] attack Blow recognized scores political points with readers and stirs controversy to drive

viewership and bring an economic benefit to The Times' business.  [Vogt Decl. Ex. 19, PL Depo Ex. 12]

216.     On the flip side, Bennet acknowledged he has never called out the Left for employing the same type of "rhetoric," images, and terminology he attacked Gov. Palin for using. [Vogt Decl. Ex. 4, Bennet Depo 101:10-102:3; 102:11-103:10, 106:9-120:8; Vogt Decl. Ex. 129, 130, 131, 133, PL Depo Ex. 216, 216(A), 217, 220]

217.     Bennet's bias runs so deep he does not consider the following graphics posted by the DCCC and DLC to be "incitement" or the same thing as Palin's Map [Vogt Decl. Ex. 4, Benet Depo. 114:16-118:7]:





**<u>The Times Marketed Itself on the Promise to Tell the Truth</u>**

218.     Following the 2016 election of Donald Trump, The Times pledged to rededicate itself to accurate reporting and publishing "the complete, unvarnished truth as best we can learn it." [Vogt Decl. Ex. 118, PL Depo Ex. 201A]

219.     This supposed rededication to accuracy coincided with The Times' new advertising campaign, "The Truth Is Hard," which debuted at the Academy Awards in February 2017.  [Vogt Decl. Ex. 150]

220.     Bennet promoted this "Truth" advertising campaign on his personal Twitter account.  [Vogt Decl. Ex. 158]

221.    Among other things, this advertising campaign included merchandise marketed to children, such as its Truth poster, and on shirts, buttons and mugs.  [Vogt Decl. Ex. 152]

222.    Through its Truth campaign, The Times used its commitment to publishing the "Truth" to convince the public to buy subscriptions: "Support fact-based journalism" by subscribing to The Times, while professing "Truth. It has no alternative… it comes at a cost… [and]… It's hard to find. But easier with 1,000+ journalists looking."  [Vogt Decl. Ex. 151, PL Depo. Ex. 254]

223.    The Times prominently featured its advertisements, such as "The Truth is more important now than ever." on billboards in Manhattan [Vogt Decl. Ex. 14, PL Depo Ex. 6 at p. 2]

224.    The Times' Truth campaign worked; earning 5.12 billion impressions, $16.8 million in media value, won more subscribers for The Times in 24 hours than the paper had gained in the preceding 6 weeks, and launched The Times to record subscription growth in 2017 (passing 2 million digital-only subscribers in the second quarter of 2017, a first for any news organization. [Vogt Decl. Ex. 190 ("*The New York Times 'Truth' Campaign Drives Digital Subscriptions*"); Vogt Decl. Ex. 207 (NYT Quarterly Reports)]

### The Times' Hypocrisy

225.    *In practice*, while drastically increasing profit on the promise of purveying Truth, The Times and its Editorial Board were plagued by factual errors they openly recognized but internally never implemented institutional changes to correct:

        a.    No changes were implemented after The Times acknowledged its major errors in covering the Loughner shooting Vogt Decl. Ex. 16, PL Depo. Ex. 8; Vogt Decl. Ex. 8, Douthat Depo 59:3-23];

        b.    No changes were implemented after Liz Spayd noted the need for "systemic change" to address failure of sufficient skepticism at every level of the reporting and editing

process."  [Vogt Decl. Ex. 15, PL Depo Ex. 7; Vogt Decl. Ex. 2, Lepping Depo 31:4-33:11];

c.     No changes were implemented by Bennet when, shortly before the subject Editorial was published, Bret Stephens (a controversial columnist hired by Bennet) published a climate change column that was widely criticized for factual inaccuracies, so much so The Times' own reporters and news editors immediately denounced it on Twitter.  [Vogt Decl. Ex. 14, PL Depo Ex. 6 *("The NY Times promised to fact check their new climate denier columnist – they lied,"* J. Room, *Think Progress*); Vogt Decl. Ex. 4, Bennet Depo 222:9-223:3; Vogt Decl. Ex. 6, Cohn Depo 30:20-31:9; Vogt Decl. Ex. 2, Lepping Depo 27:19-24]

226.    *In practice*, The Times and Bennet have been anything but "transparent" when it comes to Bennet's errors:

a.     Williamson was forced to remove post critical of another Editorial Board hire from her personal social media page [Vogt Decl. Ex. 3, Williamson Depo 110:22-115:22; Vogt Decl. Ex. 90, 55, 56, 57 (PL Depo Ex. 158, 69B, 69C, 69D)].

b.     At the same time, Bennet issued a company-wide memo instructing all staff to "criticize our work privately." [Vogt Decl. Ex. 58, PL Depo Ex. 70; Vogt Decl. Ex. 3, Williamson Depo 116:18-124:4; Vogt Decl. Ex. 4, Bennet Depo 236:3-237:8]

c.     Soon after that, Bennet got "upset" about a transcript of a meeting with staffers being "leaked" because "[h]e didn't realize that [he] was on the record and it was going to be shared…when you talk to journalists and it's off the record, they respect that…in this case they didn't."  [Vogt Decl. Ex. 93, PL Depo Ex. 161; Vogt Decl. Ex. 4, Bennet Depo 214:7-215:8]

### The Ultimate Hypocrisy—The Times' True Mission

227.    Although The Times and Bennet outwardly profess their "mission" to tell the Truth and reaped the financial rewards of positioning themselves as such, *in practice*, behind closed doors, the directives were much different: stir controversy to drive readership and revenue—an

objective confirmed by A.G. Sulzberger when he commended Bennet for "ensuring [his] editorial strategy is advancing our company strategy." [Vogt Decl. Ex. 4, Bennet Depo 220:17-221:10]

228. Among other things, Sulzberger lauded Bennet for his hiring of Michelle Goldberg, Brett Stephens, and Bari Weiss. [Vogt Decl. Ex. 4, Bennet Depo 221:11-20]

229. Sulzberger also told Bennet to "move faster, take bigger risks, and play more aggressively outside your lanes." [Vogt Decl. Ex. 4, Bennet Depo 216:10-218:8, 219:10-20] He also told Bennet he wanted "more" of what occurred in 2017, instructing Bennet to "[a]sk for forgiveness, not permission…[because] you enjoy much more autonomy and a much bigger tolerance for risk…[which] should give you the blessing to move faster or to make changes that are more disruptive," and also told him to "play outside you lanes a bit more often". [Id.]

230. Bennet's implementation of his and The Times' true mission, consistent with Sulzberger's directives,  is apparent from numerous controversies during Bennet's  tenure at The Times:

      a.  Bret Stephens hiring was very controversial and resulted in several factually inaccurate columns that garnered significant attention and had to be corrected. [Vogt Decl. Ex. 4, PL Depo Ex. 6; Vogt Decl. Ex. 4, Bennet Depo 221:5-222:16, 223:4-224:15];

      b.  Michelle Goldberg was another controversial Bennet hire who wrote a book review the day she was hired that was plagued with factual errors for which a correction had to be issued. [Vogt Decl. Ex. 128 ("The Opinionator"); Vogt Decl. Ex. 4, Bennet Depo 226 :6-227 :20]

      c.  Bari Weiss was another very controversial Bennet hire involved in several controversies and factual errors. [Vogt Decl. Ex. 53, PL Depo Ex. 69; Bennet Depo 227:21-228:8]]

      d.  Bennet "hired" Quinn Norton but she never actually started working in the opinion department after public outrage over her "pattern of tweeting activity" Bennet begrudgingly admitted was

"racist" led to Bennet's employment offer being "rescinded." [Vogt Decl. Ex. 54, 93 (PL Depo Ex. 69A, 161); Vogt Decl. Ex. 4, Bennet Depo 228:10-230:17];

e.   Bennet also stoked controversy by hiring Sarah Jeong, who like Quinn Norton had a pattern of tweeting activity deemed by many to be "racist," although her employment offer was not rescinded because her tweets were directed at white people.   [Vogt Decl. Ex. 90, 55, 56, 57 (PL Depo Ex. 158, 69B, 69C, 69D); Vogt Decl. Ex. 4, Bennet Depo 230:18-231:15]

f.   Bennet's tenure was also marked with publishing controversial pieces by the likes of Louise Mensch and Erik Prince [Vogt Decl. Ex. 128; Vogt Decl. Ex. 4, Bennet Depo 232:15-235:5]

## **James Bennet**

231.   Bennet is an extremely intelligent individual with an excellent memory. [Vogt Decl. Ex. 4. Bennet Depo 30:20-31:9; Vogt Decl. Ex. 2, Lepping Depo 27:19-24; Vogt Decl. Ex. 6, Cohn Depo 155:25-157:9; Vogt Decl. Ex. 3, Williamson Depo 103:10-20]

232.   Bennet was born to privilege and raised in a family with a strong Democrat tradition:

a.   Bennet's grandfather was an aid to Connecticut Governor and congressman Chester Bowles and served as an economic adviser in the Roosevelt Administration [Vogt Decl. Ex. 191 at p. 2; Vogt Decl. Ex. 192]

b.   Bennet's father was a Washington insider with an esteemed career in politics, journalism, and the educational field, including: serving as an assistant to Ambassador Bowles in the 1960s; running for Congress in 1970s serving in 1967-1968 as an assistant to Vice President Humphrey; serving as Assistant Secretary of State for Legislative Affairs in 1977-1979; running the U.S. Agency for International Development 1979-1981; serving as Assistant Secretary of State for International Organization Affairs in 1993-1995   for   the Clinton administration; serving as President of NPR from 1983-1992; and serving as President of Wesleyan University from 1995-2007  [Id.]

