# EXHIBIT 6

```
1

2   IN THE UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3
    - - - - - - - - - - - - - - - - - -x
4
    SARAH PALIN,
5                                        No. 17-cv-4853

6                        Plaintiff,
              v.
7
    THE NEW YORK TIMES COMPANY and
8   JAMES BENNET,

9                        Defendants.

10  - - - - - - - - - - - - - - - - - -x

11

12          Remote videotaped deposition of LINDA

13  COHN, taken pursuant to Subpoena, was held via

14  videoconference, commencing May 7, 2020, at

15  10:02 a.m., on the above date, before Amanda

16  McCredo, a Court Reporter and Notary Public in the

17  State of New York.

18

19

20

21

22

23

24

25
```

```
                                    Page 2
1
2   A P P E A R A N C E S:
3   For the Plaintiff:
4        SHANE B. VOGT, ESQ.
         BAJO CUVA COHEN TURKEL
5        100 North Tampa Street
         Suite 1900
6        Tampa, Florida 33602
         svogt@bajocuva.com
7        (813)443-2199
8
9   For the Defendants:
10       JACQUELYN SCHELL, ESQ.
         DAVID AXELROD, ESQ.
11       BALLARD SPAHR LLP
         1675 Broadway
12       19th Floor
         New York, New York 10019
13       schellj@ballardspahr.com
         axelrod@ballardspahr.com
14       (212)223-0200
15
16
17  ALSO PRESENT:
18  Alexandra Perloff Giles - New York Times
19  Daniel Macom - videographer
20
21
22
23
24
25
```

```
                                    Page 3
1
2               I N D E X
3   WITNESS          EXAMINATION BY        PAGE
4   Linda Cohn       Mr. Vogt                 7
5
6                  EXHIBITS
7   EXHIBIT                                 PAGE
8   Cohn A     An unlikely journey to The New   19
               York Times editorial page
9
10         PREVIOUSLY MARKED EXHIBITS
11  EXHIBIT                                 PAGE
12  Exhibit 1                                26
13  Exhibit 8                                33
14  Exhibit 10                               42
15  Exhibit 11                               46
16  Exhibit 12                               48
17  Exhibit 60                               49
18  Exhibit 61                               50
19  Exhibit 16                               52
20  Exhibit 15                               53
21  Exhibit 17                               54
22  Exhibit 20                               62
23  Exhibit 25                               72
24  Exhibit 101                              81
25  Exhibit 72                               84
```

```
                                    Page 4
1
2   Exhibit 33                               85
3   Exhibit 34                               89
4   Exhibit 32E                              90
5   Exhibit 32F                             102
6   Exhibit 74                              108
7   Exhibit 74A                             109
8   Exhibit 103                             114
9   Exhibit 108                             116
10  Exhibit 32G                             118
11  Exhibit 104                             123
12  Exhibit 76                              125
13  Exhibit 32H                             126
14  Exhibit 106                             128
15  Exhibit 106                             133
16  Exhibit 107                             133
17  Exhibit 109                             135
18  Exhibit 110                             137
19  Exhibit 78                              142
20  Exhibit 111                             143
21  Exhibit 32J                             145
22  Exhibit 50                              149
23  Exhibit 51                              150
24  Exhibit 52                              152
25  Exhibit 81                              154
```

```
                                    Page 5
1
2        THE VIDEOGRAPHER:  We're now on the record.
3   Participants should be aware that this
4   proceeding is being recorded.  And as such, all
5   conversations held will be recorded unless
6   there is a request and agreement to go off the
7   record.  Private conversations and/or
8   attorney-client interactions should be held
9   outside the presence of the remote interface.
10       This is the remote, video-recorded
11  deposition of Ms. Linda Cohn taken for the
12  plaintiff.
13       Today is Thursday, May 7, 2020.  The time
14  is now 10:01 a.m. in the Eastern Time Zone.
15  We're here in the matter of Sarah Palin versus
16  New York Times.  My name is Daniel Macom.  I'm
17  the remote video technician on behalf of U.S.
18  Legal Support, which is located at 90 Broad
19  Street in New York, New York.  I'm not related
20  to any party in this action, nor am I
21  financially interested in the outcome.
22       At this time, will our court reporter,
23  Ms. Amanda McCredo, on behalf of U.S. Legal
24  Support, please enter the statement for remote
25  proceedings into the record, please.
```

Page 6

L. Cohn

1
2    THE COURT REPORTER:  The attorneys
3    participating in this deposition acknowledge
4    that I am not physically present in the
5    deposition room and that I will be reporting
6    this deposition remotely.  They further
7    acknowledge that, in lieu of an oath
8    administered in person, I will administer the
9    oath remotely, pursuant to Executive Order
10   Number 202.7 issued by Governor Cuomo on
11   March 19, 2020.  The parties and their counsel
12   consent to this arrangement and waive any
13   objections to this manner of reporting.
14       Please indicate your agreement by stating
15   your name and your agreement on the record.
16       Thank you.
17       MR. VOGT:  This is Shane Vogt, counsel for
18   the plaintiff, and we agree.
19       MS. SCHELL:  This is Jacquelyn Schell,
20   counsel for the defendant and the witness, and
21   we agree.
22   LINDA COHN, the witness herein, after having been
23       first duly sworn by a Notary Public of the
24       State of New York, was examined and
25       testified as follows:

Page 7

L. Cohn

1
2    EXAMINATION BY
3    MR. VOGT:
4    Q    Good morning, Ms. Cohn.
5    A    Good morning.
6    Q    Can you please state your full name for me?
7    A    Linda Cohn.
8    Q    And where do you currently live?
9    A    ███████████, New York.
10   Q    Have you ever been deposed before?
11   A    No.
12   Q    Okay.
13       I'm just going to go over some of the
14   ground rules.  Hopefully today will go as smoothly
15   as possible with the Zoom conference system that
16   we're using.  But I'm going to ask you a series of
17   questions.  Hopefully I ask the questions well, but
18   oftentimes I don't.  So if I ask you a question that
19   is confusing or that you don't understand for any
20   reason, please let me know, speak up.  I won't take
21   offense.  Tell me it's a bad question, so I can
22   rephrase it for you so that it makes sense.  The
23   caveat to that is if I ask you a question and you go
24   ahead and answer it, I'm going to assume you
25   understood what I was asking you.

Page 8

L. Cohn

1
2    Q    Okay?
3    A    (No verbal response.)
4    Q    It's also important that you give verbal
5    responses to the questions.  "Yes," "no."  No
6    uh-huh, uh-uhs, head nods, things like that, because
7    Amanda is taking down everything that we're saying.
8        Another important part of that is wait
9    until I finish the question that I'm asking, for
10   several reasons.  Sometimes there's a little bit of
11   a lag because of the video conferencing and the
12   Internet.  It will also give Jacquelyn time to
13   object to my questions.
14       Throughout the deposition, she's going to
15   object.  In most instances, she'll just say
16   "objection to form."  And if she does just say just
17   "objection to form," you can go ahead and answer the
18   question unless she says, "Linda, don't answer that
19   question."
20       Okay?
21   A    Okay.
22   Q    If you need to take a break at any time for
23   any reason, just let me know.  We'll finish the
24   question that we're on and I'm happy to take a
25   break.  I try not to go more than an hour at a time.

Page 9

L. Cohn

1
2    It will go a lot faster than you think.  So, you
3    know, if you need to take a break for any reason,
4    just let me know and we can do that.
5        Okay?
6    A    Okay.
7    Q    I'm going to send exhibits through the chat
8    feature on Zoom.  Once I send them through, if you
9    would just first let me know that you have received
10   them, that they've come through, and then take a
11   moment to look through them.  And then once you've
12   looked through the exhibit and familiarized yourself
13   with it, then just let me know that you're done
14   looking through it.
15       Okay?
16   A    Uh-huh.
17   Q    Have you done anything to prepare for your
18   deposition today?
19   A    I did, on Tuesday, speak to Jackie and
20   David Axelrod.
21   Q    And I don't want to know anything that you
22   talked to your lawyers about.  If I ask you any
23   question during this deposition and you start to
24   think, as you answer that, you're going to tell me
25   something that your lawyer said to you, don't tell

Page 10

```
1                    L. Cohn
2   me.
3          Okay?
4          I don't want to know anything that you
5   talked to your lawyers about.  If the answer calls
6   for anything like that, just say, "I talked to my
7   lawyers and that was it," and we'll leave it at
8   that.
9          Okay?
10  A      (No verbal response.)
11  Q      Have you -- did you do anything else
12  besides meet with lawyers to prepare for your
13  deposition?
14  A      Last night, I took a quick look at the
15  editorial in question.
16  Q      And that would be "America's Lethal
17  Politics," correct?
18  A      Correct.
19  Q      And did you look at any other documents?
20         MS. SCHELL:  To the extent you looked at
21     documents with us, you don't have to go into
22     those.
23  A      No.  I mean, I glanced at a couple of news
24  articles.
25  Q      Do you know which news articles those were?
```

Page 11

```
1                    L. Cohn
2   A      No.
3   Q      All right.
4   A      I actually was looking up some of the names
5   involved, like Jared Loughner.
6   Q      And other than attorneys, did you talk to
7   anyone else about your deposition?
8   A      I mentioned to quite a few friends that I
9   was going to be deposed.
10  Q      And in the conversations you had with them,
11  did you talk about any of the specifics or details
12  about this case?
13  A      Well, we discussed what editorial it was
14  about, my emotional feelings about being deposed.
15  Q      Okay.  I can imagine what those are, so...
16         Anything else?
17  A      No.  Just very general.
18  Q      Are you currently employed?
19  A      No.
20  Q      If I understand correctly, you retired from
21  The New York Times several years ago; is that right?
22  A      Correct.
23  Q      And when was your official end date?
24  A      Oh, I -- November 1st, 2000 -- sorry.
25  Q      It's all right.
```

Page 12

```
1                    L. Cohn
2   A      2017.
3   Q      Okay.
4          And since retiring from The Times, have you
5   worked anywhere else?
6   A      No.
7   Q      And you -- when did you first start with
8   The New York Times?
9   A      1988.
10  Q      And so, throughout the entire time period
11  that you worked at The Times, did you work in the
12  editorial department?
13  A      Correct.  I also worked for the Sunday
14  business section for quite a few years, just one day
15  a week.
16  Q      And do you remember the time period that
17  you worked for the Sunday business section?
18  A      No.  There were several different stints on
19  and off starting maybe a year or two after I arrived
20  up until two years before I left.  But there were
21  some gaps in there, but...
22  Q      And were you -- were you working as an
23  editor throughout the entire time period that you
24  worked at The Times?
25  A      Yes.
```

Page 13

```
1                    L. Cohn
2   Q      And did you also work as an editor when you
3   were helping out the Sunday business section?
4   A      Yes.
5   Q      And then, did you have an official title or
6   position in 2017?
7   A      I actually don't remember what the exact
8   title was.  I believe it was either senior editor or
9   it might have officially been staff editor.  I'm not
10  sure.
11  Q      And then, as an editor or senior staff
12  editor in that 2017 time period, what were your job
13  duties and responsibilities?
14  A      Excuse me, did you say in 2017?
15  Q      Yes.
16  A      I attended some board meetings, not all.  I
17  edited editorials.  I prepared the schedule for the
18  international edition.  I cut and further edited
19  some pieces for the international edition that were
20  based on our pieces for the American edition but had
21  to be much shorter and take a different stance for
22  the international.  I worked with writers on their
23  pieces.
24  Q      And when you say, in the context of cutting
25  and editing international edition pieces, that they
```

                          L. Cohn
1
2   had to be shorter and take a different stance, what
3   do you mean by "take a different stance"?
4       A    We tried to focus on what would be more of
5   interest to international readers who might not want
6   as much local news or certain specifics.  They were
7   also published a little later, so we would want to
8   make sure we weren't putting in things that weren't
9   being overtaken by news developments.
10      Q    Who -- in 2017, who would have been your
11  immediate supervisor?
12      A    I'm trying to remember the exact dates that
13  Terry Tang left.  I'm not sure.  When she was the
14  deputy, she would be.  And then whoever the editor
15  was, so James Bennet, at that time.  And then I
16  suppose Bob Semple -- yeah, Bob Semple was also
17  maybe my first-level supervisor, then Terry Tang,
18  then James Bennet.
19      Q    How long did you work with Bob Semple?
20      A    Every since he arrived in the department.
21  I'm not sure when.  Decades.
22      Q    And did he retire around the same time that
23  you did?
24      A    No, he stayed longer.
25      Q    Was there -- in the 2017 time period, was

                          L. Cohn
1
2   there any, like, a team or a group that you would
3   have been a part of when you were working for The
4   Times?  Almost like -- you know, was there sort of,
5   like, an editing team or something like that, like a
6   group like that that worked, you know, you worked
7   with on a regular basis?
8       A    In 2017, did you say?
9       Q    Yes.
10      A    I'm not sure I know what you mean.  There
11  were editors; we worked together.
12      Q    Who -- in 2017, who were the editors that
13  worked with the editorial board?
14      A    Bob Semple, Terry Tang, James Bennet,
15  myself, Nick Fox.
16      Q    Can you spell Terry's last name for me,
17  please?
18      A    T-A-N-G.  I'm sorry, I would like to add
19  something to that last answer.
20      Q    Sure.
21      A    There were also copy editors.
22           And would you like their names?
23      Q    I think I know them, or at least we'll go
24  through a couple of them when we go through some
25  documents.

                          L. Cohn
1
2       Q    Did you work with Phoebe Lett?
3       A    Yes.
4       Q    What was Phoebe's position?
5       A    She was -- I really don't remember what her
6   title was.  She took care of administrative tasks
7   and she helped with fact checking.
8       Q    In your position and role at The New York
9   Times in the 2017 time period, did you also work on
10  fact checking?
11      A    Fact checking was part of everyone's role
12  from the writer on, so yes.
13      Q    And who bore the ultimate responsibility
14  for the factual accuracy of an editorial?
15      A    It was a shared responsibility starting
16  with the writer going on through to the copy editor.
17      Q    Was there anyone that had the ultimate
18  responsibility, though, for the factual accuracy of
19  the piece?
20           MS. SCHELL:  Object to form.
21      Q    You can answer.
22           MS. SCHELL:  You can answer.
23      A    Oh, I -- I'm not really sure what that --
24  what that even means.  No, I wouldn't say one person
25  was wholly responsible.  I mean, no.  There's no --

                          L. Cohn
1
2   the copy editor's the last one to see the copy.
3   There is a certain responsibility there.  The fact
4   checker has a certain responsibility.  The writer,
5   the editor, and, of course, the editor of the page.
6   I'm not sure how to quantify.
7       Q    And when you -- when you use the term
8   "writer," would the writer be the same thing as the
9   author of the piece?
10      A    Yes.
11      Q    And the situation where an editorial was
12  written in the name of the editorial board, who
13  would the writer be?
14      A    It would depend on which editorial.
15      Q    So do you know who the writer was with
16  respect to the ""America's Lethal Politics""
17  editorial?
18      A    Elizabeth Williamson.
19      Q    And what role, to your knowledge, did James
20  Bennet have on the ""America's Lethal Politics""
21  editorial?
22      A    He did the last round of editing on it.
23      Q    And what role did you have on the
24  "America's Lethal Politics" editorial?
25      A    I did an initial edit.

Page 18

```
 1                     L. Cohn
 2     Q    And when you say "initial," what do you
 3  mean by that?
 4     A    Well, actually, I don't know that it was
 5  the first edit.  I did an edit on it around 4:30,
 6  5:00, put in a couple questions, and then turned it
 7  over to James.
 8     Q    And after you turned it over to James, do
 9  you recall doing anything else on the "America's
10  Lethal Politics" editorial?
11     A    Yes, I got it back from James, looked it
12  over, made sure it fit, worked on the headline,
13  and --
14     Q    And when -- I'm sorry.
15     A    -- and the blurb, which is the little
16  pull-quote we use.
17     Q    And what's the purpose of the blurb or the
18  pull-quote?
19     A    I actually can't remember, actually, if
20  there was a blurb on that one.  But the purpose of a
21  blurb is really to break up the type visually and
22  draw the reader in.
23     Q    And do you recall whether or not, after you
24  got the "America's Lethal Politics" editorial back
25  from Mr. Bennet, did you do any fact checking on it?
```

Page 19

```
 1                     L. Cohn
 2          MS. SCHELL:  Object to form.
 3          You can answer.
 4     A    Yes.  I checked some -- at least one thing.
 5     Q    And what did you -- what do you recall
 6  checking after you got the editorial back from
 7  Mr. Bennet?
 8     A    There was a question about some kind of gun
 9  control rule, regulation, or law I remember spending
10  time on, along with Eileen Lepping.
11     Q    And was that it?
12     A    That's all I can remember.  That is the one
13  that stuck out.  There may have been other things.
14     Q    Okay.
15          Let me ask you, I'm going to send you
16  through what I'm going to mark as Exhibit A to your
17  deposition.
18                    (An unlikely journey to The New
19                     York Times editorial page was
20                     marked as Cohn A for
21                     identification, as of this
22                     date.)
23     A    Should I open that PDF, in other words?
24     Q    Yes.
25     A    Okay.
```

Page 20

```
 1                     L. Cohn
 2     Q    One reason I think I'm going to introduce
 3  this is because I think it is the only piece of
 4  paper that talks about you on the Internet.  So it
 5  is like a unicorn in the Linda Cohn universe.
 6          But do you recall giving this interview to,
 7  I guess it would have been a student doing a thesis
 8  at the university -- go ahead.
 9     A    I'm not sure it was for a thesis.
10     Q    Okay.
11          But do you recall this?
12     A    I do.
13     Q    And I just want to ask you about a couple
14  of things that are in here.  They ask you one of
15  the -- the first question they ask you is about a
16  typical day for you and you say a typical day is a
17  9:30 a.m. editorial board meeting led by our
18  editorial page editor James Bennet.
19          Was that the typical time of the editorial
20  board meetings while in 2017?
21     A    I believe so.  We changed the start time
22  quite a bit, so...
23     Q    And were there set days of the week that
24  the editorial board meetings took place or did they
25  happen every day?
```

Page 21

```
 1                     L. Cohn
 2     A    They did not happen every day.  I don't
 3  remember the days they did happen because it was
 4  something that did shift over the years with
 5  different editors and even during the tenure of each
 6  editor.
 7     Q    And do you remember who generally would
 8  have attended the editorial board meetings?
 9     A    It varied, but the editorial board writers
10  who were based in New York, sometimes others by
11  video in the later years, of course, and Bob Semple,
12  Terry Tang, James, or whoever the editor was.
13          I only started attending in 2015 when my
14  job changed a bit.  And often the fact checker,
15  Eileen Lepping, would attend.  Often Phoebe Lett or
16  whoever was in that position.  The other editors,
17  Nick Fox, at that time.  Often a photo editor.  I'm
18  trying to think if there was anyone else.  It was a
19  big group.
20     Q    Where did the meetings take place?
21     A    In the editorial board conference room.
22     Q    And were the meetings recorded?
23     A    No.
24     Q    Did anyone take notes during the meetings?
25     A    I -- no one took what I would call official
```

