# EXHIBIT 7

1

2    IN THE UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3
     - - - - - - - - - - - - - - - - -x
4
     SARAH PALIN,
5                                        No. 17-cv-4853

6                       Plaintiff,
              v.
7
     THE NEW YORK TIMES COMPANY and
8    JAMES BENNET,

9                       Defendants.

10   - - - - - - - - - - - - - - - - -x

11

12          Remote videotaped deposition of PHOEBE

13   LETT, taken pursuant to Subpoena, was held via

14   videoconference, commencing May 4, 2020, at

15   10:02 a.m., on the above date, before Amanda

16   McCredo, a Court Reporter and Notary Public in the

17   State of New York.

18

19

20

21

22

23

24

25

## Page 2

```
1
2   A P P E A R A N C E S :
3   For the Plaintiff:
4           SHANE B. VOGT, ESQ.
            BAJO CUVA COHEN TURKEL
5           100 North Tampa Street
            Suite 1900
6           Tampa, Florida 33602
            svogt@bajocuva.com
7           (813)443-2199
8
9   For the Defendants:
10          DAVID L. AXELROD, ESQ.
            BALLARD SPAHR LLP
11          1675 Broadway
            19th Floor
12          New York, New York 10019
            axelrod@ballardspahr.com
13          (212)223-0200
14
15  ALSO PRESENT:
16  James Soto - videographer
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1
2                   I N D E X
3   WITNESS           EXAMINATION BY        PAGE
4   Phoebe Lett        Mr. Vogt               8
5
6            PREVIOUSLY MARKED EXHIBITS
7   EXHIBIT                                  PAGE
8   Exhibit 1                                 38
9   Exhibit 2                                 46
10  Exhibit 3                                 46
11  Exhibit 6                                 51
12  Exhibit 7                                 53
13  Exhibit 8                                 56
14  Exhibit 9                                 58
15  Exhibit 10                                61
16  Exhibit 11                                61
17  Exhibit 12                                64
18  Exhibit 13                                69
19  Exhibit 15                                74
20  Exhibit 16                                75
21  Exhibit 17                                81
22  Exhibit 20                                83
23  Exhibit 21                                83
24  Exhibit 22                                84
25  Exhibit 23                                84
```

## Page 4

```
1
2   Exhibit 24                                88
3   Exhibit 25                                88
4   Exhibit 26                                92
5   Exhibit 27                                95
6   Exhibit 28                                95
7   Exhibit 29                                96
8   Exhibit 30                               100
9   Exhibit 32                               101
10  Exhibit 33                               103
11  Exhibit 34                               108
12  Exhibit 37A                              110
13  Exhibit 45                               111
14  Exhibit 47                               113
15  Exhibit 46                               116
16  Exhibit 52                               118
17  Exhibit 55                               119
18  Exhibit 59                               121
19  Exhibit 60                               122
20  Exhibit 61                               122
21  Exhibit 63                               123
22  Exhibit 69                               123
23
24
25
```

## Page 5

```
1
2              I N D E X (continued)
3                   EXHIBITS
4   EXHIBIT                                  PAGE
5   Lett A    LinkedIn profile of Phoebe Lett   13
6   Lett B    Four-page Twitter printout        20
7   Lett C    Non-Party Phoebe Lett's          131
              Responses and Objections to
8             Plaintiff's Subpoena
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1                                        THE VIDEOGRAPHER:  We're now on the record.
2        Participants should be aware that this
3    proceeding is being recorded.  And as such, all
4    conversations held will be recorded unless
5    there is a request and agreement to go off the
6    record.  Private conversations and/or
7    attorney-client interactions should be held
8    outside the presence of the remote interface.
9        A link to the recording will be available
10   to all parties to the case for up to 90 days
11   from today's date provided the requesting party
12   has purchased a certified copy of the
13   transcript.
14       This is the remote-recorded deposition of
15   Phoebe Lett.  Today is Monday, the 4th day of
16   May 2020.  The time is now 10:02 a.m. in the
17   Eastern Time Zone.
18       We're here in the matter of Sarah Palin
19   versus The New York Times Company.  My name is
20   Jim Soto, remote video technician on behalf of
21   U.S. Legal Support.  I'm not related to any
22   party in this action, nor am I financially
23   interested in the outcome.
24       At this time, will the reporter, Amanda

Page 7

1    McCredo, on behalf of U.S. Legal Support,
2    please enter the statement for remote
3    proceedings into the record.
4        THE COURT REPORTER:  The attorneys
5    participating in this deposition acknowledge
6    that I am not physically present in the
7    deposition room and that I will be reporting
8    this deposition remotely.  They further
9    acknowledge that, in lieu of an oath
10   administered in person, I will administer the
11   oath remotely, pursuant to Executive Order
12   Number 202.7 issued by Governor Cuomo on
13   March 19, 2020.  The parties and their counsel
14   consent to this arrangement and waive any
15   objections to this manner of reporting.
16       Please indicate your agreement by stating
17   your name and your agreement on the record.
18       MR. VOGT:  This is Shane Vogt, counsel for
19   the plaintiff, and we agree.
20       MR. AXELROD:  And this is David Axelrod,
21   counsel for defendants, The New York Times and
22   James Bennet, and we agree.
23       THE COURT REPORTER:  Please raise your
24   right hand.

Page 8

1                                        P. Lett
2    PHOEBE LETT, the witness herein, after having been
3            first duly sworn by a Notary Public of the
4            State of New York, was examined and
5            testified as follows:
6    EXAMINATION BY
7    MR. VOGT:
8        Q    Good morning.
9             Can you please state your full name for us?
10       A    Phoebe Ann Lett.
11       Q    And where do you live?
12       A    I live in Bed-Stuy -- Bedford-Stuyvesant,
13   Brooklyn.
14       Q    Have you ever been deposed before?
15       A    I have not.
16       Q    Okay.
17            I'll go through, first, some of the ground
18   rules, so hopefully we can get through today as
19   quickly as possible.
20            Obviously we're doing this remotely, so
21   there will be some lags at times and probably some
22   technical issues, but I'll do my best to keep those
23   to a minimum.  And just for everybody's purposes,
24   obviously we're all sitting at home right now.  I
25   have kids and dogs, who are going to make noise at

Page 9

1                                        P. Lett
2    some point; I apologize in advance.  If they
3    interrupt to the point where you can't hear anything
4    or you need me to repeat anything, just let me know.
5            Okay?
6        A    (No verbal response.)
7        Q    I'm also -- during the course of your
8    deposition, I'm going to use exhibits.  I'll be
9    uploading those electronically as we go through the
10   chat feature on Zoom.  Just let me know when you
11   receive them, if there's any problems with them,
12   anything like that, and I'll try to get that taken
13   care of.
14            I'm going to introduce some of the exhibits
15   by letter that will be very specific to you; and
16   then others I'm going to do by number, because we're
17   probably going to -- I'm going to keep a running set
18   for the whole case.  And so, we may jump around.
19   Don't be alarmed if I, you know, skip numbers or
20   anything like that.  It's just because I may not
21   need to use something based on your testimony.
22            Okay?
23       A    (No verbal response.)
24       Q    It's important today, just listen carefully
25   to the questions I ask you.  Let me finish the

Page 10

P. Lett

1  question before you answer. It may not be a huge
2  problem because, obviously, we're doing this by
3  video so it takes a little while, but you're going
4  to want to wait until I finish my question for a
5  couple of reasons.
6          One is Amanda is taking everything down, so
7  we can't be talking over each other. And the other
8  reason is you want to give Mr. Axelrod time to
9  object to a question that I ask you. Unless he
10 instructs you not to answer a question because of a
11 privilege or something like that, just let him
12 finish his objection. If he objects to the form,
13 then you can go ahead and answer.
14         Okay?
15    A   (No verbal response.)
16    Q   It's also important that you give verbal
17 responses. No head nods, uh-huhs, uh-uhs, things
18 like that, because it's difficult for Amanda to take
19 those things down.
20         Okay?
21    A   (No verbal response.)
22    Q   If I ask you a question that is confusing,
23 if you don't understand it for any reason, if it
24 doesn't make sense, please speak up and let me know.

Page 11

P. Lett

1  The caveat to that is if you just answer a question,
2  I'm going to assume that you understood what I was
3  asking you and didn't have any problems with the
4  question.
5          Okay?
6     A   (No verbal response.)
7     Q   And if you need to take a break for any
8  reason, just let me know. We'll probably take a
9  couple. It helps me get reorganized and everybody,
10 I think, needs to take a break from staring at a
11 screen for this long.
12         So we'll go ahead and get started and
13 hopefully this will go smoothly.
14         So where do you currently work?
15    A   I work at The New York Times.
16    Q   And what's your position there?
17    A   I am an audio producer in the Opinion
18 department.
19    Q   And what is that? What do you do?
20    A   I make podcasts.
21    Q   And how long have you been doing that?
22    A   Since November of 2019.
23    Q   And who is your current supervisor?
24    A   My supervisor is Paula Szuchman.

Page 12

P. Lett

1     Q   Does she have a title?
2     A   I believe she's the managing editor of
3  Audio and Opinion. She started last month, so she's
4  new.
5     Q   Okay.
6          Did you do anything to prepare for your
7  deposition today?
8     A   I just met with the -- my law team at
9  Miller's.
10    Q   Did you speak with anyone else other than
11 lawyers about your deposition?
12    A   I told my partner he shouldn't come in
13 until 2:00 p.m.
14    Q   Okay.
15         Have you spoken with anybody else at The
16 Times, not lawyers at The Times, but anybody else at
17 The Times about your deposition?
18    A   No.
19    Q   Have you had any conversations with anyone
20 at The Times other than lawyers about this lawsuit?
21    A   No.
22    Q   All right.
23         And I'm going to talk a little bit about
24 just your general background, and I'm going to start

Page 13

P. Lett

1  with your educational background.
2          But my understanding is you first attended
3  college at Villanova; is that right?
4     A   Yes.
5     Q   And that was from 2009 to 2011?
6     A   Correct.
7     Q   And what subject areas did you study at
8  Villanova?
9     A   I studied political science and English.
10    Q   And were you a member of any societies or
11 groups while you were at Villanova?
12    A   No. I was on the school newspaper.
13    Q   Okay.
14         Let me -- again, I'm not trying to trick
15 you, I'm just -- some of these questions I just ask
16 before I go straight to documents.
17         But let me show you what we're going to
18 mark as Exhibit A. Hopefully that popped up. It
19 should be a copy of your LinkedIn.
20              (LinkedIn profile of Phoebe Lett
21              was marked as Lett A for
22              identification, as of this
23              date.)
24    A   I see it.

Page 14

P. Lett

2  Q   Have you got that?
3  A   I do.
4  Q   Okay.
5      I'm just going to go through this with you.
6  Some of these things -- and I'm not going to go over
7  everything in detail, but I just want to talk about
8  a couple of them.
9      If you turn to -- or, actually, scroll to
10 the fourth page of the exhibit, it should have your
11 Villanova time listed there.
12 A   Uh-huh.  Oh, I was also in the Gay-Straight
13 Coalition.  That makes sense.
14 Q   You've also got listed there the Villanova
15 Democrats.
16 A   Uh-huh.
17 Q   What's that?
18 A   As a 17-year-old, I was very politically
19 ignited in 2007 and 2008, but I couldn't vote.  And
20 so, my interest in being a political science major
21 was led by an idea that I would want a career in
22 political speechwriting.  And so, I was educating
23 myself politically.
24 Q   And what ignited you in 2007 into the
25 political arena?

Page 15

P. Lett

2  A   The election between John McCain and Barack
3  Obama.
4  Q   And what about it ignited you?
5  A   I was really drawn to Barack Obama as a
6  political leader.  Mostly for his speech and
7  rhetoric, which is why I decided to be that
8  double-major, in particular, because it seemed like
9  it would be -- it would serve me well if I wanted to
10 be a political speechwriter.
11 Q   And when you said "rhetoric," what do you
12 mean by that?
13 A   He's a very good speaker.  I'm drawn to
14 audio, words.
15 Q   Now, did anybody in your family have any
16 background in politics or anything like that, or was
17 it just something you got into because of President
18 Obama?
19 A   Yeah.  No, they did not.  No political
20 leanings.  My parents were small business owners at
21 the time, but didn't really do anything related to
22 politics.
23 Q   And then you transferred to Georgetown in
24 2011; is that right?
25 A   Uh-huh.

Page 16

P. Lett

2  Q   Why did you transfer to Georgetown?
3  A   I didn't have any friends and was getting a
4  4.0 at Villanova.  And so, I was told usually the
5  social part or the academic part satisfies people
6  for the four years, and I was satisfied with
7  neither, so I transferred.
8  Q   And then when you transferred to
9  Georgetown, did you keep the same majors?
10 A   Well, at Georgetown, there's so many
11 different kinds of government majors, they don't
12 call it political science, but the equivalent was
13 government, which is what I majored in.
14 Q   Okay.
15     And then I think it indicates English also,
16 so did you double-major?
17 A   Yes.  I kept my same majors.
18 Q   And then while you were at Georgetown, you
19 were the copy editor for The Hoya?
20 A   I was.
21 Q   And you also participated in the GU College
22 Democrats.
23     What was that?
24 A   That was affiliation mostly for the
25 speakers that they would bring to campus.  I didn't

Page 17

P. Lett

2  actually participate very much.  The friendlessness
3  thing continued, surprisingly.
4  Q   Who -- did you see any speakers while you
5  were there?
6  A   Sure, all the time.
7  Q   Who did you see?
8  A   I -- I mean, I couldn't -- many, many
9  people.  Many different political speakers of all
10 stripes.  The one that's coming to mind right now is
11 Donald Glover, the comedian, so that's embarrassing.
12 Q   Were you involved politically at all while
13 you were at college other than those -- the
14 Villanova Democrats and the GU College Democrats?
15 A   I interned for Senator Robert Menendez of
16 New Jersey my junior year, I believe, for a
17 semester.
18 Q   Yeah.  And I think you have that listed on
19 here.  That was January of 2012 to May of 2012; is
20 that right?
21 A   Yes.  And that's my junior year.
22 Q   And one of the things you have listed for
23 that is that you read and drafted local and senate
24 speeches.
25     How many senate speeches did you draft?

Page 18

P. Lett

2    A    Personally, I drafted one.  I assisted his
3  lead speechwriter with edits on more than one.
4    Q    And who was the lead speechwriter?
5    A    I only remember his first name.  It was
6  Tom.  I would have to review.  It's been some time.
7    Q    That's okay.
8         And again, I didn't tell you this at the
9  beginning, but it's not -- this isn't like an exam.
10  If you don't remember or you don't recall something,
11  that's perfectly fine, just let me know.  You're not
12  getting graded at the end.
13         The one speech that you did draft for
14  Senator Menendez, what was the subject matter of
15  that speech?
16    A    I don't recall.
17    Q    And what led you to go to work for or to
18  intern for Senator Menendez?
19    A    I took a required course for my major that
20  required, as our term paper, to pick a politician
21  running for reelection and to assess,
22  mathematically, their chances and best outcomes for
23  winning and what the trials of the race would be.
24         And so, I picked my own senator.  I am from
25  New Jersey originally.  And at the end of that

Page 19

P. Lett

2  semester, I thought it would make a pretty good
3  application to send the application saying -- the
4  essay saying he would win, to the senator, and it
5  did.
6    Q    And then, Senator Menendez, he actually --
7  he was a pretty staunch advocate on gun control, was
8  he not?
9         MR. AXELROD:  Objection to form.
10    A    I don't recall.
11    Q    Do you know, during the time period when
12  you were interning for Senator Menendez, did you
13  review or edit any speeches related to gun control
14  issues?
15    A    Not to my knowledge.
16    Q    While you were there interning for Senator
17  Menendez, did you edit or review any speeches that
18  related to gun control legislation that had been
19  offered by Senator Menendez?
20    A    No.
21    Q    I'm going to show you what should be
22  Exhibit B.  It's got a "2" behind it because I just
23  changed the name of it real quick.
24         (Four-page Twitter printout was
25         marked as Lett B for

Page 20

P. Lett

2         identification, as of this
3         date.)
4    Q    Do you recognize this document?
5    A    I do not.
6    Q    It should be a tweet from Senator Menendez.
7         And I just want to ask you whether or not,
8  while you were interning there, you worked on any of
9  the bills that are listed in the image in this
10  tweet?
11    A    No.  I spent 95 percent of my time entering
12  constituent logs and answering constituents on
13  calls.
14    Q    Okay.
15         While you were at Senator Menendez's office
16  and during the time periods that you were at
17  Georgetown and Villanova, did you ever have any
18  involvement with any issues associated with the --
19  what we'll call the Tuscon shooting, Jared
20  Loughner's shooting, in Arizona?
21         MR. AXELROD:  Objection to form.
22    A    You can answer.
23    A    Could you please restate the question?
24    Q    Sure.
25         During the time period that you were at --

Page 21

P. Lett

2  and I'll break it up so it's a little bit easier,
3  but...
4         During the time period that you were at
5  either Villanova or Georgetown, did you have any
6  involvement in any -- call them events, movements,
7  groups, anything like that, having to do with the
8  Tuscon shooting involving Jared Loughner?
9         MR. AXELROD:  Objection to form.
10    Q    You can answer, if you can.
11    A    No.
12    Q    And then during the time period that you
13  were working as an intern for Senator Menendez, did
14  you have any involvement while you were there with
15  any work associated with the Loughner shooting?
16    A    No.
17         MR. AXELROD:  Objection to form.
18         Phoebe, just give me a second to listen to
19    the question, just a second.
20         Thanks very much.
21  BY MR. VOGT:
22    Q    And then you also interned for Patrick
23  Murphy in September of 2010 to November of 2010; is
24  that right?
25    A    That was an election campaign.

Page 22

