**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                  :

SARAH PALIN                  :  No. 17 Civ. 4853 (JSR)
            Plaintiff,    :  ECF Case
                  :
      -against-       :  **DEFENDANTS' REPLY**
                  :  **STATEMENT OF UNDISPUTED**
THE NEW YORK TIMES COMPANY and JAMES  :  **MATERIAL FACTS**
BENNET,               :
          Defendants.   :
                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Pursuant to Rule 56.1 of the Local Rules for the United States District Court for the

Southern District of New York, Defendants The New York Times Company ("The Times") and

James Bennet ("Bennet," and, together with The Times, "Defendants") submit the following

Reply Statement of Undisputed Material Facts in support of their Motion for Summary Judgment

(Dkt. 97) ("SUMF") and in response to Plaintiff's Counter-Statement of Material Facts

("Counter-Statement") (Dkt. 108):

## PRELIMINARY OBJECTIONS

Palin's Counter-Statement suffers from three significant problems that required

Defendants to expend substantial time and space to address below, and that ultimately should

lead the Court to strike significant portions of the Counter-Statement.

First, Palin**,** in her Counter-Statement, routinely disregards the requirement that "[e]ach

statement … must be followed by citation to evidence which would be admissible, set forth as

required by Fed. R. Civ. P. 56(c)."  L.R. 56.1(c); *see Giannullo v. City of N.Y.*, 322 F.3d 139, 140

(2d Cir. 2003) (Rakoff, J.) (Local Rule 56.1 "requires a party moving for summary judgment to

submit a statement of the allegedly undisputed facts on which the moving party relies, together

with citation to the admissible evidence of record supporting each such fact"); *Holtz v.*

*Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("where there are no citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion" (internal quotation marks omitted)).

Many of Palin's "disputes" about otherwise undisputed facts are "supported" only by argument about the meaning of the facts, not admissible evidence to the contrary.  Pl. Resp. to ¶¶ 1, 12, 32, 52-54, 56-57, 60, 63, 67-70, 75, 78, 86-87, 91-93, 98, 103, 105, 124, 127, 145-146. And many of these "disputes" are supported *solely* by a conclusory attack on the credibility of Bennet's testimony, without citation to any facts at all, admissible or otherwise.  Pl. Resp. to ¶¶ 75, 86-87, 93, 124, 127, 145-146.  Similarly, Plaintiff asserts a number of new statements of "fact" that are not supported by any admissible evidence.  Pl. ¶¶ 156-164, 169-172, 176-179, 190, 192, 196-209, 214-215, 218-225, 232, 243-244, 246-247, 251, 257-258, 260-262, 285, 287-289, 292-94, 300, 303, 307-308.

Second**,** Palin's Counter-Statement includes dozens of new statements that merely re-frame or argue about the meaning of facts already introduced.  Pl. ¶¶ 263-265, 272-284, 309-381.  The last *seventy-two* paragraphs of the Counter-Statement, Pl. ¶¶ 309-381, are almost entirely re-purposed versions of Defendants' original statements of undisputed material facts. Plaintiff introduces few, if any, additional facts in these paragraphs, and instead asserts legal arguments and unsupported conclusions.

Third**,** the Counter-Statement misrepresents testimony on a number of central points:

| Plaintiff's Representation | Testimony |
|---|---|
| "Cohn testified that after turning over the Editorial to Bennet at around 5:00 p.m. she did not do anything on it again until she got it back from Bennet."  Pl. Resp. to ¶ 64. | Cohn testified that she turned the draft over to Bennet around 5:00 p.m. and, while Bennet was revising the Editorial, she, Lepping, and Fox worked on fact-checking, specifically considering questions about gun laws.  Def. Reply to ¶ 64. |

| | |
|---|---|
| "Bennet testified Defendants did not fact check the Editorial until after Bennet completed his re-write."  Pl. Resp. to ¶ 64 . | Bennet testified that he personally did not fact-check Williamson's draft before editing it and did not know at the time what others had done in that regard.  Def. Reply to ¶ 64. |
| "Bennet was responsible for fact-checking the portions of the Editorial he re-wrote."  Pl. Resp. to ¶¶ 68, 183, 184. | Q:  And, so, would Mr. Bennet have been responsible for fact checking the portions that he rewrote?<br><br>A.  He would be responsible for checking the portions that he wrote *as assisted by the fact checkers, yes*.<br><br>Williamson Dep. 68:1-6 (emphasis added); Def. Reply to ¶¶ 68, 183, 184. |
| "The *entirety* of Cohn's testimony about her thoughts at that time is that she did not believe the map circulated by Sarah Palin's PAC incited Loughner to commit his shooting in 2011 because 'incitement,' Cohn said, "'sounds very direct, that it—that the map led him to commit the shooting.'"  Pl. Resp. to ¶ 83 (emphasis added). | Q:  What did you mean by "incited"?<br><br>A:  Maybe fostered or said things that might make people who were prone to such things feel that they should take some sort of violent action. I don't know.· Just sort of a general – I don't – I, I – I certainly didn't mean someone was giving, like, orders or saying go shoot someone or go commit a violent act, but just that the rhetoric was ugly enough that it would boil up and foster people to take things into their own hands.<br><br>Cohn Dep. 94:12-20; Def. Reply to ¶ 83. |
| "Bennet used 'incitement,' which he knew was a very 'strong word' that meant 'deliberate orders, invocations, summonses for people to carry out violent attacks' and was 'a call to violence.'"  Pl. Resp. to ¶ 85. | Bennet understood "incitement" to mean a "a range of communications," from "deliberate orders" to lies about history or "maps that misrepresent the politics of the region."  Def. Reply to ¶ 85. |
| "Bennet also admitted to being directly involved in his brother's political career."  Pl. Resp. to ¶ 150 (citing Bennet Dep. 63:7-16). | Bennet testified that his involvement in his brother's political career was limited to briefly keeping his brother company and editing "a couple speeches" during Sen. Bennet's first campaign.  Def. Reply to ¶ 150 (citing Bennet Dep. 62:13-63:24). |
| "In fact, attacks on his family are a 'trigger' for Bennet, known to send him into 'fit[s] of rage.'"  Pl. ¶ 241 (citing Pl. Dep. Ex. 159). | Q:  And one of the things that's mentioned in here [Pl. Dep. Ex. 159, an unauthenticated magazine article offered for the truth of the statements within it] is they claim that – "in stories published about his relatives have |

|  | proved to be something of a trigger for him." Is that true? |
|  | [Objection] |
|  | A:  No. |
|  | Bennet Dep. 60:17-24; Def. Resp. to ¶ 241. |

For these reasons, Defendants respectfully submit that Plaintiff's Responses to Defendants' Paragraphs 1, 12, 32, 52-54, 56-57, 60, 63, 67-70, 75, 78, 86-87, 91-93, 98, 103, 105, 124, 127, 145-146 and Plaintiff's Paragraphs 156-164, 169-172, 176-179, 190, 192, 196-209, 214-215, 218-225, 232, 243-244, 246-247, 251, 257-258, 260-265, 272-285, 287-289, 292-94, 300, 303, 307-308, and 309-381 should be stricken from the Counter-Statement.

## REPLY TO COUNTER-STATEMENT

In this section, Defendants provide the initial paragraph in Defendants' SUMF, Plaintiff's response found in Plaintiff's Counter-Statement, and Defendants' reply.

### The Parties

1.      Sarah Palin is the former governor of Alaska, a former vice presidential candidate, and an influential public figure.  Am. Compl. ¶¶ 20-23.

**Plaintiff's Response:** Plaintiff OBJECTS to the phrase "public figure" because it is a legal conclusion, not a statement of fact. Subject to and with full reservation of Plaintiff's argument that the actual-malice rule and its "public figure" component should no longer apply for the reasons more fully set forth in Plaintiff's Motion for Partial Summary Judgment [Doc. No. 100], it is undisputed that Plaintiff is the former governor of Alaska and vide-presidential candidate.

**Defendants' Reply:**  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

2.      SarahPAC was a political action committee created under Federal law and domiciled in Virginia that ceased operation in 2016.  Sullivan Decl. ¶ 6, Ex. 5 ("Crawford Dep.") at 25:13-26:5; Brown Decl. in Supp. of Defs.' Mot. to Dismiss Exs. A, B, Dkt. 26.

**Plaintiff's Response:**  Undisputed that SarahPAC was Sarah Palin's PAC, domiciled in Virginia that ceased operations in 2016, the goal of which was to promote Palin and her agenda and to which Palin was critical. [Vogt Decl. Ex. 10, Crawford Depo. 57:1-7, 64:19-22]

**Defendants' Reply:**  None.


3.      Bennet was, at all times relevant to this lawsuit, the editor overseeing all opinion journalism at The Times, including columns written by opinion columnists, letters from readers, individual contributions, op-eds solicited from outside writers, and masthead editorials written by The Times Editorial Board.  Sullivan Decl. ¶ 3, Ex. 2 ("Bennet Dep.") at 12:6-19.

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.


4.      The opinion division is separate from the larger newsroom division of The Times. Bennet Dep. at 12:25-13:7.

**Plaintiff's Response:**  Disputed. Although The Times' Newsroom and Opinion divisions are considered separate, the opinion division relies upon the newsroom division for facts in support of Editorials and both divisions are governed by The Times Ethics Handbook and Guidelines on Integrity, including their standards for fact-checking, accuracy, and corrections. [Vogt Decl. Ex. 12, PL Depo Ex 2; Vogt Decl. Ex. 13, PL Depo Ex 3; Vogt Decl. Ex. 11, PL

Depo Ex 1 at p. 3; Vogt Decl. Ex. 6, Cohn Depo 29:5-10; Vogt Decl. Ex. 2, Lepping Depo 77:11-78:15]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), because the cited documents are not to the contrary.  Defendants do not dispute that *Ethical Journalism*, Vogt Decl. Ex. 12, Pl. Dep. Ex. 2, applies to both the newsroom and opinion division, but this does not change the fact that the two divisions operate separately.

Defendants object to Plaintiff's additional allegations because they are not supported by the cited evidence or other admissible evidence.


5.     Editorials are pieces that reflect the work of the Editorial Board of The Times. They do not include an individual author's byline.  Bennet Dep. at 12:14-17.

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.


6.     Bennet oversaw the editorials and opinion pieces that The Times publishes, but did not individually review each piece.  Bennet Dep. at 12:9-19, 13:8-14:10, 42:23-11.

**Plaintiff's Response:**  Disputed, except to the extent that Bennet concedes he is ultimately responsible for everything the opinion section publishes. [Vogt Decl. Ex. 4, Bennet Depo 13:8-24]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c).

**The Crosshairs Map**

7.      In 2010, SarahPAC published a map that featured crosshairs positioned over congressional districts of twenty Democrats who supported the Affordable Care Act, along with a list of each Representative's name (the "Crosshairs Map").  Am. Compl. ¶ 99; Sullivan Decl. ¶ 35, Ex. 34; Sullivan Decl. ¶ 7, Ex. 6 ("Palin Dep.") at 82:16-24, 140:15-22; Crawford Dep. at 67:1-8.

**Plaintiff's Response:**  Disputed. The map did not "feature[] crosshairs." The "Take Back the 20" map was created by SarahPAC's Internet consultant, Upstream, and staffer Andy Davis, with symbols "pulled from Google mapping tools" to depict 20 congressional districts "that went for McCain-Palin, but were represented by Democratic members." [Vogt Decl. Ex. 10, Crawford Depo 67:1-68:10, 70:1-4]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff does not dispute that SarahPAC published the Crosshairs Map or that Exhibit 34 to the Sullivan Declaration is a true copy of it.

Plaintiff disputes only whether the symbols on the map are "crosshairs."  On this point, Plaintiff's Amended Complaint, ¶ 99, states that the Crosshairs Map "depicted crosshairs;" she has described the symbol "bull's eye" in a tweet, Sullivan Decl. ¶ 36, Ex. 35; and news coverage has described it as such, Brown Decl. in Supp. of Defs.' Mot. to Dismiss Ex. C.

Plaintiff also adds additional, but not contradictory, allegations about the reasons for congressional districts' inclusion on the map.  As stated on the Crosshairs Map, "20 House Democrats from districts we carried in 2008 voted for the health care bill…"  *Id.* at Ex. 34; *see also* Vogt Decl. Ex. 172 ("We're paying particular attention to those House members who voted

in favor of Obamacare and represent districts that Senator John McCain and I carried during the 2008 election.").

**8.**     The Crosshairs Map places a crosshairs symbol over Rep. Gabrielle Giffords' district, and listed her name. Sullivan Decl. ¶ 35, Ex. 34.

**Plaintiff's Response:**  Disputed. The map did not place a "crosshairs" symbol over Rep. Giffords' district; it used symbols "pulled from Google mapping tools" to depict 20 congressional districts that "went for McCain-Palin, but were represented by Democratic members." [Vogt Decl. Ex. 10, Crawford Depo 67:1-68:10, 70:1-4]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff does not dispute that SarahPAC published the Crosshairs Map or that the Map listed Rep. Giffords' district and name.

Plaintiff disputes only whether the symbols on the map are "crosshairs."  On this point, Plaintiff's Amended Complaint, ¶ 99, states that the Crosshairs Map "depicted crosshairs;" she has described the symbol "bull's eye" in a tweet, Sullivan Decl. ¶ 36, Ex. 35; and news coverage has described it as such, Brown Decl. in Supp. of Defs.' Mot. to Dismiss Ex. C.

Plaintiff also adds additional, but not contradictory, allegations about the reasons for congressional districts' inclusion on the map.  As stated on the Crosshairs Map, "20 House Democrats from districts we carried in 2008 voted for the health care bill…"  *Id.* at Ex. 34; *see also* Vogt Decl. Ex. 172 ("We're paying particular attention to those House members who voted in favor of Obamacare and represent districts that Senator John McCain and I carried during the 2008 election.").

9.      Shortly after publication of the Crosshairs Map, violent attacks occurred on the offices of several Representatives identified on the Map, including that of Rep. Giffords. Sullivan Decl. ¶ 48, Ex. 47 (Linda Feldmann, *Stumping for McCain, Sarah Palin dials back the gun rhetoric*, The Christian Science Monitor (Mar. 26, 2010)) at 3]; Sullivan Decl ¶ 59, Ex. 58 (E. Robinson, *Is there a right to 'reload'?*, Wash. Post (Mar. 26, 2010)).

**Plaintiff's Response:**  Plaintiff **OBJECTS** to this statement because improperly and inaccurately suggests a causal connection and/or attempts to draw an inference between the publication of the map and "violent attacks," contrary to the facts and controlling summary judgment standard. *Palin*, 940 F.3d at 812. Nevertheless, this statement is disputed because it is false. The vandalism on Rep. Giffords' office occurred early (2:40 a.m.) on the morning on ***March 22, 2010—BEFORE*** Sarah Palin posted the map on March 23, 2020. [Vogt Decl. Ex. 176, "*Rep. Giffords' Tucson office vandalized after health care vote*" Arizona Daily Star, Mar. 22, 2010 ("The front door was smashed out at Congresswoman Gabrielle Giffords' congressional office last night."); Vogt Decl. Ex. 172, Def. Depo Ex. 16 (Palin March 23, 2010 10:18 a.m. "Don't Get Demoralized! Get Organized! Take Back the 20!" Tweet); Vogt Decl. Ex. 177, "Vandalism reported at offices of three Democrats [including Giffords]", CNN, Mar. 22, 2010 (discussing vandalism before map posted); Vogt Decl. Ex. 178, "Vandals Attack Dem Offices Nationwide," Talking Points Memo, Mar. 23, 2010 9:00 a.m. (compiling list of vandalism occurring before map was posted)] Moreover, the vandalism referenced in the Washington Post article Defendants cite (Sullivan Decl. Ex. 58—"Is there a right to reload?") were directed at Representatives not identified on the map, *i.e.*, Rep. Carnahan (Missouri); Rep. Louise Slaughter (New York); Democratic Party offices (Wichita, Cincinnati, Rochester); Rep. Bart Stupak (Michigan). [compare Sullivan Decl. Ex. 34 (map) to Sullivan Decl. Ex. 58] Moreover, as

explained in the Washington Post article Defendants cite, the "vandalism appears to have been inspired by Alabama blogger, Mike Vanderboegh, who trumpeted the bright idea that opponents of health-care reform should throw bricks at Democratic headquarters across the country." [Doc. No. 99, Sullivan Decl. Ex. 58 at p. 3] Vanderboegh is a "longtime leader and propagandist in the antigovernment 'Patriot' movement specializing in fiery rhetoric urging violent self-defense' against a tyrannical, Constitution-flouting U.S. government determined to impose the Communist principles of gun control and universal health care." [Vogt Decl. Ex. 179, SPLC Extremist Files, Michael Brian Vanderboegh] On March 19, 2010, Vanderboegh reacted to the imminent passage of health care reform by posting on his blog, "To all modern Sons of Liberty: THIS is your time. Break their windows. Break them NOW." [Vogt Decl. Ex. 180, "To All Modern Sons of Liberty," Sipsey Street Irregulars, Mar. 19, 2010] In January 2011, Mother Jones reported that "Giffords Office Was Vandalized by Followers of Former Militia Leader [Vanderboegh]" [Vogt Decl. Ex. 181 (citing Sullivan Decl. Ex. 58)].

**Defendants' Reply:**  There is no genuine factual dispute.  The relevant fact—that "violent attacks occurred on the offices of several Representatives identified on the Map, including that of Rep. Giffords" at or near the time of publication of the Crosshairs Map—is undisputed.  As to the specific order of events and motivation for the attached, Plaintiff's response does not set forth any specific, admissible facts, as required by Local Rule 56.1(c).

10.    Publication of the Crosshairs Map prompted a national debate, including discussion of the actual or potential impact of inflammatory rhetoric—specifically including the Crosshairs Map as an example.  Sullivan Decl. ¶ 48, Ex. 47 (discussing "epithets, death threats, and attacks on some members' offices" after passage of the Affordable Care Act).

**Plaintiff's Response:** Disputed. Publication of the map did not "prompt[] a national debate." The "debate" and "epithets, death threats, and attacks on some members' offices after passage of the Affordable Care Act" occurred before Palin posted the map. [*See* Paragraph 9, above] Moreover, as explained in the Christian Science Monitor article ("*Stumping for McCain, Sarah Palin dials back the gun rhetoric*") cited by Defendants, Palin spoke at a nationally televised campaign rally for McCain in ***Tucson*** on March 26, 2010 and said, "We know violence isn't the answer...When we take up our arms, we're talking about our vote..." [*See* Doc. No. 99, Sullivan Decl. Ex. 47 at p. 2]

**Defendants' Reply:** There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts and adds additional, but not contradictory, evidence.

11.    On November 4, 2010, Palin referred to the symbol on the Crosshairs Map as a "bull's eye" in a tweet.  Sullivan Decl. ¶ 36, Ex. 35 (Nov. 4, 2010 Sarah Palin Tweet).

**Plaintiff's Response:** Palin **OBJECTS** to and disputes this statement because it mischaracterizes Plaintiff's tweet (Sullivan Decl. Ex. 35), ignores Plaintiffs testimony explaining the tweet, and distorts the facts and evidence to try to suggest Plaintiff intended the symbols on the map to be a "bull's eye." Plaintiff testified that by placing the word "bullseye" *in quotes* she was referring to it "facetiously or, like, that's what they say, that's what they call it. But it wasn't hey, these are bullseyes, somebody go out and get an individual...I always put quotation marks around it to say this what what somebody else says" [Vogt Decl. Ex. 9, Palin Depo 145:20-146:15]. Plaintiff also **OBJECTS** based on relevance because there is no evidence that Bennet

was aware of this tweet. Moreover, as explained in Paragraphs 8-9, above, this statement is disputed because the symbols on the map were not crosshairs or a "bullseye."

**Defendants' Reply:**  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the meaning of those facts and adds additional, but not contradictory, testimony.

12.    The Amended Complaint states that the Crosshairs Map "depicted crosshairs." Am. Compl. ¶ 99.

**Plaintiff's Response:**  Plaintiff **OBJECTS** to and disputes this statement because it mischaracterizes and takes out of context the allegations in Plaintiff's First Amended Complaint ("FAC") [Doc. No. 70]. Paragraph 99 of the FAC uses the phrase "crosshairs" to explain Defendants' statement "that the Palin Map 'put Giffords and 19 other democrats under stylized crosshairs'" is false. [Doc. No. 70 at p. 24] Throughout her FAC, Palin alleges the editorial falsely asserts the map placed crosshairs over individual lawmakers. [*See* i.e. FAC ¶¶ 9, 118]

**Defendants' Reply:**  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the meaning of those facts.

13.    At her deposition, Palin denied that the symbol placed over the districts on the Crosshairs Map represented a gun sight.  Palin Dep. at 23:16-24:2, 140:23-141:3, 143:14-25.

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.

14. Palin used the expression "Don't retreat. RELOAD" as a rallying cry for opponents of the Affordable Care Act, also known as Obamacare.  Sullivan Decl. ¶ 39, Ex. 38 at 2.

**Plaintiff's Response:**  Plaintiff **OBJECTS** to the relevance of her use of the phrase "Don't retreat, instead reload" because Bennet testified he was not even aware of her referenced Tweet or use of this phrase when he wrote and published the defamatory passages in the subject Editorial and, further, that he did not consider metaphors such as this used in politics to be "incitement." [Vogt Decl. Ex. 6, Bennet Depo 98:19-99:13, 102:11-23] Plaintiff further **OBJECTS** to the extent this statement ignores Plaintiff's testimony explaining that the expression "Don't retreat. Reload" is "an old saying of my dad's...a retired teacher and coach...that's where he would go with motivation..." and was never meant as an allusion to a gun, "Not at all. 'Don't retreat, reload,' means don't back down, don't let them tell you to sit down and shut up just because they have the power of the pen or whatever they—whatever they want to use to make you stop what you're doing if what you're doing is right. Don't let them. Don't retreat." [Vogt Decl. Ex. 9, Palin Depo 144:8-145:19]

**Defendants' Reply:**  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the meaning of those facts.

### The Loughner Shooting

15. On January 8, 2011, Jared Loughner shot nineteen people at a political event in Tucson, killing a federal judge and five other people, and wounding thirteen others, including Rep. Giffords.  Am. Compl. ¶ 1.

**Plaintiff's Response:**  Undisputed, although this statement omits the reference in the cited allegation to the nine-year-old girl Loughner murdered.

**Defendants' Reply:**  None.


16.     This renewed speculation by the public and the media whether Rep. Giffords' inclusion on the Crosshairs Map, and similar political rhetoric contributed, directly or indirectly, to political violence like the Giffords' shooting.  Palin Dep. at 148:2-17, 149:3-22; Sullivan Decl. ¶ 16, Ex. 15 (Frank Rich, *No One Listened to Gabrielle Giffords*, N.Y. Times (Jan. 15, 2011)); Sullivan Decl. ¶ 37, Ex. 36 (Dan Balz, *Cross hairs: Crossroads for Palin?*, Wash. Post (Jan. 11, 2011)) at A.9 (noting that issue of whether Palin "was partly to blame" became the top question on Facebook after shooting); Sullivan Decl. ¶ 38, Ex. 37 (Dana Milbank, *A McKinley moment?*, Wash. Post (Jan. 11,  2011)) at A.21 (opining that heat on Palin for "recklessly playing with violent images" was well deserved).

**Plaintiff's Response:**  Plaintiff **OBJECTS** to this statement as an incomplete, inaccurate, and an argumentative description of the aftermath of Loughner's shooting. Undisputed that certain members of the media falsely speculated about the motive for Loughner's shooting immediately after it occurred, among whom The Times' Paul Krugman stood out as one of the first to incorrectly rush to judgment. [Vogt Decl. Ex. 3, ("Assassination Attempt In Arizona," P. Krugman, NYT Opinion, Jan. 8, 2011 at 3:22 p.m. ("We don't have proof yet that this was political, but the odds are that it was..."); Vogt Decl. Ex. 104, ("Climate of Hate," P. Krugman, NYT, Jan. 9, 2011); Vogt Decl. Ex. 38, PL Depo Ex. 38 (Ross Douthat 6/14/17 email string with Bennet stating, "people assumed a link initially—there was a Paul K[rugman] column that was particularly vivid in blaming Republicans—but the investigation

debunked it."); Vogt Decl. Ex. 74, PL Depo Ex. 123 ("*Caldwell's Unfairness*," A. Sullivan, Jun. 16, 2017 (discussing Krugman's "leap" to linking Loughner to Palin map); Vogt Decl. Ex. 102, PL Depo Ex. 181 ("*We Don't Have Proof Yet*" J. Taranto, WSJ, Jan. 10, 2011)] This speculation occurred in the days immediately after Loughner's shooting, but soon after a consensus was reached that Loughner's shooting was not incited by or connected to Palin's map. [Vogt Decl. Ex. 32, PL Depo Ex. 30 at pp. 19-21 ("As We Mourn," NYT Editorial, Jan. 12, 2011 (recognizing President Obama's statement during Loughner shooting memorial service that "If, as has been discussed in recent days, their death helps usher in more civility in our public discourse, let us remember it is not because a simple lack of civility caused this tragedy—**it did not**" and noting Palin maintained "journalists and pundits" had committed a "blood libel")); Vogt Decl. Ex. 106, PL Depo Ex. 182 ("*It Did Not*," J. Taranto, WSJ, Jan. 13, 2011 (noting how "New York Times's response to last weekend's murders in Tucson was to instigate a witch hunt against Republican politicians, and how President Obama's statement "It did not" (quoted in "*As We Mourn*") "[w]ith those three truthful words—an improvisation or a late addition, as they were not in the prepared text—[President Obama] rebuked the out-of-control liberal media that have, under the leadership of the New York Times, been engaging in a vicious campaign of lies and smears.")); Vogt Decl. Ex. 74, PL Depo Ex. 123 ("*Caldwell's Unfairness*," in which Andrew Sullivan demanded a correction from The Financial Times for article accusing him of "linking" Loughner shooting to Palin map; ; Vogt Decl. Ex. 107 ("*Massacre, followed by libel*," C. Krauthhammer, Washington Post, Feb. 26, 2011 ("Not only is there no evidence that Loughner was impelled to violence by any of those upon whom Paul Krugman, Keith Olbermann, the New York Times, the Tucson Sheriff and other rabid partisan as fixated. There is no evidence that he was responding to *anything*, political or otherwise, outside of his own head."); Vogt Decl. Ex.

107 ("Sarah Palin Is Right About 'Blood Libel'," Rabbi Shmuley Boteach, WSJ. Jan. 14, 2011

("Sarah Palin has every right to use ['Blood Libel']. The expression may be used whenever an

amorphous mass is collectively accused of being murderers or accessories to murder.")] The

Times, *The Atlantic* (while Bennet was at its helm), *Wall Street Journal, and Washington Post*—

all of which Bennet was "regularly reading" for his news in 2011—were among the major news

outlets confirming within **days** (not weeks or months) of Loughner's shooting that it was not

linked to or incited by Gov. Palin or the map. [Vogt Decl. Ex. 4, Bennet Depo. 103:25-104:10;

*see* Vogt Decl. Ex. 32, 38, 74, 103, 104, 106, 107, above; *see also* Vogt Decl. Ex. 83, PL Depo.

Ex. 147 ("*Was the Shooting of Rep. Giffords Political?*"—The Atlantic/Wire); Vogt Decl. Ex.

84, PL Depo. Ex. 148 ("*Did Sarah Palin's Target Map Play Rile in Giffords Shooting?"*—The

Atlantic/Wire); Vogt Decl. Ex. 85, PL Depo. Ex. 149 ("*What We Know About Jared Lee

Loughner*"—The Atlantic/Wire); Vogt Decl. Ex. 86, PL Depo. Ex. 150 "*Stop the Blame

Game*"— The Atlantic); Vogt Decl. Ex. 87, PL Depo. Ex. 151 "*The More We Know*"—The

Atlantic/Dish); Vogt Decl. Ex. 88, PL Depo. Ex. 153 ("*Ten Days That Defined 2011*"—The

Atlantic/Wire); Vogt Decl. Ex. 16, PL Depo Ex. 8 ("*Time, the Enemy*"—NYT); Vogt Decl. Ex.

50, PL Depo. Ex. 60 ("*The Tucson Witch Hunt*"—NYT); Vogt Decl. Ex. 51, PL Depo. Ex. 64

("*Suspect's Odd Behavior Caused Growing Alarm*"—NYT); Vogt Decl. Ex. 52, PL Depo. Ex.

67 ("*Looking Behind the Mug-Shot Grin*"—NYT); Vogt Decl. Ex. 102, PL Depo Ex. 181 ("*We

Don't Have Proof Yet*"—WSJ), 182 ("*It Did Not*"—WSJ); Vogt Decl. Ex. 80 ("The bogus claim

that a map of crosshairs by Sarah Palin's PAC incited Rep. Gabby Giffords' shooting"). In fact,

on January 15, 2011, The Times publicly discussed how the media's rush to judgment about the

motive for Loughner's actions should be a teaching moment for how the media's bias and

"storytelling habits" led them to falsely accuse people like Gov. Palin of inciting the shooting

when it became known fairly quickly after the tragedy that Loughner was not motivated by anything Gov. Palin said or did. [Vogt Decl. Ex. 16, PL Depo Ex. 8 ("Time, the Enemy," ("The Times had a lot of company [in the 'egregious rush to judgment in the Times coverage of the Arizona shooting'], as news organizations, commentators and political figures shouldered into an unruly scrum battling over whether the political environment was to blame. Meanwhile, opportunities were missed to pick up on evidence—quite apparent as of early the first day—that Jared Lee Loughner, who is charged with the shootings, had a mental disorder and might not have been motivated by politics at all.")]]

**Defendants' Reply:**  There is no genuine factual dispute.  The relevant facts—and that there was speculation by the public and the media whether Rep. Giffords' inclusion on the Crosshairs Map, and similar political rhetoric contributed, directly or indirectly, to political violence like the Giffords' shooting or, in Plaintiff's words, "that some members of the media speculated about the motive for Loughner's shooting immediately after it occurred"—are undisputed.

Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c).  The articles cited by Plaintiff are examples of the kind of speculation and discussion referenced by Defendants.


17.     During the ensuing criminal investigation, law enforcement discovered no evidence regarding whether Loughner had or had not seen the Crosshairs Map.  Sullivan Decl. ¶ 39, Ex. 38 (John Berman, *Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate*, ABC News (Jan. 9, 2011).

**Plaintiff's Response:**  Undisputed there is no evidence Loughner saw the map. However,

this statement is incomplete in that omits the testimony of The Times' witnesses who investigated the underlying facts surrounding Loughner's shooting who confirmed no link between Loughner and the map was established. [Vogt Decl. Ex. 2, Lepping Depo. 15:6-17 ("[T]here was a [police] report saying that there was no direct connection between political incitement and the Loughner shooting."); Vogt Decl. Ex. 6, Cohn Depo. 68:10-22 ("I know that there was no link established between the [map circulated by Sarah Palin's PAC] and the Giffords shooting.")]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific, admissible facts to dispute this paragraph, as required by Local Rule 56.1(c).  Instead, the response adds unrelated allegations that are not to the contrary and that mischaracterize the cited testimony.

The cited testimony from Lepping and Cohn described research conducted on June 15, 2017, after publication of the Editorial and in relation to the First Correction.  Vogt Decl. Ex. 2, Lepping Depo, 15:6;14; Vogt Decl. Ex. 6, Cohn Dep. 68:10-69:8.

Cohn testified that she understood there to be no direct connection to political incitement, not because she confirmed there was *not* a link but "Because when I walked into work the next day, I discovered we'd been wrong and we were running a correction."  Vogt Decl. Ex. 6, Cohn Dep. 68:23-69:5.  In discussing her research undertaken on the day after the Editorial, Lepping testified about her recollection of a police report (that is not in evidence):

> Q:  Did you, at any point in time, conduct any factual investigation
> to determine whether or not a link was established between
> political incitement and the 2011 shooting of Gabrielle Giffords?
> A:  On the 15th, yes. I believe there was a report saying that there
> was no direct connection between political incitement and the
> Loughner shooting.
> Q:  Do you remember which report that was?
> A:  I'm sorry, I don't.· It might have been the police report they did

after the shooting.
Q:  And did the report make any specific reference to a map that
was circulated by Sarah Palin's action committee in March of
2010?
A:  Not that I recall.

Vogt Decl. Ex. 2, Lepping Dep. 15:6-21.

**18.**    In the weeks and months following the shooting, multiple news organizations, including The Times, reported that Loughner was mentally unstable and appeared to have developed animosity toward Rep. Giffords well before publication of the Crosshairs Map.  Am. Compl. ¶¶ 59, 61 & Exs. 8-12.

**Plaintiff's Response:** Undisputed, except to the extent multiple news organizations, including The Times, reported in the ***days*** (not "weeks and months") following the shooting that Loughner was mentally unstable and developed animosity toward Gifford ***years*** before Palin's map. [*See* Paragraph 16, above.]

**Defendants' Reply:**  There is no genuine factual dispute.  The relevant fact—that multiple news organizations reported that Loughner was mentally unstable and appeared to have developed animosity towards Rep. Giffords well before publication of the Crosshairs Map—is undisputed.  Plaintiff's purported dispute over the period of time in which this news coverage continued is not relevant and contradicted by her own evidence, *see, e.g.*, Vogt Decl. Ex. 88 (reporting on the Loughner Shooting in December 2011, nearly a year later).

### The Congressional Baseball Shooting

**19.**    The morning of June 14, 2017, during a baseball practice in Virginia, James Hodgkinson opened fire on several Republican members of Congress and others, seriously

wounding Republican Rep. Steve Scalise, among others.  Am. Compl. ¶ 4.

      **Plaintiff's Response:**  Undisputed.

      **Defendants' Reply:**  None.


      20.      Hodgkinson was a political supporter of Senator Bernie Sanders and "'virulently opposed'" President Trump.  Am. Compl. ¶ 4.

      **Plaintiff's Response:**  Undisputed.

      **Defendants' Reply:**  None.


### Drafting the Editorial America's Lethal Politics

      21.      On June 14, 2017, around 10:45 a.m., Elizabeth Williamson, a writer for the Editorial Board based in the District of Columbia, asked whether the Board intended to write about the shooting involving Rep. Scalise.  Sullivan Decl. ¶ 4, Ex. 3 ("Williamson Dep.") at 194:14-195:10; Sullivan Decl. ¶ 9, Ex. 8 (NYTIMES0001068-69).

      **Plaintiff's Response:**  Undisputed.

      **Defendants' Reply:**  None.


      22.      Williamson, Bennet, and their Editorial Board colleagues Robert Semple and Linda Cohn debated whether the proposed piece should focus on the shooting itself, the Board's position in favor of sensible gun control, or "concern about the state of political rhetoric in the country."  Sullivan Decl. ¶ 2, Ex. 1 ("Hr'g Tr.") at 5:13-6:1; Williamson Dep. at 199:22-200:2; Sullivan Decl. ¶ 10, Ex. 9 (NYTIMES 0001082); Sullivan Decl. ¶ 5, Ex. 4 ("Cohn Dep.") at 40:21-41:13.

