**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X
                                :

SARAH PALIN,                   :  No. 17 Civ. 4853 (JSR)

           Plaintiff,      :  ECF Case

                              :

        -against-        :

                              :

THE NEW YORK TIMES COMPANY and JAMES  :
BENNET,                           :

           Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION *IN LIMINE* TO EXCLUDE THE
<u>TESTIMONY OF CRAIG KRONENBERGER</u>**

David L. Axelrod
Jay Ward Brown
Thomas B. Sullivan
Jacquelyn N. Schell
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
axelrodd@ballardspahr.com
brownjay@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

*Counsel for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

I.    INTRODUCTION ..................................................................................................1

II.   KRONENBERGER'S PURPORTED TESTIMONY ...........................................2

      A.    Kronenberger's Background .......................................................................2

      B.    Kronenberger's Report ...............................................................................3

III.  STANDARD OF REVIEW ....................................................................................5

IV.   ARGUMENT ..........................................................................................................6

      A.    Kronenberger Improperly Assumed Palin Had Been Harmed ..................7

            1.    The Report Does Not Analyze Gov. Palin's Pre-Existing
                  Reputation and Polarizing Public Persona .....................................7

            2.    The Report Does Not Consider the Impact of 2011 Criticism....................9

            3.    Kronenberger Failed to Analyze the Impact of Pro-Palin
                  Media Coverage or The Times' Corrections .................................9

            4.    Kronenberger Ignored His Usual Methods for Assessing
                  Reputational Impact Because the Analysis Would Not Support
                  Palin's Position ...........................................................................11

      B.    Kronenberger's Analysis of "Engagement" is Meaningless.................13

      C.    Kronenberger's Analysis of Repair Cost is Untested, Untestable, and
            Completely Unreliable .............................................................................17

            1.    Kronenberger Relies on a Widely-Rejected, Unexplained, and
                  Mis-Applied Methodology to Calculate the Cost of a Digital
                  Ad Campaign .................................................................................17

            2.    Kronenberger Has No Basis for His Opinion on the Cost of a
                  Print Campaign ..............................................................................19

            3.    Kronenberger Failed to Consider the Impact of Other
                  Reporting About the Editorial.......................................................19

V.    CONCLUSION......................................................................................................20

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Algarin v. NYC Dep't of Corr.*,
   460 F. Supp. 2d 469 (S.D.N.Y. 2006)..........................................................................14, 18, 19

*Amorgianos v. Amtrak*,
   303 F.3d 256 (2d Cir. 2002)..............................................................................5, 6, 17, 18

*Boucher v. U.S. Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996)..............................................................................................7

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
   650 F. Supp. 2d 314 (S.D.N.Y. 2009)...............................................................................14, 15

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993).................................................................................... *passim*

*Faiveley Transp. USA, Inc. v. Wabtec Corp.*,
   511 F. App'x 54 (2d Cir. 2013) ....................................................................................7

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)..................................................................................................6, 14

*Israel v. Springs Indus.*,
   No. 98 CV 5106 (ENV) (RML), 2006 U.S. Dist. LEXIS 80863 (E.D.N.Y.
   Nov. 3, 2006) ......................................................................................................20

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)..................................................................................................5

*Scentsational Techs., LLC v. Pepsi, Inc.*,
   No. 13-cv-8645 (KBF), 2018 U.S. Dist. LEXIS 24375 (S.D.N.Y. Feb. 14,
   2018) ..............................................................................................................13, 14, 16

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991)........................................................................................7

**Other Authorities**

Fed. R. Evid. 702 ............................................................................................ *passim*

Defendants The New York Times Company ("The Times") and James Bennet (together with The Times, "Defendants"), by and through their undersigned attorneys, respectfully submit the following Memorandum of Law in Support of their Motion to Exclude the Testimony of Craig Kronenberger.

## I.    INTRODUCTION

Plaintiff Sarah Palin, the former governor and Republican vice presidential nominee, filed this suit against Defendants, claiming that they defamed her by the publication of the editorial, "America's Lethal Politics" ("Editorial").  Gov. Palin has not articulated any specific financial harm and is not seeking to recover any lost income or business opportunities.  Rather, she claims she is entitled to damages for harm to her reputation.

In the absence of any direct evidence of such harm, Gov. Palin intends to introduce the testimony of Craig Kronenberger, a purported expert witness, who simply assumes that she was harmed, in a futile attempt to both prove damage to her reputation and establish how much it would cost to repair the hypothetical harm.  Kronenberger is expected to offer an expert opinion as to: (1) the dissemination, reach, and "engagement" of the Editorial; and (2) the cost of "a campaign designed to counteract" the harm purportedly caused by the Editorial.  His approach to rendering these opinions, however, does not even begin to satisfy the admissibility requirements set forth in Rule 702 of the Federal Rules of Evidence or *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny.

