# Exhibit 1

*Sarah Palin*

*v.*

*The New York Times Company & James Bennet*
*Case No. 17-CV-4853*

*EXPERT REPORT OF CRAIG KRONENBERGER*

Prepared for

Shane B. Vogt & Kenneth G. Turkel

Bajo Cuva Cohen Turkel, P.A.

100 North Tampa Street, Suite 1900

Tampa, Florida 33602

Submitted By



Stripe Reputation, Inc.

1190 North Highland Ave

Atlanta, GA 31106

**February 28, 2020**

## I.    Introduction

### a.    The Assignment

Bajo Cuva Cohen Turkel, P.A. (the "Firm") retained Craig Kronenberger of Stripe Reputation, Inc. to provide expert opinions concerning a June 14, 2017 article published by The New York Times titled, "*America's Lethal Politics*" (the "Article"), in connection with a defamation claim asserted by Sarah Palin against The New York Times Company ("The Times") and James Bennet ("Bennet") (collectively, "Defendants") in a case pending in the *United States District Court for the Southern District of New York, Case No. 17-cv-4853* (the "Lawsuit").  Specifically, the Firm asked Stripe to evaluate the volume, reach, and authority of the Article, as well as its associated online content and conversation, and determine the cost of a campaign designed to counteract the defamatory impacts of the Article on Sarah Palin (i.e. a campaign designed to reach the audience to which the defamatory statements were disseminated with the message that the defamatory statements are not true).

This report is submitted as of February 28, 2020 ("Report Date").  The findings herein reflect the analysis of the information provided to us and our independent research as of the Report Date.  I reserve the right to amend, expand, and/or supplement this report should additional information or data be made available.  I anticipate my opinions will be updated, expanded, and/or supplemented once depositions are completed in this case to provide context for some of the information, documents, and data Defendants provided thus far in discovery, and to the extent Defendants produce any additional or updated data, information and/or documents related to the Article.

This report was prepared primarily by Craig Kronenberger with the assistance of individuals employed by Stripe Reputation acting under his supervision.  The opinions expressed herein are those of Mr. Kronenberger.

### b.    Craig Kronenberger Expert Qualifications

I have been working in the public relations, advertising, reputation management, and online reputation repair industries for over 20 years.  Over the course of my career, I have developed extensive knowledge, education, experience, and training in the digital media, public relations, and online reputation management fields. I

1

am proficient in using multiple industry-standard technologies that help evaluate the performance and impact of content across social media, news media, email, and search engines. I work on an average of 10 reputation management or crisis assignments per week. Throughout my career, I have studied the impact and damage caused by the dissemination of online and traditional media content and developed significant knowledge, experience, and expertise in understanding how information disseminates through news media and online and its impactd on brands and individual reputations.

I am currently the owner and CEO of Stripe Reputation, a leading global consultancy firm in the field of reputation and crisis management. Stripe Reputation provides services in a wide array of digital marketing and reputation management strategies and services, such as digital measurement and analytics, paid media management, crisis and issues management, new media analysis and monitoring, and search engine optimization, among others. I have extensive experience promoting and protecting reputations for brands, organizations, executives, and individuals.  My reputation management experience has included work for companies such as Coca-Cola, General Electric and Hyundai, as well as individuals such as Paul Allen and the Koch family.

Prior to Stripe Reputation, I was Global Managing Director of Strategic Growth at Edelman, the world's largest public relations firm, where I was responsible for leading global teams in the areas of Search Engine Management, Digital Crisis and Risk, Paid Media, Research, and Insights.  At Edelman, I helped create certifications and training courses in areas such as search engine optimization, paid online media, analytics, understanding data as it relates to online brands, content strategy, and how to use data to inform communications strategies.

Throughout my career, I have handled numerous crisis and reputational management situations for private individuals, companies, celebrities, and high profile clients.   In each situation, I obtain and assess available data and then use my own independent analysis of that data to understand the level of conversation, engagement, sentiment, volume, and authority of the publications and content involved.  I have used this method for assessing and addressing the impact and damage caused by the dissemination of online and media content for many years, and it constantly evolves with changes in technology.  I have spent decades working on reputation management projects and studying the impact and damage caused

2

by the dissemination of content and the effectiveness of strategies to repair online reputational harm.  I use my practical, real world experience repairing reputations and observing what actually happens in the marketing and PR space to determine the most effective ways to deal with reputation management, repairing reputations, and estimating what reputational repair will cost in each unique situation.  My experience is diversified across PR, advertising, and reputation management, which provides me with a broad field of knowledge from which to understand and estimate the impacts of false and defamatory content and the costs associated with repairing reputation.  This experience includes the following:

- **Advertising Experience.**  I have significant practical, real-world experience building, planning and managing advertising campaigns with the goal of bringing awareness around issues, individuals, and products.  This includes work for companies such as Delta Airlines, Nissan, Amazon, and Starbucks, as well as on political and issue campaigns.

