# Exhibit 2

Craig Kronenberger
05/22/2020                                          1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Craig Kronenberger
05/22/2020

- - - - - - - - - - - - - - - - -X

SARAH PALIN,                      : Case No.

         Plaintiff,        : 17 Civ. 4853

v.                                :

THE NEW YORK TIMES COMPANY,       :

a New York corporation, and       :

JAMES BENNET, an individual       :

        Defendants.       :

- - - - - - - - - - - - - - - - -X

(CONFIDENTIAL PORTIONS INCLUDED)

Remote Videotaped Deposition Of

CRAIG KRONENBERGER

Friday, May 22, 2020

10:01 a.m.

Job No. 306334

Pages:  1 - 343

Reported by:  Dana C. Ryan, RPR, CRR

U.S. LEGAL SUPPORT
(877) 479-2484

Craig Kronenberger
05/22/2020                                    2

Craig Kronenberger May 22, 2020
05/22/2020

10:01 a.m.

Remote Videotaped Deposition of CRAIG KRONENBERGER, held via video teleconference, before Dana C. Ryan, Registered Professional Reporter, Certified Realtime Reporter and State of Georgia Certified Shorthand Reporter.

U.S. LEGAL SUPPORT
(877) 479-2484

A P P E A R A N C E S


ON BEHALF OF PLAINTIFF:

Craig Kronenberger
05/22/2020

        SHANE B. VOGT, ESQ.

        Bajo Cuva Cohen Turkel

        100 North Tampa Street

        Suite 1900

        Tampa, Florida 33602

        Telephone:  (813) 443-2199

        Email: svogt@bajocuva.com




    ON BEHALF OF DEFENDANTS:

        DAVID L. AXELROD, ESQ.

        Ballard Spahr LLP

        1735 Market Street

        51st Floor

        Philadelphia, PA 19103-7599

        Telephone: (215) 665-8500

        Email: axelrodd@ballardspahr.com


                    - and -

Craig Kronenberger
05/22/2020                                    4

A P P E A R A N C E S   C O N T I N U E D


ON BEHALF OF THE DEFENDANTS:

        THOMAS B. SULLIVAN, ESQ.

        Ballard Spahr LLP

        1675 Broadway

        19th Floor

        New York, New York 10019

        Telephone: (212) 850-6139

        Email: sullivant@ballardspahr.com


    Also present:

        Dan Macom, Videographer

        David McCraw, In-House Counsel,

            The New York Times

Craig Kronenberger
05/22/2020                                    20

there was a defamatory impact?

A      No --

MR. VOGT:  Objection to form.

THE WITNESS:  -- that's not what I'm hired to do.

BY MR. AXELROD:

Q      So is that a no?

A      Correct.  That's a no.

Q      Okay.  So is it fair to say that you just assumed there was a defamatory impact and then calculated what you thought the cost would be to repair that defamatory impact assuming there was one?

A      Yes.  Yes, that's correct.

Q      Why didn't you try to determine if there was a defamatory impact in this case?

MR. VOGT:  Objection to form.

THE WITNESS:  My role isn't to determine whether it's -- the actual content is defamatory.  That's not my role.

My role is to understand the reputational impact of it on an entity or an individual.

BY MR. AXELROD:

Q      Did you do an assessment of the

Craig Kronenberger
05/22/2020                          127

Craig Kronenberger
05/22/2020

case?

A    No.

Q    Okay.  Were you certified by the court as an expert in that case?

A    I believe so, yeah.

Q    What about the Kifle case?  Were you certified as an expert in that case?

A    Yes.

Q    What about the Jason Miller case?  Were you certified as an expert in that case?  I guess that case -- that case didn't go to trial?

A    Yeah, it didn't go far enough.

Q    Kifle -- the Opdeweegh case went to trial?

A    No, I don't know where -- where it is in the process now.

Q    So when I asked you if you were certified as an expert and you said yes, what did you mean?

A    I didn't mean that the -- the court certified me.

Q    Right.

A    Yeah.

Q    Have you ever been certified by a court as an expert?

Craig Kronenberger
05/22/2020                                    128

Craig Kronenberger
05/22/2020

A     Yes.

Q     And in which case was that?

A     Kifle case.

Q     Okay.  Before we move on, the Daniels case, did you prepare a report in that case?

A     A report in what case?

Q     In Daniels.

A     Yes.

