UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SARAH PALIN

                 Plaintiff,

               -against-

THE NEW YORK TIMES COMPANY and JAMES BENNET,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

No. 17 Civ. 4853 (JSR)

ECF Case

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF JAMES BENNET'S DEPARTURE FROM THE TIMES, UNRELATED CONTROVERSIES DURING HIS TENURE AS OPINION EDITOR, AND THE ELIMINATION OF THE PUBLIC EDITOR POSITION**

David L. Axelrod
Jay Ward Brown
Thomas B. Sullivan
Jacquelyn N. Schell
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
axelrodd@ballardspahr.com
brownjay@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

*Counsel for Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

I.  EVIDENTIARY STANDARDS ...............................................................................1

II. THE EVIDENCE AT ISSUE ....................................................................................2

    A.  The Essay by Senator Cotton and Mr. Bennet's Resignation ..................2

    B.  Other Controversies ...................................................................................7

    C.  Departure of the Public Editor ................................................................10

CONCLUSION ..........................................................................................................................11

# TABLE OF AUTHORITIES

**Cases**                                                                                                             **Page(s)**

*Carter v. Hewitt*,
   617 F.2d 961, 972 (3d Cir. 1980)..................................................................................2

*Gariepy v. Pearson*,
   120 F. Supp. 597, 598 (D.D.C. 1954) ...........................................................................9

*Kipper v. NYP Holdings Co.*,
   12 N.Y.3d 348, 355 (2009) ..........................................................................................11

*Nickerson v. G.D. Searle & Co.*,
   900 F.2d 412, 418, 419 (1st Cir. 1990) .........................................................................6

*St. Amant v. Thompson*,
   390 U.S. 727, 731 (1968) ..............................................................................................5

*Tavoulareas v. Piro*,
   93 F.R.D. 35, 35  (D.D.C. 1981) ...................................................................................9

*United States v. Cadet*,
   664 F.3d 27, 32 (2d Cir. 2011) ......................................................................................6

*United States v. Carneglia*,
   603 F. Supp. 2d 488, 496 (E.D.N.Y. 2009) ..................................................................1

*United States v. Gordon*,
   987 F.2d 902, 908 (2d Cir. 1993) ..................................................................................6

*United States v. Quattrone*,
   441 F.3d 153, 186 (2d Cir. 2006) ..................................................................................2

*Westmoreland v. CBS, Inc.*,
   601 F. Supp. 66, 68, 69 (S.D.N.Y. 1984) ..................................................................9, 10

## Other Authorities

Fed. R. Evid. 401 .................................................................................................................1

Fed. R. Evid. 402 .....................................................................................................1, 5, 8, 11

Fed. R. Evid. 403 ......................................................................................................... *passim*

Fed. R. Evid. 404 ..............................................................................................................6, 9

1 J. Weinstein & M. Berger, Weinstein's Evidence § 403(03) (1978) ............................................2

Defendants The New York Times Company ("The Times") and James Bennet ("Mr. Bennet" and together with The Times, "Defendants"), respectfully submit this memorandum of law in support of their motion *in limine* asking the Court to exclude from evidence and preclude the Plaintiff from asking witnesses questions about topics intended to turn this trial, which is narrowly focused on two lines of a single Editorial conceived, written, published, and corrected within less than a day, into a baseless and broad indictment of Mr. Bennet's tenure as head of the Opinion section and The Times itself.

To this end, Gov. Palin apparently intends to introduce evidence about editorial and policy decisions that have nothing to do with that Editorial and, in many cases, occurred years after the Editorial's publication, and are intended to confuse and distract the jury, including: (1) the publication of an op-ed column by Senator Tom Cotton that ultimately led to Mr. Bennet's resignation, (2) other "controversies" that occurred during Mr. Bennet's tenure as Opinion Editor such as content and hiring decisions that had no connection to the events of this case, and (3) The Times's decision to eliminate the public editor position. These issues have no relevance to the case before the Court, and the introduction of these topics will only serve to confuse and distract the jury such that Defendants are unduly prejudiced.

I. **EVIDENTIARY STANDARDS**

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. "Irrelevant evidence is not admissible," Fed. R. Evid. 402, and indeed must be excluded "in order to ensure a fair and efficient adjudication," *United States v. Carneglia*, 603 F. Supp. 2d 488, 496 (E.D.N.Y. 2009).

