UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SARAH PALIN, an individual,

    Plaintiff,

    – against –

THE NEW YORK TIMES COMPANY,
A New York corporation,

    Defendants.

No. 17 Civ. 4853

Hon. Jed S. Rakoff

ECF Case

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
MOTION TO EXCLUDE CRAIG KRONENBERGER**

TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 834-9191
Facsimile:  (813) 443-2193

and

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile:  (212) 754-0330

*Attorneys for Plaintiff Sarah Palin*

## TABLE OF CONTENTS

Table of Contents ....................................................................................................... i

Table of Authorities ................................................................................................. ii

Introduction .............................................................................................................. 1

      A.      LEGAL STANDARD ..................................................................... 3

            1.      Qualification ................................................................. 3

            2.      Reliability ..................................................................... 3

      B.      ARGUMENT .................................................................................. 6

            1.      Mr. Kronenberger is Amply Qualified ........................ 6

            2.      Mr. Kronenberger's Opinions are Reliable ................ 10

                   (A)      Reputational Harm is Presumed as a Matter of Law .................. 11

                   (B)      Governor Palin's Reputation Prior to Publication of the Editorial is Irrelevant to Kronenberger's Opinions ................. 12

                   (C)      Mr. Kronenberger's Methods Are Reliable ............... 15

Conclusion .............................................................................................................. 17

Certificate of Service ............................................................................................. 19

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ahmed v. Kifle,* 2015 WL 11199078 (N.D. Ga. Feb. 6, 2015)............................................... 10, 11

*Amorgianos v. Amtrak,* 303 F.3d 256 (2d Cir. 2002) ................................................................5

*Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179 (2d Cir. 2001) ...............................................................................................................................4, 14

*Carey v. Piphus*, 435 U.S. 247 (1978) ................................................................................ 1, 11

*Chefs Diet Acquisition Corp. v. Lean Chefs, LLC*, 2016 WL 5416498 (S.D.N.Y. Sept. 28, 2016) .................................................................................................... 4, 5, 14, 16

*Chen-Oster v. Goldman, Sachs & Co.,* 114 F. Supp. 3d 110 (S.D.N.Y. 2015), objections overruled, 325 F.R.D. 55 (S.D.N.Y. 2018) ......................................................2

*Chill v. Calamos Advisors LLC*, 417 F. Supp. 3d 208 (S.D.N.Y. 2019) .......................................5

*D'Amico v. Correctional Med. Care, Inc.*, 991 N.Y.S.2d 687, 120 A.D.3d 956 (2014).............................................................................................................................. 1, 11

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993)....................................3, 15

*George v. Ford Motor Co.*, 2007 WL 2398806 (S.D.N.Y. Aug. 17, 2007) ...................................3

*Gussak Realty Co. v. Xerox Corp.*, 224 F.3d 85 (2d Cir. 2000) .................................................15

*In re Fosamax Prod. Liab. Litig.,* 688 F. Supp. 2d 259 (S.D.N.Y. 2010) .................................3, 5

*In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2015 WL 9480448 (S.D.N.Y. Dec. 29, 2015)................................................................................... 6

*Jewell v. NYP Holdings, Inc.*, 23 F.Supp.2d 348 (S.D.N.Y. 1998) ........................................ 1, 11

*Kewazinga Corp. v. Microsoft Corp.*, 2021 WL 4066597 (S.D.N.Y. Sept. 1, 2021) ... 4,14, 15, 16

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999) .......................................................3, 4, 5, 17

*Liberty Media Corp. v. Vivendi Universal, S.A.,* 874 F. Supp. 2d 169 (S.D.N.Y. 2012) ...............................................................................................................................4

*Lion Oil Trading & Transp., Inc. v. Statoil Mktg. & Trading (US) Inc.*, No. 08 CIV. 11315 WHP, 2011 WL 855876 (S.D.N.Y. Feb. 28, 2011).........................................4, 16

*McCullock v. H.B. Fuller Co.,* 61 F.3d 1038 (2d Cir. 1995) ...............................................4, 15, 16

*Middle Mkt. Fin. Corp. v. D'Orazio*, 2002 WL 31108260 (S.D.N.Y. Sept. 23, 2002) ...................................................................................................................................14

*Nicholas v. Bratton*, 376 F. Supp. 3d 232 (S.D.N.Y. 2019) .......................................................... 3

*Olin Corp. v. Certain Underwriters at Lloyd's London*, 468 F.3d 120 (2d Cir. 2006) ...................................................................................................................................5

*Packard v. City of New York*, 2020 WL 1479016 (S.D.N.Y. Mar. 25, 2020) ............................... 6

