# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

SARAH PALIN,                     : Case No.

          Plaintiff,      : 17 Civ. 4853

v.                               :

THE NEW YORK TIMES COMPANY,     :

a New York corporation, and     :

JAMES BENNET, an individual     :

          Defendants.      :

- - - - - - - - - - - - - - - -X

NON-CONFIDENTIAL PORTION

(CONFIDENTIAL PORTIONS REDACTED)

Remote Videotaped Deposition Of

CRAIG KRONENBERGER

Friday, May 22, 2020

10:01 a.m.

PAGES 42 - 46 and 55 - 93 WERE EXCERPTED
AND BOUND SEPARATELY

Job No. 306334

Pages:  1 - 343

Reported by:  Dana C. Ryan, RPR, CRR

Craig Kronenberger Nonconfidential
05/22/2020                                                    2

May 22, 2020

10:01 a.m.

Remote Videotaped Deposition of CRAIG KRONENBERGER, held via video teleconference, before Dana C. Ryan, Registered Professional Reporter, Certified Realtime Reporter and State of Georgia Certified Shorthand Reporter.

A P P E A R A N C E S


ON BEHALF OF PLAINTIFF:

        SHANE B. VOGT, Esquire

        Bajo Cuva Cohen Turkel

        100 North Tampa Street

        Suite 1900

        Tampa, Florida 33602

        Telephone:  (813) 443-2199

        Email: svogt@bajocuva.com




ON BEHALF OF DEFENDANTS:

        DAVID AXELROD, Esquire

        Ballard Spahr LLP

        1909 K Street, Northwest

        12th Floor

        Washington, D.C. 20006

        Telephone: (202) 661-2200

        Email: axelrodd@ballardspahr.com


                - and -

A P P E A R A N C E S   C O N T I N U E D


  ON BEHALF OF THE DEFENDANTS:

        THOMAS B. SULLIVAN, Esquire

        Ballard Spahr LLP

        1675 Broadway

        19th Floor

        New York, New York 10019

        Telephone: (212) 223-1942

        Email: sullivant@ballardspahr.com


  Also present:

        Dan Macom, Videographer

        David McCraw, In-House Counsel,

              The New York Times

information is coming from.  And in those cases, The New York Times is a high authority, if not one of the highest authority news publications.

The opinion article itself was heavily disseminated or distributed through social channels but also picked up by other news online outlets.  It also derived a high level of engagement and conversation around the article itself.

So you put that in context with information that's negative against Sarah Palin, and you obviously have an issue, and you have reputational damage and reputational impact.

Q   So I think -- I'm a little bit confused so let me just make sure I got this right.

I think when I asked you before if you did any analysis of the defamatory impact, you said no.

Was that right?

A   Whether it was considered legally defamation or not, no, that's not -- that's not what I'm doing.  I'm not --

Q   Okay.  So that's --

A   -- (audio distortion) whether it is defamation or not defamation.

Q     Okay.  So you're distinguishing whether

something is defamatory versus whether, in your

opinion, it harmed her reputation?

A     Correct.

Q     All right.  Thank you very much.

That's very helpful.

If you go to the next paragraph, you

write, This report is submitted as of February 28,

2020.

A     Uh-huh.

Q     The findings herein reflect the

analysis of the information provided us to date.

You said, I reserve the right to amend,

but then you go to the next sentence, I anticipate

my opinions will be updated, expanded and/or

supplemented once depositions are completed in

this case to provide context for some of the

information, documents and data defendants

provided thus far in discovery, and to the extent

defendants produce any additional or updated data,

information and/or documents related to the

article.

A     Uh-huh.

Q     Did you have all the information you

needed to reach the conclusion or the findings

Q      -- and go to the top paragraph, Was this attack.

A      Okay.  "Was this attack."  Yep.

Q      And it says, and then it goes on -- and the paragraph has been edited now.  It says was -- I'm not going to read the whole thing, but the second-to-last sentence of that paragraph says, Before the shooting, Sarah Palin's political action committee circulated a map that showed the targeted electoral districts of Ms. Giffords and 19 other Democrats under stylized crosshairs.  But in that case no connection to the shooting was ever established.

Do you see that?

A      Yes.

Q      Would the correction have referred to anything else but that paragraph?

MR. VOGT:  Objection to form.

THE WITNESS:  Once -- once again, it is still the context of the overall article that's been established in the correction.

I mean, if you're doing a correction, I find it, quite honestly, odd that -- that the correction didn't correct the connection that was made with the previous article between Sarah

Palin's political action committee which, by the

way, I don't even believe that's what her

political action committee is called so making it

even more, I think, harmful to Sarah Palin as

you're saying Sarah Palin's political action

committee.  And, so, the correction that was made

does not show what that connection was whatsoever.

