**IN THE UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
                                          :

SARAH PALIN,
                                           :    No. 17 Civ. 4853 (JSR)

                  Plaintiff,            :    ECF Case

                                            :

             -against-                 :

                                            :

THE NEW YORK TIMES COMPANY and JAMES
BENNET,
                                            :

                  Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

## <u>JOINT PRETRIAL CONSENT ORDER</u>

       Pursuant to Rule 4 of the Court's Individual Rules of Practice, Plaintiff Sarah Palin and

Defendants The New York Times Company ("The Times") and James Bennet respectfully

submit this proposed joint pretrial order for the jury trial scheduled to commence on January 24,

2022.

## I.   <u>JOINT OVERVIEW OF THE CASE</u>

       This is an action to recover damages for libel, also commonly referred to as defamation.

A libel is a false statement, in writing, about the plaintiff, which tends to expose the plaintiff to

public hatred, contempt, ridicule or disgrace.

       Sarah Palin is the former governor of Alaska and a former vice-presidential candidate.

The Times is a media company that that publishes *The New York Times* newspaper, and

Mr. Bennet was the Editor of the Opinion Section of the newspaper during the relevant period.

On the morning of June 14, 2017, a gunman named James Hodgkinson attacked a group

of Republican members of Congress practicing for the annual Congressional Baseball Game at a

field in Arlington, Virginia – hitting four people, among them Congressperson Steve Scalise.

After the shooting, Defendants published an editorial entitled "America's Lethal Politics" (also

referred to as the "Editorial").

The Editorial states, in part:

"Was this attack evidence of how vicious American politics has become?
Probably.  In 2011, when Jared Lee Loughner opened fire in a supermarket
parking lot, grievously wounding Representative Gabby Giffords and killing six
people, including a 9-year-old-girl, the link to political incitement was clear.
Before the shooting, Sarah Palin's political action committee circulated a map of
targeted electoral districts that put Ms. Giffords and 19 other Democrats under
stylized cross hairs.

Conservatives and right-wing media were quick on Wednesday to demand
forceful condemnation of hate speech and crimes by anti-Trump liberals.  They're
right.  Though there's no sign of incitement as direct as in the Giffords attack,
liberals should of course hold themselves to the same standard of decency that
they ask of the right."

Governor Palin asserts that these passages of the Editorial defamed her.  Defendants contend that

Governor Palin cannot satisfy her burdens of proof on the elements of her defamation claim.

## II.   <u>GOVERNOR PALIN'S PARTICULARIZED DESCRIPTION OF HER CLAIM[1]</u>

Governor Palin's libel claim is based on the following defamatory passages in

"America's Lethal Politics":

"Was this attack evidence of how vicious American politics has
become?  Probably.  In 2011, when Jared Lee Loughner opened
fire in a supermarket parking lot, grievously wounding
Representative Gabby Giffords and killing six people, including a
9-year-old -girl, the link to political incitement was clear.  Before
the shooting, Sarah Palin's political action committee circulated a
map of targeted electoral districts that put Ms. Giffords and 19
other Democrats under stylized cross hairs.

---

[1] Defendants have not asserted any claims or counterclaims.

> Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask of the right."

Defendants published these defamatory passages, which are "of and concerning" Plaintiff, false, and defamatory, both online and in print.  Specifically, Governor Palin maintains that these passages falsely assert that she "incited" Jared Loughner to "open fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old-girl," and that Governor Palin's "political incitement" of Loughner's crimes was clear and directly linked to the "Giffords attack."  As a matter of law, the challenged statements are actionable without proof of special damages because they tend to expose Governor Palin to hatred, contempt, ridicule, or disgrace and, independently, because they are reasonably susceptible to a connotation of criminality and/or tend to disparage Governor Palin in her office, profession, occupation, or trade.

## III.   PARTICULARIZED STATEMENT OF THE SPECIFIC FACTS, STIPULATIONS, ADMISSIONS, AND OTHER MATTERS ON WHICH THE PARTIES AGREE

### Factual Stipulations

1.   In 2006, Governor Palin was elected as the first female governor of Alaska.

2.   Governor Palin rose to national prominence when Senator John McCain selected her as his running mate in the 2008 presidential election, becoming the first woman nominated to be the Republican vice-presidential candidate.

3.   On January 8, 2011, Loughner attacked a "Congress on Your Corner" political event hosted by Congressperson Giffords at a supermarket parking lot in Tucson, Arizona.  Loughner shot 19 people, killing six, including a nine year-old girl and Chief Federal Judge John Roll, and severely wounding Congressperson Giffords and others.

4.   In May 2016, The Times hired Bennet as Editor of the Opinion Section.

5.      On the morning of June 14, 2017, Republican members of Congress were at a field in Arlington, Virginia, practicing for the annual Congressional Baseball Game, when James Hodgkinson shot and wounded Republican Congressperson Scalise and others, before he was shot and killed by police.

6.      In June 2017, the Editorial Board members and Opinion staff at The Times included, among others, the following individuals who worked on "America's Lethal Politics":

- Bennet was the Editor of the Opinion Section of The Times during the relevant period.

- Robert B. Semple Jr. was an Editorial Board Member who served as an associate editor and had worked for The Times for around 50 years when The Times published the Editorial.  Semple has since retired from The Times.

- Linda Cohn was an Editorial Board Member who had served as an editor within the Opinion Section since 1988 and retired in November 2017.

- Nick Fox is an Editorial Board Member who serves as an editor within the Opinion Section and has worked for The Times since 1995.

- Jesse Wegman is an Editorial Board Member who joined the board in 2013 and is focused on The Supreme Court and legal affairs.

- Elizabeth Williamson was an Editorial Board Member who joined the board in 2015 and focused on national politics and the United States Congress.  Williamson is now employed by The Times for its Features Section.

- Eileen Lepping has been a researcher for the Editorial Board since 2007 and served as the "main" fact-checker in 2017.

- Phoebe Lett was a research, administrative, and editorial assistant for the Editorial Board who performed various administrative tasks and helped with researching and fact checking in 2017.  She remains at The Times in a different role.

7.      Soon after this shooting, Hodgkinson was identified as a Bernie Sanders supporter and campaign volunteer virulently opposed to President Trump.

8.      On June 14, 2017, Times Editorial Board Member Elizabeth Williamson wrote the first draft of the Editorial.

9.      Bennet revised Williamson's draft.

10.     At approximately 9:45 p.m. on June 14, 2017, The Times published "America's Lethal Politics" on The Times's website

11.     On June 15, 2017, The Times published "America's Lethal Politics" in the print edition of the newspaper.

12.     At approximately 11:15 a.m. on June 15, 2017, The Times published a revised digital version of "America's Lethal Politics" and added the following to the end of the Editorial:

> **Correction: June 15, 2017**
> *An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established.*

13.     At approximately 11:15 a.m. on June 15, 2017, The Times's Opinion Section tweeted about this correction.

14.     The Times's main Twitter account re-tweeted the above tweet.

15.     On June 16, 2017, The Times published a print version of the corrections at the bottom of its Editorial Page.

16.     Governor Palin is not seeking to recover and will not claim or assert loss of income, job, or other paid opportunities, including losses of book sales or any decrease in ad revenue from sarahpalin.com or any other websites.

### Documents

1.      The parties waive all objections to the admissibility of documents listed on each party's Rule 26(a)(3) disclosure on the ground that they are duplicates under Federal Rule of Evidence ("FRE") 1002 (originals) and 1003 (admissibility of duplicates), except to the extent that the version of a document produced at trial varies materially from the original.

## IV.   EACH PARTY'S PARTICULARIZED CONTENTIONS AS TO THE SPECIFIC FACTS THAT ARE DISPUTED

### A.   Plaintiff's Contentions as to Disputed Facts

The following are facts Plaintiff asserts which she understands Defendants some of and dispute the legal significance:

### 1.   Publication

Shortly after 7:00 a.m. on June 14, 2017, James Hodgkinson opened fire on Republican members of Congress practicing for the annual Congressional Baseball Game for Charity, severely wounding Representative Scalise, House majority whip, as well as Capitol Police Officer Crystal Griner, congressional aide Zack Barth, and lobbysit Matt Mika.   The Times published "news reports" about the Scalise shooting soon after it occurred and throughout the day on June 14, 2017.

Later that morning, *Times* Editorial Board member Elizabeth Williamson raised the question of whether the Editorial Board should write about the shooting.   After quickly researching the shooter and locating his social media pages, which contained pro-Bernie Sanders and anti-Trump messages, Williamson circulated this information to Bennet and Board members Semple, Fox, and Cohn.

Initially, Semple was uninterested in writing about a "nut case who hunts republicans," but eventually wanted to pursue a "gun control angle."   At one poinjt, Cohn mentioned the Giffords shooting.   Semple decided at 12:08 p.m. that the Board should "shoot for a piece" that would:   (1) focus attention on the shooting; and (2)  restate the longstanding position of The Times's Editorial Board in favor of gun control.

Approximately forty minutes after Semple made this decision, Bennet interjected with his narrative about "the rhetoric of demonization and whether it incites people to this

kind of violence" and the "inciting hate speech" he "tended to associate with the right." Bennet "thought that [the Board] should deal with this issue of incitement if there was evidence of inciting hate speech on the Left." Bennet has conceded that he and the Board never uncovered any evidence of inciting hate speech on the Left leading up to Hodgkinson's shooting.

Williamson was tasked with writing the piece, and Bennet specifically asked her to research whether there was a link between incitement and the Loughner shooting and whether there was any evidence of a link between incitement and the Hodgkinson shooting. Bennet also told Times researcher Phoebe Lett that he was wondering whether there were any editorials "connecting to the Giffords shooting to some kind of incitement?"

As directed by Bennet, Williamson researched Loughner's shooting and knew she could not say there was a link between it and the map circulated by Sarah Palin's political action committee. She also knew any assertion that there was a clear and direct link between Gov. Palin and Loughner's Shooting would be false, so she made no such assertion in her draft. Bennet conceded that Williamson's first draft of the editorial embodied the research he specifically asked her to conduct, and Williamson testified she wrote her draft consistent with what the research Bennet asked for showed.

Williamson's draft included a hyperlink to a January 9, 2011 ABC article by John Berman, which is a "4 Min read" and in its first multi-sentence paragraph states: "No connection has been made between this graphic and the Arizona shooting…" At around 4:45 p.m., Williamson emailed her draft to Bennet, Semple, Fox, Frank Clines, and Cohn.

Bennet then rewrote the piece, significantly changing the passage reflecting the results of Williamson's research and replacing it with the defamatory passages. Defendants

published the false and defamatory passages of "*America's Lethal Politics*" online and in print and promoted the piece on their social media accounts.  The Editorial was also prominently featured on The Times's homepage.

2.   **Of and Concerning**

As stated in the Editorial, the map referenced in the defamatory passages was "circulated" by "Sarah Palin's political action committee."  This political action committee, SarahPAC, was formed in 2009 for Governor Palin to promote candidates she supported and build an organization to support her future political plans.  She was the eponymous figurehead of her PAC, and its publications and related materials prominently featured images of Governor Palin and her signature.

The defamatory passages of the Editorial are reasonably understood as referring to Governor Palin.  Among other things, the Editorial refers to Governor Palin specifically by her full name in the context of the challenged statements.  Public reaction to the Editorial after it was published, including reader comments and emails, social media posts, and reports and press inquiries by members of the media, demonstrate the defamatory passages are "of and concerning" Governor Palin.

The Times's witnesses confirmed through testimony that the Editorial references and is about Governor Palin.  Hannah Ingber, who worked on with Bennet on the Tweets about the correction, even referred to the Editorial as the "Sarah Palin editorial."  In emails on the night of June 14, 2017 and the morning of June 15, 2017, Times columnist Ross Douthat repeatedly recognized Governor Palin as the subject of the defamatory passages in the Editorial, including when he told Bennet that "[t]here was not, and continues to be

so far as I can tell, no evidence that Jared Lee Loughner was incited by Sarah Palin or anyone else…"

3.      **Falsity**

As Bennet and others have conceded several times, the challenged passages about Gov. Palin in the Editorial are false statements of fact.  Defendants admitted falsity in their correction and Tweets about it:



The Times's correction policy is explained in its Manual of Style and Usage, which provides:

> **corrections.** Because its voice is loud and far-reaching, The Times recognizes an ethical responsibility to correct all its factual errors, large and small (even misspellings of names), promptly and in a prominent reserved space in the paper.  A correction serves all readers, not just those who were injured or complained, so it must be self-explanatory, tersely recalling the context and the background while repairing the error…If a correction is warranted, it should follow immediately…For the handling of more general lapses (those of fairness, balance and perspective), *see* <u>editor's notes</u>.

The use of a correction as opposed to an Editor's Note in this instance proves the challenged statements were false statements of fact, not a legitimate misunderstanding over the meaning of the word "incite."

The night of June 14th, Times columnist Ross Douthat told Bennet the Editorial was false because "[t]here was not, and continues to be so far as I can tell, no evidence that Jared Lee Loughner was incited by Sarah Palin or anyone else…"  The following morning, Douthat stated to Bennet: "the point is that the map had no link, none at all, to Gifford's actual murder."  In Douthat's email string with Bennet, he also told Bennet "people assumed a link initially—there was a Paul K[rugman] column that was particularly vivid in blaming Republicans—but the investigation debunked it."

After the Arizona shooting, law enforcement conducted a thorough investigation, during which they searched Loughner's home and seized a letter from a safe in his basement written by Giffords in 2007 (3 years before the map was created) along with other materials about his planning of the attack.

A well-known consensus was reached shortly after Loughner's shooting that it was not connected in any way to the map.  The Times, The Atlantic (while Bennet was at its

helm), Wall Street Journal, and Washington Post—all of which Bennet was "regularly reading" for his news in 2011—were among the major news outlets confirming within days of Loughner's shooting that it was not linked to incitement, Palin, or the map in any way. In fact, The Times wrote about how the media's rush to judgment in blaming Gov. Palin for Loughner's actions should be a teaching moment—an example of how the media's bias and "storytelling habits" led them to falsely accuse Gov. Palin of inciting the shooting when it became known fairly quickly that Loughner was not motivated by anything Gov. Palin said or did.

President Obama even made a statement during the Loughner shooting memorial service that "If, as has been discussed in recent days, their death helps usher in more civility in our public discourse, let us remember it is not because a simple lack of civility caused this tragedy—it did not."

The Times's witnesses who investigated the underlying facts surrounding Loughner's shooting also confirmed no link between Loughner and the map was established. Lepping testified "[T]here was a [police] report saying that there was no direct connection between political incitement and the Loughner shooting." Cohn testified, "I know that there was no link established between the [map circulated by Sarah Palin's PAC] and the Giffords shooting." She also testified that as soon as she arrived at work early on the morning of June 15, 2017, everyone already knew the challenged passages were false

The second correction admits the Editorial falsely asserted the map placed crosshairs over individual lawmakers:

*Correction: June 16, 2017*
*An editorial on Thursday about the shooting of Representative Steve Scalise*
*incorrectly stated that a link existed between political rhetoric and the 2011*
*shooting of Representative Gabby Giffords. In fact, no such link was*
*established. The editorial also incorrectly described a map distributed by a*
*political action committee before that shooting. It depicted electoral districts,*
*not individual Democratic lawmakers, beneath stylized cross hairs.*

4.   **Defamatory**

The defamatory passages in the Editorial are actionable without proof of special damages because they were published in writing and tend to expose Governor Palin to hatred, contempt, ridicule, or disgrace.  Independently, the challenged statements also (although need not) qualify as defamatory "*per se*" because they are reasonably susceptible to a connotation of criminality and/or tend to disparage Governor Palin in her office, profession, occupation, or trade.

Bennet used the "very strong" word "incitement" because he "wanted to get our readers' attention" and knew the term was used to mean "deliberate orders, invocations, summonses for people to carry out violent attacks," and understood as meaning "a call to violence."  Bennet found inspiration for his narrative about Gov. Palin's "incitement" of Loughner in Thomas Friedman's August 9, 2016 column, "*Trump's Wink Wink to 'Second Amendment People*," and its premise that "Donald Trump's language… could end up *inciting*… violence," akin to the "wave of toxic *incitement* against [Yitzhak] Rabin," which included calls for Rabin's death prior to his assassination at a peace rally in 1995.

Cohn understood "incitement" to be "very direct" and meaning "that it—that the map led him to commit the shooting"  As discussed above, Douthat immediately understood Bennet's use of "incitement" to draw a direct connection between Palin and the map and Loughner's shooting.  Reaction to the Editorial after it was published, including

reader comments and emails, social media posts, and reports and press inquiries, demonstrate the same.

When Loughner opened fire at the "Congress on Your Corner" event hosted by Congressperson Giffords for her constituents in Tucson, he murdered a nine-year-old girl, federal judge, and five other people, and severely wounded thirteen others, including shooting Representative Giffords in the head.  Aseertin that Plaintiff "incited" these crimes subjected Plaintiff to hatred, ridicule, and disgrace.  The details of these crimes are laid out in law enforcement investigation files about the attack.  Loughner was charged with attempting to kill a Member of Congress (18 U.S.C. 351(c)); attempting to murder a federal employee (18 U.S.C. 1114); use of a firearm in relation to a crime of violence (18 U.S.C. 924(c)(1)(A); murder of a federal employee (18 U.S.C. 1114); causing a death through the use of a firearm (18 U.S.C. 924(j)(1)); causing the death of participants in a federally provided activity (18 U.S.C. 245(b)(1)(B)); and injuring participants in a federally provided activity (18 U.S.C. 245(b)(1)(B).  The "incitement" of these crimes violates 18 U.S.C. 373.

