UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SARAH PALIN,

                Plaintiff,

        v.                          17 CV 4853 (JSR)

THE NEW YORK TIMES,

                Defendant.

------------------------------x
                                    New York, N.Y.
                                    January 24, 2022
                                    9:00 a.m.

Before:

                    HON. JED S. RAKOFF,

                                    District Judge

                    APPEARANCES

TURKEL CUVA BARRIOS, P.A.
     Attorneys for Plaintiff
BY:  SHANE B. VOGT

BALLARD SPAHR LLP
     Attorneys for Defendants
BY:  DAVID AXELROD JACQUELYN N. SCHELL

(Case called)

MR. TURKEL:  Your Honor, Ken Turkel and Shane Vogt, for the plaintiff.

THE COURT:  Good morning.

MR. AXELROD:  David Axelrod.  I'm here with Thomas Sullivan who is the down at the end.  We represent James Bennet and the New York Times.  Mr. Bennet is right next to me and Dana Greene is the representative from The Times.

THE COURT:  Good morning.

So, I'm sorry for the delay.  Traffic was particularly bad this morning.  Although, on my very first day on the bench over 26 years ago, Judge Brieant, the late Judge Brieant, a great judge, took me aside and he said I'm going to tell you the two most important things about being a judge.  One is, you have to rule in robe by which he meant it's important for the parties to know your decision, whether they agree with it or disagree with it but don't play Hamlet.

And the other rule he said was, don't forget they can't start without you.

So, I appreciate your patience.

We have had the unfortunate news that was received by the Court last evening that Ms. Palin had tested positive for coronavirus.  She is, of course, unvaccinated.  So, I ask counsel to arrange for her to take a more proficient test, so to speak, this morning.

Has that been done?

MR. TURKEL:  Your Honor, she is scheduled for one at 10:15.

THE COURT:  There were ones available at 8:15.

MR. TURKEL:  By the time I got the links, which I believe was an email at 10:15 p.m., forwarded them and discussed with my client what was happening.  She went on the site.  10:15 was the earliest available appointment.

THE COURT:  All right.  We'll see what happens.

So, last night I informed counsel that if she continued to test positive, obviously, if she tested negative we hopefully could move forward today.  If she tested positive after that further test, it seemed to me there were three options.  One was to go forward today with a selection of the jury which we could only do with her consent.  Although, there's not the same constitutional right for a party to be present when the jury is selected as there is in criminal cases.  Nevertheless, I think it's appropriate that a party be present if they wish to be at the selection of the jury, or if she was willing to let her able lawyers, who are vaccinated, select the jury with the help of the Court and adversary counsel, then we could start the trial and she could either attend by Zoom or give her own testimony towards the end of the trial.  She will be eligible.  Even if she is positive now and turns to negative she will be eligible to return to the

courthouse next Tuesday, or we could have her testify earlier but by Zoom. Although, I'd want to hear from defense counsel.

There's one other option, slight variation. I said last night to the lawyers that if we postpone the trial we would postpone it for two weeks because of jury selection, but it now turns out that there will be a jury panel available next Thursday, February 3rd. So we could begin the trial next Thursday. And again, if Ms. Palin had tested negative, she would be eligible to come back on that day.

So, let me hear from plaintiff's counsel.

MR. TURKEL: Your Honor, may it please the Court, judge, given by way of refreshing the Court's recollection perhaps on the background we had on January 7, it applied to move this case slightly so my partner could marry his daughter off this weekend.

THE COURT: Yes. And I had agreed that we would not sit this Thursday and Friday in order to accommodate his situation which, of course, the marriage of his daughter trumps all other concerns. I am the first to acknowledge that as at father of three daughters.

MR. TURKEL: Correct. We had also raised some COVID concerns, but the point really is because of that accommodation we're dealing with two of those days this week for starters.

THE COURT: Right. Today, tomorrow and Wednesday.

MR. TURKEL: So. In looking at those options

particularly, judge, in understanding that the rules are clear about civil litigant's right to be present and interest of getting our client the best trial possible, the one that we would normally get under normal circumstances and we don't have to deal with some of the peculiarities brought on by this pandemic, we do want our client here for jury selection.  She wants to be here for jury selection.  She wants to testify live.  And in that respect because we're already dealing with a truncated week, judge, it kind of chops things up anyway and I understand where we've picked a jury on Friday, started on Tuesday and so forth, but our preference would be, and I guess we have gone from moving to two weeks to moving to next Thursday, at least for jury selection.  So, that's a slight modification on the option we discussed last night, your Honor.

THE COURT:  Yes.

MR. TURKEL:  That's assuming she's negative, your Honor.

