UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌───────────────────────────┐
│ SARAH PALIN,              │
│                           │
│         Plaintiff,        │
│                           │
│     -v-                   │
│                           │
│ THE NEW YORK TIMES COMPANY│
│ and JAMES BENNET,         │
│                           │
│         Defendants.       │
└───────────────────────────┘
```

17-cv-4853 (JSR)

OPINION

JED S. RAKOFF, U.S.D.J.:

At trial, plaintiff Sarah Palin wholly failed to prove her case even to the minimum standard required by law. Accordingly, defendants the New York Times Company (the "Times") and James Bennet moved to dismiss the case prior to the start of jury deliberations. After hearing extensive argument, the Court granted the motion shortly after the jury had begun its deliberations. This Opinion sets forth the reasons for that decision, as well as the reasons for how the Court then dealt with the deliberating jury.

By way of background, on June 14, 2017, defendant Times published an editorial, approved and materially revised by co-defendant Bennet, entitled "America's Lethal Politics" (the "Editorial"). The Editorial was prompted by the shooting earlier that day of Republican members of Congress, including Representative Steve Scalise. However, several sentences in the Editorial could be read to suggest that an earlier mass shooting -- an attack that occurred in Tucson, Arizona in 2011, grievously wounding Congresswoman Gabrielle Giffords and killing

1

several others -- was prompted by a graphic advertisement circulated some months earlier by a political action committee ("SarahPAC") associated with Palin. The graphic (the "crosshairs map") featured a map of the United States with stylized rifle crosshairs superimposed over congressional districts that SarahPAC had targeted for replacing incumbent Democratic members of Congress with Republican candidates in the 2010 midterm elections. Giffords' district was one of 20 featured on the map.

Prior to publication of the Editorial, Bennet, the top editor on the Times' Editorial Board, had added language asserting a "clear" and "direct" link between the 2011 shooting and the "political incitement" generated by the crosshairs map. Although the original author of the Editorial, several other editors, and a fact checker read the draft after Bennet's revision and before publication, none flagged the new language as inaccurate. Nonetheless, journalists and other readers began criticizing the "clear" and "direct" allegation immediately after the Times published the Editorial online. The Times ultimately issued two corrections (the first approximately 14 hours after the editorial was published online) stating that no such link had been established.

Shortly thereafter, Palin commenced this lawsuit, asserting that she had been libeled by Bennet and the Times in violation of New York defamation law.[1] After extensive delays occasioned by an intervening

_____

[1] The parties subsequently agreed that Bennet and The New York Times Co. should be considered as a single unit for the purpose of

appeal and constraints arising from the COVID-19 pandemic, the Court held a seven-day jury trial starting on February 3, 2022. Following the close of evidence, but before the start of jury deliberations, defendants moved under Fed. R. Civ. P. 50(a) for judgment as a matter of law. Rule 50(a) provides, in general, that:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> (A) resolve the issue against the party; and
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a). The rule further provides that such a motion may be "made at any time before the case is submitted to the jury." Id. While Rule 50(a) does not expressly require a court to grant or deny the motion before jury deliberations begin, it clearly contemplates that a court will rule expeditiously.[2]

Because this was a serious and case-dispositive motion, the Court did not rule precipitously. Rather, the Court reserved judgment, first so that it could hear the lawyers' closing arguments and then, even after the jury had begun its deliberations late on Friday afternoon, so that the Court could receive further written and oral submissions

___

assessing liability. See ECF 170 ("Jury Instructions") at 12. Accordingly, hereinafter, the Court uses "the Times" to refer to both defendants collectively, except where it is necessary to refer to Bennet or The New York Times Co. individually.

[2] If the motion is denied, however, it can be renewed after the jury renders its verdict, pursuant to Fed. R. Civ. P. 50(b).

from counsel. Ultimately, however, by the early afternoon of Monday, February 14, 2022, the Court had reached the firm conclusion that it would have to grant the motion for judgment as a matter of law and so informed the parties.

At that point, the Court could have simply entered final judgment in defendants' favor and dismissed the jury. Instead, however, the Court, while announcing its decision, explained that it would allow the jury to continue its deliberations, so that, if the Court of Appeals were to disagree with the Court's determination to dismiss the case as a matter of law, the appellate court would not have to send the case back for trial, since it would have the benefit of the jury's verdict. Moreover, as a technical matter, the Court could then issue its Rule 50 judgment, post-verdict, pursuant to Rule 50(b). While this approach was a bit unusual, neither side objected to it in the slightest.

Regardless of these procedural niceties, however, the Court never seriously considered hiding from the parties the firm determination it had reached to dismiss the case as a matter of law. This, as the Court noted at the time, would have been grossly unfair to both sides, who would have been left with the impression that the case was going to be determined by the jury's verdict when it was not. Tr. 1298-1299.[3]

Therefore, on the afternoon of February 14, 2022, the Court announced its conclusion that Palin had failed to prove, by the

---

[3] "Tr. __" citations refer to pages in the trial transcript.

necessary clear and convincing evidence, that Bennet and The New York Times Co. had published the allegedly libelous statements with the state of mind known as "actual malice." Specifically, after reviewing all evidence adduced at trial in the light most favorable to Palin and drawing all reasonable inferences in her favor, the Court concluded that no reasonable jury could find by clear and convincing evidence that Bennet or The New York Times Co. knew at the time of publication that the allegedly libelous statements were false or that Bennet thought that the challenged statements were probably false but recklessly proceeded to publish them anyway. The Court further indicated that it would likely issue a written opinion detailing the reasons for these conclusions. Tr. 1307. Hence, this Opinion.

After the Court announced its determination to enter final judgment for the defendants as a matter of law, the Court, as noted, still allowed the jury to continued deliberating for the aforementioned reasons, stating that it would not formally enter the order dismissing the case until after the jury had rendered its verdict. Tr 1305-1306. As also noted, no party objected in the slightest to the Court's plan. Indeed, the parties were given four opportunities to object to the procedure -- when the Court made the initial proposal, Tr. 1256; when the Court indicated it was about to issue its ruling on the motion, Tr. 1295-1297; after that ruling was delivered, Tr. 1306-1307; and when the verdict was returned -- and never did so.

The only issue that was raised -- and then only by counsel for defendants -- was whether it was necessary to further inoculate the

jury against the risk that it might learn of the Court's intended ruling through media reports. When the Court asked counsel what they recommended in this regard, plaintiff's counsel was of the view that the Court should do nothing and "leave things as is." Tr. 1307. But the Court was persuaded by defendants' counsel to again admonish the jury that "If you see anything in the media about this case, just turn away." Tr. 1308. Even though defendants' counsel had raised the possibility (presciently, as it turns out) that some jurors might receive "push notifications" of the Court's Rule 50 determination, Tr. 1307, neither side asked for any other relief than the aforementioned instruction, which was then given to the jury, and accordingly the Court had no occasion to consider any further steps. Tr. 1307.

The next afternoon, the jury returned a verdict of "Not Liable." In the Court's view, the verdict further validated the Court's legal conclusion that no reasonable juror could find by clear and convincing evidence that Bennet or the Times had acted with actual malice. However, this verdict was without immediate legal effect because the Final Judgment entered that day in favor of the Times relied independently on the Court's decision to grant the Rule 50 motion and dismiss the case as a matter of law. ECF 171.

After the jury had been excused, the Court's law clerk discovered, during a routine inquiry, that a few jurors had inadvertently received "push notifications" (alerts automatically generated by news apps installed on their smartphones) containing the bottom-line of the Court's intended Rule 50 determination. See ECF 172. Although these

jurors were adamant that this knowledge had not affected their determination of the verdict in the slightest, the Court promptly notified the parties of this information. See id.

As detailed toward the end of this Opinion, the Court is of the firm view that a few jurors' pre-verdict awareness of news about the Court's intended Rule 50 decision did not nullify the jury's verdict in any respect. But the more fundamental point is that any effect the push notifications may have had is legally irrelevant. The Court had already determined to dismiss Palin's libel claim as a matter of law pursuant to defendants' Rule 50 motion, and the Final Judgment reflected that determination. Even if one indulges the implausible hypothesis that the jury would have returned a verdict for Palin absent the news alerts, the operative final judgment would still have been the same: dismissal of Palin's claim as a matter of law.

The Court now elaborates the reasons for that decision.

## I.   **Factual Background**

As explained further in § III.B, infra, the Court on a Rule 50 motion must view all evidence in the record in the light most favorable to the non-moving party, here Palin, and must draw all reasonable inferences to her benefit. The recitation of relevant facts below therefore reflects these presumptions.

### A. **The Allegedly Libelous Statements**

On June 14, 2017, defendant The New York Times Co. published the Editorial entitled "America's Lethal Politics" in response to the shooting that morning of Representative Steven Scalise and several

other Republican members of Congress who had been holding a practice session in suburban Virginia for a charity baseball game. The Editorial identified the attack as part of a "sickeningly familiar pattern [that was] emerging" of members of Congress being targeted by people committing mass shootings. PX-1 at 1.[4] The Editorial's thesis was that this political violence emerged from the "readily available guns and ammunition" in the United States and from "deranged" people whose "derangement had found its fuel in politics" by virtue of the increasingly violent rhetoric used in American political discourse. Id. The "pattern" identified by the Editorial identified only one prior data point: the January 8, 2011 incident in which Jared Lee Loughner opened fire in a Tucson, AZ supermarket parking lot during a "Congress on Your Corner" event hosted by Representative Gabby Giffords, killing six people (including U.S. District Judge John Roll and a nine-year-old girl) and grievously wounding the Congresswoman.

In comparing the two shootings, the Editorial, in language that was added by defendant Bennet to an earlier draft, stated that there was a "clear" and "direct" "link" between Loughner's shooting and the "political incitement" arising from a graphic distributed in March 2010 by the political action committee ("PAC") associated with plaintiff Sarah Palin, who previously served as the Governor of Alaska

---

[4] PX-__ citations refer to plaintiff's exhibits received into evidence at trial, and DX-__ citations refer to defendants' exhibits received into evidence at trial. Unless otherwise specified, all internal quotation marks, omissions, elisions, alterations, citations, and emphases are omitted from all sources cited herein.

and as the 2008 Republican candidate for Vice President. Specifically, plaintiff alleges that she was libeled by the following two paragraphs:

> In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs.

> Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask for the right.

PX-4. These paragraphs (the "Challenged Statements") were the fifth and sixth paragraphs in the twelve-paragraph Editorial. Id. "America's Lethal Politics" was published online on The New York Times website at approximately 9:45 p.m. on June 14, 2017, PX-1, and appeared as the first of three editorials in the June 15, 2017 print newspaper, PX-4. Neither Palin, nor SarahPAC, nor the map of targeted congressional districts was referenced elsewhere in the Editorial or in the headline. See id.

Palin alleges that these two paragraphs contain two defamatory statements. The first paragraph, Palin argues, asserts that her PAC's circulation of the so-called crosshairs map was "clear" incitement of Loughner's shooting of Representative Giffords and others. See ECF Jury Instructions at 14. The second paragraph, Palin argues, asserts that the circulation of the crosshairs map served as "direct"

"incitement" of the "attack," or, in other words, that the map caused Loughner to act. See id.

Palin contends that both of these paragraphs contain unsupported or unsupportable factual errors concerning the purported causative role of Palin's PAC's "crosshairs map." Although the crosshairs map was widely blamed for inciting Loughner's violence against Giffords in the days following that shooting, it was subsequently determined that Loughner suffered from mental illness and no link between Loughner's attack and the crosshairs map was ever established. DX-111 at 3-4. Rather, it was determined that Loughner acted because of his own personal demons and mental illness. Accordingly, Palin alleges, it was defamatory for the Editorial to assert that the crosshairs map was either a "clear" or "direct" incitement to Loughner's shooting.[5]

## B. The Original Drafting of the Editorial

On the morning of June 14, 2017, James Hodgkinson opened fire on a group of Republican congressmen, who were practicing in suburban Virginia for an upcoming charity baseball game, wounding four persons, including Representative Scalise. See Tr. 107; PX-4; DX-12. The idea of writing an editorial on the shooting was first raised in a brief

---

[5] Although not central to Palin's case, it may also be noted that the Challenged Statements describe the map as having "put Ms. Giffords and 19 other Democrats under stylized cross hairs," PX-4, thereby suggesting that the crosshairs appeared over images or words signifying the politicians themselves. However, the map in fact placed the stylized crosshairs over these 20 Democrats' congressional districts on a map of the United States, which was positioned above a list of the politicians' names. See DX-61.

