UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SARAH PALIN, an individual,<br><br>              Plaintiff,<br><br>– against –<br><br>THE NEW YORK TIMES COMPANY,<br>a New York corporation, and JAMES<br>BENNET, an individual,<br><br>              Defendant. | No. 17 Civ. 4853<br><br>Hon. Jed S. Rakoff<br><br>ECF Case |

## PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW
## IN SUPPORT OF POST-TRIAL MOTIONS

TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 834-9191
Facsimile: (813) 443-2193

and

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile: (212) 754-0330
Facsimile: (212) 754-0330

*Attorneys for Plaintiff Sarah Palin*

# **TABLE OF CONTENTS**

Table of Contents ................................................................................................. i

Table of Authorities ........................................................................................... ii

I.     INTRODUCTION ...................................................................................... 1

II.    GOVERNING LAW ................................................................................. 2

    A.    Disqualification ................................................................................ 2

    B.    Vacatur and New Trial ................................................................... 3

III.   THE ERRORS SUPPORTING VACATUR AND NEW TRIAL ................ 5

    A.    The Refusal to Carry Out the Mandate on Summary Judgment ........... 5

    B.    The Insufficient *Voir Dire* ............................................................. 8

    C.    The Erroneous and Prejudicial Exclusion of Evidence at Trial in Violation of the Mandate ............................................................... 10

    D.    The Erroneous Judgment as a Matter of Law Under Rule 50 ............ 12

    E.    The Erroneous Instruction Responding to the Jury's Question About Evidence of Actual Malice ............................................................. 17

    F.    The Tainted Verdict ...................................................................... 20

    G.    The *Ex Parte* Jury Interview ........................................................ 21

    H.    The Court's Extra-Judicial Comment to the Press ............................ 21

    I.    The Rule 50 "Opinion" ................................................................. 23

IV.   DISQUALIFICATION IS REQUIRED ..................................................... 35

CONCLUSION ................................................................................................... 38

CERTIFICATE OF SERVICE ........................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aetna Cas. & Sur. Co. v. Home Ins. Co.*, 882 F.Supp. 1355 (S.D.N.Y. 1995)............................ 5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...................................................... 5, 13, 14

*Arilo v. Lively*, 474 F.3d 46 (2d Cir. 2007)................................................................. 11

*Banister v. Davis*, 140 S. Ct. 1698 (2020) ................................................................. 4

*Bibbins v. Dalsheim*, 21 F.3d 13 (2d Cir. 1994) .......................................................... 24

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009).................................................... 2

*Davidson v. Riley*, 44 F.3d 1118 (2d Cir. 1995) .......................................................... 1

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) ........................................................... 1

*Delima v. Trinidad Corp.*, 302 F.2d 585 (2d Cir. 1962)................................................... 20

*Giano v. Sullivan*, 709 F.Supp. 1209 (S.D.N.Y. 1989)..................................................... 1

*Girden v. Sandals Intern.*, 262 F.3d 195 (2d Cir. 2001) ................................................. 20

*Gottwald v. Sebert*, 2022 WL 709757 [Case No. 2021-03036] (1st Dept. Mar. 10, 2022) ............................................................................................. 12

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989) .............................. 29

*Holzapfel v. Town of Newburgh*, 145 F.3d 516 (2d Cir. 1998)............................................. 20

*In re Boston's Children First*, 244 F.3d 164 (1st Cir. 2001) ............................................ 35, 36

*In re Coudert Brothers, LLP*, 809 F.3d 94 (2d Cir. 2015)................................................. 8

*In re IBM Corp.*, 45 F.3d 641 (2d Cir. 1995)............................................................. 35

*Innomed Labs, LLC v. ALZA Corp.*, 368 F.3d 148 (2d Cir. 2004) ........................................ 20

*Johnstone v. Kelly*, 808 F.2d 214 (2d Cir. 1986) ........................................................ 1

*Kaytor v. Electric Boat Corp.*, 609 F.3d 537 (2d Cir. 2010) ............................................ 14, 15

*Lamborn v. Dittmer*, 726 F.Supp. 510 (S.D.N.Y. 1989).................................................... 3

*Lee v. McCue*, 2007 WL 2230100 (S.D.N.Y. Jul. 25, 2007).................................................. 14

*Ligon v. City of New York*, 736 F.2d 118 (2d Cir. 2013), *vacated in part on other grounds*, 743 F.3d 362 (2d Cir. 2014) ................................................................. 36

**Page(s)**

*Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988)................................. 36, 37

*Liteky v. U.S.*, 510 U.S. 540, 555 (1994) ....................................................................... 2

*Loeb v. New Times Communications Corp.*, 497 F.Supp. 85 (S.D.N.Y. 1980)........................ 34

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991)...................................................... 15

*Microsoft Corp. v. Bristol Tech., Inc.*, 250 F.3d 152 (2d Cir.2001) ........................................ 4

*Montgomery Ward & Co. v. Duncan*, 311 U.S. 243 (1940) ...................................................... 3

*Nemaizer v. Baker*, 793 F.2d 58 (2d Cir. 1986)......................................................................... 4

*Owen v. Thermatool Corp.*, 155 F.3d 137 (2d Cir. 1998)......................................................... 20

*Paddington Partners v. Brouchard*, 34 F.3d 1132 (2d Cir. 1994)............................................ 4

*Palin v. New York Times Co.*, 940 F.3d 804 (2d Cir. 2019) ..... 1, 5, 6, 7, 8, 14, 23, 24, 29, 31, 33

*Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534 (2d Cir.1992) ......................................... 3

*Raedle v. Credit Agricole Indosuez*, 670 F.3d 411 (2d Cir.2012) ............................................. 3

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000)........................... 14, 15, 24

*Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017)........................................................ 11, 20

*Rippo v. Baker*, 137 S.Ct 905 (2017) ...................................................................................... 2

*Santa Maria v. Metro-North Commuter R.R.*, 831 F.3d 265 (2d Cir. 1996) .............................. 3

*Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135 (2d Cir. 2008) ........................................... 4

*Shade v. Hous. Auth. of New Haven*, 251 F.3d 307 (2d Cir. 2001) ........................................ 20

*Sharkey v. J.P. Mogan Chase & Co.*, 251 F.Supp.3d 626 (S.D.N.Y. 2017)................................ 2

*Sharon v. Time, Inc.*, 599 F.Supp. 538 (S.D.N.Y. 1984) .................................................. 14, 15, 26

*Shrader v. CSX Transp., Inc.*, 70 F.3d 255 (2d Cir. 1995) ..................................................... 4

*Soto v. Gaudett*, 862 F.3d 148 (2d Cir. 2017).......................................................................... 5

*Stampf v. Long Island R.R. Co.*, 71 F.3d 192 (2d Cir. 2014)................................................... 3

*Tumey v. Ohio*, 273 U.S. 510 (1927) ...................................................................................... 1

*Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394 (2006)............................... 15

*U.S. v. Adegbite*, 877 F.2d 174 (2d Cir. 1989)......................................................................... 4

*U.S. v. Amico*, 486 F.3d 764 (2d Cir. 2007).................................................................... 2, 3, 36

*U.S. v. Bando*, 244 F.2d 833 (2d Cir. 1957), *cert. denied* 355 U.S. 844 (1957) ........................ 10

*U.S. v. Cooley*, 1 F.3d 985 (10th Cir. 1993) ............................................................ 35

*U.S. v. Diaz*, 797 F.2d 99 (2d Cir. 1986) ................................................................ 2

*U.S. v. Ferguson*, 550 F.Supp. 1256 (S.D.N.Y. 1982) .................................................. 3

*U.S. v. Kahaner*, 204 F.Supp. 921 (S.D.N.Y. 1962) ................................................... 10

*U.S. v. Kozeny*, 667 F.3d 122 (2d Cir. 2011) ...................................................... 3, 20

*U.S. v. Lawes*, 292 F.3d 123 (2d Cir. 2002) ........................................................ 8, 10

*U.S. v. Lovaglia,* 954 F.2d 811 (2d Cir. 1992) ........................................................ 2

*U.S. v. Marin*, 662 F.Supp.2d 155 (D.D.C. 2009) ..................................................... 3

*U.S. v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ........................................ 35, 36, 37

*U.S. v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ........................................................... 2

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18 (1994) ................................. 4

*Virgin Atl. Airways v. Nat'l Mediation Bd.*, 956 F.2d 1245 (2d Cir. 1992) .......................... 4

*Village of Freeport v. Barrella*, 814 F.3d 594 (2d Cir. 2016) ...................................... 11

*Withrow v. Larkin*, 421 U.S. 35 (1975) ................................................................. 2

*Yimouyannis v. Consumer Union of the U.S., Inc.*, 619 F.2d 932 (2d Cir. 1980) ...................... 34

*Young v. Gannett Satellite Info. Network, Inc.*, 734 F.3d 544 (6th Cir. 2013) ...................... 29

**Page(s)**

OTHER AUTHORITIES

28 U.S.C. § 455 ................................................................................. 1, 35, 36

28 U.S.C. § 455(a) .................................................................................... 2

Canon 3A(6) of the Code of Conduct for United States Judges .......................................... 35

Federal Rule of Civil Evidence 401 ................................................................... 12

Federal Rule of Civil Evidence 606(b) ................................................................ 24

Federal Rule of Civil Procedure 12 .................................................................... 5

Federal Rule of Civil Procedure 47(a) ................................................................ 10

Federal Rule of Civil Procedure 59 .................................................................... 1

Federal Rule of Civil Procedure 59(a) ................................................................ 3

Federal Rule of Civil Procedure 59(a)(1)(A) .................................................... 3

Federal Rule of Civil Procedure 59(e) ............................................................... 3

Federal Rule of Civil Procedure 60 ................................................................... 1

Federal Rule of Civil Procedure 60(b)(6) .......................................................... 4

N.Y. Civil Rights L. § 76-a(2) ........................................................................... 12

## I.   INTRODUCTION

The totality of the facts and circumstances surrounding this case and its recent trial require vacatur of the Verdict [Doc. 173], Rule 50 Opinion [Doc. 196], and Final Judgment [Doc. 171] and a new trial under Rules 59 and 60, *Fed. R. Civ. P.*  These facts and circumstances also demonstrate an appearance of partiality requiring recusal under 28 U.S.C. § 455, which should be granted *before* the Court rules on Plaintiff's post-trial motions.   The grounds necessitating the relief Plaintiff seeks include:

(1)    failure to carry out the Second Circuit's decision in *Palin v. New York Times Co.*, 940 F.3d 804 (2d Cir. 2019) (the "Mandate");

(2)    a legally insufficient *voir dire*;

(3)    the exclusion of crucial evidence of actual malice contrary to the Mandate;

(4)    requiring Plaintiff to prove actual malice as to defamatory meaning;

(5)    requiring Plaintiff to prove actual malice under New York's anti-SLAPP law;

(6)    the erroneous oral and written [Doc. 196] Rule 50 decision;

(7)    the announcement of the Rule 50 decision during jury deliberations;

(8)    the erroneous instruction in response to the jury's February 15, 2022 question; and

(9)    the Court's extra-judicial comments to a journalist about the jury's exposure to push notifications.

