**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
                                                          :
                                                          :
SARAH PALIN                                               :        No. 17 Civ. 4853 (JSR)
                                                          :
                          Plaintiff,                      :
                                                          :        ECF Case
                                                          :
                                                          :
          -against-                                       :
                                                          :
                                                          :
                                                          :
THE NEW YORK TIMES COMPANY and JAMES                      :
BENNET,                                                   :
                                                          :
                          Defendants.                     :
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X


**DEFENDANTS' OPPOSITION TO PLAINTIFF'S POST-TRIAL MOTIONS**

David L. Axelrod
Jay Ward Brown
Jacquelyn N. Schell
Thomas B. Sullivan
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
axelrodd@ballardspahr.com
brownjay@ballardspahr.com
schellj@ballardspahr.com
sullivant@ballardspahr.com

*Counsel for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... iii

I.     INTRODUCTION ........................................................................... 1

II.    RELEVANT PROCEDURAL HISTORY ........................................ 1

III.   LEGAL STANDARD....................................................................... 2

IV.    PLAINTIFF IS NOT ENTITLED TO A NEW TRIAL ................... 3

       A.    Plaintiff's Mandate Argument Is Not Supported By Law Or Logic ........................ 3

       B.    The Court's Jury Selection Process Ensured A Fair Jury ........................................ 8

       C.    The Court Properly Excluded Certain Evidence.................................................... 11

       D.    The Mid-Deliberation Instruction Was Not Erroneous ......................................... 16

       E.    Certain Jurors' Exposure To "Push Notifications" Did Not Impact Their Deliberations, And The Court Properly Concluded The Jury Was Impartial.......................................................................................... 19

       F.    The Court's Post-Verdict Statement To The Press Does Not Warrant A New Trial .......................................................................... 24

       G.    The Court's Entry Of Judgment For Defendants Pursuant To Rule 50 Is Supported By The Law And The Evidence Actually Of Record.................... 26

             1.    The Court's ruling was procedurally correct ............................................. 26

             2.    The Court correctly ruled that Plaintiff had not adduced clear and convincing evidence of actual malice as to falsity............................. 29

                   a.    The Court's evaluation of evidence did not violate the mandate or the summary judgment order........................................ 30

                   b.    The Court did not make improper credibility determinations ...................................................................... 31

                   c.    Plaintiff has not identified any evidence that would suffice to prove actual malice........................................................ 33

             3.    The Court could have granted the Rule 50 motion for failure to prove actual malice as to awareness of defamatory meaning .................... 37

i

V.      DISQUALIFICATION IS NOT WARRANTED..............................................................38

        A.      Plaintiff Has Failed To Meet Her Burden To Show This Court's
                Impartiality Would Be Doubted..........................................................................38

                1.      Plaintiff's disagreement with this Court's decisions is not a
                        basis for recusal.......................................................................................39

                2.      The Court's comment to Bloomberg is not a basis for recusal.................45

        B.      The Court's Decisions Taken As A Whole Do Not Give The
                Appearance Of Partiality....................................................................................48

VI.     CONCLUSION...........................................................................................................49

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                    **Page(s)**

*Aguinda v. Texaco,*
 241 F.3d 194, 201 (2d Cir. 2001)................................................................39

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242, 251, 252, 256 (1986)...............................................18, 30, 31, 32

*Bagheri v. Bailey,*
 713 F. App'x 141, 145 (4th Cir. 2017) ..........................................................21

*Banco Nacional de Cuba v. Farr,*
 383 F.2d 166, 177 (2d Cir. 1967)....................................................................4

*In re Barry,*
 946 F.2d 913, 914 (D.C. Cir. 1991) ...............................................................46

*Berger v. New York City Police Dep't,*
 No. 13 Civ. 6084 (VSB), 2019 U.S. Dist. LEXIS 219872, at *8-9 (S.D.N.Y.
 Dec. 19, 2019)................................................................................................15

*Bibbins v. Dalsheim,*
 21 F.3d 13, 14, 16-17 (2d Cir. 1994) (per curiam) .................................23, 24

*Bose Corp. v. Consumers Union,*
 466 U.S. 485, 511 (1984)..................................................................................6

*In re Boston's Children First,*
 244 F.3d 164, 166, 167, 172 (1st Cir. 2001).........................................41, 46, 47, 48

*Britt v. Garcia,*
 457 F.3d 264, 272 (2d Cir. 2006).....................................................................22

*Brown v. City of Syracuse,*
 673 F.3d 141, 148 (2d Cir. 2012)..................................................................5, 6

*Burton v. Richmond,*
 370 F.3d 723, 728 (8th Cir. 2004) ...................................................................6

*Carter v. Rosenberg & Estis, P.C.,*
 No. 95 Civ. 10439 (DLC), 1998 U.S. Dist. LEXIS 4010, at *88-89 (S.D.N.Y.
 Mar. 30, 1998)...............................................................................................40

*Coleman v. Grand,*
 523 F, Supp. 3d 244, 257-59 (E.D.N.Y. 2021).............................................29

*Contemp. Mission, Inc. v. N.Y. Times Co.,*
 842 F.2d 612, 621-23 (2d Cir. 1988) ...................................................*passim*

*In re: Coronavirus/COVID-19 Pandemic*,
  No. 1:20-mc-197, ECF 1 (S.D.N.Y. Apr. 20, 2020) ................................................................41

*In re Drexel Burnham Lambert Inc.*,
  861 F.2d 1307, 1312 (2d Cir. 1988) ....................................................................................38

*Flores v. DOJ*,
  391 F. Supp. 3d 353, 365 (S.D.N.Y. 2019) ...........................................................................3

*Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*,
  136 F.3d 276, 282, 285 (2d Cir. 1998) ................................................................................28

*Gottwald v. Sebert*,
  2022 NY Slip Op 01515, ¶ 2, 3 (1st Dep't March 10, 2022) ...............................................29

*Great Wall Med. P.C. v. Levine*,
  No. 157517/2017, 2022 N.Y. Misc. LEXIS 988, at *2 (Sup. Ct. N.Y. Cnty.
  Mar. 8, 2022) ......................................................................................................................29

*Harte-Hanks Commc'ns v. Connaughton*,
  491 U.S. 657, 666 (1989) ....................................................................................................36

*Hill v. Novartis Pharms. Corp.*,
  No. 1:06-cv-00939-JSR-SAB, ECF 194 (E.D. Cal. Jun. 26, 2013) ......................................28

*Huddleston v. United States*,
  485 U.S. 681, 690 (1988) ....................................................................................................15

*In re IBM Corp.*,
  45 F.3d 641, 642-43 (2d Cir. 1995) .................................................................................46, 47

*In re IBM Corp.*,
  618 F.2d 923, 927, 929, 930 (2d Cir. 1980) .................................................................39, 47, 49

*Kesner v. Buhl*,
  No. 20 Civ. 3454 (PAE), 2022 U.S. Dist. LEXIS 43094, at *26 (S.D.N.Y.
  Mar. 10, 2022) ....................................................................................................................29

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*,
  729 F.3d 99, 104 (2d Cir. 2013) ............................................................................................2

*Konik v. Champlain Valley Physicians Hosp. Med. Ctr.*,
  733 F.2d 1007, 1013 n.4 (2d Cir. 1984) .........................................................................26, 27

*Lamborn v. Dittmer*,
  726 F. Supp. 510, 517 (S.D.N.Y. 1989) ...............................................................................40

*Liberman v. Gelstein*,
  80 N.Y.2d 429, 438 (1992) ..............................................................................................30, 34

*Ligon v. City of N.Y.*,
   736 F.3d 118, 124, 126, 127 (2d Cir. 2013)...................................................46, 47, 48

*Liteky v. United States*,
   510 U.S. 540, 555, 556 (1994)........................................................................1, 39, 40

*Luce v. United States*,
   469 U.S. 38, 41 (1984)...................................................................................................7

*Massa Constr. v. Meaney*,
   No. 126837/2020, slip op. at 2 (Sup. Ct. Ontario Cnty. May 13, 2021).................29

*Mattivi v. S. African Marine Corp.*,
   618 F.2d 163, 166 n.2 (2d Cir. 1980).......................................................................26

*McKenzie v. BellSouth Telecomms., Inc.*,
   219 F.3d 508, 513 (6th Cir. 2000) .............................................................................6

*Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*,
   290 F.3d 98, 106 (2d Cir. 2002)..................................................................................2

*Metro. Opera Ass'n v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*,
   332 F. Supp. 2d 667, 671 (S.D.N.Y. 2004)..............................................................46

*Mistretta v. Prokesch*,
   5 F. Supp. 2d 128, 132 (E.D.N.Y. 1998) .................................................................27

*Muller-Paisner v. TIAA*,
   No. 03 Civ. 6265 (GWG), 2014 U.S. Dist. LEXIS 5229, at *7, *8-9 (S.D.N.Y.
   Jan. 15, 2014).......................................................................................................39, 49

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254, 280 (1964)...........................................................................................29

*Nemaizer v. Baker*,
   793 F.2d 58, 63 (2d Cir. 1986).....................................................................................2

*New Eng. Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*,
   352 F.3d 599, 606 (2d Cir. 2003).................................................................................4

*NOVAGOLD Res., Inc. v. J Capital Rsch. USA LLC*,
   No. 20 Civ. 2875 (LDH) (PK), 2022 U.S. Dist. LEXIS 55734, at *25
   (E.D.N.Y. Mar. 28, 2022) ..........................................................................................29

*Palin v. N.Y. Times Co.*,
   940 F.3d 804, 807, 808, 812, 813-14, 816-17 (2d Cir. 2019).......................4, 5, 6, 7

*Palin v. N.Y. Times Co.*,
   482 F. Supp. 3d 208, 218 (S.D.N.Y. 2020)..................................................................7

*Palin v. N.Y. Times Co.*,
   No. 17 Civ. 4853 (JSR), ECF 196, at 3, 4, 6-7, 30 n.17, 32, 33-36, 37-38, 41,
   42, 43-44,45-64, 64-66 (S.D.N.Y. Mar. 1, 2022) ........................................................... *passim*

*Rafter v. Bank of Am.*,
   No. 04 Civ. 3341 (JSR), 2011 U.S. Dist. LEXIS 133041, at *2 (S.D.N.Y.
   Nov. 14, 2011) ................................................................................................................2

*Reeves v. Sanderson Plumbing Prods.*,
   530 U.S. 133, 149 (2000) ...............................................................................................31

*Richardson v. Marsh*,
   481 U.S. 200, 206 (1987) ...............................................................................................22

*Rodriguez v. United States*,
   No. 10 Civ. 5259 (KTD), 2010 U.S. Dist. LEXIS 93634, at *4 (S.D.N.Y.
   Sep. 7, 2010) ..................................................................................................................41

*Rosales-Lopez v. United States*,
   451 U.S. 182, 189 (1981) .................................................................................................8

*Sackler v. ABC*,
   71 Misc. 3d 693, 698 (Sup. Ct. N.Y. Cnty. 2021) .........................................................29

*SEC v. Razmilovic*,
   738 F.3d 14, 30 (2d Cir. 2013).......................................................................................40

*Shaoxing Daqin Imp. & Exp. Co. v. Notations, Inc.*,
   No. 19 Civ. 2732 (JSR), 2020 U.S. Dist. LEXIS 11654, at *2-3 (S.D.N.Y.
   Jan. 22, 2020) ..................................................................................................................2

*Simo Holdings, Inc. v. H.K. uCloudlink Network Tech. Ltd.*,
   396 F. Supp. 3d 323, 340 (S.D.N.Y. 2019).....................................................................2

*Simone v. Prudential Ins. Co.*,
   164 F. App'x 39, 40 (2d Cir. 2006) .................................................................................3

*Skilling v. United States*,
   561 U.S. 358, 399 n.34 (2010)........................................................................................23

*Sompo Japan Ins. Co. v. Norfolk S. Ry.*,
   762 F.3d 165, 175 (2d Cir. 2014)......................................................................................4

*Spiegel v. Schulmann*,
   604 F.3d 72, 83 (2d Cir. 2010)........................................................................................39

*Sprague v. Ticonic Nat'l Bank*,
   307 U.S. 161, 168 (1939)..................................................................................................4

*St. Amant v. Thompson*,
  390 U.S. 727, 731, 733 (1968) ......................................................................30, 36

*Steel v. C.I.R.*,
  No. 99 Civ. 5499 (JSR), 1997 U.S. Dist. LEXIS 15862, at *2 (S.D.N.Y.
  Oct. 14, 1997) ...........................................................................................................39

*Sweeney v. Prisoners' Legal Servs.*,
  84 N.Y.2d 786, 793 (1995) ...............................................................................18, 36

*Sweigert v. Goodman*,
  No. 18 Civ. 8653 (VEC) (SDA), 2021 U.S. Dist. LEXIS 77704, at *4-5
  (S.D.N.Y. Apr. 22, 2021) ........................................................................................29

*Trott v. Platinum Mgmt. (NY) LLC*,
  400 F. Supp. 3d 2, 4 (S.D.N.Y. 2019) .......................................................................2

*Turley v. ISG Lackawanna, Inc.*,
  774 F.3d 140, 153 (2d Cir. 2014) .............................................................................18

*United States v. Abu-Jihaad*,
  630 F.3d 102, 131 (2d Cir. 2010) .............................................................................14

*United States v. Ben Zvi*,
  242 F.3d 89, 95 (2d Cir. 2001) ...................................................................................4

*United States v. Boles*,
  914 F.3d 95, 109 (2d Cir. 2019) .........................................................................12, 13

*United States v. Calbas*,
  821 F.2d 887, 894-95 (2d Cir. 1987) .......................................................................24

*United States v. Casamento*,
  887 F.2d 1141, 1154 (2d Cir. 1989) .........................................................................22

*United States v. Colon*,
  961 F.2d 41, 44 (2d Cir. 1992) .................................................................................39

*United States v. Dawkins*,
  999 F.3d 767, 789 (2d Cir. 2021) .............................................................................15

*United States v. Fortier*,
  242 F.3d 1224, 1229 (10th Cir. 2001) ......................................................................46

