**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
                                        :

SARAH PALIN,                        :

                   Plaintiff,       :

                                          :

              -against-           :    No. 1:17-cv-04853-JSR

                                          :

THE NEW YORK TIMES COMPANY and JAMES      :
BENNET,                                      :

                                        :

                Defendants.      :

                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

## <u>JOINT PRETRIAL CONSENT ORDER</u>

Pursuant to Rule 4 of the Court's Individual Rules of Practice, Plaintiff Sarah Palin and

Defendants The New York Times Company ("The Times") and James Bennet respectfully

submit this proposed joint pretrial order for the jury trial scheduled to commence on April 14,

2025.

## I.    <u>JOINT OVERVIEW OF THE CASE</u>

This is an action to recover damages for libel, also commonly referred to as defamation.

A libel is a false statement, in writing, about the plaintiff, which tends to expose the plaintiff to

public hatred, contempt, ridicule or disgrace.

Sarah Palin is the former governor of Alaska and a former vice-presidential candidate.

The Times is a media company that that publishes *The New York Times* newspaper, and

Mr. Bennet was the Editor of the Opinion Section of the newspaper during the relevant period.

On the morning of June 14, 2017, James Hodgkinson attacked a group of Republican

members of Congress practicing for the annual Congressional Baseball Game at a field in

Arlington, Virginia – shooting four people, among them Congressperson Steve Scalise. After the shooting, Defendants published an editorial entitled "America's Lethal Politics" (the "Editorial"). The Editorial was published online on the evening of June 14, 2017 and in the print newspaper the following day.

The Editorial states, in part:

Was this attack evidence of how vicious American politics has become? Probably. In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old-girl, the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.

Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask of the right.

Governor Palin asserts that these passages of the Editorial defamed her. Defendants contend that Governor Palin cannot satisfy her burdens of proof on the elements of her defamation claim.

## II.    GOVERNOR PALIN'S PARTICULARIZED DESCRIPTION OF HER CLAIM[1]

Gov. Palin asserts a claim for defamation/libel against Mr. Bennet and The Times. The challenged Passages of the Editorial are "of and concerning" Gov. Palin, false, and defamatory *per se* and were published with actual malice as to truth or falsity and common law malice.

The Second Circuit has already determined that: "The challenged statements here are unambiguous and facially defamatory because they claimed there was a 'direct' and 'clear' 'link' between the crosshairs map and the Loughner shooting. Thus, this is an 'ordinary' defamation case in which the intent to defame can be established by showing 'that the defendants knew their

---

[1] Defendants have not asserted any claims or counterclaims.

statement was false,' not a case in which the challenged statement was susceptible to both 'defamatory and nondefamatory meanings.'" *Palin v. New York Times Co.*, 113 F.4th 245, 276-277 (2d Cir. 2024). This holding is law of the case and must be followed. *United States v. Uccio*, 940 F.2d 753, 757 (2d Cir. 1991) (citing *United States v. Cirami*, 563 F.2d 26, 32 (2d Cir. 1977)); *United States v. Tenzer*, 213 F.3d 34, 40 (2d Cir. 2000) (discussing the "mandate rule").

Gov. Palin's compensatory damages caused by the Editorial include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering and are presumed. *Palin*, 113 F.4th at 268; *Wachs v. Winter*, 569 F.Supp. 1438, 1443-1444 (E.D.N.Y. 1983); *Paravas v. Tran*, 2022 WL 718842, *7 (S.D.N.Y. Feb. 22, 2022); *Caroll v. Trump*, 731 F.Supp.3d 626, 629-630 (S.D.N.Y. 2024). Gov. Palin also seeks punitive damages because Defendants defamed her with a deliberate intent to injure, out of hatred, ill will or spite, or with willful, wanton or reckless disregard of her rights. *Celle v. Filipino Reporter Entreprises Inc.*, 209 F.3d 163, 184 (2d Cir. 2000); *Caroll*, 731 F.Supp.3d at 630; *Wachs*, 569 F.Supp. at 1444.

## III.  PARTICULARIZED STATEMENT OF THE SPECIFIC FACTS, STIPULATIONS, ADMISSIONS, AND OTHER MATTERS ON WHICH THE PARTIES AGREE

### Factual Stipulations

1.  In 2006, Governor Palin was elected as the first female governor of Alaska.

2.  Governor Palin rose to national prominence when Senator John McCain selected her as his running mate in the 2008 presidential election, becoming the first woman nominated to be the Republican vice-presidential candidate.

3.  On January 8, 2011, Jared Loughner attacked a "Congress on Your Corner" political event hosted by Congressperson Gabrielle Giffords at a supermarket parking lot in Tucson, Arizona, shooting 19 people, killing six, including a nine year-old girl and Chief Federal Judge John Roll, and severely wounding Congressperson Giffords and others.

4.  In May 2016, The Times hired Bennet as Editor of the Opinion Section.

5.      On the morning of June 14, 2017, Republican members of Congress were at a field in Arlington, Virginia, practicing for the annual Congressional Baseball Game, when James Hodgkinson shot and wounded four people, among them Republican Congressperson Scalise.

6.      In June 2017, The Times's Editorial Board members and Opinion staff included the following individuals who worked on "America's Lethal Politics":

- Mr. Bennet, Editor of the Opinion Section.

- Robert B. Semple Jr., an Editorial Board Member and associate editor who had worked at The Times for around 50 years and has since retired.

- Linda Cohn, an Editorial Board Member and editor within the Opinion Section since 1988 who retired in November 2017.

- Nick Fox, an Editorial Board Member and editor within the Opinion Section who has worked for The Times since 1995.

- Jesse Wegman, an Editorial Board Member who joined the board in 2013.

- Elizabeth Williamson, an Editorial Board Member who joined the board in 2015 and now works in The Times's Features Section.

- Eileen Lepping, a researcher for the Editorial Board since 2007 who served as the "main" fact-checker for the Editorial Board.

- Phoebe Lett, a research, administrative, and editorial assistant for the Editorial Board who performed various administrative tasks and helped with researching and fact checking.

7.      Shortly after this shooting, Hodgkinson was identified as a Bernie Sanders supporter and campaign volunteer virulently opposed to President Trump.

8.      On June 14, 2017, Ms. Williamson wrote the first draft of the Editorial.

9.      Mr. Bennet revised Ms. Williamson's draft.

10.     At approximately 9:45 p.m. on June 14, 2017, The Times published a digital version of "America's Lethal Politics" on The Times's website.

11.     After publication, The Times's Opinion section Facebook account posted a link to the Editorial, with the text "Was this attack evidence of how vicious American politics has become?  Probably.  Was this attack evidence of how readily available guns and ammunition are in the United States?  Indisputably."

12.     The Times's main Twitter account also tweeted a link to the Editorial, with the text "Opinion: America's lethal politics."

13.     On June 15, 2017, The Times published a print version of "America's Lethal Politics" in the newspaper.

14.     The Times printed 610,531 copies of the June 15, 2017 edition of the newspaper, which included the Editorial.

15.     At approximately 11:15 a.m. on June 15, 2017, The Times published a revised digital version of the Editorial and added a correction to the end of it:

> *Correction: June 15, 2017*
> *An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established.*

16.     At approximately 11:15 a.m. on June 15, 2017, The Times's Opinion Section tweeted about this correction, and The Times's main Twitter account re-tweeted the Opinion Section's tweet.

17.     On June 16, 2017, The Times published a correction at the bottom of its Editorial Page, stating:

> **CORRECTION**
> An editorial on Thursday about the shooting of Representative Steve Scalise incorrectly stated that a link existed between political rhetoric and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established. The editorial also incorrectly described a map distributed by a political action committee before that shooting. It depicted electoral districts, not individual Democratic lawmakers, beneath stylized cross hairs.

18.     There were 283,829 page views of the Editorial in the week it was published, with roughly 40% of views on phones, 17% of views on tablets, and 43% of views on desktop computers.

19. The web address, or "URL," for the Editorial is https://www.nytimes.com/2017/06/14/opinion/steve-scalise-congress-shot-alexandria-virginia.html.

20. This URL has not changed since publication, and anyone clicking on this URL (or a link to this URL) will be directed to the latest version of the Editorial.

21. Anyone who accessed this URL after The Times revised the Editorial on June 15, 2017, would see the revised version and the most recent correction.

22. After the Editorial was revised, the original version was no longer available on The New York Times' website.

23. Of the 283,829 page views of the Editorial the week it was published, roughly 150,000 were before the correction at approximately 11 a.m. on June 15, 2017, and roughly 133,500 were after the correction.  The exact breakdown is as follows:

|  | Number of First Week Page Views | Percent of First Week Page Views |
|---|---|---|
| **Before Correction** | 150,257 | 53% |
| **After Correction** | 133,572 | 47% |
| *Total* | **283,829** | |

24. Governor Palin is not seeking to recover and will not claim or assert loss of income, jobs, or other paid opportunities, including losses of book sales or any decrease in ad revenue from sarahpalin.com or any other websites.

### Documents

1. The parties waive all objections to the admissibility of documents listed on each party's Rule 26(a)(3) disclosure on the ground that they are duplicates under Federal Rule of Evidence ("FRE") 1002 (originals) and 1003 (admissibility of duplicates), except to the extent that the version of a document produced at trial varies materially from the original.

## IV.    EACH PARTY'S PARTICULARIZED CONTENTIONS AS TO THE SPECIFIC FACTS THAT ARE DISPUTED

### A.    Plaintiff's Contentions as to Disputed Facts

The challenged Passages of the Editorial are "of and concerning" Gov. Palin, false, and defamatory *per se* and were published with actual malice as to truth or falsity and common law malice.  "The challenged statements here are unambiguous and facially defamatory because they claimed there was a 'direct' and 'clear' 'link' between the crosshairs map and the Loughner shooting. Thus, this is an 'ordinary' defamation case in which the intent to defame can be established by showing 'that the defendants knew their statement was false,' not a case in which the challenged statement was susceptible to both 'defamatory and nondefamatory meanings.'" *Palin*, 113 F.4th at 276-277.  The challenged Passages are "defamatory *per se*, meaning that they tended "to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of [her] in the minds of right-thinking persons, and to deprive [her] of their friendly intercourse in society."  *Id.* at 268.

### Publication of the Editorial

Shortly after James Hodgkinson opened fire on Republican members of Congress practicing for the annual Congressional Baseball Game and severely wounded House majority whip Scalise, Capitol Police Officer Crystal Griner, congressional aide Zack Barth, and lobbyist Matt Mika, Ms. Williamson raised the question of whether the Editorial Board should write about the shooting.  After quickly researching the shooter and locating his social media pages containing pro-Bernie Sanders and anti-Trump messages, Ms. Williamson circulated this information to Mr. Bennet other Editorial Board Members.

Although initially Editorial Board Member Semple was uninterested in writing about a "nut case who hunts republicans," he eventually decided on pursuing a "gun control angle" and

that the Editorial Board should "shoot for a piece" that would (1) focus attention on the shooting and (2) restate the Editorial Board's longstanding gun control position. Approximately forty minutes later, Mr. Bennet interjected with his narrative about "the rhetoric of demonization and whether it incites people to this kind of violence" and the "inciting hate speech" he "tended to associate with the right." Mr. Bennet "thought that [the Board] should deal with this issue of incitement if there was evidence of inciting hate speech on the Left."

Ms. Williamson was tasked with writing the piece. Mr. Bennet specifically asked her to research whether there was a link between incitement and the Loughner shooting and whether there was any evidence of a link between incitement and the Hodgkinson shooting. Mr. Bennet also told researcher Phoebe Lett that he was wondering whether there were any editorials "connecting to the Giffords shooting to some kind of incitement?"

Ms. Williamson conducted this research for the editorial with the aid of Ms. Lett. Prompted by Bennet's suggestions, she asked Ms. Lett whether there was a prior Times editorial "that references hate type speech against [Democrats] in the runup to [the Loughner] shooting," since "James [had] referenced that." Ms. Lett forwarded the email to Mr. Bennet, who clarified that he was asking if the Times had "ever writ[ten] anything connecting ... the [Loughner] shooting to some kind of incitement." He asked Ms. Lett to "send [him] the pieces [she] sent [Williamson]," and he forwarded to Ms. Williamson other pieces that he received from Ms. Lett.

During the research and drafting process, Mr. Bennet was actively involved in reviewing Times editorials and op-eds about the Loughner shooting, several of which contained information refuting any direct or clear link between the map and incitement of Loughner's attack. Ms. Lett sent Mr. Bennet the following three Times articles, the first of which was sent to Ms. Williamson

by Ms. Lett at Mr. Bennet's suggestion and the latter two of which Mr. Bennet forwarded to Ms.

Williamson himself:

> • "*No One Listened to Gabrielle Giffords*" by Frank Rich (Jan. 15, 2011), which stated that "[w]e have no idea" whether Loughner saw the crosshairs map and referred to Loughner as being "likely insane, with no coherent ideological agenda," while also noting that that "does not mean that a climate of antigovernment hysteria ha[d] no effect on [Loughner]."

> • "*Bloodshed and Invective in Arizona*" by the Times' Editorial Board (Jan. 9, 2011), which noted that Loughner "appears to be mentally ill," indicated that Loughner does not fall into "usual ideological categories," and stated that "[i]t is facile and mistaken to attribute [the Loughner shooting] directly to Republicans or Tea Party members."

> • "*As We Mourn*" by the Times' Editorial Board (Jan. 12, 2011), which quoted then-President Barack Obama's statement that "a simple lack of civility ... did not" cause the Loughner shooting and mentioned that Palin accused journalists of "committ[ing] a 'blood libel'" when they raised questions about overheated rhetoric" in connection with the Loughner shooting.

Mr. Bennet admitted reading "*Bloodshed and Invective in Arizona*" and "*As We Mourn*" and sent

an e-mail stating that these two pieces were "more relevant" precedent to his predetermined

narrative.

In "*As We Mourn*," President Obama's denial that political incivility caused the shooting,

coupled with Ms. Palin's implied condemnation of any assertion that Loughner took inspiration

from her, demonstrates that the crosshairs map was unrelated to the attack. Although "*No One

Listened to Gabrielle Giffords*" stated that the fact that Loughner had "no coherent ideological

agenda[ ] does not mean that a climate of antigovernment hysteria ha[d] no effect on him," its

disclosure that "[w]e have no idea" whether Loughner saw the crosshairs map undermines the

assertion that there was a was a "clear" and "direct" "link" between the shooting and the map.

"*Bloodshed and Invective in Arizona*" not only reiterates that Loughner does not fall into "usual

ideological categories" but directly contradicts the challenged Passages by its pronouncement that

"[i]t is facile and mistaken to attribute [the Loughner shooting] directly to Republicans or Tea

Party members." "*Bloodshed and Invective in Arizona*" also indicates that blaming Gov. Palin (or any other Republican) for the Loughner shooting was "mistaken" as a matter of fact and not simply as a matter of opinion.

When writing the Editorial, Ms. Williamson knew she could not say there was a link between Loughner's shooting and the map circulated by Gov. Palin's political action committee and that any assertion that there was a clear and direct link between Gov. Palin and Loughner's shooting would be false, so she made no such assertion in her draft. Mr. Bennet concedes that Ms. Williamson's first draft of the editorial embodied the research he specifically asked her to conduct. Ms. Williamson wrote her draft consistent with what the research Mr. Bennet asked for showed.

Ms. Williamson drafted the Editorial and uploaded it to "Backfield," part of the Times' content management system, in the late afternoon of June 14. Ms. Williamson's draft ("the Initial Draft") did not contain the challenged statements. It stated only that Loughner's "rage was nurtured in a vile political climate" and that the "pro-gun right [was] criticized" at the time of the Loughner shooting. It also noted that, before the shooting, Palin's political action committee had "circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs." The word "circulated" in the Initial Draft was hyperlinked to a January 9, 2011 *ABC News* article entitled "*Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate*" ("the ABC Article"), which stated that "[n]o connection ha[d] been made between [the crosshairs map] and the [Loughner] shooting." The ABC Article only took 4 minutes to read.

Linda Cohn, an Editorial Board member, was the first person to edit the Initial Draft. After making her edits, Ms. Cohn asked Mr. Bennet to look at the piece. Mr. Bennet rewrote the Editorial and added the challenged Passages. Ms. Williamson later acknowledged that it "was mostly a [Bennet] production" and that Mr. Bennet had been "super keen to take it on."

10

Mr. Bennet pressed forward with his incitement narrative even though there was no evidence to support the "pattern" upon which the Editorial was based and Ms. Williamson's draft already "communicate[d] to readers that overheated political rhetoric can create a climate that is capable of nurturing rage."  Mr. Bennet used the "very strong" word "incitement" because he "wanted to get our readers' attention" and knew the term was used to mean "deliberate orders, invocations, summonses for people to carry out violent attacks," and understood as meaning "a call to violence."  Bennet found inspiration for his narrative about Gov. Palin's "incitement" of Loughner in Thomas Friedman's August 9, 2016 column, "*Trump's Wink Wink to 'Second Amendment People*,'" and its premise that "Donald Trump's language… could end up *inciting*… violence," akin to the "wave of toxic *incitement* against [Yitzhak] Rabin," which included calls for Rabin's death prior to his assassination at a peace rally in 1995.

After saving his revisions in Backfield, Mr. Bennet emailed Ms. Williamson, noting that he "really reworked this one" and apologizing for "do[ing] such a heavy edit." Mr. Bennet also asked Williamson to "[p]lease take a look."  Ms. Williamson responded seven minutes later that the revised piece "[l]ook[ed] great." Several other Times employees under Mr. Bennet also reviewed the revised draft prior to its publication and made minor edits, but none raised concerns regarding the challenged statements.

As the individual responsible for re-writing Ms. Williamson's Initial Draft, Mr. Bennet was responsible for fact-checking the portions of the Editorial he re-wrote.  When it comes to facts—verifiable pieces of information—editorials are no different than any other article in The Times—the Editorial Board's policy is that if something is represented as a fact, it has to be correct.  The Times's Editorial Department "ensures" facts are correct "[t]he same way the newsroom does, by reporting."  The Editorial Board relies upon the news pages of *The Times* (and other papers) for

facts to support editorials.  Editorial Board writers have the first and primary responsibility for fact-checking, although they are "backed up" by the editors who edit their editorials, staff researchers and copy editors.

The editorial was published online on the Times' website at approximately 9:45 pm on June 14, 2017 and appeared in the Times' print edition the next morning.  Both Defendants promoted the piece on their social media accounts.  The Editorial was also prominently featured on The Times homepage.

Within an hour of the Editorial being published online, Times Op-Ed Columnist Ross Douthat emailed Mr. Bennet and told him the statements in the Editorial about Gov. Palin were false.  Mr. Douthat wrote to Mr. Bennet: "I feel I would be remiss if I didn't express my bafflement at the editorial that we just ran on today's shootings and political violence. There was ... no evidence that ... Loughner was incited by Sarah Palin or anyone else, given his extreme mental illness and lack of any tangible connection to th[e] crosshair[s] map .... [O]ur editorial seems to essentially reverse the fact pattern as I understand it, making it sound like *Loughner* had the clearer connection to partisan rhetoric, when to the best of my knowledge he had none."  Mr. Douthat wrote about and followed the Loughner shooting closely and knew the press jumped to conclusions about a political connection and that subsequent reporting revealed that extreme mental illness was the only cause and that Loughner had left-wing political associations.

Mr. Douthat was not the only one who criticized the Editorial.  Reader comments and emails, social media posts, and reports and press inquiries ensued.  After the public backlash, The Times revised the challenged Passages and issued two corrections.  The first correction was published on June 15, along with revisions to the challenged statements, and read: "An earlier version of this editorial incorrectly stated that a link existed between political incitement and the

2011 shooting of Representative Gabby Giffords. In fact, no such link was established." The second correction, released the next day, clarified that the map had overlaid crosshairs on Democratic congressional districts, not photos of the representatives themselves.

