# ATTACHMENT 4

**PLAINTIFF'S NOTICE OF FILING IN SUPPORT OF
MEMORANDUM OF LAW ON POST-TRIAL MOTIONS**

| **From:** | Shane Vogt |
| **To:** | Katarina Resar Krasulova; Rakoff NYSD Chambers; Ken Turkel; schulzd@ballardspahr.com; brownjay@ballardspahr.com; O"Laughlin, Andy; axelrodd@ballardspahr.com; Ellsworth, Felicia H; schellj@ballardspahr.com; Gayla Arnold |
| **Cc:** | David Hayes |
| **Subject:** | RE: Palin v. The New York Times Company, 17-cv-04853 [Preliminary Jury Instruction] |
| **Date:** | Monday, April 14, 2025 8:25:00 PM |
| **Attachments:** | 2025.04.14. Palin Preliminary Instruction as of 5 50 pm [Revised Final].pdf |
| | 2025.04.14. Palin Preliminary Instruction as of 5 50 pm [clean].docx |
| | Plaintiff Objection to 4-14-2025 Preliminary Instruction.pdf |

Attached are Plaintiff's suggested edits (redline and clean versions) and Objection to the latest draft of the Preliminary Instruction.

---

**From:** Katarina Resar Krasulova <Katarina_Krasulova@nysd.uscourts.gov>
**Sent:** Monday, April 14, 2025 5:54 PM
**To:** Rakoff NYSD Chambers <RakoffNYSDChambers@nysd.uscourts.gov>; Ken Turkel <kturkel@tcb-law.com>; Shane Vogt <svogt@tcb-law.com>; schulzd@ballardspahr.com; brownjay@ballardspahr.com; O'Laughlin, Andy <Andy.OLaughlin@wilmerhale.com>; axelrodd@ballardspahr.com; Ellsworth, Felicia H <Felicia.Ellsworth@wilmerhale.com>; schellj@ballardspahr.com; Gayla Arnold <garnold@tcb-law.com>
**Subject:** Palin v. The New York Times Company, 17-cv-04853 [Preliminary Jury Instruction]

Counsel,

Attached is Judge Rakoff's latest draft of the preliminary instruction. While all objections previously stated on the record are hereby preserved, any further objections or suggested edits should be emailed to the undersigned by no later than 8:30 p.m. tonight.

The Judge will give his final rulings on any such objections or suggestions at 9 a.m. tomorrow but will not hear any further argument.

Best,

Katarina
**Katarina Resar Krasulova**
**Law Clerk to the Hon. Jed S. Rakoff**
United States District Court
Southern District of New York
500 Pearl Street – Room 1340
New York, NY 10007
Chambers: (212) 805-0401

Sarah Palin

-v-

17-cv-4853 (JSR)

The New York Times Co. & James
Bennet

**PRELIMINARY INSTRUCTION**

To the jury:

Before we hear counsel's opening statements and begin to hear the evidence, I would like to give you a brief overview of this case and focus your attention on some of the main factual debates that you will be asked to resolve. After you have heard all the evidence and the parties have made their closing arguments, I will give you detailed instructions of law that will displace these preliminary comments and will govern your deliberations. But for now, it may be useful to give you a quick overview that may help focus your evaluation of the evidence.

This is an action for libel, also commonly referred to as defamation. A libel is a false statement, in writing, about the plaintiff that tends to expose the plaintiff to public contempt, aversion, ridicule or disgrace. The plaintiff here is Sarah Palin, the former governor of Alaska and a former vice- presidential candidate. One of the defendants, The New York Times Company, is a media company that publishes *The New York Times* newspaper. The other defendant, James Bennet, is a journalist who at most of the times relevant to this case was the Editor of the Opinion Section of *The New York Times.*

Back on January 8, 2011, a man named Jared Loughner attacked a political event in Tucson, Arizona hosted by Democratic Congressperson Gabrielle Giffords, killing six persons and severely wounding 13 others, including Congressperson Giffords. More than six years later, on June 14, 2017, a man named James Hodgkinson attacked a group of Republican members of Congress practicing for an annual Congressional baseball game in Arlington, Virginia, shooting and severely injuring four people including Congressperson Steve Scalise. Later that same day, members of *The New York Times* Opinion staff drafted an editorial entitled "America's Lethal Politics," that was published in the newspaper's on-line edition late that evening and in the newspaper's print edition the following morning. It is this editorial that contained the statements that Ms. Palin claims

*1*

libeled her.

The full editorial, which the parties have stipulated will be introduced in evidence, is attached hereto as Exhibit A. However, the portions of which Ms. Palin complains appeared in two paragraphs that read:

> "*In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.*
>
> *Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask for the right.*"

Co-defendant Bennet was principally responsible for the words in these paragraphs that Ms. Palin claims libeled her.

