**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                                    :
                                                                    :
SARAH PALIN,                                                        :
                                                                    :
                               Plaintiff,                           :
                                                                    :
                                                                    :
                                                                    :
                  -against-                                         :    No. 1:17-cv-04853-JSR
                                                                    :
                                                                    :
THE NEW YORK TIMES COMPANY and JAMES                               :
BENNET,                                                             :
                                                                    :
                               Defendants.                          :
                                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### DEFENDANTS' OPPOSITION TO PLAINTIFF'S POST-TRIAL MOTIONS

Felicia H. Ellsworth (admitted pro hac vice)
Andy O'Laughlin (admitted pro hac vice)
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA 02109
Phone: (617) 526-6000
Fax: (617) 526-5000
felicia.ellsworth@wilmerhale.com
andy.olaughlin@wilmerhale.com

David L. Axelrod
Jay Ward Brown
Thomas B. Sullivan
Jacquelyn N. Schell
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
axelrodd@ballardspahr.com
brownjay@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

*Counsel for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................1

ARGUMENT ......................................................................................................1

I.    CONTRARY TO PALIN'S ASSERTIONS, THE SECOND CIRCUIT DID
      NOT DECIDE ANY ISSUE OF FACT..........................................................1

II.   PALIN'S MOTION FOR JUDGMENT AS A MATTER OF LAW SHOULD
      BE DENIED...................................................................................................7

      A.    There Is No Motion to "Renew" because Palin Failed to Make a
            Timely and Specific Motion for Judgment as a Matter of Law Prior to
            the Case Being Submitted to the Jury......................................................7

      B.    Even if the Court were Inclined to Consider This "Renewed" Motion,
            It Also Fails on the Merits .......................................................................8

            1.    Palin Did Not Prove as a Matter of Law That the Challenged
                  Statements Were "Of and Concerning" Her Personally .............................9

            2.    Palin Did Not Prove Falsity as a Matter of Law ........................................11

            3.    Palin Did Not Establish Actual Malice as a Matter of Law......................13

III.  PALIN'S MOTION FOR A NEW TRIAL SHOULD BE DENIED ...............................15

      A.    Introduction of Evidence and Argument about Bennet's Intent and
            Awareness of the Meaning of the Challenged Statements was not
            Error .......................................................................................................16

      B.    There Was No Error in the Court's Instructions to the Jury ..................................19

IV.   THERE IS NO BASIS FOR RECUSAL ........................................................21

CONCLUSION..................................................................................................24

## **TABLE OF AUTHORITIES**

**Cases**                                                                    **Page(s)**

*Apple v. Jewish Hosp. & Med. Ctr.,*
    829 F.2d 326 (2d Cir. 1987)...................................................................................23

*Benevento v. United States,*
    81 F. Supp. 2d 490 (S.D.N.Y. 2000)......................................................................20

*Berns v. EMI Music Publ'g, Inc.,*
    No. 95 Civ. 8130 (KTD), 1999 U.S. Dist. LEXIS 17541 (S.D.N.Y. Nov. 12,
    1999) ........................................................................................................................24

*Bloom v. A360 Media LLC,*
    735 F. Supp. 3d 466 (S.D.N.Y. 2024)...................................................................13

*Celle v. Filipino Reporter Enters., Inc.,*
    209 F.3d 163 (2d Cir. 2000)......................................................................................5

*DiBella v. Hopkins,*
    403 F.3d 102 (2d Cir. 2005)....................................................................................11

*Flores v. DOJ,*
    391 F. Supp. 3d 353 (S.D.N.Y. 2019)....................................................................21

*Friedman v. Bloomberg L.P.,*
    884 F.3d 83 (2d Cir. 2017)........................................................................................5

*Goldfarb v. Channel One Russia,*
    663 F. Supp. 3d 280 (S.D.N.Y. 2023)......................................................................4

*Harte-Hanks Commc's v. Connaughton,*
    491 U.S. 657 (1989).....................................................................................13, 14, 17

*Holmes v. United States,*
    85 F.3d 956 (2d Cir. 1996)........................................................................................7

*Hunt v. Mobil Oil Corp.,*
    557 F. Supp. 368 (S.D.N.Y.) .................................................................................22

*ING Glob. v. United Parcel Serv. Oasis Supply Corp.,*
    757 F.3d 92 (2d Cir. 2014)..................................................................................8, 16

*Kipper v. NYP Holdings Co.,*
    12 N.Y.3d 348 (2009) .....................................................................................13, 15, 17

*Leidig v. Buzzfeed, Inc.,*
    371 F. Supp. 3d 134 (S.D.N.Y.)..............................................................................11

*Liteky v. United States*,
  510 U.S. 540 (1994)................................................................................1, 21, 22

*Lore v. City of Syracuse*,
  670 F.3d 127 (2d Cir. 2012)..............................................................................7, 8

*Markus v. United States*,
  545 F. Supp. 998 (S.D.N.Y. 1982) ........................................................................22

*Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*,
  290 F.3d 98 (2d Cir. 2002)..............................................................................15, 16

*Mencher v. Chesley*,
  297 N.Y. 94 (1947) .......................................................................................3, 4

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964)......................................................................................10, 17

*New Eng. Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*,
  352 F.3d 599 (2d Cir. 2003)................................................................................2

*Palin v. N.Y. Times Co.*,
  113 F.4th 245 (2d Cir. 2024) ...................................................................... *passim*

*Phila. Newspapers, Inc. v. Hepps*,
  475 U.S. 767 (1986)........................................................................................12

*Rafter v. Bank of Am.*,
  No. 04 CIV. 3341 JSR, 2011 U.S. Dist. LEXIS 133041 (S.D.N.Y. Nov. 14,
  2011) ..................................................................................................8, 9, 15

*Rosenblatt v. Baer*,
  383 U.S. 75 (1966).........................................................................................9

*Satanic Temple, Inc. v. Newsweek Mag. LLC*,
  No. 1:22-cv-1343 (MKV), 2025 U.S. Dist. LEXIS 56150 (S.D.N.Y. Mar. 26,
  2015) ...............................................................................................15, 17

*Schlieman v. Gannett Minn. Broad., Inc.*,
  637 N.W.2d 297 (Minn. Ct. App. 2001)..................................................................5, 6

*SEC v. Razmilovic*,
  738 F.3d 14 (2d Cir. 2013)................................................................................22

*Simo Holdings, Inc. v. H.K. uCloudlink Network Tech. Ltd.*,
  396 F. Supp. 3d 323 (S.D.N.Y. 2019)................................................................8, 9, 19