c.   Bennet's brother, Michael F. Bennet, received his J.D. from Yale Law School, after which he clerked for the 4th Circuit Court

of Appeals and  as Counsel to the Deputy Attorney General in the Clinton Administration, and later served in the Clinton White House.  He is currently the senior Democratic Senator for Colorado—a position to which he was appointed in late 2009. He was also  national co-chair of President Obama's re-election campaign. [Vogt Decl. Ex. 195; Vogt Decl. Ex. 113; Vogt Decl. Ex. 194; Vogt Decl. Ex. 195]

233.    From his father, Bennet was instilled with a passion for "civility" in discourse. [Vogt Decl. Ex. 191 at p. 4 (describing Douglas Bennet's banning of "chalking at Wesleyan University because it did not "meet the civility test."); Vogt Decl. Ex. 4,  Bennet Depo 123:12-124:5]

234.    While his father excelled as a Washington elite, Bennet shined at the prestigious St. Albans School in Washington D.C. and at Yale, before interning for Sen. Tom Eagleton.  [Vogt Decl. Ex. 4, Bennet Depo 25:17-27:15, 28:3-7; Vogt Decl. Ex. 196]

235.    Bennet began his career in journalism working as an intern for The News & Observer and The New Republic.  [Vogt Decl. Ex. 4, Bennet Depo 27:19-25, 28:8-29:9]

236.    Early in his career, Bennet spent 15 years working for The Times in several roles, including as its' Detroit bureau chief, White House correspondent and Jerusalem bureau chief. [Vogt Decl. Ex. 4, Bennet Depo 35:13-23, 38:18-39:11]

237.    From 2006 to 2016, Mr. Bennet served as Editor-In-Chief of The Atlantic.  [Vogt Decl. Ex. 4, Bennet Depo 41:12-42:11, 64:9-13]

238.    Mr. Bennet returned to The Times as its Editorial Page Editor in April 2016 [Vogt Decl. Ex. 4, Bennet Depo 64:9-13].

239.    Bennet's family's prominence in the Democratic "establishment" is well-known; even chronicled in 2019 by the Washington Post in "*Can the Bennet Brothers save the*

*Establishment?*" in which Bennet and his brother  are described as an "*Anti-Trump Dynasty*." [Vogt Decl. Ex. 196, PL Depo Ex 159; Vogt Decl. Ex. 4, Bennet Depo 59:10-61:9, 35:24-38:17]

## The Bennet Brothers' Close Connection

240.    Bennet is extremely close with his brother, and editing speeches for him and traveling with him for the last 2 weeks of his 2010 Senate campaign.  [Vogt Decl. Ex. 4, Bennet Depo 62:3-63:18]

241.    In fact, attacks on his family are a "trigger" for Bennet, known to send him into "fit[s] of rage."  [Vogt Decl. Ex. 191, PL Depo Ex. 159; Vogt Decl. Ex. 4, Bennet Depo 59:10-60:21]  Although Bennet denies the facts reported in the Washington Post story, he concedes he read the story when it came out and never asked for a correction and refused to be interviewed for the piece, while acknowledging his lack of knowledge of human resources complaints lodged against him.  [Id.]  In the past, Bennet has asked other media outlets for corrections where he has read stories about him that were inaccurate.  [Vogt Decl. Ex. 4, Bennet Depo 66:15-24]

242.    Sen. Bennet was running for re-election in 2010 when Gov. Palin's political action committee posted a map of targeted electoral districts (the "Palin Map"), including two districts in Sen. Bennet's home state.  [Vogt Decl. Ex. 4, Bennet Depo 63:13-24; Sullivan Decl. Ex. 34; Sullivan Decl. Ex. 38 (Mar. 23, 2010 post with map)]

243.    The two incumbent Colorado lawmakers whose districts were depicted on the Palin Map, Reps. John Salazar and Betsy Markey, endorsed Sen. Bennet during his 2010 Democratic primary. [Vogt Decl. Ex. 175 (Palin 4571-4577)]

244.    On January 6, 2011—two days before the Loughner Shooting—a man called Sen. Bennet's offices and threatened to "come down there and shoot you all."  Following

additional threats, the man was arrested (two days after the Loughner Shooting).  The FBI even placed additional security at Sen. Bennet's home and Denver office. [Vogt Decl. Ex. 77]

245.    Bennet knew about the threats made against his brother surrounding the Loughner Shooting, which were also reported by The Atlantic in an article also disclosing the family connection between Bennet and his brother.  [Vogt Decl. Ex. 4, Bennet Depo 145:5-146:14; Vogt Decl. Ex. 77]

246.    Sen. Bennet, like James, became an outspoken advocate for gun control; even giving a floor speech on gun control on  June 15, 2016, joining 30 of his Democratic colleagues for a filibuster about gun laws following the Pulse Nightclub shooting. [Vogt Decl. Ex. 11, PL Depo Ex. 190] Sen. Bennet's floor speech occurred *the same day* James Bennet's Editorial Board published an editorial about the Pulse Nightclub shooting [Vogt Decl. Ex. 164, PL Depo Ex. 286] and was circulating drafts of a book about political rhetoric and Sarah Palin.  [Vogt Decl. Ex. 122, PL Depo Ex. 208]

247.    Sen. Bennet was even endorsed by Rep. Gabrielle Giffords' PAC, Americans for Responsible Solutions, a gun control political action committee. [Vogt Decl. Ex. 110, PL Depo Ex. 189]  .

248.    Bennet's editorial department at The Times is no stranger to Giffords PAC.  Thwey regularly received emails from Giffords PAC and used its website as a resource for conducting research in support of their gun control positions.  [Vogt Decl. Ex. 24; Vogt Decl. Ex. 2, Lepping Depo 86:14-88:4; Vogt Decl. Ex. 61, 62, 63 (PL Depo Ex. 74, 74(A), 74(B))]

249.    Gun control was also an important issue for James Bennet "personally."  [Vogt Decl. Ex. 4, Bennet Depo 165:5-7], one he even hosted a gun control forum attended by Gabby

Giffords and Mark Kelly (Americans for Responsible Solutions), who spoke about gun control. [Vogt Decl. Ex. 114, PL Depo Ex. 195; Vogt Decl. Ex. 4, Bennet Depo 169:7-171:10]

250.    Simply stated, Bennet is as an extremely-intelligent, highly-educated journalist with an excellent memory who spent his career serving as a reporter and  editor-in-chief working in a field that requires him to remember facts and have an exceptional grasp over the English language, and who has a strong personal connection to political rhetoric, civility, gun control, and threats of gun violence against politicians.  (*See* Paragraphs 231-249, above).

### Bennet's History of Trolling

251.    According to The Times, a "troll is a figure who skips across the web, saying whatever it takes to rile up unsuspecting targets, relishing the chaos in his wake and feasting on attention, good or bad."  [Vogt Decl. Ex. 163, "*How the Trolls Stole Washington,*" A. Hess, *New York Times*, Feb. 28, 2017 at p. 1], much in the same way Liz Spayd recognized *The Times* was "morph[ing] into something more partisan, spraying ammunition at every favorite target and openly delighting in the chaos."  [Vogt Decl. Ex. 153, PL Depo Ex. 256 at pp. 2-3]

252.    Bennet began his career interning at *New Republic*, where his mentors included Andrew Sullivan.  [Vogt Decl. Ex. 112, PL DEPO EX 191 at p. 2 (noting A. Sullivan as oner of Bennet's "mentors"); Vogt Decl. Ex. 4, Bennet Depo 28:16-29:16]

253.    Bennet "learned a lot from [Sullivan] over the years," including Sullivan's controversial, polemic, polarizing style, and how people were drawn to that kind of work—even those who disagreed—leading to success in digital media.  [Vogt Decl. Ex. 4, Bennet Depo 29:11-33:15]

254.    Once Bennet took over at *The Atlantic*, he hired Sullivan to help transform The Atlantic from a print to digital first publication – where Bennet reaped the rewards of Sullivan's

controversial, polarizing, polemic style, even being named Editor of the Year in 2009 after the addition of Sullivan increased The Atlantic's traffic by 50% (1 million to 2 million unique visitors). [Vogt Decl. Ex. 4, Bennet Depo 56:20-57:19]

255.    Bennet remembers Sullivan writing posts about Sarah Palin while he was working for The Atlantic ("I recall he was quite critical of her").  [Vogt Decl. Ex. 4, Bennet Depo 53:20-54:16]

256.    Sullivan's most well-known controversy that drove traffic for *The Atlantic* under Bennet's tenure was "Trig-Trutherism," an ongoing campaign against Sarah Palin maintaining she is not actually the mother of her son with Down syndrome, Trig.  [Vogt Decl. Ex. 78, 79, 80; Vogt Decl. Ex. 4, Bennet Depo 55:25-56:19]

257.    While working at *The Atlantic* for Bennet, Sullivan even once said of Palin:  "Do not under-estimate the appeal of a beautiful, big breasted, divinely chosen warrior-mother as a military leader in a global religious war."  [Vogt Decl. Ex. 109, PL Depo Ex. 187 ("*Sarah Palin's Breasts and Andrew Sullivan*")]