Page 22

```
1                      L. Cohn
2    notes.  People took notes for their own purposes and
3    we would jot down what pieces we had, perhaps,
4    decided to work on that day.
5         Q    Did you take notes during the meetings?
6         A    Very occasionally I might jot something
7    down, just maybe the names or, rather, the topics we
8    were going to address for the following day.
9         Q    And you had mentioned that, in 2015, your
10   job changed a bit.
11        A    Uh-huh.
12        Q    How and why was that?
13        A    I was planning to take a buyout offer and
14   leave because I'd been working nights and weekends
15   for decades and I thought -- I was considering the
16   buyout offer.  And then Andy Rosenthal and Laurie
17   Munster and Terry Tang came to me with a proposal
18   that I switch to working days and help out with the
19   editing earlier in the day.
20        Q    And so, in the 2017 time period, did you
21   have, like, typical hours that you worked?
22        A    I was still working part-time.  I had
23   always worked three days a week before.  I think it
24   might have moved to four days a week by then.  I'm
25   not sure.  And I was still often the person of the
```

Page 23

```
1                      L. Cohn
2    Bob Semple/Terry Tang/Nick Fox group to stay the
3    latest and answer questions and deal with the
4    international edition and maybe answer some
5    questions from copy editors.  So some days I came in
6    more like noon, and other days I came in for the
7    meeting.
8         Q    So in June of 2017, were there set days of
9    the week, then, that you were working?
10        A    I can't remember what they were.  I think I
11   had at least one day off, and I just can't remember
12   what day it was.  It changed according to the news
13   developments and what days they thought they needed
14   me, and then it changed when other people were on
15   vacation, and then it changed when Terry Tang left.
16        Q    So I want to make sure I understand
17   correctly.
18             You were working part-time and you got at
19   least one day of the week off; is that right?
20        A    One during the week, one Monday through
21   Friday off.
22        Q    Okay.  It started to sound an awful lot
23   like a lawyer schedule.
24             And then the other thing I wanted to ask
25   you about in this Exhibit A is the last question
```

Page 24

```
1                      L. Cohn
2    that you were asked and your answer to it.  They
3    asked you what advice you have for people who want
4    to become editors or you wish you would have known
5    when you started.
6             And you said, "I had an older colleague
7    tell me, 'We want to have a certain consistency in
8    the editing.  In the end, it's just you and the copy
9    and you have to use your internal sense of what's
10   right and wrong.  We have these stylebooks from
11   different institutions.  But within that, there's
12   this grey area that you have to develop your own
13   sense of right and wrong and to trust it.'"
14             Is that an accurate quote from you?
15        A    I suspect it is.  It sounds like me.
16        Q    Do you recall who the colleague is that you
17   were referencing in that quote?
18        A    I do.  It was Steven Pickering.
19        Q    And who is he?
20        A    He was the -- a long-time copy editor on
21   the foreign desk and then on the editorial op-ed
22   pages who trained me when I began.  And when he said
23   that to me -- and this is what I was thinking of --
24   we were really -- what we were talking about was
25   just Times style and grammar, but mainly about Times
```

Page 25

```
1                      L. Cohn
2    style.  That's why I spoke of those stylebooks
3    there.  So, just to clarify.
4         Q    So when you -- and that's what I was going
5    to ask you.
6             When you were talking about "right" and
7    "wrong" there, you're referencing style and grammar?
8         A    Yes.
9         Q    Okay.
10             And you mentioned a minute ago
11   Mr. Rosenthal.  That's Andrew Rosenthal, correct?
12        A    Correct.
13        Q    And who was Andrew Rosenthal?
14        A    Andrew Rosenthal was editor of the
15   editorial section page, the predecessor of James
16   Bennet.
17        Q    And how long was Mr. Rosenthal the editor
18   of the editorial page?
19        A    I would have to look that up.
20        Q    Okay.  That's all right.  Yeah, that's
21   another one of the things I should have told you at
22   the beginning is I don't want you to guess or
23   speculate in any of your answers, unless I ask you
24   to do that.  If you don't know something, that's
25   perfectly fine, just let me know.
```

Page 26

                    L. Cohn
1        I'm going to show you now what's been
2   marked as Exhibit 1.
3                 (Exhibit 1 was shown to the
4                 witness.)
5   A    Oops.  I just lost the video.  Wait.
6        Can you hear me?  I just lost the whole
7   screen.
8   Q    Yup.  I can still hear you and see you.
9   A    I can't see anyone or anything.
10  Q    You should be able to -- at the bottom, do
11  you see a box down there with, like, a little camera
12  on it?
13  A    Oh, no.  No, I don't.
14  Q    What we can do is, you can log back in.
15  A    Yeah, I have a box that says, "Please click
16  open Zoom, U.S.  Click here to launch the meeting."
17  MS. SCHELL:  Do we want to go off the
18       record for a second?
19       MR. VOGT:  Yeah, let's go off.
20       THE VIDEOGRAPHER:  Ms. Cohn.  It might just
21       be covered by the document that you have opened
22       up.
23       MS. SCHELL:  Do you have --
24       MR. VOGT:  You can close it and then it

*Note: line numbers above are offset; original shows lines 1-25.*

Page 27

                    L. Cohn
1   will reopen it.
2        MS. SCHELL:  Or you can make it smaller.
3        THE WITNESS:  Now I have something back.
4   Let's see, desktop one, desktop two.
5        Okay, I'm back.
6        THE VIDEOGRAPHER:  Okay.
7   We're still on the record, sir.
8        MR. VOGT:  Thank you.
9        THE WITNESS:  Oh, excuse me, before that
10       interruption, I don't remember what you had
11       asked me.
12  BY MR. VOGT:
13  Q    That's okay.
14       Do you have Exhibit 1 up?
15  A    Let me open it.
16       Okay.
17  Q    And this is a piece that's entitled "Talk
18  to The Times Editorial Page Editor Andrew Rosenthal"
19  from April of 2009.
20       Have you ever seen this piece before?
21  A    I'm looking at it to see.
22  Q    Yup, just let me know when you're done
23  looking through it.
24  A    I do not remember whether I have seen this

Page 28

                    L. Cohn
1   before.
2   Q    And one of the things that Mr. Rosenthal
3   says in here is that, "When it comes to facts --
4   verifiable pieces of information -- editorials are
5   no different than any other article in The Times."
6        Is that your understanding, as well?
7        MS. SCHELL:  Where is that, Shane?
8        MR. VOGT:  Page 2 of 21.  It will be the
9        third page of the exhibit itself because
10       there's a cover page on there.
11  A    I'm looking for that quote.  Wait, I'm
12  sorry, which page?
13  Q    It's okay.
14  A    Page 3, okay.
15  Q    Page 3 of the exhibit.
16  A    So in this, his first answer there, that
17  long --
18  Q    Yes.  It's down -- it's the third paragraph
19  from the bottom.
20  A    I agree with him.
21  Q    And is that -- is that the way things
22  worked in June of 2017?
23       MS. SCHELL:  Objection to form.
24  A    I don't recall -- that question's a bit

Page 29

                    L. Cohn
1   general, so I'm not quite sure how to answer that.
2   "How that worked," what do you mean by "how that
3   worked"?
4   Q    I mean, was it your understanding that, in
5   June of 2017, within the editorial board, that when
6   it came to facts, verifiable pieces of information,
7   editorials were no different than any other article
8   in The Times?
9   A    Yes.
10  Q    And then if you go to the next page.
11  A    Okay.
12  Q    The second paragraph down, it says, "Our
13  writers bear the first and primary responsibility
14  for checking their facts, but they are backed up by
15  the editors who edit their editorials and signed
16  opinion pieces, by our very able staff researcher,
17  and dedicated and extremely hard-working team of
18  copy editors."
19       Do you agree, do you agree -- do you agree
20  with that statement?
21  A    Yes.
22  Q    And is that -- would that statement also be
23  applicable to the June of 2017 time period?
24       MS. SCHELL:  Objection to form.

Page 30

                    L. Cohn
1                   L. Cohn
2      A    I did not know that anything had changed
3  from that.  But since James was the editor of the
4  page, I don't -- I don't know how he viewed it.  I
5  would say that I would still view it that way.
6      Q    Did -- when -- do you remember when
7  Mr. Bennet came in and became the editor of the
8  editorial page?
9      A    Yes.
10     Q    When was that?
11     A    Oh, excuse me.  I thought you meant, "Do
12 you remember when that happened?"  I don't know the
13 date.
14     Q    That would be an example of one of the bad
15 questions that I warned you about at the beginning.
16         Do you remember, in 2016, Mr. Bennet coming
17 in and becoming the editor of the editorial page?
18     A    I remember -- I don't -- I cannot remember
19 the date when he came.
20     Q    When Mr. Bennet did come in and became the
21 editor of the editorial page, do you recall whether
22 any changes were implemented in terms of standards
23 that govern the editorial department?
24     A    In the way I would define "standards," I
25 would say no, there were no changes about standards,

Page 31

1                   L. Cohn
2  editorial standards and quality.  No.  And -- yeah.
3      Q    And when Mr. Bennet came on as the
4  editorial -- as the editor of the editorial
5  department, were any changes implemented that
6  related to fact checking?
7      A    Not that I was aware of.  There could have
8  been changes that he would have voiced to the fact
9  checkers, but I was not aware of any.
10     Q    And when Mr. Bennet came in and took over
11 as editor of the editorial department, did you
12 notice any changes in terms of the content that was
13 being published on the editorial page?
14         MS. SCHELL:  Objection to form.
15     A    I mean, of course he had made different
16 decisions than his predecessor would have when he
17 was picking pieces.  But the changes were very slow
18 to come.  I would say very minimal until later years
19 and mainly after I left.
20     Q    Did you notice at all whether the content
21 of the editorial page, once Mr. Bennet took over,
22 seemed to become more controversial?
23         MS. SCHELL:  Objection to form.
24     Q    You can answer.
25     A    Yeah, I -- I don't think it was more

Page 32

1                   L. Cohn
2  controversial, in my view.  I thought we were
3  dealing with issues that were very controversial
4  before.
5      Q    Did you notice at all whether or not any of
6  the people that Mr. Bennet brought on, once he took
7  over as editor of the editorial department, seemed
8  to draw controversy towards The Times?
9          MS. SCHELL:  Objection to form.
10     A    Are you talking about editorial board hires
11 or --
12     Q    Editorial board hires and op-ed columnists.
13     A    Op-ed columnists, well, yes, the Bret
14 Stephens would be one case.
15         Not on the editorial board.  I can't
16 actually think of anyone who was hired while I was
17 there.
18     Q    Did you ever -- in the 2017 time period,
19 did you ever work on or edit any op-ed columns?
20     A    I'm sorry, in what period?
21     Q    2017.
22     A    No.  That was completely separate.
23     Q    Was there -- do you recall, at any point in
24 time, ever working on any op-ed columns while -- say
25 from the 2011 time period up until November of 2017?

Page 33

1                   L. Cohn
2      A    Until my job shifted in that last two
3  years, yes, I edited op-ed columnists all the time,
4  because I was then the night copy editor, night and
5  weekend, and the copy editor's job is to edit both
6  within the op-ed section and the editorial page.  So
7  I edited many, many, many columnists.
8      Q    I'm going to show you another exhibit,
9  which is Exhibit Number 8, and it should be a piece
10 by the public editor Arthur Brisbane called "Time,
11 The Enemy."
12         (Exhibit 8 was shown to the
13          witness.)
14     A    How do I get out of looking at this one
15 piece and go back to the list?
16         MS. SCHELL:  You can close the earlier one.
17     A    Can I just close that out?
18     Q    Yes.
19     A    Okay, sorry.
20         Ah, okay.  So let me open this new one.
21         And could you repeat your question?
22     Q    Yeah.  I just wanted to know if you were
23 familiar with this piece.
24     A    No.  I may have read it, but I don't
25 remember it.

L. Cohn

1    L. Cohn
2    Q    While you were working at The Times, did
3    you read the paper, its paper, every day?
4    A    I did not read every piece online and in
5    the paper, no.
6    Q    While you were working at The Times, did
7    you read the Opinion section every day?
8    A    I tried.  I don't think I read it every
9    day.  Or I don't think I read all of it every day.
10   Q    Okay.
11        Did you -- did you get the print edition of
12   the paper or were you getting it online?
13        MS. SCHELL:  Object to form.
14   A    Print.
15   Q    And was that -- was that the way that you
16   received the paper up through November of 2017?
17   A    Yes.  I also had access to it online, but I
18   did receive a print paper at home the next morning.
19   Q    And do you know this exhibit we're looking
20   at, Exhibit 8, do you know Arthur Brisbane?
21   A    No.
22   Q    Do you know what the public editor is -- or
23   I guess I should say "was" -- at The New York Times?
24   A    Yes.
25   Q    And what was the public editor?

L. Cohn

1    L. Cohn
2    A    Kind of an ombudsman for readers in the
3    public, looking at all aspects of the paper and
4    commenting on ways -- what it did well and how it
5    can be improved.  Mainly on how it can be improved.
6    Q    Did the -- while you were working there at
7    least, did the editorial department take note of
8    ways that the public editor said that the paper
9    could be improved?
10        MS. SCHELL:  Objection to form.
11   A    Well, for all those years I was the
12   night/weekend copy editor, if there were discussions
13   about that, I don't -- I probably was not part of
14   them.  I don't remember any sort of change coming
15   down from my managers that specifically mentioned,
16   as the public editor, that.  So that's all I can
17   say.
18   Q    At this particular piece that we're looking
19   at, Exhibit 8, if you go to the third page, down on
20   the bottom there, underneath the photo, there are a
21   few paragraphs there that it starts with, "The
22   Tuscon shooting."
23   A    Okay.
24   Q    If you want to look through those, I'm
25   going to ask you some questions about the section

L. Cohn

1    L. Cohn
2    that sort of goes from there on to the top of the
3    next page.
4    A    Okay.  I'll read it.  I think something
5    might be cut off on mine.  "But core speech raising
6    the" -- I can't really read what comes after that,
7    but I can read as far as that.
8    Q    Okay.  There's a paragraph in here that
9    reads, "The Times's day-one coverage in some of its
10   Sunday print editions included a strong focus on the
11   political climate in Arizona and the nation.  For
12   some readers -- and I share this view to an
13   extent -- placing the violence in the broader
14   context was problematic."
15        Do you recall there being any discussions
16   within the editorial department around the time of
17   the Loughner shooting in January of 2011 about
18   whether or not placing the shooting in the broader
19   political context was problematic?
20   A    There were no conversations about that I
21   was part of.
22   Q    Did you work on any pieces in the 2011 time
23   period that related to the Loughner shooting?
24   A    No.  It's -- it's possible.  I mean, I was
25   a copy editor.  I got the pieces at the, at the --

L. Cohn

1    L. Cohn
2    on the weekend that had already been edited, and
3    there could have been something on that.  I could
4    have had a column that I edited on that.  I mean, I
5    would have to go back and look at all those papers
6    and see what the columns were because I was editing
7    the Monday columns and some of the Saturday/Sunday
8    columns.
9        Actually, at that point, I might have just
10   been doing Sunday, Monday, depending what the print
11   schedules were.  So I would have to look back and
12   see if any of them fell on my days and see if I
13   actually worked that day.  So -- but nothing I can
14   recall.
15   Q    Okay.
16        And then he goes on in this piece to talk
17   about -- he says, "The Times had a lot of company,
18   as news organizations, commentators, and political
19   figures shouldered into an unruly scrum battling
20   over whether the political environment was to blame.
21   Meanwhile, opportunities were missed to pick up on
22   evidence -- quite apparent as early as the first
23   day -- that Jared Lee Loughner, who is charged with
24   the shootings, had a mental disorder and might not
25   have been motivated by politics at all."

Page 38

L. Cohn

1
2      Do you recall any discussions within the
3  editorial department about that concept that he's
4  talking about in the paragraph that I just read?
5      MS. SCHELL:  Objection to form.
6      A    There were no discussions about that that I
7  was a part of.
8      Q    Do you recall, at any point in time, from
9  the time of the Loughner shooting up until the date
10  of the Scalise shooting, learning whether or not any
11  link had been made between political rhetoric and
12  Jared Loughner's shooting in Tuscon?
13      MS. SCHELL:  Objection to form.
14      A    Could you repeat that?  It was a bit long
15  and I --
16      Q    Yeah.
17      Do you recall, at any point in time between
18  the date of the Loughner shooting and the date of
19  the Scalise shooting in Virginia, during that time
20  period, do you recall ever learning whether any link
21  was established between political rhetoric and
22  Mr. Loughner's shooting in Arizona?
23      MS. SCHELL:  Same objection.
24      A    I don't recall.
25      Q    And in this piece we've been looking at,

Page 39

L. Cohn

1
2  Exhibit 8, down a couple of paragraphs in the one
3  that I was just reading from, it reads, "So why does
4  a story get framed this way?  Journalism educators
5  characterize this kind of framing as a storytelling
6  habit -- one of relating new facts to an existing
7  storyline -- and also as a reflex of news
8  organizations that are built to handle some topics
9  well, and others less well."
10      Did you ever hear anyone talk about the
11  concept of a storytelling habit while you were
12  working at The Times?
13      MS. SCHELL:  Objection to form.
14      A    I, I have never heard that phrase,
15  "storytelling habit," before.
16      Q    Have you ever heard anyone, while you were
17  working at The Times, talk about the concept of
18  "framing a story"?
19      A    Yes.
20      MS. SCHELL:  Objection to form.
21      Q    And what is your understanding of what
22  "framing a story" means?
23      A    Through what lens do we want to look at
24  this issue.  Is it -- for example, you might say is
25  it an economic issue, is it a cultural issue, do we

Page 40

L. Cohn

1
2  want to see it politically in terms of the political
3  parties.  That would be a general idea to me of what
4  framing is.
5      Q    And do you recall whether or not there were
6  any discussions about framing in the context of the
7  "America's Lethal Politics" editorial?
8      A    I don't recall anyone using the word
9  "framing" or "frame."
10      Q    Do you recall anyone discussing the lens
11  through which they wanted to look at the topics that
12  were discussed in the "America's Lethal Politics"
13  editorial?
14      A    Well, there was much discussion as to what
15  we wanted to say in the editorial.  I don't know
16  that the concepts of lenses or framing is exactly
17  what we were talking about.  We were really talking
18  about what's important in the story and what do we
19  want to say and what direction do we want the
20  editorial to go.  There was discussion about that.
21      Q    And when you say "what direction we want
22  the editorial to go," what do you mean by that?
23      A    Is this piece going to be mainly about gun
24  control or are we going to -- is there anything
25  specific we want in terms of gun control; is it

Page 41

L. Cohn

1
2  going to be more about the political climate, the
3  fact that it was a member of Congress who was
4  attacked.  Yeah, what -- what themes are we going to
5  explore in this piece.
6      Q    And when you say there were discussions,
7  were those discussions -- did they take place
8  verbally or strictly by email?  Do you recall?
9      A    I recall there was an email from Bob Semple
10  laying out the initial direction.  And there were
11  various discussions throughout the day, just
12  informal.  I don't remember if they were phone, text
13  message, or email.  Probably a variety.
14      Q    Okay.
15      MR. VOGT:  Why don't we go ahead and take a
16  break there.  That's a good stopping point, and
17  we're at about an hour, and we'll come back at,
18  say, 11:10.
19      THE VIDEOGRAPHER:  We're now off the
20  record.  The time is 10:56 a.m.
21      (Recess taken.)
22      THE VIDEOGRAPHER:  This marks the beginning
23  of Media Unit No. 2.  We're back on the record.
24  The time is 11:13 p.m.
25  BY MR. VOGT:

Page 42

1                         L. Cohn
2        Q    You had mentioned before in your testimony
3   that when you were working as the -- did you say
4   night editor, or was it just you were the editor at
5   night?
6        A    My official title was weekend editor,
7   but -- yeah.  It was the copy editor position.
8        Q    And how would the copy editor position
9   differ from just a regular editor position?
10       A    You are editing a copy that's already been
11  edited and approved by either the editor of the page
12  or the deputy or, in some instances, Bob Semple, and
13  is closer to the point where it is just ready to go
14  into the paper.  More emphasis on style, grammar,
15  and some fact checking.
16       Q    Okay.
17            And I'm going to go through just a few
18  different pieces and see if you recall at all
19  whether you worked on these.
20            Let me start with Exhibit 10.
21                 (Exhibit 10 was shown to the
22                 witness.)
23       Q    It should be a piece entitled "Playing All
24  the Angles" by Maureen Dowd.
25            Do you have that?