```
1                       P. Lett
2       Q    And did you do that -- was that also
3  affiliated with a class at school or was that just
4  interning?
5       A    That was trying to get experience to see if
6  working on a campaign was something that I wanted to
7  do as a career.
8       Q    And was there any reason in particular that
9  you interned for Patrick Murphy?
10      A    It was a race that was happening while I
11 was at Villanova and within driving distance.
12      Q    And then underneath the entry on your
13 LinkedIn for your internship with Patrick Murphy, it
14 says you "organized canvasers, directed daily
15 updates and campaign memos," and "gained valuable
16 experience in on-the-ground political rhetoric and
17 speaking."
18           What does "on-the-ground political rhetoric
19 and speaking" mean?
20      A    So that's probably -- I can't remember
21 writing that down on my LinkedIn.  I imagine that I
22 was referring to how politicians, in particular, the
23 one I was working for, engage with their
24 constituents.
25      Q    When you use "political rhetoric" there,
```

Page 23

```
1                       P. Lett
2  what do you mean by that?
3       A    The language of civics in order to solve
4  problems for constituents.
5       Q    And did you do any speechwriting while you
6  worked as an intern for Patrick Murphy?
7       A    No, I did not.
8       Q    Other than working with Patrick Murphy and
9  Senator Menendez as an intern, have you done any
10 other political work?
11      A    No.
12      Q    And then your current position with The New
13 York Times as a podcast producer, how long have you
14 been in that position?  Since November of '19; is
15 that correct?
16      A    Correct.
17      Q    And before that, you were an editorial
18 assistant for the editorial board at The New York
19 Times, correct?
20      A    Correct.
21      Q    And was there any reason why you switched
22 positions to podcast producer?
23      A    I -- yes.  I wanted --
24      Q    And -- go ahead.
25      A    No, sorry.  Go ahead.
```

Page 24

```
1                       P. Lett
2       Q    Was there any reason why you switched
3  positions and what was the reason?
4       A    The reason was I had been in the editorial
5  assistant role for five years and -- or almost five
6  years, and I had taken a great interest in podcasts
7  and audio and had helped out with the launch of our
8  first podcast, The Argument.  And after working on
9  that for about a year, it was decided that it could
10 be a more formalized role for me.
11      Q    And then you were in the editorial
12 assistant position for five years, I think you just
13 said?
14      A    Yes.  I think it's just under five years
15 due to my promotion.
16      Q    It says on your LinkedIn you were a
17 research and editorial assistant to the editorial
18 board of The New York Times.
19           What does a research and administrative
20 assistant do?
21      A    Most of my job was wrangling the schedule
22 of the editorial board.  The editorial board has
23 guests from all different stripes from all over the
24 world come in a couple of times a week to -- at
25 their request, to talk with the board to try to
```

Page 25

```
1                       P. Lett
2  explain the way they personally see the world and
3  hope that the board would roll that into their own
4  reporting and coverage.  And so, my job was to make
5  sure that the guests got to the right place at the
6  right time and had a good experience inside The
7  Times.
8            The other end of the admin job was basic IT
9  tech help for the board.  A lot of organizing and
10 office supply ordering.  And -- yeah.
11      Q    And you said that you would help with the
12 scheduling of the guests.
13           Was there actually, like, an electronic
14 calendar that was kept of guests that came in?
15      A    Eventually, yes, when I started in 2015,
16 but a Google calendar.
17      Q    And was that Google calendar being used in
18 June of 2017?
19      A    I -- I would have to look that up.
20      Q    And among the guests that came in to the
21 editorial board at The New York Times, was -- was
22 Gabby Giffords ever a guest?
23      A    No.
24      Q    No?
25      A    No.
```

Page 26
```
1                      P. Lett
2      Q    Was Sarah Palin?
3      A    No.
4      Q    Is there a running list of all the guests
5  that have come in to the editorial board?  Do you
6  know?
7      A    There's not.
8      Q    When -- when the guests would come in and
9  speak with the board, would those meetings be
10  recorded?
11      A    They would not.
12      Q    Would anyone take notes of what was
13  discussed during the meetings?
14      MR. AXELROD:  Objection to form.
15      Q    You can answer.
16      A    Okay.
17      Journalists take notes in every
18  conversation.  So, yes, the board members who
19  were -- whose meeting it was, depending on their
20  beat, would probably be taking notes on what the
21  guests were saying.
22      Q    Did any of the speakers that came in while
23  you were working as an editorial assistant, did they
24  come in to speak about gun control issues?
25      MR. AXELROD:  Objection to form.
```

Page 27
```
1                      P. Lett
2      Q    You can answer.
3      A    I can't recall.
4      Q    And then underneath your entry for
5  editorial assistant at The Times, you also have
6  editorial/op-ed editor fact checker.
7      A    Uh-huh.
8      Q    How much of your time was spent performing
9  those tasks?
10      A    It was sporadically over the years of
11  working there.  I was being trained and was looking
12  into a future as an editor of op-eds, specifically
13  of college students.  So I assisted the main editor
14  who was handling our on-campus vertical with
15  submissions by college students.
16      Q    And you mentioned "vertical."
17      How many different verticals were there
18  within the Opinion department?
19      A    I have no -- I don't know.
20      Q    Was there, to your knowledge, any kind of a
21  chart, like an organizational chart, showing the
22  verticals and who was in them at various times
23  within the Opinion department?
24      A    No, no.  I am sure there is an org chart
25  somewhere, but I've never seen one from that time.
```

Page 28
```
1                      P. Lett
2      Q    Okay.
3      And when -- your entry here mentions "fact
4  checker."  And I know it's fairly obvious, but
5  people may not know, you know, journalism as well,
6  obviously, as you do.
7      But what does a fact checker do?
8      A    A fact checker goes through a piece when
9  it's mostly done being edited and ensures that every
10  line, every sentence is the truth, reflects the
11  facts and is a fair and truthful representation of
12  what has happened.
13      Q    And while you were at The Times, did you
14  receive any training that specifically related to
15  how to fact check an article or a piece?
16      A    The -- I was the editorial assistant
17  beneath Eileen Lepping, and she was the main fact
18  checker.  Her main job was to fact check, so she
19  trained me in how to fact check.
20      Q    And as part of that process, were there any
21  written guidelines or policies or procedures that
22  you reviewed that specifically related to fact
23  checking?
24      A    No.  No, not to my recollection.
25      Q    Did you work with certain people on the
```

Page 29
```
1                      P. Lett
2  editorial board more often than others?
3      A    What do you mean?
4      Q    Like, by happenstance or by assignment, did
5  it happen where you worked with certain members of
6  the board more than you worked with other members of
7  the board?
8      A    If you're fact checking for the board,
9  you're fact checking whatever piece is coming in,
10  which means you're working with whatever writer
11  happens to be writing that piece.  So I would say it
12  was pretty evenly split among the members of the
13  board.
14      Q    Who -- while you were working as an
15  editorial assistant -- and I know it was a large
16  period of time -- but -- let's say who was your
17  immediate supervisor in 2017?
18      A    In 2017, my immediate supervisor was Terry
19  Tang.
20      Q    Can you spell that, please?
21      A    T-E-R-R-Y, T-A-N-G.
22      Q    And is that a man or a woman?
23      A    That's a woman.
24      Q    And what was her official title?
25      A    I believe she was deputy editor of the
```

Page 30

P. Lett

1        P. Lett
2  editorial page.
3      Q    And then prior to Terry Tang, who was your
4  immediate super?
5      A    Terry Tang was my only supervisor.  I
6  believe that was the year she was replaced by Katie
7  Kingsbury, who became my immediate supervisor, but
8  Terry was always my only supervisor.
9      Q    Did you -- in June of 2017, did you have a
10 set work schedule?  Like, were you Monday through
11 Friday, 9:00 to 5:00 type deal?
12     A    Yes.  I worked Monday through Friday,
13 9:30 to 6:00 typically.  The leaving time is not
14 always set depending on the news day.
15     Q    And then where was your office located?
16     A    620 Eighth Avenue, New York, New York.
17     Q    And then can you give me an idea of the
18 office, like, the physical location, of your
19 workspace within the office?  Like, was the
20 editorial department -- was it all on one floor
21 together?
22     A    It was.
23          MR. AXELROD:  Objection to form.
24          THE WITNESS:  I'm so sorry.
25     Q    And then did you have -- what was your work

Page 31

P. Lett

1        P. Lett
2  space like?  I mean, were you guys in cubicles, was
3  it desks?  How did it look?
4      A    I was at a cubicle.  The members of the
5  board had their own offices that year.  So they were
6  not in cubicles, but I was, personally.
7      Q    And what about Eileen Lepping, where was
8  she physical location-wise in proximity to you?
9      A    She was at the cubicle that was effectively
10 next to mine, but we were separated by a big
11 supporting beam.  Like, I couldn't actually see her
12 directly without leaning.
13     Q    And then, at that time, in June of 2017,
14 were all of the board members physically located in
15 the office space on 620 Eighth Avenue or were some
16 of them in other locations?
17     A    Some were in other locations.
18     Q    What about Elizabeth Williamson, where was
19 she working from?
20     A    She typically worked out of D.C.
21     Q    And at that time period, June of 2017, was
22 Robert Semple working out of the Eighth Avenue
23 offices?
24     A    Yes.
25     Q    And what about Linda Cohn, where was she

Page 32

P. Lett

1        P. Lett
2  working from?
3      A    The New York office.
4      Q    And what about Nick Fox?
5      A    The New York office.
6      Q    Did Frank Rich also work in the New York
7  office?
8      A    No.
9      Q    Where did Frank Rich work from?
10     A    I have no idea.
11     Q    Did you ever work with Mr. Rich while you
12 were with -- working with the editorial board?
13     A    No.
14     Q    How often did you work with Mr. Semple?
15     A    Every day.  Bob needed a lot of IT help.
16     Q    Bob's an older gentleman, correct?
17     A    He is.  I love him very much.
18     Q    How often did you work with Linda Cohn?
19     A    Every day.
20     Q    How often did you work with Elizabeth
21 Williamson?
22     A    Because she was based in D.C., I would work
23 with her if she wanted to virtually join us for a
24 guest, or if she needed research, or if her piece
25 was being fact checked that day and I was the fact

Page 33

P. Lett

1        P. Lett
2  checker.
3      Q    Other than Eileen Lepping and you, who were
4  the other fact checkers working for the editorial
5  department in June of 2017?
6          MR. AXELROD:  Objection to form.
7      Q    You can answer.
8      A    We were the only two fact checkers for the
9  board itself.  The Opinion section, which the
10 editorial board is a part of, is made up of several
11 fact checkers.  They don't touch the editorials we
12 did.
13     Q    And why wouldn't the other fact checkers
14 touch the editorials?
15     A    They had other pieces to fact check.
16     Q    Did -- in June of 2017, did the editorial
17 board have access to a research desk?
18          MR. AXELROD:  Objection to form.
19          You can answer.
20     A    There was an internal research desk at The
21 Times that I would -- that I very rarely sent a
22 request for -- to on the chance that I couldn't find
23 a Congressional transcript of some kind or, you
24 know, a transcript of a speech they were looking
25 for.  If I had exhausted all of my searches, then I

Page 34

1               P. Lett
2  would contact them.
3     Q    Let me ask about that because you brought
4  it up.
5          When you went about fact checking a piece,
6  what resources would you use to check facts?
7     A    We used sources that are verified and
8  trusted.  So that means reliable reporting, often
9  our own, from the news side of the company.
10    Q    But how would you actually go about -- I
11 mean, would you just start off with a Google search?
12    A    I would -- it really depends on what you're
13 asking about, what kind of piece you're asking
14 about.
15    Q    So in terms of if you were researching
16 something concerning the Loughner shooting, what
17 was -- what were the resources that were available
18 to you to research that issue?
19    A    So I would look at newsrooms like our own
20 or local newsrooms, ones that we knew we could trust
21 as presenting the facts and -- yeah.
22    Q    And what would be newsrooms -- some
23 examples of newsrooms that you could trust for the
24 facts?
25    A    The Wall Street Journal, The Washington

Page 35

1               P. Lett
2  Post, LA Times, et cetera.
3     Q    Would ABC News be a source that you could
4  trust?
5     A    Yes.  I should say that I, as a fact
6  checker, needed to find evidence of any fact in more
7  than one place.  So it was often finding multiple
8  trustworthy sources that verified the claims.
9     Q    And then, do you know, did The Times itself
10 have research files that it maintained on certain
11 topics?  Like, was there a database that you could
12 go to to pull things up?
13    A    No.
14    Q    Do you know whether The Times maintained
15 any files internally on the Loughner shooting?
16    A    No.
17    Q    And just to be clear, are you saying you
18 don't know if they did or not, or, no, they didn't
19 maintain internal files?
20    A    To my knowledge, there are no such files.
21    Q    Does The Times have an intranet?
22    A    I don't know what that means.
23    Q    I guess, is there an internal network where
24 The Times maintains things like policies and
25 procedures, manuals, things like that, that's only

Page 36

1               P. Lett
2  available internally, not externally to the public?
3     A    Yes.  There's an internal Workday site.
4     Q    And is that the name of the site that's
5  available, Workday?
6     A    Workday is where we enter our timesheets.
7  There's like an internal communications --
8  company-wide communications site, as well.
9     Q    What's that called?
10    A    Good question.  I think -- it's gone
11 through a few different names.  I remember it being
12 called Insight or -- but I don't know what it's
13 called now.  I should know that better.
14    Q    And what kinds of communications would be
15 sent on that site?
16    A    Job openings, promotions, major life
17 milestones like somebody in the Styles department
18 welcomed their baby or someone's grandmother passed
19 away.  Basically internal communication things in a
20 company.
21    Q    Were there any other programs, other
22 than -- or applications -- let me restart the
23 question.
24          Were there any other applications or
25 programs you used to communicate with other

Page 37

1               P. Lett
2  employees at The Times, other than email, in the
3  June of 2017 time period?
4     A    That was prior to Slack, so I think that's
5  the only way, email was the only way.
6     Q    And when did you start using Slack at The
7  Times?
8     A    I don't know.
9     Q    Do you know, were you a part of any
10 channels within The Times on Slack?
11    A    When?
12    Q    No.  Do you know if you were?  So, in other
13 words, did the Opinion department have its own
14 channel within Slack?
15    A    In 2017?
16    Q    Yes.
17    A    We did not have Slack in 2017.
18    Q    Was there another messaging system that The
19 Times was using in 2017?
20    A    To my knowledge, we were only using email.
21    Q    And to sort of short-circuit this so we can
22 move on to another area, but look through your
23 LinkedIn for me, which is Exhibit A, and just let me
24 know if everything in there is accurate.
25    A    (Perusing document.)

Page 38