**Plaintiff's Response:** Disputed. There was no "debate" about the focus of the proposed editorial. As set forth in the below table, Robert Semple and Williamson discussed the piece and Semple decided to write about the Scalise shooting and "gun control" well before Bennet got involved:

| Time | Description | Supporting Evidence |
|------|-------------|---------------------|
| 10:46 a.m. | E. Williamson emails B. Semple, J. Bennet, and N. Fox with the subject line "are we writing on the congressional shooting?" | Vogt Decl. Ex. 174 (NYTIMES 1034) |
| 10:49 a.m. | E. Williamson emails "possible shooter ID" with link to Washington Post article identifying James Hodgkinson | Vogt Decl. Ex. 96, PL Depo Ex. 164 |
| 10:53 a.m. | E. Williamson emails "POSSIBLE shooter's POSSIBLE social media pages pro-Bernie, anti-Trump" with links to Hodgkinson's Facebook, LinkedIn and Twitter accounts | Vogt Decl. Ex. 97, PL Depo Ex. 165 |
| 11:28 a.m. | R. Semple responds to Williamson's 10:46 a.m. question by saying, ***"Can't see it yet...but keep looking...a nut case who hates republicans???..."*** | Vogt Decl. Ex. 21, PL Depo Ex. 15 (emphasis added) |
| 11:31 a.m. | N. Fox responds that he "talked to Bob about the politicize of horror angle and he didn't quite see it..." | Vogt Decl. Ex. 21, PL Depo. Ex. 15 |
| 11:49 a.m. | R. Semple emails his potential angles for a piece: "We have written a ton (mainly Frank [Clines]) on gun control...we did a huge series on it a few years ago...while this is almost certainly a lone nut, ***it would be interesting to know ho many of those Republican athletes are beholden to the NRA and its generally anti-regulatory philosophy, and whether something like this might pound a little sense into their heads...***whether the guy bought the rifle at a gun show or inherited from his grandmother, it's still a gun, of which there enough | Vogt Decl. Ex. 22, PL Depo Ex. 16 (emphasis added) |

| Time | Description | Supporting Evidence |
|------|-------------|---------------------|
|  | [sic] for practically every man woman and child in this country..." |  |
| 11:59 a.m. | R. Semple responds to himself by saying, "second (or third) message—*the more I think about the gun control angle, the better I like it*." | Vogt Decl. Ex. 22, PL Depo Ex. 16 (emphasis added) |
| 12:04 p.m. | L. Cohn replies in email string "The nutcase went to my high school in Belleville...I'm thinking back to what A GIANT STORY [g]ABBY Giffords shooting was. Amazing that shooting congressmen doesn't seem so shocking now." | Vogt Decl. Ex. 23, PL Depo Ex. 17 |
| 12:08 p.m. | R. Semple confirms the Editorial Board will write a piece, "*OK we should definitely shoot for a piece, not huge, but a piece*." | Vogt Decl. Ex. 23, PL Depo Ex. 17 (emphasis added) |

It was not until *forty minutes after* Semple made the decision to write a piece about the Scalise shooting and gun control that Bennet—in response to Williamson's 10:53 a.m. email circulating Hodgkinson's "pro-Bernie, anti-Trump" social media accounts—interjected with his narrative about "the rhetoric of demonization and whether it incites people to this kind of violence" and the "inciting hate speech" he "tended to associate with the right." [Vogt Decl. Ex. 25, PL Depo Ex. 20; Vogt Decl. Ex. 4, Bennet Depo 247:3-249:5, 250:4-23]:

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts and adds other unrelated allegations, Vogt Decl. Ex. 96, 97, 174.

The cited documents—emails among Williamson, Bennet, Cohn, and Semple debating possible topics for the proposed Editorial over the course of the morning, Vogt Decl. Ex. 22, 23, and Bennet's testimony about the meaning of his suggestion, Vogt Decl. Ex. 4, Bennet Dep. 247:3-249:5—are not to the contrary.  They show the debate Defendants describe in Paragraph

22.  Plaintiff's arguments about the duration of the conversation, order of speakers, or allegations about other conversations do not create an issue of fact.


**23.**     During that discussion, Cohn pointed out a difference she perceived between the response to the 2017 shooting involving Scalise and the shooting involving Giffords only a few years earlier, writing "I'm thinking back to what a giant story [G]abby Giffords shooting was. Amazing that shooting congressmen doesn't seem so shocking now."  Sullivan Decl. ¶ 11, Ex. 10 (NYTIMES0001070-71).

**Plaintiff's Response:**  The content of Cohn's referenced email is undisputed.

**Defendants' Reply:**  None.


**24.**     Around noon, Semple decided that the Board should write a piece on the shooting, and Williamson began to draft one. Sullivan Decl. Ex. 10; Williamson Dep. at 206:10-18.

**Plaintiff's Response:**  Undisputed, subject to the additional facts set forth in Paragraph 22, above.

**Defendants' Reply:**  Defendants incorporate their reply in support of Paragraph 22, above.


### *Research*

**25.**     To start the writing process Williamson researched breaking news reports about the Scalise shooting and familiarized herself with the Loughner Shooting in 2011.  Williamson Dep. at 195:21-196:25, 213:7-19; Sullivan Decl. ¶ 12, Ex. 11 (NYTIMES0001078).

**Plaintiff's Response:**  Disputed to the extent this statement mischaracterizes Williamson's research as "familiarize[ing] herself with the Loughner Shooting in 2011." Rather, at Bennet's request, Williamson specifically researched whether there was a link between incitement and the Loughner shooting and whether there was any evidence of a link between incitement and the Hodgkinson shooting. [Vogt Decl. Ex. 3, Williamson Depo 142:1-143:24, 126:8-131:22; Vogt Decl. Ex. 6, Bennet Depo 245:5-247:2]

**Defendants' Reply:**  There is no genuine dispute of fact.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.  The cited exhibits—which describe Williamson's research and an additional research request from Bennet—are not to the contrary.

26.  Semple tasked Times Editorial Assistant, Phoebe Lett, with conducting research for the piece and had her provide this research to Williamson.  Sullivan Decl. Ex. 9.

**Plaintiff's Response:**  Disputed. Semple—consistent with his decision to address gun control in the editorial—asked Lett to send Williamson "four [of his] basic gun control pieces (dealing mainly with the plentitude of weapons and porous controls) that also happen to mention Gabrielle Giffords..." [Doc. 99, Sullivan Decl. Ex. 9; Vogt Decl. Ex. 9, Lett Depo 87:15-21] Plaintiff also **OBJECTS** to this statement to the extent it insinuates Semple tasked Lett to conduct all the research for the editorial. As set forth in Paragraph 25, above, Bennet specifically tasked Williamson with researching whether there was a link between incitement and Loughner's shooting.

**Defendants' Reply:**  There is no genuine dispute of fact.  Plaintiff's response does not

set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.  The cited exhibits, which further describe Semple's request to Williamson, are not to the contrary.

27.    Lett circulated four pieces to Williams, Bennet, and others that the Editorial Board had previously published relating to gun policy.  Sullivan Decl. ¶ 13, Ex. 12 (NYTIMES0001083); Sullivan Decl. ¶ 14, Ex. 13 (Aug. 17, 2017 email from J. Brown).

**Plaintiff's Response:**  Undisputed that Lett circulated the "four basic gun control pieces (dealing mainly with the plentitude of weapons and porous controls) that also happen to mention Gabrielle Giffords..." Semple asked her to send to Williamson. (Sullivan Decl. Ex. 9) (these four pieces included "*Rep. Gabby Giffords Farewell*" (1/27/2012), "*6000 Bullets in Colorado*" (7/24/2012), "*Democrats Find their Voice on Gun Control*" (7/29/2016), and "*Myths About Gun Regulation*" (1/2/2013)—all of which were pieces written by Semple.) [Doc. 99, Sullivan Decl. Ex. 13 (PL Depo. Ex. 30)]

**Defendants' Reply:**  None.

28.    Williamson asked Lett for assistance finding a prior editorial "that references hate type speech against dems in the runup to [the Giffords] shooting."  Sullivan Decl. Ex. 12.

**Plaintiff's Response:**  Undisputed except as to completeness. Williamson asked Lett for assistance finding a piece on "hate type speech" (Sullivan Decl. Ex. 12), in response to Bennet's 12:41 p.m. email [Vogt Decl. Ex. 25]. As set forth in Paragraph 25, above, Williamson was already conducting the research Bennet asked for concerning incitement and the Loughner shooting, and she testified she did not know or ask what Bennet meant by the term "hate

speech." [Vogt Decl. Ex. 3, Williamson Depo 207:18-208:5, 209:18-210:16]

**Defendants' Reply:** There is no genuine factual dispute. Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts and adds additional, but not contradictory, allegations.

29. Bennet responded by asking if the Editorial Board had ever written "anything connecting [] the Giffords shooting to some kind of incitement." Sullivan Decl. ¶ 30, Ex. 29 (NYTIMES0001157-58).

**Plaintiff's Response:** Disputed. This statement takes the facts out of context and asserts an inaccurate timeline of events. In response to Williamson's 1:40 p.m. email to Lett (*see* Paragraph 28, above; Sullivan Decl. Ex. 12), Lett then emailed Bennet at 1:46 p.m. asking, "I'm trying to find the piece Elizabeth is referring to here, do you happen to know which one she is talking about?" [Vogt Decl. Ex. 28, PL Depo Ex. 27] Bennet responded to Lett (not Williamson) at 2:07 p.m., asking, "No— I was just wondering if there was such a piece; that is, did we ever write anything connecting to the Giffords shooting to some kind of incitement?" [ *Id.*]

**Defendants' Reply:** There is no genuine factual dispute. Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts and adds additional, but not contradictory, allegations.

30. Lett responded that the Editorial Board had not, but circulated an opinion piece by Frank Rich, *No One Listened to Gabby Giffords*, published in the aftermath of the Giffords

Shooting.  Sullivan Decl. ¶ 15, Ex. 14 (NYTIMES0001159-60); Sullivan Decl. Ex. 15.

**Plaintiff's Response:**  Disputed. This statement takes the facts out of context and asserts an incomplete timeline of events. At 2:20 p.m., Lett replied to Bennet's 2:07 p.m. email (*see* Paragraph 29, above) by forwarding him a link to a Frank Rich column (not an Editorial): "*No One Listened to Gabrielle Giffords*," Jan. 15, 2011. [Vogt Decl. Ex. 28, PL Depo Ex. 27; Vogt Decl. Ex. 30, PL Depo Ex. 30 at pp. 11-15 (Frank Rich Column)] At 2:34 p.m., Bennet responded to Lett by saying "Good for Us. Can you let Elizabeth [Williamson] know?" [Vogt Decl. Ex. 28, PL Depo Ex. 27] Bennet testified that he doesn't recall what he meant by "Good for Us," but the inference to be drawn is that Bennet was free to advance his preconceived narrative because the Editorial Board had not written about the subject. [Vogt Decl. Ex. 4, Bennet Depo 252:6-24] At 2:52 p.m., Bennet followed up by asking Lett to send him the four basic gun control pieces Semple asked Lett to send to Williamson. [Vogt Decl. Ex. 28, PL Depo Ex. 27] Bennet does not recall whether he read all of the materials Lett sent him. [Vogt Decl. Ex. 4, Bennet Depo 250:24-251:11] Bennet asked Lett to "dig a little further" because it "seemed strange" to him that the Editorial Board had not "editorialized at all about the [Loughner] shooting...because it was an important news event and the kind of thing we would typically editorialize on." [*Id.*, Bennet Depo. 253:8-254:10] Lett found 2 additional Editorials ("Bloodshed and Invective In Arizona" and "As We Mourn"). [*Id.*, Bennet Depo 254:6-10; Vogt Decl. Ex. 29, PL Depo Ex. 29; Vogt Decl. Ex. 30, PL Depo Ex. 30 at pp. 16-21] However, Bennet claims he did not read those pieces either. [Vogt Decl. Ex. 24, Bennet Depo 254:11-18]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but

instead makes arguments about the implications of those facts and adds additional, but not contradictory, allegations.

31.     During the planning of the Editorial, Bennet emailed Williamson:  "there's a point to be made about the rhetoric of demonization and whether it incites people to this kind of violence."  Sullivan Decl. Ex. 11.

**Plaintiff's Response:**  Disputed. This statement takes the facts out of context and asserts an inaccurate timeline of events. As set forth in Paragraph 22, above, Semple decided the Board should write a piece on the shooting and gun control 40 minutes ***before*** Bennet interjected his incitement narrative in response to Williamson's email about Hodgkinson's "pro-Bernie, anti-Trump" social media accounts. [Vogt Decl. Ex. 25, PL Depo Ex. 20] Bennet testified that he "thought that [the Board] should deal with this issue of incitement if there was evidence of inciting hate speech on the Left." [Vogt Decl. Ex. 4, Bennet Depo 250:4-14] However, Bennet conceded he and the Board never uncovered any evidence of inciting hate speech on the Left leading up to Hodgkinson's shooting [*Id.*, Bennet Depo 250:15-13 ("We didn't find a specific example of hate speech connected to the people on the -- hate ·speech, I'm sorry, I don't usually use that term of, of -- of rhetoric of demonization connected to the ball players that day.· You know, naming Steve Scalise or something like that.")]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts and adds additional, but not contradictory, allegations.

32.     Bennet asked Williamson to be mindful of whether such rhetoric came from both sides of the political spectrum.  Sullivan Decl. Ex. 9 ("[I]f there's evidence of the kind of inciting hate speech on the left that we, or I at least, have tended to associate with the right (e.g. in the run-up to the Gabby Giffords shooting) we should deal with that."); Sullivan Decl Ex. 11; Sullivan Decl. Ex. 14.

**Plaintiff's Response:**  Disputed. Bennet did not "ask Williamson to be mindful of whether such rhetoric came from both sides of the political spectrum." Rather, as set forth in Paragraph 31, above, Bennet interjected his incitement narrative in response to Williamson's email about Hodgkinson's "pro-Bernie, anti-Trump" social media accounts; and testified that he "thought that [the Board] should deal with this issue of incitement if there was evidence of inciting hate speech on the Left." Unlike Bennet, Williamson did not associate any speech on the right that she considered to be inciting hate speech to the Gabby Giffords shooting. [Vogt Decl. Ex. 3, Williamson Depo 208:18-209:3, 209:18-210:6] Bennet conceded he and the Board never saw any evidence of inciting hate speech on the Left leading up to Hodgkinson's shooting [Vogt Decl. Ex. 4, Bennet Depo 250:15-13 ("We didn't find a specific example of hate speech connected to the people on the – hate speech, I'm sorry, I don't usually use that term of, of -- of rhetoric of demonization connected to the ball players that day.· You know, naming Steve Scalise or something like that.")]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the meaning and implications of those facts and adds additional, but not contradictory, allegations.

29

33.     Bennet was "specifically asking if there was some evidence of a piece of incitement … that was directed at the ball players, the Congressmen who were playing ball that day."  Bennet Dep. at 245:22-25, 246:4-13.

**Plaintiff's Response:**  Disputed. Bennet specifically asked Williamson to research the Loughner shooting and the Scalise shooting. [Vogt Decl. Ex. 3, Williamson Depo. 142:1-14, 126:8-25]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts and adds additional, but not contradictory, allegations.


34.     Much of the research Editorial Board employees conducted focused on prior editorials by The Times, because Bennet assumed that the Board "had talked about the political climate and I wanted to harmonize whatever we were saying now with the position the board had taken" previously.  Hr'g Tr. at 6:5-12; Sullivan Decl. Ex. 11; Cohn Dep. at 77:17-78:3.

**Plaintiff's Response:**  Disputed. This statement is false. The research did not "focus" on prior editorials by The Times. As discussed in Paragraphs 25-33, above, at Bennet's request, Williamson specifically researched whether there was a link between incitement and the Loughner shooting and whether there was a link between incitement and the Hodgkinson shooting. [Vogt Decl. Ex. 3, Williamson Depo 142:1-143:24, 126:8-131:22; Vogt Decl. Ex. 4, Bennet Depo 245:5-247:2]. As for "editorials," Semple merely asked Lett to send Williamson "four basic gun control pieces (dealing mainly with the plentitude of weapons and porous controls) that also happen to mention Gabrielle Giffords..." Bennet also told Lett he "was just

wondering" whether there were any editorials "connecting to the Giffords shooting to some kind of incitement?" [Vogt Decl. Ex. 28, PL Depo Ex. 27] Also, Benet's cited testimony from the 8/16/17 Hearing (p. 6:5-12) is impeached by Williamson (Williamson Depo. 142:1-14).

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), because the cited testimony is not to the contrary.  The response points to specific examples of Editorial Board employees researching prior editorials.

### *First Draft*

**35.**     Williamson wrote the first draft of the America's Lethal Politics editorial (the "Editorial").  Williamson Dep. at 232:14-233:3; Sullivan Decl. ¶ 25, Ex. 24 (PALIN00234-35).

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.

**36.**     As it relates to the language Palin contends is defamatory, Williamson's draft included the following:

> Just as in 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a nine year-old girl, Mr. Hodgkinson's rage was nurtured in a vile political climate.  Then, it was the pro-gun right being criticized: in the weeks before the shooting[,] Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs.

Williamson Dep. at 232:2-233:9; Sullivan Decl. Ex. 24.

**Plaintiff's Response:**  Undisputed Williamson's draft included the quoted passages. Palin objects to the characterization of Palin's [sic] contentions as incomplete.

31

**Defendants' Reply:**  None.

37.     The word "circulated" was a hyperlink such that a reader who clicked on it would be directed to a package of on-line news reports published by ABC.  Williamson Dep. at 234:11-15; Brown Decl. in Supp. of Defs.' Mot. to Dismiss Ex. C; Sullivan Decl. Ex. 38 (Partial Version).

**Plaintiff's Response:**  Undisputed except that the referenced hyperlink does not appear to direct a reader who clicked on it to a "package of on-line news reports published by ABC." Exhibit C of the cited Brown Declaration appears to contain materials from different URLs. Undisputed the hyperlink directed readers to a January 9, 2011 ABC article by John Berman [Vogt Decl. Ex. 32, PL Depo Ex. 34; Vogt Decl. Ex. 3, Williamson Depo 234:3-235:16], which in its byline states it is a "**4 Min read**" and in its first multi-sentence paragraph (found on the top of page 2) states:

> No connection has been made between this graphic and the Arizona shooting, but it has put the Palin team somewhat on the defensive. Rebecca Mansour, a spokesperson for SarahPac, told conservative commentator Tammy Bruce, "We never imagined, it never occurred to us that anybody would consider it violent." Insisting she was speaking for herself, and not on behalf of Palin, Mansour added, "We never ever, ever intended it to be gun sights."

**Defendants' Reply:**  There is no genuine factual dispute.  The only dispute is whether Plaintiff's deposition exhibit 34 is a full and complete copy of the documents available at the referenced hyperlink—it is not—and Plaintiff's response does not set forth any specific facts to contradict this statement, as required by Local Rule 56.1(c).  *See* Brown Decl. in Supp. of Defs.' Mot. to Dismiss Ex. C.

38.     The original version of the Editorial published online also included this hyperlink. Sullivan Decl. ¶ 50, Ex. 49 (Original Web Editorial); Brown Decl. in Supp. of Defs.' Mot. to Dismiss Ex. C.

**Plaintiff's Response:**  Undisputed the Editorial included a hyperlink to the article quoted above (PL Depo. Ex. 34)

**Defendants' Reply:**  None.

39.     The first article in the package of hyperlinked news reports was an article published shortly after the Arizona shooting, titled "Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate."  Brown Decl. in Supp. of Defs.' Mot. to Dismiss Ex. C.

**Plaintiff's Response:** Disputed for the reasons stated in Paragraph 37, above.

**Defendants' Reply:**   Defendants incorporate their reply to Paragraph 37, above.

40.     This article included a statement that "[n]o connection has been made between [the Crosshairs Map] and the Arizona shooting."  Brown Decl. in Supp. of Defs.' Mot. to Dismiss Ex. C at 2.

**Plaintiff's Response:** Undisputed that the January 9, 2011 ABC article by John Berman states in pertinent part:

> No connection has been made between this graphic and the Arizona shooting, but it has put the Palin team somewhat on the defensive. Rebecca Mansour, a spokesperson for SarahPac, told conservative commentator Tammy Bruce, "We never imagined, it never occurred to us that anybody would consider it violent." Insisting she was speaking for herself, and not on behalf of Palin, Mansour added, "We never ever, ever intended it to be gun sights."

**Defendants' Reply:**  None.

41.     At the time she drafted the Editorial, Williamson did not recall reading in the

ABC article that that suggested no evidence of a link between the Crosshairs Map and the

Loughner Shooting.  Williamson Dep. 236:2-24, 237:23-238:5.

**Plaintiff's Response:** Undisputed that Williamson had no "specific" recollection of

reading the ABC article "because three years have gone by since I conducted that research."

[Vogt Decl. Ex. 3, Williamson Depo 234:3-236:1] However, disputed as an incomplete statement

of Williamson's knowledge at the time she drafted the editorial which, based on the research she

conducted concerning the Loughner shooting, was that she knew she could not say there was a

clear and direct link between the map circulated by Sarah Palin's political action committee and

the Loughner shooting. [*Id.*, Williamson Depo 143:2-24]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not

set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but

instead makes arguments about the implications of those facts.

Plaintiff's response also mischaracterizes Williamson's testimony.  Williamson did not

testify "that she knew she could not say there was a clear and direct link between the map

circulated by Sarah Palin's political action committee and the Loughner shooting," as Plaintiff

contends, but that she *knew* there was a debate over the possible link and reported on that debate

in her draft, rather than any specific finding:

> Q:  And when you researched that particular shooting, the
> Loughner shooting, did you unearth any news reports that
> indicated that Mr. Loughner was motivated by a map circulated by
> Sarah Palin's political action committee?
>
> A:  I uncovered evidence of that debate, and that was included in
> what I wrote.
>
> Q:  And when you say you uncovered evidence of the debate, what
> was the debate?

A:  About the political rhetoric circulating at the time.

Q:  And did you unearth any research that indicated whether or not that debate had been resolved?

A:  I wrote my piece based on what I found, so I did not draw a link in what I wrote.

Q:  Why not?

A:  I talked about the overheated political climate.

Q:  Why didn't you draw a link?

A:  Because that's not my job.· I wrote -- I wrote my piece based on the research that I did, and what I wrote reflected that research.

Q:  When you say that's not your job, what do you mean?

A:  I did my job.· So I did the research, and I wrote the piece based on the research that I found.

Q:  Based on the research that you found, did you think that you could say that there was a clear and direct link between the map circulated by Sarah Palin's political action committee and the Loughner shooting?

A:  No.

Vogt Decl. Ex. 3, Williamson Dep. 142:16-143:24.


**42.**      Williamson did not recall reading any source that specifically addressed the link between the Crosshairs Map and the Loughner Shooting.  Williamson Dep. at 237:22-238:5.

**Plaintiff's Response:** Disputed. Plaintiff **OBJECTS** to this statement concerning Williamson's recollection of the research she conducted because The Times failed and refused to produce Williamson's search and browsing history from June 14, 2017. [Vogt Decl. Ex. 3, Williamson Depo. 1271:1-131:22] This statement also is disputed because Williamson testified

she recalled the results of the research Bennet asked her to conduct concerning the Loughner

shooting, based on which she knew she could not say there was a "clear and direct link" between

the map circulated by Sarah Palin's political action committee and the Loughner shooting. [ *Id.*,

Williamson Depo 143:2-24]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not

set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but

instead makes arguments about the implications of those facts.

Plaintiff's response also mischaracterizes Williamson's testimony.  Williamson did not

testify "that she knew she could not say there was a clear and direct link between the map

circulated by Sarah Palin's political action committee and the Loughner shooting," as Plaintiff

contends, but that she knew there was a debate over the possible link and reported on that debate

in her draft, rather than any specific finding.  *See* Reply to Paragraph 41, above.

Plaintiff first asked for Williamson's search history on May 18, 2020, after the

conclusion of the first day of her deposition, and Defendants responded that they would look into

it.  Plaintiff formally requested Williamson's and four other witnesses' search histories for the

first time on June 4, 2020, by letter.  Defendants objected on the grounds that search histories

were not responsive to Plaintiff's document requests, were not relevant to the claims in the case,

and that the burden or expense associated with the production outweighs its likely benefit.

Plaintiff did not seek to compel production or otherwise follow up on this request.

**43.**     Williamson did not know why Loughner targeted Gifford.  Williamson Dep.

237:11-238:5.

**Plaintiff's Response:** Disputed. Plaintiff **OBJECTS** to this statement concerning

Williamson's knowledge of the research she conducted because, although she turned over her search and browsing history from June 14, 2017 to counsel for The Times, The Times failed and refused to produce that documentation in response to discovery requests served by Plaintiff. [*See* Paragraph 42, above.] Plaintiff also objects because the cited testimony does not support the statement that Williamson "did not know why Loughner targeted Gifford." This statement also is disputed because Williamson testified she recalled the results of the research Bennet asked her to conduct concerning the Loughner shooting, based on which she knew she could not say there was a clear and direct link between the map circulated by Sarah Palin's political action committee and the Loughner shooting. [Vogt Decl. Ex. 3, Williamson Depo 143:2-24]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

Plaintiff's response also mischaracterizes Williamson's testimony.  Williamson did not testify "that she knew she could not say there was a clear and direct link between the map circulated by Sarah Palin's political action committee and the Loughner shooting," as Plaintiff contends, but that she knew there was a debate over the possible link and reported on that debate in her draft, rather than any specific finding.  *See* Reply to Paragraph 41, above.


44.     Williamson submitted this first draft to her editor, Linda Cohn, around 4:45 p.m. on June 14, 2017.  Williamson Dep. 232:14-233:3; Sullivan Decl. Ex. 16 (Email), 18 at 3-4 (Draft).

**Plaintiff's Response:** Disputed. Williamson emailed her first draft to Bennet, Semple, Fox, Frank Clines, as well as Cohn, at 4:45 p.m. [Vogt Decl. Ex. 59, PL Depo Ex. 72 ("shootings

is in backfield" reference in Williamson's email indicates draft has been submitted to The Times content management system for editing); Vogt Decl. Ex. 3, Williamson Depo 230:16-231:11]]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c).  In fact, the response concedes the truth of this statement and adds additional, but not contradictory, allegations.

45.      Williamson received further drafts but believed that Cohn and Bennet would edit and finalize the Editorial.  Williamson Dep. 248:9-25; Sullivan Decl. ¶ 18, Ex. 17 (NYTIMES0003239).

**Plaintiff's Response:**  Undisputed, but incomplete to the extent Williamson also testified Bennet was responsible for fact-checking the portions of the editorial he re-wrote. [Vogt Decl. Ex. 3, Williamson Depo 67:14-68:6]

**Defendants' Reply:**  Defendants incorporate their Reply in support of Paragraph 83.

46.      Williamson did no further work on the Editorial prior to publication.  Williamson Dep. at 248:9-25.

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.

### *Revisions*

47.      Cohn reviewed Williamson's draft and "wasn't sure if the piece worked" in part because she found it unclear whether the piece was focused on gun control or "about the political

climate and the sort of lack of civility in America's political discourse."  Cohn Dep. at 57:19-

58:7, 17:23-18:7, 57:19-58:7, 60:8-12.

**Plaintiff's Response:**  Disputed as to the characterization of Cohn's cited testimony,

which states in pertinent part:

> I sort of remember standing in front of his glass door, you know,
> opening up the door or something, and saying, "You need to look
> at this."...I recall thinking I wasn't really sure if its what **_he_**
> **_wanted_**. I thought there had been quite the confusion over the day
> as to where this piece was headed, as to be either more of a gun
> control piece or to be more of a piece about the political climate
> and the sort of lack of civility in America's political discourse...**_I_**
> **_wasn't sure what James intended, wanted in the piece_**. I wasn't
> sure if the piece worked...I wasn't sure it accomplished what James
> would want it to accomplish...there were a couple competing ideas
> about the piece...

[Vogt Decl. Ex. 6, Cohn Depo 57:13-58:22 (emphasis added)]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not

set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c).  In fact,

the response concedes the truth of this statement and merely adds additional, but not

contradictory, allegations about Cohn's testimony.

48.     Cohn added some questions to the draft and around 5:00 p.m. and went to

Bennet's office in person to speak with him about her criticism of the draft.  Cohn Dep. at 18:5-

7, 57:5-16; Sullivan Decl. ¶ 19, Ex. 18 (NYTIMES0000288-91).

**Plaintiff's Response:**  Undisputed, except to the extent this statement is incomplete in

that it does not identify the "questions" Cohn asked, indicated by the bold text in the draft

editorial. [Sullivan Decl. Ex. 18 at pp. 1-2]

**Defendants' Reply:**  Plaintiff's response does not set forth any specific facts to dispute

this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

**49.**     Cohn then handed the draft off to Bennet for further revision.  Cohn Dep. at 17:23-18:7; 60:8-12.

**Plaintiff's Response:**  Disputed. Cohn testified that when she went to Bennet's office to raise her concerns about the piece (*see* Paragraph 47, above), Bennet responded by saying something along the lines of, "yeah, it needs some work, I'll do it." [Vogt Decl. Ex. 6, Cohn Depo 60:3-7]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), and adds additional, but not contradictory, allegations about Cohn's testimony.

**50.**     In relevant part, Williamson's draft included the sentence, "In the aftermath of Wednesday's shooting, the political right and left and both sides of the gun debate dove into their respective foxholes."  Sullivan Decl. Ex. 18 at 2.  Cohn added a question after that line asking, "do we know of any elected official on the left who have incited violence? [O]r just unaffiliated people online or comedians.  [M]ost are pro-gun control.  [D]oes this graph imply equivalence?" *Id.*; Cohn Dep. at 92:12-22, 92:23-94:20.

**Plaintiff's Response:**  Plaintiff objects to the phrase "in relevant part."  Otherwise, undisputed.

**Defendants' Reply:**  None.

51.    Upon reading Williamson's draft, Bennet, who was ultimately responsible for the content of such editorials agreed with Cohn that the draft needed substantial revisions and began substantially rewriting it himself.  Hr'g Tr. at 7:19-8:7.

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.

52.    As the Editorial related to breaking news, the Editorial Board sought to publish the Editorial in the next day's print edition of the paper.  Bennet Dep. at 22:6-19; Cohn Dep. at 60:13-15, 61:7-13; Williamson Dep. 252:22-253:4.

**Plaintiff's Response:** Disputed. The editorial was not itself "breaking news," and the Hodgkinson shooting was already being covered by The Times newsroom. [Doc. 41-34, 8/16/17 Hrg. Transcr. 24:11-23]. Cohn testified that "goal" was to get it in the next day's print paper" but there were already at least two or three other editorials scheduled to run in the next day paper which could have been run instead. [Vogt Decl. Ex. 6, Cohn Depo 61:2-24]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts and adds additional, but not contradictory, allegations.

53.    The deadline to submit the Editorial for publication in the next morning's print edition was roughly 8:00 p.m.  Bennet Dep. at 22:6-19; Cohn Dep. at 61:7-13.

**Plaintiff's Response:**  Disputed. Cohn testified the deadline was sometime between 8:00 and midnight, and the Editorial Section did not go to press until later. [Vogt Decl. Ex. 6, Cohn

Depo. 130:4-132:25]

**Defendants' Reply:** There is no genuine factual dispute. Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), and adds additional, but not contradictory, allegations.

54.      At the time he decided to substantially rewrite the Editorial, Bennet had less than three hours to do so. Hr'g Tr. at 8:11-16; Cohn Dep. at 60:13-15, 101:22-102:10.

**Plaintiff's Response:** Disputed. As set forth in paragraphs 52-53, above, the editorial was not itself "breaking news," the Hodgkinson shooting was already being covered by The Times newsroom, Cohn testified that "goal" was to get it in the next day's print paper" but there were already at least two or three other editorials scheduled to run the next day and the print deadline was between 8:00 p.m. and midnight.

**Defendants' Reply:** There is no genuine factual dispute. Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts and adds additional, but not contradictory, allegations.

55.      Bennet ultimately "effectively rewrote the piece." Hr'g Tr. at 8:25.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** None.

56.      When he rewrote Williamson's draft, Bennet worried that phrases like "incendiary" or "inflammatory rhetoric" had been "drained of [their] power because [they are]

used so often." Hr'g Tr. at 12:8-12.

**Plaintiff's Response:** Plaintiff **OBJECTS** to and disputes this statement because Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, although Bennet made this conclusory statement, he cites no facts to support his supposed belief, and therefore lacks sufficient foundation to admit.

**Defendants' Reply:** There is no genuine factual dispute. Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony. The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]." Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

57.    Bennet decided to use the word "incitement" because he had "a very specific history and experience with the term." Hr'g Tr. at 11:13-12:2.

**Plaintiff's Response:** Plaintiff **OBJECTS** to and disputes this statement because Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be

accepted as true. *Palin*, 940 F.3d at 812 Moreover, this statement is incomplete and omits

portions of Bennet's quoted testimony, which reads in full:

> Q. Could you explain what you meant by the term "political incitement" when you wrote this?
>
> A. Yeah. There are a couple of things at work there. One, I had been very much affected by and was thinking about that day a column that a colleague of mine, Tom Friedman, had written during the course of the presidential campaign -- the last presidential campaign. Then candidate Donald Trump had at a rally and in a speech -- I won't get the words exactly correct -- had said something to the effect that, well, maybe the Second Amendment people can do something about Hillary Clinton. And Tom had made a connection that day that I did not make. He had said that -- he wrote a piece saying basically to hold on. I have seen this movie before. This is the kind of direct language that was heard at the runup to the assassination of Rabin. We need to take this kind of stuff very seriously.
>
> And then that morning in June this terrible thing had happened. Right? We had actually seen the Congressman come under fire on this field in Virginia. And I was looking for a very strong word to write about the political climate because I wanted to get our readers' attention. This is a word that we do use sometimes; we don't use it every day. We use lots of strong expressions like "inflammatory rhetoric," things like that. Those aren't actually quite as powerful expression as it has been largely drained of its power because it is used so often, "incendiary rhetoric," so on and so forth.
>
> Also, I was thinking about -- the way I view that particular word from is in my experience in one of my roles at the time that I was a correspondent in Jerusalem at one point for The Times, and the word "incitement" is used there by the Israelis -- in my time by the Israelis about the Palestinians but also, to some degree, by the Palestinians about the Israelis to talk about a range of communications from, you know, to deliberate orders, invocations, summonses for people to carry out violent attacks to textbooks that are published that align important facts from the other side's national narrative or history, to tell outright lies about that history, to maps that misrepresent the politics of the region. And that's specifically where I was drawing that word from.

[Doc. 41-34, 8/16/17 Hr'g Tr. at 11:13-12:25]

44

**Defendants' Reply:** There is no genuine factual dispute. Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts and adds additional, but not contradictory, testimony.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony. The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]." Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

58.     Bennet had served as The Times Jerusalem bureau chief and prior to the assassination of Israeli Prime Minister Yitzhak Rabin inciting language had been used. Hr'g Tr. at 11:13-12:2; Bennet Dep. at 112:23-113:18, 186:7-8.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** None.

59.     Bennet also chose to use "incitement" because it was "a very strong word to write about the political climate," and it was a word that that was not used every day so it would draw readers' attention to the particular horror of the Scalise shooting. Hr'g Tr. at 12:3-12; Bennet

Dep. at. 112:23-113:18.

**Plaintiff's Response:**  Undisputed, as part of the testimony cited in Paragraph 57, above.

**Defendants' Reply:**  None.  Defendants incorporate their reply in support of Paragraph 57, above.

60.    Bennet worried that "some of what I saw [in Israel] could happen here."  Bennet Dep. at 123:22-25.

**Plaintiff's Response:**  Plaintiff **OBJECTS** and disputes this statement because Bennet's self-serving testimony about his beliefs lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, this statement omits portions of and mischaracterizes the quoted testimony to improperly suggest Bennet used "incitement" to draw readers' attention to the Scalise shooting. Bennet's re-write uses "incitement" in the context of Sarah Palin and the Loughner shooting [Vogt Decl. Ex. 33, PL Depo Ex. 35 (*America's Lethal Politics* (original version))], and Bennet concedes that despite researching the issue of any incitement leading to the Scalise shooting, they "didn't find anything." [Vogt Decl. Ex. 4, Bennet Depo 245:5-247:1]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts and adds additional, but not contradictory, testimony.

The response also misrepresents Bennet's testimony.  Regarding the Scalise shooting, Bennet testified that "we didn't find a specific instance of, you know, political rhetoric or political literature that connected the victims on the field to incitement."  Vogt Decl. Ex. 4, Bennet Dep. 246:20-23.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

61.     Bennet said that, when he reported from Jerusalem for The Times, the word "incitement" was used broadly to "talk about a range of communications" "that contributed to intensifying and raising the temperature of the political debate," that is "very, very, strong language that describes the person on the other side of the debate as an enemy."   Hr'g Tr. at 12:13-25, 47:20-48:1; Bennet Dep. at 112:23-113:18.

**Plaintiff's Response:**  Defendants' summarization of Bennet's referenced testimony is undisputed.

**Defendants' Reply:**  None.

62.     Such incitement ranged from "deliberate orders, invocations, summonses for people to carry out violent attacks" to more subtle contributions to the poisonous atmosphere between the groups, like "maps that misrepresent the politics of the region."  Hr'g Tr. at 12:20-24.

**Plaintiff's Response:**  Defendants' summarization of Bennet's referenced testimony is undisputed.

**Defendants' Reply:**  None.

63.     Bennet had previously written an article for The Times, discussing a meeting of a joint Israeli-Palestinian "committee on 'prevention of incitement,' which [was] focusing on messages in the schools and news media encouraging violence."  Sullivan Decl. ¶ 29, Ex. 28 (NYTIMES0003278-81).

**Plaintiff's Response:**  Plaintiff **OBJECTS** to the relevance of this statement and article because Bennet did not mention it when testifying about drafting the Editorial. [Doc. 41-34 at 11:13-12:25]

**Defendants' Reply:**  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

64.     While Bennet revised the Editorial, Cohn, Eileen Lepping, and Nick Fox focused on fact-checking the Editorial.  Cohn Dep. at 74:8-75:8.