Kronenberger's opinion suffers from three primary infirmities.  First, Kronenberger simply assumes that the Editorial harmed Palin's reputation, without any evidentiary basis or analysis of Palin's reputation pre-publication versus post-publication.  Second, his analysis of the extent of this harm consists of simply his conclusions about "readership" and "engagement,"

unsupported by any academic or scientific methodology.  Third, Kronenberger's purported

methodology for calculating the cost of a campaign to "fix" Palin's reputation is nonsensical and

Kronenberger cannot even explain how it works.

Kronenberger's proposed testimony fails to satisfy the *Daubert* standard, and Defendants

respectfully request that the Court grant this motion and preclude Gov. Palin from introducing

Mr. Kronenberger's testimony at trial.

## II.      KRONENBERGER'S PURPORTED TESTIMONY

To prove harm to her reputation at trial, Gov. Palin will rely solely on her own,

uncorroborated testimony.  She will not introduce testimony from other people or any documents

to support her assertion.  Kronenberger is expected to offer expert testimony on the impact of the

Editorial and his proposal to correct the assumed harm to Gov. Palin's reputation.

### A.      Kronenberger's Background

Kronenberger is not an academic or a social scientist, and he does not analyze the impact

of published articles or editorials.  Rather, he is a public relations professional who claims to

work in the field of "promoting and protecting reputations for brands, organizations, executives,

and individuals," and dabbles as a putative expert witness.  *See* Declaration of David L. Axelrod

("Axelrod Decl."), Ex. 1 ("Kronenberger Report" or "Report") at 3.[1]  Consequentially,

Kronenberger does not apply an academically rigorous approach to his analysis.  Instead, his

methodology is based on his experience, his opinion, and his attempt to be "fair."  *See id.*, Ex. 2

("Kronenberger Dep.") at 264:13-265:14.

---

[1] The Kronenberger Report is 15 pages long including its cover page. However, pages that
should be numbered 7 through 14 are labeled pages 2 through 9. For this reason, the page cites
herein refer to the pdf page numbers of the Report (including its cover) and not the page number
listed on the page.

Kronenberger does not have a significant track record as an expert in the area of reputational repair.  He has only been proposed as an expert five times, including this case. Report at 5.  It appears that only one court has permitted Kronenberger to testify as an expert, Kronenberger Dep. at 127:24-128:3, and in at least two of the five cases, the opposing party has sought to preclude Kronenberger's testimony.  Axelrod Decl. Ex. 3 (Motion to Exclude in *Jason Miller v. Gizmodo*); Ex. 4 (Motion to Exclude in *Gordon Daniels v. HSN*).[2]

## B.    Kronenberger's Report

On February 28, 2020, Plaintiff's counsel disclosed Kronenberger's 14-page Report, which purports to summarize Kronenberger's expert opinions on both (1) the reach of the Editorial; and (2) the cost of a campaign designed to counteract the purportedly defamatory impact of the publication of the Editorial on Sarah Palin's reputation.

Kronenberger's Report does not assess, in any way, whether the Editorial harmed Gov. Palin's reputation.  Instead, he simply assumes that her reputation was harmed, without identifying any record evidence to support this assumption.  *See* Kronenberger Dep. at 20:9-14 (purporting to "calculate[] . . . the cost . . . to repair the defamatory impact *assuming there was one*" (emphasis added)).[3]  The Report does not analyze Palin's historical popularity or assess how the public has viewed Palin – positively or negatively – over the years.[4]

---

[2] Both the *Miller* and *Daniels* courts denied the motions as moot, after granting the respective defendants' motion for summary judgment on Miller and Daniels' defamation claims.

[3] Kronenberger's Report makes any number of smaller assumptions, as well.  For instance, he contends that it is "safe to assume" that not everyone read the corrections, but appears to assume that everyone read the Editorial through to the reference to Gov. Palin's PAC half-way through the Editorial and understood that reference as Gov. Palin did.  *See* Report at 10.