- **Public Relations Experience.**  I spent decades building strategies to land stories with the media, and learning and understanding the value of a story in the media.  This experience helped me develop a unique understanding of how stories spread online and through social media.  I also have significant experience influencing, planning, pitching, and landing press coverage in traditional and online media outlets.

- **Crisis and Reputation Management Experience.**  I have decades of experience suppressing negative content in search engines, running campaigns to change perception through advertising and PR strategies, and helping companies, individuals, and brands handle media and communications crises.  In this area, my experience includes work for celebrities, entrepreneurs, athletes, governments, and private individuals with no established online reputation.

Through all my experience, training, and education, I developed a deep understanding of what methods work in the reputational repair field and how much those methods will cost.  In this case, as in all cases, I relied upon my experience across public relations, advertising, and reputation management to asses the

3

impact of the Article and arrive at a reasonable estimate of the cost of a campaign that will have the best chance of effectively repairing the damage caused by the Article.

### c.      Expert Testimony

During the previous four years, I have testified as an expert at trial or by deposition in the following cases:

- *ELIAS KIFLE VS ETHIOPIAN REVIEW, INC.*
  *Court: United States District Court, Northern District of Georgia*
  *Case No.: 1:12-cv-02697*
  *Nature of Suit: Assault, Libel, and Slander*

- *JASON MILLER VS. GIZMODO MEDIA, KATHERINE KRUEGER, WILL MENAKER*
  *Court: United States District Court, Southern District of Florida*
  *Case No.: 1:18-cv-24227- CMA*
  *Nature of Suit: Defamation*

- *OPDEWEEGH VS. CAUFF*
  *Court: Eleventh Judicial Circuit, Miami-Dade County, Florida*
  *Case No.: [Sealed]*
  *Nature of Suit: Defamation*

- *GORDIE DANIELS V. HSN, INC. HSNI, LLC; AND QURATE RETAIL, INC., D/B/A QURANTE RETAIL GROUP*
  *Case No. 8:18-cv-03088-SCB-JSS*
  *Nature of Suit: Defamation*

### d.      Compensation

Stripe Reputation agreed to provide our initial analysis and this report for a fixed fee of $12,000. All other work performed on this assignment will be billed at the rate of $450/HR.

## II.      Background Facts & Data Regarding the Article

4

### a.    Factual Background

On June 14, 2017, *The Times* published online an editorial ("*America's Lethal Politics*") authored in the name of its Editorial Board (which represents the "voice" of *The Times*[1]) that falsely stated Sarah Palin incited Jared Loughner's January 8, 2011 mass shooting at a political event in Tucson, Arizona (the "Loughner Shooting"), during which he shot thirteen people, severely wounding United States Congresswoman Gabrielle Giffords, and killing six others, including Chief U.S. District Court Judge John Roll and a nine-year-old girl  (the "Article").  [FAC ¶ 1, Ex. 1-2]  Following its provocative and negative title, the Article states, among other things:

> *Was this attack evidence of how vicious American politics has become? Probably. In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.*
>
> *Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals.  They're right.  Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask of the right.*

The Article drove significant traction on social media channels and generated a relatively high volume of comments, indicating readers' engagement with the defamatory statements about Sarah Palin. The Article generated 1,183 comments on *The Times* website, several of which defended Sarah Palin.  Although the number of comments was relatively high, that number represents only a small fraction of the total number of people exposed to the Article.

*The Times* also promoted the Article on social media.  For example, *The Times* – which has 45.2 million followers on Twitter – and NYT Opinion – which has 727.9 thousand followers – both tweeted links to the Article, including a phrase in the

---

[1]  www.nytimes.com/interactive/opinion/editorialboard.html

post copy: "a sickeningly familiar pattern is emerging in the assault on members of Congress at a ball field." There were more than 450 engagements (comments shares or likes) on the *The Times'* tweet, and 345 engagements across three NYT Opinion tweets; illustrating the reach of *The Times* and the Article.