Q     In that case, did you do any analysis of what percentage of comments about the plaintiff were negative overall?

A     I -- I couldn't tell you.  I'd have to look at it.  Once again, you're -- you're -- you're not looking at the -- the methodology that we use, and anyone in our industry would use, is that it provides context.  It is not quantitative. It's just not.

Not everybody out there who has an opinion is going to voice their opinion on it. All it can do is give you context of how people feel and what they're thinking about a certain issue.  That's all it can do.

And -- and because of that, that's -- you can use that in providing content -- context to what's happening and how people are feeling

Craig Kronenberger
05/22/2020                                           174

Craig Kronenberger

issuing your report with the information that you had?

    A    I already said that.  I said that I was.

    Q    Okay.  All right.

    A    We actually talked about that at the very beginning.

    Q    Of these engagements, do you know how many engagements referred to the original editorial as posted or to the versions that were edited later?

    A    I mean, offhand, I do not know.  I mean, we -- this is a -- this is (audio distortion) of Tweets that we could find, so I don't know.  I don't know without going and spending some time with it and breaking it down.

        MR. VOGT:  Yeah.  And, for the record, I just looked so we're clear on the issue.  The documents that are referenced in my March 13 letter weren't produced until March 6th, which was after his report.

    BY MR. AXELROD:

    Q    So, now, in your analysis, Mr. Kronenberger, did you do anything to determine how the public viewed Sarah Palin's reputation

Craig Kronenberger
05/22/2020                                    175

Craig Kronenberger

before the publication of the editorial?

MR. VOGT:  Objection to form.

THE WITNESS:  No.

BY MR. AXELROD:

Q    Did you do any analysis of whether the corrections that The New York Times published had any positive or negative impact on Mrs. Palin's reputation?

MR. VOGT:  Objection to form.

THE WITNESS:  Whether it had positive or negative -- what -- say that again.  Say the question again, please.

BY MR. AXELROD:

Q    Did you do any analysis of whether the correction that The New York Times published had any positive or negative impact on Mrs. Palin's reputation?

MR. VOGT:  Objection to form.

THE WITNESS:  Well, the -- the corrections never stated -- I don't believe they ever stated Sarah Palin's name in the correction, and so the corrections were vague, so I don't know that the corrections were effective at all.

And then in addition to that, you've got problems such as in the print version of the

Craig Kronenberger
05/22/2020                                    177

corrections that were made as part of the ongoing

methodology we always follow to understand, you

know, what's happened, what has not happened.

So, I mean, we went through our

standard process on looking at it.  And in looking

at the correction itself, if we look at what the

issue was and we look at what the correction was,

we don't believe the correction fully stated what

the correction should have.  We also don't think

the corrections were effective in things such as

the print --

BY MR. AXELROD:

Q     Yeah.

And you've already testified to that.

But I just want to know, did you -- besides giving

your opinion as to whether they were effective or

not, did you do any analysis of how people viewed

the corrections?

MR. VOGT:  Objection to form.

THE WITNESS:  No.  And -- and any --

and anything that you can find out there, once

again, would be -- were providing a qualitative

context.  It would be people's commentary, social

media commentary on it, other news media outlets

commenting on it.

Craig Kronenberger
05/22/2020                              183

Craig Kronenberger
05/22/2020

media outlet connected Sarah Palin to the Jared

Loughner shooting was?

          MR. VOGT:  Objection to form.

          THE WITNESS:  No, I do not.

     BY MR. AXELROD:

     Q    Do you know whether after the Gabby

Giffords shooting in 2011 -- whether any media

outlets accused her of inciting that shooting?

     A    I really don't have a whole lot of

information on what happened back in 2011.

     Q    So you don't know, as you sit here

today -- strike that.

          You don't know at the time you wrote

your report whether there had been media outlets

that had written previously back in 2011 that

Sarah Palin had incited Jared Loughner's shooting?

          MR. VOGT:  Objection to form.

          THE WITNESS:  I can't really give an

opinion on it.  It wasn't really what I was doing.

     BY MR. AXELROD:

     Q    Right.

          And as you -- at the time you wrote

your report, you don't know -- you didn't know

whether those allegations from 2011 had already

impacted Sarah Palin's reputation?

Craig Kronenberger
05/22/2020

MR. VOGT:  Objection to form.

THE WITNESS:  I -- I don't know.