Even relevant evidence may be excluded where "its probative value is substantially outweighed by a danger of . . . confusing the issues, misleading the jury, undue delay, wasting

1

time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  Among other things, evidence is unfairly prejudicial if it could "inappropriately lead the jury to [rule] on the basis of conduct not at issue in the trial."  *United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir. 2006); *see Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980) (evidence is "unfairly prejudicial if it 'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish,' or otherwise 'may cause a jury to base its decision on something other than the established propositions in the case.'" (quoting 1 J. Weinstein & M. Berger, Weinstein's Evidence § 403(03), at 403-15 to 403-17 (1978)); *see* Fed. R. Evid. 403 advisory comm. notes to 1972 amendment ("Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.").

## II.     THE EVIDENCE AT ISSUE

Given the paucity of evidence of Defendants' actual malice, it appears that Gov. Palin intends to focus a large part of her trial presentation on controversies involving Mr. Bennet and The Times that have nothing to do with the publication of "America's Lethal Politics" or Gov. Palin.  As described more fully below, these other controversies are irrelevant to this case, and introduction of such evidence will only serve to confused the jury, unfairly prejudice Defendants, and waste significant time.

### A.     The Essay by Senator Cotton and Mr. Bennet's Resignation

On June 3, 2020, almost three years after publication of "America's Lethal Politics," The Times published an essay titled "Send in the Troops" by Republican United States Senator Tom Cotton (the "Cotton Op-Ed").  *See* Declaration of Thomas B. Sullivan in Support of Defendants' Motions *In Limine* ("Sullivan Decl."), Ex. A.  The Cotton Op-Ed called for the use of the military as part of "an overwhelming show of force" in response to illegal behavior occurring at protests in American cities reacting to death of George Floyd.  *Id.*  For a number of reasons,

2

including the public outcry over George Floyd's murder and President Trump's decision to use force to clear protesters from Lafayette Square, just two days before, the reaction to the Cotton Op-Ed was immediate and intense, including inside The Times itself. Dozens of Times employees tweeted that "[r]unning [the Cotton Op-Ed] puts Black @NYTimes staff in danger" and "[m]ore than 800 staff members signed a letter protesting its publication." *See id.*, Ex. B (Palin Exhibit 23). Critics outside The Times assailed The Times for the decision to run the editorial, running articles and editorials with headlines such as "You Don't Have to Publish Both Sides When One Side Is Fascism."[1]

In response to this intense criticism, the following day, Mr. Bennet explained in The Times' *Opinion Today* newsletter the decision to publish the Cotton Op-Ed. *See id.*, Ex. C (Palin Exhibit 318). Mr. Bennet explained that The Times editorial board had published pieces criticizing the "president's used of federal forces in Washington, D.C.," defending the protesters as patriots, and condemning police brutality. Mr. Bennet defended publishing the Cotton Op-Ed on the grounds that The Times "committed to Times readers to provide a debate on important questions like this [and] [i]t would undermine the integrity and independence of The New York Times if we only published views that editors like me agreed with . . . ." *Id.*

On June 5, The Times appended an editor's note to the Cotton Op-Ed stating that, following a review, the editors had "concluded that the essay fell short of our standards and should not have been published." *See id.*, Ex. A. Mr. Bennet ultimately resigned from The Times on June 7. *See id.*, Ex. D. The publication of the note and Mr. Bennet's resignation led

---

[1] *See, e.g.*, Eric Alterman, *You Don't Have to Publish Both Sides When One Side Is Fascism*, The Nation, June 11, 2020, *available at* https://www.thenation.com/article/society/tom-cotton-new-york-times/)

to another round of criticism, now "about the potential chilling effects the response to the Op-Ed may cause."[2]

Indeed, the Times's own Editorial Page reflected the extent the intensity of the response on all parts of the political spectrum. The headline of a column by Michelle Goldberg referred to the Cotton Op-Ed as "fascist" and read Senator Cotton as "calling for what would almost certainly amount to massive violence against his fellow citizens."[3] By contrast, Bret Stephens said that, "decision by this newspaper to disavow an Op-Ed by Senator Tom Cotton is a gift to the enemies of a free press — free in the sense of one that doesn't quiver and cave in the face of an outrage mob."[4]

The publication of the Cotton Op-Ed and the related fall-out has nothing to do with this trial. Yet, Gov. Palin's exhibit list indicates that she intends to spend significant time on this at trial. Gov. Palin has included on her exhibit list: (1) an article by The Times concerning the reaction to the Cotton Op-Ed (Exhibit 23); (2) a series of tweets by Mr. Bennet on June 3, 2020 concerning the Cotton Op-Ed (Exhibit 316)[5]; (3) a tweet by The Times concerning the Cotton Op-Ed (Exhibit 317);[6] and (4) Mr. Bennet's explanatory article from June 4 (Exhibit 318).[7]

---

[2] Kathleen Kingsbury, *Our Writers' Responses to the Tom Cotton Op-Ed*, N.Y. Times, June 12, 2020, available at https://www.nytimes.com/2020/06/12/opinion/tom-cotton-new-york-times.html.