*Qube Films Ltd. v. Padell*, 2016 WL 888791 (S.D.N.Y. Mar. 1, 2016) ........................................5

*Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017) ......................................................4, 14, 15, 16

*Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (1977) ................................................................................................ 1, 11

*Robertson v. Doe*, 2010 WL 11527317 (S.D.N.Y. May 11, 2010) ......................................... 1, 11

*Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33 (S.D.N.Y. 2016) ........................................ 5

*Solid Oak Sketches, LLC v. 2K Games, Inc.,* 449 F.Supp.3d 333 (S.D.N.Y. 2020) .................... 10

*Stern v. Cosby*, 645 F.Supp.2d 258 (S.D.N.Y. 2009) ............................................................... 1, 11

*U.S. v. Mulder*, 273 F.3d 91 (2d Cir. 2001) ............................................................................... 15

**Page(s)**

**OTHER AUTHORITIES**

Fed. R. Evid. 702 ...................................................................................................................... 3, 6

**INTRODUCTION**

Governor Palin sued Defendants for libel because they published an editorial that falsely asserts under the title "*Lethal Politics*" and in the context of a "sickeningly familiar pattern" of violence that included James  Hodgkinson's shooting in Virginia (characterized as a "form of terror" and a "killing field" and "savagery"), that Plaintiff "incited" Jared Loughner to "open fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old-girl," and that Plaintiff's "political incitement" of Loughner's crimes was clear and directly linked to the "Giffords attack."  It seems inconceivable that anyone (other than the people responsible for publishing these statements) would even try to argue that assertions such as these do not tend to subject Governor Palin to hatred, ridicule or disgrace and induce an evil opinion of her in the minds of reasonable people.

These statements are libelous on their face, and as such are actionable without proof of special harm.[1]  The reason such statements do not require proof of harm is simple:  they are so bad that the law presumes they are "***virtually certain to cause serious harm to reputation***," as well as humiliation and emotional distress.  *Carey v. Piphus*, 435 U.S. 247, 262-263 (1978) (emphasis added); *Robertson v. Doe*, 2010 WL 11527317, at *2 (S.D.N.Y. May 11, 2010); *Stern v. Cosby*, 645 F.Supp.2d 258, 289 (S.D.N.Y. 2009).[2]

---

[1] *Jewell v. NYP Holdings, Inc.*, 23 F.Supp.2d 348, 396-401 (S.D.N.Y. 1998); *D'Amico v. Correctional Med. Care, Inc.*, 991 N.Y.S.2d 687, 694, 120 A.D.3d 956, 962 (2014); *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 379, 397 N.Y.S.2d 943, 949, 366 N.E.2d 1299, 1305 (1977).

[2] As more fully explained in Plaintiff's Memorandum of Law in Opposition to Defendants' Motion in Limine for a Ruling that the Challenged Statements are not Defamatory Per Se, filed contemporaneously herewith, the challenged statements also meet the standard for slander per se because they tend to injure Governor Palin in her trade, business or profession and are "reasonably susceptible to a connotation of criminality.

1

Ignoring the presumed harm arising from their challenged statements as a matter of law, Defendants primarily seek to exclude Mr. Kronenberger's opinions based on the proposition that he could not presume reputational harm.  Specifically, Defendants claim Kronenberger is a "purported expert witness, who simply assumes that [Plaintiff] was harmed, in a futile attempt to prove damage to her reputation and establish how much it would cost to repair the hypothetical harm."  See Doc. 133 at p. 1.  Apparently, Defendants think Mr. Kronenberger should be excluded because he did something the Supreme Court and numerous other courts have said he is lawfully entitled to do.

The suggestion that Mr. Kronenberger is a "purported" expert in his field is as baseless as the contention that he did something wrong by presuming reputational harm.  As explained below, Mr. Kronenberger is a highly qualified expert in the fields of public relations, advertising, reputation management, and online reputational repair.

There is no legitimate basis to support the extraordinary remedy[3] of striking Mr. Kronenberger's opinions.  He is highly qualified and used his vast knowledge, experience, and expertise to evaluate the impacts of Defendants' libelous statements and then through reliable methods estimated the reasonable cost of an effective advertising campaign to repair the presumed reputational harm caused by the challenged statements.  To support his methods, Mr. Kronenberger explained how his experience and the tools he used led to his conclusions, why those tools and his experience are a sufficient basis for his opinions, and how his experience reliably applies to the facts of this case.  Mr. Kronenberger's analysis and opinions will assist the jury in assessing

---

[3] *Chen-Oster v. Goldman, Sachs & Co.,* 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015), objections overruled, 325 F.R.D. 55 (S.D.N.Y. 2018) ("There is a presumption that expert evidence is admissible, and 'the rejection of expert testimony is the exception rather than the rule.'" (quoting Fed.R.Evid. 702 advisory committee's note (2000)))

2

damages, and his opinions are admissible.  The Motion should be denied.