BY MR. AXELROD:

Q    I'm not sure I -- I'm not sure I'm

following.

A    There's not enough information that was

provided in where the mistake was made and why the

correction was made.

Q    Sir, do you understand that after this

version of the editorial was published that this

was the only version of the editorial that was

accessible on The New York Times Web site?

MR. VOGT:  Objection to form.

THE WITNESS:  That this version --

okay.  Yes.

BY MR. AXELROD:

Q    I mean, would someone -- after -- after

the editorial was edited and this version was put

up, would a reader going to The New York Times be

able to access the previous version of the

MR. VOGT:  Objection to form.

THE WITNESS:  I -- I don't know.

BY MR. AXELROD:

Q    I mean, let me ask you a hypothetical.

If -- if it's true that those allegations had been made already in 2011 and had been widespread, wouldn't that be an important fact to consider to determine whether the 2017 publication harmed her reputation?

MR. VOGT:  Objection to form.

THE WITNESS:  Well, first off, from what I understand from, you know, articles that I have read is that anything around the connection was kind of, like, dismissed.

As a matter of fact, I believe -- I believe The Times, in fact, also dismissed that there was a connection to it.

So -- so, first off, that would be a thing which is -- that should have been put to rest a long time ago.  Second of all, there was a long period of time that went by during that, so all that's doing is resurfacing something that was not factual correct turning it into a problem.

So I -- I -- I mean, that's my -- my way of kind of answering it.  As far as it's

at Stripe 0107.

Do you see that?

A    Okay.  Yep.

Q    And it goes through Stripe 0128.

And if you look at the top of this document, it says, Total Comments, 1,138.  It says, Comments With Keywords Found, 56.

A    Yep.

Q    In parenthesis it says, 73 times Defendant Sarah Palin's name was mentioned.

A    Yep.

Q    Then positive 45, negative 4, neutral 7.

What does this all mean?

A    That's me going through it and trying to pick it out, words, language that I am seeing, how many times Sarah Palin is mentioned, whether I thought things were positive, negative or neutral.

But just by the way of clarification, I've gone through this document a couple of times, and I've -- I -- the actual positive, negative, neutral is not -- it's correcting, so -- but I don't use that number anyways, so it's irrelevant.

But I just want to make sure you're not getting caught up into another discussion around

negative one on the first page?

A    Neutral is unclear.

THE COURT REPORTER:  I'm sorry.  I didn't hear you, the answer.

THE WITNESS:  I was saying neutral is unclear.

And then to your question around the negative example here, that's an example of someone saying it's negative.

BY MR. AXELROD:

Q    So at least in your initial cut, you determined that only four of 1,138 comments posted on America's Lethal Politics editorial in The New York Times Web site were negative about Sarah Palin; is that right?

A    No, let me state exactly what it is. I -- of what I can extract from the comments and from what I could extract from them and what I could find using Sarah Palin's name, this is what my initial take was.  And it was an initial take.

It's changed since then because I've read more into these, and I feel like some of these aren't categorized the way I would have initially categorized them as I went through it.

Once again, this is used for providing

context to how people feel about things.  I don't use the calculation of numbers to influence or impact the opinion around damages because it's not a full representation of how people -- all the people who read it, what they felt.

Q    Now, you've said that at some point you went through and read these again and made changes to these totals.

A    Yeah, not formal changes.  I read through and said, nah, that's not correct.  I think that's more this and this is more that.

Q    When did you do that?

A    I've done it twice now.  My last one I did was maybe two days ago.

Q    Why did you do it again two days ago?

A    Just to reread through my materials.

Q    Do you have updated numbers?

A    No.

Q    Has the number of negatives --

A    I don't use the numbers.  It's not part of a calculation.  It's to provide context.

Q    Did the number of negative comments as you graded them increase when you went back and did it again?

A    That there was more negative --

THE WITNESS:  I'm not using the term "frequency."  I'm not using it.  I did not use it in the opinion.

As I stated before, if I used frequency, it would actually be higher numbers than what I put in here.  But I wanted to be fair with it, and I felt the fairest way of doing it -- because my goal is is that in this entire thing when you look at reputational repair, is that it's important that in this case, Sarah Palin, gets the facts out there and the truth out there around this issue, and she -- with the goal of reaching the same audiences and the same people that the original article got to.  And that is what the goal is.

And, so, I felt like it was fair to do it to the point of the corrections and the traffic.  That's how I got to the two-day period.  I did not use frequency.

BY MR. AXELROD:

Q     As part of your analysis, did you undertake any analysis as to whether Sarah Palin got the facts out there using her Facebook or Twitter accounts?