### 5.   "Actual Malice"[2]

Despite claiming his true intent was to "express concern about the state of political rhetoric," Bennet rewrote Williamson's draft even though it already said what Bennet claims he was trying to convey.  If what Bennet claims were true, there was no reason to

---

[2] Governor Palin asserts the facts in this section without waiving her arguments and positions against the continued viability and applicability of the actual malice standard under *Times v. Sullivan*, as well as her arguments against the application of that standard under New York's Anti-SLAPP statute—both of which this Court previously rejected [Doc. No 117 and 125]. Plaintiff preserves these arguments for purposes of any subsequent appeal in this case.  Also, there are a number of disputed facts outlined in the Court's Order denying summary judgment [Doc. 117] which, to the extent not  specifically referenced herein, are incorporated by reference.

make any changes.

Bennet admits reasonable readers understand "incitement" to mean a "call to violence." He also knew "rhetoric" and "incitement" have different meanings, and even changed the word "incitement" to "rhetoric" in the second correction. Bennet's own definition of "incitement," a "very strong word," originates from "incitement" leading to violent attacks, such as the assassination of Rabin. Bennet admitted Friedman's article about incitement leading to Rabin's assassination was a driving force behind his choice of language. Bennet also knowingly used the word "incitement" in the context of the Scalise shooting under the title "Lethal Politics."

The title's reference to "Lethal Politics" in conjunction with the word "incitement," which Bennet admittedly knew to mean "deliberate orders, invocations, summonses to carry out violent attacks," clearly demonstrates Bennet intended to convey to readers that Gov. Palin incited Loughner to shoot and murder innocent people. Cohn new exactly what "incitement" meant: "that it – that the map led him to commit the shooting."

Bennet specifically instructed Williamson to research whether there was any established link between incitement and Loughner's shooting. Bennet conceded, and Williamson confirmed, her draft embodied the results of her research. Thus, Bennet knew there was no link to incitement but rewrote the draft anyway to say one existed – consistent with the narrative he already decided to publish.

Bennet's claim that he cannot recall whether he read news reports and posts confirming no link existed lacks credibility. Bennet is a very intelligent person with a good memory and conceded he "regularly" read The Times and "consumed" The Atlantic's website in 2011, even admitting he "must have read" some of The Atlantic's articles about

Loughner and spoke with Andrew Sullivan about the shooting.  If a "direct" and "clear" link had been made between Palin's map and the Loughner shooting, Bennet agreed that would have been something he would have known because the Loughner shooting was a "very big story" and political discourse and gun control were two of Bennet's hot button issues

Bennet "was a regular reader of The Atlantic's website both because [he] was interested in it as a reader and because [he] would try to keep [his] eye on it for purposes of commenting to our editor about what [he] liked and didn't like."  Bennet also regularly read Andrew Sullivan's *The Dish*, published on The Atlantic's website[3], and recalled Sullivan writing about Sarah Palin.  Sullivan live-blogged about the Loughner shooting on The Atlantic's website and posted several other pieces about the shooting which denounced any "link" between Palin and Loughner's crime

As noted above, soon after the Loughner Shooting, Bennet received a potential article and hyperlinked story ("How the media botched the Arizona shooting") which, like a Times article written at the same time, discussed the false narratives of incitement surrounding the Loughner shooting and explaining how journalists to falsely concluded Palin incited Loughner's crimes.

Bennet also received daily email updates for pieces posted by The Wire on The Atlantic's website, as well as "Daily News Roundup" emails containing relevant news

---

[3] The Dish was "integrated" into The Atlantic's website –it was "digitally present[ed] as part of the Atlantic.com [and] …its audience would be credited -- as part of The Atlantic's network of sites"—and The Atlantic "took responsibility for the production, meaning, the digital production of the site… mean[ing] maintaining the links, maintaining the archive, and so forth, and at the same time had the ability to sell advertising on the business side against the content that -- and the page views that [The Dish] was producing.

stories posted on The Atlantic's website.  The January 10, 2011 article, "*What We Know about Jared Lee Loughner*," posted on The Atlantic's website notes, "He Was More Delusional Than Political… Jared Lee Loughner appeared to be more driven by a delusional mind than a real interest in politics, mental health experts said Sunday."  The article also references and hyperlinks The Times's January 9, 2011 article, "*Suspect's Odd Behavior Caused Growing Alarm*" an in-depth report about Loughner's behavior and past. A year-ending piece, "*Ten Days That Defined 2011*," that ran on *The Atlantic's* website recognized that it was wrong to link Gov. Palin to the Loughner Shooting:

> In a meta media sense, the bad thing to come out of this already terrible story was a round of blame hurling, with people rushing to point at Sarah Palin's infamous target map or Loughner's left seeming (but not really) anti-Bush sentiments.  In truth, Loughner is clinically insane and this was not really about politics at all.  That many, including us, immediately jumped to that conclusion says some pretty sorry things about the state or our political machine.

Bennet conceded at his deposition that "it's possible" he read "*Ten Days That Defined 2011.*"

Bennet injected his narrative after seeing the shooter's pro-Sanders social media 40 minutes after the decision was already made to write about gun control.  He rewrote the piece because Williamson's version didn't advance his narrative.  Bennet pursued his narrative based on a "pattern" of incitement he knew did not exist and ignored the results of Williamson's research so he could advance it.  Bennet pursued his narrative and disregard the truth for several reasons, including his personal biases, agenda, and "political scorekeeping."  Bennet purposefully avoided the truth, ignoring Williamson's research and failing to read any of the research conducted and ABC article in the hyperlink, so he could advance his narrative.

16

From the outset, Bennet was predetermined to use the Loughner Shooting as "political incitement" to counterbalance the fact that Hodgkinson was pro-Sanders and anti-Trump, and recent criticism over the Kathy Griffin Trump-beheading situation and The Times's sponsorship of the Shakespeare in the Park production featuring Trump as Cesar.

Bennet already knew that there was no established connection or link between political rhetoric or "incitement" and Loughner's shooting, let alone any "clear" and "direct" link between Gov. Palin or the map and Loughner's horrific crime, but he already had made up his mind that "hate-type speech" needed to be used to counter-balance the Left's rhetoric leading up to Hodgkinson's attack on Republican lawmakers.

At Bennet's request, Williamson specifically researched whether there was a link between the Palin map and Loughner shooting and whether there was any evidence of a link between incitement and the Hodgkinson shooting. Eventually, Lett and Williamson also looked to see whether they could find the piece about "hate-type speech" Bennet referenced in an earlier email, although Williamson had no idea what Bennet meant by that term. In response to an email from Williamson about Bennet's request, Lett emailed Bennet asking, "I'm trying to find the piece Elizabeth is referring to here, do you happen to know which one she is talking about?" Bennet responded to Lett (not Williamson) asking, "No—I was just wondering if there was such a piece; that is, did we ever write anything connecting to the Giffords shooting to some kind of incitement?" Lett replied to Bennet's email by forwarding him a link to a Frank Rich column "*No One Listened to Gabrielle Giffords*." Bennet responded to Lett by saying "Good for Us. Can you let Elizabeth [Williamson] know?"

Although Bennet testified that he doesn't recall what he meant by "Good for Us," this statement demonstrates Bennet was glad because he felt he was free to advance his preconceived narrative.  Bennet followed up by asking Lett to send him the four basic gun control pieces Semple asked Lett to send to Williamson, but Bennet claims he does not recall whether he read all these materials Lett sent him.  Later, Bennet asked Lett to "dig a little further" because it "seemed strange" to him that the Editorial Board had not "editorialized at all about the [Loughner] shooting…because it was an important news event and the kind of thing we would typically editorialize on."  Lett found 2 additional Editorials ("*Bloodshed and Invective In Arizona*" and "*As We Mourn*"), but Bennet claims he does  not recall reading those pieces either.  Notably, the "*As We Mourn*" editorial discusses President Obama's speech about Loughner's shooting and statement that Loughner's shooting cannot be blamed on rhetoric.

Bennet had ample time to click on the hyperlink and review the ABC article, but chose not to.  He made his first change to the operative paragraph of Williamson's draft at **6:39 p.m.** and had re-written that paragraph and the following one to include the defamatory statements by **6:58 p.m.**  As noted in the byline of the ABC Article, it would at most only have taken 4 minutes to read that entire article.

At around 5:00 p.m., Cohn took Williamson's draft to Bennet's office and spoke with him about it because she (like everyone else besides Bennet) was not sure what he wanted in the piece:

> I sort of remember standing in front of his glass door, you know, opening up the door or something, and saying, "You need to look at this."…I recall thinking I wasn't really sure if its what he wanted.  I thought there had been quite the confusion over the day as to where this piece was headed, as to be either more of a gun control piece or to be more of a piece about the political climate and the sort of lack

of civility in America's political discourse...I wasn't sure what James intended, wanted in the piece.  I wasn't sure if the piece worked…I wasn't sure it accomplished what James would want it to accomplish…there were a couple competing ideas about the piece…

Cohn testified that when she went to Bennet's office to raise her concerns about the piece, Bennet responded by saying something along the lines of, "yeah, it needs some work, I'll do it."  At that point, Bennet rewrote the editorial consistent with his preconceived narrative expressed in his earlier email (that draft "wasn't exactly accomplishing the objective that we had set out to achieve," so Bennet "effectively re-wrote the piece.").

In doing so, Bennet knowingly re-wrote the paragraph that embodied the results of Williamson's research, replacing it with his preconceived narrative, including the defamatory statements.  As an experienced editor, Bennet knew and understood the meanings and significance of the words he used.  Bennet sent his rewrite to Williamson at around 7:30 PM—leaving plenty of time for him to check his facts before publication. Bennet was responsible for fact-checking the portions of the editorial he re-wrote.

An editorial is not "hot news," and The Times had other editorials on deck to run instead of the Editorial.  Plus, the Hodgkinson shooting was already being covered by The Times newsroom.  Cohn testified the "goal" was to get it in the next day's print paper but there were already at least two or three other editorials scheduled to run the next day that could have been run instead.  The Editorial could have waited until the following day to make sure it was accurate—if Bennet had actually cared about its accuracy.  Regardless, there was plenty of time to read the research Bennet requested and read the source Williamson included in her draft.

Bennet admittedly failed to follow The Times's heightened journalism standards and never fact-checked his re-write; even going so far as to ignore the results of Williamson's research and all the other materials his colleagues sent for him to review on June 14, 2017.

The Times admittedly holds itself to a higher standard of care with respect to seeking and publishing the truth.  The Times holds itself to "the highest standards of journalistic ethics."  The Times's journalism standards apply to the newsroom and opinion section alike.  ("These guidelines generally apply to all members of the news and editorial departments whose work directly affects the content of the paper…")]  In June 2017, The Times and Bennet were bound by The Times's Ethical Journalism Handbook of Values and Practices for the News and Editorial Departments and the Guidelines on Integrity.

When it comes to facts—verifiable pieces of information—editorials are no different than any other article in *The Times*—the Editorial Board's policy is that if something is represented as a fact, it has to be correct.  The Times's Editorial Department "ensures" facts are correct "[t]he same way the newsroom does, by reporting."  The Editorial Board relies upon the news pages of *The Times* (and other papers) for facts to support editorials.

Editorial Board writers have the first and primary responsibility for fact-checking, although they are "backed up" by the editors who edit their editorials, staff researchers and copy editors. With respect to the Editorial at issue in this case, Bennet was responsible for fact-checking the portions he re-wrote.

The relevant policies governing The Times and Bennet from the Ethical Journalism Handbook provide:

A.  "DUTY TO READERS":  "In print and online, we tell our readers the complete, unvarnished truth as best we can learn it.  It is our policy to correct our errors, large and small, as soon as we become aware of them. ]

B.    "FAMILY TIES":  A spouse or companion who runs for public office would obviously create the appearance of conflict for a political reporter or an editor involved in election coverage.  A brother or daughter in a high-profile job on Wall Street might produce the appearance of conflict for a business reporter or editor…To avoid such conflicts, staff members may not write about people to whom they are related by blood or marriage or with whom they have close personal relationships, or edit material about such people or make news judgments about them.

The Guidelines On Integrity provide that "it is imperative that The Times and its staff maintain the highest possible standards" and practice daily journalism which must be "beyond reproach" including the following specific practices:

a.  Fact Checking:  Writers at The Times are their own principal fact checkers and often their only ones…If deadline pressure requires skipping a check, the editors should be alerted with a flag like "desk, please verify," but ideally the writer should double back for the check after filing; usually the desk can accommodate a last-minute repair…

b.    Corrections:  Because our voice is loud and far-reaching, The Times recognizes an ethical responsibility to correct all its factual errors, large and small…any complaint should be relayed to a responsible supervising editor and investigated quickly.  If a correction is warranted, fairness demands that it be published immediately.  In case of reasonable doubt or disagreement about the facts, we can acknowledge that a statement was "imprecise" or "incomplete" even if we are not sure it was wrong.

Bennet confirmed he and The Times followed the policies embodied in The Times Ethics Handbook and Guidelines on Integrity in June 2017.   Ultimately, Bennet acknowledged he is responsible for the accuracy of every editorial published by *The Times*, particularly the editorials which he authors and edits.   Bennet's failure to adhere to journalistic standards was used as the justifications for ending his employment in June 2020, after The Times's increasingly liberal staff revolted over a highly controversial column Bennet approved for publication but later admitted he never reviewed.

Defendants published the challenged statements about Plaintiff knowing they were false or, at minimum, in reckless disregard of their truth, purposefully avoiding information easily demonstrating the falsity of the statements, in part because of bias and ill-will toward Plaintiff and her politics.

The Times's Public Editor, Liz Spayd, acknowledged that The Times's coverage "is in fact biased" and that "the Opinion section [] promotes the columns and editorials of its mostly liberal writers."   As one example, a Times's gun control editorial Spayd mentioned ("End the Gun Epidemic in America") was published December 15, 2015 and ran on the front page of the newspaper—the first time an editorial has such placement since 1920.

Defendants are also biased when it comes to the Second Amendment and gun control, publishing numerous pieces and a book about the subjects.   Bennet was "very concerned [about] the epidemic of gun violence," and gun control is "important to [him] personally.   Bennet's bias runs so deep that he openly admitted never calling out the Left for employing the same type of "rhetoric," images, and terminology he attacked Gov. Palin

for using.  For example, he does not consider a bullseye map "targeting" Republicans posted by Democrats "incitement."

Defendants have a history of bias against Sarah Palin. Bennet described Palin as "in over her head," "lacking sufficient preparation," and "polarizing."  Bennet hied Andrew Sullivan because of his controversial, polarizing, style, which increased The Atlantic's traffic by 50% (1 million to 2 million unique visitors), including through regular, vicious attacks against Sarah Palin—the worst of which was "Trig-Trutherism," an ongoing campaign maintaining Governor Palin is not actually the mother of her son, Trig.  Within The Times, Palin was seen as a convenient target for attacks against conservative policies and a subject likely to spark readership interest, as described by Charles M. Blow in his column "She Who Must Not Be Named."

Bennet's bias also stems from family ties.  His grandfather was an aid to Chester Bowles and served as an economic adviser in the Roosevelt Administration.  His father was a Washington insider with an esteemed career in politics, journalism, and the educational field.  Bennet shined at the prestigious St. Albans School in Washington D.C. and Yale before interning for Sen. Tom Eagleton.  Bennet's brother, Sen. Michael Bennet, served in the Clinton Administration, worked in the Clinton White House, and was national co-chair of President Obama's re-election campaign.  Bennet is close with his brother, and edited speeches for and traveled with him for the last 2 weeks of his 2010 Senate campaign.

Bennet's brother was running for re-election in 2010 when the map of targeted electoral districts, which including two districts in Sen. Bennet's home state, circulated. On January 6, 2011—two days before the Loughner Shooting—a man called Sen. Bennet's offices and threatened to "come down there and shoot you all."  Following additional

threats, the man was arrested (two days after the Loughner Shooting).  The FBI placed additional security at Sen. Bennet's home and Denver office.  Bennet knew about the threats made against his brother, which were also reported by The Atlantic in an article also disclosing the family connection between Bennet and his brother.

Both Bennets are outspoken advocates for gun control.  Bennet hosted a gun control forum attended by Gabby Giffords and Mark Kelly (Americans for Responsible Solutions). Sen. Bennet was endorsed by Rep. Gabrielle Giffords' PAC, Americans for Responsible Solutions, a gun control political action committee.  Bennet and the Editorial Department regularly received emails from Giffords PAC and used its website as a resource for conducting research in support of their gun control positions.  Sen. Bennet gave a floor speech on gun control on June 15, 2016 as of a filibuster after the Pulse Nightclub shooting. Sen. Bennet's floor speech occurred the same day James Bennet's Editorial Board published an editorial about the Pulse Nightclub shooting and was also circulating drafts of a book about political rhetoric and Sarah Palin.

Bennet's purposeful avoidance of the truth also stemmed from A.G. Sulzberger's directives for Bennet to stir controversy to drive readership and revenue.  Among other things, Sulzberger lauded Bennet for his hiring of Michelle Goldberg, Brett Stephens, and Bari Weiss.  Sulzberger also told Bennet to "move faster, take bigger risks, and play more aggressively outside your lanes," and that he wanted "more" of what occurred in 2017, instructing Bennet to "[a]sk for forgiveness, not permission…[because] you enjoy much more autonomy and a much bigger tolerance for risk…[which] should give you the blessing to move faster or to make changes that are more disruptive," and also told him to "play

outside you lanes a bit more often."  Bennet stoked numerous controversies during tenure at The Times:

- Bret Stephens hiring was very controversial and resulted in several factually inaccurate columns that garnered significant attention and had to be corrected.