THE COURT:  Yes, of course.

MR. TURKEL:  Judge, just so it's clear on the record, she had two positive antigen tests.

THE COURT:  Yes.  And I'm not holding my breath that she will be negative this morning but I wanted the test that she took, the normal at-home test that whose reliability is not as high as the test that she will be taking today.

MR. TURKEL:  Correct, judge.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

So, what I come back to is this. We want to try the case, judge. We're no strangers to jury trial. That's what we do. But the most seamless way to minimize the potential of any other problems whether they be COVID related or just the normal things that occur during a jury trial, our preference would obviously be to get the, whether it's the Thursday or whatever day depending on how this test comes back, start fresh, start clean, have consecutive sequential days.

Judge, there's no -- I know and I understand and I was trained to defer to the Court province in moving cases along and I get it particularly when --

THE COURT: It's not just that. It's that through no fault of anyone's, this case has not gone to trial. We've all tried to get it to trial months, if not years ago. But because of the pandemic, criminal cases took precedence in the court and it makes perfect sense. But given all of that, I hope everyone is anxious to get this trial done. But your point is that under these circumstances a delay of what I guess would be about ten days now --

MR. TURKEL: Seven to ten business days, judge.

Judge, I make this point also. When we applied originally with one concern being the wedding and the other one being the COVID numbers up here, which I think we've put on the record, it wasn't to move it far. It was just to give it a little breathing room to sort of try to avoid these things

given it wasn't the cleanest, or weekend for his daughter. We are all trying, it's uncharted territory. I tried my first jury trial last April. The only prejudice I've heard from the other side throughout these discussions is they've worked over the holidays. There is just no real prejudice to anyone. We were up on appeal for a year and a half to two years. It's a seven to ten day business day swing and we could have sequential days. We wouldn't have to chop up jury selection.

THE COURT: Well, of course I was disappointed since I worked on this case over the weekend and didn't get to see any of the playoffs, but my understanding is they were very boring games really.

MR. TURKEL: Judge, I have been at every game except for the four years I spent in Tampa stadium or in the James stadium. I watched the Bucks game or (inaudible). But we all work, judge, as I was telling you there's no passive income in the practice of law. We have been working constantly on this, judge, seven to ten days. It's --

THE COURT: Well, I understand what your preference is. Let me hear from defense counsel.

MR. AXELROD: Your Honor, we, unfortunately, missed most of the playoffs ourselves. We were working all weekend. Quite honestly, my clients want to go to trial. This thing has been languishing. The public has the right to know the outcome but we recognize the problem caused by the pandemic and of

course, Governor Palin's positive test. I would hope however if her test does go come back negative we could come back and say let's go forward.

THE COURT: Well, my understanding is she should get the results in 15 minutes after she takes the test. So, she would have the results by 10:30.

MR. TURKEL: Judge, I'm not familiar with where she's going. I've been in situations where there's sort of on-site PCRs come back in 30 to 45 minutes.

THE CLERK: About an hour.

THE COURT: Okay. Now I am being told it may be as much as an hour.

Well, I think the thing to do is, there's lots of things we can do in the meantime like the motions in limine and so forth. So, it's not like we won't be using the time. It's a shame that we'll have to ask the jury panel to wait a little while but they're usually not ready even for the beginning of jury selection till about 10:30. So, that won't be that much of an inconvenience for them. Although, I will tell you in advance, once we do go to trial the convenience of the jury is in my view the single highest important consideration in any scheduling that we work out.

So, here is what I think makes sense. We will wait to hear the result of her test. If it's negative, we'll go forward with the jury selection and the trial. If it's

positive, we will adjourn the trial to Thursday. I think it's February 3rd. And then we'll go every business day without a break until the conclusion of the trial. And this, of course, assuming that in the interim she tests negative. So, I think that's makes sense.

I didn't mean to cut you off, Mr. Axelrod.

MR. AXELROD: No, your Honor. Obviously, I will say this out of an abundance of caution. We think it's very important for the process that Governor Palin testify live. It sounds like that's the way we're headed. Of course, I'm not sure that even if she recovers in the next ten days, she'll test negative, given I think if you test positive, given the antibodies in your system --

THE COURT: Well, that is, if that were to be the situation, then we'll have to pick still a later date, and that would be a great misfortune in my view because there were criminal cases, not just my case, but cases selected by the court because we only have courtrooms that are designed for COVID protection. And so it might be several months in that situation before we could get a trial date again. These are dates assigned by a committee of the judges. I don't have any personal control over that.

Anyway, we will deal with that when we have to. Being an American, I'm a perennial optimist.