email sent at 10:46 a.m. by Elizabeth Williamson, a member of the Times' Editorial Board based in Washington, who covered national politics. DX-9; Tr. 78-79. The email went to Bennet and two other editors on the Editorial Board, Robert Semple and Nicholas Fox. DX-9. A few minutes later, in an email titled "POSSIBLE shooter's POSSIBLE social media pages pro-Bernie, anti-Trump," Williamson circulated a set of links to Facebook, LinkedIn, and Twitter profiles that her research suggested belonged to the suspected shooter. DX-13. At 11:49 a.m., after then-President Donald J. Trump had delivered a statement on the shooting, Semple responded by email approving Williamson's proposal to begin drafting an editorial on the shooting, suggesting that the piece focus on gun control. DX-14. Then, at 12:04 p.m. another editor, Linda Cohn, replied to Semple's email, noting that Hodgkinson had gone to high school in her hometown and writing that it was "hard to picture any anti-trump sentiment there." DX-16. Cohn also commented that she was "thinking back to what a giant story [G]abby Gifford[s] shooting was. Amazing that shooting congressmen doesn't seem so shocking now." Id. The record reflects that this was the first time a member of the Editorial Board linked the Virginia and Arizona shootings. Semple, who was a long-tenured member of the Editorial Board, reaffirmed his earlier approval, writing "OK we should definitely shoot for a piece, not huge, but a piece." Id.

Bennet's first contribution to the discussion came in a 12:41 p.m. reply to Williamson's email containing Hodgkinson's suspected social media profiles and copying Semple, Fox, and Cohn. DX-17.

Suggesting an additional argument for the Editorial to make, Bennet wrote:

> Hey Elizabeth -- As Bob has said there's most likely a gun control point to be made here. The other question is whether there's a point to be made about the rhetoric of demonization and whether it incites people to this kind of violence. Hard for me to imagine that Bernie himself is guilty of anything like that. But if there's evidence of the kind of inciting hate speech on the left that we, or I at least, have tended to associate with the right (e.g., in the run-up to the Gabby Giffords shooting) we should deal with that.

Id. Williamson then agreed to begin writing a draft, noting that she had spoken to Semple. DX-18.

As the assigned writer, Williamson had primary responsibility for research, which included both factual reporting and research on opinions previously expressed by the Editorial Board to maintain consistency with those earlier positions. Tr. 88-89. Williamson testified that on June 14, 2017, she "was researching the political rhetoric that was circulating in our discourse in the run-up to the 2011 shooting in Arizona," not "the shooting itself" or "the state of mind of the gunman." Tr. 174.

To assist Williamson in her research, Semple directed the Board's editorial assistant, Phoebe Lett, to search through prior editorials and send Williamson "four basic gun control pieces (dealing mainly with the plenitude of weapons and porous controls) that also happen to mention Gabrielle Giffords." See DX-21; DX-19.[6] Williamson replied

---

[6] At trial, the four editorials hyperlinked in Lett's email were never shown to any witness, their content was never discussed before the jury, and they were never offered into evidence as part of any witness's testimony. The Court accordingly sustained an objection to

to Lett at 1:40 p.m. asking "is there one that references hate type speech against [Democrats] in the runup to [Giffords'] shooting? James referenced that." DX-22. Lett forwarded this request to Bennet, asking if he "happen[ed] to know which one she is talking about." DX-25. Bennet responded: "No -- I was just wondering if there was such a piece; that is, did we ever write anything connecting ... the Giffords shooting to some kind of incitement?" Id. After searching further, Lett responded "No, but Frank Rich did," providing a link to a January 15, 2011 Op-Ed column entitled "No One Listened to Gabrielle Giffords," DX-24. DX-25. Bennet replied 14 minutes later: "Good for us. Can you let Elizabeth know?" DX-25. Lett then relayed Rich's column to Williamson. DX-23. Viewing the evidence in the light most favorable to Palin, the Court presumes that Bennet read and understood this column by Frank Rich before the Editorial was published.

Rich's column, written one week after the Loughner shooting, discussed that attack and other acts of apparent political violence,

---

plaintiff's counsel motion to admit pre-marked exhibits containing these four editorials when they were offered outside the presence of the jury immediately before closing statements were delivered. See Tr. 1060.

When asked if he had read these four editorials, Bennet testified that he did not recall reading any of them. Tr. 705. And Palin neither adduced any evidence from which the Court could infer that Bennet read these four editorials nor argued in summation that Bennet's knowledge at the time of publication was informed by these four editorials.

Therefore, the content of these four editorials is not in the record and, as a matter of law, none of the four is properly considered as a source for Bennet's pre-publication knowledge. This is so, even though the Court must view the evidence most favorably to Palin and draw all reasonable inferences in her favor.

arguing about they arose from a combination of violent political rhetoric, inadequate gun control, and an ineffective mental health safety net. See DX 24. Rich wrote that it was not yet known whether Loughner had seen the crosshairs map and that then-President Obama had "said, correctly ... that 'a simple lack of civility' didn't cause the Tucson tragedy" or the other incidents he had discussed, such as an earlier act of vandalism at Giffords' office. Id. at 1-2. However, Frank argued that these acts of violence were "inform[ed]" by "an antigovernment radicalism as rabid on the right now as it was on the left in the late 1960s." Id. at 2-3. Rich continued:

> That Loughner was likely insane, with no coherent ideological agenda, does not mean that a climate of antigovernment hysteria has no effect on him or other crazed loners out there. Nor does Loughner's insanity mitigate the surge in unhinged political zealots acting out over the last two years. That's why so many on both the finger-pointing left and the hyper-defensive right automatically assumed he must be another of them.

Id. at 3.

At 2:52 p.m., following Bennet's request, Lett forwarded to Bennet the four editorials that she had previously sent to Williamson. DX-26; DX-27. Lett then kept searching through past editorials and found two more relevant articles, which she emailed to Bennet at 3:01 p.m. and Bennet forwarded to Williamson two minutes later with the note "We dug a little further. Take a look at these two." PX-128. A few minutes later, Bennet separately forwarded the two additional editorials published in the days following the Loughner attack to a group including Semple, Williamson, Fox, and Cohn, writing "FYI -- these two are more relevant precedent for tonight's piece." PX-136. Semple

replied, "just right. The Obama 'as we mourn' in particular." <u>Id.</u>
Bennet testified that although he does not recall reading these two
editorials, he concluded based on his review of this email traffic
that he "must have read them, because [he] knew something about their
content." Tr. 608. Viewing the evidence in the light most favorable
to Palin, the Court presumes that Bennet read and understood these two
editorials prior to publication.

The first of these two editorials, entitled "Bloodshed and
Invective in Arizona," was published January 9, 2011, the day after
the Arizona shooting. PX-134. It describes the Editorial Board's
position on the relationships among gun control, violent political
rhetoric, and mental illness and how these forces increase the risk
of political violence and assassination attempts:

> Jared Loughner, the man accused of shooting Ms. Giffords, killing
> a federal judge and five other people, and wounding 13 others,
> appears to be mentally ill. His paranoid Internet ravings about
> government mind control place him well beyond usual ideological
> categories.
>
> But he is very much a part of a widespread squall of fear, anger
> and intolerance that has produced violent threats against scores
> of politicians and infected the political mainstream with violent
> imagery. With easy and legal access to semiautomatic weapons like
> the one used in the parking lot, those already teetering on the
> edge of sanity can turn a threat into a nightmare.

<u>Id.</u> at 1. "Bloodshed and Invective in Arizona" continues:

> It is facile and mistaken to attribute this particular madman's
> act directly to Republicans or Tea Party members. But it is
> legitimate to hold Republicans and particularly their most
> virulent supporters in the media responsible for the gale of
> anger that has produced the vast majority of these threats,
> setting the nation on edge. Many on the right have exploited the
> arguments of division, reaping political power by demonizing
> immigrants, or welfare recipients, or bureaucrats. They seem to

have persuaded many Americans that the government is not just misguided, but the enemy of the people.

Id. at 2.

The second of these editorials, entitled "As We Mourn," was published on January 12, 2011. PX-135. It addressed then-President Barack H. Obama's speech at a memorial service in Tucson for the victims of the Loughner attack:

> This horrific event, he said, should be a turning point for everyone -- "not because a simple lack of civility caused this tragedy -- it did not -- but rather because only a more civil and honest public discourse can help us face up to our challenges as a nation."

Id. at 1-2.[7] "As We Mourn" does not include any conclusive statement regarding the Arizona gunman's motivations or political convictions, if any.

Bennet testified that on June 14, 2017, he relied on the research Lett conducted on his behalf, and that he never conducted his own factual research in connection with the Editorial. Tr. 610.

C. **Bennet's Revisions**

At 4:44 p.m., Williamson uploaded her draft of the Editorial to "Backfield," a section of the Times' content management system that

---

[7] "As We Mourn" continues:

The president's words were an important contrast to the ugliness that continues to swirl in some parts of the country. The accusation by Sarah Palin that "journalists and pundits" had committed a "blood libel" when they raised questions about overheated rhetoric was especially disturbing, given the grave meaning of that phrase in the history of the Jewish people.

PX-135.

stores drafts during the editorial process. Tr. 136-137. Williamson also notified Bennet, Semple, Fox, and Frank Clines (a member of the Editorial Board who covered gun policy). PX-143. After that point, Williamson made no further edits to the piece, Tr. 138, and Palin has not accused her of any actual malice.

The portion of Williamson's 4:44 p.m. draft that served as a precursor to the Challenged Statements reads as follows:

> That in 10 minutes a single gunman could wreak such carnage in a bedroom community a short drive from the Capitol is horrifying, but no longer surprising. Not all the details are known yet, but a sickeningly familiar pattern is emerging: a deranged individual with a gun-perhaps multiple guns-and scores of rounds of ammunition uses politics as a pretense for a murderous shooting spree. Mr. Hodgkinson was a Bernie Sanders supporter and campaign volunteer virulently opposed to President Trump, who among many anti-Trump messages posted "Time to Destroy Trump & Co." on social media in March.

> Just as in 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a nine year-old girl, Mr. Hodgkinson's rage was nurtured in a vile political climate. Then, it was the pro-gun right being criticized: in the weeks before the shooting Sarah Palin's political action committee <u>circulated</u> a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs.

PX-141.

The underlined word "circulated" in the latter paragraph of Williamson's draft was hyperlinked to an ABC News article that is dated January 9, 2011, the day after the Arizona shooting, and is entitled "Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate." DX-10; Tr. 144. The article discusses the debate in the wake of the shooting about whether Palin's distribution of the crosshairs map "may have fueled the gunman's rage," though it notes in the tenth

paragraph that "[n]o connection has been made between this graphic and the Arizona shooting." DX-10 at 1-2. Bennet testified that he neither clicked on the "circulated" link in Williamson's draft nor read the ABC News article before the Editorial was published. Tr. 609-610.