Several of these errors independently require a new trial, and collectively they establish Plaintiff was denied her right to a fair trial before a judge who appears impartial.[1]

---

[1] *Davidson v. Riley*, 44 F.3d 1118, 1122 (2d Cir. 1995); *Delaware v. Van Arsdall*, 475 U.S. 673, 681-682 (1986); *Tumey v. Ohio*, 273 U.S. 510, 535 (1927); *see also Giano v. Sullivan*, 709 F.Supp. 1209, 1217 (S.D.N.Y. 1989) (*citing Johnstone v. Kelly*, 808 F.2d 214, 218 (2d Cir. 1986)).

## II.     GOVERNING LAW

### A.     Disqualification

The U .S. Constitution, federal statutory law, and codes of judicial conduct each prescribe recusal standards. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876-77 (2009); *U.S. v. Microsoft Corp.*, 253 F.3d 34, 113-115 (D.C. Cir. 2001). Due process requires recusal "when, objectively speaking, 'the probability of actual bias on the part of the judge… is too high to be constitutionally tolerable.'" *Rippo v. Baker*, 137 S.Ct. 905, 907 (2017) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). Under 28 U.S.C. § 455(a), any federal judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." "The Second Circuit applies this standard by asking whether 'an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal,' or alternatively, whether a 'reasonable person, knowing all the facts,' would question the judge's impartiality.'" *Sharkey v. J.P. Mogan Chase & Co*., 251 F.Supp.3d 626, 629 (S.D.N.Y. 2017) (citing *U.S. v. Yousef*, 327 F.3d 56, 169 (2d Cir. 2003) (quoting *U.S. v. Lovaglia,* 954 F.2d 811, 815 (2d Cir. 1992))).

The rules governing disqualification are "obviously formulated in general terms and do not offer bright-line guidelines." *Lovaglia*, 954 F.2d at 815. Generally, disqualification is appropriate where a judge expresses a personal bias concerning the outcome of the case at issue. *Id*. (*citing U.S. v. Diaz*, 797 F.2d 99, 100 (2d Cir. 1986). While it is generally accepted that judicial rulings and remarks *almost* never constitute a valid basis for a bias or partiality motion, they will support recusal where they "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. U.S.*, 510 U.S. 540, 555 (1994)

Section 455(a) "deals exclusively with appearances." *U.S. v. Amico*, 486 F.3d 764, 775 (2d Cir. 2007). "Its purpose is the protection of the public's confidence in the impartiality of the

judiciary." *Id*.  Under the statute, courts consider "the allegations of bias or impartiality" as well as "the judge's rulings on and conduct regarding them," and ask whether the facts would lead the public reasonably to believe that these problems affected the manner in which the judge presided over the case.  *Id*.  An appearance of partiality sufficient to warrant recusal can arise from the "cumulative effect of the judge's reactions." *Id*. at 776.  Moreover, "[a]lthough a legal ruling may not itself serve as the basis for a motion to disqualify, a particular judicial ruling 'can be evidence of an extrajudicial bias or prejudice.'" *U.S. v. Marin*, 662 F.Supp.2d 155, 158 (D.D.C. 2009).

Where the question of recusal is a close call, a court should recuse itself.  *Amico*, 486 F.3d at 775; *Lamborn v. Dittmer*, 726 F.Supp. 510, 518 (S.D.N.Y. 1989); *U.S. v. Ferguson*, 550 F.Supp. 1256, 1259-60 (S.D.N.Y. 1982).

## B.    Vacatur and New Trial

Pursuant to Rule 59(a) of the *Federal Rules of Civil Procedure*, "[a] court may grant a new trial 'for any reason for which a new trial has heretofore been granted in an action at law in federal court....'" *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir.2012) (quoting *Fed.R.Civ.P.* 59(a)(1)(A)).  Grounds for a new trial include substantial errors in the admission or exclusion of evidence, *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 203 (2d Cir.2014), prejudicial misconduct affecting the fairness of the trial, *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540 (2d Cir.1992), non-harmless errors in jury instructions, *United States v. Kozeny*, 667 F.3d 122, 130 (2d Cir.2011), and other actions rendering the trial unfair, *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940), *Santa Maria v. Metro-North Commuter R.R.*, 831 F.3d 265, 273 (2d Cir. 1996).

Rule 59(e) "gives a district court the chance to rectify its own mistakes in the period immediately following its decision"  based on manifest errors of fact or law or to prevent manifest

injustice. *Banister v. Davis*, 140 S. Ct. 1698, 1703 (2020); *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 153 (2d Cir. 2008). One such situation arises when a court misapprehended factual matters or controlling law. *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). As explained by the Second Circuit, "[t]he standard for granting a [motion for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Id*. To grant reconsideration based on the need to correct a clear error or prevent a manifest injustice, "the Court must have 'a clear conviction of error on a point of law that is certain to recur.'" *Virgin Atl. Airways v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citations omitted); *U.S. v. Adegbite*, 877 F.2d 174, 178 (2d Cir. 1989).

Rule 60(b)(6) of the *Federal Rules of Civil Procedure* allows a court to relieve a party from a final judgment, order, or proceeding for "any other reason that justifies relief." A motion seeking relief under Rule 60(b) is addressed to the sound discretion of the district court. *Nemaizer v. Baker,* 793 F.2d 58, 61–62 (2d Cir.1986); *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1140 (2d Cir.1994) ("A district court's decision on a Rule 60 motion is reviewed for abuse of discretion."). The moving party bears the burden of demonstrating "equitable entitlement to the extraordinary remedy of vacatur." *Microsoft Corp. v. Bristol Tech., Inc.,* 250 F.3d 152, 154 (2d Cir.2001) (*quoting U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship,* 513 U.S. 18, 26 (1994)). In determining whether to grant a motion under Rule 60(b)(6), a court must weigh the interests of the

parties against the public interest in finality of judgments, including any precedential or preclusive effect. *Aetna Cas. & Sur. Co. v. Home Ins. Co.,* 882 F.Supp. 1355, 1357 (S.D.N.Y.1995).

## III.    THE ERRORS SUPPORTING VACATUR AND NEW TRIAL

Several fundamental, prejudicial errors occurred before and during the February 3-15, 2022 jury trial, ultimately resulting in a contaminated jury verdict, erroneous judgment as a matter of law, and final judgment.  These errors independently and collectively necessitate vacatur and a new trial.

## A.    The Refusal to Carry Out the Mandate on Summary Judgment

When the Second Circuit vacated this Court's dismissal and refusal to accept Plaintiff's proposed amended complaint [Doc. 45], it also addressed facts supporting actual malice under summary judgment standards,[2] and remanded "for proceedings consistent with this opinion." *Palin*, 940 F.3d at 808, 813.  The Mandate identifies several jury issues and contains directives that were not followed throughout this case.

First, Bennet's testimony could not be accepted as true: "The jury may ultimately agree with the district court's conclusion that Bennet was credible—*but it is the jury that must decide*." *Palin*, 940 F.3d at 812 (emphasis added) and n. 25 (*citing Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Second, inferences from Bennet's background as an editor and political advocate and the Editorial's drafting and editing process had to be drawn in Plaintiff's favor, specifically including articles about the Loughner shooting published on *The Atlantic's* website while Bennet was its Editor-In-Chief and facts associated with Bennet's brother (Sen. Michael Bennet) and his "political

---

[2] The Mandate reached these issues because the Times briefed and argued on appeal that the dismissal should be affirmed on summary judgment grounds under Rule 12(d).  *Id.* at 185

opposition" to Plaintiff and her political views. *Id*. at 814-815.[3]  Third, Bennet's testimony that he did not read the ABC News article ("*Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate*") hyperlinked in the Editorial that "stated, contrary to the claim in the published editorial, that '[n]o connection' was made between the SarahPAC map and Loughner" could not be accepted as true. *Id*. at 815 ("… any inference to be drawn from the inclusion of the hyperlinked article was for the jury - not the court."). Fourth, an honest mistake was not the only reasonable inference that could be drawn from the facts. *Id.* at 815.

On August 28, 2020, this Court denied summary judgment [Doc. 117] but ruled actual malice must be established *both* as to defamatory meaning and falsity.  Requiring proof of actual malice as to defamatory meaning is indicative of the continued acceptance of Bennet's testimony that he made a mistake, contrary to the Mandate.[4]  *Palin*, 940 F.3d at 813.

After acknowledging the Mandate [Doc. 117 at p. 21], the Court begrudgingly found Plaintiff adduced sufficient evidence of actual malice as to *defamatory meaning* based on "at least four items of evidence" that "taken in the light most favorable to plaintiff, could enable a rational jury to conclude that Bennet either knew, or was reckless not to know, that his words would carry

---

[3] These facts demonstrated Bennet "in particular was more likely than the average editor-in-chief to know the truth about the Loughner shooting because he had reason to be personally hostile toward Palin, her political party, and her pro-gun stance," are "***relevant to the credibility of Bennet's testimony*** that he was unaware of facts published on his watch relating to the Loughner shooting and that he made a mistake when he connected [Plaintiff] to that shooting," which "[w]hen properly viewed in the plaintiff's favor, ***a reasonable factfinder could conclude*** this amounted to more than a mistake due to a research failure." *Id*. at 814-815 (emphasis added)

[4] The decision to require proof of actual malice as to defamatory *meaning* was also erroneous because it was based on non-binding defamation by implication cases, as acknowledged in this Court's conclusion that "where a plaintiff's defamation case depends on a statement that is capable of multiple meanings - one defamatory, the other innocuous - the plaintiff must prove that the defendant acted with actual malice not only with respect to the statement's falsity but also as to its meaning." [Doc. 117 at pp. 18-19] The Court previously recognized that "what [the Editorial is] asserting is not that people at the time thought this, it's asserting as a fact that there's a direct link between this [the map] and the shooting."  [7/31/17 Trans. at 11:12-14]

the defamatory meaning." [*Id.* at 19-26].    As for actual malice as to *falsity*, the Court denied summary judgment but refused to carry out the Mandate by disregarding *The Atlantic's* Loughner shooting articles (*Palin*, 940 F.3d at 813-814) and Bennet's background and brother (*Palin*, 940 F.3d at 814-815).  [*Id*. at 27-30].  The Court concluded *The Atlantic* articles were irrelevant based on Bennet's "editorial control[5]" (which ignores whether Bennet *read* them[6]) and evidence concerning Bennet's brother and personal connections to the shooting was irrelevant because its relevancy rested exclusively on whether Bennet had "editorial control" over *The Atlantic* articles [Doc. 117 at pp. 29-30].