*United States v. Gaggi*,
  811 F.2d 47, 51, 53 (2d Cir. 1987) ...............................................................21, 22, 23

*United States v. Ganias*,
  755 F.3d 125, 132 (2d Cir. 2014) .............................................................................21

*United States v. Grinnell Corp.*,
  384 U.S. 563, 583 (1966) ................................................................................1

*United States v. IBM Corp.*,
  475 F. Supp. 1372, 1379 (S.D.N.Y. 1979) ......................................................41

*United States v. Int'l Bhd. of Teamsters*,
  247 F.3d 370, 391 (2d Cir. 2001) ....................................................................2

*United States v. Kozeny*,
  643 F. Supp. 2d 415, 417 (S.D.N.Y. 2009) ......................................................7

*United States v. Kyles*,
  40 F.3d 519, 524 (2d Cir. 1994) ......................................................................8

*United States v. Lawes*,
  292 F.3d 123, 128, 129 (2d Cir. 2002) ....................................................8, 9, 11

*United States v. Lloyd*,
  269 F.3d 228, 240 (3d Cir. 2001) ...................................................................22

*United States v. Lovaglia*,
  954 F.2d 811, 815 (2d Cir. 1992) ....................................................................3

*United States v. Microsoft Corp.*,
  253 F.3d 34, 107-08, 112 (D.C. Cir. 2001) ..........................................46, 47, 48

*United States v. Millar*,
  79 F.3d 338, 342 (2d Cir. 1996) ......................................................................8

*United States v. Nektalov*,
  461 F.3d 309, 318 (2d Cir. 2006) ...................................................................12

*United States v. Perrotti*,
  734 F. App'x 764, 768 (2d Cir. 2018) ............................................................14

*United States v. Sierra Pac. Indus., Inc.*,
  862 F.3d 1157, 1175 (9th Cir. 2017) ..............................................................46

*United States v. Treacy*,
  639 F.3d 32, 39, 46 (2d Cir. 2011) ...........................................................9, 11

*United States v. Vera*,
  362 F. App'x 199, 200 (2d Cir. 2010) .............................................................23

*United States v. Wedd*,
  993 F.3d 104, 117-18 (2d Cir. 2021) ........................................................39, 44

*Unitherm Food Systems v. Swift-Eckrich, Inc.*,
   546 U.S. 394, 406 (2006) ...........................................................................27

*Vill. of Freeport v. Barrella*,
   814 F.3d 594, 610 (2d Cir. 2016) ........................................................14, 16

*Watkins v. Smith*,
   561 F. App'x 46, 47 (2d Cir. 2014) ..........................................................40

*Williams v. Cnty. of Westchester*,
   171 F.3d 98, 101, 102 (2d Cir. 1999) .........................................27, 30, 32

*Zuckerbrot v. Lande*,
   No. 655110/2020, 2022 N.Y. Misc. LEXIS 929, at *30-31, *52 (Sup. Ct. N.Y.
   Cnty. Mar. 17, 2022) ................................................................................29

**Statutes**

28 U.S.C. § 455 .............................................................3, 38, 39, 45, 46, 48

**Other Authorities**

Code of Conduct for United States Judges, Canon 3A(6) .......................45, 46

Fed. R. Civ. P. 50(a) ................................................................................31

Fed. R. Evid. 104(b) .................................................................................15

Fed. R. Evid. 606(b) .................................................................................23

*Press Briefing by White House COVID-19 Response Team & Public Health
   Officials* (Nov. 22, 2021) ........................................................................42

9 Wright & Miller, *Federal Practice & Procedure* § 2533 (1971) ...............26

9A Wright & Miller, *Federal Practice & Procedure* § 2533 (2d ed. 1995)...............27

## I.      INTRODUCTION

Trial in this case demonstrated unequivocally that Defendants did not libel Plaintiff.  This was confirmed both by the Jury's verdict and by the Court's decision to grant Defendants' motion for judgment as a matter of law.  Plaintiff nonetheless asks the Court to vacate the judgment and grant her a new trial.  Additionally, Plaintiff demands that the Court recuse itself.

None of Plaintiff's baseless contentions, whether considered individually or collectively, justify a new trial or recusal.  Rather, Plaintiff's lengthy list of alleged errors purportedly committed by the Court in fact reflects well-supported rulings on disputed issues that the Court simply did not resolve in Plaintiff's favor.  As explained more fully below, the Court did not commit error, much less error so "extraordinary" as to justify a new trial.  Moreover, adverse "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," *Liteky v. United States*, 510 U.S. 540, 555 (1994) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)), and that is certainly true here.

## II.     RELEVANT PROCEDURAL HISTORY

On February 15, 2022, the Court entered final judgment dismissing this case.  ECF 171.  Subsequently, Plaintiff filed a notice informing the Court that she sought the following post-trial relief: (1) disqualification, pursuant to 28 U.S.C. § 455, retroactive to August 28, 2020, vacating every ruling since that time; (2) permission to interview jurors concerning their receipt of push notifications about the trial during deliberations; (3) reconsideration of the Court's decision granting Defendants' motion for judgment as a matter of law; and (4) setting aside of the final judgment, pursuant to Rules 59 and 60 of the Federal Rules of Civil Procedure.  ECF 195.  On March 22, 2022, Plaintiff filed her Omnibus Memorandum of Law in Support of Post-Trial Motions ("Pl. Mem."), ECF 198, in which she abandoned her request to interview jurors, *see generally* Pl. Mem. at 38 (omitting this from her requested relief).

### III.  LEGAL STANDARD

For motions under Local Rule 6.3 or Rule 59(e), the standard "is strict and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shaoxing Daqin Imp. & Exp. Co. v. Notations, Inc.*, No. 19 Civ. 2732 (JSR), 2020 U.S. Dist. LEXIS 11654, at *2-3 (S.D.N.Y. Jan. 22, 2020).  "This standard is intended to 'ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters.'" *Trott v. Platinum Mgmt. (NY) LLC*, 400 F. Supp. 3d 2, 4 (S.D.N.Y. 2019). Therefore, such a motion "should be granted only when the [movant] identifies 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013).

A motion for a new trial under Rule 59 "ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Rafter v. Bank of Am.*, No. 04 Civ. 3341 (JSR), 2011 U.S. Dist. LEXIS 133041, at *2 (S.D.N.Y. Nov. 14, 2011) (quoting *Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98, 106 (2d Cir. 2002)).  Jury verdicts "should be disturbed with great infrequency." *Simo Holdings, Inc. v. H.K. uCloudlink Network Tech. Ltd.*, 396 F. Supp. 3d 323, 340 (S.D.N.Y. 2019).

Rule 60(b)(6) is "properly invoked only when there are extraordinary circumstances justifying relief" or "when the judgment may work an extreme and undue hardship." *Nemaizer v. Baker*, 793 F.2d 58, 63 (2d Cir. 1986); *see also United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001) (noting that a "motion for relief from judgment is generally not

favored"). The party seeking relief from judgment bears the burden of proof. *Simone v. Prudential Ins. Co.*, 164 F. App'x 39, 40 (2d Cir. 2006).

Pursuant to 28 U.S.C. § 455(a), a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." This requires the Court to consider whether "an objective, disinterested observer, fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal." *United States v. Lovaglia*, 954 F.2d 811, 815 (2d Cir. 1992). "[C]onsideration of a motion for recusal is committed to the sound discretion of the district court, and there is a substantial burden on the moving party to show that the judge is not impartial." *Flores v. DOJ*, 391 F. Supp. 3d 353, 365 (S.D.N.Y. 2019).

## IV.   PLAINTIFF IS NOT ENTITLED TO A NEW TRIAL

### A.   Plaintiff's Mandate Argument Is Not Supported By Law Or Logic

Plaintiff contends that the Second Circuit's reversal of this Court's dismissal of the case pursuant to Rule 12(b)(6) deprived this Court of discretion in a number of critical areas. Specifically, Plaintiff claims that, because of the mandate: (1) the Court was precluded from entering judgment in Defendants' favor pursuant to Rule 50; (2) the Court could not rely upon Bennet's testimony regardless of the evidence presented at trial; (3) the Court had no discretion to preclude the admission of articles published by Atlantic Media or evidence concerning Bennet's relationship with his brother, U.S. Senator Michael Bennet; (4) the Court could not rely upon Bennet's testimony that he did not read the hyperlinked ABC News article in the Editorial; and (5) the Court was required to find that an "honest mistake" was not the only reasonable inference that could be drawn from the evidence at trial. Pl. Mem. at 5-6. Plaintiff's contentions about the effect of the mandate are not supported by precedent or logic.

Under the mandate rule, a district court must comply "on remand with the dictates of the superior court" and cannot relitigate issues expressly or implied decided by the Court of Appeals.

*United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001).  However, "a mandate is controlling

only 'as to matters within its compass,'" *New Eng. Ins. Co. v. Healthcare Underwriters Mut. Ins.*

*Co.*, 352 F.3d 599, 606 (2d Cir. 2003) (quoting *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168

(1939)), and a district court does "not violate the mandate rule by addressing on remand an issue

that was not decided by the [Second Circuit] in the original appeal," *Sompo Japan Ins. Co. v.*

*Norfolk S. Ry.*, 762 F.3d 165, 175 (2d Cir. 2014).  "Put simply, the law of the case 'does not

extend to issues an appellate court did not address.'"  *New Eng. Ins. Co.*, 352 F.3d at 606; *see*

*Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 177 (2d Cir. 1967) ("[o]f course it does not

apply to matters left open by the mandate").

Here, the Second Circuit's mandate was limited to vacating the order granting

Defendants' motion to dismiss.  Indeed, the panel stressed that it was ruling *only* on whether

Plaintiff had adequately pleaded her defamation claim:

> We conclude by recognizing that First Amendment protections are
> essential to provide "breathing space" for freedom of expression.  *But, at*
> *this stage, our concern is with how district courts evaluate pleadings.*
> Nothing in this opinion should therefore be construed to cast doubt on
> the First Amendment's crucial constitutional protections.  Indeed, this
> protection is precisely why Palin's evidentiary burden at trial—to show
> by clear and convincing evidence that Bennet acted with actual malice—
> is high.  *At the pleading stage*, however, Palin's only obstacle is the
> plausibility standard of *Twombly* and *Iqbal*.  She has cleared that hurdle.

*Palin v. N.Y. Times Co.*, 940 F.3d 804, 816-17 (2d Cir. 2019) (emphasis supplied); *see id.* at 807

("This case is ultimately about the First Amendment, but the subject matter implicated in this

appeal is far less dramatic: rules of procedure and pleading standards.").  The panel's

determination explicitly was limited to whether the Amended Complaint stated a plausible claim

for defamation.  Therefore, the case was allowed to "proceed to full discovery," *id.* at 808, but

the panel expressly took "no position on the merits of Palin's claim," *id.* at 817.  The case was

remanded for "further proceedings consistent with this opinion."  *Id.*

Plaintiff attempts to turn the Second Circuit's analysis of the *motion to dismiss* into one which "addressed facts supporting actual malice under summary judgment standards" because, she contends, "the Times briefed and argued on appeal that the dismissal should be affirmed on summary judgment grounds under Rule 12(d)." Pl. Mem. at 5 & n.2. This is flatly contradicted by the Second Circuit's opinion itself, which expressly "decline[d] to treat the Rule 12(b)(6) motion here as having been converted to one for summary judgment." *Palin*, 940 F.3d at 812. While Plaintiff points to instances in which the Second Circuit refers to issues to be decided by "the jury," the panel necessarily was saying only that such issues could not be decided at the dismissal stage and prior to discovery, not limiting the district court's role moving forward by prejudging what might occur in the course of discovery and trial.[1]

Because the Second Circuit dealt only with whether the claim as pleaded in the Amended Complaint survived a motion to dismiss (*i.e.*, was plausible), the mandate did not in any way cabin this Court's later Rule 50 decision or any other evidentiary decision. The Second Circuit considered almost this precise issue in *Brown v. City of Syracuse*, 673 F.3d 141 (2d Cir. 2012). On an initial appeal, the panel had reversed the district court's grant of a motion to dismiss. On remand and following discovery, the court granted defendant summary judgment. Plaintiff appealed, arguing that the summary judgment decision was inconsistent with language in the first appellate opinion. The Second Circuit ruled that "[t]here is no inconsistency between our statement of hypothetical circumstances in [the original appeal] about what could be possible based on the allegations in the complaint and the district court's subsequent determination of

---

[1] Plaintiff provides an extended recitation of ways in which she believes the Court's ruling on Defendants' motion for summary judgment did not comply with the mandate. *See* Pl. Mem. at 5-8. That ruling, however, was in her favor. The Court's denial of Defendants' summary judgment motion provides no grounds for vacating the jury verdict or Rule 50 decision.

what [plaintiff] would in fact be able to prove given the evidence," as well as other intervening court decisions. *Id.* at 148; *accord Burton v. Richmond*, 370 F.3d 723, 728 (8th Cir. 2004) (trial judge was "free to reassess" because earlier appellate opinion "dealt only with the allegations made by plaintiffs in their complaint" and "such facts are not supported by the record developed by discovery and before the District Court at the summary-judgment stage of the proceedings"); *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 513 (6th Cir. 2000) ("our holding on a motion to dismiss does not establish the law of the case for purposes of summary judgment, when the complaint has been supplemented by discovery").

Just as in *Brown*, this Court was in no way precluded from conducting a full and independent analysis of the evidence actually introduced at trial and concluding that, despite the plausibility of the allegations in the Amended Complaint, Plaintiff failed to meet her burden of proof at trial. *E.g.*, *Bose Corp. v. Consumers Union*, 466 U.S. 485, 511 (1984) ("Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'").

Nor does the Second Circuit's conclusion that certain of Plaintiff's allegations were sufficient to meet the plausibility standard at the motion to dismiss stage somehow require the drawing of specific inferences or the admission of specific evidence at trial. On appeal, the Second Circuit accepted as true the Amended Complaint's allegations that Bennet was "responsible for the content of, reviewed, edited and approved" numerous articles supposedly in *The Atlantic* and found it was a plausible inference "that one who had risen to editor-in-chief at *The Atlantic* knew their content and thus that there was no connection between Palin and the Loughner shooting." *Palin*, 940 F.3d at 813-14. The evidence actually developed in discovery, however, failed to support these factual allegations. *See infra* Section IV(C).