However, the edits to the Editorial did not remove the entirely unnecessary reference in the piece to Gov. Palin, even though there was no established connection between "political incitement" and Loughner's crime or Hodgkinson's shooting. Ms. Cohn confirmed that the International Edition of the Editorial, which was trimmed to remove any reference to Governor Palin, adequately conveyed the points the Board wanted to make in the piece. Even after being revised, the Editorial still suggests that a link exists or might still be established, which led Mr. Bennet's own colleagues to question why Gov. Palin was still being mentioned at all. Given that Mr. Bennet's entire thesis in re-writing the Palin Article was supposedly the "sickening pattern" of politically incited violence that did not exist, the entire Editorial (or at least all references to Governor Palin) should have been retracted—not minimally and inadequately corrected.

### Of and Concerning

The defamatory Passages of the Editorial are reasonably understood as referring to Gov. Palin. The map referenced in the defamatory passages was "circulated" by "Sarah Palin's political action committee," SarahPAC, formed in 2009 for Gov. Palin to promote candidates she supported and build an organization to support her future political plans. She was the eponymous figurehead of her PAC, and its publications and related materials prominently featured images of Gov. Palin and her signature. The Editorial refers to Gov. Palin specifically by her full name in the context of the challenged statements. Public reaction to the Editorial after it was published, including reader comments and emails, social media posts, and reports and press inquiries by members of the media, also demonstrate the defamatory passages are "of and concerning" Gov. Palin.

The Times witnesses confirmed that the Editorial references and is about Governor Palin. Hannah Ingber, who worked on with Mr. Bennet on the Tweets about the correction, even referred to the Editorial as the "Sarah Palin editorial."  In emails on the night of June 14, 2017 and the morning of June 15, 2017, Mr. Douthat repeatedly recognized Gov. Palin as the subject of the defamatory passages in the Editorial, including when he told Bennet that "[t]here was not, and continues to be so far as I can tell, no evidence that Jared Lee Loughner was incited by Sarah Palin or anyone else…"

## Defamatory Per Se

"The challenged statements here are unambiguous and facially defamatory because they claimed there was a 'direct' and 'clear' 'link' between the crosshairs map and the Loughner shooting." *Palin*, 113 F.4th at 276-277 (2d Cir. 2024).  They are "defamatory *per se*, meaning that they tended "to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of [her] in the minds of right-thinking persons, and to deprive [her] of their friendly intercourse in society."  *Id.* at 268.

Asserting that Gov. Palin "incited" Loughner's shooting subjected her to hatred, ridicule, and disgrace, charged her with committing a serious crime, and tended to injure her in her trade and profession.  When Loughner opened fire at the Congress on Your Corner event hosted by Congressperson Giffords for her constituents in Tucson, he murdered a nine-year-old girl, federal judge, and five other people, and severely wounded thirteen others, including shooting Representative Giffords in the head.  Loughner was charged with attempting to kill a Member of Congress (18 U.S.C. § 351(c)); attempting to murder a federal employee (18 U.S.C. § 1114); use of a firearm in relation to a crime of violence (18 U.S.C. § 924(c)(1)(A); murder of a federal employee (18 U.S.C. § 1114); causing a death through the use of a firearm (18 U.S.C. § 924(j)(1));

14

causing the death of participants in a federally provided activity (18 U.S.C. § 245(b)(1)(B)); and injuring participants in a federally provided activity (18 U.S.C. § 245(b)(1)(B). The "incitement" of these crimes violates 18 U.S.C. § 373.

### Falsity

The Editorial falsely states that there was a "clear" and "direct" "link" between the Loughner shooting and a map published in March 2010 by Gov. Palin's eponymous political action committee. In fact, a relationship between the crosshairs map and the Loughner shooting was never established. Rather, a well-known consensus was reached shortly after Loughner's shooting that it was not connected in any way to the map. The Times, The Atlantic (while Bennet was at its helm), Wall Street Journal, and Washington Post—all of which Bennet was "regularly reading" for his news in 2011—were among the major news outlets confirming within days of Loughner's shooting that it was not linked to incitement, Gov. Palin, or the map in any way. The Times even wrote about how the media's rush to judgment in blaming Gov. Palin for Loughner's actions should be a teaching moment—an example of how the media's bias and "storytelling habits" led them to falsely accuse Gov. Palin of inciting the shooting when it became known fairly quickly that Loughner was not motivated by anything Gov. Palin said or did.

Mr. Bennet and others concede that the challenged passages about Gov. Palin in the Editorial are false statements of fact, including in their correction and Tweets about it:

*Correction: June 15, 2017*
*An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established.*



The use of a correction as opposed to an Editor's Note in this instance also proves the challenged statements were false statements of fact.

After the Arizona shooting, law enforcement conducted a thorough investigation, during which they searched Loughner's home and seized a letter from a safe in his basement written by Giffords in 2007 (3 years before the map was created) along with other materials about his planning of the attack.  Ms. Lepping testified "[T]here was a [police] report saying that there was no direct connection between political incitement and the Loughner shooting." The Times witnesses who investigated the underlying facts surrounding Loughner's shooting also confirmed no link between Loughner and the map was established.  Ms. Cohn testified, "I know that there was no link established between the [map circulated by Sarah Palin's PAC] and the Giffords shooting."  She also testified that as soon as she arrived at work early on the morning of June 15, 2017, everyone already knew the challenged passages were false.

## Actual Malice

Defendants published the challenged Passages knowing they were false or, at minimum, in reckless disregard of their truth, purposefully avoiding information easily demonstrating the falsity of the statements.  Mr. Bennet knew there was no link, let alone a "clear" and "direct" one, between Gov. Palin and incitement of Loughner's shooting.  Mr. Bennet testified that, *"I didn't think then and don't think now that the map caused Jared Loughner to act…"*  He also had actual knowledge of falsity based on the June 14, 2017  articles he revied (outlined above), as well as the articles and

materials he read in 2011 at the time of the Loughner shooting. He rewrote the Initial Draft anyway to say that one existed – consistent with the narrative he already decided to publish.

Mr. Bennet is a very intelligent person with a good memory, a well-read journalist, and a long-time senior editor, whose job required him to be generally aware of current events. The Loughner shooting in January 2011 was "a big story" with "blaring headlines." Mr. Bennet recalled at least some details about the Loughner shooting coverage. He read articles at the time that determined that Loughner "was deranged" and "that there had been a debate ... after that shooting about ... exactly this issue, about, you know, inciting rhetoric." Soon after the Loughner Shooting, Mr. Bennet received a potential article and hyperlinked story ("How the media botched the Arizona shooting") which, like a Times article written at the same time, discussed the false narratives of incitement surrounding the Loughner shooting and explaining how journalists falsely concluded Gov. Palin incited Loughner's crimes.

At the time, Mr. Bennet was the editor-in-chief of *The Atlantic* and acknowledged that "keep[ing] up" with "the competition" by reading their articles was "really important in [his] job" at *The Atlantic* and that he "regularly read[ ]" "or at least browsed" a "long list of publications." Mr. Bennet "regularly" read The Times and "consumed" The Atlantic's website in 2011, even admitting he "must have read" some of The Atlantic's articles about Loughner and spoke with Andrew Sullivan about the shooting. If a "direct" and "clear" link had been made between Gov. Palin's map and the Loughner shooting, Mr. Bennet agreed that would have been something he would have known because the Loughner shooting was a "very big story" and political discourse and gun control were two of his hot button issues.

Mr. Bennet "was a regular reader of The Atlantic's website both because [he] was interested in it as a reader and because [he] would try to keep [his] eye on it for purposes of

commenting to our editor about what [he] liked and didn't like."  The January 10, 2011 article, "*What We Know about Jared Lee Loughner*," posted on The Atlantic's website notes, "He Was More Delusional Than Political… Jared Lee Loughner appeared to be more driven by a delusional mind than a real interest in politics, mental health experts said Sunday."  The article also references and hyperlinks The Times's January 9, 2011 article, "*Suspect's Odd Behavior Caused Growing Alarm,*" an in-depth report about Loughner's behavior and past.

The Wire, which primarily served to aggregate news articles published by other sites, was a "sister site" of The Atlantic.  Mr. Bennet was familiar with The Wire's site and was subscribed to its email list.  Mr. Bennet received daily email updates for pieces posted by The Wire on The Atlantic's website, as well as "Daily News Roundup" emails containing relevant news stories posted on The Atlantic's website.  The Wire's piece, "*Ten Days That Defined 2011*," that ran on *The Atlantic's* website recognized that it was wrong to link Gov. Palin to the Loughner Shooting:

> In a meta media sense, the bad thing to come out of this already terrible story was a round of blame hurling, with people rushing to point at Sarah Palin's infamous <u>target map</u> or Loughner's left seeming (but not really) anti-Bush sentiments.  In truth, Loughner is clinically insane and this was not really about politics at all.  That many, including us, immediately jumped to that conclusion says some pretty sorry things about the state or our political machine.

Bennet conceded at his deposition that "it's possible" he read "*Ten Days That Defined 2011.*"

Mr. Bennet also regularly read Andrew Sullivan's *The Dish* published on The Atlantic's website[2] and recalled Mr. Sullivan writing about Sarah Palin.  Mr. Sullivan live-blogged about the

---

[2] The Dish was "integrated" into The Atlantic's website –it was "digitally present[ed] as part of the Atlantic.com [and] …its audience would be credited -- as part of The Atlantic's network of sites"—and The Atlantic "took responsibility for the production, meaning, the digital production of the site… mean[ing] maintaining the links, maintaining the archive, and so forth, and at the same time had the ability to sell advertising on the business side against the content that -- and the page views that [The Dish] was producing."

Loughner shooting on The Atlantic's website and posted several other pieces about the shooting which denounced any "link" between Gov. Palin and Loughner's crime. Although he lacked editorial control over *The Daily Dish*, its articles were nonetheless published on *The Atlantic*'s website while Mr. Bennet served as *The Atlantic*'s editor-in-chief. Mr. Bennet not only "regular[ly] read[ ]" that website, both out of personal interest and for professional purposes, but specifically indicated that he was a "huge admirer" of The Daily Dish editor's "writing and thinking." In fact, Mr. Bennet was partially responsible for The Daily Dish's migration onto The Atlantic's site.

Mr. Bennet pursued his narrative and disregarded the truth for several reasons, including personal biases and agenda and "political scorekeeping." From the outset, Mr. Bennet was predetermined to use the Loughner Shooting as "political incitement" to counterbalance the fact that Hodgkinson was pro-Sanders and anti-Trump. Mr. Bennet knew that there was no established connection or link between political rhetoric or "incitement" and Loughner's shooting, let alone any "clear" and "direct" link, but still chose to use Gov. Palin as the example of "incitement" to counter-balance the Left's rhetoric leading up to Hodgkinson's attack on Republican lawmakers. As an experienced editor, Mr. Bennet knew and understood the significance of the language he used to re-write the Passages to include his preconceived narrative.

The ABC Article hyperlinked in Ms. Williamson's Initial Draft—which remained in the article following Mr. Bennet's edits—unequivocally states that "[n]o connection has been made between [the crosshairs map] and the [Loughner] shooting." Mr. Bennet had ample time to click on the hyperlink and review the ABC article, but claims he did not. He made his first change to the operative paragraph of Ms. Williamson's draft at 6:39 p.m. and had re-written that paragraph and the following one to include the defamatory statements by 6:58 p.m. As noted in the byline of the ABC Article, it would at most only have taken 4 minutes to read that entire article.

Ms. Williamson testified that, although editorial writers were "the first line of fact-checking" for the pieces they drafted, when "someone rewrote a draft" that someone else prepared, the person who did the rewrite had "primary responsibility for fact-checking the portion that they rewrote." Mr. Bennet was responsible for fact-checking the sentence containing the hyperlink to the ABC Article because, although his revisions to that sentence were minor, his revisions to the preceding sentence—where he added that "the link to political incitement was clear"—substantially changed the nature of the sentence that contained the hyperlink. Such fact-checking obligations would include clicking on and reading through articles hyperlinked in the edited portions of an editorial draft to ensure the accuracy of any changes.

Defendants have a history of bias against Gov. Palin. Mr. Bennet described her as "in over her head," "lacking sufficient preparation," and "polarizing." He also hired Andrew Sullivan because of his controversial, polarizing, style (which increased The Atlantic's traffic by 50% (1 million to 2 million unique visitors) and Mr. Sullivan regularly attacked Gov. Palin—the worst of which was "Trig-Trutherism," an ongoing campaign maintaining Governor Palin is not actually the mother of her son, Trig.

Mr. Bennet's bias also stemmed from his positions on gun control and political rhetoric—both of which are closely tied to his relationship with his brother, Sen. Michael Bennet. Mr. Bennet was "very concerned [about] the epidemic of gun violence" and gun control is "important to [him] personally. Mr. Bennet's bias runs so deep that he openly admitted never calling out the Left for employing the same type of "rhetoric," images, and terminology he attacked Gov. Palin for using. For example, he does not consider a bullseye map "targeting" Republicans posted by Democrats "incitement."

In 2010, the same year that the map was released, Mr. Bennet's brother was running for re-election as a Democratic U.S. Senator.  The map targeted the districts of two House Democrats who endorsed Senator Bennet; Palin—a Republican and known pro-gun advocate—endorsed Senator Bennet's opponent.  Mr. Bennet was involved in his brother's 2010 re-election bid, editing speeches and traveling with his brother for the last two weeks of the campaign. Two days prior to the Loughner shooting, a man threatened to shoot up Senator Bennet's offices, an incident of which James Bennet could have been aware.  The FBI placed additional security at Sen. Bennet's home and Denver office.  Mr. Bennet knew about the threats made against his brother, which were also reported by The Atlantic in an article also disclosing the family connection between Mr. Bennet and his brother.

Mr. Bennet and Sen. Bennet are outspoken advocates for gun control.  Mr. Bennet hosted a gun control forum attended by Gabby Giffords and Mark Kelly (Americans for Responsible Solutions).   Sen. Bennet was endorsed by Rep. Gabrielle Giffords' PAC, Americans for Responsible Solutions, a gun control political action committee.  Mr. Bennet and the Editorial Department regularly received emails from Giffords PAC and used its website as a resource for conducting research in support of their gun control positions.  Sen. Bennet gave a floor speech on gun control on June 15, 2016 as a filibuster after the Pulse Nightclub shooting.  Sen. Bennet's floor speech occurred the same day Mr.  Bennet's Editorial Board published an editorial about the Pulse Nightclub shooting and was also circulating drafts of a book about political rhetoric and Sarah Palin.

Mr. Bennet thus had reason to personally dislike Gov. Palin and intentionally or recklessly connected her to the Loughner shooting. Furthermore, the threat to Senator Bennet just prior to the

Loughner shooting heightened Mr. Bennet's sensitivity to stories about political shootings and made it more likely that he learned of the map controversy.

Within The Times, there was also considerable bias against Gov. Palin. Gov. Palin was seen as a convenient target for attacks against conservative policies and a subject likely to spark readership interest, as described by Charles M. Blow in his column "She Who Must Not Be Named." The Times's Public Editor, Liz Spayd, acknowledged that The Times's coverage "is in fact biased" and that "the Opinion section [] promotes the columns and editorials of its mostly liberal writers." As one example, a Times's gun control editorial Spayd mentioned ("End the Gun Epidemic in America") was published December 15, 2015 and ran on the front page of the newspaper—the first time an editorial has such placement since 1920.

Mr. Bennet's purposeful avoidance of the truth also stemmed from A.G. Sulzberger's directives for Mr. Bennet to stir controversy to drive readership and revenue. Among other things, Mr. Sulzberger lauded Mr. Bennet for his hiring of Michelle Goldberg, Brett Stephens, and Bari Weiss. Mr. Sulzberger also told Mr. Bennet to "move faster, take bigger risks, and play more aggressively outside your lanes," and that he wanted "more" of what occurred in 2017, instructing Mr. Bennet to "[a]sk for forgiveness, not permission…[because] you enjoy much more autonomy and a much bigger tolerance for risk…[which] should give you the blessing to move faster or to make changes that are more disruptive," and also told him to "play outside you lanes a bit more often."

The events leading up to the publication of the Editorial also reflect the growing bias, ill-will, and animosity toward Gov. Palin and need for "political score-keeping" that led Defendants to publish the Editorial. In January of 2016, Gov. Palin endorsed Donald Trump for President, following which The Times's Opinion pages referred to her as a "Rage Whisperer." On June 7,

2016, Sarah Palin endorsed Republican candidate Darryl Glenn in Sen. Bennet's senate re-election race in Colorado.  On June 13, 2016, after the Pulse Nightclub shooting occurred in Orlando, the Editorial Board published the editorial "*What Donald Trump Gets Wrong About Orlando*," which railed on Republicans for opposing gun control and causing "America's gun-violence epidemic."

On June 15, 2016, Times's CEO Mark Thompson emailed Mr. Bennet an extract from his book, "Enough Said," which Mr. Bennet then forwarded to Times's deputy Op-Ed editor James Dao ("The good news is that it's a book on political rhetoric").  The first chapter is devoted to Sarah Palin and rhetoric.  That same day, Sen. Bennet gave his Floor Speech on gun control as part of the Democratic filibuster.  On August 24, 2016, Rep. Giffords' Americans for Responsible Solutions PAC endorsed Sen. Bennet in his senate re-election race.  Soon after Trump was elected, on November 13, 2016, The Times published a letter to its readers pledging to "rededicate themselves to The Times 'core mission.'"  On December 17, 2016, Mr. Bennet ordered the Book, "*The Persecution of Sarah Palin: How the Media Elite Tried to Bring Down a Rising Star.*"  On February 7, 2017, Brent Staples emailed Mr. Bennet about concern and nervousness about anxiety within the Editorial Department, specifically mentioning "a right-wing propaganda tweet [from] Sarah Palin claiming The Times was desperately renting out floors because it was failing."

In May 2017, Kathy Griffin posted a photo of herself holding a bloody severed head of President Trump, which drew widespread media attention.  In early June 2017, The Times eliminated its Public Editor—a position that essentially served as a watchdog and held it to account.  As she was being ousted, Public Editor Liz Spayd noted that The Times elimination of its Public Editor position showed the paper's move away from "institutional integrity," demonstrated an unwillingness to seriously listen to criticism and doubt the impulses and wisdom of its inner sanctum, and was leading to "morph[ing] into something more partisan, spraying

ammunition at every favorite target and openly delighting in the chaos." In the days leading up to the June 14, 2017 shooting, The Times was at the center of public criticism for its sponsorship of a Shakespeare in the Park production of Julius Ceasar depicting Trump as Caesar, while other sponsors withdrew over public outcry that the play was a form of incitement.

Mr. Bennet also admittedly failed to follow The Times's heightened journalism standards and never fact-checked his re-write; even going so far as to ignore the results of Ms. Williamson's research and all the other materials his colleagues sent for him to review on June 14, 2017 (discussed above). The Times admittedly holds itself to a higher standard of care with respect to seeking and publishing the truth and to "the highest standards of journalistic ethics." The Times's journalism standards apply to the newsroom and opinion section alike.

In June 2017, The Times and Mr. Bennet were bound by The Times's Ethical Journalism Handbook of Values and Practices for the News and Editorial Departments and the Guidelines on Integrity.

> a.    Fact Checking: Writers at The Times are their own principal fact checkers and often their only ones…If deadline pressure requires skipping a check, the editors should be alerted with a flag like "desk, please verify," but ideally the writer should double back for the check after filing; usually the desk can accommodate a last-minute repair…

> b.    Corrections:  Because our voice is loud and far-reaching, The Times recognizes an ethical responsibility to correct all its factual errors, large and small…any complaint should be relayed to a responsible supervising editor and investigated quickly.  If a correction is warranted, fairness demands that it be published immediately.  In case of reasonable doubt or disagreement about the facts, we can acknowledge that a statement was "imprecise" or "incomplete" even if we are not sure it was wrong.

Mr. Bennet confirmed he and The Times followed the policies embodied in The Times Ethics Handbook and Guidelines on Integrity in June 2017. Mr. Bennet also acknowledges he is ultimately responsible for the accuracy of every editorial published by *The Times*, particularly the editorials which he authors and edits.

The Editorial was not "hot news" and The Times had other editorials on deck to run instead of the Editorial. The Hodgkinson shooting was already being covered by The Times newsroom. Ms. Cohn testified the "goal" was to get it in the next day's print paper but there were already at least two or three other editorials scheduled to run the next day that could have been run instead. The Editorial could have waited until the following day.