Around 11:15 a.m. on June 15, 2017, the *Times* published a revised digital version of the editorial and added a correction to the end of it that read:

> "**Correction: June 15, 2017**
> *An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established.*"

Later, on June 16, 2017, the *Times* also published a correction at the bottom of the Editorial Page in the printed edition that read:

> "**CORRECTION**
> *An editorial on Thursday about the shooting of Representative Steve Scalise incorrectly stated that a link existed between political rhetoric and the 2011 shooting of Representative Gabby Giffords. In fact, no*

> *such link was established. The editorial also incorrectly described a map distributed by a political action committee before that shooting. It depicted electoral districts, not individual Democratic lawmakers, beneath stylized cross hairs."*

The assertion that there was a "direct" and "clear" "link" between the crosshairs map and the Loughner shooting is defamatory as a matter of law, but you will still have to decide whether the assertion is false and reasonably understood to refer to Ms. Palin personally.

In addition, Ms. Palin needs to prove certain other elements of her claim, such as what the law calls "actual malice." To prove this essential element of her claim, Ms. Palin would have to show that it was highly probable that at the time he drafted the relevant parts of the editorial, Mr. Bennet actually knew that the complained-of assertion was false or knew that there was a high risk that the assertion was false but intentionally chose to disregard that risk.

The issues outlined above are not the only disputed issues in this case; but they are issues that are likely to be subject of much of the evidence and argument that you are about to hear, and that is why I wanted to focus your attention on it from the outset. But please remember that this Preliminary Instruction is simply a brief and partial overview. At the start of your deliberations, I will give you more complete and detailed instructions that will replace this overview and will govern your deliberations.

Judge Rakoff

3

A22

# Opinion

IbeNew Uorklimes

## ı EDITORIALS ı
## America's Lethal Politics

America's elected representatives enjoying America's pastime on a ball field just across the Potomac fr9m the Capitol. A particularly American form of terror changed that idyll early Wednesday morning into what Senator Rand Paul, who was there, called "basically a killing field."

A gunman with a rifle fired dozens of rounds at members of Congress and current and former aides, who dove for cover. "He was hunting us," said Representative Mike Bishop, Republican of Michigan, who was at home plate when the gunman appeared. In all, five victims were hit, including Representative Steve Scalise of Louisiana, the House majority whip, who was in critical condition Wednesday night after surgery on a bullet wound to his hip.

As sickening pattern emerges in the assault on members of Congress at a ball field.

An American would once have been horrified and shocked by such savagery. An American today would be right to be horrified - and not very surprised. This was one of two mass shootings in the United States on Wednesday. At a San Francisco UPS facility, a gunman killed three people and himself.

Not all the details are known yet about what happened in Virginia, but a sickeningly familiar pattern is emerging in the assault. The sniper, James Hodgkinson, who was killed by Capitol Police officers, was surely deranged, and his derangement had found its fuel in politics. Mr. Hodgkinson was a Bernie Sanders supporter and campaign volunteer virulently opposed to President Trump. He posted many anti-Trump messages on social media, including one in March that said "Time to Destroy Trump & Co."

Was this attack evidence of how vicious American politics has become? Probably. In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, the link to political incite- ment was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.

Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask of the right.

Was this attack evidence of how readily available guns and ammunition are in the United States? Indisputably. Mr. Hodgkinson, by definition, should not have had a gun, but he was licensed in his home state, Illinois. And in any event it would have been easy for him to acquire a weapon in Virginia, which requires no background checks in private sales, requires no registration for most weapons and has few restrictions on open carry.

The reaction of some was that the only solution is yet more guns. Representative Mo Brooks of Alabama, who was among those who came under fire on Wednesday, said, "It's not easy to take when you see people around you being shot and you don't have a weapon yourself."

That's an entirely reasonable reflex. All people in that situation, unarmed and under fire, would long to be able to protect themselves and their friends. Yet consider the soci- ety. Americans would have to live in - the choices they would all have to make - to enable that kind of defense. Every member of Congress, and every other American of whatever age, would have to go to baseball practice, or to school, or to work, or to the post office, or to the health clinic - or to any of the other places mass shootings now take place - with a gun on their hip. And then, when an attack came and they returned fire, they would probably kill or wound not the assailant but another innocent bystander, as studies have repeatedly shown.

That is the society the gun lobby is working toward. Is it the one Americans want?

President Trump said just the right thing after the at- tack on Wednesday: "We may have our differences, but we do well in times like these to remember that everyone who serves in our nation's capital is here because, above all, they love our country. We can all agree that we are blessed to be Americans, that our children deserve to grow up in a nation of safety and peace."