*Sompo Japan Ins. Co. v. Norfolk S. Ry.*,
    762 F.3d 165 (2d Cir. 2014)..................................................................................2

*Spiegel v. Schulmann*,
    604 F.3d 72 (2d Cir. 2010)....................................................................................21

*Sprague v. Ticonic Nat'l Bank*,
    307 U.S. 161 (1939).............................................................................................2

*St. Amant v. Thompson*,
    390 U.S. 727 (1968).............................................................................................14

*Stern v. Cosby*,
    645 F. Supp. 2d 258 (S.D.N.Y. 2009)..................................................................4

*Sweeney v. Prisoners' Legal Servs.*,
    84 N.Y.2d 786 (1995)...........................................................................................14

*Turley v. ISG Lackawanna, Inc.*,
    774 F.3d 140 (2d Cir. 2014)................................................................................21

*United States v. Ben Zvi*,
    242 F.3d 89 (2d Cir. 2001)..................................................................................2

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966).............................................................................................1

*United States v. Lovaglia*,
    954 F.2d 811 (2d Cir. 1992)................................................................................21

*Van Buskirk v. N.Y. Times Co.*,
    325 F.3d 87 (2d Cir. 2003)..................................................................................4

**Statutes & Other Authorities**

28 U.S.C. § 455..............................................................................................................21

Fed. R. Civ. P. 50............................................................................................*passim*

Individual Rule of Practice 2..........................................................................................24

Local Rule 7.1.................................................................................................................24

## INTRODUCTION

Trial in this case unequivocally demonstrated that former Governor Sarah Palin cannot prove her claim for defamation against Defendants.  Despite the jury's clear repudiation of her claim, Palin now asks the Court to vacate that verdict, order a new trial or enter judgment in her favor as a matter of law, and recuse itself from future proceedings.  None of Palin's contentions have merit, however, and her list of alleged errors purportedly committed by the Court are an unfortunate attempt to re-litigate well-supported rulings on disputed issues that the Court simply did not resolve in her favor.

As explained more fully below, the Court did not commit any error, much less error so "extraordinary" as to disturb the jury's verdict or to justify a new trial.  Moreover Palin cannot "renew" a motion for judgment as a matter of law under Rule 50(b) when she did not make one under Rule 50(a) at the close of evidence, and in any event, she cannot point to evidence sufficient to merit judgment as a matter of law in her favor.  And adverse "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," *Liteky v. United States*, 510 U.S. 540, 555 (1994) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)), and that is certainly true here.  For these reasons, the Court should not disturb the jury's verdict in Defendants' favor and should deny Palin's post-trial motions in full.

## ARGUMENT

### I.    CONTRARY TO PALIN'S ASSERTIONS, THE SECOND CIRCUIT DID NOT DECIDE ANY ISSUE OF FACT

Palin first argues that the Second Circuit held as a matter of law that the challenged statements were understood by ordinary readers as conveying the defamatory meaning she alleged and thereby granted her judgment on this element of her defamation claim.  She contends that this Court therefore erred by allowing the Defendants to "offer argument and evidence" on

1

the issue of defamatory meaning and by including the element of defamatory meaning as a contested factual issue in the instructions presented to the jury. *See* Pl. Mem. In Supp. of Post-Trial Mot. ("Mem.") (Dkt. 260) at 3-7. As this Court previously concluded when these arguments were presented at trial, the Second Circuit did no such thing. The Court's ruling on this issue correctly interpreted the appellate opinion and, consistent with that opinion, allowed the jury to decide this issue.

Following the first trial in this case, Palin appealed both the Court's decision to grant Defendants a directed verdict pursuant to Rule 50 and the jury's verdict in favor of Defendants. Ultimately, the Second Circuit remanded the case for a new trial. *Palin v. N.Y. Times Co*., 113 F.4th 245, 254-55, 268 (2d Cir. 2024). Under the mandate rule upon which Palin relies, a district court must comply "on remand with the dictates of the superior court" and cannot relitigate issues expressly or implied decided by the Court of Appeals. *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001). However, "a mandate is controlling only 'as to matters within its compass,'" *New Eng. Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*, 352 F.3d 599, 606 (2d Cir. 2003) (quoting *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939)), and a district court does "not violate the mandate rule by addressing on remand an issue that was not decided by the [Second Circuit] in the original appeal," *Sompo Japan Ins. Co. v. Norfolk S. Ry.*, 762 F.3d 165, 175 (2d Cir. 2014). "To determine whether an issue remains open for reconsideration on remand, the trial court should look to both the specific dictates of the remand order as well as the broader spirit of the mandate." *Ben Zvi*, 242 F.3d at 95 (cleaned up).

First, of course, it bears emphasis that Palin did not actually argue in her briefing on the prior appeal that she was entitled to judgment as a matter of law on the defamatory meaning element of her cause of action. And, significantly, at the very beginning of its opinion, the

Second Circuit emphasized that "[n]o statement in this opinion should be understood as resolving issues of fact." *Palin*, 113 F.4th at 255.  Indeed, as this Court recognized, the fundamental message of the Second Circuit's opinion is "that this is a case for the jury . . . [T]hey could not have made more plain in their overall thrust that they felt that this was a jury case."  Tr. at 727:14-18; *see id.* at 25:9-11 ("And, of course, the Second Circuit has made very clear to this Court that every effort must be made not to usurp in any respect the prerogatives of the jury.").

To accept Palin's argument here, this Court would need to determine that – despite the fact that Palin did *not* make this argument in her briefing on the prior appeal – the Second Circuit nevertheless chose *sua sponte* to determine the factual question of whether ordinary readers would interpret the challenged portions of the Editorial to have the meaning alleged by Palin and that it did so in passing in a handful of sentences in sections of the opinion addressing other topics.  If the Second Circuit had intended to award judgment as a matter of law to Palin on the defamatory meaning element of her cause of action – a central issue in this case – it surely would have said so clearly and unambiguously.  It did not.