258.    Not surprisingly, fellow journalists began to notice "Bennet's propensity toward trolling, which was noticed during his tenure at *The Atlantic*, seemed to be based on the following premise:  We are too divided to convince each other of the truth, so all we can do is entertain each other with outrageous opinions."  [Vogt Decl. Ex. 197 ("*America Is Fracturing—and So Is 'The New York Times*'")]

259.    As The Times was in the midst of its transformation to a digital-first platform, it hired Bennet because of his success using these methods to drive traffic at *The Atlantic*.  [Vogt Decl. Ex.4, Bennet Depo 219:23-221:10]

260.     A number of Bennet's peers, some of whom once worked for him, have noted Bennet's propensity for trolling continued at The Times.  [Vogt Decl. Ex. 198, "*Opinion: Trolling is Not Opinion*," L. Finnegan, Aug. 30, 2017 at p. 2 (Bennet "loves to troll, and position his writers as martyrs for their bad opinions…the controversial pieces the Opinion section runs under the auspices of fomenting some sort of 'conversation' are done so disingenuously.  The Times is not furthering useful conversation with these bad and wrong op-eds, it is spraying its readers in the eyes with tear gas and then asking them why they are screaming…[which] is particularly egregious when you consider that, post-Trump, the Times has widely marketed itself as a crusader for capital-T Truth and an essential component of a healthy democracy."); Vogt Decl. Ex. 199, "*How Bret Stephens and Bari Weiss have taken the NY Times' campus concern trolling to new heights in just 2 ye*ars," P. Holloy, Media Matters; Vogt Decl. Ex. 200, "*Why are Newsweek and The New York Times using troll tactics for clicks?*" A. Nichols, The Outline, Nov. 29, 2017 at p. 3, 5 ("The insidious trend in which influential news organizations promote the most incendiary part of an otherwise milquetoast article on social media has unfortunately become the norm.  It's like clickbait, but more irritating and less profitable.  The New York Times, our most august defender of democracy, uses this strategy in what is either the most cynical or most idiotic of ways...The objective, it seems, is to provoke liberals into momentarily thinking about The New York Times by any means necessary.  Acting out for attention—this is the logic of children.  Every so often, these attempts to troll readers actually drive some traffic")]

261.     In "*The Opinionator*," Jason Linkins (*The Baffler*) outlines in detail Bennet's tenure of "trolling" at The Times.  [Vogt Decl. Ex. 128 at pp. 9-14]

262.     As set forth above under the guise of "expanding voices," Bennet often stirred controversy by hiring writers like Bret Stephens [Vogt Decl. Ex. 14, PL Depo Ex. 6; *see also* Vogt

Decl. Ex. 201 ("New York Times Promises Truth and Diversity, Then Hires Climate-Denying Anti-Arab White Guy," Z. Jilani, The Intercept, Apr. 14, 2017)], Bari Weiss [Vogt Decl. Ex. 128 at p. 9-10; see also Vogt Decl. Ex. 199 (*How Bret Stephens and Bari Weiss have taken the NY Times' campus concern trolling to new heights in just 2 years*")], Michelle Goldberg [Vogt Decl. Ex. 128 at p. 14]; Quinn Norton [Vogt Decl. Ex. 53-54 (PL Depo Ex.69, 69(A))]; see also Vogt Decl. Ex. 202 (*New York Times writer fired just hours after being hired*" J. Tacopino, *New York Post*, Feb. 14, 2018)] and Sarah Jeong [Vogt Decl. Ex. 53, 55, 56, 57, 90 (PL Depo Ex. 69, 69(B), 69(C), 69(D), 158) ("Sarah Jeong and the N.Y. Times: When Racism is Fit to Print," A. Sullivan, New York Magazine, Aug. 3, 2018; see also Vogt Decl. Ex. 203 (*Newest Member of NYT Editorial Board Has History of Racist Tweets*," J. Crowe, National Review, Aug. 2, 2018)].

## The Lessons of the Loughner Shooting Coverage

263.    Members of the media, including The Times, rushed to blame Sarah Palin and others for Jared Loughner's January 8, 2011 shooting in Tucson Arizona; first among them The Times' Paul Krugman.  [Vogt Decl. Ex. 103, PL Depo Ex. 181(A) ("Assassination Attempt In Arizona," P. Krugman, NYT Opinion, Jan. 8, 2011 at 3:22 p.m. ("We don't have proof yet that this was political, but the odds are that it was…"; Vogt Decl. Ex. 104 ("Climate of Hate," P. Krugman, NYT, Jan. 9, 2011; Vogt Decl. Ex. 38, PL Depo Ex. 38 (Douthat email string with Bennet stating, "people assumed a link initially—there was a Paul K[rugman] column that was particularly vivid in blaming Republicans—but the investigation debunked it."; Vogt Decl. Ex. 74, PL Depo Ex. 123 (*Caldwell's Unfairness*," discussing Krugman's "leap" to linking Loughner to Palin map; Vogt Decl. Ex. 102, PL Depo Ex. 181 (*We Don't Have Proof Yet*" J. Taranto, WSJ, Jan. 10, 2011)]

264.     However, a well-known consensus was reached shortly after Loughner's shooting that it was not connected in any way to the map circulated by Plaintiff's PAC.  [Vogt Decl. Ex. 30, PL Depo Ex. 30 at pp. 19-21 ("As We Mourn," NYT Editorial, Jan. 12, 2011 (recognizing President Obama's statement during Loughner shooting memorial service that "If, as has been discussed in recent days, their death helps usher in more civility in our public discourse, let us remember it is not because a simple lack of civility caused this tragedy—**it did not not**"…; and noting Palin's position that "journalists and pundits" had committed a "blood libel")); Vogt Decl. Ex. 106, PL Depo Ex. 182 ("*It Did Not*," J. Taranto, WSJ, Jan. 13, 2011 (noting how "New York Times's response to last weekend's murders in Tucson was to instigate a witch hunt against Republican politicians, and how "[w]ith those three truthful words—an improvisation or a late addition, as they were not in the prepared text—[President Obama] rebuked the out-of-control liberal media that have, under the leadership of the New York Times, been engaging in a vicious campaign of lies and smears.")); Vogt Decl. Ex. 74, PL Depo Ex. 123 ("*Caldwell's Unfairness*," asking for correction from Financial Times for Caldwell's article accusing Andrew Sullivan of "linking" Loughner shooting to Palin map; Vogt Decl. Ex. 105 ("*Massacre, followed by libel*," C. Krauthhammer, Washington Post, Feb. 26, 2011 ("Not only is there no evidence that Loughner was impelled to violence by any of those upon whom Paul Krugman, Keith Olbermann, the New York Times, the Tucson Sheriff and other rabid partisan as fixated.  There is no evidence that he was responding to *anything*, political or otherwise, outside of his own head."); Vogt Decl. Ex.  107, ("Sarah Palin Is Right About 'Blood Libel'," Rabbi Shmuley Boteach, WSJ. Jan. 14, 2011 ("Sarah Palin has every right to use ['Blood Libel'].  The expression may be used whenever an amorphous mass is collectively accused of being murderers or accessories to murder.")]

265.    The Times, The Atlantic (while Bennet was at its helm), Wall Street Journal, and Washington Post—all of which Bennet was "regularly reading" for his news in 2011—were among the major news outlets confirming *within days* of Loughner's shooting that it was not linked to incitement, Palin or the map in any way.  [Vogt Decl. Ex. 4, Bennet Depo. 103:25-104:10; Vogt Decl. Ex. 74, PL Depo Ex. 123 ("*Caldwell's Unfairness*"—The Atlantic/Dish), Vogt Decl. Ex. 83, ("*Was the Shooting of Rep. Giffords Political?*"—The Atlantic/Wire), Vogt Decl. Ex. 84 ("*Did Sarah Palin's Target Map Play Rile in Giffords Shooting?*"—The Atlantic/Wire), Vogt Decl. Ex. 85 ("*What We Know About Jared Lee Loughner*"—The Atlantic/Wire), Vogt Decl. Ex. 86 "*Stop the Blame Game*"—The Atlantic), Vogt Decl. Ex. 87 ("*The More We Know*"—The Atlantic/Dish), Vogt Decl. Ex. 88 ("*Ten Days That Defined 2011*"—The Atlantic/Wire); Vogt Decl. Ex. 16, PL Depo Ex. 8 ("*Time, the Enemy*"—NYT), Vogt Decl. Ex. 50 ("*The Tucson Witch Hunt*"—NYT), Vogt Decl. Ex. 51("*Suspect's Odd Behavior Caused Growing Alarm*"—NYT), Vogt Decl. Ex. 52 ("*Looking Behind the Mug-Shot Grin*"—NYT); Vogt Decl. Ex. 102 ("*We Don't Have Proof Yet*"—WSJ), Vogt Decl. Ex. 106 ("*It Did Not*"—WSJ); Vogt Decl. Ex. 105 ("*Massacre, followed by Libel*"—WaPo); Vogt Decl. Ex. 80 ("*The Bogus Claim that a map…*")].