Page 43

1                         L. Cohn
2        A    I'm opening it.  Do you know what day of
3   the week it appeared?
4        Q    I looked that up during the break.  It
5   was -- according to Google, at least, it was a
6   Saturday.
7        A    I do not believe I worked on that, but I
8   could be wrong.  If I could go back into The Times'
9   computer and check to see who had worked on it, but
10  I don't believe so.
11       Q    You don't recall off the top of your head?
12       A    No.  I think I probably did not.
13       Q    And have you -- while you were working at
14  The Times, did you ever hear people refer to Sarah
15  Palin as a "mean girl"?
16       A    No.
17       Q    Did you ever hear anyone refer to her as
18  "Queen Bee Sarah"?
19       A    Not that I can recall.
20       Q    While you were working at The Times, did
21  you ever hear anyone within the editorial department
22  refer to Sarah Palin in a derogatory manner?
23            MS. SCHELL:  Objection to form.
24       A    "Editorial department," when you use that
25  phrase, are you referring to Opinion columnists,

Page 44

1                         L. Cohn
2   because -- or?
3        Q    First just start, like, editorial board
4   members.
5        A    Editorial board members, and --
6        Q    So let me rephrase the question and phrase
7   it in a proper manner.
8            While you were working at The New York
9   Times, did you ever hear an editorial board member
10  refer to Sarah Palin in a derogatory manner?
11            MS. SCHELL:  Objection to form.
12       A    Not that I can recall.
13       Q    And while you were working at The Times,
14  did you ever hear an op-ed columnist refer to Sarah
15  Palin in a derogatory manner?
16            MS. SCHELL:  Objection to form.
17       A    When you say "refer," are you saying in a
18  written piece, something they wrote, or something
19  they said?
20       Q    Something they said.
21       A    No.  I don't recall -- I mean, I don't
22  recall any conversations with op-ed columnists about
23  Sarah Palin other than William Kristol, whom I
24  edited for the entire year he was at The Times, and
25  we had conversations about Sarah Palin.  Nothing he

Page 45

1                         L. Cohn
2   said was derogatory.  He was -- in fact, those
3   columns were right when she started to appear more
4   in the national stage and he was urging that she be
5   considered as a VP candidate.  So they were -- there
6   was nothing derogatory.
7        Q    And who was William Kristol?
8        A    A journalist, and he was a columnist for
9   one year leading up to Sarah Palin's candidacy and
10  during the candidacy.  I don't -- I don't remember
11  if it was actually a calendar year or what, but
12  hired to cover that campaign.  And he was one of the
13  first people who started talking about Sarah Palin.
14  And I edited those columns, so we certainly had many
15  conversations.
16       Q    Could he be considered a conservative
17  journalist?
18            MS. SCHELL:  Objection to form.
19            You can answer.
20       A    Yes.
21       Q    Would he actually be considered
22  neo-conservative?
23            MS. SCHELL:  Objection to form.
24            You can answer.
25       A    I'm not sure.  That term is -- I'm not

Page 46

```
1                     L. Cohn
2  sure.  To me, he's a conservative.  I don't know
3  that I would -- I'm sure people have called him a
4  neo-con.
5       Q   Okay.
6           Let me show you -- you can close
7  Exhibit 10, and I'm going to send you Exhibit 11.
8                (Exhibit 11 was shown to the
9                 witness.)
10      A   Okay.
11      Q   And Exhibit 10 -- I mean Exhibit 11 should
12 be a piece titled "Sarah Palin, Rage Whisperer."
13      A   Okay.
14      Q   And this is dated January 26, 2017, which I
15 believe was a Monday.
16      A   Okay.
17      Q   Do you recall whether or not you worked on
18 this piece?
19      A   I would not have worked on that piece
20 because -- wait.  This is online, right?
21      Q   Yes.
22      A   Yeah, I really worked on print.
23          And she's an outside commentator; that's
24 the Opinion department.  I only worked on Opinion --
25 New York Times Opinion columnists, which is, you
```

Page 47

```
1                     L. Cohn
2  know, the kind of -- those definitions are starting
3  to change a bit now, but up until I left, it was
4  very clear.  There were, you know, two columnists a
5  day, about, sometimes one, and they were the
6  regular, stable, weekly Times op-ed columnists.
7           These are, like, out -- Nicole Wallace was
8  an outside contributor.  I wouldn't -- that goes to
9  a department I was not part of.  It was the Opinion
10 department.  But not -- yeah, it didn't go through
11 the editorial board copy editor.
12      Q   And do you recall reading this piece,
13 Exhibit 11?
14      A   No.
15      Q   Do you recall, at any point in time while
16 you were working for the editorial board, there
17 being any discussions within the editorial
18 department about any attacks that Sarah Palin had
19 made on the media?
20          MS. SCHELL:  Objection to form.
21      A   I don't recall any.  I -- I don't recall
22 any.  I was -- I was there at night and on weekends,
23 so it would have had to have been a telephone
24 conversation, and I don't recall any.
25      Q   Okay.
```

Page 48

```
1                     L. Cohn
2       Q   You can close Exhibit 11, and I'm going to
3  send you Exhibit 12.
4                (Exhibit 12 was shown to the
5                 witness.)
6       A   Okay.
7       Q   And it should be Charles Blow's
8  December 3rd, 2010, column "She Who Must Not Be
9  Named"; and that, I believe, was a Friday.
10      A   Okay.
11      Q   Do you recall whether you worked on this
12 piece?
13      A   I did not.
14      Q   Have you ever seen this piece before?
15      A   I have seen many, many Charles Blow
16 columns.  I do not recall seeing this particular
17 one.
18      Q   Do you recall there ever being any
19 discussions while you were working for the editorial
20 board about whether articles about Sarah Palin drive
21 web traffic?
22          MS. SCHELL:  Objection to form.
23      A   I never heard anyone say that ever.
24      Q   While you were working with the editorial
25 board, did anybody talk about web traffic or what
```

Page 49

```
1                     L. Cohn
2  topics may generate more interest online?
3       A   We talked about what readers would find
4  interesting and we did look to see how many readers
5  had read certain pieces.  And, yes, we did -- yeah.
6  There were times where people said, "Yeah, that will
7  get a lot of clicks."  But -- yeah.
8           As the years went on, there was more
9  technology to track those things.  Most of the time
10 I was there, there was not.
11      Q   Let me show you another piece by Charles.
12 This is Exhibit 60.
13                (Exhibit 60 was shown to the
14                 witness.)
15      A   Okay.
16      Q   And it should be a piece titled "The Tuscon
17 Witch Hunt" from January 14 of 2011, which I believe
18 was a Friday.
19          Do you know whether you worked on this
20 piece?
21      A   I did not.
22      Q   Have you ever seen this piece before?
23      A   I may have seen it.  I don't recall.  I've
24 seen hundreds of Charles Blow columns, so I don't
25 know, I'm sorry.
```

Page 50

L. Cohn

2    Q   Do you recall when you may have seen it?
3        MS. SCHELL:  Objection to form.
4    A   I don't recall seeing it, so I can't tell
5    you when I might have seen it.
6    Q   Do you know whether or not, on June 14 of
7    2017, anyone reviewed this article -- or, I'm sorry,
8    this column, by Mr. Blow, "The Tuscon Witch Hunt"?
9        MS. SCHELL:  Objection to form.
10   A   Whether anyone -- did you say whether
11   anyone reviewed it?
12   Q   Yeah.  Anyone -- let me rephrase the
13   question.
14       Do you know whether on June 14 of 2017,
15   whether anyone that worked on the "America's Lethal
16   Politics" editorial reviewed Mr. Blow's column, "The
17   Tuscon Witch Hunt"?
18   A   I do not.  That could have been on the list
19   of some articles that were circulated.  I'm sure
20   there were a list of articles that were circulated
21   during the fact-checking process.  But no, I can't
22   recall whether anyone reviewed it.
23   Q   And you can close that one.  Let me show
24   you one more.  This is Exhibit 61.
25       (Exhibit 61 was shown to the

Page 51

L. Cohn

2        witness.)
3    A   Okay.
4    Q   This should be a column titled "United in
5    Horror" by Ross Douthat from January 9, 2011, and
6    that's a Sunday.
7        And do you know whether you worked on this
8    column?
9    A   I -- based on the date and the day of the
10   week, I probably did, if I wasn't on vacation.  But
11   can I take a second to read it?
12   Q   Yes.
13   A   Okay.
14       (Perusing document.)
15   I don't remember that column, but I may
16   have edited that.  As I said, I've edited hundreds
17   of op-ed columns, and so many by Ross Douthat, that,
18   you know --
19   Q   That's what I was going to ask you, too.
20   A   -- that I can't recall.
21   Q   Did you edit a number of Ross Douthat
22   columns?
23   A   Yes.
24   Q   Let's talk about June 14 of 2017 now.
25       Do you recall how you first learned about

Page 52

L. Cohn

2    the -- what we'll call "the Scalise shooting" that
3    happened in Virginia?
4    A   I -- I don't recall exactly.  I know I came
5    in a bit later in the day.  Whether I heard --
6    whether I saw it on my phone or on the way in, I
7    don't know.  I remember I got an email about it.
8    Q   And do you remember who the email that you
9    received was from?
10   A   Bob Semple.
11   Q   And do you remember what the subject matter
12   of the email from Mr. Semple was?
13   A   Can I see it?
14   Q   Well, I was just trying to figure out which
15   one -- let me start with this one.  I think this is
16   the first one I saw your name on.
17       I'm sending you Exhibit 16.
18       (Exhibit 16 was shown to the
19        witness.)
20   A   Okay, okay.
21   Q   And there's an email from Mr. Semple at
22   11:59 a.m., and you're among one of the people
23   listed on the "to" line.
24   A   Right.
25   Q   Is this the email that you were referencing

Page 53

L. Cohn

2    a moment ago in your testimony?
3    A   Either it was that one or one similar.  I
4    think there's another.  I don't know.  This feels a
5    little like it's already midstream in thought, but
6    there may have been an earlier one.
7    Q   Let me show you Exhibit 15.
8        (Exhibit 15 was shown to the
9        witness.)
10   A   Okay.
11   Q   Is that possibly the email that you were
12   thinking of?
13   A   I -- no.  I mean, I don't see me on this.
14   Q   All right.  Do you know whether the email
15   that you're thinking of, was it just between you and
16   Mr. Semple?
17   A   Yeah.  I know we had some exchange about
18   the shooting and -- yeah.
19   Q   Do you remember what, in general, what the
20   exchange was about?
21   A   I know there was some talk about the --
22   what's his name?  I always forget his name -- the
23   shooter, having gone to high school in Belleville,
24   Illinois.  That's where I went.
25   Q   Mr. Hodgkinson?

Page 54

L. Cohn

1
2    A    Hodgkinson, thank you.
3    Q    Let me show you Exhibit 17, because this
4    one has a reference to that.
5                   (Exhibit 17 was shown to the
6                   witness.)
7    A    Right.
8    Q    And you have an email in that string at
9    12:04 p.m.
10        Is that the one you're thinking of?
11   A    Yes.
12   Q    Okay.
13        And you reference in there the fact that
14   this guy went to your high school in Belleville.
15   And then you go on to say, "I'm on the train and
16   don't know what Trump said, but I'm thinking back to
17   what a giant story Gabby Giffords's shooting was.
18   Amazing that shooting Congressmen doesn't seem so
19   shocking now."
20        So, in your mind, was the Gabby Giffords
21   shooting, in your mind, was that a giant story?
22            MS. SCHELL:  Objection to form.
23   A    Yes.
24   Q    Does that -- does the Giffords shooting
25   stand out in your mind?

Page 55

L. Cohn

1
2    A    Stand out as in --
3            MS. SCHELL:  Objection to form.
4    Q    Is it something you recall easily?
5    A    I recall the story.  I mean, I may not
6    recall the details, but I recall it was a moment
7    that shook up the country.
8    Q    And in response to your 12:04 p.m., email,
9    Mr. Semple responds at 12:08 and says, "Okay.  We
10   should definitely shoot for a piece, not huge, but a
11   piece.  P.S. Linda, did Jimmy Connors go to your
12   school?  I think I already asked you that."
13        So once Mr. Semple said, "Okay, we should
14   definitely shoot for a piece," what, if anything,
15   did you do next?
16   A    Well, I was on the train then, so I was on
17   my way in, I think it said.  Or maybe that was the
18   earlier email.  I don't know -- yeah, "I'm on
19   train," it says.  So I'm sure I got into work and
20   just checked in.  He was just letting me know what
21   his thoughts are -- were on what the pieces should
22   be for the next day, that we should do something
23   like this.  So there really was nothing for me to
24   do.
25   Q    And do you recall whether or not, aside

Page 56

L. Cohn

1
2    from the "America's Lethal Politics" editorial, were
3    you working on anything else on June 14 of 2017?
4    A    I'm sure I picked up other pieces and
5    worked on them during the day.  That would be
6    normal.  I don't think I really turned -- got that
7    involved with the legal politics piece until quite
8    late in the day.  So I'm sure I was working on
9    something else.  I don't recall what.
10   Q    Do you recall -- let me ask you this.
11        So once you get into the office, where was
12   your office located?
13   A    In relation -- in The Times Building?
14   Q    Yes.
15   A    In the editorial page section.
16   Q    Did you have your own office or did you
17   work at a cubicle or an area like that?  Where was
18   your work space?
19   A    I had my own office.  There was -- the copy
20   editors had an office.  I think there was maybe one
21   other than mine.
22        At that point, the empty deputy editor
23   office was, you know, across from me with some desks
24   in the middle.  And then James's was next to that.
25        So, like -- yeah, I was on the side --

Page 57

L. Cohn

1
2    like, theirs was across the window and mine was
3    across the little workspace.
4    Q    Okay.
5        Do you recall, at any point in time on
6    June 14 of 2017, having any conversations either on
7    the phone or in an office with Mr. Bennet about the
8    "America's Lethal Politics" editorial?
9    A    I may have had some casual conversations,
10   but the only one I can recall is after the piece got
11   to me very late afternoon or early evening and I --
12   I might have texted him, but I think I went to his
13   office at one point.  I sort of remember standing in
14   front of his glass door, you know, opening up the
15   door or something, and saying, "You need to look at
16   this."
17   Q    When you said "you need to look at this,"
18   what were you referring to?
19   A    That I wasn't -- I recall thinking I wasn't
20   really sure if it's what he wanted.  I thought there
21   were some issues with it.  I thought there had been
22   quite the confusion over the day as to where this
23   piece was headed, as to be either more of a gun
24   control piece or to be more of a piece about the
25   political climate and the sort of lack of civility

Page 58

L. Cohn

1
2    in America's political discourse.
3        Q    And when you say you recall thinking you
4    weren't really sure, what weren't you really sure
5    about?
6        A    I wasn't sure what James intended, wanted
7    in the piece.  I wasn't sure if the piece worked.
8    And I think there were also some, maybe, issues
9    about fit for the prep paper, big question of how it
10   was going to work with the other pieces.  I think
11   there might have been some issues about length.
12       Q    And when you say you weren't sure it
13   worked, what do you mean by that?
14           MS. SCHELL:  Objection to form.
15       A    I wasn't sure it accomplished what James
16   would want it to accomplish.
17       Q    And what did you -- what was your
18   understanding of what James wanted it to accomplish?
19       A    Well, that's what I wasn't sure about.
20       Q    Okay.
21       A    I mean, we had -- you know, there were a
22   couple competing ideas about the piece.  Gun
23   control, I could see that Bob was kind of pushing
24   that.  However, our gun control -- usual gun control
25   writer and expert on the issue, Frank Clines, was

Page 59

L. Cohn

1
2    not in that day.  So Elizabeth was writing it.  And
3    she's more of a political writer, but could
4    certainly write about gun control.  So -- and then I
5    think there were pushes from other people.  And I
6    cannot actually recall who, although you showed me
7    the email with Nick Fox's thought on it, which I
8    hadn't recall -- actually, I don't think I've seen,
9    because I don't think I was on that one, so I hadn't
10   seen that -- where he thought it would -- suggesting
11   it should be more about the broader political issue
12   of discourse.
13       Q    And were those competing ideas that you
14   were referencing, gun control versus the political
15   climate issue?
16       A    Yes.
17           MS. SCHELL:  Objection to form.
18       A    Yeah.  I -- yeah.  I'm not -- I might not
19   say "competing" because you could deal with more
20   than one issue in a piece, but there was a question
21   as to how much nitty-gritty we wanted to get into on
22   gun control and what that would be.  Right, yes.
23       Q    And do you recall, during the course of
24   this conversation that you had with Mr. Bennet on
25   June 14 of 2017, what Mr. Bennet said in response to

Page 60

L. Cohn

1
2    the questions that you raised?
3        A    He said, "I'll take a look at it," and he
4    called up the piece.  He, I think, at one point
5    said, yeah, it needs some work, I'll do it.
6    Something to that effect.  That's not -- I'm not
7    quoting him.  That was the message.
8        Q    And do you recall around what time this
9    conversation occurred?
10       A    I don't know.  I mean, 5:00 maybe.  I don't
11   know.  Maybe later.  Approaching deadline.  I
12   then -- yeah.
13       Q    And you said approaching deadline.  When
14   was the deadline?
15       A    8:00.
16       Q    And what was that the deadline for?
17       A    The print edition.
18       Q    And was it for the print edition in the
19   U.S. or international?
20       A    U.S.
21       Q    Was there a deadline for the international?
22       A    We sent it to them before we left for the
23   night and I think -- I don't know.  And it did --
24   those deadlines do change over time.  But, like,
25   3:00 a.m. or something.