```
1                    P. Lett
2          I don't go on LinkedIn very much, but yes,
3  this all looks accurate.
4       Q  Okay.
5          Now, you were -- go ahead.
6       A  I'm not presently a tutor at 826NYC.  That
7  ended.
8       Q  Okay.
9          What were you tutoring, what subject areas?
10      A  Reading.  It was for elementary school
11 children.  We mostly just did homework help.
12      Q  Okay.
13         And then you were -- you worked with the
14 editorial board before and after Mr. Bennet came in;
15 is that correct?
16      A  That is correct.
17      Q  And then prior to Mr. Bennet, who was
18 running the Editorial department?
19      A  Andrew Rosenthal.
20      Q  And did you ever work with Mr. Rosenthal?
21      A  Yes.
22      Q  I'm going to show you what's marked as
23 Exhibit 1.  I'll ask you a few questions about this,
24 and then we'll take a break.
25              (Exhibit 1 was shown to the
```

Page 39

```
1                    P. Lett
2              witness.)
3          MR. AXELROD:  And Ms. Lett, take as long as
4      you need to look at the exhibit.
5       A  I read the first part.  I'm on -- I
6  finished page 4.  Should I keep going?
7       Q  I can point you to where I'm going to ask
8  you just a couple of questions about this, and then
9  if you want to take time before you answer me to
10 read that area or anything else around it, then we
11 can do it that way, if that's okay with David, since
12 it is a long piece and I'm not going to touch on
13 most of it.
14         MR. AXELROD:  That's fine.
15         Why don't you ask the question and focus
16     Ms. Lett on where you want to go, and then
17     we'll see -- and then she can tell you if she
18     needs to read more of the exhibit for context.
19         MR. VOGT:  That's fine.
20 BY MR. VOGT:
21      Q  So, first of all, let me ask you, have you
22 ever seen this article before?
23      A  No.
24      Q  Okay.
25         If you turn to the second page of the
```

Page 40

```
1                    P. Lett
2  article, it should say 2 of 21 on the bottom.
3          I'm going to ask you a couple of questions
4  about the bottom of the page there.
5          And really it's the bottom of page 2 of 21
6  and then it goes on to page 3 of 21.
7          There's a portion here that says, "If
8  something is presented as a fact, it has to be
9  correct.  How do we ensure that?  The same way the
10 newsroom does, by reporting.  In fact, I have often
11 told people that the thing that surprised me the
12 most about the editorial page was just how much
13 reporting went into each editorial."
14         What I wanted to ask was, is that an
15 accurate description of how the editorial department
16 was operating in June of 2017?
17         MR. AXELROD:  Objection to form.
18      Q  You can answer.
19      A  Yes.
20      Q  And then I think you touched on this
21 earlier, but Mr. Rosenthal goes on to say that --
22 talk about, in the next paragraph, the editorial
23 department relies on the news pages of The Times and
24 other pages, too, for information.
25         Is that an accurate description, as well,
```

Page 41

```
1                    P. Lett
2  of how things would have worked in June of 2017?
3       A  Yes.
4          MR. AXELROD:  Objection to form.
5       Q  You can answer.
6       A  Yes.
7       Q  And then if you turn to the next page, 3 of
8  21 -- I keep saying "turn."  My kids would be making
9  fun of me right now.
10         There's a paragraph that says, "Our writers
11 bear the first and primary responsibility for
12 checking their facts, but they are backed up by the
13 editors who edit their editorials and signed opinion
14 pieces, by our very able staff researcher, and by
15 our dedicated and extremely hard-working team of
16 copy editors."
17         Is that an accurate description of how it
18 was working in June of 2017, as well?
19         MR. AXELROD:  Objection to form.
20      Q  You can answer.
21      A  Yes.
22      Q  And would that also apply to opinion pieces
23 attributed to the editorial board?
24      A  Yes.
25      Q  And then if you go down a couple of
```

Page 42

P. Lett

1  paragraphs, he talks about meetings. It says,
2  "In our meetings, I call on each member in turn to
3  talk about what is going on in their areas, what we
4  should be writing about that day and in coming days,
5  and what our editorial position should be.
6  Sometimes there is no debate. Sometimes there is a
7  lot of debate."
8       Let me ask you first, to put it in the
9  context of June 2017, during that time period, were
10 there regular meetings by the editorial board?
11 A   Yes. It was our practice to meet three
12 times a week.
13 Q   What days were those meetings scheduled
14 for? Was it like a routine?
15 A   Yes. I believe they were at 9:30 or
16 10:00 on Monday, Tuesday, and Thursday. The timing
17 wasn't consistent. It was either 9:30 or 10:00, but
18 I'm not sure which days for which.
19 Q   And who would have attended those meetings?
20 A   The members of --
21 Q   Just in general. I know it varied from
22 meeting to meeting.
23      But generally speaking, who were the
24 attendees of those meetings?
25

Page 43

P. Lett

1  A   The New York-based members of the board and
2  typically -- always the editors of the editorial
3  board, so.
4  Q   And at that time period, June 2017, who
5  were the editors of the editorial board?
6  A   Certainly Linda Cohn and Bob Semple. Nick
7  Fox went from the Room for Debate vertical when we
8  had to joining the board, I believe around that
9  time, but I don't actually know the exact month he
10 joined. But I'm guessing, if you know his name,
11 then he probably was on the board.
12 Q   Did -- were there any -- anyone other than
13 board members that attended those meetings?
14 A   No.
15 Q   Do you know whether the meetings were
16 recorded?
17 A   Never.
18 Q   And other than the Monday, Tuesday,
19 Thursday board meetings, were there any other
20 regularly scheduled meetings within the editorial
21 department?
22 A   No, no. Those were the only regularly
23 scheduled meetings for the board.
24 Q   Did you ever attend board meetings?
25

Page 44

P. Lett

1  A   I would, usually, if Eileen Lepping could
2  not attend. So I think, on Thursdays, she would
3  come into work later and, therefore, miss the early
4  morning meetings, so I would join for that, or if
5  she was out.
6  Q   I'm sorry. That would typically be on
7  Thursdays?
8  A   I believe so. I don't quite remember our
9  routine at this point. But even if she was there, I
10 would sometimes join if I had the time in my
11 schedule.
12 Q   And other than you and Ms. Lepping, was
13 there anyone else that attended the Monday, Tuesday,
14 Thursday board meetings?
15 A   Yes. Usually a photo editor would join in
16 order to get a sense of what sort of arting [sic]
17 they would be looking for for the pieces of the day.
18 A web editor, so the person -- we call them "web
19 editors," but they're responsible for getting the
20 article published to the section front. They would
21 usually have one person in that meeting, again, to
22 be kept ahead of what would be published and the
23 timetable, just in case anything required quick
24 action.
25

Page 45

P. Lett

1  Q   During the June of 2017 time period, did
2  Mr. Bennet have to sign off or give approval on
3  every piece that was published in the editorial --
4  or in the Opinion section?
5       MR. AXELROD: Objection to form.
6  A   Can you --
7  Q   You can answer.
8  A   Can you restate the question?
9  Q   Sure.
10      During the June 2017 time period, did James
11 Bennet have to approve every piece before it could
12 be published in the Opinion section?
13      MR. AXELROD: Objection to form.
14      You can answer.
15 A   Okay.
16      MR. AXELROD: If you can.
17 A   No, I don't believe he did. I think he
18 would never be able to sleep if he did that.
19 Q   Okay.
20      MR. VOGT: Why don't we go ahead and take a
21 10-minute break there.
22      THE VIDEOGRAPHER: Going off the record,
23 11:01.
24      (Recess taken.)
25

Page 46

```
 1                        P. Lett
 2          THE VIDEOGRAPHER:  Back on the record,
 3     11:15.
 4 BY MR. VOGT:
 5     Q    Okay.  Ms. Lett, I'm going to show you a
 6 couple of other documents, which are marked as
 7 Exhibit 2, Exhibit 3.
 8                        (Exhibit 2 was shown to the
 9                    witness.)
10     Q    Exhibit 2 is the New York Times Ethical
11 Journalism, A Handbook of Value and Practices for
12 the News and Editorial Departments.
13                        (Exhibit 3 was shown to the
14                    witness.)
15     Q    And Exhibit 3 is The New York Times
16 Guidelines on Integrity.
17          And I just wanted to ask you, first, in
18 general, if you're familiar with both of these
19 documents.
20     A    I have read them both before, yes.
21     Q    All right.
22          And do you know, were both of these
23 documents in effect in the June of 2017 time period?
24     A    The video glitched for me.  Can you please
25 repeat that?
```

Page 47

```
 1                        P. Lett
 2     Q    Yeah.  I'll ask you if both of these
 3 documents were in effect in the June of 2017 time
 4 period?
 5     A    I don't know.
 6          MR. AXELROD:  Objection to form.
 7     Q    Yeah.  I've got a message on my screen,
 8 that yeah, Phoebe, your bandwidth is low, so that
 9 might be the problem.
10     A    Yeah.  I'm on a different wi-fi.
11     Q    I'm just going to ask Amanda to repeat the
12 question, okay.
13          THE COURT REPORTER:  Would you like me to
14     repeat the question?
15          MR. VOGT:  Yes, if you can, please.
16                        (Record read.)
17          MR. AXELROD:  Objection to form.
18     Q    Ms. Phoebe, are you there or did you drop
19 off?
20     A    I'm here.  Can you hear me?
21     Q    Yes.
22          Did you hear that question?
23     A    I did.
24          The answer is I don't know.
25     Q    Okay.
```

Page 48

```
 1                        P. Lett
 2          While you were working for the editorial
 3 department in June of 2017, were you following the
 4 Ethical Journalism Handbook of Values and Practices?
 5          MR. AXELROD:  Objection to form.
 6     A    Yes, I was following the Ethical Journalism
 7 Handbook of Values and Practices, yes.
 8     Q    And in June of 2017 time period, were you
 9 also following The New York Times guidelines on
10 integrity, which is Exhibit 3?
11          MR. AXELROD:  Objection to form.
12 BY MR. VOGT:
13     Q    I'm sorry, did you answer?  I didn't hear
14 you.
15     A    Yes, I personally was following The New
16 York Times guidelines.  Yes, I was following the
17 guidelines outlined by my employer.
18     Q    And if you look at Exhibit 3 and scroll to
19 the third page, I'm going to ask you some questions
20 about that, if you want to take a minute to read
21 through it.
22          Actually, I'm going to ask you questions
23 about the Other People's Reporting section.
24     A    (Perusing document.)
25     Q    Are you done going through that?
```

Page 49