**Plaintiff's Response:**  Disputed. The cited testimony does not support the statement that "[w]hile Bennet revised the Editorial, Cohn, Eileen Lepping, and Nick Fox focused on fact checking the Editorial." Bennet testified Defendants did not fact check the Editorial until after Bennet completed his re-write ("We--·you know, fact checked the version that was edited, not this [Williamson's draft] version."). [Vogt Decl. Ex. 4, Bennet Depo 262:11-263:17] Cohn testified that after turning over the Editorial to Bennet at around 5:00 p.m. she did not do

anything on it again until she got it back from Bennet. [Vogt Decl. Ex. 6, Cohn Depo 18:4-16]

Moreover, Bennet was responsible for fact-checking the portions of the Editorial he re-wrote.

[Vogt Decl. Ex. 3, Williamson Depo 68:1-6]

      **Defendants' Reply:** There is no genuine factual dispute. In the cited testimony, Cohn

testifies that, while Bennet was revising the Editorial, she, Lepping, and Fox worked on fact-

checking, specifically considering questions about gun laws:

> A: I do remember doing some research on one aspect of gun
> control that we were very nervous we were going to get that
> wrong.· And as happens with fact checking, you have a sense of
> what aspects you think are most susceptible to confusion or to
> error, even, and I remember spending a lot of time on that because
> gun control issues are very ornate and detailed and different in all
> the states.· And it's, it's -- it tends to be an issue that can be very
> prone to error because there's so many different kinds of guns and
> different laws and such a patchboard across the country.· So -- and
> because Elizabeth was not our gun control writer, I do remember
> doing -- being concerned, I think along with Eileen Lepping, the
> fact checker, and probably Nick Fox, who was reading the piece
> while I was reading it, but he had it on view and I had – had it
> active about -- it was something about a guncontrol regulation or
> rule, and we spent quite a bit of time researching that.
>
> Q: And do you know –
>
> A: Unfortunately –
>
> Q: Go ahead.
>
> A: Unfortunately, we spent a lot of time on that and that ate up
> quite a bit of time, yeah.

Cohn Dep. 74:8-75:8.

      Plaintiff's response does not set forth any specific facts to dispute this paragraph, as

required by Local Rule 56.1(c), but instead mischaracterizes the cited testimony. Cohn did not

testify that "she did not do anything on it again until she got [the draft] back from Bennet;" the

cited testimony describes her work on drafting, not all of her work on the piece:

A:  Well, actually, I don't know that it was the first edit.· I did an edit on it around 4:30, 5:00, put in a couple questions, and then turned it over to James.

Q:  And after you turned it over to James, do you recall doing anything else on the "America's Lethal Politics" editorial?

A:  Yes, I got it back from James, looked it over, made sure it fit, worked on the headline, and –

Q: And when -- I'm sorry.

A: and the blurb, which is the little pull-quote we use.

*Id.* at 18:4-16.  Similarly, Bennet did not testify that The Times did not fact check the Editorial until after he completed his re-write; the full testimony makes clear that he personally did not fact-check Williamson's draft before editing it and did not know what others had done in that regard:

Q:  And do you know whether, as written by Ms. Williamson in her draft, what she wrote was factually accurate?

A:  I had not considered that question.· We --  you know, fact checked the version that was edited, not this version.· So I can't -- sitting here now, it hasn't -- this particular paragraph, I've not done the fact checking myself and we didn't do it at the time.· ***So I really -- I can't say for certain one way or another***.

Q:  So you didn't fact check the rewrite you did of this particular paragraph; is that what you're saying?

A:  ***No, no.· I'm saying the opposite.***· We did fact check the rewrite, but we didn't fact check the original draft.· You know, we, we, we -- ***at least not to my knowledge***.  I mean, typically we – we fact check the version that's about to be published ·so you have the most current version.

Vogt Decl. Ex. 4, Bennet Depo 263:8-264:2 (emphasis added).  Defendants also incorporate their Reply in support of Paragraph 83.

65.     In particular, they focused on specific details of cited gun laws, which Cohn knew

from her experience to be "ornate and detailed and different in all the states," requiring

additional fact checking.  Cohn Dep. at 74:8-75:8; Sullivan Decl. ¶ 60, Ex. 59 ("Lepping Dep.")

at 86:7-12.

**Plaintiff's Response:**  Disputed. This statement mischaracterizes Cohn's cited testimony

and omits the question asked ("Q. Do you have any recollection of whether or not, on June 14 of

2017, you conducted any research related to political rhetoric or political incitement in

connection with the "America's Lethal 24· ·Politics" editorial?"), as well as the beginning of

Cohn's answer to that question, which states, "I really can't specifically recall. I mean, I know I

got that I wasn't really involved with that piece until very late in the day, so I really can't recall

what kind of research I was doing prior to that or in that small amount of time I had it." [Vogt

Decl. Ex. 6, Cohn Depo 73:20-74:7]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not

set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but

instead makes arguments about the implications of those facts and mischaracterizes the cited

testimony.  *See* Reply to Paragraph 64, above.


66.     Around 7:22 p.m., Bennet emailed a revised draft to Williamson, asking her to

"'[p]lease take a look" to "make sure that the piece is correct."  Bennet Dep. at 266:13-16;

Sullivan Decl. Ex. 17.

**Plaintiff's Response:**  Disputed, and Plaintiff **OBJECTS** because this statement

mischaracterizes the evidence. Bennet sent Williamson an email at 7:22 p.m. that said only "I

really reworked this one. I hope you can see what I was trying to do. Please take a look. Thank

you for the hard work today and I'm sorry to do such a heavy edit." [Vogt Decl. Ex. 100, PL Depo Ex. 172] The statement "make sure the piece is correct" <u>does</u> <u>not</u> appear anywhere in this email. [*Id.*; Vogt Decl. Ex. 4, Bennet Depo 266:11-22]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts and adds additional, but not contradictory, language from the quoted document.

The phrase "make sure the piece is correct," quotes Bennet's deposition testimony about the email, not the email itself.  *See* Bennet Dep. 266:13-16 ("That's what I mean by "please take a look," to make sure that the piece is correct.").


**67.**     Bennet assumed that Williamson had fact-checked her initial draft before sending it to him.  Bennet Dep. at 263:21-264:6.

**Plaintiff's Response:**  Disputed. Bennet's self-serving testimony lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, this statement is incomplete because it omits that Williamson's draft embodied the results of her research about the Loughner shooting. [Vogt Decl. Ex. 4, Bennet Depo. 264:3-12]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony.

Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

**68.**    Bennet also believed that Williamson would check the revised draft to make sure he had not added anything contrary to her research.  Bennet Dep. at 264:23-266:16; Hr'g Tr. 60:1-9.

**Plaintiff's Response:**  Disputed. Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, Bennet was responsible for fact-checking the portions of the Editorial he rewrote. [Vogt Decl. Ex. 3, Williamson Depo 68:1-6] Also, Bennet already knew Williamson's draft was the embodiment of the research she conducted about the Loughner shooting, including the research Bennet specifically requested concerning any link to incitement [Vogt Decl. Ex. 4, Bennet Depo 262:17-263:17, 264:3-12], which was embodied in the paragraph Bennet rewrote – which Williamson testified she originally wrote to reflect the true results of the research Bennet asked for:

> A     I wrote my piece based on what I found, so I did not draw a link in what I wrote.
>
> Q     Why not?
>
> A     I talked about the overheated political climate.
>
> Q     Why didn't you draw a link?
>
> A     Because that's not my job.· I wrote -- I wrote my piece

based on the research that I did, and what I wrote reflected that research.

Q      When you say that's not your job, what do you mean?

A      I did my job.· So I did the research, and I wrote the piece based on the research that I found.

Q      Based on the research that you found, did you think that you could say that there was a clear and direct link between the map circulated by Sarah Palin's political action committee and the Loughner shooting?

A      No.

[Vogt Decl. Ex. 3, Williamson Depo 142:3-143-24 (lines 143:5-24 quoted above)]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not

set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but

instead makes arguments about the implications of those facts.  Those arguments contradict

Plaintiff's response to Paragraph 64, where she contends, "Bennet testified Defendants did not

fact check the Editorial until after Bennet completed his re-write."  *See also* Reply to Paragraph

64.  The response also cites to additional testimony—regarding Williamson's earlier research

and her  understanding of Bennet's obligations—that is not to the contrary.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812,

which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility

and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony.

Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory

statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks

credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.

1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

69.     Bennet did not click on the hyperlink or review the ABC article included at that link.  Bennet Dep. at 261:15-262:10; Hr'g Tr. at 20:23-21:4.

**Plaintiff's Response:**  Plaintiff **OBJECTS** to and disputes this statement because Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true, *Palin*, 940 F.3d at 812, and Defendants failed and refused to produce Bennet's browsing and search history from June 14, 2017, which would have showed what Bennet clicked on and reviewed. [Vogt Decl. Ex. 4, Bennet Depo. 293:21-294:4]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony.  Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

Plaintiff first asked for Bennet's search history on June 4, 2020.  Defendants objected on

the grounds that search histories were not responsive to Plaintiff's document requests, were not relevant to the claims in the case, and that the burden or expense associated with the production outweighs its likely benefit.  Plaintiff did not seek to compel production or otherwise follow up on this request.  *See* Def. Reply to Paragraph 42.

**70.**    When The Times published the Editorial Bennet did not know whether there was or was not a direct causal link between the Crosshairs Map and the Giffords shooting, and had not read anything suggesting that such a connection did not exist.  Bennet Decl. ¶ 10; Bennet Dep. at 97:3-11.

**Plaintiff's Response:**  Disputed. Bennet knew the results of Williamson's research, which showed no link. (*See* Paragraph 68, above). Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812.

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.

1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

      **71.**     Bennet did not click the link because he was "on a tight deadline," and viewed his role as editing the Editorial, not reporting it.  Hr'g Tr. at 21:11-14.

      **Plaintiff's Response:**  Disputed for the reasons stated in Paragraph 52-54 and 69, above. Also, Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, the contention that Bennet did not have time to click on the hyperlink and review the ABC article is false. Bennet made his first change to the operative paragraph of Williamson's draft at **6:39 p.m**. and had re-written that paragraph and the following one to include the defamatory statements about the "clear" and "direct" link between Plaintiff's "incitement" and Loughner by **6:58 p.m**. [Vogt Decl. Ex. 210, PL Depo Ex 32(L) at pp. 55-57, 49-52]. As noted in the byline of the ABC Article [Vogt Decl. Ex. 32, PL Depo Ex. 34], it would at most only have taken **4 minutes** to read that entire article.

      **Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

      Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.

1995) ("The party opposing summary judgment may not rely simply on conclusory statements or

on contentions that the affidavits supporting the motion are not credible").

Defendants incorporate their replies to Paragraphs 52-54 and 69, above.


**72.**    Bennet and Cohn continued working on the draft and a proposed headline until

shortly after 8:00 p.m.  Cohn Dep. at 104:18-105:5, 117:19-118:3; Sullivan Decl. ¶ 49, Ex. 48

(NYTIMES0000250-253).

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.


## Publication of the Editorial

**73.**    The Times published the Editorial on its website around 9:00 p.m.  Am. Compl.

¶ 1, Ex. 1; Def. Ex. 2 (Print Editorial).

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.


**74.**    The Editorial included the following passages, which Palin contends are

defamatory:

> Was this attack evidence of how vicious American politics has
> become?  Probably.  In 2011, when Jared Lee Loughner opened
> fire in a supermarket parking lot, grievously wounding
> Representative Gabby Giffords and killing six people, including a
> 9-year-old girl, the link to political incitement was clear.  Before
> the shooting, Sarah Palin's political action committee circulated a
> map of targeted electoral districts that put Ms. Giffords and 19
> other Democrats under stylized cross hairs.

> Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals.  They're right.  Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask of the right.

Am. Compl. ¶ 117; Def. Ex. 2.

**Plaintiff's Response:**  Undisputed, although an incomplete summary of all Plaintiff's operative allegations.

**Defendants' Reply:**  None.


**75.**    The hyperlink added by Williamson remained in the published draft.  Sullivan Decl. Ex. 49.  Bennet did not click on the hyperlink and has no memory of having seen the article on June 14, 2017.  Hr'g Tr. at 20:23-21:4; Bennet Dep. at 261:15-262:10.

**Plaintiff's Response:**  Undisputed that the published version of the Editorial contains the hyperlink. Disputed that Bennet did not click on the hyperlink and has no memory of having seen the article; for the reasons stated in Paragraph 71, above, and because Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812.

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony.

Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

Defendants incorporate their reply to Paragraph 71, above.

76.     The international print edition of The Times did not include the passage that Palin contends is defamatory or reference "Sarah Palin's political action committee." Sullivan Decl. ¶ 51, Ex. 50 (NYTIMES0002914).

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.

77.     That same evening, The Times published a series of news reports about the shootings.  Am. Compl. Ex. 6.

**Plaintiff's Response:**  Disputed. The Times published "news reports" about the Scalise shooting soon after it occurred and throughout the day on June 14, 2017. [Vogt Decl. Ex. 108, "*What Happened at the Shooting...*," NYT, June 14, 2017 @ 3:15 p.m.] Also, this statement cites to Ex. 6 of the FAC, but that Exhibit does not support this statement.

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.  In fact, the response expressly

concedes the truth of this statement.  *See also* Compl. Ex. 6 (Dkt. 1-6).

**78.** Bennet did not read The Times news stories about the Scalise shooting prior to publication of the Editorial.  Hr'g Tr. at 24:13-25:1.

**Plaintiff's Response:**  Disputed. Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, Defendants should be precluded from arguing about what Bennet clicked or reviewed because they failed and refused to produce his browsing and search history from June 14, 2017. [Vogt Decl. Ex. 4, Bennet Depo. 293:21-294:4] Also, Bennet testified that despite specifically asking for research concerning whether there was any incitement leading to the Scalise shooting, they "didn't find anything"— which means he must have been aware of news stories about the Scalise shooting. [*Id.*, Bennet Depo 245:5-247:1]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or

ca

on contentions that the affidavits supporting the motion are not credible").

The response also misrepresents Bennet's testimony.  Regarding the Scalise shooting, Bennet testified that "we didn't find a specific instance of, you know, political rhetoric or political literature that connected the victims on the field to incitement."  Vogt Decl. Ex. 4, Bennet Dep. 246:20-23.

Plaintiff first asked for Bennet's search history on June 4, 2020. Defendants objected on the grounds that search histories were not responsive to Plaintiff's document requests, were not relevant to the claims in the case, and that the burden or expense associated with the production outweighs its likely benefit.  Plaintiff did not seek to compel production or otherwise follow up on this request.  *See* Def. Reply to Paragraph 42.

<u>**Criticism of the Editorial and The Times' Response**</u>

**79.**      Following publication of the Editorial online, some readers posted comments on and tweeting reactions to the Editorial challenging the notion that the Crosshairs Map constituted "political incitement" or that there was any "link" between it and the Arizona shootings.  Bennet Dep. at 85:20-86:22.

**Plaintiff's Response:**  Undisputed, except as to the use of the word "some." Bennet stated Defendants were "taking ***a lot of criticism*** for saying that the attack on Giffords was in any way connected to incitement..." [Vogt Decl. Ex. 37, PL Depo Ex. 37 (emphasis added)] Numerous readers and journalists commented. [*See* Paragraph 364, below; *see also* Vogt Decl. Ex. 70, PL Depo Ex. 96 (Comments on Editorial)]

**Defendants' Reply:**  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the

implications of those facts.

**80.**     Ross Douthat, a Times opinion writer, first told Bennet that readers were

questioning the Editorial in an email he sent at around 10:00 p.m. on June 14th. Sullivan Decl. ¶

22, Ex. 21 (NYTIMES0001716-17); Bennet Dep. at 81:22-24.

**Plaintiff's Response:**  Disputed. Douthat told Bennet in his email the night of June 14,

2017 that "[t]here was not, and continues to be so far as I can tell, no evidence that Jared Lee

Loughner was incited by Sarah Palin or anyone else...], and made no mention in this email about

readers questioning the Editorial. [Vogt Decl. Ex. 41, PL Depo Ex. 39] Douthat's first mention

of other comments on the Editorial was the following morning, when Douthat sent Bennet links

to two tweets from left-leaning journalists. [Vogt Decl. Ex. 40-42, PL Depo Ex. 38; 38(A);

38(B); Vogt Decl. Ex. 8, Douthat Depo. 95:16-98:11]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not

set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but

instead makes arguments about the implications of those facts and adds additional, but not

contradictory, testimony.

**81.**     Douthat explained that he believed there was "no evidence that Jared Lee

Loughner was incited by Sarah Palin or anyone else, given his extreme mental illness and lack of

any tangible connection to that crosshair map".  Sullivan Decl. Ex. 21; Bennet Dep. at 86:12-14.

Bennet responded by email a few minutes later:

> Thanks, and I'll look into this tomorrow. But my understanding
> [is] that in the Giffords case there was a gun sight superimposed
> over her district; so far in this case we don't know of any direct
> threat against any of the congressman on the field.  That's not to

say that any of it is ok, obviously, or that the violence in either case was caused by the political rhetoric. But the incitement in this case seems, so far, to be less specific.

Sullivan Decl. Ex. 21.

**Plaintiff's Response:** Undisputed that the contents of the cited email string between Douthat and Bennet [Sullivan Decl. Ex. 21] speak for themselves. Also undisputed that Bennet responded to Douthat's statement that there was "no evidence that Jared Lee Loughner was incited by Sarah Palin or anyone else" over 30 minutes later by saying he would "look into this tomorrow." [Sullivan Decl. Ex. 21]

**Defendants' Reply:** There is no genuine factual dispute. Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c).

82.     Douthat in turn replied by email, explaining his concern about the editorial as he had understood it:

> The targets were used by Palin, or her group, in a map of seats targeted for pickup in the midterms. You can argue about whether that crosses a line … but the point is that the map had no link, none at all, to Giffords' actual murder. People assumed a link initially … but the investigation debunked it. I think Loughner was instigated by a non-answer she'd given him at a town hall about one of his theories of grammar, or his obsession with lucid dreaming, or something. His act had nothing to do with the political climate, so far as anyone can tell. Whereas the Alexandria shooter seems to have had an explicit political motivation. So saying that Giffords was a case of incitement and this one isn't reads like we're downplaying that motive or implying that Loughner had right-wing motivations that he simply didn't have."

Sullivan Decl. Ex. 21.

**Plaintiff's Response:** Undisputed.

**Defendants' Reply:** None.

83.     The drafters of the Editorial—Cohn, Williamson, and Bennet—did not intend to suggest a causal link between the Crosshairs Map and the Loughner Shooting.  Hr'g Tr. at 5:24-6:1 (testifying that "incitement" referred to "the danger that we're increasingly treating political opponents like enemies a conflict"); Bennet Dep. at 112:23:113:18; Bennet Decl. ¶ 8; Cohn Dep. at 96:22-97:7, 94:12-20 ("I certainly didn't mean someone was giving, like, orders or saying go shoot someone or go commit a violent act, but just that the rhetoric was ugly enough that it would boil up and foster people to take things into their own hands."); Williamson Dep. at 233:16-21 (testifying that "political rhetoric" referred to "a general overheated back-and-forth political climate"), 234:3-15.

**Plaintiff's Response:**  Plaintiff **OBJECTS** to and disputes this statement because it is false and misleading, and mischaracterizes the testimony of several witnesses. First, Bennet wrote the defamatory portions of the Editorial—not Williamson or Cohn—specifically including the rewrite of the paragraph Williamson drafted embodying the results of her research showing no direct link between incitement and Loughner's shooting. The testimony of Williamson Defendants partially quote related to her original draft of the Editorial <u>NOT</u> the final version Bennet re-wrote. [Vogt Decl. Ex. 3, Williamson Depo 232:2-234:10] The partially quoted testimony of Cohn had <u>nothing</u> to do with Bennet's drafting of the defamatory language at issue. The quoted portion of Cohn's testimony is taken out of context to make it appear as if she was talking about the use of the word "incitement" in the final version of the Editorial when, in reality, Cohn's testimony about the word "incitement" was in reference to the question she added into <u>Williamson's first draft</u> of the Editorial ("Do we know of any elected officials on the Left who have incited violence?· Or just unaffiliated people online or comedians, most are pro-gun control..."). [Vogt Decl. Ex. 6, Cohn Depo 92:4-22]. The entirety of Cohn's testimony about her

thoughts at that time is that she did not believe the map circulated by Sarah Palin's PAC incited Loughner to commit his shooting in 2011 because "incitement," Cohn said, "sounds very direct, that it—that the map led him to commit the shooting." [*Id.*, Cohn Depo 96:15-97:7] Bennet's testimony about his "intent" when he wrote the defamatory passages at issue lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812.

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

The response also mischaracterizes Cohn's testimony, which responds to counsel's phrasing, not the Editorial:

> Q:  And when you said "incited violence" in this bolded section that we've been looking at, at this time on June 14 of 2017, at 5:03 p.m., did you  believe that the map that Sarah Palin's political action committee had circulated had incited Jared Loughner to commit his shooting in 2011?
>
> MS. SCHELL:· Objection to form.
>
> A:  I -- no.· I -- not that directly.· I would think of it more as -- the way you phrased it sounds very direct, that it -- that the map led him to commit the shooting.

Vogt Decl. Ex. 6, Cohn Depo 96:15-25.  Regarding her intended meaning, Cohn testified:

> Q:  What did you mean by "incited"?
>
> A:  Maybe fostered or said things that might make people who were prone to such things feel that they should take some sort of violent action. I don't know.· Just sort of a general -- I don't -- I, I -- I certainly didn't mean someone was giving, like, orders or saying go shoot someone or go commit a violent act, but just that the rhetoric was ugly enough that it would boil up and foster people to take things into their own hands.

*Id.* at 94:12-20.  Defendants also incorporate their Reply in support of Paragraph 83.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony.  Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

**84.**     Bennet has admitted that he "did a very poor job . . . of trying to express" his intended thought and "created an inference for readers that there was a causal link between political incitement and the shooting of Gabby Giffords."  Bennet Dep. at 93:8-12.

**Plaintiff's Response:**  Disputed. Bennet's testimony about his subjective beliefs or intent lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, Bennet did not create an "inference" for readers that there was a causal link—he stated unequivocally that the map was "incitement" and was clearly and directly linked to Loughner's shooting [Vogt Decl. Ex. 35, PL Depo Ex. 35 (Original Editorial)]. Even those within The Times knew this language conveyed a causal link. Cohn understood "incitement" to be "very direct" and mean "that it—that the map led him to commit the shooting" [Vogt Decl. Ex. 6, Cohn Depo 96:15-97:7], and Douthat immediately understood Bennet's use of "incitement" to draw a causal connection between Palin's map and Loughner's shooting (*see* Vogt Decl. Ex. 43, PL Depo Ex. 39)]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

The response also mischaracterizes Cohn's testimony.  *See* Reply to Paragraph 83, above.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony.  Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

85.    Bennet was not "trying to say that any particular piece of political incitement causes a maniac like Jared Lee Loughner to take up arms and shoot at elected representatives," nor that Palin was responsible for this particular piece of political incitement.  Hr'g Tr. at 15:11-13; Bennet Decl. ¶ 9.

**Response:**  Disputed. Bennet's testimony about his subjective beliefs or intent lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, Bennet used "incitement," which he knew was a very "strong word" that meant "deliberate orders, invocations, summonses for people to carry out violent attacks...[Doc. 41-34, 8/16/17 Hr'g. Trans. 11:13-12:25] and was "a call to violence." [Vogt Decl. Ex. 4, Bennet Depo 114:10-15]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

Plaintiff's response also mischaracterizes Bennet's testimony.  He testified that he understood "incitement" to mean a "a range of communications," from "deliberate orders" to lies about history or "maps that misrepresent the politics of the region."  Hr'g Tr. 12:13-25.  The cited testimony reads in full:

> Also, I was thinking about -- the way I view that particular word from is in my experience in one of my roles at the time that I was a correspondent in Jerusalem at one point for The Times, and the word "incitement" is used there by the Israelis -- in my time by the Israelis about the Palestinians but also, to some degree, by the Palestinians about the Israelis to talk about a range of communications from, you know, to deliberate orders, invocations, summonses for people to carry out violent attacks to textbooks that are published that align important facts from the other side's national narrative or history, to tell outright lies about that history, to maps that misrepresent the politics of the region. And that's specifically where I was drawing that word from.

*Id.*; *see also* Plaintiff's Resp. to Paragraph 62 (acknowledging same).

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony.  Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

**86.**     Bennet did not know then, and does not know now, whether or not Loughner was aware of the Crosshairs Map at the time he committed the shooting.  Bennet Decl. ¶¶ 10-11; Hr'g Tr. 33:10-34:12.

**Plaintiff's Response:**  Disputed. Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812.

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c).

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

**87.**     Bennet stated that he "didn't remotely intend" to "accus[e] Governor Palin of complicity in this shooting,"  Hr'g Tr. at 28:6-8.

**Plaintiff's Response:**  Disputed. Bennet's testimony about his subjective beliefs or intent lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812.

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c).

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

**88.**     Moreover, he said that he "was very concerned to see that that was one of the inferences that people had drawn from what I had written."  Hr'g Tr. at 28:15-18.

**Plaintiff's Response:**  Disputed. Bennet's testimony about his subjective beliefs lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, Bennet used "incitement," which he considered a very "strong word" that he knew meant "deliberate orders, invocations, summonses for people to carry out violent attacks..." (Doc. 41-34, 8/16/17 Hr'g. Trans. 11:13-12:25) and "a call to violence." (Bennet Depo 114:10-15) The evidence also refutes that Bennet was truly "concerned," because his response on the night of June 14, 2017 when learning from Douthat that the Editorial was false was to respond that he would "look into this tomorrow." (PL Depo Ex. 380 Moreover, Bennet did not create an "inference" for readers that there was a causal link—he stated unequivocally that there is a "clear" and "direct" link between incitement by the map and Loughner's shooting (PL Depo Ex. 35), language which even those within The Times knew meant the map caused Loughner to shoot (*see* Cohn Depo 96:15-97:7;

*see also* PL Depo Ex. 39).

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

Plaintiff's response also mischaracterizes Bennet's testimony.  He testified that he understood "incitement" to mean a "a range of communications," from "deliberate orders" to lies about history or "maps that misrepresent the politics of the region."  Hr'g Tr. 12:13-25; *see* Reply to Paragraph 85.

The response's argument that Bennet was not "truly 'concerned'" is contrary to the record, which shows that Bennet contacted Williamson immediately after his correspondence with Douthat (at 11:00 p.m.), to see if she was available to begin investigating Douthat's concerns, Paragraph 99; was emailing others on the Editorial Board by 5:08 a.m. the following morning to enlist their assistance as well, Paragraph 101-101; and published the First Correction by 11:15 a.m. the next morning, Paragraph 106.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

89.     Though he later recognized that "some people" can interpret incitement to mean a "call to violence," he testified that "[t]hat was not the way [The Times was] using it in the editorial."  Bennet Dep. at 114:10-15.

**Plaintiff's Response:**  Disputed. Bennet's self-serving testimony about his subjective beliefs or intent lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, although Bennet made this conclusory statement, he cites no facts to support his supposed belief, and therefore lacks a factual predicate to establish the requisite foundation to admit his testimony. Defendants do not cite a single example of anyone interpreting the defamatory statements consistent with Bennet. Moreover, Bennet used "incitement," which he considered a very "strong word" that he knew meant "deliberate orders, invocations, summonses for people to carry out violent attacks" (8/16/17 Hr'g. Trans. 11:13-12:25) and "a call to violence" (Bennet Depo 114:10-15). Bennet did not create an "inference" for readers that there was a causal link—he stated unequivocally that there is a "clear" and "direct" link between incitement by the map and Loughner's shooting (PL Depo Ex. 35), language which even those within The Times knew meant the map caused Loughner to shoot. (Cohn understood "incitement" to be "very direct" and mean "that it—that the map led him to commit the shooting" [Vogt Decl. Ex. 6, Cohn Depo 96:15-97:7] and Douthat immediately understood Bennet's use of "incitement" to draw a causal connection between Palin's map and Loughner's shooting [Vogt Decl. Ex. 43, PL Depo Ex. 39)] Also, Bennet knew the difference between incitement and rhetoric, as demonstrated by the changes made to the correction. (*See* Paragraph 107 and 109, below).

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but

instead makes arguments about the implications of those facts.

Plaintiff's response also mischaracterizes Bennet's testimony.  He testified that he understood "incitement" to mean a "a range of communications," from "deliberate orders" to lies about history or "maps that misrepresent the politics of the region."  Hr'g Tr. 12:13-25; *see* Reply to Paragraph 85.

The response also mischaracterizes Cohn's testimony.  *See* Reply to Paragraph 83, above.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").


**90.**     Bennet's aim in the Editorial was "to express concern about the state of political rhetoric in the country of political incitement, the danger that we're increasingly treating political opponents like enemies in a conflict."  Hr'g Tr. at 5:23-6:1.

**Plaintiff's Response:**  Disputed. Bennet's testimony about his subjective "aim in the Editorial" lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Bennet's true "aim" is apparent from, among other things, the communications and events leading up to and surrounding his rewrite of Williamson's draft—such Bennet's injection of the "incitement"

74

narrative into what was originally intended to be a "gun control" piece (*see* Paragraphs 22-23, above) and insistence on re-writing it to ensure what he "wanted" to accomplish (*see* Paragraph 47, above) even though he already knew there was no evidence of incitement associated with the Scalise shooting (*see* Paragraph 31, above) and that the results of Williamson's research embodied in her draft did not make any link between political incitement and Loughner's shooting (*see* Paragraphs 41 and 67, above).

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

91.    Specifically, Bennet worried that "the overall climate of political incitement . . . gives permission, to some degree, for violence against elected officials."  Hr'g Tr. at 15:8-11.

**Plaintiff's Response:**  Disputed. Bennet's testimony about his subjective "worries" lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, this contention is

disproven by the fact that Bennet <u>never</u> called out liberals or democrats for incitement. [Vogt Decl. Ex. 4, Bennet Depo. 101:10-102:3]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

The response also mischaracterizes Bennet's testimony.  When asked if he knew whether he "published any pieces that called out the Left for using what you just called incendiary rhetoric," Bennet testified, "Well, the piece we're discussing today attempted to do – did do that. At other points, I don't – I don't remember."  Vogt Decl. Ex. 4, Bennet Dep. 101:12-17.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

92.     Bennet was attempting to advance the idea "that overheated political rhetoric can create a climate conducive to violent acts."  Hr'g Tr. at 48:4-8; Bennet Decl. ¶ 8.

**Plaintiff's Response:**  Disputed. Bennet's testimony about his subjective beliefs lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. In support, *see* Paragraph 91,

above. Moreover, if Bennet was supposedly trying to address "rhetoric," Williamson's Draft already did that.

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

Defendants incorporate their reply to Paragraph 91, above.


93.     Bennet mentioned the map circulated by SarahPAC as "an example of the kind of political incitement that contributes to this atmosphere" and one which had mentioned by name a person who ultimately was a victim of the Loughner Shooting.  Hr'g Tr. at 16:5-7; *id.* at 17:21-18:2, 19:16-22, 50:22-51:7; Bennet Decl. ¶ 6.

**Plaintiff's Response:**  Disputed. Bennet's testimony about his subjective beliefs lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. In support, see Paragraph 91, above.

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

94.     While the editorial "criticized the left for creating an atmosphere of incitement" in advance of the Scalise Shooting," Bennet was not aware of a specific, concrete example of such rhetoric "that connected the victims [of the Scalise Shoooting"] there to that atmosphere."  Hr'g Tr. at 19:11-20; Bennet Decl. ¶ 7.

**Plaintiff's Response:**  Undisputed that Bennet had actual knowledge and testified there was no link between incitement and the Scalise shooting, and therefore no "pattern" of incitement to support his narrative. [Vogt Decl. Ex. 4, Bennet Depo. 246:14-247:2; Vogt Decl. Ex. 25, PL Depo. Ex. 25, PL Depo. Ex. 20] In fact, Bennet was not aware of any example of what he considers to be "incitement" on the Left and had never called out the Left for "incitement." [Vogt Decl. Ex. 4, Bennet Depo 101:10-102:3]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.  The response also mischaracterizes Bennet's testimony.  *See* Reply to Paragraph 91, above.

95.     The question asked at the very beginning of the paragraph at issue—was the Scalise Shooting "evidence of how vicious American politics has become?"—was answered in the Editorial with "probably."  Hr'g Tr. at 16:8-14.

**Plaintiff's Response:**  The language of the Editorial speaks for itself and is undisputed, but, as set forth in Paragraph 94, above, the entire premises of Bennet's supposed thesis, like the Palin incitement claim, was debunked.

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

96.     Bennet did not intend to suggest that the Crosshairs Map had included "actual photographs of these representatives . . . put under the crosshairs," as opposed to over their districts, and the Editorial specifically referred to it as "a map of targeted electoral districts."  see Hr'g Tr. 31:3-8; Sullivan Decl. ¶ 50, Ex. 49 at 3.

**Plaintiff's Response:**  Disputed. Williamson wrote referenced passage about crosshairs being placed over lawmakers, not Bennet. [Vogt Decl. Ex. 31, PL Depo Ex. 33; Vogt Decl. Ex. 3, Williamson Depo 232:24-234:10, 269:11-270:16]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

97.     Williamson viewed the Editorial as talking about the "general overheated back-and-forth political climate."  Williamson Dep. at 233:16-21.

**Plaintiff's Response:**  Disputed. This statement is false. Williamson's partially quoted testimony was about her **draft**, not the <u>final</u> Editorial. [Vogt Decl. Ex. 3, Williamson Depo 232:2-234:10; 270:2-16] As set forth in Paragraph 41 and 67, above, Bennet re-wrote this portion of Williamson's draft even though it embodied the results of her research on the Loughner shooting.

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

98.     Cohn read the Editorial as saying that the "rhetoric was ugly enough that it would boil up and foster people to take things into their own hands."  Cohn Dep. at 94:12-20.

**Plaintiff's Response:**  Plaintiff objects to and disputes this statement because it is false and mischaracterizes the referenced testimony. Cohn was not testifying about the use of the word "incitement" in the Editorial—she was testifying about *her* use of "incitement" in the question she posed in Williamson's ***original draft*** of the Editorial. [Vogt Decl. Ex. 6, Cohn Depo. 91:15-96:25; Sullivan Decl. Ex. 18]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

99.    Bennet sent a text message to Williamson around 11:00 p.m., asking if she was available to begin investigating Douthat's concerns.  Sullivan Decl. ¶ 23, Ex. 22 (JBENNET0000038-39).

**Plaintiff's Response:**  Undisputed.  However, the entirety of the test messages should be included.  (*See* Paragraph 362, below).

**Defendants' Reply:**  None.

100.    Williamson responded early the following morning that she would look into the issue.  Sullivan Decl. Ex. 22.

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.

101.    On June 15 at 5:08 a.m., Bennet emailed several people who had worked on the Editorial to ask them to "get to the bottom of this as quickly as possible."  Sullivan Decl. ¶ 24, Ex. 23 (NYTIMES0001803).

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.

**102.**    Bennet also told Williamson that he needed "a rock-solid version of what we should say – that an investigation showed no link to incitement, or no direct link, or no clear link. I don't want to soften it if we don't need to.  If there was no link, we should say so."  Bennet Dep. at 278:25-279:11; Sullivan Decl. ¶ 40, Ex. 39 (NYTIMES0003261); Sullivan Decl. Ex. 22.

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.

**103.**    Bennet asked this because, "At that point, [he] didn't know" the answer and "wanted our people to go back and start over and figure out precisely what the right way to characterize it was." Bennet Dep. at 279:17-24.

**Plaintiff's Response:**  Disputed. Bennet's testimony about his subjective beliefs lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Bennet was covering for himself – and his e-mail asking Williamson and Lepping to research "what the truth is here" raises even more doubts about his credibility because, based on Bennet's "honest mistake" excuse, there was no need to ask for this research, and doing it was inconsistent with Bennet's claim this was an error in syntax.

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony.  Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory

statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks

credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.

1995) ("The party opposing summary judgment may not rely simply on conclusory statements or

on contentions that the affidavits supporting the motion are not credible").

## The Times Revises the Editorial

**104.**     After investigating, the Editorial Board was not able to affirmatively prove or

disprove any direct connection between Loughner and the Crosshairs Map.  Williamson Dep. at

261:6-9, 277:2-11; Cohn Dep. at 68:14-22.

**Plaintiff's Response:**  Disputed. As set forth above, the Editorial Board already knew

there was no direct connection between Plain's map and Loughner's shooting – they said there is

a "direct" and "clear" link. (*See* Paragraphs 42 and 68, above).

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not

set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but

instead makes arguments about the implications of those facts.  The response also relies on

earlier responses that mischaracterize Williamson's testimony.  *See* Def. Reply to Paragraphs 41,

42, 68.

**105.**     Nonetheless, The Times revised the online version of the Editorial to remove

portions understood as suggesting a direct connection and to make clear that, on the Map, the

crosshair appeared over Giffords' district, not over her name or image.  Am. Compl. ¶¶ 134-40.