[4] Kronenberger did not analyze whether the Editorial harmed Palin's reputation, even though Kronenberger has undertaken this very type of analysis in at two previous expert reports.  *See Miller v. Gizmodo Media Group, LLC*, No. 1:18-cv-24227-CMA (S.D. Fla.), Dkt. 161-1 ("*Miller* Report") at 13-17; *Ahmed v. Kifle*, No. 1:12-cv-02697-SCJ (N.D. Ga.), Dkt. 77-1 ("*Kifle*

Kronenberger's analysis is broken into two parts.  First, Kronenberger provides a superficial analysis of the reach of the Editorial, relying on general readership of *The New York Times*, rather than specific readers of the Editorial, to estimate how many people "potentially" saw the Editorial.  Report at 10.  Without any rigorous quantitative analysis, he purports to look at readers' "engagement" with the Editorial, using words like "significant" and "high volume" but offering no basis for those conclusions.  *Id.* at 6.  He provides no context for these numbers—that is, he does not meaningfully compare the Editorial against other contemporaneous New York Times editorials or to editorials in other outlets.  Instead, solely using his experience as a guide, he claims the "impacts of the [Editorial] on Sarah Palin are substantial," implicitly making yet another assumption—that high readership or engagement necessarily means that readers understood the Editorial as Gov. Palin does and thought less of her as a result.  *Id.* at 9.

Second, Kronenberger purports to calculate the cost of repairing the harm to Palin's reputation. He opines there are three components: (1) a digital ad campaign; (2) a print ad campaign; and (3) the cost to devise and construct the digital and print ads.  *Id.* at 13-15.  To calculate the cost of the digital ad campaign, Kronenberger uses a proprietary formula from a third-party entity, though he claims not to know the components that make up this formula, Kronenberger Dep. at 290:3-21, and concedes he is the only person in the industry to use this formula to calculate the cost of reputation repair, *id.* at 281:8-24.  To calculate the cost of the print ad campaign, Kronenberger came up with a number that he thought was "fair."  *Id.* at 264:13-265:14.

---

Report") at 9-10.  The *Miller* and *Kifle* Reports are attached to the Axelrod Declaration as Exs. 5 and 6, respectively.

III.    STANDARD OF REVIEW

Trial courts serve as gatekeepers for expert witnesses and are tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (holding that the *Daubert* principles apply to all forms of expert testimony).  This determination begins with the requirement that an expert witness must be qualified by "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  Even if the expert is qualified, his or her testimony is admissible only if:

    a.  the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue;

    b.  the testimony is based upon sufficient facts or data;

    c.  the testimony is the product of reliable principles and methods; and

    d.  the expert has reliably applied the principles and methods to the facts of the case.

*Id.*; *Daubert*, 509 U.S. at 591.  The party seeking to present an expert's testimony must establish each of these elements by a preponderance of proof.  *See Daubert*, 509 U.S. at 592 n.10; Fed. R. Evid. 702, Advisory Committee Notes on 2000 Amendments ("[T]he proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence").

When evaluating the reliability of an expert's testimony, the court must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."  *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002).  It is "critical that an expert's analysis be reliable *at every step*."  *Id.* (emphasis added).

First, the district court must determine whether an expert is qualified.  Next, the court "must determine 'whether the proffered testimony has a sufficiently "reliable foundation" to permit it to be considered,'" based on the factors enumerated in *Daubert*: whether a theory or technique had been and could be tested, whether it had been subjected to peer review, its error rate, and its degree of acceptance within the relevant scientific community.  *See Amorgianos*, 303 F.3d at 265 (citing *Daubert*, 509 U.S. at 597).  Finally, Rule 702 requires a sufficiently rigorous analytical connection between the expert's methodology and conclusions, and "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."  *Id.* at 266, 270 (affirming trial court's exclusion of experts where there was "too great an analytical gap"); *see Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

## IV.  ARGUMENT

There are a number of significant problems with Kronenberger's proffered opinions which make them completely unreliable and inadmissible.  *First*, he simply assumes, without any evidentiary or analytical basis, that Ms. Palin has been harmed and requires compensation to fix this harm.  *Second*, he opines, without any scientific or mathematical basis, that there was a "high volume" of readership and engagement with the Editorial and that this correlates with a "substantial" impact on Gov. Palin.  *Third*, he opines on the anticipated cost of repairing Gov. Palin's reputation, relying on a formula that he claims he does not even understand.

### A.      Kronenberger Improperly Assumed Palin Had Been Harmed

Gov. Palin seeks to call Kronenberger as an expert witness to testify how much it will cost to fix her reputation, but Kronenberger skips over the first necessary step of actually determining *whether* Palin's reputation was harmed.[5]  Kronenberger simply assumes that it was.  Thus, his opinion fails before it even begins, because it is based on speculative assumptions, rather than "facts or data."  Fed. R. Evid. 702(b); s*ee Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996) (reversing admission of expert testimony that was based on "unrealistic and speculative assumption[s]"); *Faiveley Transp. USA, Inc. v. Wabtec Corp.*, 511 F. App'x 54, 56-57 (2d Cir. 2013) (affirming exclusion of expert whose testimony "included sweeping statements that were detached from the actual evidence").