*The Times* eventually posted two online corrections related to the Article, neither of which  mention Sarah Palin by name [FAC ¶¶ 136, 139, NYT 0002903-2910]:

First Correction (June 15, 2017)

*"An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established."*

Second  Correction (June 16, 2017)

> *"The editorial also incorrectly described a map distributed by a political action committee before that shooting. It depicted electoral districts, not individual Democratic lawmakers, beneath stylized cross hairs."*

At approximately 11:33 a.m. on June 15, 2017, NYT Opinion also posted several tweets related to the First Correction.  [*See* NYT 0002878]

*The Times* also published a correction at the bottom of the June 16, 2017 print edition of *The Times* Opinion page [*see* NYT 0002915]:

> **CORRECTION**
>
> An editorial on Thursday about the shooting of Representative Steve Scalise incorrectly stated that a link existed between political rhetoric and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established. The editorial also incorrectly described a map distributed by a political action committee before that shooting. It depicted electoral districts, not individual Democratic lawmakers, beneath stylized cross hairs.

### b.    Article Authority

*The New York Times* is a prestigious newspaper with worldwide influence and readership. It has won five Peabody Awards, earned 57 Emmy and Oscar nominations, and been awarded 127 Pulitzer Prizes; more than any other news organization. The outlet remains number one in overall reach of U.S. opinion leaders. Furthermore, *The New York Times* is ranked fourteenth amongst the Top 15 American newspapers by circulation. The circulation of the weekday printed edition reaches 525,546 subscribers and the newspaper's site boasts more than 44 million unique visitors per month. The outlet also has significant influence outside of the U.S. as 500,000 of *The New York Times'* 5.3 million subscribers are international.

*The Times'* authority and readership is  showcased in the below infographic, which can be found in the newspaper's media kit:



Newspapers (such as *The Times*) and similar forms of traditional media (such as broadcast and magazines) are seen as highly credible. Recent research from the 2020 Edelman Trust Barometer, an online survey around the state of trust spanning 28 markets and 34,000 respondents, which is in its 20th year, found that traditional media sources are tied with search engines as the most trusted sources for news and information at 61%. Given the authority of the medium (newspapers) and *The Times* itself, the impacts of the Article on Sarah Palin are substantial.



c.    **Reach of Article**

The Article garnered a strong online reach, based on the number of people exposed to the publication at least once during the time period analyzed. I analyzed the reach of the Article from  June 14, 2017 to June 16, 2017 because it encompasses the timeframe between initial publication and publication of the online and print editions corrections.  This timeframe is conservative because, as noted above, the corrections did not name Sarah Palin and, as a general matter, it is likely that many readers did not see the corrections located at the bottom of the Article online or at the bottom of the print edition on June 16, 2017. Based on my experience, it is safe to assume that not everyone who read the article also saw and read the corrections.

According to internal *New York Time*s emails (*see* NYT 1699-1701), on the day the Article was published, it earned 37K page views. Internal emails also show that on June 15, 2017, the Article drove 131,201 unique page views, more than 3.5 times the views on the first day (*see* NYT 2628-2632).  While we have not been provided page view figures for all of the days since publication, it is likely that many more people saw and read the Article, especially in light of *The Times*' overall reach and the fact the Article still is available online as of February 28, 2020.

According to *The Times'* media kit, the weekday print edition of the paper reaches 525,546 people in the U.S.  However, actual exposure to the Article through print readership is likely higher because one newspaper often is read by multiple people (*i.e.,* by multiple people in a household, at an office, or in a library).

**Circulation**

|  | New York Region[1] | U.S.[2] |
|---|---|---|
| Weekdays | 215,397 | 525,546 |
| Sundays | 304,371 | 1,010,619 |

According to *Cision*, a leading public relations and earned media software company and services provider, *The Times* has a digital readership of 44,235,941 per month. Readership is the number of people who potentially saw an article based on unique visitors to the publication website.  *Cision* relies on data from *SimilarWeb*, a

4

provider of web analytics services for clients such as Amazon, Deloitte, Microsoft and P&G, to calculate readership. *SimilarWeb* calculates unique visitors based on the visits of an anonymous unique ID over the period of a month of time.

Given *The Times'* print and digital distribution, an estimated 44,761,487 people were potentially exposed to the Article through *The Times*.

The Article also was linked to and referenced by other media outlets, significantly increasing its reach. According to ahrefs.com, a digital marketing analysis tool used for SEO analysis, the Article published in the online edition of *The New York Times* was linked to by 1,297 unique web domains at least one time. This means 1,297 separate websites linked to the Article. Much like *The Times*, some of these outlets, including *The Washington Post*, *Forbes*, the *New York Post*, and *Business Insider*, have a substantial digital reach and authority.

### d.    Engagement

The Article also drove a high volume of engagement. Engagement is an indication of whether people interacted with content online and is measured by actions such as comments, likes, shares, reactions, etc.