BY MR. AXELROD:

Q    I mean, let me ask you a hypothetical.

If -- if it's true that those allegations had been made already in 2011 and had been widespread, wouldn't that be an important fact to consider to determine whether the 2017 publication harmed her reputation?

MR. VOGT:  Objection to form.

THE WITNESS:  Well, first off, from what I understand from, you know, articles that I have read is that anything around the connection was kind of, like, dismissed.

As a matter of fact, I believe -- I believe The Times, in fact, also dismissed that there was a connection to it.

So -- so, first off, that would be a thing which is -- that should have been put to rest a long time ago.  Second of all, there was a long period of time that went by during that, so all that's doing is resurfacing something that was not factual correct turning it into a problem.

So I -- I -- I mean, that's my -- my way of kind of answering it.  As far as it's

Craig Kronenberger
05/22/2020

of newspaper subscribers would have read any given

article in a newspaper?

     A     No.

     Q     So of that 525 and change --

     A     Print.  Of print circulation.

     Q     Yeah, that's the print circulation.

          Of that 525,000 and change in print

circulation, do you have any idea how many people

who actually received that paper read it -- read

the America's Lethal Politics editorial?

     A     No.  And, furthermore, I mean,

typically more than one person in a household

reads it.  So, you know, the reality is is it

could be higher.

     Q     Or it could be lower.  You just don't

know?

     A     We don't know.

     Q     We don't know.

          Skip over that circulation box and you

say, According to Cision, a leading public

relations and earned media software company and

services provider, The Times has a digital

readership of 44 million people plus per month?

     A     Yeah.  Cision, by the way.

     Q     Cision.

Craig Kronenberger
05/22/2020                                    196

Craig Kronenberger

Q    Do you know how Cision calculates that?

A    Well, it relies on data from SimilarWeb and SimilarWeb calculates unique visitor data based upon browser extensions.  In this case, typically Google Chrome is the most common one.  And that's how they do it.

But it's a proprietary formula and both Cision and SimilarWeb are highly recognized tools used in the industry.

Q    But you don't know because it's proprietary what -- how or how SimilarWeb calculates that number?

A    We don't have a full calculation of it, no.  We have the elements that make up the aspects such as pulling data from browser extensions, and we know it does not use cookie data.

Q    Is that number an estimate of projection or something else?

A    What do you mean?

Q    What does that 44 million number represent is what I'm asking, or do you know?

A    In our industry, remember we don't -- we don't -- like, when you go out and there's the story written, in the public relations industry, we don't know how many people read that article

Craig Kronenberger
05/22/2020                                    238

Craig Kronenberger
05/22/2020

Times Web site?

A      I -- I believe so, yeah.  I mean, it looks like I've -- I pulled these all from there, yeah.

Q      And did you employ any type of sampling to get a fair set to compare that to?

A      This is the sampling I picked.  This was the right kind of sampling, and this was the only sampling needed for what I was trying to do.

Q      Why do you say it was the right kind of sampling?

A      I don't need to go back years trying to extract and pull data on it.  I need to look to see whether context during that moment in time -- whether it was considered high or not, and this was enough opinions being written that I could get a sense of whether it was high or it was not high.

Q      I'm not asking whether you needed to go back years, but did you look at the set of editorial board opinions that were just published in June of 2017 before grabbing these four to compare them to?

A      Well, no.  These are the four I picked. I picked these.

Q      Why did you -- why did you -- why did

Craig Kronenberger
05/22/2020                                          239

Craig Kronenberger
05/22/2020

you pick these four?

A     I -- I picked four that I had access to, and I picked four.

Q     And, so, one of the four you picked, Our Disgraceful Exit from the Paris Accord -- you see that's the one in the upper left-hand corner of page 12?

A     Okay.  I think the one that I see -- yeah, yeah, Gallup poll, Americans worried about -- the Gallup poll found two-thirds of Americans?

Q     Oh, yeah.  Sorry.  I'm looking at the opinion -- the headline.  Yes, that's the one.

A     Okay.  All right.

Q     And you see that that one had 1,984 comments?

A     Yeah.

Q     And then moving to the right, there's one called, Free Speech at the Supreme Court.

Do you see that?

A     Yep.

Q     And that one had 342 comments?

A     Right.

Q     And then moving down to the next two boxes, there's two articles or editorials you

Craig Kronenberger
05/22/2020                                243

you do.