[3] Michelle Goldberg, *Tom Cotton's Fascist Op-Ed*, N.Y. Times, June 4, 2020, available at https://www.nytimes.com/2020/06/04/opinion/tom-cotton-op-ed-new-york-times.html.

[4] Bret Stephens, *What The Times Got Wrong*, N.Y. Times, June 12, 2020, available at https://www.nytimes.com/2020/06/12/opinion/tom-cotton-op-ed.html.

[5] Sullivan Decl., Ex. E.

[6] Sullivan Decl., Ex. F.

[7] Sullivan Decl., Ex. C.

Defendants anticipate that Gov. Palin will also ask witnesses questions about the Cotton Op-Ed and Mr. Bennet's resignation.  While Defendants have no objection to acknowledging the fact that Mr. Bennet no longer works for The Times, the circumstances behind Mr. Bennet's resignation and the controversy surrounding the Cotton Op-Ed should be excluded as they are completely irrelevant.

The publication of the Cotton Op-Ed, the resulting outcry, and Mr. Bennet's decision to resign from The Times are all simply irrelevant to this case, and therefore should be excluded under Rule 402.  Confronted with negligible evidence of actual malice, Gov. Palin is attempting to prove actual malice through the accumulation of irrelevant, confusing, and distracting sideshows.  As part of this kitchen sink approach, Gov. Palin undoubtedly seeks to argue that the Opinion section had poor editorial controls or was error prone, but, even if that was somehow true, which Defendants do not concede, that would have nothing to do with whether Defendants acted with actual malice in publishing the Editorial three years earlier.

For purposes of actual malice, "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing," but rather whether "defendant in fact entertained serious doubts as to the truth of his publication."  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).  Potential flaws in The Times' editing process or criticisms of Mr. Bennet's running of the Opinion section in 2020 say nothing whatsoever about what Mr. Bennet or anyone else was thinking at the time the Editorial was published in 2017.

There are fundamental differences between publication of the Cotton Op-Ed and publication of the Editorial that further demonstrate irrelevance.  First, the Cotton Op-Ed was written by a United States Senator, not Mr. Bennet or any other member of The Times's staff. Second, the Cotton Op-Ed controversy centered on The Times' decision about what content and

5

opinion is appropriate to publish, not the clarity of the words used in an editorial. There was no allegation that the Cotton Op-Ed said anything injurious of another person's reputation.[8]

Moreover, the introduction of the Cotton Op-Ed, the reaction to it, and Mr. Bennet's resignation would be unfairly prejudicial in multiple ways and, therefore, even if this evidence was somehow relevant, it should be excluded under Rule 403. Inevitably, just like among The Times's own columnists, the jury will potentially include people with differing and strong political views. Some jurors may think The Times put lives at risk and even embraced fascistic ideas by giving a platform to the views expressed in the Cotton Op-Ed. Others may believe that a police response to illegal activities is entirely appropriate or think that The Times' subsequent failure to defend the essay's publication and cave to public pressure is a threat to free speech. None of this has anything to do with this case.

The very real risk that the jury could rule based on political opinion and emotion about issues that remain raw for some people, instead of the relevant facts, requires this evidence's exclusion. *Cf. Nickerson v. G.D. Searle & Co.*, 900 F.2d 412, 418-19 (1st Cir. 1990) (finding that district court did not abuse its discretion in excluding questions about expert's experience with abortion, noting "the fierce emotional reaction that is engendered in many people when the subject of abortion surfaces in any manner").

The introduction of this evidence would also create the strong possibility that jurors could view Mr. Bennet's role in the decision to run the Cotton Op-Ed and departure from The Times as

---

[8] Because of these differences between the publishing of the Editorial and the Cotton Op-Ed, the evidence would also not be admissible to prove intent or for another permissible purpose under Rule 404(b). *See United States v. Cadet*, 664 F.3d 27, 32 (2d Cir. 2011) ("[w]hen 'other act' evidence is offered to show knowledge or intent . . . such evidence must be sufficiently similar to the conduct at issue to permit the jury to draw a reasonable inference of knowledge or intent from the other act" (internal marks omitted)); *see also United States v. Gordon*, 987 F.2d 902, 908 (2d Cir. 1993) (requiring a "close parallel")

a confirmation that he was unfit for the job and connect that to his role in publishing the Editorial three years earlier. But there is no evidence whatsoever that Bennet's departure from The Times had anything to do with the publication of "America's Lethal Politics." Indeed, if forced, The Times would introduce uncontroverted evidence that Mr. Bennet's departure had nothing to do with the Editorial. Nonetheless, the introduction of this evidence would create a mini-trial on this issue, require The Times to call additional witnesses who would not otherwise testify but for the introduction of this issue, and importantly, would only serve to confuse the jury and waste time.