## A.  <u>LEGAL STANDARD</u>

Defendants move to exclude Mr. Kronenberger's testimony by arguing that his opinions do not satisfy the admissibility requirements of Rule 702 or *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and its progeny. "[C]ourts evaluating challenges to expert testimony must engage in a two-step inquiry. First the court must evaluate whether the proposed expert is sufficiently qualified to testify in such a capacity. Second, courts must determine whether the challenged testimony has a sufficiently reliable foundation." *Nicholas v. Bratton*, 376 F. Supp. 3d 232, 289 (S.D.N.Y. 2019) (citations and quotations omitted). Defendants' Motion fails on both grounds.

### 1.  Qualification

To be qualified, an expert need not satisfy the rigorous scientific standards set forth in *Daubert*.  Rather, "Rule 702 specifies that a witness may be qualified as an expert by knowledge, skill, experience, training or education." *In re Fosamax Prod. Liab. Litig.,* 688 F. Supp. 2d 259, 267 (S.D.N.Y. 2010). "Indeed, in *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999), the Court acknowledged specifically that an expert opinion based on 'skill or experienced-based observation' may satisfy Rule 702's standard of evidentiary reliability." *George v. Ford Motor Co.*, 2007 WL 2398806, at \*2 (S.D.N.Y. Aug. 17, 2007).  Ultimately, "[q]ualification as an expert is viewed liberally and may be based on a broad range of knowledge, skills, and training." *In re Fosamax Prod. Liab. Litig.,* 688 F. Supp. 2d at 267.

### 2.  Reliability

There is no "definitive checklist or test" for assessing reliability because "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co.*, 526 U.S. at 152.  Rather, the

3

"proper inquiry is to 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Liberty Media Corp. v. Vivendi Universal, S.A.,* 874 F. Supp. 2d 169, 176 (S.D.N.Y. 2012) (quoting *Kumho Tire Co.,* 526 U.S. at 150).

Arguments (such as Defendants') raising the limitations of theories or studies upon which an expert relies do not render the expert's opinions unreliable. *Lion Oil Trading & Transp., Inc. v. Statoil Mktg. & Trading (US) Inc.*, No. 08 CIV. 11315 WHP, 2011 WL 855876, at *3 (S.D.N.Y. Feb. 28, 2011) (concluding that "flaws [in a study] go to the weight a jury should accord the survey at trial, rather than to its admissibility."). Likewise, arguments that an expert should have used different formulas in computing damages is not a basis for excluding the expert's testimony. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) ("Disputes as to the strength of [an expert's] credentials, faults in his use of different etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony.").

Whether an expert includes certain variables in their calculations does not make their opinions unsound either. Rather, "'gaps or inconsistencies in the reasoning leading to [the expert's] opinion ... go to the weight of the evidence, not to its admissibility.'" *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (quoting (*Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001)); *Kewazinga Corp. v. Microsoft Corp.*, 2021 WL 4066597, at *2 (S.D.N.Y. Sept. 1, 2021) ("Any contentions that the expert's assumptions are unfounded go to the weight, not the admissibility, of the testimony. The Court need not exclude testimony because of a minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method." (citations and quotations omitted)); *Chefs Diet Acquisition Corp. v. Lean Chefs, LLC*, 2016 WL

4

5416498, at \*10 (S.D.N.Y. Sept. 28, 2016) ("Ultimately, however, all of those objections [relating to 'valuation formula,' failure to 'consider all relevant data', and 'unsupported assumptions'] go to the weight of [the expert's] testimony rather than to its admissibility.")

The Court's gatekeeper role is not intended to supplant the adversary system or the role of the jury. "Instead, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Qube Films Ltd. v. Padell*, 2016 WL 888791, at \*2 (S.D.N.Y. Mar. 1, 2016) (quoting *Daubert*, 509 U.S. at 596)); *Olin Corp. v. Certain Underwriters at Lloyd's London*, 468 F.3d 120, 134 (2d Cir. 2006) ("[Cross-examination ]is an appropriate way of attacking weak expert testimony, rather than complete exclusion.") "As long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *In re Fosamax Prod. Liab. Litig.,* 688 F. Supp. 2d 259, 267–68 (S.D.N.Y. 2010). Id. (quotations and citations omitted). "Only serious flaws in reasoning will warrant exclusion." *Id.*