A     Well, I mean, not even close to The New

AVE model is not a fair accusation of the value of a news media article.

Q    Haven't there been trade groups in the PR world who have flat out said that AVE shouldn't be used?

A    Not for my purposes, no, but for the purposes of placing value on PR, yes, there have been people who have done that.

But, once again, the reason why they do it is because they think the PR is more valuable than the ad equivalency value.

Does that make sense?

Q    Not really, but we'll get into it.

Now, what role did Cision have in your use of the AVE calculation?

A    Well, I wanted to make sure that I was using a recognized global technology platform and a technology platform that was used by many, many, many companies.  And I wanted the platform to have a AVE model built in in order to let me do that, which is why I chose Cision.

So Cision just -- obviously, because of the data they collect, it's much easier for them to build out an AVE model around a particular Web site such as The New York Times.  They can

Q     And at the very bottom of the page, it says, All this means that AVA may be too high or too low making it a quite useless thing to track?

A     Correct.

Q     And despite the fact that Cision itself says that AVE has to go, you think that it's a good measure of calculating the cost to repair someone's reputation in this case?

MR. VOGT:  I'm going to object to the question to the extent that this is a statement by The Chartered Institute of Public Relations, not Cision.

But you can answer, Craig.

MR. AXELROD:  This is from Cision.

MR. VOGT:  Yeah.  And it says an announcement by The Chartered Institute of Public Relations.  It doesn't matter.  I'm just noting it for the record.

THE WITNESS:  So, first off, Cision has AVE built in, so Cision uses AVE.  The number one technology platform for PR uses AVE in its model. So I want to make sure that's clear.  So that's the most important point.

AVE has not gone away because coming up with other ways to do AVE or other options does

not exist yet.  There's no confidence around

another system.  So that's another point to make

as part of this.

So I want to make sure that I get that

across there.

Now, the biggest thing, though, that

it's important to understand, because I want to

make sure we don't go down a hole debating this, I

am using it for reputation management purposes.

That is what I'm using it for.  I am not using it

for PR purposes, number one.

Number two is the reason that AVE is

problematic and what the argument is against it is

that the physical article, the argument is is that

that article is worth more than the advertising

dollars that come out of it.  That is what the

problem is.

So the issue is is that -- and without

question is that if -- they're saying that because

it's a New York Times article, because it's an

opinion that's being put out there from a trusted

source.  It's not advertising; it's not paid for.

So that's a big part of it.

On top of that in this case, it's The

New York Times, so high-trust, high-authority

publication.  So the challenge is, they say, well, how could you put an ad value to -- to this; this is worth so much more; you can't do it because it's trusted and it's better than advertising because it is trusted.  It has more value than advertising because of the trust behind it.  That is the fundamental biggest reason and problem with AVE as PR professionals use it.

But for reputational management purposes, it makes complete sense.  As a matter of fact, it's a great formula for doing it and a great methodology and approach because it comes up with a way that is a fair way to determine what the actual value might be of that particular article that's out there.

Now, we know that the value's under what it's really worth because I know that if I put an ad, side-by-side comparison to that article, I know the article would win out every day, but what I want to do is get the best shot that I can, and AVE does that.  It provides a simplified recognized formula for being able to do it.

Does that make --

BY MR. AXELROD:

Q    And --

A    -- sense, the difference between the PR industry, why they don't like it, why they use it or don't use it, and why I use it and why it does matter?

Q    Not really.  But we'll drill down a little bit.

I think your testimony is is that you're using it for reputational harm management and not for PR purposes.

Do I have that right?

A    Correct.

Q    Is there anyone besides you that you can tell me who has endorsed using AVE for reputational harm management?

A    No, I'm the one that's using it.  I use it for reputation management.  The PR industry uses it.

Keep in mind, by the way, not everybody in the PR industry is against the AVE.  There's just only certainly people are against it versus others.  So people use AVE; hence, why Cision still has it integrated into their system and most PR platforms do.

But --

Q    Do --

A    -- I use it for reputation management, but I'm also on the forefront of our space. I've been doing this a long time. I teach people in this area. I've been leading it.

So that is why I use it.

Q    Does Cision support using AVA for reputational harm management?

MR. VOGT:  Objection to form.

THE WITNESS:  They certainly know that I use it for reputation management purposes.

BY MR. AXELROD:

Q    How do they know that you use it for reputational harm management?

A    My reps, the people I work with, know the data that I'm putting in, the reports that I'm pulling.

Q    So how do they know that you're using it for --

A    I've had --

Q    -- reputational harm management and for not PR purposes?