- Michelle Goldberg was another controversial Bennet hire who wrote a book review the day she was hired that was plagued with factual errors for which a correction had to be issued.

- Bari Weiss was another very controversial Bennet hire involved in several controversies and factual errors.

- Bennet "hired" Quinn Norton but she never actually started working in the opinion department after public outrage over her "pattern of tweeting activity" Bennet begrudgingly admitted was "racist" led to Bennet's employment offer being "rescinded."

- Bennet also stoked controversy by hiring Sarah Jeong, who like Quinn Norton had a pattern of tweeting activity deemed by many to be "racist," although her employment offer was not rescinded because her tweets were directed at white people.

- Bennet's tenure was also marked with publishing controversial pieces by the likes of Louise Mensch and Erik Prince.

The events leading up to the publication of the Editorial also reflect the growing bias, ill-will, and animosity toward Governor Palin and need for "political score-keeping" that led Defendants to publish the challenged statements despite their known and obvious falsity:

- In January of 2016, Gov. Palin endorsed Donald Trump for President, following which The Times's Opinion pages referred to her as a "Rage                                                                        Whisperer."

- On June 7, 2016, Sarah Palin endorsed Republican candidate Darryl Glenn in Sen. Bennet's senate re-election race in Colorado.

- On June 13, 2016, after the Pulse Nightclub shooting occurred in Orlando, the Editorial Board published the editorial "*What Donald Trump Gets Wrong About Orlando*," which railed on Republicans for opposing gun control and causing "America's gun-violence epidemic."

- On June 15, 2016, Times's CEO Mark Thompson emailed Bennet an extract from his book, "Enough Said," which Bennet then forwarded to Times's deputy Op-Ed editor James Dao ("The good news is

that it's a book on political rhetoric").  The first chapter  is devoted to Sarah Palin and rhetoric.

- That same day, Se, Bennet gave his Floor Speech on gun control       as       part       of       the       Democratic       filibuster.

- On August 9, 2016, Friedman wrote his column "*Trump's Wink     Wink     to     'Second     Amendment     People.'*"

- On  August  24,  2016,  Rep.  Giffords'  Americans  for Responsible Solutions PAC endorsed Sen. Bennet in his senate re-election race.

- Soon after Trump was elected, on November 13, 2016, The Times published a letter to its readers pledging to "rededicate themselves to The Times "core mission."  The same day, The Times engaged directly with President                 Trump                 on                 Twitter.

- On December 17, 2016, Bennet ordered the Book, "*The Persecution of Sarah Palin: How the Media Elite Tried to Bring Down a Rising Star.*"

- In  early  2017,  The  Times  embarked  on  its  "Truth" advertising campaign and capitalized on refocusing its coverage to promote

its      "subscription       strategy."

- On February 7, 2017, Brent Staples emailed Bennet about concern and nervousness about anxiety within the Editorial Department, specifically mentioning "a right-wing propaganda tweet [from] Sarah Palin claiming The Times was desperately renting out floors because it was failing."

- In May 2017, Kathy Griffin posted a photo of herself holding a bloody severed head of President Trump, which drew widespread media attention.

- In early June, 2017, The Times eliminated its Public Editor—a position that essentially served as a watchdog and held it to account.  As she was being ousted, Public Editor Liz Spayd noted that The Times's elimination of its Public Editor position showed the paper's move away from "institutional integrity," demonstrated an unwillingness to seriously listen to criticism and doubt the impulses and wisdom of its inner sanctum, and was leading to "morph[ing] into something more partisan, spraying ammunition at every favorite target and openly delighting in the chaos."

- In the days leading up to the June 14, 2017 shooting, The Times was at the center of public criticism for its sponsorship of a Shakespeare in the Park

production of Julias Cesar depicting Trump as Caesar, asother sponsors
withdrew over public outcry that the play was a form of incitement.

Even after Bennet's false narrative was quickly identified by his colleagues and
members of the press, he and The Times steadfastly refused to meaningfully correct the
Editorial or apologize to Governor Palin.  Defendants' half-hearted corrections were due
to public backlash and embarrassment, and did not adequately address the libelous
statements they published about Governor Palin.

The edits to the Editorial did not remove the entirely unnecessary reference in the
piece to Gov. Palin, even though there was no established connection between "political
incitement" and Loughner's crime or Hodgkinson's shooting.  Even after being revised,
the Editorial still  suggests that a link exists or might still be established, which led Bennet's
own colleagues to question why Palin was still being mentioned at all.  Cohn testified that
the International Edition of the Editorial, which was trimmed to remove any reference to
Governor Palin, adequately conveyed the points the Board wanted to make in the piece.
Given that Mr. Bennet's entire thesis in re-writing the Palin Article was supposedly the
"sickening pattern" of politically incited violence that did not exist, the entire Editorial (or
at least all references to Governor Palin)  should have been retracted—not minimally and
inadequately corrected.

Even after the second correction, Bennet refused to recede from his preconceived
narrative, despite Wegman pointing out that keeping any reference to Palin in the Editorial
was still trying to "sneaking the link in."  Instead, Bennet reaffirmed his allegiance to his
narrative in a statement provided to and published by CNN, in which he said:

While it is always ***agonizing*** to get something wrong we appreciate
it when our readers call us out like this.  We made an ***error of fact***

in the editorial and we've corrected it.  ***But that error doesn't undercut or weaken the argument of the piece.***

Bennet later revealed that he would not apologize to Governor Palin because The Times has a policy prohibiting apologies, although there is nothing in writing to this effect. Regardless, Bennet agreed that he never personally reached out to Governor Palin to apologize either.

The Times's June 16, 2017, inadequate corrections published at the bottom of its Editorial Page, in fine print was equally deficient.  This correction was completely devoid of any reference or apology to Governor Palin.

### 6.      **Damages**

The Editorial Board represents the "loud and far-reaching voice" of The Times. The Times is regarded as the "Paper of  Record," which reflects the considerable weight and influence attributed to its "voice."   The Times actively promotes content in several ways, such as on its social media accounts (i.e. Facebook and Twitter), homepage, through news alerts and newsletters, and similar strategies.

The impact of Defendants' defamatory statements about Governor Palin were made within the context of The Times's pledge to rededicate itself to accurate reporting and publishing "the complete, unvarnished truth as best we can learn it."  The editorial was published in the midst of The Times's advertising campaign, "The Truth Is Hard," which debuted at the Academy Awards and Bennet promoted on his Twitter account.  The Times used its commitment to publishing the "Truth" to convince the public about the accuracy of the facts it published and to buy subscriptions: ("Support fact-based journalism" by subscribing to The Times because "Truth. It has no alternative… it comes at a cost… [and]… It's hard to find. But easier with 1,000+ journalists looking.)   The Times

prominently featured its "The Truth is more important now than ever" ads on billboards in Manhattan and online.

Plaintiff seeks to recover damages for reputational harm, humiliation, embarrassment, and mental anguish. These types of damages do not lend themselves to precise calculation and will be determined by the jury based on what is fair and just. *See* N.Y. Pattern Jury Inst. – Civil § 3.29; *Maleski v. Long Island Railroad Co.*, 499 F.2d 1169 (2d Cir. 1974). Plaintiff also seeks damages for the cost of reputational repair or correcting the defamatory statements in the approximate amount of $421,000, which is supported by the testimony of her expert witness, Craig Kronenberger, and other documents and evidence, such as The Times's advertising rates and internal data related to the publication of the Editorial. Plaintiff also seeks to recover punitive damages, the amount of which have not been determined and falls within the jury's discretion. N.Y. Pattern Jury Instr. – Civil § 3.30. Plaintiff also seeks recovery of her attorneys' fees and recoverable costs.

7.   **Plaintiff's Position On Defendants' Disputed Facts About The Map**

The map circulated by Sarah Palin's political action committee was created by an Internet consultant and staffer using symbols "pulled from Google mapping tools" to depict 20 congressional districts "that went for McCain-Palin but were represented by Democratic members."

Defendants' contentions about the "Don't retreat. Reload" tweet are irrelevant because (1) Bennet testified he was not was not even aware of this Tweet; (2) Bennet testified he was not aware of Governor Palin's use of this phrase when he wrote and published the defamatory the Editorial; and (3) Bennet testified he did not consider metaphors such as this used in politics to be "incitement." [Bennet Depo 98:19-99:13,

102:11-23]  Without waiving Plaintiff's objections to this evidence, Plaintiff also disputes Defendants' interpretation of the Tweet.  The expression "Don't retreat.  Reload" is "an old saying of [Gov. Palin's] dad's…a retired teacher and coach…that's where he would go with motivation…" and was never meant as an allusion to a gun, "Not at all.  'Don't retreat, reload,' means don't back down, don't let them tell you to sit down and shut up just because they have the power of the pen or whatever they—whatever they want to use to make you stop what you're doing if what you're doing is right.  Don't let them.  Don't retreat."

Defendants' contentions about another Tweet involving a "bullseye" are also irrelevant, and similarly misconstrue the facts.  The Tweet does not characterize the map as placing a "bullseye" on lawmakers.  Rather, Governor Palin testified she put the word "bullseye" *in quotes* because she used it "facetiously or, like, that's what they say, that's what they call it.  But it wasn't hey, these are bullseyes, somebody go out and get an individual…I always put quotation marks around it to say this what somebody else says"

Defendants' contentions concerning attacks supposedly occurring after the map was circulated are also wrong and irrelevant.  Rep. Giffords' office was vandalized early (2:40 a.m.) on the morning on March 22, 2010—**before** the map was posted on March 23, 2020.  ["*Rep. Giffords' Tucson office vandalized after health care vote*" Arizona Daily Star, Mar. 22, 2010 ("The front door was smashed out at Congresswoman Gabrielle Giffords' congressional office last night."); March 23, 2010 10:18 a.m. "Don't Get Demoralized!  Get Organized!  Take Back the 20!" Tweet); "Vandalism reported at offices of three Democrats [including Giffords]", CNN, Mar. 22, 2010 (discussing vandalism before map posted); "Vandals Attack Dem Offices Nationwide," Talking Points Memo, Mar. 23, 2010 9:00 a.m. (compiling list of vandalism occurring **before** map was posted)]

Other vandalism during that time period was directed at Representatives not identified on the map (*i.e.,* Rep. Carnahan (Missouri); Rep. Louise Slaughter (New York); Democratic Party offices (Wichita, Cincinnati, Rochester); Rep. Bart Stupak (Michigan)), and appear to have been inspired by Alabama blogger, Mike Vanderboegh, a "longtime leader and propagandist in the antigovernment 'Patriot' movement specializing in fiery rhetoric" who encouraged his followers to "Break [Democrats'] windows."  In January 2011, *Mother Jones* reported that "Giffords Office Was Vandalized by Followers of Former Militia Leader [Vanderboegh]"

The "controversy" Defendants contend surrounded the map after the Loughner shooting was quickly resolved, long-before June 14, 2017.  As Ross Douthat explained to Bennet on the night of June 14, 2017, "people assumed a link initially—there was a Paul K[rugman] column that was particularly vivid in blaming Republicans—but the investigation debunked it.".  Speculation may have occurred in the days immediately after Loughner's shooting, but a consensus was quickly reached that Loughner's shooting was not incited by Governor Palin or linked to the map.  The Times, The Atlantic (while Bennet was at its helm), Wall Street Journal, and Washington Post—all of which Bennet was "regularly reading" for his news in 2011—were among the major news outlets confirming within days of Loughner's shooting that it was not linked to or incited by Gov. Palin or the map.

**B.**    **Defendants' Contentions as to Disputed Facts**

Plaintiff's above contentions as to disputed facts are inaccurate, inflammatory, and contain assertions of fact that are unfounded, irrelevant, and unduly and unfairly prejudicial and

for that reason, are the subject of Defendants' motions *in limine*.  The following are facts that Defendants assert and will establish at trial, and that Defendants understand Plaintiff disputes:

### 1.       The Crosshairs Map

Palin denied at deposition that the crosshair symbol on the Crosshairs Map represented a gun sight, but she had described it shortly after publication as a "bull's eye," and, in the same period, "issued her now oft repeated rallying cry" to opponents of so-called "Obamacare": "Don't retreat. RELOAD."

At around the time of publication of the map, violent attacks on the offices of several Representatives it identified, including that of Giffords, led to a substantial national debate about the potential of such inflammatory rhetoric to incite those "on the fringe of the movement."  At the time, Giffords said on national television "when people do that, they've got to realize there are consequences to that action."  After the Arizona Shooting, there soon followed a renewed public controversy about the Crosshairs Map and whether it contributed to Loughner's attack on Giffords.

### 2.       The Drafting Process Demonstrates no Focus on Gov. Palin

At around 10:45 a.m. on June 14, 2017, hours after the Virginia Shooting, Elizabeth Williamson, a writer for The Times's Editorial Board who was based in the District of Columbia, inquired of her New York-based colleagues via email whether the Board intended to write about the shooting.  Williamson, Semple, Cohn, and to a lesser extent Bennet, discussed by email whether the proposed piece should focus on the horror of the shooting itself, the Board's long-held position in favor of sensible gun control regulation, or "concern about the state of political rhetoric in the country."  During that email exchange, Cohn pointed out one difference she perceived between the responses to the Virginia Shooting and the Arizona Shooting a few years earlier, observing that she was "thinking back to what a giant story [G]abby Gifford[s'] shooting

34

was.  Amazing that shooting congressmen doesn't seem so shocking now."

(a)     Research

Around noon, Semple decided that the Board should write a piece on the shooting, and Williamson began researching and drafting.  Initially, Williamson researched breaking news relating to the Virginia Shooting to "keep [herself] apprised of what authorities knew."  She also familiarized herself with the Arizona Shooting, which had occurred years earlier.  Semple, who suggested focusing on gun control measures, asked an Editorial Assistant, Phoebe Lett, to send several "basic gun control pieces" to Williamson.  Lett circulated four past editorials relating to gun policy, which incidentally referenced the Arizona Shooting and other notable shootings that had prompted policy debates.[4]

Bennet, who had suggested in an email that there might be "a point to be made about the rhetoric of demonization and whether it incites people to this kind of violence," asked Williamson to be mindful of whether such rhetoric came from both sides of the political spectrum.  He also wanted to know whether there was "some evidence of a piece of incitement … that was directed at the ball players, the Congressmen who were playing ball that day."  Bennet did not, prior to publication of the Editorial, ask Williamson or anyone else to research the Arizona Shooting and/or determine whether Loughner had been motivated by politics generally, or the Crosshairs Map specifically.

Plaintiff repeatedly asserts or implies in this filing (as she did in her opposition to Defendants' motion for summary judgment) that, *prior* to publishing the Editorial, Bennet

---

[4] Much of the research focused on prior editorials by The Times, rather than its news reports or other news organizations' publications because, as Bennet testified, he assumed that the Board "had talked about the political climate and I wanted to harmonize whatever we were saying now with the position the board had taken" previously.

instructed Williamson to research "whether there was a link between the Palin map and Loughner shooting . . . ." and to research whether Loughner acted because of political incitement.  This is inaccurate.  Bennet first asked Williamson (and Eileen Lepping) to research whether there was any proof that the map had caused the Arizona shooting the morning *after* publication and after Douthat had shared his concerns with Mr. Bennet about the Editorial.  *See* DX-46.  Accordingly, Plaintiff's argument that actual malice is demonstrated by the fact that Bennet purportedly ignored Williamson's research when he revised her draft of the Editorial on June 14 is baseless.

(b)    Initial Draft

Williamson submitted her draft to her New York-based colleagues via The Times's document management system around 4:45 p.m. the day of the Virginia Shooting.  Williamson sought to deliver a message about the dangers of an abundance of guns and the risk that inflammatory political rhetoric could increase the likelihood that someone would commit a violent act.  As it relates to the language at issue in this case, Williamson's draft contained the following passage:

> Just as in 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a nine year-old girl, Mr. Hodgkinson's rage was nurtured in a vile political climate.  Then, it was the pro-gun right being criticized: in the weeks before the shooting[,] Sarah Palin's political action committee circulated[5] a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs.

Williamson drafted the sentence including the reference to "Sarah Palin's political action committee."

---

[5] In her draft, Williamson inserted at the word "circulated" a hyperlink to a package of on-line news reports published by ABC.  The linked report, published in January 2011 shortly after the Arizona shooting, is titled "Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate."

Cohn reviewed the draft and "wasn't sure if the piece worked," in part because she found it unclear whether the piece was focused on gun control or "about the political climate and the sort of lack of civility in America's political discourse."  She added questions to the draft and handed it off to Bennet for his review.

Bennet agreed that the draft needed substantial revision.  He thought that the top of that draft "read like the kind of piece that the news side was going to do" and he wanted to "capture the shock and wrongness" of the attack on members of Congress playing baseball.  As the Editorial related to breaking news and the deadline for publication in the next morning's print edition was less than three hours away, he began editing it himself.  Bennet made substantial changes to sections of the Editorial with which Governor Palin does not take issue, and he also edited the above-quoted paragraph from Williamson's draft and added a further paragraph, as follows:

> Was this attack evidence of how vicious American politics has become?
> Probably.  In 2011, when Jared Lee Loughner opened fire in a supermarket
> parking lot, grievously wounding Representative Gabby Giffords and killing six
> people, including a 9-year-old girl, the link to political incitement was clear.
> Before the shooting, Sarah Palin's political action committee circulated a map of
> targeted electoral districts that put Ms. Giffords and 19 other Democrats under
> stylized cross hairs.
>
> Conservatives and right-wing media were quick on Wednesday to demand
> forceful condemnation of hate speech and crimes by anti-Trump liberals.
> They're right.  Though there's no sign of incitement as direct as in the Giffords
> attack, liberals should of course hold themselves to the same standard of
> decency that they ask of the right.