MR. AXELROD: As am I. The only thing I would

suggest, I know that the district executive is consulting with an epidemiologist. If we get to next week and Governor Palin is still testing positive, maybe we can consult with the epidemiologist.

THE COURT: All right. That's a good point. We'll deal with it then. So, let's at least make use of the time between now and when we hear of hers test results. Her appointment is 10:15. So, hopefully, worst case, we'll know by 11:15.

She knows how to reach you?

MR. TURKEL: Yes, your Honor.

THE COURT: Very good. Okay. So, let's turn to the motions in limine.

So, here are my bottom line rulings and I thank counsel for both sides for their helpful written submissions and I don't think I need oral argument. I may want to write a written decision given the reasons for my ruling, but let me for today's purposes, simply give the bottom line.

Most of the motions are by The New York Times. Their motion for a ruling that the challenge statements are not libelous, per se, is denied on the basis of the present papers but without prejudice to that issue being raised at the charging conference. The Second Circuit has described New York Law on that issue as "fuzzy", an interesting legal term of art, I'm sure. But as I read the cases, while I think The New York

Times relied on the wrong legal standard in their papers, I think there is at least certain circumstances where that doctrine still could apply.  So, we'll see how the evidence goes and revisit that at the charging conference.  So, the motion in limine is denied without prejudice.

I might mention since we have so much time this morning, that motions in limine are not something set forth in the Federal Rules of Civil Procedure or in any statute.  They are a judicial creation for the convenience of the parties and the Court and therefore, they take account of the fact that while certain issues can be decided before a trial begins, many others will be affected by how the proof actually comes out at a trial and this is one example of that.

But I state that more generally because even if I have excluded something in a motion in limine and for example, the other side as they say opens the door to what was otherwise excluded, then, of course, I would revisit the issue.  So, motions in limine don't have the permanence, if you will, that other forms of motions do.

The next motion though is one that I think the Court is clear and definitive on which is The New York Times motion to exclude plaintiff's damages expert, that motion is granted.

I don't think the expert meets the requirements of Rule 702.  I don't think the expert meets the requirements of Daubert.  I think the expert is, to be frank, an example of

someone that the Daubert case had in mind when they advised the Court to take a good look at experts before allowing them to be admitted. So, that motion is not subject to reconsideration and Ms. Palin's damages expert is excluded.

The next motion is The New York Times motion to exclude evidence relating to Mr. Bennet's departure from The New York Times and other controversies during his time at The New York Times with respect to his departure. That motion is granted.

It came well after the events that are the subject of this case. It didn't relate to Ms. Palin. And while I won't say that it's totally irrelevant, given the requirement of actual malice, whatever probative value it has it's very substantially outweighed by the prejudice. So, that part of the motion is granted.

With respect to other events, earlier events, I don't think I can make a ruling at this time. And this again, relates to the nature of motions in limine. When plaintiff is ready to introduce either by questioning on cross-examination or through exhibit or whatever any of the earlier incidents, you'll flag that for the Court by asking for a side bar and I'll rule then on this, and then at that point I'll have a much more finely tuned evidentiary basis for ruling on that.

So, the motion, other than with respect to Mr. Bennet's departure, is denied without prejudice.

MR. TURKEL: Judge, so the record is clear, I think you've made it clear, but with the nature of motions in limine being what they are, when we get to the portion of Mr. Bennet that you granted, presumably, that is also without prejudice. We can proffer, take him up on voir dire and proffer to make the record, right?

THE COURT: As to any of my rulings, if you want to make a record, let me tell you the procedure.

So, the jury will sit from 9:45 to 3:45. However, we will convene each day at nine o'clock -- assuming this stupid judge can get his act together -- and we will sit, perhaps, depending on other things I have, even after 3:45. So, if you want to make a record on one of my rulings that was adverse to your position, you can do it then. I don't want to interrupt and have the jury sit here for five minutes while we go into the robing room -- which is where we'll have our side bars because of the pandemic -- and have you do it then. But can you do it in advance of something I've already ruled on like this one or if it's the morning before you would introduce it, you can make your record then or you can do to afterwards. Either way is fine. You can make whatever record you want, but not a lengthy making of the record itself while the jury is sitting.

MR. TURKEL: With the parties, like Mr. Bennet, we will have the opportunity, if we had to take him on voir dire

and lay some predicate facts as part of the proffer, we'd have that opportunity. Normally, in the middle of the trial you would dismiss the jury, take him on voir dire, ask him whatever questions the judge has to rule on, you don't want to do that.

THE COURT: You mean ask the witness on voir dire?

MR. TURKEL: Yes.