After Williamson circulated her draft, Cohn, one of the Editorial Board editors, reviewed the piece. While reading, she made notes on her reactions to the draft, for instance asking whether the referenced to Hodgkinson as "deranged" reflected "signs of mental illness" or was used "just in the sense that anyone who commits [a] mass shooting is deranged." PX140E at 1. Cohn re-saved the draft at 5:03 p.m. Tr. 526; PX-140E at 2. Then, after she had finished her read-through, Cohn went to Bennet's office and told him that she "was just a little confused about ... what we wanted out of this piece, where it was going.... [She] felt he needed to take a look and weigh in." Tr. 520. Bennet recalls that Cohn "did not think it was a great draft." Tr. 636. Bennet agreed to take a look. Tr. 522; 636-637. Cohn testified that it was her decision to take Williamson's draft and pass it off to Bennet, and Bennet testified that he had never told either Williamson or Cohn that he wanted to edit the draft. Tr. 566, 715.

At approximately 5:03 p.m., after speaking with Cohn, Bennet opened and read through Williamson's draft. Tr. 637; DX-30 at 235. He testified that his impression of Williamson's draft was that it "read like a news story, rather than an opinion piece," and Bennet "felt like it wasn't capturing the shock of the attack and kind of the horror of what had happened." Tr. 716. Although his initial intent was to

provide Williamson guidance on rewriting the Editorial, Bennet soon
decided to do the revisions himself:

> I initially started drafting a note to Elizabeth at the top of
> the editorial, trying to provide some instruction on how I thought
> the piece should be rewritten. And at that point I realized how
> late in the day it was getting, and I was concerned about getting
> the piece done in time. So I couldn't tell you exactly what time
> this was, but I began just editing the piece myself.

Tr. 637. With respect to the time pressure, Bennet testified that the
deadline to submit editorials for print publication the following day
was approximately 8:00 p.m. Tr. 640.

Bennet testified that in reading Williamson's draft, he
interpreted the paragraphs about the Arizona shooting as "the specific
example that Elizabeth returned with of incitement or incendiary
rhetoric, and I just trusted that it was ... an example of that based
on her characterization." Tr. 719. Bennet further testified that he
thought the relationship Williamson had posited between the crosshairs
map and Loughner's "made sense" because he suspected that "when
politicians get shot, ... it has something to do with politics," and
"that an atmosphere of highly charged political rhetoric makes such ...
terrifying events more likely." Tr. 719-720.

There are words and phrases in the language about which Palin
complains that appeared in Williamson's original draft, such as "a
sickeningly familiar pattern is emerging" and "Sarah Palin's political
action committee circulated a map of targeted electoral districts that
put Ms. Giffords and 19 other Democrats under stylized crosshairs."
See DX-136 at 2. But Bennet added the key language that Palin argues

conveys the allegedly defamatory meaning -- the assertion that Palin's actions "clear[ly]" and "direct[ly]" caused Loughner to commit a mass shooting. Id.

A redline of the Editorial, comparing Bennet's revision to Williamson's first draft, was accepted into evidence, and it succinctly illustrates Bennet's specific contributions to the two paragraphs containing the Challenged Statements:

> ~~Just as in~~ Was this attack evidence of how vicious American politics has become? Probably. In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a ~~nine~~ 9-year-old girl, ~~Mr. Hodgkinson's rage was nurtured in a vile political climate. Then, it was the pro-gun right being criticized: in the weeks before~~ the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized ~~crosshairs.~~
>
> ~~In the aftermath of Wednesday's shooting, the political right and left and both sides in the gun debate dove into their respective foxholes~~ cross hairs.
>
> Conservatives and right-wing media ~~demanded that~~ were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals ~~get.~~ They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask of the right.

Id.[8] Bennet testified that as he worked on the Editorial, he did not know whether or not Loughner had seen the crosshairs map, nor did he research that question. Tr. 720. As Bennet explained:

> I was functioning as the editor, not the reporter on the piece, so I wouldn't normally do the reporting in a situation like this, particularly when we were on a tight deadline. But also˘... I

---

[8] As in a standard redline, plain text represents material from Williamson's initial draft, underlined text represents additions by Bennet, and ~~strikethroughs~~ represent deletions by Bennet.

> didn't think then and don't think now that the map caused Jared
> Loughner to act. I didn't think we were saying that, and
> therefore ... [it] didn't enter my mind to research that
> question.... My goal was to make it, you know, a clearer argument
> and ... [a] more compelling description of what happened that
> day, a more vivid description of what happened that day.

Tr. 721.

### D. **Further Editing**

Bennet saved his draft in Backfield at 7:21 p.m. DX-30 at 178.

He then emailed Williamson, alerting her that he had finished revising

her draft:

> I really reworked this one. I hope you can see what I was trying
> to do. Please take a look. Thank you for the hard work today and
> I'm sorry to do such a heavy edit.

PX-163. Bennet testified that his request to "[p]lease take a look"

was indicating to Williamson that she should review the piece for fact

checking. Tr. 638. As Bennet explained at trial:

> [T]his is why we send playbacks to writers, because they are the
> ones who reported the story. They are the ones who are in
> possession of the facts. And it is important for them to review
> pieces to make sure that edits haven't introduced errors.

Tr. 639. Williamson testified that, after receiving this email, she

"glanced at" the Editorial and replied to Bennet, writing, among other

things, that the draft "Looks great." Tr. 274; DX-38. She suggested

no edits to Bennet's draft. Id.

Cohn re-claimed the pen around 7:23 p.m. and began editing

Bennet's draft of the Editorial. Tr. 571. She continued working on the

piece, making changes for clarity and accuracy until approximately

7:57 p.m. Tr. 571-573; DX-30 at 136. During that time, Fox and Lepping

were reviewing the piece as well, though they had to relay their

changes to Cohn, since only one person was able to edit the Backfield version at a time. Tr. 572; 575-576; PX-155. Cohn testified that she reviewed the Challenged Statements and did not perceive there to be any problem with the language in those paragraphs. Tr. 574-575. Nor did she approach Bennet to discuss those paragraphs. Tr. 575.

Then, at 7:58 p.m., just after storing the latest version of the Editorial reflecting Bennet's revisions, Cohn emailed a "playback," or a static copy of the latest draft, to Williamson for her review.[9] Tr. 576-577. Cohn explained that she sent the playback to Williamson because, although Cohn "assumed that James Bennet had sent one since at that point he was really editing the piece, [she] was playing it safe since [she] had been the original editor on the piece." Tr. 577. The reason Cohn wanted to be sure Williamson received a playback was so Williamson "could make sure that everything in there was correct and that ... the changes seemed fair to her, that ... there was nothing that she wanted to object to either in terms of facts or tone." Id. Cohn did not receive any further edits or comments from Williamson. Tr. 577-578.

Shortly after Bennet filed his draft of the Editorial to Backfield, Eileen Lepping, the Editorial Board's principal fact checker, also began her process of fact checking and editing. Tr. 395.

---

[9] Cohn described the practice of sending a writer a "playback with changes" as "send[ing] a copy to the writer so ... the changes would show up ... so they could go back and look and get back to [the editors] if there were any issues or problems with it." Tr. 577.

Lepping testified that she fact checked the draft Editorial line-by-line. Tr. 416, 421-422. However, she continued editing the piece as Cohn and Bennet also edited and revised it. Tr. 400-401. While fact checking the Editorial, Lepping clicked through the "circulated" hyperlink to the ABC News article, and "scan[ed] it for the facts that [she] was looking for at the moment," meaning specific details such as times, dates, that it was Palin's PAC that had circulated the map, and the number of congressional districts identified. Tr. 399, 422-423. One correction Lepping made around 7:34 p.m. was to edit words indicating the relative timing of the crosshairs map's publication (March 23, 2010, see DX-62; DX-63) and the Arizona shooting (January 8, 2011) from "in the weeks before the shooting" to "in the months before."[10] See PX-153; Tr. 399-403. Lepping testified that she did look at the crosshairs map itself, though she missed the inaccuracy regarding the location of the stylized crosshairs, an error which had already appeared in Williamson's 4:44 p.m. draft. Tr. 406-407. Lepping further testified that she does not recall fact checking the phrase "the link to political incitement was clear" in the first paragraph. Tr. 405. Nor did she fact check the phrase "Though there's no sign of incitement as direct as the as in the Giffords attack" in the second paragraph. Tr. 407. At that point, with the 8:00 print deadline

---

[10] This text was changed yet again, sometime after Lepping completed her edit at approximately 7:56 p.m. that night: the published version reads "Before the shooting." Tr. 404-406. Lepping testified that she did not know who made that further edit. Tr. 406.

nearing, Lepping testified that she "was doing more of a quick check of names and dates and things like that." Tr. 426. However, Lepping said she was able to confirm all of the facts she did check, and no one instructed her not to check any aspect of the piece. Tr. 426-427. At the end of her edit, Lepping sent a playback to Semple, who had a practice of reading the final versions of editorials before they ran and reaching out if he had any concerns; but Semple did not raise any concerns to Lepping about "America's Lethal Politics." Tr. 428-429.

After Cohn and Lepping's review, the copy editors assigned to the editorials page that night -- Bruce Levine and Joe Rakowski -- also edited the piece. Tr. 578. Additional fact checking occurred at this step, with Levine correcting the number of victims hit by Hodgkinson's bullets from five to four, since the fifth victim was determined to have been hit by shrapnel. See PX-178. Levine made this edit by comparing the draft Editorial to the article on the Virginia shooting prepared by the news department for the following day's paper. Tr. 579. Still, no fix was made to the Challenged Statements.

### E. **Publication**

The _Times_ published "America's Lethal Politics" on its website at approximately 9:45 p.m. on June 14, 2017.[11] Tr. 640-641. The _Times'_ Twitter accounts posted two tweets promoting the Editorial on the

---

[11] The online version of the Editorial received 150,257 page views before the first correction was posted, and 133,572 page views (after it was corrected) for the remainder of the first week after publication. DX-500 ¶ 13; DX-128.

evening of June 14, 2017. PX-3; DX-500 ¶¶ 16-20. "America's Lethal Politics" was the lead article on the editorial page in the June 15, 2017 print edition of The New York Times.[12] PX-4. And the Editorial was featured on the Times' website homepage through June 15, 2017, although it no longer appeared on the homepage as of 3:00 p.m. June 15, 2017. DX-126; DX-127; DX-500 at 1.

### F. Corrections

At 10:35 p.m., less than one hour after the Editorial was published online, Bennet received an email from Ross Douthat, a conservative columnist for the Times' Opinion section who covers national politics, among other topics. Tr. 820. Douthat's email was a response to an email from Bennet complimenting Douthat's latest column. PX-174 at 2. In his email, Douthat criticized the factual basis for the Challenged Statements:

> I feel I would be remiss if I didn't express my bafflement at the editorial that we just ran on today's shootings and political violence. There was not, and continues to be so far as I can tell, no evidence that Jared Lee Loughner was incited by Sarah Palin or anyone else, given his extreme mental illness and lack of any tangible connection to that crosshair map, the Tea Party or other right-wing cause. Whereas the shooter today, as our editorial concedes, seems to have had a clear partisan, anti-Trump purpose. That doesn't mean that liberals or "The Resistance" were in any way responsible for this horror; I don't buy those kind of arguments at all, in either case. But our editorial seems to essentially reverse the fact pattern as I understand it, making it sound like *Loughner* had the clearer connection to partisan rhetoric, when to the best of my knowledge he had none. I don't understand that claim at all, and I don't understand why we're making it.

---

[12] 610,531 copies of the June 15, 2017 print edition of The New York Times, which included the Editorial, were printed. DX-500 ¶ 8.

Id. at 1. Bennet responded at 11:09 p.m.:

> Thanks, and I'll look into this tomorrow. But my understanding
> was that in the Giffords case there was a gun sight superimposed
> over her district; so far in this case we don't know of any direct
> threat against any of the congressmen on the field. That's not
> to say any of it is ok, obviously, or that the violence in either
> case was caused by the pol[i]tical rhetoric. But the incitement
> in this case seems, so far, to be less specific.

Id. Bennet testified that when he read Douthat's email he "took away
from [it that Douthat] was reading the editorial to say that Loughner
was incited by Sarah Palin or somebody else, and that is not the
message we intended to send." Tr. 645.