The Court relied on evidence associated with the drafting and editing process to deny summary judgment, which "taken in the light most favorable to plaintiff… shows Bennet came up with an angle for the Editorial, ignored the articles brought to his attention that were inconsistent with his angle, disregarded the results [of] the Williamson research that he commissioned, and ultimately made the point he set out to make in reckless disregard of the truth."  [Doc. 117 at pp. 33-34]  The Court specifically acknowledged fact issues arising from the Times' editorials about the Loughner shooting circulated on June 14, 2017 (which "disclaimed the idea that Loughner had

---

[5] Several of *The Atlantic* articles about Loughner's shooting were authored by "sister" publications (blogs) that were "integrated" into and under the "umbrella" of *The Atlantic's* website.  [Doc. 108 at ¶¶ 114, 128, 134, 264-265, 269-284] Bennet did not have day-to-day direct editorial control over the blogs' content, but did over *The Atlantic's* website as a whole, which he "consumed" its website as part of his job as Editor.  [*Id*.]  Bennet "must have read" some of these Loughner shooting articles and was regularly reading the "sister" blogs.  [Doc. 108 at ¶¶ 272-273, 278]

[6] These articles are relevant and material because Bennet likely ***read*** (<u>not</u> edited) them.  Bennet admittedly "consumed" *The Atlantic's* site in 2011 and "must have read" some of these articles. [Doc. 108 at ¶¶ 272-273] Further, because of his position as Editor-in-Chief, Bennet "was a regular reader of *The Atlantic's* website both because [he] was interested in it as a reader and because [he] would try to keep [his] eye on it for purposes of commenting to our editor about what [he] liked and didn't like."  [Doc. 108 at ¶ 272]

been motivated by violent rhetoric") and the hyperlink to the ABC News article[7] (specifically addressed in the Mandate, *Palin*, 940 F.3d at 815). [Doc. 117 at pp. 30-34]

Courts are required to scrupulously carry out mandates and give them full effect. *In re Coudert Brothers, LLP*, 809 F.3d 94, 98 (2d Cir. 2015). This includes "matters expressly decided" and issues "impliedly resolved," and the broader "spirit of the mandate." *Id*. at 99.

## B.      The Insufficient *Voir Dire*

Although district courts have broad discretion in jury selection, a *voir dire* is so insufficient that it calls for reversal where: (1) it is so demonstrably brief and lacking in substance as to afford counsel too little information even to draw any conclusions about potential jurors' general outlook, experience, communication skills, intelligence, lifestyle, etc.; or (2) there is a failure to inquire about, or warn against, a systemic or pervasive bias in the community that would have been cured by asking a question posed by a party. *U.S. v. Lawes*, 292 F.3d 123, 129 (2d Cir. 2002).

Here, the jury selection process did not sufficiently explore the venire's potential biases or prejudices. The Court began *voir dire* by telling the venire that whether they had "heard of one side or the other… [or]… will have perhaps views…is an irrelevancy." [Tr. Trans. at 3:19-22] After providing a brief overview of the case, the Court asked the venire whether there was anything about the description that made them feel they could not serve as fair and impartial jurors, and whether they were exposed to media about this case[8] and, if so, whether they thought they would

---

[7] The Court stated "a jury might discredit [Bennet's] testimony that he did not click on the hyperlink…[and]…[n]onetheless, even if it were true, it could be evidence of reckless disregard… [and]… a reasonable jury might conclude, Bennet had obvious reasons to doubt whether there existed a link between the map and the Loughner shooting… [and his] failure to further investigate or at least just click on the link to the only article Williamson had presented could support the inference that he was purposefully avoiding the truth." [Doc. 117 at pp. 32-33]

[8] The Court did not ask the jurors who responded affirmatively what media coverage they were exposed to.

have a problem being fair and impartial.  [*Id*. at 4:20-23, 9:6-11] One juror who responded affirmatively revealed significant hostility[9] toward Plaintiff, and the Court tried to convince this person to be impartial before striking them for cause.

After some general background questions [*Id*. at 11:3-13:7], the selection process began [*Id*. at 13:8-18].  When Plaintiff's counsel inquired about asking the parties' potential *voir dire* questions [*Id*. at 15:8-9], the Court responded "I have chosen not to ask those questions."  [*Id*. at 15:10-12]  When Plaintiff's counsel raised exploring "whether anybody has preconceived biases" [*Id*. at 15:13-16], and the Court indicated that would be addressed in a final question [*Id*. at 15:17-20].  After two rounds of preemptory challenges, the Court asked the venire whether "there [was] any other reason that I haven't covered why any of the nine of you feel that you cannot serve as a fair and impartial juror," and tried to persuade one juror who responded affirmatively to be impartial [*Id*. at 21:7-22:11], which continued after the juror revealed hearing about the case and working for "progressive type not-for-profits" [*Id*. at 22:12-23:14].

Defendants' counsel objected over the "dismissal of jurors who would be fine, are educated jurors who read the paper…" [*Id*. at 23:21-24:2].  Plaintiff's counsel again expressed concern over the lack of questions addressing preconceived notions and biases [*Id*. at 25:19-24], in response to which the Court admonished Plaintiff's counsel: "You have made your record.  You have made it twice.  I don't want a third time."  [*Id*. at 24:25-25:4]  A short while later, the Court stated: "Just for the record, so to speak, my philosophy of picking a jury is, of course, to make sure that we get the fairest jury possible, but also that we don't artificially exclude anyone of intelligence, and many of the questions [submitted prior to trial] that were suggested in this case seemed to me inevitably

---

[9] This person stated, "I don't like Sarah Palin. I think she is a cruel person. I don't like her, and I don't think I would be fair to her listening to what she has to say."  [Tr. Tran. at 9:19-21]

to have the effect, I'm sure this was not the intent, but have the effect of dumbing down the jury, and I have seen that repeatedly in the 300 juries I have selected over the years, and I'm not going to let that happen."  [*Id*. at 27:1-8].[10]

Plaintiff's proposed *voir dire* questions asked about (among other things) the venire's sources for news and whether they subscribed to any news media [Doc. 154].  These questions were not designed to exclude "educated" jurors but figure out whether jurors subscribed to the Times (and might be biased) or other news websites or apps through which they were or could be exposed to extra-judicial information about the case.

These questions should have been asked in a case involving a major media defendant, polarizing parties and political issues, and extensive press coverage.  *See* Rule 47(a), *Fed. R. Civ. P.*[11]  Moreover, the jury selection process as a whole was so insufficient it calls for reversal. *Lawes*, 292 F.3d at 129.

## C.   The Erroneous and Prejudicial Exclusion of Evidence at Trial in Violation of the Mandate

Defendants moved to exclude [Doc. 136 and 138] substantial evidence of actual malice, including all evidence associated with Bennet's brother, *The Atlantic's* Loughner shooting articles, the "*How the Media Botched the Arizona Shooting*" article sent to Bennet, and evidence associated with the Public Editor.  In opposition, Plaintiff explained the relevancy and materiality of this evidence and rebutted Defendants' argument that the summary judgment order [Doc. 117] excluded it.  [Doc. 145 and 147]

---

[10] Based on defense counsel's prior objection, this comment must have been directed at Plaintiff's counsel.

[11] As one court noted, "it would be naïve not to recognize…that the publicity surrounding the case…underscores the court's duty to question jurors on *voir dire* with painstaking care to assure…an impartial jury and a fair trial."  *U.S. v. Kahaner*, 204 F.Supp. 921, 924 (S.D.N.Y. 1962) (*citing U.S. v. Bando*, 244 F.2d 833, 838 (2d Cir. 1957), *cert. denied*, 355 U.S. 844 (1957)).

The Court initially deferred ruling on Defendants' motions, but excluded this crucial evidence at trial as irrelevant and overly prejudicial [Doc. 196 at p. 53], including *The Atlantic* articles about the Loughner shooting, the Times' article ("*Time, the Enemy*") and article Bennet received at *The Atlantic* discussing how the media erroneously blamed Plaintiff for the Loughner attack,[12] and all evidence related to Bennet's brother.  [Tr. Tran. At 501-511]

Clearly erroneous evidentiary rulings such as these warrant a new trial.  *See e.g.*, *Village of Freeport v. Barrella*, 814 F.3d 594, 610-611 (2d Cir. 2016) (new trial appropriate where evidentiary rulings are a clear abuse of discretion and clearly prejudicial to the outcome of the trial).  An "abuse of discretion" occurs where the district court "based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or rendered a decision that cannot be located within the range of permissible decisions."  *Barrella*, 814 F.3d at 610-611.  Errors are prejudicial to the outcome of the trial where "the jury's judgment would be swayed in a material fashion by the error."  *Restivo v. Hessemann*, 846 F.3d 547, 573 (2d Cir. 2017) (citing *Arilo v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007)).

Here, the Court excluded *The Atlantic* articles based on the conclusion they could not be admitted unless Bennet admitted reading and remembering them when he rewrote the Editorial [Tr. Tran. at 506:22-507:4]:

> THE COURT:  To make this relevant, you have to have a foundation for the following: first, that he read it; second, that, at the relevant time of his adding his sentences to the draft editorial, he remembered it and chose to purposely disregard it; and that, in some cases, but not in this one, there would be the further question whether there is any reason to believe he read it at all, but you seem to have evidence on the third point with respect to *The Wire*.