6

Indeed, even if Plaintiff had been able to support some of the allegations of the Amended Complaint, this Court would still have had discretion to exclude the evidence in question. Evaluating evidence is inherently contextual.  The Second Circuit had no opportunity to consider whether the evidence in dispute, even if potentially relevant, should otherwise be excluded under Rule 403.  Any *in limine* "ruling is subject to change when the case unfolds, particularly if the actual testimony differs" from what was previously proffered.  *See Luce v. United States*, 469 U.S. 38, 41 (1984); *see also United States v. Kozeny*, 643 F. Supp. 2d 415, 417 (S.D.N.Y. 2009) ("courts considering a motion in limine may reserve judgment until trial, so that the motion is placed in the appropriate factual context").  In evaluating the parties' *in limine* motions here, this Court made the same point, noting that relevant evidentiary decisions "will be affected by how the proof actually comes out at a trial."  1/24/22 Tr. at 11:6-19.

Finally, the mandate did not preclude this Court from evaluating Bennet's testimony in the context of all the evidence presented at trial or, as Plaintiff suggests, require this Court to assume Bennet's testimony was not credible.  *See, e.g.*, Pl. Mem. at 6 ("Requiring proof of actual malice as to defamatory meaning is indicative of the continued acceptance of Bennet's testimony that he made a mistake, contrary to the Mandate.").  Instead, the panel simply held, as this Court acknowledged, that a court "cannot automatically credit this testimony."  *See Palin v. N.Y. Times Co.*, 482 F. Supp. 3d 208, 218 (S.D.N.Y. 2020).  The Court was free to consider Bennet's testimony, along with all of the other evidence presented at trial, to conclude that Plaintiff did not meet her burden of proof and judgment was required as a matter of law in Defendants' favor. And, indeed, a plaintiff must point to "concrete evidence from which a reasonable juror could return a verdict in h[er] favor" and cannot merely "assert that the jury might, and legally could, disbelieve the defendant's denial . . . of legal malice."  *Contemp. Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 621-22 (2d Cir. 1988).  As the Court concluded, Plaintiff failed to adduce any

evidence that contradicted Bennet's testimony or that was otherwise sufficient to show, clearly and convincingly, that he made the statements at issue with actual malice. *See Palin v. N.Y. Times Co.*, No. 17 Civ. 4853 (JSR), 2022 U.S. Dist. LEXIS 36035, at *55-77 (S.D.N.Y. Mar. 1, 2022) (ECF 196, at 45-64 [hereinafter, "Op."]).

For these reasons, there is no basis in law or logic on which to grant Plaintiff a new trial based on any purported failure of this Court to follow the Second Circuit's mandate.

**B.     The Court's Jury Selection Process Ensured a Fair Jury**

Plaintiff's arguments about the Court's voir dire are frivolous.  The Court asked a number of targeted voir dire questions to ensure that potential jurors did not harbor biases toward either party such that they would be unable to decide the case fairly based on the evidence.  The process demonstrably worked, as the Court excused multiple panel members who expressed they could not serve impartially.  The Court did not make any error in jury selection, much less a significant error requiring a new trial.

District court judges have broad discretion in how they carry out jury selection.  *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981); *see also United States v. Millar*, 79 F.3d 338, 342 (2d Cir. 1996).  This discretion compensates for the "different goals" of court and counsel during voir dire: "The court wants a fair and impartial jury to be chosen and to move expeditiously to the presentation of evidence.  Counsel want a jury favorable to their cause – fair or not – and voir dire aids them in exercising peremptory challenges and challenges for cause." *United States v. Lawes*, 292 F.3d 123, 128 (2d Cir. 2002) ("The questioning of potential jurors on voir dire is . . .  quintessentially a matter for the discretion of trial courts.").  A district court, correspondingly, has "broad discretion whether to pose a [party's] requested voir dire questions." *United States v. Kyles*, 40 F.3d 519, 524 (2d Cir. 1994).

Plaintiff claims that the Court's "jury selection process did not sufficiently explore the venire's potential biases or prejudices." Pl. Mot. at 8. Yet, in the course of her argument, she acknowledges the Court's numerous attempts to do just that. *Id.* at 8-9 ("After providing an overview of the case, the Court asked the venire whether there was anything about the description that made them feel they could not serve as fair and impartial jurors, and whether they were exposed to media about this case, and, if so, whether they thought they would have a problem being fair and impartial."). Her argument falls far short of the high bar for reversal.

A trial court judge has such broad discretion in conducting voir dire that the Second Circuit noted in 2011, as it had in 2002, that it "appear[s] never to have reversed a conviction for the failure to ask a particular question on the voir dire of perspective jurors." *United States v. Treacy*, 639 F.3d 32, 46 (2d Cir. 2011); *Lawes*, 292 F.3d at 129 (stating same in 2002). Based on Defendants' research, this remains true today. Nonetheless, at least hypothetically,

> voir dire may be so insufficient as to call for a reversal, but the record viewed as a whole must show . . . a failure to inquire about, or warn against, a systematic or pervasive bias, including one that may be short-lived but existent at the time of trial, in the community that would have been cured by asking a question posed by a party.

*Lawes*, 292 F.3d at 129.

Plaintiff's primary complaint about the Court's jury selection process is that the Court did not ask her proposed voir dire questions about "the venire's sources for news . . . through which they were or could be exposed to extra-judicial information about the case." Pl. Mot. at 9. The Court did not ask Plaintiff's (or Defendants') proposed voir dire questions, nor did it ask the jurors for a digest of their news consumption. Instead, it asked simple and pointed venire questions, probing where appropriate, and it gave warnings sufficient to explore and caution against potential biases or prejudices. Voir Dire Tr. 15:8-13. The Court began the voir dire process by giving the venire a broad instruction about their role as potential jurors in the case:

9

> As you will hear in a minute, the parties in this case are well known,
> and some of you undoubtedly will have heard of one side or the other
> or both and will have perhaps views.  That is an irrelevancy.  What is
> central to every jury is the American sense of fair play.  Jurors, of
> course, have all sorts of views, but when they become jurors, they put
> aside any views they may have and calmly, coldly look at the facts and
> determine what the truth is in any given case.  So that is going to be
> your responsibility in this case as it has been the responsibility of
> every jury since our Constitution was created.

*Id.* at 3:19-4:5.  The Court then asked the following questions to ensure no potential juror would

be partial: (1) "is there anything about that general description that makes any of you nine feel

that you cannot serve as a fair and impartial juror" (no hands raised), *id.* at 4:20-22; (2) "do any

of you or any of your family own stock in or have any special relationship to *The New York

Times*" (no hands raised), *id.* at 8:10-12; (3) "do any of you . . . have any personal relations with

any [named potential witnesses]" (no hands raised), *id.* at 9:4-5; (4) "have any of you . . . heard

or seen anything about this case in the media" (several hands raised), *id.* at 9:6-7; (5) reacting to

the raised hands, "raise your hand again if you think you would have any problem being a fair

and impartial juror as opposed to being able to put that out of your mind and judging the case on

the facts" (one hand raised, juror dismissed for cause), *id.* at 9:7-10; and (6) "is there any other

reason that I haven't covered why any of the nine of you feel that you cannot serve as a fair and

impartial juror" (no hands raised), *id.* at 21:8-10.

Juror No. 6, the juror who raised their hand in response to question 5, told the Court: "I

don't like Sarah Palin.  I think she is a cruel person.  I don't like her, and I don't think I would be

fair to her listening to what she has to say."  *Id.* at 9:19-21.  The Court excused Juror No. 6 for

cause.  *Id.* at 9:19-10:14.  Shortly thereafter, Juror No. 3 was dismissed on a peremptory

challenge, and a new Juror No. 3 was called.  This juror informed the Court that, because of

knowledge about the case, they would "struggle to be impartial."  *Id.* at 16:22-18:19.  Just as

with Juror No. 6, the Court also excused Juror No. 3 for cause, *id.* at 18:20-19:3, and it

subsequently did the same with Juror No. 1, *id.* at 25:13-24.  In total, the Court dismissed three

potential jurors who informed the Court that they were biased or could not be impartial.[2]

Given the Court's questioning of the venire and the individual responses of panel

members, Plaintiff's assertion that "the jury selection process did not sufficiently explore the

venire's potential biases or prejudices" rings hollow.  The record establishes that the Court asked

more than sufficient questions "about . . .  systematic or pervasive bias." *Lawes*, 292 F.3d at

129.  As described above, the Court firmly instructed the venire that, "[j]urors, of course, have

all sorts of views, but when they become jurors, they put aside any views they may have and

calmly, coldly look at the facts and determine what the truth is in any given case."  Voir Dire Tr.

3:24-4:2.  This warning was, in and of itself, an effective bias screening tool. *Treacy*, 639 F.3d

at 39 ("[A] district court may find that warning a jury against an improper bias may be more

effective in some cases than inquiring about that bias." (citing *Lawes*, 292 F.3d at 129)).

The Court's voir dire was in no way deficient.  Rather, the Court asked questions

informed by its experience in conducting jury selection in more than 300 trials and that were

intended to secure "the fairest jury possible."  Voir Dire Tr. 26:24-27:8.  That the Court chose

not to ask Plaintiff's proposed questions is legally irrelevant in light of the fair process it

undertook.

C.     **The Court Properly Excluded Certain Evidence**

Plaintiff asserts that the Court erred in excluding evidence that she claims would support

a finding of actual malice, thus warranting a new trial.  This argument suffers from two

---

[2] The Court also had potential jurors disclose where they lived, their employment, and their
partner's employment. *Id.* at 11:16-19.  One member of the venire informed the Court that their
partner previously worked at "Fox News Channel" where "I think [Palin] was a contributor."
Voir Dire Tr. 27:10-28:8.  This person told the Court "I feel that I will be fair and
nonjudgmental" and was not struck for cause. *Id.*

problems.  First, district courts have "broad discretion" over the admission of evidence.  *United States v. Boles*, 914 F.3d 95, 109 (2d Cir. 2019) (quoting *United States v. Nektalov*, 461 F.3d 309, 318 (2d Cir. 2006)).  Second, the Court gave Plaintiff ample opportunity to establish a foundation for the admission of this evidence.  Plaintiff failed to do so—indeed, with respect to certain pieces of evidence, she did not even bother to try.

Prior to trial, Plaintiff tendered a lengthy list of proposed exhibits, many of which were objectionable on the grounds of relevance, undue prejudice, and hearsay.  ECF 148 at 54-70.  The inadmissible evidence included: (1) articles published by Atlantic Media while James Bennet was the editor of *The Atlantic*; (2) documents about the Bennet family and James Bennet's relationship with his brother, Senator Michael Bennet; and (3) exhibits related to other "controversies" that occurred at The Times long after June 2017.

Defendants moved in limine to exclude evidence regarding articles and blog posts published by Atlantic Media, an article Bennet was sent in 2011, and exhibits related to Senator Michael Bennet.  ECF 136 (the "Atlantic/Sen. Bennet MIL").[3]  As detailed in that motion, Defendants sought to exclude articles and blog posts published by Atlantic Media because Plaintiff's proposed exhibits were all published by the *Daily Dish* or the *Atlantic Wire* rather than by *The Atlantic* itself, and there was no evidence demonstrating that Bennet had actually read these pieces.  *See id.* at 1-8.  Defendants sought to exclude Plaintiff's proposed exhibits related to Senator Michael Bennet because the evidence was entirely irrelevant and unduly prejudicial.  *See*

---

[3] Plaintiff identified an email Bennet received in 2011 (PX-57) containing a link to an article titled "How the Media Botched the Arizona Shooting" (PX-58) about the Loughner shooting. Defendants sought to exclude these exhibits. ECF 136 at 8. Though Plaintiff contends the Court erred by excluding these documents, Pl. Mem. at 10, at trial, Plaintiff never sought to admit them.  Indeed, Plaintiff in her Memorandum fails to cite to any point in the record at which the Court made a decision excluding these exhibits, and offers no argument regarding the "error."

*id.* at 8-11.  Defendants also filed a motion in limine seeking to exclude evidence relating to other "controversies" that occurred at The Times, including the decision to eliminate the "Public Editor" position, on the same grounds.  ECF 138 (the "Other Controversies MIL") at 10.  Plaintiff opposed both motions.  ECF 145, 147.

On January 24, 2022, the Court held a short hearing regarding these and other motions.  The Court granted the Other Controversies MIL in its entirety pursuant to Rule 403 of the Federal Rules of Evidence.  1/24/22 Tr. 12:5-15.  The Court deferred ruling on the Atlantic/Sen. Bennet MIL.  *Id.* at 12:16-23.  However, over the ensuing trial days, the Court heard multiple arguments about content published by the *Daily Dish* or the *Atlantic Wire*.  Trial Tr. at 27:24-34:20, 332:19-333:8, 501:18-511:1.  The Court permitted Plaintiff to ask witnesses questions in an attempt to lay a proper evidentiary foundation.  Trial Tr. at 413:2-8 (Lepping), 504:5-11 (Court), and 615:25-621:6 (Bennet), and even offered Plaintiff opportunities to question Bennet outside the presence of the jury.  Trial Tr. at 13:24-14:9, 508:11-17.

After extensive argument, the Court concluded the Atlantic-related exhibits were inadmissible because there was no evidence whatsoever indicating that Bennet had read the articles in question.  Op. at 53 n.32.  The Court also correctly excluded exhibits related to Senator Bennet, finding that these exhibits were irrelevant, due to a lack of foundation, and unduly prejudicial.  *Id.* at 53 n.31.  Plaintiff now claims that both decisions were erroneous but makes no argument as to *why* the Court's decision about the exhibits related to Senator Bennet was incorrect.  Plaintiff also fails to make any argument about "evidence associated with the public editor."  Accordingly, Defendants respond here only to Plaintiff's arguments concerning Atlantic Media.