The edits to the Editorial did not remove the entirely unnecessary reference in the piece to Gov. Palin, even though there was no established connection between "political incitement" and Loughner's crime or Hodgkinson's shooting. Ms. Cohn confirmed that the International Edition of the Editorial, which was trimmed to remove any reference to Gov. Palin, adequately conveyed the points the Board wanted to make in the piece. Even after being revised, the Editorial still suggests that a link exists or might still be established, which led Mr. Bennet's own colleagues to question why Gov. Palin was still being mentioned at all. Given that Mr. Bennet's entire thesis in re-writing the Palin Article was supposedly the "sickening pattern" of politically incited violence that did not exist, the entire Editorial (or at least all references to Gov. Palin) was knowingly false.

Even after the second correction, Mr. Bennet refused to recede from his preconceived narrative, despite Mr. Wegman pointing out that keeping any reference to Palin in the Editorial was still trying to "sneaking the link in." Instead, Mr. Bennet reaffirmed his allegiance to his narrative in a statement provided to and published by CNN, in which he said:

> While it is always ***agonizing*** to get something wrong we appreciate
> it when our readers call us out like this. We made an ***error of fact***

in the editorial and we've corrected it. ***But that error doesn't
undercut or weaken the argument of the piece.***

Even after Mr. Bennet's false narrative was identified by his colleagues and members of the press,

he and The Times steadfastly refused to meaningfully correct the Editorial or apologize to

Governor Palin. Defendants' half-hearted corrections were due to public backlash and

embarrassment and did not adequately address the libelous statements they published about Gov.

Palin.

## Damages

Gov. Palin's compensatory damages caused by the Editorial include impairment of

reputation and standing in the community, personal humiliation and mental anguish and

suffering—are presumed. *Palin*, 113 F.4[th] at 268; *Wachs*, 569 F.Supp. at1443-1444; *Paravas*,

2022 WL 718842 at *7; *Caroll*, 731 F.Supp.3d at 629-630. These types of damages do not lend

themselves to precise calculation and will be determined by the jury based on what is fair and just.

*See* N.Y. Pattern Jury Inst. – Civil § 3.29; *Maleski v. Long Island Railroad Co.*, 499 F.2d 1169 (2d

Cir. 1974). Generally, compensatory damages for defamation are based on the extent of circulation

and weight of the publication. *Paravas*, 2022 WL 718842 at *7; *Goodrow v. New York Times Co*.,

271 N.Y.S. 855, 241 A.D. 190, 195 (1934).

The Editorial Board represents the "loud and far-reaching voice" of The Times. The Times

is regarded as the "Paper of  Record," which reflects the considerable weight and influence

attributed to its "voice." The Times actively promotes content in several ways, such as on its social

media accounts (i.e. Facebook and Twitter), homepage, through news alerts and newsletters, and

similar strategies. The defamatory statements were made within the context of The Times's pledge

to rededicate itself to accurate reporting and publishing "the complete, unvarnished truth as best

we can learn it." The Editorial was published in the midst of The Times's "Truth" advertising

campaign, which debuted at the Academy Awards and Mr. Bennet promoted on his Twitter account.  The Times used its commitment to publishing the "Truth" to convince the public about the accuracy of the facts it published and to buy subscriptions: ("Support fact-based journalism" by subscribing to The Times because "Truth. It has no alternative… it comes at a cost… [and]… It's hard to find. But easier with 1,000+ journalists looking.")  The Times prominently featured its "The Truth is more important now than ever" ads on billboards in Manhattan and online.

Plaintiff also seeks recovery of her attorneys' fees and recoverable costs because she had to file this action to vindicate her rights and establish the truth.  *Metropolitan Opera*, 2005 WL 1712241, at *5-7.  As discussed above, the edits to the Editorial did not remove the entirely unnecessary reference in the piece to Gov. Palin. Even after being revised, the Editorial still suggests that a link exists or might still be established.  Mr. Bennet also reaffirmed the false narrative in a statement provided to and published by CNN, in which he said: "While it is always ***agonizing*** to get something wrong we appreciate it when our readers call us out like this.  We made an ***error of fact*** in the editorial and we've corrected it.  ***But that error doesn't undercut or weaken the argument of the piece.***"  Mr. Bennet and The Times steadfastly refused to meaningfully correct the Editorial or apologize to Governor Palin.  Defendants' half-hearted corrections were due to public backlash and embarrassment, and did not adequately address the libelous statements they published about Gov. Palin.

Gov. Palin is also entitled to recover punitive damages from Defendants because they defamed her with deliberate intent to injure, out of hatred, ill will or spite, or with willful, wanton or reckless disregard of her rights.  *Celle v. Filipino Reporter Entreprises Inc*., 209 F.3d 163, 184 (2d Cir. 2000); *Caroll*, 731 F.Supp.3d at 630; *Wachs*, 569 F.Supp. at 1444.

**The Map**

The map circulated by Sarah Palin's political action committee was created by an Internet consultant and staffer using symbols "pulled from Google mapping tools" to depict 20 congressional districts "that went for McCain-Palin but were represented by Democratic members."

Defendants' contentions about the "Don't retreat. Reload" tweet are irrelevant because (1) Bennet testified he was not even aware of this Tweet; (2) Bennet testified he was not aware of Governor Palin's use of this phrase when he wrote and published the defamatory the Editorial; and (3) Bennet testified he did not consider metaphors such as this used in politics to be "incitement." [Bennet Depo 98:19-99:13, 102:11-23]  Without waiving Plaintiff's objections to this evidence, Plaintiff also disputes Defendants' interpretation of the Tweet.  The expression "Don't retreat. Reload" is "an old saying of [Gov. Palin's] dad's…a retired teacher and coach…that's where he would go with motivation…" and was never meant as an allusion to a gun, "Not at all.  'Don't retreat, reload,' means don't back down, don't let them tell you to sit down and shut up just because they have the power of the pen or whatever they—whatever they want to use to make you stop what you're doing if what you're doing is right.  Don't let them.  Don't retreat."

Defendants' contentions about another Tweet involving a "bullseye" are also irrelevant, and similarly misconstrue the facts.  The Tweet does not characterize the map as placing a "bullseye" on lawmakers.  Rather, Governor Palin testified she put the word "bullseye" *in quotes* because she used it "facetiously or, like, that's what they say, that's what they call it.  But it wasn't hey, these are bullseyes, somebody go out and get an individual…I always put quotation marks around it to say this what somebody else says."

Defendants' contentions concerning attacks supposedly occurring after the map was circulated are also wrong and irrelevant.  Rep. Giffords' office was vandalized early (2:40 a.m.)

on the morning on March 22, 2010—**before** the map was posted on March 23, 2020.  ["*Rep. Giffords' Tucson office vandalized after health care vote*" Arizona Daily Star, Mar. 22, 2010 ("The front door was smashed out at Congresswoman Gabrielle Giffords' congressional office last night."); March 23, 2010 10:18 a.m. "Don't Get Demoralized!  Get Organized!  Take Back the 20!" Tweet); "Vandalism reported at offices of three Democrats [including Giffords]", CNN, Mar. 22, 2010 (discussing vandalism before map posted); "Vandals Attack Dem Offices Nationwide," Talking Points Memo, Mar. 23, 2010 9:00 a.m. (compiling list of vandalism occurring **before** map was posted)].

Other vandalism during that time period was directed at Representatives not identified on the map (*i.e.,* Rep. Carnahan (Missouri); Rep. Louise Slaughter (New York); Democratic Party offices (Wichita, Cincinnati, Rochester); Rep. Bart Stupak (Michigan)), and appear to have been inspired by Alabama blogger, Mike Vanderboegh, a "longtime leader and propagandist in the antigovernment 'Patriot' movement specializing in fiery rhetoric" who encouraged his followers to "Break [Democrats'] windows."  In January 2011, *Mother Jones* reported that "Giffords Office Was Vandalized by Followers of Former Militia Leader [Vanderboegh]."

The "controversy" Defendants contend surrounded the map after the Loughner shooting was quickly resolved, long-before June 14, 2017.  As Ross Douthat explained to Bennet on the night of June 14, 2017, "people assumed a link initially—there was a Paul K[rugman] column that was particularly vivid in blaming Republicans—but the investigation debunked it..  Speculation may have occurred in the days immediately after Loughner's shooting, but a consensus was quickly reached that Loughner's shooting was not incited by Governor Palin or linked to the map. The Times, The Atlantic (while Bennet was at its helm), Wall Street Journal, and Washington Post—all of which Bennet was "regularly reading" for his news in 2011—were among the major

news outlets confirming within days of Loughner's shooting that it was not linked to or incited by Gov. Palin or the map.

## Defamatory Meaning

Defendants assert that "Bennet did not intend to convey that the Crosshairs Map directly caused Loughner to commit the Arizona Shotting," and that "some readers had understood [the Editorial] as making the unintended assertion that the Crosshairs Map was a direct cause of the Arizona Shooting."  Plaintiff objects to any argument or evidence about the supposed meaning of the defamatory Passages, any argument or evidence concerning what Mr. Bennet supposedly intended to convey, and any argument or evidence about what readers supposedly understood. The Second Circuit has already determined that: "The challenged statements here are unambiguous and facially defamatory because they claimed there was a 'direct' and 'clear' 'link' between the crosshairs map and the Loughner shooting. Thus, this is an 'ordinary' defamation case in which the intent to defame can be established by showing 'that the defendants knew their statement was false,' not a case in which the challenged statement was susceptible to both 'defamatory and nondefamatory meanings.'" *Palin*, 113 F.4th at 276-277.  This holding is law of the case and must be followed.  *Uccio*, 940 F.2d at 757 *Tenzer*, 213 F.3d at 40.

## Revised Editorial

Defendants maintain that Plaintiff "suggests – for the first time in this case – that the revised version of the Editorial is defamatory" and is trying to "change her claim."  Not true.  Plaintiff maintains – as she has throughout this case – that Defendants never published a full, fair or meaningful retraction or correction of the Editorial and failed to sufficiently correct the falsehoods they published about Plaintiff.  *See* e.g. First Amended Complaint [Doc. 70] at ¶¶ 12, 133-150, 188.

## Evidence of Actual Malice

Defendants incorrectly maintain that "there is a complete absence of evidence of actual malice" and that Plaintiff "seeks to make this case about anything but the Editorial." The Second Circuit disagreed. *Palin*, 113 F.4th at 263-268, 271-276; *Uccio*, 940 F.2d at 757 *Tenzer*, 213 F.3d at 40. Even absent evidence excluded at the 2022 trial, "taking the evidence as a whole, we conclude that there is a 'legally sufficient evidentiary basis' for a reasonable jury to find for the non-movant plaintiff on the question of actual malice, which means that the question must be left to a jury." *Palin*, 113 F.4th at 268. Plaintiff seeks to introduce relevant evidence, of actual malice, some of which is "inferential and circumstantial;" which "can satisfy the 'affirmative evidence' requirement set forth in *Anderson*." *Palin*, 113 F.4th at 262-265. Such evidence should be admitted consistent with the requirements and standards established by the Second Circuit in Palin. *Palin*, 113 F.4th at 263-268, 271-276.

### B.    Defendants' Contentions as to Disputed Facts

Many of Plaintiff's above contentions as to disputed facts are inaccurate or inflammatory, and some contain assertions that are unfounded, irrelevant, and unduly and unfairly prejudicial and for that reason, are the subject of Defendants' motions *in limine*. The following are facts that Defendants assert and will establish at trial and that Defendants understand Plaintiff disputes:

### 1.    The Crosshairs Map

While Governor Palin has denied that the crosshair symbol on the Crosshairs Map represented a gun sight, she described it shortly after publication as a "bull's eye" and, in the same period, "issued her now oft repeated rallying cry" to opponents of so-called "Obamacare": "Don't retreat. RELOAD."

Around the time of publication of the Crosshairs Map, violent attacks on the offices of several Representatives whose districts it identified, including Giffords' office, led to a substantial national debate about the potential of such inflammatory rhetoric to lead to violent action. At the time, Giffords said on national television "when people do that, they've got to realize there are consequences to that action." After the Arizona Shooting, there soon followed a renewed public controversy about the Crosshairs Map and whether it contributed to Loughner's attack on Giffords.

### 2.    The Drafting Process Focused on the Arizona Shooting, Not Gov. Palin

At around 10:45 a.m. on June 14, 2017, hours after the Virginia Shooting, Elizabeth Williamson, a writer for The Times's Editorial Board who was based in the District of Columbia, asked her New York-based colleagues via email whether the Board intended to write about the shooting. Williamson, Semple, and Cohn discussed by email whether the proposed piece should focus on the horror of the shooting itself or the Board's long-held position in favor of sensible gun control regulation. During that email exchange, Cohn observed, "thinking back to what a giant story [G]abby Gifford[s'] shooting was. Amazing that shooting congressmen doesn't seem so shocking now."

### (a)    Research

Around noon, Semple decided that the Board should write a piece on the shooting, and Williamson began researching and drafting. Initially, Williamson researched breaking news relating to the Virginia Shooting to "keep [herself] apprised of what authorities knew." She also familiarized herself with the Arizona Shooting, which had occurred years earlier. Semple, who suggested focusing on gun control measures, asked an Editorial Assistant, Phoebe Lett, to send several "basic gun control pieces" to Williamson. Lett circulated four past editorials relating to

gun policy, which incidentally referenced the Arizona Shooting and other notable shootings that had prompted policy debates.[3]

After Semple decided the Board should write a piece on the issue, Bennet weighed in, suggesting in an email that there might also be "a point to be made about the rhetoric of demonization and whether it incites people to this kind of violence." He asked Williamson to be mindful of whether such rhetoric came from both sides of the political spectrum. He also wanted to know whether there was "some evidence of a piece of incitement ... that was directed at the ball players, the Congressmen who were playing ball that day." Bennet did not, prior to publication of the Editorial, ask Williamson or anyone else to research the Arizona Shooting and/or determine Loughner's motivations, including whether he had been motivated by politics generally, or the Crosshairs Map specifically. Nor did he direct Williamson to discuss the Crosshairs Map published by SarahPAC in 2010.

Plaintiff repeatedly asserts or implies in this filing (as she has on several other occasions) that, *prior* to publishing the Editorial, Bennet instructed Williamson to research "whether there was a link between the Palin map and Loughner shooting . . . ." and to research whether Loughner acted because of political incitement. This is inaccurate. Bennet only asked Williamson (and Eileen Lepping) to research whether there was any proof that the map had caused the Arizona shooting the morning *after* publication and after Opinion Columnist Ross Douthat had shared his concerns with Mr. Bennet about the Editorial. *See* DX-46. Accordingly, Plaintiff's argument that actual malice is demonstrated by the fact that Bennet purportedly

---

[3] Much of the research focused on prior editorials by The Times, rather than its news reports or other news organizations' publications because, as Bennet testified, he assumed that the Board "had talked about the political climate and I wanted to harmonize whatever we were saying now with the position the board had taken" previously.

ignored Williamson's research when he revised her draft of the Editorial on June 14 is not only

baseless—it is contradicted by the evidence.

**(b)    Initial Draft**

Williamson submitted her draft to her New York-based colleagues via The Times's

document management system around 4:45 p.m. the day of the Virginia Shooting.  In her draft,

Williamson sought to deliver a message about the dangers of an abundance of guns and the risk

that inflammatory political rhetoric could increase the likelihood that someone would commit a

violent act.  As it relates to the language at issue in this case, Williamson's draft contained the

following passage:

> Just as in 2011, when Jared Lee Loughner opened fire in a supermarket
> parking lot, grievously wounding Representative Gabby Giffords and killing
> six people, including a nine year-old girl, Mr. Hodgkinson's rage was nurtured
> in a vile political climate.  Then, it was the pro-gun right being criticized: in
> the weeks before the shooting[,] Sarah Palin's political action committee
> circulated[4] a map of targeted electoral districts that put Ms. Giffords and 19
> other Democrats under stylized crosshairs.

Williamson drafted the sentence including the reference to "Sarah Palin's political action

committee."

Cohn reviewed the draft and "wasn't sure if the piece worked," in part because she found

it unclear whether the piece was focused on gun control or "about the political climate and the

sort of lack of civility in America's political discourse."  She added questions to the draft and

suggested that Bennet review the draft.

Bennet agreed with Cohn that the draft needed revisions.  He thought that the top of that

draft "read like the kind of piece that the news side was going to do" and he wanted to "capture

---

[4] Williamson inserted at the word "circulated" a hyperlink to a package of on-line news reports
published by ABC.  The linked report, published in January 2011 shortly after the Arizona
shooting, is titled "Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate."

the shock and wrongness" of the attack on members of Congress playing baseball. As the

Editorial related to breaking news and the deadline for publication in the next morning's print

edition was less than three hours away, he began editing it himself. Bennet made substantial

changes to sections of the Editorial with which Governor Palin does not take issue, and he also

edited the above-quoted paragraph from Williamson's draft and added a further paragraph, as

follows:

> Was this attack evidence of how vicious American politics has become?
> Probably. In 2011, when Jared Lee Loughner opened fire in a supermarket
> parking lot, grievously wounding Representative Gabby Giffords and killing six
> people, including a 9-year-old girl, the link to political incitement was clear.
> Before the shooting, Sarah Palin's political action committee circulated a map of
> targeted electoral districts that put Ms. Giffords and 19 other Democrats under
> stylized cross hairs.
>
> Conservatives and right-wing media were quick on Wednesday to demand
> forceful condemnation of hate speech and crimes by anti-Trump liberals.
> They're right. Though there's no sign of incitement as direct as in the Giffords
> attack, liberals should of course hold themselves to the same standard of
> decency that they ask of the right.

Bennet did not intend to convey that the Crosshairs Map directly caused Loughner to

commit the Arizona Shooting. Instead, Bennet used the word "incitement" in a broad sense,

referring to communications that "contributed to intensifying and raising the temperature of the

political debate," – that is "very, very, strong language that describes the person on the other side

of the debate as an enemy."[5]  And with respect to his use of the words "link" and "direct,"

---

[5] Plaintiff repeatedly asserts in this filing that Bennet testified that "the term [incitement] was
used to mean 'deliberate orders, invocations, summonses for people to carry out violent attacks,'
and understood as meaning 'a call to violence.'" Plaintiff's assertion is based on a misleading
edit of Bennet's testimony to remove the parts she does not like. Bennet's full relevant
testimony, from the Court's hearing on August 16, 2017, is as follows: "I was thinking about --
the way I view that particular word from is in my experience in one of my roles at the time that I
was a correspondent in Jerusalem at one point for The Times, and the word 'incitement' is used
there by the Israelis -- in my time by the Israelis about the Palestinians but also, to some degree,
by the Palestinians about the Israelis to talk about *a range of communications* from, you know, to
deliberate orders, invocations, summonses for people to carry out violent attacks to textbooks

Bennet was referring to the fact that, prior to the Arizona Shooting, the Crosshairs Map, had included Giffords' name and superimposed rifle crosshairs over her congressional district. Bennet was referring to a link between an example of inflammatory rhetoric and a victim of the shooting, not suggesting a causal link between such rhetoric and the shooter.

After Bennet completed his editing, Editorial Board members Cohn, Williamson, Wegman, Fox, and Lepping all reviewed this draft. Meanwhile, Cohn and another colleague worked on fact-checking the draft, including the specific details of Virginia gun laws cited in the draft, because Cohn knew from her experience that such laws were "ornate and detailed and different in all the states."

Plaintiff has suggested that Cohn knew the Editorial was making a false assertion because Cohn purportedly testified that incitement means, "that it—that the map led him to commit the shooting." Plaintiff baldly misrepresents Cohn's testimony regarding the meaning of incitement. The full exchange accurately reflects Cohn's testimony, in which she *rejects* the interpretation offered by Plaintiff's counsel:

> Q:    And when you said "incited violence" in this bolded section that we've been looking at, at this time on June 14 of 2017, at 5:03 p.m., did you believe that the map that Sarah Palin's political action committee had circulated had incited Jared Loughner to commit his shooting in 2011?
>
> A:    I -- no.  I -- not that directly.  I would think of it more as -- the way *you phrased it* sounds very direct, that it -- that the map led him to commit the shooting.  I -- no, I did not see that.  I saw it as, as one example of the kind of heated political rhetoric against which all these sorts of violent activities were happening.  That it was part of a backdrop of how the conversation in this country was becoming heated and often used violent imagery (emphasis added).