Yet he will not help create that nation if he continues to advocate easy access to lethal weapons.

## ı LETTERS ı
## The Attack on G.O.P. Lawmakers

TO THE EDITOR:

On Wednesday morning there was a shooting at a baseball field filled with Republican members of Con- gress practicing for a charity game. Only the diligence of their police protectors prevented a mass killing. The gunman has been identified as a political extremist who was ardently anti-Trump and opposed to Republican tax policies.

Has it really come to this? Has the extreme animus and disrespect between Republicans and Democrats finally morphed into potentially life-taking violent out- bursts? Does this event portend a sad and dangerous devolving of societal norms where some fringe, marginalized people feel they have alicense, even a duty, to kill tho se whose views they strongly dis- agree with?

These are legitimate questions.

In this very new presidency, if there has ever been an opportunity and a need for real presidential leadership and wisdom, it is now. President Trump, please refrain from the temptation to politicize this event and help us to heal the abyss that divides us as a nation.

KEN DEROW, SWARTHMORE, PA.

TO THE EDITOR:

Ever since Representative Ga- brielle Giffords was shot during an exercise in outdoor democracy in Tucson in 2011, I've wondered how Democrats can safely campaign on contentious issues in red-state America Evidently neither party is immune from the harms that come from rampant gun prolifera- tion.

I wish Representative Steve Scalise and the others who were shot a full recovery. And I hope Mr. Scalise takes back to his fellow G.O.P. members, and to President Trump, just how much it hurts to get shot.

If this isn't enough of a crime to persuade Congress to tighten up on gun laws, what kind of a crime would be? We've already seen thE- horrors of Aurora, Newtown, Col- umbine and Virginia Tech. Presi- dent Trump went from advocating a ban on assault rifles to being a National Rifle Association parrot, and now talks as if he really be- lieves that the trouble with Amer- ica is too few guns, not too many.

RON CHARACH, TORONTO

TO THE EDITOR:

I am as disturbed as anyone by the rash and often reckless leadership of President Trump, and what he means to our delicate democracy. But maybe now, in the wake of this apparently politically motivated shooting, the ceaseless drumbeat by Trump critics over the sup- posed coming fascism in America,

along with celebrations of ty- rannicide (fake severed heads held up by comedians; theater compa- nies acting out bloody executions), can be toned down a bit.

And this applies especially to the American media, which were rightly appalled when Mr. Trump called them the "enemy of the people," but have, for months now, presented him in exactly that same way. Is it any wonder folks are. bursting at the seams out there?

Now is the perfect moment for reboot. My hope is that Mr. Trump will finally lay off his Twitter feed and start acting presidential. But even if he does not, we must all bear in mind that the best way to oppose politicians and policies with which we may vehemently dis- agree is through the constitutional and electoral freedoms that remain very much alive and well, even in Mr. Trump's America.

STUART GOTTLIEB, NEW YORK
*The writer, a former senior adviser in the Senate, teaches public policy at Columbia.*

## Daughters Will Suffer From Medicaid Cuts

Nearly one in five adult children at some point provide

that is more than double the total cost

**Sarah Palin**

        -v-
                                                    **17-cv-4853 (JSR)**

**The New York Times Co. & James
        Bennet**


### PRELIMINARY INSTRUCTION

To the jury:

    Before we hear counsel's opening statements and begin to hear the evidence, I would like to give you a brief overview of this case and focus your attention on some of the main factual debates that you will be asked to resolve. After you have heard all the evidence and the parties have made their closing arguments, I will give you detailed instructions of law that will displace these preliminary comments and will govern your deliberations. But for now, it may be useful to give you a quick overview that may help focus your evaluation of the evidence.

    This is an action for libel, also commonly referred to as defamation. A libel is a false statement, in writing, about the plaintiff that tends to expose the plaintiff to public contempt, aversion, ridicule or disgrace. The plaintiff here is Sarah Palin, the former governor of Alaska and a former vice- presidential candidate. One of the defendants, The New York Times Company, is a media company that publishes *The New York Times* newspaper. The other defendant, James Bennet, is a journalist who at most of the times relevant to this case was the Editor of the Opinion Section of *The New York Times*.

    Back on January 8, 2011, a man named Jared Loughner attacked a political event in Tucson, Arizona hosted by Democratic Congressperson Gabrielle Giffords, killing six persons and severely wounding 13 others, including Congressperson Giffords. More than six years later, on June 14, 2017, a man named James Hodgkinson attacked a group of Republican members of Congress practicing for an annual Congressional baseball game in Arlington, Virginia, shooting and severely injuring four people including Congressperson Steve Scalise. Later that same day, members of *The New York Times* Opinion staff drafted an editorial entitled "America's Lethal Politics," that was published in the newspaper's on-line edition late that evening and in the newspaper's print edition the following morning. It is this editorial that contained the statements that Ms. Palin claims

libeled her.