Moreover, contrary to Palin's contention, the Second Circuit cannot have concluded that the challenged statements were understood by readers in the defamatory sense she alleges because, given the context in which these challenged statements were published and the difference between their precise wording and Palin's allegation of the defamatory meaning those words convey.  In this category of defamation claims, there are separate roles for the court and jury on this element of the claim.  *Mencher v. Chesley*, 297 N.Y. 94, 100 (1947) (where alleged meanings were defamatory per se as matter of law and therefore actionable without proof of special damages, remanding case for jury to determine if ordinary reader in fact would have

interpreted them in this way because court "may not determine that that is the only meaning to be placed upon the words used; to do so would encroach upon the province of the jury" (cleaned up)); *accord Van Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 90 (2d Cir. 2003) (holding as matter of law statements were not reasonably susceptible of alleged defamatory meaning and therefore issue of whether plaintiff was actually defamed did not need to be determined by jury); *Goldfarb v. Channel One Russia*, 663 F. Supp. 3d 280, 297 (S.D.N.Y. 2023) ("[W]hile the question of whether the words could express the alleged defamatory meaning must be resolved by the court in the first instance, the actual meaning of those words must ultimately be determined at trial: If the contested statements are reasonably susceptible of a defamatory connotation, then it becomes the jury's function to say whether that was the sense in which the words were likely to be understood by the ordinary and average reader." (cleaned up)); *Stern v. Cosby*, 645 F. Supp. 2d 258, 272 (S.D.N.Y. 2009) (ruling that various statements about plaintiff's sexual conduct could be understood in a defamatory sense, but observing that "the court does not determine as a matter of law that the statement is defamatory, as that is the exclusive province of the jury").

It therefore remained up to the jury to decide the factual question of whether the challenged statements conveyed to ordinary readers the specific defamatory meaning Palin alleged. Put differently, once the Court decided that the challenged statements *could* be read as Palin contends—to suggest a causal link between Palin, the Crosshairs Map, and the Arizona shooting—it was up to the jury to decide whether an ordinary reader *would* read the statements to convey that meaning, as opposed to some other, non-defamatory meaning.

Simply put, Palin's argument is premised on a misconception about what legal issues the Second Circuit reviewed. The Second Circuit only considered the meaning that Palin alleged the Editorial conveyed in the context of addressing the issues of whether she was required to prove

(i) special damages, *see Palin*, 113 F.4th at 268, and (ii) "defamatory malice," *see id.* at 276-77. The Second Circuit *did not* determine whether the Editorial would be understood by the ordinary reader to convey that alleged defamatory meaning, which as discussed above, is a question for the jury given the actual wording of the challenged publication and the meaning it is alleged to have conveyed.

Palin argues that any *alleged* meaning held to be defamatory *per se* must be understood by the ordinary reader in that defamatory sense as a matter of law, and therefore the Second Circuit's ruling that the alleged meaning of the challenged statements was defamatory *per se* resolves the issue of whether the statements at issue conveyed that defamatory meaning to reasonable readers.  *See* Mem. at 5, 8-10.  This is simply not the case.[1]  As this Court previously noted, the issue of whether a challenged statement is defamatory *per se* (thus excusing plaintiff from proving special damages) presents a "very different context."  Tr. at 25:25.  A statement may be "defamatory per se" and also "subject to other meanings, all of which may not be defamatory."  *Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 187 (2d Cir. 2000); *see also Friedman v. Bloomberg L.P.*, 884 F.3d 83, 97-98 (2d Cir. 2017) (Walker, J.) (holding that challenged statement that plaintiff "repeatedly tried to extort money from the company" could be read to accuse him of criminal misconduct but remanding for jury to determine whether readers would have so understood the statement); *Schlieman v. Gannett Minn. Broad., Inc.*, 637 N.W.2d

---

[1] Palin contends that, before the first trial, Defendants conceded that the Court should decide the element of defamatory meaning as a matter of law.  *See* Mem. at 9.  There, as here, Defendants distinguished between the question of whether statements are reasonably understood as having a defamatory meaning and whether that alleged meaning would be *per se* or *per quod*.  *See id*. (quoting Dkt. 131-1 ("If the Court holds that the challenged statements *(if understood by the average reader to have the meaning alleged by Gov. Palin)* are defamatory per se…." (emphasis added))).

297, 307 (Minn. Ct. App. 2001) ("'defamatory per se' defines a rule of damages, not of defamatory meaning").

On the issue of defamatory malice, the panel's reference to the challenged statements as being "unambiguous and facially defamatory," *see Palin*, 113 F.4th at 276-77, must be read in the context of this particular section of the opinion, *see* Tr. at 27:4-18.  In this portion of its opinion, the Second Circuit ruled that this was not a defamation-by-implication case and therefore rejected as inapplicable a line of cases holding that a plaintiff must prove the defendant's subjective awareness at time of publication of the statement's defamatory meaning. *See Palin*, 113 F.4th at 276-77.  As with the *per se/per quod* discussion earlier in its opinion, the Second Circuit was explaining Palin's contentions as to the defamatory meaning conveyed by the statements, *see id.* at 276 (describing issue as whether "Bennet intended or recklessly disregarded that ordinary readers would  understand his words to have the defamatory meaning alleged by [plaintiff]"), not deciding that the statements must have been read that way by ordinary readers.  If the rule were otherwise, the defamatory meaning element of the cause of action would effectively be read out of every case involving what the Second Circuit refers to as "ordinary" defamation, *see Palin*, 113 F.4th at 277 – that is, the element would be removed from most defamation cases.

 Because the Second Circuit did not even purport to resolve as a matter of law the defamatory meaning element of Palin's cause of action, the "mandate rule" did not foreclose the jury from considering that factual issue, and therefore there was no error in the admission of evidence and argument regarding nor in the preliminary and final instructions on the defamatory meaning element of the cause of action.

II.   **PALIN'S MOTION FOR JUDGMENT AS A MATTER OF LAW SHOULD BE DENIED.**

   A.  **There Is No Motion to "Renew" because Palin Failed to Make a Timely and Specific Motion for Judgment as a Matter of Law Prior to the Case Being Submitted to the Jury.**

It is well-established that "[a] Rule 50(b) motion can be made after the jury verdict, but *only if a Rule 50(a) motion was made prior to the close of the evidence*." *Holmes v. United States*, 85 F.3d 956, 962 (2d Cir. 1996) (emphasis added); *see also* Fed. R. Civ. P. 50(b). Palin seeks to "renew" her motion for judgment as a matter of law on the elements of "of and concerning," falsity, and actual malice, but she did not actually move on these grounds prior to the case being submitted to the jury, as Rule 50 requires. *See* Mem. at 10. For this reason alone, her Rule 50(b) motion must be denied.

Rule 50(a) requires that a party make a timely motion that "specif[ies] the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). This specificity requirement is "obligatory." *Lore v. City of Syracuse*, 670 F.3d 127, 152 (2d Cir. 2012) (quoting *Holmes*, 85 F.3d at 962). "The principal purpose of the requirement that any such motion be made before the case is submitted to the jury is 'to assure the responding party an opportunity to cure any deficiency in that party's proof.'" *Id.* Failure to comply with Rule 50(a)'s requirements may serve as an independent basis to deny a subsequent motion made under Rule 50(b). *Id.* at 153 (holding that Rule 50(b) motion was not properly preserved because it was not raised in the Rule 50(a) motion).