266.    In fact, The Times wrote about how the media's rush to judgment in blaming Gov. Palin for Loughner's actions should be a teaching moment—an example of how the media's bias and "storytelling habits" led them to falsely accuse Gov. Palin of inciting the shooting when it became known fairly quickly that Loughner was not motivated by anything Gov. Palin said or did. [Vogt Decl. Ex. 18 ("*Time, the Enemy*") ("The Times had a lot of company [in the "egregious rush to judgment in the Times coverage of the Arizona shooting"], as news organizations, commentators and political figures shouldered into an unruly scrum battling over whether the political environment was to blame.  Meanwhile, opportunities were missed to pick up on

evidence—quite apparent as of early the first day—that Jared Lee Loughner, who is charged with the shootings, had a mental disorder and might not have been motivated by politics at all."))]  In relevant part, The Times' said:

> The Tucson shootings afforded another, quite different illustration of the pressure of time in news coverage — not pressure measured in seconds and minutes, but pressure that news organizations feel to define the context of a story, to set up a frame for it, sometimes before the facts can be fully understood.
>
> The Times's day-one coverage in some of its Sunday print editions included a strong focus on the political climate in Arizona and the nation. For some readers — and I share this view to an extent — placing the violence in the broader political context was problematic.
>
> C. Wenk, a reader in Alexandria, Va., criticized "an egregious rush to judgment in the Times coverage of the Arizona shooting, specifically aimed at linking the shooting to various conservative or Republican political rhetoric."
>
> So why does a story get framed this way? Journalism educators characterize this kind of framing as a storytelling habit — one of relating new facts to an existing storyline — and also as a reflex of news organizations that are built to handle some topics well, and others less well.
>
> Jerry Ceppos, dean of the journalism school at the University of Nevada, Reno, said journalists' impulse to quickly impose a frame on a story is "genetic."
>
> "Journalists developed automatic framing protocols generations ago because of the need to report quickly," he said. "Today's hyper-deadlines, requiring journalists to report all day long and all night long, made that genetic disposition even more dominant."

Still, I think the intense focus on political conflict — not just by The Times — detracted from what has emerged as the salient story line, that of a mentally ill individual with lawful access to a gun.

Whether covering the basic facts of a breaking story or identifying more complex themes, the takeaway is that time is often the enemy. Sometimes the best weapon against it is to ignore it, and use a moment to consider the alternatives.

267.     Bennet was well-aware of the problem of "framing," specifically in the context of the Loughner shooting coverage, from his time at The Atlantic.  [Vogt Decl. Ex. 138, 139]  On January 12, 2011, the editor of The Atlantic's website, Bob Cohn, forwarded Bennet a potential story by Jim Sleeper, a writer and "lecturer in political science at Yale, [who] teaches a course in Journalism, Liberalism, and Democracy."  [Vogt Decl. Ex. 138 at p.1, 5; Vogt Decl. Ex. 4, Bennet Depo 135:10-136:9]  In this email Bennet received were links to sources Sleeper cited, the first of which is to an article by T.A. Frank in the New Republic, "How the Media Botched the Arizona Shooting."  [Vogt Decl. Ex. 138 at p. 2; Vogt Decl. Ex. 139]

268.     The T.A. Frank article Bennet received on January 14, 2011 [Vogt Decl. Ex. 139] provides in pertinent part:

When disaster strikes, journalists have to write something about it—and write it fast. That means they have to take mental shortcuts, calling up established narratives and laying them out like old wrapping paper for new and more ambiguous facts. (Wife poisons husband. Revenge killing? Money killing? Self-defense killing? We stand at the ready with a lot of templates.) While the resulting gift isn't always pretty, it's generally good enough for deadline work.

But sometimes the shortcuts produce a journalistic stampede at the worst possible time. That's what happened last weekend, when 22-year-old Jared Lee Loughner shot six people to death at an Arizona Safeway and gravely wounded many more, including Democratic Congresswoman Gabrielle Giffords. The dominant storyline in the press—one that persisted in the face of all the facts —was that right-wing hysteria and lunacy had given rise to Loughner's atrocity. Only on Wednesday night, when President Obama delivered a speech that effectively told everyone to cut it out, was the stampede halted (one hopes). But it's still worth reviewing how the nation's leading periodicals descended into such mindlessness.

So why did the press go so far astray this week? How did many fine, otherwise fair-minded journalists allow their judgment to become so clouded? Let's venture briefly—and hopefully not too speculatively, lest I be accused of double standards—into the realm of cognition. Organizational theorists such as Karl E. Weick, a professor of psychology at the University of Michigan Business School, have researched how we react to unexpected events. In his 1995 book *Sensemaking in Organizations*, Weick notes that we humans automatically categorize what we encounter, ushering messy new complexities into tidier established categories ("myths, metaphors, platitudes, fables, epics and paradigms," to be precise). When something bad and inexplicable takes us by surprise, our brains reach for the handiest existing narratives, and accuracy falls by the wayside in favor of simple plausibility. "The stories are templates," writes Weick. "They are products of previous efforts at sensemaking. They explain. And they energize."

Contributing to such tendencies are the habits of newsrooms. In their 1989 book *How Do Journalists Think?*, S. Holly Stocking and Paget H. Gross note that a typical reporter launches into a story with an investigative hypothesis, one that is often bolstered during the reporting process by "confirmation bias." Only with great reluctance—in the face of overwhelming evidence to the contrary—is such a hypothesis normally discarded. Added to that is the weakness that competing hypotheses are tested one at a time, so that alternative explanations for the same data points are almost never considered simultaneously. "For example," write the authors, "if one is testing a theory about the negative impact of feminism on women's lives, one is unlikely also to test theories about its positive impact."

At this point, however, a reader might reasonably ask why, in this case, launching into a discussion of political hysteria was such a bad thing. If the shootings in Arizona can serve as a springboard for discussing a significant, if not necessarily related, societal menace, why not let them do so? After all, much of the right truly has become unhinged.

Well, yes, but let's remember that the deaths caused by Jared Loughner were preventable. There were concrete things that could have been done and that we now should do. Some people think we should place more restrictions on gun ownership. Some think we should provide more security services to members of Congress. Some think we should have improved mental-health resources. Such solutions may be wise or foolish, but the point is that they are directly relevant to the tragedy of last weekend.

By focusing on explanations that are abstract and speculative and only indirectly related, however, we risk losing sight of the crucial and immediate questions at hand. For instance, when Congressman James Clyburn was interviewed by NPR about the shootings, Clyburn followed the lead of all the major news outlets and focused almost entirely on "the discourse around the political arena," suggesting a reexamination of the Fairness Doctrine. In short, Clyburn largely ignored a real problem while pledging to focus on an imagined one. That is the danger here.

In 1911, a fire at the Triangle Shirtwaist Factory in New York killed 146 garment workers, most of them women and immigrants. Fortunately, the outrage that followed it went in a healthy direction, resulting in new federal workplace safety laws. This was a lot more helpful than essays blaming the fire on misguided ideals of femininity. There's a place for speculation and supposition, of course. But not a big place, and not for long. It's well past time for journalists to move on from what we *don't* know about the causes of last weekend's tragedy and grapple seriously with a great deal that we now *do* know—even if, God forbid, it means we'll have to abandon our hypotheses.

**Bennet's  Knowledge of No Palin/Loughner Link Before the Scalise Shooting**

269.    Bennet had actual knowledge the "Media Botched the Arizona Shooting" by "reaching for the handiest existing narratives" to conclude a link existed between Plaintiff and Loughner's shooting—the very same "framing" concept The Times warned against in the context of its own false reporting surrounding the Loughner shooting.  [Vogt Decl. Ex. 4, Bennet Depo 137:15-139:3; Vogt Decl. Ex. 139; Vogt Decl. Ex. 16 (PL Depo Ex. 8)]

270.    The same problem was addressed in another article posted on The Atlantic's website three days after the Loughner shooting, while Bennet was at its helm—"*Stop the Blame Game*" [Vogt Decl. Ex. 86, PL Depo. Ex. 150]:

> I'm not a media critic and never will be, but this has not been a shining 48 hours for my profession. Following the shooting that left Rep. Gabrielle Giffords, D-Ariz., gravely wounded and six bystanders murdered at a Tucson shopping center, the media have spent as much time trying to assign political blame for the cause of the shooting as they have trying to unearth facts. As it turns out, the murderer is a mentally unstable individual, with no coherent political ideology.

> And in the aftermath of the Tucson shooting, the media's worst tendencies were on display, from the onset of the crisis when several outlets inaccurately reported that Giffords had died, to the immediate, unwarranted assumption that the killer was associated with the tea party.

71

It's becoming increasingly clear that overheated political vitriol played virtually no role in Jared Lee Loughner's shooting spree. His political thinking is hardly coherent, and his obsession with Giffords predated the tea party and Sarah Palin's emergence in national politics. One of his few close friends told Mother Jones that he became fixated on the congresswoman when he asked her a question at a 2007 town hall about "the government having no meaning" and felt she didn't answer. His killing spree wasn't motivated by disagreement with her positions on health care or immigration.

The other lesson learned from the coverage of this awful tragedy is that it's better to be right than first -- a challenge in a journalism culture that increasingly rewards speed over substance. In the rush to break news as the crisis unfolded, several major media outlets inaccurately reported that Giffords had died. Others later inaccurately reported that Giffords was speaking after her surgery on the day of the attack. It raises questions about news organizations' standards for what's allowed on air or online.