Page 61

L. Cohn

1
2        Q    And do you recall, at any point on June 14
3    of 2017, did anyone express an urgency to get this
4    particular piece, "America's Lethal Politics", out
5    that day?
6            MS. SCHELL:  Objection to form.
7        A    We -- the sense was -- yes, we wanted to
8    get it in the paper the next day, which -- you know,
9    once we put it on what we call the DEW, the
10   schedule, you know, when Bob Semple said, "Yes,
11   let's put it on there," the goal is to get it in the
12   next day's print paper and to get it online that
13   night.
14       Q    Was there already another editorial that
15   was planned for the June 15, 2017, edition of the
16   paper before you started working on "America's
17   Lethal Politics"?
18           MS. SCHELL:  Objection to form.
19       A    Well, there -- there were at least two or
20   three editorials that day.  I'd have to look at them
21   to remind myself whether it was two or three.  So we
22   could have had those.
23           Is that what you were asking?
24       Q    Yes.
25       A    Yes.

Page 62

L. Cohn

1                    L. Cohn
2       Q    Do you have any independent recollection of
3  what those were?
4       A    No.
5       Q    Let me show you another document, which is
6  Exhibit 20.
7                    (Exhibit 20 was shown to the
8                    witness.)
9       A    Okay.
10      Q    This should be an email from Mr. Bennet on
11  June 14 at 12:41 p.m.
12      A    Uh-huh.
13      Q    Do you recall this email?
14      A    I'm going to take a second to read it.
15      Q    Yes, please do.
16      A    (Perusing document.)
17           Okay.  I don't recall that email.
18      Q    In this email, Mr. Bennet says, "Hard for
19  me to imagine that Bernie himself is guilty of
20  anything like that.  But if there's evidence of the
21  kind of inciting hate speech on the Left that we, or
22  I at least, have tended to associate with the Right
23  (e.g., in the run-up to the Gabby Giffords
24  shooting), we should deal with that."
25           Do you recall, at any time, having any

Page 63

L. Cohn

1                    L. Cohn
2  conversations with Mr. Bennet about that particular
3  issue?
4           MS. SCHELL:  Objection to form.
5       A    No, we had one very brief exchange about a
6  question I put into the piece later that is not
7  exactly that question but tangential to it.
8       Q    Do you recall whether or not, on June 14 of
9  2017, you had any conversations with anyone else
10  that was working on the editorial about this topic
11  that Mr. Bennet raises in Exhibit 20 about inciting
12  hate speech?
13          MS. SCHELL:  Objection to form.
14      A    About -- can I just ask if you mean
15  inciting hate speech in general, or the point he's
16  making about hate speech by people on the Left?
17      Q    In general.
18      A    In general.  I'm sure I did have
19  conversations that touched on that or were about
20  that, but I can't recall any specific conversations.
21      Q    Do you know who you may have had those
22  conversations with?
23      A    Probably Bob Semple, possibly Nick Fox, and
24  possibly Elizabeth Williamson.
25      Q    And if you had spoken with Ms. Williamson,

Page 64

L. Cohn

1                    L. Cohn
2  would that have been by phone?
3       A    Correct.
4           MS. SCHELL:  Objection to form.
5       Q    And if you had spoken with Mr. Semple,
6  would that have been in person?
7           MS. SCHELL:  Objection to form.
8       A    It could have been in person, on the phone,
9  through our chat platform, or email.
10      Q    What was your chat platform?
11      A    I don't know.  Some kind of -- whatever The
12  New York Times system had.
13      Q    Was it Slack?
14      A    Oh, I don't know if we were using Slack
15  then.  I think we had a separate system.  I think
16  there was Slack; I don't think the editorial page
17  used it that much.  But I think there was some other
18  little texting platform.
19      Q    And when you mentioned before that you
20  couldn't recall whether -- I think we were talking
21  about Mr. Bennet, but you couldn't remember certain
22  conversations with him, you brought up texting.
23           When you said "texting," were you talking
24  about texting on a phone or through this chat
25  platform?

Page 65

L. Cohn

1                    L. Cohn
2       A    Oh, chat platform.  I should have referred
3  to it as a chat, I guess.
4       Q    And at any point in time, have you gone
5  back and tried to look through any of your personal
6  documents for materials related to this case?
7       A    Yes.
8       Q    When did you do that?
9       A    After I received the subpoena for
10  documents.
11      Q    Did you find anything?
12      A    No.  I mean, I -- on my personal -- we're
13  talking about my personal accounts because I don't
14  have access to anything at The New York Times.
15      Q    Right.
16      A    No, I found one email link that I had sent
17  from myself to my home email which was a link to the
18  SNL skit that Sarah Palin did with the rap and the
19  moves.
20      Q    Okay.
21      A    Famous skit.  I wanted to watch it again.
22      Q    Okay.
23           Do you have any recollection of whether or
24  not you had any conversations with Mr. Fox on
25  June 14 of 2017 that would have been either face to

Page 66

1                    L. Cohn
2  face or by phone as opposed to, you know, in
3  writing?
4      A   I am sure I spoke to Nick Fox in person
5  that day.  I would have spoken to him in person
6  every day.  And I'm sure we discussed the editorials
7  we were working on.  I'm sure we discussed this.
8          I can't recall it happening.  It's just so
9  long ago.  I just really don't have that kind of
10 recollection of the specific events of that day.
11 Only a very few stand out.
12     Q   Which ones stand out?
13     A   Walking to James's door, talking to him
14 very, very briefly, his saying that he would look at
15 the piece and work on it.
16         And then I remember going back to my office
17 and looking and waiting, as were the other, you
18 know, editors, and Eileen Lepping, the fact checker,
19 for him to drop the piece.  Because until he hits
20 the "save" button, we can't see what he's doing with
21 the piece.  And he seemed very busy working, so I --
22 that's about all I can recall -- I mean, that's what
23 I recall from that day, waiting for the piece.
24     Q   Do you recall at all, at any point, on
25 June 14 of 2017, having any conversations with

Page 67

1                    L. Cohn
2  anyone that was working on the "America's Lethal
3  Politics" editorial that related to any link between
4  political incitement and the Giffords shooting?
5          MS. SCHELL:  Objection to form.
6      A   I cannot recall a conversation.
7      Q   And can you recall, at any point in time on
8  June 14 of 2017, whether you personally looked to
9  see whether or not any link between political
10 incitement and the Giffords shooting had been
11 established?
12         MS. SCHELL:  Objection to form.
13     A   I do not recall looking.
14     Q   And do you recall if anyone else looked to
15 see whether or not a link had been established
16 between political incitement and the Giffords
17 shooting?
18         MS. SCHELL:  Objection to form.
19     A   Excuse me, could you ask that again?
20     Q   Sure.  Do you remember whether or not, on
21 June 14 of 2017, anyone who was working on the
22 "America's Lethal Politics" editorial looked to see
23 whether or not a link had been established between
24 political incitement and the Giffords shooting?
25         MS. SCHELL:  Same objection.

Page 68

1                    L. Cohn
2      A   I don't think I would know if they had
3  looked.
4      Q   Which I understand, you don't think that
5  you would know.
6          But do you know whether anyone did?
7      A   I don't remember hearing that -- I don't
8  remember it.  I mean, I just don't remember whether
9  anyone did.
10     Q   And as we sit here today, do you know
11 whether or not any link between political incitement
12 and the Giffords shooting has been established?
13         MS. SCHELL:  Objection to form.
14     A   I know that there was no link established
15 between the flyer we mentioned and the Giffords
16 shooting.
17     Q   And when --
18     A   I --
19     Q   When you say "the flyer we mentioned," are
20 you referring to the map that was circulated by
21 Sarah Palin's political action committee?
22     A   Correct.
23     Q   And how is it that you know that no link
24 was established between the map circulated by Sarah
25 Palin's political action committee and the Loughner

Page 69

1                    L. Cohn
2  shooting?
3      A   Because when I walked into work the next
4  day, I discovered we'd been wrong and we were
5  running a correction.
6      Q   And how did you discover that you were
7  wrong?
8      A   Everyone told me when I walked in the door.
9      Q   When you say "everyone told me when I
10 walked in the door," who's everyone?
11     A   James was there, Jesse Wegman.  Just the
12 room was abuzz with discussion of that.
13         But because I worked on the correction with
14 James and Jesse Wegman, I most clearly remember that
15 there was a general gasp in the room like, "Oh, my
16 God.  How could we get this wrong?"
17     Q   Did -- what time did you get to work on
18 June 15th?
19     A   I don't know.  I, I -- I don't know.  I
20 would assume probably, like -- I'd have to see when
21 the correction ran, and then I would know I was
22 there probably an hour before.  Probably like 11:00,
23 12:00.  11:00.  I don't know.
24     Q   That was a Thursday.  Did you normally get
25 into the office later on Thursdays?

Page 70

1                    L. Cohn
2      A    All I know is I did not go to -- was there
3  a morning meeting that day?  I don't know.
4      Q    That's the next question I was going to ask
5  you, is whether or not you recall going to a morning
6  meeting that day.
7      A    I didn't go.  I don't know whether there
8  was one scheduled, whether it occurred before I got
9  there, or -- I think my assumption is when I walked
10 in, we went straight to working on the correction.
11 And if there had been a meeting, it didn't take
12 place or was delayed because we were working on the
13 correction first thing.
14     Q    All right.  And if you go back to
15 Exhibit 20, the one we were talking about before we
16 went down this sort of side avenue, that sentence I
17 went over from Mr. Bennet.
18     A    Oh, okay, hold on.  Okay.
19     Q    He says, "But if there's evidence on the
20 Left that we, or I at least, have tended to
21 associate with the Right."
22          Now, at this point in time, June 14 of
23 2017, did you tend to associate hate speech with the
24 Right in the lead-up to the Gabby Giffords shooting?
25          MS. SCHELL:  Objection to form.

Page 71

1                    L. Cohn
2      A    Well, my feeling is that it was -- the
3  issue really came back to gun control, that if you
4  have -- you have hate speech and you have people
5  saying there should be more availability of guns.
6  That's a much more dangerous mixture than if you
7  have -- I really -- I don't think there is as much
8  hate speech -- there was as much hate speech at that
9  time on the Left.  But I think there was much more
10 extremism on the Right.  But the danger was when --
11 I think it had to come back to gun control, that it
12 was really the different distinction between, yes,
13 there was uncivil discourse on the Left as well as
14 the Right, but people weren't, at the same time,
15 urging that guns remain free and available and
16 flowing through society.
17     Q    And when you -- when you said "hate speech"
18 a minute ago, what do you mean by "hate speech"?
19     A    Racist rhetoric, the vilifying of the poor
20 and powerless, anti-Semitism, Nazi signs, protests.
21     Q    Would you consider the map that Sarah
22 Palin's political action committee circulated to be
23 hate speech?
24          MS. SCHELL:  Objection to form.
25     A    I probably would not call that exactly hate

Page 72

1  speech.  I would call it -- I would call it maybe
2  heated rhetoric.  I don't think -- because, I mean,
3  it had electoral districts being targeted.  I think
4  of hate speech as being more about, you know, toward
5  a certain group of people; and not geographic, but
6  people defined more by their race, gender, religion,
7  or maybe just their powerlessness or their
8  immigration status.
9      Q    You can close that exhibit that we were
10 looking at.  I'm going to show you Exhibit 25.
11              (Exhibit 25 was shown to the
12                  witness.)
13     A    Okay.
14     Q    Do you know whether you've ever seen this
15 email or one like it before?
16          MS. SCHELL:  Objection to form.
17     A    Well, it looks like it wasn't addressed to
18 me, so I don't think I saw it.
19     Q    Do you recall, on June 14 of 2017,
20 receiving any emails that contained links to prior
21 articles or editorials that were written by the
22 editorial board that were compiled in connection
23 with preparing the "America's Lethal Politics"
24 editorial?

Page 73

1                    L. Cohn
2      A    I am sure I was included on some of those,
3  yes.
4      Q    And do you recall whether or not, on the
5  morning of -- or the afternoon of June 14, 2017, you
6  went back and looked at any links that were shared
7  amongst the people that were working on the
8  "America's Lethal Politics" editorial?
9          MS. SCHELL:  Objection to form.
10     A    Did you say on the 15th or on the 14th?
11     Q    On the 14th, but I'll rephrase it because
12 it was probably a bad question.
13          On June 14 of 2017, do you recall at any
14 point in time reviewing editorials that were
15 circulated amongst the people who were working on
16 the "America's Lethal Politics" editorial?
17     A    I vaguely recall seeing some gun control
18 stories.  Whether I looked them up on my own or they
19 were the ones being circulated, I don't know.
20     Q    Do you have any recollection of whether or
21 not, on June 14 of 2017, you conducted any research
22 related to political rhetoric or political
23 incitement in connection with the "America's Lethal
24 Politics" editorial?
25          MS. SCHELL:  Objection to form.

Page 74

L. Cohn

1          L. Cohn
2     A    I really can't specifically recall.  I
3  mean, I know I got that -- I wasn't really involved
4  with that piece until very late in the day, so I
5  really can't recall what kind of research I was
6  doing prior to that or in that small amount of time
7  I had it.
8          I do remember doing some research on one
9  aspect of gun control that we were very nervous we
10 were going to get that wrong.  And as happens with
11 fact checking, you have a sense of what aspects you
12 think are most susceptible to confusion or to error,
13 even, and I remember spending a lot of time on that
14 because gun control issues are very ornate and
15 detailed and different in all the states.  And it's,
16 it's -- it tends to be an issue that can be very
17 prone to error because there's so many different
18 kinds of guns and different laws and such a
19 patchboard across the country.  So -- and because
20 Elizabeth was not our gun control writer, I do
21 remember doing -- being concerned, I think along
22 with Eileen Lepping, the fact checker, and probably
23 Nick Fox, who was reading the piece while I was
24 reading it, but he had it on view and I had -- had
25 it active about -- it was something about a gun

Page 75

L. Cohn

1 control regulation or rule, and we spent quite a bit
2 of time researching that.
3     Q    And do you know --
4     A    Unfortunately --
5     Q    Go ahead.
6     A    Unfortunately, we spent a lot of time on
7 that and that ate up quite a bit of time, yeah.
8     Q    And just generally speaking, when you were
9 working on a piece that had an issue that was
10 susceptible to confusion or error in it, would you
11 typically slow down, like, take a step back and say,
12 "Wait, we need to slow down on this piece and make
13 sure we get it right"?
14     MS. SCHELL:  Objection to form.
15     A    If deadline pressure allowed, yes.  I mean,
16 you use your instincts as to what you think is --
17 are the susceptible points in terms of accuracy in a
18 piece of writing and devote the time that you have
19 accordingly.
20     Q    And do you know, at any point in time on
21 June 14 of 2017, did you have any discussions with
22 Mr. Bennet about the issue in the piece that you had
23 just described to me that you thought was -- you had
24 a sense was most susceptible to confusion or error?

Page 76

L. Cohn

1     MS. SCHELL:  Objection to form.
2     A    There might have been some little written
3 back-and-forth.  But, I mean, probably that -- I
4 believe that was between me, Eileen Lepping,
5 possibly Nick Fox, maybe Elizabeth, because I just
6 remember it being fairly granular about gun control,
7 not really about our policy about gun control, which
8 is more, you know, something -- that I probably
9 would have discussed more with James.  But this had
10 a certain specificity that was more a question, I
11 think, for the writer and Eileen.
12     Q    Did -- in this email that we're looking at,
13 the one on June 14 2017 that's Exhibit 25,
14 there's an email from Elizabeth Williamson at
15 1:40 in that one.  It says, "Phoebe, Thanks.  Is
16 there one that references hate-type speech against
17 Dems in the run-up to her shooting?  James
18 referenced that."
19     A    Right.
20     Q    Do you know whether anyone ever did any
21 research for articles that related to hate-type
22 speech against Dems in the run-up to the Gabby
23 Giffords shooting on June 14, 2017?
24     MS. SCHELL:  Objection to form.

Page 77

L. Cohn

1     A    I don't know if anyone did.  I don't know
2 if --
3     Q    Did you --
4     A    I don't know if they did or didn't.
5     Q    Did you ever research that specific issue?
6     MS. SCHELL:  Objection to form.
7     A    I may have.  I spent much of the
8 day just reading news, refreshing myself on certain
9 issues.  I don't recall if I read that or not.
10     Q    When you -- in this time period, June 14 of
11 2017, when you were conducting research in
12 association with editorials that you were working
13 on, how would you typically do that?  I mean, would
14 you go to The Times website?  Would you use Google?
15 What would you do?
16     A    All the above.  It depends on the issue.
17 If we had a long history of pieces, I would go and
18 read those previous pieces.  Because one of the
19 concerns is that if the board has a position, if we
20 change our position, we want -- we want to make sure
21 we're doing it with thought and, you know, it's a --
22 that we've made a thoughtful decision if there is
23 some policy change.  So you want to make sure you're
24 reflecting past, established positions.  So I

Page 78

1                    L. Cohn
2    probably would rely mostly on -- you know, that
3    would be a primary source.
4           And then news stories, which could be from
5    The Times or from any other publication.  And yes, I
6    would probably get to them through Google.
7       Q   If you were trying to verify a fact through
8    news stories, would you look for news stories in The
9    Times first?
10          MS. SCHELL:  Objection to form.
11      A   Not necessarily.  I would consider it a
12   good source, but, I mean, I often would be checking
13   Washington Post.  Sometimes it's just about you
14   Google something and it was whichever established
15   source would come up first.
16      Q   And when you conducted research in
17   connection with editorials that you were working on,
18   would you save your research?
19      A   No.  I mean, I didn't keep files of what I
20   read for each piece, no.
21      Q   So if an occasion arose, if you needed to
22   go back and find what sources you had relied on to
23   verify a fact in an editorial, how would you go
24   about doing that?
25          MS. SCHELL:  Objection to form.

Page 79

1                    L. Cohn
2       A   Well, often writers would compile lists of
3    sources they had and they would send it to an email.
4    So some writers -- say, for example, Mira Kamdar was
5    a writer in editorial.  She would always send a long
6    list which would have a source for almost
7    everything, everything that could be broken down
8    into a little fact in a piece, which the fact
9    checkers would look at.  I would look at some of
10   them.  And then -- so -- for those, there might be a
11   record.  I'm not really quite sure -- could you ask
12   that again?
13      Q   Yeah.
14      A   Sorry, I started talking and I just kind of
15   went on.
16      Q   I was just asking if a situation arose
17   where the accuracy of the fact in an editorial was
18   questioned, how would you go about going back and
19   checking the sources that were used to verify the
20   fact in question?
21      A   Well, it would depend on how much time had
22   elapsed.  But, you know, you could go into your
23   Google history and, you know, there would probably
24   be hundreds and hundreds of things in a day that you
25   had looked at, and you could look at that.

Page 80

1                    L. Cohn
2           And then often, when we were editing the
3    pieces, we had note mode, which, you know, appeared
4    just between us, and fact checkers would also put a
5    check mark on something they had checked, or a
6    writer insists, you know, they spoke to so-and-so
7    and they know this or some such.
8       Q   What's -- what's note mode?
9       A   Note mode is just you're typing something
10   in and it's in a -- it's for notes.  Anyone who's in
11   The Times system can see, but they don't appear in
12   print, so you don't accidentally get something in
13   print that says, "per Wash Post story," in the
14   middle of a sentence, which would be terrible.
15      Q   Right.  I think lawyers need note mode.
16      A   There's also a function that strips it all
17   out before it's published.
18          MR. VOGT:  Why don't we take a break there.
19          Do you guys want to check and see, Linda,
20      if you need a break for lunch or something like
21      that?  I mean, I still have a decent amount to
22      do, so I don't know if you want to break for
23      lunch and come back at 1:00.
24          THE VIDEOGRAPHER:  We're now off the
25      record.  The time is 12:16 p.m.