```
 1                        P. Lett
 2     A    Yeah.
 3     Q    On page 3, there's a section -- a paragraph
 4 there that talks about attribution.  And the last
 5 sentence of that paragraph says, "And when the need
 6 arises to attribute, that is a good cue to consult
 7 with the department head about whether publication
 8 is warranted at all."
 9          Do you see that sentence?
10     A    I do.
11     Q    Was that a policy that was in effect in
12 June of 2017, to your knowledge?
13     A    I don't know.
14     Q    And when "attribution" is used in this
15 context, would hyperlinking to another news
16 organization's article be considered attribution?
17          MR. AXELROD:  Objection to form.
18     A    I'm not sure.
19     Q    And in the Fact Checking section, I just
20 wanted to ask you about, there's a sentence in the
21 middle of the paragraph that says, "If deadline
22 pressure requires skipping a check, the editors
23 should be alerted with a flag like 'desk, please
24 verify,' but ideally the editor should double back
25 for the check after filing; usually the desk can
```

Page 50

1   P. Lett
2   accommodate a last-minute repair."
3           What I was going to ask you about is have
4   you ever seen instances while you were working for
5   the editorial board where someone used this process
6   of inserting "desk, please verify" in an editorial?
7       A    That specific line, no.  But it would
8   likely say something like, "Eileen or Phoebe, verify
9   this" or "is this right?"
10      Q    And would that -- would that type of
11  notation, would that have been done in Scoop?
12      A    So before Scoop, we had another CMS.  I
13  forget what it was called.  And I'm not sure the
14  year that we switched over to Scoop.  I don't
15  remember.  So if it were done today, it would be in
16  Scoop, but I'm not sure about in 2017.
17      Q    Are you familiar with the Society of
18  Professional Journalists Code of Ethics?
19      A    No, I am not.
20      Q    Do you know whether anyone on the editorial
21  board made it a policy to follow the Society of
22  Professional Journalists Code of Ethics?
23      A    I don't know.
24      Q    I'm going to skip over Exhibit 4 and send
25  you Exhibit 5.

Page 51

1   P. Lett
2           This is a printout from The Times website,
3   a standards and ethics page.
4           Have you ever seen this page before?
5       A    Yes.
6       Q    The professional guideline document
7   section, do you see that?
8       A    Yes, I do.
9       Q    To your knowledge, are all -- are those
10  links that are included in there that are indicated
11  in blue, are those all of the professional guideline
12  documents that you're aware of that were in effect
13  at The Times while you were working for the
14  editorial board?
15          MR. AXELROD:  Objection to form.
16      A    I don't know.
17      Q    Do you recall a point in April of 2017 when
18  the Opinion section came under some fire for some
19  fact checking errors in an op-ed?
20      A    Not based on that description, no.
21      Q    If you'll take a look at Exhibit 6, which
22  is an article related to a Bret Stephens column.
23              (Exhibit 6 was shown to the
24              witness.)
25      Q    Are you familiar with this Bret Stephens

Page 52

1   P. Lett
2   columns -- column?  It's referenced in the article
3   that's Exhibit 6.
4       A    I don't remember this particular --
5           MR. AXELROD:  Objection to form.
6       A    I don't --
7           MR. AXELROD:  And Ms. Lett, if you need to
8       read the article to understand it --
9       A    I don't remember this particular column.
10          MR. AXELROD:  -- you can do so.
11          THE WITNESS:  Okay.
12      Q    Do you remember, in the April of 2017 time
13  period, there being a discussion, a public
14  discussion, about a column that Mr. Stephens wrote
15  concerning climate change?
16      A    I remember --
17          MR. AXELROD:  Objection to form.
18      A    -- Mr. Stephens trending on Twitter and I
19  don't remember the specifics.
20      Q    So just that he was trending, but you don't
21  remember any details about why; is that right?
22      A    Correct.  He was trending several times.
23      Q    Do you know, the several times that he's
24  trended, do you know the reasons why?
25      A    The one that comes to mind most recently is

Page 53

1   P. Lett
2   bedbug related.
3       Q    Would you consider Mr. Stephens to be
4   controversial?
5       A    Mr. Stephens was hired to be a conservative
6   columnist.  And so, he was hired to write from his
7   own political views.  Some people may deem that as
8   controversial.
9       Q    And while you were working for the
10  editorial board, did Mr. Bennet hire anyone else
11  that could be considered controversial?
12          MR. AXELROD:  Objection to form.
13      A    In 2017?
14      Q    At any time while you were working for the
15  board.
16      A    The New York Times has such a reputation
17  that its readers have a very high standard for it.
18  So the scale of controversy is entirely dependent on
19  where your point of view is, and the controversial
20  matters is based on who you are rather than the
21  institution itself.
22      Q    I'm going to show you Exhibit 7, which is
23  an Opinion pages piece by Liz Spayd from September
24  of 2015.
25              (Exhibit 7 was shown to the

Page 54

1                    P. Lett
2       witness.)
3       Q    When you're done reading through it, let me
4  know if you're familiar with this piece.
5       A    I don't recall either.
6       Q    Liz Spayd was the public editor in 2015,
7  correct?
8       A    (No verbal response.)
9       Q    What is a public editor?
10      A    I don't know.
11      Q    You don't know what a public editor is?
12      A    That's a question slightly above my pay
13  grade.  I do, I just don't want to define the job.
14  I can tell you what it is from my point of view.
15           The public editor serves as the critic --
16      Q    What is it from your point of view?
17      A    -- in freelance reporting which is a way of
18  holding accountable -- we have a lag here, I'm
19  sorry.
20           It is a way of holding the paper
21  accountable to the values that we hold in the
22  highest, which is keeping a paper of record and a
23  continuing record of the reality of the world as we
24  see it.
25      Q    And were articles or editorials or whatever

Page 55

1                    P. Lett
2  this might be called that we're looking at, this
3  exhibit, when those were published in the name of
4  the public editor, were those taken seriously by the
5  editorial board?
6       MR. AXELROD:  Objection to form.
7       A    Yes.
8       Q    And if you scroll down to the fourth page
9  of the exhibit, which should be page 3 of 4 of the
10  actual piece, there is a paragraph there that reads,
11  "The Times needs to fix its overuse of unnamed
12  government sources and it needs to slow down the
13  reporting and editing process, especially in a
14  fever-pitch atmosphere surrounding a major news
15  event.  Those are procedural changes and they are
16  needed.  But most of all and more fundamental, the
17  paper needs to show far more skepticism, the kind of
18  prosecutorial scrutiny at every level of the
19  process."
20           And then she concludes there by saying, "If
21  this isn't a red alert, I don't know what will be."
22           Do you recall at all, in this 2015 time
23  period, those specific statements by Ms. Spayd being
24  discussed within the editorial department?
25      MR. AXELROD:  Objection to form.

Page 56

1                    P. Lett
2       A    I don't recall.
3       MR. AXELROD:  Misstates the exhibit.
4       Q    And do you recall, in the wake of this
5  piece put out by Ms. Spayd, whether there were any
6  changes that took place within The Times related to
7  slowing down the reporting and editing process?
8       A    This article was published in December of
9  2015.  At that time, I was just a freelance fact
10  checker for the opinion section and was working
11  elsewhere.  So whether it resulted in systemic
12  change, I was not privy to that.
13      Q    And do you know -- this piece by Ms. Spayd
14  is published in the Opinion section.
15           Do you know why?
16      A    I believe the public editor column was
17  usually in the Opinion section because it was
18  arguing a point of view and not reporting facts;
19  that point of view being whatever the public editor
20  was going to say.
21      Q    Now, if you could take a look at Exhibit 8
22  that I just sent.  This is a slightly older article.
23  It's from January 15 of 2011.  It's a piece by the
24  public editor at that time, Arthur Brisbane.
25           (Exhibit 8 was shown to the

Page 57

1                    P. Lett
2       witness.)
3       Q    Let me know if you're familiar at all with
4  this piece.
5       A    I'm not.
6       Q    And you're familiar with the editorial that
7  was published on June 14 of 2017 that related to the
8  Scalise shooting, correct?
9       A    I am.
10      Q    And in connection with the editorial of
11  June 14 of 2017 on the Scalise shooting, did you go
12  back and do research for past articles in the
13  Opinion section concerning the Loughner shooting?
14      A    I was asked to look up our previous
15  positions and what we had written about personally
16  as -- from the board's perspective.  So I focused my
17  research on what the board wrote.
18      Q    Did you conduct any research into any other
19  Opinion pieces, though, besides what the board
20  wrote?
21      A    Yes.  Part of my job was to make sure that
22  our writers and editors were the most informed as
23  they could be.  And so, I looked for what they asked
24  me to within the whole department.
25      Q    And in researching for the editorial on

Page 58

P. Lett

1   June 14 of 2017, did you come across this piece that
2   I've marked as Exhibit 8?
3       A   No.
4       Q   Other than researching past articles from
5   the Opinion -- and I get -- I get confused
6   sometimes.  It's my fault.
7           Is it the Opinion department or Opinion
8   section?
9       A   I -- it's not your fault.  It's a bit
10  confusing.
11          It's the Opinion department, but "section"
12  is pretty interchangeably used.
13      Q   Okay.
14          Let me show you Exhibit 9.
15              (Exhibit 9 was shown to the
16              witness.)
17      Q   And I know we talked a little bit about
18  this earlier, but if you look at Exhibit 9, there's
19  a URL on the bottom; it's archive.nytimes.com.
20          Do you see that?
21      A   I do.
22      Q   Do you know what the archive is?
23      A   I don't.
24      Q   And this particular page that I printed out

Page 59

P. Lett

1   that's Exhibit 9 contains Loughner documents within
2   the archive.
3           Have you ever seen these before?
4       A   I have not.
5       Q   While you were working on the editorial
6   board, did you ever work on any pieces that involved
7   Sarah Palin?
8       A   I don't know.  I can't recall.  None that
9   stand out.
10      Q   While you were working on the editorial
11  board, do you recall ever fact checking or
12  researching Sarah Palin?
13      A   I don't recall specifically researching
14  Sarah Palin.  If there was a story that we were
15  writing that involved her, that would be the time
16  that I would fact check and research.
17      Q   Is there -- is there a way to tell which --
18  whether you fact checked certain articles?
19      A   I don't think so.  On our old system, there
20  was, I believe.  I don't -- no, actually, there
21  wasn't on our old system.  There is now.  You can
22  see who's touched a piece.  So I can only remember
23  the very specific details of certain pieces,
24  finding -- usually about foreign affairs, I remember

Page 60

P. Lett

1   those.  But, otherwise, it's sort of -- all flows
2   through time.
3       Q   Do you recall, at any point in time,
4   whether at The New York Times or before that, ever
5   working on any pieces that related to the Loughner
6   shooting?
7       A   I don't.
8       Q   Do you recall, at any point in time, ever
9   conducting any research related to the Loughner
10  shooting?
11      A   Nothing more than the emails I turned over
12  that relate.
13      Q   When you say the email you turned over, is
14  that relating to the research you did on June 14 of
15  2017?
16      A   Yes.
17      Q   Do you recall ever hearing any discussions,
18  while you were working with the editorial board,
19  that related to Sarah Palin?
20      A   I don't recall any particular discussions.
21  Though, again, whatever was in the -- was the news
22  stories of the day would be discussed.  So I don't
23  doubt that there was, but I don't recall any
24  specifically.

Page 61

P. Lett

1       Q   I'm going to show you deposition
2   Exhibit 10.
3               (Exhibit 10 was shown to the
4               witness.)
5       Q   This is a 2010 article by Maureen Dowd
6   calls Playing All the Angles, and I know this was
7   before your time at The Times.
8           But have you ever seen this piece before?
9       A   No.
10      Q   Have you ever worked with Maureen Dowd?
11      A   No.
12      Q   Have you ever heard anyone at The Times
13  refer to Sarah Palin as Queen Bee Sarah?
14      A   No.
15      Q   Have you ever heard anyone refer to her as
16  a mean girl?
17      A   No.
18      Q   I'm going to show you Exhibit 11.
19              (Exhibit 11 was shown to the
20              witness.)
21      Q   This is a January 25, 2017, piece by Nicole
22  Wallace.
23          Who is Nicole Wallace?
24          MR. AXELROD:  If you know.

Page 62

P. Lett

1
2     THE WITNESS:  Do I answer?
3   Q   You can answer.
4     MR. AXELROD:  Yes.
5   A   According to her biography at the bottom of
6  this page, she was an analyst for MSNBC, and the
7  author of Madam President, and a senior advisor to
8  the McCain-Palin campaign.
9   Q   Do you recall this piece, Exhibit 11,
10 titled Sarah Palin, Rage Whisperer?
11  A   No.
12  Q   Do you know whether or not you worked on
13 this page?
14  A   Yes.  I know I did not work on this page.
15  Q   How do you know that?
16  A   Because it was by the editorial board.
17  Q   Got it.
18     Have you ever heard anyone within the
19 editorial department refer to Sarah Palin as a Rage
20 Whisperer?
21  A   No.
22  Q   If you turn to page 2 of 4, there's a
23 sentence in the second paragraph there, it says,
24 "The Alaska governor whipped the crowds into a
25 frenzy with her fiery attacks on the media and the

Page 63

P. Lett

1
2  establishment politicians that she had gleefully
3  upended in the Alaska statehouse."
4     Did you -- are you aware of any attacks on
5  the media that were launched by Sarah Palin?
6     MR. AXELROD:  Objection to form.
7     And Ms. Lett, if you need to read this
8     article with respect to questions that are
9     being asked about specific lines, please take
10     your time --
11     THE WITNESS:  Okay.
12     MR. AXELROD:  -- to do so.
13  A   Can you repeat the question, please?
14  Q   Are you aware of any instances in which
15 Sarah Palin has attacked the media?
16  A   I don't know.
17  Q   Are you aware of any instances in which
18 Sarah Palin has attacked The New York Times?
19  A   I don't know.
20  Q   While you were working with the editorial
21 board, did anyone ever discuss any attacks that
22 Sarah Palin had made on the media or The New York
23 Times?
24  A   I don't know.
25     MR. AXELROD:  Objection to form.

Page 64

P. Lett

1
2   Q   You can answer.
3   A   I don't recall.
4  BY MR. VOGT:
5   Q   I just sent Exhibit 12.
6     (Exhibit 12 was shown to the
7       witness.)
8   Q   If you want to take a look through that and
9  let me know when you're done.
10  A   I'm done reading.
11  Q   Have you ever seen this piece before?
12  A   I have not.
13  Q   Do you know Charles -- is it "Blow" or
14 "Blow"?
15  A   "Blow."
16  Q   Do you know Charles Blow?
17  A   Not personally.
18  Q   Have you ever worked with him?
19  A   No.  He -- no.
20  Q   Have you ever worked on any pieces that
21 he's authored?
22  A   No.
23  Q   If you turn to the second page, there is a
24 paragraph there says, "Yes, she's about as sharp as
25 a wet balloon, but we already know that.  How much

Page 65

P. Lett

1
2  time and energy must be to devoted to dissecting
3  that?  How is this constructive, or even instructive
4  at this point?  What purpose does it serve other
5  than inflaming passions and Web clicks?"
6     Do you see that part?
7   A   I do.
8   Q   Did you ever hear any discussions within
9  the editorial board about whether certain subjects
10 or topics generated viewership or readership within
11 The Times?
12     MR. AXELROD:  Objection to form.
13     You can answer.
14  A   Yes.  We're a newspaper, so the topics that
15 are of interest to our readers matters greatly to
16 us.
17  Q   And did you ever hear any discussions where
18 Sarah Palin was mentioned in that context?
19  A   Not to my recollection.
20  Q   Were there any programs or software or
21 applications, things of that nature, that The Times
22 used while you were working at the editorial board
23 that tracked the performance of certain topics
24 online?
25     MR. AXELROD:  Objection to form.

Page 66

1              P. Lett
2      You can answer, if you know.
3      A    I can't speak for The Times broadly.  I
4  know that when we look for SCO, when we're looking
5  for the best SCO when we want our pieces to show up
6  for the audiences that are looking for them, we will
7  look in Google Trends.
8      Q    And would that have been -- that process
9  have been done in the June of 2017 time period?
10     A    That, I don't know.
11     Q    Who would have been responsible for SCO
12  associated with particular editorials in the June of
13  2017 time period?
14         MR. AXELROD:  Objection to form.
15     A    I don't know that we were actually using
16  SCO yet.  I don't -- I'm not sure when that went
17  into place, so I can't answer that.
18     Q    Did -- are you familiar with what a Blossom
19  bot is?
20     A    I believe Blossom tells us when a piece
21  that we've published has content in it, that there's
22  an uptick in interest in Google searches and trends
23  on the Internet.  However, I learned -- I don't work
24  with that and I don't know very much about it.  I
25  don't even know if we still use it or were using it

Page 67

1              P. Lett
2  then.
3      Q    Did you -- when Blossom was being used, how
4  would that information get to you; in other words,
5  when Blossom was telling you when a piece of content
6  had trends on it, would you get an email or another
7  kind of notification about that?
8         MR. AXELROD:  Objection to form.
9      A    Yeah, I don't know.  I know, in the age of
10  Slack -- there's -- the Blossom bot is a Slack bot
11  that you can -- it just does it automatically.  I
12  don't know about 2017, how it came -- and again, my
13  work didn't really overlap with that.
14     Q    And when you say it does it automatically,
15  what do you mean by that?  How would that work?
16     A    Well, it's a bot, and bots work without
17  being told.
18     Q    And then when it -- say -- it would tell
19  you when something was trending; is that fair to
20  say?
21     A    I think that's how it works.  I'm not
22  entirely sure.
23         I think it would -- from my experience,
24  what I think it would do is say, "This piece on
25  Ukraine has a lot of keywords in it that are showing

Page 68

1              P. Lett
2  up in searches.  If you'd like to retweet it, now
3  would be a good time."
4      Q    And would it tell you what those keywords
5  are?
6      A    No -- I don't know.  It might have.
7      Q    And when it would tell you that, would it
8  send you, like, a message on Slack giving you that
9  information about the keywords being trending?
10         MR. AXELROD:  Objection to form.
11     A    No, it would not send a message.
12     Q    How would you get that information then?
13     A    Again, when we had Slack, which I don't
14  know what the timeframe was on that, there was a
15  dedicated channel in which Blossom would just be
16  running its bot procedure.
17     Q    And was everyone on The Times a member of
18  that channel?
19     A    No.  I don't know who was a member of that
20  channel.
21     Q    And then is there also -- within the Scoop
22  system, does the Scoop content manager system --
23  does it also track article performance?
24     A    No.
25     Q    And then in terms of the editorial board,

Page 69

1              P. Lett
2  would the editorial board get any regular reports
3  about what topics were trending online?
4         MR. AXELROD:  Objection to form.
5      A    I don't believe so.
6      Q    And do you recall any instances, during the
7  Monday, Tuesday, Thursday meetings of the board when
8  the issue of topics that were trending, coming up
9  during any of those meetings?
10     A    I don't -- that phrasing isn't correct.
11         The -- each of the writers on the board had
12  their own beat.  And so, they would bring to these
13  meetings the biggest topics in their beat and then
14  the board would discuss them.  So those topics were
15  likely the things that one could call trending at
16  the time.  They were the big stories of the day in
17  each beat.  But never -- it was never informed by
18  the Internet trends.
19         (Exhibit 13 was shown to the
20              witness.)
21     Q    Okay.  If you could, take a look at
22  Exhibit 13, which is a February 7 of 2017 email
23  string between James Bennet and Brent Staples.
24         Let me know when you're done looking
25  through it.

Page 70

1               P. Lett
2      A   I'm done looking through it.
3      Q   Who's Brent Staples?
4      A   Brent Staples is a Pulitzer prize-winning
5  editorial board writer.
6      Q   And have you ever worked with him before?
7      A   I have.
8      Q   Is he one of the senior members of the
9  board?
10     A   What do you mean by "senior"?
11     Q   Is he one of the longest tenured?
12     A   He is, yes.
13     Q   And in this email string, if you look, on
14  February 7 at 6:04 p.m. is where it starts with an
15  email from Mr. Staples to Mr. Bennet.
16     A   Yes.
17     Q   He says, in the second paragraph, "For
18  several weeks now, people - particularly younger
19  ones - have been gathering around the department
20  nervously discussing an impending move.
21         "(Some of them first heard of it from a
22  right-wing propaganda tweet - Sarah Palin claiming
23  that The Times was desperately renting out floors
24  because it was failing.  I know this because a
25  colleague sent me the tweet)."

Page 71

1               P. Lett
2          During this time period of February of
3  2017, do you recall this topic being discussed?
4      MR. AXELROD:  Objection to form.
5      A   I don't remember it being around this time.
6  But when we did have to move floors, the subject of
7  the move was a daily discussion of conversation --
8  point of discussion, yes.
9      Q   When was the time period when you had to
10  move floors?
11     A   I believe it was October of 2017.  The
12  company did it in stages, and I believe our stage
13  was October-ish.
14     Q   And do you recall anything concerning the
15  tweet that's referenced by Mr. Staples here as a
16  right-wing propaganda tweet - Sarah Palin claiming
17  that The Times was desperately renting out floors
18  because it was failing?
19     A   No, I don't recall any tweet like that.
20     Q   Did you follow Sarah Palin on Twitter at
21  any time?
22     A   I don't think so.
23     Q   And then Mr. Staples goes on to say, "As a
24  senior guy, I have done what I can to tamp this
25  down.  But it is clearly feeding on itself.  Was it

Page 72

1  perhaps discussed in a meeting while I was away on
2  vacation?  If not, you might consider addressing it
3  openly with the staff to dispel what has become a
4  chronic source of background anxiety."
5          Do you know, was there ever an open
6  discussion or meeting about what Mr. Staples is
7  discussing in this email?
8      MR. AXELROD:  Objection to form.
9      A   We certainly were told in group settings
10  that we would be embarking on a move over the course
11  of -- like, within the next couple of months or
12  year, and the logistics of that was discussed in
13  many group meetings, yes.
14     Q   In any of those group meetings, did the
15  subject matter of Sarah Palin or her tweet come up?
16     A   No, no.  It was about how many boxes you
17  get to bring your stuff to your new desk.
18     Q   Do you know what the reason for the move
19  was?
20     A   I believe for us to all enjoy open office
21  seating.
22     Q   And so, after the move -- what floor were
23  you on prior to the move?
24     A   Thirteen.

Page 73

1               P. Lett
2      Q   Thirteen?
3      A   Thirteen.
4      Q   And so, after the move, the editorial board
5  members no longer had their own offices; is that
6  right?
7      A   Yes.
8      MR. VOGT:  Okay.  Why don't we take a break
9  there.  Come back at 12:20.
10     THE VIDEOGRAPHER:  Off the record, 12:08.
11         (Recess taken.)
12     THE VIDEOGRAPHER:  Back on the record,
13  12:20.
14     Q   I want to talk now about the morning of the
15  Scalise shooting on June 14, 2017.
16         Do you recall that incident happening?
17     A   Yes, I recall the shooting happening.
18     Q   Do you recall how you first learned of it?
19     A   I do not.
20     Q   You were working that day, correct?
21     A   Yes.
22     Q   Do you know what time you got into the
23  office?
24     A   I don't recall.
25     Q   Do you recall, at some point in time, the

Page 74

P. Lett

1
2  Scalise shooting being discussed at the office?
3      A    I don't recall a particular discussion
4  about it.
5      Q    Do you recall, at some point in time,
6  learning that the board was going to write a piece
7  on the shooting?
8      A    To be honest, I don't remember specific
9  details about that day.  It was not -- it didn't
10  stand out in any way as different than any other day
11  that we would cover the day's shooting -- the day's
12  business or, in this case, unfortunately it was a
13  shooting.  So though I'm sure a conversation
14  happened, I don't remember a specific one that I was
15  privy to.
16      Q    Do you recall, that day, if you worked on
17  anything else other than the editorial about the
18  shooting?
19      A    I'm sure I did other work that day, but I
20  don't recall what.
21      Q    Let me show you -- hold on one second.
22          Let me show you Exhibit 15.
23                  (Exhibit 15 was shown to the
24                  witness.)
25      Q    Have you ever seen this email before?

Page 75

P. Lett

2      A    All right.  It hasn't loaded for me yet.
3          I have not seen this email before.  I have
4  seen the Bob Semple email before in these doc --
5  court documents.
6      Q    Okay.  Now, during this time period when
7  this email string starts, 10:46 to 11:28 a.m., do
8  you recall having any discussions during that time
9  period about writing an editorial related to the
10  Scalise shooting?
11      A    No, I don't recall.
12      Q    Do you recall whether Mr. Semple was in the
13  office that day?
14      A    I don't recall specifically that day.  But
15  it was very rare for Bob to leave the office, in
16  general, so I'd imagine he was.
17      Q    Do you know whether or not Mr. Fox was in
18  the office that day?
19      A    I have no idea.
20      Q    I'm sending Exhibit 16.
21                  (Exhibit 16 was shown to the
22                  witness.)
23      Q    Do you recall whether you've ever seen this
24  email string before?
25      A    I did not recall this at all until seeing

Page 76

P. Lett

1
2  the documents provided in the -- in this -- for this
3  trial.
4      Q    Okay.
5          And you're talking about the documents that
6  you were given by counsel.  I don't want to know any
7  specifics, but is that what you're referring to?
8      A    Yes.
9      Q    Okay.
10          So you're included on the "to" line of an
11  email from Mr. Semple at 11:59 a.m., but you don't
12  recall receiving this email at the time; is that
13  right?
14      A    I don't recall.  It was rather unremarkable
15  and a discussion about pieces happened -- took place
16  over email often.  So this was an unremarkable
17  occurrence.
18      Q    And it was three years ago, so I get it.
19          The people involved in this email, though,
20  Robert Semple, Elizabeth Williamson, Linda Cohn,
21  Eileen Lepping, and Nicholas Fox, was that a group
22  that worked together often?
23      A    With the exception of Elizabeth Williamson,
24  Linda, Eileen, myself, James, and Nick were all on
25  the team that took the writing and edited it, fact

Page 77

P. Lett

1
2  checked it, had it copy edited, and ready to be
3  published.
4      Q    And what was Mr. Semple's role at this
5  time, June of 2017?  Was he like an advisor to other
6  people?  Did he kind of oversee things -- is the
7  impression that I get.
8      A    Yeah.  Bob had worked at The Times for 50
9  years-ish, if not more.  And so, at that point, he
10  was technically an editor of the -- for the page,
11  but he read and shaped the language in a lot of our
12  editorials with Linda and Nick, I guess, at that
13  point.
14      Q    And was there -- we had talked about
15  verticals earlier.
16          Was the team that took on the writing, was
17  that a vertical, what we could call a vertical?
18      A    No.  We'd call that the editorial board.
19      Q    Okay.
20          And if you look, Mr. Semple sent an email
21  at 11:49 a.m.  It says, "Okay.  Meanwhile, Bob, we
22  have written a ton (mainly Frank) on gun control.
23  We did a huge series on it a few years ago."
24          The "Frank" there that's mentioned is Frank
25  Rich; is that right?

Page 78

1                        P. Lett
2      A    Correct.
3      Q    Who is the Frank that's mentioned there?
4      A    Frank Clines was a writer on the editorial
5  board.
6      Q    And who is he?  What is he -- what's his
7  background?
8      A    He retired around the same time as Bob, so
9  he is of Bob's vintage, of Bob's generation.  He,
10 for the most part -- he was the kind of editorial
11 board writer who would write about a lot of
12 different things.  He was sort of -- it was -- he
13 was one of the writers who you could sort of ask him
14 to write anything if someone was out or something
15 like that.
16      So he -- while he had a beat, I don't
17 remember exactly what it was; he was more of just
18 like a generalist writer for the board.
19      Q    And at that time, did he work out of the
20 New York office in 2017?
21      A    He did, yes.  I -- I believe, yeah, I think
22 he was there.
23      Q    And by any chance, do you recall whether or
24 not Mr. Clines was in the office on June 14 of 2017?
25      A    I don't know.

Page 79

1                        P. Lett
2      Q    At any point in time, did you do a search
3  for any pieces that Mr. Clines wrote about gun
4  control?
5      A    The only search I did was of the editorial
6  board's archives for pieces about the Gabby Giffords
7  shooting, as I was instructed to.
8      Q    There's a -- the last sentence of
9  Mr. Semple's 11:49 a.m. email says, "I pout" -- but
10 I think it's supposed to say "put" -- "the thing on
11 the DEW for now as an alternate #3."
12      What does DEW mean?
13      A    That's the DEW.  It's what we called the
14 Google spreadsheet that every day had one, two,
15 three, and it would say the -- this is when we were
16 writing three -- basically three to four editorials
17 a day.  And each line would say who -- what's being
18 written or what the subject was, so it would be
19 something like vaccine or something, which everyone
20 who was privy to the meetings would understand as
21 we're going to write about a new vaccine or
22 whatever.  It would say who the writer was and it
23 would say who was editing it.  So whether that was
24 LC for Linda Cohn, or I think he went by BS, not RS,
25 for Bob Semple.  Things like that.

Page 80

1                        P. Lett
2      Q    How was the Google spreadsheet -- like, how
3  and where was it kept?
4      A    It was kept as a Google spreadsheet and the
5  editors would reference it every day to sort of keep
6  track of where in the writing and editorial process
7  the piece was.
8      Q    Was it saved electronically on any kind of
9  system?
10     A    It wasn't, which -- yeah.  Every day, we
11 would erase the day prior and change it to the next
12 day, to that day's pieces.
13     Q    And was there a one person who was
14 responsible for maintaining and updating and then
15 deleting that spreadsheet?
16     A    Yes.  That was usually Eileen.  If Eileen
17 was on vacation, that would be me.
18     Q    And do you know whether any hard copies
19 were saved of any of the DEW spreadsheets?
20     A    No, not to my knowledge, but I don't know.
21     Q    And would they be sent around to people to
22 look at by email or were hard copies passed out?
23     A    I don't --
24     MR. AXELROD:  Objection to form.
25     Q    You can answer.

Page 81

1                        P. Lett
2      A    The answer is neither.
3      Q    So how would -- say, if Eileen was working
4  on an update of the DEW, how would everyone else
5  find out what was on it?
6      A    It was --
7      MR. AXELROD:  Objection to form.
8      A    It was general practice that you would --
9  that the editors on that team, we call them back
10 fielders, which means not the writers, but the
11 people who work on the piece after it's been
12 written, they would -- we would all keep it open as
13 a tab in our web screen so that we could see -- in
14 particular, if something was being moved to a
15 different day, then we would know to stop
16 prioritizing that and move to whatever we would need
17 to.
18     Q    And do you know whether Mr. Bennet would
19 have followed that practice, as well, of keeping the
20 tab open?
21     A    I have no idea.
22     Q    Let me show you -- and you may not recall
23 this either, but I just want to check.
24          (Exhibit 17 was shown to the
25          witness.)

Page 82

P. Lett

1          P. Lett
2      Q    Exhibit 17 looks like another one on the
3  same string.
4          Did you have any independent recollection
5  of this email string?
6      A    No, I did not.
7      Q    Do you recall at all or at any point in
8  time on the 14th someone bringing up the Giffords
9  shooting in the context of the Scalise shooting?
10     A    I do not recall a specific discussion that
11 day.
12     Q    Do you recall, at any point in time -- you
13 may not remember the substance, but did you have
14 any, like, meetings about the editorial that was
15 being worked on on the 14th of 2017?
16         MR. AXELROD:  Objection to form.
17     A    I -- to my recollection, I did not
18 participate in any of those meetings and I don't
19 know if they took place.
20     Q    You don't know if they took place?
21     A    I had not heard of them before.
22     Q    Okay.
23         What about phone calls, do you know whether
24 or not any phone calls took place on June 14 of 2017
25 regarding the editorial concerning the Scalise

Page 83

1          P. Lett
2  shooting?
3      A    I do not recall any phone calls that day.
4      Q    Let me show you what's going to be marked
5  as Exhibit 20.  It should be a June 14 email from
6  Mr. Bennet.
7          (Exhibit 20 was shown to the
8          witness.)
9      Q    Do you see that?
10     A    I do.
11     Q    Are you familiar with this email at all?
12     A    No, this is the first time I've seen it.
13     Q    Do you recall whether or not you had any
14 conversations with Mr. Bennet on June 14 of 2017
15 regarding the editorial on the Scalise shooting?
16     A    I do not recall any conversations with
17 James on that day.
18     Q    Let me show you, now, Exhibit 21.
19         (Exhibit 21 was shown to the
20         witness.)
21     Q    I'm just going to ask quickly about the
22 email from Ms. Williamson at 12:51 p.m.  There at
23 the top, she says, "Okay, shall do.  Just spoke with
24 Bob, as well."
25         Do you know whether or not you were a party

Page 84

1          P. Lett
2  to any conversation between Ms. Williamson and
3  Mr. Semple?
4      A    I was not.
5      Q    Do you recall, at any point in time, having
6  any conversations with Mr. Semple that related to
7  the editorial that was being written on June 14 of
8  2017 concerning the Scalise shooting?
9      A    I do not recall any conversations like
10 that.
11     Q    Let me show you -- I'm going to give you
12 two exhibits, 22 and 23.
13         Twenty-two should be an email from you on
14 June 14 of 2017 at 12:54 p.m.
15         And 23 should be an email from Mr. Semple
16 on June 14, 2017 at 12:58 p.m. at the top of it.
17         (Exhibit 22 was shown to the
18         witness.)
19         (Exhibit 23 was shown to the
20         witness.)
21     Q    Do you see that?
22     A    Uh-huh.
23     Q    Okay.
24         MR. AXELROD:  Shane, Shane.  Let me just
25     slow you down here.  We're getting these much

Page 85

1          P. Lett
2      slower than you have them.  If you could give
3      her a little bit more time to look at them as
4      they come up on the screen.
5          Thanks.
6          MR. VOGT:  Yeah, no problem.
7          MR. AXELROD:  Thanks.
8  BY MR. VOGT:
9      Q    Let me know when you've had a chance to
10 look through those.  Just do that for all of them.
11 I'm going to assume that you're just going to look
12 through them first, and then when you're done, just
13 tell me, "Okay, I've looked through them," so I know
14 when to start.
15         MR. AXELROD:  And I'm blaming it on the
16     witness, but my computer is going a little bit
17     more slow.
18         MR. VOGT:  If you want to tell me, too,
19     David, that's fine.  Give me a heads up and
20     I'll wait until I hear from you guys.
21         MR. AXELROD:  I'm not saying you have to
22     give us a ton of time.  Just give us a little
23     bit more time.
24         MR. VOGT:  Okay.
25 BY MR. VOGT:

Page 86