**Plaintiff's Response:**  Disputed. The referenced passages of the Editorial did not

"suggest" a direct connection. (*See* Paragraphs 84-85, above).

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.  *See* Def. Reply to Paragraph 84-85.

106.    The Times published the first revised online version at 11:15 a.m. on June 15. Hr'g Tr. at 30:9-17; Sullivan Decl. ¶ 41, Ex. 40 (PALIN02729-32).  Specifically, The Times deleted the phrases "the link to political incitement was clear" and "[t]hough there's no sign of incitement as direct as in the Giffords attack" and added the sentence "But no connection to that crime was ever established."  Op. & Order at 7, Dkt. 45; Sullivan Decl. ¶ 20, Ex. 19 (NYTIMES0002912); Sullivan Decl. Ex. 40.

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.

107.    The Times also published a series of corrections.  The first version of the correction, published at the bottom of the online version of the Editorial on June 15, 2017, read:

> An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords.  In fact, no such link was established.

Sullivan Decl. ¶ 28, Ex. 27 (PALIN02733-37).

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.

108.     Once The Times revised the Editorial on June 15, 2017, the publicly-accessible version of the Editorial available on The Times website did not contain language connecting the Crosshairs Map to the Loughner shooting.  Sullivan Decl. Ex. 40.

**Plaintiff's Response:**  Disputed. As described above, and alleged by Plaintiff, the entire premise of the Bennet's narrative in the Editorial mentioning Palin was mentioned was bogus – there was no "pattern" and therefore no reason to mention Palin. (*See* Paragraphs 94-95, above). Nonetheless, Bennet insisted on keeping that section and Palin in the "Lethal Politics" Editorial, even though Board member Jesse Wegman (like Douthat) told Bennet that doing so was nothing more than political scorekeeping. [Vogt Decl. Ex. 43, PL Depo. Ex. 39 (Douthat email); Vogt Decl. Ex. 63, PL Depo. Ex. 81 (Wegman email re. "sneaking the link in.")].

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts and adds additional, unrelated allegations.

109.     The final version of the correction, published at the bottom of the online version of the Editorial on June 16, 2017, read:

> An editorial on Thursday about the shooting of Representative Steve Scalise incorrectly stated that a link existed between political rhetoric and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established.  The editorial also incorrectly described a map distributed by a political action committee before that shooting.  It depicted electoral districts, not individual Democratic lawmakers, beneath stylized cross hairs.

Sullivan Decl. Ex. 27.

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.

110.     On July 16, 2017, the print version of The Times contained the final version of the correction in the Editorial section of the newspaper.  Sullivan Decl. ¶ 52, Ex. 51 (NYTIMES0002916).

**Plaintiff's Response:**  Undisputed, except to note the print edition corrections does [sic] not mention Palin or the name of the Editorial.

**Defendants' Reply:**  None.

111.     On June 15, 2017, at 11:33 a.m., 11:37 a.m., and 11:40 a.m., The Times published a series of tweets on the opinion division Twitter account, @NYTOpinion, including the text: "We got an important fact wrong, incorrectly linking political incitement and the 2011 shooting of Giffords.  No link was ever established.  We're sorry about this and we appreciate that our readers called us on the mistake."  Sullivan Decl. ¶ 26, Ex. 25 (PALIN03829-33); Sullivan Decl. ¶ 27, Ex. 26 (PALIN03827-28).

**Plaintiff's Response:**  Undisputed, except to note no such tweets were sent out following the second correction (see Paragraph 109, above) to the Editorial.

**Defendants' Reply:**  None.

## Allegations Regarding Actual Malice

112.     Prior to his most recent role at The Times, Bennet was the Editor-in-Chief for *The Atlantic* monthly magazine.  Bennet Dep. at 41:16-18.

**Plaintiff's Response:**  Disputed. Bennet was Editor of "The Atlantic magazine ***and The***

*Atlantic's website*." [Vogt Decl. Ex. 4, Bennet Depo 41:12-25 (emphasis added)]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c).

The additional allegations in the response are not to the contrary.  Bennet testified that he was the "editor of *The Atlantic* magazine and *The Atlantic's* website."  Vogt Decl. Ex. 4, Bennet Dep. 41-21:23.  Bennet further testified that, although *The Atlantic* "took responsibility for the production, meaning the digital production of the site," *id.* at 49:19-20, neither he nor *The Atlantic* had editorial control over the sister publications, *id.* at 50:8-11, 50:20-51:21. Specifically, Bennet did not edit, have editorial content, or have any role in the content published by *The Dish*, *The Atlantic Wire*, or *National Journal*.  *See* Paragraphs 115-116, 119-127, 133-136.  He does not recall reading *any* of the articles from these publications presented to him by Plaintiff.  *See* Paragraphs 115-136.

**113.**    Palin contends that as the Atlantic's Editor-in-Chief Bennet must have "reviewed, edited and approved the publication of numerous articles [that] confirm[ed] there was no link between Gov. Palin and Loughner's shooting."  Am. Compl. ¶¶ 42, 54-59.

**Plaintiff's Response:**  Disputed to the extent this statement mischaracterizes and incorrectly summarizes the allegations in paragraphs 42 and 54-59 of the FAC, which speak for themselves. Moreover, Bennet conceded at his deposition that while Editor-in-Chief "regularly read" The Atlantic in 2011 and "must have read at least several" of articles about the Loughner Shooting published on The Atlantic's website [Vogt Decl. Ex. 69, PL Depo. Ex. 122; Vogt Decl. Ex. 4, PL Depo Ex 22; Bennet Depo 122:6-22]. Bennet testified he "must have read at least several" of these Loughner articles because he "was a regular reader of The Atlantic's website

both because [he] was interested in it as a reader and because [he] would try to keep [his] eye on it for purposes of commenting to our editor about what [he] liked and didn't like." [Vogt Decl. Ex. 4, Bennet Depo 122:23-123:7] In fact, Bennet described himself as "consuming [The Atlantic's] site." [*Id.*, Bennet Depo 123:7-9]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts and references additional, unrelated testimony.  *See* Def. Reply to Paragraph 112.

**114.**    *The Dish* was a blog controlled and edited by Andrew Sullivan that was hosted on the same website as *The Atlantic* magazine at the time the Loughner Shooting occurred in January 2011.  Bennet Decl. ¶ 15; Sullivan Decl. ¶ 42, Ex. 41 ("A. Sullivan Dep.") at 85:11-86:6; 86:22-87:3; 106:21-107:11; Bennet Dep. at 48:2-8; 49:3-50:11; Hr'g Tr. at 64:20-65:1; 67:4-5.

**Plaintiff's Response:**  Disputed. The Dish was "integrated" into The Atlantic's website – it was "digitally present[ed] as part of the Atlantic.com [and] ...its audience would be credited -- as part of The Atlantic's network of sites"—and The Atlantic "took responsibility for the production, meaning, the digital production of the site... mean[ing] maintaining the links, maintaining the archive, and so forth, and at the same time had the ability to sell advertising on the business side against the content that -- and the page views that [The Dish] was producing. [Vogt Decl. Ex. 4, Bennet Depo 49:3-25]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but

instead makes arguments about the implications of those facts.  The additional allegations in the response are not to the contrary.  *See* Def. Reply to Paragraph 112.

**115.**    Sullivan had complete editorial independence in running *The Dish*.  No one, including Bennet, reviewed or edited his blog posts before publication.  Bennet Decl. ¶ 15; A. Sullivan Dep. at 85:11-86:6; 106:21-107:11; Bennet Dep. at 46:6-48:7; Hr'g Tr. at 64:20-65:1; 67:4-5.

> **Plaintiff's Response:**  Undisputed.

> **Defendants' Reply:**  None.

**116.**    Bennet had no role "whatsoever" in *The Dish*.  A. Sullivan Dep. at 86:22-87:3.

> **Plaintiff's Response:**  Undisputed.

> **Defendants' Reply:**  None.

**117.**    Sullivan and his staff made over 1,400 individual posts to *The Dish* in January 2011 alone.  A. Sullivan Dep. at 90:5-8.

> **Plaintiff's Response:**  Disputed. (*See* Paragraphs 112-114, above).

> **Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c).  *See* Def. Reply to Paragraph 112-114.

**118.**    The piece titled "An Assassination," discussed in the Amended Complaint at Paragraph 57, was a blog post from *The Dish*, not a column in *The Atlantic.* A. Sullivan Dep. at

58:18-21, 91:3-93:3; Sullivan Decl. ¶ 43, Ex. 42 (PALIN04351-58); Am. Compl. ¶ 57.

**Plaintiff's Response:** Disputed. As set forth in Paragraphs 113 and 114, above, and shown through the URL for "An Assassination" [Sullivan Decl. Ex. 42 at p. 1]—the post appeared on *The Atlantic's* website, of which Bennet was the Editor, and for which he was responsible.

**Defendants' Reply:** There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.  The additional allegations in the response are not to the contrary.  *See* Def. Reply to Paragraph 112.


119.    James Bennet had no role in preparing or editing the blog post "An Assassination."  A. Sullivan Dep. at 93:4-7.  At the time of publication of the Editorial, Bennet had no recollection of reading "An Assassination."  Hr'g Tr. at 21:19-22:1.

**Plaintiff's Response:** Undisputed as to first sentence. Disputed as to second sentence. Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, Bennet conceded at his deposition that he "regularly read" The Dish [Vogt Decl. Ex. 4, Bennet Depo. 54:5-9] and The Atlantic website in 2011 and "must have read at least several" of articles about the Loughner Shooting published on The Atlantic's website (*see* Paragraph 113, above). Moreover, as set forth in Paragraph 121, below, Bennet recalls Sullivan writing posts about Palin and spoke to Andrew Sullivan about the Loughner shooting.

**Defendants' Reply:** There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but

instead makes arguments about the implications of those facts.  The additional allegations in the response are not to the contrary.  *See* Def. Reply to Paragraph 112.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").


**120.**    Sullivan's live blog titled "An Assassination Attempt in Arizona: Live-Blogging," discussed in Paragraph 58 of the Amended Complaint, was published as part of *The Dish*.  A. Sullivan Dep. at 56:8-16, 93:8-96:15; Sullivan Decl. ¶ 56, Ex. 55 (PALIN04359-72); Am. Compl. ¶ 58.

**Plaintiff's Response:**  Disputed. As set forth in paragraphs 112-114, above, and shown through the URL for "An Assassination Attempt in Arizona: Live-Blogging,"" [Sullivan Decl. Ex. 55 at p. 1]— Sullivan's live blog appeared on *The Atlantic's* website, of which Bennet was the Editor and for which he was responsible.

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but

instead makes arguments about the implications of those facts.  The additional allegations in the response are not to the contrary.  *See* Def. Reply to Paragraph 112.

**121.** James Bennet had no role in preparing or editing the live blog tiled "An Assassination Attempt in Arizona: Live-Blogging."  A. Sullivan Dep. at 96:16-22.  At the time of publication of the Editorial, Bennet had no recollection of reading of Sullivan's live blog. Hr'g Tr. at 21:19-22:1.

**Plaintiff's Response:**  Undisputed as to first sentence. Disputed as to second sentence. Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, Bennet conceded at his deposition that he "regularly read" The Dish [Vogt Decl. Ex. 4, Bennet Depo. 54:5-9] and The Atlantic website in 2011 and "must have read at least several" of articles about the Loughner Shooting published on The Atlantic's website (*see* Paragraph 113, above), and recalls Sullivan posting about Palin and even spoke to Sullivan about the Loughner shooting (*see* Paragraph 119, above).

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.  The additional allegations in the response do not contradict Bennet's testimony that he did not recall reading this piece at the time of publication or prior to publishing the Editorial.  *See* Def. Reply to Paragraph 112.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory

statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks

credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.

1995) ("The party opposing summary judgment may not rely simply on conclusory statements or

on contentions that the affidavits supporting the motion are not credible").


122.    The piece titled "Caldwell's Unfairness," discussed in the Amended Complaint at

Paragraphs 66-67, was a blog post from *The Dish*, not a column in *The Atlantic.* A. Sullivan Dep.

at 62:22-74:15, 98:8-99:14; Sullivan Decl. ¶ 44, Ex. 43 (PALIN04388-91); Am. Compl. ¶¶ 66-

67.

**Plaintiff's Response:**  Disputed. As set forth in paragraphs 112-114, above, and shown

through the URL for "Caldwell's Unfairness" [Sullivan Decl. Ex. 43 at p. 1]—this post appeared

on *The Atlantic's* website, of which Bennet was the Editor and for which he was responsible.

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not

set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but

instead makes arguments about the implications of those facts.  The additional allegations in the

response are not to the contrary.  *See* Def. Reply to Paragraph 112.


123.    James Bennet had no role in preparing or editing the blog post "Caldwell's

Unfairness."  A. Sullivan Dep. at 99:15-25.

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.

**124.**    At the time of publication of the Editorial, Bennet had no recollection of reading "Caldwell's Unfairness."  Hr'g Tr. at 21:19-22:1, 65:2-4.

**Plaintiff's Response:**  Disputed. Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. In support, *see* Paragraph 119, above.

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.  The additional allegations in the response do not contradict Bennet's testimony that he did not recall reading this piece at the time of publication or prior to publishing the Editorial.  *See* Def. Reply to Paragraph 112, 119.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

**125.**    The piece titled "The More We Know," discussed in the Amended Complaint at Paragraphs 59 and 63, was a blog post from *The Dish*, not an article in *The Atlantic.* A. Sullivan

Dep. at 74:16-75:3, 96:23-98:7; Sullivan Decl. ¶ 57, Ex. 56 (PALIN04498-505); Am. Compl. ¶¶
59, 63.

**Plaintiff's Response:**  Disputed. As set forth in paragraphs 112-114, above, and shown
through the URL for "The More We Know" [Sullivan Decl. Ex. 56 at p. 1]—this post appeared
on *The Atlantic's* website, of which Bennet was the Editor and for which he was responsible.

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not
set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but
instead makes arguments about the implications of those facts.  The additional allegations in the
response are not to the contrary.  *See* Def. Reply to Paragraph 112.

126.    James Bennet had no role in preparing or editing the blog post "The More We
Know."  A. Sullivan Dep. at 98:4-7.

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.

127.    At the time of publication of the Editorial, Bennet had no recollection of reading
"The More We Know."  Hr'g Tr. at 21:19-22:1.

**Plaintiff's Response:**  Disputed. Bennet's testimony about what he recalls reading lacks
credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. In support, *see* Paragraph 119,
above.

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not
set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but
instead makes arguments about the implications of those facts.  The additional allegations in the

response do not contradict Bennet's testimony that he did not recall reading this piece at the time of publication or prior to publishing the Editorial. *See* Def. Reply to Paragraph 112, 119.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").


**128.**    *The Atlantic Wire* was a "sister site" to *The Atlantic* magazine, run by a separate editor, Gabriel Snyder, that primarily acted as a news aggregation hub.  Bennet Decl. ¶¶ 13-14; Bennet Dep. at 124:20-125:4; Sullivan Decl. ¶ 45, Ex. 44 ("Douthat Dep.") at 66:11-21; A. Sullivan Dep. at 101:20-102:9.

**Plaintiff's Response:**  Undisputed, except that The Wire, like The Dish, was integrated into The Atlantic's Website. [*See* URLs on Sullivan Decl. Exs. 30, 52, 53, 54.]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), and the additional allegations in the response are not to the contrary.  *See* Def. Reply to Paragraph 112.

129.    The piece titled "Ten Days That Defined 2011," discussed in the Amended

Complaint at Paragraphs 59, 68 and 69, was a blog post from *The Atlantic Wire*, not an article in

*The Atlantic*.   Bennet Dep. at 127:13-128:4; Sullivan Decl. ¶ 31, Ex. 30 (PALIN04486-97); Am.

Compl. ¶¶ 59, 68-69.

   **Plaintiff's Response:**  Disputed. As set forth in paragraphs 112-113, and shown through

the URL for "Ten Days That Defined 2011" [Sullivan Decl. Ex. 30 at p. 1]—this post appeared

on *The Atlantic's* website, of which Bennet was the Editor and for which he was responsible.

Also, during his deposition, Bennet testified "it's possible" he read this piece. [Vogt Decl. Ex. 4,

Bennet Depo 127:13-128:8; Vogt Decl. Ex. 88, PL Depo Ex. 153]

   **Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not

set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but

instead makes arguments about the implications of those facts.  The additional allegations in the

response are not to the contrary.  *See* Def. Reply to Paragraph 112.


130.    The piece titled "Was Shooting of Rep. Gabrielle Giffords Political," discussed in

the Amended Complaint at Paragraph 59, was a blog post from *The Atlantic Wire*, not an article

in *The Atlantic*.  Sullivan Decl. ¶ 53, Ex. 52 (PALIN04514-21); Am. Compl. ¶ 59.

   **Plaintiff's Response:**  Disputed. As set forth in paragraphs 112-113, and shown through

the URL for "Was Shooting of Rep. Gabrielle Giffords Political" [Sullivan Decl. Ex. 52 at p.

1]—this post appeared on *The Atlantic's* website, of which Bennet was the Editor and for which

he was responsible. Also, this post was among those listed in PL Depo. Ex. 122 Bennet testified

he "must have read." (Bennet Depo. 122:6-22)

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.  The additional allegations in the response are not to the contrary.  *See* Def. Reply to Paragraph 112.

131.    The piece titled "Did Sarah Palin's Target Map Play Role in Giffords Shooting," discussed in the Amended Complaint at Paragraphs 59 and 69 n.2, was a blog post from *The Atlantic Wire*, not an article in *The Atlantic.*  Sullivan Decl. ¶ 54, Ex. 53 (PALIN04392-99); Am. Compl. ¶¶ 59, 69 n.2.

**Plaintiff's Response:**  Disputed. As set forth in paragraphs 112-113, and shown through the URL for "Did Sarah Palin's Target Map Play Role in Giffords Shooting" [Sullivan Decl. Ex. 53 at p. 1]— this post appeared on *The Atlantic's* website, of which Bennet was the Editor and for which he was responsible. Also, this post was among those listed in PL Depo. Ex. 122 Bennet testified he "must have read." (Bennet Depo. 122:6-22)

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.  The additional allegations in the response are not to the contrary.  *See* Reply to Paragraph 112, above.

132.    The piece titled "What We Know About Jared Lee Loughner," discussed in the Amended Complaint at Paragraphs 59 and 61, was a blog post from *The Atlantic Wire*, not an article in *The Atlantic.*  Sullivan Decl. ¶ 55, Ex. 54 (PALIN04530-38); Am. Compl. ¶¶ 59, 61.

**Plaintiff's Response:**  Disputed. As set forth in paragraphs 112-113, and shown through

the URL for "What We Know About Jared Lee Loughner" [Sullivan Decl. Ex. 54 at p. 1]—this post appeared on *The Atlantic's* website, of which Bennet was the Editor and for which he was responsible. Also, this post was among those listed in PL Depo. Ex. 122 Bennet testified he "must have read." (Bennet Depo. 122:6-22)

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.  The additional allegations in the response do not contradict Bennet's testimony that he did not recall reading this piece at the time of publication or prior to publishing the Editorial.  *See also* Reply to Paragraph 112, above.

133.    Bennet did not edit the content of *The Atlantic Wire* and does not recall reading the posts to it cited by Palin in her Amended Complaint at the time of publication or prior to publishing the Editorial.  Bennet Decl. ¶¶ 10, 13-14; Hr'g Tr. at 21:19-22:1.

**Plaintiff's Response:**  Disputed. Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true. *Palin* v, 940 F.3d at 812. Moreover, Bennet conceded at his deposition that he "regularly read" The Atlantic website in 2011 and "must have read at least several" of articles about the Loughner Shooting published on The Atlantic's website [Vogt Decl. Ex. 69, PL Depo Ex 122; Vogt Decl. Ex. 4, Bennet Depo 122:6-22]. Bennet testified he "must have read at least several" of these Loughner articles, that was because he "was a regular reader of The Atlantic's website both because [he] was interested in it as a reader and because [he] would try to keep [his] eye on it for purposes of commenting to our editor about what [he] liked and didn't like." [*Id.*, Bennet Depo 122:23-123:7] In fact, Bennet described himself as "consuming [The Atlantic's] site." [*Id.*, Bennet Depo 123:7-9] The Atlantic wire posts about the

Loughner shooting are listed in PL Depo. Ex. 122 at pp. 1, 5, among numerous other articles and posts debunking the Palin/Loughner link.

**Defendants' Reply:**  There is no genuine factual dispute.  The additional allegations in the response do not contradict Bennet's testimony that he did not recall reading this piece at the time of publication or prior to publishing the Editorial.  *See* Def. Reply to Paragraph 112, 119.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

**134.**    *National Journal* was another "sister site" to *The Atlantic* magazine, run by a separate editor, Ron Fournier.  Bennet Decl. ¶¶ 13-14.

**Plaintiff's Response:**  Undisputed except that *National Journal*, like *The Dish*, was integrated into The Atlantic's Website. [*See* URL on Sullivan Decl. Ex. 57 at p. 1; *see also* PL Depo. Ex. 122 at p. 5 ("Stop the Blame Game" with Atlantic URL).]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), and the additional allegations in the response are not to the contrary.  *See* Def. Reply to Paragraph 112.

135.     The piece titled "Stop The Blame Game," discussed in the Amended Complaint at Paragraphs 59, was published by *National Journal*, not *The Atlantic*.  Sullivan Decl. ¶ 58, Ex. 57; Am. Compl. ¶¶ 59.

**Plaintiff's Response:**  Disputed. As shown through the URL for "Stop The Blame Game" [Sullivan Decl. Ex. 57 at p. 1; PL Depo. Ex. 122 at p. 5]—this post appeared on *The Atlantic's* website, of which Bennet was the Editor for which he was responsible.

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.  The additional allegations in the response are not to the contrary.  *See* Def. Reply to Paragraph 112.

136.     Bennet did not edit the content of *National Journal* and does not recall reading "Stop The Blame Game" at the time of publication or prior to publishing the Editorial.  Bennet Decl. ¶¶ 10, 13-14; Hr'g Tr. at 21:19-22:1.

**Plaintiff's Response:**  Disputed. Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, Bennet conceded at his deposition that he "regularly read" The Atlantic website in 2011 and "must have read at least several" of articles about the Loughner Shooting published on The Atlantic's website (PL Depo Ex 122; Bennet Depo 122:6-22]. Bennet testified he "must have read at least several" of these Loughner articles because he "was a regular reader of The Atlantic's website both because [he] was interested in it as a reader and because [he] would try to keep [his] eye on it for purposes of commenting to our editor about what [he] liked and didn't like." (Bennet Depo 122:23-123:7) In fact, Bennet described himself as "consuming [The Atlantic's] site." (Bennet Depo 123:7-9)

"Stop the Blame Game" is among the articles on PL Depo. Ex. 122 at p. 5 Bennet testified he

must have read.

      **Defendants' Reply:**  There is no genuine factual dispute.  The additional allegations in

the response do not contradict Bennet's testimony that he did not recall reading this piece at the

time of publication or prior to publishing the Editorial. *See* Def. Reply to Paragraph 112, 119.

      Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812,

which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility

and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony.

Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory

statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks

credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.

1995) ("The party opposing summary judgment may not rely simply on conclusory statements or

on contentions that the affidavits supporting the motion are not credible").


      **137.**     Cohn did not edit the piece titled, "She Who Must Not Be Named," discussed in

the Amended Complaint at Paragraph 76, and does not recall ever reading it.  Cohn Dep. at 48:7-

17; Sullivan Decl. ¶ 47, Ex. 46 (PALIN03562-64); Am. Compl. ¶ 76.

      **Plaintiff's Response:**  Undisputed.

      **Defendants' Reply:**  None.


      **138.**     Cohn did not edit the piece titled, "The Tucson Witch Hunt," discussed in the

Amended Complaint at Paragraph 126, and does not recall reading it at the time of publication or

prior to publishing the Editorial.  Cohn Dep. at 49:16-50:5; Sullivan Decl. ¶ 46, Ex. 45

(PALIN03655-58); Am. Compl. ¶ 126.

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.


139.    Bennet, Williamson, and Cohn each have no recollection of editing, drafting, or

even reading the pieces from The Times that Palin contends would have demonstrated to them

that it would be false to suggest a causal link between the Crosshairs Map and the Loughner

Shooting.  Bennet Decl. ¶ 10; Hr'g Tr. at 22:22-25:6, 59:2-24, 62:15-63:23; Williamson Dep. at

285:10-288:11 (testifying that she did not recall seeing Pl. Ex. 64, 67, 149, 150, or 60 while

drafting Editorial); Cohn Dep. at 46:11-50:20 (testifying that she did not recall working on Pl.

Ex. 10, 11, 12, 60, 61); *id.* at 48:14-17; 51:7-18 (testifying that she cannot recall individual

columns because of the volume she has edited over years working as an editor).

**Plaintiff's Response:**  Disputed. Plaintiff **OBJECTS** to this statement concerning

Bennet's, Williamson's, and Cohn's recollection of editing, drafting, and reading prices from

The Times because although they turned over their search and browsing history from June 14,

2017 to counsel for The Times, The Times failed and refused to produce that documentation in

response to discovery requests served by Plaintiff, and The Times refused to produce documents

Plaintiff requested concerning who edited, drafted, and researched the pieces Defendants cite in

this statement. [Bennet Depo. 293:21-294:4; Cohn Depo. 78:21-79:25; Williamson Depo. 127:1-

130:13] Moreover, Bennet's testimony about what he recalls reading lacks credibility and cannot

be accepted as true. *Palin*, 940 F.3d at 812. As set forth in paragraphs 112-136, above, Bennet

likely read The Atlantic articles about the Loughner shooting. Bennet also testified he regularly

read The Times. (Bennet Depo. 104:25-105:18) Williamson testified she recalled the results of

the research Bennet asked her to conduct concerning the Loughner shooting, based on which she

knew she could not say there was a clear and direct link between the map circulated by Sarah

Palin's political action committee and the Loughner shooting (Williamson Depo 143:2-24).

**Defendants' Reply:**  There is not genuine factual dispute.  Plaintiff's response does not

set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but

instead makes arguments about the implications of those and other irrelevant facts.  *See* Def.

Reply to Paragraph 112, 119.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812,

which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility

and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony.

Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory

statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks

credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.

1995) ("The party opposing summary judgment may not rely simply on conclusory statements or

on contentions that the affidavits supporting the motion are not credible").

Plaintiff's response also mischaracterizes Williamson's testimony.  Williamson did not

testify "that she knew she could not say there was a clear and direct link between the map

circulated by Sarah Palin's political action committee and the Loughner shooting," as Plaintiff

contends, but that she knew there was a debate over the possible link and reported on that debate

in her draft, rather than any specific finding.  *See* Reply to Paragraph 41, above.

Plaintiff first asked for Williamson's search history on May 18, 2020, after the

conclusion of the first day of her deposition, and Defendants responded that they would look into it.  Plaintiff formally requested Williamson's and four other witnesses' search histories for the first time on June 4, 2020, by letter.  Defendants objected on the grounds that search histories were not responsive to Plaintiff's document requests, were not relevant to the claims in the case, and that the burden or expense associated with the production outweighs its likely benefit. Plaintiff did not seek to compel production or otherwise follow up on this request.  *See* Def. Reply to Paragraph 42.

140.    Bennet does not recall reading and was not at the time of publication of the Editorial aware of having read any of the articles cited by Palin that purportedly demonstrate a consensus that the Loughner Shooting was not in any way caused by the Crosshairs Map. Bennet Decl. ¶ 10; Hr'g Tr. 21:15-22:1; 26:13-27:1, 59:2-24; 63:20-67:12; Bennet Dep. 122:15-22; 123:23-124:6; 132:3-11; 134:10-15.

**Plaintiff's Response:**  Plaintiff **OBJECTS** and Defendants should be precluded from arguing about what Bennet recalls or reviewed because they refused to produce his browsing and search history from June 14, 2017. [Bennet Depo. 104:25-105:18] Also, Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, Bennet conceded at his deposition that he "regularly read" The Atlantic in 2011 and "must have read at least several" of articles about the Loughner Shooting published on The Atlantic's website because he "was a regular reader of The Atlantic's website both because [he] was interested in it as a reader and because [he] would try to keep [his] eye on it for purposes of commenting to our editor about what [he] liked and didn't like," and Bennet described himself as "consuming [The Atlantic's] site." (*See* Paragraphs 112-136, above.) Also, Bennet knew

Williamson's draft was the embodiment of the research she conducted about the Loughner shooting, including the research Bennet specifically requested concerning any link to incitement (Bennet Depo 262:17-263:17).

**Defendants' Reply:**  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those and other irrelevant facts.  *See* Def. Reply to Paragraph 41 (regarding Williamson's testimony about her research), 112 (regarding Bennet's role at *The Atlantic*).

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

Plaintiff first asked for Bennet's search history on June 4, 2020.  Defendants objected on the grounds that search histories were not responsive to Plaintiff's document requests, were not relevant to the claims in the case, and that the burden or expense associated with the production outweighs its likely benefit.  Plaintiff did not seek to compel production or otherwise follow up on this request.  *See* Def. Reply to Paragraph 42.

**141.**     Palin also alleged that Bennet had "reason to be personally hostile toward Palin, her political party, and her pro-gun stance," namely that Bennet's brother is a Senator from Colorado who was endorsed by House members whose districts had been targeted by the Crosshairs Map, that a man had threatened to attack Sen. Bennet's offices in the days before the Loughner Shooting, that both Bennets had become advocates for gun control, and that Palin had endorsed Sen. Bennet's opponent in 2016.  Am. Compl. ¶ 50; *Palin*, 940 F.3d at 814.

**Plaintiff's Response:**  Undisputed, however the referenced allegations speak for themselves.

**Defendants' Reply:**  None.

**142.**     Bennet does not recall speaking with his brother about the threat to his office, and it was not the sort of topic about which they typically would speak.  Bennet Dep. at 145:5-15.

**Plaintiff's Response:**  Disputed. Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, with respect to the threat on his brother's office, Bennet testified that he did, in fact, recall a threat on his brother's office: "I remember an arrest was made -- I mean, I remember a threat. I remember this incident. I just didn't remember when it took place." [Doc. No. 41-34, 8/16/17 Hr'g. Trans. 69:10-18] This is not surprising because Bennet conceded such threats are a "big deal." [Vogt Decl. Ex. 4, Bennet Depo 145:16-146:14]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts and references additional, but not contradictory, testimony.

The response also misstates Bennet's testimony, which reads as follows:

> Q:  Q. Two days before the Tucson shooting [Sen. Bennet's] office was threatened, was it not?
>
> A: I don't remember that, but if you say it's true, I'm sure it is.
>
> …
>
> Q: Does [Ex. 14] refresh your memory?
>
> A. No. No. I'm sorry. I remember an arrest was made – I mean, I remember a threat. I remember this incident. I just didn't remember when it took place.

Hr'g Tr. 68:23-69:1. 69:15-18.  At deposition, Bennet also testified as follows:

> Q:  Do you recall having any conversations with your brother about him receiving a death threat?
>
> A:  No.
>
> Q:  Is that the type of thing that you all might have talked about?
>
> MR. BROWN:· Object to the form, but you can answer.
>
> A:  I don't recall ever talking to my brother about death threats against him, actually.· So I  guess -- I guess the answer's no, we wouldn't  typically talk about it.
>
> Q: Have you ever received a death threat?
>
> A:  I mean, I don't know what you would -- I -- I have -- a number of my colleagues receive death threats regularly, I would say.  The Times has received threats.· You know, I've been physically attacked doing my job, whether it was -- amounted to a death threat or not.· I have been shot at doing my job.  I was the subject of an attempted kidnapping in the Gaza Strip once.  I don't know, does that count as a death threat?
>
> I just think it's -- you know, I think the language that people use these days, the stuff that I see that comes to our people, that goes to politicians -- you see, like Sarah Palin and others, I mean, I just abhor it.  It's terrible.
>
> Q:  It's a big deal, right?

108

A:  I think it's a big deal.

Vogt Decl. Ex. 4, Bennet Dep. 145:5-146:8.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").


**143.**     Bennet does not recall that Sen. Bennet had given a floor speech about gun violence.  Bennet Dep. at 163:11-13.

**Plaintiff's Response:**  Disputed. Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, it is highly suspect that Bennet would not recall his brother giving a speech during the filibuster immediately after the Pulse Nightclub shooting, when his Editorial Board wrote about the filibuster and the Pulse shooting, and gun control was one of Bennet's hot button issues. [Vogt Decl. Ex. 4, Bennet Depo 163:20-23, 164:4-165:16; Vogt Decl. Ex. 162, PL Depo Ex. 286]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony. The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]." Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

**144.** Bennet was unaware at the time he wrote the Editorial that Palin had endorsed Michael Bennet's opponent in his 2016 senate race. Hr'g Tr. at 70:24-71:10.

**Plaintiff's Response:** Disputed. Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, when asked, "You are saying you didn't know when you wrote the editorial that Sarah Palin had endorsed your brother's opponent?" Bennet conceded "If I had known that, I didn't remember it. That's all I'm saying. It doesn't surprise me, certainly." [Doc. No. 41-34, 8/16/17 Hr'g Trans. 71:6-10]

**Defendants' Reply:** There is no genuine factual dispute. Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts and adds additional, but not contradictory, testimony.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility

and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony.

Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory

statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks

credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.

1995) ("The party opposing summary judgment may not rely simply on conclusory statements or

on contentions that the affidavits supporting the motion are not credible").

145.    Bennet was unaware at the time he wrote the Editorial that the Crosshairs Map

had included among targeted districts those of two lawmakers who had endorsed his brother.

Hr'g Tr. at 70:19-23.

**Plaintiff's Response:**  Disputed. Bennet's testimony about what he recalls reading lacks

credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812.

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not

set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but

instead makes arguments about the implications of those facts.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812,

which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility

and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony.

Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory

statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks

credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.

1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

146.    Bennet was unaware at the time he wrote the Editorial that Giffords' PAC had endorsed Senator Bennet.  Hr'g Tr. at 71:11-17.

**Plaintiff's Response:**  Disputed. Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812.

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony.  Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

147.    Linda Cohn testified that Bennet was "very concerned [about] the epidemic of gun violence," but the issue was not a "big focus" of his.  Cohn Dep. at 113:11-21.

**Plaintiff's Response:**  Undisputed Bennet was "very concerned [about] the epidemic of

gun violence." Cohn's referenced testimony about a "big focus" is irrelevant because Bennet himself testified issues involving gun control were "important to [him] personally. [Vogt Decl. Ex. 4, Bennet Depo 165:5-7]

**Defendants' Reply:**  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those fact and adds additional, but not contradictory, testimony.

148.    In response to a subpoena from Palin, Sen. Bennet stated that a reasonable search had discovered no communications with his brother James Bennet regarding threats made against his office in January 2011.  Sullivan Decl. ¶ 33, Ex. 32 at No. 7 (Non-Party Michael Bennet's Responses and Objections to a Subpoena from Plaintiff ("Sen. Bennet R&O")).

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.

149.    In response to a subpoena from Palin, Sen. Bennet stated that a reasonable search had discovered no communications with his brother, James Bennet, concerning Sen. Bennet's speeches on gun control.  Sen. Bennet R&O Nos. 8-9.

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.

150.    Bennet did not write, edit, or comment on any of Sen. Bennet's speeches on gun control.  Bennet Dep. at 62:25-63:6.

**Plaintiff's Response:**  Disputed. Bennet testified he could not "remember" editing his

brothers' speeches on gun control. [Vogt Decl. Ex. 4, Bennet Depo 62:25-63:6] Moreover, his testimony about his involvement with his brother's speeches on gun control lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Bennet also admitted to being directly involved in his brother's political career [*Id.*, Bennet Depo 63:7-16]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), because the cited passage is not to the contrary.  When asked, "Have you ever edited any of your brother's speeches that related to issues involving the second amendment?" Bennet testified, "No."  Vogt Decl. Ex. 4,, Bennet Dep. 62:25-63:4.  When asked again, "or gun control?" Bennet testified, Not that I remember, no, I don't think so."  *Id.* at 63:5-6.

Instead, the response adds unrelated allegations that misstate Bennet's testimony.  Bennet did not testify to being "directly involved in his brother's political career," but rather, testified that his involvement was limited to editing "a couple speeches" and briefly keeping his brother company during his first Senate campaign in 2010.  *Id.* at 62:13-63:24.  The cited testimony and subsequent lines read:

> Q: Were you involved in your brother's 2010 election campaign at all?
>
> A: I got permission from my boss then, David Bradley, to go out for the last couple of weeks of that campaign and I just accompanied him.· I rode around with him in the final two weeks of the campaign.· So I was involved then.
>
> Q:  You went to, like, campaign stops and things like that?
>
> A:  Yes.
>
> Q:  And why did you do that?
>
> A: Just to keep him company.