### 1.      The Report Does Not Analyze Gov. Palin's Pre-Existing Reputation and Polarizing Public Persona

It is indisputable that Gov. Palin was already a known quantity on June 14, 2017, when The Times published "America's Lethal Politics."  She served as the Governor of Alaska and was the first female Republican Party Vice Presidential nominee.  Since Palin resigned as Governor of Alaska in 2009, she has written books, hosted reality television shows, and been a paid Fox News contributor.  It is also true that Gov. Palin is a politically polarizing figure.  Since she emerged on the national scene, she has been lionized by conservatives for her outspoken support of the Tea Party, attacks on "Obamacare," and trolling of popular Democratic Party politicians.  This picture is just one example:

---

[5] By merely assuming that Gov. Palin's reputation was harmed, Kronenberger also usurps the role of the judge and jury, who must decide whether Gov. Palin has proven actual harm to her reputation and/or whether the law and other evidence in the case allow for the presumption of such harm.  *See United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).



Others have been highly critical of her. Palin has been lampooned on *Saturday Night Live* and chided for interviews she gave during the 2008 presidential election. By June 14, 2017, when The Times published "America's Lethal Politics," Palin was well known, and her reputation – for better or worse – was well established.  In a 2016 ABC News/Washington Post poll, 56% of Republicans viewed Palin favorably, while 69% of the rest of the public viewed her "unfavorably." Axelrod Decl. Ex. 7 at 3 (ABC News/Washington Post Poll: The GOP Contest (Jan. 26, 2016)).

Despite this, Kronenberger did nothing to assess Gov. Palin's reputation before the Editorial, whether the Editorial had an impact on it, or the positive or negative extent of that impact.  (As discussed below, much of the public reaction to the Editorial was in support or defense of Gov. Palin.)  That is, he did nothing to determine "how the public viewed Sarah Palin's reputation before the publication of the Editorial," Kronenberger Dep. at 174:23-175:3;

did not consider Sarah Palin's favorability polling, *id*. at 334:19-335:24; and did not conduct any focus groups or other analysis from which he could empirically evaluate to what extent, if any, Palin's reputation was harmed.

### 2.   The Report Does Not Consider the Impact of 2011 Criticism

This lawsuit considers *only* the impact from the publication of the Editorial in 2017. However, in the aftermath of the Arizona Shooting on January 8, 2011, many news outlets published stories blaming Gov. Palin and her political action committee for inciting the attack by publishing the Crosshairs Map.  *See* Am. Compl. ¶¶ 1, 73.  Gov. Palin responded to this barrage of criticism by releasing a video attacking those accusations and labeling them a "blood libel," which in turn led to accusations that Gov. Palin was improperly using an anti-semitic trope.  *See* Axelrod Decl. Ex. 8 (Jennifer Epstein, *Palin charges critics with 'blood libel'*, Politico (Jan. 12, 2011)).  Gov. Palin asserted that the harm to her reputation from those 2011 articles was so significant that Fox News dropped her as a paid contributor four years later.  Am. Compl. ¶ 73.

However, given the volume of articles in 2011 tying Gov. Palin to the Arizona Shooting, even assuming that the Editorial *was* defamatory or had an impact on Gov. Palin's reputation, it is uncertain whether "America's Lethal Politics*"* moved the needle.  Kronenberger needed to analyze and disentangle the impact of the reporting after these two events, more than six years apart.  He did nothing of the sort, Kronenberger Dep. 183:21-184:2, and admitted that he did not even know whether in 2011 any media outlets connected Gov. Palin to the Arizona Shooting, *id.* at 183:6-19.

### 3.   Kronenberger Failed to Analyze the Impact of Pro-Palin Media Coverage or The Times' Corrections

Even if the Editorial had a negative impact on Gov. Palin's reputation, this impact was likely short-lived.  Immediately after publication of "America's Lethal Politics," mainstream

media outlets, conservative media outlets, and Gov. Palin herself all called out what they perceived as an error by The Times.  Traditional and digital news entities like the Washington Post, New York Post, Business Insider, and Forbes all published articles either criticizing The Times for the Editorial or reporting on Palin's lawsuit.  Kronenberger Report at 11; *see also* Axelrod Decl. Ex. 9 (David French, *Shame on the New York Times. Shame*, National Review (June 15, 2017)); *Id.* at Ex. 10 (Gov. Palin's tweets and articles on her website threatening The Times with lawsuits).