According to a daily analytics report from *Chartbeat* produced by *The Times* (*see* NYT 2412-2412), on June 15, 2017, the Article earned 328,463 total engaged minutes; the second highest volume of engaged minutes that day for Opinion articles. This means the public spent more than 5,470 hours reading this Article in one day.

Significant engagement also is evidenced in the comments section of the Article. There were a total of 1,183 comments posted by readers, which shows a relatively high amount of engagement on *The Times'* website. It is worth noting that there were at least four other articles published by the Editorial Board during the month of June, 2017; only one received a similar amount of engagement in the comment section, one received less than 342 comments, and the two others did not receive any comments at all. The comment rate illustrates the significant interest and engagement driven by the Article.



*The Times* allows readers to post comments on a comment section thread under each article. Only registered users are allowed to post comments, and they must adhere to certain guidelines published on the *Times'* website. According to the outlet, it employs machine learning to determine which comments will be accepted and which will be rejected. Comments that are deemed as personal attacks, obscene, vulgar, profane, for commercial promotion, incendiary or abusive are more likely to be rejected. As such, it is likely that comments using threatening or highly negative language toward Sarah Palin would have been rejected; making it possible that there are more comments than those actually displayed.

The relatively high number of comments shows the Article received a considerable amount of engagement by readers, only some of whom shared their views and concerns with others. That some readers felt the need to defend Sarah Palin in

their comments upon reading the Article illustrates the Article was understood to state Sarah Palin incited Loughner's Shooting.

The Article also received significant traction and engagement on social media platforms; specifically, Twitter. A Twitter search conducted on February 25, 2020 shows more than 400 tweets sharing the link to the Article between June 14-16, 2017, resulting in  more than 740 comments, 4,300 retweets, and 6,500 likes.  Like the comments on the Article itself, this social media activity surrounding the Article demonstrates readers were highly engaged with and perceived the Article as stating Sarah Palin incited Loughner's Shooting.

### III.    Repair Recommendations and Cost Calculation

To effectively counteract or correct the impact of the Article and repair the damage it caused, I recommend running a digital and print ad campaign. This would include an advertisement specifically mentioning Sarah Palin by name and informing readers that the statements in the Article about her are false.  I used *The Times'* properties as a reliable indicator of the cost of this campaign.

In other situations, I have recommended a more extended ad campaign incorporating all outlets that picked up a story and social media, but did not do that here because most of the other outlets that picked up the Article addressed in some form the falsity of the statements about Sarah Palin.  Thus, readers of these other outlets were told at the outset *The Times'* statements about Sarah Palin were false.  I did not include or calculate costs for a social media campaign for the same reason.   Thus, the campaign I recommend is specifically targeted to readers exposed to the defamatory statements on *The Times'* properties.

Based on the June 14-16, 2017 timeframe discussed above, I recommend running an ad campaign for two days.

According to *Cision*, the *Times'* digital Article had an ad value of equivalency of $83,163.57. This formula estimates what it would cost to place a similar sized article as an advertisement.   Here, I use AVE as a reliable means of measuring the advertising costs of earned media placements, not to determine return on investment.  Based on my experience, education, training, and skill, AVE is the most effective measure to estimate the cost of placing online advertisements that will

7

be as effective as or comparable to the Article.  As the above-listed cost is for one ad, to run two ads would cost $166,327.14.

In addition to the digital ad, I recommend running a full page ad for two days in the print edition of the *Times* to reach those exposed to the print edition of the Article, as well as others who may not see the digital ads. Per the Times' advertising media rate card, the cost of a full-page, black-and-white ad with national distribution on a weekday is $122,759. The costs for two ads would be $245,518. Rates for a full-page ad were used because a large ad is reasonable and necessary to effectively reach the target audience; as opposed to running multiple smaller ads with less space but higher frequency to try to change reader perception.

To be effective, the advertising must run within content and pages with a similar readership and profile of the Article.

To place the ads and develop the ad content, a public relations or ad agency would need to be retained. We estimate this would require at least 40 hours of planning, conception, and advertising production. Using a conservative blended billing rate of $250/hour, agency support would cost at least $10,000.

**Summary of Costs**

It is my opinion, within a reasonable degree of certainty, it will cost at least **$421,845.14** to counteract the impacts of, or repair the reputational harm caused by, the Article.

- Digital advertising costs: $166,327.14

- Print advertising costs: $245,518

- Agency support: $10,000

**Total: $421,845.14**

**THE MATERIALS RELIED UPON IN PREPARING AND CITED IN THIS REPORT ARE BEING PRODUCED CONTEMPORANEOUSLY HEREWITH.**

Dated: February 28, 2020.

Craig Kronenberger
Stripe Reputation, Inc.

9