The last thing I've got is, "It's an article that people care about."

MR. AXELROD:  Sorry.  Tom is having a domestic issue.  Which is fine, Tom.  I got it.

BY MR. AXELROD:

Q    Do you know whether the two articles that had zero comments -- whether those articles were open for comments?

A    I don't know.

Q    If it's true that those articles weren't even open for comments --

A    It doesn't --

Q    -- (indiscernible) --

A    It does not --

Q    -- (indiscernible) -- just let me finish my point -- my question.

If it's true that those articles weren't open for comments, doesn't it undermine your conclusion that commenters were relatively -- had a relatively high amount of engagement on America's Lethal Politics?

A    No, none at all.

The article was engaged with.  It had a high volume of engagements with it.  There is no

Craig Kronenberger
05/22/2020

the numbers because the numbers are only to provide context.  They're actually not correct after I've gone through it.  I found other ones that when I looked into it more were not, in fact, neutral.  I found ones that were negative that were actually more than that, so . . .

Q     So my first question is you searched through the 1,138 comments for Sarah Palin's name --

A     Yep.

Q     -- and only came back with 56 comments?

A     Yeah.  The best that I can do, yeah. It's not foolproof.  It's a way for me to try to extract it and pull it.

Q     When you say "extract," extract the comments that were actually about Sarah Palin?

A     Yeah.  Because I can't, yeah, formally extract it, so I do the best I can to try to pull it.

Q     And, so, then at some point, you graded these, right, to try to assess whether they were positive, negative or neutral?

A     Yes.

MR. VOGT:  Objection to form.

THE WITNESS:  Yes, so that I can narrow

Craig Kronenberger
05/22/2020                                        249

Craig Kronenberger

in on certain ones and understand and read them, yes.  Correct.

BY MR. AXELROD:

Q     Did you do this grading or did your assistant?

A     I did the grading.

Q     Okay.  And of the 56, you initially found that 45 were positive?

A     Initially when I did it, yes, but that's not correct now.  I've gone --

Q     And --

A     -- through a couple of times since then.

Q     And a positive comment would be something like the first one we see where it says, Please stop being dishonest and spraying untruths?

A     Yeah.  It would be -- it would be defending Sarah Palin.

Q     And then you found of the -- you initially found -- we'll talk about the corrections in a second.

You initially found of the 56, four were negative?

A     Correct.

Q     And I think there's an example of a

Craig Kronenberger
05/22/2020                                                257

Craig Kronenberger
05/22/2020

A      I felt that while I can't agree with the final correction, I -- I cut it off after -- one, there's a reduction of traction around the article; there's -- the physical retraction was out there; so I felt like the fair thing to do was to do that particular time frame of when the retractions were being edited and changed and obviously when the article itself was getting traffic.

Now, there's many arguments that say that I should have extended it, but I wanted to be fair, and that's why I focused on that time frame. I thought it was the best way of doing it as part of the process.

Q      Do you know whether during that time frame, June 14th through June 16th, whether The New York Times ran any other stories that contradicted the allegation in the editorial that Sarah Palin incited Jared Loughner's shooting?

A      No.

Q      If it were true that The New York Times during that two-day period, the 14th through the 16th, did indeed run stories that said there was no connection between the crosshairs map and the Loughner shooting, would that have impacted your

Craig Kronenberger
05/22/2020                                    258

Craig Kronenberger
05/22/2020

analysis at all?

MR. VOGT:  Objection to form.

THE WITNESS:  I mean, one, it's unclear.  I don't know.  I'd have to think through it to be fair and to do it the right way.

That said, I -- I -- you know, my gut instinct would be to say that it -- are the same people reading it; are -- did it reach the same potential amount of people; did it have the same context to it.  So it would be -- it would be difficult to assess that.

I'd have to know more -- I'd have to know more about the timing and the context of it to do a real fair analysis of it.

MR. AXELROD:  Tom, if you could put up DX-68.

(Defendants' Exhibit 68 was marked for identification and attached to the transcript.)

BY MR. AXELROD:

Q     If you could open that up when that comes, Mr. Kronenberger.

A     Okay.

Q     Do you have that in front of you?

A     Yeah.

Q     And, so, if you flip to the second

Craig Kronenberger
05/22/2020                                                    264

second from the bottom, it says, Based on the

June 14th through 16th, 2017 time frame discussed

above, I recommend running an ad campaign for two

days.