For these reasons, evidence concerning the Cotton Op-Ed, the reaction to it, and Mr. Bennet's resignation should be excluded as irrelevant, improper character evidence, and unfairly prejudicial.

### B.  Other Controversies

Not satisfied with only introducing the Cotton Op-Ed controversy to unduly prejudice Defendants, , Gov. Palin's exhibit list also includes documents related to a number of other insignificant "controversies" that arose while Mr. Bennet ran the Opinion section of The Times. Again, Gov. Palin's intent is clear. Lacking evidence of actual malice, she seeks to use whatever she can find, no matter how irrelevant, to make The Times look bad. Specifically, the list includes (1) an overview article about "backfires and explosions" at the Opinion section (Exhibit 65)[9]; (2) various documents related to "controversial" hires by the Opinion Department during Mr. Bennet's tenure, Quinn Norton and Sarah Jeong, (Exhibits 66,[10] 67,[11] 68,[12] 69[13], 291[14]); (3)

---

[9] Sullivan Decl., Ex. G.

[10] Sullivan Decl., Ex. H.

[11] Sullivan Decl., Ex. I.

7

an article about a factual error made by columnist Bret Stephens in a piece he wrote about climate change (Exhibit 286)[15]  In addition, Gov. Palin has designated portions of Mr. Bennet's deposition testimony, *see* Sullivan Decl., Ex. O on several related topics, including "public controversy" surrounding Mr. Stephens's error, *see id.*, Ex. P at 221:25-226:3; the hiring of Ms. Norton, Ms. Jeong, Michelle Goldberg and Bari Weiss, Quinn Norton, and Sarah Jeong, *id.* at 226:6-232:14; and op-eds published by Louise Mensch and Erik Prince, *id.* at 232:15-234:14. Plaintiff's counsel also asked Times columnist Ross Douthat similar questions during his deposition.  *See* Sullivan Decl., Ex. Q at 120:25-127:12.[16]  Gov. Palin should not be permitted to introduce this evidence in a transparent effort to distract from the issues actually at hand.

Like the Cotton Op-Ed, all of this evidence should be excluded as irrelevant under Rule 402.  That Mr. Bennet hired (or attempted to hire) controversial opinion columnists or was involved in the decision to publish certain pieces that were later criticized, says absolutely nothing about whether the Editorial was true or false, whether its publication damaged Gov. Palin's reputation or even concerned her at all, or whether Bennet wrote the sentences at issue with actual malice.  Unlike the Editorial, none of these other controversies involved Mr. Bennet's writing or Gov. Palin herself in any way.

---

[12] Sullivan Decl., Ex. J.

[13] Sullivan Decl., Ex. K.

[14] Sullivan Decl., Ex. N.

[15] Sullivan Decl., Ex. L.

[16] Gov. Palin has also designated an exhibit involving a metropolitan editor's resignation due to "inappropriate communications" with female employees, *see* Sullivan Decl., Ex. R (Exhibit 240), which has nothing to do with Mr. Bennet or the Opinion section.  This exhibit is addressed in Defendants' objections to Gov. Palin's exhibits.

A judge in this District previously found that even evidence of "other controversies" involving the *same* documentary at issue in the case then at bar was irrelevant at trial. In *Westmoreland v. CBS, Inc.*, 601 F. Supp. 66 (S.D.N.Y. 1984), the plaintiff sought to introduce sections of a report prepared by CBS that suggested that, in addition to the portions of the documentary which were allegedly defamatory, the broadcast had violated internal rules and guidelines in several ways, including by allowing an interview subject to rehearse his interview, allowing the same person to be interviewed twice, and failing to identify him as a paid consultant, *id.* at 68-69. Judge Leval ruled that "[i]f it is the case that various internal rules of CBS were broken in the making of the documentary, that fact has no bearing on whether the documentary was made in reckless or intentional disregard of the truth. The fact of the violation of rules is not relevant to any issue in the lawsuit." *Id.* at 69. Here, the evidence Gov. Palin would admit is even further from the issues at the core of this case, in that none of it has anything to do with the Editorial at issue.