Ultimately, "[t]he test for reliability of expert testimony is flexible, especially in cases where the expert's knowledge is non-scientific and based on his experience." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 49–50 (S.D.N.Y. 2016)); *Chill v. Calamos Advisors LLC*, 417 F. Supp. 3d 208, 246 (S.D.N.Y. 2019) (same). The requirement that the court's gatekeeping inquiry ***must be tailored to the facts of the case and the type of expert testimony at issue is equally important.*** *Kumho Tire,* 526 U.S. at 150 (emphasis added); *see also Amorgianos v. Amtrak,* 303 F.3d 256 (2d Cir. 2002) ("the inquiry envisioned by Rule 702 is a flexible one and the gatekeeping inquiry must be tied to the facts of a particular case" (citations, quotations, and alterations

5

omitted)); *Packard v. City of New York*, 2020 WL 1479016, at *5 (S.D.N.Y. Mar. 25, 2020); *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2015 WL 9480448, at *2 (S.D.N.Y. Dec. 29, 2015) ("The Rule 702 inquiry is a flexible one that "depends upon the particular circumstances of the particular case at issue.").

B.    **ARGUMENT**

1.    **Mr. Kronenberger is Amply Qualified**

After baselessly disparaging Mr. Kronenberger as a "purported" expert, Defendants' main gripe about his qualifications seems to be that he does not testify as an expert *enough* [he "does not have a significant track record *as an expert* in the area of reputational repair"].  See Doc. 133 p. 3 (emphasis added).[4]  Notably, Defendants do not claim Mr. Kronenberger lacks a significant "track record" in the area of reputational repair itself—nor could they.  Mr. Kronenberger has spent the past 20 years working in the public relations, digital media marketing, advertising reputation management, and online reputation repair fields. [Expert Report of Craig Kronenberger dated February 28, 2020 ("Report") [Doc. 134, Ex. 1], p. 1].

After graduating college, Mr. Kronenberger served as the Vice President of Interactive Media for a one of the most successful interactive agencies in the Southeast where he led marketing strategy and brand development for some of the firm's biggest clients. [Declaration of Craig Kronenberger ("Kronenberger Dec."), ¶ 4]. He then founded his own company growing it to a highly successful 70-person online marketing agency. [Kronenberger Dec., ¶ 5]. Mr. Kronenberger eventually moved on to become the Vice President of Marketing Strategy and

---

[4] Although Defendants half-heartedly point out that Mr. Kronenberger is not an academic or a social scientist, this is meaningless because an expert need not be an "academic" or "scientist" to be qualified as an expert, and can instead be qualified based on specialized knowledge, skill, experience, or training. *See* Fed. R. Evid. 702.

the Global Practice Lead for Search Marketing at Digitas. [Kronenberger Dec., ¶ 6].  He then worked as Vice President and Managing Director at iCrossing. [Kronenberger Dec., ¶ 7]. In these roles, he led marketing strategy and development for clients like CNN, E*Trade, Choice Hotels, Coca-Cola, and Marriot. [Kronenberger Dec., ¶ 8].

In 2010, Mr. Kronenberger was hired as the Global Managing Director of Strategic Growth at Edelman, the world's largest and one of the most prominent public relations firms. [Report, p. 2]. During his tenure at Edelman, Mr. Kronenberger was responsible for leading global teams of more than 200 analysts, data scientists and research experts in Search Engine Management, Digital Crisis and Risk, Paid Media, and Research and Insights. [Report, p. 2]. He was initially recruited to Edelman to create and develop an online reputation management practice for the company. [Kronenberger Dec., ¶ 10]. Along the way, he helped create training courses in areas such as search engine optimization, paid and online media, analytics, understanding data as it relates to online media, content strategy, how to leverage resources on the Internet, and how to use data to inform communications strategies. [Report, p. 2]. He also taught classes and trained Edelman personnel worldwide in the field of online reputation management. [Kronenberger Dec., ¶ 12]. In fact, he was responsible for managing an incubation group for online reputation management and trained that group in digital crisis management.  [Depo., 69:3-70:15]

Mr. Kronenberger is now the Chief Executive Officer and Lead Strategist of a leading consultancy for online reputation management, Stripe Reputation, Inc. ("Stripe Reputation"). [Report, p. 2]. At Stripe Reputation, Mr. Kronenberger advises clients in paid media management, crisis and issues management, media analysis and monitoring, and search engine optimization, among other services. [Kronenberger Dec., ¶ 3]. Stripe Reputation provides clients with brand and reputation monitoring, insights, and strategy, including crisis management, social media strategy,

7

digital communication strategy, and messaging strategy. [Report, p. 2; Kronenberger Dec., ¶ 2]. Stripe Reputation provides reputation crisis management for a wide range of high-profile clients, including celebrities, athletes, political figures, executives, and companies of all sizes. [Report, p. 2; Kronenberger Dec., ¶ 2].