A    I've had discussions with them about it.  I've had discussions with trying to get to the nuances of the AVE formula, the calculations,

where does the SimilarWeb data come up from, how do they come up with the data, why I'm doing it. I've just had conversations with them, you know, over time about the topic.

Q    What's the difference between reputational harm management and PR purposes as we've just been talking about it for the last few minutes?

MR. VOGT:  Objection to form.

THE WITNESS:  Well, PR is going out and -- and in this case of how they would use it, they're going out and pitching a story.

So let's say you're Coca-Cola and you're the media PR team on it.  You're going out and pitching a news outlet -- let's say The New York Times -- on a news story about Coca-Cola, and they're trying to convince the reporter that it's a story worth writing about.  And if the journalist takes it and writes about it, then that is classic PR, pitching the media, getting your stories written.

Now, I overly simplified PR, but that is a great example of what it would be.

For online reputation management purposes, I'm dealing with something that already

exists out there that's negative, and my job is to come in to try to figure out how do I change the opinions that have been created because of this negative information content.  So my job is to use this information in order to put a value on it so that we can come up with a way to message to those audiences to change their opinion on it.  It's a pretty big distinction between the two.

BY MR. AXELROD:

Q    Do you still have DX-81 in front of you?

A    Yes.

Q    So I'm looking at the second page where it says, The approach relies on three very bad assumptions.

Do you see that?

A    Yeah.

Q    And number two says that the entire article is about your brand.

A    Yeah.

Q    Users of AVE calculate the cost of the space taken up by the whole article even if there was only a brief mention of the brand, thus introducing the potential to grossly overestimate the impact of the mention.

correction and was able to make some connection,
and that assumes that the correction is even
effective.

So because of that, there's a --
there's a couple challenges.  So I think it's
important -- oh, and the other component is is
that once again, I do not believe that you can
run, you know, large ads on the opinion pages.
Once again, I could be incorrect on that.  So
because of that, I feel that it's important that
you're doing a full page over the full time period
that I stated.

Q     Is there any support for that
conclusion in any article that you read that you
can point me to?

A     Support for what?  What do you mean?

Q     For your --

A     Specific --

Q     For your conclusion that to redress the
harm from the printed story, there needs to be a
full page ad?

A     Well, as I stated, there are several
variables that make up the rationale for doing
that including the time frame in which it
occurred.

Secondly, as we stated, the correction didn't work the same for print. The correction didn't go with the print article. The correction went after the print article. So anyone who saw the article never saw the correction on it. And when the correction did show up, there was no article there and it certainly didn't say Sarah Palin's name.

So there's a complete disconnect.

So I gave you several variables that make up for it, and then I also put -- I emphasized the importance that the opinion section of the newspaper is a valuable placement for an article, and my assumption is is that we don't have the ability to do something equivalent within that placement or that positioning.

Q    So I understand --

A    I -- I --

Q    Sorry.

A    You do understand that?

Q    I understand that's your rationale, but my question was actually much more specific. Is there any literature or an article that you can cite to me that supports or suggests that your conclusion about full-page ads is the correct one?

A    Literature that supports a full-page ad is -- well, sure, there's certainly literature out there that talks about the importance of ad placements, what people view, what makes sense, what people are likely to see.  There's -- there's plenty of information out there about that.

And it certainly informs my opinion. If you take up a little bit of space, it's less likely that someone is going to see you -- see it. We also know that an ad is not going to be as trusted as an article.  These are all things that there's been plenty written about.  So because of that, that has to factor into it.

And then, once again, the correction is an issue.  So it's not as easy as to answer it how you stated it.  There's plenty out there and based upon the variables I explained, it would back it up.  You have to have something that is going to get the point across, and I think that's a good way to judge this --

Q    Is there any --

A    -- (inaudible).

Q    Is there any article that you relied on that says that in a situation like this where there's been a false allegation that the

that it does not matter.  It is irrelevant.  It is irrelevant for several reasons.  As I stated, one from the polling exercise, but also what's important to note is that this is an article that is trying to connect Sarah Palin to people getting killed and shot, so -- gun violence.

So, and it's trying to create this connection towards it.  So that forms an opinion and regardless of political views -- and I would argue that I bet in some of the commentary you might even see it, and even though it's contextual, you'd get somehow -- a sense of how people feel that, you know, when you're talking about things, it makes people upset regardless of your political views.

So I just don't think looking at polling data related to Sarah Palin and then trying to align it with this gun shooting and The New York Times article, I just don't think it's fair and I don't think it aligns correctly at all. I just don't think it fits.

BY MR. AXELROD:

Q     So just to be clear, you did no assessment of how Sarah Palin was viewed by the public before trying to determine whether her