Bennet did not intend to convey the idea that the Crosshairs Map directly caused Loughner to commit the Arizona Shooting.  Instead, Bennet used the word "incitement" in a broad sense, to "talk about a range of communications" "that contributed to intensifying and raising the temperature of the political debate," – that is "very, very, strong language that

describes the person on the other side of the debate as an enemy."[6]  And with respect to his use

of the words "link" and "direct," Bennet was referring to the fact that, prior to the Arizona

Shooting, the Crosshairs Map (which Bennet viewed as an example of "incitement" in the sense

he was using the term), had included Giffords' name and superimposed rifle crosshairs over her

congressional district.

After Bennet completed his editing, Editorial Board members Cohn, Williamson,

Wegman, Fox, and Lepping all reviewed this draft.  Meanwhile, Cohn and another colleague

worked on fact-checking the draft, including the specific details of Virginia gun laws cited in the

draft, because Cohn knew from her experience that such laws were "ornate and detailed and

different in all the states."

Above, Plaintiff suggests that Cohn knew the Editorial was making a false assertion

because Cohn purportedly testified that incitement means, "that it—that the map led him to

commit the shooting."  Plaintiff baldly misrepresents Cohn's testimony regarding the meaning of

incitement.  The full exchange accurately reflects Cohn's testimony, in which she *rejects* the

interpretation offered by Plaintiff's counsel:

_____

[6] Plaintiff repeatedly asserts in this filing (as she did in her opposition to Defendants' motion for
summary judgment) that Bennet testified that "the term [incitement] was used to mean
'deliberate orders, invocations, summonses for people to carry out violent attacks,' and
understood as meaning 'a call to violence.'"  Plaintiff's assertion is based on a misleading edit of
Bennet's testimony to remove the parts she does not like.  Bennet's full relevant testimony, from
the Court's hearing on August 16, 2017, is as follows: "I was thinking about -- the way I view
that particular word from is in my experience in one of my roles at the time that I was a
correspondent in Jerusalem at one point for The Times, and the word 'incitement' is used there
by the Israelis -- in my time by the Israelis about the Palestinians but also, to some degree, by the
Palestinians about the Israelis to talk about *a range of communications* from, you know, to
deliberate orders, invocations, summonses for people to carry out violent attacks to textbooks
that are published that align important facts from the other side's national narrative or history, to
tell outright lies about that history to maps that misrepresent the politics of the region.  And that's
specifically where I was drawing that word from." (emphasis added).

Q:      And when you said "incited violence" in this bolded section that we've
        been looking at, at this time on June 14 of 2017, at 5:03 p.m., did you
        believe that the map that Sarah Palin's political action committee had
        circulated had incited Jared Loughner to commit his shooting in 2011?

A:      I -- no.  I -- not that directly.  I would think of it more as -- the way *you
        phrased it* sounds very direct, that it -- that the map led him to commit the
        shooting.  I -- no, I did not see that.  I saw it as, as one example of the kind
        of heated political rhetoric against which all these sorts of violent
        activities were happening.  That it was part of a backdrop of how the
        conversation in this country was becoming heated and often used violent
        imagery (emphasis added).

### 3.      Defendants' Response to Criticism of the Editorial Demonstrates a Lack of Actual Malice

The Times published the Editorial online at approximately 9:45 p.m.  Shortly thereafter,

Ross Douthat, an opinion columnist, brought to Bennet's attention by email around 10:00 p.m.

that evening questions about what he understood the Editorial to be suggesting.  Douthat

explained that he understood that there was "no evidence that Jared Lee Loughner was incited by

Sarah Palin or anyone else, given his extreme mental illness and lack of any tangible connection

to that crosshair map."  Bennet responded by email a few minutes later:

> Thanks, and I'll look into this tomorrow. But my understanding [is] that in the
> Giffords case there was a gun sight superimposed over her district; so far in
> this case we don't know of any direct threat against any of the congressman on
> the field.  That's not to say that any of it is ok, obviously, or that the violence
> in either case was caused by the political rhetoric.  But the incitement in this
> case seems, so far, to be less specific.

Douthat in turn replied by email, explaining his concern about the Editorial as he had understood

it:

> The targets were used by Palin, or her group, in a map of seats targeted for
> pickup in the midterms.  You can argue about whether that crosses a line …
> but the point is that the map had no link, none at all, to Giffords' actual
> murder.  People assumed a link initially … but the investigation debunked it.  I
> think Loughner was instigated by a non-answer she'd given him at a town hall
> about one of his theories of grammar, or his obsession with lucid dreaming, or
> something.  His act had nothing to do with the political climate, so far as
> anyone can tell.  Whereas the Alexandria shooter seems to have had an explicit

political motivation.  So saying that Giffords was a case of incitement and this one isn't reads like we're downplaying that motive or implying that Loughner had right-wing motivations that he simply didn't have."

The testimonial and documentary evidence demonstrates without dispute that no one involved in the preparation of the Editorial had intended to convey the proposition inferred by Douthat and others.

In response to Douthat's late-night email alerting Bennet to the fact that some readers were interpreting the Editorial as alleging the existence of a direct causal link between the Crosshairs Map and Loughner's attack, Bennet immediately sent a message to Williamson to see if she was available to begin investigating and, early the next morning, Bennet emailed several people who had worked on the Editorial to request their help.  Bennet, who had not intended to suggest such a direct causal link and therefore had not considered while writing the sentences challenged by Palin whether such a link between the Map and Loughner's actions had been established, explained in writing to his colleagues that morning that he was *unsure* whether a direct connection between Loughner and the Crosshairs Map had been proven or disproven and asked that they "get to the bottom of this as quickly as possible."

Until Bennet reached out to them on the morning of June 15, 2017, Williamson and Cohn were unaware that the Editorial was being criticized for asserting that Loughner acted because of the Crosshairs Map.  Neither had intended for the Editorial to make that assertion and, at the point Bennet reached out to them on the morning of June 15th, neither knew whether that assertion was accurate or not.  Both Lepping and Williamson promptly began looking into this question.  Ultimately, they determined that multiple news outlets, including The Times, had reported that Loughner was mentally unstable and appeared to have developed animosity toward Giffords prior to SarahPAC's publication of the Map, but that it had never been affirmatively proven or disproven whether Loughner was familiar with or inspired by the Crosshairs Map.

40

### 4.      The Times Promptly Corrects the Editorial Less than 14 Hours after Publication

The Times promptly revised the online version of the Editorial to remove the words that had caused readers to draw the unintended inference of an assertion that the Crosshairs Map was a direct cause of the Arizona Shooting, and later to make clear that, on the Map, the crosshair symbol appeared over Giffords' district, not over her name or image – though her name was listed separately.  Additionally, The Times published a tweet stating: "We got an important fact wrong, incorrectly linking political incitement and the 2011 shooting of Giffords.  No link was ever established.  We're sorry about this and we appreciate that our readers called us on the mistake."

### 5.      Given the Absence of Actual Malice, Plaintiff Seeks to Make this Case About Anything But the Editorial

From the facts surrounding the drafting of the Editorial to the responsive correction and revision there is a paucity of evidence of actual malice.  Recognizing this fatal deficiency, Plaintiff seeks to make this case about anything but the Editorial.  To that end, and as Plaintiff's summary above demonstrates, Plaintiff seeks to introduce irrelevant and unduly prejudicial evidence about the following distractions:

- Kathy Griffin's Photo of a beheaded Donald Trump

- A rendition of Julius Caesar in Central Park

- Sen. Tom Cotton's 2020 Op-Ed regarding the Protests Following George Floyd's Murder

- Andrew Sullivan's 2008 assertions about the parentage of Gov. Palin's son

- The fact that in 2014 James Bennet attended a forum at which Congresswoman Giffords and her husband were interviewed by someone (not by James Bennet)

- The 2016 Pulse Nightclub shooting in Orlando, Florida

- Sen. Bennet's Senate floor speech about the Pulse Nightclub shooting

- Louise Mensch's 2017 Op-Ed about Russian hacking

- Threats made against Sen. Michael Bennet that have no connection to this case

- The Times decision to revamp the "Public Editor" position and the question of whether the Reader Center was an adequate replacement

- Sen. Michael Bennet's 2016 Presidential campaign

- A 2016 book written by Times CEO Mark Thompson about the language of politics that includes a chapter that discusses Gov. Palin's use of language

- Bret Stephen's 2017 column about global warming

- James and Sen. Michael Bennet's family lineage

- Erik Prince's 2017 Op-Ed about Afghanistan

- The Times's liberal bias and position on gun control

- Bennet's decisions to hire diverse (and ideologically diverse) writers for the Opinion Section, including Sarah Yeong, Quinn Norton, Bari Weiss, and Bret Stephens

- Whether President Trump was good for The Times's business

**6.      Governor Palin Cannot Prove She was Harmed by Publication of the Editorial**

Less than two weeks after the Virginia Shooting and the publication of the Editorial, Governor Palin sued the Times.  She has not asserted that she suffered any particular financial or economic harm from publication of the Editorial, and she affirmatively has stated in the course of discovery in this action that she is not seeking to recover any such damages.  Governor Palin asserts generally that her reputation was harmed but she concedes that, since publication of the Editorial, she has not hired a public relations firm or any similar service to help repair the purported damage to her reputation.  Substantial evidence will show that any evidence of

reputational harm is far-fetched because by the time of publication of the Editorial, Gov. Palin

already was viewed as a controversial figure with a complicated history and reputation, and in

the time since the Editorial was published, Gov. Palin has prospered.

Governor Palin also seeks compensation for alleged emotional harm.  However,

Governor Palin will introduce no evidence whatsoever, other than her own self-serving and

uncorroborated testimony, supporting her claim of alleged emotional harm.

## V.     RELIEF SOUGHT BY PLAINTIFF[7]

### A.     Plaintiff's Contentions Regarding Appropriate Relief[8]

Plaintiff seeks to recover damages for reputational harm, humiliation, embarrassment,

and mental anguish.  These types of damages are presumed, do not lend themselves to precise

calculationm and will be determined by the jury based on what is fair and just.  *See* N.Y. Pattern

Jury Inst. – Civil § 3.29; *Maleski v. Long Island Railroad Co.*, 499 F.2d 1169 (2d Cir. 1974);

*Rinaldi v. Winston, Inc.*, 42 N.Y.2d 369, 379 (1977); *Carey v. Piphus*, 435 U.S. 247, 262-263

(1978); *Stem v. Cosby*, 645 F.Supp.2d 258, 289 (S.D.N.Y. 2009); *Metropolitan Opera Ass'n. v.

Local 100*, 2005 WL 1712241, at *4 (S.D.N.Y. Jul. 19, 2005).

Plaintiff also seeks damages for the cost of reputational repair or correcting the

defamatory statements in the approximate amount of $421,000, which is supported by the

testimony of her expert witness, Craig Kronenberger, and other documents and evidence, such as

The Times's advertising rates and internal data related to the publication of the Editorial.

---

[7] Defendants have not asserted any claims or counterclaims and thus do not seek relief in this action at this time.
[8] Plaintiff incorporates by reference her Memoranda of Law filed contemporaneously herewith in opposition to Defendants' Motions in Limine.

*Metropolitan Opera*, 2005 WL 1712241, at *4; *Den Norske v. Sun Printing and Pub'g Ass'n.*, 226 N.Y. 1 (1919); *Ahmed v. Kifle*, 2015 WL 11199078, *2 (N.D. Ga. Feb. 6, 2015).

Plaintiff also seeks to recover punitive damages, the amount of which have not been determined and falls within the jury's discretion.  N.Y. Pattern Jury Instr. – Civil § 3.30. *Prozeralik v. Cap Cities Commc'ns., Inc.*, 82 N.Y.2d 466, 478 (1993); *Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163 (2d Cir. 2000); *Stem v. Cosby*, 645 F.Supp.2d 258 (S.D.N.Y. 2009). Plaintiff also seeks recovery of her attorneys' fees and recoverable costs. *Metropolitan Opera*, 2005 WL 1712241, at *5-7.

Plaintiff's First Amended Complaint also requests the entry of a permanent injunction prohibiting Defendants from publishing the defamatory statements in the future.  Such injunctions are legally appropriate and not unconstitutional prior restraints where they are awarded after an adjudication at a trial on the merits that the challenged statements are false and defamatory.  *Rombom v. Weberman*, 2002 WL 1461890, at *2 (N.Y. Sup. Ct. Jun. 13, 2002), aff'd, 309 A.D.2d 844 (Oct. 20, 2003); *Brown v. Petrolite Corp.*, 965 F.2d 38, 51 (5th Cir. 1992).

In her First Amended Complaint, Plaintiff also sought to recover unjust enrichment or restitution damages.  However, the Court granted judgment on the pleadings against the Plaintiff on these damages [Doc. 83].  Plaintiff raises her request for these damages here solely for purposes of preserving it in the event of any appellate proceedings.

## B.    Defendants' Contentions Regarding Limitations on Relief

### 1.    Plaintiff Cannot Assert a Claim for Economic or Special Damages Nor Use Evidence of Lost Opportunities in Support of Claims for Other Damages

During discovery, Defendants sought information regarding Governor Palin's income, arguing that it was relevant to her claim of reputational harm.  *See, e.g.*, Def.'s First Set of Reqs.

to Pl. for the Production of Docs., at Req. No. 14 ("Your federal and state income tax returns, all related schedules and attachments, and W-2, 1099, K-1 or similar forms"), Req. No. 28 ("Documents sufficient to show website traffic, advertising revenue, and donations to the website site sarahpalin.com, for the three months prior to publication of the Editorial, and for the three months following publication of the Editorial."). Indeed, Defendants ultimately requested that the Court compel Governor Palin to produce this and related information and materials. Governor Palin responded that her financial information was irrelevant because she was not asserting that she suffered economic harm. Ultimately, in a February 26, 2020 ruling via email, the Court agreed with Governor Palin and denied Defendants' motion to compel evidence related to economic damages, including lost opportunities.

Due to Governor Palin's assertion that she is not claiming any economic damages, and the Court's ruling that she was thus not required to disclose evidence related to economic damages in discovery, Defendants have not obtained any information about Governor Palin's finances, income, or economic opportunities. For instance, Defendants served the following two requests for admission on Plaintiff: (1) "Admit that you did not lose income as a result of the publication of the Editorial"; and (2) "Admit that you did not lose any job or other paid opportunities as a result of the publication of the Editorial." Pl.'s Resps. and Objs. to Defs.'s Reqs. for Admiss., at Req. Nos. 23, 24. In response to each, Governor Palin asserted:

> Plaintiff objects to this Request based on the Court's February 26, 2020 ruling denying Defendants' request to compel discovery concerning this topic, and because it seeks discovery regarding a matter is not relevant to any party's claim or defense, nor proportional to the needs of the case, and seeks to invade Plaintiff's privacy and the disclosure of private financial information outside the scope of permissible discovery. *Plaintiff does not seek to recover lost income as a result of Defendant's defamatory publication.* Accordingly, the request is outside the permissible scope of discovery. *Wiesenberger v. W.E. Hutton & Co.*, 35 F.R.D. 556, 557-58 (S.D.N.Y. 1964); *Delpilar v. Foodfest Depot, LLC*, 2015 WL 9460141, *1-2 (S.D.N.Y. Dec. 23, 2015). This request is a fishing

expedition for private, personal information about Plaintiff that is completely irrelevant to this case.  Moreover, and subject to the foregoing, Plaintiff is not able to admit or deny this Request because she has not determined whether she lost income as a result of the publication because she is not seeking to recover lost income as an element of her damages.

*Id.* at Req. No. 23; *see also id.* at Req. No. 24 (substantively stating same).

Similarly, Defendants served on Governor Palin the following request for admission:

"Admit you suffered no financial or other economic harm of any kind as a result of the

publication of the Editorial."  Pl.'s Am. Resp. and Obj. to Defs.'s Req. for Admis. No. 27.  She

responded:

> Plaintiff objects to this Request to the extent the phrase "financial or other economic harm" is undefined, vague and ambiguous, and could be interpreted as calling for a legal conclusion.  To the extent this Request seeks discovery concerning whether Plaintiff has suffered loss of income, job or other paid opportunities, book sales, any decrease in ad revenue from sarahpalin.com or any other websites, or similar "financial" or "economic harm," Plaintiff objects because this Request is an attempt to circumvent the Court's February 26, 2020 ruling denying Defendants' request to compel discovery concerning this topic. Based on that ruling, Plaintiff is not required to respond if the intent of this Request is to force Plaintiff to determine and disclose whether she lost income, job or other paid opportunities, book sales, any decrease in ad revenue from sarahpalin.com or any other websites, or similar "financial" or "economic harm," as a result of the Editorial.  *See also* Plaintiff's Responses to Requests 23-26.
>
> *For sake of clarity, Plaintiff admits she is not seeking to recover and will not claim or assert loss of income, job or other paid opportunities, book sales, any decrease in ad revenue from sarahpalin.com or any other websites, or similar "financial" or "economic" harm as a result of the publication of the Editorial.*
>
> However, to the extent the phrase "financial or other economic harm" is defined or can be interpreted as including the damages Plaintiff seeks to recover for reputational repair/the cost of correcting or counteracting the injurious effects of the Editorial—which are in the nature of a pecuniary or "financial" loss and supported by the expert opinions of Craig Kronenberger—Plaintiff denies this Request.