THE COURT: Yes, we could hold the witness at the end of the day or bring him in early in the morning on the day he or she is going to testify.

MR. TURKEL: Moving a jury in and out is --

THE COURT: So, the point is, yes, you will be able to voir dire for foundational reasons or whatever inappropriate, something on the assumption that you could do all the voir dire that you wanted and it would come on your way --

MR. TURKEL: It would be facts that are before you?

THE COURT: Yeah.

MR. TURKEL: Thank you.

THE COURT: By the way, while I am thinking about it, I may have mentioned this to you in one of our phone conferences but juries really hate side bars and I can well understand that. They sit there twiddling their thumbs while the lawyers and the judge talk legalese out of their presence. So, here's my practice.

When you have an objection to a question, you state "objection" and one or two words. The one word would be

something like "hearsay", "foundation", something like that. Or you can do the rule, "Rule 402", "Rule 403". I'll obviously understand what you mean. That's all you say.

If the objection is to an exhibit, of course, we look first to the pretrial consent order where you've indicated your objections. So, I'll know what your objections are just by looking at the pretrial consent order. So, there, all you need to say is "objection".

In those rare cases where you think that it's a more complicated situation, for example, where you think that the door has been opened, so there's something that would otherwise be excludable, now is permissible, then you can ask for a side bar and I will accommodate you. But the point is to keep side bars to the absolute minimum so we don't distract the jury.

Okay. Let's go back to the motions in limine.

The New York Times next motion is to exclude articles from a blog posted on The Atlantic, an article Bennet was sent in 2011 and evidence related to the fact that his brother is a democratic senator from Colorado.

I began, with one exception, not going to grant that motion at this time but in denying it's without prejudice. I think that will turn a lot on how examination and cross-examination of Mr. Bennet goes. The exception is articles posted by Andrew Sullivan about Ms. Palin's son, Trig. Those will be excluded. So, the motion is granted as to those

articles.

MR. AXELROD:  Your Honor, if I may?  Excuse me for interrupting.  The one concern I have about that ruling is if Mr. Bennet's on the stand and cross-examination goes and opens the door just to the fact that his brother being a democratic U.S. senator, I think that plaintiff's counsel can easily slide into that issue and have that out before the jury.

THE COURT:  No, no, no.  I thought I made clear before -- and maybe I didn't -- even though I don't encourage side bars, where something is about to be raised and has been the subject one of these motions in limine and then I will take a side bar before it's brought to the attention of the jury. But I think the way to do that now that I think that through a little further, when counsel for either side is about to introduce something that I've not ruled on definitively in the motions in limine, so it's still alive, so to speak, they should alert their adversary, and the adversary can then say whether they want a side bar or not.

Next, there was The Times motion partly jointly by the plaintiff that the jurors read the editorial before evidence otherwise began, and to receive the pre-charge before opening statements and for use of a special verdict form.

So, first, I don't think the editorial should be introduced before, sort of by the Court before we start the evidence.  I'm sure the very first witness, whoever it is is

going to introduce it.  That's the way things normally work in a trial and I don't see any reason to depart from that but clearly, the jury will know all about the editorial because of opening statements.  You're free in opening statements to show a picture of the editorial, refer to the language or whatever.

In addition, however -- and we'll get in a moment to my proposed preliminary charge -- I have decided that it would be appropriate to give that preliminary charge right after opening statements.  And that charge pinpoints the language of the editorial and the retraction in the relevant respects.  So, in that sense the motion will be sort of granted.

As for a special verdict with the exception of punitive damages, I don't usually give that and I don't see any reason to give it here.  But there will be on punitive damages, assuming they make it to the jury, just a box for them to check on the "we award punitive damages or we don't", and then we'll have a further proceeding with regard to punitive damages because that involves evidence that would otherwise be inadmissible.

So, in other words, on the verdict form that the jury gets for the case in chief, unless I've ruled out punitive damages and which I won't decide until the charging conference later, if punitive damages are still alive, then there will be an instruction to the jury about what punitive damages involved and they will check either "yes" or "no".  If they check "yes",

then they will, after they've reached their verdict on the case in chief, we'll bring them back for a short proceeding on punitive damages in which the parties could produce evidence on both sides that would not otherwise be admissible but would be admissible on punitive damages since punitive damages involves really a different standard than all other standards. So, that's my practice on that.

Now, with respect to Ms. Palin's motion to preclude reference to numerous exhibits to which there are objections, to preclude reference to them in the selection of the jury in opening statements and before the questions are put, so to speak, or before the Court has had a chance to rule outside the presence of the jury, as I've already told you, there's no danger of any exhibit being shown to the jury during selection because the Court is the only person who questions the jury. That's the federal practice.