In addition to replying to Douthat by email, Bennet testified
that he "checked Twitter, because this ... obviously rang a big alarm
for me and, yes, I saw other media people at that point tweeting that
we had gotten it wrong," making similar points to Douthat's. Id. at
645-646. Shortly thereafter, Bennet sent a text message to Williamson:
"Are you up? The right is coming after us over the Giffords comparison.
Do we have it right?" DX-46. Williamson, however, had gone to sleep
and did not respond until the morning. Id. Bennet testified that he
spent time reading the criticism of the Editorial that was appearing
online and tried to sleep but was unable to get much rest, because he
was "so upset and confused."[13] Tr. 747-748.

---

[13] Plaintiff's counsel asked Bennet if Douthat's email prompted
Bennet to make any effort to take the Editorial offline while the
Times was investigating its accuracy. Bennet said he made no such
effort because at the time, "The New York Times ... had a rule against
so-called unpublishing stories; that if you published a story, you
couldn't then just pull it down." Tr. 648. Bennet also noted that the
Editorial was irrevocably set to run in the June 15, 2017 print
edition. Tr. 649. Plaintiff's counsel adduced no evidence suggesting

At 5:08 a.m. on June 15, 2017 Bennet emailed Williamson and Lepping with the subject line "Giffords:"

> Hey guys -- We're taking a lot of criticism for saying that the attack on Giffords was in any way connected to incitement. The claim is that this was fully investigated and debunked in the months after the attack, and the shooter was found to have acted only because of his personal demons. I don't know what the truth is here but we may have relied too heavily on our early editorials and other early coverage of that attack. If so, I'm very sorry for my own failure on this yesterday. In any case I'd like to get to the bottom of this as quickly as possible this morning and correct the piece if needed. Can you two please put your heads together on this first thing this morning? Please skip the morning meeting if necessary. JB

PX-191. Later that morning, Williamson and Bennet spoke by phone; Williamson described Bennet's demeanor on the call as reflecting that he was "clearly crestfallen that this had happened." Tr. 183; see PX-190. Williamson ("EB") and Bennet ("JB") also exchanged text messages about the apparent error:

> EB:  Hey I'm sorry James. I should have read those [para]grafs more closely and asked more questions. That's on me. Will get a [correction] drafted soonest. E.

> JB:  No worries. I feel lousy about this one -- I just moved too fast. I'm sorry.

> JB:  Now what I need from you/Eileen soonest is a rock-solid version of what we should say -- that an investigation showed NO link to incitement, or NO DIRECT link or NO CLEAR link. I don't want to soften if it we don't need to -- if there was no link we should say so.

> EW:  On it. We'll do the right thing

DX-46; PX-188; Tr. 182-183.

---

that Bennet could have taken the Editorial down at that time or that he lacked awareness of this "unpublishing" policy at the time, so there is no inference that can reasonably be drawn from Bennet's decision not to pursue this.

Williamson and Lepping began researching the issue shortly thereafter to determine if a correction was required, skipping the Editorial Board's morning meeting as directed. Tr. 172. Williamson described the <u>Times'</u> corrections policy as "if we were alerted of an error, the policy would be to as swiftly as possible ascertain the correct facts and write the correction and post it."[14] Tr. 206-207. At 7:18 a.m., Williamson emailed her Editorial Board colleague, Jesse Wegman, who had noted criticism of the Editorial on Twitter the night before, asking "What in your view would be the most reliable assessment of the politics link (or not) in the Loughner case? Am thinking court records/assessment of his state of mind." Williamson's focus was correcting the description of the map itself; the bulk of the research and the correction drafting was done in New York. Tr. 173, 185. That morning, Lepping was responsible for researching whether a link had ever been established between the crosshairs map and Loughner's attack. Tr. 410. Lepping testified that she found a police report online

---

[14] The applicable "Corrections" policy from <u>The New York Times'</u> "Guidelines on Integrity" states in full:

> Because our voice is loud and far-reaching, The Times recognizes an ethical responsibility to correct all its factual errors, large and small. The paper regrets every error, but it applauds the integrity of a writer who volunteers a correction of his or her own published story. Whatever the origin, though, any complaint should be relayed to a responsible supervising editor and investigated quickly. If a correction is warranted, fairness demands that it be published immediately. In case of reasonable doubt or disagreement about the facts, we can acknowledge that a statement was "imprecise" or "incomplete" even if we are not sure it was wrong.

PX-18; <u>see also</u> Tr. 299-300.

indicating that the shooting "wasn't politically connected."[15] Id.
Cohn, working under direction from Bennet and Wegman, drafted the
corrections. Tr. 552-553. The first correction, positioned below the
online version of the Editorial, was published at approximately 11:15
a.m. on June 15, 2017, Tr. 659, and it read as follows:

> An earlier version of this editorial incorrectly stated that a
> link existed between political incitement and the 2011 shooting
> of Representative Gabby Giffords. In fact, no such link was
> established.

PX-5 at 3. At the same time, the two paragraphs containing the
Challenged Statements was revised to read as follows:

> Was this attack evidence of how vicious American politics has
> become? Probably. In 2011, Jared Lee Loughner opened fire in a
> supermarket parking lot, grievously wounding Representative Gabby
> Giffords and killing six people, including a 9-year-old girl. At
> the time, we and others were sharply critical of the heated
> political rhetoric on the right. Before the shooting, Sarah
> Palin's political action committee circulated a map that showed
> the targeted electoral districts of Ms. Giffords and 19 other
> Democrats under stylized cross hairs. But in that case no
> connection to the shooting was ever established.
>
> Conservatives and right-wing media were quick on Wednesday to
> demand forceful condemnation of hate speech and crimes by anti-
> Trump liberals. They're right. Liberals should of course be held
> to the same standard of decency that they ask of the right.

---

[15] Lepping's testimony about the investigative conclusions she
read in the police report was offered for, among other things, the
truth of the matters asserted in the report. Plaintiff's counsel never
offered the police report, which they had pre-marked as an exhibit and
included in the pre-trial exhibit list, see ECF 157 at 55. As such,
Lepping's testimony regarding what the report concluded about
Loughner's mental state was objectionable hearsay to the extent it was
offered for its truth. But since no objection was interposed by
defendants, the testimony was received in evidence for all purposes.

Id. at 2.[16] The Times' Opinion Section and its main Twitter accounts also tweeted out the correction. PX-7. The evidence showed that Bennet was involved in drafting the Twitter posts, and that he edited the proposed language to add the apology that "[w]e're sorry about [the error]" and thanked readers for "call[ing] us on the mistake." DX-53 at 1; Tr. 1033.[17]

---

[16] The record contains an email from Wegman to Williamson sent at 12:44 p.m. on June 15, 2017 discussing the correction to the text of the Editorial. In it, Wegman writes, "I made the case that talking about Palin and Giffords in the same [para]graf at all risked seeming like we were still trying to sneak the link in, but James pointed out that in order to write the next [para]graph, we had to put it in there to explain." PX-204 at 1. Plaintiff's counsel, however, elicited no testimony providing context for this statement, and plaintiff's counsel did not rely on any inferences from this document during summation or in argument on the Rule 50 motion.

[17] There was considerable debate at trial about whether the Times has a policy against offering apologies in connection with corrections. See, e.g., Tr. 675, 1036. Plaintiff's counsel raised this issue in connection with the assertion that Palin never received an apology from the Times or Bennet. The Court need not, and does not, resolve the factual issues regarding any apology policy at the Times or whether Palin received an apology, neither of which is materially relevant to the matter at hand. However, it is undisputed that on June 15, 2017, Bennet received a request for comment from CNN's senior media reporter regarding the Editorial's inaccuracy, and that Bennet provided draft comments to the vice president of the New York Times Co. for communications for her to relay back to the CNN reporter. See DX-60. The reporter had asked, inter alia, whether the Times would "be issuing an apology to Sarah Palin for wrongly linking her to the shooting of Giffords." Id. at 2. Bennet's response to this question was "I'm not aware that Sarah Palin has asked for an apology, but yes, I, James Bennet, do apologize to her for this mistake." Id. However, Bennet's statement of apology was not ultimately relayed to CNN, and so it was never published. See PX-236.

Later, the Times issued a second correction to replace the first, addressing the remaining error regarding the description of the map. That second correction read:

> An editorial on Thursday about the shooting of Representative Steve Scalise incorrectly stated that a link existed between political rhetoric and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established. The editorial also incorrectly described a map distributed by a political action committee before that shooting. It depicted electoral districts, not individual Democratic lawmakers, beneath stylized cross hairs.

PX-6. This second correction also ran at the bottom of the editorial page in the June 16, 2017 print edition of the newspaper. PX-10.

## II.  **Procedural Background**

### A. **Prior Proceedings**

Palin initiated this lawsuit by filing a one-count complaint on June 27, 2017. ECF 1. Defendants moved to dismiss the complaint on July 14, 2017. ECF 24. The Court subsequently determined that it was a "close question" whether the complaint had pled sufficient allegations of actual malice. ECF 35. Therefore, without objection from the parties, the Court held a brief evidentiary hearing on August 16, 2017, at which the Court ascertained who were the authors of the Editorial and other basic facts that provided context for assessing the plausibility of the inferences upon which the complaint relied to state a libel claim. See ECF 35 at 2. The Court then determined that Palin had not plausibly pled actual malice and dismissed the complaint. Id. Palin appealed that order and the Second Circuit reversed, holding

that the plausibility hearing contravened Fed. R. Civ. P. 12(d). See Palin v. New York Times Co., 940, F.3d 804, 812-813 (2d Cir. 2019).

Following remand, Palin filed the operative, first amended complaint on December 30, 2019. ECF 70. The Court subsequently granted defendants' motion for partial judgment on the pleadings, dismissing Palin's claim for disgorgement of advertising revenues specifically associated with the Editorial. ECF 83. On June 12, 2020, the parties filed cross-motions for summary judgment. ECF 94, 95. The Court denied these motions on August 28, 2020 and set the case for trial February 1, 2021. ECF 117.

Defendants subsequently filed a motion for reconsideration on the basis of an intervening change in substantive law: New York State's November 10, 2020 amendment of its libel statute to expressly require a public figure such as Palin to prove actual malice by clear and convincing evidence. ECF 119. On December 29, 2020, the Court granted defendants' motion for reconsideration and held that the amendment to New York's so-called "Anti-SLAPP Statute,"[18] N.Y. Civil Rights L. § 76-a(2), applies to this action. Consequently, Palin's burden to prove actual malice as to falsity by clear and convincing evidence is not only required by the First Amendment to the United States Constitution but also by New York State statutory law. ECF 125.

---

[18] "Anti-SLAPP" refers to statutes enacted to prevent libel claims from operating as Strategic Lawsuits Against Public Participation ("SLAPP suits") that would otherwise create a risk of litigation tending to wrongly inhibit public discourse.

### B. **The Trial and Rule 50 Motion**

Unfortunately, the COVID-19 pandemic's cycles of intensification and abatement resulted in several epidemiological "surges" at times set for trial, requiring repeated adjournments to comply with the pandemic protocols of the Southern District of New York. After these delays, trial was set to commence on January 24, 2022. But on the eve of trial, Palin contracted COVID-19 and so was barred by the pandemic protocols from entering the courthouse. See Minute Entries 1/24/2022. Finally, on February 3, 2022, a jury was empaneled, and the trial commenced.

Following the close of evidence on Thursday, February 10, 2022, defendants moved for judgment as a matter of law under Fed. R. Civ. P. 50(a) on four issues, each of which was necessary for Palin to prove the essential elements of their liability on her single claim of libel.[19] See Tr. 1053. These included the two aspects of the "actual malice" element, actual malice as to falsity and actual malice as to defamatory meaning, as well as the "of and concerning" and falsity elements. Tr. 1054-1055. Oral argument proceeded in at least five sessions outside the presence of the jury over three days, and counsel

---

[19] The Court notes that the Times made the Rule 50 motion at the earliest available time. The Times did not call any witnesses of its own or otherwise present an affirmative case after Palin rested. This follows from the Court's individual rules of practice, which provide that each witness may only be called once but can be examined at that time by both sides on any issue.