---

[12] The Court excluded *all* evidence related to the Public Editor, who wrote the "*Time, the Enemy*" piece [PL Tr. Ex. 32] published in the Times Opinion Section.  [Tr. Tran. at 392:13-394:17]

11

If this were the standard, a defendant could automatically guarantee exclusion of such evidence simply by claiming not to have read or remembered an article when writing a challenged statement.

Under Rule 401, Plaintiff only needed to demonstrate the evidence had the tendency to make a fact of consequence more or less probable. [*Id*. at 386:13-387:12]   She did this by introducing evidence that Bennet:  regularly read *The Atlantic's* website (including its integrated blogs) and the Times at the time of the Loughner shooting [*Id*. at 616:3-620:16, 621:7-9] and "must have read" some of the articles; considered the Loughner shooting a "big story" [*Id*.at 620:17-19]; read articles about the shooting that concerned Loughner's "mental state" [*Id*. at 620:20-25]; confirmed his particular interest in political rhetoric and gun control and moderated a gun control event at which Gabrielle Giffords spoke [*Id*. at 626:5-25]; and was personally observed by a co-worker (Lepping) recalling articles from several years ago.  [*Id*. at 412:22-413:1]  This laid a more than adequate foundation to admit excluded articles.

**D.   The Erroneous Judgment as a Matter of Law Under Rule 50**

Defendants moved for judgment as a matter of law under Rule 50 (the "Rule 50 Motion") based on several elements of Plaintiff's claim (of and concerning, actual malice, and falsity),[13] but the Court eventually zeroed in on the same issue used to dismiss this case in 2017:  actual malice as to falsity.[14]

---

[13] The Court characterized the "of and concerning" issue as a "slam dunk" for Plaintiff [Tr. Tran. at 1226:12-17] and easily dispensed the falsity issue based on the first correction ("We got an important fact wrong, incorrectly linking political incitement and the 2011 shooting of Giffords. No link was ever established.") and Lepping's testimony that she found a police report saying the Loughner shooting was not politically connected [*Id*. at 1296:4-1297:9]

[14] Pursuant to a December 29, 2020 Memorandum Order [Doc. 125], the Court applied the actual malice requirement under New York's amended Anti-SLAPP statute (N.Y. Civil Rights L. § 76-a(2)).  This conclusion was recently called into question.  *Gottwald v. Sebert*, 2022 WL 709757 [Case No. 2021-03036] (1st Dept. Mar. 10, 2022).

At one point during the argument, Defendants' counsel correctly conceded that granting judgment as a matter of law is improper where "the key witness made a statement suggesting in its wording that he doubted or disbelieved the truth of the statement." [Tr. Tran. at 1231-1232] Bennet testified at trial that: "***I didn't think then and don't think now that the map caused Jared Loughner to act***…" [*Id*. at 721:5-6] Independently, this testimony was sufficient evidence of actual knowledge of falsity to require denial of the Rule 50 Motion.[15]

However, the Court's focus centered around "the possibility of the so-called adverse inference"[16] and the clear and convincing burden of proof. [Tr. Tran. at 1232:6-21; 1234:16-1236:20; 1240:5-1241:13] The Court expressed surprise over the requirement to "view the evidence through the prism of the substantive evidentiary burden—namely, the clear and convincing standard" during the Rule 50 argument [Tr. Tran. at 1240:5-1241:13], but cited this standard several times in the summary judgment order [Doc. 117 at pp. 11, 34], and specifically evaluated the evidence through the "prism[17]" of the clear and convincing burden of proof at summary judgment. [Doc. 117 at p. 11 (*citing Anderson*, 477 U.S. at 257)]

---

[15] For purposes of the Rule 50 Motion, the Court "assume[d] as Palin alleges, that Bennet either intended his edits to Williamson's draft to convey that the crosshairs map played a causal role in spurring Loughner to commit the Arizona shooting or at least that Bennet recklessly disregarded the defamatory meaning." [Doc. 196 at pp. 45-46]

[16] This refers to the proposition that a plaintiff cannot rely *exclusively* on the jury's ability to disbelieve the defendants' testimony as the *only* evidence of actual malice [Doc. 196 at pp. 44-45] (*i.e.,* "merely asserting that the jury might, and legally could, disbelieve the defendant's denial of a conspiracy or of legal malice").

[17] The Court evaluated the evidence through the "**prism**" of the clear and convincing burden of proof: "Further still, a court ruling on a motion for summary judgment on actual malice 'must be guided by the New York Times 'clear and convincing' evidentiary standard in determining whether a genuine issue of actual malice exists - that is, whether evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity." [Doc. 117 at p. 11 (citing *Anderson*, 477 U.S. at 257)] It also concluded "there is ***sufficient evidence to allow a rational finder of fact to find actual malice by clear and convincing evidence***. Anderson, 477 U.S. at 254." [*Id*. at p. 34 (emphasis added)]

13

After learning the jury would be continuing deliberations on Monday (February 14) [Tr. Tran. at 1248:22-1249:12], the Court indicated it would consider the Rule 50 arguments over the weekend and invited the parties to email any additional authorities they wanted the Court to consider.  [*Id.* at 1249]   On Sunday (February 13), the parties emailed their case citations. [Doc. 174][18]

On the morning of February 14, 2022, the Court briefly addressed an issue raised by Defendants (a non-party posting video excerpts of depositions from this case over the weekend) [Tr. Tran. 1253-1256][19] before resuming the Rule 50 argument.  After confirming a decision had not been reached, the Court stated "were I to grant the motion, I would still let the jury continue to reach a verdict." [*Id*. at 1256:4-12][20]  If a judge were inclined to grant a Rule 50 motion but wanted the jury to reach a verdict, the natural and customary course of action would be to defer ruling until after the verdict, as permitted under Rule 50(b).

After the Court commented on various evidence and "prism of the substantive evidentiary burden" [*Id*. at 1259:13-1260:13], the jury requested Ross Douthat's testimony.  [*Id*. at 1262:6-12] When the Rule 50 argument continued, Plaintiff's counsel directed the Court's attention to *Sharon v. Time, Inc*., 599 F.Supp. 538, 582 (S.D.N.Y. 1984) for the proposition that materially altering

---

[18] The case law Plaintiff provided confirmed that the same standard governs Rule 56 and Rule 50 motions [Doc. 174 (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-153 (2000); *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545-546 (2d Cir. 2010); *Lee v. McCue*, 2007 WL 2230100, *3 (S.D.N.Y. Jul. 25, 2007))] "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Reeves*, 530 U.S. at 150 (citing *Anderson*, 477 U.S. at 255); *see also Palin*, 940 F.3d at 812, n. 25.]

[19] The judicial law clerk called Plaintiff's counsel about this issue while they were on their way to the courthouse from the airport on the morning of February 14, 2022.

[20] In the written Rule 50 decision [Doc. 196], the Court asserts it "indicated [it] was leaning toward agreement with Defendants' position on the issue of actual malice as to falsity" [Doc. 196 at n. 20], but no such indication was given (and the Court included no citation in support of this assertion).

language in a draft can establish actual malice.[21]    [*Id*. at 1264-1266]   Then, the jury requested Bennet's testimony.  [*Id*. at 1284]

Near the end of the Rule 50 argument, Plaintiff's counsel specifically reminded the Court about the standards established in *Reeves*, 530 U.S. at 150-153, and *Kaytor*, 609 F.3d at 545 (required inferences, credibility determinations, and evidence collectively must be viewed in Petitioner's favor).  [*Id*. at 1292:7-1293:4]   The Court recessed for lunch and reconvened nearly three hours later.  [*Id*. at 1295:4-16 ("I will see you at 2:30, unless we get a note from the jury before then, at which time I will give you a ruling on the Rule 50 motion.")]   Upon returning without a verdict, the Court announced the Rule 50 decision, [*Id*. at 1295-1306], noting the decision could be deferred until after the verdict, "but the more I thought about it over the weekend, the more I thought that was unfair to both sides."  [*Id*. at 1298:2-25]

In *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 405 (2006), the Supreme Court recognized that "while a district judge is permitted to enter judgment as a matter of law when it concludes that the evidence is legally insufficient, it is not required to do so."  ***"To the contrary, the district courts are, if anything, encouraged to submit the case to the jury, rather than granting such motions.***"  *Id*. (emphasis added)

The Court granted judgment as a matter of law on actual malice as to falsity based on the "prism of the substantive evidentiary burden."  [*Id*. at 1299:11-15, 1300:8-1301:6]   In support, the

---

[21] *Sharon* states "[a]lthough a reporter may have sufficient evidence of his charge to foreclose any material issue of constitutional malice for its publication, he may nonetheless make himself liable if he knowingly or recklessly misstates that evidence to make it seem more convincing or condemnatory than it is."  599 F.Supp. at 582.  Over the weekend, Plaintiff's counsel directed the Court's attention to *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520-522 (1991) [Doc. 174], which the Court cited on summary judgment for the jury issue created by Bennet's substantial revision to Williamson's draft [Doc. 117 at pp. 23-24] and in finding sufficient evidence of actual malice to satisfy the clear and convincing standard.  [*Id*. at pp. 26-27]

Court asserted there was no "prepublication email in which Mr. Bennet suggests in any respect probable falsity" and that "[Bennet's] prepublication email suggesting the framing for the editorial" [*Id*. (PL Tr. Ex. 119)] only "shows his preexisting belief that violent right-wing rhetoric incited Loughner's attempted assassination…" [Tr. Tran. at 1302:21-1303:9]  The Court disregarded the research Bennet admittedly read during the drafting process as "giv[ing] opinions on both sides" [*Id*. at 1303:10-21], and explained away the ABC News article hyperlink as only being evidence of "negligence," while crediting Bennet's testimony that he did not open or read it. [*Id*. at 1303:22-1304:7]  The Court also credited Bennet's testimony when concluding that his actions after rewriting Williamson's draft "undermined" a finding of actual malice [*Id*. at 1304:8-20], specifically adopting Bennet's claim that by emailing Williamson at 7:21 p.m. to "please take a look" Bennet "meant for her to fact-check the revision." [*Id*.]  Finally, the Court characterized Bennet's email exchange with Douthat on the night the Editorial was published as innocuous (Douthat "questioning whether the information [in the Editorial] was all correct" and Bennet responding, "this was his understanding but he would pursue it further.") [*Id*. at 1304:21-25]