"A district court has 'broad discretion' over the admission of evidence."  *Boles*, 914 F.3d at 109.  The trial court receives significant deference in making these determinations because of

its "superior position to assess relevancy and to weigh the probative value of evidence against its potential for unfair prejudice." *United States v. Abu-Jihaad*, 630 F.3d 102, 131 (2d Cir. 2010). A district court abuses its discretion "only if the ruling was arbitrary and irrational." *United States v. Perrotti*, 734 F. App'x 764, 768 (2d Cir. 2018). A party challenging a district court's evidentiary rulings is generally entitled to a new trial only if (1) "the district court committed errors that were a clear abuse of discretion," and (2) those errors "were clearly prejudicial to the outcome of the trial, where prejudice is measured by assessing the error in light of the record as a whole." *Vill. of Freeport v. Barrella*, 814 F.3d 594, 610 (2d Cir. 2016).

In excluding exhibits published by Atlantic Media, the Court did not make a decision that was "arbitrary and irrational," and its decision was not "clearly prejudicial to the outcome of the trial." In assessing the admissibility of this evidence, the Court focused on the important distinction between content published by *The Atlantic* when Bennet was its editor versus content published by other entities under the Atlantic Media corporate umbrella, which Bennet did not directly oversee. Trial Tr. 325:20-24, 331:22-332:10. This distinction was critical. Whereas the jury may have had a basis on which to conclude that Bennet read (or even edited) articles published by *The Atlantic* under his watch, the same could not be said for articles published by the *Daily Dish* or the *Atlantic Wire*. The evidence clearly showed that Bennet had little involvement with content published by these two entities even though they fell under the Atlantic Media umbrella. ECF 136 at 5. When asked by Plaintiff whether he had read any of these articles, Bennet testified that he had no recollection of reading any. Trial Tr. 620:5-10.

Accordingly, the Court, over the course of multiple arguments on this point, focused on whether Plaintiff had established an evidentiary foundation for admission of these exhibits. The only relevant testimony Plaintiff was able to muster at trial was Bennet's recognition that he considered "the Loughner shooting to be a big story," *id.* 620:17-19, but that he couldn't "recall

14

a specific article" published about Loughner in *The Atlantic, Daily Dish, New York Times,*
*Washington Post, Politico, Drudge Report, New Yorker, or The New York Review of Books,*
among others, *id.* at 619:2-620:16.  This was consistent with the evidence Plaintiff produced in
discovery.

Rule 104(b) of the Federal Rules of Evidence states that, "[w]hen the relevance of
evidence depends on whether a fact exists, proof must be introduced sufficient to support a
finding that the fact does exist."  *See United States v. Dawkins*, 999 F.3d 767, 789 (2d Cir. 2021)
(affirming district court's exclusion of statement on relevancy grounds where a party made only
a "meager proffer" that failed to establish necessary foundational facts) (quoting *Huddleston v.*
*United States*, 485 U.S. 681, 690 (1988) ("In determining whether [a party] has introduced
sufficient evidence to meet Rule 104(b), . . . [t]he court simply examines all the evidence in the
case and decides whether the jury could reasonably find the conditional fact . . . by a
preponderance of the evidence.")); *Berger v. New York City Police Dep't*, No. 13 Civ. 6084
(VSB), 2019 U.S. Dist. LEXIS 219872, at *8-9 (S.D.N.Y. Dec. 19, 2019) (excluding "other
employees' complaints" in an employment discrimination action where the link between
complaints about other workplace conditions and the complained-of condition had not been
established).  Here, the relevance of content published by the *Daily Dish* and *Atlantic Wire*
depended on whether Bennet had actually read the content.  Despite multiple opportunities for
Plaintiff to develop evidence in discovery and at trial, there was simply no evidence to establish
that Bennet had ever read any of the Atlantic-related exhibits that Plaintiff sought to admit.
Without such a foundation, the jury would simply be speculating as to whether Bennet had
actually seen them.  Plaintiff could not clear this basic evidentiary hurdle.

Turning to the next question, there is no basis on which to conclude, and Plaintiff does
not even argue, that the failure to admit these exhibits was "clearly prejudicial to the outcome of

the trial." *Barrella*, 814 F.3d at 610.  As a general matter, the evidence overwhelmingly demonstrated that Defendants made an honest mistake.  Moreover, the admission of these exhibits would not have provided to the jury any additional information that it did not already have.  The jury had already heard from Ross Douthat that "people had jumped to the conclusion that there was a connection, a political motivation for the [Giffords] shooting" but "subsequent reporting had revealed that to be not the case . . . ."  Trial Tr. 825:6-17; *see also* PX-171 (Douthat emails Bennet after publication that there was "no evidence that Jared Lee Loughner was incited by Sarah Palin").  Had the Court admitted the exhibits, the jury also would have heard testimony from Bennet that he had no recollection of reading these exhibits.  Additionally, Andrew Sullivan and Bennet would have both testified that Bennet had no knowledge or control of content published by the *Daily Dish*.  ECF 136 at 4.  Accordingly, there is simply no basis on which to conclude that Plaintiff was prejudiced and entitled to a new trial.

### D.      The Mid-Deliberation Instruction Was Not Erroneous

There is no error in the Court's response to the jury's question on February 15, 2022. Contrary to Plaintiff's contention, the Court's "immediate response" was not to "give an instruction misstating the law and dissuading a finding of actual malice."  *See* Pl. Mem. at 18. Rather, the Court offered an initial suggestion, "off the top of [his] head," and then sought the parties' input on the appropriate response.  Trial Tr. 1311-23.  Part of the Court's initial suggestion was to inquire further of the jury about the nature of its concern, *id.* at 1311:14-17, but the Court decided not to do so, after both Plaintiff and Defendants expressed concerns with that suggestion, *id.* at 1319:3-19.  The Court also heard argument about the proposed response for nearly half an hour, from 10:24 to 10:51 a.m.  *Id.* at 1311:1, 1320:19.  After a brief recess, the Court returned with a written copy of its proposed response and heard further argument from the parties on that draft.  *Id.* at 1320:22-1323:20.

The jury's note included two questions: whether a juror could draw an inference that Bennet doubted the truth of the challenged statement based on Bennet's response to a question posed by defense counsel, and whether such an inference can contribute to the evidence brought forth by the plaintiff.  Pl. Mem. at 18; Trial Tr. at 1314:12-19.  After considering arguments from both parties, the Court sent the jury the following instruction:

> In response to your first inquiry, you are free to draw any reasonable inference you choose to draw from any answer received in evidence, regardless of which side posed the question to which the answer was given.
>
> In response to your second inquiry, any answer given by Mr. Bennet and a reasonable inference drawn therefrom is not sufficient in itself to carry the plaintiff's burden of showing by clear and convincing evidence that there was a high probability that Mr. Bennet actually doubted the truth of a challenged statement prior to publication, but it can contribute to the other evidence brought forth by plaintiff.

Pl. Mem. at 19.  Plaintiff objects to the second portion of the Court's response, but she does not propose any alternative language that she would view as having been acceptable.  *Id.* at 18-19; Trial Tr. at 1320:1-18.

Plaintiff contends that the Court's response is contrary to its earlier instructions regarding circumstantial evidence, Pl. Mem. at 18, presumably referring to the statement that "[t]he law makes no distinction between direct and circumstantial evidence. … you may consider either or both, and may give them such weight as you conclude is warranted."  *See id.* at 9 n.24; ECF 170 at 8.[4]  While that instruction is true as a general matter, the Supreme Court has made clear that a circumstantial inference, alone, is insufficient to satisfy the clear and convincing standard required for proof of actual malice, and the Court's instruction was consistent with the law of

---

[4] Plaintiff also contends, in conclusory fashion, that the Court's response differs from the earlier instruction regarding actual malice, but she offers no explanation of this contention.  *Id.*

actual malice.  *See* Trial Tr. at 1321:21-1322:17; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

256 (1986) (plaintiff cannot prevail "without offering any concrete evidence from which a

reasonable juror could return a verdict in his favor and by merely asserting that the jury might,

and legally could, disbelieve the defendant's denial of a conspiracy or of legal malice");

*Contemp. Mission*, 842 F.2d at 621-22 (same, quoting *Anderson*, 477 U.S. at 256); *Sweeney v.*

*Prisoners' Legal Servs.*, 84 N.Y.2d 786, 793 (1995) ("Absent some direct evidence that

defendants in this case were aware that Mays' complaint was probably false, they cannot be

found to have harbored an intent to avoid the truth.").  Plaintiff has not offered contrary

authority, during trial or in her post-trial memorandum.  Moreover, jury instructions must be read

as a whole, and the Court's pre-deliberation instructions, which Plaintiff does not challenge and

which the jury had in hand during deliberations, would resolve any arguable ambiguity in the

mid-deliberation instruction.  *See Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 153 (2d Cir.

2014) ("We will not require a new trial if the instructions, read as a whole, presented the issues

to the jury in a fair and evenhanded manner." (internal marks and citation omitted)).

     Plaintiff also contends that the instruction was in error because it "effectively instruct[ed]

the jury to find a certain way or accept certain evidence," Pl. Mem. at 20, but the instruction only

advised on the law and evidentiary burdens it imposes.  Indeed, at the parties' suggestion, the

Court decided against inquiring further into the jury's question and it therefore could not know

what evidence was at issue, much less instruct the jury to make a particular finding regarding it.

Plaintiff also argues that new trials are required where an instruction contains "errors that are so

serious and flagrant that they threaten the integrity of the trial or deprive the jury of legal

guidance," *id.*, but she offers no explanation as to how this instruction, which accurately states

the law of actual malice, could possibly rise to that level.  These conclusory contentions should

be rejected.

E.       **Certain Jurors' Exposure To "Push Notifications" Did Not Impact Their Deliberations, And The Court Properly Concluded The Jury Was Impartial**

Plaintiff next argues that jurors' exposure to "push notifications" about the Court's intent to decide the case as a matter of law warrants vacatur and a new trial.  *See* Pl. Mem. at 20-21. The exposure of certain jurors to a news headline that flashed on their cell phone did not prejudice the jury or render the verdict infirm.

On the afternoon of February 14, 2022, the Court expressed its intent to grant Defendants' motion for judgment as a matter of law.  Trial Tr. 1298:22-25, 1299:11-15. Nevertheless, the Court allowed the jury to continue deliberating so "the Court of Appeals will have the benefit of both determinations before it when it views the inevitable appeal."  *Id.* at 1306:2-4.  Following this announcement, the Court asked the parties whether it should give the jury an "admonition about avoiding anything in the media."  *Id.* at 1307:9-15.  Plaintiff declined to ask for any such relief.  *Id.* at 1307:9-18.  Defendants, however, requested an additional warning to "make sure [the jury] is hypervigilant about not seeing anything."  *Id.* at 1307:20-24. The Court agreed and gave the jury the following instruction:

> I need to remind you something that you've heard before, but just keep it in mind: If you see anything in the media about this case, just turn away. . . .  But in any event, seriously though, do not look at anything regarding the case, don't discuss the case with anyone outside, etc.

*Id.* at 1308:7-25.  This was consistent with the Court's instruction not to pay attention to outside media that the Court gave numerous times during the trial.  *See, e.g.*, *id.* at 71:11-16 ("The key to being an American juror is to decide the case on the facts that you hear in the courtroom, not on some report or some view that some other person may express in the media."); *id.* at 1254:16-1255:13 (reading message that the Court sent jurors over the weekend, which stated in part: "It is your duty to remain focused solely on the evidence and arguments presented in the courtroom. Please avoid any media coverage of the trial.").

On February 15, 2022, the jury returned to court to continue deliberating.  That morning, at approximately 10:24 a.m., the jury asked the Court a question.  *Id.* at 1311:1-3.  After discussing the jury's note with the parties, the Court provided an answer to the jury at approximately 11:21 a.m.  *Id.* at 1323:19-21.  At approximately 2:28 p.m. the jury returned a defense verdict, *id.* Trial Tr. 1323:22, and each juror confirmed their agreement with the verdict, *id.* 1324:13-1325:13.  Following the verdict, the Court stated:

> As you leave the court, it is quite possible that you will be approached by reporters and other members of the media, because this case has been followed in the media.  I'm glad that you were free of all that coverage since you were instructed, and it's clear to me you followed, not to pay attention to that and to disregard it and turn away from it. But here's the point.  It's up to you whether or not you want to talk to folks from the media. . . .
>
> I wanted to tell you one other thing.  Your job was to decide the facts, which you have now done.  My job is to decide the law, and I have concluded as a matter of law that the defendants are not liable too.  So we've reached the same bottom line.  And you'll probably hear about that if you get into the media.

*Id.* at 1325:14-1326:25.  Prior to being dismissed, no juror stated there had been any kind of irregularity during the deliberation process or that they had been subject to any undue influence.

After the jurors left the courtroom they met briefly with the Court's law clerk.  During this meeting, the purpose of which was to assess the efficacy of the jury instructions, a number of jurors said that, at the end of the day on February 14, 2022, they had involuntarily received "push notifications" – headlines that news apps flash on the face of subscribers' cell phones – that conveyed "the bottom-line of the Court's intended Rule 50 determination."  ECF 172 ("Push Notification Order"); Op. at 6-7, 37-38, 64-66.  These jurors "were adamant that this knowledge had not affected their determination of the verdict in the slightest," and they "insisted to the Court's law clerk that the information played no role whatsoever in their deliberations and did not affect the outcome."  Op. at 7, 65.  The jurors reportedly "did as instructed" and "turned

away from the reports and set the information aside for the remainder of the deliberation." *Id.* at 65.  There is no indication whatsoever to the contrary.