---

that are published that align important facts from the other side's national narrative or history, to tell outright lies about that history to maps that misrepresent the politics of the region.  And that's specifically where I was drawing that word from." (emphasis added).

### 3.    Defendants' Response to Criticism of the Editorial Demonstrates a Lack of Actual Malice

The Times published the Editorial online at approximately 9:45 p.m.  Shortly thereafter, Ross Douthat, an opinion columnist for The Times, brought to Bennet's attention by email around 10:00 p.m. that evening questions about what he understood the Editorial to be suggesting.  Douthat explained that he understood that there was "no evidence that Jared Lee Loughner was incited by Sarah Palin or anyone else, given his extreme mental illness and lack of any tangible connection to that crosshair map."  Bennet responded by email a few minutes later:

> Thanks, and I'll look into this tomorrow. But my understanding [is] that in the Giffords case there was a gun sight superimposed over her district; so far in this case we don't know of any direct threat against any of the congressman on the field.  That's not to say that any of it is ok, obviously, or that the violence in either case was caused by the political rhetoric.  But the incitement in this case seems, so far, to be less specific.

Douthat in turn replied by email the next day, explaining his concern about the Editorial as he had understood it:

> The targets were used by Palin, or her group, in a map of seats targeted for pickup in the midterms.  You can argue about whether that crosses a line … but the point is that the map had no link, none at all, to Giffords' actual murder.  People assumed a link initially … but the investigation debunked it.  I think Loughner was instigated by a non-answer she'd given him at a town hall about one of his theories of grammar, or his obsession with lucid dreaming, or something.  His act had nothing to do with the political climate, so far as anyone can tell.  Whereas the Alexandria shooter seems to have had an explicit political motivation.  So saying that Giffords was a case of incitement and this one isn't reads like we're downplaying that motive or implying that Loughner had right-wing motivations that he simply didn't have.

The testimonial and documentary evidence demonstrates without dispute that no one involved in the preparation of the Editorial had intended to convey the proposition inferred by Douthat (and apparently others).

In response to Douthat's late-night email, Bennet immediately texted Williamson to see if she was available to begin investigating and, early the next morning, Bennet emailed Williamson

and Lepping to request their help.  Bennet, who had not intended to suggest a causal link and

therefore had not considered that possibility, explained in writing to his colleagues that morning

that he was *unsure* whether a direct connection between Loughner and the Crosshairs Map had

been proven or disproven and asked that they "get to the bottom of this as quickly as possible."

Until Bennet reached out to them on the morning of June 15, 2017, Williamson and Cohn

were unaware that the Editorial was being criticized for asserting that Loughner acted because of

the Crosshairs Map.  Neither had intended for the Editorial to make that assertion.  Both Lepping

and Williamson promptly began looking into this question.  Ultimately, they determined that

multiple news outlets, including The Times, had reported that Loughner was mentally unstable

but that it had never been affirmatively proven or disproven whether Loughner was familiar with

or inspired by the Crosshairs Map.

### 4.    The Times Promptly Corrects the Editorial Less than 14 Hours after Publication

The Times promptly revised the online version of the Editorial to remove the words that

some readers had understood as making the unintended assertion that the Crosshairs Map was a

direct cause of the Arizona Shooting.  The Times also issued a correction, which it later updated

to make clear that, on the Crosshairs Map, the crosshair symbol appeared over Giffords' district,

not over her name or image.  Additionally, at Bennet's suggestion, The Times's Opinion

Department published a tweet stating: "We got an important fact wrong, incorrectly linking

political incitement and the 2011 shooting of Giffords.  No link was ever established.  We're

sorry about this and we appreciate that our readers called us on the mistake."

In this filing, Governor Palin suggests – for the first time in this case – that the revised

version of the Editorial is defamatory.  This argument is improper.  Throughout this case, Gov.

Palin has consistently argued that her defamation claim is based on the Editorial as originally

published.  *See* First Am. Compl. (Dkt. 70) at ¶¶ 1, 207-08 (alleging a defamation claim based on statements in the "Palin Article," defined as the June 14, 2017 online version of the Editorial); *see also* Feb. 11, 2022 Tr. at 1212:18-1213:24 (court reads the jury the "challenged statements" from the original Editorial and instructs that these two statements are the bases of Plaintiff's defamation claim).

It is far too late for Gov. Palin to change her claim to be based additionally or alternatively on the entirely different statements in the corrected Editorial.  *See Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986) (defamation complaints must "afford [the] defendant sufficient notice of the communications complained of to enable him to defend himself") (quoting *Liguori v. Alexander*, 495 F. Supp. 641, 647 (S.D.N.Y. 1980)); *see also Herbert v. Lando*, 603 F. Supp. 983, 991 (S.D.N.Y. 1985) (rejecting plaintiff's request to expand his defamation claim to cover additional statements not identified in the complaint or in summary judgment briefing).

The revised Editorial changed the challenged portions as follows:

Was this attack evidence of how vicious American politics has become? Probably.  In 2011, Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl.  At the time, we and others were sharply critical of the heated political rhetoric on the right.  Before the shooting, Sarah Palin's political action committee circulated a map that showed the targeted electoral districts of Ms. Giffords and 19 other Democrats under stylized cross hairs. But in that case no connection to the shooting was ever established.

The revised Editorial does not include the challenged statements to which Governor Palin objects, nor does it carry the allegedly defamatory meaning that Governor Palin attributes to the original.  Indeed, the revised Editorial expressly states, "But in that case no connection to the shooting was ever established."  It therefore cannot serve as a basis for Governor Palin's

defamation claim, and the Court should not permit Governor Palin to change her legal theory at the eleventh hour.

### 5.    Given the Absence of Actual Malice, Plaintiff Seeks to Make this Case About Anything but the Editorial

From the facts surrounding the drafting of the Editorial to the responsive correction and revision there is a complete absence of evidence of actual malice.  Recognizing this fatal deficiency, Plaintiff seeks to make this case about anything but the Editorial.  To that end, and as Plaintiff's summary above demonstrates, Plaintiff seeks to introduce irrelevant and unduly prejudicial evidence about the following distractions:

- Kathy Griffin's Photo of a beheaded Donald Trump

- A rendition of Julius Caesar in Central Park

- Sen. Tom Cotton's 2020 Op-Ed regarding the protests following George Floyd's murder

- The fact that in 2014, Bennet attended a forum at which Congresswoman Giffords and her husband were interviewed (by someone other than Bennet)

- The 2016 Pulse Nightclub shooting in Orlando, Florida

- Sen. Bennet's Senate floor speech about the Pulse Nightclub shooting

- Louise Mensch's 2017 Op-Ed about Russian hacking

- Threats made against Sen. Michael Bennet that have no connection to this case

- The Times decision to revamp the "Public Editor" position and the question of whether the Reader Center was an adequate replacement

- Sen. Michael Bennet's 2016 Presidential campaign

- A 2016 book written by Times CEO Mark Thompson about the language of politics that includes a chapter that discusses Gov. Palin's use of language

- Bret Stephen's 2017 column about global warming

- James and Sen. Michael Bennet's family lineage

- Erik Prince's 2017 Op-Ed about Afghanistan

- The Times's liberal bias and position on gun control

- Bennet's decisions to hire diverse (and ideologically diverse) writers for the Opinion Section, including Sarah Yeong, Quinn Norton, Bari Weiss, and Bret Stephens

- Whether President Trump was good for The Times's business

As set forth more fully in Defendant's Motion *In Limine* to Exclude Evidence of Unrelated Controversies and Associated Relief, these topics and evidence related to them are irrelevant, unfairly prejudicial, would cause confusion and delay, and should be excluded. Defendants further request that Plaintiff's counsel inform them or seek a sidebar prior to introducing or soliciting any evidence related to these topics.

Gov. Palin also seeks to introduce Andrew Sullivan's 2008 commentary and assertions about the parentage of her son Trig. She suggests that Mr. Bennet's decision to hire Mr. Sullivan – when Mr. Bennet was running an entirely different publication, *The Atlantic* – is evidence of his "bias against Gov. Palin." This Court excluded reference to these articles at the earlier trial. *See* 1.24.22 Tr. at 15:23-25; *see also* Dkt. 136 at 4-8. As the Second Circuit noted, Gov. Palin did not challenge the exclusion of this evidence on appeal. *See Palin v. N.Y. Times Co.*, 113 F.4th 245, 260 n.6 (2d Cir. 2024). Therefore, the exclusion of these articles is law of the case.

Even if it was not, these articles are irrelevant and any arguable probative value is greatly outweighed by the by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, and wasting time. *See* Fed. R. Evid. 401, 403; Dkt. 136 at 4-8. To the extent Gov. Palin argues that the mere hiring of Mr. Sullivan is evidence of Mr. Bennet's bias against her, Mr. Sullivan's writing on Trig Palin could have played no role in that decision. Mr. Bennet and the Atlantic hired Mr. Sullivan in 2007, before Gov. Palin was on the presidential ticket and

before Trig Palin was even born.  Still, Gov. Palin seeks to introduce these exhibits at this trial.

Defendants respectfully submit that, as before, the Court should exclude them from this trial for

the same reasons.

### 6.    Governor Palin Cannot Prove She was Harmed by Publication of the Editorial

There is no evidence that anyone who read the Editorial thought less of Sarah Palin.

Rather, the only admissible evidence is that Ross Douthat understood it as making the

unintended assertion that the Crosshairs Map was a direct cause of the Arizona Shooting, and

concluded that The Times had gotten it wrong.

Less than two weeks after the Virginia Shooting and the publication of the Editorial,

Governor Palin sued the Times.

Governor Palin argues above that the Second Circuit determined that the challenged

statements were defamatory.  Not so.  The language on which Gov. Palin relies comes from the

Second Circuit's analysis of whether the challenged statements were defamatory *per se* or *per

quod*, for purposes of determining the appropriate legal standard for actual malice.  *Palin v. N.Y.

Times Co.*, 113 F.4th 245, 276-77 (2d Cir. 2024).  The Second Circuit opinion makes clear that

"[n]o statement in this opinion should be understood as resolving issues of fact."  *Id.* at 255.

Thus, the Second Circuit did not resolve the factual issue of how an ordinary reader would

actually interpret the statements in the Editorial, and this remains an issue for the jury to

determine.  *See Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 178 (2d Cir. 2000) ("If the

words are reasonably susceptible of multiple meanings, some of which are not defamatory, it is

then for the trier of fact, not for the court acting on the issue solely as a matter of law, to

determine in what sense the words were used and understood." (cleaned up)).

Relatedly, Governor Palin contends that the Second Circuit's decision precludes Defendants from arguing or admitting evidence about the meaning of the challenged statements, Mr. Bennet's intended meaning, and readers' interpretations of the statements.  Nothing in the Second Circuit's opinion forecloses the introduction of such evidence or argument, and indeed, Mr. Bennet's intention in editing the challenged passages and understanding of those passages at the time is directly relevant to the question of actual malice.  If Gov. Palin intended to preclude Defendants from introduce this broad category of evidence and argument, she should have filed a motion *in limine* to exclude it.  She did not do so.

Governor Palin has not asserted that she suffered any particular financial or economic harm from publication of the Editorial.  She has instead affirmatively stated and stipulated that she is not seeking to recover any such damages.  Governor Palin also seeks compensation for alleged emotional harm.  However, Governor Palin will not introduce any evidence, other than her own self-serving and uncorroborated testimony, supporting her claim of alleged emotional harm.

She asserts generally that her reputation was harmed, but Governor Palin concedes that, since publication of the Editorial, she has not hired a public relations firm or any similar service to help repair the purported damage to her reputation.  Substantial evidence will show that any evidence of reputational harm is far-fetched because by the time of publication of the Editorial, Gov. Palin already was viewed as a controversial figure with a complicated history and reputation, and in the time since the Editorial was published, Gov. Palin has prospered.  Indeed, in 2022, Governor Palin ran for Congress in Alaska, garnering 48.5 percent of the votes (in a ranked choice voting system).

## V.   RELIEF SOUGHT BY PLAINTIFF

### A.   Plaintiff's Contentions[6]

Plaintiff seeks to recover damages for reputational harm, humiliation, embarrassment, and mental anguish. These damages are presumed, do not lend themselves to precise calculation, and will be determined by the jury based on what is fair and just. *See* N.Y. Pattern Jury Inst. – Civil § 3.29; *Palin*, 113 F.4th at 268; *Wachs*, 569 F.Supp. at 1443-1444; *Paravas*, 2022 WL 718842 at *7; *Caroll*, 731 F.Supp.3d at 629-630; *Maleski v. Long Island Railroad Co.*, 499 F.2d 1169 (2d Cir. 1974); *Rinaldi v. Winston, Inc.*, 42 N.Y.2d 369, 379 (1977); *Carey v. Piphus*, 435 U.S. 247, 262-263 (1978); *Stem v. Cosby*, 645 F.Supp.2d 258, 289 (S.D.N.Y. 2009); *Metropolitan Opera Ass'n. v. Local 100*, 2005 WL 1712241, at *4 (S.D.N.Y. Jul. 19, 2005). Generally, compensatory damages for defamation are based on the extent of circulation and weight of the publication. *Paravas*, 2022 WL 718842 at *7; *Goodrow v. New York Times Co.*, 271 N.Y.S. 855, 241 A.D. 190, 195 (1934). Plaintiff also seeks recovery of her attorneys' fees and recoverable costs because Defendants failed to meaningfully correct the Editorial and have never admitted liability for defaming Gov. Palin—including continuing to contest falsity—which caused Gov. Palin to have to bring and prosecute this lawsuit. *Metropolitan Opera*, 2005 WL 1712241, at *5-7.

Plaintiff also seeks to recover punitive damages, the amount of which has not been determined and also falls within the jury's discretion. N.Y. Pattern Jury Instr. – Civil § 3.30; *Caroll*, 731 F.Supp.3d at 629-630; *Prozeralik v. Cap Cities Commc'ns., Inc.*, 82 N.Y.2d 466, 478 (1993); *Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163 (2d Cir. 2000); *Stem v. Cosby*, 645 F.Supp.2d 258 (S.D.N.Y. 2009). Entitlement to punitive damages "requires hatred, ill will, spite,

---

[6] Defendants have not asserted any claims or counterclaims and thus do not seek relief in this action at this time.

criminal mental state or that traditional required variety of common-law malice." *DiBella v. Hopkins,* 403 F.3d 102, 122 (2d Cir. 2005); see also *Stern v. Cosby,* 645 F.Supp.2d 258, 286 (S.D.N.Y. 2009) ("To be entitled to punitive damages, a defamation plaintiff must prove that the defendant acted, toward the plaintiff, with hatred, ill will, spite, criminal mental state or that traditionally required variety of common-law malice." (citations and quotation omitted)); *Prozeralik v. Capital Cities Communications, Inc.,* 82 N.Y.2d 466, 479 (1993) (same).   As recognized by the Second Circuit in *DiBella v. Hopkins*, 403 F.3d 102, 122 (2d Cir. 2005), "[u]nder New York law, punitive damages in a defamation case are justified "to punish a person for outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's rights." (quoting *Prozeralik,* 82 N.Y.2d at 479-480 (1993)).   This District also recently rejected the proposition that a plaintiff must prove that a defendant was motivated *solely* by a desire to injure the plaintiff to recover punitive damages in a defamation case.   *Carroll v. Trump*, 731 F.Supp.3d at 630-631.   Further, the standard of proof of punitive damages cases is the preponderance of the evidence.   *Id.* at 632.

"Common law malice is established by examining all of the relevant circumstances surrounding the dispute, including any rivalries and earlier disputes between the parties so long as they are not too remote."   *Celle,* 209 F.3d at 184*;* see also *Herbet v. Lando,* 441 U.S. 153, 164 n. 12 (1979) ("any competent evidence, either direct or circumstantial, can be resorted to [to establish common law malice], and all the relevant circumstances surrounding the transaction may be shown, provided they are not too remote, including threats, prior or subsequent defamations, subsequent statements of the defendant, circumstances indicating the existence of rivalry, [and] ill will, or hostility between the parties.");  *Marcus v. Bressler,* 277 A.D.2d. 108, 716 N.Y.S.2d 395, 396 (2000) ("Acts of malice, apart from the instance of slander on which the action was brought,

were probative of whether or not plaintiff bore defendant common-law malice, which is required to justify punitive damages").

In *Celle*, the Second Circuit sustained a punitive damages award in favor of a public figure and noted that "[p]unitive damages may only be assessed under New York law if the plaintiff has established common law malice in addition to the other elements of libel." *Celle*, 209 F.3d at 190–91. Likewise, in *DiBella*, another public figure case, the court noted that "[u]nder New York law, punitive damages in a defamation case are justified 'to punish a person for outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's rights.'" *DiBella*, 403 F.3d at 122; see also *Stern,* 645 F. Supp. 2d at 272. The Court in *DiBella* explicitly noted that the New York Pattern Jury Instruction § 3:30 is in accord with the standard for punitive damages under New York law. *DiBella,* 403 F.3d at 122 ("New York Pattern Jury Instruction §3:30, under which Judge Chin charged the jury, is in accord with this standard").[7] In *Lewis v. Newsday, Inc.*, a case in which a topic of public concern was at issue, the Court found that it was error to dismiss plaintiff's punitive damages claim on summary judgment because there was sufficient evidence for a juror to conclude the articles at issue were published with constitutional malice. *Lewis v. Newsday, Inc.,* 246 A.D.2d 434, 437–38, 668 N.Y.S.2d 377, 379–80 (1998); see also *Huggins v. Moore*, 94 N.Y.2d 296, 302 (1999) ("Where the defendant is a media publisher or broadcaster and the plaintiff is neither a public official nor a public figure, but the statement involves a matter of public concern, the plaintiff still must prove constitution malice to recover presumed or punitive

---

[7] The New York Pattern Jury Instruction related to punitive damages in defamation cases, Pattern Jury Instruction 3:30, provides that "[p]unitive damages may be awarded to punish a defendant who has acted maliciously and to discourage others from doing the same." The instruction goes on to explain that a "statement is made maliciously if it is made with deliberate intent to injure or made out of hatred, ill will, or spite or made with willful, wanton or reckless disregard of another's rights."

damages."); *Rombom v. Weberman*, 2002 WL 1461890, at *9 (N.Y. Sup. Ct. June 13, 2002), *aff'd.* 309 A.D.2d 844, 766 N.Y.S.2d 88 (2003) ("Punitive damages may be asserted in a defamation action and constitutional free speech protections are not a bar, provided that 'actual malice' is proven, as it was here" (citation and quotation omitted)); *Nellis v. Miller*, 101 A.D.2d 1002, 1002, 477 N.Y.S.2d 72, 73–74 (1984) ("Punitive damages may be asserted in a defamation action and constitutional free speech protections are not a bar, provided that 'actual malice' is proven, as it was here" (internal citations omitted)).

Plaintiff's First Amended Complaint also requests the entry of a permanent injunction prohibiting Defendants from publishing the defamatory statements in the future.  Such injunctions are legally appropriate and not unconstitutional prior restraints where they are awarded after an adjudication at a trial on the merits that the challenged statements are false and defamatory. *Rombom v. Weberman*, 2002 WL 1461890, at *2 (N.Y. Sup. Ct. Jun. 13, 2002), aff'd, 309 A.D.2d 844 (Oct. 20, 2003); *Brown v. Petrolite Corp.*, 965 F.2d 38, 51 (5th Cir. 1992).