The full editorial, which the parties have stipulated will be introduced in evidence, is attached hereto as Exhibit A. However, the portions of which Ms. Palin complains appeared in two paragraphs that read:

> "*In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.*
>
> *Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask for the right.*"

Co-defendant Bennet was principally responsible for the words in these paragraphs that Ms. Palin claims libeled her.

Around 11:15 a.m. on June 15, 2017, the *Times* published a revised digital version of the editorial and added a correction to the end of it that read:

> "***Correction: June 15, 2017***
> *An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established.*"

Later, on June 16, 2017, the *Times* also published a correction at the bottom of the Editorial Page in the printed edition that read:

> "***CORRECTION***
> *An editorial on Thursday about the shooting of Representative Steve Scalise incorrectly stated that a link existed between political rhetoric and the 2011 shooting of Representative Gabby Giffords. In fact, no*

2

> *such link was established. The editorial also incorrectly described a map distributed by a political action committee before that shooting. It depicted electoral districts, not individual Democratic lawmakers, beneath stylized cross hairs."*

~~If you were to find that the admittedly incorrect statements made in the two editorial paragraphs quoted above amounted in effect to an assertion that the cross hairs map issued by Sarah Palin's political action committee clearly and directly incited the Loughner shooting, and if you were to further find that such an assertion was at least in part an assertion concerning the activity of Sarah Palin personally -- all matters that the parties dispute -- then the challenged statements in the editorial must be considered defamatory in the sense of exposing Ms. Palin to public contempt, aversion, ridicule or disgrace.~~

The assertion that there was a "direct" and "clear" "link" between the crosshairs map and the Loughner shooting is defamatory as a matter of law, but you will still have to decide whether the assertion is false and reasonably understood to refer to Ms. Palin personally.

In addition, ~~however,~~ Ms. Palin~~, to establish her libel claim, would~~ needs to prove certain other elements of her claim, such as what the law calls "actual malice." To prove this essential element of her claim, Ms. Palin would have to show that it was highly probable that at the time he drafted the relevant parts of the editorial, Mr. Bennet actually knew that the complained-of assertion was false or knew that there was a high risk that the assertion was false but intentionally chose to disregard that risk.

The issues outlined above are not the only disputed issues in this case; but they are issues that are likely to be subject of much of the evidence and argument that you are about to hear, and that is why I wanted to focus your attention on it from the outset. But please remember that this Preliminary Instruction is simply a brief and partial overview. At the start of your deliberations, I will give you more complete and detailed instructions that will replace this overview and will govern your deliberations.

Judge Rakoff

**Commented [A1]:** This language ("amounted in effect to an assertion …") asks the jury to determine the meaning of the challenged statements in violation of *Palin II*, 113 F.4th 245, 276-277 (2d Cir. 2024) ("The challenged statements are unambiguous and facially defamatory because they claimed there was a 'direct' and 'clear' 'link' between the crosshairs map and the Loughner shooting.") and constitutes fundamental error *Id.* at 277 ("Such an erroneous instruction requires a new trial unless the error is harmless" (citations and quotations omitted)).

**Commented [A2]:** This language tracks *Palin II,* 1q143 F.4th at 276-77.

3

# Exhibit A

A22

THURSDAY, JUNE 15, 2017

# Opinion

## The New York Times

### EDITORIALS

## America's Lethal Politics

America's elected representatives enjoying America's pastime on a ball field just across the Potomac from the Capitol. A particularly American form of terror changed that idyll early Wednesday morning into what Senator Rand Paul, who was there, called "basically a killing field."

A gunman with a rifle fired dozens of rounds at members of Congress and current and former aides, who dove for cover. "He was hunting us," said Representative Mike Bishop, Republican of Michigan, who was at home plate when the gunman appeared. In all, five victims were hit, including Representative Steve Scalise of Louisiana, the House majority whip, who was in critical condition Wednesday night after surgery on a bullet wound to his hip.

A sickening pattern emerges in the assault on members of Congress at a ball field.

An American would once have been horrified and shocked by such savagery. An American today would be right to be horrified – and not very surprised. This was one of two mass shootings in the United States on Wednesday. At a San Francisco UPS facility, a gunman killed three people and himself.