In the midst of arguing her *opposition* to Defendants' motion for judgment as a matter of law on the issue of actual malice, Palin's counsel summarily stated that "we believe the Court should enter judgment in our favor on that issue." Tr. at 722:3-8. Palin never moved on this

issue herself and her response to Defendants' motion is not a motion of her own.[2]  Palin's

counsel also stated that she "want[s]" to make a motion for directed verdict on the issues of "of

and concerning" and falsity, Tr. at 728:8-10, but she never actually made this motion or

explained the bases for it.  None of these conclusory and vague statements from Palin's counsel

meets Rule 50(a)'s specificity requirement.

The court is permitted to grant a Rule 50(b) motion on an issue that was not previously

raised in a Rule 50(a) motion only when necessary to prevent "manifest injustice."  *Lore*, 670

F.3d at 153.  "Manifest injustice exists where a jury's verdict is wholly without legal

support."  *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir.

2014).  This is not such a situation.  As discussed in in the other sections of this memorandum,

the evidence of record and the law clearly do support the jury's verdict in this case. It likely is for

this reason that Palin does not argue that the defense verdict was "wholly without legal

support."  Because Palin did not make a timely motion for judgment as a matter of law on these

issues, her attempted "renewed" motion must be denied.

## B.  Even if the Court were Inclined to Consider This "Renewed" Motion, It Also Fails on the Merits.

Jury verdicts "should be disturbed with great infrequency."  *Simo Holdings, Inc. v. H.K.*

*uCloudlink Network Tech. Ltd.*, 396 F. Supp. 3d 323, 340 (S.D.N.Y. 2019).  Under Rule 50(b),

> a jury verdict should be set aside only where there is such a
> complete absence of evidence supporting the verdict that the jury's
> findings could only have been the result of sheer surmise and

---

[2] Even if the court were to consider Palin's arguments in *opposition* to Defendants' motion as *affirmative* arguments in support of her own separate motion, she is limited to only those arguments actually asserted by her at that time.  *See Lore*, 670 F.3d at 153 (recognizing that "[b]ecause the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion" (quoting Fed. R. Civ. P. 50 Advisory Committee Note (2006))).  She is not permitted to move on any additional grounds not previously articulated.

> conjecture, or . . . such an overwhelming amount of evidence in
> favor of the movant that reasonable and fair minded men could not
> arrive at a verdict against him.

*Rafter v. Bank of Am.*, No. 04 CIV. 3341 JSR, 2011 U.S. Dist. LEXIS 133041, at *1-2 (S.D.N.Y.

Nov. 14, 2011) (cleaned up), *aff'd sub nom. Rafter v. Fleet Bos. Fin. Corp.*, 523 F. App'x 79 (2d

Cir. 2013).  Indeed, motions under Rule 50 "must be denied unless the evidence is such that,

without weighing the credibility of the witnesses or otherwise considering the weight of the

evidence, there can be but one conclusion as to the verdict that reasonable persons could have

reached."  *Simo Holdings*, 396 F. Supp. 3d at 333 (cleaned up).

### 1.   Palin Did Not Prove as a Matter of Law That the Challenged Statements Were "Of and Concerning" Her Personally.

Palin bears the burden of establishing that the challenged statements in the Editorial were

"of and concerning" her *personally*, as opposed to some other person or entity.  *See Rosenblatt v.

Baer*, 383 U.S. 75, 81 (1966) ("of and concerning" element of defamation is constitutionally

mandated, and only statements that are "specifically directed at the plaintiff" satisfy this

constitutional mandate).  Palin therefore was required to prove that the "ordinary and average

reader" would in fact have understood the Editorial as accusing her *personally* of circulating the

Map and thereby causing the Arizona shooting.

Palin did not and cannot meet this burden as a matter of law.  Palin's name appears once

in the Editorial for the sole purpose of identifying the entity that circulated the Crosshairs Map –

"Sarah Palin's political action committee" – and does not refer to Palin herself personally as

responsible for that act.  Palin has not presented any evidence that she and the political action

committee are or were alter egos or had a nexus between them such that a reference to one in this

context is necessarily a reference to the other.  In fact, the evidence admitted at trial establishes

that the political action committee at issue, SarahPAC, was aligned with but was not controlled by

9

Palin, either generally or with respect to the creation and circulation of the Crosshairs Map.  *See* Crawford Dep. Tr. at 49:20-50:10 (Palin was not involved in the "day-to-day operations" of her political action committee), 70:15-24 (Palin had no role in creating or approving the Crosshairs Map).

Palin did not call a single witness who testified that he or she read the Editorial and understood the purportedly defamatory statement to be about Palin personally.  *Cf. N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 289 (1964) (plaintiff called witnesses at trial who testified that they had seen the allegedly defamatory advertisement and understood the challenged statements to be about him because statements were directed at conduct of department he ran).  Instead, she relies on one line in Hannah Ingber's post-publication email referencing the "Sarah Palin editorial" and cites, without explanation, testimony about the correction and about Douthat's email.  *See* Mem. at 11.  This ignores the evidence that Ingber only learned of the Editorial through Twitter criticism and referred to it as the "Sarah Palin editorial . . . because the only reason she had read the editorial, was aware of it, or was involved in it was because of a line that includes Sarah Palin's name."  DX-501 (stipulation as to Ingber's testimony) at ¶10.  In contrast, several people involved in drafting the Editorial testified that they purposefully referred to the political action committee, rather than Palin, personally.  *See* Tr. at 159:15-160:9 (Williamson's draft referred to the map being circulated by "The Sarah Palin political action committee" because "a political action committee is legally distinct from an individual … [i]t acts on its own"); *id*. at 522:5-16 (Bennet understood that "it was the political action committee that had circulated [the Crosshairs Map]," not Palin herself).  And again, the plain language of the Editorial referred not to "Sarah Palin," but to "Sarah Palin's political action committee."

The record thus reflects an allegedly defamatory passage that refers to the conduct of a nonparty entity, not the individual plaintiff; evidence that the entity was, in fact, separate from the individual; testimony that Times employees understood and intended to refer to the entity specifically; and no evidence that the "ordinary and average" reader would have interpreted that passage as a charge that Palin personally was responsible for creation or circulation of the Map and the subsequent Arizona shooting. This record does not support Palin's claim that the Court should have decided the "of and concerning" element in her favor as a matter of law and taken this issue away from the jury.