Those standards have been in decline, and go beyond reporting inaccurate information. Far too often, we give serious leeway for sources to anonymously attack their opponents. It makes for sexier stories but further coarsens the discourse in Washington.

Far too often, we rush to report campaign attacks on candidates without verifying their validity and without even getting a response. Campaigns and national party committees know that news outlets are hungry for sensational material, and they exploit that.

271.   In fact, as an editor who trains journalists, Bennet acknowledged his familiarity with the problem of "framing" and publishing "preconceived narratives" occurring in the aftermath of the Loughner shooting and even "cautioned the journalists that work for [him] about doing what Mr. Frank was referencing in his piece [Vogt Decl. Ex. 139] about framing events in terms of

72

preconceived narratives;" analogizing that problem to Bennet's self-directive to "guard[] ourselves against our own assumptions about any given story."  [Vogt Decl. Ex. 4, Bennet Depo 139:10-19]

272.     Bennet claims he cannot "recall" certain stories published on The Atlantic website denouncing any connection between Gov. Palin and Loughner's shooting, but conceded at his deposition that he "regularly read" The Atlantic in 2011 and "must have read at least several" of the articles about the Loughner Shooting published on The Atlantic's website [Vogt Decl. Ex. 69; Vogt Decl. Ex. 4, Bennet Depo 122:6-22]  Bennet testified he "must have read at least several" of these Loughner articles because he "was a regular reader of The Atlantic's website both because [he] was interested in it as a reader and because [he] would try to keep [his] eye on it for purposes of commenting to our editor about what [he] liked and didn't like."  [*Id.*, Bennet Depo 122:23 123:7]  In fact, Bennet described himself as "consuming [The Atlantic's] site."  [*Id.*, Bennet Depo 123:7-9]

273.     Bennet also conceded that he regularly read Sullivan's *The Dish* published on The Atlantic's website and even recalled Sullivan writing about Sarah Palin.  [*Id.*, Bennet Depo 54:5-9]

274.     Bennet acknowledged he may have even spoken with Sullivan about the Loughner shooting.  [*Id.*, Bennet Depo 98:6-9]

275.     Sullivan live-blogged about the Loughner shooting on *The Atlantic's* website under the post "*An Assassination Attempt in Arizona: Live-Blogging*"  [Vogt Decl. Ex. 81], and posted several other pieces about the shooting which denounced any "link" between Palin and Loughner's crime.  [Vogt Decl. Ex. 74, 87]

276.     On January 15, 2011, Mr. Bennet's "close friend," Sullivan, posted a column on *The Atlantic's website* titled "*Caldwell's Unfairness*," in which Sullivan demanded a correction

from a journalist for the *Financial Times* who wrote that "Andrew Sullivan, the *New York Times* columnist Paul Krugman, and the Pima County Sheriff Clarence Dupnik **linked** the shootings to Republican ideology or rhetoric, as expressed by former vice presidential candidate Sarah Palin…" [Vogt Decl. Ex. 74]  Sullivan asked for "actual evidence" to support such a charge and then stated that his "first personal judgment of any link between Loughner and the Tea Party is to *debunk* it." Sullivan then concluded with the following passage:

> Did I explore the issue of far right violence after Giffords' father cited the Tea Party?  You bet I did.  How could I not?  Did I ever link the shootings to Republican ideology or rhetoric?  Nope.  Do I think such rhetoric is over the top in a world where crazy people have access to guns?  Yes.  Do I agree with Giffords that Palin's imagery was dangerous?  Yes.  But as for the motive of Loughner, by the time 6:32 p.m. comes along, I have concluded that this was likely a psychotic breakdown, and cited a psychiatrist to that effect, and specifically ended with the case that he is "of no party."  How can I be accused of linking Loughner to the GOP when I specifically cite that he seems to be of "no party"?

> *The Financial Times* needs to run a correction.

277.    In the ensuing days after the Loughner shooting, numerous other articles were published on The Atlantic's website noting the lack of a connection between Palin or the Palin Map and the shooting, including but not limited to:

a.    "*Was shooting of Rep. Gabrielle Giffords Political?*" (January 8, 2011); [Vogt Decl. Ex. 83]

b.    "*Did Sarah Palin's Target Map Play Role in Giffords Shooting?*" (January 10, 2011); [Vogt Decl. Ex. 84]

c.    "*What We Know about Jared Lee Loughner*" (January 10, 2011); [Vogt Decl. Ex. 85]

d.    "*Ten Days That Defined 2011*" (December 29, 2011) [Vogt Decl. Ex. 88].

278.    These articles about the Loughner Shooting were among those Bennet testified he must have read because he was "consuming" The Atlantic's website.  [*See* Paragraph 272-273, above]

279.    If a "direct" and "clear" link had been made between Palin's map and the Loughner shooting, that clearly would have been something Bennet would have known because Bennet testified the Loughner shooting was a "very big story" and political discourse and gun control were two of Bennet's hot button issues.  [Vogt Decl. Ex. 4, Bennet Depo 40:5-22, ]

280.    Bennet tries to distance himself from involvement with *The Wire* published on The Atlantic's website, but conceded at his deposition that he received daily email updates for pieces posted by The Wire on The Atlantic's website, as well as "Daily News Roundup" emails containing relevant news stories posted on The Atlantic's website.  [Vogt Decl. Ex. 4, Bennet Depo 124:10-127:12; Vogt Decl. Ex. 136-137, PL Depo Ex. 226, 228]

281.    The January 10, 2011 article, "*What We Know about Jared Lee Loughner*," (Vogt Decl. Ex. 85) posted on The Atlantic's website notes, "**He Was More Delusional Than Political**… Jared Lee Loughner appeared to be more driven by a delusional mind than a real interest in politics, mental health experts said Sunday."  The article also references and hyperlinks *The New York Times* is to *The Times'* January 9, 2011 article, "*Suspect's Odd Behavior Caused Growing Alarm*" an in-depth report about Loughner's behavior and past.  [Vogt Decl. Ex. 151]

282.    A year-ending 2011 piece, "*Ten Days That Defined 2011*," [Vogt Decl. Ex. 88] that ran on *The Atlantic's website,* recognized that it was wrong to link Gov. Palin to the Loughner Shooting:

> In a meta media sense, the bad thing to come out of this already terrible story was a round of blame hurling, with people rushing to point at Sarah Palin's infamous target map or Loughner's left seeming (but not really) anti-Bush sentiments.  In truth, Loughner is

75

clinically insane and this was not really about politics at all.  That
many, including us, immediately jumped to that conclusion says
some pretty sorry things about the state or our political machine.

283.    Bennet conceded at his deposition that "it's possible" he read "*Ten Days That*

*Defined 2011*." [Vogt Decl. Ex. 4, Bennet Depo 127:13-128:8]

284.    Within days of the Loughner Shooting, the consensus within *The Times* and *The*

*Atlantic*—the first two of Bennet's primary news sources—was that Gov. Palin and the Palin Map

did not incite Loughner's shooting and no direct or clear link between the two was ever established.

(*See* Paragraphs 263-283, above).  In fact, both news organizations published pieces calling out

the media (including themselves) for rushing to blame people like Sarah Palin for Loughner's

criminal actions.  (*See* Paragraphs 266-271).

## The Events Leading to the Editorial

285.    In January of 2016, Gov. Palin endorsed Donald Trump for President, following

which The Times' Opinion pages referred to her as a "Rage Whisperer."  [Vogt Decl. Ex. 75, 115]

286.    In April/May 2016, Bennet re-joined The Times as Editor of the Editorial

Department.  (*See* Paragraph 238, above).

287.    On June 7, 2016, Sarah Palin endorsed Republican candidate Darryl Glenn in Sen.

Bennet's senate re-election race in Colorado.  [Vogt Decl. Ex. 76]

288.    On June 12, 2016, the Pulse Nightclub shooting occurred in Orlando, Florida.

[Vogt Decl. Ex. 94]

289.    On June 13, 2016, the Editorial Board published the editorial "*What Donald Trump*

*Gets Wrong About Orlando*," which states, "Now the politics.  All mass shootings convulse the

nation, but this one falls in the middle of one of the nastiest, most divisive presidential campaigns

in memory" before railing on Republicans for opposing gun control and causing "America's gun-

violence epidemic."  [Vogt Decl. Ex. 211]

290.    On June 15, 2016, Times' CEO Mark Thompson emailed Bennet an extract from his book, "Enough Said," which Bennet then forwarded to Times' deputy Op-Ed editor James Dao [Vogt Decl. Ex. 4, Bennet Depo 159:4-162:18; Vogt Decl. Ex. 122-123]  In his forwarding email, Bennet states, "The good news is that it's a book on political rhetoric," [Vogt Decl. Ex. 122] in which the first chapter is devoted to Sarah Palin's "rhetoric"  [Vogt Decl. Ex. 123 at pp. 3-24]

291.    That same day, June 15, 2016 Bennet received a potential op-ed on gun-control from Steven Hill, a Senior Fellow at New America Foundation.  [Vogt Decl. Ex. 95]

292.    Also on that same day, June 15, 2016, Sen. Bennet gave a  Floor Speech on gun control as part of the Democratic filibuster.  [Vogt Decl. Ex. 111]

293.    Also on that same day, June 15, 2016, the Editorial Board published its editorial about the Pulse Nightclub shooting.   [Vogt Decl. Ex. 162]

294.    On July 1, 2016, Gov. Palin spoke at the Western Conservative Summit in Colorado to support then-candidate Donald Trump and Sen. Bennet's re-election opponent, Darryl Glenn. [Vogt Decl. Ex. 204]

295.    In July 2016, Bennet and his Editorial Board were following Gov. Palin in connection with the Republican National Convention, which Bennet and Williamson attended in Cleveland Ohio.  [Vogt Decl. Ex. 124-127; Vogt Decl. Ex.  3,  Williamson Depo. 173:13-174:1]

296.    On August 9, 2016, The Times reported on a statement made by then-candidate Donald Trump made a comment at a North Carolina rally which The Times characterized as "suggest[ing] 'Second Amendment People' could act against Hillary Clinton."   [Vogt Decl. Ex. 116]

297.    That same day, August 9, 2016, Tom Friedman wrote a column published in The Times Opinion section titled, "*Trump's Wink Wink to 'Second Amendment People*.'"  [Vogt Decl.