Page 81

1                    L. Cohn
2           (Recess taken.)
3           THE VIDEOGRAPHER:  This marks the beginning
4       of Media Unit No. 3.  We're now back on the
5       record.
6           The time is 12:41 p.m.
7           MR. VOGT:  I'm going to send you now
8       Exhibit 101.
9               (Exhibit 101 was shown to the
10                  witness.)
11      A   Okay.
12      Q   And it should be a June 14 email string
13   between you and Nick Fox; is that right?
14      A   Correct.
15      Q   And do you recall this email string?
16      A   No.
17      Q   Okay.
18          Just to go through it, but at the bottom,
19   it starts off with Mr. Fox saying, at 4:08 p.m.,
20   "Would you like to take Carol and I'll take
21   Elizabeth?"  And you respond at 4:09 saying, "Carol
22   may hold, so I can pick up Elizabeth."
23          Do you know what you're talking about there
24   with respect to Carol and Elizabeth?
25      A   Elizabeth would be the piece in question,

Page 82

1              L. Cohn
2    "Lethal Politics," I assume, unless she had some
3    other piece running.  But, yeah, let's say it's
4    "Lethal Politics."
5              Carol would be Carol Giacomo, and it would
6    be some other piece that was being considered, I
7    guess, for the next day.
8              Or did run; I actually have not gone back
9    to check to see what pieces ran alongside "Lethal
10   Politics."
11   Q    Okay.  And then eventually did -- was the
12   decision made that -- were you and Mr. Fox here
13   deciding who would edit which pieces?
14   A    We were working it out, yes.
15   Q    And then in this exchange at 4:26 p.m.,
16   Mr. Fox says, "Both are around 700" -- that's words,
17   right?
18   A    Correct.
19   Q    And it says, "I think Bob was thinking
20   Afghan could hold for a lede tomorrow."
21   A    Hold on.
22   Q    Do you recall?
23   A    Okay.  I mean, I see that.
24        What is your question?
25   Q    Do you know what that's a reference to?

Page 83

1              L. Cohn
2    A    It would be an editorial about Afghanistan,
3    which could likely be what we're referring to when
4    we say "Carol," because she was our foreign affairs
5    editorial writer.
6    Q    And then eventually, once you get to the
7    end of this string, you say, at 4:35, "Aha, yes.
8    That's the plan.  I've updated the DEW."
9         What's "the DEW"?
10   A    The DEW is what we call the schedule for
11   upcoming editorials; what runs which days in which
12   position on the page.
13   Q    And is the DEW saved, do you know, for each
14   day?
15   A    We can see it several days ahead and
16   sometimes before, but -- are you asking me whether
17   it's, like, archived in The Times system?
18   Q    Yes.
19   A    I have no idea.
20   Q    And do you recall what you meant when you
21   say, "Aha, yes.  That's the plan," in this email at
22   4:35 p.m.?  Do you know what you were talking about
23   there?
24   A    No.
25   Q    And then let me show you -- I'm going to

Page 84

1              L. Cohn
2    show this just for a context, sort of, for the
3    timeline.  I'm sending you Exhibit 72.
4              (Exhibit 72 was shown to the
5              witness.)
6    A    Okay.
7              MR. VOGT:  Just let me know when you're
8    ready, Jacquelyn.
9              MS. SCHELL:  Yes, thank you for waiting.
10             MR. VOGT:  Do you want me to resend it?
11             MS. SCHELL:  Yeah, if you don't mind.  It's
12   showing it's downloaded, but when I open it --
13   wait, let me try one other thing.
14             No, it just won't reopen.  If you don't
15   mind resending, that would be great.
16             MR. VOGT:  Yeah.
17             THE VIDEOGRAPHER:  Ms. Cohn, would you mind
18   just moving a little closer to the middle of
19   the screen?
20             THE WITNESS:  Sorry.
21             THE VIDEOGRAPHER:  Thank you.
22             MS. SCHELL:  Okay.  Dave has even emailed
23   it to me and it will not open.
24             MR. VOGT:  Let me see -- let me know if you
25   can get this one because I can probably do the

Page 85

1              L. Cohn
2    same thing off of this one.
3              MS. SCHELL:  Okay.
4              If not, Dave has it, and if he wants to
5    jump in until my PDF starts working again.
6              MR. AXELROD:  We can always do that.  You
7    can also try, Jacquelyn, just shutting down
8    your PDF and restarting it.  Sometimes the PDF
9    Reader gets messed up.
10             MS. SCHELL:  It was closed and won't
11   reopen.
12             MR. VOGT:  See if you can open 33.  I just
13   sent that one through.
14             (Exhibit 33 was shown to the
15             witness.)
16             MS. SCHELL:  I'm trying, as well.  I'm not
17   sure what's going on with this.
18             Dave, do you want to take over for me and
19   I'll see if I can figure it out in the
20   background for a second?
21             MR. AXELROD:  Sure.  That's fine.
22             MS. SCHELL:  Okay.  Thank you.
23   BY MR. VOGT:
24   Q    Exhibit 72 that I sent you first is just an
25   email from Ms. Williamson at 4:45.  The subject line

Page 86

L. Cohn

1  says "Shooting in Back Field."
2      What's "back field"?
3      A    That's the directory where editorial
4  writers put their piece when they're ready to have
5  someone, an editor, pick it up to edit.
6      Q    And then if you go to Exhibit 33.
7      A    Okay.
8      Q    It should be a draft of the article that,
9  at the very bottom on the second page or at the end
10 of the text on the second page, it should say
11 "Elizabeth Williamson back field, 6/14/2017, at
12 4:44 p.m."?
13     A    Yes.
14     Q    And do you recall if at or around the time
15 of 4:44 p.m., on June 14 of 2017, you started
16 reviewing the draft of the article that Elizabeth
17 Williamson had filed?
18     A    I don't recall.
19     Q    And do you recall this document that we're
20 looking at, Exhibit 33, do you recall if this is the
21 version of the editorial that you took with you when
22 you went to speak with Mr. Bennet at his office?
23     A    I can't recall that.  There would be --
24 every time we save the editorial, which would be
25

Page 87

L. Cohn

1  after even the most, you know, minor alteration,
2  even a period, it creates a new copy.  So I can't --
3  I don't know which time-stamped copy I took to him.
4  I can't recall.
5      Q    Do you know whether or not you were the
6  first person to review the draft editorial after
7  Elizabeth Williamson filed it for the first time?
8          MR. AXELROD:  Objection to form.
9      A    I don't know whether anyone had picked it
10 up before me or not, no.
11     Q    And do you recall, in the first iteration
12 of the editorial that you looked at, reviewing the
13 paragraph that's in the middle of the first page, it
14 starts with, "That in 10 minutes a single gunman
15 could wreak such carnage in a bedroom community a
16 short drive from the Capitol is horrifying, but no
17 longer surprising.  Not all the details are known
18 yet, but a sickeningly familiar pattern is emerging:
19 a deranged individual with a gun -- perhaps multiple
20 guns -- and scores of rounds of ammunition uses
21 politics as a pretense for a murderous shooting
22 spree."
23     Do you recall reading that passage the
24 first time you looked at the draft editorial?
25

Page 88

L. Cohn

1      A    No.
2      Q    And then do you recall the first time you
3  reviewed the editorial, reading the paragraph
4  following the one I was just reading from that
5  starts with "Just as in 2011"?
6      A    I'm reading it, sorry.
7          I don't recall that exact wording, no.
8      Q    And in that paragraph --
9          MS. SCHELL:  Dave, I'm hopping back.
10         MR. VOGT:  Okay.
11         MS. SCHELL:  Yeah, I'm back up and running
12     again.
13         Thank you.
14     Q    In that same paragraph, the one we're
15 looking at where it says "just as in 2011," in the
16 last sentence of that paragraph, the word
17 "circulated" appears and it's blue and underlined.
18     Is that a hyperlink?
19     A    Yes.
20     Q    Do you recall whether you clicked on that
21 hyperlink at any point in time when you were
22 reviewing the editorial?
23     A    No.
24     Q    No, you do not recall or no, you did not?
25

Page 89

L. Cohn

1      A    No, I do not recall.
2      Q    Would it have been your standard practice,
3  at the time when you were editing a editorial, if
4  there were a hyperlink included in it, to click on
5  that link and see where it led?
6      A    That would depend whether I were -- you
7  know, often, when I was editing, I was reading
8  behind someone else who was working on the piece.  I
9  probably would click on a hyperlink, but not always.
10     Q    Let me show you now Exhibit 34.
11         (Exhibit 34 was shown to the
12         witness.)
13     A    Sorry.
14     Q    It's okay.
15     A    I keep forgetting I have to go back to the
16 chat box.  I'm thinking it's going to pop up without
17 me having to do anything.
18     Okay, yes.
19     Q    And Exhibit 34 should be an ABC News
20 article from June 9 of 2011 titled "Sarah Palin's
21 crosshairs Ad Dominates Gabrielle Giffords Debate."
22     A    Okay.
23     Q    Have you ever seen this article before?
24     A    I don't recall seeing this particular
25

Page 90

1                    L. Cohn
2  article.
3      Q    And do you have any recollection of whether
4  or not, on June 14 of 2017, you would have read this
5  article?
6      MS. SCHELL:  Objection to form.
7      A    Well, I -- I don't know.  I don't recollect
8  reading this article, so I don't -- can you ask that
9  question again?
10     Q    Yeah.  I just wanted to know specifically,
11 having looked at it and seeing it now, do you know
12 whether or not, on June 14 of 2017, you would have
13 read this article?
14     A    I don't know whether I would have read this
15 article on that date.
16     Q    Let me show you now 32E.
17              (Exhibit 32E was shown to the
18              witness.)
19     A    Okay.
20     Q    And this is an excerpt from a big group of
21 pages that we received from The Times in discovery
22 in this case, and I think these are printouts of
23 different versions of the editorial from Scoop.
24          Is that correct?
25     A    Are you asking me if this is from Scoop?

Page 91

1                    L. Cohn
2      Q    Yes.
3          Do you know?
4      A    I don't know what you were given.
5      Q    Well, let me ask you this.
6          Were you using Scoop as your content
7  management system as of June 14 of 2017?
8      A    Yes.
9      Q    Okay.
10         And if you look at the -- if we start with
11 the last page of the exhibit, there should be a line
12 there, it says, "Elizabeth Williamson, back field,
13 4:44 p.m."
14     A    Oh, yes, uh-huh.
15     Q    And then if we go up above that to the
16 second page of the exhibit, it should have your name
17 there with "back field" at 5:03 p.m.
18     A    Yes.
19     Q    Do you know, would that be, that 5:03 p.m.
20 stamp, would that be an accurate time period for
21 when you would have first reviewed and made any
22 changes or comments on the "America's Lethal
23 Politics" editorial?
24     A    It means that I opened the file and made
25 some change, which could be as small as adding a

Page 92

1                    L. Cohn
2  space, and then stored it.  But that sounds about
3  right for when I first picked it up.
4      Q    All right.  And if you go up above your
5  name at that time stamp at 5:03, the first full
6  paragraph on that page where it says, "In the
7  aftermath of Wednesday's shooting, the political
8  Right and Left and both sides in the gun debate dove
9  into their respectful foxholes."
10         Do you see that?
11     A    Yes.
12     Q    In bold, it says, "Do we know of any
13 elected officials on the Left who have incited
14 violence?  Or just unaffiliated people online or
15 comedians, most are pro-gun control.  Does this
16 graph imply equivalence?"
17         Did you insert that?
18     A    I'm pretty sure I did.  We usually, if this
19 were -- if I were looking in Scoop online, I would
20 hover my little cursor over there and it would
21 confirm who put it in.  But I believe that was me,
22 to the best of my recollection, yes.
23     Q    And do you recall why it was that you were
24 asking this first question, "do we know of any
25 elected officials on the Left who have incited

Page 93

1                    L. Cohn
2  violence?"
3      A    Because the phrase before it says "both
4  sides" -- where it says "both sides dove into" --
5  actually, let me read the sentence that came before
6  that, just to --
7      Q    And you may want to read -- read the entire
8  thing, because I'm going to ask you some other
9  questions about this, too.  So go ahead and read the
10 entire thing.
11         So going back, the question of "do we know
12 of any elected officials on the Left who have
13 incited violence," do you recall, after reading the
14 entire draft that we're looking at, why you asked
15 that question?
16     A    Because, in that sentence, we're saying the
17 political Right and Left, the piece is implying
18 there's been this kind of vitriolic speech on both
19 sides of the political spectrum.  And for me, the
20 issue comes -- and what the thresh of the piece is
21 that it comes back to gun control.
22         So while people on the Left might have been
23 speaking in very strong terms politically about, you
24 know, how political opponents were hurting the
25 country, it wasn't -- they were also talking about

Page 94

L. Cohn

1 gun control.
2         So their rhetoric wasn't paired with the
3 idea that the free flow of guns throughout our
4 culture was acceptable.  That, to me, was the
5 distinction between the Left and the Right,
6 particularly as it pertains to this piece about a
7 shooting.
8     Q    And then you used the word "incited" in
9 that question.
10         What did you mean by "incited"?
11    A    Maybe fostered or said things that might
12 make people who were prone to such things feel that
13 they should take some sort of violent action.  I
14 don't know.  Just sort of a general -- I don't -- I,
15 I -- I certainly didn't mean someone was giving,
16 like, orders or saying go shoot someone or go commit
17 a violent act, but just that the rhetoric was ugly
18 enough that it would boil up and foster people to
19 take things into their own hands.
20    Q    Now, at any point in time on June 14 of
21 2017, did anyone answer that question that you
22 asked, whether or not you knew of any elected
23 officials on the Left who had incited violence?
24         MS. SCHELL:  Objection to form.

Page 95

L. Cohn

1    A    I don't remember a specific -- someone
2 saying, you know, "person X did."  I don't remember
3 any discussion.
4    Q    And when you say in here "or just
5 unaffiliated people online or comedians," what were
6 you referring to?
7    A    Well, I was here really -- when we talk
8 about the political Right and Left, I was really
9 talking about people, not late night comedians or
10 someone like a Kathy Griffin.  Someone you would
11 think is a little bit more part of the political
12 discussion.
13    Q    And was this -- do you recall whether this
14 editorial was written around the same time period
15 that Kathy Griffin came under fire for posting a
16 picture of her holding a severed head of President
17 Trump?
18    A    I actually do not remember the timing of
19 when she did that.
20    Q    But you do recall her doing that, correct?
21    A    I do.
22    Q    Is that one of the things you were thinking
23 of when you referenced "or just unaffiliated people
24 online or comedians" here?

Page 96

L. Cohn

1         MS. SCHELL:  Objection to form.
2    A    Seeing the word "comedian" makes me think
3 it could be that.  In retrospect, I don't know if
4 that's what I was thinking of.
5    Q    And when you asked "does this graph imply
6 equivalence," what do you mean?
7    A    That the heated rhetoric on the Right and
8 the heated rhetoric on the Left were the same.  I
9 think I thought that somehow the respective foxholes
10 line was a little bit -- and the Left was doing this
11 and doing that and the Right is doing that.  It was
12 just parallel that their rhetoric was somehow
13 equivalent.
14    Q    And when you said "incited violence" in
15 this bolded section that we've been looking at, at
16 this time on June 14 of 2017, at 5:03 p.m., did you
17 believe that the map that Sarah Palin's political
18 action committee had circulated had incited Jared
19 Loughner to commit his shooting in 2011?
20         MS. SCHELL:  Objection to form.
21    A    I -- no.  I -- not that directly.  I would
22 think of it more as -- the way you phrased it sounds
23 very direct, that it -- that the map led him to
24 commit the shooting.

Page 97

L. Cohn

1    I -- no, I did not see that.  I saw it as,
2 as one example of the kind of heated political
3 rhetoric against which all these sorts of violent
4 activities were happening.  That it was part of a
5 backdrop of how the conversation in this country was
6 becoming heated and often used violent imagery.
7    Q    If you go to the first page of the exhibit,
8 there's a paragraph there that starts, "That in 10
9 minutes a single gunman."
10         Do you see that one?
11    A    Yes.
12    Q    And then there's a bolded question there,
13 "Are there signs of mental illness or just in the
14 sense that anyone who commits mass shootings is
15 deranged?"
16         Is that a question that you put in there?
17    A    I'm not sure.
18    Q    And do you know whether, during the course
19 of the day on June 14, 2017, whether anyone answered
20 that question, whether there were signs of mental
21 illness with Mr. Hodgkinson?
22    A    I don't know.
23    Q    And right before that bolded question we're
24 looking at, it says, "Not all the details are known

Page 98

```
 1                       L. Cohn
 2   about, but a sickeningly familiar pattern is
 3   emerging: a deranged" -- and if we take out the bold
 4   part -- "individual with a gun -- perhaps multiple
 5   guns -- and scores of rounds of ammunition uses
 6   politics as a pretense for a murderous shooting
 7   spree."
 8           When you reviewed this, where it says "a
 9   sickeningly familiar pattern is emerging," what was
10   your understanding of what that pattern was?
11           MS. SCHELL:  Objection to form.
12       A   I really can't recall what I would have
13   been thinking at the time about a specific phrase
14   like that.
15       Q   Do you recall whether or not, on June 14 of
16   2017, around the time of 5:00, this draft that we've
17   been looking at, were you aware of any of the other
18   pieces that were being worked on for the editorial
19   page the following day?
20           MS. SCHELL:  Objection to form.
21       A   I would have been aware of other pieces
22   being worked on.  As a matter of course, I would
23   have been aware of other pieces.
24       Q   Were you aware of op-eds that were being
25   worked on for the editorial page the following day?
```

Page 99

```
 1                       L. Cohn
 2       A   No, no.  That's --
 3           MS. SCHELL:  Objection to form.
 4       A   No, that's a completely different section.
 5   When I said I would have been aware, I meant only of
 6   the pieces on the DEW listed for the editorials.
 7       Q   So the DEW that we've been talking about
 8   that you looked at, was that just for the editorial
 9   board?
10       A   Yes.
11       Q   Was there any separate document similar to
12   the DEW -- I'm sorry, let me rephrase.
13           Was there any separate document similar to
14   the DEW that would have listed out everything that
15   was worked on for the editorial page the following
16   day, including things like op-eds?
17           MS. SCHELL:  Objection to form.
18       A   I believe the op-ed section had their own
19   thing called "the op sched."
20       Q   And who maintained that, if you know?
21       A   I don't know.
22       Q   And do you know whether or not Mr. Bennet
23   would have been privy to the op-ed sched during that
24   time period?
25       A   He had access to it, certainly, yes.
```