```
1                        P. Lett
2      Q    All right.  So let's just start with 22,
3  the email from you at 12:54 p.m.  The subject on
4  that is "Gun Control Past Pieces from Bob," and then
5  you have four pieces there, links to them.
6           Do you see that?
7      A    I do.
8      Q    And then if you look at Exhibit 23 on 4/14
9  at 12:58 p.m., the email from Mr. Semple says,
10 "Elizabeth, so as not to overwhelm you, I just asked
11 Phoebe to send you four gun control pieces that also
12 happen to mention Gabby Giffords."  There is a part
13 in the middle there, but...
14          What I was going to ask you was do you
15 remember the conversation you had with Mr. Semple
16 where he asked you to send Ms. Williamson four basic
17 gun control pieces?
18     A    I do not.
19     Q    And do you know whether it was a -- would
20 have been a conversation or an email or some other
21 type of message?
22     A    It would have been a conversation.
23     Q    And it would have been on the phone?
24     A    No.  No, probably not.  Bob probably would
25 have come to my office and said, hey, kid, get me
```

Page 87

```
1                        P. Lett
2  blank, as he had for all of my life there.
3      Q    Where was -- where was Bob's office in
4  relation to yours, your desk area?
5      A    Bob's office was around the corner of the
6  building.  So maybe 50 feet.
7      Q    And where was Mr. Bennet's office in
8  relation to yours?
9      A    In the other direction, further down the
10 side of the building that I resided -- that I was
11 kept at.  The south side of the building.
12     Q    Did you -- do you know whether, when you
13 spoke with Mr. Semple -- obviously you pulled these
14 four pieces in Exhibit 22.
15          Do you know whether he told you, "Pull
16 these four specific pieces"?
17     A    As I said, I don't recall the conversation
18 at all.  It was apparently unremarkable.  But it
19 seems like, from this email that you just shared in
20 Exhibit 23, that he did ask me to find those
21 specific pieces.
22     Q    And do you recall anything else that he
23 asked you to do?
24     A    No.  To be honest, I did not remember this
25 ask until I was asked to retain documents.
```

Page 88

```
1                        P. Lett
2      Q    Okay.  Let me show you Exhibit 24.
3      A    Yup.
4               (Exhibit 24 was shown to the
5               witness.)
6      Q    And there's an email from Ms. Williamson at
7  the top.  It says, "Phoebe, Thanks.  Is there one
8  that references hate-type speech against Dems and
9  the run-up to her shooting.  James referenced that.
10 Thanks, E."
11          Do you recall this email?
12     A    I did not recall it until I was told to
13 retain documents.
14     Q    And do you recall any other communications
15 that you had with anyone between 12:54 p.m. when you
16 sent the four links and this email from
17 Ms. Williamson at 1:40 p.m.?
18     A    No, I don't recall any other conversation.
19     Q    And then let me show you 25.
20               (Exhibit 25 was shown to the
21               witness.)
22     A    Sorry, it's not loading.  Give me a second.
23     Q    It should be a June 14, 2017, email from
24 you at 2:21 p.m.
25          Do you see that?
```

Page 89