> Q: And did you do that in any other campaigns?
>
> A: No, I don't think so.· I went out to Colorado during his second campaign, but I didn't -- I didn't do the same thing.· I mean, just for a visit, but I didn't -- I didn't do the same thing, no.

*Id.* at 63:7-24.

Plaintiff's objection misstates the Second Circuit's ruling in *Palin*, 940 F.3d at 812, which spoke to the propriety of determining credibility on a motion to dismiss, not the credibility and admissibility of Bennet's testimony.  The Court can and should consider Bennet's testimony. Bennet's testimony as to his beliefs and understanding is admissible evidence, not "conclusory statement[s]."  Moreover, Plaintiff's conclusory argument that Bennet's testimony lacks credibility does not create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

**151.**    In response to a subpoena from Palin, Sen. Bennet stated that a reasonable search had discovered no communications with his brother, James Bennet, concerning Palin's endorsement of Sen. Bennet's political opponent in 2016.  Sen. Bennet R&O No. 10.

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.

**152.**    In response to a subpoena from Palin, Sen. Bennet stated that a reasonable search had discovered no communications with his brother, James Bennet, concerning gun control or gun legislation.  Sen. Bennet R&O No. 13.

**Plaintiff's Response:**  Undisputed.

**Defendants' Reply:**  None.

153.    As Editor of The Times's opinion section, Bennet sought to expand the range of voices represented, including by adding more conservative writers or contributors.  Bennet Dep. at 200:4-21; 209:22-210:24.

**Plaintiff's Response:**  Disputed for the reasons more fully explained in Paragraphs 251-262, below.

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.  *See also* Defendants' Response to Paragraphs 251-62, below.

154.    Palin concedes that, at the time the Editorial was published, "reasonable people could have interpreted either way" whether there was a "connection between the crosshairs map and Jared Loughner's motivation."  Palin Dep. at 195:14-20.; *id.* at 195:24-196:2 ("I guess it's tough for me to judge whether the public believed that there was a consensus out there as to motivation of Jared.").

**Plaintiff's Response:**  Disputed. Defendants' statement is incorrect and incomplete, as shown by Palin's full testimony on pages 194-196 of her deposition. [Vogt Decl. Ex. 9]

**Defendants' Reply:**  There is no genuine factual dispute.  Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but

instead makes arguments about the implications of those facts and adds additional, but not contradictory, testimony.

**155.** Palin concedes that, following some initial reporting that connected the Crosshairs Map and Loughner Shooting, "obviously there was not the clarification made even within The New York Times team in those years" that no such connection existed because "otherwise why would The New York Times have said it again" in the Editorial in 2017. Palin Dep. at 201:2-6.

**Plaintiff's Response:** Disputed. Defendants' statement is incorrect and incomplete, as shown by Palin's full testimony on pages 198-201 of her deposition. [Vogt Decl. Ex. 9]

**Defendants' Reply:** There is no genuine factual dispute. Plaintiff's response does not set forth any specific facts to dispute this paragraph, as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts and adds additional, but not contradictory, testimony.

## PLAINTIFF'S COUNTERSTATEMENT OF MATERIAL FACTS

### The Times

156. *The New York Times* is regarded as the "Paper of Record," reflecting the considerable weight and influence attributed to the "voice" of *The Times*. [Vogt Decl. Ex. 166 (NYT Innovation Report) at p. 22; *see also* Vogt Decl. Ex. 182, 183]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment. *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

157.    *The Times* publishes one of the oldest and most widely circulated print papers in the United States. [Vogt Decl. Ex. 159 (NYT 2019 Annual Report) at p. 6]

**Defendants' Response:**  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

158.    Over the past decade, *The Times* has been transitioning to a subscription-first, mobile-first content provider primarily dependent on digital subscriptions and digital advertising to generate revenue. [*Id.* at pp. 2, 6-7; Vogt Decl. Ex. 166 at pp. 82-84]

**Defendants' Response:**  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

159.    In its 2014 Innovation Report, The Times recognized it had fallen behind in a "critical area" in the digital age: "the art and science of getting our journalism to readers." [Vogt Decl. Ex. 166, p. 4]

**Defendants' Response:**  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

160.    The Times also acknowledged '[t]he realities of a cluttered Internet and distracted mobile world require extra effort to get our journalism to readers." [Id. at p.7]

**Defendants' Response:**  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

161.    The Times was under attack by news "startups" trying to "disrupt" its industry using new technology to offer cheaper and inferior alternatives, such as Huffington Post, Vox, Business Insider, Buzzfeed, Politico, and Twitter. [Id. at p. 17]

**Defendants' Response:**  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

162.    To compete in this challenging digital landscape, The Times shifted its focus from journalism to "audience development" through strategies such as promotion and distribution through social media and mobile platforms, tagging, search engine optimization, and similar methods of engaging readers. [Id. at pp. 24, 26] During that process, The Times integrated its journalism with its "business side." [Id. at pp. 60-61]

**Defendants' Response:**  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants

also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ.

P. 56(c)(1)(A), 56(c)(2).

Plaintiff's statement also mischaracterizes the document on which it relies. The Times

did not and has not "shifted its focus from journalism" or "integrated" its journalism and

business divisions, like Plaintiff contends.  As the document from which Plaintiff quotes states,

> The New York Times is winning at journalism. Of all the
> challenges facing a media company in the digital age, producing
> great journalism is the hardest. Our daily report is deep, broad,
> smart and engaging— and we've got a huge lead over the
> competition. At the same time, we are falling behind in a second
> critical area: the art and science of getting our journalism to
> readers. We have always cared about the reach and impact of our
> work, but we haven't done enough to crack that code in the digital
> era. . . . Our core mission remains producing the world's best
> journalism. But with the endless upheaval in technology, reader
> habits and the entire business model, The Times needs to pursue
> smart new strategies for growing our audience.

Vogt Decl. Ex. 166, p. 3.

163.    The Times also decided to be more "aggressive" in promoting itself and

implementing its competitors' standard practices for maximizing traffic. [*Id.* at p. 95]

**Defendants' Response:**  Defendants object to this statement because it is not material to

Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants

also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ.

P. 56(c)(1)(A), 56(c)(2).  Plaintiff's statement also mischaracterizes the document on which it

relies.  The cited passage states that "other companies are aggressively bringing in digital talent."

Vogt Decl. Ex. 166 at 95.

164.    During its digital-transition, The Times began developing artificial intelligence-based tools that helped them determine what content to publish and promote on social media and summarized what The Times audience was reading so it could target certain topics and connect topics with readers. [Vogt Decl. Ex. 168]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Plaintiff's statement also mischaracterizes the document on which it relies.  The press release cited by Plaintiff refers to advertising technology developed and utilized by The Times' Advertising & Marketing Group for advertising placement; it does not state that  not The Times published AI tools to help them "determine what content to publish."

165.    Among these tools, The Times developed "*Project Feels*," an artificial intelligence model that predicts readers' emotional response to content The Times publishes [Vogt Decl. Ex. 169; Vogt Decl. Ex. 5; Stile Depo 46:22-47:6], and "*ReaderScope*," an AI-driven data insights tool that summarizes what The Times' audience is reading and uses that data to visualize interest in certain topics. [*Id.* ; Vogt Decl. Ex. 5, Stile Depo 44:20-45:16]

**Defendants' Response:**  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  There is no evidence that any Times employee used these tools in connection with the Editorial.  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

166.    The Times data strategy team also built "Blossom Bot," a digital tool that predicts how articles and posts will perform on social media and suggests which stories should be promoted by drawing from enormous stores of data including information on story content and performance metrics on social media. [Vogt Decl. Ex. 15, PL Depo Ex. 272; Stile Depo 88:15-17]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment. *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  There is no evidence that any Times employee used this tools in connection with the Editorial.  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants do not dispute that The Times has a digital tool called "Blossom Bot" but deny Plaintiff's characterization, which is not supported by any admissible evidence.

167.    The Times also developed an in-house data analytics dashboard, "*Stela*," a tool that pulls in data from multiple sources and presents it in one place (a dashboard or "view"), with simplified visuals and non-jargony categories catered towards journalists to help reporters and editors get feedback on the things they are being asked to do online, such as tweaking headlines and promoting stories on social media. [Vogt Decl. Ex. 165, PL Depo Ex. 293 at pp. 1-3; Vogt Decl. Ex. 5, Stile Depo 27:20-28:17, 29:22-30:12]

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). There is no evidence that any Times employee used this tool in connection with the Editorial. Defendants do not dispute that The Times has a data analytics dashboard called Stela, which

"will show the pageviews of a given article over time, Vogt Decl. Ex. 5, Stile Dep. 28:4-6, but dispute the remaining allegations in this statement, which are not supported by admissible evidence.

168.    Stela pulls in data from The Times' desktop and mobile websites, as well as all of The Times' mobile apps, as well as third-party data sources like Google analytics and Chartbeat, to provide data on specific articles, such as pageviews, referrals, top comments from social media, information on what social posts are performing the best, and the "conversation" surrounding a story. [Vogt Decl. Ex. 165, PL Depo Ex. 293 at p. 4; Vogt Decl. Ex. 5, Stile Depo 31:14-43:18]

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). There is no evidence that any Times employee used this tool in connection with the Editorial. Defendants do not dispute that The Times has a data analytics dashboard called Stela, but dispute the remaining allegations in this statement, which are not supported the cited testimony or any other admissible evidence.  *See* Vogt Decl. Ex. 5, Stile Dep. 33:13-34:19 (testifying that Stela does *not* pull in data from Chartbeat, Google Analytics, or other third parties, but is "primarily powered from our internal system").

169.    The Times uses these tools for content strategy—deciding which topics to write about and promote on social media. [Vogt Decl. Ex. 169]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  There is no

evidence that any Times employee used this tool in connection with the Editorial.  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

170.    The Times actively promotes content in several ways, such as on its social media accounts (i.e. Facebook and Twitter), homepage, through news alerts and newsletters, and similar strategies. [Vogt Decl. Ex. 159 at pp. 46-49]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants do not dispute that The Times promotes content in the specified ways but object to the phrase "similar strategies" as unclear and ambiguous.

171.    As The Times was transitioning from a traditional print publication to primarily a digital platform, it also eliminated its Public Editor position—which was responsible for holding The Times accountable for its journalism ethics and standards—and replaced it with a "Reader Center," described as "faux-accountability" system. [Vogt Decl. Ex. 153 ("The Public Editor Signs Off"); Vogt Decl. Ex. 154, ("Reader Center Already Proving a Step Backward"); Vogt Decl. Ex. 171, Ingber Depo Ex. D; Vogt Decl. Ex. 155]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

### The Editorial Board

172.    The Editorial Board represents the "loud and far-reaching voice" of The Times. [Vogt Decl. Ex. 11; PL Depo. Ex. 1 at p. 4]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

Plaintiff's statement also mischaracterizes the document on which it relies.  The cited exhibit itself states, "[t]he editorial board is the voice of its board, its editor and the publisher of The Times. . . . [I]t is most emphatically NOT the voice of the newsroom, which is run by Executive Editor Bill Keller and is entirely separate from my department." Vogt Dec. Ex. 11.

173.    In 2017, *The Times'* Editorial Board was comprised of 16 experienced journalists with varying focuses of expertise, led by its editor, James Bennet ("Bennet"). [FAC ¶¶ 33-34]

**Defendants' Response:**  Undisputed, though Defendants object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

174.    In June 2017, the Editorial Board members and Opinion staff included, among others, the following individuals who worked on "*America's Lethal Politics*":

  a. Bennet: the editorial page editor of The New York Times, in charge of the Opinion department. [Vogt Decl. Ex. 209 at p.1]

  b. Robert B. Semple Jr. ("Semple"): Editorial Board Member who served as an Associate Editor and senior statesman of the Editorial department, who "had worked at The Times for 50·years-ish, if not more [and]... at that point, he was technically an editor of the -- for the page, but he read and shaped the language in a lot of our editorials with Linda [Cohn] and Nick

[Fox], I guess, at that point." Semple since retired from The Times. [Id. pp. 1-2; Vogt Decl. Ex. 7, Lett Depo 43:5-12, 77:4-13; Vogt Decl. Ex. 6, Cohn Depo 14:19-24];

c.     Linda Cohn ("Cohn"): Editorial Board Member who served "as an editor at the Editorial page since 1988, beating the arrival of the Internet by years [who] worked with Op-Ed columnists, most recently Paul Krugman and Ross Douthat. She retired in November 2017. [Vogt Decl. Ex. 209, p. 2; Vogt Decl. Ex. 6, Cohn Depo 12:10-14:9, 11:20-12:2];

d.     Nick Fox ("Fox"): Editorial Board Member who served as an Editor at the Editorial page and had worked for The Times since 1995. [Vogt Decl. Ex. 209, p. 2; Lett Depo 43:5-12];

e.     Jesse Wegman: Editorial Board Member who joined the board in 2013 and who's expertise included The Supreme Court and Legal Affairs. [Vogt Decl. Ex. 209, p. 4];

f.     Elizabeth Williamson ("Williamson"): Editorial Board Member who joined the board in 2015 and focused on National Politics and Congress [Vogt Decl. Ex. 209, p. 5] Before joining The Times, Williamson worked as a reporter for the Wall Street Journal's Washington D.C. special projects team, writing features about national politics and the culture of Washington. [Id.]

g.     Eileen Lepping ("Lepping"): Researcher for Editorial Board since 2007, who served as the "main" fact-checker in 2017. [Vogt Decl. Ex. 2, Lepping Depo 18:18-20:15; Vogt Decl. Ex. 7, Lett Depo 28:13-19]

h.     Phoebe Lett ("Lett"): Editorial Board research, administrative, and editorial assistant who performed various administrative tasks and helped fact-check pieces. [Vogt Decl. Ex. 7, Lett Depo 23:17-25:10, 27:4-28:4; Vogt Decl. Ex. 172, Lett Depo Ex. A; Vogt Decl. Ex. 6, Cohn Depo 16:5-7]

**Defendants' Response:** Undisputed.


175.     Cohn, Lepping, Lett, Bennet, and Fox "were all on the team that took the writing and edited it, fact checked it, had it copy edited, and ready to be published." [Vogt Decl. Ex. 7, Lett Depo 76:19-77:3]

**Defendants' Response:** Undisputed.

## The Times Professed Journalistic Standards

176.    The Times admittedly holds itself to a higher standard of care with respect to seeking and publishing the truth. [Vogt Decl. Ex. 159, PL Depo Ex. 280 at p. 1 ("Our mission [is] to seek the truth...")]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment. *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2). Defendants also object to the phrase "higher standard of care"" as a legal term of art and ambiguous in this context.

It is undisputed that The Times seeks and endeavors to publish the truth. The actual quotation, from which Plaintiff excerpts, reads as follows:

> "Independent journalism is the foundation of everything we do as a company. It's the heart of our mission to seek the truth and help people understand the world. It's the core of our business strategy to make journalism so good that it's worth paying for. But it's more than that. It's the foundation of our democracy, and it's the reason all of us are here, working so hard to support an informed and engaged public." – A. G. Sulzberger, Publisher

Vogt Decl. Ex. 159 at 1.

177.    "The central mission of The New York Times is to help people understand the world by providing them with trustworthy, deeply reported, independent and timely news and information." [*Id.* at p. 2]

**Defendants' Response:** Defendants do not dispute that The Times seeks to provide its readers with trustworthy, deeply reported, independent and timely news and information, but Defendants object to this statement because it is not material to Defendants' Motion for

Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

178.    The Times holds itself to "the highest standards of journalistic ethics." [Vogt Decl. Ex. 12, PL Depo Ex. 2 at p. 2]

**Defendants' Response:**  Defendants do not dispute that, "In keeping with its solemn responsibilities under the First Amendment, The Times strives to maintain the highest standards of journalistic ethics," but Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

179.    The Times' adopted standards apply to the newsroom and opinion section alike. [*Id.*, PL Depo Ex. 2 at p. 2 ("These guidelines generally apply to all members of the news and editorial departments whose work directly affects the content of the paper...")]

**Defendants' Response:** Undisputed, but Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

180.    In June 2017, The Times and Bennet were bound by The Times' Ethical Journalism Handbook of Values and Practices for the News and Editorial Departments [Vogt

Decl. Ex. 12, PL Depo Ex. 2] and the Guidelines on Integrity [Vogt Decl. Ex. 13, PL Depo Ex. 3; Vogt Decl. Ex. 4, Bennet Depo 70:24-73:12]

**Defendants' Response:**  Defendants do not dispute that *Ethical Journalism* and *Guidelines on Integrity* guide The Times, but dispute Plaintiff's characterization of the cited testimony and document and dispute that *Guidelines on Integrity* specifically applied to Bennet or the opinion division.  *See* Defendants' Reply to Paragraph 4, above.

181.    When it comes to facts—verifiable pieces of information—editorials are no different than any other article in *The Times*—the Editorial Board's policy is that if something is represented as a fact, it has to be correct. [Vogt Decl. Ex. 11, PL Depo Ex. 1 at p. 3; Vogt Decl. Ex. 6, Cohn Depo 29:5-10]

**Defendants' Response:** Undisputed.

182.    The Times' Editorial Department "ensures" facts are correct "[t]he same way the newsroom does, by reporting." [Vogt Decl. Ex. 11, PL Depo Ex. 1 at p. 2]

**Defendants' Response:** Undisputed, but Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

183.    The Editorial Board relies upon the news pages of *The Times* (and other papers) for facts to support editorials. [Vogt Decl. Ex. 11; Vogt Decl. Ex. 2 Lepping Depo 77:11-78:15]

**Defendants' Response:** Undisputed, except that Defendants dispute any suggestion that the Editorial Board conducts research exclusively through these means.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement to the extent it relies on documents that are not admissible as evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

184.    Editorial Board writers have the first and primary responsibility for fact-checking, although they are "backed up" by the editors who edit their editorials, staff researchers and copy editors. [Vogt Decl. Ex. 1, PL DEPO EX 1 at p. 4; Vogt Decl. Ex. 6, Cohn Depo 29:13-31:19; Vogt Decl. Ex. 2, Lepping Depo 25:3-6; Vogt Decl. Ex. 3, Williamson Depo 68:1-6]

**Defendants' Response:** Undisputed.

185.    With respect to the Editorial at issue in this case, Bennet was responsible for fact-checking the portions he re-wrote. [Vogt Decl. Ex. 3, Williamson Depo 67:14-68:6]

**Defendants' Response:**  Disputed, to the extent this statement mischaracterizes Williamson's testimony, which read as follows:

> Q:  And, so, would Mr. Bennet have been responsible for fact checking the portions that he rewrote?
> A.  He would be responsible for checking the portions that he wrote as assisted by the fact checkers, yes.

Vogt Decl. Ex. 3, Williamson Dep. 68:1-6.

186.    The relevant policies governing The Times and Bennet from the Ethical Journalism Handbook (PL DEPO EX 2) provide:

A.     "DUTY TO READERS": "In print and online, we tell our readers the complete, unvarnished truth as best we can learn it. It is our policy to correct our errors, large and small, as soon as we become aware of them. [Vogt Decl. Ex. 12 at p. 5]

B.     "FAMILY TIES": A spouse or companion who runs for public office would obviously create the appearance of conflict for a political reporter or an editor involved in election coverage. A brother or daughter in a high-profile job on Wall Street might produce the appearance of conflict for a business reporter or editor...To avoid such conflicts, staff members may not write about people to whom they are related by blood or marriage or with whom they have close personal relationships, or edit material about such people or make news judgments about them. [*Id.* at p. 24]

**Defendants' Response:**  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

Defendants do not dispute the contents of *Ethical Journalism* and *Guidelines on Integrity*, but dispute Plaintiff's characterization of these documents and dispute that *Guidelines on Integrity* specifically applied to Bennet or the opinion division.

187.     The Guidelines On Integrity provide that "it is imperative that The Times and its staff maintain the highest possible standards" and practice daily journalism which must be "beyond reproach" (PL Depo Ex. 3 at p. 1) including the following specific practices:

a.     Fact Checking: Writers at The Times are their own principal fact checkers and often their only ones...If deadline pressure requires skipping a check, the editors should be alerted with a flag like "desk, please verify," but ideally the writer should double back for the check after filing; usually the desk can accommodate a last-minute repair... [Vogt Decl. Ex. 13 at pp. 2-3]

b.     Corrections: Because our voice is loud and far-reaching, The Times recognizes an ethical responsibility to correct all its factual errors, large and small...any complaint should be relayed to a responsible supervising editor and investigated quickly. If a correction is warranted, *fairness*

> ***demands that it be published <u>immediately</u>. In case of reasonable doubt
> or disagreement about the facts, we can acknowledge that a
> statement was "imprecise" or "incomplete" even if we are not sure it was wrong.***
> [Vogt Decl. Ex. 13 at pp. 3-4 (emphasis added)]

**Defendants' Response:**  Defendants object to this statement because it is not material to

Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants

also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ.

P. 56(c)(1)(A), 56(c)(2).

Plaintiff's statement also mischaracterizes the document on which it relies. Certain of

Plaintiff's ellipses have altered the meaning of paragraph a by implying that deadline pressure

permits all fact-checking to be skipped. This is not so. The paragraph actually reads, in pertinent

part:

> Writers at The Times are their own principal fact checkers and
> often their only ones. . . . *Concrete facts—distances, addresses,
> phone numbers, people's titles—must be verified by the writer with
> standard references . . . . More obscure checks may be referred to
> the research desk.* If deadline pressure requires skipping a check,
> the editors should be alerted with a flag like "desk, please verify,"
> but ideally the writer should double back for the check after filing;
> usually the desk can accommodate a last-minute repair . . . .

Vogt Decl. Ex. 13 at 3-4.

Defendants do not dispute that *Ethical Journalism* and *Guidelines on Integrity* guide The

Times, but dispute Plaintiff's characterization of the cited testimony and document and dispute

that *Guidelines on Integrity* specifically applied to Bennet or the opinion division.


188.    Bennet confirmed he and The Times followed the policies embodied in The

Times Ethics Handbook and Guidelines on Integrity in June 2017. [Vogt Decl. Ex. 4, Bennet

Depo 70:24-71:9, 73:6-15; 74:24-75:12]

**Defendants' Response:** Undisputed.

189.    Bennet also confirmed he was not aware of any situation where a correction was made that involved an issue on which there was reasonable doubt or disagreement about the facts or where he acknowledged that a statement was imprecise or incomplete. [*Id.*, Bennet Depo 75:20-76:10]

**Defendants' Response**: Disputed, to the extent that this statement misstatements the cited testimony, which reads:

> Q.  Were there situations involving corrections that you're aware of where there was reasonable doubt or disagreement about the facts, so you or your department acknowledged that a statement in an editorial was imprecise or incomplete?
>
> A.  *I don't remember if* there's been an occasion like that.

Vogt Decl. Ex. 4, Bennet Dep. 76:4-10 (emphasis added).  Defendants also object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).

190.    The Times' correction policy is further explained in its Manual of Style and Usage [Vogt Decl. Ex. 160], which provides:

> **corrections**. Because its voice is loud and far-reaching, The Times recognizes an ethical responsibility to correct all its factual errors, large and small (even misspellings of names), promptly and in a prominent reserved space in the paper. A correction serves all readers, not just those who were injured or complained, so it must be self-explanatory, tersely recalling the context and the background while repairing the error...If a correction is warranted, it should follow immediately...For the handling of more general lapses (those of fairness, balance and perspective), *see* editor's notes.

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment. *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2). Plaintiff's statement also mischaracterizes the document on which it relies, which reads in pertinent part:

> **corrections**. Because its voice is loud and far-reaching, The Times recognizes an ethical responsibility to correct all its factual errors, large and small (even misspellings of names), promptly and in a prominent reserved space in the paper. A correction serves all readers, not just those who were injured or complained, so it must be self-explanatory, tersely recalling the context and the background while repairing the error. *A complaint from any sources should be relayed to a responsible editor and investigated quickly.* If a correction is warranted, it should follow immediately. *In the rare case of a delay longer than a month, the correction should include an explanation (saying, for example, how recently the error was discovered, or why the checking took so long). If the justification is lame or lacking, the correction should acknowledge a reporting or editing lapse.*
> . . .
> For the handling of more general lapses (those of fairness, balance and perspective), *see* editor's notes.

Ex. 160 at 5-6.

191. Bennet defined an "editor's note" as "usually not a correction of fact—although it can be that as well...corrections are much more our standard way of addressing mistakes that are made in the paper. And editor's notes tend to be reserved for those occasions, I think, when The Times is addressing a body of work, like the Iraq war coverage." [Vogt Decl. Ex. 4, Bennet Depo 76:21-77:10]

**Defendants' Response:** Undisputed, except that the cited testimony reads, in full, as follows: "An editor's note is usually not a correction of fact -- although it can be that, as well.

134

We've done editor's notes for things like --from my memory, anyway, reflecting on the tone and tenor of The Times' Iraq war coverage when an editor wanted to express regret about it, I think." Vogt Decl. Ex. 4, Bennet Depo 76:22 – 77:3.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).

192.    Following several prominent factual errors by The Times over recent years, The Times recognized the need to slow down and fact-check its work. [Vogt Decl. Ex. 15, PL Depo Ex. 7 ("Systemic Change Needed After Faulty Times Article," L. Spayd, Dec. 18, 2015); Vogt Decl. Ex. 16, PL Depo Ex. 8 ("*Time, the Enemy*," A. Brisbane, Jan. 15, 2011)]

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

Plaintiff cites two columns by Margaret Sullivan and Arthur Brisbane, two former Public Editors of The Times, who do not speak on behalf of The Times itself, and mischaracterizes those columns.  Neither Sullivan nor Brisbane write that The Times does not "fact check its work."

193.    Bennet likewise held himself to the principle that "a writer must listen carefully, question everybody's assumptions, including his own." [Vogt Decl. Ex. 112, PL Depo Ex. 191 at p. 2; Vogt Decl. Ex. 4, Bennet Depo 68:2-69:13]

**Defendants' Response:**  Defendants do not dispute Bennet's testimony, which reads:

Q:  There's a quote attributed to you in this·writer piece that we
started looking at, Exhibit 191.  It's about in the middle of the page
on the cover page of the article.· It says, "'Charlie impressed upon
me that nobody is 100 percent right.· So a writer must listen
carefully, must question everybody's assumptions, including his
own,' Bennet says." Do you see that?
A:  Yeah, I do.

Q:  Is that a correct quote from you?

A:  I don't know that it's an absolutely correct quote.· It's the kind
of thing I would say. It's a sentiment that I certainly recognize.

Q:  Is that the way that you practice journalism?

A:  It's the way I aspire to practice journalism.

Vogt Decl. Ex. 4, Bennet Dep. 68:2-19.

194.     Ultimately, Bennet acknowledged he is responsible for the accuracy of each and

every editorial published by *The Times*, particularly the editorials which he authors and edits.

[Vogt Decl. Ex. 4, Bennet Depo 13:8-24; Vogt Decl. Ex. 3, Williamson Depo 65:16-68:6]

**Defendants' Response:** Disputed.  Plaintiff's statement mischaracterizes the cited

testimony, which states as follows:

Q:  When you say you oversee all of the editorial page, what do
you mean by "oversee"?

A:  I'm the -- I'm the ultimate manager of the department; the
decision maker, in the end, of the department; and I'm ultimately
responsible for the journalism that we produce.  That doesn't mean
I write everything that we do, commission every story, edit every
story. In fact, I don't, only a very small number of them.· But I'm
the person who hires the people who do that work.  I don't review
every one of those people, but I review ultimately all the managers
of those people and I'm the -- I'm the, effectively, the editor-in-
chief of the opinion journalism, I guess.  Maybe that's not a helpful
comparison, but I -- I'm the ultimate -- you know, I'm the top editor
with the ultimate responsibility for our work.

Q:  Do you personally review all of the pieces that are published in
the editorial section?

A:  No.

Q:  Do you personally approve every piece before it's published?
A:  No.

Q: Are you aware of all of the pieces that are  published in the
editorial section before they are actually published?

A:  No.

Vogt Decl. Ex. 4, Bennet Dep. 13:8-14:10; *see also* Paragraph 6, above.

195.    The Times also publicly pronounced its devotion to "transparency" in its editorial
and fact-checking processes ("We should be much more transparent than we were in the past.
We should tell people how we do things. We should be open about how we make decisions.")
[Vogt Decl. Ex. 157 at p. 2 (quoting Dean Baquet)]

**Defendants' Response:**  Defendants do not dispute the quotation from Baquet, but
dispute Plaintiff's characterization of it.  Defendants also object to this statement because it is not
material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).
Defendants also object to this statement because it is not supported by any admissible evidence.
Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

## The Times' Subverts its Principles to Profits

196.    In the digital landscape, The Times operates in a "highly competitive environment
where it competes for subscription and advertising revenue with both traditional and other
content providers, as well as search engines and social media platforms." [Vogt Decl. Ex. 159 at
p. 11]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants also object to the heading of this section as it is unsupported argument, rather than a statement of fact.

197.    In this digital environment, The Times' "ability to compete depends on, among other things, audience engagement, its ability to reach new users, and its visibility on search engines and social media platforms and in mobile app stores." [*Id.* at p. 11]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

198.    As she was being ousted from The Times shortly before the Editorial was published, The Times' Public Editor, Liz Spayd, noted that, "Digital disruption and collapsing business models get all the attention, but the prospect of major media losing its independence, and its influence, ranks equally high among the industry's perils." [Vogt Decl. Ex. 153 ("The Public Editor Signs Off" at p. 2]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

199.    Spayd also recognized The Times' elimination of its Public Editor position showed the paper's move away from "institutional integrity," demonstrated an unwillingness to seriously listen to criticism and doubt the impulses and wisdom of its inner sanctum, and was leading to "morph[ing] into something more partisan, spraying ammunition at every favorite target and openly delighting in the chaos." [*Id.* at pp. 2-3]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Plaintiff's statement also mischaracterizes the cited document, which states:

> There probably hasn't been a time in recent American history when the role of the media was more important than now. The Trump administration is downing in scandal, the country is calcified into two partisan halves. *And large newsrooms are faced with a choice: to maintain an independent voice, but one as aggressive and unblinking as the days of Watergate. Or to morph into something more partisan, spraying ammunition at every favorite target and openly delighting in the chaos*.

Vogt Decl. Ex. 153 at 3.  A full five paragraphs later, after extolling the virtue of independent and non-partisan reporting by newsrooms, the document continues:

> [A public editor is] not really about how many critics there are, or where they're position, or what Times editor can be rounded up to produce answers. It's about having an institution that is willing to seriously listen to that criticism, willing to doubt its impulses and challenge the wisdom of the inner sanctum. *Having the role was a sign of institutional integrity and losing it sends an ambiguous signal: Is the leadership growing weary of such advice or simply searching for a new model? We'll find out soon enough*.

*Id.* at 4.

## The Times Systemic Bias

200.    The Times has a Left-leaning media bias. [Vogt Decl. Ex. 185]

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants also object to the heading of this section as it is unsupported argument, rather than a statement of fact.

201.    The Editorial Board and Opinion pages have a Left media bias. [Vogt Decl. Ex. 186]

**Defendants' Response:** Disputed.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

202.    One review of the Editorial Board found it to be "consistently left" and "could not find even one example of an editorial piece with a Center or Right perspective." [Id.]

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

203.    This review concluded:

> [T]he New York Times Editorial Board never writes favorably or
> sympathetically about the Republican Party, its members and
> ideas. We found The New York Times Editorial Board engages in
> some sensationalism around issues, contributing to its Far Left
> Stance...The New York Times Editorial Board consistently
> displays a Far Left stance on policies and issues of the day.

[ Id.]

**Defendants' Response:** Defendants object to this statement because it is not material to

Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants

also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ.

P. 56(c)(1)(A), 56(c)(2).

204.    In June 2016, when she first took over as The Times' Public Editor, Liz Spayd,

wrote about public perception about The Times' bias—which she described as "poison." [Vogt

Decl. Ex. 187, ("*Why Readers See The Times as Liberal*")]

**Defendants' Response:** Defendants object to this statement because it is not material to

Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants

also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ.

P. 56(c)(1)(A), 56(c)(2).  Defendants further object that the Public Editor does not speak on

behalf of The Times itself.

205.    After noting that The Times' coverage "is in fact biased," Spayd called out The

Times' "home page...[a]nchoring its top right corner is the Opinion section, which promotes the

columns and editorials of its mostly liberal writers." [Id. at p. 2] "'Readers know the difference

between opinion and news,' you'll often hear. I'm not sure all do, especially when the website

makes neighbors of the two and social platforms make them nearly impossible to tease apart."

[Id.]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants further object that the Public Editor does not speak on behalf of The Times itself.  Plaintiff's statement also mischaracterizes the cited document, which makes the exact opposite point from what Plaintiff's asserts:

> Why is it that conservatives, and even many moderates, see in The Times a blue-state worldview? *Let's set aside for now the core of their criticism — that the coverage is in fact biased. I'll be turning to that as I settle into the job.* My focus here is only on the perceptions. Because while one might debate the substance of the claims, the building blocks that created them are in plain sight.

Vogt Decl. Ex. 187.


206.    Spayd made specific note of "the placement of an editorial calling for gun control on the front page last December, which garnered a record number of comments, was shrill proof of the kind of Times bias they expect." [Id. at p. 3]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants further object that the Public Editor does not speak on behalf of The Times itself.

207.     Spayd went on to say, "WHAT'S happening at The Times isn't only about The Times. It's part of the fracturing media environment that reflects a fractured country. That in turn leads liberals and conservatives toward separate news sources. A Pew Research Center survey two years ago found that liberals are flocking to The Times, with 65 percent of its readers possessing political values that were left of center." [Id. at p. 3]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants further object that the Public Editor does not speak on behalf of The Times itself.

208.     Spayd concluded with, "Imagine a country where the greatest, most powerful newsroom in the free world was viewed not as a voice that speaks to all but as one that has taken sides...Or has that already happened?" [Id. at p. 4]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants further object that the Public Editor does not speak on behalf of The Times itself.

209.     The Times' gun control editorial Spayd mentioned (see Paragraph 206, above), "End the Gun Epidemic in America," was published December 15, 2015. This Editorial ran on the front page of the newspaper—the first time an editorial has such placement since 1920. [Vogt

Decl. Ex. 188 ("*End the Gun Epidemic in America*"); *see also* Vogt Decl. Ex. 189

("*Conservatives take shots at New gun control editorial*," T. Kludt, CNN, Dec. 7, 2015, at p. 2

("The Times generated quite the stir with its Saturday editorial on the "gun epidemic." It was the

first time the newspaper ran an editorial on page one since 1920, when it expressed regret over

the nomination of Warren G. Harding")]

**Defendants' Response:** Defendants object to this statement because it is not material to

Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants

also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ.

P. 56(c)(1)(A), 56(c)(2).  Defendants further object that the Public Editor does not speak on

behalf of The Times itself.


210.    The Times and its Editorial Board hold a well-established history of bias

concerning Second Amendment rights and gun control, even publishing a book on the subject.

[Vogt Decl. Ex. 11, PL Depo Ex. 1 at p. 8; Vogt Decl. Ex. 161, PL Depo Ex. 285 ("*Gun Control:*

*Changing Perspectives*"); Vogt Decl. Ex. 162, PL Depo Ex. 286; Vogt Decl. Ex. 30, PL Depo

Ex. 30]

**Defendants' Response:**   Defendants do not dispute that the Editorial Board has taken

positions in favor of gun control or sensible gun regulations, but dispute Plaintiff's

characterization of that position as "bias concerning Second Amendment rights."   Defendants

also object to this statement because it is not supported by admissible evidence.  *See* Fed. R. Civ.

P. 56; L.R. 56.1(a).

211.     They also have a history of bias against Sarah Palin. [*See, e.g.*, Vogt Decl. Ex. 17,

PL Depo. Ex. 10; Vogt Decl. Ex. 18, PL Depo. Ex. 11]

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not

material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).

Defendants also object to this statement because it is not supported by any admissible evidence.

Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).


212.     Hannah Ingber, who was tapped to lead The Times Reader Center shortly before

the Palin Editorial was published, once attacked Palin for being a mother while running for Vice

President:

> Watching Sarah Palin accept the Republican nomination for vice
> president, all I could think was that I am so grateful my mother did
> not run for president or VP while I was a baby. This is hardly good
> judgment on Palin's part.
> ...
> But running on a national ticket months after your child was born?
> Let alone a son who has Downs Syndrome and therefore under the
> best of circumstances is going to need every last bit of attention.
> How can one possibly be an involved and nurturing parent while
> campaigning in such a heated race?
> You can be a great mother and work. But you can't be a great
> mother and work 80 hours a week. There is no way you are a great
> mother if you are not there...