The extent of this reaction, favorable to Gov. Palin and critical of The Times, suggests that any harm to Gov. Palin's reputation was negated by favorable coverage.  (In fact, it undercuts the argument that the Editorial harmed Gov. Palin's reputation in the first place.) Kronenberger recognized this himself, writing in his Report: "most of the other outlets that picked up the [Editorial] addressed in some form the falsity of the statements about Sarah Palin." Report at 13.  Nonetheless, he did not consider this fact in his analysis.

Similarly, Kronenberger failed to consider the impact of the corrections.  The Times published the original, online version of "America's Lethal Politics" in the evening of June 14, 2017, Am. Compl. Ex. 1, and corrected this version by 11:33 a.m. the following morning, Axelrod Decl., Ex. 11.  The original print version of the Editorial ran on June 15, 2017, Am. Compl. Ex. 2, and The Times published a correction in the print edition the following day, Axelrod Decl., Ex. 12.  The Times' Opinion page also tweeted out the correction to its numerous followers.  *Id.* at Ex. 13.  Yet Kronenberger's analysis did not account for the impact of these corrections.  Kronenberger Dep. at 177:13-25.

### 4. Kronenberger Ignored His Usual Methods for Assessing Reputational Impact Because the Analysis Would Not Support Palin's Position

This case is not the first time a defamation plaintiff has retained Kronenberger to provide expert testimony about damages for reputational harm.  In at least three of the four expert reports that Kronenberger has provided, he has analyzed whether that plaintiff's reputation was, in fact, harmed.[6]  In those three cases, Kronenberger concluded the plaintiff's reputation had been harmed by analyzing the (1) economic impact on the plaintiff from the allegedly defamatory media; (2) impact on social media mentions caused by the alleged defamatory statement; and/or (3) comments posted to social media regarding the alleged defamatory statement.  In this case, Kronenberger undertook no such analysis and likely abandoned his standard methodology because he knew such analysis would undermine Gov. Palin's claim of reputational harm.

On January 20, 2015, Kronenberger issued the *Kifle* Report.  Axelrod Decl. Ex. 6. Kronenberger concluded that the "widespread online dissemination of the negative content greatly increased the damage to Mr. Ahmed's reputation," based on his assessment of how search engines and social media platforms reacted to the "negative content":

> The magnitude and extent of that harm can be seen by searching Jemal Ahmed's name across search engines and major social media platforms. From March 2012 through January 2015, the search engine results page for "Jemal Ahmed" ranged from 30-50% negative. Removing content unrelated to this Jemal Ahmed -- i.e., for others with the same name -- negative results jump to 80-100% of first page results. That negative content also appears at the top of search engine results where people are most likely to see and click on it.

*Id.* at 1.

---

[6] Counsel could only obtain Kronenberger's prior reports for these three cases, because the *Opdeweegh v. Cauff* docket is sealed and pleadings are unavailable.  *See* Report at 5.

Kronenberger undertook a similar analysis in concluding that the reputation of an aide to former President Trump was damaged in the *Miller* Report.  *See* Axelrod Decl., Ex. 5 (issued April 18, 2019).  In that case, Kronenberger concluded that the article in question:

> caused significant negative impact on the reputation of Miller . . . evidenced by an analysis of the reach and traction of the Article (outlined below), and through Miller's loss of employment with CNN within 24 hours of the publication.

*Id.* at 4.  Kronenberger pointed to the following pieces of evidence supporting his conclusion: (1) the article "generated approximately 96% of the total engagements related to Jason Miller in the past year," *id.*, demonstrating that the only news about Jason Miller was connected to the purported defamatory piece; (2) Miller lost his job as a CNN commentator shortly after publication, *id.*; (3) "conversation related to Miller was historically low but saw a massive spike on the date of the Article's publication," *id.* at 14; (4) the most common words associated "with Miller's name" in internet searches, included words associated with the Article's reporting, "abortion," "pregnant," and "stripper," *id.*; and (5) the "vast majority of the comments [posted to the Article] were negative (79 percent) or neutral (20 percent), *id.* at 15.

On September 16, 2019, Kronenberger issued an expert report in *Daniels v. HSN, Inc.*, No. 18-cv-3088 (M.D. Fla. 2018).  Axelrod Decl., Ex. 14 ("*Daniels* Report").  In that report, Kronenberger "reviewed Daniels' digital reputation during the 17 . . . months prior to, as well as following" publication of the alleged defamatory article.  *Id.* at 11.  Kronenberger's analysis showed that internet "conversation" related to Daniels was low "but spiked" at publication, and all of Daniels' internet "mentions" related to the alleged false statement.  *Id.* at 18.  Kronenberger also analyzed the "sentiment" of internet "mentions" for Daniels, and found that the sentiment related to the allegedly false article was "overwhelmingly negative."  *Id.* at 21.  Based on this analysis Kronenberger concluded that the article had damaged Daniels' reputation.