        Do you see that?

    A    Yeah.

    Q    What is that opinion based on?

    A    It's based upon the time frame of when

the article was initially released to the

conclusion of the edits that were made on it --

I'm sorry, the corrections -- edits and

corrections.

    Q    I -- I mean, is there any articles or

literature that support your conclusion you're

aware of that running an ad for the same number of

days -- well, actually, strike that.

        Is there any scholarly articles or

literature that you're aware of that support your

conclusion that running ads for two days is the

appropriate repair of this case?

    A    Well, first off -- well, yeah, there's

plenty of stuff out there, and this is a -- this

is a whole topic in itself.  You know, the -- the

reality is is that an ad format is not as good as

an article itself, so just -- just keep that in --

Craig Kronenberger
05/22/2020                                                265

in context here.  So that's an important part --

an important element to it.

Second is, you know, there are lots of

things around frequency and how long things should

be up there, and the reality in this case because

of the type of content, there's certainly an

argument that there should be a lot more increased

frequency in the ads and it should be up there for

a longer period of time.

But I wanted to do it correctly, and so

I based it upon the time frame of the articles,

the traffic to the articles and the correction to

the article.  And I felt that was the fairest way

of doing it as far as how I broke it out.

Q     So frequency is the term that you use

that talks about how many days or instances an ad

should be run?

A     So, first off, the methodology we use

in the advertising space would look at reach, and

we'd look at the frequency at which our ad hits

those targets.  And then, of course, we'd want to

reach the same type of audience, the same amount

of people.  That's typically how advertising would

look, would generate itself as a model.

So -- so those would be elements that

Craig Kronenberger
05/22/2020                                          266

you kind of look at in the model itself.  But if

you do that, then you get into this bigger

discussion around how much frequency.  Either way,

the numbers are going to be more than what I

actually recommended.

So I was trying to be fair in my

recommendation, and I felt like I was going to

take the time frame in which all of this was going

on because there's multiple edits and corrections

happening.

The process in itself is fairly

confusing.  I mean, if you kind of like block out

the physical timeline of the article, the edits

and the corrections that are made, there's a lot

going on with this article.  And, so, I felt the

fair way is just to do it within the time frame

all of this was going on.

And, to me, that was the fairest way of

doing it versus getting into a broader discussion

around reach and frequency, because if you get

into that, it opens up into a lot of different

areas, and, of course, the number becomes much

bigger than what we have here.

So I was trying to do something that

was fair.  That was my goal based upon a

Craig Kronenberger
05/22/2020                                                    267

methodology that's a recognized methodology in the

industry.  That's how I framed it up.

    Q    And when you say the methodology is a

recognized methodology in the industry, what did

you mean by that?

    A    Well, you saw in the calculations I --

I used a combination of estimated ad value, and

I -- and I also used actual ad value based upon

information that was available which would be a

common way that we would approach it in -- in

trying to understand it.

         Now, it's important to note that in the

industry a -- a article or an opinion is worth

more than an ad is, and so whatever calculations

we come up with, it does not hold the same amount

of trust and value that an actual article does.

         And, so, that's just an important note

to make.

         But outside of that, we -- we looked at

ad rates from The New York Times and we looked at

estimated ad rates through Cision because we do

not have access to the -- some of the ad rates

from The New York Times.

    Q    Yeah.

         My question was really focused on the

Craig Kronenberger
05/22/2020                                            270

Craig Kronenberger
York Times.                   05/22/2020

Q    Yeah, that's not really my question.

Did you account for whether Sarah Palin

got her message out there through her Facebook or

Twitter accounts?

A    Once again, there's no comparison to

The New York Times and the amount of distribution

The New York Times has across all of its channels.

There's -- I'm not -- I'm not going to compare

Sarah Palin's Web site and social channels to it.

It doesn't --

Q    Well, I'm not -- yeah.

A    As a matter of fact, I think if you

look at authority, which looks at the overall

traffic that goes to the Web site as well as The

New York Times, Sarah Palin's doesn't even come

close to it.  The New York Times is like a nine

rating, you know, on Ahrefs.  It's got an

extremely high rating, one of the highest out

there.

Q    During our testimony today, we looked

at a number of articles from media entities that I

think you wrote in your report have authority and

reach.