Gov. Palin apparently intend to use this evidence to baselessly argue that Mr. Bennet has a poor character and that Mr. Bennet acted in conformity with this character in publishing the Editorial, it should be excluded under Rule 404. In *Tavoulareas v. Piro*, 93 F.R.D. 35 (D.D.C. 1981), the court denied discovery into, among other things, demand and complaint letters received by the defendant about unrelated allegedly defamatory articles, noting that evidence of unrelated prior bad acts would be inadmissible under Rule 404 to prove the character of the defendant and that the defendant acted in conformity with his character in publishing the article at issue. *Id.; see also Gariepy v. Pearson*, 120 F. Supp. 597, 598 (D.D.C. 1954) ("evidence of defamation committed by the defendant against third persons in no way connected with the suit

9

is inadmissible"). None of the events here are in way similar to the conduct at issue here, let alone a close parallel.

And, just like the Cotton Op-Ed, the introduction of these events carries significant risk of unfair prejudice against The Times and Mr. Bennet, wasting time at trial, and misleading the jury about the issues they will actually be tasked to decide, and therefore, even if it was somehow relevant, this evidence should be excluded under Rule 403. Most significantly, there would be a significant chance that a jury could conclude that other missteps in running the Opinion section somehow demonstrated that Defendants were at fault in publishing the Editorial. As Judge Leval noted in *Westmoreland*, such evidence could be seen as demonstrating "recklessness of a different sort – not recklessness as to truth. It might therefore prejudice the jury against the defendants. Even if some marginal relevance can be found, it is far outweighed by the potential for misunderstanding, confusion and prejudice." 601 F. Supp. at 69. Many of these controversies also involved issues or figures about which and whom jurors could hold passionate views. And again, while Gov. Palin will attempt to paint these "controversies" as clear-cut examples of mistakes that demonstrate negligence, the truth is much more nuanced, and The Times will be forced to spend significant trial time calling witnesses and introducing evidence demonstrating the thought, time, and care that Mr. Bennet put into each of these supposed controversies.

For these reasons, all evidence involving these supposed other controversies should also be excluded from the trial of this matter.

C. **Departure of the Public Editor**

Finally, Gov. Palin appears to intend to introduce evidence of The Times' decision in May 2017 to eliminate the position of Public Editor, held at that time by Liz Spayd. *See* Sullivan

Decl., Ex. S (Exhibit 100) and Ex. T (Exhibit 101). Gov. Palin seems to seek to introduce this evidence to suggest that, in the absence of the Public Editor, The Times had no incentive to comply with "editorial standards." *See id.*, Ex. T.

This subject should be excluded from the trial for much of the same reasons as those discussed above with respect to other evidence. First, it is completely irrelevant to this case, and therefore should not be admitted pursuant to Rule 402. There is no suggestion anywhere in the record that eliminating the Public Editor position had anything to do with the publication of the Editorial weeks later. Second, as also discussed in the prior sections of this motion, even if this evidence could in some way be relevant, its introduction would be unfairly prejudicial, in violation of Rule 403, because its only purpose is to criticize The Times's following of proper editorial standards when those standards are not at issue here. *See, e.g. Kipper v. NYP Holdings Co.*, 12 N.Y.3d 348, 355 (2009) (noting that paper's "failure to employ fact-checkers" is not evidence of actual malice). The introduction of these subjects would also unnecessarily occupy significant trial time. At about the same time The Times eliminated the Public Editor position, it created a department called the Reader Center. Thus, if the Court permits Palin to engage in this detour, unnecessary time and effort will be spent debating whether the Reader Center was an adequate replacement.

For these reasons, this Court should also exclude from the trial any reference to the elimination of the Public Editor position.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court grant this motion and bar Gov. Palin from introducing evidence or soliciting testimony concerning the following subjects:

1. The publication of the Cotton Op-Ed, the reaction to it, and Mr. Bennet's departure from The Times;

2. The fact-checking of columns by Bret Stephens,;

3. The hiring of Mr. Stephens, Michelle Goldberg, Bari Weiss, Quinn Norton, and/or Sarah Jeong;

4. Op-eds published by Louise Mensch and/or Erik Prince; and

5. The elimination of the Public Editor position.

Dated:  New York, New York  
January 10, 2022

Respectfully submitted,

BALLARD SPAHR LLP

By: */s/ David L. Axelrod*
David L. Axelrod
Jay Ward Brown
Thomas B. Sullivan
Jacquelyn N. Schell
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

*Counsel for Defendants*