Throughout his career, Mr. Kronenberger has spent significant time promoting, protecting, and managing reputations for some the world's largest companies, international governments, sectors of the United States government, celebrities, political figures, professional athletes, executives for Fortune 100 companies, and many others. [Kronenberger Dec., ¶ 14]. His clients have included companies like Amazon, Google, Facebook, PayPal, Disney, Nissan, Hewlett Packard, Coca-Cola, Kaiser Permanente, the White House, the King of Jordan, a best-selling, Grammy award-winning musician, an NBA All-Star, a U.S. Ambassador, prestigious universities such as California Institute of Technology, Stanford, and Emory, multiple top executives for Fortune 500 companies, mainstream media news outlets, and many others. [Kronenberger Dec., ¶ 15].

Mr. Kronenberger handles reputational repair for his clients daily.  He does that by doing this same things he did in this case: obtaining and assessing available data and using his own independent analysis of that data to understand the level of engagement, sentiment, volume, and authority of the publications and content involved to assess and address the impact and damage caused by the digital dissemination of such publications and content. [Report, p. 2] [5]  On average, he handles ten reputation management and crisis assignments per week. [Report, p. 2].

---

[5] While the precise task and Mr. Kronenberger's role differs depending on the client and the scenario, he has provided an array of services including scenario planning, reputation damage analysis and impact, designing crisis communication protocols and digital communication strategies, and developing reputation management internal strategies and protocols for some of his top corporate clients. [Kronenberger Dec., ¶ 16].

8

He has spent decades working on reputation management projects and studying the impact and damage caused by the dissemination of content and the effectiveness of strategies to repair reputational harm. [Report, p. 2-3]. His practical, real world experience repairing reputations and observing what happens in the digital marketing and PR space allows him to determine the most effective ways to deal with online reputation management and what it will cost to effectively counteract harmful content. [Report, p. 3]. His experience is diversified across PR, advertising, and reputation management, which gives him a broad field of knowledge from which to understand and estimate the costs associated with repairing reputation.  This includes:

- **Advertising Experience.**
  Mr. Kronenberger has practical, real-world experience building, planning and managing advertising campaigns with the goal of bringing awareness around issues, individuals, and products.  His experience includes work for companies such as Delta Airlines, Nissan, Amazon, and Starbucks, as well as on political and issue campaigns.

- **Public Relations Experience.**
  Mr. Kronenberger spent decades building strategies to land stories with the media, and learning and understanding the value of a story in the media. This experience helped him develop a unique understanding of how stories spread online and through social media. He also has significant experience influencing, planning, pitching, and landing press coverage in media outlets such as CNN, New York Times, and Good Morning America.

- **Crisis and Reputation Management Experience.**
  Mr. Kronenberger also has decades of experience suppressing negative content in search engines, running campaigns to change perception through advertising and PR strategies, and helping companies, individuals, and brands handle media and communications crises.  In this area, his experience includes work for celebrities, entrepreneurs, athletes, governments, and private individuals with no established online reputation.

[Report, p. 3].

Based on the experience obtained during his career, Mr. Kronenberger has had the opportunity to work with a number of prestigious universities in connection with reputation management. For instance, he developed a curriculum for and taught reputation management

9

classes at Emory University.  He has also provided training and held speaking engagements on reputation management at California Institute of Technology, University of Florida, Florida State University, and Oglethorpe University.  [Kronenberger Dec., ¶ 13].

Mr. Kronenberger does not "dabble[] as a putative expert witness.[6]"  He has been asked to serve as an expert witness in several cases besides this one.  He testified as an expert witness in a case in the United States District Court for the Northern District of Georgia, providing testimony regarding reputation damages which the Court used to enter a damages award.  *See Ahmed v. Kifle,* 2015 WL 11199078 (N.D. Ga. Feb. 6, 2015).  He has also served as a consulting or advising expert in the areas of online reputation, search engine management, paid media, and digital crisis, numerous times.  [Kronenberger Dec., ¶ 17].

Without question, Mr. Kronenberger has a wealth of specialized knowledge, skill, and experience in reputation management and repair that will assist the jury in arriving at the truth. *See Solid Oak Sketches, LLC v. 2K Games, Inc.,* 449 F.Supp.3d 333, 350 (S.D.N.Y. 2020) ("In assessing the expert's qualifications, the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth.").  In particular, he has a profound understanding of reputational harm, what methods work best to counteract it, and how much those methods cost to be effective.