*Id.* (emphasis added).

Once again, during Defendants' deposition of Governor Palin, Defendants sought to ask

questions about her claimed damages.  In response, Plaintiff's counsel refused to let her answer

any such questions.  *See, e.g.*, Tr. of May 20, 2020 Dep. of S. Palin, at 103:8-20.  The following

exchange is one example:

> MR. AXELROD [Defendants' counsel]: Shane, I've asked her how she was
> harmed.  If she claims business opportunities, people[] shied [a]way. . . .
>
> MR. VOGT [Governor Palin's counsel]: She's not – she's not
>
> MR. AXELROD: I'm entitled -- these are relevant questions about harm, and
> you're [sic] client has brought them into this deposition, and I'm entitled to get an
> answer.
>
> MR. VOGT: No.  You asked her questions.  She's not bringing them into the
> deposition.  She's not seeking these damages.
>
> MR. AXELROD: I asked --
>
> MR. VOGT: She's not seeking the damages.

*Id.*

Despite refusing to answer discovery requests and deposition questions about economic

damages, Governor Palin, in response to questions about the harm she claims to have suffered,

repeatedly and vaguely referred to lost opportunities.  *See, e.g.*, Tr. of May 21, 2020 Dep. of S.

Palin, at 292:24-25–293:1-12.  The following exchange is one example:

> Q       . . . You say "resources, time and fiscal."  What fiscal resources have you
> spent repairing your reputation or correcting the defamatory statement?
>
> A       Fiscal resources in terms of not having earned income because of The
> New York Times' success and [sic] unfortunately defaming me.
>
> Q       So you haven't spent any money out of pocket to this point to repair your
> reputation or correct the defamatory statements?
>
> A       I travel and speak and work pro bono a lot.  And in these travels and
> speeches and events, when I have tried to correct The New York Times and
> media's defamation, that's, that's an economic impact.

*Id.*

Because Governor Palin and her counsel have stated she is not asserting economic

damages, including lost economic opportunities, which prevented Defendants from obtaining

evidence related to economic damages and lost opportunities – Plaintiff cannot assert such damages to establish reputational or any other type of injury at trial.  *See Bunstine v. Kivimaki*, 2021 N.Y. Misc. LEXIS 4942, *11-12 (N.Y. Sup. Ct., Westchester County, Jul. 12, 2021) (granting defendant's motion to compel discovery information relating to economic damages, or alternatively precluding plaintiff from "offering evidence and/or testimony at trial on the issue of special damages").

      **2.**      **Governor Palin Cannot Obtain Damages for Prospective Reputation Repair Costs**

      To support her claim for money damages to repair her reputation, Governor Palin seeks to introduce the testimony of Craig Kronenberger.  For all the reasons in Defendants' Motion *in Limine*, the Court should conclude that, under the Federal Rules of Evidence and applicable case law, Kronenberger's testimony is unreliable, and his opinion and estimated cost to repair the alleged harm to Gov. Palin's reputation are not admissible.  Even if the Court disagrees and allows Kronenberger to offer expert testimony, Kronenberger's opinion and Gov. Palin's claim for reputation repair costs that she has not incurred would only be relevant if the Court also holds that the statements are defamatory *per se*.  For the reasons stated in Defendants' Motion *in Limine*, the Court should conclude that the statements are not defamatory *per se*.  As the statements are, at most, defamatory *per quod*, Gov. Palin cannot recover any damages unless she first proves special damages, which she will not be able to do, as she has already conceded she is "not seeking to recover and will not claim or assert loss of income, job, or other paid opportunities, including losses of book sales or any decrease in ad revenue from sarahpalin.com or any other websites."  *See Agnant v. Shakur*, 30 F. Supp. 2d 420, 426 (S.D.N.Y. 1998) ("To satisfy the special damages requirement, a plaintiff must set forth an itemized account of his losses; round figures, general allegations of a dollar amount or boilerplate allegations of some

impairment to business reputation are insufficient"); *see also Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (requiring proof of defamation *per se* or special damages).

### 3. Palin is Only Entitled to Damages from Publication of "America's Lethal Politics"

In her Amended Complaint, Governor Palin spends significant time describing how she was defamed in *January 2011* immediately following the Arizona Shooting, *see, e.g.*, *Am. Compl.* ¶¶ 73-74, and how she was harmed by that defamation, *id.* ¶ 73. Indeed, during her deposition, Governor Palin was unable to disentangle the harm she claims she suffered from the publication of "America's Lethal Politics" from the harm she claims she suffered from publication of unspecified articles in 2011. *See e.g.*, Tr. of May 21, 2020 Dep. of S. Palin, at 501:20-25 – 502:1-19.

To the extent Governor Palin is entitled to recover at all, that recovery must be limited to the harm she suffered *as a result of* the publication of "America's Lethal Politics" – separate and apart from the harm she claims to have suffered previously because of unspecified 2011 articles that similarly linked the Crosshairs Map to the Arizona Shooting. *See Celle v. Filipino Reporter Enters.*, 209 F.3d 163,184 (2d Cir. 2000) (reversing jury verdict as to one of three statements and remitting damages proportionally). In other words, just as Governor Palin's damages cannot be based on *true* statements within the Editorial, they cannot be based on *separate* statements outside of the Editorial. *See* Hon. Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems*, § 10:5.3 (5th Edition 2021) ("Plainly, the causation that a plaintiff must establish is between the false and defamatory statement made with the requisite degree of fault and the injury. If truthful information in a statement causes some or all of the harm, there can be no recovery for that portion of the injury."). There plainly must be a proven nexus between the allegedly defamatory statement and the alleged damages. *Id.* Given Governor Palin's inability

to distinguish between the harm allegedly caused by news published about her in 2011 and the
harm allegedly caused by the statements in the 2017 Editorial, there is a substantial risk of jury
confusion – and this may require clarification or instruction at trial.

### 4. New York State Law Does Not Permit Punitive Damages in Cases Such as This

Plaintiff has provided notice of her intent to seek punitive damages.  All apart from
Plaintiff's inability to meet her burden at common law of proving that Defendants' sole
motivation in publishing the Editorial was to harm her, Defendants respectfully submit that New
York State law separately prohibits the imposition of punitive damages in a defamation case such
as this one, in which a public figure has sued over a statement to the public on a matter of public
concern.  It is well established that the New York Constitution affords materially broader
protection to speech on matters of public concern than does the First Amendment.  *See, e.g., 600
W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 138 (1992); *Immuno AG v. Moor-Jankowski*,
77 N.Y.2d 235, 249 (1991).

There do not appear to be any reported cases in which a New York state court has
awarded punitive damages in a case like this one.  Indeed, the two state court cases that address
the issue suggest that cases involving public figures and "matters of public concern" are different
than non-public concern cases with respect to punitive damages.  *See Mahoney v. Adirondack
Pub. Co.*, 71 N.Y.2d 31, 41 (1987) ("[W]e have no occasion to consider whether plaintiff's proof
of common-law malice was sufficient to sustain such an award or whether punitive damages are
ever recoverable in libel actions involving matters of public concern."); *Prozeralik v. Cap. Cities
Commc'ns, Inc.*, 82 N.Y.2d 466, 478 (1993) (quoting *Mahoney*).

Defendants acknowledge that there are at least two federal cases, applying New York
State law, that assume such damages are available, relying on the somewhat ambiguous language

in *Prozeralik* for their conclusion.  In *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 172, 176, 190-91 (2d Cir. 2000), the court concluded that public figure plaintiffs had sufficiently proven common-law malice to sustain punitive damages with regard to two of three challenged statements made by newspaper defendants, and in *Stern v. Cosby*, 645 F. Supp. 2d 258, 286 (S.D.N.Y. 2009), the court denied the defendant journalist's motion for summary judgment on the issue of punitive damages in a defamation case brought by a public-figure plaintiff.  There is no indication, however, that in either of those cases the defendants raised the State Constitutional question raised by Defendants here.  While Defendants recognize this Court may consider itself bound to follow the assumption made by the Court of Appeals in *Celle*, Defendants respectfully ask the Court to address the question so that, at a minimum, Defendants preserve the issue for appeal to the Second Circuit, if necessary.  Defendants can provide additional briefing if the Court has questions or is inclined to hear oral argument on this issue.

### 5.    The Jury's Determination of Punitive Damages – if Necessary – Should be Bifurcated

If the Court concludes that New York state law permits an award of punitive damages in this type of defamation action at all, then bifurcation of the question whether Defendants are liable for punitive damages from the question of what amount of punitive damages to award would serve the interests of both judicial economy and fundamental fairness.[9]  Plaintiff consents to this proposal.

---

[9] To establish that defendants are liable to her for punitive damages, Governor Palin would have to prove, in addition to the other elements of her claim, that Defendants acted with common law malice – a separate and distinct standard from actual malice.  *See Prozeralik v. Cap. Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 479 (1993) ("[a]ctual malice, as defined in *New York Times Co. v Sullivan* (376 US 254, *supra*), is insufficient by itself to justify an award of punitive damages"); *Celle*, 209 F.3d at 184 ("Punitive damages may only be assessed under New York law if the plaintiff has established common law malice in addition to the other elements of libel.").

Determination of the amount of punitive damages in this case would require the jury to consider factual and legal issues that it would not otherwise need to consider – and this prospect carries a high risk of juror confusion and prejudice to Defendants.  A separate proceeding to determine the amount of such damages if, and only if, the jury determines Defendants are liable for punitive damages, is therefore both practical and warranted, and this separate trial would only become necessary if the jury were to find in favor of Governor Palin on liability.

Federal Rule of Civil Procedure 42(b) authorizes the Court to "order a separate trial of one or more separate issues . . . [f]or convenience, to avoid prejudice, or to expedite and economize" the proceedings.  "[B]ifurcation may be appropriate where, for example, the litigation of the first issue might eliminate the need to litigate the second issue, . . . or where one party will be prejudiced by evidence presented against another party." *Amato v. City of Saratoga Springs*, 170 F.3d 311, 316 (2d Cir. 1999); *see also Smith v. Lightning Bolt Prods.*, 861 F.2d 363, 373-74 (2d Cir. 1988) (stating "it often would be prejudicial to a defendant to attempt to litigate its financial condition during the trial on the issues of liability and compensatory damages").  Liability and damage issues are commonly bifurcated, and it is particularly appropriate to do so in cases raising First Amendment issues, where potential confusion or prejudice can take on constitutional dimensions.  *See, e.g., Guccione v. Hustler Magazine,* 800 F.2d 298, 300 (2d Cir. 1986) (liability and damages bifurcated in libel action).

Here, factually, as relevant to punitive damages, Defendants may be required to put forth evidence of their financial information, and this showing would likely require the testimony of witnesses who would not otherwise testify.  The admission of evidence that is not otherwise relevant at trial, coupled with the addition of a distinct legal standard, would create a high risk of jury confusion and of prejudice to Defendants.  Further, as noted above, if the jury finds in favor

of Defendants on liability, it will not need to reach the issue of punitive damages at all.

Therefore, bifurcation of the trial, so that a determination of the proper amount of punitive

damages is *only* addressed by the parties and the jury if Governor Palin is able to prove liability

and common law malice, would preserve the time and resources of the Court, the parties, and the

jury.

### 6.    New York Law Does not Provide for an Award of Attorney's Fees in Defamation Actions

In this filing, Plaintiff states that she seeks recovery of her attorneys' fees and

recoverable costs.  However, New York law does not provide for an award of attorney's fees to a

plaintiff in a defamation action.  *Robertson v. Doe*, 05 Civ. 7046(LAP), 2010 U.S. Dist. LEXIS

151305, at *11-14 (S.D.N.Y. May 11, 2010) (stating there is a "general rule in New York against

recovery of attorneys' fees in the context of defamation actions"); *Wallace v. Weiss*, 82 Misc. 2d

1053, 372 N.Y.S.2d 416, 421 (Sup. Ct. 1975) (holding that "attorney's fees for the

commencement of this [libel] action . . . do not constitute an item of damage").

## VI.    WITNESS LIST IN THE LIKELY ORDER OF APPEARANCE

1.    Sarah Palin
2.    James Bennet
3.    Elizabeth Williamson
4.    Linda Cohn
5.    Ross Douthat
6.    Eileen Lepping
7.    Phoebe Lett
8.    Andrew Sullivan (by deposition)
9.    Tim Crawford (by deposition)
10.    Danielle Rhoades Ha
11.    Hanna Ingber
12.    Justin Stile
13.    Sebastian Tomich (if necessary)
14.    Craig Kronenberger (Expert)
15.    Roland Caputo (if necessary)

VII.  **EXHIBIT LISTS WITH PARTICULARIZED OBJECTIONS NOTED IN ACCORDANCE WITH FED. R. CIV. P. 26(a)(3)**

A.  **Plaintiff's Exhibit List[10]**

Below is a list of exhibits that Plaintiff intends to offer in its case in chief, with any objections, referenced by the applicable Federal Rule of Evidence, to such exhibits noted in the column at the right.  Defendants reserve all objections under 402 and 403, as well as foundational objections that may depend on the witness through whom the exhibit is offered.

| Pl. Ex. No. | DESCRIPTION | OBJECTIONS |
|---|---|---|
| 1 | *America's Lethal Politics [6/14/2017 Original Version--Online]* | |
| 2 | *NYT Opinion Tweet of America's Lethal Politics [6/14/2017]* | |
| 3 | *NYT (Main Twitter Account) Tweet of America's Lethal Politics [6/14/2017]* | |
| 4 | *America's Lethal Politics [6/14/2017 Original Version--Print]* | |
| 5 | *America's Lethal Politics—First Correction [6/15/2017]* | |
| 6 | *America's Lethal Politics—Second Correction [6/16/2017]* | |
| 7 | *NYTOpinion Tweet—"We got an important fact wrong" [6/15/2017]* | |
| 8 | *NYT (Main Twitter Account) Retweet of NYTOpinion Correction Tweet* | |
| 9 | *NYTOpinion Full Correction Tweet (3 parts) [6/15/2017]* | |
| 10 | *NYT Opinion Section—Print Edition—Correction of America's Lethal Politics [6/16/2017]* | |
| 11 | *America's Lethal Politics—International Edition—print edition [6/16/2017]* | |
| 12 | *NYT Homepage Preservation [6/15/2017]* | |

---

[10] In addition to Defendants' stated specific objections, many of the Plaintiff's exhibits attach cover pages and have added content which is inauthentic and inadmissible.  *See, e.g.*, Pl. Ex. 1.  Defendants do not object to Plaintiff's exhibits containing such content as a whole, but object to these extraneous additions, which should be removed prior to trial.

| 13 | *The Struggles of Sarah Palin [10/2/2008]* | 402, 403 (undue prejudice, etc.) |
| 14 | *Palin and Her Enemies [7/5/2009]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 15 | *9/3/2008 WSJ Article re. Palin Candidacy* | |
| 16 | Andrew Rosenthal—*Talk to The Times-Reader Questions & Answers* | 402 (relevance), 403 (undue prejudice, etc.) |
| 17 | *Ethical Journalism—A Handbook of Values and Practices for the News & Editorial Departments* | 402 (relevance), 403 (undue prejudice, etc.) |
| 18 | NYT *Guidelines on Integrity* | 402 (relevance), 403 (undue prejudice, etc.) |
| 19 | NYT Campus Weblines—SPJC Code of Ethics | 402 (relevance), 403 (undue prejudice, etc.) |
| 20 | *"Can the Bennet Brothers save the Establishment?"—Washington Post [10/29/2019]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 21 | *"The Well Connected Bennet Family"* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 22 | *Technology Policing Violence—CSPAN [5/6/2014]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 23 | *"New York Times Says Senator's Op-Ed Did Not Meet Standards,"* NYT, June 4, 2020 | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |
| 24 | *Sarah Palin, Rage Whisperer—NYT--Nicole Wallace (Opinion) [1/25/2016]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 25 | *She Who Must Not Be Named—NYT--Charles Blow [12/3/2010]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 26 | *"A Smear?"—Andrew Sullivan [8/31/2008]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 27 | *"Why Does Trigg Matter?"—Andrew Sullivan [6/28/2010]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 28 | *"The Day Trigg Was Born"—Andrew Sullivan [6/31/2011]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 29 | *Ingber Article— "Mom for Vice President"* | 402 (relevance), 403 (undue prejudice, etc.) |
| 30 | *Pima Sheriff Loughner Investigation Files* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 31 | *Loughner Files—*NYTimes.com | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 32 | *Time, the Enemy—NYT--Arthur Brisbane (Public Editor) [1/15/2011]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 33 | *"The Tucson Witch Hunt"—Charles Blow [1/14/2011]* | 402 (relevance), 403 (undue prejudice, etc.) |

| 34 | *"United in Horror"—Ross Douthat* [1/9/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 35 | *"The Arizona Shooting, and What Led Up to it"—NYT* [1/9/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 36 | *"Suspect's Odd Behavior Caused Growing Alarm"— NYT* [1/9/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 37 | *"Looking Behind the Mug-Shot Grin"—NYT* [1/15/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 38 | *"Before Attack, Parents of Gunman Tried to Address Son's Strange Behavior"— NYT* [3/27/2013] | 402 (relevance), 403 (undue prejudice, etc.) |
| 39 | *Atlantic—"Jared Loughner" Articles Search* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 40 | *"Caldwell's Unfairness"—Andrew Sullivan* [1/15/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 41 | *"5 Best Monday Columns"—Atlantic* [1/10/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 42 | *"An Assassination—Live Blogging—Andrew Sullivan"* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 43 | *"An Assassination?"—Andrew Sullivan* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 44 | *"Was the Shooting of Rep. Gabrielle Giffords Political?"—The Atlantic* [1/5/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 45 | *"Did Sarah Palin's Target Map Play Role in Giffords Shooting?"—The Atlantic* [1/16/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 46 | *"What We Know About Jared Lee Loughner"—The Atlantic* [1/10/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 47 | *"Stop the Blame Game"—The Atlantic* [1/11/2011 | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 48 | *"The More We Know"—Andrew Sullivan* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 49 | *"Here Comes the Jared Loughner Competency Hearing"—The Atlantic [5/24/2011]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 50 | *"Ten Days That Defined 2011—The Atlantic* [12/29/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |

| 51 | *Sen Bennet Statement on Giffords Shooting* [1/8/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 52 | *WaPo—Sarah Palin's Crosshairs* [1/9/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 53 | USGS Topographic Map Symbols | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 54 | *Sarah Palin's & Democrats' Maps With Crosshairs— FactReal* [1/11/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 55 | DCCC.org *"Recovery" Map page Wayback Machine* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 56 | *5 Best Columns from the Atlantic Wire* [11/28/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 57 | *Something About Tucson the I Haven't Said* Email & Attachment [1/14/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 58 | *How the Media Botched the Arizona Shooting—*T.A. Frank (Hyperlinked in Ex. 230) | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 59 | *Loughner's Descent Into Madness—*Atlantic [1/13/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 60 | *Prosecutors Expect Jared Loughner to Be Found Unfit for Trial—*Atlantic [5/25/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 61 | *"America's Enduring Strength"* | 402 (relevance), 403 (undue prejudice), 801 (hearsay) |
| 62 | *The Opinionator—The Baffler* [12/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 63 | *James Bennet 2017 Performance Review Letter—A.G. Sulzberger* | |
| 64 | *Liberal Use of 'Extremist' Is the Winning Strategy—* James Bennet [11/7/96] | 402 (relevance), 403 (undue prejudice, etc.) |
| 65 | *"The Newsroom Feels Embarrassed"—Vanity Fair HIVE* [2/26/2018] | 402 (relevance), 403 (undue prejudice, etc.), 404 (character), 801 (hearsay) |
| 66 | *NYTComms Tweet re. Bennet Statement on Quinn Norton* [2/14/2018] | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |
| 67 | *"Times Stands By Editorial Board Member After Outcry Over Old Tweets"—NYT* [4/2/2018] | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |

| 68 | *"The Outrage Over Sarah Jeong"—Brett Stephens* [8/9/2018] | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |
| 69 | *Elizabeth Williamson Apologizes for Jeong Tweet* [8/1/2018] | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |
| 70 | *"The New York Times Has Abandoned Liberalism for Activism"—Andrew Sullivan* [9/13/2019] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 71 | *O'Keefe Investigates Scope of NYT Anti-Trump Bias Within Editorial Ranks* [10/10/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 72 | *"Staff Anxiety"* Email between Bennet & Stephens [2/7/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 73 | *"Sarah Palin endorses Darryl Glenn in Colorado's U.S. Senate primary"—The Denver Post* [6/7/2016] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 74 | *"Arrest Made in Threat on Sen. Bennet's Office"—The Atlantic* [1/10/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 75 | *"The Trumpiest Roman of Them All"—Ross Douthat* [6/14/2017] | |
| 76 | *"The real tragedy of Orlando"* Op-Ed proposal Bennet forwards to Dao [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 77 | *ARS PAC Endorses Michael Bennet for United States Senate* [8/24/2016] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 78 | *Watch Colorado Se. Michael Bennet's Floor Speech on Guns* [6/16/2016] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 79 | *"Trump Suggests 'Second Amendment People' Could Act Against Hillary Clinton"—NYT* [8/9/2016] | |
| 80 | *For NYT, Trump is a sparring partner with benefits—Columbia Journalism Review* [6/29/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 81 | *"To Our Readers, From the Publisher and Executive Editor"* [11/13/2016] | 402 (relevance), 403 (undue prejudice, etc.) |
| 82 | *"Trump's Wink to Second Amendment People"—Thomas Friedman* [8/9/2016] | |
| 83 | Bennet Book Order/Reimbursement Request—*"The Persecution of Sarah Palin"* [12/17/2016] | |
| 84 | *Enough Said* Excerpts emailed to Bennet/Baquet by Mark Thompson [6/15/2016] | 402 (relevance), 403 (undue prejudice, etc.) |
| 85 | Bennet forwards Thompson email re. *Enough Said* to J. Dao [6/16/2016] | 402 (relevance), 403 (undue prejudice, etc.) |

| 86 | Bennet email string with Williamson re. RNC Lineup [7/14/2016] | |
| 87 | NYT Daily Clip Report Email 7/18/2016—GOP Arena Highlights Trump's Blacklist | 402 (relevance), 403 (undue prejudice, etc.) |
| 88 | *"New Colleague to Stir Things Up"* Tweet—James Bennet [4/5/2017] | |
| 89 | *Breitbart—Sarah Palin Condemns Kathy Griffin* [5/30/2017] | |
| 90 | *NYT/Trump Twitter Exchange* [11/13/2016] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 91 | *Dean Baquet : 'Trump Is the Best Thing to Happen to The Times Subscription Strategy'—Grabien* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 92 | *Reliable Sources—CNN—Transcript 2/26/2017* | 402 (relevance), 403 (undue prejudice, etc.) |
| 93 | *'Truth Is Hard' Advertising Campaign First Ever Oscars Ad—AdAge* [2/23/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 94 | *NYT Truth Advertisements* | 402 (relevance), 403 (undue prejudice, etc.) |
| 95 | *The Truth—NYTStore—Truth Merchandise* | 402 (relevance), 403 (undue prejudice, etc.) |
| 96 | *NYT Truth Advertising Campaign--Poster* | 402 (relevance), 403 (undue prejudice, etc.) |
| 97 | *NYT Truth Advertising Campaign – Comes at a Cost* | 402 (relevance), 403 (undue prejudice, etc.) |
| 98 | *NYT Truth Advertising Campaign – It has no Alternative* | 402 (relevance), 403 (undue prejudice, etc.) |
| 99 | *NYT Truth Advertising Campaign – Tweet/All Facts No Alternatives* | 402 (relevance), 403 (undue prejudice, etc.) |
| 100 | *The Public Editor Signs Off—NYT* [6/2/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 101 | *NYT's New reader Center Already Proving a Step Backward in Accountability— FAIR* [6/23/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 102 | *NYT Opinion—Hillary Clinton for President* [9/24/2016] | 402 (relevance), 403 (undue prejudice, etc.) |
| 103 | *NYT Book—Gun Control : Changing Perspectives* | 402 (relevance), 403 (undue prejudice, etc.) |
| 104 | *The Corrosive Politics That Threaten L.G.T.B. Americans* [6/15/2016] | 402 (relevance), 403 (undue prejudice, etc.) |
| 105 | *Exclusive—Sarah Palin Condemns 'Sick Audacity' of Kathy Griffin's Trump Beheading Photo—Breitbart [5/30/2017* | |

| 106 | *"End the Gun Epidemic in America,"* NYT Editorial Board, Dec. 4, 2015 | 402 (relevance), 403 (undue prejudice, etc.) |
|-----|---|---|
| 107 | *"How the Trolls Stole Washington,"* Amanda Hess, NYT, Feb. 28, 2017 | 402 (relevance), 403 (undue prejudice, etc.) |
| 108 | "*Social Media's Globe-Shaking Power*," F. Manjoo, Nov. 16, 2016 | 402 (relevance), 403 (undue prejudice, etc.) |
| 109 | *Times Digest* email for 6/15/2017 | |
| 110 | *"The Indigenous American Berserk Strike Again"—Bret Stephens* [6/15/2017] | |
| 111 | *"Rhetoric and Bullets"—Charles Blow [6/15/2017]* | |
| 112 | *"Shooting is Latest Eruption in a Grim Ritual of Rage and Balme"—Alexander Burns* [6/14/2017] | |
| 113 | *"Notes on a Political Shooting"—Ross Douthat* [6/17/2017] | |
| 114 | *Breitbart—Sarah Palin Don't Blame Sanders* [6/14/2017] | |
| 115 | *"Are we writing about the congressional shooting"* Email String between Williamson/Semple/Fox [6/14/2017] | |
| 116 | *"Are we writing on congressional shooting"* Email String between Williamson/Semple/Fox/Cohn/Lepping/Lett [6/14/2017] | |
| 117 | *"Are we writing on the congressional shooting"* Email String between Semple/Cohn/Bennet/Lepping/Lett/Williamson/Fox [6/14/2017] | |
| 118 | *"Are we writing on the congressional shooting"* Email String between Williamson/Fox | |
| 119 | *"POSSIBLE shooter's POSSIBLE social media pages pro-Bernie, anti-Trump"* Email String between Bennet/Williamson/Semple/Fox/Cohn [6/14/2017] | |
| 120 | *"POSSIBLE shooter's POSSIBLE social media pages pro-Bernie, anti-Trump"* Email String between Bennet/Williamson/Semple/Fox/Cohn [6/14/2017] | |
| 121 | *"Gun Control past pieces from Bob"* Email String between Lett/Williamson/Semple/Cohn [6/14/2017] | |
| 122 | *"POSSIBLE shooter's POSSIBLE social media pages pro-Bernie, anti-Trump"* Email String between Bennet/Williamson/Semple/Fox/Cohn [6/14/2017] | |
| 123 | *"Gun Control past pieces from Bob"* Email String between Lett/Williamson [6/14/2017] | |
| 124 | *"Gun Control past pieces from Bob"* Email String between Lett/Williamson [6/14/2017] | |

| 125 | *"Gun Control past pieces from Bob"* Email String between Lett/Bennet [6/14/2017] | |
| 126 | *"Gun Control past pieces from Bob"* Email String between Lett/Bennet [6/14/2017] | |
| 127 | *"Gun Control past pieces from Bob"* Email String between Lett/Bennet [6/14/2017] | |
| 128 | *"Gun Control past pieces from Bob"* Email String between Williamson/Bennet [6/14/2017] | |
| 129 | "*Gabby Giffords's Farewell,*" NYT Opinion, Jan. 26, 2012 | |
| 130 | "*6,000 Bullets,*" NYT Opinion, July 23, 2012 | |
| 131 | "*Democrats Find Their Voice on Gun Control,*" NYT Editorial Board, July 29, 2016 | |
| 132 | "*Myths About Gun Regulation,*" NYT Opinion, Jan. 31, 2013 | |
| 133 | "*No One Listened to Gabrielle Giffords,*" NYT Opinion, Jan. 15, 2011 | |
| 134 | "*Bloodshed and Invective in Arizona,*" NYT Opinion, Jan. 9, 2011 | |
| 135 | "*As We Mourn*," NYT Opinion, Jan. 12, 2011 | |
| 136 | *"Gun Control past pieces from Bob"* Email String between Semple/Bennet/Williamson/Fox/Cohn [6/14/2017] | |
| 137 | *"possible shooter id"* Email sent from Williamson to Fox [6/14/2017] | |
| 138 | *"POSSIBLE shooter's POSSIBLE social media"* Email sent from Williamson to Bennet/Semple/Fox [6/14/2017] | |
| 139 | *"demons"* Email from Fox to Williamson [6/14/2017] | |
| 140 | *Scoop* History for *America's Lethal Politics* | |
| 140A | *Excerpt* | |
| 140B | *Excerpt* | |
| 140C | *Excerpt* | |
| 140D | *Excerpt* | |
| 140E | *Excerpt* | |
| 140F | *Excerpt* | |
| 140G | *Excerpt* | |
| 140H | *Excerpt* | |
| 140I | *Excerpt* | |
| 140J | *Excerpt* | |
| 140K | *Excerpt* | |
| 140L | *Excerpt* | |
| 140M | *Excerpt* | |
| 141 | *America's Lethal Politics—Williamson Draft* | |

| 142 | *Sarah Palin's 'Crosshairs' Ad Dominates Giffords Debate*—ABC News [1/9/2011] | |
|-----|-------------------------------------------------------------------------------|---|
| 143 | *"shootings in backfield, thanks"* Email from Williamson to Bennet/Semple/Fox/Clines [6/14/2017] | |
| 144 | Fox/Cohn Email String re: who's handling Williamson Editing [6/14/2017] | |
| 145 | *"shootings in backfield, thanks"* Email from Fox to Williamson [6/14/2017] | |
| 146 | *"shootings in backfield"* Email string between Williamson/Fox [6/14/2017] | |
| 147 | *"a couple small suggestions"* Email String between Williamson/Fox [6/14/2017] | |
| 148 | *"guns in Virginia"* Email from Lepping to Bennet/Williamson/Fox/Cohn [6/14/2017] | |
| 149 | *Law Center to Prevent Gun Violence* | |
| 150 | *Giffords Law Center to Prevent Gun Violence* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 151 | *"also on shootings"* Email String between Williamson/Lepping [6/14/2017] | |
| 152 | *"Lawmakers Head Warily for Home"*—NYT Opinion Editorial [3/26/2010] | |
| 153 | *"also on shootings"* Email String between Lepping/Cohn [6/14/2017] | |
| 154 | *"15thu1 playback—America's Lethal Politics* [6/14/2017] | |
| 155 | *"fixes on shooting"* Email from Fox to Cohn [6/14/2017] | |
| 156 | *"15thu1 playback" for America's Lethal Politics—Scoop* [6/14/2017] | |
| 157 | *"also on shootings"* Email String between Cohn/Lepping [6/14/2017] | |
| 158 | *"Do we need to put a blurb in Mira's piece?"* Email String between Fox/Cohn [6/14/2017] | |
| 159 | *"shooting hed and blurg"* Email String between Cohn & Fox [6/14/2017] | |
| 160 | *Ross Douthat Tweet—"You are responsible for inciting violence if you actually incite or organize or bless violence..."* [6/14/2017] | |
| 161 | *"a couple small suggestions"* Email from Fox to Bennet [6/14/2017] | |
| 162 | *"Sanders condemnation of violence"* Email from Rabbi Lerner to Bennet [6/14/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 163 | *"hey"* Email from Bennet to Williamson [6/14/2017] | |

| 164 | *"Inciting Violence May Not Be Protected Speech"— NYT—March 5, 2013* | 402 (relevance), 403 (undue prejudice, etc.) |
|---|---|---|
| 165 | *NYT Manual of Style & Usage Excerpts* | 402 (relevance), 403 (undue prejudice, etc.) |
| 166 | *"Trump Incites Mob," NYT, Jan. 7, 2021* | |
| 167 | *Opinion Today—*NYTimes.com *[6/15/2017]* | |
| 168 | *"This brings Shooting to 330"* Email String between Fox/Cohn re. TRIM of America's Lethal Politics for International Edition [6/14/2017] | |
| 169 | *"The day on social, 6/15"* Social Media Wrapup Email [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 170 | *NYT 2017 Annual Report* | |
| 171 | *"NYTimes: The Trumpiest Roman of Them All"* Email String between Bennet/Douthat [6/14/2017-6/15/2017] | |
| 172 | *Jonathan Chait Tweet* | |
| 173 | *Chris Hayes Tweet* | |
| 174 | *"NYTimes: The Trumpiest Roman of Them All"* Email String between Bennet/Douthat [6/14/2017-6/15/2017] | |
| 175 | *NYTPolitics Tweet-"Fact Check: Partisans falsely blamed Loretta Lynch, Tim Kaine, Bernia Sanders for Wednesday's Virginia Shooting"* [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 176 | Sarah Palin Tweets re. Editorial to *"@nytopinion"* [6/15/2017] | |
| 177 | Sarah Palin "With this sickening NYT's editorial" Tweet [6/15/2017] | |
| 178 | *"fyi, small fix on shooting editorial"* Email String between Cohn/Rakowski/Levine | |
| 179 | NYT Reader Emails re. *America's Lethal Politics* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 180 | Comments on *America's Lethal Politics* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 181 | LEGIBLE Comments on *America's Lethal Politics* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 182 | *Washington Post—Fact Checker* Email [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 183 | *"Media rips NYT Editorial after Alexandria shooting"— Axios* [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |

| 184 | *"No evidence Sarah Palin's PAC incited shooting of Rep. Gabby Giffords"— PunditFact* [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
|---|---|---|
| 185 | *"Sunday sked 6.18.17"* Email String between Weiss/Seaton/!NYHQ-op-discuss [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 186 | *"Guns"* Email string between Wegman/Williamson [6/14/2017] | |
| 187 | *"And now I see"* Email string between Wegman/Williamson [6/14/2017] | |
| 188 | *Text Exchange w James* Email from Williamson to self [6/16/2017] | |
| 189 | *Williamson/Bennet 6/14/2017 Text Exchange (screen shots)* | |
| 190 | *Williamson/Bennet 6/15/2017 Text Exchange (screen shots)* | |
| 191 | *"Giffords"* Email String between Lepping/Bennet/Williamson [6/15/2017] | |
| 192 | Lepping forwards Lett *"Giffords"* Email String between Lepping/Bennet/Williamson [6/15/2017] | |
| 193 | Bennet forwards Williamson *"NYTimes: The Trumpiest Roman of Them All"* Email String between Bennet/Douthat [6/15/2017] | |
| 194 | *"And now I see"* Email String between Wegman/Cohn [6/15/2017] | |
| 195 | *"let's check count of those injured"* Email String between Williamson/Bennet/Lepping/Wegman [6/15/2017] | |
| 196 | *"let's check count of those injured"* Email String between Williamson/Bennet/Lepping/Wegman [6/15/2017] | |
| 197 | *"looks like we may have another error"* Email String between Bennet/Wegman/Lepping [6/15/2017] | |
| 198 | *"editorial and readers?"* Email string between Ingber/Bennet [6/15/2017] | |
| 199 | *"NYT Editorial correction"* Email String between Rhoades Ha/Rubin/Alahydoian/Ingber [6/15/2017] | |
| 200[11] | *"Question from Yahoo News"* Email String between Rhoades Ha/McGraw/Bennet [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |

---

[11] Plaintiff's exhibits 200 and 227 contain redactions for "Attorney Client Privilege." Defendants object only to those portions of the exhibits.

| 201 | *"Criticize Our Work Privately..."*—Washington Post [2/16/2018] | 402 (relevance), 403 (undue prejudice, etc.) |
|---|---|---|
| 202 | *"new wording"* Email from Cohn to Bennet | |
| 203 | *"earlier version, w Linda's question"* email between Wegman/Cohn/Lepping [6/15/2017] | |
| 204 | *"earlier version, w Linda's question"* email between Wegman/Williamson [6/15/2017] | |
| 205 | *"Moment to chat?"* Email String between Wegman/Erika lamb (Everytown.org) | |
| 206 | *"editorial and readers?"* Email string between Ingber/Bennet [6/15/2017] | |
| 207 | *"editorial and readers?"* Email string between Ingber/Bennet/Evans/Higa [6/15/2017] | |
| 208 | *"editorial and readers?"* Email string between Ingber/Higa [6/15/2017] | |
| 209 | *"NYT Editorial Correction"* Email String between Ingber/Rhoades Ha [6/15/2017] | |
| 210 | *"editorial and readers?"* Email string between Ingber/Bennet/Evans/Higa [6/15/2017] | |
| 211 | *"editorial and readers?"* Email string between Ingber/Higa [6/15/2017] | |
| 212 | *"Media Inquiry"* Email String between Rhoades Ha/Sydney Smith (iMediaEthics) [6/15/2017] | |
| 213 | *"NYT Editorial correction"* Email String between Rhoades Ha/Bevacqua/Jordan Cohen [6/16/2017] | |
| 214 | *"NYT Editorial correction"* Email String between Rhoades Ha/Bevacqua/Jordan Cohen [6/16/2017] | |
| 215 | *"DRAFT—corp comm note"* Email String between Bevacqua/Rhoades Ha [6/16/2017] | |
| 216 | *"New York Times issues correction to editorial after firestorm of controversy"*— CNN [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 217 | *"earlier version, w Linda's question"* email between Wegman/Williamson [6/15/2017] | |
| 218 | *"this line is misleading"* Email String between Williamson/Cohn/Wegman/Bennet [6/15/2017] | |
| 219 | *"earlier version, w Linda's question"* Email String between Cohn/Wegman [6/15/2017] | |
| 220 | *"could you make one change, via BOB"* Email String between Cohn/Fox [6/16/2017] | |
| 221 | *"David Rubenstein observer"* Email String between Bennet/Cohn/Semple [6/16/2017] | |

| 222 | *"CNN request for comment re: Times Editorial"* Email String between O. Darcy(CNN)/Rhoades Ha [6/15/2017] | |
|-----|------|------|
| 223 | *"Fox News Comment Request"* Email String between Bennet/Rhoades Ha [6/15/2017] | |
| 224 | *"And now I see"* Email string between Wegman/Williamson [6/14/2017] | |
| 225 | *"question from Yahoo News"* Email between Stableford & Rhoades Ha [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 226 | *New York Times requests apology from Fox"—Politico* [7/23/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 227 | Email String between Bennet/McGraw/Rhoades Ha re. CNN Inquiry [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) (partially; other parts are admissible); 901 (authenticity) |
| 228 | *Fox News Comment Request* Email String between Rhoades Ha/Bennet [6/15/2017] | |
| 229 | *Question from Business Insider* Email String between Rhoades Ha/Max Tani [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.); 801 (hearsay) |
| 230 | *NYT Editorial* Email String Between Rhoades Ha & Sara Fisher (Axios) [6/15/2017] | |
| 231 | *CNN Request for Comment re. Times Editorial* Email String Between Rhoades Ha/E. Murphy/Oliver Darcy [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 232 | *NYT Editorial Correction* Email String between J. Cohen & Rhoades Ha [6/15/2017] | 402 (relevance), 403 (hearsay) |
| 233 | *WaPo question on Loughner claim* Email String between Bennet and Paul Farhi [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 234 | *CNN Request for Comment re. Times Editorial* Email String Between Rhoades Ha/Bennet/Oliver Darcy [6/15/2017] | |
| 235 | *CNN Request for Comment re. Times Editorial* Email String Between Rhoades Ha/Oliver Darcy [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 236 | *CNN Request for Comment re. Times Editorial* Email String Between Rhoades Ha/Oliver Darcy [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 237 | *Politifact Media Inquiry re. « America's Lethal Politics »* Email String [6/15/2017] | |
| 238 | *A Note from James Bennet* [2/15/2018] | 402 (relevance), 403 (undue prejudice, etc.) |
| 239 | *The Times Issues Social Media Guidelines for the Newsroom* [10/13/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 240 | *NYT Slammed for Lack of Transparency in Editor's Resignation—The Hill* [5/2/2018] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |

| 241 | *On Trust and Transparency—A.G. Sulzberger, Our New Publisher, Answers Readers' Questions* [1/22/2018] | 402 (relevance), 403 (undue prejudice, etc.) |
| 242 | *How the New York Times Maintains its Credibility—Quill* [12/15/2018] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 243 | *Former NY Times Editor Rips Trump Coverage as Biased—Fox News* [1/2/2019] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 244 | *Williamson Re-Tweet of Correction* | |
| 245 | *"Palin gets Death Threats Too"—The Atlantic* [3/7/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 246 | *"The Threats Against Palin"—Andrew Sullivan* [1/14/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 247 | *James Devine--#HuntRepublicans Tweet* | 402 (relevance), 403 (undue prejudice, etc.) |
| 248 | *[Same w/ Time Stamp]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 249 | *Dozens of Twitter Users Call for Palin's Death—Daily Caller* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 250 | *FBI Complaint Form re. Palin Threats* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 251 | *FBI Complaint Form re. Palin Threats* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 252 | *FBI Complaint Form re. Palin Threats* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 253 | *Death Threats Against Palin Increase—Politico* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 254 | *Rhoades Ha* Email to Kruzel re. timing of Corrections [6/15/2017] | |
| 255 | *Enough Said—"Incitement" is a crime passage* | 402 (relevance), 403 (undue prejudice, etc.) |
| 256 | *New York Times Editor Says Trump Has Put His Reporters' Lives at Risk— Guardian* 11/18/2019] | 402 (relevance), 403 (undue prejudice, etc.) |
| 257 | *Analytics NYT-Roll-Up-Opinion—Main Daily Opinion Dashboard* Email 6/16/2017 to Bennet & to opinionweb@nytimes.com | |
| 258 | *Chartbeat Daily Perspective for* nytimes.com Email [6/16/2017] | |

| 259 | *NYT Spreadsheets re. Digital Subscriptions as of 6/14/2017 and 6/15/2017* | |
| 260 | *NYT Pageviews* | |
| 261 | *NYT Spreadsheets re. Social Media/Users/Referring URL's* | |
| 262 | *NYT Slack Messages re. Editorial & Social* | 402 (relevance), 403 (undue prejudice, etc.) |
| 263 | *NYT Slack Coding for America's Lethal Politics traction* | 402 (relevance), 403 (undue prejudice, etc.) |
| 264 | *That Time Trump Spent Nearly $100,000 on an Ad Criticizing U.S. Foreign Policy in 1987—BuzzFeed.News [1/10/2015]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 265 | *Fox News Takes Out Full Page New York Times Ad After Dispute With The Paper—HuffPo [7/27/2017]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 266 | NYT 2017 Rate Card | |
| 267 | NYT 2019 Rate Card | |
| 268 | NYT 2021 Rate Card | |
| 269 | *NYT « Today's Paper » May 21, 2020* | |
| 270 | *NYT Advertising Media Kit* | 901 (authenticity) |
| 271 | *NYT Spreadsheet Print Distribution 6/15/2017* | |
| 272 | *How the NYT's AI-driven data insight tool is informing ad campaigns [1/10/2019]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 273 | *The New York Times Advertising & Marketing Solutions Group Introduces 'nytDEMO' : A Cross-Functional Team Focused on Bringing Insights and Data Solutions to Brands [2/15/2018]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 274 | *New York Times Thinks Small to reach readers on Apple Watch—Mobile Marketer* | 402 (relevance), 403 (undue prejudice, etc.) |
| 275 | Stela Opinion Daily Report [6/14/2017] | |
| 276 | Daily Opinion Dashboard Email—Google Analytics [6/16/2017] | |
| 277 | Chartbeat Email [Redacted—6/16/2017] | 402 (relevance), 403 (undue prejudice, etc.), 901 (authenticity) |
| 278 | Chartbeat Email [Unredacted—6/16/2017] | |
| 279 | Kronenberger Summary of Editorial Comments | 801 (hearsay) |
| 280 | Kronenberger Cision/SimilarWeb Spreadsheet for Readership & Ad Equivalency | 801 (hearsay) |
| 281 | *"It's True: False News Spreads Faster and Wider,"* S. Lohr, Mar. 8, 2018 | 402 (relevance), 403 (undue prejudice, etc.) |
| 282 | *NYT Insurance Policies* | 402 (relevance), 403 (undue prejudice, etc.) |
| 283 | *NYT Form 10-Q September 26, 2021* | |

| 284 | *NYT 2020 Annual Report – Form 10-K* | |
| 285 | *Systemic Change Needed After Faulty Times Article—*<br>NYT—Margaret Sullivan (Liz Spayd, Public Editor)<br>[12/18/15] | 402 (relevance), 403 (undue<br>prejudice, etc.) |
| 286 | *The NY Times Promised to Fact Check their New*<br>*Climate Denier Columnist— They Lied* [4/29/2017] | 402 (relevance), 403 (undue<br>prejudice, etc.), 801<br>(hearsay) |
| 287 | *"Atlantic Assures Fans It Hasn't Sold Its Soul—Media*<br>*Ad-Age* [3/10/2008] | 402 (relevance), 403 (undue<br>prejudice, etc.), 801<br>(hearsay) |
| 288 | *"editorials INYT, Fri., June 16"* Email from Cohn to<br>Levine/et.al. [6/14/2017] | |
| 289 | *"Exclusive: Loughner Friend Explains Alleged*<br>*Gunman's Grudge Against Giffords"—Mother Jones*<br>[1/10/2011] | 402 (relevance), 403 (undue<br>prejudice, etc.), 801<br>(hearsay) |
| 290 | *"We're Not Going to Let Our Campaign Be Dictated by*<br>*Fact-Checkers"— James Bennet (Atlantic)* [8/28/2012] | 402 (relevance), 403 (undue<br>prejudice, etc.) |
| 291 | *"Sarah Jeong and the N.Y. Times: When Racism is Fit to*<br>*Print"—Andrew Sullivan* [8/2/2018] | 402 (relevance), 403 (undue<br>prejudice, etc.), 801<br>(hearsay) |
| 292 | *Daily Clip Report June 14* Email to James Bennet | 402 (relevance), 403 (undue<br>prejudice, etc.), 801<br>(hearsay) |
| 293 | *"We Don't Have Proof Yet"—WSJ—Taranto*<br>[1/10/2011] | 402 (relevance), 403 (undue<br>prejudice, etc.), 801<br>(hearsay) |
| 294 | *"Assassination Attempt in Arizona"—Krugman*<br>[1/8/2011] | 402 (relevance), 403 (undue<br>prejudice, etc.) |
| 295 | *"Climate of Hate"—Krugman* [1/9/2011] | 402 (relevance), 403 (undue<br>prejudice, etc.) |
| 296 | *"Massacre, followed by libel"—Charles Krauthammer*<br>[2/26/2011] | 402 (relevance), 403 (undue<br>prejudice, etc.), 801<br>(hearsay) |
| 297 | *"It Did Not"—WSJ—Taranto* [1/13/2011] | 402 (relevance), 403 (undue<br>prejudice, etc.), 801<br>(hearsay) |
| 298 | *"Paladino's Rant"—Andrew Sullivan* [10/12/2010] | 402 (relevance), 403 (undue<br>prejudice, etc.) |
| 299 | *"Sarah Palin Is Right About 'Blood Libel'"—WSJ—*<br>*Rabbi Boteach* [1/14/2011] | 402 (relevance), 403 (undue<br>prejudice, etc.), 801<br>(hearsay) |
| 300 | *"Palinoia, the Destroyer"—WSJ—Taranto* [1/19/2011] | 402 (relevance), 403 (undue<br>prejudice, etc.), 801<br>(hearsay) |
| 301 | *"James Bennet—Big Ideas—The Writer"* [3/15/2016] | 402 (relevance), 403 (undue<br>prejudice, etc.) |

| 302 | *James Bennet Twitter Following* | 402 (relevance), 403 (undue prejudice, etc.) |
| 303 | *« NYT Requests Apology from Fox on ISIS Story"—Politico* [7/23/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 304 | *"House Democrats Unveil 2020 Targets"—CNN* [1/28/2019] 28/2019] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 305 | *"Democrats Go on Offense..." DNCC Cheri Bustos* [1/ | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 306 | *DLC—Heartland Strategy* [12/13/2004]—Bullseye Map | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 307 | *First Read* Email Atlantic [8/22/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 308 | *MPA Daily News Roundup 9.5.11*—Atlantic | 402 (relevance), 403 (undue prejudice, etc.) |
| 309 | *Content Title Report—Top Daily*—Atlantic [11/21/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 310 | *Josh's Palin Piece* Email between Bennet/Purdum/Codinha [5/12/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 311 | *How 'Fake News' Changed The New York Times—The Wilson Quarterly* [Winter 2018] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 312 | *Reader Center : Covering Studies That Were Not Peer Reviewed* [6/22/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 313 | *The NYT Had Two Embarrassing takes on the Alexandria Shooting—The New Republic* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 314 | *SimilarWeb Monthly Unique Visitors* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 315 | *"Why Readers See The Times as Liberal,"* Liz Spayd, July 23, 2016 | 402 (relevance), 403 (undue prejudice, etc.) |
| 316 | Bennet Tweets June 3, 2020 | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |
| 317 | NYT Tweet re. Cotton Op-Ed | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |
| 318 | *"Why We Published the Tom Cotton Op-Ed,"* J. Bennet, June 4, 2020 | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |

70

B.    **Defendants' Exhibit List**

| Exhibit No | Date | Description | Objections |
|---|---|---|---|
| 1 | | Complaint, Palin v. NYT | 401, 402, 403, 105 (if Admitted); 106 (if Admitted) |
| 2 | | Amended Complaint, Palin v. NYT | 401, 402, 403, 105 (if Admitted); 106 (if Admitted) |
| 3 | 6/14/2017 | America's Lethal Politics, Print version | |
| 4 | 6/14/2017 | America's Lethal Politics, Original Digital Version | |
| 5 | 6/15/2017 | America's Lethal Politics, Corrected Digital Version | |
| 6 | 6/16/2017 | America's Lethal Politics, Second Corrected Digital Version | |
| 7 | 6/16/2017 | Print Correction | |
| 8 | 6/15/2017 | NYT Tweet re Correction | |
| 9 | 6/14/2017 | Email: Williamson to Bennet, Semple, & Fox "are we writing one the congressional shooting?" | |
| 10 | 1/9/2011 | ABC News: Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate | |
| 11 | 6/14/2017 | Email: Fox to Williamson "Re: are we writing on the congressional shooting?" | |
| 12 | 6/14/2017 | Email: Williamson to Bennet, Semple, & Fox "possible shooter ID" | |
| 13 | 6/14/2017 | Email: Williamson to Bennet, Semple, & Fox "Possible shooter's Possible social media pages pro-Bernie, anti-Trump" | |
| 14 | 6/14/2017 | Email: Fox to Williamson "Fwd: are we writing on the congressional shooting?" | |
| 15 | 6/14/2017 | Email: Williamson to Fox "are we writing on the congressional shooting?" | |
| 16 | 6/14/2017 | Email: Semple to Cohn "Re: are we writing on the congressional shooting?" | |
| 17 | 6/14/2017 | Email: Bennet to Williamson "Re: POSSIBLE shooter's POSSIBLE social . . ." | |
| 18 | 6/14/2017 | Email: Williamson to Bennet "Re: POSSIBLE shooter's POSSIBLE social . . ." | |