Second, we can deal now or if you want to wait to see if we're going forward, we can deal with on the morning of the later trial any exhibits anyone wants to mention in opening statements. But that's as far as it goes. The rest of the motion is denied without prejudice along the lines I've already indicated.

When defense counsel is about to introduce an exhibit that plaintiff's counsel has objected to in more of than trivial ways, you'll alert plaintiff's counsel, here comes like

there's a video that has been the subject of some controversy. And then if plaintiff wants a side bar, you will say "Can we have a side bar"? And I will, I am grateful for those motions in limine because I've now familiarizes myself with any of these exhibits. It won't be that lengthy but it'll turn on what's happened thus far in the trial and therefore, I can't make the decision at this point.

I will, of course, in choosing the jury, inquire to what they have seen in the media about this case. And if I recall correctly, The New York Post ran a copy of that video which I took the liberty of watching. I thought it was charming myself but it's --

MR. TURKEL: Judge, I could tell you the ebb and flow of trials being what we are, the idea that, we'll always give them the courtesy if we're going through a piece of evidence that they thought was way outside the parameters of admissibility, whatsoever. Our opinion on that may change. I'm not so sure under 405 standards there's necessarily a relevant incident of conduct but we could very well not have a problem.

THE COURT: This is your call, not mine. So, for those of you who hasn't watched it, this was a video of Ms. Palin in a, I guess it's sort of like a quiz show where she was dressed up as a kind of teddy bear and then they had the people on the panel had to guess who she was and when they

didn't guess who she was.  But when she took off her, the cover of her head, one of the panelists said "Oh, it's Tina Fey".  I thought that was great.

Okay.  Let's see what else.  I think we've covered all the motions in limine.  Is there any motion in limine that I haven't covered.

MR. AXELROD:  Your Honor, I think you've covered everything outstanding.

THE COURT:  Okay.  Then let's turn to the preliminary charge which you both submitted your proposed versions and then I put together what I thought was appropriate and sent it to you yesterday.

So, any objections to that preliminary charge?  As I said, my plan was to give it to the jury right after opening statements before the start.

MR. VOGT:  Your Honor, two points.  One is not so much an objection.  I understand what the Court was trying to do in truncating an explanation of the corrections itself.  We'll be addressing in opening the situation I wanted to avoid was telling the jury there were two corrections at different times. And the Court gives an instruction makes it look like there's one maybe making counsel lose credibility in front of the jury.

THE COURT:  No.  Did you really want me to give both?

MR. VOGT:  Well, both are actually in here because the way we wrote it down was there was a correction at 11:55 and

there was a subsequent correction at four o'clock.

THE COURT:  I understand.  And they were not identified, but my point is this.  All I'm trying to bring across to the jury is what's obviously a major issue in this case which was The Time's position is, we made a mistake but we quickly corrected it and so there's no actual malice, et cetera.

So, I'd be pretty surprised if you want me include all the versions of that.

MR. VOGT:  I don't.  I'm just thinking practically if my opening gives the impression that there were two and the judge says there's one.

THE COURT:  Okay.  So, you want something along the lines that the times published two corrections, one at such and such a time, the other at later time and here is the later one.

MR. VOGT:  It could just be around 11:15a.m.  And four or five p.m. on June 15 The Times published corrections.  The first time in their later paper in their final form read.

THE COURT:  Okay.  Any problem with that?

MR. BROWN:  No, your Honor, we have no problem with that at all.

THE COURT:  All right.  I think something I noticed, I referred to Congressman Steven Scalise, but I think he uses the name "Steve" is his first name, if I'm not mistaken, not "Steven".  So, I will change that back to "Steve".

Anything else from plaintiff's counsel?

MR. VOGT:  The only other point is in point one of the elements, the Court has the word "personally" in there.

THE COURT:  Yes.

MR. VOGT:  I just noted that the Pattern Instruction case law don't include "personally" again.  It's just --

THE COURT:  No, no, no.  One of the issues in this case is whether the reference to Sarah Palin's Political Action Committee was a reference to Sarah Palin or might reasonably simply have been interpreted as a reference to a committee.  So, I think that will stay.

MR. VOGT:  Understood, your Honor.  I didn't want to to appear as if there was sort of an additional element.

THE COURT:  When we get to the charging, remember, all of this gets, as I say to them repeatedly, is displaced by the final instructions and that's because, of course, when we get to the charging conference you may convince me to exclude that but at least for now I am going to include it.

MR. VOGT:  Thank you, your Honor.

MR. BROWN:  Your Honor, just two points.  And we'll we've provided red lines to plaintiffs counsel on these two points and I can hand them up to the Court if it's helpful.  Would you like me to do that?