made written submissions of relevant caselaw citations over the intervening weekend, see ECF 174 at 5-9.

Meanwhile, while the Court continued to reserve judgment on the Rule 50 motion, the jury began deliberations on the afternoon of Friday, February 11, 2022. That evening, following relevant argument and a close review of caselaw cited by counsel, the Court denied the prong of defendants' Rule 50 motion directed at the "of and concerning" element of Palin's libel claim. Tr. 1228.

Argument then turned to the portion of the actual malice element concerning whether Bennet knew or recklessly disregarded the Challenged Statements' falsity prior to publication. Id. The Court was initially skeptical of defendants' position, on the basis that the jury might make adverse determinations as to Bennet's credibility and draw adverse inferences about his pre-publication state of mind therefrom. See, e.g., Tr. 1232. However, defense counsel drew the Court's attention to a Second Circuit libel case, Contemp. Mission, Inc. v. New York Times Co., which holds, in sum, that in light of the clear and convincing evidence standard, a plaintiff must adduce some affirmative, "concrete evidence from which a reasonable juror could return a verdict in h[er] favor" to establish a jury question on actual malice, and that it is "[i]t is not enough for the plaintiff merely to assert that the jury might, and legally could, disbelieve the defendant's denial of legal malice." 842 F.2d 612, 621-622 (2d Cir. 1988); see Tr. 1235-1241. Over the weekend, the Court studied the

relevant caselaw, including the numerous citations provided by counsel.

During argument regarding defendants' pending Rule 50 motion on the morning of Monday, February 14, 2022, the Court indicated that it was leaning toward agreement with defendants' position on the issue of actual malice as to falsity, but that, to make sure, it would hear further argument on the issue. The Court further advised the parties that if the Court determined that defendants' Rule 50 motion was meritorious, it would still let the jury reach a verdict so that the case might not need to be retried if the Court's judgment as a matter of law were reversed on appeal.[20] As previously noted, neither party objected in the slightest to this proposal either at that time, during either of the two following sessions of oral argument, or even later that afternoon when the Court indicated it was about to announce its decision on the actual malice prong of the Rule 50 motion. See Tr. 1256-1295.

Later that afternoon, the Court reconvened outside the presence of the jury. First, the Court denied the prong of defendants' motion concerning the falsity element. Specifically, it held that there was

---

[20] See Tr. 1256 ("So I think it comes down to a single issue. By the way, were I to grant the motion -- and I haven't decided yet, but were I to grant the motion, I would still let the jury continue to reach a verdict so that the Court of Appeals, if they disagree with my determination, would still have the jury's verdict before them and we wouldn't have to retry the case. But I don't mean to suggest by that that I've made a decision. I just wanted to flag what would be the result if I did grant the motion.").

sufficient evidence, including unobjected-to testimony from Lepping about her research for the corrections (see n. 15, supra) from which a reasonable jury could conclude that Palin had carried her burden to establish the Challenged Statements' falsity by clear and convincing evidence. See Tr. 1295-1297. Then, after discussing the requirements of Rule 50, the Court explained its determination that no reasonable jury could find that Palin had carried her burden to prove by clear and convincing evidence that Bennet had known or recklessly disregarded the Challenged Statements' falsity prior to publication. Tr. 1299-1305. The Court further stated that it would permit the jury to continue its deliberations, and it would formally enter its Rule 50 judgment as a matter of law after the jury returned its verdict. Tr. 1298, 1305. There were no objections.[21]

At the end of the day and after announcing its ruling on the Rule 50 motion, the Court reconvened counsel and asked whether either side sought a further instruction about avoiding media coverage of the

---

[21] Plaintiff's counsel has since suggested that the Court recognized an objection to this procedure when it stated, after delivering the substance of its Rule 50 decision, that "needless to say, the plaintiff is deemed to have objected to my decision, and that is preserved for appeal as well." Tr. 1306. But plaintiff's interpretation grossly misconstrues the record. The full context of the quoted remark reflects that it concerned only the legal substance of the Court's Rule 50 decision, which plaintiff's counsel had addressed at length, and that the Court was merely recognizing plaintiff counsel's presumed reassertion of those prior objections to the substance of the Court's Rule 50 decision. Because neither party had ever objected to the Court's proposal not to discharge the jury after delivering its Rule 50 decision, there was no prior objection to the procedural aspect of the Court's action that the Court could have recognized as reasserted.

trial or whether "we should just leave things as is." Tr. 1307. Plaintiff's counsel declined to ask for any instruction, stating "We leave things as is." Id. However, defense counsel requested an instruction, raising the risk posed by "push notifications that get sent out to people's phones." Id. The Court ultimately recalled the jury and again admonished the jurors not to look at anything regarding the trial, not to speak with anyone about the trial, and "if you see anything in the media about this case, just turn away."[22] Tr. 1308.

The following afternoon, the jury delivered a verdict of not-liable, which was confirmed in a poll of each individual juror. See ECF 173; Tr. 1324-1325. The Court then informed the jury about its ruling on the Rule 50 motion and discharged the jury. Tr. 1326-1327. The Court entered final judgment later on February 15, 2022. ECF 171.

After the jury was excused, the Court directed its law clerk to speak with the jury about any problems it might have had with the Court's instructions of law or any suggestions they might have for improvements. This has been the Court's routine practice for over 25 years and more than 300 jury trials, and it has led to material improvements. For example, as suggested by a jury several years ago, the Court now always provides the jury with a "short-form" version of its instructions of law at or near the very start of the trial, as it

---

[22] The jury was instructed to turn away from media coverage repeatedly throughout the trial, including when it was empaneled, Tr. 71; after an incident in which a member of the public cheered Palin and denigrated The Times while jurors were waiting for the elevator, Tr. 500, 512; and by email over a weekend recess, ECF 174.

did in this very case. However, in the course of their post-verdict
discussion in the instant case, a few of the jurors volunteered to the
law clerk that they had previously become aware of the bottom line of
the Court's February 14 ruling, because, notwithstanding that they had
assiduously adhered to the Court's instruction to avoid media coverage
of the trial, they had received "push notifications" on their
smartphones containing a few words to the effect that the Court
intended to dismiss the case. ECF 172. Although the same jurors made
a point of affirmatively expressing to the law clerk that their limited
knowledge had not affected their deliberations in the slightest, the
Court, upon learning of this conversation, promptly disclosed it, in
writing, to the parties and the public. Id.

III.  **Legal Framework**

As explained, the Court entered Final Judgment for defendants as
a consequence of their Rule 50 motion for judgment as a matter of law.
ECF 171. Specifically, the Court granted the Rule 50 motion with
respect to Palin's failure to adduce evidence from which any rational
jury could find by clear and convincing evidence either that Bennet
and the Times published the Editorial knowing that it contained a
false statement of fact about Palin or that Bennet and the Times
published in reckless disregard of the Editorial's truth or falsity.
Therefore, the Court sets forth in this section the legal frameworks
governing the substantive and procedural aspects underlying its
judgment.

## A. <u>Elements of Liability for Libel of a Public Figure</u>

A claim of libel arises from the publication of a false defamatory statement made in writing or print. To establish liability for such a claim under here-applicable New York law, Palin, who is a "public figure," was required to prove four essential elements concerning any allegedly libelous statement:[23]

(1) It was a statement of fact that the ordinary reader of the publication would understand, when taken in the context in which it appears, to convey a defamatory meaning, <u>Mahoney v. Adirondack Pub. Co.</u>, 71 N.Y.2d 31, 38 (1987);

(2) An ordinary reader would reasonably understand the statement to be "of and concerning" the plaintiff personally, rather than referring to another person or entity, <u>Three Amigos SJL Rest., Inc. v. CBS News Inc.</u>, 28 N.Y.3d 82, 86 (2016);

(3) The statement was materially false, <u>Rinaldi v. Holt, Rinehart & Winston, Inc.</u>, 42 N.Y.2d 369, 380 (1977); and

(4) At the time of publication, the Times (and Bennet, in particular) had the state of mind known as "actual malice," <u>Harte-Hanks Commc'ns, Inc. v. Connaughton</u>, 491 U.S. 657, 666 (1989).

While a plaintiff may prove the first two elements by a preponderance of the credible evidence, the elements of falsity and actual malice must be proven by clear and convincing evidence. <u>See Rinaldi</u>, 42 N.Y.2d at 379. Also, the parties agreed, based on the record and the scope of <u>respondeat superior</u> liability under New York law, to treat Bennet and The New York Times Co. as a single unit with any finding of liability or non-liability applying equally to both defendants. Tr.

---

[23] Although a fifth element, publication, is also an essential element of a libel claim, defendants here conceded that the challenged statements were published, so this was never in dispute. <u>See</u> Tr. 466.

462-464 (charge conference); Jury Instructions at 12 (corporate liability). As for damages, since the Challenged Statements, as construed by Palin, were defamatory per se, damages were presumed, and proof of special damages was not required as an element of liability.[24]

The First Amendment's guarantees of freedom of speech and of the press prohibit imposition of liability for libel of a public figure unless the plaintiff proves that the defendants acted with "actual malice." Sullivan, 376 U.S. at 279-280; see also Harte-Hanks Commc'ns, 491 U.S. at 666 (confirming that the Sullivan rule applies to public figures).[25] It is undisputed that Palin is a public figure for the purposes of this lawsuit. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974) (defining public figures as those who "have thrust themselves to the forefront of particular public controversies in

---

[24] During argument concerning the jury charge, the Court denied defendants' motion in limine that sought a ruling that the Challenged Statements were not defamatory per se. See ECF 159; Tr. 682. Under New York law, "[a]ny written or printed article is libelous or actionable without alleging special damages if it tends to expose the plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." Rinaldi, 42 N.Y.2d at 379. The assertion that Palin's actions played a "clear" or "direct" role in causing Loughner to commit a mass shooting undoubtedly falls within this definition of a libelous per se statement. See Tr. 896-897 (describing death threats Palin and her children received after the accusation was first made in 2011).

[25] Palin has consistently maintained that New York Times v. Sullivan either is no longer good law or does not apply to this case, and thus that the First Amendment does not require her to prove that Defendants published with actual malice. The Court has repeatedly rejected these contentions, which are fully preserved for appellate review. See, e.g., ECF 117 at 11-13.

order to influence the resolution of the issues involved" and thereby "invite attention and comment"). Therefore, to prevail, Palin must prove by clear and convincing evidence that Bennet and the Times published the Editorial "with knowledge that it was false or with reckless disregard of whether it was false or not." Sullivan, 376 U.S. at 280.[26]

New York State's "Anti-SLAPP" statute independently requires a plaintiff in Palin's position to prove actual malice, i.e., to have "established by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false." Civil Rights L. § 76-a(2). The Court has already held that the current version of this

---

[26] A central plank of the defense was Bennet's assertion that he did not intend the Editorial to convey that the crosshairs map directly caused Loughner to commit the Arizona shooting. This issue largely turns on Bennet's intent in using the word "incitement." On summary judgment, the Court accepted defendants' argument that Bennet could not have actual malice as to the Editorial's purported falsity unless he was also aware that readers would interpret his words to convey the allegedly false meaning. See ECF 117 at 13-15. Accordingly, the Court held that Palin was required to prove two necessary aspects of actual malice by clear and convincing evidence: actual malice as to falsity and actual malice as to defamatory meaning. See id. at 18-19. To prove actual malice as to defamatory meaning, Palin was required to show that Bennet either intended to convey the alleged defamatory meaning or that he was aware that ordinary readers would probably understand his words to convey the allegedly defamatory meaning and he published anyway. See Jury Instructions at 20.

Although defendants' Rule 50 motion contended that Palin had failed to prove by clear and convincing evidence the aspect of actual malice concerning defamatory meaning, the Court did not address this prong of defendants' motion during oral argument. See Tr. 1263. It therefore forms no part of the Court's reasoning as set forth below and is deemed denied as moot.