Although the Court expressed it was "troubled by the fact that the erroneous edits made by Mr. Bennet could be read by many readers as an accusation that Ms. Palin's PAC's distribution of the crosshairs map was clearly and directly linked to the Loughner shooting and concomitant murders," it ultimately concluded this "an example of very unfortunate editorializing on the part of The Times." [*Id*. at 1305:2-20]  The Court completed the announcement of the Rule 50 decision without interruption, specifically mentioning "non-lawyers" [*Id*. at 1299:1-2 and 1297:10-16] and that "I will ultimately issue an order pursuant to Rule 50 dismissing the complaint, but I will only do so after the jury returned its verdict." [*Id*. at 1305:19-23]  The Court also commented, "[a]nd [the jurors] of course will not know about my decision…" [*Id*. at 1305:23-24]

The Court concluded by acknowledging the "inevitable appeal" and stating: "So, needless to say, the plaintiff is deemed to have objected to my decision, and that is preserved for appeal as well." [*Id*. at 1306:5-7]  At that point, *ALL* of Plaintiff's objections to the ruling were preserved. There was no need for her to object.  The "cat was out of the bag" with respect to the announcement of the decision[22] which was the subject of immediate news coverage and "push notifications" while the jury was still deliberating.  [Doc. 172]  News outlets, including the Times, published stories about the dismissal as early as 3:22 p.m., many revealing the decision to dismiss the case in their headlines.[23]  [*See* **Exhibit 1**]

**E.**     **The Erroneous Instruction Responding to the Jury's Question About Evidence of Actual Malice**

On the morning of February 15, 2022, the jury submitted a question dealing directly with the issue of actual malice as to falsity:

---

[22] The Court recessed after the announcement (at 3:30 p.m.) and reconvened at 4:46 p.m.  [Tr. Tran. 1307]  Upon returning, the Court immediately asked whether it should bring back the jury and give them an additional admonition about avoiding anything in the media, but recognized that giving yet another reminder could be problematic.  [*Id*. at 1307:25-1308:5]

[23] It is also reasonable to assume that jurors' family members or friends learned about the decision through news reports and may have mentioned it to the jurors when they returned home (on Valentine's Day).



This question quotes the jury instruction on actual malice [Instruction No. 13], including the clear and convincing ["high probability'] burden of proof.  [Doc. 170]

Upon receiving this question, the Court's immediate response was to give an instruction misstating the law and dissuading a finding of actual malice:  "an inference from a statement by Mr. Bennet is not itself sufficient to carry the clear and convincing burden…"  [Tr. Tran. at 1311:18-23]  Defendants' counsel urged the Court to provide this improper instruction, stating "an inference alone wouldn't allow them to find the burden has been satisfied."  [Id. at 1318:1-7]

Plaintiff's counsel objected and advised that the proposed language was inconsistent with Jury Instructions No. 5 (circumstantial evidence) and No. 13 (actual malice) [Doc. 170].  [Tr. Tran. at 1321:21-1322:3]  Nevertheless, the Court persisted ("I don't think there's anything inconsistent

18

here") and explained why the jury should be instructed about the rationale for granting the Rule 50

Motion:

> THE COURT:   The gloss that wasn't given to them was the particular burden that the case law in defamation subsequent to New York Times v. Sullivan and comparable New York law places on a plaintiff to establish clear and convincing evidence of actual malice ***through something other than the mere statements of the defendant***, which would otherwise be sufficient in a more average case...."

[*Id*. at 1322:4-11][24]   Consequently, the Court gave the jury the following erroneous instruction:

```
                                    Response to Jury Note of
                                    2/15/2022 at 10:21 a.m.

To the jury,

Thank you for your latest note.

In response to your first inquiry, you are free to draw any
reasonable inference you choose to draw from any answer received
in evidence, regardless of which side posed the question to which
the answer was given.

In response to your second inquiry, an answer given by Mr. Bennet
and a reasonable inference drawn therefrom is not sufficient in
itself to carry the plaintiff's burden of showing by clear and
convincing evidence that there was a high probability that Mr.
Bennet actually doubted the truth of a challenged statement prior
to publication, but it can contribute to the other evidence brought
forth by the plaintiff.


            Judge Rakoff
```

[Tr. Tran. at 1323]  This instruction contradicted the law and instructions the jury already received,

told them to disregard legally sufficient evidence of actual malice, and effectively instructed them

to find in Defendants' favor on actual malice at a critical time during deliberations.  It is far from

harmless, constitutes fundamental error, and requires a new trial.

---

[24] This explanation is focused exclusively on the "negative inference" issue, ignoring that the jury question could have been about a direct inference or conclusion to be drawn from Bennet's testimony, or even an admission of actual knowledge of falsity.

"An erroneous instruction, unless harmless, requires a new trial." *U.S. v. Kozeny*, 667 F.3d 122, 130 (2d Cir. 2011). A jury instruction is erroneous if "the instruction misleads the jury as to the proper legal standard, or it does not adequately inform the jury of the law." *Owen v. Thermatool Corp.*, 155 F.3d 137, 139 (2d Cir. 1998). Instructions that effectively instruct the jury to find a certain way or accept certain evidence are erroneous. *Girden v. Sandals Intern.*, 262 F.3d 195, 204-205 (2d Cir. 2001). The timing of an instruction is also important, as instructions given at critical points of trial are likely to affect a verdict. *Id.* at 205 (citing *Delima v. Trinidad Corp.*, 302 F.2d 585, 587 (2d Cir. 1962); *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 525 (2d Cir. 1998)). A new trial is appropriate where an erroneous instruction is given about a "potentially dispositive" issue. *Restivo*, 846 F.3d at 572. Instructions containing errors that are so serious and flagrant that they threaten the integrity of the trial or deprive the jury of legal guidance in making a decision are fundamental error. *Innomed Labs, LLC v. ALZA Corp.*, 368 F.3d 148, 162 (2d Cir. 2004) (citing *Shade v. Hous. Auth. of New Haven*, 251 F.3d 307, 313 (2d Cir. 2001)).

## F.    The Tainted Verdict

After their exposure to push notifications about the Rule 50 decision and the improper instruction, the jury soon reached a verdict for Defendants. [Tr. Tran. 1323] After the verdict, the Court discussed the media coverage of the case,[25] recommended jurors not talk to the media,[26] and told them about the Rule 50 Motion decision.[27] None of the jurors volunteered any information

---

[25] "I'm glad that you were free of all that coverage since you were instructed, and its clear to me you followed, not to pay any attention to that and to disregard it and turn away from it." [Tr. Tran. at 1325:15-21]

[26] Deliberations were "clothed with the knowledge that this was all secret" and "it would be very unfair to your fellow jurors to now start talking about it with members of the press." [Trial Tr. at 1326:1-8]

[27] "I have concluded as a matter of law that the defendants are not liable too. So we've reached the same bottom line…You decided the facts; I decided the law. As it turns out, they both were in agreement in this case." [Tr. Tran. at 1326:25-1327:2]

about their exposure to media coverage or "push notifications," and they were released.  [Tr. Tran. at 1327

At 4:53 p.m. on February 15, 2022, the Court docketed the Final Judgment, [Doc. 171], which states "[i]n view of the jury having returned a verdict of not-liable, and independently, for the reasons stated by the Court previously in granting Defendants' Rule 50 motion, final judgment is hereby entered dismissing the complaint with prejudice."

## G.      The *Ex Parte* Jury Interview

On the afternoon of February 15, 2022, the judicial law clerk conducted an exit interview of the jurors.[28]  [Doc. 172]  During the interview, several jurors apparently volunteered that they were exposed to push notifications about the Rule 50 decision.  [*Id*.]  This also means they received push notifications **throughout the trial**, which was the subject of intense press coverage, including articles with headlines that disparaged Plaintiff and her trial testimony.  [*See* **Exhibit 2**]

## H.      The Court's Extra-Judicial Comment to the Press

The exposure to push notifications was not disclosed to counsel for the parties on February 15, 2022 or on the morning of February 16, 2022.  On February 16, 2022, at 12:13 p.m., Plaintiff's counsel received an e-mail [**Exhibit 3**] from a *Bloomberg* journalist requesting comment on the article "*Palin Jurors Knew Judge Dismissed N.Y. Times Case Before Verdict*," which was posted online that morning at 11:34 a.m.  [**Exhibit 4**]  This article quoted the Court, which spoke to the *Bloomberg* reporter and confirmed jurors' exposure to push notifications:

> "I'm disappointed that the jurors even got these messages, if they did," Rakoff said in an interview Wednesday, referring to the news notifications received by jurors.  ***I continue to think it was the right way to handle things.***

---

[28] Presumably, this occurred shortly after the jury was excused (at approximately 2:30 p.m.) and well before the Final Judgment was entered (at 4:53 p.m.).

> The judge said he spoke to his clerk today **after being informed of the issue by Bloomberg**, and was told that "at most three" jurors reported knowing about his ruling before delivering their verdict **and said it didn't affect their deliberations**.

The Court did not inform counsel about the jury's exposure to push notifications until <u>12:26 p.m.</u>, when the judicial law clerk emailed counsel a copy of a 2-page order that would be "docketed shortly."  [**Exhibit 5**]

At a hearing on February 23, 2022, the Court elaborated on the conversation with the journalist:

> After the trial, after final judgment had been entered, you may recall that I went off to Columbia to teach, which is why we had told the jury earlier that day that they could only sit to 3:30. The next morning, when I arrived, which, I have to admit, was somewhat late because I slept in, my courtroom deputy told me that a Bloomberg reporter had called and said it was urgent, so I called that reporter back. And it turned out it was about information he had received about push notifications that the jurors had told my law clerk about. I was already beginning to explore that issue with my law clerk, but I decided to give the reporter a very short statement so that if his story appeared before the order that I was already undertaking a draft, there would be no misunderstandings. So I did give him a short statement, which contained the same information, in more abbreviated form than my order, which appeared -- that was sent to counsel as well -- I think approximately five minutes after his story came out.