Plaintiff nevertheless claims, without any legal support, that these jurors' minimal exposure to a news headline that flashed on their phones warrants a new trial.  Pl. Mem. at 20-21. Plaintiff further criticizes the Court both for complimenting the jury as a "model jury," which the Court described as "carefully watching the witnesses, taking copious notes, and in general, showing that they intended to decide the case based solely on the evidence," and for commenting that the jurors who had seen the push notifications "were adamant that this knowledge had not affected their determination of the verdict in the slightest." *Id.* at 24; Op. at 7, 65-66 n.37.[5]

"A new trial will be granted only if the juror's ability to perform her duty impartially has been adversely affected . . . and [a party] has been substantially prejudiced as a result." *United States v. Ganias*, 755 F.3d 125, 132 (2d Cir. 2014) (internal marks and citations omitted); *see also Bagheri v. Bailey*, 713 F. App'x 141, 145 (4th Cir. 2017) ("Most importantly, each of these five jurors [who were exposed to media reports during the trial in a medical malpractice action] assured the district court that any information he or she heard had no effect on his or her ability to be fair and impartial and had not influenced his or her perception of the case.").  "It is not an uncommon occurrence for a notorious trial held in Metropolitan New York to engender extensive publicity," and a juror's exposure to such publicity, though it should be avoided to the extent possible, does not automatically render a trial unfair.  *United States v. Gaggi*, 811 F.2d 47,

---

[5] Plaintiff also deduces, without any evidence, that the jurors must have "received push notifications **throughout the trial**, which was the subject of intense press coverage, including articles with headlines that disparaged Plaintiff and her trial testimony."  Pl. Mem. at 21 n.28. Nothing supports this assertion, as Plaintiff has not provided a single example of a potentially prejudicial push notification that was sent prior to February 14, 2022.

51 (2d Cir. 1987) (addressing how courts should handle exposure to publicity when it comes to light during a trial, while court is still in session).

The jury plainly was not prejudiced by certain members' exposure to news headlines that flashed on their cell phones.  "The jurors, both those who reported awareness of the Rule 50 decision and the others, insisted to the Court's law clerk that the information played no role whatsoever in their deliberations and did not affect the outcome."  Op. at 65; *see also* Push Notification Order, at 1-2 ("The jurors repeatedly assured the Court's law clerk that these notifications had not affected them in any way or played any role whatever in their deliberations.").  And the jury's actions support this:  At the time of the push notifications, they had already deliberated for two days, "so it is reasonable to expect that the jurors were well-informed about the evidence set forth at trial and about the different theories of the case" by then. *United States v. Lloyd*, 269 F.3d 228, 240 (3d Cir. 2001).  Additionally, the day after the push notifications, the jury deliberated for another five hours before rendering a verdict of "not liable," which they each independently confirmed without hesitation.  *See Gaggi*, 811 F.2d 47 at 53 (agreeing with the district court "that the jury's ability to render an impartial verdict is confirmed by the care which it took in its deliberations" and stating that the record "reveals both an impartial and meticulous jury").

The Court repeatedly instructed the jury to ignore media reports and base its verdict only on the evidence received at trial.  *See, e.g.*, Trial Tr. at 71:11-16; *id.* at 1254:16-1255:13.  It is an "almost invariable assumption of the law that jurors follow their instructions."  *Richardson v. Marsh*, 481 U.S. 200, 206 (1987); *accord Britt v. Garcia*, 457 F.3d 264, 272 (2d Cir. 2006) (same); *United States v. Casamento*, 887 F.2d 1141, 1154 (2d Cir. 1989) ("In the absence of evidence to the contrary, we will presume the jury followed these admonitions and avoided exposure to news reports about the trial.").  Despite some jurors being exposed to the push

notifications, there is no suggestion anywhere in the record that they failed to follow the Court's instructions to ignore media reports and decided the case on anything other than the evidence presented in Court. *See Skilling v. United States*, 561 U.S. 358, 399 n.34 (2010) ("News coverage of civil and criminal trials of public interest conveys to society at large how our justice system operates. And it is a premise of that system that jurors will set aside their preconceptions when they enter the courtroom and decide cases based on the evidence presented.").

The Court did not err in concluding the jury's verdict was free from undue prejudice. When jurors are exposed to media coverage the Court properly may "ascertain how much [jurors] know" of publicity related to a high-profile trial and "what effect, if any" it had on a juror's "ability to decide the case fairly." *Gaggi*, 811 F.2d at 51.[6] Here, the Court appropriately discussed with each of the jurors whether certain jurors' exposure to the push notifications played any role in their deliberations, and all "insisted" that it had not. Op. at 65. The Court also considered the "special facts" of this case, including the jurors' attentive conduct throughout the proceedings, *id.* at 65-66 n.37, and the Court's instructions regarding "their duty to disregard anything they heard about the case in the media," *id.*; *Gaggi*, 811 F.2d at 51. The Court properly exercised its broad discretion when it concluded, with full confidence and no reason for doubt, that the jury rendered its decision impartially. *Gaggi*, 811 F.2d at 51 ("Absent a clear abuse of the trial court's discretion, its finding that the jury was impartial should be upheld.").

---

[6] Plaintiff claims that Rule 606(b) of the Federal Rules of Evidence "prohibits the disclosure of 'the effect of anything on [a] juror's or another juror's vote.'" Pl. Mem. at 24 (citing *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir. 1994) (per curiam)). Plaintiff ignores that Rule 606(b)(2) explicitly provides that the court may obtain information about "extraneous prejudicial information" brought to the jury's attention. *United States v. Vera*, 362 F. App'x 199, 200 (2d Cir. 2010). The Court acted well within its discretion in the manner and degree of its questioning.

Even in far more extreme cases, where a jury actually discussed prejudicial evidence that was not in the record during its deliberations, the Second Circuit has held that the verdict must stand. *See, e.g.*, *Bibbins*, 21 F.3d at 14, 16-17 (upholding jury's verdict where juror shared that she lived in the neighborhood of the drug transaction at issue and there was little foot traffic, thus making "the street identification of the defendant more compelling"); *United States v. Calbas*, 821 F.2d 887, 894-95 (2d Cir. 1987) (holding that, where juror consulted a telephone directory to determine information about the defendant's address(es), and discussed her findings with other jurors, a new trial was not warranted). The circumstances presented here do not warrant a new trial or any manner of further attention. *Cf. Bibbins*, 21 F.3d at 17 (holding that jury's exposure to extra-record evidence did not warrant a new trial).

### F.     The Court's Post-Verdict Statement To The Press Does Not Warrant A New Trial

Plaintiff contends that the Court's innocuous comment to Bloomberg on February 16, 2022, after the jury verdict and after the Court granted Defendants' Rule 50 motion, warrants a new trial. However, Plaintiff cites no case law supporting this contention. Instead, Plaintiff's complaint seems to be that the Court made the comment to Bloomberg before informing the parties. Pl. Mem. at 23. Defendants respond to Plaintiff's claim that this is evidence of bias in Section V.A.2 *infra*, but briefly explain here why this affords no basis for a new trial.

There is no evidence the Court had any "communications with the media during trial." 2/24/22 Tr. at 2:25-3:3. Rather, the morning *after* the Court entered judgment, a Bloomberg reporter contacted the Court with an urgent message and the Court responded to that message. *Id.* at 3:6-10. The reporter asked the Court about the "push notifications that the jurors had told [his] law clerk about." *Id.* at 3:10-12. The Court had already begun to explore this issue and the Court gave the reporter "a very short statement so that if his story appeared before the order that

[he] was already undertaking a draft, there would be no misunderstandings." *Id.* at 3:14-16.

The Court's statement to Bloomberg does not reveal any improprieties during trial or suggest that Plaintiff received an unfair trial. Rather, the Court's statement was limited to the news that some jurors had received push notifications about the Court's Rule 50 determination:

> "I'm disappointed that the jurors even got these messages, if they did," Rakoff said in an interview, referring to the news notifications. "I continue to think it was the right way to handle things."
>
> * * *
>
> When Rakoff was informed of that information by Bloomberg on Wednesday, he said he spoke to his clerk.
>
> The judge said he was told "at most three" jurors reported knowing about his ruling before delivering their verdict, and all said it didn't affect their deliberations.

Pl. Mem. at Ex. 4 (Bloomberg article, "Palin Jurors Knew Judge Dismissed Times Case Before Verdict"). The Court included substantively the same information in the Push Notification Order, which the Court issued shortly after Bloomberg published the story. 2/24/22 Tr. at 3:16-20 (stating that the Order was published "approximately five minutes" after the Bloomberg story); Pl. Mem. at 21-22 (stating that it was published 52 minutes after the Bloomberg story).

Plaintiff fails to cite any precedent, much less a case that supports her contention that this innocuous post-trial comment warrants a new trial. This is for good reason. Defendants could find no legal authority that supports Plaintiff's argument. Moreover, it would require an extreme scenario, such as public comments calling into question the fairness of the entire trial, to warrant vacatur. The Court's comment to Bloomberg certainly does not rise to that level, and Plaintiff suffered no prejudice from the brief delay between the time the Court spoke to Bloomberg and its issuance of the Push Notification Order.

G.    **The Court's Entry Of Judgment For Defendants Pursuant To Rule 50 Is Supported By The Law And The Evidence Actually Of Record**

In addition to challenging the jury's verdict, Plaintiff argues that the Court incorrectly granted judgment to Defendants as a matter of law pursuant to Rule 50. She takes issue with the timing of the Court's announcement of its intended ruling, argues that the Court was precluded by the Second Circuit's mandate and the Court's own order on summary judgment from granting judgment as a matter of law to Defendants, and contends that the Court improperly made credibility determinations or ignored evidence that, in Plaintiff's view, requires a different outcome. None of these arguments has merit, and Plaintiff is not entitled to a new trial.

### 1.    The Court's ruling was procedurally correct

Plaintiff first argues that the Court's announcement of its intended ruling on Defendants' motion pursuant to Rule 50(a) while the jury was still deliberating was procedurally improper. Pl. Mem. at 12-17. However, the timing of the announcement of the ruling was both consistent with guidance from the Second Circuit and in keeping with the Court's past practice.

The Second Circuit has long advised that, even where trial judges are inclined to grant judgment as a matter of law, they generally should wait until the close of evidence, allow the jury to reach a verdict, and *then* rule pursuant to Rule 50(b), rather than dismissing the jury sooner pursuant to Rule 50(a), to avoid the cost and expense of retrying a case if the appellate court were to reverse the ruling. *Mattivi v. S. African Marine Corp.*, 618 F.2d 163, 166 n.2 (2d Cir. 1980) ("it is in the best interests of efficient judicial administration for the trial judge to refrain from considering a motion for a directed verdict in favor of deciding a motion for judgment n.o.v." (citing 9 Wright & Miller, *Federal Practice & Procedure* § 2533, at 585-86 (1971)); *Konik v. Champlain Valley Physicians Hosp. Med. Ctr.*, 733 F.2d 1007, 1013 n.4 (2d Cir. 1984) (it is preferable to "allow the case to be decided—at least in the first instance—by the

26

jury," so that "[i]f this ruling is reversed on appeal, the jury's verdict may simply be reinstated").[7]

The Court followed the Second Circuit's direction, allowing the jury to deliberate and ultimately converting Defendants' Rule 50(a) motion to a Rule 50(b) motion after the jury verdict.  As the Court succinctly explained:

> At that point, the Court could have simply entered final judgment in defendants' favor and dismissed the jury.  Instead, however, the Court, while announcing its decision [to the parties while the jurors deliberated], explained it would allow the jury to continue its deliberations, so that, if the Court of Appeals were to disagree with the Court's determination to dismiss the case as a matter of law, the appellate court would not have to send the case back for trial, since it would have the benefit of the jury's verdict.  Moreover, as a technical matter, the Court could then issue its Rule 50 judgment, post-verdict, pursuant to Rule 50(b).

Op. at 4.

Plaintiff argues that this is contrary to *Unitherm Food Systems v. Swift-Eckrich, Inc.*, 546 U.S. 394, 406 (2006), suggesting that the Supreme Court there advised trial courts not to grant judgment as a matter of law at all.  *See* Pl. Mem. at 15.  Insofar as that case relates to judgment as a matter of law, however, the Supreme Court offered the same advice as the Second Circuit— that trial courts generally should allow the case to go to the jury first, so that, "if the appellate court holds that the trial court was in error in its appraisal of the evidence, it can reverse and order judgment on the verdict of the jury, without any need for a new trial."  *Unitherm*, 546 U.S. at 406 (quoting 9A Wright & Miller, Federal Practice & Procedure § 2533, at 319 (2d ed. 1995)).

---

[7] *See also, e.g., Williams v. Cnty. of Westchester*, 171 F.3d 98, 102 (2d Cir. 1999) (advising courts to allow jury to reach a verdict even when ruling as a matter of law so that, "if that ruling is reversed on appeal, the case may be efficiently concluded by reinstatement of the jury's verdict, without the need to hold an entire new trial"); *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 132 (E.D.N.Y. 1998) (declining to follow *Konik* where one-day trial did not require "sift[ing] through the record before ruling" but noting that "where that is necessary, the argument that the trial judge should charge the jury and let it deliberate in the meantime is stronger").

Presumably, Plaintiff's real objection is to the Court's decision to advise the parties of its intended ruling while the jury was still deliberating. However, the Court has followed this same procedure previously, including in a case in which the judgment for defendants was affirmed by the Second Circuit. *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 282 (2d Cir. 1998) (affirming judgment as matter of law for defendants that was "indicated" during deliberations but not entered until jury returned verdict in plaintiff's favor and stating this followed "prior observations" about how to grant judgment as matter of law). *See also Hill v. Novartis Pharms. Corp.*, No. 1:06-cv-00939-JSR-SAB, ECF 194 (E.D. Cal. Jun. 26, 2013).[8]

Before announcing its intended ruling to the parties, the Court explained that it was going to do so out of fairness to all parties. Trial Tr. 1298:8-14. Plaintiff did not object to the Court proceeding in that way. Trial Tr. 1298-99; *see also* Op. at 34-36. Plaintiff now makes the novel argument that, in recognizing that Plaintiff had sufficiently preserved her substantive objections after asserting them across several days of argument, the Court preserved "*ALL* of Plaintiff's objections," raised or un-raised. Pl. Mem. at 17. The Court correctly rejected this argument, because "there was no prior objection to the procedural aspects of the Court's action that the Court could have recognized as reasserted," Op. at 36 n.21, and Plaintiff has not pointed to any law that would support her contention that this was error.

---

[8] In *Galdieri-Ambrosini*, the Second Circuit said that it had found "several of the procedural aspects of this case troubling," but the advance announcement by the Court of its intention to rule as a matter of law for defendants is not among the enumerated concerns. 136 F.3d at 285.