## B.      **Defendants' Contentions Regarding Limitations on Relief**

### 1.      **Gov. Palin Cannot Assert a Claim for Economic or Special Damages Nor Use Evidence of Lost Opportunities in Support of Claims for Other Damages**

Gov. Palin has stipulated in this document and the earlier Joint Pretrial Consent Order that she is not seeking to recover any alleged loss of income, job, paid opportunities, book sales, or ad revenue.  During discovery, Defendants sought information regarding Governor Palin's income, arguing that it was relevant to her claim of reputational harm.  *See, e.g.*, Def.'s First Set of Reqs. to Pl. for the Production of Docs., at Req. No. 14 ("Your federal and state income tax returns, all related schedules and attachments, and W-2, 1099, K-1 or similar forms"), Req. No. 28 ("Documents sufficient to show website traffic, advertising revenue, and donations to the

website site sarahpalin.com, for the three months prior to publication of the Editorial, and for the three months following publication of the Editorial.").  Indeed, Defendants ultimately requested that the Court compel Governor Palin to produce this and related information and materials. Governor Palin responded that her financial information was irrelevant because she was not asserting that she suffered economic harm.  Ultimately, in a February 26, 2020 ruling, the Court agreed with Governor Palin and denied Defendants' motion to compel evidence related to economic damages, including lost opportunities.

Due to Governor Palin's forfeiture of any economic damages, and the Court's ruling that she was thus not required to disclose evidence related to economic damages in discovery, Defendants have not obtained any information about Governor Palin's finances, income, or economic opportunities.  For instance, Governor Palin objected to and refused to answer Defendants' requests for admission that: (1) "you did not lose income as a result of the publication of the Editorial"; and (2) "you did not lose any job or other paid opportunities as a result of the publication of the Editorial."  Pl.'s Resps. and Objs. to Defs.'s Reqs. for Admiss., at Req. Nos. 23, 24.  Governor Palin later conceded that, "For sake of clarity, Plaintiff admits she is not seeking to recover and will not claim or assert loss of income, job or other paid opportunities, book sales, any decrease in ad revenue from sarahpalin.com or any other websites, or similar "financial" or "economic" harm as a result of the publication of the Editorial."  Pl.'s Am. Resp. and Obj. to Defs.'s Req. for Admis. No. 27.

During Defendants' deposition of Governor Palin, Defendants sought to ask questions about her claimed damages.  In response, Plaintiff's counsel refused to let her answer any such questions.  *See, e.g.*, Tr. of May 20, 2020 Dep. of S. Palin, at 103:8-20.

Despite refusing to answer discovery requests and deposition questions about economic damages, Governor Palin, in response to questions about the harm she claims to have suffered, repeatedly and vaguely referred to lost opportunities. *See, e.g.*, Tr. of May 21, 2020 Dep. of S. Palin, at 292:24-25–293:1-12.  The following exchange is one example:

> Q      . . . You say "resources, time and fiscal."  What fiscal resources have you spent repairing your reputation or correcting the defamatory statement?
>
> A      Fiscal resources in terms of not having earned income because of The New York Times' success and [sic] unfortunately defaming me.
>
> Q      So you haven't spent any money out of pocket to this point to repair your reputation or correct the defamatory statements?
>
> A      I travel and speak and work pro bono a lot.  And in these travels and speeches and events, when I have tried to correct The New York Times and media's defamation, that's, that's an economic impact.

*Id.*

Because Governor Palin and her counsel have stated she is not asserting economic damages, including lost economic opportunities, which prevented Defendants from obtaining evidence related to economic damages and lost opportunities – Plaintiff cannot assert such damages to establish reputational or any other type of injury at trial.  *See Bunstine v. Kivimaki*, 2021 N.Y. Misc. LEXIS 4942, at **11-12 (N.Y. Sup. Ct. Westchester Cnty., July 12, 2021) (granting defendant's motion to compel discovery information relating to economic damages, or alternatively precluding plaintiff from "offering evidence and/or testimony at trial on the issue of special damages").

## 2.    Gov. Palin is Only Entitled to Damages from Publication of "America's Lethal Politics"

In her Amended Complaint, Governor Palin spends significant time describing how she was allegedly defamed in *January 2011* immediately following the Arizona Shooting, *see, e.g.*, *Am. Compl.* ¶¶ 73-74, and how she was harmed by that defamation, *id.* ¶ 73.  Indeed, during her

deposition, Governor Palin was unable to disentangle the harm she claims she suffered from the publication of "America's Lethal Politics" from the harm she claims she suffered from publication of unspecified articles in 2011. *See e.g.*, Tr. of May 21, 2020 Dep. of S. Palin, at 501:20-25 – 502:1-19.

As set forth more fully in Defendants' Motion *In Limine* to Exclude Evidence Concerning Certain Articles Published by *The New York Times* in 2011, Governor Palin never filed any claims against The Times related to any of its publications from 2011 and does not allege that any columns or blog posts from that time are a basis for liability in this case.

To the extent Governor Palin is entitled to recover at all, that recovery must be limited to the harm she suffered *as a result of* the publication of "America's Lethal Politics" – separate and apart from the harm she claims to have suffered previously because of unspecified 2011 articles. *See Celle v. Filipino Reporter Enters.*, 209 F.3d 163,184 (2d Cir. 2000) (reversing jury verdict as to one of three statements and remitting damages proportionally). In other words, just as Governor Palin's damages cannot be based on *true* statements within the Editorial, they cannot be based on *separate* statements outside of the Editorial. *See* Hon. Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems*, § 10:5.3 (5th ed. 2021) ("Plainly, the causation that a plaintiff must establish is between the false and defamatory statement made with the requisite degree of fault and the injury. If truthful information in a statement causes some or all of the harm, there can be no recovery for that portion of the injury."). There plainly must be a proven nexus between the allegedly defamatory statement and the alleged damages. *Id.* Given Governor Palin's inability to distinguish between the harm allegedly caused by news published about her in 2011 and the harm allegedly caused by the statements in the 2017 Editorial, there is a substantial risk of jury confusion – and this may require clarification or instruction at trial.

### 3.    Gov. Palin Cannot Prove Entitlement to Punitive Damages

Plaintiff has provided notice of her intent to seek punitive damages.  New York law

prohibits the imposition of punitive damages in a defamation case such as this one, in which a

public figure has sued over a statement to the public on a matter of public concern.[8]  The New

York Constitution affords materially broader protection to speech on matters of public concern

than does the First Amendment.  *See, e.g.*, *600 W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d

130, 138 (1992); *Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 249 (1991).[9]  However, there

do not appear to be any reported cases in which a New York state court has awarded punitive

damages in a case like this one.  *See Mahoney v. Adirondack Publ'g Co.*, 71 N.Y.2d 31, 41

(1987) ("[W]e have no occasion to consider whether plaintiff's proof of common-law malice was

sufficient to sustain such an award or whether punitive damages are ever recoverable in libel

actions involving matters of public concern."); *Prozeralik v. Cap. Cities Commc'ns, Inc.*, 82

N.Y.2d 466, 478 (1993) (quoting *Mahoney*).

Even if punitive damages were available, to show liability Governor Palin would have to

prove, in addition to the other elements of her claim, that Defendants acted with common law

malice—a separate and distinct standard from actual malice.  *See Prozeralik*, 82 N.Y.2d at 479

("[a]ctual malice, as defined in *New York Times Co. v Sullivan* [], is insufficient by itself to

justify an award of punitive damages"); *Celle*, 209 F.3d at 184 ("Punitive damages may only be

---

[8] The Court rejected this argument at the first trial of this case.  Defendants recognize the same result is likely here but raise the argument to preserve the issue for appeal.

[9] Defendants acknowledge that some federal courts have assumed that such damages are available and that juries in two recent, related cases in the Southern District of New York awarded such damages.  *See Celle*, 209 F.3d at 172, 176, 190-91; *Stern v. Cosby*, 645 F. Supp. 2d 258, 286 (S.D.N.Y. 2009); *Carroll v. Trump*, 731 F. Supp. 3d 626, 631 (S.D.N.Y. 2024).  It does not appear, however, that the defendants in those cases raised the State Constitutional question that Defendants raise here.

assessed under New York law if the plaintiff has established common law malice in addition to the other elements of libel.").

As the Court ruled during the first trial, in order to show common law malice, Gov. Palin is required to prove that Defendants' publication of the challenged statements was solely motivated by hostility and a desire to injure the plaintiff.  *See* Feb. 10, 2022 Tr. at 1051:13-1053:4 (ruling that, under *Morsette*, common law malice requires that a defendant be "solely motivated by a desire to injure plaintiff"); *Verdi v. Dinowitz*, 204 A.D.3d 627, 627 (1st Dep't 2022); *Morsette v. The Final Call*, 309 A.D.2d 249, 253-55 (1st Dep't 2003).[10]  In this filing, Governor Palin argues for a lesser standard that does not require that ill will and hostility be the "sole" motivation, but Gov. Palin did not challenge the Court's ruling on the applicable standard on appeal.  *See generally, Palin*, 113 F.4th 245.  Thus, the standard requiring proof of sole motivation is law of the case.

Common law malice looks at the subject motivation of the speaker, in this case Mr. Bennet.  *See Morsette*, 309 A.D.2d at 255 (asking if "the speaker was *solely* motivated by a desire to injure plaintiff" and finding "the record is bereft of any evidence that the libel suffered by plaintiff was the one and only cause for the publication") (cleaned up).  The question is not about the defendant's general feelings towards the plaintiff, but rather, about his specific motivation in making the challenged statements.  *See Lieberman v. Gelstein*, 80 N.Y.2d 429, 439

---

[10] Gov. Palin cites *Carroll*, 731 F. Supp. at 631, in which Judge Kaplan held that common law malice did not require that the defendant was "solely" motivated by spite or ill will, finding that the First Department's reference to sole motivation in *Morsette* was dicta and was limited to evaluating whether a plaintiff could overcome a qualified privilege.  Since *Morsette*, however, the First Department has expressly ruled that punitive damages in a defamation case are available only where a "defendant was motivated solely by malice."  *Verdi*, 204 A.D.3d at 627 (Apr. 28, 2022) (affirming denial of request to amend and add punitive damages, where plaintiff alleged multiple motivations for defamatory statements, rather than the required sole motivation).

(1992) (in evaluating whether proof of common law malice defeated a conditional privilege, noting that "spite or ill will refers not to defendant's general feelings about plaintiff, but to the speaker's motivation for making the defamatory statements").

The evidence in this case does not support Governor Palin's requested award of punitive damages.  At the conclusion of evidence in the first trial, the Court ruled that no reasonable juror "could conclude that the alleged libelous statements in this case were motivated solely by a desire to injure plaintiff and that that animus was the one and only cause for the publication." *See* Feb. 10, 2022 Tr. at 1052:16-19.  Governor Palin will not be able to offer any new evidence that would require a different result in this case, and Defendants expect to move for judgment as a matter of law on this issue at the conclusion of evidence.

### 4.      The Jury's Determination of Punitive Damages – if Necessary – Should be Bifurcated

The Court bifurcated the initial trial of this case, separating the question whether Defendants are liable for punitive damages from the question of what amount of punitive damages to award, and Defendants submit that the same bifurcation would serve the interests of both judicial economy and fundamental fairness in this trial as well.  Plaintiff consents to this proposal.

Determination of the amount of punitive damages in this case would require the jury to consider factual and legal issues that it would not otherwise need to consider – and this prospect carries a high risk of juror confusion and prejudice to Defendants.  A separate proceeding to determine the amount of such damages if, and only if, the jury determines Defendants are liable for punitive damages, is therefore both practical and warranted, and this separate trial would only become necessary if the jury were to find in favor of Governor Palin on liability.

Federal Rule of Civil Procedure 42(b) authorizes the Court to "order a separate trial of one or more separate issues . . . [f]or convenience, to avoid prejudice, or to expedite and economize"

the proceedings.  "[B]ifurcation may be appropriate where, for example, the litigation of the first issue might eliminate the need to litigate the second issue, . . . or where one party will be prejudiced by evidence presented against another party."  *Amato v. City of Saratoga Springs*, 170 F.3d 311, 316 (2d Cir. 1999); *see also Smith v. Lightning Bolt Prods*., 861 F.2d 363, 373-74 (2d Cir. 1988) (stating "it often would be prejudicial to a defendant to attempt to litigate its financial condition during the trial on the issues of liability and compensatory damages").

Liability and damage issues are commonly bifurcated, and it is particularly appropriate to do so in cases raising First Amendment issues, where potential confusion or prejudice can take on constitutional dimensions.  *See, e.g.*, *Guccione v. Hustler Magazine,* 800 F.2d 298, 300 (2d Cir. 1986) (liability and damages bifurcated in libel action).

Here, factually, assessing punitive damages may require introduction of evidence and testimony with no bearing on issues of liability, includinig the testimony of witnesses who would not otherwise testify.  The admission of evidence that is not otherwise relevant at trial, coupled with the addition of a distinct legal standard, would create a high risk of jury confusion and of prejudice to Defendants.  Further, as noted above, if the jury finds in favor of Defendants on liability or if the Court finds that Governor Palin has not introduced evidence sufficient to create a jury question on the issue, as it did in the earlier trial, the jury will not need to reach the issue of punitive damages at all.  Therefore, bifurcation of the trial, so that a determination of the proper amount of punitive damages is *only* addressed by the parties and the jury if Governor Palin is able to prove liability and common law malice, would preserve the time and resources of the Court, the parties, and the jury.

### 5. New York Law Does not Provide for an Award of Attorney's Fees to a Plaintiff in a Defamation Action

In this filing, Plaintiff states that she seeks recovery of her attorneys' fees and recoverable costs. However, New York law does not provide for an award of attorney's fees to a plaintiff in a defamation action. *Robertson v. Doe*, 05 Civ. 7046(LAP), 2010 U.S. Dist. LEXIS 151305, at *11-14 (S.D.N.Y. May 11, 2010) (stating there is a "general rule in New York against recovery of attorneys' fees in the context of defamation actions"); *Wallace v. Weiss*, 82 Misc. 2d 1053, 372 N.Y.S.2d 416, 421 (Sup. Ct. 1975) (holding that "attorney's fees for the commencement of this [libel] action . . . do not constitute an item of damage").

### 6. Governor Palin Cannot Obtain a Permanent Injunction

Gov. Palin's request for a permanent injunction is improper, first and foremost, because she cannot prove liability on her claim for defamation. Even if she could, "for almost a century the Second Circuit has subscribed to the majority view that, absent extraordinary circumstances, injunctions should not ordinarily issue in defamation cases." *Metro. Opera Ass'n v. Local 100*, 239 F.3d 172, 176 (2d Cir.2001). Gov. Palin cannot establish that any sufficiently extraordinary circumstances exist in this case. She cannot, for instance, show that she has "suffered an irreparable injury for which no other remedy at law provides adequate compensation," nor can she prove that the injunction would be in the public interest, as it would be an unconstitutional prior restraint on speech. *See Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 531 (S.D.N.Y. 2013).

## VI. WITNESS LIST IN THE LIKELY ORDER OF APPEARANCE

1. Elizabeth Williamson
2. Phoebe Lett
3. Linda Cohn
4. Andrew Sullivan (by deposition)
5. James Bennet
6. Ross Douthat
7. Eileen Lepping

8.    Hanna Ingber (if necessary)
9.    Justin Stile (if necessary)
10.   Danielle Rhoades Ha
11.   Tim Crawford (by deposition)
12.   Sarah Palin
13.   Joy Robbins (if necessary)
14.   William Bardeen (if necessary)

Defendants object to Gov. Palin calling Justin Stile as a witness.  Defendants have

informed Plaintiff that Mr. Stile no longer works for The Times and that he lives outside of the

state and more than 100 miles from Court.  *See* Fed. R. Civ. P. 45(c)(1).

Defendants also object to Gov. Palin calling Joy Robbins or William Bardeen as

witnesses in the liability phase of this trial (assuming the Court agrees to bifurcate this trial), as

neither proposed witness's testimony would be relevant.  To the extent that either witness could

offer relevant testimony (and Defendants do not concede that they could), such testimony would

only be relevant in the second phase of the trial, if reached.

In her pre-trial disclosures, Plaintiff indicated that she intends to present deposition

testimony from Mr. Sullivan and Mr. Crawford, and deposition and prior trial testimony from

Mr. Bennet.  Defendants will be submitting to the Court specific objections to designated

testimony portions, but Defendants object to the introduction of any prior testimony from Mr.

Bennet by designation.  Mr. Bennet will be present and available to testify at this trial as well.

Previously, the Court did not allow Plaintiff to introduce deposition testimony for witnesses

available at trial, and Defendants respectfully submit that the Court should follow the same

procedure here.

## VII.  EXHIBIT LISTS WITH PARTICULARIZED OBJECTIONS NOTED IN ACCORDANCE WITH FED. R. CIV. P. 26(a)(3)

### A.    Plaintiff's Exhibit List

Below is a list of exhibits that Plaintiff intends to offer in her case in chief, with any objections, referenced by the applicable Federal Rule of Evidence, to such exhibits noted in the column at the right.  Defendants reserve all objections under 402 and 403, as well as foundational objections that may depend on the witness through whom the exhibit is offered.

In addition to Defendants' stated specific objections, several articles and social media posts that Plaintiff proposes to introduce include reader, Twitter user, Facebook user, or other comments or reactions.  *See, e.g.*, Pl. Ex. 2, 9.  Defendants object to these comments and reactions as inadmissible hearsay.  Fed. R. Evid. 801.  Several of Plaintiff's exhibits also attach cover pages or include added content which is inauthentic and inadmissible.  *See, e.g.*, Pl. Ex. 1. Defendants do not object to Plaintiff's exhibits containing such content as a whole, but object to these extraneous additions, which should be removed prior to trial.  Some of Plaintiff's exhibits also are not fully legible because portions are cut off or obscured by headers or footers. Defendants object to the versions of these exhibits to the extent they are not fully legible.

| Pl. Ex. No. | DESCRIPTION | OBJECTIONS |
|---|---|---|
| 1 | *America's Lethal Politics* [*6/14/2017 Original Version--Online*] | |
| 2 | *NYT Opinion* Tweet of *America's Lethal Politics* [6/14/2017] | 801 (user comments) |
| 3 | *NYT (Main Twitter Account)* Tweet of *America's Lethal Politics* [6/14/2017] | |
| 4 | *America's Lethal Politics* [*6/14/2017 Original Version--Print]* | |

| 5 | *America's Lethal Politics—First Correction* [6/15/2017] | |
| 6 | *America's Lethal Politics—Second Correction* [6/16/2017] | |
| 7 | *NYTOpinion Tweet—"We got an important fact wrong"* [6/15/2017] | |
| 8 | *NYT (Main Twitter Account)* Retweet of NYTOpinion Correction Tweet | |
| 9 | *NYTOpinion Full Correction Tweet (3 parts)* [6/15/2017] | 801 (Twitter user comments) |
| 10 | *NYT Opinion Section—Print Edition—Correction of America's Lethal Politics* [6/16/2017] | |
| 11 | *America's Lethal Politics—International Edition—print edition* [6/16/2017] | |
| 12 | *NYT Homepage Preservation* [6/15/2017] | |
| 13 | *The Struggles of Sarah Palin* [10/2/2008] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 14 | *Palin and Her Enemies* [7/5/2009] | 402 (relevance), 403 (undue prejudice, etc.) |
| 15 | *9/3/2008 WSJ Article re. Palin Candidacy* | |
| 16 | Andrew Rosenthal—*Talk to The Times-Reader Questions & Answers* | 402 (relevance), 403 (undue prejudice, etc.) |
| 17 | *Ethical Journalism—A Handbook of Values and Practices for the News & Editorial Departments* | 402 (relevance), 403 (undue prejudice, etc.) |
| 18 | NYT *Guidelines on Integrity* | 402 (relevance), 403 (undue prejudice, etc.) |
| 19 | NYT Campus Weblines—SPJC Code of Ethics | 402 (relevance), 403 (undue prejudice, etc.) |
| 20 | *"Can the Bennet Brothers save the Establishment?"—Washington Post* [10/29/2019] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |

| 21 | *"The Well Connected Bennet Family"* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 22 | *Technology Policing Violence—CSPAN* [5/6/2014] | 402 (relevance), 403 (undue prejudice, etc.) |
| 23 | *"New York Times Says Senator's Op-Ed Did Not Meet Standards,"* NYT, June 4, 2020 | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |
| 24 | *Sarah Palin, Rage Whisperer*—NYT--Nicole Wallace (Opinion) [1/25/2016] | 402 (relevance), 403 (undue prejudice, etc.) |
| 25 | *She Who Must Not Be Named*—NYT--Charles Blow [12/3/2010] | 402 (relevance), 403 (undue prejudice, etc.) |
| 26 | *"A Smear?"—Andrew Sullivan* [8/31/2008][11] | 402 (relevance), 403 (undue prejudice, etc.) |
| 27 | *"Why Does Trigg Matter?"—Andrew Sullivan* [6/28/2010] | 402 (relevance), 403 (undue prejudice, etc.) |
| 28 | *"The Day Trigg Was Born"—Andrew Sullivan* [6/31/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 29 | *Ingber Article— "Mom for Vice President"* | 402 (relevance), 403 (undue prejudice, etc.) |
| 30 | *Pima Sherriff Loughner Investigation Files* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 31 | *Loughner Files—*NYTimes.com | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 32 | *Time, the Enemy*—NYT--Arthur Brisbane (Public Editor) [1/15/2011] | 402 (relevance), 403 (undue prejudice, etc.) |