Not all the details are known yet about what happened in Virginia, but a sickeningly familiar pattern is emerging in the assault: The sniper, James Hodgkinson, who was killed by Capitol Police officers, was surely deranged, and his derangement had found its fuel in politics. Mr. Hodgkinson was a Bernie Sanders supporter and campaign volunteer virulently opposed to President Trump. He posted many anti-Trump messages on social media, including one in March that said "Time to Destroy Trump & Co."

Was this attack evidence of how vicious American politics has become? Probably. In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.

Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask of the right.

Was this attack evidence of how readily available guns and ammunition are in the United States? Indisputably. Mr. Hodgkinson, by definition, should not have had a gun, but he was licensed in his home state, Illinois. And in any event it would have been easy for him to acquire a weapon in Virginia, which requires no background checks in private sales, requires no registration for most weapons and has few restrictions on open carry.

The reaction of some was that the only solution is yet more guns. Representative Mo Brooks of Alabama, who was among those who came under fire on Wednesday, said, "It's not easy to take when you see people around you being shot and you don't have a weapon yourself."

That's an entirely reasonable reflex. All people in that situation, unarmed and under fire, would long to be able to protect themselves and their friends. Yet consider the society Americans would have to live in – the choices they would all have to make – to enable that kind of defense. Every member of Congress, and every other American of whatever age, would have to go to baseball practice, or to school, or to work, or to the post office, or to the health clinic – or to any of the other places mass shootings now take place – with a gun on their hip. And then, when an attack came and they returned fire, they would probably kill or wound not the assailant but another innocent bystander, as studies have repeatedly shown.

That is the society the gun lobby is working toward. Is it the one Americans want?

President Trump said just the right thing after the attack on Wednesday: "We may have our differences, but we do well in times like these to remember that everyone who serves in our nation's capital is here because, above all, they love our country. We can all agree that we are blessed to be Americans, that our children deserve to grow up in a nation of safety and peace."

Yet he will not help create that nation if he continues to advocate easy access to lethal weapons.

### LETTERS

## The Attack on G.O.P. Lawmakers

TO THE EDITOR:

On Wednesday morning there was a shooting at a baseball field filled with Republican members of Congress practicing for a charity game. Only the diligence of their police protectors prevented a mass killing. The gunman has been identified as a political extremist who was ardently anti-Trump and opposed to Republican tax policies.

Has it really come to this? Has the extreme animus and disrespect between Republicans and Democrats finally morphed into potentially life-taking violent outbursts? Does this event portend a sad and dangerous devolving of societal norms where some fringe, marginalized people feel they have "alicense, even a duty, to kill those whose views they strongly disagree with?

These are legitimate questions.

In this very new presidency, if there has ever been an opportunity and a need for real presidential leadership and wisdom, it is now. President Trump, please refrain from the temptation to politicize this event and help us to heal the abyss that divides us as a nation.

KEN DEROW, SWARTHMORE, PA.

TO THE EDITOR:

Ever since Representative Gabrielle Giffords was shot during an exercise in outdoor democracy in Tucson in 2011, I've wondered how Democrats can safely campaign on contentious issues in red-state America. Evidently neither party is immune from the harms that come from rampant gun proliferation.

I wish Representative Steve Scalise and the others who were shot a full recovery. And I hope Mr. Scalise takes back to his fellow G.O.P. members, and to President Trump, just how much it hurts to get shot.

If this isn't enough of a crime to persuade Congress to tighten up on gun laws, what kind of a crime would be? We've already seen the horrors of Aurora, Newtown, Columbine and Virginia Tech. President Trump went from advocating a ban on assault rifles to being a National Rifle Association parrot, and now talks as if he really believes that the trouble with America is too few guns, not too many.

RON CHARACH, TORONTO

TO THE EDITOR:

I am as disturbed as anyone by the rash and often reckless leadership of President Trump, and what he means to our delicate democracy. But maybe now, in the wake of this apparently politically motivated shooting, the ceaseless drumbeat by Trump critics over the supposed coming fascism in America, along with celebrations of tyrannicide (fake severed heads held up by comedians, theater companies acting out bloody executions), can be toned down a bit.

And this applies especially to the American media, which were rightly appalled when Mr. Trump called them the "enemy of the people," but have, for months now, presented him in exactly that same way. Is it any wonder folks are bursting at the seams out there?

Now is the perfect moment for a reboot. My hope is that Mr. Trump will finally lay off this Twitter feed and start acting presidential. But even if he does not, we must all bear in mind that the best way to oppose politicians and policies with which we may vehemently disagree is through the constitutional and electoral freedoms that remain very much alive and well, even in Mr. Trump's America.

STUART GOTTLIEB, NEW YORK
The writer, a former senior adviser in the Senate, teaches public policy at Columbia.