### 2. Palin Did Not Prove Falsity as a Matter of Law.

Palin bears the burden of proving falsity of the challenged statement by clear and convincing evidence. *See DiBella v. Hopkins*, 403 F.3d 102, 113 (2d Cir. 2005). Palin asserts that the Editorial communicated to the ordinary reader that she personally was responsible for the Crosshairs Map and that the Crosshairs Map caused Loughner to commit the Arizona Shooting. But Palin did not offer any evidence to establish that the purported assertion of causation was false. She did not introduce testimony from Loughner himself (who was available to be deposed during discovery) or from law enforcement to establish Loughner's actual motivation or to demonstrate that he had *not* seen or was *not* inspired by the Crosshairs Map. *See, e.g., Leidig v. Buzzfeed, Inc.*, 371 F. Supp. 3d 134, 144 (S.D.N.Y.) ("Plaintiffs provide no evidence that BuzzFeed's eight statements . . . are false. As such, no jury could find BuzzFeed's statements to be false."), *aff'd*, 788 F. App'x 76 (2d Cir. 2019).

Lacking testimony by witnesses with actual knowledge of what caused Loughner to act, Palin relies instead on Bennet's testimony that he regrets his "mistake" and The Times's corrections, including a Tweet stating that it got "an important fact wrong" and that "[n]o link

was ever established" between the Crosshairs Map and the shooting. *See* Mem. at 12. But none of this evidence, either alone or cumulatively, establishes falsity by clear and convincing evidence. At most, this evidence proves it has never been conclusively established whether Loughner had seen and was influenced by the Map; it does not affirmatively *disprove* the existence of a causal link, as Palin is required to do. This is insufficient to establish falsity as a matter of law. *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986) (where the "speech is unknowably true or false … the Constitution requires us to tip [the scales] in favor of protecting true speech.").

And Palin's assertion that Defendants "conceded" falsity is incorrect. Mem. at 12. The record establishes that none of Defendants' witnesses ever found any evidence conclusively establishing whether Loughner was or was *not* influenced by the Crosshairs Map. *See* Tr. at 96:1-5 (Williamson did not research whether there was a "clear and direct link between [the Crosshairs Map] and the Loughner shooting"); Tr. at 498:12-500:13 (Bennet explains that "[w]e weren't certain, and to this day can't be certain, about what motivated either of these guys, as far as I know"). The news reports cited by Palin, as well as Douthat's testimony, emails, and tweets, convey that there was "no evidence" of such a link but do not establish that a link had actually been disproven. PX-171; *see also* Tr. at 562:5-563:14. Bennet testified that the challenged passages "for many readers . . . drew a link to incitement that we didn't intend," but he never testified that it had been proven or disproven that Loughner acted because of political incitement. Tr. at 528:8-9. And in closing, defense counsel accordingly argued that, "if you read the editorial the way James Bennet intended, then the [challenged] statement is not false." Tr. at 811:6-7. But this affirmative assertion about the truth of Bennet's intended meaning does not constitute a concession that the challenged statement as published was false. Neither in

testimony by any witness nor in closing argument did Defendants concede that it had been proven that Loughner's actions were unconnected to political incitement.

### 3. Palin Did Not Establish Actual Malice as a Matter of Law.

Palin contends that there can be no dispute about actual malice because the Second Circuit purportedly held that the words in the challenged statements are unambiguous and Bennet "had to have known" that they were false. *See* Mem. at 12-13. Once again, Palin misreads the Second Circuit's opinion. As discussed in Section I above, the Second Circuit did not decide as a matter of law the meaning the challenged statements would have conveyed to an ordinary reader.[3] Bennet's interpretation of the challenged statements at the time he wrote them is not only relevant, but in fact *critical* for determining whether the actual malice requirement is met.

The Supreme Court has long held that actual malice is a subjective standard. *See Harte-Hanks Commc's v. Connaughton*, 491 U.S. 657, 688 (1989) ("[t]he [actual malice] standard is a

---

[3] Even if Palin were correct about the Second Circuit's ruling, Bennet's subjective understanding and intent would still be relevant to actual malice. Even in defamation cases involving unambiguously false and defamatory statements, courts can and do consider the author's subjective intent in evaluating actual malice. *See, e.g., Kipper v. NYP Holdings Co.*, 12 N.Y.3d 348, 350, 356 (2009) (where defendant newspaper in reliance on prior publication falsely reported that "the state medical board revoked [plaintiff doctor's] license" but prior publication actually had reported correctly only that board had begun revocation proceedings, reaffirming grant of summary judgment to defendants despite their concession of falsity and defamatory meaning because plaintiff did not adduce evidence that defendants "actually entertained serious doubts about the truth of the . . . inaccurate headline and sentence or that they published those statements with a high degree of awareness of their falsity"); *Bloom v. A360 Media LLC*, 735 F. Supp. 3d 466, 474-75 (S.D.N.Y. 2024) (where defendant used photograph of wrong person to illustrate article about mother of Elon Musk's "secret twins" and defendant allegedly knew or should have know who the correct person was, court nevertheless dismissed claim for failure to plead actual malice because "all that those allegations plausibly suggest is a negligent failure to uncover the truth rather than a subjective awareness of falsity" and concluding that "all the amended complaint really alleges is an unfortunate but unintentional mistake by defendant that was swiftly corrected").

subjective one – there must be sufficient evidence to permit the conclusion that the defendant actually had a 'high degree of awareness of . . . probable falsity'" of the challenged statement at the time of its publication).  Thus, the central question is Bennet's own subjective understanding of the statements' meaning at the time of publication and whether he knew that meaning was false, not what his state of mind might have been years before or hours after publication.  This Court correctly recognized this principle.  *See* Tr. at 727:2-9 (describing the standard as "an intent to make a false statement knowing it's false or a deliberate disregard, meaning that one intentionally chooses to disregard the high probability that the statement is false").

Palin failed to demonstrate actual malice as a matter of law because she did not present clear and convincing evidence that Bennet actually knew that, through the words he added to the Editorial, he was communicating a falsehood to readers or that he likely was communicating a falsehood to readers.  Palin's arguments about what Bennet or "anyone in the media business" *should* have known are irrelevant.  Mem. at 13; *see Sweeney v. Prisoners' Legal Servs.*, 84 N.Y.2d 786, 793 (1995) ("failure to investigate . . . , standing alone, is not enough to prove actual malice even if a prudent person would have investigated before publishing the statement" (citing *St. Amant v. Thompson*, 390 U.S. 727, 731, 733 (1968))).  To establish actual malice as a matter of law, Palin must prove by clear and convincing evidence that Bennet *actually* knew or *actively suspected* the statements he drafted were false.  She did not meet this burden.