Ex. 120]  Friedman's column drew a parallel between Trump's comment and the "rabid rhetoric" leading to that assassination of Israeli Prime Minister Yitzhak Rabin.  [Id.]

298.    Bennet testified that Friedman's column was one of his motivations for re-writing and crafting the defamatory portions of the America's Lethal Politics editorial.  [Vogt Decl. Ex. 4, Bennet Depo 184:21-25]   Bennet described Friedman's piece as having made a "powerful impression on me."  [Id., Bennet Depo 182:18-25]

299.    In fact, Bennet and Friedman spoke about the column before it was published, when Friedman told Bennet Trump's statement "reminded him of the kind of rhetoric, inflammatory rhetoric" in Israel leading up to the shooting of Prime Minister Rabin.  [Id., Bennet Depo 183:1-24]

300.    On August 24, 2016, Rep. Giffords' Americans for Responsible Solutions PAC endorsed Sen. Bennet in his senate re-election race. [Vogt Decl. Ex. 110]

301.    Soon after President Trump was elected, on November 13, 2016, The Times published a letter to its readers pledging to "rededicate themselves to The Times "core mission." [Vogt Decl. Ex. 118]  The same day, The Times engaged directly with President Trump on Twitter [Vogt Decl. Ex. 147-148]

302.    On December 17, 2016, Bennet ordered the Book, "*The Persecution of Sarah Palin: How the Media Elite Tried to Bring Down a Rising Star.*"  [Vogt Decl. Ex. 121]

303.    In early 2017, The Times embarked on its "Truth" advertising campaign and capitalized on refocusing its coverage to promote its "subscription strategy."  (*See* Paragraphs 218-224, above).

304.    On February 7, 2017, Brent Staples emailed Bennet about concern and nervousness about anxiety within the Editorial Department, specifically mentioning "a right-wing propaganda

tweet [from] Sarah Palin claiming The Times was desperately renting out floors because it was failing."  [Vogt Decl. Ex. 20]

305.    On April 5, 2017, Bennet tweet that he was "looking for a great new colleague to stir things up" [Vogt Decl. Ex. 132]

306.    In May 2017, Kathy Griffin posted a photo of herself holding a bloody severed head of President Trump, which drew widespread media attention.  [Vogt Decl. Ex. 135, 205]

307.    In early June, 2017, The Times eliminated its Public Editor—a position that essentially served as a watchdog over the paper and held it to account.  [Vogt Decl. Ex. 153]

308.    In the days leading up to the June 14, 2017 Scalise shooting, The Times was at the center of public criticism for its sponsorship of a Shakespeare in the Park production of Julias Cesar depicting Trump as Caesar, which other sponsors withdrew from over public outcry that the play was a form of incitement  [Vogt Decl. Ex. 206]

### The Defamatory Palin Article

309.    After the Hodgkinson shooting on the morning on June 14, 2017, *Times* Editorial Board member Elizabeth Williamson first raised the question of whether the Editorial Board should comment on the shooting.  (*See* Paragraph 22, above).

310.    She quickly researched the shooter, located his social media pages, realized they contained pro-Bernie/anti-Trump messages, and circulated them to Bennet, Semple.  (*Id.*)

311.    Initially, Semple was uninterested in writing about a "nut case who hunts republicans."

312.    Eventually, Semple wanted to pursue a "gun control angle."  (*Id.*)

313.    In response, Cohn mentioned the Giffords shooting.  (*Id.*)

314.    Once Semple decided at 12:08 p.m. that the Board should "shoot for a piece," Bennet had not been involved in the email strings, and the purpose of the piece Semple decided to try to write was twofold:   (1) to focus attention on the shooting; and (2) to restate the longstanding position of *The Times'* Editorial Board in favor of sensible gun control.  (*Id.*)

### Bennet's Predetermined Storyline & Objective

315.    Forty minutes after Semple decided to "shoot for a piece" with a "gun control angle," Bennet—specifically in response to Williamson's email sending the group Hodgkinson's anti-Trump/Pro-Bernie social media pages—injected his preconceived narrative about "inciting hate speech" into the discussion.  (*Id.*)

316.    Bennet, having seen Williamson's earlier emails, knew Hodgkinson was pro-Bernie and anti-Trump; and Bennet was also well-aware of the recent criticism over the Kathy Griffin Trump-beheading situation and The Times' sponsorship of the Shakespeare in the Park production featuring Trump as Cesar.  [Vogt Decl. Ex. 4, Bennet Depo 237:23-240:14]

317.    Semple decided the Board should write a piece on the shooting ***before*** Bennet interjected with his preconceived storyline in response to Williamson's email about Hodgkinson's "pro-Bernie, anti-Trump" social media accounts; an email in which Bennet asked "***whether*** there's a point to be made about the rhetoric of demonization and whether it incites people to this kind of violence."  (*See* Paragraph 22, above).  Bennet went on to ask "***if*** there's evidence of the kind of inciting hate speech on the left that ***we, or I at least, have tended to associate with the right (e.g., in the run-up to the Gabby Giffords shooting)*** we should deal with that."  (*Id.* (emphasis added)) Bennet testified that he "thought that [the Board] should deal with this issue of incitement if there was evidence of inciting hate speech on the Left."  (*Id.*)  However, Bennet also conceded he and the Board never saw any evidence of inciting hate speech on the Left leading up to Hodgkinson's

shooting [Vogt Decl. Ex. 4, Bennet Depo 250:15-13 ("We didn't find a specific example of hate speech connected to the people on the -- hate ·speech, I'm sorry, I don't usually use that term of, of -- of rhetoric of demonization connected to the ball players that day.· You know, naming Steve Scalise or something like that.")]

318.    From the outset, Bennet was predisposed to use the Loughner Shooting as the sole example of "political incitement" to counterbalance the fact that the Left and The Times were taking criticism for "incitement" in the lead-up to the Scalise shooting.  (*See* Paragraphs 304-308, above).

319.    Based on his prior personal and professional experience and his actual knowledge of *The Atlantic's* publications and other media publications described in Paragraphs 263-284, above, Mr. Bennet already knew that there was no established connection or link between political rhetoric or "incitement" and Loughner's shooting, let alone any "clear" and "direct" link between Gov. Palin or the Palin Map and Loughner's horrific crime.

320.    Before Williamson had ever set pen to paper and conducted her research, Bennet already had made up his mind that "hate-type speech" on the Right caused the Loughner shooting. [Vogt Decl. Ex. 25]

321.    At Bennet's request, Williamson specifically researched whether there was a link between the Palin map and Loughner shooting and whether there was any evidence of a link between incitement and the Hodgkinson shooting.  [Vogt Decl. Ex. 3, Williamson Depo 142:1-143:24, 126:8-131:22; Vogt Decl. Ex. 4, Bennet Depo 245:5-247:2]

322.    It was actually Semple—who decided to write about gun control—that asked  Lett to circulate "four basic gun control pieces (dealing mainly with the plentitude of weapons and porous controls) that also happen to mention Gabrielle Giffords…"  [Sullivan Decl. Ex. 9]  These

four pieces included "*Rep. Gabby Giffords Farewell*" (1/27/2012), "*6000 Bullets in Colorado*"
(7/24/2012), "*Democrats Find their Voice on Gun Control*" (7/29/2016), and "*Myths About Gun
Regulation*" (1/2/2013)—all of which were pieces written by Semple.  [Vogt Decl. Ex. 9; Sullivan
Decl. Ex. 13 (PL Depo. Ex. 30)]

323.    Eventually, Lett and Williamson also looked to see whether they could find the
piece about "hate-type speech" Bennet referenced in his earlier email, although Williamson had
no idea what Bennet meant by that term.  [*See* Paragraphs 29-30, above; Vogt Decl. Ex. 3m
Williamson Depo 207:18-208:5, 209:18-210:16]

324.    In response to an email from Williamson at 1:40 p.m.  about Bennet's request
(Sullivan Decl. Ex. 12), Lett emailed Bennet at 1:46 p.m. asking, "I'm trying to find the piece
Elizabeth is referring to here, do you happen to know which one she is talking about?"  (*Id.*)  Bennet
responded to Lett (not Williamson) at 2:07 p.m., asking, "No—I was just wondering if there was
such a piece; that is, did we ever write anything connecting to the Giffords shooting to some kind
of incitement?"  (*Id.*)