Page 100

```
 1                       L. Cohn
 2       Q   And would anyone have been checking to see,
 3   like, as of June 14 of 2017, for example, whether
 4   the op-ed -- there were op-ed pieces that were being
 5   written on the same subject matter as the editorials
 6   that were being written?
 7           MS. SCHELL:  Objection to form.
 8       A   I mean, every -- those things were open.
 9   Everyone was free to look and had access to the
10   directories for Opinion.  So I don't recall that it
11   was any one person's specific job to do that.  I
12   mean -- yeah.
13       Q   And during the June 14 of 2017 time period,
14   was there anyone checking to make sure that there
15   wasn't going to be any kind of inconsistency
16   factually between op-eds and editorials that were
17   published the same day in the paper or online?
18           MS. SCHELL:  Objection to form.
19       A   Well, I mean, everyone was trying to get
20   their individual parts right.  And then, I think,
21   you know, when I was a copy editor, I would see both
22   sometimes and, yes, sometimes you would notice
23   something in one piece.  An Opinion piece might
24   trigger you to recheck something in an editorial and
25   vice versa, but...
```

Page 101

```
 1                       L. Cohn
 2       Q   Do you know who the copy editor was for the
 3   "America's Lethal Politics" editorial?
 4       A   I don't recall who would have picked that
 5   up.  I don't know.
 6       Q   We'll go through it.  I think I have who it
 7   is.  I was just seeing if you remember while we were
 8   talking about that.
 9           Let me show you now what we're going to
10   mark as 32F.
11           And have you already closed 32E?
12       A   No.
13       Q   Let me ask you one more question before we
14   move on.  The portion that we were looking at with
15   respect to your edits and back field was at
16   5:03 p.m.  And if you look on the first page, above
17   those edits, you have -- it shows Mr. Bennet, back
18   field, at 6:32 p.m.
19       A   Uh-huh.
20       Q   Do you see that?
21       A   Yes.
22       Q   Do you know whether or not the conversation
23   that you talked about earlier that you had with
24   Mr. Bennet when you were at the door of his office,
25   did that occur in the time period between 5:03 p.m.
```

1                    L. Cohn
2    and 6:32 p.m.?
3         A    I think it would probably have been around
4    then.  I -- yeah.  It wasn't before I picked up the
5    piece.  And I know it was by 7:00, I would say.  So
6    it could have been at 6:30.  Either a little before
7    or a little after.
8         Q    So once Mr. Bennet picks up the piece at
9    6:32 p.m., are you able to go in and make changes to
10   it?
11        A    No.
12        Q    So once he's in the document, what
13   capabilities did you have with respect to the
14   editorial?
15        A    I could only see what it would have looked
16   like before he picked it up.  I could only see the
17   previous version unless he hit the "save" button,
18   which would update it.
19        Q    Okay.
20             And then now if you go to Exhibit 32F.
21        A    Okay.
22             (Exhibit 32F was shown to the
23             witness.)
24        Q    If you go to the last page of the exhibit,
25   there should be a time stamp there below your name

1                    L. Cohn
2    and back field at 7:17 p.m.?
3         A    Yes.
4         Q    Would that indicate that, by 7:17 p.m., you
5    were able to go back in and access and make changes
6    to the document?
7         A    That shows that, at 7:17, I stored some
8    change I had made, I think, yeah.
9         Q    Would you have been able to do that if
10   Mr. Bennet was still editing the piece at that time?
11        A    No.  I mean, while I -- well, I think --
12        MS. SCHELL:  Objection to form.
13        A    I think the way the system worked at that
14   time -- you know, I can't recall.  We changed
15   computer systems, but there was a period where one
16   person could be working on the headline and someone
17   else could be working on the text.
18             But if we're just talking about the text,
19   that just shows that, at 7:17, I made a change and
20   stored it.  I don't know whether I kept the piece up
21   after that or if he then took it and went back into
22   it.  I would have to see all the time stamps.  I
23   don't know.  It does show I made a change at 7:17.
24        Q    And if you -- if you start looking through
25   Exhibit 32F that we're looking at, the text of the

1                    L. Cohn
2    editorial itself, you see how it's all bold?
3         A    Yes.
4         Q    What does that indicate?
5         A    You know, I'm not completely sure, because
6    I don't know how these things are printed out
7    from -- what it looks like when you print out
8    something from Scoop.
9             But it -- I don't think it was just so in
10   bold in the type.  That may be showing -- it could
11   be showing new text.  That's my guess.  But I
12   can't -- I can't know for sure.  I would have to ask
13   more of a tech person.
14        Q    And then on this first page, right at the
15   beginning, underneath that bolded line where
16   Mr. Bennet's name is.
17        A    Uh-huh.
18        Q    It says "print headline," and there's a
19   number of potential headlines listed there?
20        A    Correct.
21        Q    Do you know whether you came up with those
22   potential headlines?
23        A    Let me look at those and think back.
24             I can't say for sure because other people
25   could have contributed headlines too, like Nick Fox

1                    L. Cohn
2    or, you know, anyone else could have put them in.
3    Elizabeth could have sent some in.  People could
4    have inserted some in, so I don't know.  Certain
5    ones sound like me to me, but...
6         Q    And then if you go down to the very bottom
7    of the first page, there's a paragraph there that
8    reads, "Was this attack evidence of how vicious
9    American politics have become?  Probably, in 2011,
10   when Jared Lee Loughner opened fire in a" --
11        A    I'm sorry --
12        Q    Do you see that?
13        A    I just got to it now.
14        Q    That's okay.
15             Do you see that paragraph that starts with
16   "Was this attack evidence"?  Can you read that
17   paragraph for me?  Not out loud, just read it to
18   yourself.
19        A    Oh, good.
20             Okay.
21             Do you know who wrote that paragraph?
22        A    It would -- it would -- I would only be
23   able to guess.  I don't know.
24        Q    When we had looked back at that
25   Exhibit 32E, which was the 5:03 version, at that

Page 106

L. Cohn

1  particular paragraph, do you notice how it's changed
2  between the 5:03 version in Exhibit 32E and this
3  version in Exhibit 32F?
4
5       A   I wish I could have them together, but can
6  you -- can you read this other paragraph to me while
7  I'm looking at this one?
8       Q   Yeah.  I'll read it to you while you're
9  looking at this one.
10          And this is out of Exhibit 32E.  It says,
11 "Just as in 2011 when Jared Lee Loughner opened fire
12 in a supermarket parking lot, grievously wounded
13 Representative Gabby Giffords and killing six
14 people, including a nine-year-old girl,
15 Mr. Hodgkinson's rage was nurtured in a vial
16 political climate.  Then, it was in the pro-gun
17 Right being criticized.  In the weeks before the
18 shooting, Sarah Palin's political action committee
19 circulated a map of targeted electoral districts
20 that put Ms. Giffords and 19 other Democrats under
21 stylized crosshairs."
22      A   Okay.  And what's --
23          MS. SCHELL:  Shane, did you have a
24      question?
25          MR. VOGT:  Yeah.

Page 107

L. Cohn

1
2       Q   My question is do you recall whether or not
3  you noticed that change at the time that you were
4  reviewing drafts of this article?
5          MS. SCHELL:  Objection to form.
6       A   I don't recall whether I specifically
7  noticed that change.
8       Q   Do you recall, at any point in time before
9  the "America's Lethal Politics" editorial was
10 published, noticing that the statement "the link to
11 political incitement was clear" had been added to
12 the editorial?
13         MS. SCHELL:  Objection to form.
14      A   I mean, I don't recall reading it and
15 thinking, "Oh, they added that phrase."  I don't
16 recall that.
17      Q   And then if you go to the next paragraph in
18 Exhibit 32F, it says, "Conservatives and right-wing
19 media were quick on Wednesday to demand forceful
20 condemnation of hate speech and crimes by anti-Trump
21 liberals.  They're right, though there is no sign
22 yet of incitement as direct as in the Giffords
23 attack.  Liberals should, of course, hold themselves
24 to the same standard of decency that they ask of the
25 Right."

Page 108

L. Cohn

1
2       Q   Do you recall whether or not you noticed
3  the addition of the phrase "no sign yet of
4  incitement as direct as in the Giffords attack"?
5       A   I am sure I read it, but I don't -- I can't
6  recall being there that day and having that thought,
7  "oh, that was added."
8       Q   And do you recall whether or not, on
9  June 14 of 2017, you personally fact checked either
10 one of the two paragraphs that we just looked
11 through?
12         MS. SCHELL:  Objection to form.
13      A   I don't recall that.
14      Q   And do you recall whether or not, when you
15 spoke with Mr. Bennet, when you were standing
16 outside his office, do you recall discussing either
17 one of those two paragraphs with him?
18         MS. SCHELL:  Objection to form.
19      A   No.  I remember -- wait, what time were
20 these?
21      Q   What we're looking at here is at 7:17 p.m.
22      A   No, that conversation I talked to you about
23 was before.
24      Q   Okay.  Let me show you now Exhibit 74.
25          (Exhibit 74 was shown to the

Page 109

L. Cohn

1
2          witness.)
3       A   Okay.
4       Q   It should be a June 14 email at 7:33 p.m.;
5  is that right?
6       A   That's right.
7       Q   And I believe you're cc'd on this email,
8  correct?
9       A   Correct.
10      Q   And this email, the subject line is "Guns
11 in Virginia."
12          Is this the issue that you were referencing
13 earlier in your testimony when you were talking
14 about some concern over a particular gun law matter
15 that you wanted to make sure was correct in the
16 piece?
17      A   Yes.
18      Q   And Ms. Lepping, when she sends this email,
19 there are some links that are listed there.
20          Do you see those?
21      A   Yes.
22      Q   Are you familiar with the smartgunlaws.org
23 website?
24      A   If I could take a look at it now, I could
25 tell you.

Page 110

```
1                      L. Cohn
2    Q    Let me show you Exhibit 74A.
3                 (Exhibit 74A was shown to the
4                 witness.)
5    A    Okay.
6    Q    After looking at Exhibit 74A, do you recall
7  whether or not you're familiar with the
8  smartgunlaws.org website?
9         MS. SCHELL:  Objection.
10        Shane, you're asking about as she sits here
11  today?
12        THE WITNESS:  I'm sorry, I couldn't hear
13   what you said.
14        MS. SCHELL:  I was asking, Shane, if you
15   could clarify -- as she sits here today?
16   Q    I'm just asking as you sit here today.
17   A    I don't, I don't know this site.
18   Q    And do you know whether or not you ever
19  used smartgunlaws.org as a source of information
20  back in the June of 2017 time period?
21   A    I can't remember.
22        MS. SCHELL:  Objection to form.
23   Q    Did the -- in the June of 2017 time period,
24  do you recall, at that time, how long Mr. Bennet had
25  been the editor of the editorial department?
```

Page 111

```
1                      L. Cohn
2    A    I would have to look that up.  I can't
3  remember the date that Andy Rosenthal left or that
4  James arrived.
5    Q    Do you know, by this time, June 14 of 2017,
6  was it common for Mr. Bennet to be actively involved
7  in editing editorials?
8    A    Yes.
9         MS. SCHELL:  Objection to form.
10   Q    And in the June 14 of 2017 time period, was
11  it common for Mr. Bennet to rewrite editorials?
12        MS. SCHELL:  Objection to form.
13   A    It would be -- I'm not quite sure when
14  something becomes a rewrite, so I'm not quite sure
15  when you're using the word, what your definition
16  would be.
17        But he could sometimes heavily edit an
18  editorial.
19   Q    Had you had a situation, prior to June 14
20  of 2017, where a writer had filed a draft piece and
21  then Mr. Bennet had gone in and taken over editing
22  it like this to where you were unable to edit the
23  piece for a significant amount of time?
24        MS. SCHELL:  Objection to form.
25   A    I mean, there were other times he would
```

Page 112

```
1  spend a long time working on a piece and so no other
2  editor could pick up that piece.  It was not usual
3  to spend, you know, hours on a piece, but -- it's
4  also relative.  It's a little hard for me to answer
5  that.  He did sometimes edit heavily, yes.  And if
6  he had the piece up, other people would not have
7  been able to get into it.  That's always the case.
8  When I have a piece up, someone can't get into it.
9    Q    While you worked for Mr. Bennet, did he
10  show any particular interest in certain topics?
11        MS. SCHELL:  Objection to form.
12   A    He seemed to, you know -- the editorial
13  page is just such a generalist page.  There were a
14  lot of issues he was interested in.  He was
15  interested in big cultural issues and he wanted us
16  to be doing more on that.  He was interested in the
17  work Brent Staples was doing, writing about race.
18        Obviously, you know, interested in
19  politics, it's an editorial page, so yes.  He seemed
20  to have pretty broad interests.
21   Q    Did -- did you ever see him express a
22  particular interest in political rhetoric?
23        MS. SCHELL:  Objection to form.
24   A    I think he's very -- thinks about language
25
```

Page 113

```
1  a lot and he's very sensitive about language and how
2  it affects the culture.  I think that's something
3  that interests him.  And I know that he was a very
4  strong believer in maintaining discourse.  I think
5  that was of interest to him.  I don't know if I
6  could define something being -- what was your
7  phrase -- of particular interest?
8    Q    Yes.
9    A    Yeah.
10   Q    Did Mr. Bennet ever express a particular
11  interest in gun control issues?
12        MS. SCHELL:  Objection to form.
13   A    He was very concerned, yeah, of the
14  epidemic of gun violence in the country.  But in
15  that amount of time, I don't see that as being a big
16  focus.  I don't think there was one individual focus
17  that had developed yet at that time or -- I mean, or
18  maybe since.  But I couldn't say that was a big
19  focus of his, no.  Certainly no more than his
20  predecessors.
21   Q    At this time period, June 14 of 2017, were
22  you aware that Mr. Bennet's brother was a
23  U.S. senator?
24   A    Yes.
25
```

Page 114

L. Cohn

1          L. Cohn
2     Q     And at this time period, June 14 of 2017,
3  were you aware that Mr. Bennet's brother, his office
4  was threatened around the same time as the Giffords
5  shooting?
6     A     No.
7          MS. SCHELL:  Objection to form.
8     Q     Did you ever hear Mr. Bennet talk about his
9  brother's office being threatened at any point in
10 time?
11    A     No.
12         MS. SCHELL:  Objection to form.
13    Q     What does the phrase "trim" mean?
14         MS. SCHELL:  Objection.
15         Where are you looking?
16         MR. VOGT:  I'm just asking a question.
17         MS. SCHELL:  Oh, okay.
18    A     To cut.
19    Q     And in the context of an editorial, when
20 the phrase "trim" is used, what would that mean?
21         MS. SCHELL:  Objection to form.
22    A     To cut or shorten.
23    Q     Let me show you Exhibit 103.
24              (Exhibit 103 was shown to the
25              witness.)

Page 115

1          L. Cohn
2     Q     It should be a June 14 email at 7:35 from
3  Nick Fox to you.
4     A     Yes.
5     Q     Do you recall this email?
6     A     No.
7     Q     If Mr. Fox was sending you emails about --
8  the subject line, "Fixes on Shooting"?
9     A     Uh-huh.
10    Q     -- and asking you to trim things, do you
11 know why he would be doing that?
12         MS. SCHELL:  Objection --
13    A     Yes.
14         MS. SCHELL:  -- to form.
15    Q     Why would he be doing that?
16    A     He was helping me -- he was also, like,
17 editing at the same time I was, and reading behind
18 me.  I had the active file.  He was giving
19 suggestions, I think helping with some of the fact
20 checking with Eileen, and giving me some ideas of
21 how -- what things should cut either because, A,
22 they were maybe not accurate, or B, unnecessary, or
23 C, just to make the piece fit.
24    Q     And do you recall discussing that at any
25 point in time with Mr. Fox, cutting anything because

Page 116

L. Cohn

1  it was inaccurate?
2          MS. SCHELL:  Objection to form.
3     A     No.  But I can see here he said that I
4  don't think it was a high school ball field.  So
5  maybe we cut the word "high school" and just say
6  ball field, if we don't know for sure if it was a
7  high school or grade school or some other.  So I can
8  see that in the email.  Yeah.
9     Q     Let me show you Exhibit 108.
10              (Exhibit 108 was shown to the
11              witness.)
12    A     Okay.
13    Q     And it should be a June 14th email string.
14 It starts at the very top, there's an
15 8:18 p.m. email from you to Mr. Fox; is that right?
16    A     Yes.
17    Q     And the subject line is Shooting H-E-D and
18 blurg [sic]?
19    A     Yeah.  That's a typo.  Blurb.
20    Q     So he's writing you here concerning the
21 headline for the editorial and the blurb for it; is
22 that right?
23    A     I think we said this was from me to him,
24 but -- that part -- but, yeah, I don't know who --

Page 117

1          L. Cohn
2  maybe he started the chain, yes.
3     Q     I think he started it at, if you look down
4  there, at 7:12 p.m.?
5     A     Uh-huh.
6     Q     And then one of the things he writes down
7  there is, "Circumstances were unusual, but the cause
8  of the assault on Congressional representatives is
9  not -- the availability of firearms."
10         Do you see that?
11    A     Uh-huh.
12    Q     Did you have any conversations or
13 discussions with Mr. Fox about the headline or blurb
14 for the editorial?
15    A     Well, I can see here we had some back and
16 forth, but I don't know if we had discussions in
17 person.  I remember we had quite a bit of back and
18 forth between James about the headline.
19    Q     What do you recall about the back and forth
20 between you and Mr. Bennet about the headline?
21    A     I mean, I threw out some ideas.  You know,
22 he would -- I remember him being, hmm, maybe, hmm,
23 and then I think he threw something out.  I don't
24 really remember who chose what, but it can just take
25 a while to get something -- it took a while to get

Page 118

1                      L. Cohn
2   something he liked and approved of.  I don't know if
3   he, in the end, wrote the headline.
4        Q    The back and forth that you were just
5   talking about with Mr. Bennet concerning the
6   headline, was that verbal or was it done through
7   email or chat?
8        A    I really can't recall.  I can't recall.
9   But there was probably some chat.  There was
10  probably some phone call.
11       Q    And then we had looked at, on Exhibit 32F,
12  there were several potential print headlines listed
13  in there.
14            And then I'm going to show you Exhibit 32G.
15                 (Exhibit 32G was shown to the
16                  witness.)
17       A    Wait, sorry, I think I opened something
18  that's not 32G.  Hold on one second.
19            Okay, I have 32G.
20       Q    If you go to the very last page of the
21  exhibit.
22       A    Okay.
23       Q    Do you see the print headline there has
24  several, I think -- it's one long -- it appears to
25  be one long sentence, but is that several different

Page 119

1                      L. Cohn
2   potential headlines?
3        A    It is.
4        Q    And if you go up a few pages before that,
5   there should be what we call a Bates number down at
6   the bottom, it says "NY Times," and then has a
7   number after it.
8        A    Okay.
9        Q    The one I'm looking at should say 224.
10       A    Okay.  Let me go down then.
11            Yes, got that.
12       Q    And do you see the print headlines listed
13  there?
14       A    No.
15       Q    I may have my numbers off.
16            Let me ask you this:  If you go to the very
17  first page of the exhibit, it has the "America's
18  Lethal Politics" headline?
19       A    Yes.
20       Q    Who came up with that title or headline?
21       A    I'm pretty sure that was James.
22       Q    And do you know whether or not he was the
23  one who inserted that headline into the editorial in
24  Scoop or did somebody else do that?
25       A    I don't recall.  Often he would tell me a