```
1                        P. Lett
2      A    Yes.
3      Q    All right.  And you say there, "We never
4  ran an editorial on it.  Frank Rich wrote this
5  piece" -- this piece is underlined -- "on it, but
6  the board never did.  James was just wondering if
7  there had been one, he says."
8           Now "this piece" is a hyperlink, correct?
9      A    Yes.
10     Q    And do you know why -- or let me ask you
11 this.
12          Once you got the email from Ms. Williamson
13 at 11:40 p.m. where she says "is there one that
14 references hate-type" --
15     A    You mean 1:40?
16     Q    Yeah, 1:40, I'm sorry.
17          Did you actually look for articles that
18 reference the hate-type speech against Dems and the
19 run-up to the Gabby Giffords shooting?
20     A    I don't recall doing that, but I must have,
21 given my response.
22     Q    Do you have any recollection of what
23 sources you would have searched for?
24     A    Yes.  My practice was to go onto
25 thenewyorktimes.com/opinion.  And if you clicked on
```

Page 90

```
 1              P. Lett
 2  the section of the -- section that said
 3  "editorials," it would lead you to a list of all of
 4  the editorials that came with the search bar.  And
 5  so, that's where I would start whenever I was asked
 6  what our past position had been on anything, was to
 7  look for keywords in that search box.  So I assume
 8  that's what I did here.
 9       Q    Do you recall what keywords you used for
10  this particular search?
11       A    I don't recall.  Again, this was one of
12  millions of requests like this that I took over the
13  years.  But I'd feel certain that it probably had
14  the words "Gabby Giffords" in it.
15       Q    Do you know whether it had the phrase
16  "Palin" in it?
17       A    I don't think I looked for her name.  I
18  believe I was instructed to look for Gabby
19  Giffords-centered pieces and that's what I looked
20  for.
21       Q    Do you remember if you used any search
22  terms that would have been related to hate-type
23  speech?
24       A    I don't know how I would have searched for
25  that, so I imagine that I just looked at everything
```

Page 91

```
 1              P. Lett
 2  we ever sent that contained the phrase "Gabby
 3  Giffords" in it and inferred from there.
 4       Q    And that would have been, at that time,
 5  just within the editorials; is that right?
 6       A    Correct, yes.
 7       Q    And so we're clear for the record,
 8  editorials, is that just pieces that are written by
 9  the editorial board?
10       A    Correct.  It's not -- not the easiest thing
11  to understand, even internally, I understand that.
12       Q    So it would not have included things like
13  op-ed pieces, right?
14       A    Yeah, never.  We never -- none of the op-ed
15  writers or columnists were members of the board and
16  their work was separate from the editorial board
17  entirely.
18       Q    And do you know whether or not you would
19  have saved the results of your research?
20       A    No.  The email included here is that record
21  of the results of my research.
22       Q    And then, so, the links that are in the
23  email, would you have just copied the link on the
24  particular piece and then pasted that into an email?
25       A    Correct.
```

Page 92

```
 1              P. Lett
 2       Q    All right.  I'm sending 26.  Let me know
 3  when you've got that and had a chance to look at it.
 4       A    Yup.
 5            (Exhibit 26 was shown to the
 6            witness.)
 7       Q    And do you -- this is an email string,
 8  again, on June 14 of 2017 between you and
 9  Mr. Bennet.
10            Did you have any independent recollection
11  of this email string?
12       A    Again, I did not -- I honestly thought that
13  I was not involved in this in any way until the rude
14  awakening.  So I don't personally recall this at
15  all.
16       Q    So at 1:46, after Ms. Williamson emailed
17  you about whether or not there was one that
18  referenced hate-type speech against the Dems and the
19  run-up toward her shooting, after that at 1:46, you
20  emailed Mr. Bennet and said, "I'm trying to find the
21  piece Elizabeth is referring to here.  Do you happen
22  to know which one she's referring to?"
23            At 2:07, he responds, "No.  I was just
24  wondering if there was such a piece; that is, did we
25  ever write anything connecting to the Giffords
```

Page 93

```
 1              P. Lett
 2  shooting some type of incitement?"
 3            Now, do you know whether, when you were
 4  conducting research on this particular issue that's
 5  referenced in this email, did you include any
 6  keywords that related to the word "incitement"?
 7       A    I don't recall.  As I said, I think I
 8  looked through all of the pieces that had referenced
 9  Gabby Giffords, and that was the best way to find
10  what I thought -- what I inferred they were looking
11  for.
12       Q    What was your understanding of what
13  Mr. Bennet meant in this email when he says
14  "incitement"?
15            MR. AXELROD:  Objection to form.
16       A    Yeah, I don't -- I don't know what James
17  meant.  Yeah, I don't know.
18       Q    Did you ask him what he meant?
19       A    Well, this is an email asking him what he
20  meant, so yes.
21       Q    When you say this is an email asking him
22  what he meant, what do you mean?  Do you mean your
23  email at 2:20?
24       A    No.  I mean the email at 1:46 that I sent
25  asking him which piece Elizabeth says he referenced.
```

Page 94

1                        P. Lett
2       Q    Right.  And then at 27 -- 2:07, he
3   responds, "No, I was just wondering if there was
4   such a piece; that is, did we ever write anything
5   connecting the Giffords shooting to some kind of
6   incitement?"
7            So after he sent that email to you at 2:07,
8   did you ever follow up to ask him what he meant by
9   "incitement"?
10      A    No.
11      Q    And then at 2:20, you respond and you said,
12  "No, but Frank Rich did," and then you have a link
13  there to a Frank Rich piece.
14           Do you see that?
15      A    Yes.
16      Q    And then at 2:34, Mr. Bennet responded,
17  "Good for us."
18           Do you know what he meant by that?
19      A    I do not know.
20           MR. AXELROD:  Objection to form.
21      Q    Now, do you recall, at any point in time on
22  June 14th of 2017, having any conversations with
23  Mr. Bennet about this research that you were doing
24  that's memorialized in Exhibit 26?
25      A    Exhibit 26 is the extent of the

Page 95

1                        P. Lett
2   conversation.
3       Q    So it was just by email?
4       A    Correct.
5       Q    All right.  I'm sending through Exhibit 27.
6   Let me know when you get that one.
7       A    I have it.
8            (Exhibit 27 was shown to the
9             witness.)
10      Q    Did you have any independent recollection
11  of these emails?
12      A    Again, no.
13      Q    And then I'm not going to go through the
14  whole string, but at 2:52, Mr. Bennet asks you to
15  send him the pieces that you sent to Ms. Williamson;
16  is that right?
17      A    Yes, that's correct.
18      Q    And do you know why he was asking you that?
19      A    I do not know, no.
20      Q    And then I'm sending number 28.
21           (Exhibit 28 was shown to the
22            witness.)
23      Q    And this is just a copy of the email where
24  you actually forward Mr. Bennet the articles that
25  you -- or the pieces that you had sent to

Page 96

1                        P. Lett
2   Ms. Williamson, correct?
3       A    Correct.
4       Q    And in connection with that, do you recall
5   having any conversations or discussions with
6   Mr. Bennet?
7       A    I do not.
8       Q    And then if you take a look at Exhibit 29.
9            (Exhibit 29 was shown to the
10            witness.)
11      Q    Let me know when that one comes through.
12      A    Yup.
13      Q    Okay.
14           So after you send -- after you forward the
15  four Opinion pieces to Mr. Bennet that you had
16  initially sent Ms. Williamson, at 3:01 p.m., you
17  sent Mr. Bennet two more pieces.
18           Do you see that?
19      A    I do see that.
20      Q    And what led you to pulling these pieces?
21      A    I have no recollection of this email and it
22  did not come up in my search of my own information
23  on this for the lawyers, so this is the first time
24  I've seen it, I assume, since 2017.  Because we did
25  not use good SCO practice, I can't even tell you

Page 97

1                        P. Lett
2   what those links are about because they use our
3   internal language for how we would refer to a piece.
4   So all I know about this is the first one was
5   published on Monday -- the first piece was published
6   on Monday, the 10th of January, and the second one
7   was published on Thursday, the 13th of January.
8       Q    Okay.
9            So between 2:52 p.m. and 3:01 p.m., do you
10  recall whether or not you were still researching the
11  issue that Mr. Bennet had told you to take a look
12  at?
13      A    I don't recall.  But judging by this email,
14  it seems I was.
15      Q    And I think you mentioned this earlier in
16  your deposition, but you did say, at some point, you
17  researched the issue that Mr. Bennet had asked you
18  to look at concerning hate-type speech against Dems
19  leading up to the Giffords shooting.
20           You researched that in areas outside
21  editorials; is that correct?
22           MR. AXELROD:  Objection to form.
23      A    Yeah, I don't recall what exactly I did.
24  But it's good practice for the writers and editors
25  to know, perhaps, everything that we have -- our

Page 98

1    P. Lett
2    section, in particular, has published on a
3    particular topic so that we can dispute or correct
4    or reference and build off of in any way, yup.
5        Q    And was that -- would that have been your
6    standard practice at the time as of June 14th of
7    2017?
8        A    It -- it would be the standard practice for
9    a request that was, "What have we written on X?"  So
10   a retrospective task, I would usually only keep it
11   to what the board itself had written.  But since the
12   answer wasn't very much, I must have expanded my
13   search to the broader Opinion section.
14       Q    And so, as we sit here today, is it -- is
15   it more likely than not that you did expand your
16   research in connection with the June 14, 2017,
17   editorial outside of pieces written by the board?
18       A    You know, as I said, this was a thoroughly
19   unremarkable day for me, other than obviously I
20   remember that news story, but I don't remember
21   anything that I did that day.  Because I only came
22   up with Frank Rich's piece and not the earlier
23   pieces that you've shown us here, I'm guessing that
24   Frank's piece might have accidentally been
25   classified as a board piece and that's why I saw it.

Page 99

1    P. Lett
2    I'm not entirely sure why it was just that piece and
3    why that piece, in general, showed up here.
4        Q    Okay.
5             How -- is there a way you could tell how
6    Mr. Rich's piece was classified?
7        A    There's a way one could tell.  The way I
8    could tell was from what we call the "front end,"
9    which is the section front.  So, again, I don't
10   remember how I came to sending that particular
11   op-ed.  But because it was the only one that I
12   found, I'm guessing my search was faulty because
13   there were obviously other pieces about this
14   subject.
15       Q    Well, do you know whether this was the only
16   one that you found or if it was just the only one
17   that you sent?
18       A    I don't recall.
19       Q    And when you said "front end" there, what's
20   "front end" mean?
21       A    Like any digital entity, the front end is
22   the end through which the client or customer
23   interacts.  So our section front at
24   nytimes.com/opinion would be the front end.
25       Q    And so, if, like, I, as a member of the

Page 100

1    P. Lett
2    public, went to that space and did a search, I'd be
3    able to see whether or not Mr. Rich's article showed
4    up under that Opinion tag?
5        A    I believe -- if it is given the right tag
6    or classification, then it should, yes.
7        Q    Okay.
8        A    Not under the board, I just want to make
9    that clear.  Because he was not a member of the
10   board.
11       Q    Right.  Mr. Rich wasn't, he was an op-ed
12   columnist, correct?
13       A    Yes.  He was either a contributor or a
14   columnist.  I'm not sure what his technical role
15   was.
16       Q    All right.  And let me just show you so
17   it's there, Exhibit 30.
18                 (Exhibit 30 was shown to the
19                 witness.)
20       Q    This one may take a little while to go
21   through because it's bigger.
22       A    Okay.
23       Q    And I believe these would be all of the
24   pieces that line up with the links that you'd sent
25   throughout the time period that you were doing

Page 101

1    P. Lett
2    research.
3             Do you have any independent recollection of
4    looking at or reviewing these pieces in Exhibit 30?
5             MR. AXELROD:  Objection to form.
6        A    I don't have a recollection of viewing
7    these specific pieces.
8        Q    And do you recall, other than pulling these
9    pieces that we've been looking at and these email
10   strings, do you recall any other research that you
11   would have done on June 14 of 2017?
12       A    I do not.  Again, I don't recall, really,
13   any details about that day.
14       Q    Let me show you -- this is a larger
15   exhibit, so it may take a little while to go
16   through.  It's still uploading on my end.
17                 (Exhibit 32 was shown to the
18                 witness.)
19       A    Am I supposed to read all of this?
20       Q    No, no, sorry.  I hadn't known if it had
21   gone through on your end or not.
22             I'm just going to ask you, if you look at
23   the first page, do you know what this is?
24       A    It looks like it is the record of changes
25   that happened to the article "America's Lethal

Page 102

```
1                    P. Lett
2  Politics."
3      Q    And do you know what content management
4  system this is in?
5      A    I don't.  I don't think it's Scoop
6  because -- but I don't know.  I don't know which
7  one, whether it was this or the old one.  CCI we
8  called it, the old one, I think.
9      Q    And do you recall whether or not, at any
10 point in time, you would have accessed the editorial
11 in the content management system on June 14 of 2017?
12          MR. AXELROD:  Objection to form.
13     A    Can you restate the question, please?
14     Q    Yeah.
15          Do you have any independent recollection of
16 accessing the editorial, "America's Lethal
17 Politics," on the content management system on
18 June 14 of 2017?
19     A    I do not.
20     Q    Do you know who was responsible for fact
21 checking the editorial "America's Lethal Politics"?
22     A    Because it was not me, I'm fairly certain
23 it would have been Eileen Lepping.
24     Q    But you're certain it was not you?
25     A    I have no recollection of fact checking
```

Page 103

```
1                    P. Lett
2  this.
3      Q    Have you ever had any conversations or
4  discussions with Ms. Lepping about the "America's
5  Lethal Politics" editorial?
6      A    None that stand out to my memory.  We
7  talked about any pieces that the board was writing
8  on a given day so that -- especially on a day of
9  breaking news; that if she needed help with, maybe,
10 a less urgent piece, I might take that to fact
11 check.
12          So while I don't recall a single instance,
13 it was very much part of our practice to be informed
14 as to what the board would be writing about that
15 day.
16     Q    Let me show you now Exhibit 33.
17     A    Yes.
18               (Exhibit 33 was shown to the
19               witness.)
20     Q    If you look on the second page, bottom of
21 the text where it says Elizabeth Williamson, back
22 field, 6/14/2017, 4:44 p.m., does that give you any
23 indication as to what content management system this
24 might have been in?
25     A    That makes me think it was CCI and not
```

Page 104

```
1                    P. Lett
2  Scoop because Scoop doesn't call it "back field"
3  anymore.  Though, internally, the people who are
4  trained on CCI, I guess, continue -- I mean, most
5  people refer to any nonwriting edits as back
6  fielding.  And because that's not the particular
7  language of Scoop, I would guess that this is not --
8  was not in Scoop.  But, again, I'm not sure.
9      Q    All right.
10          And if you look on the first page, do you
11 recall, at any point in time on June 14 of 2017,
12 reviewing a draft version of the editorial that was
13 prepared by Elizabeth Williamson?
14     A    I don't recall.  I don't recall doing that.
15 That's not to say I didn't, but I just have no
16 standout recollection of doing so.
17     Q    And then if you look in the third
18 paragraph, there is a section there that says --
19 highlighted that says, "need to check/update."
20          Would that typically be a way that someone
21 would give an indication to the fact checker that
22 they wanted them to look at this issue?
23     A    Yeah.  That's a, that's a good example of
24 one way.  Particularly on unfolding stories, for
25 instance, in the case that people were injured and
```

Page 105