[Vogt Decl. Ex. 170, Ingber Depo Ex. D]

**Defendants' Response:**  Defendants object to this statement because it is not material to

Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Ingber had

nothing to do with writing, editing, or publishing the Editorial.  Defendants also object to this

statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A),

56(c)(2).

213.     Bennet described Palin as "in over her head," "lacking sufficient preparation,"
and "polarizing." [Vogt Decl. Ex. 4, Bennet Depo 133:3-11, 134:14-17]

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not
material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).
Plaintiff's statement mischaracterizes Bennet's testimony.  When asked to describe Palin and
expressly asked to state his criticisms of her, Bennet testified:

> Q:  If you were trying to describe Sarah Palin to someone who
> knew nothing about her, how would you describe her?
>
> A:  Today?
>
> Q:  Yes.
>
> A:  I'd say she was a former vice president --former governor of
> Alaska and former vice presidential candidate for the Republican
> party on a ticket with John McCain who, you know, remained kind
> of a political figure but also transitioned a bit to being a kind of
> pop cultural figure.
>
> Q:  Would you have anything negative to say about her if you were
> describing her?
>
> A:  Well, it depends what I was asked, I guess. If you asked me --
> if I was asked to volunteer a description, I would give the one I just
> gave.· If someone asked me more specifically, well, I mean -- are
> you asking me do I have something bad to say about Sarah Palin?·
> I don't generally volunteer something bad about people when I'm
> asked a description of them.· That's not my way.
>
> Q:  If you did have anything negative to say about her, what would
> it be?
>
> A:  I would say that I thought that she was in over her head as a
> vice presidential candidate, that she didn't have sufficient
> preparation to take on the role. I thought she was a tremendously
> charismatic politician. I actually do remember the speech she gave
> when she kind of appeared on the stage and -- at the convention.
> And the other thing I would say if I was trying to say something
> bad about her is, I guess, I was disappointed when she stepped
> down as governor of Alaska. I didn't think that that was the right

thing to do. When a politician runs for office and takes on that responsibility of public service, I feel like they should see it through.

Q:  Do you know why she stepped down?

A:  I don't remember why.· And there may have been very good personal reasons for it, which is why I would be loath to volunteer that as a criticism. But I also remember that she went on --well, I'm mixing all this stuff up and I haven't --you know, I haven't gone back to research because I don't want to -- as part of this process, I haven't -- but I remember she did a television show, and I don't know if that followed immediately on the stepping down from governor or not.· That's what I'm referring to about her sort of pursuing a career in the popular culture.  And I understand she was recently on one of those, you know, singing programs.

Q:  Masked Singer?

A:  Is that what it was?  Yes.· I didn't see it.  We watched that once with our kids, but I didn't see that episode. To use the word you used earlier, again --I'm going on here -- she was a -- I would say she was a polarizing figure, to use the words you used about Andrew Sullivan.

Q:  And that's common in politics, isn't it, for people at the forefront to be polarizing?

A:  That's true.

Vogt Decl. Ex. 4, Bennet Dep. 132:6 – 134:20.

214.    Within The Times, Gov. Palin was also seen as a convenient target for attacks against conservative policies and a subject likely to spark readership interest, as described by Charles M. Blow in his column "She Who Must Not Be Named" [Vogt Decl. Ex. 19, PL Depo Ex. 12]:

> She was a vice presidential nominee. But she lost. She was the governor of Alaska. But she quit. Now she's just a political personality — part cheerleader, part bomb-thrower — being kept afloat in part by the hackles of her enemies and the people who

admire her resilience in the face of them. The left's outsize and
unrelenting assault on her has made her a folk hero. The logic goes
that if she's making people on the left this upset, she must be doing
something right.

Yet the left continues to elevate her every utterance so that they
can mock and deride her. The problem is that this strategy
continues to backfire. The more the left tries to paint her as one of
the "Mean Girls," the more the right sees her as "Erin
Brockovich." The never-ending attempts to tear her down only
build her up. She's like the ominous blob in the horror films: the
more you shoot at it, the bigger and stronger it becomes.

Yes, she's about as sharp as a wet balloon, but we already know
that. How much more time and energy must be devoted to
dissecting that? How is this constructive, or even instructive at this
point? What purpose does it serve other than inflaming passions to
drive viewership and Web clicks?

As Politico's editor in chief, John F. Harris, and its executive
editor, Jim VandeHei, very candidly expressed in August: "More
traffic comes from an item on Sarah Palin's 'refudiation' faux pas
than from our hundreds of stories on the complexities of health
care reform or Wall Street regulation." So left-leaning blogs like
The Huffington Post plaster pictures of her and her family all over
their sites with entries about her latest gaffe or sideswipe. But she's
barely mentioned on popular conservative blogs.

The same leftward skew is also true on television. An analysis of
CNN, MSNBC and Fox News from Nov. 3 to Dec. 2, using data
from ShadowTV, a monitoring service, found that CNN mentioned
the name "Sarah Palin" nearly 800 times... Left-leaning MSNBC
mentioned it nearly 1,000 times. But Fox News, which employs
her, mentioned it fewer than 600 times... People on the left seem to
need her, to bash her, because she is, in three words, the way the
left likes to see the right: hollow, dim and mean. But since she's
feeding on the negativity, I suggest three other words: get over it.

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not

material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).

Defendants also object to this statement because it is not supported by any admissible evidence.

Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Plaintiff' statement also mischaracterizes the cited

document, which does not make any statement about The Times, The Times' view of Palin, or any particular Times' employee's view of Palin.

215.    In an increasingly competitive digital media landscape, attacking Gov. Palin in the context of gun control issues was the type of biased, partisan "spraying [of] ammunition at [a] favorite target and openly delighting in the chaos" [Vogt Decl. Ex. 153 ("The Public Editor Signs Off")] attack Blow recognized scores political points with readers and stirs controversy to drive viewership and bring an economic benefit to The Times' business. [Vogt Decl. Ex. 19, PL Depo Ex. 12]

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).   Defendants also incorporate by reference their response to Paragraph 199.

216.    On the flip side, Bennet acknowledged he has never called out the Left for employing the same type of "rhetoric," images, and terminology he attacked Gov. Palin for using. [Vogt Decl. Ex. 4, Bennet Depo 101:10-102:3; 102:11-103:10, 106:9-120:8; Vogt Decl. Ex. 129, 130, 131, 133, PL Depo Ex. 216, 216(A), 217, 220]

**Defendants' Response:**  Disputed.  This statement mischaracterizes Bennet's testimony. *See* Reply to Paragraph 91, above.

217.   Bennet's bias runs so deep he does not consider the following graphics posted by the DCCC and DLC to be "incitement" or the same thing as Palin's Map [Vogt Decl. Ex. 4, Benet Depo. 114:16-118:7]:







**Defendants' Response:**   Disputed.  This statement mischaracterizes Bennet's testimony.
Nowhere in the cited testimony (or elsewhere) does Bennet testify that he did not consider the
documents below to be "incitement."   Defendants also object to this statement because it is not
material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).

### The Times Marketed Itself on the Promise to Tell the Truth

218.    Following the 2016 election of Donald Trump, The Times pledged to rededicate
itself to accurate reporting and publishing "the complete, unvarnished truth as best we can learn
it." [Vogt Decl. Ex. 118, PL Depo Ex. 201A]

**Defendants' Response:**  Defendants object to this statement because it is not material to
Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants
also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ.
P. 56(c)(1)(A), 56(c)(2).

219.    This supposed rededication to accuracy coincided with The Times' new
advertising campaign, "The Truth Is Hard," which debuted at the Academy Awards in February
2017. [Vogt Decl. Ex. 150]

**Defendants' Response:** Defendants object to this statement because it is not material to
Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants
also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ.
P. 56(c)(1)(A), 56(c)(2).

220.    Bennet promoted this "Truth" advertising campaign on his personal Twitter
account. [Vogt Decl. Ex. 158]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

221.     Among other things, this advertising campaign included merchandise marketed to children, such as its Truth poster, and on shirts, buttons and mugs. [Vogt Decl. Ex. 152]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

222.     Through its Truth campaign, The Times used its commitment to publishing the "Truth" to convince the public to buy subscriptions: "Support fact-based journalism" by subscribing to The Times, while professing "Truth. It has no alternative... it comes at a cost... [and]... It's hard to find. But easier with 1,000+ journalists looking." [Vogt Decl. Ex. 151, PL Depo. Ex. 254]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

223.    The Times prominently featured its advertisements, such as "The Truth is more important now than ever." on billboards in Manhattan [Vogt Decl. Ex. 14, PL Depo Ex. 6 at p. 2]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).


224.    The Times' Truth campaign worked; earning 5.12 billion impressions, $16.8 million in media value, won more subscribers for The Times in 24 hours than the paper had gained in the preceding 6 weeks, and launched The Times to record subscription growth in 2017 (passing 2 million digital-only subscribers in the second quarter of 2017, a first for any news organization. [Vogt Decl. Ex. 190 ("*The New York Times 'Truth' Campaign Drives Digital Subscriptions*"); Vogt Decl. Ex. 207 (NYT Quarterly Reports)]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).


## The Times' Hypocrisy

225.    ***In practice***, while drastically increasing profit on the promise of purveying Truth, The Times and its Editorial Board were plagued by factual errors they openly recognized but internally never implemented institutional changes to correct:

       a.    No changes were implemented after The Times acknowledged its major errors in covering the Loughner

shooting Vogt Decl. Ex. 16, PL Depo. Ex. 8; Vogt Decl. Ex. 8, Douthat Depo 59:3-23];

b.     No changes were implemented after Liz Spayd noted the need for "systemic change" to address failure of sufficient skepticism at every level of the reporting and editing process." [Vogt Decl. Ex. 15, PL Depo Ex. 7; Vogt Decl. Ex. 2, Lepping Depo 31:4-33:11];

c.     No changes were implemented by Bennet when, shortly before the subject Editorial was published, Bret Stephens (a controversial columnist hired by Bennet) published a climate change column that was widely criticized for factual inaccuracies, so much so The Times' own reporters and news editors immediately denounced it on Twitter. [Vogt Decl. Ex. 14, PL Depo Ex. 6 ("*The NY Times promised to fact check their new climate denier columnist – they lied," J. Room, Think Progress*); Vogt Decl. Ex. 4, Bennet Depo 222:9-223:3; Vogt Decl. Ex. 6, Cohn Depo 30:20-31:9; Vogt Decl. Ex. 2, Lepping Depo 27:19-24]

**Defendants' Response:** Disputed.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants also object to the heading of this section as it is unsupported argument, rather than a statement of fact.

This statement is directly contradicted by record evidence, for example, Bennet's testimony that the need for care to ensure factual accuracy "is kind of the thing that we remind our people of regularly.  And the corrections process has the effect of reminding people of that because it is considered an extremely upsetting thing to have to correct a piece.  That's something that is just understood by journalists at The Times."  Vogt Decl. Ex. 4, Bennet Dep. 222:21 – 223:3.  This statement is also directly contradicted by Plaintiff's other statements, *e.g.*, Paragraph 188.

226. ***In practice***, The Times and Bennet have been anything but "transparent" when it comes to Bennet's errors:

      a.      Williamson was forced to remove post critical of another Editorial Board hire from her personal social media page [Vogt Decl. Ex. 3, Williamson Depo 110:22-115:22; Vogt Decl. Ex. 90, 55, 56, 57 (PL Depo Ex. 158, 69B, 69C, 69D)].

      b.      At the same time, Bennet issued a company-wide memo instructing all staff to "criticize our work privately." [Vogt Decl. Ex. 58, PL Depo Ex. 70; Vogt Decl. Ex. 3, Williamson Depo 116:18-124:4; Vogt Decl. Ex. 4, Bennet Depo 236:3-237:8]

      c.      Soon after that, Bennet got "upset" about a transcript of a meeting with staffers being "leaked" because "[h]e didn't realize that [he] was on the record and it was going to be shared...when you talk to journalists and it's off the record, they respect that...in this case they didn't." [Vogt Decl. Ex. 93, PL Depo Ex. 161; Vogt Decl. Ex. 4, Bennet Depo 214:7-215:8]

**Defendants' Response:** Disputed. Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment. *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2). This statement is directly contradicted by the evidence in the record. *See, e.g.*, Paragraphs 106-111.

## The Ultimate Hypocrisy—The Times' True Mission

227. Although The Times and Bennet outwardly profess their "mission" to tell the Truth and reaped the financial rewards of positioning themselves as such, ***in practice***, behind closed doors, the directives were much different: stir controversy to drive readership and revenue—an objective confirmed by A.G. Sulzberger when he commended Bennet for "ensuring

[his] editorial strategy is advancing our company strategy." [Vogt Decl. Ex. 4, Bennet Depo 220:17-221:10]

**Defendants' Response:** Disputed. Defendants do not dispute the contents of Bennet's performance review, but dispute Plaintiff's characterization and summary of that review. Defendants object to Plaintiff's selective quotations of a lengthy back and forth on the topic of his review. Vogt Decl. Ex. 4, Bennet Dep. 216:10-221:24.

Defendants dispute the remaining allegations of this Statement, which are not supported by admissible evidence, as required by L.R. 56.1, and are directly contradicted by Bennet's testimony:

> Q:  In the 2017 time period, were you trying to be more provocative?
>
> A:  I don't believe in being provocative for the sake of being provocative, no.· I think -- I've used that word.· I think the effect of our work is to be provocative.· But as I said earlier, I think that's the effect of work that challenges  conventional wisdom.
>
> So the goal is not to be provocative, but the goal is to not be predictably partisan and to not reinforce the cocoons into which I fear it's quite easy for all of us to withdraw these days in which we are constantly having our own opinions reaffirmed.
> Now, challenging one of those cocoons, whether from the Left or the Right, I recognize, acknowledge, that that is a provocative act and I do use that word sometimes.· But the goal is not to provoke for the sake of provoking.
>
> I honestly -- you know, the suggestion -- we talk sometimes about is the objective of opinion in journalism to bring more heat or more light, and I am much more interested, as some of my colleagues, as being in the lighting business than the heating  business, because I think there's enough heat already.  Inevitably, though, our work does generate heat.

> Vogt Decl. Ex. 4, Bennet Dep. 209:22-210:24.

Defendants object to this statement in its entirety because it is not material to Defendants'

Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to

the heading of this section as it is unsupported argument, rather than a statement of fact.


228.    Among other things, Sulzberger lauded Bennet for his hiring of Michelle

Goldberg, Brett Stephens, and Bari Weiss. [Vogt Decl. Ex. 4, Bennet Depo 221:11-20]

**Defendants' Response:**  Defendants do not dispute the contents of Bennet's performance

review, but dispute Plaintiff's characterization and summary of that review.  Defendants do not

dispute the statement but object to this statement because it is not material to Defendants'

Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to

Plaintiff's selective quotations of a lengthy back and forth on the topic of his review.  Vogt Decl.

Ex. 4, Bennet Dep. 216:10-221:24.


229.    Sulzberger also told Bennet to "move faster, take bigger risks, and play more

aggressively outside your lanes." [Vogt Decl. Ex. 4, Bennet Depo 216:10-218:8, 219:10-20] He

also told Bennet he wanted "more" of what occurred in 2017, instructing Bennet to "[a]sk for

forgiveness, not permission...[because] you enjoy much more autonomy and a much bigger

tolerance for risk...[which] should give you the blessing to move faster or to make changes that

are more disruptive," and also told him to "play outside you lanes a bit more often". [Id.]

**Defendants' Response:**   Disputed.  Defendants do not dispute the contents of Bennet's

performance review, but dispute Plaintiff's characterization and summary of that review.

Defendants object to this statement because it is not material to Defendants' Motion for

Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to Plaintiff's

selective quotations of a lengthy back and forth on the topic of his review.  Vogt Decl. Ex. 4,

Bennet Dep. 216:10-221:24.


230.    Bennet's implementation of his and The Times' true mission, consistent with

Sulzberger's directives, is apparent from numerous controversies during Bennet's tenure at The

Times:

a.      Bret Stephens hiring was very controversial and resulted in several factually inaccurate columns that garnered significant attention and had to be corrected. [Vogt Decl. Ex. 4, PL Depo Ex. 6; Vogt Decl. Ex. 4, Bennet Depo 221:5-222:16, 223:4-224:15];

b.      Michelle Goldberg was another controversial Bennet hire who wrote a book review the day she was hired that was plagued with factual errors for which a correction had to be issued. [Vogt Decl. Ex. 128 ("The Opinionator"); Vogt Decl. Ex. 4, Bennet Depo 226 :6-227 :20]

c.      Bari Weiss was another very controversial Bennet hire involved in several controversies and factual errors. [Vogt Decl. Ex. 53, PL Depo Ex. 69; Bennet Depo 227:21-228:8]]

d.      Bennet "`hired" Quinn Norton but she never actually started working in the opinion department after public outrage over her "pattern of tweeting activity" Bennet begrudgingly admitted was "racist" led to Bennet's employment offer being "rescinded." [Vogt Decl. Ex. 54, 93 (PL Depo Ex. 69A, 161); Vogt Decl. Ex. 4, Bennet Depo 228:10-230:17];

e.      Bennet also stoked controversy by hiring Sarah Jeong, who like Quinn Norton had a pattern of tweeting activity deemed by many to be "racist," although her employment offer was not rescinded because her tweets were directed at white people. [Vogt Decl. Ex. 90, 55, 56, 57 (PL Depo Ex. 158, 69B, 69C, 69D); Vogt Decl. Ex. 4, Bennet Depo 230:18-231:15]

f.      Bennet's tenure was also marked with publishing controversial pieces by the likes of Louise Mensch and Erik Prince [Vogt Decl. Ex. 128; Vogt Decl. Ex. 4, Bennet Depo 232:15-235:5]

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants deny that the testimony cited supports Plaintiff's statement and object to this statement's extensive mischaracterization of Bennet's testimony.

### James Bennet

231.    Bennet is an extremely intelligent individual with an excellent memory. [Vogt Decl. Ex. 4. Bennet Depo 30:20-31:9; Vogt Decl. Ex. 2, Lepping Depo 27:19-24; Vogt Decl. Ex. 6, Cohn Depo 155:25-157:9; Vogt Decl. Ex. 3, Williamson Depo 103:10-20]

**Defendants' Response:**  Undisputed.


232.    Bennet was born to privilege and raised in a family with a strong Democrat tradition:

      a.      Bennet's grandfather was an aid to Connecticut Governor and congressman Chester Bowles and served as an economic adviser in the Roosevelt Administration [Vogt Decl. Ex. 191 at p. 2; Vogt Decl. Ex. 192]

      b.      Bennet's father was a Washington insider with an esteemed career in politics, journalism, and the educational field, including: serving as an assistant to Ambassador Bowles in the 1960s; running for Congress in 1970s serving in 1967-1968 as an assistant to Vice President Humphrey; serving as Assistant Secretary of State for Legislative Affairs in 1977-1979; running the U.S. Agency for International Development 1979-1981; serving as Assistant Secretary of State for International Organization Affairs in 1993-1995 for the Clinton administration; serving as President of NPR from 1983-1992; and serving as President of Wesleyan University from 1995-2007 [Id.]

      c.      Bennet's brother, Michael F. Bennet, received his J.D. from Yale Law School, after which he clerked for the 4th Circuit

> Court of Appeals and as Counsel to the Deputy Attorney
> General in the Clinton Administration, and later served in
> the Clinton White House. He is currently the senior
> Democratic Senator for Colorado—a position to which he
> was appointed in late 2009. He was also national co-chair
> of President Obama's re-election campaign. [Vogt Decl.
> Ex. 195; Vogt Decl. Ex. 113; Vogt Decl. Ex. 194; Vogt
> Decl. Ex. 195]

**Defendants' Response:**  Defendants do not dispute the underlying facts regarding the

careers of Bennet's extended family members, but dispute Plaintiff's characterization of them.

Defendants also object to this statement because it is not material to Defendants' Motion for

Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants object to this statement

because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).


233.    From his father, Bennet was instilled with a passion for "civility" in discourse.

[Vogt Decl. Ex. 191 at p. 4 (describing Douglas Bennet's banning of "chalking at Wesleyan

University because it did not "meet the civility test."); Vogt Decl. Ex. 4, Bennet Depo 123:12-

124:5]

**Defendants' Response:**  Defendants object to this statement because it is not material to

Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants

object to this statement because it is not supported by any admissible evidence, and the cited

testimony does not support this statement.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).


234.    While his father excelled as a Washington elite, Bennet shined at the prestigious

St. Albans School in Washington D.C. and at Yale, before interning for Sen. Tom Eagleton.

[Vogt Decl. Ex. 4, Bennet Depo 25:17-27:15, 28:3-7; Vogt Decl. Ex. 196]

**Defendants' Response:**  Defendants do not dispute the underlying facts regarding Bennet's education and career, but dispute Plaintiff's characterization of them and extraneous, unsupported references to Bennet's father.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).

235.    Bennet began his career in journalism working as an intern for The News & Observer and The New Republic. [Vogt Decl. Ex. 4, Bennet Depo 27:19-25, 28:8-29:9]

**Defendants' Response:**  Undisputed.

236.    Early in his career, Bennet spent 15 years working for The Times in several roles, including as its' Detroit bureau chief, White House correspondent and Jerusalem bureau chief. [Vogt Decl. Ex. 4, Bennet Depo 35:13-23, 38:18-39:11]

**Defendants' Response:**  Undisputed.

237.    From 2006 to 2016, Mr. Bennet served as Editor-In-Chief of The Atlantic. [Vogt Decl. Ex. 4, Bennet Depo 41:12-42:11, 64:9-13]

**Defendants' Response:**  Undisputed.  *See* Paragraph 112, above.

238.    Mr. Bennet returned to The Times as its Editorial Page Editor in April 2016 [Vogt Decl. Ex. 4, Bennet Depo 64:9-13].

**Defendants' Response:**  Undisputed.

239.    Bennet's family's prominence in the Democratic "establishment" is well-known; even chronicled in 2019 by the Washington Post in "*Can the Bennet Brothers save the*

*Establishment*?" in which Bennet and his brother are described as an "*Anti-Trump Dynasty*." [Vogt Decl. Ex. 196, PL Depo Ex 159; Vogt Decl. Ex. 4, Bennet Depo 59:10-61:9, 35:24-38:17]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

### The Bennet Brothers' Close Connection

240.     Bennet is extremely close with his brother, and editing speeches for him and traveling with him for the last 2 weeks of his 2010 Senate campaign. [Vogt Decl. Ex. 4, Bennet Depo 62:3-63:18]

**Defendants' Response:**  Undisputed, but Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  *See also* Paragraph 150, above.

241.     In fact, attacks on his family are a "trigger" for Bennet, known to send him into "fit[s] of rage." [Vogt Decl. Ex. 191, PL Depo Ex. 159; Vogt Decl. Ex. 4, Bennet Depo 59:10-60:21] Although Bennet denies the facts reported in the Washington Post story, he concedes he read the story when it came out and never asked for a correction and refused to be interviewed for the piece, while acknowledging his lack of knowledge of human resources complaints lodged against him. [Id.] In the past, Bennet has asked other media outlets for corrections where he has read stories about him that were inaccurate. [Vogt Decl. Ex. 4, Bennet Depo 66:15-24]

**Defendants' Response:**   Disputed.  Defendants do not dispute that Bennet once requested a correction, but dispute Plaintiff's characterization of that fact.  Defendants do not dispute Bennet's testimony, which states:

> Q:  And one of the things that's mentioned in here is they claim that – "in stories published about his relatives have proved to be something of a trigger for him."  Is that true?
>
> MR. BROWN:· Object to the form, but you can answer.
>
> A:  No.

Vogt Decl. Ex. 4, Bennet Dep. 60:17-24.

Defendants dispute the remaining allegations in this statement, which are not supported by any admissible evidence, as required by L.R. 56.1, and directly contradicted by Bennet's admissible testimony.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).

242.    Sen. Bennet was running for re-election in 2010 when Gov. Palin's political action committee posted a map of targeted electoral districts (the "Palin Map"), including two districts in Sen. Bennet's home state. [Vogt Decl. Ex. 4, Bennet Depo 63:13-24; Sullivan Decl. Ex. 34; Sullivan Decl. Ex. 38 (Mar. 23, 2010 post with map)]

**Defendants' Response:**  Undisputed, but Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).

243.    The two incumbent Colorado lawmakers whose districts were depicted on the Palin Map, Reps. John Salazar and Betsy Markey, endorsed Sen. Bennet during his 2010

Democratic primary. [Vogt Decl. Ex. 175 (*Palin* 4571-4577)]

**Defendants' Response:**  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

244.    On January 6, 2011—two days before the Loughner Shooting—a man called Sen. Bennet's offices and threatened to "come down there and shoot you all." Following additional threats, the man was arrested (two days after the Loughner Shooting). The FBI even placed additional security at Sen. Bennet's home and Denver office. [Vogt Decl. Ex. 77]

**Defendants' Response:**  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

245.    Bennet knew about the threats made against his brother surrounding the Loughner Shooting, which were also reported by The Atlantic in an article also disclosing the family connection between Bennet and his brother. [Vogt Decl. Ex. 4, Bennet Depo 145:5-146:14; Vogt Decl. Ex. 77]

**Defendants' Response:**  Disputed.  This statement is directly contradicted by Bennet's testimony in this case.  *See* Paragraph 142; Reply to Paragraph 142.  Defendants also object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).

246.     Sen. Bennet, like James, became an outspoken advocate for gun control; even giving a floor speech on gun control on June 15, 2016, joining 30 of his Democratic colleagues for a filibuster about gun laws following the Pulse Nightclub shooting. [Vogt Decl. Ex. 11, PL Depo Ex. 190] Sen. Bennet's floor speech occurred ***the same day*** James Bennet's Editorial Board published an editorial about the Pulse Nightclub shooting [Vogt Decl. Ex. 164, PL Depo Ex. 286] and was circulating drafts of a book about political rhetoric and Sarah Palin. [Vogt Decl. Ex. 122, PL Depo Ex. 208]

**Defendants' Response:**   Disputed.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants dispute that James Bennet was "an outspoken advocate for gun control."

247.     Sen. Bennet was even endorsed by Rep. Gabrielle Giffords' PAC, Americans for Responsible Solutions, a gun control political action committee. [Vogt Decl. Ex. 110, PL Depo Ex. 189] .

**Defendants' Response:**  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

248.     Bennet's editorial department at The Times is no stranger to Giffords PAC. They regularly received emails from Giffords PAC and used its website as a resource for conducting

research in support of their gun control positions. [Vogt Decl. Ex. 24; Vogt Decl. Ex. 2, Lepping

Depo 86:14-88:4; Vogt Decl. Ex. 61, 62, 63 (PL Depo Ex. 74, 74(A), 74(B))]

**Defendants' Response:**  Defendants do not dispute the underlying testimony regarding

Lepping's familiarity with the Giffords PAC website and materials, but deny Plaintiff's

characterization of that testimony.  Defendants object to this statement because it is not material

to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).


249.    Gun control was also an important issue for James Bennet "personally." [Vogt

Decl. Ex. 4, Bennet Depo 165:5-7], one he even hosted a gun control forum attended by Gabby

Giffords and Mark Kelly (Americans for Responsible Solutions), who spoke about gun control.

[Vogt Decl. Ex. 114, PL Depo Ex. 195; Vogt Decl. Ex. 4, Bennet Depo 169:7-171:10]

**Defendants' Response:**  Disputed.  Defendants do not dispute Bennet's testimony, but

dispute Plaintiff's characterization of it.  Defendants deny Plaintiff's characterization of the

evidence to the extent that she seeks to imply that Bennet hosted a gun control event for

Americans for Responsible Solutions; in fact, the event was a forum on the topic of "technology

and policing gun violence" hosted by, among others, *The Atlantic* magazine, where Bennet

worked at the time, and The Aspen Institute.  Among the people participating in the forum were

Gabrielle Giffords and Mark Kelly.  Vogt Decl. Ex. 4, Bennet Dep. 169:2 – 171:25.


250.    Simply stated, Bennet is as an extremely-intelligent, highly-educated journalist

with an excellent memory who spent his career serving as a reporter and editor-in-chief working

in a field that requires him to remember facts and have an exceptional grasp over the English

language, and who has a strong personal connection to political rhetoric, civility, gun control, and threats of gun violence against politicians. (*See* Paragraphs 231-249, above).

**Defendants' Response:**  Defendants incorporate by reference their responses to Paragraphs 231-249 above.


## Bennet's History of Trolling

251.    According to The Times, a "troll is a figure who skips across the web, saying whatever it takes to rile up unsuspecting targets, relishing the chaos in his wake and feasting on attention, good or bad." [Vogt Decl. Ex. 163, "*How the Trolls Stole Washington*," A. Hess, *New York Times*, Feb. 28, 2017 at p. 1], much in the same way Liz Spayd recognized *The Times* was "morph[ing] into something more partisan, spraying ammunition at every favorite target and openly delighting in the chaos." [Vogt Decl. Ex. 153, PL Depo Ex. 256 at pp. 2-3]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants also object to the heading of this section as it is unsupported argument, rather than a statement of fact.


252.    Bennet began his career interning at *New Republic*, where his mentors included Andrew Sullivan. [Vogt Decl. Ex. 112, PL DEPO EX 191 at p. 2 (noting A. Sullivan as one of Bennet's "mentors"); Vogt Decl. Ex. 4, Bennet Depo 28:16-29:16]

**Defendants' Response:**  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants

also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ.
P. 56(c)(1)(A), 56(c)(2).  This statement also mischaracterizes Bennet's testimony that Sullivan
is "a friend and a colleague. …I wouldn't necessarily call him a mentor."  Vogt Decl. Ex. 4,
Bennet Dep. 29:13-16.


253.    Bennet "learned a lot from [Sullivan] over the years," including Sullivan's
controversial, polemic, polarizing style, and how people were drawn to that kind of work—even
those who disagreed—leading to success in digital media. [Vogt Decl. Ex. 4, Bennet Depo
29:11-33:15]

**Defendants' Response:**  Disputed, except that Bennet testified he has learned a lot from
Sullivan over the years.  *See* Defendants' Response to Paragraph 252.  Defendants deny the
remaining allegations in this statement, which are not supported by any admissible evidence, as
required by L.R. 56.1, and are directly contradicted by evidence in the record.  *See, e.g.*,
Defendants' Response to Paragraph 227.  Defendants object to this statement because it is not
material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).


254.    Once Bennet took over at *The Atlantic*, he hired Sullivan to help transform The
Atlantic from a print to digital first publication – where Bennet reaped the rewards of Sullivan's
controversial, polarizing, polemic style, even being named Editor of the Year in 2009 after the
addition of Sullivan increased The Atlantic's traffic by 50% (1 million to 2 million unique
visitors). [Vogt Decl. Ex. 4, Bennet Depo 56:20-57:19]

**Defendants' Response:**  Disputed.  Defendants do not dispute Bennet's testimony
regarding the Editor of the Year award he won and that web traffic to the *The Atlantic's* website

and its sister sites increased when *The Dish* joined.  Defendants incorporate Paragraph 112 and

their reply in support of that paragraph, regarding the relationship between *The Atlantic* and *The*

*Dish*.  Defendants deny the remaining allegations and argument in this statement, which are not

supported by admissible evidence, as required by L.R. 56.1.  Defendants object to this statement

because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56;

L.R. 56.1(a).


255.    Bennet remembers Sullivan writing posts about Sarah Palin while he was working

for The Atlantic ("I recall he was quite critical of her"). [Vogt Decl. Ex. 4, Bennet Depo 53:20-

54:16]

**Defendants' Response:**  Defendants do not dispute the quoted testimony but refer to

Paragraphs 112-153.  Defendants object to this statement because it is not material to

Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).


256.    Sullivan's most well-known controversy that drove traffic for *The Atlantic* under

Bennet's tenure was "Trig-Trutherism," an ongoing campaign against Sarah Palin maintaining

she is not actually the mother of her son with Down syndrome, Trig. [Vogt Decl. Ex. 78, 79, 80;

Vogt Decl. Ex. 4, Bennet Depo 55:25-56:19]

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not

material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).

Defendants also object to this statement because it is not supported by any admissible evidence.

Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

257.     While working at *The Atlantic* for Bennet, Sullivan even once said of Palin: "Do not under-estimate the appeal of a beautiful, big breasted, divinely chosen warrior-mother as a military leader in a global religious war." [Vogt Decl. Ex. 109, PL Depo Ex. 187 ("*Sarah Palin's Breasts and Andrew Sullivan*")]

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

258.     Not surprisingly, fellow journalists began to notice "Bennet's propensity toward trolling, which was noticed during his tenure at *The Atlantic*, seemed to be based on the following premise: We are too divided to convince each other of the truth, so all we can do is entertain each other with outrageous opinions." [Vogt Decl. Ex. 197 ("*America Is Fracturing— and So Is 'The New York Times'*")]

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

259.     As The Times was in the midst of its transformation to a digital-first platform, it hired Bennet because of his success using these methods to drive traffic at *The Atlantic*. [Vogt Decl. Ex.4, Bennet Depo 219:23-221:10]

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

260.     A number of Bennet's peers, some of whom once worked for him, have noted Bennet's propensity for trolling continued at The Times. [Vogt Decl. Ex. 198, "*Opinion: Trolling is Not Opinion*," L. Finnegan, Aug. 30, 2017 at p. 2 (Bennet "loves to troll, and position his writers as martyrs for their bad opinions...the controversial pieces the Opinion section runs under the auspices of fomenting some sort of 'conversation' are done so disingenuously. The Times is not furthering useful conversation with these bad and wrong op-eds, it is spraying its readers in the eyes with tear gas and then asking them why they are screaming...[which] is particularly egregious when you consider that, post-Trump, the Times has widely marketed itself as a crusader for capital-T Truth and an essential component of a healthy democracy."); Vogt Decl. Ex. 199, "*How Bret Stephens and Bari Weiss have taken the NY Times' campus concern trolling to new heights in just 2 years*," P. Holloy, Media Matters; Vogt Decl. Ex. 200, "*Why are Newsweek and The New York Times using troll tactics for clicks*?" A. Nichols, The Outline, Nov. 29, 2017 at p. 3, 5 ("The insidious trend in which influential news organizations promote the most incendiary part of an otherwise milquetoast article on social media has unfortunately become the norm. It's like clickbait, but more irritating and less profitable. The New York Times, our most august defender of democracy, uses this strategy in what is either the most cynical or most idiotic of ways...The objective, it seems, is to provoke liberals into momentarily

thinking about The New York Times by any means necessary. Acting out for attention—this is

the logic of children. Every so often, these attempts to troll readers actually drive some traffic")]

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not

material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).

Defendants also object to this statement because it is not supported by any admissible evidence.

Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).


261.    In "*The Opinionator*," Jason Linkins (*The Baffler*) outlines in detail Bennet's

tenure of "trolling" at The Times. [Vogt Decl. Ex. 128 at pp. 9-14]

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not

material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).

Defendants also object to this statement because it is not supported by any admissible evidence.

Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).


262.    As set forth above under the guise of "expanding voices," Bennet often stirred

controversy by hiring writers like Bret Stephens [Vogt Decl. Ex. 14, PL Depo Ex. 6; *see also*

Vogt Decl. Ex. 201 ("New York Times Promises Truth and Diversity, Then Hires Climate-

Denying Anti-Arab White Guy," Z. Jilani, The Intercept, Apr. 14, 2017)], Bari Weiss [Vogt

Decl. Ex. 128 at p. 9-10; *see also* Vogt Decl. Ex. 199 ("*How Bret Stephens and Bari Weiss have*

*taken the NY Times' campus concern trolling to new heights in just 2 years*")], Michelle

Goldberg [Vogt Decl. Ex. 128 at p. 14]; Quinn Norton [Vogt Decl. Ex. 53-54 (PL Depo Ex.69,

69(A))]; *see also* Vogt Decl. Ex. 202 ("*New York Times writer fired just hours after being hired*"

J. Tacopino, New York Post, Feb. 14, 2018)] and Sarah Jeong [Vogt Decl. Ex. 53, 55, 56, 57, 90

(PL Depo Ex. 69, 69(B), 69(C), 69(D), 158) ("Sarah Jeong and the N.Y. Times: When Racism is Fit to Print," A. Sullivan, New York Magazine, Aug. 3, 2018; *see also* Vogt Decl. Ex. 203 ("*Newest Member of NYT Editorial Board Has History of Racist Tweets," J. Crowe, National Review, Aug. 2, 2018*)].

      **Defendants' Response:**  Disputed.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  *See also* Defendants' Response to Paragraph 227.