Here, Kronenberger has not analyzed lost opportunities, spikes in internet mentions, or the volume or sentiment of internet mentions to assess the supposed harm to Gov. Palin's reputation.  Presumably, Kronenberger skipped his usual analysis because he knew it was unhelpful.  Kronenberger could not rely on economic harm because Gov. Palin will not contend she lost any economic opportunities because of the Editorial.  Axelrod Decl., Ex. 15. Kronenberger did not analyze the impact of "America's Lethal Politics" on Gov. Palin's online standing because he knew it would not move the needle.

In assessing the impact of the Editorial, Kronenberger did actually analyze the comments posted on "America's Lethal Politics" but did not include it in his report, and disregarded it, because it undercut his conclusion.  Kronenberger analyzed the comments posted directly to the New York Times webpage for "America's Lethal Politics."  Kronenberger Dep. at 248:7-14. The results undercut Kronenberger's assumption that Palin's reputation was harmed.  Of the 1,138 comments posted to the Editorial's webpage, only 56 mentioned Sarah Palin.  Axelrod Decl., Ex. 16 (Kronenberger Comment Analysis, Bates-labeled STRIPE 0107- 0128).  Of those 56 comments, 45 were positive comments about Sarah Palin.  *Id.* at 1; Kronenberger Dep. at 249:7-10.  Indeed, Kronenberger only graded 4 out of 1,183 comments as being negative about Palin.  *Id.* at 249:19-24.

**B.      Kronenberger's Analysis of "Engagement" is Meaningless**

In lieu of analyzing whether the Editorial actually harmed Gov. Palin's reputation, Kronenberger opines on readership and engagement.  This "analysis" is essentially a summary of his preferred statistics – a narration, rather than analysis, of facts in support of Gov. Palin's argument.  *Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13-cv-8645 (KBF), 2018 U.S. Dist. LEXIS 24375, at *9 (S.D.N.Y. Feb. 14, 2018) ("It is therefore inappropriate for experts to act as

a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together one party's story.").

He does not identify or apply any accepted methodology for evaluating the significance of reader engagement, only his unexplained conclusions, purportedly based on his experience. *See* Fed. R. Evid. 702(c) (requiring identification and application of a "reliable principles and methods"); *Algarin v. NYC Dep't of Corr.*, 460 F. Supp. 2d 469, 477 (S.D.N.Y. 2006) ("[a]n anecdotal account of one expert's experience … does not by itself equate to a methodology, let alone one generally accepted by the scientific community"), *aff'd*, 267 F. App'x 24 (2d Cir. 2008). He simply contends that these numbers are "significant" and essentially asks the Court to take his word for it. *See* Fed. R. Evid. 702, Advisory Committee Notes on 2000 Amendments ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"); *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 319 (S.D.N.Y. 2009) (Rakoff, J.) ("Obviously, 'nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the experts.'" (quoting *Gen. Elec.*, 522 U.S. at 144).

These conclusions compound Kronenberger's original error of simply assuming that the Editorial was harmful to Gov. Palin and suffer from three simplistic errors.

First, when analyzing "engagement" Kronenberger uses adjectives like "high" or "significant" without any context to support his conclusion that "America's Lethal Politics" was widely disseminated. Kronenberger makes the following statements about the Editorial:

- It generated a "*relatively high* volume of comments." Report at 6 (emphasis added).

- There were 1,183 comments "which shows a *relatively high* amount of engagement on The Times' website." *Id.* at 11 (emphasis added).

- There were "more than 450 engagements (comments shares or likes) on *The Times*' tweet . . . illustrating the *reach* of *The Times* and the Article [sic]."  *Id.* at 7 (emphasis added).

- "A Twitter search . . . shows more than 400 tweets sharing the link to the Article . . . resulting in more than 740 comments, 4,300 retweets, and 6,500 likes . . . this social media activity surrounding the Article demonstrates readers were *highly engaged* with and perceived the Article as stating Sarah Palin incited Loughner's shooting."[7]  *Id.* at 13 (emphasis added).

With one exception, discussed below, Kronenberger provides no context for these numbers.  He does not compare the Editorial to other editorials published by The Times (or any other publication) around the same time.  His analysis consists of unmoored conclusions that, without context or analytical basis, are worthless.  *See Compania Embotelladora Del Pacifico*, 650 F. Supp. 2d at 321.