As part of your analysis, did you

Craig Kronenberger
05/22/2020                          271

Craig Kronenberger
05/22/2020

account for the fact that there were media

entities that wrote about the fact that Sarah

Palin was suing The New York Times for defamation?

          MR. VOGT:  Objection to form.

          THE WITNESS:  No, I -- I wouldn't.

     BY MR. AXELROD:

     Q     You wouldn't?  Why not?

     A     Because it's -- in a lot -- these

publications are different audiences, different

reach distributing the content that's being put

out there.  It is not The New York Times.  One,

it's the authority of The New York Times; the type

of audience that The New York Times actually

reaches, the people who read it, it is completely

different.

          So, no, it doesn't factor in.  Our --

the goal -- in any type of reputational repair,

the goal of it is to reach the same people that

were impacted -- potentially the same people, as

close as you could get, want to try the best you

possibly can to reach those people that were

impacted by the negative content.

          And, so, we want to look at The New

York Times.  The New York Times is the one that

published it, distributed it.  It went through

Craig Kronenberger
05/22/2020                                      281

Craig Kronenberger
Q     And --            05/22/2020

A     -- sense, the difference between the PR industry, why they don't like it, why they use it or don't use it, and why I use it and why it does matter?

Q     Not really.  But we'll drill down a little bit.

I think your testimony is is that you're using it for reputational harm management and not for PR purposes.

Do I have that right?

A     Correct.

Q     Is there anyone besides you that you can tell me who has endorsed using AVE for reputational harm management?

A     No, I'm the one that's using it.  I use it for reputation management.  The PR industry uses it.

Keep in mind, by the way, not everybody in the PR industry is against the AVE.  There's just only certainly people are against it versus others.  So people use AVE; hence, why Cision still has it integrated into their system and most PR platforms do.

But --

Craig Kronenberger
05/22/2020                                    282

Craig Kronenberger
Q     Do --         05/22/2020

A      -- I use it for reputation management,

but I'm also on the forefront of our space.  I've

been doing this a long time.  I teach people in

this area.  I've been leading it.

So that is why I use it.

Q     Does Cision support using AVA for

reputational harm management?

MR. VOGT:  Objection to form.

THE WITNESS:  They certainly know that

I use it for reputation management purposes.

BY MR. AXELROD:

Q     How do they know that you use it for

reputational harm management?

A      My reps, the people I work with, know

the data that I'm putting in, the reports that I'm

pulling.

Q     So how do they know that you're using

it for --

A      I've had --

Q      -- reputational harm management and for

not PR purposes?

A      I've had discussions with them about

it.  I've had discussions with trying to get to

the nuances of the AVE formula, the calculations,

Craig Kronenberger
05/22/2020                                           290

the number that you put into your report?

A      Yes.      Craig Kronenberger
                              05/22/2020

Q      You didn't put it -- you didn't put it

into your report, so what is the equation that

allows -- that comes up with the 83163 and 57

cents number?

A      Well, I told you that the AVE is -- the

AVE formula for Cision is proprietary formula, but

it is based upon traffic to The New York Times Web

site and articles and they pull their data from

Google which is Google Chrome, so -- example.  So

they see how many people actually pull up a unique

URL and that's how they track it, and then they

have a formula based upon the amount of people

that visited that.

Q      So you don't know, as we sit here

today, what the formula is that was used to come

up with this 83,000 number?

A      I don't know the formula because it's

proprietary to Cision.  I only know the elements

that help make it up.  That's all I know.

Q      And what are those elements?

A      Like I said, it's looking at the actual

site traffic that's going to the URL itself, and

it's not using cookie data, but it is using data

Craig Kronenberger
05/22/2020                                          291

from browser.

              And then in some cases Cision has

partnerships with certain media outlets.  They

could have one with The New York Times.  I don't

know.  In which case if they do, they pull data

directly as part of it.

              So it kind of depends on the URL and

the domain based upon what Cision has publicly put

out there about the formula.

    Q    I'm very confused.  Can you just take

me through the different components generally that

you think go into this formula?

    A    So -- so there's a couple of different

ways that they capture the data.  So they can,

one, have a direct partnership with The New York

Times, and based upon that, they collect data

directly from The New York Times based upon that.

That's an example.

              Now, I don't know if they have an

agreement with The New York Times or not.  They

don't disclose who they have agreements with.