### 2.    Mr. Kronenberger's Opinions are Reliable.

Mr. Kronenberger's opinion does not "suffer from three infirmities" [Doc. 133 at p.2]. *First,* as mentioned above, Mr. Kronenberger was justified in presuming harm to reputation, and did not need to conduct any "analysis" of Plaintiff's "reputation pre-publication versus post-publication" to arrive at his opinions.  *Second,* Mr. Kronenberger's analysis of reputational harm

---

[6] Doc. 133 at p. 2.

did not merely consist of conclusions about "readership" and "engagement." *Third*, the advertising campaign Mr. Kronenberger opines about to correct the reputational harm caused by the challenged statements is logical, reasonable, and reliable.

### (A)     Reputational Harm is Presumed as a Matter of Law

The challenged passages of the Editorial are libelous on their face, and as such are actionable without proof of special harm.[7]  The law presumes they are "virtually certain to cause serious harm to reputation."  *Carey*, 435 U.S. at 262-263; *Robertson*, 2010 WL 11527317, at *2; *Stern v. Cosby*, 645 F.Supp.2d 258, 289 (S.D.N.Y. 2009).[8]

"Presumed damages are justified on the grounds that those forms of defamation that are actionable per se are virtually certain to cause serious injury to reputation, and that this kind of injury is extremely difficult to prove." *Robertson,* 2010 WL 11527317 at *2; *Stern,* 645 F.Supp.2d at 289 ("The reason the law dispenses with the special damages requirement in some cases is because certain statements are considered so inflammatory and offensive that the law presumes the statements to have caused damage"); *Carey,* 435 U.S. at 262-63.[9]

The legally recognized presumption of reputational harm applicable here and acknowledged difficulty in quantifying that harm are sound reasons why Mr. Kronenberger did not and was not required to evaluate or estimate the magnitude harm in this case.  Rather,

---

[7] *Jewell v. NYP Holdings, Inc.*, 23 F.Supp.2d 348, 396-401 (S.D.N.Y. 1998); *D'Amico v. Correctional Med. Care, Inc.*, 991 N.Y.S.2d 687, 694, 120 A.D.3d 956, 962 (2014); *Rinaldi v. Holt, Rinehart & Winston, Inc*., 42 N.Y.2d 369, 379, 397 N.Y.S.2d 943, 949, 366 N.E.2d 1299, 1305 (1977).

[8] Mr. Kronenberger explained that engaging in the exercise of estimating the harm caused by the editorial was irrelevant to his opinion, although stressed the offensiveness of the Editorial and that it was "trying to connect Sarah Palin to people getting killed and shot, so – gun violence." [Depo, 338:1-6]  Excerpts of Mr. Kronenberger's deposition cited herein are attached as **Exhibit A**.

[9] Mr. Kronenberger has experience testifying as an expert in a per se defamation case.  *Ahmed v. Kifle,* 2015 WL 11199078 (N.D. Ga. Feb. 6, 2015).

Mr. Kronenberger's opinion is narrowly tailored to the most effective means of counteracting the defamatory statements Defendants published and estimating the cost of those corrective efforts.

Although Mr. Kronenberger did not render a formal opinion about or evaluate the magnitude of harm suffered by Governor Palin, he was asked about this issue and explained why the Editorial was harmful:

> Well, the reputational impact and looking at how people are reacting to the negative article and how the negative article is being disseminated; how many people it's reaching; and the authority, the source of which the negative information is coming from. And in those cases, The New York Times is a high authority, if not one of the highest authority news publications. The opinion article itself was heavily disseminated or distributed through social channels but also picked up by other news online outlets. It also derived a high level of engagement and conversation around the article itself.  So you put that in context with the information that's negative again Sarah Palin, and you obviously have an issue, and you have reputational damage and reputational impact."

Depo., 21:14- 22:13.

### (B)    Governor Palin's Reputation Prior to Publication of the Editorial is Irrelevant to Kronenberger's Opinions

Because of the narrow focus of what Mr. Kronenberger did here—determining the reasonable cost of advertising to correct the defamatory statements—Governor Palin's overall reputation and specific incidents Defendants seem fixated on discussing are irrelevant to his opinions. Mr. Kronenberger did not (and was not retained to) render an opinion concerning Governor Palin's reputation as a whole.[10]  The scope of his work was confined to the presumed harm arising from the editorial and what it will cost to counteract that specific harm. Indeed, Mr. Kronenberger's goal for this case was to propose a solution that would "get[] the facts out there

---

[10] See Report p. 1 ("The Assignment").

and the truth out there around this issue . . . with the goal of reaching the same audiences and the same people that the original article got to." Depo., 269:10-15.