| Exhibit No | Date | Description | Objections |
|---|---|---|---|
| 19 | 6/14/2017 | Email: Lett to Williamson "Gun Control past pieces from Bob" | |
| 20 | | Editorials Lett emailed | |
| 21 | 6/14/2017 | Email: Semple to Williamson "Re: POSSIBLE shooter's POSSIBLE social . . ." | |
| 22 | 6/14/2017 | Email: Williamson to Lett "Re: Gun Control past pieces from Bob" | |
| 23 | 6/14/2017 | Email: Lett to Williamson "Re: Gun Control past pieces from Bob" | |
| 24 | | Frank Rich editorial | |
| 25 | 6/14/2017 | Email: Bennet to Lett "Re: Gun Control past pieces from Bob" | |
| 26 | 6/14/2017 | Email: Bennet to Lett "Re: Gun Control past pieces from Bob" | |
| 27 | 6/14/2017 | Email: Lett to Bennet "Fwd: Gun Control past pieces from Bob" | |
| 28 | 6/14/2017 | Email: Bennet to Williamson: "Fwd: Gun Control past pieces from Bob" | |
| 29 | 6/14/2017 | Editorials Bennet emailed. | |
| 30 | 6/14/2017 | Entire Scoop File | |
| 31 | 6/14/2017 | Excerpt from Scoop: Bennet 7:21 p.m. version | |
| 32 | 6/14/2017 | Excerpt from Scoop: Williamson in backfield | |
| 33 | 6/14/2017 | Excerpt from Sccop: Linda Cohn first edit | |
| 34 | 6/14/2017 | Email: Williamson to Bennet et al: "Shootings is in backfield, thanks" | |
| 35 | 6/14/2017 | Email: Lepping to Bennet: "guns in Virginia" | |
| 36 | 6/14/2017 | Email: Williamson to Lepping: "Re: also on shootings" | |
| 37 | 3/26/2010 | Editorial cited in Lepping email above | |
| 38 | 6/14/2017 | Email: Bennet to Williamson "Re: hey" | |
| 39 | 6/14/2017 | Email: Fox to Cohn "fixes on shooting" | |
| 40 | 6/14/2017 | Email: Lepping to Cohn "Fwd: also on shooting" | |
| 41 | 6/14/2017 | Email: Lepping to Semple, including scoop file and "clean version" of America's Lethal Politics | |

| Exhibit No | Date | Description | Objections |
|:---:|:---:|---|---|
| 42 | 6/14/2017 | Email: Cohn to Williamson, including scoop file and "clean version" of America's Lethal Politics | |
| 43 | 6/14/2017 | Email: Douthat to Bennet: "Re: NYTimes: The Trumpiest Roman of Them All" | |
| 44 | 6/15/2017 | Jonathan Chait Tweet | |
| 45 | 6/15/2017 | Chris Hayes Tweet | |
| 46 | 6/14/2027 | Text: Bennet to Williamson "Are you up? . . . ." | |
| 47 | 6/14/2017 | Email: Williamson to Wegman "And now I see" | |
| 48 | 6/15/2017 | Email: Lepping to Lett: "Fwd: Giffords" | |
| 49 | 6/15/2017 | Email: Lepping to Bennet: "Re: Giffords" | |
| 50 | 6/15/2017 | Email: Wegman to Williamson: "Re: And now i see" | |
| 51 | 6/15/2017 | Text: Williamson to Bennet: "Do you have time to talk by phone this morning?" | |
| 52 | 6/15/2017 | Email: Bennet to Ingber: "Re: editorial and readers" | |
| 53 | 6/15/2017 | Email: Ingber to Higa, Bennet: "Re: editorial and readers?" | |
| 54 | 6/15/2017 | Email: Higa to Ingber, Bennet: "Re: editorial and readers? | |
| 55 | 6/15/2017 | Email: Rhoades Ha to Smith: "Re: Media Inquiry" | |
| 56 | | INTENTIONALLY LEFT BLANK | |
| 57 | | INTENTIONALLY LEFT BLANK | |
| 58 | | INTENTIONALLY LEFT BLANK | |
| 59 | 6/15/2017 | Williamson Retweet of Correction | |
| 60 | 6/15/2017 | Bennet to Rhoades Ha: "CNN Request for Comment" | |
| 61 | | Crosshairs Map | |
| 62 | 3/23/2010 | Palin Facebook: Don't Get Demoralized! | 401, 402,403, 404, 405 |
| 63 | 3/23/2010 | Palin Tweet: Don't Retreat. Reload | 401, 402,403, 404, 405 |
| 64 | 11/4/2010 | Palin Tweet: "Remember months ago "bullseye" icon used 2 target . . . | 401, 402,403, 404, 405 |

| Exhibit No | Date | Description | Objections |
|---|---|---|---|
| 65 | 1/9/2011 | CBS News: Palin Criticized Over Giffords . . . | 401, 402, 403, 404, 405, 801, 802 |
| 66 | 1/9/2011 | CBS News: The End of Palin's Don't Retreat . . . | 401, 402, 403, 404, 405, 801, 802 |
| 67 | 1/12/2011 | Politico: Palin Charges Critics with "Blood Libel" . . . . | 401, 402, 403, 404, 405, 801, 802 |
| 68 | 5/30/2017 | Breitbart: Sarah Palin Condemns 'Sick Audacity' of Kathy Griffin's Trump . . . | |
| 69 | 6/1/2017 | Palin Article: Kathy Griffin Blamed Sarah Palin's "Crosshairs Map" | |
| 70 | 6/14/2017 | Breitbart: Exclusive -- Sarah Palin: Hopefully Media Have Learned To Not Play . . . | |
| 71 | 6/14/2017 | Email: Recher to Windeknecht: "Aaron pls post this link next . . ." | 401, 402, 403, 404, 405, 801, 802 |
| 72 | 6/14/2017 | Email: Perry to Recher: "I'm going to publish the SP one you did to FB in about 15 mins . . ." | 401, 402, 403, 404, 405, 801, 802 |
| 73 | 6/14/2017 | Email: Perry to Knorr: "I think it would be great if you want to write it up for the website." | 401, 402, 403, 404, 405, 801, 802 |
| 74 | 6/15/2017 | Palin Article: FLASHBACK: Sanders' Fundraising Email Falsely Accuses Palin of Inciting 2011 Shooting | 401, 402, 403, 404, 405, 801, 802 |
| 75 | 6/15/2017 | Palin Tweet: "With this sickening NYT's editorial, the media is doing exactly what I said yesterday should not be done . . ." | |
| 76 | 6/15/2017 | Palin Tweet: Does Sarah Palin have a libel case? | |
| 77 | 6/14/2017 | Rep. Rodney Davis on Poltically-Motived Violence | 401, 402, 403, 404, 405, 801, 802 |
| 78 | 6/15/2017 | Palin Article: Palin Investigates Legal Options Following New York Times' Fake News | 401, 402, 403, 404, 405, 801, 802 |
| 79 | 10/5/2018 | Palin Tweet: Hey Lisa Murkowski - I can see 2022 from my house... | 401, 402, 403, 404, 405, 801, 802 |
| 80 | 9/23/2020 | Palin Video: Lisa Murkowski - I can 2022 from my House | 401, 402, 403, 404, 405, 801, 802 |
| 81 | 3/11/2020 | Masked Singer Video - Reveal | 401, 402, 403, 404, 405, 801, 802 |
| 82 | 12/12/2016 | 1 Quote from NYT's Editor about Christians Tells You Everything You Need To Know . . . | 401, 402, 403, 404, 405 |

| Exhibit No | Date | Description | Objections |
|---|---|---|---|
| 83 | 2/14/2017 | NYT Reporter Calls Melania "A Hooker," Instantly Two Things Happen | 401, 402, 403, 404, 405 |
| 84 | 3/2/2017 | NYT Just Slammed Trump For Something They IGNORED Under Obama For 8 Years | 401, 402, 403, 404, 405 |
| 85 | 3/26/2017 | The NY Times Just Dropped a BOMBSHELL Concession About MSNBC And The Liberal Media | 401, 402, 403, 404, 405 |
| 86 | 4/19/2017 | NYT Publishes Articles From Convicted Terrorist...But It Gets WORSE | 401, 402, 403, 404, 405 |
| 87 | 4/22/2017 | NYT Editor Calls Himself THIS For Misleading Tweet | 401, 402, 403, 404, 405 |
| 88 | 4/26/2017 | FINALLY! NYT Reporter Posts Misleading Tweet On Trump . . . | 401, 402, 403, 404, 405 |
| 89 | | Masked Singer Video - Dancing and Rapping | 401, 402, 403, 404, 405, 801, 802 |
| 90 | 7/22/2021 | Zillow: Sarah Palin most desirable celebrity neighbor: poll | |
| 91 | 7/26/2021 | Breitbart: Sarah Palin, Seahwaks Greats Team Up for Alaska Kids | |
| 92 | 4/20/2020 | Palin Responses to Requests for Admission | 401, 402, 403,106 (if Admitted) |
| 93 | | INTENTIONALLY LEFT BLANK | |
| 94 | 5/14/2020 | Palin Am. Response to Request for Admission - RFA 27 | 401, 402, 403, 106 (if Admitted) |
| 95 | 6/14/2017 | Email: Recher to Knorr re "This is great and I think it would be good for tomorrow" | 401, 402, 403, 801, 802 |
| 96 | 8/9/2016 | Thomas Friedman: Trump's Wink Wink to 'Second Amendment People' | |
| 97 | 6/17/2017 | Elizabeth Williamson: Another, Far Different, Washington Billionaire | 401, 402, 403, 404, 405, 801, 802 |
| 98 | 2/28/2020 | Kronenberger Report | |
| 99 | 2/28/2020 | Kronenberger underlying documents | |
| 100 | 2/28/2020 | Kronenberger Comment analysis | |
| 101 | 6/15/2017 | Stela Report | |
| 102 | 6/16/2017 | Daily Opinion Dashboard | |
| 103 | 7/27/2017 | New York Post: Sarah Palin sues NY Times | 401, 402, 403, 404, 405, 801, 802 |

| Exhibit No | Date | Description | Objections |
|---|---|---|---|
| 104 | 6/15/2017 | Business Insider: New York Times corrects editorial that drew huge backlash for blaming Sarah Palin | 401, 402, 403, 404, 405, 801, 802 |
| 105 | 8/29/2017 | Forbes: Sarah Palin's Defamation Suit Against the New York Times is Dismissed | 401, 402, 403, 404, 405, 801, 802 |
| 106 | 8/21/2019 | Washington Post: New York Times lawyer on Palin editorial: 'It was an honest mistake' | 401, 402, 403, 404, 405, 801, 802 |
| 107 | | INTENTIONALLY LEFT BLANK | |
| 108 | 2/28/2020 | Cision: America's Lethal Politics | |
| 109 | 1/26/2016 | Washington Post: The GOP Contest | 401, 402, 403, 404, 405, 801, 802 |
| 110 | | About SarahPalin.com | 401, 402, 403, 404, 405 |
| 111 | 6/14/2017 | NYT: Shooting Is Latest Eruption in a Grim Ritual of Rage and Blame | |
| 112 | 9/3/2008 | WSJ: Palin Candidacy Exposes Divisions Among Women | 401, 402, 403, 404, 405, 801, 802 |
| 113 | | INTENTIONALLY LEFT BLANK | |
| 114 | 1/30/2016 | A Chance to Reset the Republican Race | 401, 402, 403, 404, 405, 801, 802 |
| 115 | | INTENTIONALLY LEFT BLANK | |
| 116 | | Palin Facebook Page | 401, 402, 403, 404, 405 |
| 117 | | Palin Twitter Page | 401, 402, 403, 404, 405 |
| 118 | | Sarahpalin.com | 401, 402, 403, 404, 405 |
| 119 | | INTENTIONALLY LEFT BLANK | |
| 120 | | INTENTIONALLY LEFT BLANK | |
| 121 | | Turning Point USA: America Fest 2021 Speakers | 401, 402, 403, 404, 405 |
| 122 | | Turning Point USA: Palin Bio | 401, 402, 403, 404, 405 |
| 123 | 6/14/2017 | Emails b/w Jesse Wegman & Elizabeth Williamson re: guns | |
| 124 | 7/29/2014 | Video - WSJ: Sarah Palin Launches Her Own Subscription Channel | 401, 402, 403, 404, 405, 801, 802 |

| Exhibit No | Date | Description | Objections |
|---|---|---|---|
| 125 | | Sarahpalin.com - Online Store | 401, 402, 403, 404, 405 |
| 126 | 6/15/2017 | Online: Front page of NYT | |
| 127 | 6/15/2017 | Online: Front page of NYT (later) | |
| 128 | | Stela: America's Lethal Politics | |
| 129 | | Stela: News Article on Shooting | |
| 130 | | Palin Instagram Account | 401, 402, 403, 404, 405 |
| 131* | 1/31/2011 | The Dish (Andrew Sullivan Blog): Guarding Their Heritage | 401, 402, 403, 404, 405, 801, 802 |
| 132* | 1/8/2011 | The Dish (Andrew Sullivan Blog): An Assassination? | |
| 133* | 1/8/2011 | The Dish (Andrew Sullivan Blog): An Assassination Attempt in Arizona | |
| 134* | 1/17/2011 | The Dish (Andrew Sullivan Blog): The More We Know | |
| 135* | 1/15/2011 | The Dish (Andrew Sullivan Blog): Caldwell's Unfairness | |
| | | | |
| 200 | 1/6/2021 | Palin Fox News re Capital Insurrection | 401, 402, 403, 404 |
| 201 | 2021 | Palin Video: American Prosperity Summit | 401, 402, 403, 404 |
| 202 | 6/10/2021 | Confirmed Speakers: Young Women's Leadership Summit | 401, 402, 403, 404 |
| 203 | 11/18/2009 | Politico: Palin Trashes "Lamestream Media" | 401, 402, 403, 404 |
| 204 | 6/17/2016 | Palin: Obama "is a special kind of stupid" | 401, 402, 403, 404 |
| 205 | | INTENTIONALLY LEFT BLANK | |
| 206 | 6/25/2009 | Miami Herald: Palin popular among Republicans but polarizing according to poll | 401, 402, 403, 404, 405, 801, 802 |
| 207 | 9/4/2008 | Politico: Media swoon over Palin's fiery speech | 401, 402, 403, 404, 405, 801, 802 |
| 208 | 8/20/2020 | Steve Schmidt: "paranoia, pathological lying, profound ignorance, brittleness and insanity" | 401, 402, 403, 404, 405, 801, 802 |
| 209 | 10/5/2011 | Palin Will Not Seek Presidential Nomination | 401, 402, 403, 404, 405, 801, 802 |
| 210 | | Washington Post: Seven Years Ago Palin Gave the Best Speech of Her Life | 401, 402, 403, 404, 405, 801, 802 |

| Exhibit No | Date | Description | Objections |
|---|---|---|---|
| 211 | 11/6/2015 | Sarah Palin Evolves on Katie Couric | 401, 402, 403, 404, 405, 801, 802 |
| 212 | 10/21/2008 | RNC Shells Out $150k for Palin Fashion | 401, 402, 403, 404, 405, 801, 802 |
| 213 | 4/26/2010 | CBS News: Did Sarah Palin Resign as Governor Because of Money | 401, 402, 403, 404, 405, 801, 802 |
| 214 | 7/4/2009 | Los Angeles Times: Sarah Palin's Resignation as Alaska Governor sets off speculation | 401, 402, 403, 404, 405, 801, 802 |
| 215 | 1/13/2010 | Steve Schmidt's war against Palin | 401, 402, 403, 404, 405, 801, 802 |
| 216 | | Going Rogue | 401, 402, 403, 404, 405 |
| 217 | | America By Heart | 401, 402, 403, 404, 405 |
| 218 | | Sarah Palin Uncut | 401, 402, 403, 404, 405 |
| 219 | | Good Tidings and Great Joy | 401, 402, 403, 404, 405 |
| 220 | | Sweet Freedom: A Devotional | 401, 402, 403, 404, 405 |
| 221 | | Sarah Palin: You Betcha! | 401, 402, 403, 404, 405 |
| 222 | 1/12/2011 | Palin Statement re Blood Libel | 401, 402, 403, 404, 405 |
| 223 | 1/12/2011 | Reuters: Palin's "Blood Libel" Charge Ignites Firestorm | 401, 402, 403, 404, 405, 801, 802 |
| 224 | 1/12/2011 | Salon: Sarah Palin Re-Inserts Herself in the News Cycle | 401, 402, 403, 404, 405, 801, 802 |
| 225 | 10/7/2010 | 60 Minutes: Steve Schmidt Article | 401, 402, 403, 404, 405, 801, 802 |
| 226 | 10/9/2008 | NBC News: Legislative Report re Palin Firing Public Safety Commissioner | 401, 402, 403, 404, 405, 801, 802 |
| 227 | 10/10/2008 | Legislative Report | 401, 402, 403, 404, 405, 801, 802 |
| 228 | 7/4/2009 | Business Insider: Sarah Palin: Quitter | 401, 402, 403, 404, 405, 801, 802 |
| 229 | 4/19/2017 | Palin Facebook Post - Hilary Clinton | 401, 402, 403, 404, 405 |

| Exhibit No | Date | Description | Objections |
|---|---|---|---|
| 230 | 8/19/2020 | Palin: "I wouldn't prostitute myself . . . ." | 401, 402, 403, 404, 405 |
| 231 | 7/29/2014 | Palin Channel Promo | 401, 402, 403, 404, 405 |

*Defendants may offer if the need arises

## VIII.  ESTIMATED LENGTH OF TRIAL

Five (5) days.

Dated: January 21, 2022

_____
Rakoff, J.

January 17, 2022

For Plaintiff:

TURKEL CUVA BARRIOS, P.A.

*/s/ Shane B. Vogt*
Kenneth G. Turkel (admitted *pro hac vice*)
Email:  kturkel@tcb-law.com
Shane B. Vogt (admitted *pro hac vice*)
Email:  svogt@tcb-law.com
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  (813) 834-9191
Fax: (813) 443-2193

Michael M. Munoz
E-mail:  mmunoz@golenbock.com
Golenbock Eiseman Assor Bell & Peskoe LLP
711 Third Avenue
New York, NY  10017
Tel:  (212) 907-7300
Fax: (212) 754-0330

*Counsel for Plaintiff*

Respectfully submitted,

For Defendants:

BALLARD SPAHR LLP

By:  */s/ David L. Axelrod*
     David L. Axelrod
     Jay Ward Brown
     Thomas B. Sullivan
     Jacquelyn N. Schell
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

*Counsel for Defendants*