THE COURT:  Yes, that's helpful.

MR. BROWN:  How many copies would the Court like?

THE COURT:  Two.  One for me and one for my law student who is seated in front of me.

(Pause)

MR. BROWN:  As your Honor will see, the first of those are the same points that counsel for the plaintiff was just addressing.  That is the first element, in legalese the other concerning element.  And, your Honor, in this particular case, although, we recognize that Pattern Jury Instructions often use word "referred", precisely for the reasons your Honor raised a moment ago with reference to the use of the word "personally", we urge the Court to adopt the phrase or the term "about" rather than "referred".

THE COURT:  I'm sorry.  Where are you?

MR. BROWN:  On page two of the document.

THE COURT:  I see.

MR. BROWN:  Precisely for the reason you raised a moment ago which is that Mrs.~Palin's name, of course, appears in the editorial.  It has an apostrophe "s" and reference "political action committee" and the word "referred" we believe would be confusing to the jury here because --

THE COURT:  OK.  I understand.  Let me ask plaintiff's counsel, given that I am going to include "personally" in this, do you care one way or the other?

MR. VOGT:  I would just note that the "referred" is what all the case law says.  It's not just the Pattern

Instructions.  They use the word "reference" for "refers to".

THE COURT:  Just so you know, case law, of course, especially in New York, state case law is binding on me if it's from a higher court.  Pattern Instructions are not.

MR. VOGT:  That's why I mentioned case law uses that language as well.

THE COURT:  All right.  Let me think about that one and I'll give you the final obviously before.

MR. BROWN:  Your Honor, just one more sentence on that.

Although, we think the wording that immediately precedes one is fine.  I note that it says that the allegedly libelous statements refer to her.  Well, based on the particular sentences of the editorial that plaintiff alleges are defamatory --

THE COURT:  Actually, in some ways your suggestion is favorable to the plaintiff in some ways, as well as to the defense because it referred, looked at very narrowly or did refer to her personally end of story, and that's not the end of the story.  So, maybe we should substitute something like "would reasonably be taken to refer to her", or something like that.

Well, let me think about it and I'll give you another version of that later only.

MR. BROWN:  Fair enough, your Honor.

And then in the paragraph below that, again, we're trying to avoid legal terms of art that can be confusing to a juror and "consciously chose to disregard" we think falls into that category. The legal standard, as articulated by the courts in plain English for that element of the claim is that the defendants had a high degree of subjective awareness of falsity and defamatory meaning. And while we don't think all of those words from the standard are necessary in its pre-instruction, we thought it was appropriate to suggest that the Court focus on "awareness of the probability of falsity and defamatory" meaning since "conscious disregard" is one way of proving that ultimate legal principle, and we just wanted to put the legal principle in plain English in the pre-instructions.

THE COURT: Well, let me hear from plaintiff's counsel on that.

MR. VOGT: Your Honor, I think it's an incomplete statement of the law. The high degree of subjective awareness is actually following the case law or acted in reckless disregard of truth. This makes it seem like --

THE COURT: Yes. I take it by this you mean what they're suggesting.

MR. VOGT: Yes, your Honor.

THE COURT: I tend to agree with that. I'm sure we'll have a discussion at the charging conference about reckless

disregard.

By the way, there have been many studies by sociologists and law professors that say the juries understand what is meant by "preponderance of the evidence". The juries understand what is meant by "proof beyond a reasonable doubt" but that when you get to in between stuff like "clear and convincing evidence", like "reckless disregard", like "willful blindness" and other things that sort of fall in between, juries have a considerable difficulty understanding those. And that's why, for example, I didn't use in the preliminary instructions the term "clear and convincing" because I think some people without the benefit of further instructions that I will give in my final instructions, some people will think well, that means a pretty high standard and other people will think, no, that's just a little bit more and just given that guidance.

The proposal here, everyone's agreed that in the first part of the sentence which reads:

"If she proves these elements, Ms. Palin in order to prevail on her claim will then have to prove that there was a high probability either that the defendants knew when they published these statements that the statements were false and defamatory."

Both sides agree with that for the purpose of preliminary statement. And then we get to the second clause:

"Or that at a minimum the defendants were aware that the statements probably were false and defamatory."

That's one way of looking at conscious disregard but I think it's a little off the mark. "Conscious disregard", "reckless disregard", although they vary a little bit between civil and criminal cases, basically, are about purposely blinding yourself to a fact. It is true that the inference a jury has to draw from purposely blinding yourself to a fact is that you knew what the facts would show if you didn't blind yourself. So, it's sometimes called the ostrich charge. But I think the proposal here from The Times doesn't quite capture that notion of willful blindness. So, I'm inclined to leave it the way it is for now.