statute, amended November 10, 2020, applies retroactively to this
action. See ECF 125. Therefore, the Court's entry of judgment as a
matter of law for Palin's failure to prove actual malice rests
independently on both federal law, via the First Amendment, and on New
York State statutory law, via Civil Rights L. § 76-a(2).

As explained above, the Court denied Defendants' Rule 50 motion
with respect to all elements except actual malice, and then only
granted the motion with respect to the aspect of actual malice
concerning Bennet's knowledge or reckless disregard of the Challenged
Statements' falsity. It was also clear from argument that Palin was
not seriously contending that Bennet published the Editorial with
actual knowledge that the Challenged Statements were false; rather,
Palin argued that she established actual malice by virtue of reckless
disregard.

The cornerstone of the reckless disregard standard for actual
malice is that the plaintiff must prove by clear and convincing
evidence, that the "defendant in fact entertained serious doubts as
to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727,
731 (1968). And, as the New York Court of Appeals has explained, "there
is a critical difference between not knowing whether something is true
and being highly aware that it is probably false. Only the latter
establishes reckless disregard in a defamation action." Liberman v.
Gelstein, 80 N.Y.2d 429, 438 (1992). Liability is therefore barred
unless Palin adduced clear and convincing evidence supporting the
conclusion that, at a minimum, "a false publication was made with a

high degree of awareness of probable falsity." Id. Proof of negligence does not suffice to establish actual malice: "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." Id.

Nor, without clear and convincing proof that the defendant harbored serious doubts about the truth of the allegedly libelous statement, would it be enough to "show[] ... highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." Harte-Hanks Commc'ns, 491 U.S. at 666. The failure to investigate a fact or confirm an assertion before publication does not establish reckless disregard -- "even if a prudent person would have investigated before publishing the statement" -- unless the evidence proves that "defendants' 'inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity' of the published statement." Sweeney v. Prisoners' Legal Servs. of New York, Inc., 84 N.Y.2d 786, 793 (1995) (quoting Harte-Hanks Commc'ns, 491 U.S. at 692).

B. **Legal Standard -- Rule 50**

As already noted, the standard for granting a motion under Fed. R. Civ. P. 50 for judgment as a matter of law requires a court to consider all the evidence in the record and draw all reasonable inferences in favor of the non-movant, here Palin. Furthermore, the Court may neither make determinations as to the credibility of

witnesses or other evidence nor weigh conflicting evidence, as any such analysis of the evidence is the jury's exclusive province.

Independently, however, in reviewing the evidentiary record of actual malice, "the judge must view the evidence presented through the prism of the substantive evidentiary burden," i.e., clear and convincing evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). Anderson was a libel case, and it addressed the legal issue before this Court: the appropriate standard to apply to a defendant publisher's motion for summary judgment on the actual malice element of a libel claim brought by a public figure, which it described as identical to the standard applied to motions made under Fed. R. Civ. P. 50. Id. at 245-246, 250. The Anderson Court held that to determine whether a jury question exists as to the actual malice element, a judge must account for the clear-and-convincing standard of proof and determine. Id. at 255. Therefore, "there is no genuine issue" of material fact, and so the defendants' motion must be granted, "if the evidence presented [by the plaintiff] is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence." Id. at 254.

Anderson also rejected the proposition that a jury question as to actual malice exists where the defendant's "state of mind is at issue and the jury might disbelieve him or his witnesses as to this issue." 477 U.S. at 256. The Court thus held that a plaintiff cannot reach the jury on her libel claim "without offering any concrete evidence from which a reasonable juror could return a verdict in [her]

favor and by merely asserting that the jury might, and legally could, disbelieve the defendant's denial of a conspiracy or of legal malice." Id. A libel plaintiff has a "burden of producing ... evidence that would support a jury verdict." Id. "[D]iscredited testimony" of the libel defendant on its own "does not constitute clear and convincing evidence of actual malice." Bose Corp., 466 U.S. at 512. Therefore, as a matter of law, a libel "plaintiff must present affirmative evidence" supporting the inference that the defendant published with knowledge or reckless disregard of the statement's falsity to reach a jury on the question of actual malice, even though such "evidence is likely to be within the possession of the defendant." Anderson, 477 U.S. at 257. As the Second Circuit has repeatedly explained, this means that a libel plaintiff bears the burden that "[s]ome [affirmative] facts must be asserted to support the claim that the state of mind existed." Contemp. Mission, 842 F.2d at 622.

**IV.   Bennet's State of Mind**

The essential question is whether the record reflects any evidence that could give rise to the conclusion that Bennet knew or consciously disregarded that the Challenged Statements were false at the time the Editorial was published on June 14, 2017. In making this assessment, the Court, construing Palin's claim most favorably to her, assumes, as Palin alleges, that Bennet either intended his edits to Williamson's draft to convey that the crosshairs map played a causal role in spurring Loughner to commit the Arizona shooting or at least that Bennet recklessly disregarded that defamatory meaning. Therefore, the

specific inquiry is whether there is any basis from which a reasonable jury could find by clear and convincing evidence that Bennet knew or strongly suspected, before publication, that no link had been established between the crosshairs map and the Loughner shooting. As explained below, the Court concludes that the record contains no such evidence.

Palin has pointed to two categories of evidence that she argues foreclose judgment as a matter of law on actual malice: the research gathered for the Editorial and Bennet's prior awareness of Loughner's motivations. The Court deals with each in turn and then discusses other evidence in the trial record that is probative of Bennet's pre-publication state of mind.

A. **The Research**

Viewed in the light most favorable to Palin, the Court assumes that Bennet read and understood three prior New York Times opinion pieces that Lett found and circulated on June 14, 2017: Frank Rich's "No One Listened to Gabrielle Giffords," DX-24, and the two editorials published in January 2011: "Bloodshed and Invective in Arizona," PX-134, and "As We Mourn," PX-135. But even on the assumption that Bennet read and understood these three articles in their entirety, none presents any definitive facts about the Arizona shooting that would have put Bennet on notice (or led him to strongly suspect) that no link had been established between the crosshairs map and Loughner's attack.

Rich's column, "No One Listened to Gabrielle Giffords" was written one week after the Arizona shooting and presented no actual evidence about Loughner's mental state at the time he committed the Tucson attack. DX-24. Rich opened by endorsing President Obama's statement that "no one can know what is in a killer's mind" but nonetheless argued that while a "simple lack of civility didn't cause the Tucson tragedy," the political violence committed by Loughner and others emerged from a context filled with violent, antigovernment political rhetoric from the radical right. Id. at 2-3. Rich contended, therefore, that the fact "[t]hat Loughner was likely insane, with no coherent ideological agenda, does not mean that a climate of antigovernment hysteria has no effect on him or other crazed loners out there." Id. at 3. Assuming that Bennet knew the contents of this column when he revised the Editorial, the Court concludes that "No One Listened to Gabrielle Giffords" provides no facts about Loughner or argument about the attack that contradict the facts asserted in the Challenged Statements. Therefore, the Frank Rich column provides no basis for finding that Bennet knew or suspected that his revision introduced false statements of fact into the Editorial.

The Times' editorial published the day after the Arizona shooting, entitled "Bloodshed and Invective in Arizona," also provides no facts or argument that contradict the Challenged Statements. This editorial describes Loughner as "appear[ing] to be mentally ill" and notes that "[h]is paranoid Internet ravings about government mind control place him well beyond usual ideological categories." PX-134 at 1. But the

piece nonetheless argues that violent, antigovernment rhetoric creates a context in which people like Loughner are more likely to commit violent acts.[27] At trial, Bennet described this as "the same point" he was trying to make in "America's Lethal Politics." Tr. 712. The core of the argument presented in "Bloodshed and Invective in Arizona" is also consistent with the argument made in "America's Lethal Politics" that violent political rhetoric can make political violence more likely to occur, even if the perpetrators are deranged:

> It is facile and mistaken to attribute this particular madman's act directly to Republicans or Tea Party members. But it is legitimate to hold Republicans and particularly their most virulent supporters in the media responsible for the gale of anger that has produced the vast majority of these threats, setting the nation on edge. Many on the right have exploited the arguments of division, reaping political power by demonizing immigrants, or welfare recipients, or bureaucrats. They seem to have persuaded many Americans that the government is not just misguided, but the enemy of the people.

PX-134 at 2. Bennet described this passage as "[t]o me, ... the same point" as the one he was trying to make in "America's Lethal Politics." Tr. 713. Granted, a tension emerges when one reads both "Bloodshed and Invective in Arizona" and "America's Lethal Politics" in the light most favorable to Palin's claim: the earlier piece says it is "facile and mistaken to attribute this particular madman's act directly to"

---

[27] See PX-134 at 1 ("But [Loughner] is very much a part of a widespread squall of fear, anger and intolerance that has produced violent threats against scores of politicians and infected the political mainstream with violent imagery. With easy and legal access to semiautomatic weapons like the one used in the parking lot, those already teetering on the edge of sanity can turn a threat into a nightmare.")

specific politicians, but the Editorial can be read as doing just that when it asserts that "the link to political incitement was clear," in the context of a discussion of the crosshairs map. But this tension emerges from the arguments made by these two pieces, not contradictions in their presentations of the relevant facts. Of course, "[u]nder the First Amendment there is no such thing as a false idea," so statements of opinion are not actionable in libel. Gertz, 418 U.S. at 340. "Bloodshed and Invective in Arizona" therefore provides no basis for concluding that Bennet knew or suspected that the Challenged Statements contained materially false statements of fact.

The third piece of research Palin emphasizes is the editorial "As We Mourn," which was published four days after the attack and praises then-President Obama's speech at a memorial service for the Tucson victims. PX-135. Palin focuses on its praise of Obama's statement that the Arizona attack should be a turning point "not because a simple lack of civility caused this tragedy -- it did not -- but rather because only a more civil and honest public discourse can help us face up to our challenges as a nation." Id. at 1-2. But neither this line nor any other portion of "As We Mourn" presents any facts that contradict the facts asserted in the Challenged Statements. Accordingly, Bennet's having read "As We Mourn" does not support the conclusion that he knew or recklessly disregarded that it was false to assert that Loughner was "incited" by the crosshairs map.

The Court also rejects Palin's argument that the presence in Williamson's draft (and the final Editorial) of the hyperlink on the

word "circulated" to the ABC News article weighs in favor of finding that Bennet published with actual malice. To be sure, had Bennet read the ABC News article -- which states in the tenth paragraph that "[n]o connection has been made between this graphic and the Arizona shooting," DX-10 at 1-2 -- it would be relevant to establishing that Bennet had reason to doubt that the "link to political incitement was clear" with respect to the Arizona shooting.[28] But Bennet testified that he neither clicked on the "circulated" link in Williamson's draft nor read the ABC News article before the Editorial was published. Tr. 609-610. And Palin has adduced no affirmative evidence to undermine Bennet's testimony on this point. Therefore, even viewing the record in the light most favorable to Palin and drawing all reasonable inferences in her favor, the Court concludes that the contents of the ABC News article did not inform Bennet's pre-publication state of mind.

Indeed, Palin effectively conceded as much by adopting the alternate position during oral argument on the Rule 50 motion that it

---

[28] Even if, assuming arguendo, Bennet had read the ABC News article, it is not at all clear that it would establish that Bennet knew that there was no connection between the cross hairs map and Loughner's attack. The ABC News article was written only one day after the shooting, and its thrust is that people were drawing a link between the shooting and the cross hairs map in the immediate aftermath of the attack. See DX-10. A reasonable reader in Bennet's position would not necessarily understand the hedge contained in the tenth paragraph -- that within one day of the attack, no firm connection had yet been made been made between Loughner and the map -- as conclusive evidence that no such connection was later established by investigators. Of course, this point is academic, since the record reflects that Bennet never read the ABC News article before publication.