[Tr. Tran. at 3:3-20]

The Court indicates it was "already undertaking a draft [of the order]" and "already beginning to explore that issue with my law clerk" [2/23/22 Tran. at 3:12-15] when calling back the *Bloomberg* journalist, but the article states "[t]he judge said he spoke to his clerk today *after being informed of the issue by Bloomberg* and was told that 'at most three' jurors reported knowing about his ruling before delivering their verdict."  (Emphasis added).  Also, the Court indicates "my order, which appeared -- that was sent to counsel as well -- I think approximately *five minutes after*

*his story came out*" [2/23/22 Tran. at 3:18-20 (emphasis added)], but the *Bloomberg* story was posted at 11:34 a.m. and the order was not sent to counsel until 12:26 p.m. (52 minutes later).

Regardless, the Court talked to the press about this issue *before* informing counsel, and made statements defending the decision to announce the Rule 50 ruling during deliberations and about the impact of the push notifications. Presumably, jurors have since read this article.

## I.    The Rule 50 "Opinion"

On February 23, the Court indicated it would be expediting a written order on the oral Rule 50 decision. [2/23/22 Tran. at 4:1-5] On March 1, 2022, the Court issued the 68-page "Opinion" (the "Rule 50 Opinion") [Doc. 196] defending the Rule 50 decision.

Beyond "elaborating" on the substance of the ruling, the Rule 50 Opinion seeks to validate the "unusual" timing of the Rule 50 decision based on a waiver (*i.e.,* "neither side objected to it in the slightest") [Doc. 196 at pp. 3-6, 33-38, 64-65]. This waiver position was rejected in the Mandate (*Palin*, 940 F.3d at 812) and contradicts the Court's statement: "So, needless to say, the plaintiff is deemed to have objected to my decision, and that is preserved for appeal as well." [Tr. Tran. at 1306:5-7][29] The Court's unconditional preservation was not limited to "prior" objections or the "legal substance" of the court's ruling. [Doc. 196 at n. 21]

---

[29] The Court suggests Plaintiff had four opportunities to object to the procedure. [Doc. 196, p. 5] Two of these were *after* the decision was announced [Tr. Tran. at 1306-1307]; one was *during* the ruling [*Id*. at 1295-1297] (apparently suggesting Plaintiff's counsel should have predicted the outcome and stopped the ruling); and the other was supposedly when the Court "made the initial proposal" [Doc. 196 at p. 5]—but no "proposal" was made (rather, the Court confirmed it had <u>not</u> made a decision "but were I to grant the motion, I would still let the jury continue to reach a verdict") [Tr. Tran. at 1256:4-12].

The Rule 50 Opinion also seeks to validate the verdict[30] by commending the "model jury" [Doc. 196 at pp. 65-66] and describing jurors as "adamant that [push notifications] had not affected their determination of the verdict in the slightest." [*Id*. at pp. 6-7, 37-38, 64-66] However, there is no way to test this assertion because Rule 606(b), *Fed. R. Evid*., prohibits the disclosure of "the effect of anything on [a] juror's or another juror's vote." *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir. 1994). The Court also comments about "promptly notif[ying] the parties" of some jurors' exposure to push notifications" [Doc. 196 at p. 7] but (as noted above) spoke to *Bloomberg* at least 52 minutes before notifying counsel about the jurors' exposure. Ultimately (despite extensive effort to validate the verdict), the Rule 50 Opinion deems the verdict "legally irrelevant" "even if one indulges the implausible hypothesis that the jury would have returned a verdict for Palin absent news alerts.[31]" [Doc. 196 at p. 7]

The substance of the Rule 50 Opinion relies on a skewed, incomplete version of the facts that disregards significant evidence of actual malice, draws inferences against Plaintiff, and adopts Bennet's testimony as true, as well as the incorrect notion that Plaintiff lacked any "concrete evidence" of actual malice and her case rested exclusively on the possibility that the jury might disbelieve Bennet's testimony. [*Id*. at pp. 44-45] The Rule 50 Opinion does precisely what the Second Circuit said in the Mandate (*Palin*, 940 F.3d at 813-815) and the Supreme Court said in *Reeves*, 530 U.S. at 152-153, cannot be done: it "disregarded critical evidence favorable to petitioner…failed to draw all reasonable inferences in favor of petitioner…discredited petitioner's

---

[30] The Court noted the "firm view that a few jurors' pre-verdict awareness of news about the Court's intended Rule 50 decision did not nullify the jury's verdict in any respect." [Doc. 196 at p. 7]

[31] The appearance of partiality arising from this speculative comment is considerable, and it ignores Rule 606(b) and the "objective test" applied to assess the likelihood that extraneous information "would affect a typical juror." *Bibbins*, 21 F.3d at 17. Learning the presiding judge determined a case has no merit is the type of information that would affect a typical juror.

evidence… [and]… impermissibly substituted its judgment concerning the weight of the evidence for the jury's."

The characterization of the "origins" of the Editorial [Doc. 196 at pp. 10-12] is one example of the slanted view of the case embracing Defendants' version of the facts and failing to account for Bennet's preconceived narrative and position as the head of the Opinion Section.  The evidence at trial presented an even stronger case of actual malice than at the summary judgment stage, when the Court concluded: "taken in the light most favorable to plaintiff, the evidence shows Bennet came up with an angle for the Editorial, ignored the articles brought to his attention that were inconsistent with his angle, disregarded the results [of] the Williamson research that he commissioned, and ultimately made the point he set out to make in reckless disregard of the truth." [Doc. 117 at p. 34]

The only inferences drawn from the limited facts cited in the Opinion related to the drafting and editing process are in favor of Defendants,[32] which makes it seem as if Bennet was not intimately involved and in control of the content of the Editorial.  However, the same facts (and others) demonstrate that Bennet (the "boss" with "ultimate decision-making authority" over the Editorial [Tr. Tran. at 521:8-18]) plowed ahead with his preconceived narrative about "incitement" (injected forty minutes after Semple already decided the Editorial was going to be about gun control) [PL Tr. Ex. 119] even though there was no evidence or "pattern" to support the defamatory statements.  [Tr. Tran. at 603:1-604:11; 784:10-786:22].[33]  It is likewise reasonable to conclude

---

[32] The Opinion notes Linda Cohn's role in the Editorial [Doc. 196 at p. 18], but Cohn only briefly reviewed Williamson's draft and immediately took it to Bennet and told him "you need to look at this" because she was not sure it was what he wanted.  [Tr. Tran. at 519:23-522:5]  This was not a "conversation" about the content, but a "one sentence" exchange.  [Id.]

[33] At one point, Bennet admitted the argument in the Editorial "fell apart," but quickly tried to backtrack.  [Tr. Tran. at 651:20-652:22]

that no one who worked for Bennet was going to question or change what he wrote in the Editorial—particularly after he decimated the operative passages of Williamson's draft [Doc. 196 at p. 20 (redline of operative passages)] because they did not say what Bennet conveyed to everyone in his 12:41 p.m. email [PL Tr. Ex. 119] he wanted the Editorial to say.[34]   In fact, Williamson testified Bennet was "super keen" to take on the Editorial [Tr. Tran. at 157:4-24; PL Tr. Ex. 163; PL Tr. Ex. 186][35] and Bennet's significant edit to Williamson's draft and insertion of language with a different meaning bolsters the conclusion that Bennet was in control.[36]

The Rule 50 Opinion ignores the "strong" language Bennet used to grab reader's attention [Tr. Tran. at 605:11-19][37] and assertion that the "link" to "incitement" was "clear" and "direct," which conveyed there was conclusive proof of the causal connection between the map and Loughner's attack.  This is significant given Bennet's admission that Williamson's draft already said what Benet claims he was trying to say [Tr. Tran. at 792:20-793:23; 784:1-786:24], meaning there was no reason to change the draft unless Bennet was purposefully editing it to convey

---

[34] Indeed, as the District Court noted in its summary judgment order, "taken in the light most favorable to plaintiff, the evidence shows Bennet came up with an angle for the Editorial, ignored the articles brought to his attention that were inconsistent with his angle, disregarded the results [of] the Williamson research that he commissioned, and ultimately made the point he set out to make in reckless disregard of the truth."  [Doc. 117 at p. 34]  This explains why no one who reviewed Bennet's rewrite flagged any problems [Doc. 196 at p. 2] and why Lepping did not fact-check the lines Bennet added about incitement [*Id*. at pp. 22-3]

[35] This is another critical area where Bennet's conflicting testimony created a fact issue.  Bennet denied Williamson's assertions that he was "keen" and "super keen" to take on the Editorial.  [Tr. Tran. at 790:14-25]

[36] The alteration of a draft by adding or changing language to create a different meaning is recognized evidence of actual malice.  *Sharon*, 599 F.Supp. at 582; *Young*, 74 F.3d at 547-548.

[37] The Court previously found this was "powerful evidence" of actual malice, strongly supportive of the inference that the statements were made "with knowledge of [their] falsity," and implicated Bennet's credibility, which "is for the jury to assess, not for this Court to credit..."  [Doc. 117 at pp. 22-24]

something different.[38]  Williamson drafted the Editorial consistent with the results of her research (refusing to draw any direct or clear connection to incitement) [Tr. Tran. at 142-143, 181-182], and Bennet obliterated it because it did not track his narrative.