### 2.    The Court correctly ruled that Plaintiff had not adduced clear and convincing evidence of actual malice as to falsity

Plaintiff does not meaningfully dispute the law governing the Court's Rule 50 decision.[9]

She does not deny that, in order to prevail, she was required to prove actual malice – that is, "that

Bennet and the Times published the Editorial 'with knowledge that it was false or with reckless

regard of whether it was false or not'" – and that she was required to do so by clear and

convincing evidence.  Op. at 41 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)).

Plaintiff does not dispute the Court's observation that she "was not seriously contending

that Bennet published the Editorial with actual knowledge that the Challenged Statements were

false," and that instead, Plaintiff had sought to establish actual malice only "by virtue of reckless

disregard," *id.* at 42, nor does she contradict the Court's summary of the law on that point:

---

[9] Plaintiff questions the application of New York's Anti-SLAPP statute, Pl. Mem. at 1, 12 n.14, and the requirement that she also prove actual malice as to defamatory meaning, *id.* at 1, but the Court's ruling that Plaintiff failed, as a matter of law, to prove actual malice as to falsity did not turn on either of these points.  *See* Op. at 32 (summarizing prior ruling that actual malice is required under both the First Amendment and New York law); *id.* at 41 n.26 (denying Defendants' Rule 50 motion as to awareness of defamatory meaning as moot).  Plaintiff never actually explains why the Court's decision to apply New York's Anti-SLAPP statute retroactively was erroneous, justifies a new trial, or demonstrates bias.  Plaintiff simply contends, in passing, that applying the law retroactively "was recently called into question."  *See* Pl. Mem. at 12 n.14 (citing *Gottwald v. Sebert*, 2022 NY Slip Op 01515, ¶ 2 (1st Dep't March 10, 2022)).  While the First Department, in *Gottwald*, ruled that the amendment was not retroactive, *see* 2022 NY Slip Op 01515, ¶ 3, the overwhelming majority of courts to consider this question have agreed with this Court's reasoning and ruled that the 2020 amendments apply to pending actions.  *See, e.g., Coleman v. Grand*, 523 F, Supp. 3d 244, 257-59 (E.D.N.Y. 2021), *appeal pending,* No. 21-800 (2d Cir.); *Sweigert v. Goodman*, No. 18 Civ. 8653 (VEC) (SDA), 2021 U.S. Dist. LEXIS 77704, at *4-5 (S.D.N.Y. Apr. 22, 2021); *Kesner v. Buhl*, No. 20 Civ. 3454 (PAE), 2022 U.S. Dist. LEXIS 43094, at *26 (S.D.N.Y. Mar. 10, 2022); *NOVAGOLD Res., Inc. v. J Capital Rsch. USA LLC*, No. 20 Civ. 2875 (LDH) (PK), 2022 U.S. Dist. LEXIS 55734, at *25 (E.D.N.Y. Mar. 28, 2022); *Sackler v. ABC*, 71 Misc. 3d 693, 698 (Sup. Ct. N.Y. Cnty. 2021); *Massa Constr. v. Meaney*, No. 126837/2020, slip op. (NYSCEF Doc. 92) at 2 (Sup. Ct. Ontario Cnty. May 13, 2021); *Great Wall Med. P.C. v. Levine*, No. 157517/2017, 2022 N.Y. Misc. LEXIS 988, at *2 (Sup. Ct. N.Y. Cnty. Mar. 8, 2022); *but see Zuckerbrot v. Lande*, No. 655110/2020, 2022 N.Y. Misc. LEXIS 929, at *30-31, *52 (Sup. Ct. N.Y. Cnty. Mar. 17, 2022).

> The cornerstone of the reckless disregard standard for actual malice is that the plaintiff must prove by clear and convincing evidence, that the "defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). And, as the New York Court of Appeals has explained, "there is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action." *Liberman v. Gelstein*, 80 N.Y.2d 429, 438 (1992).

*Id.*; *see generally id.* at 39-43.

Similarly, Plaintiff does not contend that the Court erred in applying the clear and convincing standard in evaluating whether Plaintiff had satisfied her burden of establishing actual malice. Op. 43-44; Pl. Mem. at 13; *Anderson*, 477 U.S. at 252 ("where the First Amendment mandates a 'clear and convincing' standard, the trial judge in disposing of a directed verdict motion should consider whether a reasonable factfinder could conclude, for example, that the plaintiff had shown actual malice with convincing clarity"). Plaintiff argues only that the Court erred in departing from earlier rulings in this case or in its application of the relevant standard to the evidence at trial. Both of Plaintiff's arguments fail.

### a.      The Court's evaluation of evidence did not violate the mandate or the summary judgment order

Plaintiff contends that the Court, in evaluating the evidence at trial, was bound by the Second Circuit's mandate and the Court's own summary judgment ruling. *See* Pl. Mem. at 25, 26 n.34, 28 n.44, 29 n.45. As explained above in Section IV.A, however, nothing in the Second Circuit's analysis of the plausibility of the factual allegations in the Amended Complaint precluded this Court from ruling on Defendants' motion for judgment as a matter of law after trial. Similarly, the Court's rulings on evidence presented at summary judgment are not binding on the Court's analysis of the evidence introduced at trial. *See Williams*, 171 F.3d at 102 (rejecting argument that trial court was precluded from ruling for defendants under Rule 50 after

previously denying defendants' motion for summary judgment); *Anderson*, 477 U.S. at 251

("summary judgment motions are usually made before trial and decided on documentary

evidence, while directed verdict motions are made at trial and decided on the evidence that has

been admitted").

Indeed, it would be illogical here for the Court's summary judgment decision to tie the

Court's hands on a motion following trial because much of the evidence that the Court relied on

at summary judgment was inconsistent with the trial evidence.  Plaintiff argued that Bennet

"ignored articles brought to his attention that were inconsistent with his angle," Pl. Mem. at 25,

but trial testimony showed that only a handful of articles or editorials were brought to Bennet's

attention and "none presents any definitive facts about the Arizona shooting that would have put

Bennet on notice (or led him to strongly suspect) that no link had been established," Op. at 46.

Similarly, Plaintiff insists that Bennet "disregarded the results [of] the Williamson research that

he commissioned," Pl. Mem. at 25 (quoting ECF 117 at 34), but Williamson's undisputed

testimony at trial showed that she did not conduct any research into Loughner's motivations until

Bennet asked that she do so the morning *after* publication.  *See e.g.*, Trial Tr. 253:4-7 (Q: "Did

you do any research on June 14 at all into whether Jared Loughner had seen any type of political

rhetoric or political incitement?"  A: "No, I did not."); *see also id.* at 174:4-12, 283:22-284:2.

### b.       *The Court did not make improper credibility determinations*

Plaintiff argues that the Court improperly "credited" Bennet's testimony as a general

matter.  Pl. Mem. at 24.  However, the Court correctly applied Rule 50, drawing reasonable

inferences in Plaintiff's favor but adopting testimony where Plaintiff had not adduced any

concrete evidence to the contrary.  *See* Op. at 50-51, 53 n.31, 57.  That is precisely what the law

requires the Court to do.  *E.g.*, *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 149 (2000)

(citing Fed. R. Civ. P. 50(a)).  The Rule 50 standard does not require that the Court adopt

inferences that are unreasonable or unsupported by the evidence in the record. *Williams*, 171 F.3d at 101 (judgment is appropriate where "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture"); *Contemp. Mission*, 842 F.2d at 622-23 ("bare assertions" that a reporter "intentionally distorted and manipulated the truth in order to blacken appellants' reputations" were "not sufficient to establish a triable issue of actual malice").

Nor does the standard require that the Court assume jurors will disbelieve uncontested testimony. To the contrary, the clear and convincing standard for actual malice requires that the plaintiff offer "concrete evidence from which a reasonable juror could return a verdict in [her] favor," which requires more than the mere assertion that the jury might disbelieve the defendant. *Contemp. Mission*, 842 F.2d at 621-22; *Anderson*, 477 U.S. at 256 (same).

More specifically, Plaintiff contends that the Court erred when it improperly "credited" Bennet's testimony that (1) he did not open the hyperlink at the word "circulated" or read the ABC article available through that link, Pl. Mem. at 16; (2) his request that Williamson "please take a look" meant for her to fact check his draft, *id.*; or (3) he did not have a specific recollection of any 2011 articles about the Arizona shooting while revising the Editorial in 2017, *id.* at 27. But even now, Plaintiff fails to point to any concrete evidence calling this testimony into question. She offers no evidence to contradict Bennet's testimony that he did not click on the hyperlink. *See* Pl. Mem. at 30 n.48; Op. at 50. As to Bennet's email to Williamson, Plaintiff points to Williamson's testimony that Bennet was also responsible for his edits or that the email did not "specifically ask [her] to fact-check anything," Pl. Mem. at 30 – but this speaks only to Williamson's understanding of the email, not to Bennet's subjective intent in sending it. *See also* Trial Tr. at 577:2-22 (Cohn testified she sent Williamson Bennet's edits so she could "get back to us if there were any [factual or tonal] issues or problems with it"). And despite the

Court's offer to Plaintiff to question Bennet outside the presence of the jury about his memory of the 2011 articles she theorized that he might have read, "plaintiff's counsel never elicited any testimony or proffered any other evidence that Bennet had in fact read the articles in question." Op. at 53-54 n.32.[10]

At bottom, the Court's Opinion demonstrates that it did not blindly "credit" Bennet's testimony, but rather, it conducted a thorough review of the record and determined that Plaintiff had not adduced any evidence to call the relevant portions of his testimony into question or that would even suggest that Bennet or The Times was "aware, at the time 'America's Lethal Politics' was published, that the hypothesized link between her crosshairs map and Loughner's attack had been widely rejected." Op. at 57.

### c. Plaintiff has not identified any evidence that would suffice to prove actual malice

Plaintiff also identifies several pieces of purported evidence that she contends should have caused the Court to deny the Rule 50 motion, primarily: an out-of-context quotation from Bennet's testimony, the ABC article hyperlinked in the Editorial, and three editorials or opinion pieces sent to Bennet on June 14, 2017. Pl. Mem. at 13, 28-29. The Court, however, properly considered and rejected this evidence in its Opinion.

**Bennet's Testimony.** Plaintiff contends that the Court "disregards Bennet's glaring admission of actual knowledge of falsity," namely, a statement that "I didn't think then and don't think now that the map caused Jared Loughner to act." Pl. Mem. at 13, 27 (citing Trial Tr. at

---

[10] Plaintiff also argues that the Court should doubt Bennet's credibility because he thought that The Times had a policy against apologizing and Hanna Ingber was not aware of such a policy. Pl. Mem. at 34. As the Court correctly noted, this is not relevant to the issues at hand. Op. at 30 n.17. Nothing in the record suggests that Ingber was involved in Bennet's email exchanges with Rhoades-Ha or any discussions of apologizing personally to Plaintiff, so any difference in their understanding is irrelevant.

721:5-6).  Plaintiff takes this statement out of context.  In full, Bennet testified:

> I was functioning as the editor, not the reporter on the piece, so I
> wouldn't normally do the reporting in a situation like this, particularly
> when we were on a tight deadline.  But also I didn't, I didn't think – I
> wouldn't have thought it was – I didn't think then and don't think now
> that the map caused Jared Loughner to act.  I didn't think we were
> saying that, and therefore I wouldn't have – the question wouldn't have
> entered my mind, didn't enter my mind to research that question.

Trial Tr. at 721:1-9.  Far from ignoring the testimony, the Court expressly rejected Plaintiff's

argument, finding that this uncontradicted statement, taken in context, "explain[s] that because

Bennet did not intend to convey that the crosshairs map directly caused Loughner to act, he

therefore did not consider the need to research the veracity of that assertion."  Op. at 55.

Even if the Court were to credit Plaintiff's unsupported theory that this was a smoking-

gun-style admission by Bennet that he did not know whether his statements were true, it would

be insufficient to prove actual malice.  As the Court correctly explained, "there is a critical

difference between not knowing whether something is true and being highly aware that it is

probably false.  Only the latter establishes reckless disregard in a defamation action."  Op. at 62

(quoting *Liberman*, 80 N.Y.2d at 438).  Nothing in Bennet's testimony suggests that he "knew or

suspected that there existed any official or widely accepted conclusion that no link whatsoever

existed between Loughner's attack and the map."  Op. at 55.[11]

---

[11] Plaintiff also points to a passage in the Opinion where the Court assumed that "Bennet either
intended his edits to Williamson's draft to covey that the crosshairs map played a causal role in
spurring Loughner to commit the Arizona shooting or at least that Bennet recklessly disregarded
the defamatory meaning."  Pl. Mem. at 13 n.15 (citing Op. at 45-46).  The statement is plainly an
assumption for the sake of argument, not an evidentiary ruling, as the Court expressly declined to
rule on the issue of Bennet's awareness of defamatory meaning, explaining that it ruled on
awareness of falsity and therefore "did not address" "actual malice concerning defamatory
meaning," denying that branch of Defendants' Rule 50 motion as moot.  Op. at 41 n.26.

*Prior Editorials.*   Plaintiff argues the Court improperly "took a one-sided view" of several past editorials that Times employees sent to Bennet on June 14, arguing that the Court "disregards several statements … that flatly refute Bennet's preconceived narrative."  Pl. Mem. at 28.  Here, too, the Court considered this evidence, but simply found that it did not support Plaintiff's argument.  The Court accepted Plaintiff's proffered inference that Bennet had read and understood the pieces, and the Court then considered in detail the contents of each of those pieces.  Op. at 46-49.  As the Court correctly observed, "even on the assumption that Bennet read and understood these three articles in their entirety, none presents any definitive facts about the Arizona shooting that would have put Bennet on notice (or led him to strongly suspect) that no link had been established between the crosshairs map and Loughner's attack."  *Id.* at 46.  The Court correctly determined that these pieces offer opinions and arguments about the correct response or assignment of blame in the wake of shootings, but none "presents any facts that contradict the facts asserted in the Challenged Statements" such that they would establish actual malice.  *Id.* at 49.[12]

*ABC Article.*   Bennet testified that he did not click on the hyperlink Williamson had inserted at the word "circulated" in her draft and did not read the article to which that link led.  Trial Tr. at 609:15-610:4.  Plaintiff has cited no evidence to the contrary, relying instead on the Court's ruling at summary judgment that "a jury might discredit [Bennet's] testimony."  Pl. Mem. at 8 n.7 (quoting ECF 117 at 32-33); *see* Op. at 50 ("Palin has adduced no affirmative evidence to undermine Bennet's testimony on this point.").  Plaintiff's hope that a jury might not

---

[12] Plaintiff argues that the Court should discredit Bennet's testimony because, in 2017, he testified that he did not recall whether he read these prior editorials, and at trial he testified that he did read them.  Pl. Mem. at 33-34.  But as Bennet explained at trial, he could not recall in 2017 whether he had read them, but, after reviewing his email describing them as "more relevant precedent," he was able to determine that he had read them.  Trial Tr. 608:13-24.

believe Bennet is insufficient as a matter of law to meet her burden, *Contemp. Mission*, 842 F.2d

at 621-22, and, as the Court noted, even if Bennet's testimony were in dispute, the mere

possibility that he read the article is not proof that he read to the tenth paragraph and understood

the statement there that – one day after the shooting – no connection between Loughner and the

Map had been found to be dispositive proof that no connection was *ever* made.  Op. at 50 n.28.