---

[11] As explained more fully above, the Court has already ruled that Plaintiff's Exhibits 26, 27, and 28 are irrelevant and/or prejudicial and should be excluded.  *See* 1.24.22 Tr. at 15:23-25; *see also* Dkt. 136 at 4-8.  These rulings are law of the case, and these exhibits should be excluded again for the same reasons.

| 33 | *"The Tucson Witch Hunt"—Charles Blow [1/14/2011]* | 402 (relevance), 403 (undue prejudice, etc.) |
|----|----|----|
| 34 | *"United in Horror"—Ross Douthat [1/9/2011]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 35 | *"The Arizona Shooting, and What Led Up to it"— NYT [1/9/2011]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 36 | *"Suspect's Odd Behavior Caused Growing Alarm"—NYT [1/9/2011]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 37 | *"Looking Behind the Mug-Shot Grin"—NYT [1/15/2011]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 38 | *"Before Attack, Parents of Gunman Tried to Address Son's Strange Behavior"— NYT [3/27/2013]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 39 | *Atlantic—"Jared Loughner" Articles Search* | 801 (hearsay) |
| 40 | *"Caldwell's Unfairness"—Andrew Sullivan [1/15/2011]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 41 | *"5 Best Monday Columns"—Atlantic [1/10/2011]* | 801 (hearsay) |
| 42 | *"An Assassination—Live Blogging—Andrew Sullivan"* | 801 (hearsay) |
| 43 | *"An Assassination?"—Andrew Sullivan* | 801 (hearsay) |
| 44 | *"Was the Shooting of Rep. Gabrielle Giffords Political?"—The Atlantic [1/8/2011]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 45 | *"Did Sarah Palin's Target Map Play Role in Giffords Shooting?"—The Atlantic [1/16/2011]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 46 | *"What We Know About Jared Lee Loughner"—The Atlantic [1/10/2011]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 47 | *"Stop the Blame Game"—The Atlantic [1/11/2011* | 801 (hearsay) |
| 48 | *"The More We Know"—Andrew Sullivan* | 801 (hearsay) |

| 49 | *"Here Comes the Jared Loughner Competency Hearing"—The Atlantic [5/24/2011]* | 801 (hearsay) |
| 50 | *"Ten Days That Defined 2011—The Atlantic [12/29/2011]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 51 | *Sen Bennet Statement on Giffords Shooting [1/8/2011]* | |
| 52 | *WaPo—Sarah Palin's Crosshairs* [1/9/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 53 | USGS Topographic Map Symbols | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 54 | *Sarah Palin's & Democrats' Maps With Crosshairs—FactReal [1/11/2011]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 55 | DCCC.org *"Recovery" Map page Wayback Machine* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 56 | *5 Best Columns from the Atlantic Wire* [11/28/2011] | 402 (relevance), 403 (undue prejudice, etc.); 801 (hearsay) |
| 57 | *Something About Tucson the I Haven't Said* Email & Attachment [1/14/2011] | 801 (hearsay) |
| 58 | *How the Media Botched the Arizona Shooting—T.A. Frank* (Hyperlinked in Ex. 230) | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 59 | *Loughner's Descent Into Madness—Atlantic [1/13/2011]* | 402 (relevance), 403 (undue prejudice, etc.); 801 (hearsay) |
| 60 | *Prosecutors Expect Jared Loughner to Be Found Unfit for Trial—Atlantic [5/25/2011]* | 402 (relevance), 403 (undue prejudice, etc.); 801 (hearsay) |

| 61 | *"America's Enduring Strength"* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 62 | *The Opinionator—The Baffler* [12/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 63 | *James Bennet 2017 Performance Review Letter— A.G. Sulzberger* | |
| 64 | *Liberal Use of 'Extremist' Is the Winning Strategy—* James Bennet [11/7/96] | 402 (relevance), 403 (undue prejudice, etc.) |
| 65 | *"The Newsroom Feels Embarrassed"—Vanity Fair HIVE* [2/26/2018] | 402 (relevance), 403 (undue prejudice, etc.), 404 (character), 801 (hearsay) |
| 66 | *NYTComms Tweet re. Bennet Statement on Quinn Norton* [2/14/2018] | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |
| 67 | *"Times Stands By Editorial Board Member After Outcry Over Old Tweets"—NYT* [4/2/2018] | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |
| 68 | *"The Outrage Over Sarah Jeong"—Brett Stephens* [8/9/2018] | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |
| 69 | *Elizabeth Williamson Apologizes for Jeong Tweet* [8/1/2018] | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |
| 70 | *"The New York Times Has Abandoned Liberalism for Activism"—Andrew Sullivan* [9/13/2019] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 71 | *O'Keefe Investigates Scope of NYT Anti-Trump Bias Within Editorial Ranks* [10/10/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 72 | *"Staff Anxiety"* Email between Bennet & Stephens [2/7/2017] | 402 (relevance), 403 (undue prejudice, etc.) |

| 73 | *"Sarah Palin endorses Darryl Glenn in Colorado's U.S. Senate primary"—The Denver Post* [6/7/2016] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 74 | *"Arrest Made in Threat on Sen. Bennet's Office"— The Atlantic* [1/10/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 75 | *"The Trumpiest Roman of Them All"—Ross Douthat* [6/14/2017] | |
| 76 | *"The real tragedy of Orlando"* Op-Ed proposal Bennet forwards to Dao [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 77 | *ARS PAC Endorses Michael Bennet for United States Senate* [8/24/2016] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 78 | *Watch Colorado Se. Michael Bennet's Floor Speech on Guns* [6/16/2016] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 79 | *"Trump Suggests 'Second Amendment People' Could Act Against Hillary Clinton"—NYT* [8/9/2016] | |
| 80 | *For NYT, Trump is a sparring partner with benefits—Columbia Journalism Review* [6/29/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 81 | *"To Our Readers, From the Publisher and Executive Editor"* [11/13/2016] | 402 (relevance), 403 (undue prejudice, etc.) |
| 82 | *"Trump's Wink to Second Amendment People"— Thomas Friedman* [8/9/2016] | |
| 83 | Bennet Book Order/Reimbursement Request—*"The Persecution of Sarah Palin"* [12/17/2016] | |
| 84 | *Enough Said* Excerpts emailed to Bennet/Baquet by Mark Thompson [6/15/2016] | 402 (relevance), 403 (undue prejudice, etc.) |
| 85 | Bennet forwards Thompson email re. *Enough Said* to J. Dao [6/16/2016] | 402 (relevance), 403 (undue prejudice, etc.) |
| 86 | Bennet email string with Williamson re. RNC Lineup [7/14/2016] | |

| 87 | NYT Daily Clip Report Email 7/18/2016—GOP Arena Highlights Trump's Blacklist | 402 (relevance), 403 (undue prejudice, etc.) |
|---|---|---|
| 88 | *"New Colleague to Stir Things Up" Tweet—James Bennet [4/5/2017]* | |
| 89 | *Breitbart—Sarah Palin Condemns Kathy Griffin [5/30/2017]* | |
| 90 | *NYT/Trump Twitter Exchange [11/13/2016]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 91 | *Dean Baquet : 'Trump Is the Best Thing to Happen to The Times Subscription Strategy'—Grabien* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 92 | *Reliable Sources—CNN—Transcript 2/26/2017* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 93 | *'Truth Is Hard' Advertising Campaign First Ever Oscars Ad—AdAge [2/23/2017]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 94 | *NYT Truth Advertisements* | 402 (relevance), 403 (undue prejudice, etc.) |
| 95 | *The Truth—NYTStore—Truth Merchandise* | 402 (relevance), 403 (undue prejudice, etc.) |
| 96 | *NYT Truth Advertising Campaign--Poster* | 402 (relevance), 403 (undue prejudice, etc.) |
| 97 | *NYT Truth Advertising Campaign – Comes at a Cost* | 402 (relevance), 403 (undue prejudice, etc.) |
| 98 | *NYT Truth Advertising Campaign – It has no Alternative* | 402 (relevance), 403 (undue prejudice, etc.) |
| 99 | *NYT Truth Advertising Campaign – Tweet/All Facts No Alternatives* | 402 (relevance), 403 (undue prejudice, etc.) |
| 100 | *The Public Editor Signs Off—NYT [6/2/2017]* | 402 (relevance), 403 (undue prejudice, etc.) |

| 101 | *NYT's New reader Center Already Proving a Step Backward in Accountability— FAIR [6/23/2017]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
|-----|---|---|
| 102 | *NYT Opinion—Hillary Clinton for President* [9/24/2016] | 402 (relevance), 403 (undue prejudice, etc.) |
| 103 | *NYT Book—Gun Control : Changing Perspectives* | 402 (relevance), 403 (undue prejudice, etc.) |
| 104 | *The Corrosive Politics That Threaten L.G.T.B. Americans* [6/15/2016] | 402 (relevance), 403 (undue prejudice, etc.) |
| 105 | *Exclusive—Sarah Palin Condemns 'Sick Audacity' of Kathy Griffin's Trump Beheading Photo—Breitbart [5/30/2017]* | |
| 106 | *"End the Gun Epidemic in America,"* NYT Editorial Board, Dec. 4, 2015 | 402 (relevance), 403 (undue prejudice, etc.) |
| 107 | *"How the Trolls Stole Washington,"* Amanda Hess, NYT, Feb. 28, 2017 | 402 (relevance), 403 (undue prejudice, etc.) |
| 108 | *"Social Media's Globe-Shaking Power,"* F. Manjoo, Nov. 16, 2016 | 402 (relevance), 403 (undue prejudice, etc.) |
| 109 | *Times Digest* email for 6/15/2017 | |
| 110 | *"The Indigenous American Berserk Strike Again"— Bret Stephens* [6/15/2017] | |
| 111 | *"Rhetoric and Bullets"—Charles Blow [6/15/2017]* | |
| 112 | *"Shooting is Latest Eruption in a Grim Ritual of Rage and Balme"—Alexander Burns* [6/14/2017] | |
| 113 | *"Notes on a Political Shooting"—Ross Douthat* [6/17/2017] | |
| 114 | *Breitbart—Sarah Palin Don't Blame Sanders* [6/14/2017] | |
| 115 | *"Are we writing about the congressional shooting"* Email String between Williamson/Semple/Fox [6/14/2017] | |

| 116 | *"Are we writing on congressional shooting"* Email String between Williamson/Semple/Fox/Cohn/Lepping/Lett [6/14/2017] | |
| 117 | *"Are we writing on the congressional shooting"* Email String between Semple/Cohn/Bennet/Lepping/Lett/Williamson/Fox [6/14/2017] | |
| 118 | *"Are we writing on the congressional shooting"* Email String between Williamson/Fox | |
| 119 | *"POSSIBLE shooter's POSSIBLE social media pages pro-Bernie, anti-Trump"* Email String between Bennet/Williamson/Semple/Fox/Cohn [6/14/2017] | |
| 120 | *"POSSIBLE shooter's POSSIBLE social media pages pro-Bernie, anti-Trump"* Email String between Bennet/Williamson/Semple/Fox/Cohn [6/14/2017] | |
| 121 | *"Gun Control past pieces from Bob"* Email String between Lett/Williamson/Semple/Cohn [6/14/2017] | |
| 122 | *"POSSIBLE shooter's POSSIBLE social media pages pro-Bernie, anti-Trump"* Email String between Bennet/Williamson/Semple/Fox/Cohn [6/14/2017] | |
| 123 | *"Gun Control past pieces from Bob"* Email String between Lett/Williamson [6/14/2017] | |
| 124 | *"Gun Control past pieces from Bob"* Email String between Lett/Williamson [6/14/2017] | |
| 125 | *"Gun Control past pieces from Bob"* Email String between Lett/Bennet [6/14/2017] | |
| 126 | *"Gun Control past pieces from Bob"* Email String between Lett/Bennet [6/14/2017] | |
| 127 | *"Gun Control past pieces from Bob"* Email String between Lett/Bennet [6/14/2017] | |

| 128 | *"Gun Control past pieces from Bob"* Email String between Williamson/Bennet [6/14/2017] | |
|---|---|---|
| 129 | *"Gabby Giffords's Farewell,"* NYT Opinion, Jan. 26, 2012 | |
| 130 | *"6,000 Bullets,"* NYT Opinion, July 23, 2012 | |
| 131 | *"Democrats Find Their Voice on Gun Control,"* NYT Editorial Board, July 29, 2016 | |
| 132 | *"Myths About Gun Regulation,"* NYT Opinion, Jan. 31, 2013 | |
| 133 | *"No One Listened to Gabrielle Giffords,"* NYT Opinion, Jan. 15, 2011 | |
| 134 | *"Bloodshed and Invective in Arizona,"* NYT Opinion, Jan. 9, 2011 | |
| 135 | *"As We Mourn,"* NYT Opinion, Jan. 12, 2011 | |
| 136 | *"Gun Control past pieces from Bob"* Email String between Semple/Bennet/Williamson/Fox/Cohn [6/14/2017] | |
| 137 | *"possible shooter id"* Email sent from Williamson to Fox [6/14/2017] | |
| 138 | *"POSSIBLE shooter's POSSIBLE social media"* Email sent from Williamson to Bennet/Semple/Fox [6/14/2017] | |
| 139 | *"demons"* Email from Fox to Williamson [6/14/2017] | |
| 140 | *Scoop* History for *America's Lethal Politics* | |
| 140A | *Excerpt* | |
| 140B | *Excerpt* | |
| 140C | *Excerpt* | |
| 140D | *Excerpt* | |
| 140E | *Excerpt* | |

| 140F | *Excerpt* | |
|---|---|---|
| 140G | *Excerpt* | |
| 140H | *Excerpt* | |
| 140I | *Excerpt* | |
| 140J | *Excerpt* | |
| 140K | *Excerpt* | |
| 140L | *Excerpt* | |
| 140M | *Excerpt* | |
| 141 | *America's Lethal Politics—Williamson Draft* | |
| 142 | *Sarah Palin's 'Crosshairs' Ad Dominates Giffords Debate—ABC News [1/9/2011]* | |
| 143 | *"shootings in backfield, thanks"* Email from Williamson to Bennet/Semple/Fox/Clines [6/14/2017] | |
| 144 | Fox/Cohn Email String re. who's handling Williamson Editing [6/14/2017] | |
| 145 | *"shootings in backfield, thanks"* Email from Fox to Williamson [6/14/2017] | |
| 146 | *"shootings in backfield"* Email string between Williamson/Fox [6/14/2017] | |
| 147 | *"a couple small suggestions"* Email String between Williamson/Fox [6/14/2017] | |
| 148 | *"guns in Virginia"* Email from Lepping to Bennet/Williamson/Fox/Cohn [6/14/2017] | |
| 149 | *Law Center to Prevent Gun Violence* | |
| 150 | *Giffords Law Center to Prevent Gun Violence* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |

| 151 | *"also on shootings"* Email String between Williamson/Lepping [6/14/2017] | |
| 152 | *"Lawmakers Head Warily for Home"—NYT Opinion Editorial* [3/26/2010] | |
| 153 | *"also on shootings"* Email String between Lepping/Cohn [6/14/2017] | |
| 154 | *"15thu1 playback—America's Lethal Politics* [6/14/2017] | |
| 155 | *"fixes on shooting"* Email from Fox to Cohn [6/14/2017] | |
| 156 | *"15thu1 playback" for America's Lethal Politics— Scoop* [6/14/2017] | |
| 157 | *"also on shootings"* Email String between Cohn/Lepping [6/14/2017] | |
| 158 | *"Do we need to put a blurb in Mira's piece?"* Email String between Fox/Cohn [6/14/2017] | |
| 159 | *"shooting hed and blurg"* Email String between Cohn & Fox [6/14/2017] | |
| 160 | *Ross Douthat Tweet—"You are responsible for inciting violence if you actually incite or organize or bless violence..." [6/14/2017]* | |
| 161 | *"a couple small suggestions"* Email from Fox to Bennet [6/14/2017] | |
| 162 | *"Sanders condemnation of violence"* Email from Rabbi Lerner to Bennet [6/14/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 163 | *"hey"* Email from Bennet to Williamson [6/14/2017] | |
| 164 | *"Inciting Violence May Not Be Protected Speech"— NYT—March 5, 2013* | 402 (relevance), 403 (undue prejudice, etc.) |
| 165 | *NYT Manual of Style & Usage Excerpts* | 402 (relevance), 403 (undue prejudice, etc.) |
| 166 | *"Trump Incites Mob," NYT, Jan. 7, 2021* | |

| | | |
|---|---|---|
| 167 | *Opinion Today*—NYTimes.com [6/15/2017] | |
| 168 | *"This brings Shooting to 330"* Email String between Fox/Cohn re. TRIM of America's Lethal Politics for International Edition [6/14/2017 | |
| 169 | *"The day on social, 6/15" Social Media Wrapup* Email [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 170 | *NYT 2017 Annual Report* | |
| 171 | *"NYTimes: The Trumpiest Roman of Them All"* Email String between Bennet/Douthat [6/14/2017-6/15/2017] | |
| 172 | *Jonathan Chait Tweet* | |
| 173 | *Chris Hayes Tweet* | |
| 174 | *"NYTimes: The Trumpiest Roman of Them All"* Email String between Bennet/Douthat [6/14/2017-6/15/2017] | |
| 175 | *NYTPolitics Tweet-"Fact Check: Partisans falsely blamed Loretta Lynch, Tim Kaine, Bernia Sanders for Wednesday's Virginia Shooting"* [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 176 | Sarah Palin Tweets re. Editorial to "*@nytopinion"* [6/15/2017] | |
| 177 | Sarah Palin "With this sickening NYT's editorial" Tweet [6/15/2017] | |
| 178 | *"fyi, small fix on shooting editorial"* Email String between Cohn/Rakowski/Levine | |
| 179 | NYT Reader Emails re. *America's Lethal Politics* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 180 | Comments on *America's Lethal Politics* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |

| 181 | LEGIBLE Comments on *America's Lethal Politics* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
|---|---|---|
| 182 | *Washington Post—Fact Checker* Email [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 183 | *"Media rips NYT Editorial after Alexandria shooting"—Axios* [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 184 | *"No evidence Sarah Palin's PAC incited shooting of Rep. Gabby Giffords"— PunditFact* [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 185 | *"Sunday sked 6.18.17"* Email String between Weiss/Seaton/!NYHQ-op-discuss [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 186 | *"Guns"* Email string between Wegman/Williamson [6/14/2017] | |
| 187 | *"And now I see"* Email string between Wegman/Williamson [6/14/2017] | |
| 188 | *Text Exchange w James* Email from Williamson to self [6/16/2017] | |
| 189 | *Williamson/Bennet 6/14/2017 Text Exchange (screen shots)* | |
| 190 | *Williamson/Bennet 6/15/2017 Text Exchange (screen shots)* | |
| 191 | *"Giffords"* Email String between Lepping/Bennet/Williamson [6/15/2017] | |
| 192 | Lepping forwards Lett *"Giffords"* Email String between Lepping/Bennet/Williamson [6/15/2017] | |
| 193 | Bennet forwards Williamson *"NYTimes: The Trumpiest Roman of Them All"* Email String between Bennet/Douthat [6/15/2017] | |
| 194 | *"And now I see"* Email String between Wegman/Cohn [6/15/2017] | |

| 195 | *"let's check count of those injured"* Email String between Williamson/Bennet/Lepping/Wegman [6/15/2017] | |
| 196 | *"let's check count of those injured"* Email String between Williamson/Bennet/Lepping/Wegman [6/15/2017] | |
| 197 | *"looks like we may have another error"* Email String between Bennet/Wegman/Lepping [6/15/2017] | |
| 198 | *"editorial and readers?"* Email string between Ingber/Bennet [6/15/2017] | |
| 199 | *"NYT Editorial correction"* Email String between Rhoades Ha/Rubin/Alahydoian/Ingber [6/15/2017] | |
| 200[12] | *"Question from Yahoo News"* Email String between Rhoades Ha/McGraw/Bennet [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 201 | *"Criticize Our Work Privately..."—Washington Post* [2/16/2018] | 402 (relevance), 403 (undue prejudice, etc.) |
| 202 | *"new wording"* Email from Cohn to Bennet | |
| 203 | *"earlier version, w Linda's question"* email between Wegman/Cohn/Lepping [6/15/2017] | |
| 204 | *"earlier version, w Linda's question"* email between Wegman/Williamson [6/15/2017] | |
| 205 | *"Moment to chat?"* Email String between Wegman/Erika lamb ([Everytown.org](Everytown.org)) | |
| 206 | *"editorial and readers?"* Email string between Ingber/Bennet [6/15/2017] | |
| 207 | *"editorial and readers?"* Email string between Ingber/Bennet/Evans/Higa [6/15/2017] | |