## Daughters Will Suffer From Medicaid Cuts

Nearly one in five adult children at some point provide

that is more than double the total cost

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SARAH PALIN, an individual,<br><br>                Plaintiff,<br><br>  – against –<br><br>THE NEW YORK TIMES COMPANY,<br>a New York corporation,<br><br>              Defendant. | No. 17 Civ. 4853<br><br>Hon. Jed S. Rakoff<br><br>ECF Case |

**<u>OBJECTION TO APRIL 14, 2025 5:50 PM PRELIMINARY INSTRUCTION</u>**

Plaintiff, Sarah Palin, objects to the Court's draft Preliminary Instruction as of April 14, 2025 emailed to counsel (the "Preliminary Instruction") and states as follows:

The following portion of the Court's Preliminary Instruction directly violates the mandate and would amount to fundamental error if given: "[i]f you were to find that the admittedly incorrect statement made in the two editorial paragraphs quoted above **amounted in effect to an assertion** that the cross hairs map issued by Sarah Palin's political action committee clearly and directly incited the Loughner shooting . . . then the challenged statements in the editorial must be considered defamatory in the sense of exposing Ms. Palin to public contempt, aversion, ridicule or disgrace" (emphasis added).

The jury cannot be instructed to decide the meaning of the challenged statements (i.e., whether the challenged statements "amounted in effect to an assertion") because the Second Circuit already held as a matter of law that these statements unambiguously "claimed there was a 'direct' and 'clear' 'link' between the crosshairs map and the

Loughner shooting," and therefore, are defamatory. *Palin v. New York Times Co.*, 113 F.4th 245, 268 and 276-277 (2d Cir. 2024). Moreover, the Second Circuit held that this is "not a case in which the challenged statement was susceptible to both 'defamatory and nondefamatory meanings.'" *Id.* at 277 (quoting *Kendall v. Daily News Publ'g Co.,* 716 F.3d 82, 90 (3d Cir. 2013)). The mandate must be followed.  *See Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (citations and quotations omitted).  Instructing the jury that they will decide whether the challenged statements amounted "to an assertion that the cross hairs map issued by Sarah Palin's political action committee clearly and directly incited the Loughner shooting," would also amount to fundamental error. *Palin,* 113 F.4th at 277.

To the extent the Court's proposed language in the above-referenced portion of the Preliminary Instruction was aimed at addressing the falsity and "of and concerning" elements of Plaintiff's libel claim within the context of also instructing the jury that the challenged statements have been determined as a matter of law to be defamatory *per se*, Plaintiff has proposed a revised version of the Preliminary Instruction (attached hereto as Exhibit A) that addresses these elements while still adhering *Palin II's* mandate.

Dated:  April 14, 2025

/s/ Shane B. Vogt
Kenneth G. Turkel (admitted *pro hac vice*)
Email:  kturkel@tcb-law.com
Shane B. Vogt (admitted *pro hac vice*)
Email:  svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 834-9191
Facsimile: (813) 443-2193

Michael M. Munoz
E-mail:  mmunoz@golenbock.com
GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile: (212) 754-0330

*Attorneys for Plaintiff*

# EXHIBIT A

**Sarah Palin**

       **-v-**

                                             **17-cv-4853 (JSR)**

**The New York Times Co. & James**
           **Bennet**


### PRELIMINARY INSTRUCTION

To the jury:

Before we hear counsel's opening statements and begin to hear the evidence, I would like to give you a brief overview of this case and focus your attention on some of the main factual debates that you will be asked to resolve. After you have heard all the evidence and the parties have made their closing arguments, I will give you detailed instructions of law that will displace these preliminary comments and will govern your deliberations. But for now, it may be useful to give you a quick overview that may help focus your evaluation of the evidence.

This is an action for libel, also commonly referred to as defamation. A libel is a false statement, in writing, about the plaintiff that tends to expose the plaintiff to public contempt, aversion, ridicule or disgrace. The plaintiff here is Sarah Palin, the former governor of Alaska and a former vice- presidential candidate. One of the defendants, The New York Times Company, is a media company that publishes *The New York Times* newspaper. The other defendant, James Bennet, is a journalist who at most of the times relevant to this case was the Editor of the Opinion Section of *The New York Times*.

Back on January 8, 2011, a man named Jared Loughner attacked a political event in Tucson, Arizona hosted by Democratic Congressperson Gabrielle Giffords, killing six persons and severely wounding 13 others, including Congressperson Giffords. More than six years later, on June 14, 2017, a man named James Hodgkinson attacked a group of Republican members of Congress practicing for an annual Congressional baseball game in Arlington, Virginia, shooting and severely injuring four people including Congressperson Steve Scalise. Later that same day, members of *The New York Times* Opinion staff drafted an editorial entitled "America's Lethal Politics," that was published in the newspaper's on-line edition late that evening and in the newspaper's print edition the following morning. It is this editorial that contained the statements that Ms. Palin claims

libeled her.