Furthermore, Bennet's testimony about his state of mind and understanding of the challenged statements at the time of publication offers a more than sufficient basis for a reasonable jury to find for Defendants on this element.  Bennet testified that he intended to convey and believed he was conveying that the Crosshairs Map represented dangerous political rhetoric of the type that, collectively, creates an atmosphere that could contribute to a violent

event like the Arizona Shooting – not that he was drawing a direct cause-and-effect connection –

and that the "link" he referenced was the fact that Congresswoman Giffords was both referenced

in the Crosshairs Map and targeted in the shooting after its publication.  *See* Tr. at 479:6-19,

498:14-500:13, 501:17-502:10.  The documentary evidence supports, rather than undermines,

this explanation.  *See, e.g.,* DX-43 ("my understanding was that in the Giffords case there was a

gun sight superimposed over her district; so far in this case, we don't know of any direct threat

against any of the Congressmen on the field."); Tr. at 508:20-509:13.

New York courts have made clear that "[e]vidence of falsity does not equate with proof

of actual malice," because actual malice is not established without clear and convincing evidence

that defendant "seriously doubted the truth of the complained-of statements or was highly aware

that they were incorrect prior to publication."  *Kipper*, 12 N.Y.3d at 356-58 (actual malice not

established where there was no evidence anyone involved was aware before publication that an

error had been introduced); *see also Satanic Temple, Inc. v. Newsweek Mag. LLC*, No. 1:22-cv-

1343 (MKV), 2025 U.S. Dist. LEXIS 56150, at *41-42 (S.D.N.Y. Mar. 26, 2015) (actual malice

was not established when there was "a total lack of any evidence that [the writer of the

challenged statement] harbored any serious uncertainties or had any obvious reasons to doubt the

truth.").  Palin failed to establish actual malice as a matter of law because she did not present

clear and convincing evidence that Bennet knew or even suspected that the statements he wrote,

as he understood them at the time of drafting them, were false.

## III.    PALIN'S MOTION FOR A NEW TRIAL SHOULD BE DENIED.

Palin contends that, because of various purported errors by the Court, she is entitled to a

new trial.  Motions for a new trial under Rule 59 "ordinarily should not be granted unless the

trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is

a miscarriage of justice."  *Rafter*, 2011 U.S. Dist. LEXIS 133041, at *2 (quoting *Medforms, Inc.*

*v. Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98, 106 (2d Cir. 2002)); *ING Glob.*, 757 F.3d at 98-99

("Our cases teach that a high degree of deference is accorded to the jury's evaluation of witness

credibility, and that jury verdicts should be disturbed with great infrequency." (cleaned up)).

Palin cannot come close to meeting this standard.

### A.  Introduction of Evidence and Argument about Bennet's Intent and Awareness of the Meaning of the Challenged Statements was not Error.

Palin claims that the Second Circuit's mandate should have precluded Defendants from

offering evidence or argument about whether the challenged statements were defamatory.  For all

the reasons discussed above, *see* Section I, her contentions about the preclusive effect of the

Second Circuit's decision are wrong.  However, in addition to arguing that Defendants should

not have been able to contest defamatory meaning, Palin seems to suggest that Defendants also

should have been precluded from offering evidence regarding actual malice.  *See* Mem. at 5

("Whether Mr. Bennet claims he meant something different is of no consequence because the

words he used are 'unambiguous' and 'facially defamatory' *per se* and already establish an intent

to defame.").

Nothing in the Second Circuit's decision circumscribed the evidence Defendants could

introduce regarding actual malice.  With respect to actual malice, the sole issue before the

Second Circuit was whether Palin was required to prove an additional element of "defamatory

malice," that is, "that Bennet intended or recklessly disregarded that ordinary readers would

understand his words to have the defamatory meaning alleged by Palin."  *Palin*, 113 F.4th at 259.

The Second Circuit held that the district court erred by requiring Palin to *prove* a second element

of actual malice as to Bennet's understanding of the challenged statements.  *Id.* at 276-77.

The Second Circuit *did not hold* or even suggest that Bennet's intent and understanding

were irrelevant, much less that introducing evidence of Bennet's understanding of and intent as

to meaning of the words he chose to use would be error.  Nor could it.  It is black-letter law that proving actual malice requires showing that an allegedly defamatory statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not."  *Palin*, 113 F.4th at 262 (quoting *Sullivan*, 376 U.S. at 280).  Determining a defendant's knowledge of falsity is "subjective" such that "there must be sufficient evidence to permit the conclusion that the defendant actually had a 'high degree of awareness of probable falsity.'"  *Harte-Hanks*, 491 U.S. at 688.

Given that the actual malice inquiry focuses on the subjective knowledge of the responsible writer, Bennet's selection of the words he chose to use and his understanding of what those words conveyed is indisputably relevant to the actual malice inquiry.  *See, e.g., Satanic Temple*, 2025 U.S. Dist. LEXIS 56150, at *41-42 (concluding that actual malice could not be established when there was "a total lack of any evidence that [the writer of the challenged statement] harbored any serious uncertainties or had any obvious reasons to doubt the truth of the [challenged statement].");  *Kipper*, 12 N.Y.3d at 356-58 (determining that no reasonable jury could find actual malice when there was no evidence anyone involved with the challenged article was aware before publication that an error had been introduced, and it was possible that the writer and editors, "all working under a deadline, simply misperceived the correct statement in the [source] article or draft rewrite").  This is not a controversial assertion—in this case or any other.

Indeed, contrary to Palin's position, the Second Circuit explicitly acknowledged that, on retrial, the jury would hear and could evaluate Bennet's testimony on this very point.  In assessing the Court's decision to grant Defendants' Rule 50 motion during the first trial, the Second Circuit observed:

> Bennet's statement – that he "didn't think," when revising the
> editorial, that "the crosshairs map caused Jared Loughner to act" –
> can permissibly be read to suggest that Bennet entertained serious
> doubts as to his assertion that the map and shooting had a "clear"
> and "direct" "link." . . . The jury may ultimately accept the district
> court's understanding of Bennet's words – *but . . . "it is the jury
> that must decide*."

*Palin*, 113 F.4th at 264 (emphasis added).