325.    At 2:20 p.m., Lett replied to Bennet's 2:07 p.m. email by forwarding him a link to
a Frank Rich column (not an Editorial):  "*No One Listened to Gabrielle Giffords*."  (*Id.*)

326.    At 2:34 p.m., Bennet responded to Lett by saying "Good for Us.  Can you let
Elizabeth [Williamson] know?"  (*Id.*)  Bennet testified that he doesn't recall what he meant by
"Good for Us," but the clear inference to be drawn is that Bennet was free to advance his
preconceived narrative because the Editorial Board had not written about the subject.  [Vogt Decl.
Ex. 4, Bennet Depo 252:6-24]

327.     At 2:52 p.m., Bennet followed up by asking Lett to send him the four basic gun control pieces Semple asked Lett to send to Williamson, but Bennet claims he does not recall whether he read all of the materials Lett sent him.  [*Id.*, Bennet Depo 250:24-251:11]

328.     Later, Bennet asked Lett to "dig a little further" because it "seemed strange" to him that the Editorial Board had not "editorialized at all about the [Loughner] shooting…because it was an important news event and the kind of thing we would typically editorialize on."  [Bennet Depo. 253:8-254:10]

329.     Lett found 2 additional Editorials ("*Bloodshed and Invective In Arizona*" and "*As We Mourn*"), but Bennet apparently did not read those pieces either.  [*Id.*, Bennet Depo 254:11-18]

330.     Notably, the "***As We Mourn***" editorial discusses President Obama's speech about Loughner's shooting and his recognition that Loughner's shooting cannot be blamed on rhetoric. [Vogt Decl. Ex. 30 at p. 19]

### ***The Results of Williamson's Research—Embodied in Her First Draft***

331.     As directed by Bennet, Williamson researched the Loughner shooting and knew, based on that research, she could not say there was a clear and direct link between the map circulated by Sarah Palin's political action committee and the Loughner shooting.  (*See* Paragraph 68, above).

332.     Williamson knew that any assertion that there was a clear and direct link between Gov. Palin and Loughner's Shooting would be false, so she made no such assertion.  (*Id.*)

333.     Bennet conceded that Williams' first draft embodied the research he specifically asked her to conduct concerning any incitement leading to the Loughner shooting [Vogt Decl.

Ex. 4, Bennet Depo 262:17-263:17, 264:3-12, and Williamson testified she wrote her draft consistent with what the research Bennet asked for showed:

> A    I wrote my piece based on what I found, so I did not draw a link in what I wrote.
>
> Q    Why not?
>
> A    I talked about the overheated political climate.
>
> Q    Why didn't you draw a link?
>
> A    Because that's not my job.· I wrote -- I wrote my piece based on the research that I did, and what I wrote reflected that research.
>
> Q    When you say that's not your job, what do you mean?
>
> A    I did my job. So I did the research, and I wrote the piece based on the research that I found.
>
> Q    Based on the research that you found, did you think that you could say that there was a clear and direct link between the map circulated by Sarah Palin's political action committee and the Loughner shooting?
>
> A    No.

[Vogt Decl. Ex. 3, Williamson Depo 142:3-143-24 (lines 143:5-24 quoted above)]

334.    Ms. Williamson did, however, falsely state that the Palin Map "put Giffords and 19 other Democrats under stylized crosshairs" because map depicted crosshairs over targeted electoral districts, not Rep. Giffords and other individual lawmakers.  [Vogt Decl. Ex. , Williamson Depo 232:24-234:10, 269:11-270:16]

A.    **Mr. Bennet's Defamatory Re-Write and Purposeful Avoidance of the Truth**

335.    Williamson submitted her first draft to Bennet, Semple, Fox, Frank Clines, as well as Cohn, at 4:45 p.m.  [Vogt Decl. Ex. 59 ("shootings is in backfield" reference in Williamson's email indicates draft has been submitted to The Times content management system for editing); Vogt Decl. Ex. 3. Williamson Depo 230:16-231:11]

336.    After reviewing the draft, at around 5:00 p.m., Cohn took it to Bennet's office and spoke with him about it because she, like everyone else besides Bennet, was not sure what he wanted in the piece:

> I sort of remember standing in front of his glass door, you know, opening up the door or something, and saying, "You need to look at this."…I recall thinking I wasn't really sure if its what ***he wanted***. I thought there had been quite the confusion over the day as to where this piece was headed, as to be either more of a gun control piece or to be more of a piece about the political climate and the sort of lack of civility in America's political discourse...***I wasn't sure what James intended, wanted in the piece.***  I wasn't sure if the piece worked…I wasn't sure it accomplished what James would want it to accomplish…there were a couple competing ideas about the piece…

[Vogt Decl. Ex. 6, Cohn Depo 57:13-58:22 (emphasis added)]

337.    Cohn testified that when she went to Bennet's office to raise her concerns about the piece, Bennet responded by saying something along the lines of, "yeah, it needs some work, I'll do it."  [Vogt Decl. Ex. 6, Cohn Depo 60:3-7]

338.    At that point, Bennet set out to re-write the editorial consistent with his preconceived narrative expressed in his earlier email  [Vogt Decl. Ex. 25; Doc. 41-34, 8/16/17 Hr'g Tran. at 7:23-25, 8:25 (that draft "wasn't exactly accomplishing the objective that we had set out to achieve," so Bennet "effectively re-wrote the piece.")]

339.    In doing so, Bennet knowingly re-wrote the paragraph that embodied the results of Williamson's research, which did not draw a clear and direct link between or label as incitement the Palin Map and Loughner's shooting, and replaced her conclusion with his preconceived narrative, including the defamatory statements that Mrs. Palin was responsible for the "incitement" of, and had a "clear" and "direct" "link" to, Loughner's shooting.  (*Id.*)

340.   Bennet testified he intentionally used the "very strong" word "incitement" because he "wanted to get our readers' attention" and knew the term was used to mean "deliberate orders, invocations, summonses for people to carry out violent attacks." and understood as meaning "a call to violence."  [Doc. 41-34, 8/16/17 Hr'g Tran. at p. 11:13-12:25; Vogt Decl. Ex. 4, Bennet Depo 114:10-15]

341.   Cohn understood "incitement" to be "very direct" and mean "that it—that the map led him to commit the shooting" [Vogt Decl. Ex. 6, Cohn Depo 96:15-97:7].  Likewise, Douthat immediately understood Bennet's use of "incitement" to draw a causal connection between Palin's map and Loughner's shooting [Vogt Decl. Ex. 41]

342.   In fact, Mr. Bennet found his inspiration for his narrative about Gov. Palin's "incitement" of Loughner  Friedman's, August 9, 2016 column, "*Trump's Wink Wink to 'Second Amendment People*," and its premise that "Donald Trump's language… could end up ***inciting***… violence," akin to the "wave of toxic ***incitement*** against [Yitzhak] Rabin," which included calls for Rabin's death prior to his assassination at a peace rally in 1995. [*See* Paragraph 57, above; Vogt Decl. Ex.  120]

343.   Bennet testified that Friedman's column was one of his motivations for re-writing and crafting the defamatory portions of the America's Lethal Politics editorial.  [Vogt Decl. Ex. 4, Bennet Depo 184:21-25]   Bennet described Friedman's piece as having made a "powerful impression on me."  [*Id.*, Bennet Depo 182:18-25]

344.   In fact, Bennet and Friedman spoke about the column before it was published, when Friedman told Bennet Trump's statement "reminded him of the kind of rhetoric, inflammatory rhetoric" in Israel leading up to the shooting of Prime Minister Rabin.  [*Id.*, Bennet Depo 183:1-24]

345.    Bennet sent his draft of the Editorial to Williamson at around 7:30 PM [Vogt Decl.

Ex. 98]—leaving plenty of time for him to check his facts before publication.

346.    Bennet was responsible for fact-checking the portions of the editorial he re-wrote.

[Vogt Decl. Ex. 3, Williamson Depo 67:14-68:6]

347.    As an experienced editor, Mr. Bennet is an expert in the business of knowing and

understanding the meanings and significance of words. [Doc. No. 41-34, 8/16/17 Hrg Tran. at

13:21-14:5; see Paragraphs 235-239, above]

## B.    The Defamatory Passages

348.    On June 14, 2017, published the false and defamatory Palin Article, "*America's

Lethal Politics,*" online, and immediately promoted it on their social media accounts.  [Vogt Decl.

Ex. 33-35]

349.    The Editorial was also prominently featured on The Times' homepage.  [Vogt Decl.

Ex.  167]

350.    On June 15, 2017, *The Times* published the Palin Article in *The New York Times*

print edition.  [Vogt Decl. Ex. 36]

351.    The Editorial asserted the existence of "Lethal Politics" evidenced by a "sickening

pattern" of politically "incited" violence against members of Congress, the only example of which

was Gov. Palin's direct and clear incitement of Loughner's  Shooting.  [Vogt Decl. Ex. 33]

352.    Bennet  wrote  and  *The Times*  published  the  following  false  and  defamatory

statements of and concerning Gov. Palin:

> Was  this  attack  evidence  of  how  vicious  American  politics  has
> become?  Probably.  In 2011, when Jared Lee Loughner opened fire
> in a supermarket parking lot, grievously wounding Representative
> Gabby Giffords and killing six people, including a 9-year-old girl,
> the link to political incitement was clear.  Before the shooting, Sarah
> Palin's  political  action  committee  circulated  a  map  of  targeted

electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.

Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask for of the right.

353. Bennet conceded the above-two passages of the Editorial are false. [Vogt Decl. Ex. 4, Bennet Depo 92:18-94:5]

354. The Editorial also falsely asserted that the map put crosshairs over individual lawmakers. (*See* Paragraph 334, above).

### The Knowingly False Premise of a "Pattern"

355. When Bennet rewrote the Editorial, he knew there was no evidence of incitement leading to Hodgkinson's shooting. [Vogt Decl. Ex. 4, Bennet Depo 245:5-247:2]]

356. And Bennet claimed he did not know whether any link existed between Palin's map Loughner's shooting. [Vogt Decl. Ex. 37]

### There was no Need to Mention Palin at all

357. After completion of the US Edition of the Editorial, Linda Cohn and Fox set out to "trim" the Editorial for the International Edition. [Vogt Decl. Ex. 71]

358. During that process, they deleted the defamatory passages of the Editorial and any reference therein to Sarah Palin. [Id.; Vogt Decl. Ex. 72]

359. Linda Cohn testified the trimmed International Edition of the Editorial does an effective job of expressing the opinions that the Board tried to express in the original Editorial that appeared on June 14 of 2017. [Vogt Decl. Ex. 6, Cohn Depo 136:4-13, 137:11-140:8]

***The Times* Concedes the Falsity of the Palin Article—
<u>But Does Not Meaningfully Retract It or Apologize</u>**

360.    The night of June 14, Times columnist Ross Douthat immediately told Bennet the Editorial was false.  (*See* Paragraph 80, above).

361.    Early the next morning, already facing significant criticism, Bennet emailed Williamson and Lepping and asked them to research whether what he said was true, and in that email makes no mention of his current position that he never intended the words "incitement" and "clear" and "direct" link to mean exactly what they said:

> Hey guys -- We're taking a lot of criticism for saying that the attack on Giffords was in any way connected to incitement. The claim is that this was fully investigated and debunked in the months after the attack, and the shooter was found to have acted only because of his personal demons. I don't know what the truth is here but we may have relied too heavily on our early editorials and other early coverage of that attack. If so, I'm very sorry for my own failure on this yesterday. In any case I'd like to get to the bottom of this as quickly as possible this morning and correct the piece if needed. Can you two please put your heads together on this first thing this morning? Please skip the morning meeting if necessary. JB

[Vogt Decl. Ex. 37]

362.    Bennet also texted Williamson early that morning, a text exchange which Williamson emailed to herself at 9:25 a.m., which stated in pertinent part [Vogt Decl. Ex. 101, 164-165]

363.     By the time of this text exchange at no later than 9:25 a.m., Williamson had not

conducted any research on the issue Bennet texted her about [Vogt Decl. Ex. 3, Williamson Depo

269:11-274:1], which shows Bennet already knew no link existed <u>before</u> Williamson conducted

any research that morning.

364.     *The Times* was hit by public backlash from its readers and even liberal-leaning

media outlets over falsely stating that Gov. Palin incited Loughner to commit murder.  [Vogt Decl.

Ex. 99, 100, 73, 140, 141, 142, 143, 144, 145, 146, 70, 39, 40]

365.     As soon as Cohn arrived at work early on the morning of June 15, 2017, everyone

already knew Editorial was wrong about the link and she immediately started working on a

correction with Bennet and Wegman in her office.  [Vogt Decl. Ex. 6, Cohn 68:14-70:3; 143:14-

18; 147:7-148:3, 150:4-152:18]

366.     During this same time period, Hannah Ingber reached out to Bennet about the

"Sarah Palin" Editorial.  [Vogt Decl. Ex. 64]

367.     Along with an initial edit, *The Times* added a half-hearted correction (the "First

Attempted Correction") [Vogt Decl. Ex. 43]  written in a passive voice about the "link" between

"political <u>incitement</u>" and Loughner's heinous crime:

> **Correction: June 15, 2017**
> *An earlier version of this editorial incorrectly stated that a link existed between*
> *political incitement and the 2011 shooting of Representative Gabby Giffords. In*
> *fact, no such link was established.*

368.     The First Attempted Correction did not remove the unnecessary reference in the

column to Gov. Palin, even though there was no established connection between "political

incitement" and Loughner's crime, and as written, also suggests that such a connection may still

be established, when Mr. Bennet and *The Times* already knew that no such link existed, while

making no mention of Gov. Palin, while the column continued to reference her by name.  (*Id.*)

369.    Given that Mr. Bennet's entire thesis in re-writing the Palin Article was the "sickening pattern" of politically incited violence that emanated from a false link between Gov. Palin and Loughner's 2011 crime, which *The Times* concedes did not exist, the entire Palin Article should have been retracted—not minimally and inadequately corrected.  [Doc. 41-34, 8/16/17 Hr'g Tran. 50:22-51:8]

370.    While working on the correction, Bennet was also working on responding to media inquiries and a Tweet to accompany the correction.  [PL Depo Ex 49]

371.    In drafting the Tweets to accompany the correction, Bennet actually wrote the portion that states, "We got an important wrong…"  [Vogt Decl. Ex. 4, Bennet Depo. 81:3-83:6, 84:14-90:14; Vogt Decl. Ex. 66]

372.    *The Times'* Editorial Page eventually published the Tweet about the correction, admitting Bennet's "<u>fact</u>" error:



373.    As that process was unfolding, Bennet and The Times also were aware of Palin's tweets about the defamatory Editorial.  [Vogt Decl. Ex. 4, Bennet Depo. 284:20-285:14; Vogt Decl. Ex. 100]

374.    The Times eventually published a second online correction  [Vogt Decl. Ex. 44] but only after it was called out by CNN for falsely asserting that the Palin Map placed crosshairs over individual lawmakers and, specifically, Rep. Giffords.  [Vogt Decl. Ex. 145]

375.    Still devoid of any reference to Gov. Palin, this second correction (the "Second Attempted Correction") addressed the mischaracterization of the map of targeted electoral districts as placing "stylized cross hairs" on Gabrielle Giffords and other lawmakers individually and changed the word "incitement" to "rhetoric." [Vogt Decl. Ex. 44]

> **Correction: June 16, 2017**
> *An editorial on Thursday about the shooting of Representative Steve Scalise incorrectly stated that a link existed between political rhetoric and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established. The editorial also incorrectly described a map distributed by a political action committee before that shooting. It depicted electoral districts, not individual Democratic lawmakers, beneath stylized cross hairs.*

376.    Even in the second correction, Bennet refused to recede from his original preconceived narrative despite the fact that Wegman pointed out that keeping any reference to Palin in the Editorial was still trying to "sneaking the link in."  [Vogt Decl. Ex. 63]

377.    In fact, Bennet confirmed his allegiance to his narrative in a statement provided to CNN,  in which Mr. Bennet said:

> While it is always ***agonizing*** to get something wrong we appreciate it when our readers call us out like this.  We made an ***error of fact*** in the editorial and we've corrected it.  ***But that error doesn't undercut or weaken the argument of the piece.***

[Vogt Decl. Ex. 145, p. 1 (Emphasis added)]

378.     Bennet maintains he could not apologize to Palin because there is a NYT policy prohibiting apologies, although there is no written policy to this effect.  [Vogt Decl. Ex. 4, Bennet Depo. 282:18-284:3]   Nevertheless, Bennet admitted he never made an attempt to personally apologize to Gov. Palin.  (*Id.*)

379.     This supposed policy against apologies flies in the face of The Times itself demanding apologies from other news organizations when they made false statements about The Times.  [Vogt Decl. Ex. 119]

380.     On June 16, 2017, *The Times'* published at the bottom of its Editorial Page, in fine print, the same inadequate online corrections it ran on the Editorial—completely devoid of any reference or apology to Gov. Palin.   [Vogt Decl. Ex. 49]

381.     Following the Editorial and its corrections, Palin still received death threats because of its publication, just like those following the false accusations in 2011.  [Vogt Decl. Ex. 208 (Devine Tweet); Vogt Decl. Ex. 9, Palin Depo. 175:14-178:2]

Dated:  July 10, 2020.

<div style="margin-left:40%">

*/s/ Shane B. Vogt*
Kenneth G. Turkel (admitted *pro hac vice*)
Email:  kturkel@bajocuva.com
Shane B. Vogt (admitted *pro hac vice*)
Email:  svogt@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 443-2199
Facsimile: (813) 443-2193

Michael M. Munoz
E-mail:  mmunoz@golenbock.com
GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile: (212) 754-0330

*Attorneys for Plaintiff*

</div>

### CERTIFICATE OF SERVICE

I hereby certify that Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Facts [Doc. No. 97] and Counterstatement of Material Facts in Opposition to Defendants' Motion for Summary Judgment was filed electronically on July 10, 2020.  This Notice will be sent by operation of the Court's electronic filing system to counsel of record for all parties as indicated on the electronic filing receipt.  Parties and their counsel may access this filing through the Court's system.

*/s/ Shane B. Vogt*
Attorney