Page 120

1                      L. Cohn
2   headline and I would actually type it in.
3        Q    Do you recall any discussion that you might
4   have had with Mr. Bennet about the headline
5   "America's Lethal Politics"?
6        A    No.  I remember taking quite a bit of time
7   trying to come up with something that fit that he
8   liked.  I think I had thrown out some ideas that he
9   didn't choose.  You know, there's a lot of back and
10  forth, so it's hard for me to be 100 percent sure
11  that he didn't say something like that and I tweaked
12  it.  But, yeah.
13       Q    And when you were discussing the potential
14  headlines with Mr. Bennet, did the concept of
15  incitement or political rhetoric come up?
16            MS. SCHELL:  Objection to form.
17       A    I don't remember using the -- do you mean
18  the word "incitement"?  I don't remember --
19       Q    Just the topic.
20       A    The topic.  If we came up with a
21  headline -- or if he chose and/or we came up with a
22  headline that says "America's Lethal Politics", then
23  the concept of rhetoric was certainly there.
24       Q    Why do you say that?
25       A    Well, I think when we say "politics" there,

Page 121

1                      L. Cohn
2   it's -- the use of "politics" there is really
3   talking about the whole political conversation.  I
4   don't think it's just talking about the passage of
5   laws.  I think it's talking about everything from,
6   like, debate over gun control to heated rhetoric.
7        Q    And so, when we get to this point now
8   where, looking at Exhibit 32G with the title we
9   looked at, "America's Lethal Politics", right above
10  that, there's -- you see Eileen Lepping's name at
11  7:37 p.m.?  And when we had first looked at
12  documents from Scoop, Elizabeth Williamson had filed
13  the draft of the editorial around 4:44 p.m.
14            And the question I'm going to ask you is
15  from 4:44 p.m. up until 7:37 p.m., had
16  Ms. Williamson been involved at all in any of the
17  edits that you were making to the editorial?
18            MS. SCHELL:  Objection to form.
19       A    I don't recall.  She had access to -- she
20  could watch changes being made.  Every time someone
21  stored, she would see the new changes.  And I assume
22  someone sent her a playback of the changes.  I would
23  have to go through everyone's emails to find out
24  exactly.
25       Q    I'm going to ask about -- I'll show you

Page 122

1                    L. Cohn
2    something in a second on that.
3            Before I get to that, do you recall, at any
4    point in time, from when Ms. Williamson filed the
5    first draft of the editorial up until this time
6    period of around 7:30 p.m. on June 14 of 2017, did
7    you have any conversations with her about the
8    editorial?
9        A    As in telephone conversations?
10       Q    Yes.
11       A    I don't know.  I don't believe so.  I think
12   she had been dealing more with Bob Semple during the
13   day.  I sort of came into the piece late when Bob
14   had to leave early.  And you showed me that email,
15   also, earlier Nick saying he had somehow been
16   involved earlier in the day.  So I don't recall
17   having a conversation, but I think if there were
18   conversations, probably I was -- it was not with me.
19   Maybe brief.
20       Q    I'm going to go to this now just because
21   you had mentioned it.  I'm sending you Exhibit 104.
22           And before we get to that, I know I'm going
23   longer than an hour.  If you need to take a break,
24   let me know, but what I was going to do is sort of
25   finish this topic area, which should only take me

Page 123

1                    L. Cohn
2    about 10 more minutes.
3        A    Okay.
4            I'm sorry, did you say open that?
5        Q    Yes.  You can open 104.
6            MR. VOGT:  And Jacquelyn, if you or Amanda,
7        if you need to take a break, let me know.
8        Otherwise, I'm going to go a little bit longer.
9            MS. SCHELL:  I would like to take a break
10       soon, but it doesn't have to be right this
11       second.
12           MR. VOGT:  I should only be about 10
13       minutes --
14           MS. SCHELL:  Why don't we go ahead and
15       break now then, if that's okay.
16           MR. VOGT:  Okay.  Let me do this one, just
17       because we talked about it.
18           MS. SCHELL:  Sure.
19           MR. VOGT:  And it's not a lot of questions
20       on it.
21               (Exhibit 104 was shown to the
22                witness.)
23       Q    Did you get Exhibit 104?
24       A    Yes.
25       Q    And it should be a June 14 email at

Page 124

1                    L. Cohn
2    7:58 p.m. from you to Ms. Williamson.
3            Is that what you have?
4        A    Yup.
5        Q    And you say in here, "I don't know whether
6    James sent you a playback with his changes.  Just in
7    case, here's another."
8            And then you send her an attachment that's
9    from Scoop; is that right?
10       A    Yes.
11       Q    And this was -- I just wanted to clarify --
12   and I'm not trying to throw you off or anything --
13   but you had mentioned earlier that you thought
14   someone would have sent Ms. Williamson a playback.
15           It appears that you --
16           MS. SCHELL:  Objection to form.
17       A    -- did that; is that right?
18       A    Right.
19       Q    And do you know, prior to this point in
20   time, 7:58 p.m. on June 14 of 2017, had you had any
21   verbal conversations with Ms. Williamson about the
22   editorial?
23       A    Telephone conversation, you're saying?
24       Q    Yes.
25       A    Yeah.  I don't recall having any telephone

Page 125

1                    L. Cohn
2    conversations with her.
3            MR. VOGT:  Okay.
4            Why don't we take a break there.
5            MS. SCHELL:  All right.
6            THE VIDEOGRAPHER:  We're now off the
7        record.  The time is 1:53 p.m.
8                (Recess taken.)
9            THE VIDEOGRAPHER:  This marks the beginning
10       of Media Unit No. 4.  We're now back on the
11       record.  The time is 2:06 p.m.
12   BY MR. VOGT:
13       Q    I'm going to send you what's been marked as
14   Exhibit 76.
15               (Exhibit 76 was shown to the
16                witness.)
17       A    Okay.
18       Q    And if you would just take a look through
19   this email, let me know when you're done.
20       A    Okay (perusing document).
21           Okay.
22       Q    Do you recall at all, on June 14 of 2017,
23   dealing with an edit in the "America's Lethal
24   Politics" editorial that related to the issue
25   addressed in Exhibit 76 on the timing of when the

Page 126

```
1                    L. Cohn
2  Palin's crosshairs map was circulated?
3      A    I'm sorry, just -- I need to hear that
4  first part of the question again.  Do I recall what?
5      Q    Do you recall, on June 14 of 2017, working
6  on an edit that related to the time period when
7  Palin's crosshairs map was circulated?
8      A    I'm getting very confused by that question.
9           Do I recall working on an editorial other
10 than the one we're talking about?
11     Q    No, no, no.  I'm sorry.
12     A    What?
13     Q    Here.  Let me show you this.  I'm going to
14 send you Exhibit 32H.
15     A    Okay.
16               (Exhibit 32H was shown to the
17               witness.)
18     Q    And if you go to the second page of this
19 exhibit.
20     A    Uh-huh.
21     Q    It should be that paragraph that starts
22 with "Was this attack evidence."
23          Do you see that?
24     A    Yes.
25     Q    And if you go to the middle of it, the
```

Page 127

```
1                    L. Cohn
2  phrase there, "the link to political incitement
3  was" -- and it has "as" right after that -- "clear,"
4  and then it has a "BIn the weekscheck."
5          Do you see that?
6      A    Hold on.  I'm sorry, "was this attack
7  evidence," that graf?
8      Q    Yes.
9      A    Oh, I'm sorry.  There's two grafs that
10 begin "was this attack evidence."
11     Q    I'm sorry.  The one that starts, "Was this
12 attack evidence of how vicious American politics has
13 become?"
14     A    Uh-huh.
15     Q    That's my mistake, I'm sorry.
16     A    That's okay.
17     Q    In the middle of that sentence where it
18 says "the link to political incitement."
19     A    Right.
20     Q    And it has "was as clear."
21     A    Yeah.
22     Q    And then the next sentence has a "B" right
23 connected to the word "in the weekscheck"?
24     A    Yes.
25     Q    Do you know who put "check" in that
```

Page 128

```
1                    L. Cohn
2  sentence, the word "check"?
3      A    No.
4      Q    And do you know who put the word "as" in
5  that sentence where it says "the link to political
6  incitement was as"?
7      A    No.
8      Q    And I started by looking at -- so hopefully
9  this will put this in context, but when we were
10 looking at Exhibit 76, which was the email string
11 about an edit in the months before, did that relate
12 to this -- what we had looked at in the actual
13 editorial where there's that "check" indication
14 given there?
15          MS. SCHELL:  Objection to form.
16     A    Let me go back to that.
17          Yeah, it could.
18     Q    You don't have any independent recollection
19 of working on that particular issue; is that right?
20     A    No.
21     Q    Now let me show you -- sorry, when I have
22 these big pauses, I'm scrolling to get to an
23 exhibit.
24          I'm sending Exhibit 106.
25               (Exhibit 106 was shown to the
```

Page 129

```
1                    L. Cohn
2                witness.)
3      A    Okay.
4      Q    It should be an email chain between you and
5  Nick Fox; is that right?
6      A    Uh-huh.
7      Q    And then the subject line on that is do we
8  need a -- "do we need to put a blurb in Mira's
9  piece" -- or is it Mira?
10     A    Mira.
11     Q    And who is Mira?
12     A    Mira Kamdar, editorial writer.
13     Q    And do you know what piece this is
14 referring to?
15     A    No.  I mean, if I could go back and see the
16 actual page that day, I might.  But no, I don't,
17 just off the top of my head.
18     Q    I got it.  We can go to it in a minute and
19 talk about it then.
20          When you write at 8:13 p.m., "I think it's
21 close to fitting.  Do you want to ask Joe" -- do you
22 see that?
23     A    Yes.
24     Q    -- who's "Joe"?
25     A    One of the copy editors.
```

Page 130

```
 1                    L. Cohn
 2       Q    Is that Joe Rakowski?
 3       A    Correct.
 4       Q    And so, do you know whether, by this time,
 5  8:13 p.m., whether the editorial would have already
 6  been put in final form and sent out?
 7            MS. SCHELL:  Objection to form.
 8       A    What do you mean by "sent out"?
 9       Q    Well, once -- once an editorial -- that's a
10  good clarification.
11            Once an editorial was finished, had been
12  approved, was in the final form, what would happen
13  next?
14       A    Well, if you mean final form, from my
15  perspective, or the next layer, which was the copy
16  editors, I mean -- the copy editors would then --
17  that piece would be completed -- as soon as the
18  whole page was completed and ready, they would hit
19  publish.
20       Q    And when they hit publish, what would that
21  do?
22       A    Well, for the print paper, it would start
23  the process of the plate being made.  But, I mean,
24  the whole paper -- until the whole paper was ready,
25  or at least that section, it wouldn't actually start
```

Page 131

```
 1                    L. Cohn
 2  printing, and not until, you know, deadline, but
 3  this was all past deadline, our deadline.
 4            For online, you know, our processes changed
 5  so much with the technology.  I'm not sure I can say
 6  exactly at that time.  But it -- they might go
 7  online before the -- they would go online before
 8  print appeared in print, but I don't know whether
 9  they were going online before the print edition or
10  the whole A-section of the paper where the editorial
11  paper appeared closed.  So it could mean you're
12  publishing it online.
13            Yeah, I'm sorry, that wasn't very clear,
14  but we had various deadlines for various aspects of
15  the paper.
16       Q    No, it helped me understand.
17            So did you have a different deadline than
18  the copy editors?
19            MS. SCHELL:  Objection to form.
20       A    I needed to get a piece to the copy editors
21  before their final deadline when it had to go press
22  or else there would be no copy editing, so yes.
23       Q    Do you know when the deadline was for when
24  an editorial was going to go to press?
25       A    I think it was 8:00 then.  That's when the
```

Page 132

```
 1                    L. Cohn
 2  rest of the paper wanted our page to be finished.
 3  However, I think the actual section it was in did
 4  not go to press until a bit later.  So you were
 5  expected to have it done at 8:00, but I think there
 6  was -- that does not mean that's when the press went
 7  rolling.
 8       Q    Do you know when, in this time period,
 9  June 14, 2017, when presses would have actually been
10  rolling?
11       A    No, I can't remember, I'm sorry.  It's been
12  a while since I was there.
13       Q    That's okay.
14            Do you know if it was before midnight?
15       A    Yes.
16            MS. SCHELL:  Objection.
17       A    I do know it was before midnight.
18            No, I'm sorry.  No.  I mean, the presses
19  actually rolling, I don't know.
20            I do know that, you know, the paper closed
21  and the plates were all made, you know, before
22  midnight.  I don't know.  I believe so, but I
23  wouldn't know.  That's like a much more -- you'd
24  have to ask a production person, I suppose.  I don't
25  know.  That wasn't my --
```

Page 133

```
 1                    L. Cohn
 2       Q    Okay.
 3       A    Yup.
 4       Q    Let me show you now Exhibit 106.
 5            (Exhibit 106 was shown to the
 6             witness.)
 7       A    Okay.
 8       Q    And it should be an email string between
 9  you and Nick Fox.
10       A    Correct.
11       Q    Do you recognize this email?
12       A    I don't recognize it.  I see that it's
13  between us.
14       Q    And in his first email on this at
15  8:09 p.m., Mr. Fox writes, "America's Lethal
16  Politics, please trim the following," and then it
17  has a number of paragraphs listed there.
18            Do you see that?
19       A    Oh, wait, I'm sorry, I'm looking at the
20  wrong thing.  Wait.  106?
21       Q    107.  I may have sent -- I'm sorry, I think
22  I sent 106 again.  My apologies.
23            (Exhibit 107 was shown to the
24             witness.)
25       A    Okay, now I see it.
```

Page 134

L. Cohn

2  Q   The top email should be from you to Nick at
3  8:15 p.m.; is that right?
4  A   Yes.
5  Q   And the subject line is "This brings
6  shooting to 330."
7  A   Yes.
8  Q   And do you recall this email string?
9  A   Not really, no.
10  Q   And then what I was talking about a minute
11  ago when I had the wrong exhibit, I apologize.
12      But at 8:09 p.m., Mr. Fox has -- writes
13  "America's Lethal Politics, please trim the
14  following," and then it has a number of paragraphs.
15      Do you see that?
16  A   Yes.
17  Q   And do you know why those paragraphs were
18  being trimmed?
19  A   That was for the international edition.
20  Q   And did the international edition have to
21  be cut down to 330 words?
22  A   Yeah.  That sounds about right, uh-huh.
23  Q   And why was that?
24  A   They had a very short news hole for their
25  editorials, very little space.  And the way the

Page 135

L. Cohn

2  typography was for international, it didn't fit as
3  much as ours, so they were always much shorter.
4  Q   And do you know why it was that you and
5  Mr. Fox were emailing about this, this trim for the
6  international edition?
7  A   It was our job.  We would trade nights
8  cutting the editorials for the international edition
9  and mailing it to those editors who handled that.
10  Q   And I think this is the email that you sent
11  to the international editors.
12  A   Is this a new exhibit I should look at?
13  Q   Yeah.  I'm going to send it through now.
14  109.
15          (Exhibit 109 was shown to the
16              witness.)
17  A   Okay.
18  Q   And this should be an email from you to a
19  number of people.
20      The first person on the subject line is
21  Bruce Levine; is that right?
22  A   Uh-huh.
23  Q   Okay.
24      And is this the email you referenced a
25  second ago where you would have sent the trims to

Page 136

L. Cohn

2  the international editors?
3  A   Yes.
4  Q   And do you know, if you look at this email
5  that you sent, do you see down near the bottom of
6  the page, the entire paragraph that starts with, "In
7  2011, when Jared Lee Loughner," that entire
8  paragraph was cut out of the piece; is that right?
9  A   Yes.
10  Q   And then below that, the phrase "as direct
11  in the Giffords attack" was also cut out of the
12  piece?
13  A   Yes.
14  Q   Do you know why that was done?
15  A   To make the piece fit.  If you're -- yeah,
16  to make the piece fit and to make it -- the
17  transitions work and make it read right.
18      So if you cut out one section, you might
19  have to cut out a phrase somewhere else that either
20  referred to the previous section or to make the -- a
21  new transition that would work.
22  Q   Was -- was Mr. Bennet involved at all in
23  the decision concerning what would be trimmed from
24  the "America's Lethal Politics" piece for the
25  international edition?

Page 137

L. Cohn

2  A   No.
3  Q   Was anyone else other than you and Mr. Fox
4  involved in trimming the "America's Lethal Politics"
5  piece for the international edition?
6  A   No.  There could have been further cuts on
7  the international side once they actually put the
8  type in and try to make it fit, because we couldn't
9  see how the lines fell, so it couldn't be exact.  So
10  there were other editors involved, yes.
11  Q   Did you ever see the international edition
12  when it was published?
13  A   It was, like a -- kind of image of it, I
14  think, sent to us and, yup, sometimes I would look
15  at it.
16  Q   And I just sent Exhibit 110, if you could
17  open that one up.
18          (Exhibit 110 was shown to the
19              witness.)
20  A   Okay.
21  Q   And I believe this should be a copy of the
22  international edition in which the "America's Lethal
23  Politics" editorial appears.
24      Do you see that on the left-hand bottom
25  side?

Page 138

1                L. Cohn
2    A    Yes.
3    Q    Do you recall reading this version of the
4 editorial in question?
5    A    I mean, I remember looking at the cuts when
6 it was completed.  I don't recall.  I may have seen
7 it.
8    Q    If you could just read through this final
9 version that printed that's in Exhibit 110 of the
10 "America's Lethal Politics" editorial.
11    A    I will have to find a way to make this
12 bigger.
13    Q    Okay.
14    A    Okay.
15         (Perusing document.)
16         Okay.
17    Q    Are you done reading through that?
18    A    Yeah.
19    Q    And can you tell me, after reading that, do
20 you think that that version of the editorial that
21 appeared in the international edition, does that
22 effectively express the opinions that the editorial
23 board tried to express in the U.S. version of the
24 editorial?
25         MS. SCHELL:  Objection to form.

Page 139

1                L. Cohn
2    A    Well, I -- I'm seeing one thing, which is,
3 the international edition, there's some lag time
4 until it gets published.  So I would need, like, to
5 really sit with the earlier thing that you showed
6 me, the trims, compare that to the editorial, kind
7 of scratch them out, then look at this, because
8 there could have been changes made after -- let's
9 see what date this ran.
10    Q    Right, but --
11    A    -- the 16th, so I think maybe there were --
12 there could have been some changes that might
13 reflect the correction.  I don't know.  I'd have to
14 really -- it would take me a while to really sit and
15 compare all three things.
16    Q    Okay.
17         But as we sit here today, when you --
18 having just read the version that's in Exhibit 110
19 in the international edition, do you think that that
20 does an effective job of expressing the opinions
21 that the board tried to express in the original
22 editorial that appeared on June 14 of 2017?
23         MS. SCHELL:  Objection to form.
24    A    Okay.
25         I'm going to have to read through it again.