```
1                    P. Lett
2  the number of which might change over the course of
3  the day, the number of the survivors might change
4  over the course of the day, that would be something
5  that we would continue to check until the moment of
6  publishing.
7      Q    And then if you look a couple of paragraphs
8  down, the word "circulated" is blue and underlined?
9      A    Yes.
10     Q    And that would be a hyperlink, correct?
11     A    Correct.
12     Q    Now, typically, when a piece like this is
13 being fact checked, what would the fact checker do
14 when they saw a hyperlink like that?
15          MR. AXELROD:  Objection to form.
16     Q    You can answer.
17     A    Click on it, and then find other sources to
18 verify it, verify the claims that it was in.
19     Q    And when you -- when you go to other --
20 find other sources to verify the claim that was in
21 there, would you save those sources?
22     A    No.
23          MR. AXELROD:  Objection to form.
24     A    No, not typically.  Saving -- if it was of
25 contention.  So if someone was like, "Are you sure
```

Page 106

P. Lett

1  that we have 52,000 nuclear warheads?" I might put
2  the hyperlink in a comment so as to show others, and
3  that would be a form of, I guess, saving it. But it
4  wouldn't go into the piece itself; it would be in
5  the back field.
6      Q   So if -- if a question ever came up later
7  on once a piece was published about whether a fact
8  was accurate or not, would there ever be a way to go
9  back and see what the second source was that
10 validated the claim made in the first source?
11         MR. AXELROD:  Objection to form.
12     A   Yeah.  The -- what would happen is the fact
13 checker would be asked where they verified the fact,
14 and the fact checker would go, perhaps, into their
15 own history.  Or if it was checked through a phone
16 call of sources or something like that, it would all
17 depend on the fact and how it was verified.
18     Q   When you say "history," are you referring
19 to search history?
20     A   Yeah.
21     Q   Would you save your search history?
22     A   I assume it's saved somehow.  But
23 intentionally saving, no.
24     Q   Would you ever delete your search history?

Page 107

P. Lett

1      A   No.
2      Q   You never deleted it?
3      A   Oh, I don't know.  I have no idea if I
4  never deleted it.  It's a work computer, so I
5  assumed there was a record somehow.
6      Q   Do you have the same work computer now that
7  you had in 2017?
8      A   I do.
9      Q   Did anyone ever ask you to look through
10 your search history in connection with documents for
11 this case?
12         MR. AXELROD:  And Ms. Lett, I'm going to
13     ask you there to not answer with respect to
14     communications with lawyers.  But to the extent
15     anyone else besides a lawyer asked you to do
16     so, you can say that.
17     A   No.
18     Q   Okay.
19         When the switch was made from the CCI
20 content management system to Scoop, was everything
21 transferred over to Scoop, like all the old stuff?
22     A   No.  Yeah, I don't think -- I don't think
23 so.  I'm not sure.  I don't really know about the
24 archival side of our content management systems.

Page 108

P. Lett

1      Q   Let me show you Exhibit 34.  Let me know
2  when that comes through.
3      A   Yup, I have it.
4             (Exhibit 34 was shown to the
5             witness.)
6      Q   Have you ever seen this article before?
7      A   Not to my recollection, no.
8      Q   Do you know whether or not this is the
9  article that is hyperlated -- I'm sorry, hyperlinked
10 as circulated in Exhibit 33 that I just showed you?
11     A   I have no idea what's hyperlinked.
12     Q   Did you ever review the "America's Lethal
13 Politics" once it was published online?
14     A   I don't know.
15     Q   Do you know whether you ever read the
16 editorial "America's Lethal Politics" once it was
17 published in print?
18     A   I assume I read it.  I read basically all
19 the editorials after they were published, but I
20 don't have a recollection of doing so.
21     Q   Other than what we've talked about so far
22 with respect to the events of June 14 of 2017, do
23 you recall any other research that you conducted in
24 connection with the "America's Lethal Politics"

Page 109

P. Lett

1  editorial?
2          MR. AXELROD:  Objection to form.
3      A   I don't recall.
4      Q   And other than what we've talked about so
5  far, do you recall any conversations that you had
6  with anyone on June 14 of 2017 related to the
7  "America's Lethal Politics" editorial?
8          MR. AXELROD:  Objection to form.  Asked and
9      answered.
10     Q   You can answer.
11     A   As I said, I don't recall a single detail
12 about that day.
13     Q   Did there come a point in time on either
14 June 14 or June 15 when you learned that there were
15 some questions being raised about the "America's
16 Lethal Politics" editorial?
17     A   I don't recall the moment, though I have
18 seen the email correspondence in which Eileen
19 Lepping shared with me the fact that there would be
20 a correction.  So I know that I was kept up to date
21 with us issuing a correction, but I don't recall the
22 conversation.  Again, it was sort of unremarkable,
23 though we took corrections very seriously and were
24 very -- wanted to be very sure that we continued to

Page 110

P. Lett

1  reflect an accurate record.  It's not very uncommon
2  when you're constantly creating as accurate news as
3  you can to need to return to correct something.
4      Q   Do you remember who told you that a
5  correction was going to be issued?
6      A   I don't.  But it seems as though Eileen
7  Lepping would have been the person.
8      Q   I'm sending you what I'm marking as 37A.
9      A   Received.
10                    (Exhibit 37A was shown to the
11                      witness.)
12     Q   And the top email is from Ms. Lepping to
13 you on 6/15 at 11:02 a.m., and she forwards an email
14 to Mr. Bennet at 5:08 a.m.
15         Do you see that?
16     A   I do.
17     Q   Do you recall this email?
18     A   I do not, but -- yeah, I don't remember it.
19     Q   Do you recall having any conversations with
20 Ms. Lepping on June 15, 2017, regarding the content
21 of this email in Exhibit 37A?
22     A   I don't recall.
23     Q   Do you recall on June 15 of 2017 being
24 involved in conducting any research that related to

Page 111

P. Lett

1  the "America's Lethal Politics" editorial?
2      A   I don't believe I did, but I don't recall.
3      Q   Do you recall having any other written
4  communications with anyone on June 15 of 2017 that
5  related to the "America's Lethal Politics"
6  editorial?
7      A   I don't have any memory of any
8  communications about it, so I -- to my knowledge,
9  no.
10     Q   Were you involved at all in working on the
11 correction that was issued for the "America's Lethal
12 Politics" editorial?
13     A   I don't recall.  The person who works on
14 the correction is the person who fact checked the
15 piece.  And since I don't believe I participated in
16 that, I would not have been included.
17     Q   Let me show you Exhibit 45.
18     A   Uh-huh.
19                    (Exhibit 45 was shown to the
20                      witness.)
21     A   I see it.
22     Q   It should be an email from June 14 from
23 Emily Brennan to "!NYHQ-Opinion Web For Times."
24         That's a group email address, correct?

Page 112

P. Lett

1      A   Correct.
2      Q   Do you know who's on that group email?
3      A   I don't, specifically, but it's likely
4  anyone on the editorial side in Opinion.
5      Q   Would that include Mr. Bennet?
6      A   I don't know.
7      Q   And what is Exhibit 45?
8      A   So this is a daily email that we -- I don't
9  know if we still do this, but, at the time, it was a
10 way for the night editors to update the people who
11 would come in in the morning as to the state of all
12 the pieces that we planned to publish.  So that
13 could mean anything from somebody didn't file or
14 still waiting on a photo to be added to this
15 article.  Anything that the morning editors would
16 need to know that the evening editors and copy
17 editors had pushed forward.
18     Q   And then there's a part that says
19 "Newsletter"?
20     A   Yes.
21     Q   With a link there that says "scoop" in it.
22     A   Yup.
23     Q   Would that be an indication that Scoop was
24 being used at this time?

Page 113

P. Lett

1      A   Yes, I think so, because as far as I can
2  recall, the CCI was not a URL.  It was an internal
3  program, I think.  It was so long ago and so many
4  iterations, I believe so.
5      Q   Yeah, I understand.  I'm not trying to trip
6  you up or anything, I'm just trying to figure out
7  what it is.
8          So -- and then what's the newsletter that's
9  referenced there?
10     A   At the time, we only had one newsletter,
11 which would have been called Opinion Today and was a
12 roundup of the links of pieces that we published at
13 the time that would go out to our readership.  Based
14 on that URL, I don't know that for sure.  I'm
15 just -- I'm making an educated guess.
16     Q   I just sent through Exhibit 47, just to
17 see, while we're talking about that, if it comes
18 through.
19     A   Yup.
20                    (Exhibit 47 was shown to the
21                      witness.)
22     Q   Would that be the newsletter?
23     A   Yes.  This is -- I don't know if it's --
24 referenced here, but it is the newsletter Opinion

Page 114

P. Lett

1  P. Lett
2  Today.
3      Q    And that would have been what -- Exhibit 47
4  would have been what the "newsletter" was at this
5  time period, June 14, June 15, 2017?
6      A    This was the Opinions Only newsletter at
7  that time.
8      Q    And what -- what was the newsletter?  What
9  was its purpose?  Like, did it get sent out to
10 readers or was it internal?
11     A    No.  It was an external product.  So when
12 you become a member of The Times or submit your
13 email address to receive a particular newsletter,
14 there's -- there was a landing page of all the
15 different newsletters The Times put out and you
16 could select the ones you wanted to receive.
17 Opinion Today was ours, and it was originally just
18 an email, listing all of the articles that we
19 published in a given day.
20     Q    And then who's David Leonhardt?
21     A    David Leonhardt is the creator of The
22 Upshot column and became an Opinion columnist, I
23 want to say early 2016, but it could have been 2015.
24 And so, he -- in an effort to make our newsletter
25 more interesting and less of a laundry list of

Page 115

P. Lett

1  things that were published, he volunteered to write
2  sort of contextualizing those pieces.
3      Q    And did you work -- I know he was an op-ed
4  columnist, but did you work with him at all given
5  that he was responsible for the newsletter?
6      A    I did not work with him on the newsletter,
7  no.
8      Q    Do you know, was there a fact checker who
9  worked on the newsletter?
10     A    I believe that his assistant fact checked
11 the newsletter, but I'm not entirely sure on that
12 because it was outside the editorial board's
13 purview.
14     Q    Do you know who his assistant was?
15     A    His assistant was Ian Prasad.
16     Q    Can you spell that?
17     A    Ian, I-A-N; Prasad, P-R-A-S-A-D.  Last name
18 is Philbrick, P-H-I-L-B-R-I-C-K.
19     Q    And Amanda is now thanking me profusely for
20 having you spell that because, phonetically, that
21 was a nightmare.
22          Do you have a recollection of working on
23 this particular newsletter, perhaps, in Exhibit 47?
24     A    No.  I wouldn't have ever touched or been

Page 116

P. Lett

1  involved in it.  Because, again, it was not related
2  or under the purview of the editorial board.
3      Q    Let me jump back now.  I'm going to send
4  you Exhibit 46.
5          (Exhibit 46 was shown to the
6           witness.)
7      A    Okay.
8      Q    Do you recognize Exhibit 46?
9      A    Not specifically, but I recognize the idea
10 of The Times Digest.
11     Q    And what is The Times Digest?
12     A    Great question.  It was an email that I
13 received every day.  What it was and where it went,
14 I'm not sure.  I believe -- again, this is not at
15 all a very intelligent answer, but my understanding
16 is it was the shortened version of the paper that
17 maybe was given to nonsubscribers or something.  I
18 didn't know.  I somehow got signed up for that email
19 and it was one of the ones that I just deleted every
20 morning when I woke up.
21     Q    Okay.  You probably shouldn't have said
22 that.
23     A    I got hundreds of thousands of these.
24     Q    Do you have any recollection of whether you

Page 117

P. Lett

1  worked on any of the tweets that went out on June 15
2  of 2017 concerning corrections to the "America's
3  Lethal Politics" editorial?
4      A    I did not work on that, no.
5      Q    Do you recall at any point in time on
6  June 15 of 2017 having any conversations with Hanna
7  Ingber regarding the "America's Lethal Politics"
8  editorial?
9      A    No, I did not talk to Hanna.
10     Q    And do you have any recollection of having
11 any conversations on June 15 of 2017 with Danielle
12 Rhoades Ha regarding the "America's Lethal Politics"
13 editorial?
14     A    I don't have any recollection.
15     Q    The editorial was published on the day of
16 the shooting, which was June 14 of 2017.  That's a
17 Wednesday.
18          The following morning, Thursday the 15th,
19 do you recall attending the editorial board meeting
20 that morning?
21     A    I do not.
22     Q    Do you recall attending any editorial board
23 meetings around the time of this "America's Lethal
24 Politics" editorial where the editorial or any

Page 118

1                   P. Lett
2   errors in it were discussed?
3        A   I do not.  I -- it doesn't stand out to my
4   memory at all.
5        Q   Did you ever see any of the tweets
6   concerning the corrections to the "America's Lethal
7   Politics" editorial?
8            MR. AXELROD:  At what time?
9        Q   June 15, 2017, did you see them
10  contemporaneous with when they came out?
11       A   I don't recall seeing them, but it wouldn't
12  surprise me if I did.
13       Q   Did you follow NYT Opinion on Twitter?
14       A   Yes.
15       Q   I'm sending you Exhibit 52.
16       A   Received.
17           (Exhibit 52 was shown to the
18           witness.)
19       Q   Seeing this tweet, do you have any
20  recollection of seeing it real-time on June 15 of
21  2017?
22       A   No, it does not jog my memory in any way.
23       Q   Do you recall having any discussions with
24  anyone about this specific tweet from June 15 of
25  2017?

Page 119

1                   P. Lett
2        A   I do not recall any discussions about this
3   tweet.
4        Q   Do you recall, around the time of June 15
5   of 2017, seeing any tweets by Sarah Palin that
6   related to the "America's Lethal Politics"
7   editorial?
8        A   I don't recall seeing any such tweets.
9        Q   I'm sending you now Exhibit 55.
10           (Exhibit 55 was shown to the
11           witness.)
12       Q   I don't need you to read through all the
13  comments and everything.  I'm just going to ask you
14  to take a look at the tweets on the first page, the
15  1 of 2 and 2 of 2 of Sarah Palin.
16           Do you see those?
17       A   I do, yes.
18       Q   Looking at those, does that refresh your
19  recollection at all as to whether or not you saw
20  those tweets on June 15, 2017?
21       A   These are unfamiliar to me.
22       Q   The 1 of 2 tweet there where it has at NYT
23  Opinion in red, do you know what that is?
24       A   Yes.  I believe that's our handle.
25       Q   And by including the handle in that tweet,

Page 120

1                   P. Lett
2   would it have gone to the NYT Opinion Twitter
3   account?
4            MR. AXELROD:  Objection to form.
5        A   Yeah, I don't know.  I wasn't on the social
6   team.  I don't know what happens.  I have no idea.
7        Q   At this time period, June 15 of 2017, who
8   would have been responsible for maintaining the NYT
9   Opinion Twitter account?
10       A   That would have been Liriel Higa, and her
11  supervisor is Snigdha Koirala.
12       Q   You have to spell that one.
13       A   S-N-I-D-G-A [sic].  Last name Koirala,
14  K-O-I-R-A-L-A.  Yeah, I think so.
15           But Snidgha was not responsible for the
16  tweets.  Liriel was.
17       Q   Okay.
18           And do you recall, at any point in time, on
19  or after -- I'm sorry.
20           Do you recall, at any point in time on or
21  after June 15 of 2017, there being any discussion
22  within the editorial department about these tweets
23  from Sarah Palin that are in Exhibit 55?
24           MR. AXELROD:  Objection to form.
25       A   I don't recall any discussion of these

Page 121

1                   P. Lett
2   tweets.
3            MR. VOGT:  All right.  Why don't we take a
4        break here.  I've just got a few more
5        documents to go quickly through and then we
6        should be wrapping up.
7            Okay?
8            MR. AXELROD:  Okay.
9            THE VIDEOGRAPHER:  Off, 1:37.
10           (Recess taken.)
11           THE VIDEOGRAPHER:  We're back on the
12       record, 1:50.
13  BY MR. VOGT:
14       Q   Okay.
15           Phoebe, I'm going to just go through,
16  now -- we can probably do this pretty quickly, but I
17  want to go through several pieces and just see if
18  you recognize them or came across them as part of
19  doing some of your research for the "America's
20  Lethal Politics" piece.
21           So the first one is Exhibit 59.  This one,
22  actually, I wanted to ask you a different question
23  on.  Sorry about that.  Let me know when it comes
24  through.
25       A   I received it.

Page 122

                    P. Lett
1
2                   (Exhibit 59 was shown to the
3                   witness.)
4        Q    And on this, I just want to ask you, do you
5    recall whether or not you worked on this column by
6    Bret Stephens?
7        A    I did not work on this column.
8        Q    And take a look at Exhibit 60.
9        A    Received.
10                  (Exhibit 60 was shown to the
11                  witness.)
12       Q    And do you recall whether or not you came
13   across this column by Mr. Blow titled "The Tuscon
14   Witch Hunt" in doing any of the research you
15   conducted in connection with the June 15, 2017,
16   editorial?
17       A    I don't recall.  And if I didn't send it,
18   then I would assume that I did not, but I don't
19   recall.
20       Q    All right.  Now I'm sending you number 61.
21                  (Exhibit 61 was shown to the
22                  witness.)
23       Q    This one is a January 9, 2011, column by
24   Ross -- is it Douthat?
25       A    Yes, you nailed it.

Page 123

                    P. Lett
1
2        Q    -- entitled "United in Horror."
3             Do you recall whether you came across this
4    article in doing your research on June 14, 2017?
5        A    I don't recall ever reading this column.
6        Q    Have you ever worked with Mr. Douthat?
7        A    Yes.  Ross is on the podcast that I help
8    produce.
9        Q    I'm sending you number 63.
10       A    Received.
11                  (Exhibit 63 was shown to the
12                  witness.)
13       Q    This is a June 15 of 2017 column by
14   Mr. Blow entitled "Rhetoric and Bullets."
15            Did you work on this column at all?
16       A    No, I did not work on this column.
17       Q    All right.  And I sent you Exhibit 69.
18       A    Received.
19                  (Exhibit 69 was shown to the
20                  witness.)
21       Q    Which should be a Vanity Fair article.
22       A    Received.
23       Q    Have you ever seen this article before?
24       A    I believe I read this article at the time.
25       Q    And were there any discussions about this

Page 124

                    P. Lett
1
2    article internally within the editorial board?
3             MR. AXELROD:  That you were present for.
4        A    Yeah, not to my recollection.  I don't
5    remember ever hearing a conversation about this
6    report.
7        Q    Do you recall ever talking to anyone else
8    within The New York Times about this article?
9        A    I certainly didn't come about it on my own.
10   I don't read this publication willingly, so someone
11   must have shared it with me and told me that it was
12   published.  But as to who or when or why, I don't
13   recall any specific details.
14       Q    Do you recall ever talking to Eileen
15   Lepping about this article?
16       A    I don't have a recollection of that.  She
17   could have been the person who shared it with me or
18   showed it to me.  I don't know.
19       Q    Are you, like, friends with Eileen Lepping?
20   Like, do you all socialize outside of the office?
21       A    "Friends" is a strong word.  I attended
22   Eileen's baby shower, but that -- which was outside
23   of the office, but that's -- other than maybe a
24   couple of after-work drinks over the years -- by "a
25   couple," I mean two or three -- that's the extent of

Page 125

                    P. Lett
1
2    our friendship.
3        Q    Is there anybody at work that you talk to
4    more about, like, workplace problems that you might
5    have or things like this article?  Is there anyone
6    that you talk to about that kind of stuff?
7        A    Things like this article, I don't know.
8    Yeah, I don't know who I talk to about this, as I
9    said, so...
10       Q    If you look on the second page of the
11   article, it's the third page of the exhibit, that
12   second paragraph, the second sentence says, "Bennet
13   has been somewhat an activist Opinion editor and a
14   surprisingly large amount of his activity has
15   produced outrage even from inside the building."
16            Are you aware of any incidents where
17   anything that Mr. Bennet has done has caused outrage
18   within The Times?
19            MR. AXELROD:  Objection to form.
20       A    The Quinn Norton incident referenced in
21   this article resulted in a public town hall for the
22   company to ask James questions about that decision.
23   And so, you could describe that as having a reaction
24   within the building.
25            But outside of that meeting, I did not hear

Page 126

P. Lett

1  anything.
2      Q    Did you attend that town hall?
3      A    I certainly did not attend in person.  I
4  may have streamed some of it.  But I don't really
5  remember actually the content of it.
6      Q    Do you recall, at any point in time during
7  that town hall, the editorial concerning Sarah Palin
8  coming up?
9      A    I don't believe -- again, I don't remember
10  that town hall at all, so it would be unfair for me
11  to comment on the substance of it.
12      Q    If you go down to the last paragraph on
13  this page, there's a couple of sentences there that
14  read, "And after the Norton fallout, some Times
15  journalists went from skeptical consternation
16  regarding Opinions' latest iteration to outright
17  concern that some of Bennet's decisions were
18  damaging the paper's credibility."
19          Do you see that?
20      A    I do.
21      Q    Had you ever had any conversations with
22  anyone that worked at The Times about whether or not
23  Mr. Bennet's decisions were damaging the paper's
24  credibility?
25

Page 127

P. Lett

1      A    Would you mind restating the question, I'm
2  sorry?
3      Q    Did you ever have any conversations with
4  anyone that worked at The Times that related to
5  whether or not decisions that Mr. Bennet was making
6  as editor of the editorial department were adversely
7  impacting The Times' credibility?
8      MR. AXELROD:  Objection to form.
9      Q    You can answer.
10      A    I don't recall any such conversations.
11      Q    If you turn to page 4 of 7 of the article,
12  there is a paragraph there that says, "The
13  P.R. crisis escalated when HuffPost got its hands on
14  an internal-chatroom transcript about Weiss."
15      A    What paragraph is that?
16      Q    It's the third paragraph.  It's page 5 of
17  the exhibit.
18      A    Okay, sorry.
19      Q    Page 4 of 7 of the article.
20      A    Sorry.  I see that paragraph, yes.
21      Q    Do you know if you were a part of that
22  chatroom transcript?
23      A    I was not.
24      Q    Do you know who was?
25

Page 128

P. Lett

1      A    I do not.
2      Q    If you turn to the next page, there's a
3  paragraph there that starts off, "This was the
4  spirit running through a 1500-word internal memo
5  Bennet issued on February 15th."
6      A    I see that.
7      Q    And he says, in the last sentence of that,
8  quote from him in that paragraph says, "I'd be far
9  sorrier if we never tested the limits."
10          Do you see that?
11      A    I do see that.
12      Q    Was -- was Mr. Bennet, to your knowledge,
13  testing the limits while you were working for the
14  editorial board?
15      MR. AXELROD:  Objection to form.
16      A    I don't -- I'm not sure how to answer that.
17  James believes -- believed that the Opinion section
18  was there to present a -- as varied and as accurate
19  a portrayal of the given opinions on any object --
20  on any given subject matter.  So by testing the
21  limits, I'm not exactly sure what he meant, but I
22  know that was his guiding philosophy.
23      Q    While you were working for the editorial
24  board, did Mr. Bennet like to stir up controversy?
25

Page 129

P. Lett

1      MR. AXELROD:  Objection to form.
2      A    No.  It seemed to be particularly horrible
3  for him when it happened.
4      Q    Why is that?  Why do you say that?
5      A    Because he would have to issue apologies, I
6  think.  His -- it never seemed like he wanted to do
7  anything other than have as accurate a report as we
8  possibly could and make the arguments that we
9  included in that report as varied and as surprising
10  and different as we possibly could.  And so --
11      Q    You mentioned that he issued apologies.
12          Did he not like to issue apologies?
13      A    No, no.  James is very -- one thing I can
14  say is James is very quick to take responsibility
15  and he was always -- started -- you know, the kind
16  of conversations around this article that might have
17  come up, he would always start by saying, you know,
18  "I've made a mistake and I'm personally sorry."
19      Q    Had you ever seen an instance of him
20  apologizing to the subject of a piece where there
21  was an error in a piece about them?
22      MR. AXELROD:  Objection to form.
23      A    I don't -- I don't think that that was
24  practice.  I'm not sure if that was even allowed --
25

Page 130

P. Lett

1
2   I'm not sure about those sorts of decisions.  It's
3   far above my pay grade.
4       Q    The next-to-last paragraph on this page
5   says, "Another commonly aired critique is that the
6   op-ed page, in these emotional, polarizing times,
7   has evinced a penchant for trolling.  Writing
8   recently on the Ringer, a sports and
9   pop-culture-oriented Web site, Justin Charity
10  posited that 'once-token provocations have become
11  the paper's most widely circulated missives,
12  diluting the impact of its other departments' work."
13           Have you ever heard about that type of
14  issue before?
15           MR. AXELROD:  Objection to form.
16           Objection to form.
17      A    Heard about what?
18      Q    Had you ever heard anybody raise the
19  critique that the op-ed page at The Times had a
20  penchant for trolling?
21      A    That language sounds like it came from
22  Twitter.  I'm sure I've seen tweets like that, but
23  nothing -- nothing in particular, to my mind.
24      Q    Mr. Bennet, in your experience with him,
25  does he have a good memory?

Page 131

P. Lett

1
2       A    I have no idea.  We are not very close.
3       Q    Does he seem intelligent?
4       A    Yes, he seems very intelligent.
5       Q    Does he seem knowledgeable in a number of
6   areas?
7            MR. AXELROD:  Objection to form.
8       A    He seems knowledgeable.
9       Q    In your interactions with him in the
10  editorial board meetings that you attended, did he
11  evidence an ability to recall stories from years ago
12  when you would be talking about various topics?
13           MR. AXELROD:  Objection to form.
14      A    I can't think of anything in particular.
15  That's not to say he couldn't, but nothing comes to
16  mind.
17      Q    Had you ever experienced Mr. Bennet having
18  any difficulties remembering any facts from the
19  past?
20           MR. AXELROD:  Objection to form.
21      A    I have no idea.  I -- no, not to my memory.
22  I don't know.
23      Q    I'm sending you what we're going to mark to
24  your deposition as Exhibit C.
25           (Non-Party Phoebe Lett's

Page 132

P. Lett

1
2            Responses and Objections to
3            Plaintiff's Subpoena was marked
4            as Lett C for identification, as
5            of this date.)
6       Q    It should be titled Non-Party Phoebe Lett's
7   Responses and Objections to Plaintiff's Subpoena.
8            Is that right?
9       A    Yes, I see that.
10      Q    Have you ever seen this document before?
11      A    No.
12      Q    All right.  There's a number of requests in
13  here.  If you just want to skim through it, kind of
14  ignore the responses, just look at the requests for
15  me.
16      A    What page might that be on?
17      Q    Like, there's -- see there's one on page 3?
18      A    I see, okay.  Thank you.
19           Should I read all of the requests?
20      Q    Well, you can skim them.
21           The only thing I'm going to ask you is do
22  you recall, at any point in time, searching for
23  documents responsive to any of these requests?
24      A    I was asked to retain all communication
25  about this subject, so I did that.

Page 133

P. Lett

1
2       Q    And what time period would that have been
3   in?
4       A    I'm not sure.  I would have to -- I would
5   have to check my email inbox.
6       Q    Do you think, though, it was back in 2017,
7   or do you think it was more recent?
8       A    More recent, I believe.
9       Q    Okay.
10           And I think you said, at one point in your
11  deposition, correct me if I'm wrong, but that you
12  had searched for some documents and had gone through
13  them, and that was when you realized that you had
14  some stuff that related to this; is that right?
15           MR. AXELROD:  Objection to form.
16      A    I received the message from the lawyers
17  asking us to retain any -- any and all documents and
18  communication --
19      Q    I don't want to know the substance of
20  anything that you talked to your lawyers about.
21           MR. AXELROD:  We're not going to go beyond
22      that.
23           MR. VOGT:  Yeah, I don't, I don't -- I
24      don't want to get into that.
25      Q    I just wanted to know whether you actually

Page 134