## The Lessons of the Loughner Shooting Coverage

      263. Members of the media, including The Times, rushed to blame Sarah Palin and others for Jared Loughner's January 8, 2011 shooting in Tucson Arizona; first among them The Times' Paul Krugman. [Vogt Decl. Ex. 103, PL Depo Ex. 181(A) ("Assassination Attempt In Arizona," P. Krugman, NYT Opinion, Jan. 8, 2011 at 3:22 p.m. ("We don't have proof yet that this was political, but the odds are that it was..."; Vogt Decl. Ex. 104 ("Climate of Hate," P. Krugman, NYT, Jan. 9, 2011; Vogt Decl. Ex. 38, PL Depo Ex. 38 (Douthat email string with Bennet stating, "people assumed a link initially—there was a Paul K[rugman] column that was particularly vivid in blaming Republicans—but the investigation debunked it."; Vogt Decl. Ex. 74, PL Depo Ex. 123 ("*Caldwell's Unfairness*," discussing Krugman's "leap" to linking Loughner to Palin map; Vogt Decl. Ex. 102, PL Depo Ex. 181 ("*We Don't Have Proof Yet*" J. Taranto, WSJ, Jan. 10, 2011)]

      **Defendants' Response:**  Defendants object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants incorporate

Paragraphs 15-18, above.

264. However, a well-known consensus was reached shortly after Loughner's shooting that it was not connected in any way to the map circulated by Plaintiff's PAC. [Vogt Decl. Ex. 30, PL Depo Ex. 30 at pp. 19-21 ("As We Mourn," NYT Editorial, Jan. 12, 2011 (recognizing President Obama's statement during Loughner shooting memorial service that "If, as has been discussed in recent days, their death helps usher in more civility in our public discourse, let us remember it is not because a simple lack of civility caused this tragedy—**it did not not**"...; and noting Palin's position that "journalists and pundits" had committed a "blood libel")); Vogt Decl. Ex. 106, PL Depo Ex. 182 ("*It Did Not*," J. Taranto, WSJ, Jan. 13, 2011 (noting how "New York Times's response to last weekend's murders in Tucson was to instigate a witch hunt against Republican politicians, and how "[w]ith those three truthful words—an improvisation or a late addition, as they were not in the prepared text—[President Obama] rebuked the out-of-control liberal media that have, under the leadership of the New York Times, been engaging in a vicious campaign of lies and smears.")); Vogt Decl. Ex. 74, PL Depo Ex. 123 ("*Caldwell's Unfairness*," asking for correction from Financial Times for Caldwell's article accusing Andrew Sullivan of "linking" Loughner shooting to Palin map; Vogt Decl. Ex. 105 ("*Massacre, followed by libel*," C. Krauthhammer, Washington Post, Feb. 26, 2011 ("Not only is there no evidence that Loughner was impelled to violence by any of those upon whom Paul Krugman, Keith Olbermann, the New York Times, the Tucson Sheriff and other rabid partisan as fixated. There is no evidence that he was responding to *anything*, political or otherwise, outside of his own head."); Vogt Decl. Ex. 107, ("Sarah Palin Is Right About 'Blood Libel'," Rabbi Shmuley Boteach, WSJ. Jan. 14, 2011 ("Sarah Palin has every right to use ['Blood Libel']. The expression

may be used whenever an amorphous mass is collectively accused of being murderers or accessories to murder.")]

    **Defendants' Response:**  Defendants object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants incorporate Paragraphs 15-18, above.


    265.    The Times, The Atlantic (while Bennet was at its helm), Wall Street Journal, and Washington Post—all of which Bennet was "regularly reading" for his news in 2011—were among the major news outlets confirming ***within days*** of Loughner's shooting that it was not linked to incitement, Palin or the map in any way. [Vogt Decl. Ex. 4, Bennet Depo. 103:25-104:10; Vogt Decl. Ex. 74, PL Depo Ex. 123 ("*Caldwell's Unfairness*"—The Atlantic/Dish), Vogt Decl. Ex. 83, ("*Was the Shooting of Rep. Giffords Political*?"—The Atlantic/Wire), Vogt Decl. Ex. 84 ("*Did Sarah Palin's Target Map Play Rile in Giffords Shooting*?"—The Atlantic/Wire), Vogt Decl. Ex. 85 ("*What We Know About Jared Lee Loughner*"—The Atlantic/Wire), Vogt Decl. Ex. 86 "*Stop the Blame Game*"—The Atlantic), Vogt Decl. Ex. 87 ("*The More We Know*"—The Atlantic/Dish), Vogt Decl. Ex. 88 ("*Ten Days That Defined 2011*"—The Atlantic/Wire); Vogt Decl. Ex. 16, PL Depo Ex. 8 ("*Time, the Enemy*"—NYT), Vogt Decl. Ex. 50 ("*The Tucson Witch Hunt*"—NYT), Vogt Decl. Ex. 51 ("*Suspect's Odd Behavior Caused Growing Alarm*"—NYT), Vogt Decl. Ex. 52 ("*Looking Behind the Mug-Shot Grin*"—NYT); Vogt Decl. Ex. 102 ("*We Don't Have Proof Yet*"—WSJ), Vogt Decl. Ex. 106 ("*It Did Not*"—WSJ); Vogt Decl. Ex. 105 ("*Massacre, followed by Libel*"—WaPo); Vogt Decl. Ex. 80 ("*The Bogus Claim that a map...*")].

**Defendants' Response:**  Defendants object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants incorporate Paragraphs 15-18, above.

266.    In fact, The Times wrote about how the media's rush to judgment in blaming Gov. Palin for Loughner's actions should be a teaching moment—an example of how the media's bias and "storytelling habits" led them to falsely accuse Gov. Palin of inciting the shooting when it became known fairly quickly that Loughner was not motivated by anything Gov. Palin said or did. [Vogt Decl. Ex. 18 ("*Time, the Enemy*") ("The Times had a lot of company [in the "egregious rush to judgment in the Times coverage of the Arizona shooting"], as news organizations, commentators and political figures shouldered into an unruly scrum battling over whether the political environment was to blame. Meanwhile, opportunities were missed to pick up on evidence—quite apparent as of early the first day—that Jared Lee Loughner, who is charged with the shootings, had a mental disorder and might not have been motivated by politics at all."))] In relevant part, The Times' said:

The Tucson shootings afforded another, quite different illustration of the pressure of time in news coverage — not pressure measured in seconds and minutes, but pressure that news organizations feel to define the context of a story, to set up a frame for it, sometimes before the facts can be fully understood.

The Times's day-one coverage in some of its Sunday print editions included a strong focus on the political climate in Arizona and the nation. For some readers — and I share this view to an extent — placing the violence in the broader political context was problematic.

C. Wenk, a reader in Alexandria, Va., criticized "an egregious rush to judgment in the Times coverage of the Arizona shooting, specifically aimed at linking the shooting to various conservative or Republican political rhetoric."

So why does a story get framed this way? Journalism educators characterize this kind of framing as a storytelling habit — one of relating new facts to an existing storyline — and also as a reflex of news organizations that are built to handle some topics well, and others less well.

Jerry Ceppos, dean of the journalism school at the University of Nevada, Reno, said journalists' impulse to quickly impose a frame on a story is "genetic."

"Journalists developed automatic framing protocols generations ago because of the need to report quickly," he said. "Today's hyper-deadlines, requiring journalists to report all day long and all night long, made that genetic disposition even more dominant."

Still, I think the intense focus on political conflict — not just by The Times — detracted from what has emerged as the salient story line, that of a mentally ill individual with lawful access to a gun.

Whether covering the basic facts of a breaking story or identifying more complex themes, the takeaway is that time is often the enemy. Sometimes the best weapon against it is to ignore it, and use a moment to consider the alternatives.

**Defendants' Response:**  Defendants object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants incorporate Paragraphs 15-18, above.

267.    Bennet was well-aware of the problem of "framing," specifically in the context of the Loughner shooting coverage, from his time at The Atlantic. [Vogt Decl. Ex. 138, 139] On January 12, 2011, the editor of The Atlantic's website, Bob Cohn, forwarded Bennet a potential story by Jim Sleeper, a writer and "lecturer in political science at Yale, [who] teaches a course in Journalism, Liberalism, and Democracy." [Vogt Decl. Ex. 138 at p.1, 5; Vogt Decl. Ex. 4, Bennet Depo 135:10-136:9] In this email Bennet received were links to sources Sleeper cited, the first of which is to an article by T.A. Frank in the New Republic, "How the Media Botched the Arizona Shooting." [Vogt Decl. Ex. 138 at p. 2; Vogt Decl. Ex. 139]

**Defendants' Response:** Disputed.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).

Plaintiff's statement also mischaracterizes Bennet's testimony.  In the cited passage, Bennet testifies that he does not know if he ever read Sleeper's proposed article, if *The Atlantic* ever published it, or if he even clicked on the link in the email, as his practice was to forward emails like this one to another editor for consideration.  Vogt Decl. Ex. 4, Bennet Dep. 135:10-17, 137:6-14.

268.    The T.A. Frank article Bennet received on January 14, 2011 [Vogt Decl. Ex. 139] provides in pertinent part:

When disaster strikes, journalists have to write something about it—and write it fast. That means they have to take mental shortcuts, calling up established narratives and laying them out like old wrapping paper for new and more ambiguous facts. (Wife poisons husband. Revenge killing? Money killing? Self-defense killing? We stand at the ready with a lot of templates.) While the resulting gift isn't always pretty, it's generally good enough for deadline work.

But sometimes the shortcuts produce a journalistic stampede at the worst possible time. That's what happened last weekend, when 22-year-old Jared Lee Loughner shot six people to death at an Arizona Safeway and gravely wounded many more, including Democratic Congresswoman Gabrielle Giffords. The dominant storyline in the press—one that persisted in the face of all the facts —was that right-wing hysteria and lunacy had given rise to Loughner's atrocity. Only on Wednesday night, when President Obama delivered a speech that effectively told everyone to cut it out, was the stampede halted (one hopes). But it's still worth reviewing how the nation's leading periodicals descended into such mindlessness.

So why did the press go so far astray this week? How did many fine, otherwise fair-minded journalists allow their judgment to become so clouded? Let's venture briefly—and hopefully not too speculatively, lest I be accused of double standards—into the realm of cognition. Organizational theorists such as Karl E. Weick, a professor of psychology at the University of Michigan Business School, have researched how we react to unexpected events. In his 1995 book *Sensemaking in Organizations*, Weick notes that we humans automatically categorize what we encounter, ushering messy new complexities into tidier established categories ("myths, metaphors, platitudes, fables, epics and paradigms," to be precise). When something bad and inexplicable takes us by surprise, our brains reach for the handiest existing narratives, and accuracy falls by the wayside in favor of simple plausibility. "The stories are templates," writes Weick. "They are products of previous efforts at sensemaking. They explain. And they energize."

Contributing to such tendencies are the habits of newsrooms. In their 1989 book *How Do Journalists Think?*, S. Holly Stocking and Paget H. Gross note that a typical reporter launches into a story with an investigative hypothesis, one that is often bolstered during the reporting process by "confirmation bias." Only with great reluctance—in the face of overwhelming evidence to the contrary—is such a hypothesis normally discarded. Added to that is the weakness that competing hypotheses are tested one at a time, so that alternative explanations for the same data points are almost never considered simultaneously. "For example," write the authors, "if one is testing a theory about the negative impact of feminism on women's lives, one is unlikely also to test theories about its positive impact."

At this point, however, a reader might reasonably ask why, in this case, launching into a discussion of political hysteria was such a bad thing. If the shootings in Arizona can serve as a springboard for discussing a significant, if not necessarily related, societal menace, why not let them do so? After all, much of the right truly has become unhinged.

Well, yes, but let's remember that the deaths caused by Jared Loughner were preventable. There were concrete things that could have been done and that we now should do. Some people think we should place more restrictions on gun ownership. Some think we should provide more security services to members of Congress. Some think we should have improved mental-health resources. Such solutions may be wise or foolish, but the point is that they are directly relevant to the tragedy of last weekend.

By focusing on explanations that are abstract and speculative and only indirectly related, however, we risk losing sight of the crucial and immediate questions at hand. For instance, when Congressman James Clyburn was interviewed by NPR about the shootings, Clyburn followed the lead of all the major news outlets and focused almost entirely on "the discourse around the political arena," suggesting a reexamination of the Fairness Doctrine. In short, Clyburn largely ignored a real problem while pledging to focus on an imagined one. That is the danger here.

In 1911, a fire at the Triangle Shirtwaist Factory in New York killed 146 garment workers, most of them women and immigrants. Fortunately, the outrage that followed it went in a healthy direction, resulting in new federal workplace safety laws. This was a lot more helpful than essays blaming the fire on misguided ideals of femininity. There's a place for speculation and supposition, of course. But not a big place, and not for long. It's well past time for journalists to move on from what we *don't* know about the causes of last weekend's tragedy and grapple seriously with a great deal that we now *do* know—even if, God forbid, it means we'll have to abandon our hypotheses.

**Defendants' Response:**  Defendants do not dispute the contents of the cited document, but Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  Defendants incorporate their response to Paragraph 267 above.

**Bennet's Knowledge of No Palin/Loughner Link Before the Scalise Shooting**

269.    Bennet had actual knowledge the "Media Botched the Arizona Shooting" by

"reaching for the handiest existing narratives" to conclude a link existed between Plaintiff and

Loughner's shooting—the very same "framing" concept The Times warned against in the

context of its own false reporting surrounding the Loughner shooting. [Vogt Decl. Ex. 4, Bennet

Depo 137:15-139:3; Vogt Decl. Ex. 139; Vogt Decl. Ex. 16 (PL Depo Ex. 8)]

**Defendants' Response:**  Defendants object to this statement because it is not supported

by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants also object to this

statement as ambiguous and unclear.  Defendants also object to the heading of this section as it is

unsupported argument, rather than a statement of fact.


270.    The same problem was addressed in another article posted on The Atlantic's

website three days after the Loughner shooting, while Bennet was at its helm—"*Stop the Blame*

*Game*" [Vogt Decl. Ex. 86, PL Depo. Ex. 150]:

> I'm not a media critic and never will be, but this has not been a shining 48 hours
> for my profession. Following the shooting that left Rep. Gabrielle Giffords, D-
> Ariz., gravely wounded and six bystanders murdered at a Tucson shopping
> center, the media have spent as much time trying to assign political blame for the
> cause of the shooting as they have trying to unearth facts. As it turns out, the
> murderer is a mentally unstable individual, with no coherent political ideology.

> And in the aftermath of the Tucson shooting,
> the media's worst tendencies were on display,
> from the onset of the crisis when several outlets
> inaccurately reported that Giffords had died, to
> the immediate, unwarranted assumption that
> the killer was associated with the tea party.

It's becoming increasingly clear that overheated political vitriol played virtually no role in Jared Lee Loughner's shooting spree. His political thinking is hardly coherent, and his obsession with Giffords predated the tea party and Sarah Palin's emergence in national politics. One of his few close friends told Mother Jones that he became fixated on the congresswoman when he asked her a question at a 2007 town hall about "the government having no meaning" and felt she didn't answer. His killing spree wasn't motivated by disagreement with her positions on health care or immigration.

The other lesson learned from the coverage of this awful tragedy is that it's better to be right than first -- a challenge in a journalism culture that increasingly rewards speed over substance. In the rush to break news as the crisis unfolded, several major media outlets inaccurately reported that Giffords had died. Others later inaccurately reported that Giffords was speaking after her surgery on the day of the attack. It raises questions about news organizations' standards for what's allowed on air or online.

Those standards have been in decline, and go beyond reporting inaccurate information. Far too often, we give serious leeway for sources to anonymously attack their opponents. It makes for sexier stories but further coarsens the discourse in Washington.

Far too often, we rush to report campaign attacks on candidates without verifying their validity and without even getting a response. Campaigns and national party committees know that news outlets are hungry for sensational material, and they exploit that.

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

271. In fact, as an editor who trains journalists, Bennet acknowledged his familiarity with the problem of "framing" and publishing "preconceived narratives" occurring in the aftermath of

the Loughner shooting and even "cautioned the journalists that work for [him] about doing what Mr. Frank was referencing in his piece [Vogt Decl. Ex. 139] about framing events in terms of preconceived narratives;" analogizing that problem to Bennet's self-directive to "guard[] ourselves against our own assumptions about any given story." [Vogt Decl. Ex. 4, Bennet Depo 139:10-19]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment. *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Plaintiff's statement also mischaracterizes the cited testimony; Bennet simply acknowledged familiarity with the concept of "framing," generally. Defendants incorporate their response to Paragraph 267 above.


272.    Bennet claims he cannot "recall" certain stories published on The Atlantic website denouncing any connection between Gov. Palin and Loughner's shooting, but conceded at his deposition that he "regularly read" The Atlantic in 2011 and "must have read at least several" of the articles about the Loughner Shooting published on The Atlantic's website [Vogt Decl. Ex. 69; Vogt Decl. Ex. 4, Bennet Depo 122:6-22]. Bennet testified he "must have read at least several" of these Loughner articles because he "was a regular reader of The Atlantic's website both because [he] was interested in it as a reader and because [he] would try to keep [his] eye on it for purposes of commenting to our editor about what [he] liked and didn't like." [*Id.*, Bennet Depo 122:23 123:7] In fact, Bennet described himself as "consuming [The Atlantic's] site." [*Id.*, Bennet Depo 123:7-9]

**Defendants' Response:**  Defendants object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants incorporate Paragraphs 112-153, above.

273.    Bennet also conceded that he regularly read Sullivan's *The Dish* published on The Atlantic's website and even recalled Sullivan writing about Sarah Palin. [*Id.*, Bennet Depo 54:5-9]

**Defendants' Response:** Defendants incorporate Paragraphs 112-153, above.


274.    Bennet acknowledged he may have even spoken with Sullivan about the Loughner shooting. [*Id.*, Bennet Depo 98:6-9]

**Defendants' Response:**  Defendants incorporate Paragraphs 112-153, above.

Defendants do not dispute Bennet's testimony, which reads in full:

> Q:  Do you recall any of The Atlantic's coverage of the Loughner shooting?
>
> A:  Do I recall it today or do I recall –actually, the answer is -- to both is no, I don't.
>
> Q:  Do you recall Andrew Sullivan live-blogging on the Loughner shooting?
>
> A:  No.
>
> Q:  Do you recall having any discussions with Mr. Sullivan about the Loughner shooting?
>
> A:  No.  It doesn't mean I didn't, but I just don't remember.

Vogt Decl. Ex. B, Bennet Dep. 97:23 – 98:9.

275.     Sullivan live-blogged about the Loughner shooting on *The Atlantic's* website

under the post "*An Assassination Attempt in Arizona: Live-Blogging*" [Vogt Decl. Ex. 81], and

posted several other pieces about the shooting which denounced any "link" between Palin and

Loughner's crime. [Vogt Decl. Ex. 74, 87]

**Defendants' Response:** Defendants incorporate Paragraphs 112-153, above.  Defendants

also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ.

P. 56(c)(1)(A), 56(c)(2).


276.     On January 15, 2011, Mr. Bennet's "close friend," Sullivan, posted a column on

*The Atlantic's website* titled "*Caldwell's Unfairness*," in which Sullivan demanded a correction

from a journalist for the *Financial Times* who wrote that "Andrew Sullivan, the *New York Times*

columnist Paul Krugman, and the Pima County Sheriff Clarence Dupnik **linked** the shootings to

Republican ideology or rhetoric, as expressed by former vice presidential candidate Sarah

Palin..." [Vogt Decl. Ex. 74] Sullivan asked for "actual evidence" to support such a charge and

then stated that his "first personal judgment of any link between Loughner and the Tea Party is to

*debunk* it." Sullivan then concluded with the following passage:

> Did I explore the issue of far right violence after Giffords' father
> cited the Tea Party? You bet I did. How could I not? Did I ever
> link the shootings to Republican ideology or rhetoric? Nope. Do I
> think such rhetoric is over the top in a world where crazy people
> have access to guns? Yes. Do I agree with Giffords that Palin's
> imagery was dangerous? Yes. But as for the motive of Loughner,
> by the time 6:32 p.m. comes along, I have concluded that this was
> likely a psychotic breakdown, and cited a psychiatrist to that effect,
> and specifically ended with the case that he is "of no party." How
> can I be accused of linking Loughner to the GOP when I
> specifically cite that he seems to be of "no party"?
>
> *The Financial Times* needs to run a correction.

**Defendants' Response:** Defendants incorporate Paragraphs 112-153, above.  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

277. In the ensuing days after the Loughner shooting, numerous other articles were published on The Atlantic's website noting the lack of a connection between Palin or the Palin Map and the shooting, including but not limited to:

    a.    "*Was shooting of Rep. Gabrielle Giffords Political*?" (January 8, 2011); [Vogt Decl. Ex. 83]

    b.    "*Did Sarah Palin's Target Map Play Role in Giffords Shooting*?" (January 10, 2011); [Vogt Decl. Ex. 84]

    c.    "*What We Know about Jared Lee Loughner*" (January 10, 2011); [Vogt Decl. Ex. 85]

    d.    "*Ten Days That Defined 2011*" (December 29, 2011) [Vogt Decl. Ex. 88].

**Defendants' Response:** Defendants incorporate Paragraphs 112-153, above.  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

278.　　These articles about the Loughner Shooting were among those Bennet testified he must have read because he was "consuming" The Atlantic's website. [*See* Paragraph 272-273, above]

**Defendants' Response:** Defendants incorporate Paragraphs 112-153, above. Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

279.    If a "direct" and "clear" link had been made between Palin's map and the Loughner shooting, that clearly would have been something Bennet would have known because Bennet testified the Loughner shooting was a "very big story" and political discourse and gun control were two of Bennet's hot button issues. [Vogt Decl. Ex. 4, Bennet Depo 40:5-22, ]

**Defendants' Response:** Defendants incorporate Paragraphs 112-153, above.  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants also object to this statement's mischaracterization of Bennet's testimony and improper argument.

280.    Bennet tries to distance himself from involvement with The Wire published on The Atlantic's website, but conceded at his deposition that he received daily email updates for pieces posted by The Wire on The Atlantic's website, as well as "Daily News Roundup" emails containing relevant news stories posted on The Atlantic's website. [Vogt Decl. Ex. 4, Bennet Depo 124:10-127:12; Vogt Decl. Ex. 136-137, PL Depo Ex. 226, 228]

**Defendants' Response:** Defendants incorporate Paragraphs 112-153, above.  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants also object to this statement's improper argument.

281.    The January 10, 2011 article, "*What We Know about Jared Lee Loughner*," (Vogt Decl. Ex. 85) posted on The Atlantic's website notes, "**He Was More Delusional Than Political**... Jared Lee Loughner appeared to be more driven by a delusional mind than a real interest in politics, mental health experts said Sunday." The article also references and hyperlinks

*The New York Times* is to *The Times*' January 9, 2011 article, "*Suspect's Odd Behavior Caused Growing Alarm*" an in-depth report about Loughner's behavior and past. [Vogt Decl. Ex. 151]

**Defendants' Response:** Defendants incorporate Paragraphs 112-153, above.  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

282.    A year-ending 2011 piece, "*Ten Days That Defined 2011*," [Vogt Decl. Ex. 88] that ran on *The Atlantic's website*, recognized that it was wrong to link Gov. Palin to the Loughner Shooting:

> In a meta media sense, the bad thing to come out of this already terrible story was a round of blame hurling, with people rushing to point at Sarah Palin's infamous <u>target map</u> or Loughner's left seeming (but not really) anti-Bush sentiments. In truth, Loughner is clinically insane and this was not really about politics at all. That many, including us, immediately jumped to that conclusion says some pretty sorry things about the state or our political machine.

**Defendants' Response:** Defendants incorporate Paragraphs 112-153, above.  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

283.    Bennet conceded at his deposition that "it's possible" he read "*Ten Days That Defined 2011*." [Vogt Decl. Ex. 4, Bennet Depo 127:13-128:8]

**Defendants' Response:** Defendants incorporate Paragraphs 112-153, above.  Defendant objects to Plaintiff's misleading presentation of Bennet's testimony, in which he testified:

Q:  Do you recall this piece?

A:  No.

Q:  Is it possible that you read it?

A:  It's possible.

Vogt Decl. Ex. 4, Bennet Dep. 128:5-8.

284.     Within days of the Loughner Shooting, the consensus within *The Times* and *The Atlantic*—the first two of Bennet's primary news sources—was that Gov. Palin and the Palin Map did not incite Loughner's shooting and no direct or clear link between the two was ever established. (*See* Paragraphs 263-283, above). In fact, both news organizations published pieces calling out the media (including themselves) for rushing to blame people like Sarah Palin for Loughner's criminal actions. (*See* Paragraphs 266-271).

**Defendants' Response:** Defendants incorporate Paragraphs 15-18, above.  Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

## The Events Leading to the Editorial

285.     In January of 2016, Gov. Palin endorsed Donald Trump for President, following which The Times' Opinion pages referred to her as a "Rage Whisperer." [Vogt Decl. Ex. 75, 115]

**Defendants' Response:**  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

286.     In April/May 2016, Bennet re-joined The Times as Editor of the Editorial

Department. (*See* Paragraph 238, above).

**Defendants' Response:** Undisputed.


287.     On June 7, 2016, Sarah Palin endorsed Republican candidate Darryl Glenn in Sen.

Bennet's senate re-election race in Colorado. [Vogt Decl. Ex. 76]

**Defendants' Response:**  Defendants object to this statement because it is not material to

Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants

also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ.

P. 56(c)(1)(A), 56(c)(2).


288.     On June 12, 2016, the Pulse Nightclub shooting occurred in Orlando, Florida.

[Vogt Decl. Ex. 94]

**Defendants' Response:** Defendants object to this statement because it is not material to

Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants

also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ.

P. 56(c)(1)(A), 56(c)(2).


289.     On June 13, 2016, the Editorial Board published the editorial "*What Donald

Trump Gets Wrong About Orlando*," which states, "Now the politics. All mass shootings

convulse the nation, but this one falls in the middle of one of the nastiest, most divisive

presidential campaigns in memory" before railing on Republicans for opposing gun control and

causing "America's gun-violence epidemic." [Vogt Decl. Ex. 211]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment. *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

290.    On June 15, 2016, Times' CEO Mark Thompson emailed Bennet an extract from his book, "Enough Said," which Bennet then forwarded to Times' deputy Op-Ed editor James Dao [Vogt Decl. Ex. 4, Bennet Depo 159:4-162:18; Vogt Decl. Ex. 122-123] In his forwarding email, Bennet states, "The good news is that it's a book on political rhetoric," [Vogt Decl. Ex. 122] in which the first chapter is devoted to Sarah Palin's "rhetoric" [Vogt Decl. Ex. 123 at pp. 3-24]

**Defendants' Response:** Defendants do not dispute the contents of the cited email or Bennet's testimony, but Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment. *See* Fed. R. Civ. P. 56; L.R. 56.1(a).

291.    That same day, June 15, 2016 Bennet received a potential op-ed on gun-control from Steven Hill, a Senior Fellow at New America Foundation. [Vogt Decl. Ex. 95]

**Defendants' Response:** Defendants do not dispute the contents of the cited email or Bennet's testimony, but Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment. *See* Fed. R. Civ. P. 56; L.R. 56.1(a).

292.    Also on that same day, June 15, 2016, Sen. Bennet gave a Floor Speech on gun control as part of the Democratic filibuster. [Vogt Decl. Ex. 111]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment. *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

293.    Also on that same day, June 15, 2016, the Editorial Board published its editorial about the Pulse Nightclub shooting. [Vogt Decl. Ex. 162]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment. *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

294.    On July 1, 2016, Gov. Palin spoke at the Western Conservative Summit in Colorado to support then-candidate Donald Trump and Sen. Bennet's re-election opponent, Darryl Glenn. [Vogt Decl. Ex. 204]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment. *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

295.    In July 2016, Bennet and his Editorial Board were following Gov. Palin in connection with the Republican National Convention, which Bennet and Williamson attended in Cleveland Ohio. [Vogt Decl. Ex. 124-127; Vogt Decl. Ex. 3, Williamson Depo. 173:13-174:1]

**Defendants' Response:**  Defendants do not dispute Williamson's testimony that she and others attended and/or followed news regarding the Republican National Convention, but deny Plaintiff's characterization of that testimony.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).

296.    On August 9, 2016, The Times reported on a statement made by then-candidate Donald Trump made a comment at a North Carolina rally which The Times characterized as "suggest[ing] 'Second Amendment People' could act against Hillary Clinton." [Vogt Decl. Ex. 116]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

297.    That same day, August 9, 2016, Tom Friedman wrote a column published in The Times Opinion section titled, "*Trump's Wink Wink to 'Second Amendment People*.'" [Vogt Decl. Ex. 120] Friedman's column drew a parallel between Trump's comment and the "rabid rhetoric" leading to that assassination of Israeli Prime Minister Yitzhak Rabin. [Id.]

**Defendants' Response:** Defendants do not dispute that The Times published the referenced column, the contents of which speak for themselves.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).

298.    Bennet testified that Friedman's column was one of his motivations for re-writing and crafting the defamatory portions of the America's Lethal Politics editorial. [Vogt Decl. Ex. 4, Bennet Depo 184:21-25] Bennet described Friedman's piece as having made a "powerful impression on me." [*Id.*, Bennet Depo 182:18-25]

**Defendants' Response:**  Disputed.  This statement is not supported by any admissible evidence, *see* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2), and mischaracterizes the cited testimony. Bennet testified only that the Friedman had made a "powerful impression" on him and that he had it in mind when editing the Editorial.  Vogt Decl. Ex. 4, Bennet Dep. 182:21-25, 184:21-25. *See also* Defendants' Response to Paragraphs 342-344, below.

299.    In fact, Bennet and Friedman spoke about the column before it was published, when Friedman told Bennet Trump's statement "reminded him of the kind of rhetoric, inflammatory rhetoric" in Israel leading up to the shooting of Prime Minister Rabin. [*Id.*, Bennet Depo 183:1-24]

**Defendants' Response:**  Undisputed.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a).  *See also*  Defendants' Response to Paragraphs 342-344, below.

300.    On August 24, 2016, Rep. Giffords' Americans for Responsible Solutions PAC endorsed Sen. Bennet in his senate re-election race. [Vogt Decl. Ex. 110]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants

also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ.

P. 56(c)(1)(A), 56(c)(2).


301.    Soon after President Trump was elected, on November 13, 2016, The Times

published a letter to its readers pledging to "rededicate themselves to The Times "core mission."

[Vogt Decl. Ex. 118] The same day, The Times engaged directly with President Trump on

Twitter [Vogt Decl. Ex. 147-148]

**Defendants' Response:** Defendants object to this statement because it is not material to

Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants

also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ.

P. 56(c)(1)(A), 56(c)(2).


302.    On December 17, 2016, Bennet ordered the Book, "*The Persecution of Sarah

Palin: How the Media Elite Tried to Bring Down a Rising Star*." [Vogt Decl. Ex. 121]

**Defendants' Response:**  Undisputed, but Defendants object to this statement because it

is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R.

56.1(a). Defendants also object to this statement because it is not supported by any admissible

evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).


303.    In early 2017, The Times embarked on its "Truth" advertising campaign and

capitalized on refocusing its coverage to promote its "subscription strategy." (*See* Paragraphs

218-224, above).

**Defendants' Response:**  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants incorporate their responses to Paragraphs 218-224.


304.    On February 7, 2017, Brent Staples emailed Bennet about concern and nervousness about anxiety within the Editorial Department, specifically mentioning "a right-wing propaganda tweet [from] Sarah Palin claiming The Times was desperately renting out floors because it was failing." [Vogt Decl. Ex. 20]

**Defendants' Response:**  Defendants do not dispute that Staples sent the referenced email, the contents of which speak for themselves.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).


305.    On April 5, 2017, Bennet tweet that he was "looking for a great new colleague to stir things up" [Vogt Decl. Ex. 132]

**Defendants' Response:**  Defendants do not dispute the contents of Bennet's tweet, but Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

306.     In May 2017, Kathy Griffin posted a photo of herself holding a bloody severed head of President Trump, which drew widespread media attention. [Vogt Decl. Ex. 135, 205]

**Defendants' Response:** Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants also incorporate their Response to Paragraph 316, below.

307.     In early June, 2017, The Times eliminated its Public Editor—a position that essentially served as a watchdog over the paper and held it to account. [Vogt Decl. Ex. 153]

**Defendants' Response:**  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

308.     In the days leading up to the June 14, 2017 Scalise shooting, The Times was at the center of public criticism for its sponsorship of a Shakespeare in the Park production of Julius Cesar depicting Trump as Caesar, which other sponsors withdrew from over public outcry that the play was a form of incitement [Vogt Decl. Ex. 206]

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not material to Defendants' Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56; L.R. 56.1(a). Defendants also object to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants also incorporate their Response to Paragraph 316, below.

## The Defamatory Palin Article

309.    After the Hodgkinson shooting on the morning on June 14, 2017, *Times* Editorial Board member Elizabeth Williamson first raised the question of whether the Editorial Board should comment on the shooting. (*See* Paragraph 22, above).

**Defendants' Response:**  Undisputed.  Defendants incorporate Paragraphs 22-24, above. Defendants also object to the heading of this section as it is unsupported argument, rather than a statement of fact.

310.    She quickly researched the shooter, located his social media pages, realized they contained pro-Bernie/anti-Trump messages, and circulated them to Bennet, Semple. (*Id.*)

**Defendants' Response:**  Undisputed.  Defendants incorporate Paragraphs 22-34, above.

311.    Initially, Semple was uninterested in writing about a "nut case who hunts republicans."

**Defendants' Response:**  Disputed.  This statement is not supported by any admissible evidence, *see* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2), and misstates the testimony in the case. Defendants incorporate Paragraphs 22-24, above.

312.    Eventually, Semple wanted to pursue a "gun control angle." (*Id.*)

**Defendants' Response:**  Undisputed.  Defendants incorporate Paragraphs 22-24, above.

313.    In response, Cohn mentioned the Giffords shooting. (*Id.*)

**Defendants' Response:**  Undisputed.  Defendants incorporate Paragraphs 22-24, above.

314.    Once Semple decided at 12:08 p.m. that the Board should "shoot for a piece," Bennet had not been involved in the email strings, and the purpose of the piece Semple decided to try to write was twofold: (1) to focus attention on the shooting; and (2) to restate the longstanding position of *The Times'* Editorial Board in favor of sensible gun control. (*Id.*)

**Defendants' Response:**  Defendants dispute Plaintiff's characterizations of the email correspondence, which is not supported by any admissible evidence.  As shown in Paragraph 22, incorporated herein, Bennet was copied on and involved in email correspondence discussing the possible focus of the proposed piece regarding the Scalise Shooting.

## Bennet's Predetermined Storyline & Objective

315.    Forty minutes after Semple decided to "shoot for a piece" with a "gun control angle," Bennet—specifically in response to Williamson's email sending the group Hodgkinson's anti-Trump/Pro-Bernie social media pages—injected his preconceived narrative about "inciting hate speech" into the discussion. (*Id.*)

**Defendants' Response:**  Defendants dispute Plaintiff's characterizations of the email correspondence, which is not supported by any admissible evidence.  As shown in Paragraph 22, incorporated herein, Bennet was copied on and involved in email correspondence discussing the possible focus of the proposed piece regarding the Scalise Shooting.  Defendants also object to the heading of this section as it is unsupported argument, rather than a statement of fact.

316.    Bennet, having seen Williamson's earlier emails, knew Hodgkinson was pro-Bernie and anti-Trump; and Bennet was also well-aware of the recent criticism over the Kathy

Griffin Trump-beheading situation and The Times' sponsorship of the Shakespeare in the Park

production featuring Trump as Cesar. [Vogt Decl. Ex. 4, Bennet Depo 237:23-240:14]

**Defendants' Response:**  Defendants object to this statement because it is not supported

by any admissible evidence.  Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Plaintiff also

mischaracterizes the cited testimony.  In that passage, Bennet testified that he was, at deposition,

aware of debates over a Shakespeare in the Park production and a social media post by Kathy

Griffin but was not sure of the details or timing of those events:

> Q:  Mr. Bennet, do you recall there being some public discussion at
> the time leading up to the Scalise shooting involving Kathy
> Griffin?
>
> A:  In that time period, no.· I remember there was a controversy
> around Kathy Griffin.· The comedian, is that who you're referring
> to?
>
> Q:  Yes.
>
> A:  Yeah.· But I don't remember exactly when it was.
>
> …
> Q:  And then was there also some public discussion around that
> time concerning a performance of Shakespeare in the Park?
>
> A: Yes.
>
> Q:  What was the –
>
> A:  I take your word for it.· I just don't remember what was
> coterminous, but I do remember there was a debate about a
> performance of Shakespeare in the Park, yes

Vogt Decl. Ex. 4, Bennet Dep. 237:23-238:7.