Second, in attempting to support his conclusion that there was "significant interest and engagement drive by the [Editorial]," Kronenberger compares the number of comments posted to the Editorial to four other New York Times editorials from June 2017.  Report at 11-12.  He offers no accepted method for sampling comparison pieces and claims to have simply picked four editorials at random.  *Id.* at 11; *see also* Kronenberger Dep. at 238:5-17, 238:25-239:3 (insisting, without explanation, that "[t]his is the sampling I picked.  This was the right kind of sampling, and this was the only sampling needed for what I was trying to do").

He asserts that there were "at least four other [editorials] published by the Editorial Board," without offering the total number of editorials in a given time period or explaining why a month was the correct time period or four comparisons was a good sample size.  In fact, Kronenberger just picked four with apparently no rhyme or reason.  *See* Kronenberger Dep. at

---

[7] Kronenberger also provides nothing to support his conclusion that "readers . . . perceived the Article as stating Sarah Palin incited Loughner's shooting."  Report at 13.

238:25-239:3.  Indeed, he did not even confirm whether those four editorials were open for comment.  *Id.* at 243:7-10.[8]

Third, Kronenberger's analysis completely overlooks the fact that on June 15, 2017 at approximately 11:30 a.m., The Times replaced the original Editorial with a corrected version that removed the alleged defamatory statements.  Axelrod Decl., Ex. 11; Am. Compl. ¶ 117. Throughout his Report, Kronenberger references the number of comments, links, engagements, and social media activity generated by the Editorial.  *See, e.g.*, Report at 11.  However, Kronenberger did not distinguish whether readers were engaged with the original or corrected version of the Editorial.  Kronenberger Dep. at 174:8-16.

For all of these reasons, Kronenberger's analysis of "readership" and "engagement" is flawed and unreliable.  Without an accepted methodology, Kronenberger cannot satisfy the plain language of Rule 702, and his selection "method" is not logically sound, for the reasons above. *See, e.g., Scentsational Techs.*, 2018 U.S. Dist. LEXIS 24375, at *21 (excluding opinions from expert as to impact of defendants' actions where she offered "no evidence or methodology to support her assertions").

---

[8] In his Report, Kronenberger states that "If We Lose Our Healthcare" and "Trump Picks the Wrong Fight on Infrastructure" had no comments.  At deposition, he conceded that he did not know whether these editorials were open for comments.  Kronenberger Dep. at 243:7-10.  These two editorials, like many Times' articles and editorials, were not open for comments.  *See* "If We Lose Our Healthcare," June 24, 2017, available at https://www.nytimes.com/2017/06/24/opinion/sunday/obamacare-repeal-health-care-bill.html; "Trump Picks the Wrong Fight on Infrastructure," June 9, 2017, available at https://www.nytimes.com/2017/06/09/opinion/trump-picks-the-wrong-fight-on-infrastructure.html.

### C.   Kronenberger's Analysis of Repair Cost is Untested, Untestable, and Completely Unreliable

Kronenberger's analysis of the costs of digital and print ad campaigns is also inherently flawed because he did not follow any scientifically-accepted process for determining what would be necessary to repair the (assumed) harm to Gov. Palin's reputation or computing the cost of that repair.  His calculation is broken in to three components: (1) cost of digital ad campaign; (2) cost of print ad campaign; and (3) the cost of developing the ad content.  Report at 13-15.

### 1.   Kronenberger Relies on a Widely-Rejected, Unexplained, and Mis-Applied Methodology to Calculate the Cost of a Digital Ad Campaign

With respect to the digital ad campaign—perhaps the only place in his Report that Kronenberger points to a methodology—he relies exclusively on a method, Ad Value Equivalency ("AVE"), which has been ridiculed and rejected by public relations professionals. *See* Axelrod Decl., Ex. 17 (*CIPR Welcomes AMEC Initiative and Pledges AVE Ban*, CIPR (May 18, 2017)).  To calculate AVE, Kronenberger procured data from a public relations data firm called Cision, Kronenberger Dep. at 195:19-24, but Cision acknowledged as early as 2017 that "most agree that AVE has no value as a PR metric and that there are much better ways of measuring the value and impact of PR."  *Id.* at Ex. 18 (Lacey Miller, *Banning AVE*, Cision.com (June 2, 2017)) at 2.

Kronenberger concedes that he is the only person who uses AVE for determining the cost of reputation repair: "I use it for reputation management, but I'm also on the forefront of our space."  Kronenberger Dep. 282:2-3.  The law, however, requires tested and accepted methodologies.  *See Amorgianos*, 303 F.3d at 266 (reviewing *Daubert* factors, including "whether a particular technique or theory has gained 'general acceptance' in the relevant scientific community").