              The second approach is that they

extract the data through Web browser data so

they're looking at people, example, in Google

Chrome; how many people go to that actual page and

Craig Kronenberger
05/22/2020                                          292

look at that data.  And they extract the data, and then based upon that, they build out the ad equivalency value to it based upon the number of people and readers of that particular article.

Q    So you're telling me that the AVE that's used here is based on the actual number of people who go to the URL for America's Lethal Politics?

A    Well, it's not actual.  I don't know whether they're partnered with The New York Times or not.  If they're not partnered, then it's not actual data.  It is a large sample set of data around readership.

And, by the way, we use Cision to pull the data because we don't have the data from The New York Times.

Q    Readership of what?

A    Of the article.

Q    So I'm looking at what's been marked as Defendants' Exhibit 76, and there's this number that says, Readership, 44,235,941?

A    It's total readership potential is what that is.

Q    And I noticed that that is the number you used before earlier in your report to talk

Craig Kronenberger
05/22/2020

doing it.

But if you gave me the numbers, I would definitely take into account the amount of people who viewed the article or potentially viewed the article itself.  I certainly would look at things such as time, time frame.  I certainly would look at placement and the positioning because the goal, remember, at the end of the day, the goal is to be able to reach the same people who are potentially influenced by this article's negative article, this incorrect statement.  The goal is to get in front of them to change the opinion, to set the record straight, to get it in front of them.  And that's all we're trying to do.

And, so, the question is is can we come up with a -- a methodology that is correct and meaningful that can ensure that we do that.  That is -- that is all we are trying to do.

Q     Do you know whether there's an error rate in -- in association with AVE?

A     It's debatable.  I mean, I've seen error rates in them.  Usually there is an error rate, but there's a debate around the error rate issue.

Q     And what's that debate?

Craig Kronenberger
05/22/2020                                    327

Craig Kronenberger
05/22/2020

A      On what the percentage of error rate is.

Q      Yeah, and what is -- what is the --

A      I don't recall.

Q      -- specifics of the debate?  You don't know?

A      No.

THE COURT REPORTER:  You've got to --

BY MR. AXELROD:

Q      But there --

THE COURT REPORTER:  -- let him --

BY MR. AXELROD:

Q      -- is an --

THE COURT REPORTER:  -- finish.

BY MR. AXELROD:

Q      -- error rate?

THE COURT REPORTER:  Okay.

THE WITNESS:  I don't know.  I don't know.

BY MR. AXELROD:

Q      Okay.  Now, let's turn to print ads. In your report, you write that you recommend running a full-page ad for two days as opposed to running multiple smaller ads with less space.

Why do you think or why do you -- why

Craig Kronenberger
05/22/2020                                                    329

correction and was able to make some connection,

and that assumes that the correction is even

effective.                    Craig Kronenberger
05/22/2020

          So because of that, there's a --

there's a couple challenges.  So I think it's

important -- oh, and the other component is is

that once again, I do not believe that you can

run, you know, large ads on the opinion pages.

Once again, I could be incorrect on that.  So

because of that, I feel that it's important that

you're doing a full page over the full time period

that I stated.

     Q    Is there any support for that

conclusion in any article that you read that you

can point me to?

     A    Support for what?  What do you mean?

     Q    For your --

     A    Specific --

     Q    For your conclusion that to redress the

harm from the printed story, there needs to be a

full page ad?

     A    Well, as I stated, there are several

variables that make up the rationale for doing

that including the time frame in which it

occurred.

Craig Kronenberger
05/22/2020                                              330

Secondly, as we stated, the correction

didn't work the same for print.  The correction

didn't go with the print article.  The correction

went after the print article.  So anyone who saw

the article never saw the correction on it.  And

when the correction did show up, there was no

article there and it certainly didn't say Sarah

Palin's name.

So there's a complete disconnect.

So I gave you several variables that

make up for it, and then I also put -- I

emphasized the importance that the opinion section

of the newspaper is a valuable placement for an

article, and my assumption is is that we don't

have the ability to do something equivalent within

that placement or that positioning.

Q      So I understand --

A      I -- I --

Q      Sorry.

A      You do understand that?

Q      I understand that's your rationale, but

my question was actually much more specific.  Is

there any literature or an article that you can

cite to me that supports or suggests that your

conclusion about full-page ads is the correct one?