If Defendants wanted an expert opinion about Governor Palin's reputation as a whole, they could have retained their own expert.   However, that failure does not justify faulting Mr. Kronenberger's opinions simply because he did not delve deeply into an exercise he was not retained to perform.

For the same reasons, press surrounding the Loughner shooting in 2011, the editorial corrections, and the press coverage following publication of the editorial are also irrelevant to the reliability of his opinions.  These issues play no role in how much it will cost to put out digital and print advertisements targeted to reach readers exposed to the editorial which will explain that what Defendants said about Governor Palin is not true.

Further, as it relates to the media coverage in 2011, any link between Governor Palin or the map and the Loughner shooting was quickly debunked—including by the New York Times— and there was a consensus soon after the shooting that there was no such link.  [Doc. 108 at ¶¶ 263-264][11]  Then, six years later, the Editorial needlessly and falsely asserted that Governor Palin incited the Loughner shooting.

As for Defendants' corrections (which, again, have no impact on the ultimate opinion), Mr. Kronenberger addressed their insufficiency:

> "I mean, if you're doing a correction, I find it, quite honestly, odd that – that the correction didn't correct the connection that was made with the previous article between Sarah Palin's political action committee which, by the way, I don't even believe that's what her

---

[11] Although coverage was not relevant to Mr. Kronenberger's opinions, he did read a few articles from that time and testified that from what he did read, "anything around the connection was kind of, like dismissed" so it was something that "should have been put to rest a long time ago," and all the Editorial was doing "is resurfacing something that was not factual correct turning it into a problem." Depo., 184:11-23

political action committee is called so making it even more, I think, harmful to Sarah Palin as you're saying Sarah Palin's political action committee. And, so, the correction that was made does not show what the connection was whatsoever."

Depo., 153:22-154:7.

Regardless, Defendants' argument about these issues only goes to the weight of Mr. Kronenberger's testimony, not its admissibility. Indeed, "whether omitted facts should have been considered is a classic subject of cross-examination and is a matter for the fact finder to consider in determining what weight, if any, should be given to the expert's opinions." *Middle Mkt. Fin. Corp. v. D'Orazio*, 2002 WL 31108260, at *7 (S.D.N.Y. Sept. 23, 2002); *see also Kewazinga Corp. v. Microsoft Corp.*, 2021 WL 4066597, at *2 (S.D.N.Y. Sept. 1, 2021) ("Any contentions that the expert's assumptions are unfounded go to the weight, not the admissibility, of the testimony. The Court need not exclude testimony because of a minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method." (citations and quotations omitted)); *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) ("'gaps or inconsistencies in the reasoning leading to [the expert's] opinion ... go to the weight of the evidence, not to its admissibility.'" quoting (*Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001))

Defendants also take issue with Mr. Kronenberger's analysis of readership and engagement, but this is a red-herring because his review of these issues was for context and had no direct impact on his ultimate opinion. [Depo., 247:19-23; 250:25-251:5] Regardless, this is another argument that goes to weight, not admissibility. *See Chefs Diet Acquisition Corp. v. Lean Chefs, LLC*, 2016 WL 5416498, at *10 (S.D.N.Y. Sept. 28, 2016) ("Ultimately, however, all of those objections [relating to 'valuation formula,' failure to 'consider all relevant data', and 'unsupported assumptions'] go to the weight of [the expert's] testimony rather than to its

14

admissibility."); *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2d Cir. 1995) ("disputes as to the strength of [an expert's] credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."); *Daubert,* 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Likewise, Defendants' arguments about the comments on the editorial are not grounds to exclude his opinions. The comments provide context but are not a necessary component of the issue on which  Mr. Kronenberger opines. Moreover, any relevance the comments have would only go to weight, not admissibility. *Restivo*, 846 F.3d at 577; *Kewazinga*, 2021 WL 4066597, at *2.

### (C)    Mr. Kronenberger's Methods are Reliable

Mr. Kronenberger relied upon his experience, knowledge and expertise, and recognized industry formulas to estimate the costs associated with a digital and print ad campaign to correct the defamatory statements. (Report p. 7)  His methods in doing so were reasonable, reliable, and appropriate in his field.