So, if we go forward today I will get that to you right after lunch. If we don't go forward I will get it to you sometime next week.

All right. I think those are the only things that we can properly do before hearing from Ms. Palin.

Hold on a minute.

(Pause)

THE COURT: Okay. Is there anything else either counsel wish to raise?

MR. TURKEL: Nothing from the plaintiff at this time, judge.

MR. AXELROD: No, your Honor.

THE COURT:  All right.  So, we figured that we should know by 11:15.  So, why don't we take an extended break and we'll reconvene at 11:15 here in the courtroom.

(Recess)

(Continued on next page)

(In open court; jury not present)

THE COURT: Any word?

MR. TURKEL: Yes, Judge. Judge, my client went to one of the centers that was on the email. And she should have an appointment. There were a few people in front of her, and she was confused about a PCR test because they have regular PCR and rapid. She was emailing me to ask me for guidance while my phone was already being used.

By the time we got into the courtroom, she had gone up the street to an urgent care center because we told her we need this done. The urgent care center did another rapid on her. It's an antigen test, but it's positive. I told her to go back to one of the centers that was referenced and get in line for a rapid PCR.

Judge, she was just confused because they were using PCR/rapid. They were telling her the PCR was three or four days. She reached out to ask me.

THE COURT: I think, even though it wasn't what I intended in terms of the more reliable PCR test, since she has apparently tested positive three times, I'm going to assume that she's positive.

Now, I have consulted with the powers that be in the court, and they have said that even if she tests -- continues to test positive, she can actually return to the Court on February 3, the day that we had talked about, provided she is

asymptomatic.

If she has symptoms, she will have to come to the court on February 2, and the doctor whom we've employed throughout the pandemic will assess whether the symptoms are such that she should not come.

So I think the chances are reasonably good that we will start on February 3.

MR. TURKEL:  Because we're traveling, it's easy for us from Tampa.  We have a number of directs a day.  I don't know if she's going to be still on the eastern seaboard or Alaska. I know you're going to say yes, but I just want to make sure we're communicating.

As this progresses, I may just want to organize calls to chambers.  It may be a little hard for us.  If we're going into the 3rd, we're probably going to be up here on the 2nd anyway.  I'll just keep lines open is my point, Judge.

THE COURT:  All right.  Obviously, Ms. Palin's health comes first, and the health of the rest of the courthouse is equally important.  But I think under these circumstances, she should assume the likelihood that she might have to be here on February 2, so come in on February 1 or whatever.

MR. TURKEL:  That's fair.  Understood.

THE COURT:  Now, I also took advantage of the break to reflect on the various objections that have been raised to the preliminary instruction, and you have now received my

resolution of those.

Did everyone get that?

MR. TURKEL: Yes, your Honor.

THE COURT: As far as I'm concerned, that's it. This will be the preliminary instruction that will be given. I heard your arguments. I made my determination.

Just so you know going forward, because I am old, I can get away with being cranky. And I don't -- once I've made a decision, I don't usually allow further reargument. Okay?

MR. TURKEL: Understood.

THE COURT: You've all been great. So I didn't expect otherwise, but I just wanted to let you know going forward.

Okay. So unfortunately, I think that's where we are today. So I will look forward to seeing you in this courtroom at 9:00 a.m. on February 3, but I'm sure you'll provide me with updates about Ms. Palin's situation.

MR. TURKEL: Yes, your Honor.

THE COURT: Very good. Anything else?

MR. VOGT: I think originally when we were going to the 3rd, you had another trial, and we were going to do half days.

THE COURT: I'm very proud of the fact, not personally, but of our court. Our court has remained open throughout the pandemic. We have had over 100 jury trials during the course of the pandemic.

We have never had a single juror contract COVID-19 because of all the precautions we take. And the result of that though is that because we only have four courtrooms, we're backed up, notwithstanding all those efforts.

So I had another trial that was going to follow immediately on your trial. And I thought -- sometimes you never know how long a trial is going to take or how long a jury is going to be out. So I thought if worse came to worse, we would sit half days on each. But I think now, given the circumstances, I'll just move the other trial. And we will go full days starting on February 3.

Now, I was a little taken aback that the order of witnesses has changed.

MR. VOGT: Yes, your Honor. We actually communicated with counsel a few days in advance and let each other know. I think it was just a little reorder at the beginning.

THE COURT: Okay. So just be sure to let me know. I'd like to get from you no later than February 2 what you consider to be a pretty definitive list of the order of witnesses.