was highly unreasonable for Bennet not to have clicked the hyperlink when revising. See, e.g., Tr. 1274. But this contention fails to establish actual malice for two reasons. First, as a legal matter, assuming arguendo that Bennet was negligent -- or even grossly negligent -- in not clicking the link, that would do nothing to establish that Bennet had the subjective awareness of (probable) falsity that is the sine qua non of actual malice. See Harte-Hanks Commc'ns, 491 U.S. at 666. And second, as a factual matter, it is not at all clear that Bennet's failure to click on the link was even negligent: the hyperlink was keyed to the word "circulated," thereby implying factual support for the well-known proposition that Palin's PAC had circulated the crosshairs map prior to the Arizona shooting.[29] Palin established no reason why Bennet was negligent not to validate this proposition, which is distinct from the allegedly libelous assertion and was not subject to question at any time. Accordingly, Bennet's failure to click the ABC News link does not support the conclusion that he published with actual malice.

In sum, drawing all reasonable inferences in Palin's favor regarding Bennet's pre-publication reading, none of the research materials in the record supports the conclusion that Bennet had reason

---

[29] The full sentence in Williamson's draft read: "Then, it was the pro-gun right being criticized: in the weeks before the shooting Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs." PX-141.

to know, or even to suspect, that his revisions had introduced false statements of fact to the Challenged Statements.[30]

Accordingly, the Court concludes that none of the evidence related to the Editorial Board's pre-publication research process supports the conclusion that the Times published the Editorial with knowledge or reckless disregard as to the Challenged Statements' falsity.

**B. Bennet's Recollection**

In addition to research conducted for the Editorial on June 14, 2017, Bennet theoretically could have had prior knowledge regarding the relationship -- or lack thereof -- between the crosshairs map and the Arizona shooting. But the record belies this possibility. Bennet testified that he was not aware of the details of the Loughner case and that he did not recall the controversies surrounding the crosshairs map before the Editorial was written. Palin offered no admissible evidence that would undermine Bennet's testimony on this point. Nor are Bennet's contemporaneous communications inconsistent with his testimony. Accordingly, the Court concludes that Palin has not proved that Bennet had any prior recollection of the Arizona shooting from which a rational jury could infer that he published with actual malice.

Bennet testified that he did not recall seeing the crosshairs map or any press coverage about it when the map was originally released

---

[30] Nor was there any other research that could have informed Bennet's state of mind on June 14, 2017, because he testified that he relied on Lett's research and did no independent research himself. Tr. 610, 621.

in 2010. Tr. 607. Nor does Bennet recall seeing any posts on Twitter that Palin made in connection with the map. Id. Indeed, Bennet testified that at the time he revised the Editorial, he did not have a mental image of the map and "was relying on [Williamson's] description of it in the piece."[31] Id.; see also Tr. 705.

Bennet also denied having any recollection of specific articles he read in 2011 or thereafter about the Arizona shooting that discussed Loughner's mental state at the time of his attack.[32] Tr. 620. Bennet

---

[31] Palin had sought to offer evidence regarding James Bennet's brother, Michael Bennet, who has served during all times relevant to this case as the Democratic Senator representing Colorado. Palin had argued both that James Bennet's relationship to his brother could establish bias and that it would have made James Bennet more likely to have been aware of the cross hairs map at the time it was published. See, e.g., Tr. 501-502; ECF 147. However, the Court ultimately sustained the Times' objections, articulated on the record and in a motion in limine, see ECF 136, and excluded this evidence both on grounds of relevance, since plaintiff's counsel had laid no foundation adequate to support either asserted theory of relevance, and on Rule 403 grounds. Tr. 502-503.

Palin adduced no affirmative evidence that Bennet or others on the Times' Editorial Board were biased, fairly or unfairly, against Palin. Even had Palin been able to elicit such evidence, whether arising from James Bennet's relationship with his brother or from any other source, that would not have established actual malice. See, e.g., Harte-Hanks Commc'ns, 491 U.S. at 666; Buckley v. Littell, 539 F.2d 882, 889 (2d Cir. 1976). ("Repeatedly the Court has said that ill will toward the plaintiff or bad motive, indeed, hatred, spite or desire to injure, are not the kind of 'malice' that the New York Times Co. v. Sullivan test comprehends.").

[32] Palin had sought to offer several articles written by the commentator Andrew Sullivan who published a blog called The Daily Dish that was associated with website of The Atlantic magazine at the time of the Arizona shooting, when Bennet was the editor of The Atlantic. The Daily Dish articles concerned the investigation into Loughner's attack and the allegation made in its immediate aftermath, but ultimately discredited, that the cross hairs map played a role in causing Loughner to commit the mass shooting. Plaintiff's counsel

did, however, have the general recollection of learning from media reports that Bennet "was deranged." Tr. 621. But Bennet testified that he was unaware on June 14, 2017 "whether or not Jared Loughner had seen the crosshairs map," because, he explained "I hadn't reported that myself and I don't think I read any reporting on that. So I didn't know." Tr. 720. Still, he testified that he had "remember[ed] that there had been a debate ... after the shooting ... about exactly this issue, about, you know, inciting rhetoric, but my memory of that was vague." Tr. 702-703. He did not think to look into this issue, Bennet explained, because he "was functioning as the editor, not the reporter on the piece, so [he] wouldn't normally do the reporting in a situation like this, particularly when ... on a tight deadline." Tr. 721.

Bennet continued:

> I didn't think then and don't think now that the map caused Jared Loughner to act. I didn't think we were saying that, and therefore I wouldn't have -- the question wouldn't have entered my mind, didn't enter my mind to research that question.

---

intended to offer these articles to show that Bennet knew that the allegations of a link between Loughner and the map had been discredited. However, plaintiff's counsel was unable to offer an adequate foundation for these articles' admission. The record reflects that Bennet had no editorial responsibility over The Daily Dish, and plaintiff's counsel never elicited any testimony or proffered any other evidence that Bennet had in fact read the articles in question. Accordingly, the Court excluded the articles under Fed. R. Evid. 401 and 402, subject to reconsideration. Tr. 503-511. Specifically, the Court provided plaintiff's counsel the opportunity to conduct voir dire of Bennet outside the presence of the jury to lay additional foundation for the articles' admission. Tr. 508. However, plaintiff's counsel never availed themselves of this opportunity.

Tr. 721. Palin might argue that the first sentence of this comment indicates that Bennet did not believe that what he was writing was true. But the Court concludes that is not a reasonable reading of Bennet's answer and that such a reading would be inconsistent with Bennet's testimony overall. The answer as a whole explains that Bennet's intention was to convey a message that was consistent with his understanding of the Arizona shooting. As Bennet explained a few answers earlier, "when politicians get shot, I suspect it has something to do with politics, and I think that an atmosphere of highly charged political rhetoric makes such, you now, terrifying events more likely." Tr. 720. Accordingly, Bennet's statement that he "didn't think then ... that the map caused Jared Loughner to act" cannot reasonably be read to mean that he thought the map did not contribute at all to the Tucson attack. Rather, the answer must be read to explain that because Bennet did not intend to convey that the crosshairs map directly caused Loughner to act, he therefore did not consider the need to research the veracity of that assertion. In any event, the statement does not suggest that Bennet knew or suspected that there existed any official or widely accepted conclusion that no link whatsoever existed between Loughner's attack and the map. Therefore, it cannot be reasonably inferred from this answer that Bennet published the Editorial with actual malice.

The evidence reflects that Bennet did not introduce the crosshairs map to the draft Editorial, nor did he direct Williamson or anyone else at the Times to refer to Palin in the Editorial. See Tr. 720.

True, Bennet brought up the Giffords shooting in his 12:41 p.m. email, which stated:

> Hey Elizabeth -- As Bob has said there's most likely a gun control point to be made here. The other question is whether there's a point to be made about the rhetoric of demonization and whether it incites people to this kind of violence. Hard for me to imagine that Bernie himself is guilty of anything like that. But if there's evidence of the kind of inciting hate speech on the left that we, or I at least, have tended to associate with the right (e.g., in the run-up to the Gabby Giffords shooting) we should deal with that.

DX-17. Bennet explained that Loughner's shooting of Representative Giffords was "the obvious precedent" for the "violence against politicians" in the Virginia shooting, Tr. 635, and that his "assumption is that when a politician gets shot, that politics probably had something to do with it," Tr. 704; see also Tr. 720. Bennet also reasonably explained the editorial guidance in his 12:41 email as a proposal for Williamson to research, rather than a directive for her to implement:

> I think "whether" is an important word in this sentence. You know, I've got it there twice. I'm -- I'm putting this to my colleagues as -- I'm raising it as a point to be considered as something we might include, you know, the other question is whether there's a point to be made about this. And then I say the point -- in my mind, the point is whether it incites people to this kind of violence. I didn't write that it incites people to this kind of violence. And I think that's a significant difference. My intention was to raise a question, to make an argument that this was this danger but not to assert it as a matter of fact. Because like the easy availability of guns, you know, I don't have -- I can't prove -- I can't prove that this kind of rhetoric actually, you know, does lead to this sort of violence.

Tr. 700-701. Bennet further testified that when he reviewed Williamson's full draft just after 5:00 p.m., he understood the

reference to the crosshairs map to be "the specific example that [Williamson] returned with of incitement or incendiary rhetoric, and I just trusted that it was ... an example of that based on her characterization." Tr. 719. While Bennet then inaccurately strengthened Williamson's language in a manner that led to the factual error, none of Bennet's editorial direction from earlier in the day supports the proposition that Bennet knew or suspected that Loughner's actions were wholly unrelated to the crosshairs map.

If anything, the record as a whole reflects that Bennet had a general, albeit inaccurate, recollection (or, perhaps, assumption) that the Arizona shooting was preceded by "inciting" political rhetoric and that he incorrectly understood Williamson's reference to the crosshairs map as confirmation of that connection. If that account does reflect Bennet's thought process, then it undermines, rather than strengthens, any inference that he knew or suspected that his revision introduced falsity to the Editorial.

In sum, Palin adduced no evidence suggesting that Bennet (and therefore the Times) was aware, at the time "America's Lethal Politics" was published, that the hypothesized link between her crosshairs map and Loughner's attack had been widely rejected.

C. **Other Evidence**

As discussed above, Palin failed to offer any affirmative evidence supporting the inference that Bennet knew or suspected that his revisions introduced falsity to the Editorial. This alone suffices for the Court to conclude that Palin failed to adduce evidence sufficient

for a reasonable jury to find by clear and convincing evidence that Bennet published with actual malice. A public figure cannot rely solely on the chance that the jury declines to credit the defendant's testimony denying that he had the necessary state of mind. See Anderson, 477 U.S. at 256; Contemp. Mission, 842 F.2d at 621-622; see also § III.B, supra. Nonetheless, the record reflects a wealth of other evidence that is incompatible with the inference that Bennet knew or suspected that his revision introduced falsity to the Editorial, even if that evidence is viewed in the light most favorable to Palin.

First, the context of Bennet's revision in the Times' editing and fact-checking processes belies the inference that he intentionally or recklessly published false information. Far from Palin's allegation that Bennet intentionally defamed her by forcing the Editorial Board to write a piece in accordance with his diktats because he purportedly held a political grudge against her or her positions, the evidence shows that Bennet did not seek out the opportunity to revise Williamson's draft. The uncontroverted testimony is that Cohn brought the draft Editorial to Bennet's attention because she thought that the draft's argument was unclear; Bennet did not direct Cohn, Williamson, or anyone else to involve him in the editing process for "America's Lethal Politics." See Tr. 520, 636. After Bennet completed his revision at 7:21 p.m., DX-30 at 178, he immediately emailed Williamson, asking her to "[p]lease take a look." PX-163. Bennet testified that his request to "[p]lease take a look" was intended to convey to Williamson

that she should review the piece for fact-checking issues. Tr. 638. This request is incompatible with the inference that Bennet published with actual malice.