The Rule 50 Opinion's description of the research conducted on June 14, 2017 about Bennet's preconceived narrative is also tilted exclusively in favor of Defendants.  It disregards Bennet's glaring admission of actual knowledge of falsity ("I didn't think then and don't think now the map caused Jared Loughner to act" [Tr. Tran. at 721:5-6]), asserting it "must be read" to mean something other than what it plainly says.  [Doc. 196 at p. 55][39]  In another attack of Plaintiff's proof at trial, the Rule 50 Opinion faults her for "offer[ing] no admissible evidence that would undermine Bennet's" claimed "recollection" [Doc. 196 at p. 52] and failing to adduce "affirmative evidence" that Bennet or the Editorial Board  were biased,[40] while crediting Bennet's "deni[al] [of] having any recollection of specific articles he read in 2011 or thereafter about the Arizona shooting that discussed Loughner's mental state," and simultaneously citing the exclusion of evidence associated with Bennet's brother and *The Atlantic* articles (in violation of the Mandate) [*Id*. at n. 31-32].    Also, despite  acknowledging  Bennet's  request  for  prior  editorials

---

[38] Bennet received a glowing review from A.G. Sulzberger for 2017 (the year the editorial was published), including that his "instinct for stories, framing, and language is impeccable."  [Tr. Tran. at 673:15-674:4]

[39] The explanation conflates defamatory meaning and falsity, but the Court did not grant judgment as a matter of law on defamatory meaning [Doc. 196 at n. 26] and assumes Bennet intended to convey the crosshairs map caused Loughner's attack.  [*Id*. at p. 45]

[40] Plaintiff introduced substantial evidence of bias, not the least of which was Semple's discussion of the Republican lawmakers shot by Hodgkinson in prepublication emails and the Editorial Board's liberal bias.  [Tr. Tran. at 829:11-18]

"connecting…the Giffords shooting to some kind of incitement," the Rule 50 Opinion ignores Bennet's "good for us" response when learning there were none.[41]

The Rule 50 Opinion also takes a decidedly one-sided view of the two editorials ("*Bloodshed and Invective*" and "*As We Mourn*") and op-ed column ("*No One Listened to Gabrielle Giffords*") circulated during the drafting process, suggesting this research Bennet requested, received, and read before writing the defamatory passages does not matter. [Doc. 196 at pp. 13-16, 49-51[42]] This erroneously disregards several statements within these articles that flatly refute Bennet's preconceived narrative.[43] If one accepts that Bennet read and understood each of these articles, it is impossible to grant judgment as a matter of law on actual malice.[44] The statements and other information in these articles demonstrate Bennet knew his assertion of a **"clear"** and **"direct"** link between the map and incitement was false.

---

[41] At summary judgment, the Court concluded that "a reasonable jury could infer from this ["good for us"] response that Bennet felt free to advance his narrative because the Editorial Board had not written on the subject." [Doc. 117 at p. 33]

[42] The Opinion tries to avoid the implications of Bennet's admission to reading this research by suggesting the articles did not "include any conclusive statement regarding [Loughner's] motivations or political convictions, if any" [Doc. 196 at p. 116] and that "none presents any definitive facts about the Arizona shooting" [*Id*.].

[43] For example, "*Jared Loughner …appears to be mentally ill. His paranoid Internet ravings about government mind control place him well beyond usual ideological categories*" [*Id*. at p. 15]; "*This horrific event, [Pres. Obama] said, should be a turning point for everyone – 'not because a simple lack of civility caused this tragedy—it did not…'*" [*Id*. at p. 16]; "*It is facile and mistaken to attribute this particular madman's act directly to Republicans or Tea Party members*." [*Id*. at p. 48]) Bennet testified it was probable he read each of these statements. [Tr. Tran. at 781:21-782:5; 778:17-779:13; 779:14-781:1] Bennet also confirmed reading the portion of "*As We Mourn*" concerning the "accusation by Sarah Palin that journalists and pundits had committed a 'blood libel'." [*Id*. at 779:14-781:1; Doc. 196 at n.7]

[44] Indeed, at summary judgment, the Court specifically addressed these same articles and described them as "disclaim[ing] the idea that Loughner had been motivated by violent rhetoric," [Doc. 117 at pp. 33-34] and ultimately concluded that "taken in the light most favorable to plaintiff, the evidence shows Bennet came up with the angle for the editorial, ignored the articles brought to his attention that were inconsistent with his angle, disregarded the results [of] the Williamson research he commissioned, and ultimately made the point he set out to make in reckless disregard of the truth." [*Id*.]

At bare minimum, these same materials establish Bennet's reckless disregard of the truth because they indisputably provide information that called Bennet's preconceived narrative into doubt.  As the Court found a summary judgment, "where [a] publisher undertakes to investigate the accuracy of a story and learns facts casting doubt on the information contained therein, it may not ignore those doubts, even though it had no duty to investigate in the first place."  [Doc. 117 at p. 27][45]  The Second Circuit acknowledged the same principle in the Mandate.  *Palin*, 940 F.3d at 814 (discussing Bennet's failure to "reacquaint[] himself with the articles published in *The Atlantic*.").[46]

The Rule 50 Opinion also contradicts the Mandate and summary judgment order[47] by discounting the ABC News article hyperlink and "reject[ing] Palin's argument that the presence…of the hyperlink" was circumstantial evidence of actual malice; which also once again erroneously accepts Bennet's testimony that he did not click on the hyperlink or read the ABC News article.  [Doc. 196 at pp. 17-18, 49-52]  *Palin*, 940 F.3d at 815.  The Opinion also argues the ABC News article is not evidence of actual malice "assuming <u>arguendo</u>" Bennet read it [*Id*. at 50, n. 28] based on the proposition (which contradicts the Mandate) that a "reasonable reader in

---

[45] The Court also concluded that: "After receiving Williamson's draft, a reasonable jury might conclude, Bennet had obvious reasons to doubt whether there existed a link between the map and the Loughner shooting… [and his] failure to further investigate or at least just click on the link to the only article Williamson had presented could support the inference that he was purposefully avoiding the truth."  [Doc. 196 at p. 33]

[46] Plaintiff cited another case during the Rule 50 argument illustrating this same proposition. *Young v. Gannett Satellite Info. Network, Inc*., 734 F.3d 544, 548 (6th Cir. 2013) (*citing Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989)).  In *Young*, the court found recklessness based on a failure to investigate further where initial research "found no definitive statement" to support an accusation, and the failure to conduct additional research indicates a "deliberate decision not to acquire knowledge of facts that might confirm the probable falsity" of the accusation." *Young*, 734 F.3d at 548.

[47] *See* Doc. 117 at pp. 32-33 ("a jury might discredit [Bennet's] testimony" that he did not click on the hyperlink and, "[n]onetheless, even if it were true, it could be evidence of reckless disregard.").

Bennet's position" would not understand the ABC News article to call Bennet's assertion of a causal link between the map and Loughner's attack into doubt."[48]  This ignores the statement "no connection has been made between [the map] and the Arizona shooting" and other information on the second page of the ABC News article which refutes any connection (*i.e.,* "an acquaintance of Loughner's, Caitie Parker… described him on Twitter as "more libertarian & definitely socially liberal").

The Court also gave considerable weight to a one-sided view of some of the events occurring after Williamson completed her draft, continuing to credit Bennet's testimony about what transpired and who was responsible for fact-checking the portions of the Editorial Bennet rewrote [Doc. 196 at pp. 18-23, 58-59], accepting as true Bennet's claim that he functioned solely as an editor, not a reporter [*Id*. at p. 20].  Williamson refuted Bennet's claim, confirming that he was responsible for fact-checking his rewrite.  [Tr. Tran. at 92:9-13]  The Rule 50 Opinion also adopts Defendants' position that "the Times' editing and fact-checking processes [bely] the inference that [Bennet] intentionally or recklessly published false information" [Doc. 196 at pp. 58-59], and gave significant weight to Bennet's claim that he sent his revised version to Williamson to fact-check it.  [*Id*. at 20-23]  However, Williamson flatly contradicted Bennet's testimony, confirming that Bennet's email on the evening of June 14, 2017 did not "specifically ask [her] to fact-check anything in the draft that he changed" [Tr. Tran. at 157:25-158:3] and that once she submitted her draft of the Editorial her work was done [*Id*. at 138:9-12].

---

[48] The Opinion suggests it is "not at all clear" Bennet was even "negligent" by failing to click on the hyperlink because it was on the word "circulated." However, Plaintiff introduced evidence that Bennet was responsible for fact-checking the portion so the Editorial he rewrote [Tr. Tran. at 92:9-13] and fact-checking requires clicking on hyperlinks ("you open every link") and confirming they support the facts.  [*Id*. at 398:5-20; 421:2-422:5]

The Rule 50 Opinion's view of Bennet's post-publication conduct also improperly draws inferences only in favor of Defendants and accepts Bennet's claim that he made an innocent mistake in its analysis of Bennet's email exchanges with Ross Douthat and Bennet's 5:08 a.m. email to Williamson and Lepping [Doc. 196 at pp. 24-27, 60-63]. [49]

The Court clearly believed Bennet's claim that he was "upset and confused" by Douthat's email.  [Doc. 196 at p. 26]  However, after Douthat informed Bennet the Editorial was false, Bennet's real-time reaction was "Thanks, and I'll look into this tomorrow" [PL Tr. Ex. 171],  and he did not immediately call Williamson [Tr. Tran. at 648:2-5] or conduct any fact research online [*Id*. at 648:2-10].  Instead, Bennet looked at comments about the false accusations in the Editorial on social media [*Id*. at 649:10-25; 795:23-796:13; 835:1-838:11], which continues to give rise to the reasonable inference that "Bennet could have published the editorial knowing—or recklessly disregarding—the falsity of the claim, and then decided later that the false allegation was not worth defending… a calculus that standing by the editorial was not worth the cost of public backlash."[50] *Palin*, 940 F.3d at 815.  This "calculus" began with Douthat's emails to Bennet, including links to social media posts by well-known *liberal* media pundits who were taking shots at the false accusations in Bennet's Editorial.  [Tr. Tran. at 835:1-14; 842:1-7; PL Tr. Ex. 171-173]  In fact, the public backlash underlying this calculus was so bad that the head of the Times' Reader Center

---

[49] The Court also noted Bennet's "regret for the mistake," citing an apology in a statement in response to questions from a CNN reporter that "a member of the [Times'] public relations staff did not pass along."  Bennet claimed at trial he did not know the apology was not published [Tr. Tran. at 797:2-20], but the full email string produced by the Times in discovery contains substantial portions redacted as attorney-client communications, which contradicts Bennet's self-serving claim.  [**Exhibit 6**]

[50] Bennet admitted he did not see anyone interpreting the Editorial consistent with what he claimed to be his intended meaning.  [Tr. Tran. at 650:1-4]

reached out to Bennet on her own initiative about the "Sarah Palin editorial."  [*Id*. at 1021:18-1023:12; 1029:17-22; 1034:9-1035:24]

The Rule 50 Opinion also fails to draw inferences in Plaintiff's favor from Bennet's 5:08 a.m. email to Williamson and Lepping [PL Tr. Ex. 191].   It only considers this email as evidence that Bennet was upset over his mistake and as inconsistent with actual malice.  [Doc. 196 at p. 61] However, this ignores that Bennet's early morning email refutes the claim that he made a mistake because it does not claim his use of the term "incitement" was being misconstrued.  Thus, "a reasonable jury could conclude that Bennet's reaction and the Times' correction may also be probative of a prior intent to assert the existence of such a direct link… If, as Bennet now contends, it was all simply a misunderstanding, the result of a poor choice of words, it is reasonable to conclude that the ultimate correction would have reflected as much and simply clarified the Editorial's intended meaning."  [Doc. 117 at p. 25][51]

Bennet's 5:08 a.m. email exchange with Williamson and Lepping also highlights Bennet's "unusual admission" that "I don't know what the truth is here."  [Doc. 196 at p. 62], which the Rule 50 Opinion characterizes as mere "negligence" [Doc. 196 at p. 60].   However, another reasonable inference is that Bennet's 5:08 a.m. email was an attempt to cover for himself and place blame on those around him (notably, Bennet states in the same email "***we*** may have relied to

---

[51] This inference is further supported by the Times' correction policy, which specifically provides for acknowledging a statement was "imprecise" or "incomplete" in situations involving mistakes in meaning.  However, Defendants admitted making a "factual" error, and Bennet testified his post-publication Tweet about the correction (admitting to an error of fact) was posted "to make sure the record was clear with respect to the fact [he] got wrong" and that he "would not, after making an error like this, misrepresent what that error was to the public" because "that would be compounding the error."  [Tr. Tran. at 786:8-24]  Bennet also admitted he "did not tell the public [that he] used the word 'incitement' in an improper way" and "didn't tell the public that's not what I meant when I used the word "incitement."  [*Id*. at 787:4-9]

heavily on past editorials and early coverage"—when he was the one who wrote the false statements).[52]  The Court made this finding on summary judgment [Doc. 117 at p. 25[53]].