Inconsistently, Plaintiff also argued that Bennet's failure to read the ABC Article

constitutes a reckless disregard for the truth.  Op. at 50-51 (noting change in Plaintiff's position

at argument).  The Court correctly ruled that there was no evidence to suggest that Bennet *should*

have checked the hyperlink.  *Id.* at 51.[13]  And even if there were any such evidence, it still would

not satisfy Plaintiff's burden of proof, because nothing suggests that Bennet had "the subjective

awareness of (probable) falsity that is the *sine qua non* of actual malice."  Op. at 51 (citing

*Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 666 (1989)); *see also Sweeney*, 84

N.Y.2d at 793 ("Failure to investigate . . . , standing alone, is not enough to prove actual malice

even if a prudent person would have investigated before publishing the statement" (citing *St.*

*Amant*, 390 U.S. at 731, 733)).

None of the other theories advanced by Plaintiff in her Memorandum demonstrates an

error in the Court's ruling.  Plaintiff argues, for example, that Bennett's contemporaneous

statements to Douthat, Williamson, or Lepping suggest that he was trying to "cover for himself

and pass blame on those around him."  Pl. Mem. at 31-32.  But Plaintiff cites no evidence at trial

---

[13] Plaintiff did not offer any evidence to suggest this was required of an editor revising a draft.
The record reflects that both Williamson and Lepping checked the hyperlink and reviewed the
ABC article while drafting and fact-checking  and neither saw an issue. *See* Op. at 50; Trial Tr.
at 144-46, 265-67, 422-24.  "Even taking every inference in Palin's favor, Bennet's compliance
with these normal pre-publication procedures is consistent with the behavior of a high-ranking
editor who is somewhat removed from the reporting details underlying the piece."  Op. at 59.

that would support this theory, and Williamson's testimony that he was "crestfallen" on June

15th reinforces his testimony.  *See* Op. at 63 (quoting Trial Tr. at 183:3-9).  Instead, Plaintiff

relies on the possibility that the jury might disbelieve Bennet's undisputed testimony, the

testimony of Douthat and Williamson, *see* Trial Tr. at 280:12-17; 282:10-15; 849:11-19, and the

statements themselves.  Additionally, the decision not to include Plaintiff's name in the

correction (made by Cohn, not Bennet, Tr. at 554:11-18) occurred after publication of the

Editorial and has no connection to Bennet's individual state of mind on June 14, 2017.  *See* Pl.

Mem at 32 (relying on summary judgment order); *Contemp. Mission*, 842 F.2d at 621 (requiring

proof that defendant had actual knowledge of falsehood or "subjective awareness of probable

falsity" at time of publication).  In short, Plaintiff has not identified any evidence overlooked or

improperly evaluated by the Court that would require it to reconsider its Rule 50 decision.

> **3.     The Court could have granted the Rule 50 motion for failure to prove
> actual malice as to awareness of defamatory meaning**

Even if the Court were inclined to revisit its Rule 50 ruling—and for all the foregoing

reasons it should not—the Court should reaffirm its judgment in favor of Defendants on the

alternative ground that, as a matter of law, Plaintiff failed to prove actual malice with respect to

awareness of the alleged defamatory meaning.  *See* Op. at 50 (denying this branch of

Defendants' motion as moot in light of ruling on actual malice as to falsity).[14]

Plaintiff failed to show that Bennet was aware that his words would convey to the

average reader the defamatory meaning that she alleges the Editorial conveys, namely that "Palin

was clearly and directly responsible for inciting a mass shooting at a political event in January

---

[14] Plaintiff baldly asserts that the Court's ruling that she must prove "actual malice as to
defamatory *meaning* was also erroneous because it was based on non-binding defamation by
implication cases," Pl. Mem. at 6 n.4, but she offers no case law to support this argument and
does not elaborate further on it.

2011." Am. Compl. ¶ 1.  Bennet testified unequivocally that he did not intend to suggest that the

Crosshairs Map directly caused Loughner to act in the Arizona Shooting, Trial Tr. 731:4-22, and

that it came as a surprise to him that some readers interpreted his words in that way, *id.* 730:8-11,

731:15-22, 743:8-16.  Plaintiff did not introduce any evidence to the contrary.  Thus, judgment

as a matter of law is proper on this ground as well.  *See* Trial Tr. 1286:14-1288:3 (Defendants'

oral argument regarding actual malice as to awareness of defamatory meaning); ECF 174, Ex. B

(case citations submitted by counsel for both parties pertaining to Rule 50 arguments on actual

malice, including as to awareness of defamatory meaning).

## V.    DISQUALIFICATION IS NOT WARRANTED

Plaintiff demands this Court recuse itself pursuant to 28 U.S.C. § 455(a).  Because she

fails to demonstrate any ground for an objective observer to doubt the Court's impartiality, this

motion must be denied.[15]

### A.    Plaintiff Has Failed To Meet Her Burden To Show This Court's Impartiality Would Be Doubted

"In deciding whether to recuse himself, the trial judge must carefully weigh the policy of

promoting public confidence in the judiciary against the possibility that those questioning his

impartiality might be seeking to avoid the adverse consequences of his presiding over their

case."  *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988).  Indeed, a

"judge is as much obliged not to recuse himself when it is not called for as he is obliged to when

it is."  *Id.*  Therefore, "where the standards governing disqualification have not been met,

---

[15] Plaintiff suggests that this Court should rule on the recusal issue before ruling on her other post-trial motions, *see* Pl. Mem. at 1, and has previously suggested the Court should also delay its consideration of those motions pending a mandamus petition if the recusal motion is denied. However, the Second Circuit has ordered that Plaintiff's petition be "held in abeyance pending the district court's resolution of Petitioner's post-trial motion." ECF 200.

disqualification is not optional; rather, it is prohibited." *Aguinda v. Texaco*, 241 F.3d 194, 201

(2d Cir. 2001).

### 1. Plaintiff's disagreement with this Court's decisions is not a basis for recusal

The law is well-settled that adverse rulings do not present appropriate grounds for

recusal.  Under Section 455, the "alleged prejudice of the trial judge must be extrajudicial, . . . it

must arise by virtue of some factor which creates partiality arising outside of the events which

occur in the trial itself." *In re IBM Corp.*, 618 F.2d 923, 927 (2d Cir. 1980).  For this reason,

> judicial rulings alone almost never constitute a valid basis for a bias
> or partiality motion.  In and of themselves (i.e., apart from
> surrounding comments or accompanying opinion), they cannot
> possibly show reliance upon an extrajudicial source; and can only in
> the rarest circumstances evidence the degree of favoritism or
> antagonism required . . .  when no extrajudicial source is involved.

*Liteky*, 510 U.S. at 555; *accord Steel v. C.I.R.*, No. 99 Civ. 5499 (JSR), 1997 U.S. Dist. LEXIS

15862, at *2 (S.D.N.Y. Oct. 14, 1997) ("a court's own prior adverse rulings 'do not provide a

reasonable basis for questioning a judge's impartiality'" (quoting *United States v. Colon*, 961

F.2d 41, 44 (2d Cir. 1992))).

Almost all of Plaintiff's various arguments for disqualification – her contentions related

to the supposed "refusal to abide by the Mandate[,] 2017 dismissal of the case, summary

judgment rulings, scheduling of the trial, insufficient jury selection process, exclusion of critical

evidence recognized in the Mandate, making and timing of the announcement of the Rule 50

decision, [and] improper jury instruction on actual malice during deliberations," *see* Pl. Mem. at

35, fall into this category.  However, "fundamental disagreements" about "questions of law . . .

are no basis for reassignment." *Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010); *see, e.g.,*

*United States v. Wedd*, 993 F.3d 104, 117-18 (2d Cir. 2021) (even flawed evidentiary rulings are

not ground for recusal); *Muller-Paisner v. TIAA*, No. 03 Civ. 6265 (GWG), 2014 U.S. Dist.

LEXIS 5229, at *7 (S.D.N.Y. Jan. 15, 2014) (adverse rulings overturned by reviewing court do not demonstrate bias); *Carter v. Rosenberg & Estis, P.C.*, No. 95 Civ. 10439 (DLC), 1998 U.S. Dist. LEXIS 4010, at *88-89 (S.D.N.Y. Mar. 30, 1998) (comments made during Rule 50 argument were not basis for recusal because they were "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings," namely testimony elicited and documentary evidence supplied at trial).  Moreover, and as discussed more fully above, the Court's rulings at trial were correct.  If Plaintiff believes this Court made an error in any of those rulings, any such error would be "proper grounds for appeal, not for recusal."  *Liteky*, 510 U.S. at 555.

The other events to which Plaintiff points are "case management decisions," which, again, are not a basis for recusal.  *Watkins v. Smith*, 561 F. App'x 46, 47 (2d Cir. 2014) (Rakoff, J., on panel); *see Liteky*, 510 U.S. at 556 ("routine trial administration efforts" are inadequate ground for recusal).  Among other things, "[s]cheduling is within the realm of judicial case management which is left to the discretion of the trial court and which does not provide a basis for recusal."  *Lamborn v. Dittmer*, 726 F. Supp. 510, 517 (S.D.N.Y. 1989).  To the extent the Court made any errors in this regard, that would still not demonstrate the sort of bias that justifies disqualification.  *See SEC v. Razmilovic*, 738 F.3d 14, 30 (2d Cir. 2013) ("[A]lthough, as the court acknowledged, two administrative errors occurred when the court ruled on two motions before they were fully submitted, we see no objective basis for attributing those errors to bias. Judges are human.  Errors are made; some are corrected; some are not, but are harmless.  Few are attributable to bias.").

Plaintiff never attempts to explain why the "rarest circumstances" exist here such that these varied rulings could demonstrate "favoritism or antagonism."  *Liteky*, 510 U.S. at 555. Instead, she simply gives a litany of these rulings and states that they "establish an appearance of

partiality that requires disqualification."  Pl. Mem. at 35.  This is clearly insufficient.  "An

application for the disqualification of a judge must rest on a factual basis and not on the whim of

a litigant who asserts vague contentions."  *Rodriguez v. United States,* 10 Civ. 5259 (KTD), 2010

U.S. Dist. LEXIS 93634, at *4 (S.D.N.Y. Sep. 7, 2010); *accord United States v. IBM Corp.*, 475

F. Supp. 1372, 1379 (S.D.N.Y. 1979) (proponent of recusal "must allege specific facts and not

mere conclusions or generalities").

While none of the grounds she cites stand up to scrutiny, several of Plaintiff's assertions

paint an incomplete picture and require additional context.  ***First,*** on the issue of the scheduling

of the trial, Plaintiff fails to provide the full history.  Following remand, this Court originally

scheduled the case for trial on August 24, 2020.  *See* ECF 90.  With the suspension of jury trials

due to the COVID-19 pandemic, *see, e.g., In re: Coronavirus/COVID-19 Pandemic*, No. 1:20-

mc-197, ECF 1 (S.D.N.Y. Apr. 20, 2020), the trial was adjourned.  Even after trials partially

resumed, scheduling was extraordinarily difficult, given limited courtroom space and the priority

to conduct criminal trials.  *See, e.g.,* 1/24/22 Tr. at 6:12-17; 9:14-22.  The trial was adjourned

four times, to (1) February 1, 2021, *see* July 22, 2020 Docket Entry, (2) June 21, 2021, *see* Dec.

17, 2020 Docket Entry, (3) September 20, 2021, *see* July 28, 2021 Docket Entry, and ultimately

(4) January 24, 2022, *see* Aug. 12, 2021 Docket Entry.

In August 2021, the Court had informed the parties that pandemic developments required

an additional postponement.  The Court proposed December 13, 2021 and January 24, 2022 as

potential new dates, in hopes that by scheduling trial far enough out another false start could be

avoided.  *Palin v. Rakoff*, No. 22-629 (2d Cir.), ECF 13-12, at PA2058.  Plaintiff's counsel told

the Court the December date would not work because of a personal conflict and because

Plaintiff's proposed damages expert would be travelling for part of that period, and that he also

had a conflict with the January 24 date because of his daughter's wedding on January 29.  *Id.* at

PA2058-60.  To accommodate Plaintiff's counsel, the Court first agreed not to hold trial on Friday, January 28, so that Plaintiff could leave New York on Thursday night and fly to Florida for the wedding.  Then, after Plaintiff's counsel raised additional COVID-related concerns, the Court also agreed not to sit on Thursday, January 27th.  *See* 1/11/22 Tr. at 10:6-8.  The Court expressed sympathy with the situation.  *See* 1/24/22 Tr. at 4:16-20 ("[O]f course, the marriage of his daughter trumps all other concerns.  I am the first to acknowledge that as a[] father of three daughters.").

Then, due to Plaintiff's subsequent positive COVID test on the eve of trial, the Court rescheduled the trial for February 3, 2022, thus avoiding any conflict with the wedding.  Given the accommodations that the Court extended to Plaintiff in scheduling, her argument that this demonstrates the Court's bias is difficult to understand.