---

[12] Plaintiff's exhibits 200 and 227 contain redactions for "Attorney Client Privilege." Defendants object only to those portions of the exhibits.

| 208 | *"editorial and readers?"* Email string between Ingber/Higa [6/15/2017] | |
|-----|---|---|
| 209 | *"NYT Editorial Correction"* Email String between Ingber/Rhoades Ha [6/15/2017] | |
| 210 | *"editorial and readers?"* Email string between Ingber/Bennet/Evans/Higa [6/15/2017] | |
| 211 | *"editorial and readers?"* Email string between Ingber/Higa [6/15/2017] | |
| 212 | *"Media Inquiry"* Email String between Rhoades Ha/Sydney Smith (iMediaEthics) [6/15/2017] | |
| 213 | *"NYT Editorial correction"* Email String between Rhoades Ha/Bevacqua/Jordan Cohen [6/16/2017] | |
| 214 | *"NYT Editorial correction"* Email String between Rhoades Ha/Bevacqua/Jordan Cohen [6/16/2017] | |
| 215 | *"DRAFT—corp comm note"* Email String between Bevacqua/Rhoades Ha [6/16/2017] | |
| 216 | *"New York Times issues correction to editorial after firestorm of controversy"— CNN* [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 217 | *"earlier version, w Linda's question"* email between Wegman/Williamson [6/15/2017] | |
| 218 | *"this line is misleading"* Email String between Williamson/Cohn/Wegman/Bennet [6/15/2017] | |
| 219 | *"earlier version, w Linda's question"* Email String between Cohn/Wegman [6/15/2017] | |
| 220 | *"could you make one change, via BOB"* Email String between Cohn/Fox [6/16/2017] | |
| 221 | *"David Rubenstein observer"* Email String between Bennet/Cohn/Semple [6/16/2017] | |
| 222 | *"CNN request for comment re: Times Editorial"* Email String between O. Darcy(CNN)/Rhoades Ha [6/15/2017] | |

| 223 | *"Fox News Comment Request"* Email String between Bennet/Rhoades Ha [6/15/2017] | |
| 224 | *"And now I see"* Email string between Wegman/Williamson [6/14/2017] | |
| 225 | *"question from Yahoo News"* Email between Stableford & Rhoades Ha [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 226 | *New York Times requests apology from Fox"—Politico* [7/23/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 227 | Email String between Bennet/McGraw/Rhoades Ha re. CNN Inquiry [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) (partially; other parts are admissible); 901 (authenticity) |
| 228 | *Fox News Comment Request* Email String between Rhoades Ha/Bennet [6/15/2017] | |
| 229 | *Question from Business Insider* Email String between Rhoades Ha/Max Tani [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.); 801 (hearsay) |
| 230 | *NYT Editorial* Email String Between Rhoades Ha & Sara Fisher (Axios) [6/15/2017] | |
| 231 | *CNN Request for Comment re. Times Editorial* Email String Between Rhoades Ha/E. Murphy/Oliver Darcy [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 232 | *NYT Editorial Correction* Email String between J. Cohen & Rhoades Ha [6/15/2017] | 402 (relevance), 403 (hearsay) |
| 233 | *WaPo question on Loughner claim* Email String between Bennet and Paul Farhi [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 234 | *CNN Request for Comment re. Times Editorial* Email String Between Rhoades Ha/Bennet/Oliver Darcy [6/15/2017] | |
| 235 | *CNN Request for Comment re. Times Editorial* Email String Between Rhoades Ha/Oliver Darcy [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |

| 236 | *CNN Request for Comment re. Times Editorial* Email String Between Rhoades Ha/Oliver Darcy [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
|---|---|---|
| 237 | *Politifact Media Inquiry re. « America's Lethal Politics »* Email String [6/15/2017] | |
| 238 | *A Note from James Bennet* [2/15/2018] | 402 (relevance), 403 (undue prejudice, etc.) |
| 239 | *The Times Issues Social Media Guidelines for the Newsroom* [10/13/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 240 | *NYT Slammed for Lack of Transparency in Editor's Resignation*—The Hill [5/2/2018] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 241 | *On Trust and Transparency*—A.G. Sulzberger, Our New Publisher, Answers Readers' Questions [1/22/2018] | 402 (relevance), 403 (undue prejudice, etc.) |
| 242 | *How the New York Times Maintains its Credibility*—Quill [12/15/2018] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 243 | *Former NY Times Editor Rips Trump Coverage as Biased*—Fox News [1/2/2019] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 244 | *Williamson Re-Tweet of Correction* | |
| 245 | *"Palin gets Death Threats Too"*—The Atlantic [3/7/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 246 | *"The Threats Against Palin"*—Andrew Sullivan [1/14/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 247 | *James Devine--#HuntRepublicans Tweet* | 402 (relevance), 403 (undue prejudice, etc.) |
| 248 | *[Same w/ Time Stamp]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 249 | *Dozens of Twitter Users Call for Palin's Death*—Daily Caller | 402 (relevance), 403 (undue prejudice, etc.), |

| | | |
|---|---|---|
| | | 801 (hearsay), 901 (authenticity) |
| 250 | *FBI Complaint Form re. Palin Threats* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 251 | *FBI Complaint Form re. Palin Threats* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 252 | *FBI Complaint Form re. Palin Threats* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 253 | *Death Threats Against Palin Increase—Politico* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 254 | *Rhoades Ha* Email to Kruzel re. timing of Corrections [6/15/2017] | |
| 255 | *Enough Said—"Incitement" is a crime passage* | 402 (relevance), 403 (undue prejudice, etc.) |
| 256 | *New York Times Editor Says Trump Has Put His Reporters' Lives at Risk— Guardian* 11/18/2019] | 402 (relevance), 403 (undue prejudice, etc.) |
| 257 | *Analytics NYT-Roll-Up-Opinion—Main Daily Opinion Dashboard* Email 6/16/2017 to Bennet & to opinionweb@nytimes.com | |
| 258 | *Chartbeat Daily Perspective for* nytimes.com Email [6/16/2017] | |
| 259 | *NYT Spreadsheets re. Digital Subscriptions as of 6/14/2017 and 6/15/2017* | |
| 260 | *NYT Pageviews* | |
| 261 | *NYT Spreadsheets re. Social Media/Users/Referring URL's* | |

| 262 | *NYT Slack Messages re. Editorial & Social* | 402 (relevance), 403 (undue prejudice, etc.) |
|---|---|---|
| 263 | *NYT Slack Coding for America's Lethal Politics traction* | 402 (relevance), 403 (undue prejudice, etc.) |
| 264 | *That Time Trump Spent Nearly $100,000 on an Ad Criticizing U.S. Foreign Policy in 1987—BuzzFeed.News* [1/10/2015] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 265 | *Fox News Takes Out Full Page New York Times Ad After Dispute With The Paper—HuffPo* [7/27/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 266 | NYT 2017 Rate Card | 402 (relevance) |
| 267 | NYT 2019 Rate Card | 402 (relevance) |
| 268 | NYT 2021 Rate Card | 402 (relevance) |
| 269 | *NYT « Today's Paper » May 21, 2020* | 402 (relevance) |
| 270 | *NYT Advertising Media Kit* | 901 (authenticity) |
| 271 | *NYT Spreadsheet Print Distribution 6/15/2017* | |
| 272 | *How the NYT's AI-driven data insight tool is informing ad campaigns* [1/10/2019] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 273 | *The New York Times Advertising & Marketing Solutions Group Introduces 'nytDEMO' : A Cross-Functional Team Focused on Bringing Insights and Data Solutions to Brands* [2/15/2018] | 402 (relevance), 403 (undue prejudice, etc.) |
| 274 | *New York Times Thinks Small to reach readers on Apple Watch—Mobile Marketer* | 402 (relevance), 403 (undue prejudice, etc.) |
| 275 | Stela Opinion Daily Report [6/14/2017] | |
| 276 | Daily Opinion Dashboard Email—Google Analytics [6/16/2017] | |

| 277 | Chartbeat Email [Redacted—6/16/2017] | 402 (relevance), 403 (undue prejudice, etc.), 901 (authenticity) |
|---|---|---|
| 278 | Chartbeat Email [Unredacted—6/16/2017] | |
| 279 | CNN Request for Comment re. Times Editorial Email String Between Rhoades Ha/Oliver Darcy [6/15/2017] [NYTIMES004212-4256] | |
| 280 | "What is an Editorial Board," James Bennet, Jan. 13, 2020 | 402 (relevance), 403 (undue prejudice, etc.) |
| 281 | *"It's True: False News Spreads Faster and Wider,"* S. Lohr, Mar. 8, 2018 | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 282 | *NYT Insurance Policies* | 402 (relevance), 403 (undue prejudice, etc.) |
| 283 | *[Deleted]* | |
| 284 | *NYT 2024 Annual Report – Form 10-K* | 402 (relevance), 403 (undue prejudice, etc.) |
| 285 | *Systemic Change Needed After Faulty Times Article*—NYT—Margaret Sullivan (Liz Spayd, Public Editor) [12/18/15] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 286 | *The NY Times Promised to Fact Check their New Climate Denier Columnist— They Lied* [4/29/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 287 | *"Atlantic Assures Fans It Hasn't Sold Its Soul— Media Ad-Age* [3/10/2008] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 288 | *"editorials INYT, Fri., June 16"* Email from Cohn to Levine/et al. [6/14/2017] | |
| 289 | *"Exclusive: Loughner Friend Explains Alleged Gunman's Grudge Against Giffords"—Mother Jones* [1/10/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |

| 290 | *"We're Not Going to Let Our Campaign Be Dictated by Fact-Checkers"— James Bennet (Atlantic)* [8/28/2012] | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |
| 291 | *"Sarah Jeong and the N.Y. Times: When Racism is Fit to Print"—Andrew Sullivan* [8/2/2018] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 292 | *Daily Clip Report June 14* Email to James Bennet | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 293 | *"We Don't Have Proof Yet"—WSJ—Taranto* [1/10/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 294 | *"Assassination Attempt in Arizona"—Krugman* [1/8/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 295 | *"Climate of Hate"—Krugman* [1/9/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 296 | *"Massacre, followed by libel"—Charles Krauthammer* [2/26/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 297 | *"It Did Not"—WSJ—Taranto* [1/13/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 298 | *"Paladino's Rant"—Andrew Sullivan* [10/12/2010] | 402 (relevance), 403 (undue prejudice, etc.) |
| 299 | *"Sarah Palin Is Right About 'Blood Libel'"—WSJ—Rabbi Boteach* [1/14/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 300 | *"Palinoia, the Destroyer"—WSJ—Taranto* [1/19/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 301 | *"James Bennet—Big Ideas—The Writer"* [3/15/2016] | 402 (relevance), 403 (undue prejudice, etc.) |
| 302 | *James Bennet Twitter Following* | 402 (relevance), 403 (undue prejudice, etc.) |

| 303 | *« NYT Requests Apology from Fox on ISIS Story"—Politico* [7/23/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 304 | *"House Democrats Unveil 2020 Targets"—CNN* [1/28/2019] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 305 | *"Democrats Go on Offense..." DNCC Cheri Bustos* [1/28/2019] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 306 | *DLC—Heartland Strategy* [12/13/2004]—Bullseye Map | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 307 | *First Read* Email Atlantic [8/22/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 308 | *MPA Daily News Roundup 9.5.11—Atlantic* | 402 (relevance), 403 (undue prejudice, etc.) |
| 309 | *Content Title Report—Top Daily—Atlantic* [11/21/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 310 | *Josh's Palin Piece* Email between Bennet/Purdum/Codinha [5/12/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 311 | *How 'Fake News' Changed The New York Times—The Wilson Quarterly* [Winter 2018] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 312 | *Reader Center : Covering Studies That Were Not Peer Reviewed* [6/22/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 313 | *The NYT Had Two Embarrassing takes on the Alexandria Shooting—The New Republic* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 314 | *SimilarWeb Monthly Unique Visitors* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 315 | *"Why Readers See The Times as Liberal,"* Liz Spayd, July 23, 2016 | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |

| 316 | Bennet Tweets June 3, 2020 | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |
|-----|---------------------------|-----------------------------------------------------------|
| 317 | NYT Tweet re. Cotton Op-Ed | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |
| 318 | *"Why We Published the Tom Cotton Op-Ed,"* J. Bennet, June 4, 2020 | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |

### B.    Defendants' Exhibit List

Below is a list of exhibits that Defendants intend to offer in their case in chief, with any objections, referenced by the applicable Federal Rule of Evidence, to such exhibits noted in the column at the right.  Plaintiff reserves all objections under 402 and 403, as well as foundational objections that may depend on the witness through whom the exhibit is offered.

| Exhibit No. | Date | Description | Objections |
|-------------|------|-------------|------------|
| 1 | | Complaint, Palin v. NYT | 401, 402, 403, 105 (if Admitted); 106 (if Admitted) |
| 2 | | Amended Complaint, Palin v. NYT | 401, 402, 403, 105 (if Admitted); 106 (if Admitted) |
| 3 | 6/14/2017 | America's Lethal Politics, Print version | |
| 4 | 6/14/2017 | America's Lethal Politics, Original Digital Version | |
| 5 | 6/15/2017 | America's Lethal Politics, Corrected Digital Version | |
| 6 | 6/16/2017 | America's Lethal Politics, Second Corrected Digital Version | |
| 7 | 6/16/2017 | Print Correction | |
| 8 | 6/15/2017 | NYT Tweet re Correction | |
| 9 | 6/14/2017 | Email: Williamson to Bennet, Semple, & Fox "are we writing one the congressional shooting?" | |

| Exhibit No. | Date | Description | Objections |
|---|---|---|---|
| 10 | 1/9/2011 | ABC News: Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate | |
| 11 | 6/14/2017 | Email: Fox to Williamson "Re: are we writing on the congressional shooting?" | |
| 12 | 6/14/2017 | Email: Williamson to Bennet, Semple, & Fox "possible shooter ID" | |
| 13 | 6/14/2017 | Email: Williamson to Bennet, Semple, & Fox "Possible shooter's Possible social media pages pro-Bernie, anti-Trump" | |
| 14 | 6/14/2017 | Email: Fox to Williamson "Fwd: are we writing on the congressional shooting?" | |
| 15 | 6/14/2017 | Email: Williamson to Fox "are we writing on the congressional shooting?" | |
| 16 | 6/14/2017 | Email: Semple to Cohn "Re: are we writing on the congressional shooting?" | |
| 17 | 6/14/2017 | Email: Bennet to Williamson "Re: POSSIBLE shooter's POSSIBLE social . . ." | |
| 18 | 6/14/2017 | Email: Williamson to Bennet "Re: POSSIBLE shooter's POSSIBLE social . . ." | |
| 19 | 6/14/2017 | Email: Lett to Williamson "Gun Control past pieces from Bob" | |
| 20 | | Editorials Lett emailed | |
| 21 | 6/14/2017 | Email: Semple to Williamson "Re: POSSIBLE shooter's POSSIBLE social . . ." | |
| 22 | 6/14/2017 | Email: Williamson to Lett "Re: Gun Control past pieces from Bob" | |
| 23 | 6/14/2017 | Email: Lett to Williamson "Re: Gun Control past pieces from Bob" | |
| 24 | | Frank Rich editorial | |
| 25 | 6/14/2017 | Email: Bennet to Lett "Re: Gun Control past pieces from Bob" | |
| 26 | 6/14/2017 | Email: Bennet to Lett "Re: Gun Control past pieces from Bob" | |
| 27 | 6/14/2017 | Email: Lett to Bennet "Fwd: Gun Control past pieces from Bob" | |
| 28 | 6/14/2017 | Email: Bennet to Williamson: "Fwd: Gun Control past pieces from Bob" | |
| 29 | 6/14/2017 | Editorials Bennet emailed. | |
| 30 | 6/14/2017 | Entire Scoop File | |
| 31 | 6/14/2017 | Excerpt from Scoop: Bennet 7:21 p.m. version | |
| 32 | 6/14/2017 | Excerpt from Scoop: Williamson in backfield | |
| 33 | 6/14/2017 | Excerpt from Scoop: Linda Cohn first edit | |

| Exhibit No. | Date | Description | Objections |
|---|---|---|---|
| 34 | 6/14/2017 | Email: Williamson to Bennet et al: "Shootings is in backfield, thanks" | |
| 35 | 6/14/2017 | Email: Lepping to Bennet: "guns in Virginia" | |
| 36 | 6/14/2017 | Email: Williamson to Lepping: "Re: also on shootings" | |
| 37 | 3/26/2010 | Editorial cited in Lepping email above | |
| 38 | 6/14/2017 | Email: Bennet to Williamson "Re: hey" | |
| 39 | 6/14/2017 | Email: Fox to Cohn "fixes on shooting" | |
| 40 | 6/14/2017 | Email: Lepping to Cohn "Fwd: also on shooting" | |
| 41 | 6/14/2017 | Email: Lepping to Semple, including scoop file and "clean version" of America's Lethal Politics | |
| 42 | 6/14/2017 | Email: Cohn to Williamson, including scoop file and "clean version" of America's Lethal Politics | |
| 43 | 6/14/2017 | Email: Douthat to Bennet: "Re: NYTimes: The Trumpiest Roman of Them All" | |
| 44 | 6/15/2017 | Jonathan Chait Tweet | |
| 45 | 6/15/2017 | Chris Hayes Tweet | |
| 46 | 6/14/2027 | Text: Bennet to Williamson "Are you up? . . . ." | |
| 47 | 6/14/2017 | Email: Williamson to Wegman "And now I see" | |
| 48 | 6/15/2017 | Email: Lepping to Lett: "Fwd: Giffords" | |
| 49 | 6/15/2017 | Email: Lepping to Bennet: "Re: Giffords" | |
| 50 | 6/15/2017 | Email: Wegman to Williamson: "Re: And now i see" | |
| 51 | 6/15/2017 | Text: Williamson to Bennet: "Do you have time to talk by phone this morning?" | |
| 52 | 6/15/2017 | Email: Bennet to Ingber: "Re: editorial and readers" | |
| 53 | 6/15/2017 | Email: Ingber to Higa, Bennet: "Re: editorial and readers?" | |
| 54 | 6/15/2017 | Email: Higa to Ingber, Bennet: "Re: editorial and readers? | |
| 55 | 6/15/2017 | Email: Rhoades Ha to Smith: "Re: Media Inquiry" | |
| 56 | | INTENTIONALLY LEFT BLANK | |
| 57 | | INTENTIONALLY LEFT BLANK | |
| 58 | | INTENTIONALLY LEFT BLANK | |
| 59 | 6/15/2017 | Williamson Retweet of Correction | |
| 60 | 6/15/2017 | Bennet to Rhoades Ha: "CNN Request for Comment" | |
| 61 | | Crosshairs Map | |
| 62 | 3/23/2010 | Palin Facebook: Don't Get Demoralized! | 401, 402,403, 404, 405 |