The full editorial, which the parties have stipulated will be introduced in evidence, is attached hereto as Exhibit A. However, the portions of which Ms. Palin complains appeared in two paragraphs that read:

> "*In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.*
>
> *Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask for the right.*"

Co-defendant Bennet was principally responsible for the words in these paragraphs that Ms. Palin claims libeled her.

Around 11:15 a.m. on June 15, 2017, the *Times* published a revised digital version of the editorial and added a correction to the end of it that read:

> "***Correction: June 15, 2017***
>  *An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established.*"

Later, on June 16, 2017, the *Times* also published a correction at the bottom of the Editorial Page in the printed edition that read:

> "***CORRECTION***
>  *An editorial on Thursday about the shooting of Representative Steve Scalise incorrectly stated that a link existed between political rhetoric and the 2011 shooting of Representative Gabby Giffords. In fact, no*

2

> *such link was established. The editorial also incorrectly described a map distributed by a political action committee before that shooting. It depicted electoral districts, not individual Democratic lawmakers, beneath stylized cross hairs."*

~~If you were to find that the admittedly incorrect statements made in the two editorial paragraphs quoted above amounted in effect to an assertion that the cross hairs map issued by Sarah Palin's political action committee clearly and directly incited the Loughner shooting, and if you were to further find that such an assertion was at least in part an assertion concerning the activity of Sarah Palin personally -- all matters that the parties dispute -- then the challenged statements in the editorial must be considered defamatory in the sense of exposing Ms. Palin to public contempt, aversion, ridicule or disgrace.~~

The assertion that there was a "direct" and "clear" "link" between the crosshairs map and the Loughner shooting is defamatory as a matter of law, but you will still have to decide whether the assertion is false and reasonably understood to refer to Ms. Palin personally.

In addition, ~~however,~~ Ms. Palin~~, to establish her libel claim, would~~ need~~s~~ to prove certain other elements of her claim, such as what the law calls "actual malice." To prove this essential element of her claim, Ms. Palin would have to show that it was highly probable that at the time he drafted the relevant parts of the editorial, Mr. Bennet actually knew that the complained-of assertion was false or knew that there was a high risk that the assertion was false but intentionally chose to disregard that risk.

The issues outlined above are not the only disputed issues in this case; but they are issues that are likely to be subject of much of the evidence and argument that you are about to hear, and that is why I wanted to focus your attention on it from the outset. But please remember that this Preliminary Instruction is simply a brief and partial overview. At the start of your deliberations, I will give you more complete and detailed instructions that will replace this overview and will govern your deliberations.

Judge Rakoff

**Commented [A1]:** This language ("amounted in effect to an assertion …") asks the jury to determine the meaning of the challenged statements in violation of *Palin II*, 113 F.4th 245, 276-277 (2d Cir. 2024) ("The challenged statements are unambiguous and facially defamatory because they claimed there was a 'direct' and 'clear' 'link' between the crosshairs map and the Loughner shooting.") and constitutes fundamental error *Id.* at 277 ("Such an erroneous instruction requires a new trial unless the error is harmless" (citations and quotations omitted)).

**Commented [A2]:** This language tracks *Palin II*, 1q143 F.4th at 276-77.

# Exhibit A

A22

THURSDAY, JUNE 15, 2017

# Opinion

## TheNew York Times

### EDITORIALS

## America's Lethal Politics

America's elected representatives enjoying America's passtime on a ball field just across the Potomac 19in the Capitol. A particularly American form of terror changed that idyll early Wednesday morning into what Senator Rand Paul, who was there, called "basically a killing field."

A gunman with a rifle fired dozens of rounds at members of Congress and current and former aides, who dove for cover. "He was hunting us," said Representative Mike Bishop, Republican of Michigan, who was at home plate when the gunman appeared. In all, five victims were hit, including Representative Steve Scalise of Louisiana, the House majority whip, who was in critical condition Wednesday night after surgery on a bullet wound to his hip.

A sickening pattern emerges in the assault on members of Congress at a ball field.

An American would once have been horrified and shocked by such savagery. An American today would be right to be horrified — and not very surprised. This was one of two mass shootings in the United States on Wednesday. At a San Francisco UPS facility, a gunman killed three people and himself.

Not all the details are known yet about what happened in Virginia, but a sickeningly familiar pattern is emerging in the assault: The sniper, James Hodgkinson, who was killed by Capitol Police officers, was surely deranged, and his derangement had found its fuel in politics. Mr. Hodgkinson was a Bernie Sanders supporter and campaign volunteer virulently opposed to President Trump. He posted many anti-Trump messages on social media, including one in March that said "Time to Destroy Trump & Co."