At re-trial, both parties and the Court asked Bennet questions about his intent and

understanding of the words he chose to use.  Palin's counsel asked Bennet whether he considered

the "harm it would cause to say Sarah Palin caused [the Arizona shooting]," to which Bennet

responded: "I didn't think we were saying that . . . . It didn't occur to me that people would read

the editorial that way."  Tr. at 406:11-17.  Palin's counsel also asked Bennet: "You also knew at

the time you wrote the editorial that there were readers who would interpret the word incitement

to mean caused, didn't you?"  *Id.* at 440:25-441:2.  And the Court asked Bennet what he meant

when he used the words "political incitement."  *Id.* at 436:16-18.

From the outset of the trial, it was clear that Defendants' strategy centered on

demonstrating that Bennet failed to appreciate how some readers could view his words.

Defendants' counsel asked Bennet a number of questions about what he intended to convey in

the challenged passages.  *Id.* at 460:6-8 ("did you intend for readers to think that the crosshairs

map … had caused Mr. Loughner to act"); 465:4 ("What did you intend to say?"); 501:8-10

("did you intend to convey that Jared Loughner had acted because he was incited or he was

directed at?"); 503:8 ("What did you mean to convey by that sentence?").  Palin did not object to

any of these questions, nor could she have done so because it is beyond dispute that the actual

malice inquiry is an analysis of the subjective state of mind of the writer or speaker in question.

Palin also contends that it was error for the Court to admit testimony about other

witnesses' understanding of the meaning of the challenged statements.  Mem. at 5.  The fact that

other of Bennet's colleagues involved in the publication of the challenged statements viewed them consistently with Bennet was evidence that Bennet's interpretation of their meaning was reasonable and credible.  Elizabeth Williamson and Linda Cohn both testified that they read the challenged statements after Bennet had written them and did not interpret them the way Palin contends they must be understood.  *See* Tr. at 146:15-147:13 (Williamson testifies that she did not understand the challenged paragraphs to say "that the crosshairs map caused the Arizona shooting"); *id.* at 284:25-288:14 (Cohn understood Bennet to be "drawing a connection between the kind of rhetoric that we were seeing, this kind of heated rhetoric, and the shooting [of Giffords]," and "explaining what the--the environment was and what the lead-up was.").  Indeed, contrary to Palin's position that the Court erred by admitting this evidence, it was her own counsel who asked Cohn to opine about the intent with respect to the Editorial.  *See id.* at 252:3-256:23.  And Palin herself introduced evidence in an attempt to show that Bennet's interpretation was not reasonable, demonstrating her belief that Bennet's understanding of the challenged statements' meaning was relevant and open to debate.  *Id.* at 432:4-433:18 (introducing tweets from journalists who had criticized the Editorial for purportedly conveying different meaning).

In short, the Second Circuit's decision explicitly acknowledged that the jury was to evaluate Bennet's testimony about his understanding of the words he used.  *See Palin*, 113 F.4th at 264.  That is exactly what happened at the second trial.  The admission of this evidence was not error.

### B.  There Was No Error in the Court's Instructions to the Jury.

"A party seeking to set aside a judgment based on erroneous jury instructions must establish, among other things, that the instructions were legally erroneous, the errors had prejudicial effect, and the party requested alternative instructions that would have remedied the error."  *Simo Holdings*, 396 F. Supp. 3d at 342 (cleaned up).  Palin cannot meet this standard.

19

Her list of criticisms, *see* Mem. at 6, boil down to two objections: (1) that the court instructed the jury on the element of defamatory meaning, which Palin contends was decided by the Second Circuit as a matter of law; and (2) an unexplained contention that the instructions unfairly "favor" Defendants. *See id.* at 6-7.

As demonstrated above, however, the Second Circuit did not decide the element of defamatory meaning as a matter of law. *See* Section I, *supra.* Therefore, there is no error in the Court instructing the jury on this element, which they were required to consider in evaluating Palin's claim. *See generally Benevento v. United States*, 81 F. Supp. 2d 490, 493 (S.D.N.Y. 2000) ("[i]t is elementary that a jury must be instructed as to each element").

Setting aside the question of *whether* the Court should have instructed the jury on the element of defamatory meaning, Palin has not identified any alleged error in the substance of the Court's instructions. She does not contend that any specific instruction included an error of law or misled the jury. Instead, Palin argues that the instructions, as a whole, favored Defendants, without offering any explanation as to why. *See* Mem. at 6. The Court should reject this conclusory argument.

The Court's pre-deliberation instructions were the product of significant debate and analysis. In fact, the Court heard extensive argument from both sides, reviewed submissions from both sides, and incorporated language from both parties' proposals into the preliminary and final instructions. *See, e.g.*, Tr. at 540:5-19, 570:10-20, 746:3-10 (discussing versions of draft instructions provided to counsel for comment); *id.* at 24:5-28:14, 540:17-546:3, 730:7-742:20, 746:3-768:25 (charging conferences).

The Court's preliminary and final instructions fairly and accurately informed the jury of the law and the burdens of proof the jury must apply in its deliberations, and Palin has not

demonstrated otherwise. *See Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 153 (2d Cir. 2014)

("We will not require a new trial if the instructions, read as a whole, presented the issues to

the jury in a fair and evenhanded manner." (cleaned up)).

## IV.    THERE IS NO BASIS FOR RECUSAL

Finally, Palin argues that this Court should recuse itself because "the manner in which the

re-trial of this case was conducted gives [her] a reasonable belief that there is 'such a high degree

of favoritism' toward Defendants 'as to make fair judgment impossible.'" Mem. at 14 (quoting

*Palin*, 113 F.4th at 280; *Liteky*, 510 U.S. at 555). She bases this supposed belief on the Court's

interpretation of the Second Circuit's decision and resulting rulings on the issues remaining in

dispute. *Id.* In so doing, she acknowledges that "judicial rulings and remarks alone *almost* never

constitute a valid basis for a bias or partiality motion," *id.* (citing *Liteky*, 510 U.S. at 555), but

contends without elaboration that this is an exception to that rule.

Pursuant to 28 U.S.C. § 455(a), a judge "shall disqualify himself in any proceeding in

which his impartiality might reasonably be questioned." This requires the Court to consider

whether "an objective, disinterested observer fully informed of the underlying facts, [would]

entertain significant doubt that justice would be done absent recusal." *United States v. Lovaglia*,

954 F.2d 811, 815 (2d Cir. 1992). "[C]onsideration of a motion for recusal is committed to the

sound discretion of the district court, and there is a substantial burden on the moving party to

show that the judge is not impartial." *Flores v. DOJ*, 391 F. Supp. 3d 353, 365 (S.D.N.Y. 2019).