Page 140

1                L. Cohn
2 This is, like -- kind of not really -- it's going to
3 take me some time.
4    Q    Okay.
5    A    (Perusing document.)
6         Yeah.  It generally expresses the same
7 ideas.  I see some little things that are a bit
8 different, yeah.
9    Q    Do you know who Emily Brennan is?
10    A    No.
11    Q    You never worked with her before?
12    A    No.
13         MS. SCHELL:  Objection.
14    A    Oh, I mean, I don't remember working with
15 her.
16    Q    Do you recall whether or not, on the night
17 of the 14th of June in 2017, you actually reviewed
18 the online version of the "America's Lethal
19 Politics" editorial once it was published?
20    A    No.  I mean, no, I don't recall.
21    Q    And do you recall whether or not, on
22 June 15 of 2017, whether you ever read the print
23 edition of the "America's Lethal Politics" editorial
24 that was published?
25    A    I know I read it again on the 15th.  I

Page 141

1                L. Cohn
2 don't know if I was reading print or online.
3    Q    Let me show you Exhibit --
4         MS. SCHELL:  Shane, while you're pulling up
5    your next exhibit, I think we're right at three
6    and a half hours right now.  I'm obviously not
7    going to -- but could you wrap it up soon?
8         MR. VOGT:  Yeah.  I had indicated, with
9    respect to Linda, because she was so involved
10   in this, that I thought I would need
11   three-quarters of a day with her rather than a
12   half.
13        MR. AXELROD:  You did?  I'm sorry, we must
14   have missed that, because Jacquelyn and I have
15   something scheduled for 3:00.  I don't remember
16   seeing that.  We would have certainly scheduled
17   this earlier.
18        MR. VOGT:  Yeah.  On that schedule I sent,
19   I've got three-quarter day next to her name.
20        MR. AXELROD:  Yeah, then we should have
21   started this earlier.  I don't recall seeing
22   that.
23        If I did -- if I didn't see it, it was a
24   mistake.  But yeah, we have something at
25   3:00 that we can't push.

Page 142

L. Cohn

1
2    MR. VOGT:  Let me see if I can just plow
3    through this, what I have left, real quick.
4    MR. AXELROD:  Okay, thanks.
5    MS. SCHELL:  Okay, thank you.
6    MR. VOGT:  Let me send you now, Linda,
7    Exhibit 78.
8        (Exhibit 78 was shown to the
9        witness.)
10   A    Okay.
11   Q    And this is an email from you to Joe
12   Rakowski at 10:35 on the top.
13       Do you see that?
14   A    Yes.
15   Q    What I want to ask about this is do you
16   know, were you still at the office at 10:35 p.m., on
17   June 14th?
18   A    Let me just read through this and see if
19   it's possible.
20       (Perusing document.)
21       Oh, okay, I don't recall whether I was
22   still there.
23   Q    Do you recall whether Mr. Bennet was still
24   at the office when you left on June 14th?
25   A    No.  I mean, I don't recall.

Page 143

L. Cohn

1
2    Q    Okay.
3        And Mr. Levine's email at 10:33 p.m., on
4    here, in that, he references -- he says, "So the
5    editorial was changed after first national edition."
6    A    Uh-huh.
7    Q    What's "first national edition"?
8    A    That's the first edition that closes.  And
9    then there's a New York edition that's later.  Then
10   there are updated editions in the second edition.
11   Q    And is that -- are those editions for
12   online or for print or both?
13   A    Print.
14   Q    So on the day of the 15th -- and I think we
15   talked a little bit about this previously -- but
16   once you came into the office, you immediately
17   started working on the correction; is that right?
18   A    Correct.
19   Q    And do you recall who it was that told you
20   that the "America's Lethal Politics" editorial was
21   going to have to be corrected?
22   A    When I walked in, I heard the room was
23   abuzz with that idea.  And so, I probably -- I don't
24   know who told me first.  There were quite a few
25   people in the room and everybody was talking about

Page 144

L. Cohn

1
2    it.
3    Q    Let me show you Exhibit 111.
4        (Exhibit 111 was shown to the
5        witness.)
6    A    Okay.
7    Q    And it should be an email string between
8    Elizabeth Williamson and Jesse Wegman.
9        Have you ever seen this before?
10   A    No.
11   Q    And when Ms. Williamson writes at
12   10:43 a.m., "The first use of the word 'incite' was
13   hers."  I believe she's referring to you there.
14       Had you ever heard anybody say that before?
15   A    No.
16       MS. SCHELL:  Objection to form.
17   Q    And Mr. Wegman is on this string.
18       And if I recall correctly, you said he was
19   one of the people that was working on the correction
20   on June 15 of 2017; is that right?
21       MS. SCHELL:  Objection to form.
22   A    Yes.
23   Q    And did -- when you were at work on June 15
24   of 2017, did anyone ask you where the word "incite"
25   came from in the "America's Lethal Politics"

Page 145

L. Cohn

1
2    editorial?
3    A    No.
4    Q    Let me show you -- this is Exhibit 32J.
5        (Exhibit 32J was shown to the
6        witness.)
7    Q    It's a bigger exhibit.  There were a lot of
8    edits in here.
9    A    Did you send it?
10   Q    Yeah.  It's going to take a minute because
11   it's a little bit bigger.
12   A    Okay.
13       MS. SCHELL:  Mine is still downloading.
14   A    Mine is still opening.
15       Okay.
16   Q    And there should be -- those numbers I
17   talked about before, the Bates numbers I talked
18   about before, the "NY Times" and then it has numbers
19   next to it?
20   A    Yes.
21   Q    At the back -- it's going to be near the
22   back, I think, hopefully, if you go to the page NY
23   Times 90.
24   A    Okay.
25   Q    Do you see, is there a line there that has

Page 146

```
1                      L. Cohn
2    your name and it says "done"?
3        A    Yes.
4        Q    "6/15 at 10:45 a.m."?
5        A    Yes.
6        Q    Would that have been around the time period
7    that you would have been working on the correction
8    to the editorial?
9        A    I think so.
10       Q    And if you go forward a couple of pages --
11       A    Forward, greater -- like, higher numbers?
12       Q    Lower number.
13       A    Lower.
14       Q    I'm sorry.  So to page 88.
15       A    Okay.
16       Q    And do you see the paragraph there that
17   starts with, "Was this attack evidence of how
18   vicious American politics has become?"
19       A    Uh-huh.
20       Q    And then some of that text is bolded.
21       A    Right.
22       Q    And then the phrase there was inserted,
23   "the crime occurred in a toxic, menacing political
24   environment similar to today."
25       A    Yes.
```

Page 147

```
1                      L. Cohn
2        Q    So that was the language you were working
3    on to correct the editorial; is that right?
4             MS. SCHELL:  Objection to form.
5        A    I'm not sure what you're asking.
6        Q    Well, let me ask you this.
7             Do you recall being told what needed to be
8    corrected in the editorial?
9             MS. SCHELL:  Objection to form.
10       A    Well, it seemed kind of in progress, but --
11   when I walked in, and no one else really knew how to
12   physically, technically, get the correction online.
13   So I remember being in my office and you have to --
14   "done" is the directory where the copy is stored
15   that has been published, and you have to pull it
16   back into another queue, open it, and there's a
17   little -- there's a spot where you write the
18   correction.  So I remember doing that.  And -- with
19   Jesse Wegman and James.
20       Q    So were Mr. Wegman and Mr. Bennet, were
21   they sitting in your office with you?
22       A    Yes.  They were standing behind me.
23       Q    And were they telling you what changes to
24   make?
25       A    Pretty much, yeah.  I mean, I offered some
```

Page 148

```
1                      L. Cohn
2    suggestions of wordings to use a format and a style
3    that was consistent with Times corrections.
4        Q    And do you recall, at any point in time on
5    June 15th, anyone taking personal responsibility for
6    the error that you were correcting?
7             MR. ZAID:  Objection to form.
8        A    I don't really understand that question.
9    What do you mean by "taking personal
10   responsibility"?
11       Q    In other words --
12       A    Did someone say "it was my fault"?
13       Q    Yes.
14            MR. ZAID:  Shane, will you let her finish,
15       please?  I didn't hear the last part.
16       A    Did someone say "it was my fault"?
17       Q    Yes.
18       A    I think -- I don't recall anyone saying
19   specifically that.  We were all just in a state of
20   "oh, no," and horrified that people felt that --
21   clearly the public and everyone had taken our
22   language in a way that was really different than
23   what we had intended to say.  Yeah.
24       Q    And during the course of those
25   conversations that you were having leading up to the
```

Page 149

```
1                      L. Cohn
2    time when the correction was issued, did anyone
3    mention Sarah Palin by name?
4             MR. ZAID:  Objection to form.
5        A    I really don't remember the specific
6    conversation, but it was -- certainly Sarah Palin
7    was -- was mentioned, yes.
8        Q    And in what context was she mentioned?
9        A    That there were objections to linking
10   material from her PAC so directly to the shooting,
11   to the Giffords shooting.
12       Q    Let me show you now Exhibit 50.
13            (Exhibit 50 was shown to the
14                 witness.)
15       A    Okay.
16       Q    And this should be a copy of the editorial
17   that we've been talking about with the correction
18   included for June 15 of 2017.  If you see, at the
19   bottom, it should say page 1 of 4, 2 of 4, 3 of 4.
20            I'm going to ask you to turn to page 3 of
21   4.
22       A    Oh, no, you know what?  I don't -- where is
23   that?  I see something that says page 3 of 4 and
24   Palin 02731.
25       Q    Yeah, if you go up, do you see the
```

Page 150

                        L. Cohn
1
2   correction on that page, on page 3 of 4?
3       A   Yes.
4       Q   Who wrote the correction?
5       A   I typed it in and contributed a few of the
6   words, and James and Jesse were standing in my
7   office going back and forth on how we should phrase
8   it and dictating.
9       Q   And was there any discussion, during that
10  process, of including Sarah Palin by name in the
11  correction?
12          MR. ZAID:  Objection to form.
13      A   I'm a little confused because we did make a
14  change to the correction.  So there was, I believe,
15  some discussion, but I believe it was -- yeah, I
16  don't know if that was in the later part where we
17  started -- had to correct our description of that
18  PAC material.
19      Q   Let me show you that one real quick.
20      A   Should I close this out or is it on the
21  same package?
22      Q   You can close that one.
23          This is Exhibit 51 that I'm sending you.
24              (Exhibit 51 was shown to the
25                  witness.)

Page 151

                        L. Cohn
1
2       A   Okay.  Go down to the correction?
3       Q   Yes, please.  And this is a correction
4   that's dated June 16 of 2017.
5       A   Right.
6       Q   And it talks about how "the editorial also
7   incorrectly described a map distributed by a
8   political action committee before that shooting.  It
9   depicted electoral districts, not individual
10  Democratic lawmakers, beneath stylized crosshairs."
11          Do you see that?
12      A   Uh-huh.
13      Q   Was there any discussion in connection with
14  that language in this particular correction as to
15  whether or not Sarah Palin's name should be included
16  there?
17          MS. SCHELL:  Objection to form.
18      A   There was discussion of including Sarah
19  Palin's name.  I cannot recall if it was in the
20  first part or the second part.  But, at one point,
21  it was discussed and it was decided, and I believe
22  it was my idea or I raised the issue, that -- and
23  this is often true with writing corrections.
24          If we felt that, you know, we're correcting
25  that we made this direct link between these two

Page 152

                        L. Cohn
1
2   things and -- we didn't want to put Sarah Palin's
3   name and yet another sentence to discuss that
4   shooting because, in some ways, it would still leave
5   the impression that -- a general thing that we -- it
6   would still convey to the reader, they would see
7   "shooting," "Sarah Palin," and we did not want those
8   two ideas to be brought together like that because
9   it would, in some ways, even though it would be
10  correcting it, might, sort of, bring her into it
11  again when she did not deserve to be linked to that.
12          That wasn't very -- I apologize for that
13  not being very articulate.
14          But we thought it would do -- it would
15  be -- it would be better to correct it without
16  having to draw her name into proximity of the
17  shooting again, since that was, in a sense, the
18  error.
19      Q   Let me show you Exhibit 52.
20              (Exhibit 52 was shown to the
21                  witness.)
22      A   Okay.
23      Q   And let me ask you, were you involved at
24  all in crafting the language for the NYT Opinion
25  account tweets that went out about the correction?

Page 153

                        L. Cohn
1
2       A   I don't think so, no.
3       Q   And if you look at Exhibit 52, this
4   particular tweet, it says, "We got an important fact
5   wrong, incorrectly linking political incitement and
6   the 2011 shooting of Giffords.  No link was ever
7   established."
8           Do you see that?
9       A   Yeah.
10      Q   Is that an accurate statement?
11          MS. SCHELL:  Objection to form.
12      A   I -- I probably would not have phrased it
13  this way.
14      Q   Why not?
15      A   I think it's confusing.  The "incorrectly
16  linking" phrase after "the fact wrong," I think
17  that's awkward.  And I don't think I would have used
18  "political incitement."  I don't know.  I
19  probably -- yeah.  There's no mention of the flyer.
20      Q   Do you agree that the editorial did get an
21  important fact wrong?
22          MS. SCHELL:  Objection to form.
23      A   I think there's more nuance to it that I
24  don't think I could quite answer that in a yes-or-no
25  question, and I think that might have to do with the

Page 154

1                    L. Cohn
2   word "fact."  I think we made a connection we
3   shouldn't have, and I think there was -- we were
4   probably -- not "probably."  We used -- we used the
5   word "incitement" in a way that we shouldn't have.
6           I don't think I can answer that in a "yes"
7   or "no."
8       Q    Let me show you -- and I'm almost done.
9       A    Can I just add one thing to that?
10      Q    Yes.
11      A    I would say we got something important
12  wrong.
13      Q    And I sent Exhibit 81.
14                  (Exhibit 81 was shown to the
15                  witness.)
16      A    Okay.
17      Q    It should be an email string between Jesse
18  Wegman and Elizabeth Williamson from June 15th.
19           Is that what you have?
20      A    Yeah.
21      Q    Have you ever seen this email string
22  before?
23      A    No.
24      Q    In the course of the 15th when you were
25  sitting in your office with Mr. Wegman and

Page 155

1                    L. Cohn
2   Mr. Bennet, did Mr. Wegman ever talk about the issue
3   that he's discussing in here with Ms. Williamson
4   when he says, "Yeah, I made the case that talking
5   about Palin and Giffords in the same graf at all
6   risked seeming like we were still trying to sneak
7   the link in, but James pointed out that in order to
8   write the next graf, we had to put it in there to
9   explain."
10          MS. SCHELL:  Objection to form.
11      Q    My question about that is do you recall
12  Mr. Bennet and Mr. Wegman discussing that issue when
13  they were with you in your office on the 15th?
14      A    No.
15          MS. SCHELL:  Objection to form.
16      Q    On the 15th, were you a party to any
17  discussions within The Times about whether the
18  entire editorial, "America's Lethal Politics",
19  should be pulled?
20      A    I never heard any discussion about that.
21      Q    And on --
22      A    I don't know what that means, actually,
23  because once something's online, I'm not sure what
24  that means, to "pull" something.
25      Q    Did -- when you -- given the time period

Page 156

1                    L. Cohn
2   that you worked with Mr. Bennet, does he seem like
3   an intelligent person?
4           MS. SCHELL:  Objection to form.
5       A    Yes.
6       Q    Given the amount of time that you worked
7   with him, would you say that Mr. Bennet has a good
8   memory?
9           MS. SCHELL:  Objection to form.
10      A    I never noticed any lapses of memory,
11  nothing that stood out, so I would say yes.  Very
12  analytical, and I never saw anything that would,
13  yeah, suggest any memory issues.
14      Q    During the time period that you worked with
15  Mr. Bennet, did you ever witness him have the
16  ability to recall articles that he had worked on
17  several years ago?
18          MS. SCHELL:  Objection to form.
19      A    Not that I can recall.  I don't recall any
20  specific references.  The articles -- he would
21  sometimes mention being at The Atlantic, but I don't
22  remember specific articles.
23      Q    Just to clarify that, when you were working
24  with Mr. Bennet, there were occasions when he would
25  bring up articles that had been written while he was

Page 157

1                    L. Cohn
2   at The Atlantic?
3           MS. SCHELL:  Objection to form.
4           I don't think that's what she said.
5       A    No.  He talked about his time at The
6   Atlantic.  He talked about maybe a few people there.
7   He made references to it.  "As we did at The
8   Atlantic," that sort of thing.  But I don't remember
9   any specific articles.
10      Q    Did he ever mention Andrew Sullivan?
11      A    Not -- no, not that I can recall, no.
12          MR. VOGT:  Okay.
13          I think we're up against that 3:00 deadline
14      that we had talked about, so I think I'm pretty
15      much done today.
16          So I thank you for your time.  I appreciate
17      it.  I know it's been a lot of stuff that we
18      looked through.
19          MR. AXELROD:  Hey Shane, thank you very
20      much.  I looked at what you sent us and you did
21      say it was three-quarters of a day and we just
22      didn't see that or plan for it.  So I really
23      appreciate your consideration there.
24          MR. VOGT:  It's okay.  It happens.
25          And hopefully now Ms. Cohn will just be

Page 158

```
1              L. Cohn
2  sure to tell everyone that she was dreading to
3  about the deposition that it was a wonderful
4  experience and that I'm a phenomenal lawyer.
5      THE VIDEOGRAPHER:  With that, I'll close
6  the record.
7      This concludes today's deposition.  We're
8  now going off the record.  The time is
9  2:59 p.m.
10              (Time adjourned: 2:59 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 160

```
1
2              ERRATA SHEET FOR THE TRANSCRIPT OF:
3  Case Name:            Sarah Palin v. The New York
                         Times
4
   Dep. Date:       May 7, 2020
5
   Deponent:        Linda Cohn
6
7
                   CORRECTIONS:
8
   Pg. Ln.  Now Reads        Should Read        Reason
9  ___ ___  _____     _____       _____
10 ___ ___  _____     _____       _____
11 ___ ___  _____     _____       _____
12 ___ ___  _____     _____       _____
13 ___ ___  _____     _____       _____
14 ___ ___  _____     _____       _____
15 ___ ___  _____     _____       _____
16 ___ ___  _____     _____       _____
17 ___ ___  _____     _____       _____
18 ___ ___  _____     _____       _____
19 ___ ___  _____     _____       _____
20                          _____
                           Signature of Deponent
21
   SUBSCRIBED AND SWORN BEFORE ME
22
   THIS___DAY OF_____, 20__
23
   _____
24
   (Notary Public)  MY COMMISSION EXPIRES:_____
25                   ACKNOWLEDGMENT OF DEPONENT
```

Page 159

```
1
2           C E R T I F I C A T E
3
4      I, AMANDA McCREDO, a Shorthand Reporter
5  and Notary Public of the State of New York, do
6  hereby certify:
7  That the witness whose examination is
8  hereinbefore set forth was duly sworn, and that
9  such examination is a true record of the
10 testimony given by such witness.
11 I further certify that I am not related to any
12 of the parties to this action by blood or
13 marriage, and that I am in no way interested in
14 the outcome of this matter.
15
16
17           _____
18           AMANDA McCREDO
19
20
21
22
23
24
25
```

Page 161

```
1
2      I,                   , do hereby
3  certify that I have read the foregoing
4  pages, and that the same is a correct
5  transcription of the answers given by me
6  to the questions therein propounded,
7  except for the corrections or changes in
8  form or substance, if any, noted in the
9  attached Errata Sheet.
10
11
12           _____
           LINDA COHN
13
14 Subscribed and sworn to
15 before me on this_____ day
16 of _____, _____.
17 _____
18 Notary Public
19
20
21
22
23
24
25
```