```
 1                      P. Lett
 2  did a search on your own for stuff, because I think
 3  I was a little bit confused by what you said
 4  earlier.
 5              Whether you did a search on your own for
 6  stuff or you just saved everything and somebody else
 7  handled it?
 8      A    When I was asked to send any documentation
 9  I had, I -- that's when I committed the search.
10      Q    Okay.
11           And everything that you found you sent to
12  the lawyers?
13      A    Correct.
14      Q    Okay.
15           MR. VOGT:  All right.  I think I'm done.
16      Let me -- give me, like, five minutes to look
17      through my notes and stuff, and then we'll
18      finish up.  So come back at, like, 2:20.
19      Okay?
20           MR. AXELROD:  That's fine.
21           THE VIDEOGRAPHER:  Off the record, 2:13.
22                 (Recess taken.)
23           THE VIDEOGRAPHER:  We're back on the
24      record, 2:19.
25  BY MR. VOGT:
```

Page 135

```
 1                      P. Lett
 2      Q    Ms. Lett, have you ever heard Mr. Bennet
 3  ever make any statements about this lawsuit?
 4      A    No, I have not.
 5      Q    Have you ever heard Mr. Bennet ever make
 6  any statements about Sarah Palin?
 7      A    No, I have not.
 8      Q    Have you ever heard Mr. Bennet make any
 9  statements concerning the editorial "America's
10  Lethal Politics"?
11           MR. AXELROD:  And actually, I just want to
12      jump in and say, Ms. Lett, you can answer all
13      of these questions, but don't answer them if
14      they were in the -- if you heard them in the
15      presence of attorneys, if that makes sense.
16      A    No, not to my knowledge; I have not.
17      Q    Have you ever heard Mr. Bennet make any
18  statements concerning whether there was a link
19  between a map circulated by Sarah Palin's political
20  action committee and the shooting of Gabrielle
21  Giffords?
22      A    I don't recall any statements like that.
23      Q    I'm going to show you again -- I'm going to
24  send it so you don't have to go back and look for
25  it -- Exhibit 52, which is the NYT Opinion tweet
```

Page 136

```
 1                      P. Lett
 2  from June 15.
 3           Did that go through?
 4      A    Received.
 5      Q    Have you ever heard Mr. Bennet make any
 6  statements to the effect that we got an important
 7  fact wrong, incorrectly linking political incitement
 8  and the 2011 shooting of Giffords?
 9           MR. AXELROD:  Objection to form.
10      A    I don't recall any particular statements.
11      Q    Do you recall having any conversations or
12  discussions with Eileen Lepping as to whether or not
13  the "America's Lethal Politics" editorial
14  incorrectly linked political incitement in the 2011
15  shooting of Giffords?
16      A    I don't recall any such conversations.
17           MR. VOGT:  Okay.  I think that's all the
18      questions that I have for you.
19           MR. AXELROD:  And I have no questions for
20      Ms. Lett.
21           MR. VOGT:  All right.  Thank you very much
22      for your time.
23           THE VIDEOGRAPHER:  Off the record, 2:22.
24                 (Time adjourned: 2:22 p.m.)
25
```

Page 137

```
 1
 2           C E R T I F I C A T E
 3
 4      I, AMANDA McCREDO, a Shorthand Reporter
 5  and Notary Public of the State of New York, do
 6  hereby certify:
 7  That the witness whose examination is
 8  hereinbefore set forth was duly sworn, and that
 9  such examination is a true record of the
10  testimony given by such witness.
11  I further certify that I am not related to any
12  of the parties to this action by blood or
13  marriage, and that I am in no way interested in
14  the outcome of this matter.
15
16
17      _____
18           AMANDA McCREDO
19
20
21
22
23
24
25
```

Page 138

1
2              ERRATA SHEET FOR THE TRANSCRIPT OF:
3    Case Name:        Sarah Palin v. The New York
                       Times
4
     Dep. Date:        May 4, 2020
5
     Deponent:         Phoebe Lett
6
7                      CORRECTIONS:
8
     Pg.  Ln.   Now Reads        Should Read      Reason
9    ___  ___  _____    _____  _____
10   ___  ___  _____    _____  _____
11   ___  ___  _____    _____  _____
12   ___  ___  _____    _____  _____
13   ___  ___  _____    _____  _____
14   ___  ___  _____    _____  _____
15   ___  ___  _____    _____  _____
16   ___  ___  _____    _____  _____
17   ___  ___  _____    _____  _____
18   ___  ___  _____    _____  _____
19   ___  ___  _____    _____  _____
20                             _____
                               Signature of Deponent
21
     SUBSCRIBED AND SWORN BEFORE ME
22
     THIS___DAY OF_____, 20__
23
24   _____
25   (Notary Public)  MY COMMISSION EXPIRES:_____

Page 139

1
2                ACKNOWLEDGMENT OF DEPONENT
3          I,                     , do hereby
4          certify that I have read the foregoing
5          pages, and that the same is a correct
6          transcription of the answers given by me
7          to the questions therein propounded,
8          except for the corrections or changes in
9          form or substance, if any, noted in the
10         attached Errata Sheet.
11
12
13              _____
                          PHOEBE LETT
14
15   Subscribed and sworn to
16   before me on this_____ day
17   of _____, _____.
18   _____
19   Notary Public
20
21
22
23
24
25