317.    Semple decided the Board should write a piece on the shooting _**before**_ Bennet

interjected with his preconceived storyline in response to Williamson's email about

Hodgkinson's "pro-Bernie, anti-Trump" social media accounts; an email in which Bennet asked "***whether*** there's a point to be made about the rhetoric of demonization and whether it incites people to this kind of violence." (*See* Paragraph 22, above). Bennet went on to ask "***if*** there's evidence of the kind of inciting hate speech on the left that ***we, or I at least, have tended to associate with the right (e.g., in the run-up to the Gabby Giffords shooting)*** we should deal with that." (*Id.* (emphasis added)) Bennet testified that he "thought that [the Board] should deal with this issue of incitement if there was evidence of inciting hate speech on the Left." (*Id.*) However, Bennet also conceded he and the Board never saw any evidence of inciting hate speech on the Left leading up to Hodgkinson's shooting [Vogt Decl. Ex. 4, Bennet Depo 250:15-13 ("We didn't find a specific example of hate speech connected to the people on the -- hate ·speech, I'm sorry, I don't usually use that term of, of -- of rhetoric of demonization connected to the ball players that day.· You know, naming Steve Scalise or something like that.")]

**Defendants' Response:**  Defendants dispute Plaintiff's characterizations of the cited testimony and exhibits, which is not supported by any admissible evidence, and refers to Paragraphs 22-24 and their Response to Paragraph 315, incorporated herein.


318.    From the outset, Bennet was predisposed to use the Loughner Shooting as the sole example of "political incitement" to counterbalance the fact that the Left and The Times were taking criticism for "incitement" in the lead-up to the Scalise shooting. (*See* Paragraphs 304-308, above).

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not supported by any admissible evidence, see Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2), and refer to Paragraphs 22-24, incorporated herein.

319.     Based on his prior personal and professional experience and his actual knowledge of *The Atlantic's* publications and other media publications described in Paragraphs 263-284, above, Mr. Bennet already knew that there was no established connection or link between political rhetoric or "incitement" and Loughner's shooting, let alone any "clear" and "direct" link between Gov. Palin or the Palin Map and Loughner's horrific crime.

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not supported by any admissible evidence, see Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants refer to Paragraphs 57-63, 81, 83, regarding Bennet's understanding and intended meaning of the word "incitement," and Paragraphs 112-139, regarding Bennet's alleged familiarity with the documents cited by Plaintiff, incorporated herein.

320.     Before Williamson had ever set pen to paper and conducted her research, Bennet already had made up his mind that "hate-type speech" on the Right caused the Loughner shooting. [Vogt Decl. Ex. 25]

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not supported by any admissible evidence, see Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2), and refer to Paragraphs 22-24, incorporated herein.

321.     At Bennet's request, Williamson specifically researched whether there was a link between the Palin map and Loughner shooting and whether there was any evidence of a link between incitement and the Hodgkinson shooting. [Vogt Decl. Ex. 3, Williamson Depo 142:1-143:24, 126:8-131:22; Vogt Decl. Ex. 4, Bennet Depo 245:5-247:2]

**Defendants' Response:**   Disputed.   Plaintiff's statement mischaracterizes the cited testimony and exhibits.   Bennet asked Williamson if the Editorial Board had ever written "anything connecting [] the Giffords shooting to some kind of incitement" and asked Williamson to be mindful of whether such rhetoric came from both sides of the political spectrum.   *See* Paragraphs 29, 32; Sullivan Decl. Ex. 9 ("[I]f there's evidence of the kind of inciting hate speech on the left that we, or I at least, have tended to associate with the right (e.g. in the run-up to the Gabby Giffords shooting) we should deal with that.").

322.    It was actually Semple—who decided to write about gun control—that asked Lett to circulate "four basic gun control pieces (dealing mainly with the plentitude of weapons and porous controls) that also happen to mention Gabrielle Giffords..." [Sullivan Decl. Ex. 9] These four pieces included "*Rep. Gabby Giffords Farewell*" (1/27/2012), "*6000 Bullets in Colorado*" (7/24/2012), "*Democrats Find their Voice on Gun Control*" (7/29/2016), and "*Myths About Gun Regulation*" (1/2/2013)—all of which were pieces written by Semple. [Vogt Decl. Ex. 9; Sullivan Decl. Ex. 13 (PL Depo. Ex. 30)]

**Defendants' Response:**  Defendants do not dispute the fact that Semple asked Lett to circulate certain gun control pieces, as set forth in Paragraphs 25-34, but dispute Plaintiff's characterizations of those facts.

323.    Eventually, Lett and Williamson also looked to see whether they could find the piece about "hate-type speech" Bennet referenced in his earlier email, although Williamson had no idea what Bennet meant by that term. [*See* Paragraphs 29-30, above; Vogt Decl. Ex. 3m Williamson Depo 207:18-208:5, 209:18-210:16]

**Defendants' Response:**  Defendants do not dispute the underlying facts, as set forth in Paragraphs 29-30, but dispute Plaintiff's characterizations of those facts.

324.    In response to an email from Williamson at 1:40 p.m. about Bennet's request (Sullivan Decl. Ex. 12), Lett emailed Bennet at 1:46 p.m. asking, "I'm trying to find the piece Elizabeth is referring to here, do you happen to know which one she is talking about?" (*Id.*) Bennet responded to Lett (not Williamson) at 2:07 p.m., asking, "No—I was just wondering if there was such a piece; that is, did we ever write anything connecting to the Giffords shooting to some kind of incitement?" (*Id.*)

**Defendants' Response:**  Undisputed.

325.    At 2:20 p.m., Lett replied to Bennet's 2:07 p.m. email by forwarding him a link to a Frank Rich column (not an Editorial): "*No One Listened to Gabrielle Giffords*." (*Id.*)

**Defendants' Response:**  Undisputed.

326.    At 2:34 p.m., Bennet responded to Lett by saying "Good for Us. Can you let Elizabeth [Williamson] know?" (*Id.*) Bennet testified that he doesn't recall what he meant by "Good for Us," but the clear inference to be drawn is that Bennet was free to advance his preconceived narrative because the Editorial Board had not written about the subject. [Vogt Decl. Ex. 4, Bennet Depo 252:6-24]

**Defendants' Response:**  Defendants do not dispute the text of Bennet's email. Defendants dispute Plaintiff's characterization of the email and improper argument regarding the inference to be drawn from it.

327.     At 2:52 p.m., Bennet followed up by asking Lett to send him the four basic gun control pieces Semple asked Lett to send to Williamson, but Bennet claims he does not recall whether he read all of the materials Lett sent him. [*Id.*, Bennet Depo 250:24-251:11]

**Defendants' Response:**  Undisputed.


328.     Later, Bennet asked Lett to "dig a little further" because it "seemed strange" to him that the Editorial Board had not "editorialized at all about the [Loughner] shooting...because it was an important news event and the kind of thing we would typically editorialize on." [Bennet Depo. 253:8-254:10]

**Defendants' Response:**  Undisputed.


329.     Lett found 2 additional Editorials ("*Bloodshed and Invective In Arizona*" and "*As We Mourn*"), but Bennet apparently did not read those pieces either. [*Id.*, Bennet Depo 254:11-18]

**Defendants' Response:**  Defendants do not dispute the underlying facts, as set forth in Paragraphs 25-34 and Bennet's testimony, but dispute Plaintiff's characterizations of those facts.


330.     Notably, the "***As We Mourn***" editorial discusses President Obama's speech about Loughner's shooting and his recognition that Loughner's shooting cannot be blamed on rhetoric. [Vogt Decl. Ex. 30 at p. 19]

**Defendants' Response:**  Defendants do not dispute the contents of the cited exhibit, which speaks for itself.

### *The Results of Williamson's Research—Embodied in Her First Draft*

331.    As directed by Bennet, Williamson researched the Loughner shooting and knew, based on that research, she could not say there was a clear and direct link between the map circulated by Sarah Palin's political action committee and the Loughner shooting. (*See* Paragraph 68, above).

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not supported by any admissible evidence, see Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2), and mischaracterizes Williamson's testimony.  *See* Paragraphs 41-44; Reply to Paragraphs 41-44. Defendants also object to the heading of this section as it is unsupported argument, rather than a statement of fact.

332.    Williamson knew that any assertion that there was a clear and direct link between Gov. Palin and Loughner's Shooting would be false, so she made no such assertion. (*Id.*)

**Defendants' Response:**  Disputed.  Defendants object to this statement because it is not supported by any admissible evidence, see Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2), and mischaracterizes Williamson's testimony.  *See* Paragraphs 41-44; Reply to Paragraphs 41-44.

333.    Bennet conceded that Williams' first draft embodied the research he specifically asked her to conduct concerning any incitement leading to the Loughner shooting [Vogt Decl. Ex. 4, Bennet Depo 262:17-263:17, 264:3-12, and Williamson testified she wrote her draft consistent with what the research Bennet asked for showed:

> A     I wrote my piece based on what I found, so I did not draw a
>        link in what I wrote.
>
> Q     Why not?

A       I talked about the overheated political climate.

Q       Why didn't you draw a link?

A       Because that's not my job.· I wrote -- I wrote my piece
        based on the research that I did, and what I wrote reflected
        that research.

Q       When you say that's not your job, what do you mean?

A       I did my job. So I did the research, and I wrote the piece
        based on the research that I found.

Q       Based on the research that you found, did you think that
        you could say that there was a clear and direct link between
        the map circulated by Sarah Palin's political action
        committee and the Loughner shooting?

A       No.

[Vogt Decl. Ex. 3, Williamson Depo 142:3-143-24 (lines 143:5-24 quoted above)]

**Defendants' Response:** Disputed.  Defendants object to this statement because it is not

supported by any admissible evidence, see Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2), and

mischaracterizes Williamson's and Bennet's testimony.  *See* Paragraphs 29-33, 41-44; Replies to

Paragraphs 29-33, 41-44.


334.    Ms. Williamson did, however, falsely state that the Palin Map "put Giffords and

19 other Democrats under stylized crosshairs" because map depicted crosshairs over targeted

electoral districts, not Rep. Giffords and other individual lawmakers. [Vogt Decl. Ex. ,

Williamson Depo 232:24-234:10, 269:11-270:16]

**Defendants' Response:**  Defendants do not dispute that Williamson added the quoted

language to the draft, but dispute Plaintiff's characterization of this sentence.  *See* Paragraphs 36,

96.  Williamson testified that The Times corrected this sentence because it was "unclear:"

Q:  And did you determine that there was an error in that line?

A:  I determined that this line was unclear and we should make certain that the political action committee map was targeting electoral districts and not the individuals themselves.

Vogt. Decl. Ex. 3, Williamson Dep. 270:11-16.

A.    **Mr. Bennet's Defamatory Re-Write and Purposeful Avoidance of the Truth**

335.    Williamson submitted her first draft to Bennet, Semple, Fox, Frank Clines, as well as Cohn, at 4:45 p.m. [Vogt Decl. Ex. 59 ("shootings is in backfield" reference in Williamson's email indicates draft has been submitted to The Times content management system for editing); Vogt Decl. Ex. 3. Williamson Depo 230:16-231:11]

**Defendants' Response:**  Undisputed.  Defendants object to the heading of this section as it is unsupported argument, rather than a statement of fact.  Defendants also object to the heading of this section as it is unsupported argument, rather than a statement of fact.

336.    After reviewing the draft, at around 5:00 p.m., Cohn took it to Bennet's office and spoke with him about it because she, like everyone else besides Bennet, was not sure what he wanted in the piece:

> I sort of remember standing in front of his glass door, you know, opening up the door or something, and saying, "You need to look at this."...I recall thinking I wasn't really sure if its what *__he wanted__*. I thought there had been quite the confusion over the day as to where this piece was headed, as to be either more of a gun control piece or to be more of a piece about the political climate and the sort of lack of civility in America's political discourse...*__I wasn't sure what James intended, wanted in the piece__*. I wasn't sure if the piece worked...I wasn't sure it accomplished what James would want it to accomplish...there were a couple competing ideas about the piece...

[Vogt Decl. Ex. 6, Cohn Depo 57:13-58:22 (emphasis added)]

**Defendants' Response:**  Defendants do not dispute the underlying facts, as set forth in

Paragraphs 47-49, but dispute Plaintiff's characterizations of those facts.

337.    Cohn testified that when she went to Bennet's office to raise her concerns about

the piece, Bennet responded by saying something along the lines of, "yeah, it needs some work,

I'll do it." [Vogt Decl. Ex. 6, Cohn Depo 60:3-7]

**Defendants' Response:**  Defendants do not dispute the underlying facts, as set forth in

Paragraphs 47-49, but dispute Plaintiff's characterizations of those facts.

338.    At that point, Bennet set out to re-write the editorial consistent with his

preconceived narrative expressed in his earlier email [Vogt Decl. Ex. 25; Doc. 41-34, 8/16/17

Hr'g Tran. at 7:23-25, 8:25 (that draft "wasn't exactly accomplishing the objective that we had

set out to achieve," so Bennet "effectively re-wrote the piece.")]

**Defendants' Response:**  Disputed.  Defendants do not dispute the underlying facts, as set

forth in Paragraphs 51-55, but dispute Plaintiff's characterizations of those facts and Plaintiff's

contention that "Bennet set out to re-write the editorial consistent with his preconceived

narrative," an assertion that is not supported by any admissible evidence.

339.    In doing so, Bennet knowingly re-wrote the paragraph that embodied the results

of Williamson's research, which did not draw a clear and direct link between or label as

incitement the Palin Map and Loughner's shooting, and replaced her conclusion with his

preconceived narrative, including the defamatory statements that Mrs. Palin was responsible for the "incitement" of, and had a "clear" and "direct" "link" to, Loughner's shooting. (*Id.*)

**Defendants' Response:**  Disputed.  Defendants do not dispute that Bennet ultimately "effectively rewrote the piece," Paragraph 55, but dispute the remaining allegations, which are unsupported by admissible evidence and mischaracterize the cited testimony.  *See* Paragraphs 41-46, 51-55.

340.    Bennet testified he intentionally used the "very strong" word "incitement" because he "wanted to get our readers' attention" and knew the term was used to mean "deliberate orders, invocations, summonses for people to carry out violent attacks." and understood as meaning "a call to violence." [Doc. 41-34, 8/16/17 Hr'g Tran. at p. 11:13-12:25; Vogt Decl. Ex. 4, Bennet Depo 114:10-15]

**Defendants' Response:**  Disputed.  Plaintiff's statement mischaracterizes Bennet's testimony.  He testified that he understood "incitement" to mean a "a range of communications," from "deliberate orders" to lies about history or "maps that misrepresent the politics of the region."  Hr'g Tr. 12:13-25; *see* Reply to Paragraph 85.

341.    Cohn understood "incitement" to be "very direct" and mean "that it—that the map led him to commit the shooting" [Vogt Decl. Ex. 6, Cohn Depo 96:15-97:7]. Likewise, Douthat immediately understood Bennet's use of "incitement" to draw a causal connection between Palin's map and Loughner's shooting [Vogt Decl. Ex. 41]

**Defendants' Response:**  Disputed.  Plaintiff's statement mischaracterizes Cohn's testimony.  *See* Reply to Paragraphs 82-83.  Defendants do not dispute the content of Douthat's

email, only Plaintiff's characterization, and refer to Paragraphs 80-82, referenced herein.

342.    In fact, Mr. Bennet found his inspiration for his narrative about Gov. Palin's "incitement" of Loughner Friedman's, August 9, 2016 column, "*Trump's Wink Wink to 'Second Amendment People*," and its premise that "Donald Trump's language... could end up ***inciting***... violence," akin to the "wave of toxic ***incitement*** against [Yitzhak] Rabin," which included calls for Rabin's death prior to his assassination at a peace rally in 1995. [*See* Paragraph 57, above; Vogt Decl. Ex. 120]

**Defendants' Response:**  Disputed.  This statement is not supported by any admissible evidence, *see* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2), and mischaracterizes the cited testimony. Bennet testified only that he had the Friedman column in mind when editing the Editorial.  Vogt Decl. Ex. 4, Bennet Dep. 184:21-25.

343.    Bennet testified that Friedman's column was one of his motivations for re-writing and crafting the defamatory portions of the America's Lethal Politics editorial. [Vogt Decl. Ex. 4, Bennet Depo 184:21-25] Bennet described Friedman's piece as having made a "powerful impression on me." [*Id.*, Bennet Depo 182:18-25]

**Defendants' Response:**  Disputed.  This statement is not supported by any admissible evidence, *see* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2), and mischaracterizes the cited testimony. Bennet testified only that the Friedman had made a "powerful impression" on him and that he had it in mind when editing the Editorial.  Vogt Decl. Ex. 4, Bennet Dep. 182:21-25, 184:21-25.

344.     In fact, Bennet and Friedman spoke about the column before it was published, when Friedman told Bennet Trump's statement "reminded him of the kind of rhetoric, inflammatory rhetoric" in Israel leading up to the shooting of Prime Minister Rabin. [*Id.*, Bennet Depo 183:1-24]

**Defendants' Response:**  Undisputed.

345.     Bennet sent his draft of the Editorial to Williamson at around 7:30 PM [Vogt Decl. Ex. 98]—leaving plenty of time for him to check his facts before publication.

**Defendants' Response:**  Defendants do not dispute the underlying facts, as set forth in Paragraphs 66-68, but dispute Plaintiff's characterizations of those facts.

346.     Bennet was responsible for fact-checking the portions of the editorial he re-wrote. [Vogt Decl. Ex. 3, Williamson Depo 67:14-68:6]

**Defendants' Response:**  Disputed, to the extent this statement mischaracterizes Williamson's testimony, which read as follows:

> Q:  And, so, would Mr. Bennet have been responsible for fact checking the portions that he rewrote?
> A.  He would be responsible for checking the portions that he wrote as assisted by the fact checkers, yes.

Vogt Decl. Ex. 3, Williamson Dep. 68:1-6.

347.     As an experienced editor, Mr. Bennet is an expert in the business of knowing and understanding the meanings and significance of words. [Doc. No. 41-34, 8/16/17 Hrg Tran. at 13:21-14:5; *see* Paragraphs 235-239, above]

**Defendants' Response:**  Defendants do not dispute that Bennet is an experienced editor. The remaining allegations in this statement are not supported by any admissible evidence, *see* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2), and instead make arguments about the implications of Bennet's experience.  Plaintiff cites to a question from the Court to Bennet.  Hr'g Tr. At 13:21-23 ("Well, maybe I am asking a more narrow question. I am asking a question about grammar and sentence structure, which presumably you have some expertise in.").

## B.      The Defamatory Passages

348.    On June 14, 2017, published the false and defamatory Palin Article, "*America's Lethal Politics*," online, and immediately promoted it on their social media accounts. [Vogt Decl. Ex. 33-35]

**Defendants' Response:**  Defendants do not dispute that The Times published the Editorial online and shared it on Facebook and Twitter.  *See* Def. Ex. 2 and Vogt Decl. Ex. 33-35.  Defendants note that the full text of the Editorial is not visible in Vogt Decl. Ex. 33 and refer to Def. Ex. 2 for the fully contents.  Defendants dispute—and expressly deny—Plaintiff's improper descriptions of the Editorial as "false and defamatory" or "the Palin Article."  Defendants also object to the heading of this section as it is unsupported argument, rather than a statement of fact.

349.    The Editorial was also prominently featured on The Times' homepage. [Vogt Decl. Ex. 167]

**Defendants' Response:**  Undisputed.

350.     On June 15, 2017, The Times published the Palin Article in *The New York Times* print edition. [Vogt Decl. Ex. 36]

**Defendants' Response:**  Undisputed, except for Plaintiff's description of the Editorial as "the Palin Article."

351.     The Editorial asserted the existence of "Lethal Politics" evidenced by a "sickening pattern" of politically "incited" violence against members of Congress, the only example of which was Gov. Palin's direct and clear incitement of Loughner's Shooting. [Vogt Decl. Ex. 33]

**Defendants' Response:**  Defendants do not dispute the contents of the Editorial, Def. Ex. 2, which speaks for itself, but dispute Plaintiff's characterization of its contents.

352.     Bennet wrote and *The Times* published the following false and defamatory statements of and concerning Gov. Palin:

> Was this attack evidence of how vicious American politics has become? Probably. In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.

> Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask for of the right.

**Defendants' Response:**  Defendants do not dispute the contents of the Editorial, Def. Ex. 2, which speaks for itself, but dispute Plaintiff's characterization of its contents.  Defendants dispute—and expressly deny—Plaintiff's improper descriptions of the Editorial as "false and defamatory."

353.    Bennet conceded the above-two passages of the Editorial are false. [Vogt Decl. Ex. 4, Bennet Depo 92:18-94:5]

**Defendants' Response:**  Disputed.  This statement mischaracterizes Bennet's testimony. Bennet did not testify that the two referenced paragraphs were false.  Bennet testified that "we did a very poor job – I did, of trying to express the thought that created an inference for readers that there was a causal link between political incitement and the shooting of Gabby Giffords. And the point where that happens is where we say "the link to political incitement is clear.'" Vogt Decl. Ex. 4, Bennet Dep. 93:8-14; Paragraph 84.  Bennet also testified:

> Q:  And did you determine that there was an error in that line?And the middle tweet here, the one that's the largest text –
>
> A:  Yes.
>
> Q:  says, "We got an important fact wrong,  incorrectly linking political incitement and the 2011 shooting of Giffords. No link was ever established."  Do you see that?
>
> A:  I do.
>
> Q:  Is that an accurate statement?
>
> A: I -- if I had been writing this, I probably would have worded it differently, but it's an accurate statement.
>
> Q:  How would you have worded it differently if you were involved in writing it?

A:  I think -- I mean, I think that -- I think this is correct.· I might have gone -- I would have said, you know, that we -- we did -- we failed to make ourselves clear and -- and, as a result, confused people about the facts of that day.

Q:  So what would you have said?

A:  But this is why I don't draft tweets.  You couldn't have done this in 140 characters.

Q:  Well, did you -- did you ever endeavor to do it in more characters?

A: We corrected it, yeah, in the paper. And that correction is linked to the tweet here, right?

*Id.* at 81:15-82:17.

354.    The Editorial also falsely asserted that the map put crosshairs over individual lawmakers. (*See* Paragraph 334, above).

**Defendants' Response:**  Disputed.  This statement is unsupported by any admissible evidence.  As explained in Defendants' Response to Paragraph 336, incorporated herein, Williamson testified that The Times corrected this sentence because it was "unclear:"

Q:  And did you determine that there was an error in that line?

A:  I determined that this line was unclear and we should make certain that the political action committee map was targeting electoral districts and not the individuals themselves.

Vogt. Decl. Ex. 3, Williamson Dep. 270:11-16; *see also* Paragraphs 36, 96.

## The Knowingly False Premise of a "Pattern"

355.    When Bennet rewrote the Editorial, he knew there was no evidence of incitement leading to Hodgkinson's shooting. [Vogt Decl. Ex. 4, Bennet Depo 245:5-247:2]]

**Defendants' Response:**  Disputed.  This statement is not supported by any admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  The cited testimony does not support Plaintiff's statement. Defendants incorporate their response to Paragraph 94, above.  Defendants also object to the heading of this section as it is unsupported argument, rather than a statement of fact.

356.    And Bennet claimed he did not know whether any link existed between Palin's map Loughner's shooting. [Vogt Decl. Ex. 37]

**Defendants' Response:**  Defendants object to this statement as unsupported by any admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  The cited testimony does not support Plaintiff's statement.  Defendants incorporate Paragraphs 83-95, regarding Bennet's intended meaning and understanding of that meaning.

### There was no Need to Mention Palin at all

357.    After completion of the US Edition of the Editorial, Linda Cohn and Fox set out to "trim" the Editorial for the International Edition. [Vogt Decl. Ex. 71]

**Defendants' Response:**  Undisputed.  Defendants object to the heading of this section as it is unsupported argument, rather than a statement of fact.

358.    During that process, they deleted the defamatory passages of the Editorial and any reference therein to Sarah Palin. [Id.; Vogt Decl. Ex. 72]

**Defendants' Response:**  Defendants do not dispute the edits to or contents of the Editorial as it appeared in the international edition of The Times, *see* Paragraph 76, Sullivan

Decl. Ex. 50, but dispute Plaintiff's characterization of those facts.  Defendants dispute—and expressly deny—Plaintiff's improper reference to the "defamatory passages."

359.    Linda Cohn testified the trimmed International Edition of the Editorial does an effective job of expressing the opinions that the Board tried to express in the original Editorial that appeared on June 14 of 2017. [Vogt Decl. Ex. 6, Cohn Depo 136:4-13, 137:11-140:8]

**Defendants' Response:**  Undisputed.  Defendants note that Williamson testified that the international edition, "generally expresses the same ideas.  I see some little things that are a bit different."  Vogt Decl. Ex. 6, Cohn Dep. 140:6-8.

### *The Times* Concedes the Falsity of the Palin Article— But Does Not Meaningfully Retract It or Apologize

360.    The night of June 14, Times columnist Ross Douthat immediately told Bennet the Editorial was false. (*See* Paragraph 80, above).

**Defendants' Response:**  Defendants do not dispute the underlying facts, as set forth in Paragraphs 80-82, but dispute Plaintiff's characterizations of those facts.  Defendants also object to the heading of this section as it is unsupported argument, rather than a statement of fact.

361.    Early the next morning, already facing significant criticism, Bennet emailed Williamson and Lepping and asked them to research whether what he said was true, and in that email makes no mention of his current position that he never intended the words "incitement" and "clear" and "direct" link to mean exactly what they said:

Hey guys -- We're taking a lot of criticism for saying that the attack on Giffords was in any way connected to incitement. The claim is that this was fully investigated and debunked in the months after the attack, and the shooter was found to have acted only because of his personal demons. I don't know what the truth is here but we may have relied too heavily on our early editorials and other early coverage of that attack. If so, I'm very sorry for my own failure on this yesterday. In any case I'd like to get to the bottom of this as quickly as possible this morning and correct the piece if needed. Can you two please put your heads together on this first thing this morning? Please skip the morning meeting if necessary. JB

[Vogt Decl. Ex. 37]

**Defendants' Response:**  Defendants do not dispute the contents of Bennet's email or that Bennet sent it at 5:08 a.m. the morning after publication of the Editorial, as set forth in Paragraphs 101-103, but dispute Plaintiff's characterizations of those facts.  Bennet contacted Williamson immediately after his correspondence with Douthat (at 11:00 p.m. on June 14, 2017), to see if she was available to begin investigating Douthat's concerns, Paragraph 99; emailed others on the Editorial Board at 5:08 a.m. the following morning to enlist their assistance as well, Paragraph 101-103; and the Times published the First Correction by 11:15 a.m. the next morning, Paragraph 106.

362.    Bennet also texted Williamson early that morning, a text exchange which Williamson emailed to herself at 9:25 a.m., which stated in pertinent part [Vogt Decl. Ex. 101, 164-165]



No worries. I feel lousy about this one -- I just moved too fast. I'm sorry.

Now what I need from you/ Eileen soonest is a rock-solid version of what we should say -- that an investigation showed NO link to incitement, or NO DIRECT link or NO CLEAR link. I

**Defendants' Response:**  Defendants do not dispute the contents of Bennet's text message, but dispute Plaintiff's characterizations of that message.  As shown in Paragraph 99, Defendant first contacted forth in Paragraphs 101-103, but dispute Plaintiff's characterizations of those facts.  Bennet contacted Williamson immediately after his correspondence with Douthat (at 11:00 p.m. on June 14, 2017), to see if she was available to begin investigating Douthat's concerns, Paragraph 99; emailed others on the Editorial Board at 5:08 a.m. the following morning to enlist their assistance as well, Paragraph 101-103; and the Times published the First Correction by 11:15 a.m. the next morning, Paragraph 106.

363.    By the time of this text exchange at no later than 9:25 a.m., Williamson had not conducted any research on the issue Bennet texted her about [Vogt Decl. Ex. 3, Williamson Depo 269:11-274:1], which shows Bennet already knew no link existed <u>before</u> Williamson conducted any research that morning.

**Defendants' Response:**  Disputed.  Defendants do not dispute Williamson's testimony that, when she received Bennet's text message at 9:25 a.m., she began to research the question in that text message. Vogt Decl. Ex. 3, Williamson Dep. 272:17-23.  Defendants dispute the remaining allegations in this statement, which are not supported by any admissible evidence, *see* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

364.    *The Times* was hit by public backlash from its readers and even liberal-leaning media outlets over falsely stating that Gov. Palin incited Loughner to commit murder. [Vogt Decl. Ex. 99, 100, 73, 140, 141, 142, 143, 144, 145, 146, 70, 39, 40]

**Defendants' Response:**  Disputed.  This statement is not supported by any admissible

evidence, *see* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).  Defendants incorporate Paragraphs 79-80.

365.    As soon as Cohn arrived at work early on the morning of June 15, 2017, everyone already knew Editorial was wrong about the link and she immediately started working on a correction with Bennet and Wegman in her office. [Vogt Decl. Ex. 6, Cohn 68:14-70:3; 143:14-18; 147:7-148:3, 150:4-152:18]

**Defendants' Response:**  Defendants do not dispute the underlying facts, as set forth in Paragraph 17 and Defendants' Reply to Paragraph 17, but dispute Plaintiff's characterizations of those facts.

366.    During this same time period, Hannah Ingber reached out to Bennet about the "Sarah Palin" Editorial. [Vogt Decl. Ex. 64]

**Defendants' Response:**  Defendants do not dispute the contents of Ingber's email, but dispute Plaintiff's characterizations of the email.

367.    Along with an initial edit, *The Times* added a half-hearted correction (the "First Attempted Correction") [Vogt Decl. Ex. 43] written in a passive voice about the "link" between "political <u>incitement</u>" and Loughner's heinous crime:

> *Correction: June 15, 2017*
> *An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established.*

**Defendants' Response:**  Defendants do not dispute that The Times published the First Correction or the contents of the first correction, *see* Paragraphs 106-107, but dispute Plaintiff's characterization of the first correction.

368.    The First Attempted Correction did not remove the unnecessary reference in the column to Gov. Palin, even though there was no established connection between "political incitement" and Loughner's crime, and as written, also suggests that such a connection may still be established, when Mr. Bennet and *The Times* already knew that no such link existed, while making no mention of Gov. Palin, while the column continued to reference her by name. (*Id.*)

**Defendants' Response:**  Defendants do not dispute that The Times published the First Correction or the contents of the first correction, *see* Paragraphs 106-107, but dispute Plaintiff's characterization of the first correction.

369.    Given that Mr. Bennet's entire thesis in re-writing the Palin Article was the "sickening pattern" of politically incited violence that emanated from a false link between Gov. Palin and Loughner's 2011 crime, which *The Times* concedes did not exist, the entire Palin Article should have been retracted—not minimally and inadequately corrected. [Doc. 41-34, 8/16/17 Hr'g Tran. 50:22-51:8]

**Defendants' Response:**  Disputed. This statement is not supported by any admissible evidence, *see* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2), misstates the evidence in the case, and makes improper legal arguments based on these misstatements.

370.    While working on the correction, Bennet was also working on responding to media inquiries and a Tweet to accompany the correction. [PL Depo Ex 49]

**Defendants' Response:**  Undisputed.


371.    In drafting the Tweets to accompany the correction, Bennet actually wrote the portion that states, "We got an important wrong..." [Vogt Decl. Ex. 4, Bennet Depo. 81:3-83:6, 84:14-90:14; Vogt Decl. Ex. 66]

**Defendants' Response:**  Undisputed.


372.    *The Times'* Editorial Page eventually published the Tweet about the correction, admitting Bennet's "fact" error:



**Defendants' Response:**  Defendants do not dispute that The Times published a series of tweets on the opinion division Twitter account, @NYTOpinion, which speak for themselves. Defendants incorporate Paragraph 111, above.

373.    As that process was unfolding, Bennet and The Times also were aware of Palin's tweets about the defamatory Editorial. [Vogt Decl. Ex. 4, Bennet Depo. 284:20-285:14; Vogt Decl. Ex. 100]

**Defendants' Response:**  Disputed.  This statement is not supported by any admissible evidence, *see* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2), and misstates the testimony in the case. Bennet expressly testified, in the cited passage, reads as follows:

> Q:  If you go to the very first page of this exhibit, you see Danielle there, there's some -- some links to some tweets by Sarah Palin?
>
> A:  I see that.
>
> Q:  Did you ever see any tweets from Sarah Palin?
>
> A:  I don't remember seeing any tweets from her.
>
> Q:  Do you –
>
> A:  I can't – I can't say that I didn't.  But again, these two days, I was scrambling.  And as it says in that note to Daniel, I can't remember what it was, but I was in, like, meetings all day long and rushing in and out of stuff, so I was relying on the way this was being translated to be and summarized by Danielle.
>
> …
>
> Q:  Do you recall seeing that tweet on the 15th?
>
> A:  No.

Vogt Decl. Ex. 4, Bennet Dep. 284:8-19, 285:12-14.

374.    The Times eventually published a second online correction [Vogt Decl. Ex. 44] but only after it was called out by CNN for falsely asserting that the Palin Map placed crosshairs over individual lawmakers and, specifically, Rep. Giffords. [Vogt Decl. Ex. 145]

**Defendants' Response:**  Disputed.  Defendants do not dispute that The Times published the Second Correction or the contents of the second correction, *see* Paragraphs 109-110, but dispute Plaintiff's characterization of the second correction and the remaining allegations in this statement, which are not supported by any admissible evidence, *see* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

375.    Still devoid of any reference to Gov. Palin, this second correction (the "Second Attempted Correction") addressed the mischaracterization of the map of targeted electoral districts as placing "stylized cross hairs" on Gabrielle Giffords and other lawmakers individually and changed the word "incitement" to "rhetoric." [Vogt Decl. Ex. 44]

> **Correction: June 16, 2017**
> *An editorial on Thursday about the shooting of Representative Steve Scalise incorrectly stated that a link existed between political rhetoric and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established. The editorial also incorrectly described a map distributed by a political action committee before that shooting. It depicted electoral districts, not individual Democratic lawmakers, beneath stylized cross hairs.*

**Defendants' Response:**  Disputed.  Defendants do not dispute that The Times published the Second Correction or the contents of the second correction, *see* Paragraphs 109-110, but dispute Plaintiff's characterization of the second correction.

376.    Even in the second correction, Bennet refused to recede from his original.
preconceived narrative despite the fact that Wegman pointed out that keeping any reference to

Palin in the Editorial was still trying to "sneaking the link in." [Vogt Decl. Ex. 63]

**Defendants' Response:**  Disputed.  Defendants do not dispute the contents of the second correction, *see* Paragraphs 109-110, but dispute the remaining allegations in this statement, which are not supported by any admissible evidence, *see* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

377.     In fact, Bennet confirmed his allegiance to his narrative in a statement provided to CNN, in which Mr. Bennet said:

> While it is always ***agonizing*** to get something wrong we appreciate it when our readers call us out like this. We made an ***error of fact*** in the editorial and we've corrected it. ***But that error doesn't undercut or weaken the argument of the piece.***

[Vogt Decl. Ex. 145, p. 1 (Emphasis added)]

**Defendants' Response:**  Disputed.  Defendants do not dispute the contents of the cited email, which speaks for itself, but dispute Plaintiff's characterization of that email.

378.     Bennet maintains he could not apologize to Palin because there is a NYT policy prohibiting apologies, although there is no written policy to this effect. [Vogt Decl. Ex. 4, Bennet Depo. 282:18-284:3] Nevertheless, Bennet admitted he never made an attempt to personally apologize to Gov. Palin. (*Id.*)

**Defendants' Response:**  Undisputed.

379.     This supposed policy against apologies flies in the face of The Times itself demanding apologies from other news organizations when they made false statements about The Times. [Vogt Decl. Ex. 119]

**Defendants' Response:**  Disputed.  This statement is not supported by any admissible evidence, *see* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2), and makes improper legal arguments.

380.    On June 16, 2017, *The Times'* published at the bottom of its Editorial Page, in fine print, the same inadequate online corrections it ran on the Editorial—completely devoid of any reference or apology to Gov. Palin. [Vogt Decl. Ex. 49]

**Defendants' Response:**  Disputed.  Defendants do not dispute that The Times published the Second Correction or the contents of the Second Correction, *see* Paragraphs 109-110, but dispute Plaintiff's characterization of the Second Correction.

381.    Following the Editorial and its corrections, Palin still received death threats because of its publication, just like those following the false accusations in 2011. [Vogt Decl. Ex. 208 (Devine Tweet); Vogt Decl. Ex. 9, Palin Depo. 175:14-178:2]

**Defendants' Response:**  Disputed.  This statement is not supported by any admissible evidence, as required by L.R. 56.1.  Plaintiff has not produced any evidence of the claimed death threats or any evidence suggesting any death threats received were caused by the Editorial, despite Defendants' repeated demands for proof.

Dated:  July 17, 2020

Respectfully submitted,

BALLARD SPAHR LLP

By:  */s/ Jay Ward Brown*
    Jay Ward Brown
    David L. Axelrod
    Thomas B. Sullivan
    Jacquelyn N. Schell
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200

Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

*Counsel for Defendants*