Further compounding Kronenberger's problematic use of AVE is his concession he does not know how AVE is calculated. His Report asserts that the Editorial had an "ad value of equivalency" of $83,163.57, but he does not explain how that number was calculated or why it would be correct. Report at 13-14. Kronenberger testified that he did not include the formula in his report because it is Cision's proprietary formula and he does not know how it was calculated.[9] Kronenberger Dep. at 290:3-21; *id.* at 196:1-16.

The fact that Kronenberger could not (or would not) explain the AVE formula is alone sufficient reason to exclude his testimony—if Kronenberger will not show his work, how can the Court "undertake a rigorous examination" of the facts, methods, and "how the expert applies the facts and methods to the case at hand"? *See generally, Amorgianos*, 303 F.3d at 267.

Kronenberger's final mistake was doubling the AVE value, for a total cost of $166,327.14, based solely on his own personal recommendation. When pressed to explain his rationale, Kronenberger testified, "I based it upon the time frame of the articles, the traffic to the articles and the correction to the article. And I felt that was the *fairest way of doing it as far as how I broke it out.*" Kronenberger Dep. at. 264:13-265:14; *see also* 265:15-267:2 ("The process in itself is fairly confusing. . . . I felt the fair way is just to do it within the time frame all of this going on."). Kronenberger's sense of "fairness" is not tethered to any factual basis or application of a generally accepted methodology and plainly insufficient under Rule 702. *See Algarin*, 460 F. Supp. 2d at 477 (excluding expert whose opinion was "not the product of the application of

---

[9] Kronenberger also conceded that he did not know how Cision calculated the "readership" number used to calculate AVE, Kronenberger Dep. at 290:22-292:4, and admitted that AVE has an error rate but that he does not know what it is, *id.* at 326:19-327:7. Kronenberger's claimed lack of understanding of AVE is all the more confounding, given that in both the *Miller* and *Daniels* Reports, prepared before the Palin Report, Kronenberger used AVE *and* disclosed the exact formula for calculating it. Axelrod Decl., Ex. 5 at 19, Ex. 14 at 22.

any analytic method, aside from [his] personal experience" and was unsupported, "other than his occasional allusions to 'common sense.'").

### 2. Kronenberger Has No Basis for His Opinion on the Cost of a Print Campaign

Kronenberger's calculation of the repair costs for the print ad campaign suffers from the same problem. Instead of applying any rigorous or generally-accepted methodology, Kronenberger opines:

> I recommend running a full page ad for two days in the print edition of [T]he Times to reach those exposed to the print edition of the Article . . . . Rates for a full page ad were used because a large ad is reasonable and necessary to effectively reach the target audience; as opposed to running multiple smaller ads with less space but higher frequency to try to change reader perception. To be effective, the advertising must run within content and pages with a similar readership and profile of the Article.

Report at 14. Kronenberger's Report does not explain why large ads were "reasonable" or necessary, and at deposition, he could not identify any support for his opinion that a full-page ad is required. Kronenberger Dep. at 329:13-330:16, 331:23-332:12.

### 3. Kronenberger Failed to Consider the Impact of Other Reporting About the Editorial

Kronenberger's analysis of the cost to repair Palin's reputation also fails to reduce the amount in light of three key facts: (1) The Times quickly published a corrected version of the Editorial, removing the alleged defamatory statements and stating that "no connection" between the crosshairs map and the Giffords shooting was ever established, Kronenberger Dep. 257:15-258:14 (admitting he had not factored this into his analysis); (2) some portion of web traffic to the Editorial was directed by Gov. Palin, her social media accounts, and her supporters, *id.* at 270:3-10 (stating that he had not and would not factor this in); and (3) many media entities reported on Palin's lawsuit against The Times, *id.* at 270:21-271:5 (acknowledging that he had not factored this in either). Kronenberger's failure to consider these obvious issues makes his

conclusions patently unreliable. *See Israel v. Springs Indus.*, No. 98 CV 5106 (ENV) (RML), 2006 U.S. Dist. LEXIS 80863, at *20 (E.D.N.Y. Nov. 3, 2006) ("the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant").

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant this motion and bar Plaintiff from introducing the testimony of Mr. Kronenberger at trial.

Dated:  New York, New York
         January 10, 2022

Respectfully submitted,

BALLARD SPAHR LLP

By: */s/ David L. Axelrod*
    David L. Axelrod
    Jay Ward Brown
    Thomas B. Sullivan
    Jacquelyn N. Schell
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

*Counsel for Defendants*