Craig Kronenberger
05/22/2020                                             331

A     Literature that supports a full-page ad

is -- well, sure, there's certainly literature out

there that talks about the importance of ad

placements, what people view, what makes sense,

what people are likely to see.  There's -- there's

plenty of information out there about that.

        And it certainly informs my opinion.

If you take up a little bit of space, it's less

likely that someone is going to see you -- see it.

We also know that an ad is not going to be as

trusted as an article.  These are all things that

there's been plenty written about.  So because of

that, that has to factor into it.

        And then, once again, the correction is

an issue.  So it's not as easy as to answer it how

you stated it.  There's plenty out there and based

upon the variables I explained, it would back it

up.  You have to have something that is going to

get the point across, and I think that's a good

way to judge this --

Q     Is there any --

A     -- (inaudible).

Q     Is there any article that you relied on

that says that in a situation like this where

there's been a false allegation that the

Craig Kronenberger
05/22/2020                                    332

appropriate remedy is a full-page ad?

A    So there is -- there's no piece of

information out there that talks about someone

like Sarah Palin being talked about negatively in

this manner in an article, in an opinion article

written by The New York Times placed the way that

it was, also running in print, had no correction

that happened the other day.  There is no

literature to back up the best approach for that

type of example.  It does not exist.  As a matter

of fact, it would be pretty darn hard to replicate

it.

Q    Any literature that you relied on that

is about a similar or even somewhat similar

example?

A    Yeah.  Well, I told you there was --

there is plenty of literature out there.  I cannot

point right off the bat, but I certainly could

provide plenty of information on the importance of

ad placement, how people view, experience, what

they're looking at when they're looking at ads and

certainly within newspapers.  There's no question

of it.

As a matter of fact, I would also argue

the data is probably available directly from The

Q    And we're going to put up the last

exhibit.  We're going to be done in a couple of

minutes.

MR. AXELROD:  Tom, if you could put up

Defense Exhibit 78, please.

(Defendants' Exhibit 78 was marked for

identification and attached to the transcript.)

BY MR. AXELROD:

Q    And, Mr. Kronenberger, if you could

open that up, that would be great.

A    Okay.

Q    So Defense Exhibit 78 is a -- the

results of an ABC News/Washington Post poll from

January 26 of 2016, and I think your testimony was

before that you didn't -- in the course of your

analysis, you didn't look at any poll at -- any

polling data related to Sarah Palin; correct?

A    Correct.

Q    If you would, could you go to page 14

of this exhibit?

A    Fourteen.  Okay.  I'm on 14.

Q    Okay.  And at the top, the first

sentence says, On another topic, 20, do you have a

favorable or unfavorable impression of Sarah

Palin.  Do you feel that way strongly or somewhat?

Craig Kronenberger
05/22/2020                                                    335

Craig Kronenberger
05/22/2020

Q    Do you see that?

A    Yeah, I see it.

Q    And if you look at the top line, there is dates from 1/24/2016 which is the summary of this poll, and do you see it says the net unfavorable number is 56?

A    Yep.

Q    And if you look at the trend line from starting at the bottom, 9/4 of '08, the net unfavorable was 37, and it goes 28, and then it goes 38, and then it keeps creeping up until it gets to 56 in the beginning of '16.

Do you see that?

A    Okay.  Yeah.  Yep.

Q    Did you do any -- did you incorporate into your analysis any way how the public viewed Sarah Palin's reputation prior to the publication of the editorial America's Lethal Politics?

MR. VOGT:  Objection to form.

THE WITNESS:  I -- I already said, no, I did not.  It doesn't make any sense.  So I'm not sure what that favorability rating has to do with an article stating that she was connected with a gun shooting.

BY MR. AXELROD:

Craig Kronenberger
05/22/2020                                    340

REPORTER'S CERTIFICATE

I, Dana C. Ryan, State of Georgia Certified Shorthand Reporter, hereby certify that the deponent was by me first duly sworn and the foregoing testimony was reported by me and was thereafter transcribed with computer-aided transcription; that the foregoing is a full, complete, and true record of said proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceedings and caption named or in any way interested in the outcome of the cause in said caption.

The dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificate null and void.

In witness whereof, I have hereunto set my hand this day: June 4, 2020.

___X___   Reading and Signing was requested.

_____   Reading and Signing was waived.

_____   Reading and Signing was not requested.


_____

Dana C. Ryan, GCSR, RPR, CRR