As part of that process, Mr. Kronenberger used Cision to estimate the ad value equivalency (AVE) of the editorial. AVE is a formula that estimates what it would cost to place a similar sized article as an advertisement. (Report p. 7)  Mr. Kronenberger used a tool available on Cision to calculate AVE. Cision is a leading public relations and earned media software company and provider, and widely-recognized global technology platform used by many industry professionals. (Report p. 4; Depo. 276:16-19, 278:19-23). Cision and the data is provides are a resource experts in Mr. Kronenberger's field reasonably rely upon. Depo. 276:16-21; *Gussak Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000); *U.S. v. Mulder*, 273 F.3d 91, 102 (2d Cir. 2001).

15

Defendants attack Mr. Kronenberger's use of AVE, but take no issue with Cision, which provides the AVE tool. Rather, based on a CIPR document and an article (Doc. 133 at p. 17), they claim AVE is not a good formula. This argument only goes to weight. *McCullock*, 61 F.3d at 1004. Defendants also ignore Mr. Kronenberger's explanation for using AVE. He does not use AVE for the purposes discussed in the materials Defendants cite. (Report p. 7; Depo. Pp. 278-284) Rather, Mr. Kronenberger uses AVE as a reliable means of measuring the advertising costs of earned media[12] placements, not to determine return on investment (*Id.*). Defendants' arguments about supposed problems with the formula itself [Doc. 133 p. 18] also only go to weight of the opinions. *Lion Oil Trading*, 2011 WL 855876, at *3; *Chefs Diet Acquisition Corp.*, 2016 WL 5416498, at *10.

Mr. Kronenberger also rationally explained his reasons for doubling the AVE[13] value based on his vast experience and knowledge running digital media campaigns to repair reputation. [Doc. 133 p. 18] Defendants' arguments about gaps in his reasoning and assumptions he made are not grounds for exclusion. *Restivo*, 846 F.3d at 577; *Kewazinga*, 2021 WL 4066597, at *2. Defendants can address all these perceived problems on cross-examination.

Mr. Kronenberger's opinion concerning the print media campaign is also sufficiently reliable and admissible. He explained the basis for his opinion in detail at his deposition:

> Well, as I stated, there are several variables that make up the rationale for doing that including the time frame in which it occurred. Secondly, as we stated, the correction didn't work the same for print. The correction didn't go with the print article. So anyone who saw the article never saw the correction on it. And when the correction did show up, there was no article there and it certainly didn't say Sarah Palin's name. So there's a complete disconnect.

---

[12] Earned Media is an organic news story like the editorial; as opposed to a paid advertisement.
[13] Mr. Kronenberger provided a reasonable explanation for the two-day period based on his experience, knowledge, and expertise.

Depo., 329:22-330:9.

He also described the industry support for his opinions, including materials that address "the importance of ad placements, what people view, what makes sense, what people are likely to see":

> There's -- there's plenty of information out there about that. And it certainly informs my opinion. If you take up a little bit of space, it's less likely that someone is going to see you – see it. We also know that an ad is not going to be s trusted as an article. These are all things there's been plenty written about. So because of that, that has to factor into it. And then, once again, the correction is an issue. So it's not as easy to answer it how you stated it. There's plenty out there and based upon the variables I explained, it would back it up. You have to have something that is going to get the point across, and I think that's a good way to judge this.

Depo, 331:1-20. Mr. Kronenberger's vast experience handling reputational repair, including print media, certainly supports the reasonableness and reliability of his opinions concerning the need for, duration (2 days), and size (full page) of the print ad needed to correct the defamatory statements.

## **CONCLUSION**

Mr. Kronenberger is a qualified expert and his opinions have a sufficiently reliable foundation. His methods employ the same level of rigor that characterizes the practice of an expert in his non-scientific field, particularly given the facts of this case and type of expert testimony at issue. *Kumho Tire*, 526 U.S. at 150. Defendants' concerns over formulas, the tools he relied upon, and his reasoning are areas for cross-examination, but do not warrant exclusion. The Motion should be denied.

Dated:  January 17, 2022.

/s/ Shane B. Vogt
Kenneth G. Turkel (admitted *pro hac vice*)
Email:  kturkel@tcb-law.com
Shane B. Vogt (admitted *pro hac vice*)
Email:  svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 834-9191
Facsimile: (813) 443-2193

Michael Munoz
E-mail:  mmunoz@golenbock.com
GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile:  (212) 754-0330
*Attorneys for Plaintiff*

18

## CERTIFICATE OF SERVICE

I hereby certify that Plaintiff's Memorandum of Law in Opposition to Motion to Exclude Craig Kronenberger [Doc. 133] was filed electronically on January 17, 2022. This Notice will be sent by operation of the Court's electronic filing system to counsel of record for all parties as indicated on the electronic filing receipt. Parties and their counsel may access this filing through the Court's system.

*/s/ Shane B. Vogt*
Attorney

19