MR. VOGT: Is it okay to email that?

THE COURT: Yes. And also in that regard -- I think I mentioned this earlier. But supposing you're calling as a hostile witness someone identified with The New York Times. You have the choice -- and you can consult with counsel --

Case 1:17-cv-04853-JSR    Document 166    Filed 02/11/22    Page 33 of 37    33

either you can do your, in effect, cross first. It's not really cross. It's your direct testimony with leading questions because it's a hostile witness.

But then The Times would not be governed by the scope of that, and they could do what would have been their direct, if they had called the witness first, as well as in response to the -- or, if counsel for both sides agree, you can just have The Times go first with a witness like that and then do cross.

It's plaintiff's call ultimately, and either is fine with me. But I just want to be sure that you know no witness will be called twice.

MR. TURKEL: We were going to I think raise this, Judge, because just recently, I had the experience of calling the other party adverse. They wouldn't agree on depo designations, and they crossed their own witness for nine hours in my case. It was something new to me.

THE COURT: If you want to do a cross or if any lawyer wants to do a cross for nine hours, that's fine. I will excuse the jury of course after the first two.

MR. TURKEL: Judge, I think the issue -- and I don't think it's something necessarily we're asking the Court to rule right today because the law is, to use a word you used earlier today, fuzzy on it. So the question becomes we call, for instance, Mr. Bennet adverse, will The Times be able to lead him. That's not a foregone --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

THE COURT:  I've encountered this situation many times.  So let me just go over it because here are my rules.

MR. TURKEL:  Okay.  Great.

THE COURT:  Assuming you want to call the witness, you want to put the witness on first with your -- and the witness is -- the technical term "hostility" is really unfair.  It's an adverse witness.

MR. TURKEL:  Yes.

THE COURT:  So you would put all your questions.  The Times would then be able to examine this witness.  And on questions that are on new areas, something they would have brought out if they had gone first, they cannot lead.

But on things that are responsive to things you've done, they can, within reason, lead.  So that's my practice.

MR. TURKEL:  If they chose to raise new areas of direct, I get sur cross on that?

THE COURT:  Let me tell you my practice in that regard.  We go as long as you guys want.  So if you want -- you'll get the next go-around, which will be redirect/recross, depending on how you want to look at it, and then they will have an opportunity, and then you will have an opportunity.

I never -- if it's a legitimate new question that fairly has now become important, I never stop counsel from going.  And that even includes, although I'm a little more unhappy about that, something that they should have asked

earlier but forgot to ask it because lawyers have an awful lot to do and don't always cover everything.  So no one will ever be deprived of having another time to question the witness about, even if they've already questioned the witness two or three times.

Having said that, if it becomes totally repetitive, I might say something in the presence of the jury like, counsel, haven't we gone over that 500 times already?  Or something else that I'm sure you would deeply appreciate.  Anyway, you will go as often as you need, both sides.

MR. TURKEL:  The threshold question is you will allow leading if we take some adverse.

THE COURT:  Absolutely.

MR. TURKEL:  So that applies uniformly?

THE COURT:  That applies uniformly.

MR. TURKEL:  Thank you.  I appreciate that.

MR. AXELROD:  Judge, the only thing I have is plaintiffs are calling most of their witnesses in their case. Some of our witnesses are traveling.  So it might be useful for us to have another day's notice of what the witness order is going to be.

THE COURT:  All right.  That's good.  So instead of February 2, let's do it February 1.

MR. AXELROD:  That would be very helpful.

THE COURT:  I think that's certainly everything on my

list.  Anything else?

MR. VOGT:  I don't think we've identified how long for opening statements.

THE COURT:  I'm sorry.  So I have a firm, fixed, and final rule on that too.  That's the trouble with being a judge all these years, you get into patterns.

Half hour.  Rarely, in my experience, do counsel need that much time.  But if you go 30 minutes, that's fine.  If you go 31, I will cut you off.

You are all experienced trial lawyers, so this I'm sure you know already.  But opening statements, the jury hasn't heard any of the evidence yet.  They will have had a two-second summary from me when we're choosing a jury about what the case is about.

You can only expect them to remember basic facts and basic principles.  Minutia, that very clever little thing that you're going to get to with your fifth witness, will be lost on them in opening statements.  Summation, fine.  But really what they need in opening statements is an overview of where the two sides basically come out.

But, as I say, you're all experienced lawyers.  I'm delighted you are.  So my only official rule is 30 minutes.

Anything else?

MR. TURKEL:  No, Judge.

MR. AXELROD:  No, your Honor.

THE COURT:  Very good.  I look forward to seeing you and Ms. Palin on February 3.

(Adjourned)