Since Bennet was acting as the editor, and since he had not conducted any of the reporting himself, sending a "playback" of the Editorial to the primary author, Williamson, was consistent with <u>Times</u> practices, as they were consistently explained at trial. <u>See</u> Tr. 639, 577. Bennet also submitted his draft to the other editors who were responsible for ensuring the quality, clarity, and accuracy of Editorial Board publications. Accordingly, after Bennet completed his revision, the draft was reviewed, edited, and (in some cases) corrected by Williamson (fact checking), Cohn (editing), Lepping (fact checking), Semple (editing), and Levine and Rakowski (copy editing). <u>See</u> <u>supra</u> § I.D. The thoroughness of these checks was obviously limited by the fact that the print deadline was less than an hour after Bennet saved his draft to Backfield. But the record reflects that this time pressure is routine in the daily newspaper business and not at all suggestive of actual malice.

The Court therefore concludes that, even taking every inference in Palin's favor, Bennet's compliance with these normal pre-publication procedures is consistent with the behavior of a high-ranking editor who is somewhat removed from the reporting details underlying the piece and so was relying on the established processes to ensure that his revisions did not introduce errors. Those processes may have failed in this case; but, nonetheless, Bennet's submission

of the Editorial to several layers of pre-publication review is inconsistent with his intentional or reckless publication of false information.

Second, Bennet's post-publication[33] email exchange with <u>New York Times</u> columnist Ross Douthat about the criticism of the Editorial emerging on Twitter is inconsistent with Bennet having already known or suspected that his revisions introduced falsity. After Douthat explained that the Editorial had the facts of the Loughner case wrong, Bennet responded by stating, in part, that his "understanding was that in the Giffords case there was a gun sight superimposed over her district; so far in this case we don't know of any direct threat against any of the congressmen on the field.... That's not to say ... that the violence in [this] case was caused by the pol[i]tical rhetoric."[34] PX-174. Bennet's response does not specifically insist that he was correct to assert that "the link to political incitement was clear," but he does not state or imply that he believes the

_____

[33] <u>See</u> <u>Stern v. Cosby</u>, 645 F.Supp.2d 258, 280 n.14 (S.D.N.Y. 2009) (holding that post-publication statements may be considered as evidence of the defendant's pre-publication state of mind) (Chin, J.).

[34] This email's accurate description of the crosshairs map contrasts with the inaccurate description of the map in the published Editorial and, when viewed in the light most favorable to Palin, could support the inference that Bennet knew that the description of the map Williamson had drafted was false. But Palin does not contend that the inaccuracy in the map's description was a defamatory falsehood; Palin instead complains about the asserted link between her PAC's map and Loughner's attack. Accordingly, no reasonable jury could find that this discrepancy establishes that Bennet published with actual malice as to the falsity of the allegedly defamatory aspects of the Challenged Statements.

Editorial to make a false assertion of fact. Bennet writes instead
that the "specific" link between the crosshairs map and Representative
Giffords does not mean that the map "caused" Loughner's violence, a
message he testified he did not "intend[] to send." Tr. 645.

After checking Twitter to read some of the criticism of the
Editorial, Bennet sent a text message to Williamson asking, about "the
Giffords comparison." DX-46. Bennet asked Williamson, "Do we have it
right?" Id. Even viewing this message and the associated testimony in
the light most favorable to Palin, it suggests that at 11:38 p.m. on
June 14, 2017, Bennet did not know whether the "link" asserted in the
Editorial between the Arizona attack and "political incitement" was
accurate. The late-night message, which Bennet said he sent "[b]ecause
[he] was really worried," Tr. 747, is inconsistent with Bennet having
already known or suspected that the asserted link was false.

Bennet's emails and text messages sent the next morning are also
inconsistent with him having already known or suspected that the
Challenged Statements were false. At 5:08 a.m. -- an "unusual[ly]"
early time for Bennet to be emailing, Tr. 282 -- Bennet told Williamson
and Lepping, in part:

> I don't know what the truth is here but we may have relied too
> heavily on our early editorials and other early coverage of that
> attack. If so, I'm very sorry for my own failure on this
> yesterday. In any case I'd like to get to the bottom of this as
> quickly as possible this morning and correct the piece if needed.
> Can you two please put your heads together on this first thing
> this morning? Please skip the morning meeting if necessary.

PX-191. There are several aspects of this message that undermine the
inference that Bennet had already known or suspected falsity.

First, Bennet states "I don't know what the truth is here." This was an unusual admission: Lepping testified that she had never heard these words from an editor before. Tr. 440. While it may have been negligent for the Times to publish an article that could be read as making a serious accusation without checking if the accusation was true, "there is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action."[35] Liberman, 80 N.Y.2d 438.

The second significant aspect about the email is that Bennet instructed Williamson and Lepping to "get to the bottom of [the factual question] as quickly as possible ... and correct the piece if needed." PX-191. Later that morning, in a text message to Williamson, Bennet reiterated that he "need[ed] ... a rock-solid version" of the correction, which he did not "want to soften if ... we don't need to -- if there was no link we should say so." DX-46 at 2. The Court concludes that these directives are irreconcilable with the suggestion that Bennet purposefully or recklessly published false information. Had he known or suspected the information was false before publication,

---

[35] The Court asked during oral argument for the parties to identify any caselaw that concerned whether the standard for reckless disregard is affected where the allegedly libelous statement had levied serious charges, criminal or otherwise, against the plaintiff. Tr. 1260-1262, 1277. There was extensive argument on this point, and the Court was ultimately persuaded that none of the cases identified by plaintiff's counsel stood for any such proposition that would reduce her burden of proof on actual malice. See generally Tr. 1264-1281.

he likely would have been defensive, avoided issuing a correction to the Editorial, or tried to minimize the correction's confession of error.

The third significant aspect of Bennet's email is his expression of regret for the mistake, which he describes as his "own failure." Bennet's apologetic tone was repeated elsewhere on June 15, 2017. Williamson testified that Bennet was "crestfallen" about the error, Tr. 183, and Bennet's text messages later that morning also reflect that he "fe[lt] lousy about" the error and that he was "sorry." DX-46 at 2. When working on the Twitter posts that would disseminate the first correction, Bennet edited the language proposed by another New York Times staff member to add an apology for the error and thank readers for "call[ing] us on the mistake." DX-53 at 1; Tr. 1033. Bennet also drafted a statement in response to questions from a CNN media reporter in which he stated that "I, James Bennet, do apologize to [Sarah Palin] for this mistake." DX-60 at 2. However, a member of the New York Times Co. public relations staff did not pass along this statement to CNN, so it was never published. PX-236. But for the purpose of assessing Bennet's state of mind, it is not relevant whether the apology ultimately reached Palin. What matters is that, as Bennet testified, "I tried [to apologize] that day. I did -- I thought I had apologized to her. I went home that night thinking I had made a personal apology to the Governor." Tr. 675. The Court concludes that even applying the Rule 50 presumptions, Bennet's private and (intended to be) public expressions of apology, all made before the prospect of

litigation had arisen, are inconsistent with his having intentionally or recklessly introduced the factual error to the Editorial.

Accordingly, the Court's review of the remaining evidence in the record that is relevant to Bennet's pre-publication state of mind weighs heavily and uniformly against finding that he knew or recklessly disregarded that his revisions introduced false statements of fact into the Editorial.

## V.   Conclusion

For the reasons set forth above, the Court finds that Palin adduced no affirmative evidence that Bennet knew that the Challenged Statements were false or recklessly disregarded their probable falsity. The Court is therefore bound to conclude that no reasonable jury could find that Bennet, and therefore The New York Times Co., published "America's Lethal Politics" with actual malice. Clear and convincing proof of knowledge or reckless disregard for falsity is an essential element of a public figure's libel claim. It is required both by Sullivan's construction of the First Amendment and, independently, by N.Y. Civil Rights L. § 76-a(2). Palin thus failed, as a matter of both state and federal law, to carry the heavy burden necessary to prove her libel claim. So the Court was obliged to grant Defendants' Rule 50 motion and dismiss the action with prejudice.

Although the Final Judgment ultimately rests on the Court's dismissal of the action under Rule 50, that legal conclusion is reinforced by the jury's verdict that defendants are not-liable. The Court continues to have great confidence in the integrity of the jury's

verdict, notwithstanding that a few jurors became aware, involuntarily, of the bare fact that the Court intended to dismiss the case as a matter of law. In a case attracting a high degree of public attention, it is inevitable that at least some jurors will encounter information outside the Court's control, even if they are completely conscientious. Here, of course, it was the timing of the Court's announcement of its Rule 50 determination that increased the risk that some jurors would encounter some snippets of the Court's legal conclusion, and that is unfortunate.[36] But the jurors who saw the media coverage say they did as instructed: they turned away from the reports and set the information aside for the remainder of the deliberation. The jurors, both those who reported awareness of the Rule 50 decision and the others, insisted to the Court's law clerk that the information played no role whatsoever in their deliberations and did not affect the outcome. While some outsiders, totally unfamiliar with the exceptional jury in this case,[37] have been quick to assume otherwise,

---

[36] The Court is frank to confess that it was not familiar with the term "push notification" when it was raised by counsel for the Times and did not fully appreciate the potential for jurors to be involuntarily informed about the Court's intended ruling through their smartphones. But it must also be remembered that when defense counsel referred to the term "push notifications," Tr. 1307, the Court responded by doing what defendants' counsel requested, i.e., reminding the jurors of their duty to disregard anything they heard about the case in the media. Defendants' counsel sought no further relief (such as a direction to the jurors to turn off any automated alerts for the duration of the trial) and plaintiff's counsel did not seek any such step or indeed any instruction to the jury whatsoever.

[37] As the Court remarked on several occasions during the trial itself, the jury in this case was a model jury, carefully watching the witnesses, taking copious notes, and in general, showing that they

the Court knows of no reason why the highly conscientious citizens who served as jurors in this case would be so firm that they were unaffected by this information unless it were true. The Court is thus left with the definite conviction that the information did not remotely affect the ultimate verdict.

It also bears repeating that the Final Judgment entered for defendants does not legally depend on the verdict. The verdict could only acquire legal significance if the Court's Rule 50 decision were overturned on appeal and the Court of Appeals then decided to give effect to the verdict rather than remand for retrial.

It remains only to add that the Court's decision to enter judgment as a matter of law also reflected its duty to ensure that public figure libel actions with constitutionally inadequate evidence do not erroneously result in the imposition of liability that might chill protected speech. In libel cases that concern public figures and matters of public concern, the court "must make an independent examination of the whole record so as to assure [itself] that the judgment does not constitute a forbidden intrusion on the field of free expression." Sullivan, 376 U.S. at 285. That principle is no less true in cases where the alleged libel was provably false but neither intentionally nor recklessly so. As the Supreme Court later elaborated:

> [J]udges ... must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation

_____

intended to decide the case based solely on the evidence. See, e.g., Tr. 689, 878, & 1324.

> case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."

Bose Corp., 466 U.S. at 510-511; see also Harte-Hanks Commc'ns, 491 U.S. at 697 (reading Bose as requiring "trial judge[s]" to "make their own 'independent' assessment of the facts allegedly establishing actual malice") (Scalia, J., concurring). This independent duty to review the whole record is particularly important where the jury is tasked primarily with "distinguishing actual malice from mere negligence," because this is an area in which "jurors have considerable trouble." Tavoulareas v. Piro, 817 F.2d 762, 807 (D.C. Cir. 1987) (R.B. Ginsburg, J., concurring). And, as this case demonstrates, the stakes of the distinction between negligent error and reckless disregard are significant: the preservation of the "area of breathing space" that "[o]ur profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out ... so that protected speech is not discouraged." Harte-Hanks Commc'ns, 491 U.S. at 686.

For all the reasons set forth above, the Court entered final judgment as a matter of law in favor of The New York Times Co. and James Bennet, because no reasonable jury could find that Sarah Palin proved that the defendants published "America's Lethal Politics" with actual malice.

SO ORDERED.

New York, NY
March 1, 2022

JED S. RAKOFF, U.S.D.J.