The Rule 50 Opinion also concludes a lack of actual malice is inferred from the fact that Bennet otherwise "likely would have been defensive, avoided issuing a correction to the Editorial, or tried to minimize the correction's confession of error."  [Doc. 196 at p. 63]  This violates the Mandate, which specifically addresses the alternative inferences arising from the correction.[54]  *Palin*, 940 F.3d at 815.  Moreover, there was substantial evidence demonstrating the minimalization of the correction's confession of error; including the exclusion of any reference to Plaintiff in the correction while leaving her name in the Editorial—which one Times' Editorial Board member recognized as Bennet "still trying to sneak the link in."  [Doc. 196 at pp. 30-31 (summarizing corrections and edits to body of Editorial); Tr. Tran. at 589:2-591:9; 591:10-592:15; 592:19-593:9; 671:14-672:13][55]

Beyond violating the Mandate, the acceptance of Bennet's credibility throughout the Rule 50 Opinion is particularly troubling given the impeachment evidence at trial.  Bennet changed his testimony about reading the June 14, 2017 research.  He denied reading the research when he testified under oath at the 2017 plausibility hearing and at his deposition, but admitted reading it

---

[52] Bennet also tried shifting blame for his false narrative by claiming it was Williamson's "theory" [Tr. Tran. at 718:25-719:17] and then a "collective" theory [*Id*. at 783:2-24].

[53] "[A] reasonable jury could conclude that Bennet's reaction and the Times' correction may also be probative of a prior intent to assert the existence of such a direct link… If, as Bennet now contends, it was all simply a misunderstanding, the result of a poor choice of words, it is reasonable to conclude that the ultimate correction would have reflected as much and simply clarified the Editorial's intended meaning."

[54] The Rule 50 Opinion ignored Bennet's public affirmation that the error "doesn't undercut or weaken the argument of the piece."  [*Id*. at 670:4-12]

[55] The Rule 50 Opinion discounts this "sneak the link" in email from Jesse Wegman to Williamson as lacking "context" [Doc. 196 at n. 16], which contravenes the obligation to draw all inferences in favor of Plaintiff.

at trial when faced with the email he wrote forwarding "*Bloodshed and Invective*" and "*As We Mourn*" to Semple and describing them as "more relevant precedent" to the Editorial.  [Tr. Tran. at 634:9-635:3; Pl Tr. Ex. 136]  Bennet's credibility also took a significant hit when he tried to claim he did not apologize to Plaintiff because the Times had a policy against apologies [Tr. Tran. at 675:1-676:2], but the Times' written policies contain no such prohibition [PL Tr. Ex. 17-18] and the head of the Reader Center testified there was no such policy.  [Tr. Tran. at 1036:19-20]

The Rule 50 Opinion concludes by asserting the judgment as a matter of law reflects the Court's "duty" to ensure that public figure libel actions do not chill free speech.  [Doc. 196 at p. 66]  This violates controlling precedent: "It is no longer permissible to take into account the 'chilling effect' a libel suit may have on the exercise of first amendment rights.  *Loeb v. New Times Communications Corp.*, 497 F.Supp. 85, 94 (S.D.N.Y. 1980) (*citing Yimouyannis v. Consumer Union of the U.S., Inc.*, 619 F.2d 932, 940 (2d Cir. 1980)).[56]

---

[56] *Loeb* is another case Plaintiff cited to the court during the Rule 50 argument.

## IV.    DISQUALIFICATION IS REQUIRED

An objective, disinterested observer fully informed of the events described herein occurring before, during, and after the trial of this action would entertain doubts about the Court's impartiality.  The Court's refusal to abide by the Mandate and handling of the trial (including the 2017 dismissal of the case, summary judgment rulings, scheduling of the trial,[57] insufficient jury selection process, exclusion of critical evidence recognized in the Mandate, making and timing of the announcement of the Rule 50 decision, improper jury instruction on actual malice during deliberations, and comments to a member of the press about the case) establish an appearance of partiality that requires disqualification.  A reasonable person fully informed of the facts would question the Court's impartiality and predisposition.

Independently, comments to the press about pending cases warrant disqualification because they run afoul of Canon 3A(6) of the Code of Conduct for United States Judges (requiring federal judges to "avoid public comment on the merits of [ ] pending or impending" cases).  Although rare, situations where judges make public comments to the press about a pending case over which they are presiding almost always result in mandatory disqualification under Section 455.  *U.S. v. Microsoft Corp.*, 253 F.3d 34, 112-113 (citing *In re Boston's Children First*, 244 F.3d 164 (1st Cir. 2001); *In re IBM Corp.*, 45 F.3d 641 (2d Cir. 1995); *U.S. v. Cooley*, 1 F.3d 985 (10th Cir. 1993)).  As discussed in *Microsoft Corp.*, 253 F.3d at 115, "Judges who covet

---

[57] The trial was originally set during the week of Plaintiff's counsel's daughter's wedding (in Tampa) on January 29, 2022.  The Court also denied a request to continue the trial due to the Omicron variant surge and concerns that COVID exposure would cause Plaintiff's counsel to miss the wedding.  After Plaintiff tested positive for COVID, the Court notified the public and stated: "She is, of course, unvaccinated."  [Tr. Tran. at 2:21-25]  This comment immediately received wide-spread, negative media attention.  Conversely, when a key Times' witness (Eileen Lepping) tested positive for COVID at trial, the Judge made no comment about her vaccination status.  [Tr. Tran. at 2:23-3:7]

publicity, or convey the appearance that they do, lead any reasonable observer to wonder whether their judgments are being influenced by the prospect of favorable coverage in the media."[58]

The Court's comment to the press can also reasonably be construed as an attempt to bolster the Court's rulings. *In re Boston's Children First*, 244 F.3d at 170 (under some circumstances judge's defense of own orders, prior to resolution of appeal, may create appearance of partiality). The 68-page "Opinion" solidifies this perception; as does the timing of the comment to the press *before* counsel was informed about the developments with the jury. Moreover, the Court did not discuss purely procedural matters with the press. *Microsoft*, 253 F.3d at 112. Regardless, as stated in *Microsoft*, "[i]t is no excuse that the judge may have intended to 'educate' the public about the case or to 'rebut misconceptions' purportedly caused by the parties." *Id*. In fact, "[b]ecause there is no scienter requirement in section 455, the test is not how a judge intended his remarks to be understood, but whether, as a result of the interviews or extra-judicial statements, the appearance of impartiality might reasonably be questioned." *Ligon v. City of New York*, 736 F.2d 118, 126-127 (2d Cir. 2013).

There are a variety of remedies for violations of 28 U.S.C § 455 based on the relative harm to the parties, the public, and the judicial process. *U.S. v. Amico*, 486 F.3d 764, 777 (2d Cir. 2007) (citing *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 862-864 (1988)). These include retroactive disqualification and vacatur of rulings, orders, and judgments. *Liljeberg*, 486 U.S. at 864; *Amico*, 486 F.3d at 777. Recusal and vacating or reversing the Court's rulings and

---

[58] Indeed, this is why "[j]udges are generally loath to discuss pending proceedings with the media." *Ligon*, 736 F.3d at 126 (citing *In re Boston's Children First*, 244 F.3d at 169). "In fact, the very rarity of such public statements, and the ease with which they may be avoided, make it more likely that a reasonable person will interpret such statements as evidence of bias. *In re Boston's Children First*, 244 F.3d at 170.

orders is necessary and appropriate here given the unique circumstances of this case. *Microsoft Corp.*, 253 F.3d at 116-117; *Liljeberg*, 486 U.S. at 862-864.

## <u>CONCLUSION</u>

Ultimately, despite public perception and speculation about possible larger implications of this case, Plaintiff's primary objective is to obtain a fair trial.  The reasons set forth herein require (1) vacatur of the verdict, judgment as a matter of law, and final judgment, as well as the Court's rulings contrary to the Mandate, (2) a new trial, and (3) recusal.  It reasonably appears to objective observers that the Court is partial and predisposed, such that a new trial before a new judge is necessary to preserve the appearance of justice.

Dated:  March 22, 2022.                    Respectfully submitted,

_/s/ Shane B. Vogt_
Kenneth G. Turkel (admitted _pro hac vice_)
Email:  kturkel@tcb-law.com
Shane B. Vogt (admitted _pro hac vice_)
Email:  svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 834-9191
Facsimile: (813) 443-2193

Michael M. Munoz
E-mail:  mmunoz@golenbock.com
GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile: (212) 754-0330

_Attorneys for Plaintiff_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that Plaintiff's Omnibus Memorandum of Law in in Support of Post-Trial Motions was filed electronically on March 22, 2022.  This Notice will be sent by operation of the Court's electronic filing system to counsel of record for all parties as indicated on the electronic filing receipt.  Parties and their counsel may access this filing through the Court's system.

_/s/ Shane B. Vogt_____
Attorney