In this section of her argument, Plaintiff also cites the Court's remark, with reference to her having tested positive for COVID, that "[s]he is, of course, unvaccinated."  *See* Pl. Mem. at 35 n.57.  Plaintiff apparently contends, though she does not explicitly argue, that this is further evidence of the Court's partiality.  But Plaintiff's vaccination status was directly relevant to the issues then at hand, (1) whether the positive result on the at-home test Plaintiff had taken was likely accurate, which the Court was attempting to assess by having Plaintiff take a more precise PCR test, and (2) whether to delay the trial.  *See* 1/24/22 Tr. at 8:23-9:5.  The fact that Plaintiff was unvaccinated and at risk of a more severe infection than had she been vaccinated was important for scheduling purposes.  *See Press Briefing by White House COVID-19 Response Team & Public Health Officials* (Nov. 22, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/11/22/press-briefing-by-white-house-covid-19-response-team-and-public-health-officials-69/.

The Court worked to ensure that Plaintiff was not in any way prejudiced by her positive test result. Though noting that there was no "constitutional right for a party" in a civil case to be present when a jury was selected, the Court stated that it thought "it's appropriate that a party be present if they wish to be at the selection of a jury" and therefore would only allow the trial to proceed in Plaintiff's absence with her consent. 1/24/22 Tr. at 3:14-19. After Plaintiff expressed her preference to attend in person, the Court adjourned the trial, *id.* at 8:23-9:3, and stated, "[o]bviously, Mrs. Palin's health comes first." *Id.* at 30:17-18.

*Second,* on the Court's voir dire process, as discussed above, *see* Section IV.B, the Court followed its normal procedure in selecting a jury, *see* Tr. at 25:18-22. As the record reflects, both sides submitted proposed questions, and the Court chose not to ask those submitted by either party. The Court's ruling on this issue thus favored neither side. *See* Voir Dire Tr. at 15:8-20. It is therefore difficult to see how an objective observer would view this as demonstrating bias against Plaintiff. Rather, an objective observer would have seen that the Court struck for cause all three jurors who revealed bias toward Plaintiff, Voir Dire Tr. at 9:19-10:14; 16:22-19:4; 21:13-25:21, but did not strike a juror who informed the Court that her husband worked at Fox News where Plaintiff was a frequent contributor, *id.* at 27:10-28:8.

*Third*, Plaintiff is simply wrong about what actually occurred at trial with respect to evidence she contends was excluded. As discussed above, *see* Section IV.C, the Court did not categorically exclude from evidence articles from Atlantic Media publications. Instead, the Court stated that it would allow Plaintiff's counsel "to put some foundational questions to [Bennett] outside the presence of the jury on this" and would reconsider if Plaintiff could establish more than she had at that point. Trial Tr. at 508:11-17. Plaintiff's counsel suggested he could instead "ask him some foundational questions, not specifically referencing these documents," and the Court said it would depend on the questions. *Id.* at 508:18-509:4.

Plaintiff's counsel, however, never attempted to follow either path. *See* Op. at 53-54 n.32. Plaintiff can hardly infer bias from her own failure to attempt to introduce the evidence in question. *See Wedd*, 993 F.3d at 118 (finding no bias in evidentiary ruling where record made clear that defendant's counsel had failed to meet requirements for its admission).

Similarly, Plaintiff argues that the Court "excluded *all* evidence related to the Public Editor," Pl. Mem. at 11 n.12. However, the section of the trial transcript she cites for this point says no such thing. Plaintiff's counsel's questions on this point were repeatedly objected to because, among other things, counsel failed to lay proper foundation and asked a "hopelessly vague question." *See* Trial Tr. at 392:13-394:18. Counsel then moved on, despite the Court indicating how a proper question could be asked. *See id.* at 393:19-394:14. Similarly, Plaintiff does not even attempt to point to a place where she attempted to introduce the "*Botched*" article.

***Fourth,*** the Rule 50 decision contains no evidence of favoritism toward Defendants or antagonism toward Plaintiff. Indeed, in its oral ruling, the Court explained that it was "not altogether happy with having to make this decision on behalf of the defendant," that it was "hardly surprised . . . that Ms. Palin brought this lawsuit," and that this case featured "an example of very unfortunate editorializing on the part of *The Times*." Tr. at 1305:2-17. As the Court has previously noted, it "did not rule precipitously" on the motion. Op. at 3. Instead, the Court held argument over several days and allowed the parties to submit supplemental citations over the intervening weekend. *See id.* at 33-34 (noting that the Court held oral argument "in at least five sessions outside the presence of the jury over three days"). Nor did the Court rule in Defendants' favor on all issues in deciding the motion, as one might expect if the Court was somehow biased toward them. The Court rejected Defendants' Rule 50 arguments with respect to substantial falsity, *see* Trial Tr. 1295:18-1297:9, and the "of and concerning" element, *see id.* at 1226:12-1228:12, as well as Defendants' separate motion for a ruling that the challenged

statements are not defamatory *per se* (which would have required dismissal of the action because of Plaintiff's failure to offer any evidence of special damages), *id.* at 682:11-16.

**Fifth**, the Court's decision to announce the Rule 50 decision prior to the conclusion of jury deliberations favored neither side and gave no appearance of partiality. The Court explained that it stated its ruling before the jury's verdict because conducting itself otherwise "would have been grossly unfair to both sides, who would have been left with the impression that the case was going to be determined by the jury's verdict when it was not." Op. at 4; *see also* Trial Tr. at 1298:12-14 ("We've had very full argument on this, I know where I'm coming out, and I ought to therefore apprise the parties of that."). Moreover, the Court has taken a similar approach in at least two other cases, demonstrating that the timing here was in no way influenced by the parties involved, as noted above. *See supra* Section IV.G.1 & n.8.

### 2. The Court's comment to Bloomberg is not a basis for recusal

Plaintiff also contends that bias is shown by the substance and timing of the Court's comment to Bloomberg on February 16, 2022. Pl. Mem. at 35-36; *see supra* Section IV.F. Plaintiff suggests that these comments violated the Code of Conduct for United States Judges and that such comments "almost always result in mandatory disqualification under Section 455." Pl. Mem. at 35. She is incorrect on both points. No reasonable person would question the Court's impartiality based on the brief response about the Court's procedure for managing Rule 50 decisions and deliberating juries.

Plaintiff's flawed analysis begins with a misapplication of the pertinent canon. Canon 3A(6) states that a "judge should not make public comment on the *merits* of a matter pending or impending in any court" (emphasis added). It goes on to say that the "prohibition on public comment on the merits does not extend . . . to explanations of court procedures." Here, the Court did not make any comment on the *merits* of any pending matter; rather, it provided an

explanation of the procedure it used in issuing the Rule 50 motion.  Canon 3A(6) does not support Plaintiff's argument.

Case law also undermines the argument for recusal.  The Second Circuit has been clear that "not every media comment made by a judge is necessarily grounds for recusal."  *Ligon v. City of N.Y.*, 736 F.3d 118, 126 (2d Cir. 2013).  Instead, as with any other disqualification analysis, "context is always critical" and "the relevant question at all times remains whether, under the circumstances taken as a whole, a judge's impartiality may reasonably be called into question."  *Id.*  Indeed, even a violation of Canon 3A(6) does not necessarily mean "disqualification is appropriate under § 455(a)."  *Metro. Opera Ass'n v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 332 F. Supp. 2d 667, 671 (S.D.N.Y. 2004); *accord United States v. Sierra Pac. Indus., Inc.*, 862 F.3d 1157, 1175 (9th Cir. 2017) ("not every violation of the Code of Conduct creates an appearance of bias requiring recusal under § 455(a)"); *United States v. Fortier*, 242 F.3d 1224, 1229 (10th Cir. 2001) ("courts construing [Canon 3A(6)] have held that a judge's public comment does not create a per se appearance of bias"); *In re Barry*, 946 F.2d 913, 914 (D.C. Cir. 1991) ("any such violation does not necessarily create an appearance of personal bias or partiality such as to require recusal under 28 U.S.C. § 455").

The cases on which Plaintiff relies are inapposite.  Each involves extensive statements to the press and, in all but one, the judges had spoken to the press multiple times, *see Ligon*, 736 F.3d at 127 (interviews with Associated Press, New York Law Journal, and for a "lengthy profile" in the *New Yorker*); *United States v. Microsoft Corp.*, 253 F.3d 34, 107-08 (D.C. Cir. 2001) (interviews with at least four separate publications, as well as speeches at college and antitrust seminar); *In re Boston's Children First*, 244 F.3d 164, 166 (1st Cir. 2001) (letter to editor and interview); *In re IBM Corp.*, 45 F.3d 641, 642-43 (2d Cir. 1995) (interviews in two newspapers).  In the one exception, *United States v. Cooley*, the judge was interviewed at length

on the nationally televised newsmagazine *Nightline*.  1 F.3d 985, 995 (10th Cir. 1993).

Plaintiff's cited cases also involved commentary about the merits of the case and/or the parties, unlike here, where the Court simply provided an extremely limited explanation of its procedure.  For instance, in *Ligon*, a case concerning stop-and-frisk practices, the judge publicly "describe[d] herself as a jurist who is skeptical of law enforcement, in contrast to certain of her colleagues, whom she characterized as inclined to favor the government," 736 F.3d at 127.  Similarly, the *Microsoft* judge "disclosed his views on the factual and legal matters at the heart of the case.  His opinions about the credibility of witnesses, the validity of legal theories, the culpability of the defendant, the choice of remedy, and so forth all dealt with the merits of the action."  253 F.3d at 112.  The judge in the *Boston's Children First* action had distinguished the case presently before her from another case which was "more complex."  244 F.3d at 167.  The judge in the *IBM* case, an antitrust matter, had spoken about defendant "IBM's activities in general and [government counsel] Assistant Attorney General Baxter's role in particular."  45 F.3d at 642.  The *Cooley* jurist, in a case involving protestors blocking access to abortion clinics, had "state[d] his views regarding the ongoing protests, the protesters, and his determination that his injunction was going to be obeyed."  1 F.3d at 995.

Finally, in the Second Circuit cases Plaintiff cites, unlike here, the comments to the media were secondary to other substantial conduct issues.  For example, in *IBM*, the Court of Appeals had previously granted a writ of mandamus in a related case after that judge had publicly criticized the government's decision to stipulate to dismiss the case and conducted a hearing regarding the role of a Justice Department official.  45 F.3d at 643.  Similarly, in *Ligon*, a large part of the Second Circuit's opinion was devoted to the trial court's "conduct while on the bench."  736 F.3d at 124.  Specifically, the court focused on the trial court's comments that "described a certain claim that differed from the one at issue in the case before her, urged a party

to file a new lawsuit to assert the claim, suggested that such a claim could be viable and would likely entitle the plaintiffs to documents they sought, and advised the party to designate it as a related case so that the case would be assigned to her." *Id.* at 125-26.

*Boston's Children First* presents the closest – though still inapposite – fact pattern. That decision created substantial controversy. After the First Circuit published the opinion, three First Circuit judges who were not on the panel said that they were "of the view that, even if the district court's statement to the reporter comprised a comment on the merits, it does not create an appearance of partiality such as to require mandatory recusal under 28 U.S.C. § 455(a)." 244 F.3d at 172. Those judges were "particularly concerned that section 455(a) not be read to create a threshold for recusal so low as to make any out-of-court response to a reporter's question the basis for a motion to recuse." *Id.* The panel itself was careful to note the "continuing need for a case-by-case determination of such issues," *id.*; *see also Microsoft*, 253 F.3d at 114 ("Although this court has condemned public judicial comments on pending cases, we have not gone so far as to hold that every violation of Canon 3A(6) or every impropriety under the Code of Conduct inevitably destroys the appearance of impartiality and thus violates § 455(a).").

Because this Court's limited comment regarding procedure did not violate Canon 3A(6) in the first instance, and even if it could somehow be said that it did, the comment does not create an appearance of bias, this argument therefore provides no basis on which disqualification even arguably could be warranted.

### B.   The Court's Decisions Taken As A Whole Do Not Give The Appearance Of Partiality

The fact that Plaintiff points to a list of decisions with which she disagrees does not alter this analysis:

> A trial judge must be free to make rulings on the merits without the
> apprehension that if he makes a disproportionate number in favor of

> one litigant, he may have created the impression of bias.  Judicial
> independence cannot be subservient to a statistical study of the calls he
> has made during the contest.

*IBM*, 618 F.2d at 929; *see id.* at 930 ("There is no authority for, and no logic in, assuming that

either party to a litigation is entitled to a certain percentage of favorable decisions.").

In crafting her argument for disqualification based on the appearance of partiality,

Plaintiff presents a false universe in which she only received unfavorable rulings.  This could not

be further from the truth, and the reality easily disposes of Plaintiff's argument.  *See Muller-*

*Paisner*, 2014 U.S. Dist. LEXIS 5229, at *8-9.  Among other things, the Court denied

Defendants' motion for summary judgment, *see* ECF 117; ruled against Defendants' request for

a special verdict form, citing its usual practices, 1/24/22 Tr. at 17:12-14; found that the

challenged statements constituted libel *per se* such that no special damages need be shown, Trial

Tr. at 682:11-15; gave Plaintiff's counsel a rebuttal summation despite its usual practice not to

do so, Trial Tr. at 1046:4-15, 1048:21-10:49-3; and rejected Defendant's Rule 50 motion on the

"of and concerning" and substantial falsity points, *see* Op. at 33-34, 42; Tr. 1226:12-1228:12;

1295:18-1297:9.  The Court was also at times perhaps frustrated with defense counsel and

expressed that sentiment.  *See, e.g.,* Trial Tr. at 509:21-511:6; 1227:3-1228:6.

In short, there is no evidence of bias nor any conduct that created an appearance of

partiality, and Plaintiff's disqualification motion should be denied.

## VI.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's

post-trial motions in their entirety.

Dated:  New York, New York
       April 12, 2022

Respectfully submitted,

BALLARD SPAHR LLP

By: _/s/ David L. Axelrod_
    David L. Axelrod
    Jay Ward Brown
    Jacquelyn N. Schell
    Thomas B. Sullivan
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
schellj@ballardspahr.com
sullivant@ballardspahr.com

*Counsel for Defendants*