| Exhibit No. | Date | Description | Objections |
|---|---|---|---|
| 63 | 3/23/2010 | Palin Tweet: Don't Retreat. Reload | 401, 402,403, 404, 405 |
| 64 | 11/4/2010 | Palin Tweet: "Remember months ago "bullseye" icon used 2 target . . . | 401, 402,403, 404, 405 |
| 65 | 1/9/2011 | CBS News: Palin Criticized Over Giffords . . . | 401, 402, 403, 404, 405, 801, 802 |
| 66 | 1/9/2011 | CBS News: The End of Palin's Don't Retreat . . . | 401, 402, 403, 404, 405, 801, 802 |
| 67 | 1/12/2011 | Politico: Palin Charges Critics with "Blood Libel" . . . . | 401, 402, 403, 404, 405, 801, 802 |
| 68 | 5/30/2017 | Breitbart: Sarah Palin Condemns 'Sick Audacity' of Kathy Griffin's Trump . . . | |
| 69 | 6/1/2017 | Palin Article: Kathy Griffin Blamed Sarah Palin's "Crosshairs Map" | |
| 70 | 6/14/2017 | Breitbart: Exclusive -- Sarah Palin: Hopefully Media Have Learned To Not Play . . . | |
| 71 | 6/14/2017 | Email: Recher to Windeknecht: "Aaron pls post this link next . . ." | 401, 402, 403, 404, 405, 801, 802 |
| 72 | 6/14/2017 | Email: Perry to Recher: "I'm going to publish the SP one you did to FB in about 15 mins . . ." | 401, 402, 403, 404, 405, 801, 802 |
| 73 | 6/14/2017 | Email: Perry to Knorr: "I think it would be great if you want to write it up for the website." | 401, 402, 403, 404, 405, 801, 802 |
| 74 | 6/15/2017 | Palin Article: FLASHBACK: Sanders' Fundraising Email Falsely Accuses Palin of Inciting 2011 Shooting | 401, 402, 403, 404, 405, 801, 802 |
| 75 | 6/15/2017 | Palin Tweet: "With this sickening NYT's editorial, the media is doing exactly what I said yesterday should not be done . . ." | |
| 76 | 6/15/2017 | Palin Tweet: Does Sarah Palin have a libel case? | |
| 77 | 6/14/2017 | Rep. Rodney Davis on Poltically-Motivated Violence | 401, 402, 403, 404, 405, 801, 802 |
| 78 | 6/15/2017 | Palin Article: Palin Investigates Legal Options Following New York Times' Fake News | 401, 402, 403, 404, 405, 801, 802 |
| 79 | 10/5/2018 | Palin Tweet: Hey Lisa Murkowski - I can see 2022 from my house... | 401, 402, 403, 404, 405, 801, 802 |

| Exhibit No. | Date | Description | Objections |
|---|---|---|---|
| 80 | 9/23/2020 | Palin Video: Lisa Murkowski - I can 2022 from my House | 401, 402, 403, 404, 405, 801, 802 |
| 81 | 3/11/2020 | Masked Singer Video - Reveal | 401, 402, 403, 404, 405, 801, 802 |
| 82 | 12/12/2016 | 1 Quote from NYT's Editor about Christians Tells You Everything You Need To Know . . . | 401, 402, 403, 404, 405 |
| 83 | 2/14/2017 | NYT Reporter Calls Melania "A Hooker," Instantly Two Things Happen | 401, 402, 403, 404, 405 |
| 84 | 3/2/2017 | NYT Just Slammed Trump For Something They IGNORED Under Obama For 8 Years | 401, 402, 403, 404, 405 |
| 85 | 3/26/2017 | The NY Times Just Dropped a BOMBSHELL Concession About MSNBC And The Liberal Media | 401, 402, 403, 404, 405 |
| 86 | 4/19/2017 | NYT Publishes Articles From Convicted Terrorist...But It Gets WORSE | 401, 402, 403, 404, 405 |
| 87 | 4/22/2017 | NYT Editor Calls Himself THIS For Misleading Tweet | 401, 402, 403, 404, 405 |
| 88 | 4/26/2017 | FINALLY! NYT Reporter Posts Misleading Tweet On Trump . . . | 401, 402, 403, 404, 405 |
| 89 | | Masked Singer Video - Dancing and Rapping | 401, 402, 403, 404, 405, 801, 802 |
| 90 | 7/22/2021 | Zillow: Sarah Palin most desirable celebrity neighbor: poll | |
| 91 | 7/26/2021 | Breitbart: Sarah Palin, Seahwaks Greats Team Up for Alaska Kids | |
| 92 | 4/20/2020 | Palin Responses to Requests for Admission | 401, 402, 403,106 (if Admitted) |
| 93 | | INTENTIONALLY LEFT BLANK | |
| 94 | 5/14/2020 | Palin Am. Response to Request for Admission - RFA 27 | 401, 402, 403, 106 (if Admitted) |
| 95 | 6/14/2017 | Email: Recher to Knorr re "This is great and I think it would be good for tomorrow" | 401, 402, 403, 801, 802 |
| 96 | 8/9/2016 | Thomas Friedman: Trump's Wink Wink to 'Second Amendment People' | |
| 97 | 6/17/2017 | Elizabeth Williamson: Another, Far Different, Washington Billionaire | 401, 402, 403, 404, 405, 801, 802 |
| 98 | 2/28/2020 | Kronenberger Report | |
| 99 | 2/28/2020 | Kronenberger underlying documents | |

| Exhibit No. | Date | Description | Objections |
|---|---|---|---|
| 100 | 2/28/2020 | Kronenberger Comment analysis | |
| 101 | 6/15/2017 | Stela Report | |
| 102 | 6/16/2017 | Daily Opinion Dashboard | |
| 103 | 7/27/2017 | New York Post: Sarah Palin sues NY Times | 401, 402, 403, 404, 405, 801, 802 |
| 104 | 6/15/2017 | Business Insider: New York Times corrects editorial that drew huge backlash for blaming Sarah Palin | 401, 402, 403, 404, 405, 801, 802 |
| 105 | 8/29/2017 | Forbes: Sarah Palin's Defamation Suit Against the New York Times is Dismissed | 401, 402, 403, 404, 405, 801, 802 |
| 106 | 8/21/2019 | Washington Post: New York Times lawyer on Palin editorial: 'It was an honest mistake' | 401, 402, 403, 404, 405, 801, 802 |
| 107 | | INTENTIONALLY LEFT BLANK | |
| 108 | 2/28/2020 | Cision: America's Lethal Politics | |
| 109 | 1/26/2016 | Washington Post: The GOP Contest | 401, 402, 403, 404, 405, 801, 802 |
| 110 | | About SarahPalin.com | 401, 402, 403, 404, 405 |
| 111 | 6/14/2017 | NYT: Shooting Is Latest Eruption in a Grim Ritual of Rage and Blame | |
| 112 | 9/3/2008 | WSJ: Palin Candidacy Exposes Divisions Among Women | 401, 402, 403, 404, 405, 801, 802 |
| 113 | | INTENTIONALLY LEFT BLANK | |
| 114 | 1/30/2016 | A Chance to Reset the Republican Race | 401, 402, 403, 404, 405, 801, 802 |
| 115 | | INTENTIONALLY LEFT BLANK | |
| 116 | | Palin Facebook Page | 401, 402, 403, 404, 405 |
| 117 | | Palin Twitter Page | 401, 402, 403, 404, 405 |
| 118 | | Sarahpalin.com | 401, 402, 403, 404, 405 |
| 119 | | INTENTIONALLY LEFT BLANK | |
| 120 | | INTENTIONALLY LEFT BLANK | |
| 121 | | Turning Point USA: America Fest 2021 Speakers | 401, 402, 403, 404, 405 |
| 122 | | Turning Point USA: Palin Bio | 401, 402, 403, 404, 405 |

| Exhibit No. | Date | Description | Objections |
|---|---|---|---|
| 123 | 6/14/2017 | Emails b/w Jesse Wegman & Elizabeth Williamson re: guns | |
| 124 | 7/29/2014 | Video - WSJ: Sarah Palin Launches Her Own Subscription Channel | 401, 402, 403, 404, 405, 801, 802 |
| 125 | | Sarahpalin.com - Online Store | 401, 402, 403, 404, 405 |
| 126 | 6/15/2017 | Online: Front page of NYT | |
| 127 | 6/15/2017 | Online: Front page of NYT (later) | |
| 128 | | Stela: America's Lethal Politics | |
| 129 | | Stela: News Article on Shooting | |
| 130 | | Palin Instagram Account | 401, 402, 403, 404, 405 |
| 131* | 1/31/2011 | The Dish (Andrew Sullivan Blog): Guarding Their Heritage | 401, 402, 403, 404, 405, 801, 802 |
| 132* | 1/8/2011 | The Dish (Andrew Sullivan Blog): An Assassination? | |
| 133* | 1/8/2011 | The Dish (Andrew Sullivan Blog): An Assassination Attempt in Arizona | |
| 134* | 1/17/2011 | The Dish (Andrew Sullivan Blog): The More We Know | |
| 135* | 1/15/2011 | The Dish (Andrew Sullivan Blog): Caldwell's Unfairness | |
| | | | |
| 200 | 1/6/2021 | Palin Fox News re Capital Insurrection | 401, 402, 403, 404 |
| 201 | 2021 | Palin Video: American Prosperity Summit | 401, 402, 403, 404 |
| 202 | 6/10/2021 | Confirmed Speakers: Young Women's Leadership Summit | 401, 402, 403, 404 |
| 203 | 11/18/2009 | Politico: Palin Trashes "Lamestream Media" | 401, 402, 403, 404 |
| 204 | 6/17/2016 | Palin: Obama "is a special kind of stupid" | 401, 402, 403, 404 |
| 205 | | INTENTIONALLY LEFT BLANK | |
| 206 | 6/25/2009 | Miami Herald: Palin popular among Republicans but polarizing according to poll | 401, 402, 403, 404, 405, 801, 802 |
| 207 | 9/4/2008 | Politico: Media swoon over Palin's fiery speech | 401, 402, 403, 404, 405, 801, 802 |

| Exhibit No. | Date | Description | Objections |
|---|---|---|---|
| 208 | 8/20/2020 | Steve Schmidt: "paranoia, pathological lying, profound ignorance, brittleness and insanity" | 401, 402, 403, 404, 405, 801, 802 |
| 209 | 10/5/2011 | Palin Will Not Seek Presidential Nomination | 401, 402, 403, 404, 405, 801, 802 |
| 210 | | Washington Post: Seven Years Ago Palin Gave the Best Speech of Her Life | 401, 402, 403, 404, 405, 801, 802 |
| 211 | 11/6/2015 | Sarah Palin Evolves on Katie Couric | 401, 402, 403, 404, 405, 801, 802 |
| 212 | 10/21/2008 | RNC Shells Out $150k for Palin Fashion | 401, 402, 403, 404, 405, 801, 802 |
| 213 | 4/26/2010 | CBS News: Did Sarah Palin Resign as Governor Because of Money | 401, 402, 403, 404, 405, 801, 802 |
| 214 | 7/4/2009 | Los Angeles Times: Sarah Palin's Resignation as Alaska Governor sets off speculation | 401, 402, 403, 404, 405, 801, 802 |
| 215 | 1/13/2010 | Steve Schmidt's war against Palin | 401, 402, 403, 404, 405, 801, 802 |
| 216 | | Going Rogue | 401, 402, 403, 404, 405 |
| 217 | | America By Heart | 401, 402, 403, 404, 405 |
| 218 | | Sarah Palin Uncut | 401, 402, 403, 404, 405 |
| 219 | | Good Tidings and Great Joy | 401, 402, 403, 404, 405 |
| 220 | | Sweet Freedom: A Devotional | 401, 402, 403, 404, 405 |
| 221 | | Sarah Palin: You Betcha! | 401, 402, 403, 404, 405 |
| 222 | 1/12/2011 | Palin Statement re Blood Libel | 401, 402, 403, 404, 405 |
| 223 | 1/12/2011 | Reuters: Palin's "Blood Libel" Charge Ignites Firestorm | 401, 402, 403, 404, 405, 801, 802 |
| 224 | 1/12/2011 | Salon: Sarah Palin Re-Inserts Herself in the News Cycle | 401, 402, 403, 404, 405, 801, 802 |

| Exhibit No. | Date | Description | Objections |
|---|---|---|---|
| 225 | 10/7/2010 | 60 Minutes: Steve Schmidt Article | 401, 402, 403, 404, 405, 801, 802 |
| 226 | 10/9/2008 | NBC News: Legislative Report re Palin Firing Public Safety Commissioner | 401, 402, 403, 404, 405, 801, 802 |
| 227 | 10/10/2008 | Legislative Report | 401, 402, 403, 404, 405, 801, 802 |
| 228 | 7/4/2009 | Business Insider: Sarah Palin: Quitter | 401, 402, 403, 404, 405, 801, 802 |
| 229 | 4/19/2017 | Palin Facebook Post - Hilary Clinton | 401, 402, 403, 404, 405 |
| 230 | 8/19/2020 | Palin: "I wouldn't prostitute myself . . . ." | 401, 402, 403, 404, 405 |
| 231 | 7/29/2014 | Palin Channel Promo | 401, 402, 403, 404, 405 |
| 300 | 6/16/2017 | Email: A. Lawson to Douthat re: column | 401, 402, 403, 404, 405, 801, 802 |
| 301 | 6/16/2017 | Email: Douthat to J. Rakowski re: column | 401, 402, 403, 404, 405, 801, 802 |
| 302 | 6/14/2017 | NYT, *The Trumpiest Roman of Them All,* Ross Douthat | |
| 303 | 6/17/2014 | NYT, *Notes of a Political Shooting*, Ross Douthat | |
| 304 | 6/14/2017 | Email: Semple to Bennet, et al. re: Gun Control past pieces from Bob | |
| 305 | 6/14/2017 | Excerpt from Scoop – Lepping 7:05 pm version | |
| 306 | 6/14/2017 | Email: E. Williamson to Fox re: a couple of small suggestions | |
| 307 | 6/14/2017 | Email: Cohn to Lepping re: also on shootings | |
| 308 | 6/15/2017 | Palin Tweets re: talking to attorneys | 106; 611; Rule of Completeness; *U.S. v. Williams*, 930 F.3d 44, 59 (2d Cir. 2019) |
| 309 | 6/14/2017 | Email: Cohn to J. Rakowski, Levine re: fyi small fix on shooting editorial | |

| Exhibit No. | Date | Description | Objections |
|---|---|---|---|
| 310 | 6/15/2017 | Email: E. Williamson to Bennet re: NYTimes: The Trumpiest Roman of Them All | |
| 311 | 10/2/2023 | Palin Tweet: Oregon Republican Party Banquet | 401, 402, 403, 404, 405 |
| 312 | 4/1/2022 | Palin Tweet: Announcement for Run of Congressional Seat | 401, 402, 403, 404, 405 |
| 313 | 4/3/2022 | Palin Tweet: Trump Endorsement of Palin | 401, 402, 403, 404, 405, 801, 802 |
| 314 | 5/17/2022 | Palin Financial Disclosure Report | 401, 402, 403, 404, 405, 801, 802 |
| 315 | 1/22/2024 | Palin Tweet: Atlantic's Bullet Hole = 47 image | 401, 402, 403, 404, 405, 801, 802 |
| 316 | 1/8/2018 | Palin to speak at Denton Republican event: https://www.wfaa.com/article/news/politics/sarah-palin-to-speak-at-denton-republican-event/287-506372707 | 401, 402, 403, 404, 405, 801, 802; Rule 26 (failure to disclose/ produce in discovery) |
| 317 | 3/13/2018 | Palin to keynote GOP fundraising dinner at Mar-a-Lago: https://thehill.com/homenews/administration/378212-sarah-palin-to-keynote-gop-fundraising-dinner-at-mar-a-lago/ | 401, 402, 403, 404, 405, 801, 802; Rule 26 (failure to disclose/ produce in discovery) |
| 318 | 9/13/2018 | Donna Brazile & Sarah Palin to Speak at Northwest Florida State College: https://www.nwfsc.edu/2018/09/13/donna-brazile-and-sarah-palin-to-speak-at-northwest-florida-state-college/ | 401, 402, 403, 404, 405, 801, 802; Rule 26 (failure to disclose/ produce in discovery) |
| 319 | 6/18/2023 | Canadians for Truth event titled "Fire and Ice with Sarah Palin" https://www.canadiansfortruth.ca/event/fire-ice-with-sarah-palin#event-details | 401, 402, 403, 404, 405, 801, 802 |
| 320 | 8/19/2023 | Idaho GOP Presents Sarah Palin in Idaho Falls: https://idgop.org/event/idgop-presents-sarah-palin-in-idaho-falls/ | 401, 402, 403, 404, 405, 801, 802 |

| Exhibit No. | Date | Description | Objections |
|---|---|---|---|
| 321 | 3/22/2025 | Sarah Palin to headline Miami-Dade GOP Women's History Month Breakfast: https://floridapolitics.com/archives/724862-sarah-palin-to-headline-miami-dade-gop-womens-history-month-breakfast/ | 401, 402, 403, 404, 405, 801, 802 |
| 322 | 7/9/2022 | Palin Speech at Trump Rally | 401, 402, 403, 404, 405 |
| 323 | 10/4/2022 | Palin Interview with Adrienne Ross on The Adrienne Ross Show Podcast: https://podcasts.apple.com/us/podcast/my-interview-with-sarah-palin-about-everything/id1567956495?i=1000581518778 | 401, 402, 403, 404, 405, 801, 802 |
| 324 | 11/13/2022 | Palin Interview with Cindy Adams on 77 WABC: https://wabcradio.com/episode/sarah-palin-11-13-2022/#/ | 401, 402, 403, 404, 405, 801, 802 |
| 325 | 2/15/2023 | Palin Interview on Newsmax: https://www.newsweek.com/sarah-palin-hints-wanting-donald-trumps-next-running-mate-newsmax-interview-1781498 | 401, 402, 403, 404, 405, 801, 802 |
| 326 | 1/22/2025 | Palin Interview on Al Arabiya News: https://www.youtube.com/watch?v=lL8aj8qPR3Q | 401, 402, 403, 404, 405, 801, 802 |
| 327 | 5/10/2018 | "An Evening with Governor Sarah Palin," hosted by MAGA Coalition at Trump International Hotel in Washington, DC | 401, 402, 403, 404, 405, 801, 802; Rule 26 (failure to disclose/ produce in discovery) |

## VIII.  ESTIMATED LENGTH OF TRIAL

Five (5) days.

Dated: April___, 2025

_____
Rakoff, J.

April 7, 2025

For Plaintiff:

TURKEL CUVA BARRIOS, P.A.

*/s/ Shane B. Vogt*
Kenneth G. Turkel (admitted *pro hac vice*)
Email:  kturkel@tcb-law.com
Shane B. Vogt (admitted *pro hac vice*)
Email:  svogt@tcb-law.com
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  (813) 834-9191
Fax: (813) 443-2193

Michael M. Munoz
E-mail:  mmunoz@golenbock.com
Golenbock Eiseman Assor Bell & Peskoe LLP
711 Third Avenue
New York, NY  10017
Tel:  (212) 907-7300
Fax: (212) 754-0330

*Counsel for Plaintiff*

Respectfully submitted,

For Defendants:

BALLARD SPAHR LLP

By:  */s/ David L. Axelrod*
     David L. Axelrod
     Jay Ward Brown
     Thomas B. Sullivan
     Jacquelyn N. Schell
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

WILMER, CUTLER, PICKERING, HALE
AND DORR LLP
Felicia H. Ellsworth (pro hac vice)
Andy O'Laughlin (pro hac vice)
60 State Street
Boston, MA 02109
Phone: (617) 526-6000
Fax: (617) 526-5000
felicia.ellsworth@wilmerhale.com
andy.olaughlin@wilmerhale.com

*Counsel for Defendants*