Was this attack evidence of how vicious American politics has become? Probably. In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.

Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask of the right.

Was this attack evidence of how readily available guns and ammunition are in the United States? Indisputably. Mr. Hodgkinson, by definition, should not have had a gun, but he was licensed in his home state, Illinois. And in any event it would have been easy for him to acquire a weapon in Virginia, which requires no background checks in private sales, requires no registration for most weapons and has few restrictions on open carry.

The reaction of some was that the only solution is yet more guns. Representative Mo Brooks of Alabama, who was among those who came under fire on Wednesday, said, "It's not easy to take when you see people around you being shot and you don't have a weapon yourself."

That's an entirely reasonable reflex. All people in that situation, unarmed and under fire, would long to be able to protect themselves and their friends. Yet consider the society Americans would have to live in — the choices they would all have to make — to enable that kind of defense. Every member of Congress, and every other American of whatever age, would have to go to baseball practice, or to school, or to work, or to the post office, or to the health clinic — or to any of the other places mass shootings now take place — with a gun on their hip. And then, when an attack came and they returned fire, they would probably kill or wound not the assailant but another innocent bystander, as studies have repeatedly shown.

That is the society the gun lobby is working toward. Is it the one Americans want?

President Trump said just the right thing after the attack on Wednesday: "We may have our differences, but we do well in times like these to remember that everyone who serves in our nation's capital is here because, above all, they love our country. We can all agree that we are blessed to be Americans, that our children deserve to grow up in a nation of safety and peace."

Yet he will not help create that nation if he continues to advocate easy access to lethal weapons.

### LETTERS

## The Attack on G.O.P. Lawmakers

TO THE EDITOR:

On Wednesday morning there was a shooting at a baseball field filled with Republican members of Congress practicing for a charity game. Only the diligence of their police protectors prevented a mass killing. The gunman has been identified as a political extremist who was ardently anti-Trump and opposed to Republican tax policies.

Has it really come to this? Has the extreme animus and disrespect between Republicans and Democrats finally morphed into potentially life-taking violent outbursts? Does this event portend a sad and dangerous devolving of societal norms where some fringe, marginalized people feel they have alicense, even a duty, to kill those whose views they strongly disagree with?

These are legitimate questions.

In this very new presidency, if there has ever been an opportunity and a need for real presidential leadership and wisdom, it is now. President Trump, please refrain from the temptation to politicize this event and help us to heal the abyss that divides us as a nation.

KEN DEBOW, SWARTHMORE, PA.

TO THE EDITOR:

Ever since Representative Gabrielle Giffords was shot during an exercise in outdoor democracy in Tucson in 2011, I've wondered how Democrats can safely campaign on contentious issues in red-state America. Evidently neither party is immune from the harms that come from rampant gun proliferation.

I wish Representative Steve Scalise and the others who were shot a full recovery. And I hope Mr. Scalise takes back to his fellow G.O.P. members, and to President Trump, just how much it hurts to get shot.

If this isn't enough of a crime to

persuade Congress to tighten up on gun laws, what kind of a crime would be? We've already seen the horrors of Aurora, Newtown, Columbine and Virginia Tech. President Trump went from advocating a ban on assault rifles to being a National Rifle Association parrot, and now talks as if he really believes that the trouble with America is too few guns, not too many.

RON CHARACH, TORONTO

TO THE EDITOR:

I am as disturbed as anyone by the rash and often reckless leadership of President Trump, and what he means to our delicate democracy. But maybe now, in the wake of this apparently politically motivated shooting, the ceaseless drumbeat by Trump critics over the supposed coming fascism in America, along with celebrations of typerannicide (fake severed heads held up by comedians; theater companies acting out bloody executions), can be toned down a bit.

And this applies especially to the American media, which were rightly appalled when Mr. Trump called them the "enemy of the people," but have, for months now, presented him in exactly that same way. Is it any wonder folks are bursting at the seams out there?

Now is the perfect moment for a reboot. My hope is that Mr. Trump will finally lay off his Twitter feed and start acting presidential. But even if he does not, we must all bear in mind that the best way to oppose politicians and policies with which we may vehemently disagree is through the constitutional and electoral freedoms that remain very much alive and well, even in Mr. Trump's America.

STUART GOTTLIEB, NEW YORK
The writer, a former senior adviser in the Senate, teaches public policy at Columbia.

## Daughters Will Suffer From Medicaid Cuts

Nearly one in five adult children at some point provide

that is more than double the total cost