As an initial matter, this Court's interpretation of the Second Circuit's opinion was

correct, for the reasons discussed above. To the extent Palin has "fundamental disagreements"

with the Court's interpretation of the Second Circuit's rulings, that is "no basis for

reassignment." *Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010). If Palin believes this

Court made an error in any of those rulings, any such error would be "proper grounds for appeal,

not for recusal." *Liteky*, 510 U.S. at 555.  Because this is the only purported basis for recusal, *see* Mem. at 14, the Court's inquiry can and should end there.[4]

However, even if the Court had somehow erred, as the Second Circuit made clear earlier in the case, judicial decisions can only be the basis for recusal "where a trial judge displays such a 'deep-seated and unequivocal antagonism that [it] would render fair judgment impossible." *Palin*, 113 F.4th at 280 (quoting *Liteky*, 510 U.S. at 556).  "[R]ecusal is not warranted where the only challenged conduct consist[s] of judicial rulings . . . . where the conduct occurs during judicial proceedings, and where the judge neither (1) relies upon knowledge acquired outside such proceedings nor (2) displays deep-seated and unequivocal antagonism that would render fair judgment impossible." *SEC v. Razmilovic*, 738 F.3d 14, 29-30 (2d Cir. 2013) (cleaned up)).

Palin does not contend that any such antagonism was displayed here.  Rather, Palin asserts her own "belief" that this Court favors defendants.  This is clearly insufficient.  "An application for the disqualification of a judge must rest on a factual basis and not on the whim of a litigant who asserts vague contentions." *Hunt v. Mobil Oil Corp.*, 557 F. Supp. 368, 376 (S.D.N.Y.), *aff'd*, 742 F.2d 1438 (2d Cir. 1983); *accord Markus v. United States*, 545 F. Supp. 998, 1000 (S.D.N.Y. 1982) ("The test here is not the subjective feelings of the defendant as to the Court's alleged bias, but whether facts have been presented, assuming their truth, that would lead a reasonable person to infer that bias or prejudice existed, thereby foreclosing impartiality of judgment."), *aff'd*, 742 F.2d 1444 (2d Cir. 1983).

---

[4] Palin also briefly refers to "events described herein occurring before" the retrial.  *See* Mem. at 15.  To the extent this is intended to refer to events during the first trial or earlier, the Second Circuit has already rejected those events as a basis for recusal.  *See Palin*, 113 F.4th at 280.  Of course, it "has long been regarded as normal and proper for a judge to sit in the same case upon its remand." *Liteky*, 510 U.S. at 551.

Objectively, no such favoritism or antagonism was on display in the retrial of this action. As in any trial, both sides made a series of motions, some of which each side won and some of which each side lost. For example, while Palin focuses on the issue of defamatory meaning, this Court denied Defendants' motion under Rule 50 on the issue of actual malice. In interpreting the impact of the Second Circuit's opinion on the defamatory meaning issue in particular, the Court gave both sides extensive time to argue their positions and then reached its conclusion. The Court held argument on this issue on at least four separate occasions: (1) the final pre-trial conference on April 11, 2025, *see* Tr. at 3:25-11:22, (2) before jury selection on April 14, 2025, *see* Tr. at 3:25-22:21, (3) before opening statements on April 15, 2025, *see id*. at 24:5-28:14, and (4) during the charging conference on April 21, 2025, *see id.* at 733:18-739:16. The Court repeatedly acknowledged the complexity of the issue and praised the work of both sides' attorneys. *See id.* at 739:3-10.

Finally, even if this motion otherwise had merit, it should be denied on three separate procedural grounds. ***First***, recusal motions must be made "at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." *Apple v. Jewish Hosp. & Med. Ctr.,* 829 F.2d 326, 333 (2d Cir. 1987). In considering timeliness, courts look at "a number of factors" including whether: "(1) the movant has participated in a substantial manner in trial or pre-trial proceedings, (2) granting the motion would represent a waste of judicial resources, (3) the motion was made after the entry of judgment, and (4) the movant can demonstrate good cause for delay." *Id.* at 334 (cleaned up). Here, Palin was aware that the Court disagreed with her interpretation of the impact of the Second Circuit's opinion by no later than April 15, 2025, when the Court ruled against her requested preliminary instruction. *See* Tr.

at 24:20-28:14.  Nevertheless, Palin did not move for recusal at that point, participated in the complete trial, and only moved for recusal after judgment was entered against her.

*Second*, under this Court's Individual Rules of Practice, "[i]n order to bring on any contemplated motion or application of any kind whatever . . . counsel for all affected parties must jointly call Chambers."  Individual Rule 2(b).  While the parties engaged in the required call for the other motions addressed in Palin's memorandum, she never raised the issue of recusal on that call.

*Third*, no such relief was sought in the notice of motion.  *See* Dkt. 258 (seeking relief under Rules 50 and 59 but not for recusal).  Under Local Rule 7.1, a party must file a notice of motion "which must specify the applicable rules or statutes pursuant to which the motion is brought, and must specify the relief sought by the motion."  *See also* Individual Rule of Practice 2(d) (requiring a movant to "file a short Notice of Motion setting forth a one-sentence description of the motion").  "Rules of pleading dictate that relief requested apply not only to complaints, but also to motions.  If the relief is not requested by the notice of motion, then the movant does not get that relief."  *Berns v. EMI Music Publ'g, Inc.*, No. 95 Civ. 8130 (KTD), 1999 U.S. Dist. LEXIS 17541, at *28 (S.D.N.Y. Nov. 12, 1999).

For all or any of the foregoing reasons, Palin's recusal motion should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny Palin's Post-Trial Motions and affirm the jury's verdict for the Defendants.

24

Dated:  New York, New York
   June 30, 2025

Respectfully submitted,

BALLARD SPAHR LLP

By: _/s/ David L. Axelrod_
  David L. Axelrod
  Jay Ward Brown
  Thomas B. Sullivan
  Jacquelyn N. Schell
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

Felicia H. Ellsworth (admitted pro hac vice)
Andy O'Laughlin (admitted pro hac vice)
WILMER CUTLER PICKERING HALE AND
DORR LLP
60 State Street
Boston, MA 02109
Phone: (617) 526-6000
Fax: (617) 526-5000
felicia.ellsworth@wilmerhale.com
andy.olaughlin@wilmerhale.com

_Counsel for Defendants_